APPEAL,PASSPORT

# U.S. District Court
## District of Wyoming (Cheyenne)
## CRIMINAL DOCKET FOR CASE #: <u>2:19−cr−00026−ABJ</u>−3
### *Internal Use Only*

Case title: USA v. Mitchell

Date Filed: 01/18/2019

Date Terminated: 08/23/2022

---

Assigned to: Honorable Alan B Johnson

Appeals court case number: 22−8061 USCA 10th Circuit

**<u>Defendant (3)</u>**

| | | |
|---|---|---|
| **Charles Winifred Winters, Jr** | represented by | **Ryan Thomas Truskoski** |

*TERMINATED: 08/23/2022*
*also known as*
Chuck Winters
*TERMINATED: 08/23/2022*

**Ryan Thomas Truskoski**
Ryan Thomas Truskoski, P.A.
1300−G El Paseo Rd.
Ste. 122
Las Cruces, NM 88001
505−404−3080
Email: rtrusk1@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: CJA Appointment

**Jason Tangeman**
NICHOLAS & TANGEMAN
170 North 5th Street
P O Box 928
Laramie, WY 82073−0928
307/742−7140
Fax: 307/742−7160
Email: jtangeman@wyolegal.com
*TERMINATED: 01/21/2020*
Designation: Retained

**Zenith S Ward**
BUCHHAMMER & WARD
1821 Logan Avenue
P O Box 568
Cheyenne, WY 82003−0568
307/634−2184
Fax: 307/634−2199
Email: zsw@wyoming.com
*TERMINATED: 09/21/2022*
Designation: CJA Appointment

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18 U.S.C. §371(Conspiracy to Commit Securities Fraud) (13) | 30 months imprisonment, 3 years supervised release, $100 special assessment, $158,878.86 restitution |
| 15 U.S.C. §§78j(b) and 78ff and 18 U.S.C §2 (Securities Fraud and Aiding and Abetting) (14) | 30 months as to Counts 14 and 15, to be served concurrently with each other and with Count 13; 3 years supervised release, concurrent; $100 special assessment per count, $158,878.86 restitution |
| 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) (15) | 30 months as to Counts 14 and 15, to be served concurrently with each other and with Count 13; 3 years supervised release, concurrent; $100 special assessment per count, $158,878.86 restitution |
| 18 U.S.C. § 1028A(a)(1) (Aggravated Identity Theft) (16−17) | 2 years per count, concurrent with each other, but consecutive to Counts 13−15; 1 year supervised release per count, concurrent; $200 special assessment |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

---

**Plaintiff**

| **USA** | represented by | **Eric J Heimann** |
| --- | --- | --- |
| | | US ATTORNEY'S OFFICE |
| | | P O Box 668 |
| | | Cheyenne, WY 82003−0668 |
| | | 307/772−2124 |
| | | Fax: 307/772−2123 |
| | | Email: eric.heimann@usdoj.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: United States Attorney* |
| | | |
| | | **C Levi Martin** |

UNITED STATES ATTORNEYS
OFFICE
PO Box 668
Cheyenne, WY 82003−0668
307/772−2124
Fax: 307/772−2123
Email: Christopher.Martin@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: United States Attorney*

**Thomas Andrew Szott**
UNITED STATES ATTORNEYS
OFFICE
2120 Capitol Avenue
4th Floor
PO Box 668
Cheyenne, WY 82001
307/772−2124
Fax: 307/772−2123
Email: Thomas.Szott@usdoj.gov
*TERMINATED: 12/28/2021*
*Designation: United States Attorney*

| Date Filed | # | Select all / clear | Docket Text |
|---|---|---|---|
| 10/12/2021 | 379 | LIST of Overt Acts as to defendants Justin Wallace Herman, Charles Winifred Winters Jr, Ian Horn (Court Staff, sbh) (Main Document 379 replaced on 10/12/2021) (Court Staff, sbh). (Entered: 10/12/2021) | |
| 10/12/2021 | 380 | Refused Jury Instructions by the court as to Justin Wallace Herman, Charles Winifred Winters Jr, Ian Horn (Court Staff, sbh) (Entered: 10/12/2021) | |
| 10/19/2021 | 393 | TRIAL EXHIBIT LIST as to defendants Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn (Court Staff, sbh) (Entered: 10/19/2021) | |
| 10/22/2021 | 396 | NOTICE *of MOI's for Purposes of Record on Appeal* by defendant Charles Winifred Winters, Jr (Ward, Zenith) (Entered: 10/22/2021) | |
| 11/01/2021 | 400 | Receipt for Exhibits re Govt. Exhibit 27.3 (Court Staff, sbh) (Entered: 11/01/2021) | |
| 01/13/2022 | 423 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Excerpted Transcript of Trial Proceedings, Volume 1 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 9/21/21 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/20/2022. Notice of Redaction Request due 2/3/2022. Redacted Transcript Deadline set for 2/14/2022. Release of Transcript Restriction set for 4/13/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/13/2022) | |

| 01/13/2022 | 424 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 2 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 9/22/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/20/2022. Notice of Redaction Request due 2/3/2022. Redacted Transcript Deadline set for 2/14/2022. Release of Transcript Restriction set for 4/13/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/13/2022) |
| 01/13/2022 | 425 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 3 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 9/23/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/20/2022. Notice of Redaction Request due 2/3/2022. Redacted Transcript Deadline set for 2/14/2022. Release of Transcript Restriction set for 4/13/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/13/2022) |
| 01/13/2022 | 426 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 4 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 9/24/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/20/2022. Notice of Redaction Request due 2/3/2022. Redacted Transcript Deadline set for 2/14/2022. Release of Transcript Restriction set for 4/13/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/13/2022) |
| 01/13/2022 | 427 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 5 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 9/27/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/20/2022. Notice of Redaction Request due 2/3/2022. Redacted Transcript Deadline set for 2/14/2022. Release of Transcript Restriction set for 4/13/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/13/2022) |
| 01/13/2022 | 428 | |

| | | |
|---|---|---|
| | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 6 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 9/28/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/20/2022. Notice of Redaction Request due 2/3/2022. Redacted Transcript Deadline set for 2/14/2022. Release of Transcript Restriction set for 4/13/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/13/2022) |
| 01/13/2022 | 429 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 7 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 9/29/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/20/2022. Notice of Redaction Request due 2/3/2022. Redacted Transcript Deadline set for 2/14/2022. Release of Transcript Restriction set for 4/13/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/13/2022) |
| 01/13/2022 | 430 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 8 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 9/30/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/20/2022. Notice of Redaction Request due 2/3/2022. Redacted Transcript Deadline set for 2/14/2022. Release of Transcript Restriction set for 4/13/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/13/2022) |
| 01/13/2022 | 431 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 9 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 10/1/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/20/2022. Notice of Redaction Request due 2/3/2022. Redacted Transcript Deadline set for 2/14/2022. Release of Transcript Restriction set for 4/13/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/13/2022) |
| 01/14/2022 | 433 | |

| | | |
|---|---|---|
| | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 10 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 10/4/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/21/2022. Notice of Redaction Request due 2/4/2022. Redacted Transcript Deadline set for 2/14/2022. Release of Transcript Restriction set for 4/14/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/14/2022) |
| 01/14/2022 | 434 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 11 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 10/5/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/21/2022. Notice of Redaction Request due 2/4/2022. Redacted Transcript Deadline set for 2/14/2022. Release of Transcript Restriction set for 4/14/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/14/2022) |
| 01/15/2022 | 435 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 12 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 10/6/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/24/2022. Notice of Redaction Request due 2/7/2022. Redacted Transcript Deadline set for 2/15/2022. Release of Transcript Restriction set for 4/15/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/15/2022) |
| 01/15/2022 | 436 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 13 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 10/7/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/24/2022. Notice of Redaction Request due 2/7/2022. Redacted Transcript Deadline set for 2/15/2022. Release of Transcript Restriction set for 4/15/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/15/2022) |
| 01/15/2022 | 437 | |

| | | |
|---|---|---|
| | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Transcript of Trial Proceedings, Volume 14 of 14 as to Robert William Mitchell, Justin Wallace Herman, Charles Winifred Winters, Jr, Ian Horn held on 10/8/2021 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (630) 452−6236 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/24/2022. Notice of Redaction Request due 2/7/2022. Redacted Transcript Deadline set for 2/15/2022. Release of Transcript Restriction set for 4/15/2022. (Humphrey−Sonntag, Melanie) (Entered: 01/15/2022) |
| 07/20/2022 | 473 | Joint MEMORANDUM OF LAW *in Support of Loss Hearing* by Justin Wallace Herman as to Justin Wallace Herman, Charles Winifred Winters, Jr. (Sirianni, Robert) Modified filer and text on 7/20/2022 (Court Staff, stmo). Modified text on 7/21/2022 (Court Staff, sbh). (Entered: 07/20/2022) |
| 08/23/2022 | 499 | Minute Entry: Sentencing held on 8/22/2022 for Charles Winifred Winters, Jr (3). Count(s) 13, 30 months imprisonment, 3 years supervised release, $100 special assessment, 158,878.86 restitution; Count(s) 14, 15, 30 months as to Counts 14 and 15, to be served concurrently with each other and with Count 13; 3 years supervised release, $100 special assessment, 158,878.86 restitution; Count(s) 16−17, 2 years per count, concurrent with each other, but consecutive to Counts 13−15; 1 year supervised release per count, concurrent; $200 special assessment. Defendant remains on bond. Proceedings held before Honorable Alan B. Johnson. (Court Reporter: Melanie Sonntag) (Court Staff, sbh) (Entered: 08/23/2022) |
| 08/23/2022 | 503 | JUDGMENT and COMMITMENT as to Charles Winifred Winters, Jr (3) by the Honorable Alan B. Johnson. Count(s) 13, 30 months imprisonment, 3 years supervised release, $100 special assessment, 158,878.86 restitution; Count(s) 14, 15, 30 months as to Counts 14 and 15, to be served concurrently with each other and with Count 13; 3 years supervised release, $100 special assessment, 158,878.86 restitution; Count(s) 16−17, 2 years per count, concurrent with each other, but consecutive to Counts 13−15; 1 year supervised release per count, concurrent; $200 special assessment. (Court Staff, sbh) (Entered: 08/23/2022) |
| 08/30/2022 | 510 | NOTICE OF APPEAL by defendant Charles Winifred Winters, Jr re 503 Judgment (Ward, Zenith) (Entered: 08/30/2022) |

List of Overt Acts



FILED

12:39 pm, 10/12/21

Margaret Botkins
Clerk of Court

These overt acts are merely allegations. They are not evidence of any kind.

1.    On November 25, 2014, Mitchell created the email address kevin@nutechenr.com.

2.    No later than November 25, 2014, Mitchell created and posted online the website www.nutechenr.com to publish false and misleading information about NuTech. This website was available nationwide, including in the District of Wyoming, through at least May 2016.

3.    On December 22, 2014, Mitchell convinced N.M. to wire $20,000 from Gillette, Wyoming, to Mitchell in Colorado. That same day, Mitchell caused M.P. to wire $100,000 to Mitchell.

4.    On December 23, 2014, Mitchell wired $10,000 to HERMAN and $80,000 to HORN. This money came from the $20,000 N.M. wired to Mitchell and the $100,000 M.P. wired to Mitchell the day before.

5.    Between January 8 and January 15, 2015, HERMAN instructed HORN to wire money to T.C. and to other persons involved in the Defendants' purchase of EcoEmissions convertible notes. This money came from the $80,000 Mitchell wired to HORN on December 23, 2014.

6.    On January 21, 2015, Mitchell and HERMAN directed T.C. to amend EcoEmissions' articles of incorporation to change the name of the company to NuTech Energy Resources Inc., and to authorize the issuance of up to 60 billion shares of common stock. The amendment was filed with the Delaware Secretary of State on March 23, 2015.

7.    On March 24, 2015, WINTERS created a login account with OTC Markets Group. This account allowed WINTERS to post information related to NuTech online at www.otcmarkets.com.

8.    On or before May 19, 2015, HERMAN and HORN created an attorney letter with respect to current information for NuTech as if the letter had been written by HORN and contained his legal opinions. In fact, the letter was written in significant part by HERMAN and contained false and misleading information. HORN did not review the information in the letter before signing and issuing it on his letterhead.

9.    On May 19, 2015, WINTERS used his email account to login and post the attorney letter with respect to current information described in Overt Act 8 online at www.otcmarkets.com, where the letter could be accessed in the District of Wyoming.

10.    On July 10, 2015, HERMAN emailed documents to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech. These documents included:

    a.  a resolution of NuTech's board of directors, which bears the apparent signature of K.T. as NuTech's chief executive officer, that claims the company's board of directors had met and authorized the issuance of free-trading shares of NuTech common stock based on the "legal conversion from debt to equity as presented to the Transfer Agent, Pacific Stock Transfer"; and

    b.  an instruction letter directing issuance of more than 12 billion free-trading shares to a number of individuals and entities, including individuals and entities related to Mitchell, HERMAN, and WINTERS.

11.    On July 27, 2015, HERMAN sent an email to WINTERS with the subject line "how do we add date" and an attachment entitled "ECMZ debt assignment signed.pdf." The attachment was a debt-assignment agreement signed by T.C., G.P., and D.R. in December 2014 and January 2015. Later that same day, WINTERS sent an email to HERMAN with an attachment entitled "Debt assignment.pdf." This attachment was substantially identical to the debt-assignment agreement HERMAN had sent to WINTERS except the handwritten dates had been altered to make it appear that T.C., G.P., and D.R. had signed the agreement one year earlier in December 2013 and January 2014.

12.    On July 27, 2015, HERMAN emailed documents to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech. These documents included:

    a.  a backdated debt-assignment agreement, which WINTERS had emailed to HERMAN earlier that day (see Overt Act 11), that made it appear Mitchell and HERMAN had acquired convertible debts one year before they actually acquired the debts; and

    b.  a notice of conversion signed by HERMAN and bearing the apparent signature of K.T. as NuTech's chief executive officer.

13.    On August 18, 2015, Mitchell emailed an application to Kingdom Trust Company to open an account for Bravo 20 Partners to hold shares of NuTech.

14.    On August 18, 2015, WINTERS emailed an application to Kingdom Trust Company to open an account for Intrepid Capital Holdings Corp to hold shares of NuTech. Intrepid Capital Holdings Corp is a Florida corporation controlled by WINTERS and HERMAN.

15.    On August 19, 2015, HERMAN sent an email to WINTERS with the subject line "fix" and an attachment entitled "Consideration NERG.pdf." The attachment was an outgoing

wire transfer request showing the $80,000 wire sent by Mitchell from Bravo 20 Partners' bank account to HORN on December 23, 2014, for the "ECMZ Debt Conversion" as further described in Overt Act 4. Later that same day, WINTERS sent an email to HERMAN with an attachment entitled "wire.pdf." This attachment was substantially identical to the outgoing wire transfer request HERMAN had sent to WINTERS except the amount wired had been altered to read $280,000 instead of $80,000.

16.     On August 19, 2015, HERMAN sent an email to Pacific Stock Transfer Company regarding the issuance of free-trading shares of NuTech in which he states, "All the free trading shares are being issued on percentage basis of ownership from the cumulative dollar consideration which was pretty good number of $280,000." [*sic.*] The email also contained the following documents:

> a. the backdated debt-assignment agreement, which WINTERS had emailed to HERMAN on July 27, 2015 (see Overt Act 11), that made it appear Mitchell and HERMAN had acquired convertible debts one year before they actually acquired the debts;
>
> b. the altered outgoing wire transfer request, which WINTERS had created and emailed to HERMAN earlier that day (see Overt Act 15), falsely showing that Mitchell had wired $280,000 from Bravo 20 Partners' bank account to HORN on December 23, 2014, for the "ECMZ Debt Conversion," when in fact Mitchell had wired only $80,000 to HORN that day;
>
> c. a notice of conversion signed by HERMAN and bearing the apparent signature of K.T. as NuTech's chief executive officer; and
>
> d. a spreadsheet listing who should receive free-trading shares of NuTech, including individuals and entities related to Mitchell, HERMAN, and WINTERS.

17.     On August 22, 2015, HERMAN sent an email to Pacific Stock Transfer Company regarding the issuance of free-trading shares of NuTech in which he states, "In case you were confused, all the parties getting the stock via debt conversion are shareholders of Bravo 20 and its a distribution to its ownership. That's how the 280 was used to buy that particular debt." [*sic.*]

18.     On September 2, 2015, HERMAN sent an email containing documents to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech. These documents included:

> a. a purchase and assignment of interest in wells and leases dated December 23, 2014, that claims to transfer 5 billion shares of EcoEmissions stock to Bravo 20 Partners

in exchange for $280,000 and an assignment of wells, which document bears the apparent signatures of Mitchell and L.L.;

   b.  the altered outgoing wire transfer request, which WINTERS had created and emailed to HERMAN on August 19, 2015 (see Overt Act 15), and an altered bank statement falsely showing that Mitchell had wired $280,000 from Bravo 20 Partners' bank account to HORN on December 23, 2014, for the "ECMZ Debt Conversion," when in fact Mitchell wired only $80,000 to HORN on that day;

   c.  a notice of conversion signed by HERMAN and bearing the apparent signature of K.T. as NuTech's chief executive officer; and

   d.  an email showing that NuTech's trading symbol had changed to NERG on June 26, 2015.

19.    On September 8, 2015, HERMAN sent an email to WINTERS with the subject line "ian horn." The body of the email read: "Could you send me a blank word doc with Ian's letterhead." That same day, WINTERS sent an email to HERMAN with an attachment entitled "Horn and assoc letterhead.docx." This attachment included HORN's letterhead and a digital copy of HORN's signature.

20.    On September 16, 2015, WINTERS sent another email to HERMAN with the attachment entitled "Horn and assoc letterhead.docx" as further described in Overt Act 19.

21.    On or before September 16, 2015, HERMAN and HORN created two attorney-opinion letters related to the issuance of free trading shares of NuTech as if the letters had been written by HORN and contained his legal opinions. In fact, each letter was written in significant part by HERMAN and contained false and misleading information. HORN did not review the information in each letter before signing and issuing each letter on his letterhead.

22.    On September 18, 2015, HERMAN sent two email messages containing documents to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech. These documents included:

   a.  statements of non-affiliation that falsely state Mitchell, HERMAN, and WINTERS are not affiliates of, and did not control, NuTech;

   b.  a purchase and assignment of interest in wells and leases dated December 23, 2014, that claims to transfer 5 billion shares of EcoEmissions' stock to Bravo 20 Partners in exchange for $280,000 and an assignment of wells;

   c.  the two attorney-opinion letters described in Overt Act 21;

    d.  a resolution of NuTech's board of directors, which bears the apparent signature of K.T. as NuTech's chief executive officer, that claims the company's board of directors had met and authorized the issuance of shares based on the "legal conversion from debt to equity as presented to the Transfer Agent, Pacific Stock Transfer";

    e.  a notice of conversion signed by HERMAN and Mitchell, and bearing the apparent signature of K.T. as NuTech's chief executive officer, claiming to convert an unpaid note into approximately 13 billion shares of non-restricted NuTech stock; and

    f.  statements of non-affiliation signed by N.M., K.M., and C.J.H.

23.    On or before September 23, 2015, HERMAN and HORN created an attorney-opinion letter related to the issuance of free-trading shares of NuTech as if the letter had been written by HORN and contained his legal opinions. In fact, the letter was written in significant part by HERMAN and contained false and misleading information. HORN did not review the information in the letter before signing and issuing the letter on his letterhead.

24.    On September 23, 2015, HERMAN sent an email to WINTERS with the subject line "call u in two" and an attachment entitled "Assignment Bravo E Pro.docx." The attachment was a draft purchase and assignment of interest in wells and leases between Bravo 20 Partners and EcoEmissions dated December 23, 2014. Less than 30 minutes later, HERMAN sent a second email with the subject line "doc edit" containing text describing an alleged transfer of debt instruments, consulting agreements, and 5 billion shares of EcoEmissions stock from E-Pro Systems LLC to Bravo 20 Partners in exchange for $280,000 and an assignment of wells. Approximately 20 minutes later, WINTERS sent an email to HERMAN with an attachment entitled "Assignment Bravo E Pro.docx." This version of the assignment document included the text sent by HERMAN in the "doc edit" email, and digital copies of the signatures of D.R. and G.P., which signatures were forged and unauthorized.

25.    On September 23, 2015, HERMAN emailed documents to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech. These documents included:

    a.  the attorney-opinion letter described in Overt Act 23; and

    b.  the E-Pro purchase and assignment of interest in wells and leases dated December 23, 2014, bearing the forged and unauthorized digital signatures of D.R. and G.P., which WINTERS had created and emailed to HERMAN earlier that day (see Overt Act 24).

26.     On September 26, 2015, HERMAN emailed a statement of non-affiliation to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech. The statement included the forged and unauthorized digital signatures of D.R. and G.P.

27.     On September 28, 2015, HERMAN emailed documents to Pacific Stock Transfer Company to support the issuance of free-trading shares of NuTech, including corporate resolutions signed by K.M. and C.J.H. in Wyoming. That same day, Pacific Stock Transfer Company issued approximately 13 billion free-trading shares of NuTech to a number of individuals and entities, including individuals and entities related to Mitchell, HERMAN, and WINTERS. These stock certificates were shipped by interstate courier to HERMAN in Pennsylvania.

28.     Between November 3 and November 9, 2015, HERMAN, Mitchell, and co-conspirators known and unknown to the grand jury sold approximately 6.3 million shares of NuTech stock to the public. During this time period, at least one investor in Wyoming purchased NuTech shares in a public sale. The conspirators used Skype to coordinate their sales of NuTech stock and timed their sales to coincide with email promotions containing false and misleading information about NuTech.

29.     On January 28, 2016, HERMAN emailed documents to J.W. Korth & Company so that HERMAN and WINTERS could execute trades of NuTech and another company's stock. The documents included:

    a.  the backdated debt-assignment agreement described in Overt Act 11;

    b.  the altered outgoing wire transfer request described in Overt Act 15;

    c.  one of the two attorney-opinion letters described in Overt Act 21;

    d.  the attorney-opinion letter described in Overt Act 23; and

    e.  the E-Pro purchase and assignment of interest in wells and leases dated December 23, 2014, bearing the forged and unauthorized signatures of D.R. and G.P., described in Overt Act 24.

30.     On January 29, 2016, HERMAN sent an email to J.W. Korth & Company to sell "1mm shares" of NuTech shares "ASAP."

31.     On or before March 1, 2016, Mitchell created a Q3 2015 financial statement and disclosure for NuTech.

32.     On March 1, 2016, WINTERS used his email account to login and post the financial statement and disclosure described in Overt Act 31 online at www.otcmarkets.com, where the statement and disclosure could be accessed in the District of Wyoming.

33.    On or before March 7, 2016, HERMAN and HORN created an attorney letter with respect to current information for NuTech as if the letter had been written by HORN and contained his legal opinions. In fact, the letter was written in significant part by HERMAN and contained false and misleading information. HORN did not review the information in the letter before signing and issuing it on his letterhead.

34.    On March 7, 2016, Mitchell used kevin@nutechenr.com to login and post the attorney letter with respect to current information described in Overt Act 33 online at www.otcmarkets.com, where the letter could be accessed in the District of Wyoming.

35.    On or before April 4, 2016, HERMAN and HORN created an attorney letter with respect to current information for NuTech dated April 3, 2016, as if the letter had been written by HORN and contained his legal opinions. In fact, the letter was written in significant part by HERMAN and contained false and misleading information. HORN did not review the information in the statement before signing and issuing it on his letterhead.

36.    On April 4, 2016, Mitchell used kevin@nutechenr.com to login and post the attorney letter with respect to current information described in Overt Act 35 online at www.otcmarkets.com, where the letter could be accessed in the District of Wyoming.

37.    On April 21, 2016, Mitchell used kevin@nutechenr.com to communicate with staff at OTC Markets Group, and to login and update NuTech's online company profile published at www.otcmarkets.com, where that profile could be accessed in the District of Wyoming.

38.    On May 10, 2016, Mitchell emailed the text of a press release to staff at OTC Markets Group. The email claimed that a Russian company had offered to buy NuTech for 2.5 cents per share.

39.    On or before May 16, 2016, Mitchell wrote a script for K.T. to read on an investor conference call, which was available nationwide, including in the District of Wyoming. Following the script, K.T. provided false and misleading information about (among other things) the alleged offer to purchase NuTech.

40.    Beginning no later than May 9 and continuing through at least May 19, 2016, HERMAN, Mitchell, and WINTERS sold approximately 65.5 million NuTech shares to the public. During this time period, at least one investor in Wyoming purchased NuTech shares in a public sale. As a result of these sales, Mitchell received from Kingdom Trust over $103,000 on May 16 and over $28,000 on May 17.

41.    On May 17, 2016, Mitchell wired $10,000 to HERMAN. This money came from the approximately $131,000 Mitchell had received from Kingdom Trust on May 16 and May 17.

FILED

INSTRUCTION NO._____

12:42 pm, 10/12/21

**Margaret Botkins**
**Clerk of Court**

One element that the government must prove beyond a reasonable

doubt is that the defendants had the unlawful intent to defraud. Evidence

that the defendants in good faith followed the advice of counsel would be

inconsistent with such an unlawful intent. Unlawful intent has not been

proved if the defendants, before acting, made full disclosure of all material

facts to an attorney, received the attorney's advice as to the specific course

of conduct that was followed, and reasonably followed the attorney's

recommended course of conduct or advice in good faith.

**Refused.**

**Alan B. Johnson**
**District Court Judge**

**Authority:**

Pattern Criminal Jury Instruction 5.10 (9th Circuit)

*See Williamson v. United States*, 207 U.S. 425, 453 (1908)

*See Bisno v. United States,* 299 F.2d 711, 719 (9th Cir. 1961)

*United States v. Ibarra-Alcarez,* 830 F.2d 968, 973 (9th Cir. 1987) *United States v. Munoz*, 233 F.3d 1117, 1132 (9th Cir. 2000)

INSTRUCTION NO. 42

To prove the conspiracy the Government must prove that the defendants had the specific intent to defraud. The "good faith" of defendants is a complete defense to the charge of conspiracy to defraud because good faith on the part of the defendant is, simply, inconsistent with the intent to defraud alleged in that charge.  While the term "good faith" has no precise definition, it encompasses, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another.

A person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect, unreasonable, or wrong. The reasonableness of a good-faith defense is a factor which the jury may properly consider in determining whether a defendant's asserted beliefs are genuinely held.  An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct.  However, merely disagreeing with the law does not constitute a good faith misunderstanding of the law because all persons have a duty to obey the law whether or not they agree with it. A defendant does not act in "good faith" if, even though he or she honestly holds a certain opinion or belief, that defendant also knowingly makes false or fraudulent statements, representation or promises to others with the intent to deceive.

In determining whether the Government has proven that a defendant acted with intent to defraud or whether the defendant acted in good faith, the jury must consider all of the evidence received in the case bearing on the defendant's state of mind.  The burden of proving good faith does not rest with the defendant because the defendant does not have any obligation to prove anything in this case. It is the Government's burden to prove to you, beyond a reasonable doubt that each defendant acted with intent to defraud as charged in Counts 13, 14 and 15.  If the evidence leaves you with a reasonable doubt as to whether a defendant acted with intent to defraud or in good faith, the jury must acquit that Defendant.

Rejected _Alan T.S. Johnson_

INSTRUCTION NO. 7

It is your duty to give separate and individual consideration to the evidence as it relates to each individual Defendant. When you do so, you should analyze what the evidence in the case shows with respect to that individual defendant, leaving out of consideration entirely any evidence solely against other defendants. Each defendant is entitled to have his case determined from evidence as to his own acts, statements and conduct and any other evidence in the case which may be applicable to him. Mere similarity of conduct among various persons and the fact that they may have associated with each other, and may have communicated and discussed common aims and interests, does not necessarily establish proof of the existence of the conspiracy.

Rejected _Alan B. Johnson_

INSTRUCTION NO. 11

Evidence has been received in this case that certain persons, who are alleged in the indictment to be co-conspirators of the Defendants, have done or said things during the existence or life of the alleged conspiracy in order to further or advance its goal(s).

Such acts and statements of other individuals may be considered by you in determining whether or not the government has proven the conspiracy charges of the indictment against the Defendants.

Since these acts may have been performed and these statements may have been made outside the presence of a particular defendant and even done or said without a particular defendant's knowledge, these acts or statements should be examined with particular care by you before considering them against the defendant who did not do the particular act or make the particular statement.

Rejected *Alan B. Johnson*



FILED

10:54 am, 10/19/21

**Margaret Botkins**
**Clerk of Court**

United States District Court
District of Wyoming
Exhibits Log: 19-CR-26-J
USA v Herman/Winters/Horn, 9/21/2021

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| Court-1 | Preliminary Instructions |
| Court-2 | Evidentiary Instructions |
| Court-3 | Final Instructions |
| Court-4 | List of Overt Acts |
| Gov-1-1 | EIG Record Showing Creation of www.nutechenr.com and kevin@nutechenr.com |
| Gov-1-2 | EIG Customer Information |
| Gov-2 | www.nutechenr.com Homepage Captured on July 25 2015 |
| Gov-2-1 | www.nutechenr.com Homepage Captured on July 25 2015 with Wayback Machine header |
| Gov-3-1 | 20000 Wire Transfer Nadine McCreery to Bravo 20 Partners |
| Gov-3-2 | 100000 Wire Transfer Emerald Operating Company to Bravo Two Zero Partners |
| Gov-4-1 | Bravo Two Zero Partners December 2014 Bank Statement |
| Gov-4-2 | 80000 Wire Transfer Bravo Two Zero Partners to Ian Horn for ECMZ Debt Conversion |
| Gov-4-3 | BMO Harris Bank Statement Ian Horn December 19 2014 to January 18 2015 |
| Gov-4-4 | 10000 Wire Transfer Bravo Two Zero Partners to Justin Herman |
| Gov-4-5 | Justin Herman Citizens Bank Statement November 27 to December 23 2014 |
| Gov-5-1 | 12232014 Herman to Horn Email - Subject wire |
| Gov-5-10 | January 2015 Outgoing Wire Transfers Ian Horns PNC Bank Account |
| Gov-5-11 | 01162015 Cash Withdrawal 2000 from Ian Horns PNC Bank Account |
| Gov-5-12 | Wire Transfer 19000 from Ian Horn to Intrepid Resources |
| Gov-5-13 | 01122015 Email from Herman to Horn - Subject last two wires |
| Gov-5-14 | Ian Horns PNC Bank Statement January 8 2015 to February 5 2015 |
| Gov-5-2 | 12232014 Herman to Horn Email - Subject Additional New Wire for 20000 |
| Gov-5-3 | 01012015 Horn to Herman Text - Dont forget bank wants evidence of why transfers had to go through me. |
| Gov-5-4 | 01022015 Herman to Horn Email 122015 - Subject Liability |
| Gov-5-5 | 01052015 Email from Herman to Horn and Jillian Hickory - Subject Justin Herman PADLECMZ TransactionIan Horn |
| Gov-5-6 | Withdrawal 80016.29 to Close Ian Horns BMO Harris Bank Account |
| Gov-5-7 | Ian Horns PNC Bank Statement December 5 2014 to January 7 2015 |
| Gov-5-8 | 01062015 Cashiers Check 80016.29 Deposit into Ian Horns PNC Bank Account |
| Gov-6 | EcoEmissions Solutions Inc. Name Change to NuTech Energy Resources Inc. NERG |
| Gov-7 | OTC Markets Group Login Information for Chuck Winters chuck@lchcorp.net |
| Gov-8 | 05192015 Attorney Letter with Respect to Current Information Bearing Ian Horns Name and Signature |
| Gov-9-1 | 05202015 Email Exchange between Winters and OTC Markets - We have finished processing your attorney letter... |
| Gov-9-2 | OTC Markets Group Record Financials Posted for ECMZNERG |
| Gov-10 | 07102015 Email from Herman to Pacific Stock Transfer - Subject here you go for a second time on NERG |
| Gov-11-1 | 07272015 Email from Justin Herman to Chuck Winters - Subject how do we add date |
| Gov-11-2 | 07272015 Email from Winters to Herman - Backdated Debt assignment.pdf Attached |
| Gov-12 | 07272015 Email from Herman to Pacific Stock Transfer - Backdated Debt assignment.pdf Attached |
| Gov-13 | August 2015 Email Exchange regarding Kingdom Trust Application for Bravo 20 Partners |

United States District Court
DIstrict of Wyoming
Exhibits Log: 19-CR-26-J
USA v Herman/Winters/Horn, 9/21/2021



| EXHIBIT | DESCRIPTION |
|---|---|
| Court-1 | Preliminary Instructions |
| Court-2 | Evidentiary Instructions |
| Court-3 | Final Instructions |
| Court-4 | List of Overt Acts |
| Gov-1-1 | EIG Record Showing Creation of www.nutechenr.com and kevin@nutechenr.com |
| Gov-1-2 | EIG Customer Information |
| Gov-2 | www.nutechenr.com Homepage Captured on July 25 2015 |
| Gov-2-1 | www.nutechenr.com Homepage Captured on July 25 2015 with Wayback Machine header |
| Gov-3-1 | 20000 Wire Transfer Nadine McCreery to Bravo 20 Partners |
| Gov-3-2 | 100000 Wire Transfer Emerald Operating Company to Bravo Two Zero Partners |
| Gov-4-1 | Bravo Two Zero Partners December 2014 Bank Statement |
| Gov-4-2 | 80000 Wire Transfer Bravo Two Zero Partners to Ian Horn for ECMZ Debt Conversion |
| Gov-4-3 | BMO Harris Bank Statement Ian Horn December 19 2014 to January 18 2015 |
| Gov-4-4 | 10000 Wire Transfer Bravo Two Zero Partners to Justin Herman |
| Gov-4-5 | Justin Herman Citizens Bank Statement November 27 to December 23 2014 |
| Gov-5-1 | 12232014 Herman to Horn Email - Subject wire |
| Gov-5-10 | January 2015 Outgoing Wire Transfers Ian Horns PNC Bank Account |
| Gov-5-11 | 01162015 Cash Withdrawal 2000 from Ian Horns PNC Bank Account |
| Gov-5-12 | Wire Transfer 19000 from Ian Horn to Intrepid Resources |
| Gov-5-13 | 01122015 Email from Herman to Horn - Subject last two wires |
| Gov-5-14 | Ian Horns PNC Bank Statement January 8 2015 to February 5 2015 |
| Gov-5-2 | 12232014 Herman to Horn Email - Subject Additional New Wire for 20000 |
| Gov-5-3 | 01012015 Horn to Herman Text - Dont forget bank wants evidence of why transfers had to go through me. |
| Gov-5-4 | 01022015 Herman to Horn Email 122015 - Subject Liability |
| Gov-5-5 | 01052015 Email from Herman to Horn and Jillian Hickory - Subject Justin Herman PADLECMZ TransactionIan Horn |
| Gov-5-6 | Withdrawal 80016.29 to Close Ian Horns BMO Harris Bank Account |
| Gov-5-7 | Ian Horns PNC Bank Statement December 5 2014 to January 7 2015 |
| Gov-5-8 | 01062015 Cashiers Check 80016.29 Deposit into Ian Horns PNC Bank Account |
| Gov-6 | EcoEmissions Solutions Inc. Name Change to NuTech Energy Resources Inc. NERG |
| Gov-7 | OTC Markets Group Login Information for Chuck Winters chuck@ichcorp.net |
| Gov-8 | 05192015 Attorney Letter with Respect to Current Information Bearing Ian Horns Name and Signature |
| Gov-9-1 | 05202015 Email Exchange between Winters and OTC Markets - We have finished processing your attorney letter... |
| Gov-9-2 | OTC Markets Group Record Financials Posted for ECMZNERG |
| Gov-10 | 07102015 Email from Herman to Pacific Stock Transfer - Subject here you go for a second time on NERG |
| Gov-11-1 | 07272015 Email from Justin Herman to Chuck Winters - Subject how do we add date |
| Gov-11-2 | 07272015 Email from Winters to Herman - Backdated Debt assignment.pdf Attached |
| Gov-12 | 07272015 Email from Herman to Pacific Stock Transfer - Backdated Debt assignment.pdf Attached |
| Gov-13 | August 2015 Email Exchange regarding Kingdom Trust Application for Bravo 20 Partners |

WYD 20

United States District Court
District of Wyoming
Exhibits Log: 19-CR-26-J
USA v Herman/Winters/Horn, 9/21/2021

| EXHIBIT | DESCRIPTION |
|---|---|
| Court-1 | Preliminary Instructions |
| Court-2 | Evidentiary Instructions |
| Court-3 | Final Instructions |
| Court-4 | List of Overt Acts |
| Gov-1-1 | EIG Record Showing Creation of www.nutechenr.com and kevin@nutechenr.com |
| Gov-1-2 | EIG Customer Information |
| Gov-2 | www.nutechenr.com Homepage Captured on July 25 2015 |
| Gov-2-1 | www.nutechenr.com Homepage Captured on July 25 2015 with Wayback Machine header |
| Gov-3-1 | 20000 Wire Transfer Nadine McCreery to Bravo 20 Partners |
| Gov-3-2 | 100000 Wire Transfer Emerald Operating Company to Bravo Two Zero Partners |
| Gov-4-1 | Bravo Two Zero Partners December 2014 Bank Statement |
| Gov-4-2 | 80000 Wire Transfer Bravo Two Zero Partners to Ian Horn for ECMZ Debt Conversion |
| Gov-4-3 | BMO Harris Bank Statement Ian Horn December 19 2014 to January 18 2015 |
| Gov-4-4 | 10000 Wire Transfer Bravo Two Zero Partners to Justin Herman |
| Gov-4-5 | Justin Herman Citizens Bank Statement November 27 to December 23 2014 |
| Gov-5-1 | 12232014 Herman to Horn Email - Subject wire |
| Gov-5-10 | January 2015 Outgoing Wire Transfers Ian Horns PNC Bank Account |
| Gov-5-11 | 01162015 Cash Withdrawal 2000 from Ian Horns PNC Bank Account |
| Gov-5-12 | Wire Transfer 19000 from Ian Horn to Intrepid Resources |
| Gov-5-13 | 01122015 Email from Herman to Horn - Subject last two wires |
| Gov-5-14 | Ian Horns PNC Bank Statement January 8 2015 to February 5 2015 |
| Gov-5-2 | 12232014 Herman to Horn Email - Subject Additional New Wire for 20000 |
| Gov-5-3 | 01012015 Horn to Herman Text - Dont forget bank wants evidence of why transfers had to go through me. |
| Gov-5-4 | 01022015 Herman to Horn Email 122015 - Subject Liability |
| Gov-5-5 | 01052015 Email from Herman to Horn and Jillian Hickory - Subject Justin Herman PADLECMZ TransactionIan Horn |
| Gov-5-6 | Withdrawal 80016.29 to Close Ian Horns BMO Harris Bank Account |
| Gov-5-7 | Ian Horns PNC Bank Statement December 5 2014 to January 7 2015 |
| Gov-5-8 | 01062015 Cashiers Check 80016.29 Deposit into Ian Horns PNC Bank Account |
| Gov-6 | EcoEmissions Solutions Inc. Name Change to NuTech Energy Resources Inc. NERG |
| Gov-7 | OTC Markets Group Login Information for Chuck Winters chuck@ichcorp.net |
| Gov-8 | 05192015 Attorney Letter with Respect to Current Information Bearing Ian Horns Name and Signature |
| Gov-9-1 | 05202015 Email Exchange between Winters and OTC Markets - We have finished processing your attorney letter... |
| Gov-9-2 | OTC Markets Group Record Financials Posted for ECMZNERG |
| Gov-10 | 07102015 Email from Herman to Pacific Stock Transfer - Subject here you go for a second time on NERG |
| Gov-11-1 | 07272015 Email from Justin Herman to Chuck Winters - Subject how do we add date |
| Gov-11-2 | 07272015 Email from Winters to Herman - Backdated Debt assignment.pdf Attached |
| Gov-12 | 07272015 Email from Herman to Pacific Stock Transfer - Backdated Debt assignment.pdf Attached |
| Gov-13 | August 2015 Email Exchange regarding Kingdom Trust Application for Bravo 20 Partners |

*Kenneth S. Ward*

*Zenith S. Ward,*
*Counsel for Charles Winters*

- 1 -

United States District Court
District of Wyoming
Exhibits Log: 19-CR-26-J
USA v Herman/Winters/Horn, 9/21/2021

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| Court-1 | Preliminary Instructions |
| Court-2 | Evidentiary Instructions |
| Court-3 | Final Instructions |
| Court-4 | List of Overt Acts |
| Gov-1-1 | EIG Record Showing Creation of www.nutechenr.com and kevin@nutechenr.com |
| Gov-1-2 | EIG Customer Information |
| Gov-2 | www.nutechenr.com Homepage Captured on July 25 2015 |
| Gov-2-1 | www.nutechenr.com Homepage Captured on July 25 2015 with Wayback Machine header |
| Gov-3-1 | 20000 Wire Transfer Nadine McCreery to Bravo 20 Partners |
| Gov-3-2 | 100000 Wire Transfer Emerald Operating Company to Bravo Two Zero Partners |
| Gov-4-1 | Bravo Two Zero Partners December 2014 Bank Statement |
| Gov-4-2 | 80000 Wire Transfer Bravo Two Zero Partners to Ian Horn for ECMZ Debt Conversion |
| Gov-4-3 | BMO Harris Bank Statement Ian Horn December 19 2014 to January 18 2015 |
| Gov-4-4 | 10000 Wire Transfer Bravo Two Zero Partners to Justin Herman |
| Gov-4-5 | Justin Herman Citizens Bank Statement November 27 to December 23 2014 |
| Gov-5-1 | 12232014 Herman to Horn Email - Subject wire |
| Gov-5-10 | January 2015 Outgoing Wire Transfers Ian Horns PNC Bank Account |
| Gov-5-11 | 01162015 Cash Withdrawal 2000 from Ian Horns PNC Bank Account |
| Gov-5-12 | Wire Transfer 19000 from Ian Horn to Intrepid Resources |
| Gov-5-13 | 01122015 Email from Herman to Horn - Subject last two wires |
| Gov-5-14 | Ian Horns PNC Bank Statement January 8 2015 to February 5 2015 |
| Gov-5-2 | 12232014 Herman to Horn Email - Subject Additional New Wire for 20000 |
| Gov-5-3 | 01012015 Horn to Herman Text - Dont forget bank wants evidence of why transfers had to go through me. |
| Gov-5-4 | 01022015 Herman to Horn Email 122015 - Subject Liability |
| Gov-5-5 | 01052015 Email from Herman to Horn and Jillian Hickory - Subject Justin Herman PADLECMZ TransactionIan Horn |
| Gov-5-6 | Withdrawal 80016.29 to Close Ian Horns BMO Harris Bank Account |
| Gov-5-7 | Ian Horns PNC Bank Statement December 5 2014 to January 7 2015 |
| Gov-5-8 | 01062015 Cashiers Check 80016.29 Deposit into Ian Horns PNC Bank Account |
| Gov-6 | EcoEmissions Solutions Inc. Name Change to NuTech Energy Resources Inc. NERG |
| Gov-7 | OTC Markets Group Login Information for Chuck Winters chuck@ichcorp.net |
| Gov-8 | 05192015 Attorney Letter with Respect to Current Information Bearing Ian Horns Name and Signature |
| Gov-9-1 | 05202015 Email Exchange between Winters and OTC Markets - We have finished processing your attorney letter... |
| Gov-9-2 | OTC Markets Group Record Financials Posted for ECMZNERG |
| Gov-10 | 07102015 Email from Herman to Pacific Stock Transfer - Subject here you go for a second time on NERG |
| Gov-11-1 | 07272015 Email Justin Herman to Chuck Winters - Subject how do we add date |
| Gov-11-2 | 07272015 Email from Winters to Herman - Backdated Debt assignment.pdf Attached |
| Gov-12 | 07272015 Email from Herman to Pacific Stock Transfer - Backdated Debt assignment.pdf Attached |
| Gov-13 | August 2015 Email Exchange regarding Kingdom Trust Application for Bravo 20 Partners |

United States District Court
District of Wyoming
Exhibits Log: 19-CR-26-J
USA v Herman/Winters/Horn, 9/21/2021

| EXHIBIT | DESCRIPTION |
| --- | --- |
| Court-1 | Preliminary Instructions |
| Court-2 | Evidentiary Instructions |
| Court-3 | Final Instructions |
| Court-4 | List of Overt Acts |
| Gov-1-1 | EIG Record Showing Creation of www.nutechenr.com and kevin@nutechenr.com |
| Gov-1-2 | EIG Customer Information |
| Gov-2 | www.nutechenr.com Homepage Captured on July 25 2015 |
| Gov-2-1 | www.nutechenr.com Homepage Captured on July 25 2015 with Wayback Machine header |
| Gov-3-1 | 20000 Wire Transfer Nadine McCreery to Bravo 20 Partners |
| Gov-3-2 | 100000 Wire Transfer Emerald Operating Company to Bravo Two Zero Partners |
| Gov-4-1 | Bravo Two Zero Partners December 2014 Bank Statement |
| Gov-4-2 | 80000 Wire Transfer Bravo Two Zero Partners to Ian Horn for ECMZ Debt Conversion |
| Gov-4-3 | BMO Harris Bank Statement Ian Horn December 19 2014 to January 18 2015 |
| Gov-4-4 | 10000 Wire Transfer Bravo Two Zero Partners to Justin Herman |
| Gov-4-5 | Justin Herman Citizens Bank Statement November 27 to December 23 2014 |
| Gov-5-1 | 12232014 Herman to Horn Email - Subject wire |
| Gov-5-10 | January 2015 Outgoing Wire Transfers Ian Horns PNC Bank Account |
| Gov-5-11 | 01162015 Cash Withdrawal 2000 from Ian Horns PNC Bank Account |
| Gov-5-12 | Wire Transfer 19000 from Ian Horn to Intrepid Resources |
| Gov-5-13 | 01122015 Email from Herman to Horn - Subject last two wires |
| Gov-5-14 | Ian Horns PNC Bank Statement January 8 2015 to February 5 2015 |
| Gov-5-2 | 12232014 Herman to Horn Email - Subject Additional New Wire for 20000 |
| Gov-5-3 | 01012015 Horn to Herman Text - Dont forget bank wants evidence of why transfers had to go through me. |
| Gov-5-4 | 01022015 Herman to Horn Email 122015 - Subject Liability |
| Gov-5-5 | 01052015 Email from Herman to Horn and Jillian Hickory - Subject Justin Herman PADLECMZ TransactionIan Horn |
| Gov-5-6 | Withdrawal 80016.29 to Close Ian Horns BMO Harris Bank Account |
| Gov-5-7 | Ian Horns PNC Bank Statement December 5 2014 to January 7 2015 |
| Gov-5-8 | 01062015 Cashiers Check 80016.29 Deposit into Ian Horns PNC Bank Account |
| Gov-6 | EcoEmissions Solutions Inc. Name Change to NuTech Energy Resources Inc. NERG |
| Gov-7 | OTC Markets Group Login Information for Chuck Winters chuck@ichcorp.net |
| Gov-8 | 05192015 Attorney Letter with Respect to Current Information Bearing Ian Horns Name and Signature |
| Gov-9-1 | 05202015 Email Exchange between Winters and OTC Markets - We have finished processing your attorney letter... |
| Gov-9-2 | OTC Markets Group Record Financials Posted for ECMZNERG |
| Gov-10 | 07102015 Email from Herman to Pacific Stock Transfer - Subject here you go for a second time on NERG |
| Gov-11-1 | 07272015 Email from Justin Herman to Chuck Winters - Subject how do we add date |
| Gov-11-2 | 07272015 Email from Winters to Herman - Backdated Debt assignment.pdf Attached |
| Gov-12 | 07272015 Email from Herman to Pacific Stock Transfer - Backdated Debt assignment.pdf Attached |
| Gov-13 | August 2015 Email Exchange regarding Kingdom Trust Application for Bravo 20 Partners |

WYD 23

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| Gov-14-1 | Email Exchange between Winters Herman and Tara Bogard regarding Kingdom Trust Application for Intrepid Capital Holdings |
| Gov-14-2 | Kingdom Trust Account Records for Intrepid Capital Holdings Corp. |
| Gov-15-1 | 07232015 Email from Bob Mitchell to Herman - Subject Bravo Wire Docs |
| Gov-15-2 | 08192015 Email from Herman to Winters - Subject fix |
| Gov-15-3 | 08192015 Email from Winters to Herman - Subject nerg wire |
| Gov-16-1 | 08192015 Email from Herman to Pacific Stock Transfer - Subject Fwd NERG |
| Gov-16-2 | Backdated Debt Assignment Agreement Attached to Email as Debt assignment.pdf |
| Gov-16-3 | Altered Wire Transfer Request Attached to Email as wire.pdf |
| Gov-16-4 | 07272015 Notice of Conversion Attached to Email as Notice of Conversion Filings.pdf |
| Gov-16-5 | Screenshot of August 19 shares.xlsx Showing Request for 13 billion Free-Trading Shares |
| Gov-17 | August 2015 Email Exchange between Herman and Pacific Stock Transfer - ...Thats how the 280 was used to buy that particular debt. |
| Gov-18-1 | 09022015 Email from Herman to Pacific Stock Transfer |
| Gov-18-10 | Rodgerss June 2008 Consulting Agreement Attached to Email as Rodgers Consulting Agree 6-26-08.pdf |
| Gov-18-11 | Pardys Consulting Agreement Attached to Email as Pardy Rodgers amended consulting agreement 2009.pdf |
| Gov-18-12 | List of Wells Attached to Email as Patriot well list.pdf |
| Gov-18-2 | Assignment Bravo wells to eco signed.pdf Attached to Email |
| Gov-18-3 | Altered Bravo Two Zero Bank Statement Attached to Email as Bravo Statement.pdf |
| Gov-18-4 | Altered Wire Transfer Request Attached to Email as wire.pdf |
| Gov-18-5 | 08242015 Notice of Conversion Attached to Email as Notice of Conversion Filings.pdf |
| Gov-18-6 | Email Showing Name Change to NuTech Energy Resources Inc. and NERG Symbol attached to email as FNRA Email.pdf |
| Gov-18-7 | 2008 EcoEmissions Assignment Attached to Email as Assignment Agreement 6-26-08.pdf |
| Gov-18-8 | Gordon Pardys June 2008 Convertible Note Attached to Email as Pardy Convertible note 6-26-08.pdf |
| Gov-18-9 | David Rodgerss June 2008 Convertible Note Attached to Email as Rodgers Convertible Note 6-26-08.pdf |
| Gov-19-1 | 09082015 Email from Herman to Winters - Subject ian horn |
| Gov-19-2 | 09082015 Email from Winters to Herman - Horn and assoc letterhead.docx attached |
| Gov-20 | 09162015 Email from Winters to Herman - Horn and assoc letterhead.docx attached |
| Gov-22-1 | 09182015 Email from Herman to Pacific Stock Transfer - Subject NERG First Email w Nonaffiliation Statements Attached |
| Gov-22-2 | 09182015 Email from Herman to Pacific Stock Transfer - Subject NERG 3rd Email |
| Gov-22-3 | Assignment Bravo wells to eco signed.pdf Attached to Email |
| Gov-22-4 | List of Wells Attached to Email as Patriot well list.pdf |
| Gov-22-5 | 09162015 Attorney Letter Bearing Ian Horns Name and Signature - Attached to Email as NERG Legal Opinion Sep 23 2015.pdf |
| Gov-22-6 | 09162015 Attorney Letter 2 Bearing Ian Horns Name and Signature - Attached to Email as NERG Opinion September 16 2015 short version.pdf |
| Gov-22-7 | 09162015 NuTech Board Resolution Attached to Email as September 16 BOD Issuance.pdf |
| Gov-22-8 | 09162015 Notice of Conversion Attached to Email as NOTICE OF CONVERSIONS 9 2016.pdf |
| Gov-24-1 | 09232015 Email from Herman to Winters - Subject call u in two |
| Gov-24-2 | 09232015 Email from Herman to Winters - Subject doc edit |
| Gov-24-3 | 09232015 Email from Winters to Herman - Subject E-pro - with Attachment Assignment Bravo E Pro.docx now incl. Digital Signatures of Pardy and Rodgers |
| Gov-25-1 | 09232015 Email from Herman to Pacific Stock Transfer - Subject NERG. |
| Gov-25-2 | 09162015 Attorney Letter Bearing Ian Horns Name and Signature - Attached to Email as NERG Legal Opinion Sep 23 2015.pdf |

WYD 24

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| Gov-25-3 | Purchase and Assignment of Interest in Wells and Leases Bearing Names and Signatures of Pardy and Rodgers Attached to Email as Assignment Bravo E Pro.pdf |
| Gov-26-1 | 09262015 Email from Herman to Pacific Stock Transfer |
| Gov-27-1 | 09282015 Email from Herman to Pacific Stock Transfer - Subject RE NUTECH |
| Gov-27-2 | Pacific Stock Transfer Company Certificate Transaction Journal for NuTech Energy Resources Showing Stock Certificates Issued on 9282015 |
| Gov-27-3 | Original Stock Certificates - PHYSICAL EVIDENCE ONLY |
| Gov-28-1 | NERG Trading Analysis 1152015 - 11102015 |
| Gov-28-10 | 11062015 Promotional Email from StockBomb.com - Subject NERG is our tiny float subpenny alert for Friday |
| Gov-28-11 | Email from Winters to FinTech Securities on 1162015 placing sell order for NERG |
| Gov-28-12 | 11062015 Email from Herman to Winters forwarding NERG Sell Order Information from FinTech |
| Gov-28-13 | 11062015 Email from Winters to FinTech Securities Placing Another NERG Sell Order |
| Gov-28-14 | 11062015 Promotional Email from Penny Stock 101 - Subject NERG climbs 51 up the chart Round 2 of profits Ding ding. |
| Gov-28-15 | 11062015 Promotional Email from MomentumOTC - Subject NERG climbs 51 up the chart Round 2 of profits Ding ding. |
| Gov-28-16 | 11062015 Promotional Email from StockBomb.com - Subject NERG climbs 51 up the chart Round 2 of profits Ding ding. |
| Gov-28-17 | 11062015 Promotional Email from MomentumOTC - Subject NERG Goes Up 31 After Our Update Get Ready For Round 3 |
| Gov-28-18 | 11062015 Promotional Email from Penny Stock 101 - Subject NERG Goes Up 31 After Our Update Get Ready For Round 3 |
| Gov-28-19 | 11062015 Promotional Email from StockBomb.com - Subject NERG Goes Up 31 After Our Update Get Ready For Round 3 |
| Gov-28-2 | 11032015 Email from Winters to FinTech Securities Placing Sell Order for NERG |
| Gov-28-20 | 11082015 Promotional Email from PennyPickAlerts.com - Subject Sub penny flyer in energy sector that looks ready to deliver |
| Gov-28-21 | 11092015 Promotional Email from PennyPickAlerts.com - Subject Its Monday and it could be a fun day if you follow todays sub penny play |
| Gov-28-22 | 11092015 Email from Chuck Winters to FinTech Securities Placing Sell Order for NERG |
| Gov-28-23 | 11092015 Promotional Email from PennyPickAlerts.com - Subject How about todays play Early 47 gains above previous close. More should be coming. |
| Gov-28-24 | 11092015 Promotional Email from Equity Profile Report - Subject NERG Immediate Attention Required |
| Gov-28-25 | 11092015 Promotional Email from Equity Profile Report - Subject NERG New Trade Alert |
| Gov-28-26 | 11092015 Email from Herman to Winters - Subject NERG Trades |
| Gov-28-27 | 11092015 Email Herman to Winters - Subject trades Please make sure those NERG shares are in the system.. |
| Gov-28-29 | 11102015 Promotional Email from Equity Profile Report - Subject Get NERG on your screen |
| Gov-28-3 | 11032015 Email from Winters to FinTech Securities Placing Another Sell Order for NERG |
| Gov-28-30 | 11102015 Promotional Email from Equity Profile Report - Subject NERG Release Breaking News incl. Press Release Text |
| Gov-28-31 | 11102015 Promotional Email from Equity Profile Report - Subject Are you awake This is time sensitive |
| Gov-28-32 | 11102015 Email from OTC Markets Group to Winters regarding Disclosure and Moving NuTech to OTC Pink Current Information Tier |
| Gov-28-34 | Skype Chat Messages found on Bob Mitchells computer |
| Gov-28-4 | 11032015 Email from Winters to Herman - Subject nerg orders |
| Gov-28-5 | 11052015 Promotional Email from Penny Stock 101 - Subject NERG is our tiny float subpenny alert for Friday |
| Gov-28-6 | 11052015 Promotional Email from StockBomb.com - Subject NERG is our tiny float subpenny alert for Friday |
| Gov-28-7 | 11052015 Promotional Email from MomentumOTC - Subject NERG is our tiny float subpenny alert for Friday |
| Gov-28-8 | 11062015 Promotional Email from Penny Stock 101 - Subject NERG is our tiny float subpenny alert for Friday |

WYD 25

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| Gov-28-9 | 11062015 Promotional Email from MomentumOTC - Subject NERG is todays tiny float subpenny alert |
| Gov-29-1 | 01282016 Email from Herman to JW Korth - Subject Data |
| Gov-29-2 | ...base data pack that Pacific Stock Transfer reviewed... attached to email as KW Data NERG pack.pdf |
| Gov-29-3 | NuTech Press Release 01282016 NuTech Energy Resources Inc. to Convene for Majority Shareholder Vote on Stock Repurchase Agreement in Preparation for NASDAQ Listing |
| Gov-29-4 | Excerpt of recorded call between Herman and Holly MacDonald-Korth on1282016 - I sent you guys a package |
| Gov-29-5 | Excerpt of recorded call between Justin Herman and Holly MacDonald-Korth on January 28 2016 - Did Mike bless us with holy water |
| Gov-30-1 | 01292016 Email from Herman to JW Korth - Subject Intrepid Capital Sell NERG... |
| Gov-30-2 | NuTech Press Release 01292016 NuTech Energy Resources Inc. Acquires Flowpower LLC Creator of Revolutionary Green Power Generating Technology to Generate Additional 15-20 Million Dollars in Revenues P |
| Gov-32-1 | Screenshot of Q3 2015 Amended Disclosure posted on www.otcmarkets.com incl. Document Properties |
| Gov-34-1 | 03072016 Attorney Letter with Respect to Current Information bearing Ian Horns name and signature |
| Gov-34-3 | OTC Markets Group Login Information kevin@nutechenr.com |
| Gov-36-1 | 04032016 Attorney Letter with Respect to Current Information bearing Ian Horns name and signature |
| Gov-37-1 | 04212016 Email from OTC Markets Group to kevin@nutechenr.com - Subject NuTech Energy Resources Inc. NERG - OTC Pink Current Information |
| Gov-38 | 05102016 Email from kevin@nutechenr.com to OTC Markets Group - below is a cut and paste of our announcement |
| Gov-40-1 | NERG Trading Analysis 04212016 - 05192016 |
| Gov-40-10 | 05132016 Email from Bayes Capital to Herman and Winters - Subject Bayes Capital Trade Recap 051316 Intrepid Capital Holdings |
| Gov-40-11 | 05162016 Email from Bayes Capital to Herman and Winters - Subject Bayes Capital Trade Recap 051616 Intrepid Capital Holdings |
| Gov-40-12 | NuTech Press Release 05132016 NuTech Energy Provides Clarification to Questions Presented at Teleconference |
| Gov-40-14 | 05192016 Email from Bayes Capital to Herman and Winters - Subject Bayes Capital Trade Recap 05192016 Intrepid Capital Holdings |
| Gov-40-15 | May 2016 Wells Fargo Bank Statement Bravo Two Zero Partners |
| Gov-40-2 | 05092016 Email from Herman to Winters - Subject woo nelly I am really expecting to sell several hundred millio shares of NERG this week. |
| Gov-40-3 | 05092016 Email from Bayes Capital to Herman and Winters - Subject Bayes Capital Trade Recap 05092016 Intrepid Capital Holdings |
| Gov-40-4 | NuTech Press Release 05102016 NuTech Energy Resources Receives Buyout Offer |
| Gov-40-5 | 05112016 Email from Bayes Capital to Herman and Winters - Subject Bayes Capital Trade Recap 05102016 Intrepid Capital Holdings |
| Gov-40-6 | 05112016 Email from Bayes Capital to Herman and Winters - Subject Bayes Capital Trade Recap 051116 Intrepid Capital Holdings |
| Gov-40-7 | NuTech Press Release 05112016 NuTech Energy Resources to Accept Buyout Offer |
| Gov-40-8 | NuTech Press Release 05122016 NuTech Energy Resources Update on TechnoInvest Buyout Offer |
| Gov-40-9 | NuTech Press Release 05132016 NuTech Energy Resources to Host Nationwide Teleconference Monday May 16 2016 |
| Gov-41-1 | 05172016 Wire Transfer 10000 from Bravo Two Zero Partners to Herman |
| Gov-41-2 | Hermans Citizens Bank Statement for April 26 to May 24 2016 |
| Gov-100 | 11242014 Email from Crom to Herman - Subject ECMZ history ...ECMZ was pumped and dumped |
| Gov-101 | 12122014 Email from Herman to Horn - Subject Eco Purchase Wire Insturctions |
| Gov-102 | 12122014 to 12152014 Text Messages between Herman and Horn |
| Gov-103 | 12122014 Wire Transfer 20000 from Kevin Trizna to Ian Horn |
| Gov-104 | 12162014 Cash Withdrawal 1250 from Ian Horns BMO Harris Bank Account |
| Gov-105 | 12162014 Wire Transfer 10750 from Horn to Eureka Ventures |

WYD 26

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| Gov-106 | 12162014 Wire Transfer 7950 Horn to Herman |
| Gov-107 | BMO Harris Bank Statement Ian Horn November 19 2014 to December 18 2014 |
| Gov-107 | BMO Harris Bank Statement Ian Horn November 19 2014 to December 18 2014 |
| Gov-108 | Summary Purchase Agreement for control of EcoEmissions Solutions Inc. Signed by Thomas Crom |
| Gov-201 | Consent to Act as Officer and Director for NuTech bearing Triznas name and signature |
| Gov-202 | 01142015 Email Exchange between Herman and Crom - Subject Re ECMZ |
| Gov-203 | 03252015 Email from OTC Markets Group to Winters - ECMZ is currently considered an SEC Reporting company |
| Gov-205 | 06262015 Email from Herman to Mitchell - Subject pr -- needs editing - ECMZ Name Change announcement.docx attached |
| Gov-206 | 06262015 Email from Mitchell to Herman - Subject Re pr -- needs editing - ECMZ Name Change announcement.docx attached |
| Gov-207 | NuTech Press Release 07012015 NuTech Energy Resources Debuts Trading on OTC Markets |
| Gov-300 | 07172015 Email from Pacific Stock Transfer to Herman - Subject NUTECH In order to move forward please provide the following |
| Gov-301 | 07312015 Email from Winters to Herman - Subject Debt Conversion need name and address of other conv assigner - CONVERT NOTE Pardy.pdf attached |
| Gov-304 | 04262016 Email from Pacific Stock Transfer to Chrysti Bluemel - Subject Legend Removal Requirements |
| Gov-305 | 07152015 Email from Herman to Pacific Stock Transfer incl. 07102015 Attorney Letter Bearing Ian Horns Name and Signature |
| Gov-306 | 07172015 Email from Herman to Pacific Stock Transfer Attorney Letter Bearing Ian Horns Name and Signature |
| Gov-307 | 07232015 Email from Herman to Pacific Stock Transfer Attorney Letter Bearing Ian Horns Name and Signature |
| Gov-308 | EcoEmissions Solutions Certificate No. 4323 Recording Charles Linharts 7650000 Restricted Shares |
| Gov-309 | EcoEmissions Solutions Certificate No. 4405 Recording Nadine McCreerys 117300000 restricted shares |
| Gov-310 | EcoEmissions Solutions Certificate No. 4404 Recording Kelley McCreerys 392700000 Restricted Shares |
| Gov-311 | EcoEmissions Solutions Certificate No. 4406 Recording Patrick John McCreerys 10200000 Restricted Shares |
| Gov-312 | EcoEmissions Solutions Certificate No. 4322 Recording Chrysti Bluemels 5100000 Restricted Shares |
| Gov-320 | Pacific Stock Transfer Company - Active Certificates through 93015 |
| Gov-321 | Pacific Stock Transfer Company Transaction Journal 6108 - 82417 |
| Gov-400 | NuTech Press Release 01132015 NuTech Energy Resources Inc. Imminent NASDAQ Listing |
| Gov-401 | ETrade Securities Investment Account Statements Charles Linhart |
| Gov-402 | Email from Winters to Kingdom Trust on 1142015 - sale of NuTech stock belonging to Bravo 20 |
| Gov-403 | 1152015 Email from Winters to Kingdom Trust - Subject SELL Bravo 20 trading |
| Gov-404 | November 2015 TD AmeriTrade Trade Confirmation 50000 Shares to Chrysti Bluemel |
| Gov-405 | 11132015 Email Exchange between Winters and Kingdom Trust - Subject Chronos Wire |
| Gov-406 | 11132015 Email from Herman to Kingdom Trust - Subject Thank you Thank you for helping me with that stupid wire for Chronos Kada. |
| Gov-407 | Kingdom Trust Withdrawal Request from Bravo 20 Partners Account for 3700 per Chuck Justin |
| Gov-408 | NuTech Press Release 11192015 NuTech Energy Resources Inc. Enters Agreement to Acquire Emerald Operating and Rocky Mountain Exploration Wells |
| Gov-409 | NuTech Press Release 1272015 NuTech Energy Resources Inc. Executes Plan to Take Ownership of Additional 7000 Wells |
| Gov-410 | NuTech Press Release 12102015 NuTech Energy Resources Inc. Announces Acquisition of Pipeline Assets Exceeding 400 Miles |
| Gov-411 | NuTech Press Release 12172015 NuTech Energy Resources Inc. Reveals Corporate Advisory Board Confirmation on Assessment that Companys Asset Base Substantiates Advancement to the NASDAQ |
| Gov-412 | 01282016 Email from Herman to JW Korth - Subject test trade of NERG |
| Gov-414 | 01292016 Email from OTC Markets to Chuck Winters and kevin@nutechenr.com - Subject NuTech Energy Resources Inc. NERG - Caveat Emptor |
| Gov-417 | Graph NERG Price and Volume Analysis 9152015 - 1142016 |

WYD 27

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| Gov-422 | Press Release 11102015 NuTech Energy Resources Inc. Fulfills Reporting Requirements and Modernizes Image |
| Gov-423 | Press Release 12032015 NuTech Energy Resources Inc. Acquires 2000 Additional Wells Pending Regulatory Approval |
| Gov-426 | January 2016 Bravo Two Zero Bank Statement from Wells Fargo Bank N.A. |
| Gov-427 | HBA Group LLC Certification |
| Gov-500 | NuTech Press Release 4252016 NuTech Energy Resources Inc. Announces Removal of Caveat Emptor Status |
| Gov-501 | ETrade Records Raymond Moore Purchasing NERG May 2016 |
| Gov-502 | NERG Retail Transaction Lowest Net Proceed Trading Summary |
| Gov-503 | otcmarkets.com Screenshot Captured 11212015 NERG OTC Pink Current Status with Wayback Machine Header |
| Gov-504 | otcmarkets.com Screenshot Captured 01252016 NERG Yield Symbol with Wayback Machine Header |
| Gov-505 | otcmarkets.com Screenshot Captured 03012016 NERG Caveat Emptor Status with Wayback Machine Header |
| Gov-506 | otcmarkets.com Screenshot Captured 04302016 NERG OTC Pink Current Status with Wayback Machine Header |
| Gov-507 | otcmarkets.com Screenshot Captured 05292016 NERG Caveat Emptor Status with Wayback Machine Header |
| Gov-510 | NERG Retail Transaction Highest Net Proceed Trading Summary |
| Gov-510-1 | NERG Retail Transaction Highest Net Proceed Trading Summary 2 |
| Gov-511 | Graph NERG Price and Volume Analysis 4182016 - 6132016 |
| Gov-514 | NERG PriceVolume Data 122015 - 6302016 |
| Gov-515 | Email Dan Hefner to Herman Attorney Letter Agreement Completed by Ian Horn incl. Drivers License and Bar Card |
| Gov-516 | Email kevin@nutechenr to Gareth Colglazier OTCMarkets Attorney Letter Agreement Signed by Ian Horn |
| Gov-520 | Intrepid Capital Holdings Corp Trading in NuTech 622015 - 6172016 |
| Gov-600 | Ian Horn Recording 10162018 I do remember writing opinion letters. |
| Gov-601 | Ian Horn Recording 10162018 That is definitely my signature. |
| Gov-602 | Ian Horn Recording 512019 Did you sign each opinion letter |
| Gov-603 | Herman and Horn Text Message Exchange 10162018 to 1182019 |
| Gov-604 | Ian Horn Grand Jury Testimony p.1-5 Oath and Advisements |
| Gov-605 | Ian Horn Grand Jury Testimony p.16 Why dont you have any of your email |
| Gov-608 | Ian Horn Grand Jury Testimony p.18 What are attorney opinion letters |
| Gov-610 | Ian Horn Grand Jury Testimony p.36-37 The date when this debt conversion was completed was that significant for the attorney letters you were going to write for NuTech |
| Gov-700 | Ian Horn Signature Exemplar - PHYSICAL EVIDENCE |
| Gov-1000 | Ian Horns BMO Harris Bank account personal signature card |
| Gov-1001 | Justin Herman Citizens Bank Personal Signature Card |
| Gov-1002 | Bravo Two Zero Partners Wells Fargo Business Account Application |
| Gov-1004 | PNC Bank Account Registration and Agreement for Ian Horn |
| Gov-1005 | Intrepid Resources LLC SunTrust Business Account Signature Card |
| Gov-1006 | Yahoo Account Management Tool chuckwinters@rocketmail.com |
| Gov-1007 | Microsoft Account Record livebmitchell1495 Skype Alias |
| Gov-1007-1 | Microsoft Account Record donkeyk007 Skype Alias |
| Gov-1007-2 | Microsoft Account Record gamecock71 Skype Alias |
| Gov-1007-3 | Microsoft Account Record mesli_mk Skype Alias |
| Gov-1007-4 | Microsoft Account Record mikeybware Skype Alias |
| Gov-1007-5 | Microsoft Account Record mr_clark1495 Skype Alias |
| Gov-1008 | Yahoo Account Management Tool justin@wallaceconsulting.com |
| Gov-1009 | CD of Blue Sheet Data - PHYSICAL EVIDENCE ONLY |

WYD 28

| EXHIBIT | DESCRIPTION |
|---|---|
| Def-2-HermanB | Pages 2-3 of Exhibit JH-AEmail |
| Def-3-CW-A | Email from Red to Winters about Wells |
| Def-3-CW-A1 | Map of Patriot Electric Services Shut-In |
| Def-3-CW-A2 | Map of Patriot Wells |
| Def-3-CW-B | Photo of Winters tool |
| Def-3-CW-C | Winters Patent for tool |
| Def-3-CW-J | Pod in Field |
| Def-3-CW-J1 | Intrepid Tools on Shelf |
| Def-3-CW-J2 | Intrepid Tools Close Up |
| Def-3-CW-N | NuTech Conference Call |
| Def-3-CW-P.1 | Tony Wants Uplist |
| Def-3-CW-P3 | 12-3 Tony Instructions |
| Def-3-CW-P4 | 11-19 General |
| Def-4-IH-1012 | 12232014SubjectWire |
| Def-4-IH-1014 | 12302014EmailCromtoHerman |
| Def-4-IH-1015 | 112015emailSubjectdeal |
| Def-4-IH-1015B | 112015EmailSubjectdeal |
| Def-4-IH-1025 | 182015emailSubjectECMZescrowpayments |
| Def-4-IH-1029 | 8312015IantheCrackheadHorn |
| Def-4-IH-1031 | 10162018emailpartoftheGJsubpoena |
| Def-4-IH-1044 | 3102016Subjectlegalopinioninword |
| Def-4-IH-1044a | 3112016Subjectlegalopinioninword |
| Def-4-IH-1047 | 4212016OTCPinkCurrent |
| Def-4-IH-1048 | 8262015SubjectNERG |
| Def-4-IH-1049 | 8282015SubjectInfoRequest |
| Def-4-IH-1057 | 1242018notrelevantandprivileged |
| Def-4-IH-1058 | 1242018PrivilegedButattachmentok |
| Def-4-IH-1076 | 5102017Pleasereadandcallmewhenyoucan |
| Def-4-IH-1078 | 5112017Correctedversion |
| Def-4-IH-1080 | 5112017PYTGletter |
| Def-4-IH-1082 | 5112017hereitis |
| Def-4-IH-1084 | 5112017emailHorntoJahearn |
| Def-4-IH-1086 | 5112017SubjectLegal |
| Def-4-IH-2206A | selecthornphonecalls |
| Def-4-IH-2209 | 8312015text |
| Def-4-IH-Q1 | 3182015OpinionLetter |
| Def-4-IH-Q10 | 9232015OpinionLetter |
| Def-4-IH-Q11 | 1192016OpinionLetter |
| Def-4-IH-Q12 | 1192016OpinionLetter |
| Def-4-IH-Q13 | 372016OpinionLetter |
| Def-4-IH-Q14 | 432016OpinionLetter |
| Def-4-IH-Q15 | 5102017OpinionLetter |
| Def-4-IH-Q15a | 5102017OpinionLetter |
| Def-4-IH-Q16 | 5102017OpinionLetter |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| Def-4-IH-Q16a | 5102017OpinionLetterfull |
| Def-4-IH-Q17 | 192013IntrepidResourcesLLC |
| Def-4-IH-Q18 | 5192015Escrowletter2500000 |
| Def-4-IH-Q19 | 442013IntrepidResourcesLLC |
| Def-4-IH-Q1a | 3182015OpinionLetterfull |
| Def-4-IH-Q2 | 3202015OpinionLetter |
| Def-4-IH-Q20 | 6162015OpinionLetter |
| Def-4-IH-Q21 | 7102015OpinionLetter |
| Def-4-IH-Q22 | 7172015OpinionLetter |
| Def-4-IH-Q23 | 7232015OpinionLetter |
| Def-4-IH-Q24A | 8282013IntrepidResourcesLLC |
| Def-4-IH-Q24B | 8282013LegalLetterforPaks |
| Def-4-IH-Q24C | 8282013IanletterforPak |
| Def-4-IH-Q25 | 8312015ConfirmationofEscrowAgreement280000 |
| Def-4-IH-Q26 | 9232015OpinionLetter |
| Def-4-IH-Q27 | 372016OpinionLetter |
| Def-4-IH-Q28 | 9152015OpinionLetter |
| Def-4-IH-Q29 | 9162015OpinionLetter |
| Def-4-IH-Q2a | 3202015OpinionLetterfull |
| Def-4-IH-Q3 | 5192015OpinionLetter |
| Def-4-IH-Q30 | 9162015OpinionLetter |
| Def-4-IH-Q31 | 412016OpinionLetter |
| Def-4-IH-Q32 | 432016OpinionLetter |
| Def-4-IH-Q4 | 5212015OpinionLetter |
| Def-4-IH-Q4a | 5212015OpinionLetterfull |
| Def-4-IH-Q5 | 6162015OpinionLetter |
| Def-4-IH-Q5a | 6162015OpinionLetterfull |
| Def-4-IH-Q6 | 7102015OpinionLetter |
| Def-4-IH-Q7 | 7172015OpinionLetter |
| Def-4-IH-Q8 | 7232015OpinionLetter |
| Def-4-IH-Q9 | 9162015OpinionLetter |
| Def-4-IH-RF1 | fullsignaturecomparison |

WYD 30

Zenith Ward, WSB #7-4584
Buchhammer & Ward, P.C.
1821 Logan Avenue
P.O. Box 568
Cheyenne, WY 82003-0568
(307) 634-2184
fax (307) 634-2199
zsw@wyoming.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket 19-CR-26-J |
| | ) | |
| CHARLES WINIFRED WINTERS, JR. | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT NOTICE OF MOI'S FOR PURPOSES
### OF RECORD ON APPEAL

COMES NOW, the Defendant, Charles Winifred Winters, Jr., and for his Defendant's Notice of MOI's for Purposes of Record on Appeal shows the Court as follows:

1.    At the trial of this matter Defendant's became aware that the Government failed to provide two (2) Memoranda of Interviews of individuals Albert Alexander and Nathan Hodge.  Defendant made an oral motion at trial arguing the Government's failure was a *Brady* violation.  The Court denied the Defendant's Motion.  Attached hereto are the two (2) Memoranda of Interview at issue.  Defendant seeks to insure these Memoranda are part of the record on appeal.

DATED this _22nd_ day of October, 2021.

*Page 1 of 2*

Charles Winifred Winters, Jr., Defendant.

By:

Zenith S. Ward, WSB # 7-4584
Buchhammer & Ward, P.C.
1821 Logan Avenue
P.O. Box 568
Cheyenne, WY  82003-0568
(307) 634-2184
(307) 634-2199 – fax
zsw@wyoming.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via CM/ECF this __220__ day of October, 2021.

Zenith S. Ward

## MEMORANDUM OF INTERVIEW

CASE NUMBER            :    2215080-MF

PERSON INTERVIEWED     :    Alexander Albert, HBA Group, LLC

PLACE OF INTERVIEW     :    893 Piedmont Ave, Apt 11, Atlanta, GA

DATE OF INTERVIEW      :    October 18, 2018

TIME OF INTERVIEW      :    Approximately 8:00am EST

INTERVIEWER            :    S. Hacker, USPIS Postal Inspector
                            T. Pikas, DOI-OIG Energy Investigations

On October 18, 2018, Alexander Albert (Albert) was interviewed concerning NuTech Energy Resources (NuTech, NERG). The interview was not recorded. Albert advised in summary:

Albert thought he might want a lawyer. Agents advised that was fine and they would end the interview. Agents served Albert with the HBA Group, LLC court order and went over the records requested. Albert then stated he wanted to talk to agents. Agents advised he didn't have to answer any questions he was uncomfortable with and could end the interview at any time. Agents asked Albert if it was okay to record the interview and Albert said he would rather not. Agents advised they would be taking notes to memorialize the interview.

Albert said HBA Group, LLC consists of Nathan Hodge (Hodge), Mike Baron (Baron), and himself. It was created to build up a fund trading on the futures market. Albert said he and Hodge wanted to start up a proprietary fund also known as a "prop fund," which is like a hedge fund, except a prop fund is all manager owned and only the managers' money is being traded. Albert has known Hodge for about twelve years and they met on the internet through a trading strategies discussion. Hodge recently moved to Detroit, Michigan.

Baron was introduced to Albert through Hodge. Baron knew about penny stocks. Albert met Baron once in person, in Abbotsford, British Columbia, Canada when he and Hodge visited Whistler. Albert said he met Baron's wife and kids and thought Baron was polite, trustworthy, and clean cut. Albert said he stopped talking to Baron in 2017. Albert said he probably met Baron in the summer of 2015 and their relationship ended after NuTech.

Albert said Baron had an opportunity to buy convertible debt in NuTech Energy Resources (NERG), convert the debt into stock, and sell the stock on an exchange. Albert said his personal role with HBA Group was trading for the fund. Albert said Baron was supposed to bring other stuff but it never worked.

Albert recalled Bravo 20 as being the company Baron was dealing with for the debt and that they needed Bob Mitchell's signature on something. Albert said HBA Group paid for the debt.

Page 1 of 4

WYD 33

Albert recalled opening an Alpine brokerage account. Albert thought the HBA Group stock certificate was sent directly to Alpine from the stock transfer agent. Albert thought he sent an email to the transfer agent with instructions to send the stock certificate to Alpine.

Albert recalled an Equinox Securities account and financial advisor Arthur Quintero. Albert said he sent the stock certificate to Equinox and they tried to clear the stock, but it took too long and the clearing agent needed some documents they didn't have or couldn't get, so they moved the shares to Alpine. Albert believed the stock certificate was sent back to the transfer agent, if it was possible, then sent to Alpine.

Albert said the documents he provided to Alpine for HBA Group, came from Baron. Albert said it was Baron's job to get the documents and Albert's job to give the documents to the broker. Albert said he recognized the name Joshua Boyer as one of the people he communicated with at Alpine.

Albert said he never spoke with Kevin Trizna. Albert might have spoken to Bob Mitchell once and Albert believed that Baron conferenced them in on the same call. Albert said Baron provided everything except the OTC Markets filing, which Albert pulled from OTC Markets' website.

Albert said HBA Group had a bank account at Bank of America that is now closed. Albert opened the account and Hodge made the initial deposit.

Albert recognized the Stock Purchase Agreement (SPA) between HBA Group and Bravo 20 and verified it is his signature on the SPA. Albert thought 200 million shares of NERG for $4,000 sounded right. Albert said he does not know why the SPA discusses the NERG stock having a stop sign. Albert said he did not draft the SPA and he believes he got it from Baron. Albert said his computer was infected with a virus in 2017 and he lost some files. Albert said he doesn't really save emails.

Albert did not recognize the name Ian Horn. Albert said Steven Mills is an attorney that Baron has known for years. Albert said Baron arranged for and obtained the Attorney Opinion Letter (AOL). Albert did not think the AOL was paid for out of the HBA Group bank account. Albert said Baron had a lot of connections in the industry.

Albert said the name Justin Herman sounded familiar and he thought it had to be from Baron. Albert said he never met Justin Herman. Albert said Baron was the "key holder" to everything about NuTech. Albert said Hodge helped look through the documents. Albert said the Alpine packet was received via email from Baron.

Albert said when the stock was cleared for trading, the market was "dead." Albert said "dead" meant the market had collapsed, there was no volume, and the trading price was down. Albert said he has six computer screens in his office and he uses TD Ameritrade live streaming to get updates on stocks. Albert said when he was ready to sell NERG, he would call Alpine and place Good 'Til Canceled (GTC) orders at certain price points. Albert said he placed the trades in the HBA Group Alpine account.

Albert said he looked on Investorshub.com and also read press releases about NuTech, but didn't really follow the company. Albert said when the price started to rise again, Baron told him to get out of the stock. Albert said he visited NuTech's website and he knew they were an oil extraction company.

WYD 34

Albert was asked if he recalled selling approximately 158 million shares of NERG for net proceeds of approximately $304,000 and Albert thought that sounded right. Albert said they had a "handshake agreement" with Baron that he got about one third of the proceeds, or approximately $100,000. Albert said he and Hodge left their portion, approximately $200,000, of the proceeds in the HBA account to use for trading in hopes of building their fund. Albert said some time later, Baron asked for more money and Albert told him, "No" and Baron basically stopped talking to Albert and Hodge.

Albert provided Baron's phone number (416) 904-9808 and said Baron had a couple email addresses but they were not in Albert's contacts. Albert said he never Skyped with Baron but did use the Viber app so he didn't have to pay for international calls.

Albert confirmed he traded in NERG from approximately December 2015 through May 2016, with the largest trading portion being conducted in May 2016. Albert said he did not know about a Russian tender offer to buy NuTech. Albert said he stopped watching NERG because nothing was happening on it. Albert said Baron called him and told Albert to look at what was going on with NERG, the price was jumping and it had high volume, and told Albert to get out of NERG. Albert said he called Alpine and put in all the sell orders.

Albert said he thinks Hodge signed the stock power form because HBA Group, LLC listed Hodge's home address. Albert said they organized HBA Group in Wyoming because it's easy and cheap to maintain. Albert said they used legal zoon for drafting their corporate setup. Albert said he, Hodge, and Baron used electronic signatures and emailed documents among themselves. Albert said he did not give anyone authorization to use his electronic signature on any forms. Albert thought Hodge would ask his permission and he didn't know what Baron would do.

Albert said he set up the Interactive Brokers account because Hodge wanted to buy some more shares of NERG and if it worked out, Hodge would move the cash to the HBA bank account. Albert said it was a private purchase and he does not know where Hodge got the stock from. Albert said he tried to talk Hodge out of buying NERG because he thought it was too high risk and they already had enough risk in their fund. Albert said Hodge did not get his money back and they still have the stock in the account. Albert said he did not trade through the Interactive Brokers account.

Albert said they opened a Kingdom Trust account to hold the deposited stock in order to "buy it easier." Albert said he believes Bravo 20 had the stock deposited there and it could be transferred to HBA Group if they opened an account. Albert said something didn't work out and he doesn't really understand what a custodial account is. Albert said he opened the Kingdom Trust account, but Kingdom Trust filled out the paperwork. Albert was asked why Justin Herman was listed as an interested party on the account application. Albert said he didn't know and that Kingdom Trust had listed Herman as an interested party. Albert said he didn't ask Kingdom Trust why or ask Baron why. Albert said he was a young guy and just wanted to get the fund going.

Albert said he knew the name Tony Papa through public source information. Albert said Papa is a notorious penny stock guy and people talk about him on Investorshub.com and Papa seems like a dangerous person who has mafia connections. Albert did not know Chuck Winters, Thomas Collins, Tony Baker, BC Limited, or Intrepid. Albert did recognize the company EY II and said it was through Baron trying to get into something, but Albert thinks they lost money on it. Albert said he wouldn't have known about

NuTech if not for Baron. Albert said Baron would ask for updates on Albert's NERG trading.

Albert said he didn't think much of Baron's involvement until the end when he felt Baron used Albert and Hodge to get more money.

Albert said a pump and dump is when you send out press releases to get people to buy stock, and the people with stock, sell it. Albert said a shell company is an empty company that has no assets and a zero balance.

Albert recognized the ticker DEAC, Elite Data Services and said it was a company Baron was involved in and they might have discussed it. Albert did not recognize UATG, Umbra Applied Technologies or HEMP.

Albert said HBA Group was not a shareholder in Bravo 20 to his knowledge. Albert said he believes the NuTech Issuer Letter signed by CEO Kevin Trizna was provided to him by Baron.

Albert said he would call Baron if he needed something for the broker and Baron would respond by email within a day or so with the document or whatever was needed.

Albert was asked what he meant when he emailed Alpine and said he didn't want to breach any thresholds. Albert said he didn't want to own too much stock because he thought if you owned over 5 percent you had to file with the Securities and Exchange Commission.

Albert said he felt like Baron was "scamming" them (he and Hodge) towards the end.

Albert said Hodge's phone number is (850) 974-5263.

Albert said Hodge knew "Eric" LNU, from the internet and "Eric" owed Hodge money. Albert said he thinks "Eric" introduced Baron to Hodge.

S. Hacker
U.S. Postal Inspector

Date Prepared: October 18, 2018

## MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 2215080-MF |
| PERSON INTERVIEWED | : | Nathan Hodge, HBA Group |
| PLACE OF INTERVIEW | : | Telephonic (850) 974-5263 |
| DATE OF INTERVIEW | : | October 18, 2018 |
| TIME OF INTERVIEW | : | Approximately 12:40pm EST |
| INTERVIEWER | : | S. Hacker, USPIS Postal Inspector |
| | | T. Pikas, DOI-OIG Energy Investigations |

On October 18, 2018, Nathan Hodge (Hodge) was interviewed telephonically concerning NuTech Energy Resources (NuTech, NERG). The interview was not recorded. Hodge advised in summary:

Hodge said he was involved with NERG because of prop trading, which is like a small hedge fund. Hodge said some debt for purchase became available and he was introduced to it by Mike Baron (Baron). Hodge provided Baron's cell phone number (604) 993-1313 and email address VirtueInvestments13@gmail.com. Hodge said Baron had an opportunity to purchase the debt.

Hodge said he did not personally purchase any debt. Hodge said HBA Group purchased some of the debt and Hodge doesn't have a lot of involvement with HBA Group. Hodge said the company was created by Alexander Albert (Albert) and Hodge as a vehicle for prop trading. Hodge tried to find ways to grow their capital internally.

Hodge said he met Baron through another acquaintance, "Eric" LNU, a stock guy from a message board. Hodge said he met Baron in person about a year ago and had known him a couple months before their in person introduction. Hodge said he met "Eric" through another acquaintance.

Hodge was asked about the convertible debt. Hodge said he did not know who the debt came from and that it was handled by Albert. Hodge did not recall the Stock Purchase Agreement between HBA Group and Bravo 20 and was not sure about it unless he looked at it.

Hodge was aware of the Interactive Brokers account and said he doesn't believe he has access to it, although he might have authorization on the account. Hodge said he never instructed Albert to purchase NERG shares outside of the aged debt.

Hodge said he would not be interested in meeting with agents in person unless it was required by the court. Hodge said, "This is not my main business" and he has meetings and other things going on.

Hodge did not recall the names of Bob Mitchell, Bravo 20, Steve Mills, Ian Horn, Tony Baker, or Tony Papa. Hodge thought Justin Herman might be familiar but he was not 100 percent sure.

Page 1 of 2

WYD 37

Hodge said he was hardly involved with anything, just bringing things to Albert. Hodge said he might have been carbon copied on an email that contained the debt conversion documents, but he could not recall who sent the email or provided the documents.

S. Hacker
U.S. Postal Inspector

Date Prepared: October 18, 2018

WYD 38



# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

Clerk's Office    CHEYENNE
2120 Capitol Avenue, Rm 2131
Cheyenne, WY 82001

---

### RECEIPT FOR EXHIBITS/DEPOSITIONS - PLEASE SIGN & RETURN

---

DATE:       October 27, 2021

TO:         U.S. Attorney's Office

            2120 Capitol Avenue

            Cheyenne, WY 82001

RE:         19-cr-000026-ABJ

---

ENCLOSED are your exhibits as indicated below:

Govt. Ex. 27.3 - Original Stock Certificates

---

RECEIPT for the exhibits/depositions listed above is hereby acknowledged.

_Hunter J. Rea_ for Eric Heimann
Attorney for Plaintiff(s)/Defendant(s)

PLEASE RETURN SIGNED ORIGINAL
WITHIN 10 DAYS.

                            Becky Harris
                            Deputy Clerk

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF WYOMING

3    _____

4

UNITED STATES OF AMERICA,           DOCKET NO. 19-CR-26-ABJ
5                                    DOCKET NO. 21-CR-14-ABJ
          Plaintiff,
6                                    VOLUME I of XIV
          vs.                        (Pages 1 through 6)
7
JUSTIN HERMAN, CHARLES W.            Cheyenne, Wyoming
8    WINTERS, JR., a/k/a Chuck       Tuesday, September 21, 2021
Winters, and IAN HORN,              9:38 a.m.
9
          Defendants.
10

11   _____

12

13              TRANSCRIPT OF TRIAL PROCEEDINGS

14

15        BEFORE THE HONORABLE ALAN B. JOHNSON
              UNITED STATES DISTRICT JUDGE
16

17

18

19

20

21

22        *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*
              *Federal Official Court Reporter*
23   *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
          *630.452.6236 * MelanieSonntagCRR@gmail.com*
24
     *Proceedings reported with digital stenography; transcript*
25        *produced with computer-aided transcription.*

Vol. I-2

```
 1   APPEARANCES:
     For the Plaintiff:          ERIC J. HEIMANN
 2                               THOMAS A. SZOTT
                                 ASSISTANT UNITED STATES ATTORNEYS
 3                               DISTRICT OF WYOMING
                                 2120 Capitol Avenue, Fourth Floor
 4                               Cheyenne, WY 82001

 5   For the Defendant          THOMAS A. FLEENER
     Herman:                    FLEENER LAW
 6                               506 South Eighth Street
                                 Laramie, WY 82073
 7
     For the Defendant          ZENITH S. WARD
 8   Winters:                   BUCHHAMER & WARD
                                 1821 Logan avenue
 9                               Cheyenne, WY 82001

10   For the Defendant          THOMAS B. JUBIN
     Horn:                      JUBIN & ZERGA
11                               2614 Pioneer Avenue
                                 Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2

3    PRETRIAL MATTERS                              PAGE
                                                    4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19-CR-26-ABJ                                                    Vol. I-4
21-CR-14-ABJ

1    (Proceedings commenced 9:38 a.m., September 21, 2021,

2    outside the jury panel's presence.)

3           THE COURTROOM DEPUTY:  Hear ye, hear ye, hear ye.

4    The United States District Court for the District of Wyoming

09:38:26    5    is now in session, the Honorable Alan B. Johnson presiding.

6           God save the United States and this Honorable Court.

7           THE COURT:  Thank you.  Please be seated.

8           I have heard this morning that one of our

9    participants this morning, Mr. Horn, had an incident on his

09:38:48    10   way to court.  I hope that he is all right and didn't suffer

11   any -- any injury.

12          MR. JUBIN:  Just a fender bender, Your Honor.

13   Thank you.

14          THE COURT:  All right.  Well, that's just one more

09:39:03    15   thing that we need to deal with, is traffic on our highways

16   during this case.

17          We're meeting presently outside of the presence of

18   the jury panel to consider any last-minute matters before we

19   start this morning.

09:39:37    20          Are there anything that the parties want to raise or

21   alert me to that would represent a special problem?

22          MR. HEIMANN:  Nothing from the Government,

23   Your Honor.

24          THE COURT:  All right.

09:39:50    25          Mr. Fleener?

19-CR-26-ABJ                                              Vol. I-5
21-CR-14-ABJ

1          MR. FLEENER:  Nothing from Defendant Herman.

2          MR. WARD:  Nothing from Mr. Winters, Your Honor.

3          MR. JUBIN:  Nothing from Defendant Horn.  Thank you,

4   Your Honor.

5          THE COURT:  And thank you.

6          Very well.  We'll be seating the jury in the -- jury

7   panel -- in the gallery, and we'll move probably, because of

8   the number of people that we have involved, rather quickly to

9   make room by seating our jurors, at least 12 of them, in the

10  jury box.

11         I might mention before the jury comes in, there was

12  an incident this morning with one of the jurors.  We'll just

13  have to play that by ear, but I think what we'll do, if there

14  still is an issue, we will take that person back into the

15  grand jury room and, with your presence, speak to him.

16         THE CLERK OF COURT:  Are we ready, Your Honor?

17         THE COURT:  I think so.  Please, Madam Clerk.

18         THE CLERK OF COURT:  We've got a quick restroom

19  break, Your Honor.

20         THE COURT:  I understand.  Very good.

21         Mr. Harris, you might want to feel free to come in

22  through the gate and be seated here on the first row.

23         MR. HARRIS:  Thank you, Your Honor.  I'm here just to

24  observe.

25         THE COURT:  I know you are.  But as a member of the

09:40:03
09:40:35
09:41:07
09:42:08
09:43:58

19-CR-26-ABJ                                                    Vol. I-6
21-CR-14-ABJ

 1    bar, you are free to be in the well.

 2              MR. HARRIS:  Thank you.

 3              THE COURT:  Please stand for the jury.

 4         (Proceedings within the jury panel's presence at 9:46 a.m.)

09:46:36    5                    *   *   *   *   *

 6         (Voir dire proceedings not transcribed.)

 7                             *   *   *   *   *

 8         (Proceedings outside the jury's presence at 9:24 p.m.)

 9              MR. JUBIN:  Do you want to swear them in tomorrow?

21:25:23   10              THE COURT:  They've been sworn in.

11              He needs the sleep worse than you do.

12              MR. HEIMANN:  I -- that's --

13              THE COURT:  It's all right.

14              Please look over those simple beginning instructions.

21:25:55   15    You may have some things -- let Thomas look at them and make

16    sure -- if there's something that needs to be added, we can

17    plug it in.

18              Get your rest.  You put in a heck of a day, all of

19    you.  Thank you for your work.

21:26:16   20         (Proceedings concluded 9:26 p.m., September 21, 2021.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5          I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14          Dated this 10th day of January, 2022.

15

16

17

18          /s/ Melanie Humphrey-Sonntag

19          _____

20              MELANIE HUMPHREY-SONNTAG
                   RDR, CRR, CRC
21          Federal Official Court Reporter

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF WYOMING

3    _____

4
     UNITED STATES OF AMERICA,        DOCKET NO. 19-CR-026-ABJ
5                                     DOCKET NO. 21-CR-014-ABJ
             Plaintiff,
6                                     VOLUME II of XIV
             vs.                      (Pages 7 through 173)
7
     JUSTIN HERMAN, CHARLES W.        Cheyenne, Wyoming
8    WINTERS, JR., a/k/a Chuck        Wednesday,
     Winters, and IAN HORN,          September 22, 2021
9                                     10:34 a.m.
             Defendants.
10
11   _____

12

13              TRANSCRIPT OF TRIAL PROCEEDINGS

14

15        BEFORE THE HONORABLE ALAN B. JOHNSON
                UNITED STATES DISTRICT JUDGE
16        and a jury of twelve and four alternates

17

18

19

20

21

22        *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*
              *Federal Official Court Reporter*
23     *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
          *630.452.6236 * MelanieSonntagCRR@gmail.com*
24
     *Proceedings reported with digital stenography; transcript*
25        *produced with computer-aided transcription.*

Vol. II-8

```
 1   APPEARANCES:
     For the Plaintiff:        ERIC J. HEIMANN
 2                             THOMAS A. SZOTT
                               ASSISTANT UNITED STATES ATTORNEYS
 3                             DISTRICT OF WYOMING
                               2120 Capitol Avenue, Fourth Floor
 4                             Cheyenne, WY 82001

 5   For the Defendant        THOMAS A. FLEENER
     Herman:                   FLEENER LAW
 6                             506 South Eighth Street
                               Laramie, WY 82073
 7
     For the Defendant        ZENITH S. WARD
 8   Winters:                  BUCHHAMER & WARD
                               1821 Logan Avenue
 9                             Cheyenne, WY 82001

10   For the Defendant        THOMAS B. JUBIN
     Horn:                     JUBIN & ZERGA
11                             2614 Pioneer Avenue
                               Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2                                            PAGE
   Preliminary Instructions              11
3  Opening Statement by Mr. Heimann      22
   Opening Statement by Mr. Jubin        56
4  Opening Statement by Mr. Ward         100

5

   **GOVERNMENT WITNESSES:**
6  **ALEX SCOUFIS**
   Direct Examination by Mr. Szott        144

7

8                  E X H I B I T S

9                              IDENTIFIED  RECEIVED
   GOVERNMENT'S EXHIBITS
10   204    EdgarPRO Form 15 Filing      162        --

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19-CR-26-ABJ                                            Vol. II-10
21-CR-14-ABJ

1      (Proceedings commenced 10:34 a.m., September 22, 2021,

2    in the presence of all defendants, outside the jury's

3    presence.)

4              THE COURTROOM DEPUTY:  Court is now in session.

10:34:45    5              THE COURT:  Thank you.  Please be seated.

6              As I understand it, there was a -- we made the

7    short correct- -- the small correction to the introductory

8    instructions that will be given this morning.  And I just

9    wanted to check to see if there's anything we need to discuss

10:35:22    10    before the jury is brought in and we launch.

11              MR. HEIMANN:  The Government doesn't have anything,

12    Your Honor.

13              THE COURT:  All right.

14              MR. JUBIN:  Nothing from Mr. Horn, Your Honor.

10:35:36    15              THE COURT:  Thank you.

16              MR. FLEENER:  Nor from Mr. -- Mr. Herman.  Excuse me.

17              MR. WARD:  Nothing from Mr. Winters.

18              THE COURT:  I think everybody has been screened this

19    morning here as well as the jury, and I hope everybody's

10:35:50    20    feeling in good health and ready to continue.  At least

21    there's no indication of any problem.  It's like we're flying

22    a small airplane through thunderstorms, but we'll hope for the

23    best and try to guide the plane carefully around danger.

24              Becky, do we have our jury or --

10:36:19    25              THE COURTROOM DEPUTY:  Yes.

```
19-CR-26-ABJ        PRELIMINARY INSTRUCTIONS        Vol. II-11
21-CR-14-ABJ
```

1   THE COURT:  Let's go ahead and bring them in and get

2   started.

3      (Proceedings within the jury's presence at 10:39 a.m.)

4      THE COURTROOM DEPUTY:  All rise.

10:40:29   5   THE COURT:  Good morning, ladies and gentlemen.

6      I hope everyone rested well --

7      JURY MEMBERS:  Good morning.

8      THE COURT:  -- after the long day we had yesterday

9   together.  Please be seated and we will begin.

10:40:54   10   Every trial begins with an introductory set of

11   instructions, really, to introduce you to some of the

12   concepts.  Certainly, this is not a detailed instruction on

13   the law that will govern your deliberations during this case

14   but, really, just intended to offer some cautionary notes and

10:41:19   15   to describe your duties to you.

16   This is a criminal case, has been brought by the

17   United States Government.  I may sometimes refer to the

18   Government as "the prosecution."  The Government is

19   represented by Assistant United States Attorneys Eric J.

10:41:43   20   Heimann and Thomas Andrew Szott.

21   Defendant Justin Wallace Herman is represented by his

22   lawyer, Thomas A. Fleener.  Defendant Charles Winifred

23   Winters, Jr., is represented by his lawyer, Zenith S. Ward.

24   Defendant Ian Horn is represented by his lawyer,

10:42:09   25   Thomas B. Jubin.

1       The second superseding indictment in this case sets

2   forth the Government's allegations.  It asserts seven counts

3   of illegal conduct against Justin Wallace Herman, five counts

4   against Charles Winifred Winters, Jr., and three counts

10:42:32   5   against Ian Horn.

6       A separate indictment sets two additional counts of

7   illegal conduct against Ian Horn.  In very general terms, the

8   second superseding indictment charges the defendants with

9   conspiring with each other and other people to unlawfully

10:42:54   10   engage in a scheme to defraud investors.  The additional

11   indictment charges Defendant Ian Horn with perjury.

12       The second superseding indictment and the additional

13   indictment are simply the description of the charges made by

14   the Government against the defendants in this case.  They are

10:43:20   15   not evidence of guilt or anything else.  The defendants have

16   pled not guilty, and they are presumed innocent of all

17   charges.

18       The Court will give you more detailed instructions on

19   each count later in the trial.

10:43:37   20       The defendants are being tried together because the

21   Government has charged that they acted together.  But you will

22   have to separately consider the charges against each

23   defendant.  Do not think of or treat the defendants as

24   a group.

10:44:00   25       It will be your duty to find from the evidence what

19-CR-26-ABJ          PRELIMINARY INSTRUCTIONS          Vol. II-13
21-CR-14-ABJ

1   the facts are.  You and you alone are the judges of the facts.

2   You will then have to apply those facts to the law as the

3   Court will give it to you.  You must follow that law, whether

4   you agree with it or not.

10:44:20  5         Nothing the Court may see -- say or do during the

6   course of the trial is intended to indicate, nor should be

7   taken by you as indicating, what your verdict should be.

8         The evidence from which you will find the facts will

9   consist of the testimony of witnesses, documents, and other

10:44:45  10  things received into the record as exhibits and any facts the

11  lawyers may agree or stipulate to or that the Court may

12  instruct you to find.

13        Certain things are not evidence and must not be

14  considered by you.  I will list them for you now:  First,

10:45:04  15  statements, arguments, and questions by lawyers are not

16  evidence.

17        Second, objections to questions are not evidence.

18  Lawyers have an obligation to their clients to make an

19  objection when they believe the evidence being offered is

10:45:25  20  improper under the rules of evidence.  You should not be

21  influenced by the objection or by the Court's ruling on it.

22  If the objection is sustained, ignore the question.  If it is

23  overruled, treat the answer like any other.  If you are

24  instructed that some item of evidence is received for a

10:45:47  25  limited purpose only, you must follow that instruction.

1        Third, testimony that the Court has excluded or told

2    you to disregard is not evidence and must not be considered.

3        Fourth, anything you may have seen or heard outside

4    the courtroom is not evidence and must be disregarded.  You

10:46:13   5    are to decide the case solely on the evidence presented here

6    in the courtroom.

7        There are two kinds of evidence:  Direct and

8    circumstantial.  Direct evidence is direct proof of a fact,

9    such as the testimony of an eyewitness.  Circumstantial

10:46:34  10    evidence is proof of facts from which you may infer or

11    conclude that other facts exist.  I will give you further

12    instructions on these as well as other matters at the end of

13    the case, but keep in mind that you may consider both kinds of

14    evidence.

10:46:56  15        It will be up to you to decide which witnesses to

16    believe, which witnesses not to believe, and how much, if any,

17    of any witness' testimony to accept or reject.  I will give

18    you guidelines for determining the credibility of witnesses at

19    the end of the case.

10:47:19  20        The jury is the sole judge of the credibility of the

21    witnesses and the weight to be given their testimony.  You

22    should take into consideration their demeanor upon the witness

23    stand, their apparent intelligence or lack of intelligence,

24    their means of knowledge of the facts testified to, the

10:47:35  25    interest, if any, which any witness may have in the outcome of

19-CR-26-ABJ          PRELIMINARY INSTRUCTIONS          Vol. II-15
21-CR-14-ABJ

1   the trial, the prejudice or motives or feelings of revenge, if

2   any, which have been shown by the evidence.

3          In so doing, you may take into consideration all of

4   the facts and circumstances in the case and give such weight

5   as you think the same are entitled to receive, in light of

6   your experience and knowledge of human affairs.

7          Try not to be swayed by the appearance of the

8   witness -- the clothing, hairstyle, or grooming.  Guard

9   against the natural tendency to believe people whose

10  appearance is similar to your own dress and grooming.  Also,

11  be on guard against being influenced by how attractive the

12  witness may be.  Beware of an inclination to be more

13  sympathetic to a witness who is appealing in his or her

14  appearance.  These factors are often unrelated to a witness'

15  truthfulness.

16         Mannerisms can also be misleading.  Sometimes a

17  truthful witness may seem to be nervous or tense -- such a

18  witness may be intimidated by the courtroom, and some

19  witnesses are typically nervous, fidgety, or tense in their

20  manner.

21         Evaluate not just what the witness says but how the

22  witness says it.  Pay attention to facial expressions,

23  gestures, posture, and tone of voice.  Look for discrepancies

24  between what the witness says and how the witness says it.

25  But remember that sometimes truthful witnesses may look

10:48:00
10:48:19
10:48:44
10:49:00
10:49:22

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

```
19-CR-26-ABJ       PRELIMINARY INSTRUCTIONS        Vol. II-16
21-CR-14-ABJ
```

1  worried because they are afraid of being disbelieved and that

2  some liars can behave convincingly.

3         As you know, this is a criminal case.  There are

4  three basic rules about a criminal case that you must keep in

5  mind.

6         First, every criminal defendant is presumed innocent

7  until proven guilty.  The indictment against the defendant

8  brought by the Government is only an accusation, nothing more.

9  It is not proof of guilt or anything else.  The defendant,

10  therefore, starts out with a clean slate.

11         Second, the burden of proof is on the Government

12  until the very end of the case.  The defendant has no burden

13  to prove his innocence or to present any evidence or to

14  testify.  Since the defendant has the right to remain silent,

15  the law prohibits you in arriving at your verdict from

16  considering that the defendant may not have testified.

17         Third, the Government must prove the defendants'

18  guilt beyond a reasonable doubt.  I will give you further

19  instructions on this point later, but bear in mind that in

20  this respect a criminal case is different from a civil case.

21         At times during the trial, a lawyer may make an

22  objection to a question asked by another lawyer or to an

23  answer by a witness.  This simply means that the lawyer is

24  properly requesting that I make a decision on a particular

25  rule of law.

10:49:50
10:50:07
10:50:29
10:50:49
10:51:13

19-CR-26-ABJ          PRELIMINARY INSTRUCTIONS          Vol. II-17
21-CR-14-ABJ

1          You should not be influenced against the attorney or

2    his client because the attorney has made objections.  Do not

3    draw any conclusions from such objections or from my ruling on

4    the objections, and do not interpret my rulings on objections

10:51:31    5    as somehow indicating to you how I think you should decide

6    this case.

7          If I sustain an objection to a question, the witness

8    may not answer it.  Do not attempt to guess what answer might

9    have been given if I'd allowed the answer.  If I overrule the

10:51:54    10    objection, treat the answer like any other.  If I tell you not

11    to consider a particular statement, you may not consider or

12    refer to that statement in your later deliberations.

13    Similarly, if I tell you to consider a particular piece of

14    evidence for a specific purpose, you may consider it only for

10:52:15    15    that purpose.

16          It is the sworn duty of the attorney on each side of

17    the case to object when the other side offers testimony or

18    exhibits which the attorney believes is not properly

19    admissible.  Only by raising an objection can a lawyer request

10:52:33    20    and obtain a ruling from the Court on the admissibility of the

21    evidence being offered by the other side.  You should not be

22    influenced against an attorney or his client because the

23    attorney has made objections.

24          Do not attempt, moreover, to interpret my rulings on

10:52:54    25    objections as somehow indicating to you how I think you should

19-CR-26-ABJ          PRELIMINARY INSTRUCTIONS          Vol. II-18
21-CR-14-ABJ

1  decide this case.

2         Next, a few words about your conduct as jurors.  To

3  ensure fairness, you, as jurors, must obey the following

4  rules.

10:53:12

5         First, I instruct you that during the trial you are

6  not to discuss the case with anyone or permit anyone to

7  discuss it with you.  Until you retire to the jury room at the

8  end of the case to deliberate on your verdict, you simply are

9  not to talk about this case.

10:53:30

10        Second, do not read or listen to anything touching on

11  this case in any way.  If anyone should try to talk to you

12  about it, bring it to the Court's attention promptly.

13        Third, do not talk among yourselves about the case or

14  about anyone involved with it until the end of the case when

10:53:52

15  you go to the jury room to decide on your verdict.

16        Fourth, when you are outside the courtroom, do not

17  let anyone tell you anything about the case or about anyone

18  involved with it until the trial has ended and your verdict

19  has been accepted by me.  If someone should try to talk to you

10:54:13

20  about the case during the trial, please report it to me, or to

21  Becky so that we will know.

22        Fifth, during the trial you should not talk with or

23  speak to any of the parties, lawyers, or witnesses involved in

24  this case.  You should not even pass the time of day with any

10:54:36

25  of them.  It is important not only that you do justice in this

 1    case but that you give the appearance of doing justice.  If a

 2    person from one side of the lawsuit sees you talking to a

 3    person from the other side, even if it is simply to pass the

 4    time of day, an unwarranted and unnecessary suspicion about

10:55:00  5    your fairness may arise.

 6              If any lawyer, party, or witness does not speak to

 7    you when you pass in the hall, ride the elevator, or the like,

 8    remember it is because you are not supposed to talk or

 9    visit -- they're not supposed to talk or visit with you,

10:55:16 10    either.

11              Sixth, do not read any news articles or stories about

12    the case or about anyone involved in it or listen to any

13    radio, television, or Internet reports about the case or about

14    anyone involved with it.  In fact, until the trial is over,

10:55:35 15    I suggest that you avoid reading any newspapers or news

16    journals and listening to any television, radio, or Internet

17    newscasts.  I do not know whether there might be any news

18    reports of this case, but if there are, you may inadvertently

19    find yourself reading or listening to something before you

10:56:05 20    could do anything about it.  If you want, you can have your

21    spouse or a friend clip out any stories and set them aside for

22    you to give you after the trial is over.  I can assure you,

23    however, that by the time you have heard the evidence in this

24    case, you will know what you need to decide it.

10:56:21 25              Seventh, do not do any research or make any

19-CR-26-ABJ          PRELIMINARY INSTRUCTIONS          Vol. II-20
21-CR-14-ABJ

1   investigation on your own about any matter involved in this

2   case.  By way of examples, that means you must not consult a

3   dictionary, textbook, encyclopedia, talk with a person you

4   consider knowledgeable, or go to the Internet for information

10:56:41   5   about some issue or person in this case.  In fairness, learn

6   about this case from the evidence you receive here at trial

7   and apply it to the law as I give it to you.

8          Eighth, cell phones are not permitted in the jury

9   room during deliberations.

10:57:03   10         Finally, do not make up your mind about what the

11   verdict should be during the trial.  Keep an open mind until

12   after you have gone to the jury room to decide the case and

13   you and your fellow jurors have discussed the evidence.

14         The Court will permit jurors to take notes during the

10:57:23   15   course of this trial, since there may be complicated issues in

16   which notes may be helpful.  You, of course, are not required

17   to take notes, and some feel that the taking of notes is not

18   helpful because it may distract you so that you do not hear

19   and evaluate all of the evidence.  If you do take notes,

10:57:45   20   please keep them in confidence between yourself and your

21   fellow jurors.

22         The trial will now begin.  The first step in the

23   trial will be the opening statements.  The Government in its

24   opening statement will tell you about the evidence which it

10:58:05   25   intends to put before you.  Just as the indictment is not

19-CR-26-ABJ        PRELIMINARY INSTRUCTIONS        Vol. II-21
21-CR-14-ABJ

1   evidence, neither is the opening statement.  Its purpose is

2   only to help you understand what the evidence will be.  It is

3   a road map to show you what is ahead.

4          After the Government's opening statement, the

10:58:24    5   defendants' attorney may make opening statements, may reserve

6   opening statements for later, or may choose not to present

7   opening statements.  Opening statements are neither evidence

8   nor argument.

9          The Court will then offer its -- the Government will

10:58:47   10   then offer its evidence.  After the Government's evidence, the

11   defendants' lawyers may present, but they are not required to

12   do so.  I remind you that the defendants are presumed innocent

13   and it is the Government that must prove the defendants' guilt

14   beyond a reasonable doubt.  If the defendants submit evidence,

10:59:06   15   the Government may introduce rebuttal evidence.

16          After all the evidence is in, the attorneys will

17   present their closing arguments to summarize and interpret the

18   evidence for you, and the Court will instruct you on the law.

19   After that, you will retire to deliberate on your verdict.

10:59:28   20          Those, then, are the opening instructions, and

21   further instructions will be given to you later, during the

22   trial.

23          The Government may proceed.

24          MR. HEIMANN:  Thank you, Your Honor.

10:59:49   25          THE COURT:  Mr. Heimann.

```
19-CR-26-ABJ              OPENING - HEIMANN              Vol. II-22
21-CR-14-ABJ
```

         1          MR. HEIMANN:  Good morning.

         2          The purpose of my opening statement this morning is

         3   to help you deliberate at the end of the case.  That's going

         4   to be your job, to come to a verdict one way or the other.

11:00:12 5          I'm going to give you a road map through the fraud

         6   that's been charged, the evidence we're going to present to

         7   you, and give you some suggestions about how to process that

         8   evidence so that, when you deliberate, you will have the best

         9   opportunity to come to the right result.

11:00:36 10         As you know, we have three defendants, we have two

        11   indictments, and we have one trial.  The Judge referred to the

        12   different indictments, the first as a second superseding

        13   indictment.  I'm going to call that the fraud indictment.  And

        14   the additional indictment, in the Judge's words, I'm going to

11:00:56 15  call that the perjury indictment.

        16         We'll talk about the fraud indictment first.  This

        17   case is about a pump and dump stock fraud.  The conspirators

        18   bought control of a publicly traded company that had no

        19   business, no revenue, no employees called EcoEmissions

11:01:23 20  Solutions.

        21         They then reimagined that company as NuTech Energy

        22   Resources.  They created a new public face, persona, image for

        23   that company, website, access to other websites where the

        24   stock could be quoted, but nothing changed.  There was no

11:01:54 25  business; there were no employees; there was no revenue.

---

19-CR-26-ABJ              OPENING - HEIMANN              Vol. II-23
21-CR-14-ABJ

1   After -- or as they're reimagining NuTech, they're also

2   working to get free-trading shares issued to themselves.  And

3   when I say "themselves," I mean, the conspirators as a group.

4        You're going to learn that you need free-trading

11:02:25   5   shares to make money in a pump and dump because there's two

6   kinds of securities -- well, there's many kinds, but there's

7   two that matter in this case.  There are restricted

8   securities, which cannot be sold to the public.  If you're

9   running a pump and dump, you cannot make money if you have

11:02:44  10   restricted securities.  Then there are free-trading shares,

11   unrestricted.  Sometimes you'll hear "no legend," but

12   "free-trading shares" is the best word to think about because

13   that's what they are.  They can be sold to the public.

14        The conspirators here altered documents and made up

11:03:11  15   documents out of whole cloth in order to deceive the transfer

16   company that was responsible for deciding whether to issue

17   shares as restricted or unrestricted.  You're going to learn

18   that a transfer company is an important player in the

19   securities market.  They keep track of who owns what

11:03:34  20   securities or what share certificates, and they decide whether

21   certain sets of shares should be issued as restricted or

22   unrestricted.

23        The conspirators then, after they got the public

24   image of NuTech created and they got their free-trading

11:03:59  25   shares, pumped up the volume or pumped up the price of those

 1    shares through press releases that were deceptive, that made

 2    it look like NuTech had an actual business when it didn't,

 3    email blasts touting the opportunity to make money by buying

 4    the stock.  And the third thing they did is they traded

11:04:28    5    amongst themselves.

 6            One of the things you're going to learn is that when

 7    a stock is traded and this trade is completed, it goes out

 8    into the world.  And manipulative trades can be made where two

 9    people decide, "Hey, I'm going to buy like 1 share of that or

11:05:01   10    10 shares of that stock.  Let's buy it for a really high

11    price."  And then they send a signal out to the market that is

12    like the press release that's deceptive about a business that

13    doesn't exist, as if it does.  It's like the email blasts,

14    "Hey, here's this great opportunity, plus 51 percent in

11:05:22   15    24 hours."

16            It gives a signal to investors that the stock is

17    worth something when it isn't.  So they pump it up through

18    those three methods.  And then what they do is they dump it by

19    selling it to unwitting investors in the public market.  So

11:05:51   20    the victims end up being -- I want to go back -- sorry.

21            The victims are those investors in the public market.

22    They're people who are online looking for information about

23    companies who then go buy that stock based on the information

24    they see because they would like to make some money.  They're

11:06:14   25    the victims.  Like every fraud case, as you listen to the

19-CR-26-ABJ                OPENING - HEIMANN              Vol. II-25
21-CR-14-ABJ

1  evidence, look for the lies for money.  Because that's fraud.

2  When a person makes a false statement in order to get paid,

3  that's fraud.

4          The other thing to remember is that this is a stock

11:06:50  5  fraud.  Pay particular attention to who controls NuTech stock

6  and who is selling NuTech stock, and then pay attention to how

7  they got it, the false statements, the altered documents, the

8  forged signatures that they used to get those shares.

9          So as you know, we have one stock fraud, but there

11:07:27  10  are several crimes charged.  At the end of the case, the Judge

11  will give you elements for each crime, and you will then go

12  back to deliberate as to each element and each defendant

13  charged with each crime.

14          I'd suggest to you as you listen to the evidence you

11:07:43  15  look for the overall scheme.  The overall pump and dump scheme

16  is where all the action is for each of these crimes.

17          There's two conspiracy crimes.  As you listen to the

18  evidence, realize that at the end of the day those two

19  conspiracy crimes will have different elements but they'll

11:08:14  20  have some in common.  One thing is a criminal agreement.  The

21  other is interdependence amongst the conspirators; that is,

22  they're working together for the mutual benefit.  Realize that

23  we're going to prove one scheme to you, and so these two

24  conspiracies are going to be based on the same set of

11:08:37  25  evidence.

1          And one of the things I encourage you to look for is

2     the defendants working together to accomplish what's necessary

3     for the pump and dump to succeed.  That is evidence of

4     interdependence, but it's also evidence of an agreement.

11:09:01    5     Because a criminal agreement does not have to be spoken; it

6     does not have to be written out.  It's not like a contract to

7     buy a house.  It can be unspoken, a nudge and a wink.  So look

8     for the evidence of the defendants' working together to do

9     what must be done to accomplish the pump and dump.

11:09:25   10          And what is that?  What has to get done?  There are

11     five steps in the fraud that we're going to prove to you.  And

12     if you're taking notes, I would encourage you to write these

13     five steps down because this is the road map.  This is the

14     map.

11:09:44   15          If you have these steps in your mind as you listen to

16     the evidence, you'll know where we are -- or at least you'll

17     have an opportunity to figure out where we are -- and you'll

18     know where we're going.  You'll also know when you might be

19     lost, and these five steps can help bring you back by trying

11:10:10   20     to figure out where are we in the fraud.

21          The five steps -- number one, buying control of

22     EcoEmissions.  Number two, creating and maintaining NuTech as

23     a public company, its image, its availability to the public.

24     Three, getting the free-trading shares.

11:10:37   25          Those are three preliminary steps.  They must be

 1    done.  They can overlap but they have to be done in order to

 2    get to where the money is made, which is the pump and the

 3    dump.

 4            Four -- let me put it this way:  Four and five are

11:10:57    5    two different pump and dump episodes that we are going to

 6    prove to you.  Because the conspirators, including the

 7    defendants, ran a pump and dump, manipulated the price, sold

 8    stock, made money November 2015 until about January 2016, and

 9    then they got interrupted because their stock was taken off a

11:11:28   10    place where its stock was -- where the price was quoted,

11    OTC Markets, and they had to get back -- and that's that

12    second door, creating a public image -- they had to get back

13    through that door to do the second pump and dump.

14            Let's talk about the first door, first requirement.

11:11:54   15    So what you're going to see is that the defendants negotiated

16    to buy EcoEmissions Solutions, ECMZ.  ECMZ was the stock

17    ticker symbol, so you're going to see that as -- referring to

18    this company.  The company was controlled by a man named

19    Tom Crom in Arizona.

11:12:22   20            You're going to hear testimony from Mr. Crom, and he

21    will tell you that Justin Herman called him up and negotiated

22    a price for EcoEmissions, tens of thousands of dollars, even

23    though EcoEmissions had no business, no revenue, no employees,

24    and at least on paper owed hundreds of thousands of dollars.

11:12:56   25    That paper debt was owed to David Rodgers and Gordon Pardy.

19-CR-26-ABJ                    OPENING - HEIMANN                    Vol. II-28
21-CR-14-ABJ

1          They will also testify.  They will tell you that in

2     2008 they were trying to make a business through EcoEmissions

3     and they got these convertible debts.  Pay attention when our

4     securities expert, Alex Scoufis, or any other witness talks

11:13:25    5     about convertible debt.  A convertible debt is a debt that can

6     be converted into stock.  It's very important for a pump and

7     dump because you can convert the debt, if you tell the right

8     lies, into free-trading shares.

9          And so a public -- publicly traded company with no

11:13:51   10     business, no employees, no revenue, no management but

11     convertible debt is really valuable if you want to do a pump

12     and dump because you don't have to worry about the management

13     when you take control of it and re-create it or when you pump

14     it and dump it because there -- it is none.  It's just a

11:14:16   15     shell.

16          So you may ask yourself aside from that evidence of

17     how much money they paid -- Defendant Herman decided to pay

18     for it.  Why would he do that if he's not planning to pump it

19     and dump it?

11:14:35   20          Kevin Trizna is named there.  You're going to --

21     well, Kevin Trizna, Nadine McCreery, and Mike Perry.  When it

22     comes to this part of the fraud, these are people whose money

23     was used to buy EcoEmissions.

24          We are -- you are going to hear from them, and you're

11:14:59   25     going to learn that they were asked to give money to a man

1   named Bob Mitchell.  Bob Mitchell is charged but he's not

2   here, so you're not considering his guilt except in two

3   ways -- well, there's three reasons you're going to hear

4   about Bob.

11:15:23   5          First, he's part of the story.  Second, a

6   conspiracy's an agreement.  It takes two.  When the time comes

7   for you to deliberate, you may find that one of these

8   defendants made their criminal agreement with Bob Mitchell.

9   There are also unindicted coconspirators, known and unknown.

11:15:55   10  And, again, when you go back to deliberate, it may be the case

11  that you decide that one of these defendants made their

12  criminal agreement with somebody who's not here.

13          Mr. Trizna sent $20,000 to Ian Horn based on

14  instructions from Bob Mitchell, and you're going to see --

11:16:17   15  we're going to trace the money through bank accounts, and

16  you're going to trace the instructions that Justin Herman gave

17  to Ian Horn about what to do with that money through email.

18          This is one of those examples of the defendants

19  working together.  Mike Perry gave the most money, a hundred

11:16:42   20  thousand dollars.  You're going to see that money go --

21  again -- to Ian Horn, Ian Horn's bank account.  When Mike

22  Perry's money goes, you're also going to see that his bank

23  refused to make the wires, transmissions, refused to do it

24  because they were suspicious.

11:17:06   25          And pay attention to that because Ian Horn decided to

19-CR-26-ABJ              OPENING - HEIMANN              Vol. II-30
21-CR-14-ABJ

1    close the account and move to a whole new bank just to get

2    that done, and it was essential to making the pump and dump

3    work.  Jillian Hickory will be a witness from BMO Harris Bank,

4    which is the bank that refused to make the wire.

11:17:39    5             I'm going to say one other thing about witnesses.

6    Typically when I make an opening statement I am 100 percent

7    confident when I tell some- -- tell you that a witness will be

8    here.  I will tell you now that these are expectations, in

9    significant part, because of the pandemic.

11:18:05    10             These are overt acts.  So the indictment alleges a

11   number of overt acts, and at least one of the conspiracy

12   crimes charged requires that you find an overt act.  So there

13   are 41 overt acts.  They describe the fraud; not every step in

14   the fraud, but they do describe the fraud.

11:18:29    15             This first set regarding buying control you can see,

16   moving the money.  You're going to hear from Nadine McCreery

17   that they sent $20,000 from Gillette, Wyoming, to Bob Mitchell

18   in Colorado, and you're going to see that money then go --

19   some of it -- to Justin Herman and the rest to Ian Horn.

11:18:53    20   You're going to see a transaction before this one for

21   20,000 -- it's not charged as an overt act -- but, again,

22   we're going to trace that money to Ian Horn.

23             Then you're going to see that Herman instructs Horn

24   to send that money to TC -- that's Tom Crom -- and to other

11:19:17    25   people, including Gordon Pardy, in order to complete the

19-CR-26-ABJ                OPENING - HEIMANN                Vol. II-31
21-CR-14-ABJ

1   purchase of EcoEmissions, and all that money came from the

2   80,000 that Bob Mitchell wired earlier.  The complexity here

3   is that it's going to change banks.

4        And when we put in this evidence, there's going to be

11:19:42  5   various wire transfers and various bank statements.  And it

6   will be slow going, but we're going to methodically show you

7   where the money went and where it came from.

8        It's also important when you see that to watch the

9   money go to Justin Herman and Chuck Winters and to watch that

11:20:03  10  Herman lets -- tells Ian Horn what he can keep.  What you're

11  seeing on the screen is a debt assignment agreement.  I would

12  love to tell you that we have a good copy of it, but this is

13  the best one there is.

14       Remember, I talked about convertible debt.

11:20:27  15  EcoEmissions had some.  Pay attention to this agreement.  When

16  you see it, pay attention.  Where did it come from?  Where is

17  it going?  And which version?  Because -- well, let me do this

18  first.

19       So the first thing on this convertible debt is to

11:20:48  20  realize that Justin Herman is representing the receiving

21  party.  So whoever's getting this convertible debt in this

22  assignment agreement, Justin Herman is representing them.

23  He's the one.  And if you want to give notice on this

24  agreement, it's "Care of Ian Horn."  Again, the defendants

11:21:10  25  working together, relying on each other.

1     Step 2, creating and maintaining NuTech, and there's

2  two aspects of this.  The first thing is they're creating a

3  web presence.  You're going to see overt acts creating a

4  website.  They're going to change the name and the symbol so

11:21:35  5  they don't -- they're not saddled with the history of

6  EcoEmissions, and they're going to create some nominee

7  officers.

8     A nominee is a person who is in name only.  And

9  Kevin Trizna is going to be the person to pay attention to

11:21:55  10  because he will tell you that he agreed to let his name be

11  used as CEO of NuTech.  He made that agreement with Bob

12  Mitchell, but then Kevin Trizna's name shows up on documents

13  submitted by Justin Herman to various entities in order to

14  make the pump and dump work.

11:22:16  15     And listen to Mr. Trizna because, number one, you're

16  going to learn that he lost a lot of money, gave a lot of

17  money to Bob Mitchell and lost it.  He sent 20,000 to buy the

18  EcoEmissions shell and lost it.  He will also admit that he

19  just let his name be used and there was no business, there

11:22:44  20  were no employees, there was no revenue for NuTech.  It

21  existed in name only.

22     There was a gentleman named Stephen Cummins, and

23  Mr. Cummins was not involved with NuTech for very long, but he

24  allowed his name to be put down as president, and it was

11:23:06  25  Justin Herman who asked him to do that.  And what they're

1    doing is they're hiding their control of the company.

2         When you hear about securities regulation and the

3    market from our expert Alex Scoufis, you're going to learn

4    that there -- there's something called an affiliate.  An

11:23:30    5    affiliate can't sell their shares because they're in charge of

6    the company.  It's meant to protect investors.

7         Well, these nominees are the conspirators and the

8    conspiracy in general covering up their control of NuTech, so

9    their names aren't on things.

11:24:02    10        Now, there's a very important company in the

11   over-the-counter stock market, and you're going to learn what

12   the over-the-counter stock market is and how it differs from,

13   say, Nasdaq or New York Stock Exchange, what we're used to,

14   the mutual funds we buy with our 401(k)s.

11:24:13    15        The over-the-counter stock market -- I often get this

16   wrong.  But typically it's smaller companies and unregistered

17   companies.  There's a website, www.otcmarkets.com, that is

18   commonly used by over-the-counter companies to put up a

19   profile.  They can put up information about their company, and

11:24:45    20   then they can make disclosures.  And most importantly, quotes

21   of what their stock is selling for will appear on the website.

22   And what does that do?  That allows people who are looking for

23   an investment to find -- to go buy it.

24        So you have to get onto OTC Markets if you want to

11:25:13    25   get quotes for your stock out to the public, and that's

 1   essential for a pump and dump to succeed.  It's essential for

 2   a legitimate business, too, but it's essential for a pump and

 3   dump.  And OTC Markets is a kind of gatekeeper because they

 4   will require a company to do certain things in order to get --

11:25:44    5   to have what's called pink sheet status so that their quotes

 6   are out there for people to see.  OTC Markets will also post

 7   news releases, press releases, along with everything else

 8   about a company.

 9           And Gareth Colglazier is a witness who's going to

11:26:07   10   come testify who works for OTC Markets and had some contact

11   with the NuTech defendants.

12           I'm going to say now something that I think is going

13   to be important.

14           When creating a public image and you're pretending a

11:26:31   15   company has a business when it doesn't, it's like a shell

16   game.  You know, find the ball.  I expect that you're going to

17   hear about a tool that goes down in wells and magically

18   produces gas.  I expect you're going to hear about all of

19   these wells that supposedly NuTech was going to get.  You're

11:27:08   20   going to see them in press releases, stories about these

21   things.

22           Remember, this is a stock fraud.  Don't get caught up

23   in the shell game and be distracted by it because it's the

24   same shell game that the conspiracy uses to take money from

11:27:29   25   the unwitting investors who look at those press releases,

1  believe the statements made, that there's a real business

2  of patented technology that's revolutionary.  Pay attention to

3  the stock, who has it, who's selling it when, and how they

4  got it.

11:27:58   5          There are overt acts related to this part of the

6  conspiracy, so you're going to see evidence of Bob Mitchell

7  creating email addresses at nutechenr.com.

8          The most important one to pay attention to is

9  kevin@nutechenr.com.  Mr. Trizna will tell you he let

11:28:25  10  Bob Mitchell use that account, and that account is used in

11  several instances to communicate with OTC Markets and to post

12  information on OTC Markets.

13          There will be a website that was created.

14          Tom Crom will talk about how he amended the articles

11:28:44  15  of incorporation to change the name of the company at the

16  direction of Mitchell and Herman, and you're going to see --

17  and you're going to see this over and over and over --

18  OTC Markets' records showing Chuck Winters posting information

19  on the NuTech page at OTC Markets.

11:29:14  20          And this Overt Act No. 7 is where that account is

21  created.  One of the first postings was an attorney letter

22  and -- with respect to current information.  You're going to

23  learn that it's important to OTC Markets that an attorney

24  provide a legal opinion that the company has disclosed enough

11:29:39  25  information.  So attorneys are gatekeepers in this market

1    because players in the market rely upon the good faith legal

2    opinions of an attorney.  What that also means is that if

3    you're going to run a pump and dump, you must have an

4    attorney.

11:30:11    5        This particular pattern you're going to see a number

6    of times where there's a letter created or a disclosure

7    created and then Mr. Winters posts it on OTC Markets.  Later,

8    Mr. Mitchell posts it on OTC Markets, but this is a pattern

9    you're going to see over and over.  And this is the kind of

11:30:40    10    pattern that suggests a conspiracy, an agreement, because the

11    defendants are working together to get it done.

12        Now let's talk about attorney opinion letters.  So

13    you're going to see letters often that -- let me do this.

14    I went too far.  I'm sorry.

11:31:09    15        So this is a letter that was put up onto OTC Markets

16    that we're going to submit to you as an exhibit.  And what

17    you're going to see in all these letters -- there are going to

18    be half a dozen or so -- is you're going to see Ian Horn's

19    name.  It's on his letterhead, and it has a signature that is

11:31:37    20    certainly meant to look like Ian Horn signed it, and it's his

21    good faith opinion.

22        I don't know exactly what you're going to see about

23    how these letters were written because there's conflicting

24    evidence.  I expect you're going to hear that Ian Horn, when

11:32:04    25    asked by investigators, said he wrote them and signed them

1   repeatedly and not once during the investigation did he say he

2   didn't.

3            But you're also going to see evidence that

4   Justin Herman and Chuck Winters were able to make these

11:32:26   5   letters themselves.  You look at these Overt Acts 19 and 20,

6   and you're going to see that Chuck Winters is sending

7   Justin Herman -- what? -- a document with Ian Horn's

8   letterhead and apparent signature.  When I come back to you to

9   close this case, I will explain to you why we don't need to

11:33:01   10   know exactly how these letters were written.  As you hear the

11   evidence, pay attention to how important they are and how

12   often they're used.

13            There are more overt acts related to this second

14   step, creating this public space -- and this, again -- this

11:33:25   15   time it's a financial statement.  It's being posted by

16   Mr. Winters.

17            Let's go to No. 3.  So this third step is getting the

18   free-trading shares, and the vast majority of the overt acts

19   you're going to see as we prove our case are related to this

11:33:52   20   step.

21            And you're going to see a lot of repetitive -- a -- a

22   repeated series of events where a document is created,

23   sometimes by Chuck Winters, sometimes by -- who knows? -- and

24   then submitted by Justin Herman to a company called Pacific

11:34:20   25   Stock Transfer.  And Pacific Stock Transfer is a transfer

1    company responsible for deciding whether a set of shares were

2    going to be issued as free-trading or restricted.  And, this

3    section, you're going to hear from Joslyn Claiborne,

4    I believe, who worked for Pacific Stock Transfer.

11:34:46   5    And I will tell you that the documents are the most

6    important part of the evidence.  Ms. Claiborne will be able to

7    say "I worked on that."  Ms. Claiborne will be able to say

8    "That's my email."  She'll be able to say what she would have

9    done if she'd known certain things.  She doesn't specifically

11:35:13  10    remember working on NuTech.  The documents show what happened.

11    And you're going to see, as I said, over and over submissions

12    of documents that are misleading or deceptive, usually Justin

13    Herman emailing it to Pacific Stock Transfer.

14    There will be a resolution of a board of directors,

11:35:38  15    supposedly signed by Kevin Trizna.  Mr. Trizna will tell you

16    there was no board of directors.  He signed some of these when

17    he was asked to, but there was no board of directors.  There

18    were no meetings.  And then an instruction letter asking for

19    12 billion free-trading shares to be issued.  We go down the

11:36:00  20    list and this continues.

21    This -- you're going to see a couple times, at least

22    three, where this pattern happens:  Justin Herman and Chuck

23    Winters email each other about creating a document, and then

24    Justin Herman submits it to Joslyn Claiborne to get

11:36:24  25    free-trading shares.

19-CR-26-ABJ                    OPENING - HEIMANN                    Vol. II-39
21-CR-14-ABJ

1           So here's an example, email where -- "How do we add

2    date?"  And what is he sending?  The ECMZ debt assignment

3    agreement I showed you earlier.  It's from Justin to Chuck,

4    and then it comes back.

11:36:51    5           So this is the original.  This is the first one,

6    signed in January 2015 by Gordon Pardy.

7           Here is what came back, "January of 2014," as if it

8    had happened one year earlier.

9           Same is true for the rest of the signatures,

11:37:18   10    "January 2015," "December 2014" on the original, and Chuck,

11   having worked his magic, made it appear that the debt

12   assignment agreement had been entered a year earlier.

13          What you're going to hear is that one year mattered.

14   It made it possible for free-trading shares to be issued at

11:37:46   15   that time because there's a holding period that's required

16   before you can make restricted shares unrestricted and by

17   backdating with the simple word, "How can we add date?"

18   Remember unspoken agreements?  Understandings?  Pay attention

19   to these kinds of patterns.

11:38:13   20          Because then it gets sent to Pacific Stock Transfer

21   by Justin, and at Pacific Stock Transfer they're none the

22   wiser.  And that's another thing to pay attention to in a case

23   like this, is you're going to see the original debt

24   assignment, and you're going to hear from the people who

11:38:37   25   signed it when it was signed, in December of 2014,

19-CR-26-ABJ                OPENING - HEIMANN                Vol. II-40
21-CR-14-ABJ

1      January 2015.

2              As you hear the evidence, especially evidence from

3      someone like Joslyn Claiborne or the Pacific Stock Transfer

4      records, look at what they got because that is significant

5      evidence of deceit, a lie to get free-trading shares that

6      they're going to sell for money, and they're working together

7      to do it.

8              So this is another example of the altered document

9      being sent.  You're going to see these documents sent more

10     than once.

11             Getting free-trading shares, also in this section.

12     You're going to hear from or hear about a company called

13     Kingdom Trust, and we have some witnesses coming from Kingdom

14     Trust, Bo Ives, Tara Bogard, who we expect will tell you about

15     their business.  They're asset custodians and Justin Herman

16     and Chuck Winters set up accounts there so that they could

17     hold the certificates for NuTech.  They would then sell

18     those -- sell those shares through a brokered dealer, a

19     separate company, and then distribute the money back out

20     through Kingdom Trust.

21             It complicates things but that's what happened.  And

22     you will see -- you will see, as we do our evidence, that

23     there are certain things that are complicated.  Things go

24     here, there, back, around, and through.  Some of that

25     complexity, complexity in our evidence, is driven by the

11:39:00
11:39:34
11:40:00
11:40:26
11:40:53

19-CR-26-ABJ                    OPENING - HEIMANN                    Vol. II-41
21-CR-14-ABJ

 1   nature of the fraud.  As you -- as we go through this trial,

 2   I expect you're going to see things that are unnecessary

 3   complexity, meant simply to confuse.

 4           So you may ask yourself as you're listening to

11:41:19   5   evidence, "Is this important?  Does it really fit in one of

 6   those five categories?  Is it something the defendants did or

 7   is it something I'm hearing about that seems to have nothing

 8   to do with them?"

 9           There are a number of other docs that go through

11:41:44  10   here.  Here is another one of those series where a document is

11   being created.

12           So Justin Herman emails Winters, "Fix" and sends him

13   part of a contract or assignment -- or actually, no, this is

14   the wire.  I'm sorry.

11:42:04  15           "Fix."  What is it?

16           Well, "Fix" -- it has this attachment,

17   "Consideration."  It comes back.  The original shows "$80,000"

18   that you're going to see in the bank record from Wells Fargo.

19   It comes back as "280."  It's been altered to make it look

11:42:32  20   like more money was paid.

21           And then Justin Herman sends it to Pacific Stock

22   Transfer to prove up that the transaction included $280,000,

23   not 80.  Again, a lie to try to convince Pacific Stock

24   Transfer to issue free-trading shares, and it's Justin and

11:42:58  25   Chuck working together to deliver that lie.

19-CR-26-ABJ                OPENING - HEIMANN                Vol. II-42
21-CR-14-ABJ

1          Opinion letters were also submitted to Pacific Stock
2     Transfer.  And all the opinion letters have the same
3     conflicting evidence as to how they were created, but pay
4     attention to how they're -- how they affect the fraud scheme
11:43:31  5     or how they affect people that want to make decisions around
6     NuTech.
7          There's a couple ginned-up documents that are
8     especially important because they are the facts that prove not
9     only an overt act in the charged conspiracies but the
11:43:56  10     aggravated identity thefts, and this is one of them.  It's an
11     email.  Again, it's Justin to Chuck and Chuck back to Justin,
12     "Call u in two," and he wants -- has this Assignment Bravo
13     E-Pro.  And it comes back from Chuck Winters to Justin Herman.
14          What you're going to see is that the original
11:44:19  15     signature page -- signature page looks like this, and then
16     magically, after Chuck is done with it, it appears to have the
17     signatures of David Rodgers and Gordon Pardy.  And this
18     contract also recites $280,000 in consideration supposedly.
19          David Rodgers will tell you he never signed it and
11:44:47  20     never saw it and never said anybody could sign it for him, as
21     will Gordon Pardy.
22          This is a similar one, different kind of statement.
23     You're going to see statements of nonaffiliation.  We talked
24     about affiliates earlier, how you can't get free-trading
11:45:10  25     shares if you're an affiliate.  These are statements where a

1    person says "I'm not an affiliate."

2            This particular one, which was emailed by

3    Justin Herman to Pacific Stock Transfer on September 26th of

4    2015, has digital signatures of Gordon Pardy and David

11:45:32    5    Rodgers, who will tell you they never signed them, they didn't

6    authorize anybody to sign them.  And they couldn't have said

7    what the statement says and they wouldn't have.

8            Again, it's an example of an altered, forged document

9    sent to Pacific Stock Transfer to try to get free-trading

11:45:52    10   shares so NuTech would be pumped and dumped by the

11   conspirators, including these defendants.

12           We have one additional overt act where a final set of

13   nonaffiliation statements are sent, and then they finally get

14   the shares issued.  They've passed through the third door, and

11:46:30    15   they're ready to pump it and dump it.

16           So let's talk about the first -- oh -- backwards.

17   There we go.

18           What's next?  Well, it's Step No. 4, the first pump

19   and dump period.

11:46:47    20           The best evidence you're going to see of this is a

21   combination of things that happened in the first part of

22   November of 2015.  You're going to learn that investigators

23   served a search warrant at Bob Mitchell's home and on one of

24   his computers they found a chat log from Skype.  And what it

11:47:12    25   showed was Justin Herman, Bob Mitchell, and some other people

19-CR-26-ABJ                    OPENING - HEIMANN                    Vol. II-44
21-CR-14-ABJ

1     talking about manipulating NuTech.

2            Remember I told you about deciding you're going to

3     make a trade between two different -- two people in the

4     conspiracy and you do it at an inflated price to try to give a

11:47:31   5  false signal to the market?  We know that because of these

6     chats and related documents.

7            So when this starts to happen, pay attention because

8     you're going to see the manipulation happen in almost

9     realtime.

11:47:55   10         So there are promotional emails.  And these are

11    emails, blasts that are just going out one after the other

12    after the other after the other after the other, and they're

13    promoting -- "NERG climbs plus 51 percent up the chart."

14           These are going out to mailboxes of day traders

11:48:14   15  and -- and people who are interested in penny stocks, the

16    public.  And they're meant to gin up interest in the stock.

17           And they just keep coming; right?  One after the

18    other.

19           And then we see the defendants -- you're going to see

11:48:36   20  how the defendants were working together.  Here's one of those

21    chats:  "Justin, please put offer for 900,000 at 4.3."

22           Hey, here's Chuck Winters.  So this is dated

23    11/6/2015, the chat, and here's Chuck sending an email to a

24    man named Scott Gilleland who I expect will testify.

11:49:02   25         He worked for a company called FinTech, and for a

1    short time they were a broker-dealer for the NuTech stocks

2    that the defendants, Winters and Herman, were selling through

3    Kingdom Trust.

4            And what do you know?  It's the exact -- it's the

5    exact same thing.

6            Here's another one.  It's Justin going back, saying

7    "It's dumping."  And we see the sale.  It actually happened.

8            They continue to talk about how they're going to do

9    it, prices and amounts, and then it happens.

10           Marking the open and close.  I talked about this

11   manipulative trading.  One way they say that is marking the

12   open and marking the close.  And so you make one of these

13   manipulative trades at an inflated price at the beginning of

14   the day so you mark the opening; you mark what everybody sees

15   when they go out to look at the value of that stock.  "What

16   was the last transaction?  Oh, well, that's better.  Somebody

17   wants it."

18           Or the close, last trade of the day if you can to

19   make it look like there's more price or more activity than

20   there really is.  So you see one share; right?

21           Nine o'clock in the morning.  A thousand.  For a

22   company -- I will tell you there are some big numbers when it

23   comes to number of shares.  13 billion free-trading shares

24   they requested and were issued.  So when you see a thousand,

25   that's nothing.  And it's a penny stock, so you read that

11:49:21
11:49:57
11:50:13
11:50:34
11:51:00

 1    correctly if you read that as half a cent each.

 2            And penny stocks are, again, good for pump and dumps

 3    because you have that person who's just read a press release

 4    online, they're sitting at their desk, and they don't have to

11:51:24   5    put that much money into it.  Because it's cheap.  They can

 6    buy a thousand shares for like, what, 10 bucks?  Hundred

 7    bucks?

 8            These are sales that you can see happening while the

 9    chats are going on, and you start -- you do enough of these,

11:51:53  10    and you start to make some real money.  And the public

11    investors lose real money.

12            Part of our evidence regarding the first pump and

13    dump period in November 2015 will be certain money going back.

14    Remember I told you that Justin Herman and Chuck Winters set

11:52:19  15    up this account at Kingdom Trust?

16            So the money's flowing through Kingdom Trust, and

17    you're going to see a series of email where Chuck Winters is

18    trying to get money sent out.  And who's it going to?  It's

19    going to Kronos and, in parentheses, Kada, and that's Justin

11:52:41  20    Herman identifying him.  And Kada Mesli was on this -- there's

21    a guy named Kada Mesli who's on that Skype chat.

22            So you can see the conspiracy working as they work

23    together to get money from the stock sales out to different

24    conspirators.

11:53:05  25            This first pump and dump period goes into January.

 1   There are some overt acts where Justin Herman is trying to get

 2   a different broker.  FinTech wasn't going to use them anymore.

 3   He contacted a JW Korth & Company, submitted the same false

 4   information he submitted to Pacific Stock Transfer to convince

11:53:30   5   Korth that these were really free-trading shares and they

 6   could sell them for him.  And then he puts in an order on

 7   January 29th for a million shares.

 8        What you're going to also hear is a couple recorded

 9   calls -- because JW Korth records its calls.  And you're going

11:53:55   10   to hear Justin Herman saying, "Hey, I want to sell this stuff"

11   because a press release went out.

12        So, again, you can see him timing his sales with the

13   press releases that contain this deceptive information as if

14   NuTech had a real business.

11:54:11   15        The first pump and dump period ends on January 29th

16   of 2016, and it ends because OTC Markets looks at the activity

17   and says, "Wait a minute.  There's a public interest concern,"

18   as they put it.  And they put them on what's called caveat

19   emptor status.

11:54:38   20        This is basically the death knell for any pump and

21   dump because when you're on caveat emptor on OTC Markets, your

22   quotes don't go up so nobody can see what your stock is

23   trading for, and you get a really beautiful skull and

24   crossbones on your page because there are concerns.

11:55:01   25        And you can see -- if you look down the section of

1  this exhibit we will offer to you -- you can see what they

2  need to do.  They need a current information letter, publish

3  an attorney letter to get back to the pink sheets where they

4  can actually be quoted and sold.

5  11:55:30        So it jumps them back into Door No. 2; right?

6  They've got to get back through that door so they can get back

7  out onto the Internet.

8          And there's a series of overt acts that are here,

9  which are the creating and posting of these attorney letters.

10 11:55:46  These attorney letters have the same conflicting evidence as

11 all the other ones.

12         But what isn't in doubt when you see the evidence

13 will be that they mattered to get back within the good graces

14 of OTC Markets, which brings us to No. 5, the end of the fraud

15 11:56:08  that we're charging.

16         And, here, you're going to see press releases and

17 emails related to press releases about some supposed offer to

18 buy NuTech from some Russian company.

19         And I'd love to tell you that I -- you're going to

20 11:56:31  see evidence that this company's fake.  You're not.  You're

21 just going to see the name of it.  But, you know -- or you're

22 going to see evidence that NuTech had no business, no revenue,

23 no nothing.  And there's a bunch of sales, then, that are made

24 by the defendants and the conspiracy during that time period.

25 11:57:02  The money goes from Kingdom Trust to Bob Mitchell and then

19-CR-26-ABJ                OPENING - HEIMANN              Vol. II-49
21-CR-14-ABJ

1   Mitchell distributes it -- distributes it, including $10,000

2   to Justin Herman.

3          That's the fraud we're going to prove to you.  We're

4   going to follow this course, mostly chronologically, and we're

11:57:30   5   going to prove the conspiracy and that these defendants were

6   all in it.

7          Let me talk a little bit about the order of our

8   witnesses so you know what's coming.

9          We're going to start with Alex Scoufis, who's going

11:57:50   10   to explain the securities market as it relates to an

11   over-the-counter security like NuTech.  He's going to give you

12   some basic definitions so you can understand some of the other

13   things that happened.

14          He's going to come back later on and explain to you

11:58:11   15   why -- how certain events happened, put together that -- that

16   summary chart for that November period with the chat text

17   messages and explain why certain submissions, say to Pacific

18   Stock Transfer or OTC Markets, mattered.

19          We're then going to put on two of our investigators:

11:58:36   20   One, Jason Berryhill, who is a special agent with the

21   Department of Interior, Office of Inspector General.

22          And Special Agent Berryhill seized and made forensic

23   copies of some of the electronic evidence in the case,

24   including Justin Herman's phone, the Bob Mitchell laptop with

11:59:03   25   the chat messages, and he processed some search warrant

19-CR-26-ABJ                OPENING - HEIMANN              Vol. II-50
21-CR-14-ABJ

1   returns from Internet providers so email.  He'll explain to

2   you some of the items that were found there, some of those

3   email exchanges.

4           Then Postal Inspector Sonia Hacker will testify, and

11:59:29    5   we will put in most of the business records through

6   Inspector Hacker.  I told you earlier that the documents are

7   really important because they document what happened even when

8   people have forgotten certain transactions.  So Inspector

9   Hacker's going to bring in most of those business records.

11:59:53   10           We're then going to bring in the individuals who are

11   with those companies, some of the people I talked about today

12   at the different steps in the fraud, to talk about those

13   records or their memory of dealing with the defendants or

14   NuTech.

12:00:11   15           When it's all said and done, this is the evidence to

16   look for:  For Justin Herman, look for evidence that he's

17   directing the flow of money and documents.  Look for evidence

18   that he's telling Winters and Horn what to do.  Look for the

19   evidence, pay attention to the evidence that Justin Herman is

12:00:41   20   coordinating the sale of stocks and -- and that he, himself,

21   is selling stocks during these manipulation periods.  And look

22   at how he makes money.  The money he gets is going to come

23   from the sale of stock, and it's going to come from money he

24   skims off of the money sent to buy EcoEmissions.

12:01:02   25           For Chuck Winters, pay attention to the evidence

19-CR-26-ABJ                    OPENING - HEIMANN                    Vol. II-51
21-CR-14-ABJ

 1   where he's altering documents and he's creating phony

 2   documents.  And he's doing so without specific instruction.

 3   He's just -- "Can we add a date?" and Chuck knows what to do.

 4   And he just so happens to do the one thing that helps them get

 5   free-trading shares.

 6          Look at the evidence of Chuck Winters selling shares

 7   or putting in sale orders at the same time that the chat

 8   messages show Justin Herman coordinating these manipulative

 9   trades.  And Chuck Winters is making his money through a

10   company called Intrepid Capital from the sale of stock and

11   from some of the money diverted from the EcoEmissions purchase

12   money through a company called Intrepid Resources.

13          And Mr. Horn.  So -- a lot of the conspiracy,

14   Mr. Horn is absent.  He's very active at the beginning when

15   they're moving money, and he's getting paid for that, and he's

16   doing it even though his bank says it's suspicious.  And then

17   his name's on the opinion letters, so his presence is through

18   the whole thing.

19          He makes his money, as far as we can tell, by just

20   taking a portion -- whatever portion Justin says he can

21   take -- from the money passing through his accounts.

22          I'm going to talk now about the perjury indictment.

23   When I come back to do closing, I'm going to suggest to you

24   that -- that after you deliberate about Justin Herman and

25   Chuck Winters and the fraud crimes and the ag ID theft, that

12:01:23

12:01:55

12:02:19

12:02:41

12:03:04

19-CR-26-ABJ                    OPENING - HEIMANN                  Vol. II-52
21-CR-14-ABJ

1  you then turn to the perjury before you decide whether

2  Ian Horn is guilty of the fraud crimes.  And I suggest that to

3  you because the perjury evidence is self-contained, is more

4  contained.

12:03:30   5        So what you're going to hear is that there was a

6  grand jury investigation.  We had grand jury subpoenas.  And

7  as part of the investigation, a subpoena was served on

8  Ian Horn on October 16th of 2018.  He then testified before

9  the grand jury in January of 2019.  And at the time we were

12:03:57  10  trying to figure out email communications, and we were trying

11  to figure out the opinion letters.

12        There are two counts in the perjury indictment, and

13  the first one charges Mr. Horn with lying about his email.

14  Basically, he said, "I don't have it, lost it all in 2016."

12:04:26  15        "Do you have online access?"

16        "I do not."  Here's that part of the transcript.

17        You will have already seen, through the evidence of

18  the fraud, that this is clearly false.  Here's one of the

19  email talking about instructions for moving money in

12:04:51  20  December of 2014, and this is the part that happened in

21  December 2014.

22        What you're going to see is that it was forwarded

23  twice by Ian Horn, once in October of 2018, about a week after

24  he was interviewed and served the subpoena, and again in

12:05:12  25  December of 2018, about five weeks before he testified in the

---

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

19-CR-26-ABJ                OPENING - HEIMANN                Vol. II-53
21-CR-14-ABJ

1   grand jury that he had no email access.

2          It's not one.  Here's another, same thing.  And

3   another.  So it's clearly false.

4          Count Two of the perjury relates to opinion letters.

12:05:49   5   And the question was -- we were trying to figure out if

6   Mr. Horn had the opinion letters when we gave him the

7   subpoena.  And he said, "I think I certainly had some opinion

8   letters when it came to records."

9          Well, that's clearly false, too, and we're going to

12:06:05   10   know that because we have a set of text messages between

11   Ian Horn and Justin Herman.  There are over 150 text messages

12   in the 92 days between that first interview in October and his

13   grand jury testimony.

14          And these messages -- here's one that you're going to

12:06:26   15   see:  "Don't forget to send me a copy of the opinion letters."

16   That is before the interview.

17          You're going to hear that agents went to his house on

18   October 15, said, "We'd like to talk to you about NuTech" --

19   or words to that effect -- didn't mention opinion letters

12:06:44   20   at all.  Before the interview started Ian Horn is saying,

21   "Hey, I need those opinion letters" to Justin Herman.

22          There's other things here after the subpoena's

23   served.  "It does seem like I have a lot of emails with a lot

24   of wiring instructions," and these things "may be responsive

12:07:06   25   to the subpoena."

1       I -- this is really important for the perjury:

2    "I don't want to cause you any harm, but I also don't want to

3    cause myself any harm."

4       On October -- October 21, five days after he's

12:07:27   5    interviewed, Ian Horn is clearly concerned about turning over

6    these emails, and he's clearly concerned that it's going to

7    hurt him and it's going to hurt Justin.  He is subjectively

8    worried about it.

9       He needs to send the documents.  These continue about

12:07:58   10   the letters and the email, wanting help, wanting direction,

11   all the way through.  He wants to talk about this stuff on

12   January 3rd of 2019.  Ian Horn asked to speak on Monday to go

13   over the documents and our position, 11 days before his

14   testimony.  "Can we talk about the documents?" on the 7th.

12:08:43   15      The perjury will be obvious by the time we've

16   finished our presentation of evidence.  There's simply no way

17   that a professional attorney, a grown man, obsessed with what

18   he's turning over to the grand jury in these responsive emails

19   and not harming himself or Justin, forgot that he had access

12:09:09   20   to these email.

21      I also suggest to you that when we're all done that

22   Ian Horn's response to the investigation demonstrates a

23   consciousness of guilt that shows he was in the criminal

24   agreement from the start when he was moving the money and,

12:09:33   25   therefore, he's guilty on the fraud crimes, as well.

19-CR-26-ABJ                OPENING - HEIMANN                Vol. II-55
21-CR-14-ABJ

1          We're going to do everything we can to present to you

2     the evidence you need to deliberate and to come to a verdict

3     at the end.  And when I come back for closing, I'm going to

4     explain to you why those verdicts must be guilty.

12:10:01    5          Thank you.

6          THE COURT:  Ladies and gentlemen, it appears that the

7     noon hour has arrived and passed by about 10 minutes.  This

8     would be a good time to take the noon recess.

9          Let's all plan on being back here at 1:30 o'clock to

12:10:33   10     resume the opening -- continue with the opening statements.

11          We'll stand in recess until 1:30.

12       (A recess was taken from 12:10 p.m. to 1:30 p.m.

13     Proceedings outside the jury's presence.)

14          THE COURT:  As you were.  Please be seated.

13:30:41   15          Is the jury ready for us?

16          THE COURTROOM DEPUTY:  I think so.

17          THE COURT:  Let's bring them in and get started.

18          If you need to take a break at any time --

19          MR. JUBIN:  Thanks.  Appreciate it.

13:32:23   20       (Discussion held between the Court and Mr. Jubin.)

21       (Proceedings within the jury's presence at 1:33 p.m.)

22          THE COURT:  I hope everybody had time to get their

23     lunch.

24          We'll get started.  Please be seated.

13:34:11   25          Mr. Jubin, are you ready?

1       MR. JUBIN:  I think so -- yes.  Thank you.

2       Did you want to do a clock or no?

3       Why am I limiting myself?

4       THE COURTROOM DEPUTY:  Sorry.

13:34:42   5       MR. JUBIN:  May it please the Court.

6       THE COURT:  Mr. Jubin.

7       MR. JUBIN:  Ladies and gentlemen, this is a case

8   about a man who had no involvement in the attorney opinion

9   letters that are at the crux of the case against him.  But who

13:34:59  10   was led to believe that he did.

11       The evidence will show you that if Justin Herman had

12   at the very beginning truthfully told Ian Horn that he had no

13   role in these opinion letters, Ian Horn wouldn't be here

14   today.  Ian Horn is not guilty of the offenses he's charged

13:35:22  15   with because Mr. Horn did not share a criminal purpose when he

16   provided services to Justin Herman and his companies.

17       Ian Horn did not intend to defraud anyone, and he did

18   not knowingly participate in any unlawful conspiracies to do

19   so.  Ian Horn never owned a single share of NuTech stock or

13:35:45  20   its related companies.  He was never promised shares.  He

21   never knew that there was talk about some Russian company

22   until the investigators told him about it, and his response

23   was, "Well, if there was one, why didn't they take it?"

24       There's no evidence that Ian Horn shared in the

13:36:08  25   criminal purposes of this apparent pump and dump stock scheme.

```
19-CR-26-ABJ                OPENING - JUBIN              Vol. II-57
21-CR-14-ABJ
```

1       So how did Ian Horn get here at this table?

2   Unwittingly.  He'd never met Justin Herman personally until he

3   walked into the courtroom and saw him here.  They were

4   introduced by a mutual acquaintance, and Ian agreed to provide

13:36:39   5   some legal services to Justin Herman because he was a business

6   entrepreneur.

7       But for Justin Herman it was a little different than

8   that.  He found someone who he could use and manipulate when

9   he found Ian Horn.

13:36:55   10       Ian Horn is a man who's a nice guy.  He'll talk your

11   ear off.  He tends to process information by just talk, talk,

12   talk.  That's kind of who he is.  He's naive, he's trusting,

13   and he's vulnerable to being used.  And, frankly, you're going

14   to learn -- apologies to Mr. Horn -- he's not a very good

13:37:17   15   lawyer.

16       But most importantly to Justin Herman, Ian Horn's

17   credentials as a lawyer was something he could use, something

18   Justin Herman could use to bolster his projects by paying

19   Ian Horn to escrow investor funds -- and there's nothing wrong

13:37:42   20   with that.  As a lawyer, he would be trusted not to run off

21   with people's money.  And, of course, he never did that.

22       But Justin Herman could also make false

23   representations about the funds that Ian Horn was holding and

24   pass those on to other people without even telling Ian Horn.

13:38:04   25   And Justin Herman could create and provide fictitious legal

1   opinions to market companies; again, without telling Ian Horn.

2   All Herman needed was a letterhead and a signature, and he had

3   a ready-made means for falsifying documents as if Ian Horn,

4   the lawyer, had created them.

13:38:35   5        The Government tells you the evidence in this regard

6   will be conflicting, i.e., reasonable doubt, but it -- there

7   won't be any doubt.

8        Here's what was found on Herman's computer -- and

9   this was not the first time it happened:  Herman's sending to

13:39:05  10  Winters, "Can you send me a blank Word document with Ian's

11  letterhead?"

12       Herman didn't tell Ian Horn that he was using his

13  name or his letterhead or what he was doing with it.  Herman

14  created fictitious documents using Ian Horn's lawyer

13:39:24  15  letterhead and a copied image of Ian Horn's signature.

16  Ian Horn didn't create these documents.  He didn't even know

17  about them.

18       Later, when he was told about and shown some of these

19  documents, these attorney opinion letters that bore his

13:39:45  20  electronically replicated signature, Ian Horn came to believe

21  that he had a role in creating them because he had done a

22  handful of opinion letters for unrelated companies for

23  Justin Herman.

24       And he -- when he was interviewed initially, he was

13:40:00  25  shown a bunch of these attorney opinion letters and the

19-CR-26-ABJ                    OPENING - JUBIN                  Vol. II-59
21-CR-14-ABJ

 1   investigators asked him, "So your involvement with Herman in

 2   these opinion letters, were they specifically for NuTech or

 3   were there other companies?"

 4          His response, "I'm sure" --

 5          MR. FLEENER:  Objection, Your Honor.  May we

 6   approach?

 7      (Proceedings held at sidebar with Prosecutor Heimann

 8   and all defense counsel.)

 9          MR. FLEENER:  Your Honor, this -- Mr. -- Mr. Jubin's

10   opening statement is going to violate -- and it's clear that

11   his theory of the case and the admission of evidence is going

12   to violate my guy's right to confront his accuser, Mr. --

13   Mr. Horn.

14          And so we would move for a mistrial as to Mr. Herman

15   and ask that the Court sever him out unless the case can

16   proceed without either Mr. Heimann or Mr. Jubin being able to

17   provide either evidence or a defense that doesn't violate

18   Mr. Herman's rights to confront Ian Horn.

19          MR. WARD:  And, Your Honor, I would -- I don't think

20   the evidence is going to be as direct towards Mr. Winters, but

21   to the extent any of those same issues apply to Mr. Winters,

22   I would join in the motion.

23          THE COURT:  All right.  I notice the document he

24   showed was a document that came from Mr. Winters.

25          MR. FLEENER:  Your Honor, it -- I was -- I was silent

Timestamps:
13:40:16 (line 5)
13:40:41 (line 10)
13:40:57 (line 15)
13:41:20 (line 20)
13:41:37 (line 25)

19-CR-26-ABJ                    OPENING - JUBIN                    Vol. II-60
21-CR-14-ABJ

1    during the United States' opening, but there were two

2    instances in the United States' opening where it showed

3    transcripts from Ian Horn's grand jury transcripts -- or

4    excuse me -- Ian Horn's grand jury transcripts that implicated

13:41:55    5    Justin Herman.

6            They were on the screen for a hot second and then

7    they went away, and I thought Mr. Heimann was doing his best

8    to avoid what is an obvious issue here.  And it came up again

9    for a hot second and it went away so I let it go.

13:42:10    10            I'm afraid that the entire case, especially

11    Mr. Jubin's defense, is going to involve statements that

12    Mr. Horn has made to others that he's going to offer -- try to

13    offer into evidence or impeach other witnesses with that

14    implicate my guy, and I can't confront Ian Horn.

13:42:30    15            THE COURT:  I guess that's where we are.

16            MR. HEIMANN:  I'm sorry, Your Honor.  Where are we?

17            THE COURT:  I think we are in a situation where

18    Mr. Horn is going to be accusing Mr. Herman --

19        (Reporter seeks clarification.)

13:42:57    20            MR. FLEENER:  They couldn't hear you, Judge.

21            THE COURT:  He will be seeking to prove that

22    Mr. Herman led him into this or as a result of the acts of

23    Mr. Herman he is accused.

24            MR. HEIMANN:  Your Honor, we have been joined for

13:43:18    25    trial for months and months, and this issue has been crystal

1   clear to every defendant.  And after we have a jury, in the

2   middle of an opening statement, we now get a motion to sever.

3   This has been clear for a long time.

4        And I think the better course would be to not allow

13:43:50  5   the admission of evidence that violates a confrontation right

6   unless and until the person who's going to say it can be

7   confronted.

8        MR. JUBIN:  Mr. Horn has a right to present his

9   defense.  It's a constitutional due process right, and the

13:44:07  10  Government can't interfere with it.

11       MR. HEIMANN:  Your Honor, if that's the case,

12  Mr. Jubin should have sought to sever this case a long, long

13  time ago.  He's been aware of this for a long time.  This has

14  been his intended defense for a long time.  He created this

13:44:21  15  issue.

16       And, frankly, so has Mr. Herman, by sitting on their

17  remedy, which is to ask for severance before we're in the

18  middle of trial.

19       MR. JUBIN:  Mr. Horn doesn't want a severance.  The

13:44:38  20  *Bruton* issue doesn't belong to him.

21       MR. FLEENER:  Your Honor, they joined these two

22  indictments.  The United States joined them.  They chose how

23  to charge the case and how to -- and to join two indictments

24  when -- and, yes, the *Bruton* issue was telegraphed and has

13:44:55  25  been telegraphed.

19-CR-26-ABJ                    OPENING - JUBIN                    Vol. II-62
21-CR-14-ABJ

1      But I don't have any idea -- again, I think the

2  United States is probably -- I don't know how they're going to

3  prove their case against Ian Horn without violating my guy's

4  right but it's their case.  They charged it.  They can do

13:45:09    5  their best.

6      I'm not responsible for Mr. Jubin's defense.

7  Mr. Jubin is -- from here on -- is going to be using

8  statements that his client made that we can't confront, and

9  they're going to inculpate my guy, and my guy's confrontation

13:45:25   10  rights prevail as to Justin Herman.

11      I don't care what happens to Ian Horn.  But as far as

12  Justin Herman goes, this jury has already heard twice from the

13  United States briefly and now is going to be hearing

14  consistently from Mr. Jubin statements that we're not -- that

13:45:42   15  inculpate my guy and that we're not able to confront, so we

16  would move for a mistrial as to Justin Herman -- this jury

17  can't hear Justin Herman's case.

18      And, again, whatever happens with Winters and Horn is

19  none of my business, but they can't hear Justin Herman's case

13:45:57   20  if Justin Herman can't confront Ian Horn and these statements

21  that are being made.

22      MR. JUBIN:  There's one potential remedy, Your Honor,

23  and that potential remedy is if Ian Horn decides to testify.

24      And this issue is no surprise to the Government, and,

13:46:11   25  of course, this Court has previously announced its concerns

1   about *Bruton*.  So the Government's claims that this is somehow

2   laying in the weeds are disingenuous.

3          But -- but what the Court could do, as a practical

4   matter, is let the case try.  And if at the end Mr. Horn takes

13:46:28    5   the witness stand, the *Bruton* issue goes away.  If he doesn't

6   take the stand, well, then, there's problems.

7          But one way or the other, we're here trying the case.

8   We might as well get the case tried.  And if there needs to be

9   a second trial with those defendants whose *Bruton* rights have

13:46:48   10   been violated, maybe that occurs down the road, but I think we

11   should proceed.

12          THE COURT:  I agree with you.  I'll deny the motion

13   at this point.  We'll see what happens.

14          MR. FLEENER:  When -- I -- I don't know if it's a

13:47:00   15   housekeeping matter, Judge.  I don't want to continually jump

16   up and down through his opening statement, and I imagine I'll

17   be jumping up and down a hundred times.

18          May I have a continuing objection or -- to issues

19   that would violate my client's confrontation rights during --

13:47:15   20   at least during -- for the purposes of his opening statement?

21          THE COURT:  Sure.

22          MR. WARD:  And I would join on behalf of Mr. Winters

23   that continuing objection so that I don't have to stand up

24   and, you know, come back here and -- and reiterate this.

13:47:29   25          MR. JUBIN:  I would appreciate that, as well.

 1          THE COURT:  I would, too.

 2      (Sidebar concluded.)

 3          MR. JUBIN:  Where were we?

 4          So the investigators asked Ian Horn, "Your

13:48:22  5  involvement with Herman in opinion letters were specifically

 6  for NuTech or were there other companies?"

 7          "I'm sure -- I'm not sure anymore; I didn't write

 8  that many opinion letters."

 9          Despite repeated expressions of uncertainties, Ian

13:48:39  10  became so convinced he even testified to the grand jury that

11  he wrote the opinion letters.

12          But he was mistaken.  In May 2019, with his lawyer

13  Gay Woodhouse on the telephone, agents interviewed Ian Horn

14  once again.  By that time he had come to firmly believe that

13:48:59  15  he'd written these letters, but his language remained flooded

16  with uncertainties.

17          Inspector Hacker here asked him "So what part of the

18  opinion letters did you write and what part did Justin write?"

19          Mr. Horn:  "I don't know that he wrote

13:49:19  20  specifically -- specific parts.  I think he sent things that

21  were -- may have been cut and pasted into the opinion.

22  Probably, more likely what happened -- I don't recall him ever

23  composing an opinion letter, then sending it to me for my

24  signature where I hadn't seen it or done any review or

13:49:38  25  contemplation of it.  So to the extent that he was

19-CR-26-ABJ                OPENING - JUBIN              Vol. II-65
21-CR-14-ABJ

 1    contributing information that we used in the opinion letters

 2    and perhaps even, you know, phrases and paragraph -- that

 3    probably was true, that's probably cut and pasted in.  But

 4    that's one reason why some don't look like the others."

13:50:01  5           "Did you sign each opinion letter, or was there a

 6    template that you just kept using?"

 7           "Oh, no, I, yeah, actually signed each opinion

 8    letter.  Actually read it, too."

 9           The evidence will be that this is true for opinion

13:50:17 10   letters that Ian Horn actually did write, but those were

11    unrelated to NuTech.  So that he actually read the NuTech

12    letters was flat wrong.  It wasn't those that he actually read

13    and signed.  He was mistaken.  And in this trial you're going

14    to learn how and why that mistake happened, and you'll see the

13:50:44 15   evidence that led Mr. Horn to realize his mistake.

16           If it weren't so tragically serious for Mr. Horn --

17    his life, his reputation, his very liberty -- it would seem a

18    comedy of errors.  But your task during this trial will be to

19    unravel it all, to follow and recognize the mistaken

13:51:08 20   assumption and where it led and to follow the evidence that

21    will lead you to a proper verdict of not guilty.

22           So where did it all start?

23           Justin Herman made a habit of creating fictitious

24    documents with Ian Horn's signature without Ian's knowledge.

13:51:27 25   It became routine.  The September 8th request for Horn's

19-CR-26-ABJ                    OPENING - JUBIN                 Vol. II-66
21-CR-14-ABJ

1   letterhead that you see on the screen was made shortly before

2   Herman was going to create a number of these dummied opinion

3   letters.  Ian Horn was not included on these emails.  None of

4   the documents I'm about to show you came from Ian Horn's

13:51:49   5   computer.  They came from Justin Herman's computer.

6          So that same day of this request, September 8th,

7   Winters replied to Herman and sent Horn's letterhead.  And

8   that attachment included a pasted Ian Horn signature.  This

9   was all done without Ian Horn's knowledge.  Indeed, you'll be

13:52:14   10   asked to consider why Herman and Winters would even need to do

11   this if Ian Horn were part of this plot.

12          On September 16, eight days later, Winters forwarded

13   his own email to Herman, sending Ian Horn's letterhead with

14   his signature on it.  You'll want to pay attention to the

13:52:37   15   timing.  September 16, that same day as the date of an

16   attorney opinion letter found on Justin Herman's computer

17   addressed to Pacific Stock Transfer Company, and at the bottom

18   was Ian Horn's same dummied signature.

19          Five days later, September 23rd, Justin Herman

13:53:07   20   created another attorney opinion letter directed to Pacific

21   Stock Transfer Company, also found on Herman's computer.  Same

22   dummied signature.

23          Two weeks earlier this fake letter was found on

24   Herman's computer, Ian Horn with "124 Florida Avenue,

13:53:35   25   Florida."  Look at the contents, claiming that Ian Horn had

 1   $280,000 wired into his account.  We'll come back to that.

 2          But look at what else.  Look how it's signed, "Ian

 3   the Crackhead Horn," mocking him.

 4          This claim that there's $280,000 wired into the

13:54:00   5   account, that is not true.  And you'll see that this document

 6   was found on Herman's computer where Herman, not Horn, created

 7   this fictitious letter.

 8          This isn't conflicting evidence.  There's more,

 9   plenty more.

13:54:21   10          You'll learn that just last week, after years of

11   investigation, the Government found the evidence that it was

12   Justin Herman who sent these fictitious opinion letters to the

13   trading companies.  Ian Horn had nothing to do with it.

14   You'll be able to track Herman's plans to create these

13:54:44   15   attorney documents to further support what Herman was doing

16   without Horn's knowledge.

17          You heard a little bit about letters to

18   Joslyn Claiborne at Pacific Stock Transfer.  This is the deal

19   that involved the fictitious $280,000.  That was false.

13:55:06   20   Ian Horn's not on that email.  He didn't know about it.

21          Five days later Justin Herman did more to cover his

22   tracks.  Here on August 24th, Herman sent an email to Horn.

23   The email address for Louis Weissing is ianhorn- -- that was a

24   part-time paralegal but -- it's ianhornlaw@gmail.com.  You'll

13:55:37   25   find that it's the same -- the same email.  So this "Louis

19-CR-26-ABJ                OPENING - JUBIN                Vol. II-68
21-CR-14-ABJ

1    Weissing" here represents Ian Horn.  All of the communications

2    were with Ian Horn, not Louis Weissing.

3           Herman reached out to Horn to get Horn's

4    December 2014 bank statement that would show the $80,000 wire

13:55:53   5    that Horn actually received to escrow a transaction you'll

6    hear more about.  Herman wanted a printout of that bank

7    statement from Horn.

8           I don't recall if he ever got it, but the evidence

9    will suggest that that was so Herman could alter the numbers

13:56:11   10   to make it look like it was $280,000.  But Horn didn't know

11   that.  Herman even reassured Horn that he would protect Horn's

12   personal information by sanitizing the document before giving

13   it to the trading company.

14          And here you'll see just how someone manipulated the

13:56:36   15   sender -- the one who sent that $80,000 -- as it turns out,

16   it's Bob Mitchell -- the sender's bank account document to

17   look like the transaction was for $280,000 while keeping Horn

18   in the dark.  This is not something Ian Horn received.

19          So what did Ian Horn tell the investigators about

13:56:55   20   this $280,000 when they came to see him in October of 2018?

21   Horn told investigators he doesn't remember that much money

22   ever going through the account.  "Possibly the $280,000 did go

23   through, although I didn't realize it at the time."

24          After Ian Horn got the subpoena that asked him for

13:57:17   25   the documents related to this transaction, Ian was similarly

---

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

1   puzzled and wondered in communications to Justin Herman, "Why

2   can't I find any record of this?  I only received two of the

3   five letters that have been sent to me here.  The Wells Fargo

4   transfer from Mitchell's account seems to indicate 280,000

13:57:44   5   went to BMO Harris.  My bank statement doesn't show any such

6   $280,000.  It's possible the $280,000 went to PNC" -- that's a

7   different bank account that Horn has -- "but they didn't ask

8   for that.  How do I reply to all this?  Do I print and supply

9   these emails, or are you and Steve" -- Steve Mills is a lawyer

13:58:05   10   who was helping Justin Herman decide what documents might be

11   privileged or not -- "are you wetting" -- means "vetting" --

12   "are you vetting the emails which I need to send and redacting

13   the parts that are privileged or confidential?"

14        Even wondered if those -- if that could have gone

13:58:30   15   into a different bank account.  The evidence will be that

16   Ian Horn was ignorant and, critically, Justin Herman never let

17   Ian Horn know that he would not find this transaction.  Justin

18   Herman never let him know "You're not going to find this

19   transaction."

13:58:49   20        I got ahead of myself a little bit here.

21        "You're not going to see it on your bank statements

22   because I invented it by falsifying the documents."  Herman

23   never told him that.  The evidence will be they were not

24   working together but that Herman kept Ian Horn in the dark.

13:59:06   25   They weren't conspiring.

1      You'll see more of these fictitious documents found

2  on Herman's computer, documents using Horn's credentials

3  without his knowledge.  Here's a fake letter found on Herman's

4  computer claiming that Ian Horn is holding $6 1/2 million in

13:59:27    5  escrow for L&R Energy.

6      Something interesting about this:  Ian Horn lives in

7  a town called Brandon, Florida.  Justin Herman has connections

8  to Bradenton, Florida.

9      This letterhead says "Brandenton, Florida."  There is

13:59:46   10  no such town.  It doesn't exist.  And the faked signature --

11  boy, if that doesn't scream "fake" to you.  It's placed on the

12  document electronically.

13      Ian Horn never had these millions of dollars in his

14  account.  And until these materials were provided in this

14:00:07   15  prosecution, he never even knew that his name and his

16  letterhead had been used in these ways by Justin Herman.

17      An expert will talk to you more later and will tell

18  you that this signature is identical to others that were

19  similarly electronically applied.  You will even see for

14:00:24   20  yourself the marks underneath the signature part of what got

21  copied and pasted here with the signature.  Others have that

22  same issue.

23      Another fictitious letter found on Herman's computer,

24  this time representing $2 1/2 million held by Horn for Kansas

14:00:44   25  projects.  Again, the same fictitious town, Brandenton,

19-CR-26-ABJ                  OPENING - JUBIN                Vol. II-71
21-CR-14-ABJ

1    Florida.  Indeed, the same -- not same, even identical faked

2    signature.

3              There were several more of these letters, similar,

4    faked by Justin Herman, and found on Justin Herman's computer

14:01:04   5    to look like Ian Horn had written them.

6              MR. FLEENER:  I apologize.  Objection.  May

7    I approach again briefly?

8        (Proceedings held at sidebar with Prosecutor Heimann

9    and all defense counsel.)

14:01:21   10             MR. FLEENER:  I don't know what the answer is, Judge,

11   but we'd object because this is all 404(b) evidence as it

12   would pertain to Mr. Herman.

13             This is out- -- or as it pertains to Mr. Herman.

14   This is all outside the charged conspiracy.  Of course, the

14:01:34   15   United States didn't provide notice of it, but that appears to

16   be Mr. Jubin's defense, and he's going to be relying on

17   uncharged misconduct to prove his defense, which we would

18   object to.

19             And I don't -- I'll shut up.

14:01:47   20             MR. WARD:  And, again, the connection to Mr. Winters

21   is somewhat unclear still at this point, but I believe

22   Mr. Winters is who lives in Bradenton, Florida, so there is --

23   there's a tangential connection, so I'd join in the 404(b)

24   objection.

14:02:02   25             THE COURT:  Overruled.  Same time period.

 1          MR. FLEENER:  Okay.  I'm going to -- may I ask for a

 2   standing objection -- or standing objection as to that, Judge?

 3          THE COURT:  Surely.  You have a standard -- standing

 4   objection.

 5          MR. WARD:  And I would join the standing objection.

 6          THE COURT:  Mr. Ward, you do, as well.

 7          MR. WARD:  Thank you, Judge.

 8       (Sidebar concluded.)

 9          MR. JUBIN:  Meanwhile, Justin Herman would

10   occasionally actually tell Horn about his great ideas.

11          10 months after that fake document out of the blue,

12   Justin Herman sent Ian Horn a paper on Kansas oil and gas

13   projects.  And about three months later, Herman sent Ian Horn

14   a press release on a project Herman was working on from the

15   Wall Street Journal.

16          Sometimes Justin Herman had Ian Horn involved in

17   other real legal work.  For example, he was asked to review a

18   nondisclosure agreement related to a business deal.  And the

19   email string, if you follow that, will contain all sorts of

20   communications that detail Herman's business deal, information

21   that would impress anyone to whom it was sent.

22          You'll also see that Horn prepared a trust for

23   someone that Herman referred for this legal work.  Herman

24   hired Horn for a patent lawsuit in Florida.  Herman hired Horn

25   to file another lawsuit about real estate in Florida.  The

14:02:15
14:02:41
14:03:01
14:03:23
14:03:46

 1   evidence will show plenty of reasons why Horn understood

 2   Justin Herman to be a legitimate businessman and trusted him.

 3          So you'll learn that Ian Horn acted as Justin

 4   Herman's lawyer at times, but his role did not extend to

14:04:09   5   fictitious documents created by Justin Herman, including the

 6   NuTech opinion letters at issue in this case that you're going

 7   to be hearing about.

 8          There's a few things you'll learn about Ian Horn

 9   which will be important for you to evaluate about him and what

14:04:25  10   he was thinking, what he believed.  The evidence will show

11   that Ian Horn didn't intend to defraud anyone or to

12   deliberately lie about anything.

13          What are you going to learn about him?  He's a pretty

14   incompetent lawyer.  He can be easily manipulated; he's

14:04:43  15   inattentive; he's negligent, maybe he's even foolish at times.

16   But he didn't share the criminal purpose or the objective to

17   defraud anyone.

18          Ian Horn suffers from some thought process deficits

19   that made him particularly vulnerable, particularly

14:05:06  20   vulnerable, and I'll talk to you in a bit about more of what

21   that evidence will be.

22          But he was vulnerable to being used by Justin Herman

23   and vulnerable to the conclusion that he unwittingly came to

24   believe that he had authored these attorney opinion letters

14:05:22  25   because his signature appeared to be on them.  Horn had no

19-CR-26-ABJ              OPENING - JUBIN              Vol. II-74
21-CR-14-ABJ

1    memory of them, but he came to believe a great deal about them

2    and his role in them as he was told about them, shown

3    documents, and primarily the contents of the letters

4    themselves.  Ian Horn filled in the blanks in his own mind,

14:05:42    5    same as we all do.

6         You'll hear from an expert; his name is

7    Dr. Daniel Reisberg.  He has a PhD in memory expertise as a

8    cognition -- cognitive psychologist.  He literally wrote the

9    book on the study of human memory, now in its eighth edition.

14:05:56    10        Memory doesn't always work the way we think.  It just

11    doesn't fade with time and then it's gone.  Rather, people

12    fill in the blanks with memories.  Memory errors are more

13    likely when someone else suggests facts to be true, leading

14    information, leading questions, and particularly when a person

14:06:14    15    is shown a document.

16        That happened here with Ian Horn, first Justin Herman

17    talking to him, then the agents showing Horn the letters, then

18    the prosecutor pointing out things on documents that caused

19    Ian Horn to believe that he had some shared responsibility in

14:06:32    20    drafting these opinion letters with Justin Herman because of

21    what he saw, what he was shown, and that he had done other

22    kinds of similar letters for unrelated companies.

23        Everyone's showing him these opinion letters, and

24    Ian Horn's impulse, when he sees his signature on the

14:06:51    25    documents, wasn't to deny that he wrote these letters but to

 1  make sense of what he was shown.  "Oh, it's my letter because

 2  that's my signature."

 3          Dr. Reisberg will tell you that these kinds of

 4  creative memories due to memory error are then populated by

 5  details that fill in the rest of the story for us, and these

 6  types of memories are no less real than memories that are

 7  accurate.  They're indistinguishable from accurate memories in

 8  the mind of the person who has them.

 9          So Ian filled in these blanks as to what certainly

10  must have occurred based on seeing his signature and some

11  general familiarity with Herman's project from having talked

12  to Herman about it and from escrowing the funds from it.

13          As it turns out, as Ian Horn subsequently learned,

14  these opinion letters were created strictly by Justin Herman,

15  completely without Ian Horn's input.  But before he did that,

16  he did everything he could to try to reconstruct what occurred

17  in an effort to be helpful, helpful to the Government in

18  collecting documents to respond to the subpoena, helpful in

19  describing what he came to honestly but mistakenly believe had

20  occurred.

21          Some of this reconstructing that he had no real

22  memory for Ian Horn got wrong, but it became his memory.  He

23  wasn't wrong on purpose.

24          A friend of Ian's, Al Burnett, who's known him for

25  20 years, will tell you "You know, I remember Ian Horn would

14:07:08
14:07:26
14:07:48
14:08:08
14:08:28

1    be at a restaurant with five people and we're talking and

2    he's -- I'm talking to him and he's in five conversations at

3    once.  I'm going, 'Is this guy getting anything that I'm

4    talking to him about?'

14:08:44    5         "My wife and I and our friends, we called him Tigger

6    because he was always bouncing around in his mind.  And my

7    wife and I would look at each other when he would do one of

8    these -- go off on these tangents and we'd go 'Squirrel.'"

9         You'll hear from another expert, Dr. Chuck Denison.

14:09:04    10   He examined and tested Ian Horn, and he had diagnosed him as

11   someone who has significant severe adult ADHD.

12        What does that mean?  Well, that disease has these

13   symptoms:  A person makes careless mistakes, lacks attention

14   to details, work is inaccurate, difficulty paying attention,

14:09:25    15   difficulty remaining focused, including in conversations.

16   Mind seems elsewhere, even in the absence of obvious

17   distraction.  Loses things, easily distracted by other things,

18   including unrelated thought, often forgetful, talks

19   excessively, blurts out answers before a question's been fully

14:09:52    20   asked.

21        Many of these symptoms of ADHD are profoundly evident

22   in Ian Horn.

23        Ian's friend Al will tell you that there was a time

24   many years ago when Ian Horn all of a sudden changed.  He went

14:10:08    25   from Tigger to Eeyore and everybody was asking, "What's going

19-CR-26-ABJ                    OPENING - JUBIN              Vol. II-77
21-CR-14-ABJ

 1    on with Ian Horn?"  And he learned it severely altered his

 2    personality when Ian Horn took some medications to try to

 3    address it, but he couldn't live with it.  And so when he got

 4    off the medications, he returned to his distracted,

 5    Tigger-like self.

 6            And Ian's wife, Marlene, will tell you about

 7    how years ago those attention deficits were so bad that she

 8    insisted he go on the medication but that he got into a car

 9    wreck because he was so drowsy.  He couldn't function.  He had

10    to quit the medications, and he was forced to go back to

11    living with these symptoms of inattention, the symptoms he

12    lives with today.

13            Let's talk about what the evidence will show Ian came

14    to believe as he was questioned about these opinion letters

15    that bore his signature.

16            To begin with, Ian had actually provided some opinion

17    letters a handful of times for clients, not exclusively for

18    Justin Herman.  It was not Ian's field of expertise, but it

19    was something that he had taken a class on and, with a little

20    guidance, he felt was a service he could provide.

21            So over the years Ian wrote a handful of attorney

22    opinion letters regarding securities.  A few of those were

23    done for Justin Herman.

24            In the middle of October of 2018, the agents stopped

25    by Mr. Horn's home.  He wasn't there.  They spoke to his wife,

14:10:34
14:10:51
14:11:07
14:11:21
14:11:37

1   Marlene, and they told her they wanted to talk to him.  And

2   perhaps they said it was about his client Justin Herman and

3   NuTech Energy.  Who knows?

4          When Ian came home, Marlene told Agent -- told Ian

14:11:53   5   that the agents had stopped by and what they had said.  Ian

6   reached out to Herman wondering what it was all about.

7   Ian Horn learned that NuTech was under investigation, the

8   Government was looking into it.

9          And it was a company that Herman had told Ian

14:12:09  10   a little bit about and for which Ian had -- a while ago, a

11   couple years ago -- he had received and distributed some

12   escrow funds pursuant to Herman's instructions, "Hey, get --

13   take these monies that will be wired in and send it out to

14   these people for this deal."

14:12:29  15          And Herman informed Horn that it must be about these

16   attorney opinion letters and the investigation was really no

17   big deal.

18          So more recently, in 2017, Ian Horn had written a

19   couple opinion letters for Herman that were unrelated to

14:12:51  20   NuTech.  But going back three or four years to the NuTech

21   stuff, that was not something Ian Horn had any memory for.  It

22   was scrambled in his head.  So Ian looked in his records for

23   these NuTech letters, couldn't find any, nothing.

24          Because his client Justin Herman was telling Ian

14:13:08  25   these letters were probably why the agents were there, Ian

 1   came to believe he had some involvement, so Ian was sure he

 2   must have them.  But he couldn't find them, so he asked Herman

 3   to send him copies of the letters so he could be prepared to

 4   discuss them when the agents returned.  Ian must have also

 5   talked to the man who introduced him to Justin Herman,

 6   somebody named Dan Hefner.

 7          Hefner went on the trading company's site, pulled

 8   down some of these NuTech letters, and emailed them to

 9   Ian Horn at Ian's request.  When the agents returned the next

10   morning, sure enough, they had questions about these opinion

11   letters.  That was the focus.

12          Justin Herman had preconditioned Ian Horn to believe

13   that he had a role in them years before.  After all, Ian Horn

14   had, in fact, since written other opinion letters for Herman.

15   So when the agents show up, they're showing him letters

16   bearing his signatures on what looks like his letterhead.

17          Ian Horn looks at them, sees them -- "I agree; that's

18   my letter."  His first impulse was -- was to affirm he'd

19   written the letter.  He wasn't lying.  He was mistaken.

20          How did that happen?  Well, this occurred in part

21   to -- to begin with Ian said "I really don't have any memory

22   of this stuff," but as he was asked, it's clear he's not

23   working from his memory but he's reconstructing.

24          The language he often used was hypothetical, "I would

25   have done this; I would have done that; it likely would have

19-CR-26-ABJ                    OPENING - JUBIN                    Vol. II-80
21-CR-14-ABJ

1    been this, probably that."  It was reconstruction.  "In order

2    to write these letters, I -- I would read public filings."

3          And then he even said he would be at the mercy of the

4    documents provided to him.  How telling.

14:14:58  5          And he has no idea who he got the information from in

6    order to write the attorney opinion letter.  He suspects it

7    could be a couple people, but he doesn't remember who.

8    Whoever's involved with this Bravo is probably someone he got

9    documents from.

14:15:13  10          He also said he would review anyone mentioned in the

11    letters and he would also discuss things and he would likely

12    inquire with OTC Markets.

13          He's guessing.  And this was all based on documents

14    that are shown to him.

14:15:32  15          Referring to the opinion letter itself, he would tell

16    them, "Well, as it indicates in the attorney opinion letter,

17    I spoke to these people."

18          But when relating information that's not part of the

19    letter, the document in front of him, he says he doesn't

14:15:50  20    specifically recall speaking to Trizna to get information.  He

21    believes he had a three-way conversation with some people, but

22    he doesn't recall specifically who was on the calls.  He said

23    Herman would have been the initiator of the calls and he would

24    have participated in the calls, would have.  He said, "I'd be

14:16:09  25    at the mercy of the documents provided to me."

 1          Now, other letters that the agents showed him, the --

 2   the ones unrelated to NuTech that were real, Ian told the

 3   agents he, quote, "absolutely recognized" the real attorney

 4   opinion letter that he did write that was unrelated to NuTech.

14:16:35   5          Ian Horn trusted Justin Herman.  It never occurred to

 6   him that there were fake letters unrelated to him.

 7          You'll learn that Ian Horn was duped.  He was not

 8   part of any conspiracy but was used by Justin Herman, who took

 9   shortcuts with these letters.

14:16:49  10          They were supposed to be authored by an attorney.

11   Instead, Justin Herman wrote them himself, cobbled them

12   together from other letters and forms, and he passed them off.

13   They were specific to Justin Herman's needs.

14          And you'll see that Herman, not Horn, submitted them

14:17:10  15   to the trading companies, pretending that Ian Horn had written

16   them, all without Ian Horn's knowledge.

17          How will you know this?  Beyond the obvious, "Send me

18   Ian Horn's letterhead and signature," what will the evidence

19   be as to who wrote them?

14:17:30  20          They were found on Justin's computer.  Several

21   versions of the letters were found, all on Justin Herman's

22   computer, including the letters with Ian Horn's signature

23   already electronically affixed.

24          There's not a single email or text from Justin Herman

14:17:48  25   or from anyone else asking Ian Horn to write the letters.  Not

1    a single email or text from Ian Horn -- or to Ian Horn from

2    Justin Herman about the substance, the content of the letters.

3    Not a single email or text conveying these letters from

4    Ian Horn to Justin Herman.  Not a single Ian Horn email

14:18:19    5    conveying these letters to the trading companies.  Nothing.

6            Instead, the records show that Justin Herman sent

7    these dummied letters to the trading company.

8            The only email from about that time that concerned

9    these at all was after Herman submitted it to the recipient,

14:18:42    10    an outfit called Empire Stock Transfer Company.  They sent an

11    email to Ian Horn, presumably because they got this letter

12    from Herman, and they said -- asking him something about the

13    letter.

14            What did Ian do?  He simply forwarded it to

14:18:58    15    Justin Herman and said "FYI."  And Herman replied and said,

16    "Oh, that's some old issue.  I'll take care of it."  Ian Horn

17    never gave it another thought.

18            Whatever other evidence will there be about who wrote

19    these letters and documents?  You're going to hear from

14:19:18    20    Dr. Roy Fenoff.  He's a forensic handwriting and document

21    examiner, a forgery expert.  He's a professor at the

22    department of criminal justice at The Citadel.  He has a PhD

23    in criminal justice from Michigan State University.  He has a

24    master's in the science field from UW, University of Wyoming,

14:19:38    25    right over in Laramie.  He's on the board that sets the

 1   standards in forensic document examination.  He teaches police

 2   officers their advanced document and forensic handwriting

 3   examination.

 4          You'll see the faked signature for the opinion

14:19:53   5   letters that Herman used.  This is the comparison.  These are

 6   those two opinion letters you saw earlier.  Dr. Fenoff will

 7   tell you that it's the same electronic signature.  Not merely

 8   similar but they're identical.  They're a reproduction, same

 9   one Justin Herman used over and over and over on each of the

14:20:20  10   opinion letters at issue.  Without Horn's knowledge, without

11   his permission.

12          Dr. Fenoff will confirm that Ian Horn didn't sign

13   these documents, did not sign these documents.

14          What you'll also hear and see is that the Government

14:20:39  15   expects to introduce evidence that the very same man who was

16   swapping Ian Horn's signature and letterhead are the guys who

17   the Government claims committed identity theft.

18          Let's talk about this escrow.  Ian Horn's businessman

19   client, Justin Herman, the entrepreneur, did send money to

14:21:03  20   Ian Horn to distribute to facilitate business transactions.

21          This is not unusual and there's nothing wrong with

22   it.  Lawyers do that; title companies do that; escrow

23   companies do that; business entities do that.  This wasn't

24   really legal work.  It was escrow work.

14:21:23  25          Now at one point Ian Horn's bank said they were

19-CR-26-ABJ                OPENING - JUBIN              Vol. II-84
21-CR-14-ABJ

 1  uncertain about this escrow transaction where there was

 2  $80,000 wired into Horn's account, the same $80,000 that,

 3  unbeknownst to Ian Horn, Justin Herman tried to make look like

 4  a transaction for $280,000.  But Ian Horn's job was simply to

14:21:43  5  follow the escrow instructions from his client, confirm the

 6  money's in your account and send the money to the persons and

 7  entities as directed.  That was his job.

 8       Of course, Ian didn't do this for free.  He charged

 9  for those services, and the amount he charged was determined

14:22:01  10  kind of based on what Justin told him he was going to pay him.

11  It was sort of a free-flowing text exchange with his client

12  for whom he's providing these services.

13       Generally, the records show that the bigger the

14  amount in escrow and the hassle and time involved in the

14:22:17  15  escrow, the greater the level of compensation paid.  And, of

16  course, Ian wanted to earn money this way.  But the

17  compensation was sort of a loose arrangement between Ian and

18  his client Justin, with whom he was friendly, although they'd

19  never met.

14:22:35  20       The compensation arrangements were so free-flowing

21  that years later, when he's asked about it, Horn thought his

22  payment was for writing these letters that he was being asked

23  about, letters he never wrote, never even knew about.  But

24  looking back and looking at the documents and looking at

14:22:50  25  Horn's bank records, Horn was paid for escrowing the money --

19-CR-26-ABJ                    OPENING - JUBIN                    Vol. II-85
21-CR-14-ABJ

1   and you'll see that in the emails -- not for writing NuTech

2   opinion letters, of which he was completely unaware.

3           The escrow was a pretty good opportunity for

4   Ian Horn, and he was generally willing to take what Herman was

14:23:09    5   willing to pay him.  It was fair enough.  So then came this

6   interruption with BMO Bank and the $80,000.  It all happened

7   in December of 2014.

8           Herman told Horn to expect a series of transactions

9   involving a total of $100,000, and Herman told Ian Horn in an

14:23:30    10   email that Horn would be receiving these funds to distribute,

11   and Herman provided the instructions how to distribute the

12   funds.

13           Herman told Ian that his compensation on the first

14   $20,000 was to be $1250.  Horn's bank records show the $20,000

14:23:48    15   came in December 15 and, as directed, Horn wired 7950, which

16   was 8,000 minus the wire fee, and he wired 10,750 direct -- as

17   directed, and he paid himself the $1250 out of this money,

18   exactly as directed.

19           The rest of this hundred thousand dollars, the

14:24:12    20   $80,000, was wired into Horn's account on December 23,

21   two days before Christmas, of 2014.

22           In a series of emails, Justin Herman gave

23   instructions to Horn where he was to send these escrowed

24   funds.  Justin Herman told Horn to keep $3,000 as his fee,

14:24:32    25   send $19,000 to one company, 22,500 to another company,

19-CR-26-ABJ                OPENING - JUBIN              Vol. II-86
21-CR-14-ABJ

1    $19,000 to another company.

2         Justin Herman was in a big hurry for this transaction

3    to go through, and Ian Horn over the holidays was out of town.

4    He and his wife were with friends, another couple, enjoying a

14:24:51   5    little trip to Georgia over the Christmas holiday.

6         Like before, Justin Herman began to pester Ian Horn

7    about the status of the wire.  On this occasion, for whatever

8    reason, BMO Bank -- they'd done wires before -- this time they

9    froze the funds.

14:25:12  10         By December 30th, a week later, Justin Herman's

11   communications were getting more concerned about the held-up

12   funds.  Herman texted him, "BMO should know" -- the bank --

13   "should know the regulatory and tax consequences.  It's

14   critical this money is released tomorrow."  Ian Horn was

14:25:33  15   simply not engaged and not responding.

16         Justin Herman began sending a bunch of documents --

17   where am I heading? -- a bunch of documents to Ian Horn to

18   show Horn and the bank the legitimacy of the transaction that

19   these funds represented.  These communications will help you

14:25:59  20   understand what Ian Horn was thinking, what he was being told,

21   and what informed his understanding as these events were

22   occurring.  You'll see what Ian Horn was led to believe about

23   what was going on and what he did not know.

24         For example, on January 5 Ian Horn emails

14:26:22  25   Justin Herman and asks him, "What is Bob Mitchell's

19-CR-26-ABJ                     OPENING - JUBIN                    Vol. II-87
21-CR-14-ABJ

1    involvement?"  You'll see that Mitchell is the guy who

2    actually wired in the money.

3             In response to the questions, Horn sent a series of

4    documents related to this $80,000 transaction to convince the

14:26:42    5    bank and to convince Ian Horn, as well, that the transaction

6    was legitimate.

7             One of those documents that Herman sent to Horn and

8    the bank was a letter purportedly by a guy named Tom Crom --

9    see, the Crom letter; maybe it's one you've seen here -- the

14:27:08   10    business- -- one of the businessmen involved, providing

11    details about this $80,000 transaction and its legitimacy.

12             Ian passed on to Justin what the bank's concerns were

13    and what the questions were.  "Why are the transfers going

14    through me?  That's what the bank wants to know."

14:27:32   15             Justin Herman explained, "Everyone felt more

16    comfortable with an attorney in the middle of the

17    transaction."

18             And Herman explained, "I hope you'll be able to write

19    the initial disclosure to OTC Markets.  It's easier to have an

14:27:48   20    attorney involved who knows something about it."

21             That initial disclosure never happened but -- Herman

22    was sort of indignant in his communications.  And,

23    importantly, Herman was adamant in telling Ian Horn that this

24    is a legitimate transaction that the bank's actions were

14:28:08   25    harming, further informing Ian Horn as Herman ranted about the

1   injustice of it.

2          As you receive this evidence, your task will be to --

3   will be to consider if the nature of the communications

4   reflects a criminal conspiracy, a shared understanding and

14:28:29   5   participation in a shared criminal objective, or, instead,

6   circumstances where one person, Ian Horn, is in the dark or

7   misled.

8          Justin Herman followed up his indignant rant about

9   the frozen funds with more explanation detailing the

14:28:54   10   legitimacy and the regulatory oversight that the transaction

11   involved.  Herman explained to Horn that, quote, "The

12   transaction is legal in every single way."  Herman included a

13   gentle threat about lawsuits against the bank and against Horn

14   for holding up the money.

14:29:16   15          Ian Horn provided an email for someone at the

16   BMO Bank, this Jillian Hickory, and Herman began to send

17   Ms. Hickory a bunch of documents to show the bank the

18   legitimacy of his transaction.

19          Now, Ian Horn's on vacation; he's traveling with his

14:29:34   20   wife.  They're in Georgia but he did a little bit to try to

21   learn what he could to understand why the bank had frozen the

22   funds and to connect Herman to the right people at the bank to

23   solve the issue.  But Ian Horn expressed some frustration at

24   the amount of work and time involved as Herman pestered him

14:29:54   25   about the wires once BMO Bank released the funds.  Herman told

1    him, "I can't keep spending my whole day catering to you."

2         A few days later Justin Herman and Tom Crom were

3    providing Ian Horn with additional instructions to distribute

4    the rest of the $80,000.  In response Ian Horn writes to

14:30:20   5    Herman, "Who are these people and why are we sending them

6    money?"

7         And Herman replies, "They hold debt in the company,

8    and this purchases the debt from them, thus completing the

9    entire transaction."  It shows you when Ian Horn was told

14:30:37   10   about this and what he was told.

11        After Justin Herman impatiently pestered Horn about

12   getting the wires accomplished, Ian Horn then dutifully sent

13   the money as directed when he was free from other

14   court-related obligations.

14:30:57   15        Later, when Ian Horn's asked about this escrow, the

16   agents ask him about the $280,000 that they, the agents, had a

17   record for and Ian was asked why he had this money coming to

18   his account that he was sending out to Herman, and Horn said

19   "Well, it's kind of murky in my head."

14:31:15   20        The evidence will be, of course, that there was no

21   $280,000.  In fact, it was only an $80,000 wire that was wired

22   into Horn's account for this escrow for this deal.  The bank

23   account will show you that, Ian Horn's bank statement.

24        He was directed by Herman to distribute to the

14:31:44   25   various participants, and that's exactly what he did.

19-CR-26-ABJ                   OPENING - JUBIN                   Vol. II-90
21-CR-14-ABJ

1   Ian Horn didn't know about this doc edit.  He wasn't on those

2   emails where Herman directed Winters to make a document edit,

3   to use this wire transaction document to forge and create

4   false documents showing the transaction was for $280,000.  The

14:32:17   5   evidence will confirm that Ian Horn knew absolutely nothing

6   about this forgery.

7          And as you'll see, later the Government subpoenas

8   Horn and they specifically request documents related to this

9   $280,000 wire, so he thought there must be such a wire.  Why

14:32:40   10  else would the Government be asking for it?  Ian didn't

11  remember it.  He looked at his bank account, couldn't find it,

12  so he contacted Herman.

13         "My bank account doesn't show any such $280,000

14  receipt.  Is it possible it went to my other bank account?"

14:33:01   15  And then, "Do we give it to them if it's not what they asked

16  for in the subpoena?  Should I just print and supply the

17  emails, or are you and the attorney, Mills, vetting them for

18  privilege?"

19         Now let's talk about what the evidence will show and

14:33:20   20  what you're going to learn about the investigation in this

21  case.

22         Later, the Government indicts this Bob Mitchell, who

23  appears to be the central guy in all of this, and then they

24  indict Justin Herman, who seems to be his sidekick.

14:33:34   25         And the Government had issued this grand jury

19-CR-26-ABJ                    OPENING - JUBIN                    Vol. II-91
21-CR-14-ABJ

1   subpoena to Ian Horn because his name was on these letters.

2   Horn just knew that his client, Justin Herman, this

3   businessman, needed help in responding to the investigation,

4   and he, Ian Horn, needed to get the documents together that

14:33:50   5   the Government was asking for.

6          There's a complication here.  He's a lawyer.  Justin

7   Herman is his client.  And there's what's called the

8   attorney-client privilege.  An attorney cannot just give the

9   Government documents that it asks for that relate to a

14:34:09   10   representation of a client, not even the Government.  As a

11   lawyer, Horn had a duty of confidentiality and standards

12   apply.

13          Gay Woodhouse, a Cheyenne lawyer who represented

14   Ian Horn to help him with responding to the grand jury, may

14:34:25   15   testify and explain to you.  I'm going to have another lawyer

16   come in and explain to you about these standards that apply,

17   or the Judge may tell you in an instruction what these ethical

18   obligations are in his instructions to you.

19          A lawyer has to be very careful.  He cannot just

14:34:42   20   start giving materials, even to the Government, without his

21   client's consent.

22          So he necessarily has a duty to communicate with his

23   client and tell Mr. Herman, "Hey, I've got a request for

24   documents related to my representation of you, and I need to

14:35:01   25   have you authorize me to disclose this information or tell me

19-CR-26-ABJ                OPENING - JUBIN              Vol. II-92
21-CR-14-ABJ

 1    what's privileged and what's not privileged that you're going

 2    to claim."

 3                And Ms. Woodhouse will tell you as she saw

 4    Ian Horn -- she saw him as he tried to fill his duty to honor

14:35:21    5    his client's privilege and the Government's request at the

 6    same time.

 7                So what did Horn do when he gets the subpoena?  He

 8    starts trying to get the records together, all the records

 9    relating to Herman.  He tries to coordinate with his client

14:35:34   10    and another lawyer, Steve Mills, that the client has hired who

11    was representing Herman on this privilege issue.

12                You know, Horn was only minimally involved escrowing

13    these funds for this NuTech project that Herman had.  And

14    Ian Horn expected that Herman and Herman's privilege lawyer

14:35:57   15    are going to be the guys who figure this out.  Right?  Steve

16    Mills is going to help Herman by getting together all these

17    documents the Government wants, and Ian Horn probably should

18    have just said "I don't -- I don't have these documents."

19    But, instead, he's trying to get them for the Government from

14:36:15   20    his client, and he's also trying to figure out what his

21    client's going to claim privilege on.

22                But Herman is sort of nonresponsive, and you can

23    understand why.  It will be apparent that Ian needed some help

24    because he didn't know much about what Herman was doing, about

14:36:33   25    his businesses, and what these transactions were for.  He was

1   just escrowing the funds.

2           He tried to -- tried to get them to help, but he felt

3   like he was on his own trying to respond to this thing

4   about -- to things he really didn't know about.

14:36:49
5           And Ian Horn remained puzzled.  "I can't explain why

6   I don't have these opinion letters" that he's been led to

7   believe he has.  Things didn't seem to make sense.  Ian simply

8   had no memory of this from a few years earlier.  It's a

9   mystery that you, as a jury, are going to be asked to solve by

14:37:09
10  careful reconstruction and attention to detail.  At that point

11  Ian Horn never even was considering that he didn't write the

12  letters.

13          Ian Horn then prepared with the prosecutor and

14  testified to the grand jury.  What a disaster.  Ian Horn's a

14:37:29
15  people-pleaser.  He was trying to be helpful, honest.  He

16  followed the prosecutor's questioning as best he could.

17          But because it was all based on this mistaken

18  assumption, this mistaken impression in his mind that he had

19  written these attorney opinion letters that were central to

14:37:48
20  the whole thing, things were jumbled in his mind.  He was

21  inconsistent; it was unclear, all still laboring under the

22  misimpression that he'd written these letters, so at times

23  Ian's testimony made little sense.

24          It was only after he was indicted, with careful

14:38:10
25  digging through all the documents, that he figured it out,

19-CR-26-ABJ                OPENING - JUBIN              Vol. II-94
21-CR-14-ABJ

 1    that he didn't write the letters.

 2            The Government provided a bunch of records, and Ian

 3    had the opportunity to carefully look at them, carefully look

 4    at the letters, put them side by side, and go, "Wait a

 5    second," to see the complete absence of any communication with

 6    Herman about creating them.  "Geez, there's no emails; there's

 7    no texts.  My signature's been -- it's the same on every one

 8    of them.  It's faked.  And -- and look at this.  These guys

 9    were asking for my letterhead.  And I never got paid for them.

10    Look at my bank statements.  There's no -- no -- no money

11    changing hands for me to do this."

12            All of that.  Ian Horn simply had no connection to

13    the letters.  The only connection is his erroneous belief and

14    his mistaken statements based on conflating letters that he

15    had done and confusing these NuTech opinion letters that he

16    had nothing to do with.

17            Ian Horn testified as to his fee for these opinion

18    letters; "Oh, it was probably about 2500 bucks."  Why does he

19    think that?  Well, in March of 2017 Horn received $2500.  And

20    it looks like it was for a lawsuit, not an opinion letter.

21            Later, May 31 of 2017, Ian Horn received a

22    thousand-dollar payment from Chuck Winters.  And it looks like

23    that could be related to some opinion letters that were done

24    in May of 2017 for some other company that actually were

25    written by Ian Horn, the ones he absolutely remembered.  They

19-CR-26-ABJ                    OPENING - JUBIN                    Vol. II-95
21-CR-14-ABJ

1  have nothing to do with this case.  They were opinion letters

2  that Ian Horn actually reviewed and signed, and they're pretty

3  darned different in terms of what they say and what they look

4  like.

14:40:17  5          Let's talk about these perjury charges.

6          Remember, I told you that there would be evidence

7  Ian Horn is naive, trusting, and vulnerable to being used?

8  Those characteristics did not change when the Government

9  sought to enlist his assistance before the grand jury.

14:40:38  10          First, the evidence will show that Ian Horn did not

11  knowingly lie.  In other words, he wasn't trying to provide

12  false information.  In fact, he provided information that was

13  true, so it cannot be perjury, but we'll come back to that

14  later.

14:40:56  15          Second, you'll learn that the information is not

16  material, in the sense that the prosecutor got the information

17  he was after when Ian Horn clarified and explained.

18          The Government alleges Horn lied when he said

19  "I think I certainly had some opinion letters."  But in his

14:41:14  20  testimony Ian also said he understood that he did not have

21  what was ultimately produced because some of what he produced

22  came from Justin Herman, and Ian was not sure if he had the

23  records from when he had done the work or if he had lost them.

24          Ian even tried to figure it out, speculating in his

14:41:34  25  testimony that when he actually did the work for NuTech, 2014,

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

1   2015, "Either I had the records or I had access to the

2   records, so I may have viewed them online; I may have viewed

3   company financials online, something of that nature."  Like he

4   said, he was simply unsure, not sure if he had these records.

14:41:56   5       And as we discussed, there was good reason for that.

6   At the time he was testifying, Ian believed he had approved

7   and signed -- and signed the opinion letters.  He thought they

8   were his letters, so, of course, he figured he had them

9   somewhere.  But as he told the prosecutor, he couldn't find

14:42:15   10  them in his files, and he couldn't figure out why.

11       But Ian admitted the stuff that he gave to the

12  prosecutor came from Justin Herman.  And he admitted when he

13  looked for them he couldn't find them.  The documents weren't

14  there.  And he admitted he didn't have what was ultimately

14:42:32   15  produced.

16       And what was produced?  The very opinion letters that

17  the prosecutor was asking about, the ones that were under

18  discussion.

19       So throughout the process of his testimony at the

14:42:47   20  grand jury, talking about it, the answer was clarified as best

21  as Ian Horn could figure out.  He did the best he could,

22  laboring under the mistaken belief that he had authored the

23  opinion letters.  It was only later that Ian Horn learned that

24  Herman used faked signatures and Ian Horn had nothing to do

14:43:05   25  with those opinion letters.

19-CR-26-ABJ                    OPENING - JUBIN                    Vol. II-97
21-CR-14-ABJ

1          Coming back for a moment to the truth of Ian Horn's

2     statement, remember the perjury charge, that he knew that --

3     perjury charges -- that you know your testimony's false when

4     you give it.  And he said, "I think I certainly had some

14:43:22   5     opinion letters."  So the Government has to prove, as an

6     element of that offense, that the statement was false, didn't

7     have the opinion letters.

8          Well, as I told you, he reached out to a guy named

9     Dan Hefner to provide copies of the attorney opinion letters,

14:43:37  10     which he couldn't seem to locate, although he then believed he

11     must have them.

12          Shortly before the agents showed up to serve that

13     subpoena on Ian Horn, Dan Hefner emailed copies of opinion

14     letters to Ian Horn.  These are the three opinion -- the three

14:43:52  15     letters for NERG as found on the OTC Markets website, boom,

16     boom, boom, three attachments.

17          So it turns out Ian Horn did, at the time in

18     question, have some of these attorney letters.  It turns out

19     it was true when he testified several months later that he had

14:44:11  20     them.  The evidence will show you that Ian Horn cannot be

21     guilty because his statement was true.

22          The second perjury charge is that Ian Horn lied when

23     he said he lost the emails in a computer crash.  But, you

24     know, the focus for months here -- months -- and the questions

14:44:33  25     in preparation for the grand jury with these folks at this

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

19-CR-26-ABJ                OPENING - JUBIN                Vol. II-98
21-CR-14-ABJ

1    table, it was all about these opinion letters.  That's where

2    Ian Horn was focused, and he thought he'd written them.

3            And he felt awful about that.  And the Government

4    lawyer who asked the question asked, "Why don't you have these

14:44:52    5    emails?" leading him, telling him he doesn't have them in his

6    very question, "Why don't you have them?"

7            That's what the Government's lawyer asked him,

8    presupposing an inaccurate fact.  Ian was likely thinking

9    about the emails with attorney opinion letters attached to

14:45:16   10    them because that was what was central and the crux of the

11    matter.  That's what he thought he had lost in the computer

12    crash.

13            At this point the evidence isn't going to be clear as

14    to how this miscommunication occurred.  How do you reconstruct

14:45:27   15    that?

16            But you're going to get to evaluate that in light of

17    Ian Horn's confusion, his deficits, his inability to focus.

18    The evidence will support that this is a misunderstanding and

19    Ian Horn did not testify falsely in a willful and knowing way.

14:45:55   20            Let's talk for a moment about this issue of pump and

21    dump and I'm nearly there.

22            Pump and dump.  At the heart of these charges is this

23    claim that Ian Horn's in on this deal where they're

24    manipulating the stock price to go higher so someone can sell

14:46:07   25    it -- so these folks can sell it at a profit.

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

```
19-CR-26-ABJ            OPENING - JUBIN              Vol. II-99
21-CR-14-ABJ
```

1    And the allegation is that Mr. Horn was knowingly,

2    and with fraudulent intent, participating in this conspiracy,

3    in a deliberate conspiracy, to fraudulently inflate the price

4    of the stocks and then sell them at a profit, that he,

5    Mr. Horn, had a role and knowledge and participation in that

6    conspiracy.

7    The evidence will be that Ian Horn had no role in

8    that.  He didn't write these opinion letters that

9    Justin Herman dummied up to make the stock tradeable.  And

10   when he engaged in escrowing funds, he had no idea what these

11   people were doing.  Ian Horn never owned, bought, sold, or

12   traded NuTech stock or any of its related companies.

13   He never knew anything about what these other folks

14   were up to, absolutely nothing.  And he knew absolutely

15   nothing about this supposed Russian offer to buy NuTech where

16   he said, "Well, if there was such a thing, why didn't they

17   take it?" when the investigators came to talk to him.

18   Ian Horn might be a bumbling attorney, but Ian Horn

19   is no thief.  At the end of this case, after you've heard and

20   seen the testimony and the exhibits, I will ask you to find

21   Ian Horn not guilty of these charges.

22   Thank you, ladies and gentlemen.

23   THE COURT:  We'll take our midafternoon recess,

24   15 minutes.

25   THE COURTROOM DEPUTY:  All rise.

19-CR-26-ABJ                OPENING - WARD                Vol. II-100
21-CR-14-ABJ

 1      (A recess was taken from 2:48 p.m. to 3:09 p.m.

 2  Proceedings outside the jury's presence.)

 3          THE COURT:  We'll bring in the jury if there's no

 4  objection.

 5          MR. WARD:  I just have one quick -- just on the time

 6  for my opening, Your Honor -- I don't believe Mr. Fleener

 7  is giving an opening.  Am I limited to 60 minutes or do

 8  I have 90?

 9          THE COURT:  How much are you going to need?

10          MR. WARD:  I might need a little more than 60 so

11  I didn't want the -- well, I'm hoping I can have a little

12  latitude past 60 since the other two attorneys got 90.

13          THE COURT:  Very well.  We'll make it 65.

14      (Proceedings within the jury's presence at 3:10 p.m.)

15          THE COURT:  Thank you, ladies and gentlemen.  Please

16  be seated.

17          Mr. Ward, and -- you've indicated to me that you may

18  go a little over 60.  60 -- we've put up 65, I think, for you,

19  but we'll be tolerant.

20          Ladies and gentlemen, Mr. Ward will be presenting the

21  opening statement for Charles Winifred Winters.

22          MR. WARD:  Thank you, Judge.  May it please the

23  Court.

24          THE COURT:  Please proceed.

25          MR. WARD:  Good afternoon, ladies and gentlemen.

15:09:21 (line 5)
15:09:33 (line 10)
15:11:29 (line 15)
15:11:55 (line 20)
15:12:08 (line 25)

19-CR-26-ABJ                    OPENING - WARD                  Vol. II-101
21-CR-14-ABJ

1          I didn't get to speak to you all as much yesterday as

2     I may have -- would have wanted to, but given the three

3     attorneys and that you guys had been through a lot of

4     questions, I just -- there wasn't a lot left to ask, so I do

15:12:23    5     look forward to speaking with you this afternoon.

6          Before I begin, I do want to remind all of you about

7     your duty to wait until you've heard all of the evidence

8     before you start making decisions on what you believe.

9          We talked about it a little bit during voir dire, but

15:12:43   10     the confirmation bias is a very real thing.  And if you begin

11     to draw conclusions before you've heard all the evidence,

12     you're likely not going to receive the evidence in the way you

13     should.  So please give my client the opportunity to present

14     his case and it -- and, frankly, it may be weeks until we have

15:13:05   15     that opportunity to begin to present our case.  So please hold

16     off on making any decisions or making your mind up about any

17     of the issues.

18          You've heard two opening statements thus far, so

19     you've received information.  We also talked a little bit

15:13:24   20     about compartmentalizing in voir dire, and you heard

21     information this morning from the Government and then you just

22     heard information from Mr. Jubin, some of which didn't relate

23     at all to my client Mr. Winters.  Keep in mind that you're

24     making decisions about three different defendants and a number

15:13:40   25     of charges and you need to keep your minds open.

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1          Another thing I want to remind you about is the

2     Government's burden of proof.

3          And we heard a couple of things from the Government

4     in their opening statement that I found very concerning, one

15:13:56    5     of which related to the opinion letters.

6          And the Government told you "Well, we don't really

7     know what's going on with these opinion letters, and,

8     hopefully, you all can figure it out."

9          Well, that's not the way that the law works, and

15:14:11    10    that's not the law that the Judge is going to read to you.

11         You all are not here to be investigators; you're not

12    here to go out and -- and figure things out.  You need to be

13    presented with evidence to allow you to reach a -- a decision,

14    and that decision has to be beyond a reasonable doubt.

15:14:27    15         So when the Government tells you, "Well, we don't

16    really know what's going on with these opinion letters but

17    that's all right," that's extremely concerning.  If the

18    opinion letters are going to be an important part of this

19    case, the Government needs to be able to present you all with

15:14:41    20    evidence about what is going on with these opinion letters.

21    And if the Government doesn't know, that's a serious problem.

22         It's also going to be important that all of you not

23    check your common sense at the door.  You've heard this case

24    is somewhat complex, and you also heard the Government say in

15:15:03    25    opening statement that, you know, the -- the case is complex,

 1   perhaps because the fraud is complex.  And, you know, what

 2   I read through the lines on that is "Forgive us if we don't

 3   explain all of this to you because the fraud was inherently

 4   complex."

15:15:20   5         But, again, it is the Government's burden, and the

 6   Government is the only one in this room with a burden to prove

 7   anything, and that burden is to prove to you beyond a

 8   reasonable doubt each of the charges contained in the

 9   indictment.  So if something is complex, that doesn't change

15:15:37  10   the Government's burden.

11         The Government in their opening statement kind of

12   jumped right to the pump and dump.  And you heard yesterday

13   the Judge read from the second superseding indictment what the

14   Government said they were going to refer to as "the fraud

15:16:00  15   indictment."  And as it relates to all three of the gentlemen

16   seated at the defense table, they started with Count Thirteen,

17   and that's because the first 12 counts related to

18   Bob Mitchell.

19         And you didn't hear a lot about Bob Mitchell in the

15:16:18  20   Government's opening statement or Mr. Horn's opening

21   statement; however, Bob Miller -- I'm sorry -- Bob Mitchell --

22   and his name is Robert William Mitchell, but he's called

23   Bob Mitchell, so you'll hear him referred to as "Bob" in the

24   evidence -- is really central in what this case is all about.

15:16:40  25         The Government said that -- that Bob isn't going to

1   be here and that he is part of the story, but the truth is

2   that Robert William Mitchell, Bob Mitchell, is the whole story

3   here.  Bob Mitchell is at the center of -- of this fraud

4   scheme, and he's pled guilty to being at the center of this

15:16:58    5   fraud scheme.

6        The Government also talked a little bit about

7   unindicted coconspirators, and that's kind of a mouthful.  But

8   there certainly are -- is going to be a lot of evidence about

9   unindicted coconspirators, meaning people other than the

15:17:16    10  defendants who were central to this crime and who actually

11  carried out the crimes that the defendants are charged with.

12       And so to understand Robert William Mitchell's story,

13  to understand Bob's story, you have to go back a ways.  And it

14  actually starts at a garage sale in 1970.  Okay?

15:17:40    15       And -- at this garage sale in the 1970s,

16  Kit Jennings, who you see there, purchased a piece of paper

17  for like $10.  Okay?  He purchased a patent to some

18  technology.  And Kit Jennings -- and the technology was this

19  technology you've heard a little bit about.  It claimed to be

15:18:00    20  able to allow someone to extract natural gas from a coalbed

21  methane well at very little expense.

22       And what you're going to hear in the evidence is that

23  coalbed methane is formed -- in a very simplistic sense --

24  from bacteria eating away at the coalbed, and that creates

15:18:21    25  natural gas, but that coalbed methane wells are usually full

19-CR-26-ABJ                   OPENING - WARD                   Vol. II-105
21-CR-14-ABJ

 1    of water.  And so the -- the gas is being made down at the

 2    coalbed, and it can't escape because the water's sitting on

 3    top of it.

 4         And so in the traditional sense, the way that

15:18:35    5    extractors and companies extract that natural gas is to remove

 6    the water.  Well, that's an extremely expensive process

 7    because it's a very regulated area.  And when you're removing

 8    water as part of an oil and gas operation, you're subject to

 9    lots of regulations that -- that make it a very expensive

15:18:57   10    process to remove that water and deal with it.

11         The other driving expense in natural gas production

12    is the electricity that's required to pump out the water.

13    These coalbed methane wells are scattered around the

14    landscape, and you have to run electricity to -- to each of

15:19:15   15    them and have electricity.

16         And so those are the two driving factors in the cost

17    to extract natural gas, and so this patent that Kit Jennings

18    buys at a garage sale for $10 in the 1970s is for a tool that

19    is going to allow individuals to extract natural gas from

15:19:35   20    these coalbed methane wells without water or electricity.  So

21    on its face this seems like a pretty exciting idea because you

22    could now extract the gas at just a fraction of the price.

23         And so normally the -- the price of natural gas has

24    to be high enough that it can cover the electricity and the

15:19:56   25    water disposal expense that's necessary to extract it.  But

1    with this tool the idea was that you could extract the natural

2    gas without the electricity cost and without the water

3    disposal cost.

4            So Kit Jennings started raising money based on the

15:20:14    5    idea of this tool.  And at some point in time he hooks up with

6    Ed Pressley, and Ed Pressley is also in this business of

7    pitching this idea to folks.

8            And then along comes Bob Mitchell.  And Bob Mitchell

9    came to Gillette with his brother, who owned a roofing

15:20:32   10    company -- actually, his twin brother.  But he's up there in

11    Gillette, and he finds out about this tool, and he gets hooked

12    up with Ed Pressley.

13            And Bob Mitchell is a crook through and through.  He

14    is a con man.  And as a con man, he is manipulative.  And when

15:20:51   15    he conducts his cons, he doesn't go out and, you know, point a

16    gun at someone and take their wallet.  He uses other people to

17    achieve his criminal ends.

18            And so Bob Mitchell begins promoting this idea.  And

19    ultimately he ends up forming numerous companies that are

15:21:15   20    involved with this alleged technology of -- of removing

21    natural gas.

22            So he forms a company called Mitchell Resources.  And

23    he's out there and he's raising money from investors, and he's

24    pitching this idea to folks.

15:21:28   25            And we talked about it in -- in jury selection.  But

1    there aren't a lot of shrewd investors out there; right?  Most

2    of us are kind of commonsense people, and we don't know

3    everything.  But this idea has -- can certainly be enticing,

4    you know, that you're going to be able to make a lot of money

15:21:45    5    with this natural gas because you've got this patented

6    technology that's going to allow you to do what -- something

7    that's going to remove all of the expense.

8              So he's getting money as Mitchell Resources.  And the

9    way his -- his scam runs is he's getting money from people

15:22:04   10    and they're investing in this idea.  And so they give Mitchell

11    money, and then some time passes.  And what's supposed to

12    happen is Bob Mitchell's supposed to make them rich through

13    this technology, but that never gets off the ground.

14              And so the way Bob Mitchell strung people along was

15:22:22   15    to always be changing the company that was -- was going to get

16    this technology to the finish line.  So you invest in Mitchell

17    Resources and, when you start to get antsy and you start to,

18    you know, come to Bob for "What's going on with my investment?

19    Where's my money?" he says, "Well, you know, most of Mitchell

15:22:39   20    Resources is going to be getting bought out by RWM," another

21    company he comes up with, stands for "Robert William

22    Mitchell."

23              So you've invested in Mitchell Resources, nothing's

24    happening with your money; now you're being told that RWM is

15:22:55   25    who is going to take over and they're going to carry this

1    thing to the finish line.

2         He has another company called CHAMA.  And so, you

3    know, maybe you've invested in RWM, and once it gets to the

4    point where clearly nothing is going to happen with RWM, he

15:23:08   5    says, "That's all right.  I'm going to give you a share in

6    this other company, CHAMA, that's actually going to get this

7    thing done."

8         Same with High Plains Gas.  Lots of folks invested in

9    High Plains, and their investment never went anywhere.

15:23:22   10   High Plains was actually a publicly traded company at some

11   point.  And, again, to cover for himself to have something to

12   say to these investors who have given lots of money but have

13   never seen a dime back, he's always got to be moving the ball

14   and changing the company, and eventually it becomes NuTech

15:23:40   15   Energy.

16        That's the -- the latest in the series of companies

17   that are actually going to get this idea off the ground, that

18   are actually going to start producing gas and selling it and

19   making all these investors rich; right?

15:23:55   20        And so NuTech Energy is -- is the most recent

21   company, is the last in the line of the Bob Mitchell companies

22   for our purposes.

23        And the way the NuTech Energy scam ran was you had a

24   guy named Gerald Luken.  That's the -- the individual there.

15:24:15   25   He goes by the name "Red," and so you're going to hear people

 1   talking about Red, Red Luken.  That's Gerald Luken, Red Luken.

 2        So Red Luken is a guy who -- he's a field guy,

 3   meaning he's spent his entire life working in the oil fields,

 4   working out on the rigs.  And that's how he presents himself.

 5   That's how he carries himself, and that's what he'll tell you

 6   about himself, is "I'm the field guy.  I'm not a stock guy;

 7   I'm not an investment guy; I'm the field guy."

 8        So Red's draw is his connection and his closeness to

 9   the actual oil production side of things.  And so what Luken

10   would do is him and Richard Shupick, another guy from

11   Gillette, they would sit down in a coffee shop in the morning

12   in Gillette, and they'd have coffee and they'd talk up this

13   idea.  They'd talk about this tool; they'd talk about -- you

14   know, they'd sell this pitch, basically, of "Look, we've got

15   this patented way we're going to be able to extract all the

16   natural gas, and we're going to be acquiring these wells, and

17   we're going to be making all this money."

18        And people bought it.  People in Gillette bought into

19   this scam, and they would give money to Red Luken and Richard

20   Shupick to invest in this idea that was being pitched by

21   Bob Mitchell.

22        Now, it's important -- Bob Mitchell's not up there in

23   Gillette.  He's not up there taking people's cash.  He's down

24   in Denver; right?  But he is the captain of this ship.  He is

25   the one who is making this happen.

1          And, ultimately, of course, Red Luken and

2    Richard Shupick aren't on trial, but you're going to hear some

3    questionable things from them.

4          For instance, you know, when people would invest in

15:26:01   5    the company, it didn't -- didn't always sound totally

6    aboveboard.  I mean, what Red Luken would do is he'd say,

7    "Okay.  You want to invest?  Well, I'll take you up to the

8    Albertsons and we'll deposit the money at Wells Fargo into

9    this Bravo 20 account," which was Bob Mitchell's account.

15:26:19   10          I mean, if that's me -- once again, if that's

11   probably any of you sitting there -- that might raise an

12   eyebrow.  That kind of seems like a weird way to invest, going

13   to a bank and direct-depositing money into an account and --

14   that's not the way I think of investments.

15:26:32   15          But, again, people -- people inherently trusted Red;

16   they inherently trusted Richard Shupick.  Richard Shupick

17   spent a lot of time as a janitor at a church up there in

18   Gillette.  He was a handyman that did work on a lot of

19   different properties.  So he'd be out there reshingling

15:26:50   20   somebody's home, and he'd be pitching this idea -- "Hey, you

21   know, we've got this technology; this company is about to take

22   off, and you've got an opportunity to get in on the ground

23   floor and -- and become rich at this."

24          And people went for it, and people invested in this

15:27:06   25   idea to the tune of hundreds of thousands of dollars.  And so

 1    people very much bought the line that Bob Mitchell was

 2    selling.

 3            And it's important to keep in mind this aspect of the

 4    fraud has nothing to do with Justin Herman, Charles Winters,

15:27:28    5    or Ian Horn.  Okay?

 6            They are nowhere on the scene at this point.  They

 7    have nothing to do with what's going on, but it's going to be

 8    important for you to understand because, one, this is how this

 9    investigation came about, was because these investors in

15:27:42    10    Gillette eventually got tired of what's going on.  You know,

11    they had -- they had given hundreds of thousands of dollars,

12    nothing was happening.  They're being told by, you know,

13    Bob Mitchell, "Oh, it's going to be the next company" or "It's

14    going to be next week" or "We've just got to get these

15:27:56    15    accountants paid off" -- or these lawyers paid off -- "and

16    then we're going to -- we're going to get to producing gas."

17            And people ran out of patience, understandably so,

18    and they went to the authorities, and that's how the

19    authorities started looking into all of this.

15:28:09    20            The other thing that happened is, once Bob Mitchell

21    had essentially exhausted the investor pool up in -- up in

22    Gillette -- because you can only run a scam like this for so

23    long.  At some point, you know, there's going to be more

24    people who have heard about, you know, the money that their

15:28:24    25    friends and neighbors invested that that they never got back,

19-CR-26-ABJ                    OPENING - WARD                 Vol. II-112
21-CR-14-ABJ

1   and you're going to run out of investors.  So Bob had to move

2   on to the next idea or another way to keep this scam going.

3   And so what he wanted to do was he wanted to buy a shell

4   company.

15:28:41    5          Now, we need to talk about shell companies for a

6   moment because the Government tried very hard in their opening

7   statement to imply that there is something inherently wrong

8   with shell companies.  The Government even used kind of an

9   insidious and a deceptive analogy of, you know, "A shell

15:28:58   10   company is kind of like a shell game, you know, where you've

11   got the guy on the bus" -- or whatever, you know -- "that has

12   the three -- three cups and, you know, you're guessing where

13   the thing is and it's a hustle."

14          Well, that is not what a shell company is.  Okay?  A

15:29:12   15   shell company is a publicly traded company.

16          And to become a publicly traded company, you have to

17   do what's called an IPO, an initial public offering.  And it's

18   an extremely heavily regulated transaction.  It costs, you

19   know, tens, hundreds of thousands of dollars to take a company

15:29:32   20   public -- okay? -- through an IPO.  You have to pay lawyers;

21   you have to pay accountants; you have to go through numerous

22   regulatory agencies.

23          And so being a publicly traded company, though, is an

24   important aspect of nearly every big, legitimate business

15:29:48   25   because you're able to get investor money.  People are able to

19-CR-26-ABJ                    OPENING - WARD                    Vol. II-113
21-CR-14-ABJ

1    buy shares of your company, give you cash, give you capital.

2          And what they get in return is not just, you know, an

3    interest in something down the road; they get something that's

4    similar to cash.  They get a publicly traded stock.  So now

15:30:05   5    I own, you know, stock in Company A.  I can sell it; I can

6    trade it; it operates similar to cash.

7          And so -- but as we all know, businesses don't go on

8    forever.  I mean, businesses fail.  Businesses come and go.

9    And so if you're a publicly traded company and you go out of

15:30:24   10   business, you still have a valuable asset.  You have the shell

11   of your company, and it's a valuable thing.

12         And this is not just a smalltime, start-up, penny

13   stock type of operation that deal with shells.  I mean, you

14   know, Nokia, the phone company, that was a rubber boot company

15:30:42   15   that, you know, was then acquired through a shell that became

16   Nokia, the -- the cell phone company.  It's a little dated in

17   terms of its application today but a big company, you know.

18         Berkshire Hathaway -- you know, Warren Buffet's

19   company -- was a -- a shell company that, you know,

15:30:59   20   transitioned into Berkshire Hathaway.  Shell Oil was literally

21   a company that sold shells, like seashells, and then was

22   acquired as a shell and became Shell Oil Company, the

23   megagiant company.

24         So "shell" is not a dirty word.  Using a shell

15:31:19   25   company is not a sign of dirty business or that you're up to

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1    something.  Shell companies are not the, you know, shell game

2    that the hustlers play on the street.

3            Shell companies are legitimate, and that's what

4    you're going to hear from all of the experts in this case.

15:31:33    5    There's nothing inherently shady or bad about buying a shell

6    company or using a shell company as a vehicle in business.

7    Now, what Bob Mitchell wanted to do with the shell company

8    undoubtedly was -- was criminal.  But the idea of a shell

9    company is not criminal in and of itself.

15:31:53   10            So Bob wanted to acquire a shell because he had ran

11    out of mom-and-pop investors in Gillette.  He needed another

12    way to continue to have money coming in, you know, so that he

13    could keep his scam going.  He wanted to buy a shell.

14            So Bob Mitchell wants a shell company.  I'm sorry for

15:32:13   15    the crude illustration, but that's what he wanted.  Bob wanted

16    a shell company, and there's nothing inherently illegal or --

17    or bad about that.

18            So then you have Tom Crom.  I think we heard

19    a little bit about Tom Crom in the opening statements, but

15:32:34   20    Tom Crom is a guy who had a shell company.

21            And these two -- you know, so Bob Mitchell wants a

22    shell.  Tom Crom has a shell.  And the way these two get

23    connected is through Justin Herman.

24            Justin Herman's an entrepreneur, and he's a start-up

15:32:50   25    entrepreneur, meaning he's in the business of getting with

1    companies at their early stages, so he understands investment

2    capital, and that's how these two connect, is through

3    Justin Herman.

4        Now, the shell that Tom Crom has is called

5    EcoEmissions.  All right?  And as the Government said in their

6    opening -- I mean, a lot of this is complicated.

7        And I think the Government kind of implied you're

8    going to hear a lot of stuff from the defendants that isn't

9    maybe, you know, directly related to the -- the crimes that

10    are charged, but this is directly related to the crimes that

11    are charged against my client, Charles Winters, in that this

12    purchase of the EcoEmissions shell is what leads to this

13    identity theft charge.  Okay?  But I've got to kind of walk

14    you through it and set up what's going on here.

15        So the shell company that Tom Crom has is called

16    EcoEmissions.  All right?  Its trading symbol was ECZM [sic].

17    That was the stock ticker.

18        And what EcoEmissions did as a company was kind of

19    similar to the scam that Bob Mitchell ran.  Right?  So

20    EcoEmissions was this company that had this catalytic

21    converter technology.  Right?  And it was supposed to be this

22    technology that you could put onto any diesel engine and it

23    would inject some kind of fluid into the diesel engine and it

24    would allow the diesel fuel to burn much more efficiently.

25        So you can imagine there's a lot of big companies

15:33:08 (line 5)
15:33:25 (line 10)
15:33:44 (line 15)
15:34:02 (line 20)
15:34:23 (line 25)

1   that run all kinds of diesel equipment.  And what this

2   technology promised to do was "We're going to substantially

3   reduce your fuel cost because we've got this technology" --

4   and it's patented; right?  It -- you know, "We're the only

15:34:39  5   ones with it.  We're going to be able to drastically reduce

6   your diesel cost in your big operation."

7           And so, again, kind of inherently, just on its face,

8   it sounds like, geez, you know, maybe one of these ideas that

9   takes off.  Maybe this is the next Amazon or, you know, next

15:34:55  10  big start-up is this idea.  So that's what EcoEmissions did.

11          And EcoEmissions stopped operating around 2008 or

12  2009.  And at that point in time a guy named Gordon Pardy was

13  the director of marketing -- I don't know if he was the

14  director, but he was one of the marketing sales guys at

15:35:20  15  EcoEmissions.  And EcoEmissions, the technology that they were

16  selling, was patented by a guy named Joel Robinson.

17          And so in order to sell this -- this technology -- to

18  go out there and market it to businesses and get people to buy

19  into it -- you had to own the -- you had to license the patent

15:35:42  20  rights from Joel Robinson, so that's what EcoEmissions was

21  doing for a while.  They had the patent rights from

22  Joel Robinson.

23          But at some point in time, their patent rights

24  lapsed.  They stopped paying Joel Robinson for the right to

15:35:57  25  market this technology, and the patent lapses about the time

 1   that EcoEmissions is going out of business.

 2          And Gordon Pardy is leaving that company, so he gets

 3   with a guy named Dave Rodgers.  Okay?  Gordon Pardy and David

 4   Rodgers form another company called E-Pro.  And E-Pro is a

 5   company that Gordon Pardy and David Rodgers form, and their

 6   business model is going to be that, "Well, we know that the

 7   EcoEmissions has allowed these patent rights to lapse and now

 8   these patent rights are up for grabs.  We're going to get

 9   money together, we're going to buy the patent rights, and then

10   we're going to do one of three things:  We're either going to

11   buy the patent rights and then sell them back to EcoEmissions

12   at a profit" -- because EcoEmissions is -- is still trying to

13   be in the business of marketing these patent rights.  "So we

14   can acquire them directly from Joel Robinson, and we can then

15   sell them back to EcoEmissions; or we can acquire the patent

16   rights and then sue EcoEmissions because EcoEmissions is still

17   going to be out there selling this technology but without the

18   underlying patent right; or we can go out on our own and just

19   sell these patent rights the same way that EcoEmissions was

20   doing it."

21          And so, you know, Gordon Pardy refinanced his home,

22   and he gets a -- a substantial investment from David Rodgers

23   so they can acquire these patent rights and go out and try to

24   make money with them.  Gordon Pardy, in order to do that -- at

25   some point they -- and so that's E-Pro.  They form the company

1    E-Pro.

2            And at first it's David Rodgers and it's Gordon

3    Pardy, and they're trying to make money with these

4    EcoEmissions patent rights, but they run out of money.  They

15:37:48    5    need to keep making payments to Joel Robinson to be able to

6    keep doing this, and so they bring in a woman named

7    Kat Quevado -- who, as you can see, I don't have a photo of.

8            They bring in Kat Quevado, and they get Kat Quevado

9    to invest a substantial amount of money into E-Pro in order to

15:38:04    10    make a patent payment to Joel Robinson.

11            Eventually, though, just like EcoEmissions wasn't

12    able to make it work, E-Pro isn't able to make it work,

13    either.  And so you've got Gordon Pardy, you've got

14    David Rodgers, and you've got Kat Quevado, and they've all

15:38:27    15    invested a pretty substantial amount of money.  And the only

16    thing they had left at the end of their business endeavor was

17    an option right.  Okay?

18            The option right -- so I have to explain a little bit

19    about what an option is.  So an option allows -- you pay money

15:38:42    20    for an option to exercise a right at some point in the future.

21            So they had an option right to extend the patent

22    rights.  They hadn't bought the full patent rights, but they

23    had purchased an option to extend the patent rights.

24            And Tom Crom, who was one of the financial officers

15:38:59    25    of EcoEmissions, is aware of this, and he joins forces with a

19-CR-26-ABJ                OPENING - WARD                 Vol. II-119
21-CR-14-ABJ

1    guy named Larry Lorenz, and they want to get to purchase that

2    option back from E-Pro.

3           You know, it's a circular thing.  I understand.

4    I mean, these patent rights are going to EcoEmissions, then

15:39:21    5    over to E-Pro.  Now E-Pro is transferring them back to

6    EcoEmissions; right?  Or that's what -- that's what they want

7    to have happen.

8           And so what Tom Crom and Larry Lorenz arrange is they

9    want to pay money to E-Pro, to David Rodgers, Gordon Pardy,

15:39:38   10    and Kat Quevado.  They do this transfer through a convertible

11    note, and you heard a little bit about that in the other

12    opening statements.

13           And so the way a convertible note works is it's

14    another kind of investment tool.  So what Tom Crom and Larry

15:39:56   15    Lorenz promised to David Rodgers and Gordon Pardy in exchange

16    for the purchase of this option is "We're not going to give

17    you cash; we're going to give you a note.  So we're going to

18    give you a promise to pay you in the future, but that note's

19    going to be a convertible note, meaning that if we don't pay

15:40:12   20    you back" -- meaning if EcoEmissions doesn't pay Gordon Pardy

21    and David Rodgers back -- then that note, that debt

22    obligation, can be converted by David Rodgers and Gordon Pardy

23    into shares of EcoEmissions.  Okay?

24           So that's kind of the -- that's why it's better than

15:40:31   25    just a promise to pay.  It's a promise to pay and then "If we

---

19-CR-26-ABJ                  OPENING - WARD                 Vol. II-120
21-CR-14-ABJ

 1   don't pay, you can convert this into shares of the company."

 2          So what Thomas Crom and Larry Lorenz do -- and I've

 3   got to take one step back just in that -- so there -- there

 4   was a convertible note, but Gordon Pardy and David Rodgers

15:40:58  5   were also supposed to get paid a portion of whatever money

 6   Tom Crom and Larry Lorenz raised with the patent rights under

 7   this new formation or this return of the patent rights to

 8   them.

 9          And the evidence you're going to hear is that

15:41:12  10   Tom Crom and Larry Lorenz ripped off Gordon Pardy and David

11   Rodgers.  They're supposed to be paying David Rodgers and

12   Gordon Pardy a portion of the money they raise through

13   marketing this technology and they don't.  And Gordon Pardy

14   and David Rodgers find out about that.  They find out that

15:41:33  15   Tom Crom and Larry Lorenz have screwed them.

16          Gordon Pardy and David Rodgers get access to the bank

17   account, and they say, "Well, by God, Tom Crom raised $750,000

18   through marketing of this option, and we're supposed to be

19   getting paid a percentage of that, and we never got a dime."

15:41:47  20   Okay?

21          Gordon Pardy and David Rodgers are not happy about

22   that, obviously, so they consider their options.  They say,

23   "Well, how do we -- how do we deal with this.  You know, we

24   can -- we can try to sue Larry Lorenz" -- who was Tom Crom's

15:42:04  25   partner at that time -- "but he's up in Canada, and that's

19-CR-26-ABJ                    OPENING - WARD                    Vol. II-121
21-CR-14-ABJ

1   going to be expensive, you know, exercising the legal process

2   against Larry Lorenz in Canada.  That doesn't seem like a

3   viable option."

4        Tom Crom was broke by this time.  He got -- they got

15:42:18   5   the $750,000 but Tom Crom was broke, so they didn't really

6   have any recourse against Tom Crom and Larry Lorenz for

7   screwing them over and not paying them that percentage they

8   were supposed to.

9        And so at this point David Rodgers is not happy

15:42:33   10   with -- not happy with Gordon Pardy.  Gordon Pardy is kind of

11   who roped David Rodgers into this in the beginning, and so

12   those two aren't getting along.

13        But then we have to kind of reorient -- reorient

14   ourselves, go back to why we're talking about all of this, and

15:42:51   15   that's because at some point later in time Tom Crom wants to

16   make money selling this Eco shell to Bob Mitchell.  Right?

17        Because you remember Bob Mitchell's got his -- you

18   know -- his natural gas scam going.  He wants to buy a shell;

19   Tom Crom wants to sell the shell.

15:43:13   20        But the way a shell works is you can have a clean

21   shell, you can have a dirty shell, and a dirty shell means

22   there's debt obligations tied to it.  And so in this case what

23   you have is you have David Rodgers and Gordon Pardy, and they

24   have debt interests in the Eco shell.

15:43:29   25        Because, remember, Eco had promised to pay them

1  money, and there were convertible notes, so they actually held

2  not just debt; they potentially held shares in EcoEmissions.

3  So if EcoEmissions gets sold to Bob Mitchell, Gordon Pardy and

4  David Rodgers still have an ownership interest and Bob

15:43:49   5  Mitchell won't own what he's trying to buy.

6          And so Tom Crom negotiates another deal.  Okay?  And

7  he's got to go back to the people that he's already screwed

8  over once -- and he's unabashed, though.  He's a little

9  shameless, I guess.

15:44:07   10         And he goes back to Gordon Pardy, and he says, "Well,

11  we want to, you know -- I want to sell this shell, and I want

12  to buy out your convertible note so that I can sell the shell

13  to a buyer."

14         And Gordon Pardy is friends with an interesting guy,

15:44:25   15  who's dead now, and that's Alan Lobock.  Okay?  And Alan

16  Lobock was actually one of the founders of SkyMall.

17         And I'm sure you guys are all familiar with SkyMall.

18  You know, when you fly on a plane -- maybe not so much

19  nowadays because we've got screens and everything.  But it

15:44:44   20  used to be you fly on a plane and in front of you was a barf

21  bag and a Sky- -- and, you know, maybe the -- the safety

22  features for the airplane -- and a SkyMall catalog where you

23  could buy, you know, back massagers or, you know, Harry Potter

24  alarm clocks.  I don't know.

15:44:58   25         But Alan Lobock was one of the founders of SkyMall,

1   and he's friends with Gordon Pardy.  And so Gordon Pardy

2   enlists Alan Lobock to act as the negotiating intermediary

3   between him and Tom Crom.

4        They also decided they're just going to screw

5   Kat Quevado out of this whole deal.  Right?  So Kat Quevado

6   was one of the investors in E-Pro.  She had invested a

7   substantial amount of money, a hundred thousand dollars, and

8   she owned a convertible note.  She was owed money from E-Pro

9   and from ECMZ, but they just -- Gordon Pardy decided he was

10  just going to cut her out of things.

11       And so you've got Alan Lobock negotiating with

12  Tom Crom for this transaction.  And what they're trying to

13  accomplish is Tom Crom is trying to pay out Gordon Pardy and

14  David Rodgers so that he can sell the ECMZ shell to Bob

15  Mitchell.  And Alan Lobock is acting as the negotiating

16  intermediary.

17       You heard the Government say that -- and Gordon Pardy

18  and Dave Rodgers are the alleged victims of identity theft.

19  Okay?  The identity theft charges against Mr. Winters are that

20  he affixed Gordon Pardy and David Rodgers' signatures to

21  documents and he thereby stole their identity.  Right?

22       And you heard the Government say in their opening

23  statement Gordon Pardy and Dave Rodgers never authorized

24  anyone to -- to act on their behalf.

25       Well, the evidence you're going to see is going to

15:45:21
15:45:40
15:46:02
15:46:24
15:46:42

19-CR-26-ABJ                    OPENING - WARD                Vol. II-124
21-CR-14-ABJ

 1  show that that just isn't true.  And what you can see here --

 2  this is an email from Gordon Pardy to Tom Crom.  And what he's

 3  saying is "Greetings.  I appreciate your comments.  I'm

 4  copying Alan Lobock on this email.  We have given Alan full

15:47:02   5  authority to work on this with you.  It has been -- he has

 6  been in touch with Dave and has his approval to move forward."

 7          And so what happened in this -- in this whole deal is

 8  by the time this comes up, Dave Rodgers has decided -- "You

 9  know what?  I don't want anything to do with this anymore.

15:47:23  10  I've invested a bunch of money in E-Pro and the idea of this

11  diesel fuel catalyst injector and all I've done is lost money,

12  so I don't want anything to do with this."

13          And that's what you're going to hear from

14  Dave Rodgers, is that he was done dealing with ECMZ,

15:47:38  15  EcoEmissions, and this catalytic injection technology and he

16  wanted nothing to do with it.  But he said, "I'm willing to

17  let Gordon Pardy go forward and, you know, sell his rights and

18  make a little money out of it.  I'm fine with that.  So

19  I don't want anything out of this transaction, and I'll sign

15:47:56  20  off on it.  I'll sign away my right to these convertible notes

21  so that Gordon Pardy can make some money."

22          And the deal that Gordon Pardy and Alan Lobock had

23  was that they were going to split whatever money they got

24  because Alan Lobock was acting as the negotiator.

15:48:11  25          So, eventually, Alan strikes a deal with Tom Crom,

 1    and the deal is Tom Crom is going to pay $15,000 and -- in

 2    exchange for Gordon Pardy and Dave Rodgers' convertible notes,

 3    to extinguish those debt obligations so that he can then sell

 4    the shell to Bob Mitchell.  And David Rodgers and Gordon Pardy

15:48:34  5    have given Alan Lobock full authority to negotiate this on --

 6    on their behalf.

 7         And what's important is you're going to hear from

 8    David Rodgers and Gordon Pardy that this transaction ended up

 9    exactly how they expected it.  They didn't get screwed out of

15:48:51 10    anything in this -- in the transaction where they're alleged

11    to have had their identity stolen.

12         They wanted to sell their rights in those convertible

13    notes for $15,000, Gordon Pardy was going to get half,

14    Alan Lobock was going to get half, and that's exactly what

15:49:08 15    happened.

16         So -- and that's important because you as jurors --

17    the Government is going to try to get you to check your common

18    sense at the door.  They're going to try to focus in on the

19    unimportant aspects of this transaction and make some claim

15:49:33 20    that Gordon Pardy and David Rodgers' identity was stolen.

21         It's simply not true.  Gordon Pardy got exactly what

22    he expected out of the deal.  He got every single penny that

23    he expected to have coming to him.  David Rodgers never wanted

24    any money in the first place, but he gave his full authority

15:49:51 25    to Alan Lobock to negotiate this deal, and that's exactly what

1    happened.

2           So then now you have Bob Mitchell with the ECMZ

3    shell.  And, again, it's important to understand -- the

4    Government tried to imply throughout its opening statement,

15:50:07    5    you know, "Well, why would anybody ever buy a shell company

6    that didn't have any employees or revenue or, you know,

7    assets?  That must be inherently illegal or, you know,

8    evidence of a bad motive."  That's simply not true.

9           This happens in business all the time, and that's

15:50:26   10    what you're going to hear from everyone who testifies who

11    understands these things, that shell company sales happen all

12    the time.  I've already given you some examples of big,

13    well-known companies that this is how they started.

14           But in order to operate as a shell company, Bob

15:50:43   15    needed to set some things up.

16           So how did NuTech Energy operate?  Well, you had

17    Red Luken, who was the field guy; right?  You had Mike Perry,

18    who owns another company, Emerald Operating Company, and he's

19    in the oil and gas business, and he's going to come in and

15:51:01   20    testify.

21           You've got Kevin Trizna.  You heard a little bit

22    about him from the Government in their opening.  But

23    Kevin Trizna is a guy who at one time was a registered

24    stockbroker.  Just like to become a lawyer you have to pass

15:51:15   25    the bar and you have to take an exam and pass, well, Kevin

1   Trizna is a guy who has passed the Series 7 stockbroker exam,

2   you know, the exam you've got to pass in order to be a

3   stockbroker.  And he agrees to serve as the CEO of NuTech

4   Energy.

15:51:33    5        The Government implied to you that, you know, he made

6   actions or did things in connection to a board of directors

7   and that there was no board of directors.

8        Well, again, that's just simply not true.  NuTech was

9   a -- a Delaware corporation, and under Delaware law you can

15:51:54   10   have a board of directors with one person on it.  And so

11   Kevin Trizna served as the CEO and the board of directors.

12   When he ultimately resigned from NuTech, he wrote a letter to

13   himself.  But he was the CEO and he was the -- the only person

14   on the board of directors.  Again, this is -- this is all

15:52:13   15   allowed under corporate law.

16        And so he served as the -- as the CEO.  And then you

17   have Tom Throne.  And I don't know if anyone's talked much

18   about Tom Throne, but I'll tell you a little bit about Tom

19   Throne.

15:52:28   20        So he's an oil and gas attorney from Wyoming.  And

21   his connection to all of this is going to be reoccurring

22   because in all these iterations of these companies that are

23   selling this natural gas idea -- this idea of extracting

24   natural gas from these abandoned coalbed methane wells --

15:52:48   25   well, all those wells sit on Tom Throne's property.

1          So Tom Throne owns a piece of property, and it's full

2   of abandoned coalbed methane wells, and he works closely with

3   Mike Perry.  And you also heard the Government say over and

4   over that -- okay -- NuTech was just a company name; it was

15:53:06   5   just a name; it was never a real company; nothing was ever

6   really going on, you know, with this oil and gas production.

7          But you're going to hear from Tom Throne that he did

8   a hundred thousand dollars worth of legal work for NuTech that

9   he feels like he's still owed -- right?  He got some shares

15:53:21  10   from NuTech.

11          And he's going to be a reoccurring common theme, in

12   that these oil and gas wells on his property are what gives

13   some legitimacy to the -- the -- these ideas of these

14   different companies and different people that are pitching

15:53:38  15   this oil and gas -- natural gas extraction technology.  Well,

16   there really are some wells, and they sit on Tom Throne's

17   property.

18          So I told you before that when Tom Crom and

19   Bob Mitchell -- you know, when Bob Mitchell wants a shell --

15:53:57  20   and he's the buyer.  Tom Crom is the seller.  And Justin

21   was -- was the guy that arranged that deal because that's the

22   business that Justin's in.  He's a start-up guy.  Okay?  And

23   he knows Chuck Winters.  And so as he's arranging for this

24   shell purchase and he's involved in this shell purchase, he --

15:54:15  25   the NuTech pitch, the idea about this oil and gas technology.

19-CR-26-ABJ                    OPENING - WARD                    Vol. II-129
21-CR-14-ABJ

 1              And knowing Chuck Winters -- Chuck's a Florida guy;
 2      right?  He's a hands-on kind of guy.  He's got a machine shop.
 3      So Justin hears, you know, "Well, look.  They've got this
 4      technology; it seems promising."
15:54:34   5              He brings in Chuck Winters to manufacture the tool;
 6      right?  Because they had the idea for this tool, but they
 7      needed to actually make it work.  And Justin felt like, "Hey,
 8      Chuck is the guy that's actually going to make this tool
 9      work."
15:54:50  10              So, again, the Government is telling you there's no
11      business -- NuTech isn't actually doing anything, that they
12      only exist on paper.
13              Well, NuTech hires Chuck to manufacture the tool.
14      And there it is right there.  Okay?  That's the tool.
15:55:04  15              And so Chuck Winters manufactures this tool.  He
16      machines it.  That's his tool.  He ultimately ends
17      up patenting it -- it's not patented.  The patent's available.
18      He patents the technology.
19              And Mike Perry -- the owner of the other oil and gas
15:55:25  20      company, Emerald Operating Company, that works with Bob --
21      pays Chuck Winters $12,000 to manufacture 15 of these tools so
22      that they can see if it works, so that they can deploy this
23      tool into Tom Throne's wells and produce natural gas.
24              And, you know, so Chuck's hearing all about this;
15:55:50  25      Chuck's excited about this technology.  He thinks he can make

1    it work.  He manufactures the tool.  He's paid to manufacture

2    it.  He sends these 15 tools up to Gillette.  And he sends

3    them up to Red Luken; right?

4          Red Luken is the field guy who's spent his life in

5    the oil fields.  And Red Luken goes out and deploys this tool

6    into the natural gas wells, and then he writes to Chuck

7    Winters, and he says, "Your tool works."  He says, "It works.

8    We're pumping gas."

9          And he tells Chuck Winters -- he sends him an email,

10   and he says, "If we continue moving forward, we will need a

11   tool in each of these wells.  This way, you know where your

12   tools are."  Okay?  And he attaches two PDFs that are these

13   maps of hundreds and hundreds of -- of gas wells.  Right?

14         So -- and this is the way Bob Mitchell works.  You

15   know, he's got all -- he's like a fraud octopus, basically.

16         So he's got Red Luken up in Gillette, who's the field

17   guy -- okay?  He's got -- you know, he's got the connection to

18   the actual oil and gas wells through Tom Throne.

19         And so Chuck sends the oil and gas tool up to -- to

20   Red Luken, who puts it in the wells and then tells him, "Look,

21   get ready to manufacture a whole bunch of these tools because

22   your tool works, and we're going to be putting it in all these

23   wells," you know.  And "You're going to get some stock in this

24   company as part of this."

25         And so not only is Chuck Winters expecting, "Well,

19-CR-26-ABJ                OPENING - WARD              Vol. II-131
21-CR-14-ABJ

1    geez, I'm going to be -- going to be manufacturing all these

2    tools; I own the patent to them; I'll be getting, you know,

3    royalties from the patent; I can get in on the ground level of

4    this company," and you can understand his belief then.

15:57:44    5    But the Government's going to sit here and tell you

6    throughout this trial that NuTech was just a company on paper.

7    And I think what the -- the language they used was, "Oh,

8    they're supposed to do something and magically it's going to

9    make the gas come out of the wells," you know, implying like

15:57:58    10    this is all so fake and phony that there's nothing to it.

11    Well, what you're going to hear from the Government's

12    own witnesses -- the Government's going to subpoena and call

13    Mike Perry.  And what Mike Perry is going to tell you is

14    "We're still doing this.  Right now.  We -- we have the oil

15:58:13    15    and gas tool deployed on Tom Throne's ranch, and we're

16    producing gas."  Okay?  You can -- you know, this is from

17    the -- the Emerald website right now.  They're producing oil

18    and gas.  They're still doing this.

19    And Tom Throne is still intimately involved because

15:58:30    20    all of this is occurring on his property, and he's the oil and

21    gas attorney.

22    So what this case ultimately ends up being about

23    is -- is a pump and dump.  And we haven't even gotten there,

24    but we're -- we're working our way towards it.  And, you know,

15:58:46    25    it's not just a pump and dump but it's this Russian pump and

19-CR-26-ABJ                OPENING - WARD              Vol. II-132
21-CR-14-ABJ

1    dump, and you've heard little tidbits of information about

2    this.

3            But what -- what ultimately ends up happening is that

4    Bob Mitchell, once he has this free-trading company, once

15:59:04    5    NuTech is an up and coming free-trading company, this false

6    information gets put out there.  Right?

7            So you've got NuTech Energy that hasn't ever made a

8    lot of money, that doesn't own a lot of assets, and this story

9    gets out into the ether that a Russian company is going to buy

15:59:23    10   NuTech for like $2 billion.  Right?

11           And, again -- I mean, I think anybody sitting -- you

12   know, you don't have to be an acute investor or -- or have a

13   business degree to understand that, well, you're only going to

14   spend $2 billion on something -- you know, that's a pretty

15:59:40    15   good deal -- or that's a going concern.  So it's pretty

16   obvious this Russian pump and dump, you know, thing is fake

17   from the beginning.

18           But there are things that give it legitimacy.

19           And so for a pump and dump -- and the Government's

15:59:57    20   going to try to tell you that acquiring control of a company

21   is necessary for a pump and dump, and that's just not true.

22           A pump and dump does not require gaining control of a

23   company.  What a pump and dump is is when you put out

24   knowingly false information to jack up the price of a company.

16:00:17    25   Right?  Because everything with the stock market is about

1    buying low and selling high, you know.

2            And kind of from an outside view, that's all anybody

3    in the stock market wants to do.  They want to -- you know,

4    they want to buy low and sell high.

16:00:32    5            And, of course, none of us want the -- the Government

6    to be in the business of legislating, you know, what business

7    ideas are too crazy to allow people to pursue.  I mean,

8    imagine, you know -- you know, think about Jeff Bezos in, you

9    know, 1993 or something.

16:00:49    10            You know, you would have thought he was the craziest

11    guy on earth:  "Oh, I'm going to sell every product in the

12    world through an online interface" -- and, yet, it was

13    something that nobody saw coming but, boom, you know, he's the

14    most successful guy in the world.

16:01:01    15            And so we don't want to stifle innovation.  The

16    Government's not in the business of going out and saying "This

17    is a good business idea, but this one is bad, so we're going

18    to make this one illegal."  That's not the way the law works.

19    The way the law works is we regulate and we say "You can't go

16:01:18    20    out and tell knowing lies."

21            So there's nothing inherently illegal about the idea

22    of the NuTech tool.  You know, there's nothing illegal about

23    trying to make it work.  What you can't do is you can't go out

24    and tell the investing public things that you know are false.

16:01:36    25    It has to be a knowingly false statement, and that is what

 1    ends up happening with this Russian pump and dump.

 2         And so the way the -- the pump and dump -- you know,

 3    the Government tried to tell you, "Oh, there's like five --

 4    five parts to it."  There's not.  There's two, the pump and

 5    the dump.  Okay?

 6         And so the pump in this case was to put out false

 7    information.  Right?

 8         And so, you know, that's not Bob Mitchell like on a

 9    Facebook page posting about NuTech or something.  The way you

10    get false information out to the public is through press

11    releases.  And press releases have to go through third

12    parties.

13         So Bob was one of the people involved in the pump.

14    He was coordinating putting out false press releases, and he

15    was working with others, though, who are going to be these

16    unindicted coconspirators.

17         And the Government, without ever explaining to you

18    who these people are, without ever identifying them, without

19    ever, you know, giving you the information for you to know

20    "Well, who were the players in this pump -- part of the pump

21    and dump?" -- the Government's just going to step over that.

22    They're not going to tell you.

23         But what I can tell you is there's going to be no

24    evidence that it was my client, Chuck Winters, that had any

25    connection to the pump.  He never paid for a press release; he

1  never put out a press release.  When the Government was, you

2  know, showing you emails going out, none of those were -- had

3  anything to do with Chuck Winters.  Okay?

4          So that's -- that's one part of the pump.

5          And then the even more egregious part of the pump

6  that you haven't heard about yet was the investor conference

7  call.

8          And the investor conference call is what it sounds

9  like.  So, you know, an investor conference call is when a

10  publicly traded company like NuTech arranges to have a

11  conference call where investors and potential investors can

12  call in and participate in this call even -- you know, ask

13  questions, hear a presentation about the company from the

14  officers and the directors and -- and ask questions as either

15  an investor who's already invested or a potential investor who

16  wants to invest, and you're going to hear this conference

17  call.

18          But I'll tell you a little bit about what goes on in

19  the conference call.  So the -- the folks who are on the

20  conference call are not Chuck Winters, are not Justin Herman,

21  are not Ian Horn.  The people on the conference call are

22  Mike Perry, Kevin Trizna, and Tom Throne, and they are the

23  people that are speaking for the company.

24          And so we've heard about Kevin Trizna and how he

25  was -- you know, agreed to be the CEO.  And when the

16:03:04
16:03:22
16:03:35
16:03:49
16:04:12

1    Government investigated this case, they went to Kevin Trizna.

2    And they conducted an interview with him, and they recorded

3    that interview, and they asked him about the Russian pump and

4    dump.  They said, "Well, what about this Russian buyout?"

16:04:28    5    Because, of course, it was Kevin Trizna who supposedly

6    received this offer from this Russian company to buy NuTech

7    for $2 billion.

8          Well, Kevin's the CEO, and the Government's going to

9    call Kevin to testify.

16:04:40    10          And when they interviewed Kevin as part of their

11    investigation, Kevin tells them, basically, "Well, yeah, of

12    course, you know, that pump -- that Russian buyout, of course,

13    that was -- you know, we all knew that was -- that was bogus

14    right from the beginning."

16:04:52    15          I think Kevin was -- was hoping maybe the conference

16    call had gone away or the Government didn't have it, but the

17    Government did have it, and you're going to hear it.

18          And what Kevin Trizna does on that conference call --

19    so he tells the investigators after the fact "I knew the

16:05:07    20    conference call was -- I knew the Russian offer was BS, you

21    know, the moment I heard it.  How could anybody believe, you

22    know, some company was going to pay $2 billion for NuTech?"

23          But what he said on the conference call was, you

24    know, "I'm Kevin Trizna.  I'm the CEO of NuTech, and I've been

16:05:23    25    approached by a Russian company with an offer to buy us out.

1    And, you know, it was a little suspect at first, but we've

2    done our due diligence, and we've looked into this, and we've

3    concluded that it's a bona fide offer."

4           And then he has the gall to even say, you know, "And,

16:05:41    5    really, the $2 billion figure -- you know, that might actually

6    be a little light, you know.  Maybe we're worth even more than

7    $2 billion.  But, you know, we care about you all, the

8    shareholders, so we're going to accept this, you know,

9    $2 billion offer."  Okay?

16:05:58    10           If anyone was involved in a pump, it wasn't

11    Chuck Winters, wasn't Justin Herman, it wasn't Ian Horn.  It

12    was Kevin Trizna.  Right?  He's on the investor conference

13    call representing to the investing public that "I've got a

14    bona fide offer from a Russian company" when he knows that's

16:06:15    15    not true.

16           That's the pump.  That's the pump.

17           And it has nothing to do with Chuck Winters, it has

18    nothing to do with Justin Herman, it has nothing to do with

19    Ian Horn, and that's what the Government's here to prove.  You

16:06:29    20    know, it's not -- the Government's not here to prove how good

21    of a lawyer Ian Horn is or, you know, how viable the -- you

22    know -- this well technology may or may not be.

23           They're here to prove a pump and dump, and the person

24    who was intimately involved in the pump part of the pump and

16:06:43    25    dump was Kevin Trizna, the guy who agreed to be the CEO of the

1    company.

2            The other guy on the conference call is Tom Throne,

3    this well-known and well-respected lawyer from Wyoming who

4    gets on the conference call.  And says, you know, "I've been

16:06:58    5    an oil and gas attorney" -- and this is after Kevin Trizna has

6    said "We've been approached by this Russian company; they've

7    offered to buy us for $2 billion."

8            And Tom Throne gets on the call and says, you know,

9    "I've been an oil and gas attorney in Wyoming for 37 years.

16:07:13   10    I've worked -- you know, I've worked closely with NuTech; I've

11    worked closely with Emerald Operating" -- you know, Mike

12    Perry's company because Mike Perry was on the call, too,

13    talking about his oil and gas business as it related to

14    NuTech.

16:07:24   15            And Tom Throne gets on and blesses the whole thing by

16    saying "I'm a lawyer, you know, and I've looked into this,

17    and, you know, NuTech and Emerald have, you know, a good thing

18    going here," basically.

19            And so when you think about, "Well, how is that going

16:07:39   20    to make you feel as an investor" -- you know, now you've got a

21    lawyer -- you've got a bona fide lawyer who's been in the oil

22    and gas industry a long time.  He's on this conference call

23    vouching for the legitimacy of this offer that everyone knows

24    is -- is fake.

16:07:52   25            And that's the illegal part of this pump, is that

```
 1   this Russian offer was fake and everyone knew it, but they

 2   pumped up the price of the stock through this investor

 3   conference call anyways.

 4          And what the evidence is going to show you is that

 5   had absolutely nothing to do with Chuck Winters, nothing to do

 6   with Justin Herman, nothing to do with Ian Horn.  The pump and

 7   dump operated absolutely unconnected from them.

 8          And so, you know, the question becomes, "Well, what's

 9   going on here?" you know.

10          Kevin Trizna agreed to serve as the CEO of the

11   company, but he's going to come in and say, "Oh, it was Bob,

12   Bob pulling all the strings," you know.  "I had to be the CEO

13   just because I knew Bob was a felon who had been barred by the

14   SEC in the '90s from ever serving as an officer or director of

15   a publicly traded company, had been barred from the -- by the

16   SEC from ever participating in a penny stock offering, but

17   I agreed to be the CEO of this company anyways."  Sounds

18   fraudulent to me on behalf of Kevin Trizna, you know.

19          Red Luken, the field guy, he agreed with Bob -- you

20   know, Bob -- you know, Red had an agreement with Bob that Red

21   was going to get shares of the company, but half of the shares

22   he got were going to be Bob's, you know, because Bob didn't --

23   you know, couldn't -- couldn't own the shares out in public.

24   So him and Red had a back -- backdoor agreement where, you

25   know, all the shares that Red got, Bob was going to get half
```

19-CR-26-ABJ                OPENING - WARD                Vol. II-140
21-CR-14-ABJ

1    of them.

2           And so these are the people that are -- that are

3    carrying out the fraud.  It's not Chuck Winters.  Chuck

4    Winters got brought into this mess because he's the one that

16:09:30    5    could manufacture the tool, and that's what he did.  He

6    manufactures the tool and then he's told by the field guy,

7    "Hey, your tool worked.  We put it in the ground and it's

8    pumping gas.  Gear up because we're going to be putting this

9    tool in hundreds, maybe thousands of wells."

16:09:43    10          So the pump part of this conspiracy had nothing to do

11   with Chuck Winters.

12          The other part of a pump and dump is the dump.  And

13   you heard the Government say in their opening when it came to

14   this $80,000 that was used to purchase the shell, they said,

16:10:01    15   "We -- we followed the money; we tracked the money through the

16   bank accounts."  Yeah, of course, you can track money through

17   bank accounts.

18          So the other part of a pump and dump is the dump.

19   Right?

16:10:11    20          And so you pump up the stock, the stock price goes

21   up, and then you dump the shares, meaning you sell all the

22   shares at that pumped-up volume; right?

23          And people make money.  And in this case that

24   happened.

16:10:26    25          But it wasn't -- you know, Chuck Winters and Ian Horn

19-CR-26-ABJ                    OPENING - WARD                   Vol. II-141
21-CR-14-ABJ

1    and Justin Herman did not dump any stock.  They didn't get the

2    money from the pump and dump.  It was other people.  It was

3    the other people that the Government has failed to even

4    identify who dumped the stock.

16:10:44    5    And that's what you're going to hear from the

6    Government's evidence, that they pumped up the price of the

7    stock and then the stock got dumped and all that money went to

8    unindicted coconspirators.

9    Well, what's going on here?  Why are we -- why are we

16:11:00   10    sitting here with, you know, three guys who made no money from

11    this and the people who did make all the money off this

12    illegal scheme are never going to be brought into court?  Why

13    are we going after Chuck Winters and Justin Herman and

14    Ian Horn?  They're not the guys that pumped it up; they're not

16:11:17   15    the guys that dumped it.

16    And -- and that's the question that's going to be

17    left for you all to answer, is where are the guys that did the

18    pump and where are the guys that did the dump in this pump and

19    dump conspiracy?  And that's what the evidence is going to

16:11:34   20    show you.

21    And so as you're listening to the evidence that's

22    presented, keep that in mind.  Keep -- keep in mind what

23    you're here about.  You're here about a pump and dump.

24    The Government tried to carefully kind of talk around

16:11:46   25    that and say, "Well, any lie that leads in -- you know, leads

19-CR-26-ABJ                    OPENING - WARD                    Vol. II-142
21-CR-14-ABJ

 1  to money is -- is somehow fraud."  Well, that's not what's

 2  charged here.  Securities fraud, what these folks are charged

 3  with, are that you knowingly put out false information to

 4  manipulate the price of the conspiracy.  There's going to be

 5  no evidence that Justin Herman, Chuck Winters, or Ian Horn

 6  ever put out false information.

 7          And you're going to hear the stock that was sold,

 8  the -- the vast -- you know, almost a hundred percent of it --

 9  the vast majority of it -- went to unindicted coconspirators

10  who are unknown.

11          And so why are we here with -- why are we here with

12  these defendants?  That's what you're going to be asking

13  yourself at the end of the evidence, and you're going to have

14  no choice but to find all three of these defendants not guilty

15  of the crimes that they've been charged with.

16          Thank you.

17          MR. FLEENER:  Your Honor, I will defer.

18          THE COURT:  Very well.

19          As I mentioned, ladies and gentlemen, a defendant may

20  defer until later to present their closing statement and

21  properly so under the procedures.

22          Again, I wanted to remind you of one of the

23  instructions I gave you at the commencement of this trial.

24  The opening statements that are made here are not evidence,

25  and you should be cautioned that they are not evidence.  The

1   evidence will be as our instructions stated, derived from the

2   testimony of witnesses and the exhibits and documents that are

3   received into evidence in this case.

4          Rather, you've heard these opening statements as road

16:14:36   5   maps of where each side of the case or each party feels that

6   the evidence will lead.

7          Is the Government ready to call its first witness?

8          Mr. Szott.

9          MR. SZOTT:  Your Honor, thank you.  The Government is

16:14:53   10   ready.  As a brief preliminary before we do that, I thought it

11   might be prudent to check defense counsel's sight lines to the

12   witness box.  We've got the extra equipment here and . . .

13          THE COURT:  We're going to move that -- that item so

14   it will be out of your way.

16:15:55   15   (Discussion held among counsel.)

16          THE COURT:  I didn't realize I'd be enlisting the

17   attorneys to handle the technical issues in the courtroom.

18          Thank you, gentlemen.  It's greatly appreciated.

19          MR. FLEENER:  Thomas, I'll move if I need to.

16:16:41   20   Thank you.

21          MR. SZOTT:  Your Honor, thank you.  The United States

22   calls Alexander Scoufis.

23          THE COURTROOM DEPUTY:  Please raise your right hand.

24   (Witness sworn.)

16:17:09   25   THE COURTROOM DEPUTY:  Please take a seat.

19-CR-26-ABJ           SCOUFIS - DIRECT - SZOTT           Vol. II-144
21-CR-14-ABJ

1          Please state and spell your name for the record.

2          THE WITNESS:  Alex Scoufis, A-l-e-x S-c-o-u-f-i-s.

3          MR. SZOTT:  Mr. Scoufis, good afternoon.

4          THE WITNESS:  Good afternoon.

16:18:05    5          MR. SZOTT:  I might remind you to make sure to speak

6     up and speak into the microphone.  And please let me know if

7     you can't hear anything I say.  All right?

8          THE WITNESS:  Sounds good.

9      **ALEX SCOUFIS, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

10:13:53   10     **BY MR. SZOTT:**

11    Q.   Mr. Scoufis, whom do you work for?

12    A.   I work for FINRA.

13    Q.   And is "FINRA" an acronym?

14    A.   Yes.

16:18:25   15    Q.   And what -- what does it stand for?

16    A.   It stands for "the Financial Industry Regulatory

17    Authority."

18    Q.   What is FINRA?

19    A.   FINRA is a self-regulatory organization in the financial

16:18:38   20    industry.  It oversees brokerage firms, including individuals

21    that work for brokerage firms, as well as trading on public

22    securities markets.

23    Q.   Is FINRA a governmental organization?

24    A.   FINRA is not a governmental organization.

16:18:56   25    Q.   And what at FINRA is your position?

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. II-145
21-CR-14-ABJ

1    A.   I am an attorney in FINRA's Criminal Prosecution

2    Assistance Group.

3    Q.   And is there an acronym for the Criminal Prosecution

4    Assistance Group?

16:19:17    5    A.   Of course.   It's shortened to "CPAG."

6    Q.   And what is CPAG's mission?

7    A.   So CPAG's mission goes along with FINRA's mission, which

8    is to protect investors and ensure that markets are safe for

9    investors.

16:19:33    10           So in order to -- to see that through and because

11    FINRA's not the Government, FINRA provides CPAG as a resource

12    to prosecutors and investigators around the country dealing

13    with criminal securities fraud matters.   Basically, just to

14    lend FINRA's expertise around the country.

16:19:55    15    Q.   And, Mr. Scoufis, as part of your work with CPAG, did you

16    assist in an investigation related to NuTech Energy Resources

17    or NERG?

18    A.   Yes, I did.

19    Q.   And, Mr. Scoufis, just for the jury's information, what's

16:20:23    20    your understanding of how the Government in this case is going

21    to present your testimony in two parts as it relates to the

22    investigation of NuTech?

23    A.   So I'm -- I'm here today to discuss general securities

24    terms and concepts, and then my understanding is I'll be back

16:20:42    25    in the future to discuss more case-specific matters.

19-CR-26-ABJ         SCOUFIS - DIRECT - SZOTT        Vol. II-146
21-CR-14-ABJ

1   Q.   And that will be later in this trial, as you anticipate?

2   A.   Yes.

3   Q.   I'll just ask a few more questions, returning to FINRA,

4   Mr. Scoufis.

16:21:01   5          How are you compensated by FINRA?

6   A.   I'm paid a salary and then potentially a bonus at the end

7   of the year.

8   Q.   Is any of your compensation with FINRA related to the

9   number of hours you worked on the NuTech investigation?

16:21:19  10  A.   No.

11  Q.   Is any of your compensation from FINRA related to the

12  potential result of this trial?

13  A.   No.

14  Q.   Mr. Scoufis, what is the United States Securities and

16:21:49  15  Exchange Commission or SEC?

16  A.   The SEC is a Federal agency that is tasked with overseeing

17  the securities industry.  They're the primary regulator of the

18  securities industry.  They can make rules; they can enforce

19  those rules.  It's just a civil agency, though.  There's no

16:22:09  20  criminal authority.  The SEC is also the ultimate overseer of

21  FINRA, the organization that I work for.

22  Q.   And I'd like to ask you just a little bit more about how

23  FINRA, the agency you works for -- you work for -- relates to

24  and works with the SEC.

16:22:26  25  A.   Sure.

 1              So FINRA is tasked with kind of being the frontline
 2    overseer of broker-dealers, and it also oversees trading on
 3    the securities markets.  FINRA is funded by the industry, by
 4    brokerage firms.  FINRA can make rules and enforce those
 16:22:46  5    rules, but, really, all of our actions are ultimately examined
 6    and overseen by the SEC.
 7    Q.  Mr. Scoufis, before I ask you some other questions about
 8    the securities industry, I'd like to ask some more about your
 9    qualifications.
 16:23:01  10              So let's start with your education.
 11              Where did you do your undergraduate studies?
 12    A.  I went to Colorado State University.
 13    Q.  And what did you study at Colorado State?
 14    A.  Political science -- I majored in political science and
 16:23:17  15    minored in economics.
 16    Q.  And when did you graduate from Colorado State?
 17    A.  2012.
 18    Q.  What was the next step of -- what institution did you
 19    attend next on your educational path?
 16:23:29  20    A.  I went to law school at George Washington University.
 21    Q.  And when did you graduate from George Washington?
 22    A.  In 2015.
 23    Q.  As pertinent here, Mr. Scoufis, what, if any, area was the
 24    focus of at least part of your studies in law school?
 16:23:47  25    A.  In law school I -- I focused on financial regulation

 1   through courses as well as internships, including interning at

 2   the SEC.

 3   Q.  Apart from interning at the SEC while you were in law

 4   school, Mr. Scoufis, where else did you intern?

16:24:05  5   A.  I also interned at OtterBox in Fort Collins.

 6   Q.  And what about for FINRA?

 7   A.  Yeah, as well as FINRA.  SEC, FINRA, and OtterBox.

 8   Q.  After you finished law school, Mr. Scoufis, did you pass

 9   the bar exam?

16:24:29  10  A.  Yes.

11  Q.  Where did go to work after law school?

12  A.  I went to work at FINRA.

13  Q.  And what was your -- the nature of your employment when

14  you first went to FINRA?

16:24:41  15  A.  I worked in FINRA's office of fraud detection and market

16  intelligence and investigated potential insider trading

17  violations.

18  Q.  And do you recall about when you went -- you transitioned

19  from that work to working for CPAG?

16:25:03  20  A.  Yeah.  So I started in -- at FINRA in 2015, May of 2015,

21  and worked in FINRA's office of fraud detection and market

22  intelligence until about the end of 2016 and then started my

23  current position.

24  Q.  You mentioned a little bit about what CPAG does.

16:25:23  25       As part of your employment with CPAG, what sort of

19-CR-26-ABJ         SCOUFIS - DIRECT - SZOTT        Vol. II-149
21-CR-14-ABJ

1   assistance do you provide to investors and prosecutors?

2   A.   Yeah.  It ranges from answering basic securities law

3   questions to complicated questions, answering questions about

4   the industry.  And then I can also assist with analyzing data

16:25:47   5   and documents like trading data or documents related to

6   transactions.

7        Ultimately, I might create visual aids like charts,

8   like you'll see later on in -- in my testimony.

9   Q.   And I will ask you more about these concepts later,

16:26:05   10   Mr. Scoufis.

11        But just roughly, what percentage would you say of

12   your work time is devoted to investigating or reviewing

13   materials related to pump and dump schemes or other market

14   manipulations?

16:26:21   15   A.   Probably about three-quarters or so.  Two-thirds,

16   three-quarters.

17   Q.   And when you are conducting such work in that two-thirds

18   to three-quarters of your time, what are you looking for, just

19   generally, in those investigations?

16:26:42   20   A.   Well, looking for violations of the securities laws,

21   primarily -- primarily looking at market manipulations.  So

22   types of manipulative trading as well as, perhaps, false

23   statements, anything, really, that's kind of out of the

24   ordinary.

16:27:06   25   Q.   Mr. Scoufis, based on your education, your experience,

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. II-150
21-CR-14-ABJ

1   have you developed specialized knowledge related to the

2   pertinent law, regulations, and practices that are typically

3   associated with pump and dump schemes and other market

4   manipulations?

16:27:24   5   A.   Yes.

6   Q.   Mr. Scoufis, as part of your duties with the CPAG, have

7   you testified before in Federal District Court?

8   A.   I have.

9   Q.   How many times have you testified as a member of FINRA's

16:27:41   10   CPAG?

11   A.   11 times.

12   Q.   So this is the -- the 12th?

13   A.   Correct.

14   Q.   What sorts of cases have you testified in previously?

16:27:58   15   A.   Market manipulation, pump and dumps, insider trading as

16   well as Ponzi scheme matters.

17   Q.   Have you previously testified as an expert witness?

18   A.   I have.

19   Q.   And in what sort of cases have you provided expert

16:28:15   20   testimony?

21   A.   Market manipulation, pump and dumps in two matters, and

22   insider trading -- and an insider trading matter.

23          MR. SZOTT:  May I have a moment, Your Honor.

24          THE COURT:  Yes, you may.

16:28:44   25          MR. SZOTT:  Your Honor, thank you.

1    BY MR. SZOTT:

2    Q.   Mr. Scoufis, I'd like now to just start asking you about

3    some basic concepts related to the securities markets and

4    related issues.

16:28:56    5         So let me ask this first:  What are securities?

6    A.   Securities are financial instruments that represent some

7    sort of ownership position.  Common examples are stocks or

8    bonds.

9    Q.   More specifically, what is stock?

16:29:22    10   A.   Yeah.  So stock -- it's a type of security that represents

11   an ownership position of a company.  So if I own stock of a

12   company, I'm at least a part owner of that company.

13   Q.   And what are shares?

14   A.   Synonymous with stock.  I own stock of a company; I own

16:29:41    15   part of that company.  I own shares of a company; I own part

16   of that company, same thing.

17   Q.   As a very general matter, what -- why might a company

18   issue shares?

19   A.   Yeah.  So -- I mean, the most basic reason for companies

16:29:59    20   existing and -- and for issuing shares is to raise money.  So

21   they issue shares; they collect money; they fund their

22   operations.  That's it.

23   Q.   I'd like to ask you about public and private companies, so

24   let's start with the former.

16:30:20    25        What is a public company?

1    A.   A public company is a company whose shares trade on public

2    securities markets.  So, commonly, we probably know of large

3    companies that trade on the New York Stock Exchange or the

4    Nasdaq stock exchange, like Amazon, big public companies as

16:30:42    5    well as smaller companies that trade on what's called the

6    over-the-counter markets.

7    Q.   And, Mr. Scoufis, in this context if I were to use the

8    term "public marketplace," what would that term refer to?

9    A.   Yeah.  "Public marketplace" or "public securities markets"

16:31:04    10    just refers to a place where investors come together to buy

11    and sell stock.  Or securities.

12         So the New York Stock Exchange, Nasdaq stock

13    exchange, and over-the-counter markets.

14    Q.   So I asked you about a public company.  What's a private

16:31:22    15    company?

16    A.   A private company is just the opposite.  It's a company

17    whose shares do not trade on the public marketplace.

18         And really what that means is, you know, any -- any

19    investor can go through a stockbroker and buy public company

16:31:37    20    shares, but the same cannot be said for a private company.

21    You cannot just go out and buy any private company shares.

22    Q.   As a general matter, what role do corporate officers play

23    within a company?

24    A.   Officers of a company run the day-to-day operations of the

16:31:57    25    company, so things that come up every day.  They are hired by

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. II-153
21-CR-14-ABJ

1   directors, the board of directors.  And -- yep, just -- just

2   kind of keep the company going every day.

3   Q.  Mr. Scoufis, what would be some common examples of

4   corporate officers in terms of their official designations?

16:32:24   5   A.  Sure.  Most -- most well known, of course, is chief

6   executive officer, CEO.  Also, chief financial officer or CFO.

7        And I suppose you can say "chief whatever" and then

8   "officer" nowadays.  But CEO and CFO are very common.

9   Q.  You alluded to a board of directors, Mr. Scoufis.  What

16:32:49   10   role does a board of directors play at a company?

11   A.  A board of directors are handling kind of big picture

12   aspects of a company.  Excuse me.

13        They will approve contracts, large contracts,

14   acquisitions.  They hire the officers of a company.  And,

16:33:09   15   importantly, the board of directors are elected.  They're

16   voted on by the shareholders.

17   Q.  So to whom are the board of directors accountable?

18   A.  Ultimately, to the shareholders.

19   Q.  Generally, Mr. Scoufis, what is a shell company?

16:33:37   20   A.  A shell company is a company that has little to no

21   operations or assets.  I like to just think of it as just

22   existing as a legal entity.  It's got a name and it's got

23   shareholders but that's about it.  It doesn't really operate.

24   Q.  What are broker-dealers or brokerage firms in the context

16:34:08   25   of the securities markets?

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. II-154
21-CR-14-ABJ

1   A.  Broker-dealers and brokerage firms are companies that buy

2   and sell stock, typically for customers.  Commonly on -- on TV

3   we'll see commercials for like Charles Schwab or Morgan

4   Stanley or E*Trade, all broker-dealers.

16:34:29   5          People can call up -- they have -- they'll have to

6   have an account at the broker-dealer, and they can call up and

7   buy and sell public companies' securities.

8   Q.  To buy or sell securities in a public marketplace, is a

9   broker-dealer's involvement required?

16:34:46   10  A.  Yes.

11  Q.  Would you explain to the jury how broker-dealers are

12  regulated and overseen by the SEC and by FINRA.

13  A.  Yeah.  So as I mentioned kind of earlier, the first

14  line of oversight is FINRA.

16:35:07   15          Broker-dealers need to be registered with FINRA.

16  Individuals that work for broker-dealers need to be registered

17  with FINRA.  FINRA makes a lot of rules; they enforce those

18  rules.  And same thing with the SEC.  But definitely relying

19  on FINRA to oversee brokerage firms.

16:35:26   20  Q.  As part of that oversight, Mr. Scoufis, what, if anything,

21  can FINRA and the SEC do to bring someone who's out of

22  compliance -- shall we say? -- back into line or to discipline

23  someone who's breaking the rules?

24  A.  Yeah.  Both FINRA and the SEC are able to suspend people

16:35:52   25  from the industry.  And, again, in order to operate in the

```
19-CR-26-ABJ        SCOUFIS - DIRECT - SZOTT        Vol. II-155
21-CR-14-ABJ
```

 1  industry, to work for a brokerage firm, you have to be

 2  licensed and a member of FINRA.

 3          So both entities, brokerage firms and individuals

 4  that work for them, can be suspended, they can be barred from

16:36:08  5  the industry, and they can be fined.

 6  Q.  Mr. Scoufis, if the jury should hear the term "market

 7  maker," what does that mean?

 8  A.  A market maker is a company or a firm in the securities

 9  industry that just stands ready to buy and sell securities.

16:36:31  10  They help to create liquidity so there's always somebody

 11  that's able to buy, and then they're going to sell to the next

 12  person.  They make just a tiny profit off of each transaction,

 13  at least that's their goal.

 14  Q.  Mr. Scoufis, I'd like to ask you a few questions, I think,

16:36:52  15  about transfer agents and how they fit into the process.

 16          What is a transfer agent?

 17  A.  A transfer agent is hired by a company to issue shares and

 18  to keep track of -- of the shares that have been -- been

 19  issued.

16:37:11  20          So if a public company sells shares to 10 new

 21  shareholders -- or issues shares, new shares, to 10 new

 22  shareholders -- they'll go to the transfer agent and ask them

 23  to -- to create the stock certificates.  They'll also keep

 24  track of if those shares are canceled, if they're kind of

16:37:33  25  retired, or, in some circumstances, if they're transferred to

19-CR-26-ABJ         SCOUFIS - DIRECT - SZOTT         Vol. II-156
21-CR-14-ABJ

1    a new holder.

2    Q.   And, Mr. Scoufis, just so we're clear, how does a transfer

3    agent's role differ from a broker-dealer's role?

4    A.   Transfer agents are tasked with kind of creating and

16:37:55    5    keeping track of shares.  And brokerage firms are -- exist to

6    help with transactions.

7         If I want to buy shares, I go to my brokerage firm.

8    I don't go to my transfer agent -- or to the transfer agent.

9    Q.   And how would a transfer agent know, Mr. Scoufis, that

16:38:17    10    it's supposed to issue shares on behalf of a particular

11    company?

12    A.   So the transfer agent answers to the company.  They work

13    for the company, and they will do what they're told by the

14    company.

16:38:31    15    Q.   And I believe you mentioned certificates.  When we're

16    talking about a transfer agent issuing certificates, what does

17    that mean exactly?

18    A.   Yeah.  They're -- they're really just creating a

19    certificate.

16:38:46    20         So issuing, creating -- we think of them oftentimes

21    as just being printed.  They don't have to be printed.  They

22    can be electronic, as well.

23         But they're creating that stock certificate.

24    Q.   What is the Depository Trust Company?

16:39:03    25    A.   The Depository Trust Company is a player in the securities

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. II-157
21-CR-14-ABJ

1   world for helping to -- or they're assisting in -- in

2   transactions.  Part of them accepts just deposits of stock.

3   They can keep them safe.  They store them away and then

4   they'll put them into electronic form and record that -- that

16:39:28   5   an individual has the stock.

6          And then they also assist in clearing.  So if a

7   customer at Charles Schwab is selling to a customer at

8   E*Trade, they're going to be involved in the middle and making

9   sure the money and the stock trades hands.

16:39:43   10          Now, the way it works is the stock isn't -- isn't

11   being sent, of course.  It's just DTC checking the box that

12   it's been transferred to a customer at E*Trade.

13          So it's all electronic, but DTC is involved in kind

14   of the mechanics of the securities industry.

16:40:03   15   Q.  And why is -- why is DTC -- why is DTC's role so important

16   in terms of the efficiency of the securities markets?

17   A.  Yeah.  If you think about having a physical stock

18   certificate and if you were to sell to somebody, you know,

19   across the country -- if you had to actually mail that

16:40:24   20   certificate and then a check or a wire was mailed back, it

21   would be expensive and time-consuming.  And, basically, just

22   doing it all electronically through DTC just makes it faster

23   and more efficient.

24   Q.  Mr. Scoufis, apart from DTC and a broker-dealer, might

16:40:50   25   someone deposit his certificates with a different kind of

1   custodian, a separate custodian?

2   A.   Yeah.   DTC isn't required -- it's very common, again, just

3   because of the efficiency.   But stock can be deposited with a

4   brokerage firm, and it can also be deposited with a qualified

16:41:13   5   custodian, again, for -- mostly for safekeeping.

6   Q.   Mr. Scoufis, what are ticker symbols?

7   A.   A ticker symbol is a unique set of letters assigned to a

8   company's stock, typically four letters but they can be more

9   or less.

16:41:32   10        And when a company's stock is trading in the public

11   markets, they're identified by that ticker symbol.

12   Q.   Where does the ticker symbol come from?

13   A.   So it is applied for by the company with FINRA, and FINRA

14   will issue that ticker symbol to the security -- to the

16:41:55   15   company's stock or securities.

16   Q.   And why is the ticker symbol so important for a company

17   that wants to be traded at a public marketplace?

18   A.   A ticker symbol is required to be traded in the public

19   marketplace.   When you're checking how a stock is doing,

16:42:12   20   various stock, it's not going to say the company; it will just

21   say this, you know, four-letter code.

22   Q.   Mr. Scoufis, now I'd like to ask you some questions about

23   convertible debt and convertible promissory notes.

24        So let me ask you, first, what is a convertible

16:42:31   25   promissory note?

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. II-159
21-CR-14-ABJ

1   A.  All right.  So just to break that up a little bit, a

2   promissory note is just a debt, an agreement between, we'll

3   say, a company, a public company, and an investor laying out

4   the terms of -- of money that the investor has lent to the

5   company.

6           And "convertible" means that the debt is allowed to

7   be converted into stock, so it -- convertible promissory notes

8   are security, and they -- they exist oftentimes if the

9   investor isn't really sure that the company can pay back the

10  debt.  And so they have an option later on in the future, if

11  that doesn't happen, to just convert the debt into stock.  And

12  then the idea is that they could sell the stock to other

13  investors to recoup their investment.

14  Q.  You alluded to this, Mr. Scoufis.  But why might a company

15  be issuing a convertible promissory note?

16  A.  I mean, to start just with the promissory note, they want

17  to -- they need money.  They are -- they're -- they need to

18  borrow money.

19          And oftentimes the -- the lender, the investor, is --

20  is saying, "No.  I want the option to convert into stock just

21  because it's not clear you're going to be able to repay."

22  Q.  I'd like to transition, Mr. Scoufis, and ask you some

23  questions about the registration of securities with the SEC.

24          Let me ask you, first, what is the general rule that

25  applies with regard to whether securities must be registered

16:42:49  (line 5)
16:43:11  (line 10)
16:43:33  (line 15)
16:43:49  (line 20)
16:44:10  (line 25)

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. II-160
21-CR-14-ABJ

1   with the SEC?

2   A.   Yeah.   Securities transactions need to be registered with

3   the SEC.   Commonly, it's a Form S-1, but there's multiple

4   forms.   If not, there needs to be an exemption from

16:44:31   5   registration.   So it needs to be registered or there needs to

6   be an exemption.

7        If the securities are issued by the company pursuant

8   to an exemption, they're going to be marked "Restricted."

9   They'll be restricted securities.

16:44:44   10  Q.   And I will be returning to the concept of restricted

11  securities.

12       Let me ask you now, what is the overall rationale for

13  requiring securities to be registered with the SEC unless they

14  satisfy an exemption?

16:45:04   15  A.   So it's kind of a big question.

16       And it's overarching in -- in the -- America's

17  securities laws, and that's basically that, in order for

18  securities to be publicly traded, available to the public,

19  investors need to have information about the company.

16:45:25   20       And that's really what it comes down to with the US

21  securities laws, is truthful disclosure.   And that's what

22  we'll see in the registration statements, that there is --

23  there's required to be information made available to the

24  public.

16:45:40   25  Q.   So as a more practical question, Mr. Scoufis, what does it

19-CR-26-ABJ           SCOUFIS - DIRECT - SZOTT          Vol. II-161
21-CR-14-ABJ

1   actually mean for a company to register its securities with

2   the SEC?  What does the company need to do?

3   A.  Well, the effect of registering securities with the SEC

4   and going along with this disclosure is that they become

16:46:05    5   what's called reporting companies.

6           So after a company files a Form S-1, securities

7   registration statement, they now need to file -- they now need

8   to make public filings, including 10-Ks, which are reports

9   about the company on an annual basis, as well as 10-Qs, which

16:46:25   10   are on a quarterly basis, as well as 8-Ks, which happen after

11   a material event.

12   Q.  And what is the system or the name of the system that

13   companies use in order to file their information with the SEC?

14   A.  These reports are filed with what's called EDGAR.  It's an

16:46:47   15   SEC website available to the public.  Companies can upload

16   these disclosures, these reports, and then the public can view

17   them.

18           MR. SZOTT:  May I have a moment, Your Honor.

19           THE COURT:  You may.

16:47:07   20       (Discussion held at counsel table.)

21           MR. SZOTT:  Your Honor, thank you.

22   BY MR. SZOTT:

23   Q.  Mr. Scoufis, you've testified about a company registering

24   with the SEC.

16:47:58   25           How does a company deregister with the SEC?

1   A.   Once a company has registered with the SEC, they need to

2   make -- they need to file 10-Ks and 10-Qs.  That is burdensome

3   and companies don't always want to make these filings.

4          And so if they meet certain requirements,

16:48:21   5   specifically drop before -- drop below a share owner threshold

6   and/or assets, they can file a Form 15-15D, which allows them

7   to stop making these reports.

8          MR. SZOTT:  Mr. Davila, would you please bring up

9   Exhibit 204.

16:48:47   10          And, Ms. Harris, I might note that this is not in

11   evidence, so the jury's screen should be muted at this point.

12          We're going to go with Plan B.

13          Ms. Harris, can I have access, please, to the

14   overhead?

16:50:43   15          Ms. Harris, if we could take one more try in

16   displaying the exhibit from counsel table.

17          THE COURTROOM DEPUTY:  Yes.

18          MR. SZOTT:  Thank you.

19   BY MR. SZOTT:

16:50:57   20   Q.   Mr. Scoufis, I've -- we've now brought up on the monitor

21   what's been marked for identification as Government

22   Exhibit 204.

23          Page 1 is on your screen now.  I'll ask you to take

24   just a moment to look at that, and then I will transition to

16:51:15   25   the next page.

 1              MR. SZOTT:  And, Mr. Davila, can we switch to page 2,

 2    please?

 3              And now back to page 1.

 4    BY MR. SZOTT:

 5    Q.  Mr. Scoufis, have you had an opportunity to examine

 6    Exhibit 204?

 7    A.  Yes.

 8    Q.  Without discussing the specifics of what it contains, what

 9    is Exhibit 204?

10    A.  So this is the -- the form that terminated NuTech's

11    registration -- or reporting requirements.

12              MR. SZOTT:  Your Honor, at this time I would

13    conditionally offer 204.

14              MR. FLEENER:  No objections from Defendant Herman.

15              MR. WARD:  No objection.

16              MR. JUBIN:  No objection.

17              THE COURT:  It is received conditionally.

18              MR. SZOTT:  Thank you, Your Honor.  May we publish to

19    the jury?

20              THE COURT:  You may.

21              MR. SZOTT:  So, folks, on your screens now is the

22    first page of Exhibit 204.

23    BY MR. SZOTT:

24    Q.  Mr. Scoufis, would you please tell the jury what they're

25    seeing here on the first page of 204.

16:51:41
16:51:49
16:52:14
16:52:23
16:52:37

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. II-164
21-CR-14-ABJ

1    A.  This is the first page of the Form 15-15D allowing NuTech

2    to stop reporting, stop filing the 10-Ks and 10-Qs.

3           MR. SZOTT:  Mr. Davila, would you move, please, to

4    page 2.

16:53:00  5    BY MR. SZOTT:

6    Q.  And, again, Mr. Scoufis, what is the jury seeing here on

7    page 2?

8    A.  Just a continuation of the Form 15 and marks the reason

9    why they are able to terminate or suspend the duty to file

16:53:15  10   reports and then signed by Kevin Trizna.

11   Q.  Thank you, Mr. Scoufis.

12          MR. SZOTT:  Ms. Harris, could we mute the monitors,

13   please?

14   BY MR. SZOTT:

16:53:28  15   Q.  So, Mr. Scoufis, after a company, whether NuTech or some

16   other company, files one of these forms that we saw in the

17   exhibit, does that mean they're no longer a public company?

18   A.  No, not necessarily.  So we've talked a lot about

19   reporting, reporting requirements, trading on the New York

16:53:53  20   Stock Exchange, the Nasdaq stock exchange.  But, of course,

21   public companies also trade on the -- or through the

22   over-the-counter markets.

23          So a company could deregister and not be reporting

24   but still be a public company trading on the over-the-counter

16:54:10  25   markets.

1  Q.  I'd like to transition now, Mr. Scoufis, and ask you about

2  the exchanges and the over-the-counter markets.

3          So you already testified about a public company, so

4  let me transition into it this way:  Can any company, just any

16:54:30  5  company, have shares that trade in a public marketplace?

6  A.  No.  Again, going back to disclosure and having

7  information available to the public, that's the key here.

8          So whether you're a listed company on the New York

9  Stock Exchange or a small company on the over-the-counter

16:54:48  10  markets, companies need to make information public.  It does

11  not have to be through SEC filings, but a certain amount of

12  information is needed for a company to become a public

13  company, including information about the officers, directors,

14  large shareholders, as well as the business, just general

16:55:10  15  information, so the public can -- can understand if it's a

16  good investment.

17          So that's the key for public companies.

18  Q.  Let me ask you about national securities exchanges.  What

19  are national securities exchanges?

16:55:28  20  A.  Exchanges are -- are places where large companies

21  generally are listed, New York Stock Exchange, Nasdaq stock

22  exchange.

23          These companies are required to make reports with the

24  SEC that I had discussed earlier, 10-Ks and 10-Qs.  And so

16:55:48  25  that's the larger company portion of the public securities

 1   markets.

 2   Q.   And are these -- are exchanges the actual places where

 3   stocks are bought and sold?

 4   A.   Yeah, in a sense.  It used to be more so, where you had

 5   people on the floor and everyone screaming, as we may have

 6   seen in movies.  But that doesn't really exist anymore, just

 7   a little bit.

 8        And so they're more just listed on the exchanges, and

 9   there's trading that happens through other venues, but they're

10   still listed companies.

11   Q.   Now, in order to be listed on national exchanges, does a

12   company need to be filing reports with the SEC?

13   A.   Correct.  They do.

14   Q.   So let's transition from the national exchanges -- let's

15   transition from the national exchanges to talking about the

16   other part of the public marketplace, the over-the-counter

17   markets.

18        Let me ask you first, what is OTC Markets Group?

19   A.   OTC Markets Group is the operator of the over-the-counter

20   markets.  It's a company.  It provides quotes for

21   over-the-counter markets or for -- for public companies that

22   trade on over-the-counter markets.

23        It also provides a -- a place for companies to file

24   information.  So we talked about filing public information

25   reports with the SEC, but smaller companies that aren't

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. II-167
21-CR-14-ABJ

1    reporting companies can do it through OTC Markets' website.

2          So there's quite a few -- for each public company

3    there's a profile, public filings, press releases, and then

4    what the stock is trading at.

16:57:44    5    Q.  Mr. Scoufis, based on your understanding of this

6    investigation, this case, for practical purposes is it fair to

7    equate the over-the-counter markets with OTC Markets, with

8    OTC Markets Group?  Just for practical purposes, are those

9    basically referring to the same thing?

16:58:03    10   A.  They -- yeah.  And I will refer to them -- refer to it as

11   all three, OTC, over-the-counter -- yep.  We're talking about

12   the same thing.

13   Q.  And I might have missed this a moment ago.

14         If a company is trading on OTC Markets, is it

16:58:19    15   possible that it's a reporting company?

16   A.  Yeah.  A reporting company that files with the SEC can

17   trade on the over-the-counter markets.  Most are companies

18   that aren't reporting and make their information public

19   through OTC Markets, on OTC Markets' website.

16:58:38    20   Q.  At this point, Mr. Scoufis, let me ask you about another

21   term:  Generally speaking, what is a penny stock?

22   A.  A penny stock is generally a small company whose shares

23   trade for pennies, fractions of pennies, up to $5.

24         Yeah, small companies.  Oftentimes they don't make as

16:59:04    25   much information public.  And they're also characterized as

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. II-168
21-CR-14-ABJ

1    having, oftentimes, low volume.  It's not very easy to buy and

2    sell these securities.

3    Q.  You mentioned "low volume," Mr. Scoufis.  In the context

4    of the securities markets, what does "volume" mean?

16:59:20    5    A.  Yeah.  So "volume" -- also another term for "volume" is

6    "liquidity."  Basically, "liquidity" refers to how easy it is

7    to buy and sell stock, and that ease depends on the volume,

8    how many shares are trading hands every day.

9         Some penny stocks might not trade during the day or

16:59:40    10    for weeks.  And I would say that that, then, is low liquidity,

11    not very easy to buy and sell that stock.

12         Investors always want liquidity.  They always want a

13    lot of volume because then, if they need to sell tomorrow,

14    they can.  They don't have to wait weeks or months to sell.

16:59:59    15    Q.  Generally, Mr. Scoufis, where are penny stocks traded?

16    A.  Over-the-counter markets.

17         MR. SZOTT:  Your Honor, I certainly can keep going.

18    I note that it's five o'clock, and this is a bit of a natural

19    break in Mr. Scoufis' testimony, so I'm -- I'm at the Court's

17:00:19    20    disposal.

21         THE COURT:  You don't have to convince me, Counsel.

22    Thank you, Mr. Szott.  I appreciate you bringing it to my

23    attention.

24         Ladies and gentlemen, early this morning I gave you

17:00:43    25    an instruction concerning some things to watch out for.

19-CR-26-ABJ                                                      Vol. II-169
21-CR-14-ABJ

1    I'm not going to reread that long list.

2         Again, I'd remind you not to discuss this case with

3    anyone or permit anyone to discuss it with you.  If anyone

4    should approach you or attempt to engage you in discussion

5    about the case, please inform them that you're a juror.  If

6    they persist at all, please inform us so that we can take

7    appropriate steps to prevent that from continuing in any way.

8         It would not be productive for you to attempt to

9    investigate this case by going to the Internet or any of the

10   apps that may be available -- Google, et cetera, Twitter,

11   et cetera, or Facebook -- concerning any of the issues in this

12   case.

13        We'll take -- as we all know, what is contained on

14   those -- those apps is not gospel, it's not under oath, it's

15   not subject to cross-examination, and lies and misinformation

16   is certainly rife on those devices.  And, besides, if you're

17   in possession of that information, what do you do with it?

18   You've just become a witness.

19        Do you swear yourself in and attempt to testify

20   outside the presence of the Court to your fellow jurors, share

21   it with them?  Not?  Or come into the courtroom and ask to be

22   sworn and testify?  It's impossible.  You don't want to do it.

23        So that would be another suggestion for you.

24        Again, I'd remind you that these folks are friendly,

25   but avoid any contact with them.  And I know the attorneys

1  will conduct themselves and advise their clients to -- and

2  witnesses -- to behave in the same way, not to approach these

3  jurors or attempt to engage them, even to pass the time

4  of day.

17:02:48   5         And, again, I'd remind you of what I said last night:

6  Don't worry about the case.  They need to worry about the

7  case.  And believe me, they are burning the midnight oil and

8  working hard on this matter.

9         And drive safely, eat well, get rest -- rested.

17:03:13   10  I know some of you are trying to work at night.  Give yourself

11  a little bit of a break, though, and go to bed at a

12  decent hour.  And we'll see you tomorrow morning -- we'd like

13  to start at 8:30 if we could.

14         Counsel, any objection to that?

17:03:32   15         MR. HEIMANN:  No, Your Honor.

16         THE COURT:  Thank you.

17         We'll stand in recess until 8:30 tomorrow morning.

18         THE COURTROOM DEPUTY:  All rise.

19      (Proceedings outside the jury's presence at 5:03 p.m.)

17:04:18   20         THE COURT:  You, of course, may step down.

21         MR. HEIMANN:  Your Honor, I want to do one thing

22  before we walk out.

23         THE COURT:  Absolutely.

24         MR. HEIMANN:  Your Honor, I just want to introduce

17:04:30   25  Donna Summers.  She is from the US Attorney's Office in

19-CR-26-ABJ                                              Vol. II-171
21-CR-14-ABJ

1    Denver, and she is here helping us with our witnesses in this

2    case.

3              So if you see Ms. Summers in the gallery or coming in

4    and out or with her phone or tablet, she's --

17:04:45    5              THE COURT:  I'm Alan Johnson.

6              MS. SUMMERS:  Nice to meet you.

7              MR. HEIMANN:  -- she's communicating with witnesses

8    so --

9              THE COURT:  Can I see your face?

17:04:52    10             All right.  Thank you.

11             MS. SUMMERS:  Yeah.

12             THE COURT:  Well, welcome to Wyoming.

13             MS. SUMMERS:  Thank you.

14             THE COURT:  It's nice to have a -- one of your expert

17:05:02    15    witnesses be somebody who graduated from a local college,

16    university, because it shows that folks in this part of the

17    country can do well.

18             MR. HEIMANN:  Yes, sir.

19             THE COURT:  What happens to them?

17:05:14    20             I hope everything goes well for you --

21             MS. SUMMERS:  Thank you.

22             THE COURT:  -- in the time you're up here.

23             MR. HEIMANN:  That's all.  Thank you, Judge.

24             THE COURT:  You're welcome.

17:05:25    25             Counsel, anything you want me to be alert to?

 1            MR. FLEENER:  No, sir, not from Justin Herman.

 2            MR. JUBIN:  Not at this time.  Thank you.

 3            MR. WARD:  No.  Thank you, Judge.

 4            THE COURT:  I want to --

17:05:38   5            MR. WARD:  Good night.

 6            THE COURT:  Concerning the issue that was raised at

 7   sidebar concerning *US versus Bruton*, I haven't really

 8   discussed it in detail and really would want your thoughts

 9   concerning whether there needs to be any kind of redaction

17:06:04  10   effort concerning exhibits that are made.

11            Frankly, I don't know how you could do that in the

12   context of this case, but -- but your thoughts would be

13   greatly appreciated in any event.

14            MR. JUBIN:  Your Honor, I think I made my thoughts in

17:06:26  15   that regard known by my citation to some case law that

16   involves the due process rights to be able to present a

17   defense.

18            And that's why I provided that in pretrial to the

19   Court, because I knew the issue was going to come up.  I think

17:06:42  20   we all knew the issue was going to come up.

21            THE COURT:  I told you it was going to come up a long

22   time ago.

23            So there is some concern --

24            MR. JUBIN:  I would be --

17:06:52  25            THE COURT:  -- concern about it, but I suspect a

19-CR-26-ABJ                                          Vol. II-173
21-CR-14-ABJ

 1   great deal of this evidence that you're talking about is going

 2   to come in through the Government, as well.  So I -- and

 3   I'm not in a position to be able to predict that one way or

 4   another.

 5            MR. JUBIN:  Well, a lot of it needs to come in for my

 6   defense, whether it comes in through the Government or not, so

 7   it's coming.

 8            THE COURT:  Yeah.  Very well.

 9        (Proceedings concluded 5:07 p.m., September 22, 2021.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5         I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14        Dated this 10th day of January, 2022.

15

16

17

18                  /s/ Melanie Humphrey-Sonntag

19        _____

20             MELANIE HUMPHREY-SONNTAG
                   RDR, CRR, CRC
21           Federal Official Court Reporter

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3

4    _____

5    UNITED STATES OF AMERICA,          DOCKET NO. 19-CR-026-ABJ
                                        DOCKET NO. 21-CR-014-ABJ
6          Plaintiff,
                                        VOLUME III of XIV
7          vs.                          (Pages 174 through 417)

8    JUSTIN HERMAN, CHARLES W.          Cheyenne, Wyoming
     WINTERS, JR., a/k/a Chuck          Thursday,
9    Winters, and IAN HORN,            September 23, 2021
                                        8:34 a.m.
10         Defendants.

11   _____

12

13

14                TRANSCRIPT OF TRIAL PROCEEDINGS

15

16           BEFORE THE HONORABLE ALAN B. JOHNSON
                UNITED STATES DISTRICT JUDGE
17          and a jury of twelve and four alternates

18

19

20

21

22       *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*
23            *Federal Official Court Reporter*
     *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
24         *630.452.6236 * MelanieSonntagCRR@gmail.com*

25   *Proceedings reported with digital stenography; transcript*
           *produced with computer-aided transcription.*

```
 1    APPEARANCES:
      For the Plaintiff:        ERIC J. HEIMANN
 2                              THOMAS A. SZOTT
                                ASSISTANT UNITED STATES ATTORNEYS
 3                              DISTRICT OF WYOMING
                                2120 Capitol Avenue, Fourth Floor
 4                              Cheyenne, WY 82001

 5    For the Defendant         THOMAS A. FLEENER
      Herman:                   FLEENER LAW
 6                              506 South Eighth Street
                                Laramie, WY 82073
 7
      For the Defendant         ZENITH S. WARD
 8    Winters:                  BUCHHAMER & WARD
                                1821 Logan Avenue
 9                              Cheyenne, WY 82001

10    For the Defendant         THOMAS B. JUBIN
      Horn:                     JUBIN & ZERGA
11                              2614 Pioneer Avenue
                                Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2       GOVERNMENT WITNESSES:
                                                    PAGE
3         ALEX SCOUFIS
          Direct Examination (Continued) by Mr. Szott    179
4         Cross-Examination by Mr. Fleener              220
          Cross-Examination by Mr. Ward                 241
5         Cross-Examination by Mr. Jubin                250
          Redirect Examination by Mr. Szott             250
6
          JASON LOY BERRYHILL
7         Direct Examination By Mr. Heimann             253
          Cross-Examination by Mr. Jubin               324
8
          SONIA HACKER
9         Direct Examination by Mr. Heimann            344
          Cross-Examination by Mr. Ward                357
10        Cross-Examination by Mr. Jubin               358

11        NADINE McCREERY
          Direct Examination by Mr. Szott              359
12        Cross-Examination by Mr. Fleener             375
          Cross-Examination by Mr. Ward                377
13        Redirect Examination by Mr. Szott            387
          Recross-Examination by Mr. Fleener           387
14
        DEFENSE WITNESSES:
15                                                  PAGE
          PATRICK KELLEY McCREERY
16        Direct Examination by Mr. Ward               389
          Cross-Examination by Mr. Heimann             407
17        Redirect Examination by Mr. Ward             409

18

19                    E X H I B I T S
                                    IDENTIFIED   RECEIVED
20      GOVERNMENT'S EXHIBITS
          3.1    Wire Transfer Records      346        346
21        5.1    Email Chain                271        272
          5.2    Email Chain                273        273
22        5.3    Text Message               312        312
          5.4    Email Chain                274        275
23

24

25

Vol. III-177

```
 1              E X H I B I T S   C O N T I N U E D
                                    IDENTIFIED   RECEIVED
 2      GOVERNMENT'S EXHIBITS
            5.5    Email Chain              276        276
 3          5.13   Email Chain              277        278
            11.1   Email Chain              279        280
 4          11.2   Email Chain              281        282
            15.2   Email Chain              285        286
 5          15.3   Email Chain              286        287
            19.1   Email Chain              289        289
 6          19.2   Email Chain              289        290
            20     Email Chain              290        291
 7          22.1   Email Chain              349        351
            24.1   Email Chain              292        292
 8          24.2   Email Chain              292        293
            24.3   Email Chain              293        294
 9          27.1   Email Chain              353        354
            28.34  Skype Chat Messages      306         --
10          100    Email Chain              267        268
            101    Email Chain              269        270
11          102    Text Messages            308        310
            305    Email Chain              313        314
12          306    Email Chain              315        316
            307    Email Chain              317        318
13          309    Stock Certificate        366        367
            310    Stock Certificate        366        367
14          311    Stock Certificate        367        367
            312    EcoEmissions Stock Certificate 187   --
15          319    Flowchart                200         --
            503    OTC Markets Screenshot   182        184
16          504    OTC Markets Screenshot   182        184
            505    OTC Markets Screenshot   182        184
17          515    Email Chain              298        299
            516    Email Chain              303        304
18          603    Text Message Chain       319        322
            1002   Business Account Application 348    348
19          1006   Yahoo! Account Management 263       264
                   Tool
20          1008   Yahoo! Account Management 265       266
                   Tool
21
        DEFENDANT HORN'S EXHIBITS
22          IH-1081 Request 26 Response      342         --
23
24
25
```

19-CR-26-ABJ                                          Vol. III-178
21-CR-14-ABJ

1      (Proceedings commenced 8:34 a.m., September 23, 2021,

2   in the presence of all defendants, outside the jury's

3   presence.)

4          THE COURT:  Good morning.  Are we ready?

08:34:25    5          Very well.  Let's bring the jury in.

6          MR. HEIMANN:  Your Honor, should we bring our witness

7   in, as well?

8          THE COURT:  Yes.

9          I think everybody's been tested this morning.  Good.

08:36:40   10      (Proceedings within the jury's presence at 8:36 a.m.)

11          THE COURT:  Good morning, ladies and gentlemen.

12   Please be seated.

13          When we recessed last evening, we were taking the

14   testimony of Alexander Scoufis, who's present here with us

08:37:43   15   this morning.  And Mr. Szott was conducting the direct

16   examination.

17          Mr. Szott, you may proceed.

18          MR. SZOTT:  Your Honor, thank you.

19          May it please the Court.

08:37:58   20          Counsel.

21          THE COURT:  Counsel.

22          MR. SZOTT:  Mr. Scoufis, good morning.

23          THE WITNESS:  Good morning -- oh, let me put on this

24   microphone.

08:38:15   25          There we go.

1          Good morning.

2          MR. SZOTT:  Do you understand that you remain under

3     oath?

4          THE WITNESS:  I do.

10:13:53    5          **ALEX SCOUFIS, GOVERNMENT'S WITNESS**

6          **DIRECT EXAMINATION (Continued)**

7     BY MR. SZOTT:

8     Q.  Mr. Scoufis, yesterday you testified about securities

9     exchanges and the OTC markets.  I'd like to ask you, first,

08:38:36   10     would you generally compare the characteristics of trading on

11     the securities exchanges as opposed to the OTC markets.

12     A.  Yeah.  Exchanges have companies that are quite large.  In

13     fact, the largest companies.  They make -- they are all

14     reporting companies, so they make a lot of information

08:39:01   15     publicly available, filings with the SEC.  There's a lot of

16     trading, as well.

17          And then when we move over to the over-the-counter

18     markets, OTC markets, these companies are generally smaller,

19     and some can be very, very small.  Some can be reporting

08:39:20   20     companies; they can file reports with the SEC, make a lot of

21     information public.  Many do not.  Many make filings with

22     OTC Markets, and some no longer make filings, no -- no longer

23     make information public.

24          So it's kind of large companies on the exchanges that

08:39:39   25     make a lot of information public or small companies that don't

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT         Vol. III-180
21-CR-14-ABJ

1    make as much information public.

2            And, again -- and the over-the-counter companies

3    oftentimes are characterized by having not very much trading,

4    very low liquidity.

08:39:55    5    Q.  And just to be clear, would it be possible for a

6    relatively small company to be traded on a national exchange

7    if it satisfies all the requirements?

8    A.  Sure.

9    Q.  I'd like to ask you now some questions focusing

08:40:14    10    specifically on OTC Markets.

11            First, what is the "Pink open market" on OTC Markets?

12    A.  OTC Markets has categories for companies, and "Pink

13    Current" is a category for companies.

14            You might see "pink sheets."  That word "pink," it

08:40:39    15    goes back in the day when these companies were traded on pink

16    sheets, just has kept that name.

17            And "current" refers to the companies making

18    information public and -- and they're up-to-date on making

19    that information public, so it's just a designation and -- a

08:40:53    20    designation that investors like because it tells them that the

21    information is up-to-date.

22    Q.  Mr. Scoufis, in terms of designations on OTC Markets, what

23    about the "yield" or "limited information" designation?

24            What generally does that betoken?

08:41:18    25    A.  OTC Markets has a variety of symbols to help alert

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

19-CR-26-ABJ         SCOUFIS - DIRECT - SZOTT         Vol. III-181
21-CR-14-ABJ

1    investors to issues.  One of those is the yield symbol.

2    And -- I mean, just as if you were driving a car and you saw a

3    yield sign, you'd slow down, look around, and that's what it's

4    intended to do.

08:41:40    5         OTC Markets might put a yield sign on if the

6    information that is out there is no longer current, they

7    haven't updated their information.  So it's just a sign --

8    "Okay.  Things aren't terrible with this company" -- but just

9    kind of proceed with caution.

08:41:55   10    Q.  What about "caveat emptor" status on OTC Markets?  What

11    does that mean?

12    A.  "Caveat emptor" is another symbol that OTC Markets may

13    place on a company's profile page.  It's also identified with

14    a skull and crossbones, and this is to alert investors to --

08:42:18   15    to stop, really look around, look at all the information,

16    buyer beware.

17         And they might slap that on a company's profile if

18    they identify promotion, if they identify some sort of fraud

19    or any other serious concern that investors should have with

08:42:37   20    this company.

21    Q.  Mr. Scoufis, does OTC Markets Group maintain a publicly

22    accessible website?

23    A.  Yes.  Anybody can go onto the Internet and go to

24    OTC Markets' website and view the company profiles.

08:42:57   25    Q.  What sorts of things would somebody find on a company

Melanie Sonntag, RDR, CRR, CRC                MelanieSonntagCRR@gmail.com

1   profile page or just a company's page on the OTC Markets

2   website?

3   A.  What comes to mind, the important things for me -- you

4   know, right away you'll see a quote for -- for the company's

08:43:15   5   stock, what it's trading at.  Sometimes that's hidden if -- if

6   it's a caveat emptor symbol on it.  But you'll generally see

7   the pricing of the company.

8        You can click on tabs for press releases to see what

9   they've announced recently as well as filings that OTC -- that

08:43:38   10   have been filed with OTC Markets.

11        MR. SZOTT:  Mr. Davila, can we please bring up

12   Exhibit 503.

13   BY MR. SZOTT:

14   Q.  Mr. Scoufis, would you take just a moment and look at

08:44:11   15   Exhibit 503.

16   A.  Okay.

17        MR. SZOTT:  Mr. Davila, would you now bring up

18   Exhibit 504.

19   BY MR. SZOTT:

08:44:21   20   Q.  And, again, Mr. Scoufis, would you please take just a

21   moment and look at Exhibit 504.

22   A.  Okay.

23        MR. SZOTT:  And, Mr. Davila, now 505, please.

24   BY MR. SZOTT:

08:44:36   25   Q.  Mr. Scoufis, would you take just a moment and examine

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT        Vol. III-183
21-CR-14-ABJ

1    Exhibit 505.

2    A.   Okay.

3    Q.   Mr. Scoufis, without giving detailed information about the

4    contents of these exhibits, generally what are Exhibits 503,

08:44:57    5    504, and 505?

6    A.   All three exhibits are a look at the main profile page of

7    NuTech Energy Resources on OTC Markets' website for three

8    different dates.

9    Q.   And were these, these looks or captures -- these were done

08:45:21   10    via the Internet Archive Wayback Machine?

11    A.   That's correct.

12    Q.   Mr. Scoufis, before your testimony did you have an

13    opportunity to compare Exhibits 503, 504, and 505 with the

14    actual web pages as they appear on the Internet Archive

08:45:43   15    Wayback Machine website?

16    A.   Yes, I did.

17    Q.   How do these exhibits compare with what you saw on the

18    computer screen from the actual website?

19    A.   These are the same exhibits as they exist on the Wayback

08:45:58   20    Machine.

21             MR. SZOTT:  Your Honor, the Government would offer

22    503, 504, and 505.

23             MR. FLEENER:  May I have a second, please, Judge.

24             THE COURT:  Absolutely.

08:46:43   25             MR. FLEENER:  I don't have any objections, Judge.

```
19-CR-26-ABJ        SCOUFIS - DIRECT - SZOTT        Vol. III-184
21-CR-14-ABJ
```

                    1              MR. JUBIN:  No objection, Your Honor.

                    2              MR. WARD:  No objection.

                    3              THE COURT:  Exhibits 503, 504, and 505 are received.

                    4         (Government's Exhibits 503, 504, and 505 received into

08:46:57            5    evidence.)

                    6              MR. SZOTT:  Thank you, Your Honor.

                    7              Mr. Davila, would you please return to 503.

                    8              And I ask that this be published to the jury.

                    9    BY MR. SZOTT:

08:47:12           10    Q.   Mr. Scoufis, what are we seeing here in Exhibit 503?

                   11    A.   All right.  In 503, if we look up at the top, we can see

                   12    that this is captured on November 21st, 2015, and it's NuTech

                   13    Energy Resources' company profile on OTC Markets' website.

                   14    Q.   And what is the jury seeing in terms of designation here

08:47:41           15    toward the upper right -- I've now circled -- on the upper

                   16    right side of the exhibit?

                   17    A.   That's the "OTC Pink Current Information" designation from

                   18    OTC Markets that we discussed a few minutes ago.

                   19    Q.   And if a potential investor had accessed the NuTech

08:48:03           20    page on OTC Markets as of December -- or November 21st, 2015,

                   21    would they have seen this information that's displayed here on

                   22    the exhibit?

                   23    A.   Yes.

                   24              MR. SZOTT:  Mr. Davila, would you please bring up

08:48:17           25    Exhibit 504.

1   BY MR. SZOTT:

2   Q.  Mr. Scoufis, what are we seeing here on Exhibit 504?

3   A.  All right.  So we're looking at the company profile of

4   NuTech Energy Resources on January 25th, 2016.

08:48:33   5          And, here, we are seeing that yield sign where, in

6   the exhibit before, we saw "OTC Pink Current," so now it's a

7   yield sign.  And below that it says "OTC Pink Limited

8   Information."

9          MR. SZOTT:  Mr. Davila, would you please bring up

08:48:54   10  Exhibit 505.

11  BY MR. SZOTT:

12  Q.  Mr. Scoufis, what are we seeing now on Exhibit 505?

13  A.  All right.  So this is the same sort of company profile

14  for NuTech on March 1st, 2016.  And now we have the caveat

08:49:12   15  emptor symbol, the skull and crossbones, saying "buyer

16  beware."  And below that saying "OTC Pink Limited

17  Information."

18          MR. SZOTT:  And I would note for the record that

19  Mr. Davila magnified the skull and crossbones and that little

08:49:32   20  section next to it.

21  BY MR. SZOTT:

22  Q.  I'd like to transition, Mr. Scoufis, now to asking you

23  some questions related to the -- the pertinent exemption to

24  the registration requirement for securities.

08:49:53   25          So, generally, to sell a security -- to sell a

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-186
21-CR-14-ABJ

1   security in a public marketplace -- well, let me just --

2   rather than me attempting to remember if you said this --

3   what's the general rule with respect to either a security must

4   be registered or there must be an exemption?

08:50:11   5   A.   Yeah.   The general principle in securities -- regulation

6   in the securities world in the US is that a securities

7   transaction needs to be registered with the SEC or there needs

8   to be an exemption from registration.

9        If a security is issued pursuant to an exemption, it

08:50:31   10   will be marked by the transfer agent, usually with a big red

11   "Restricted" stamp, saying "This cannot be traded on the

12   public markets."

13   Q.   What is Rule 144?

14   A.   Rule 144 is a major rule that allows individuals to remove

08:50:55   15   that restrictive legend from a security so that the security

16   can be traded in the public markets.   Certain conditions need

17   to be met in order to remove the -- the restrictive legend,

18   including holding the security for a certain amount of time.

19        And it also separately -- although sometimes the two

08:51:17   20   parts of the rule can work together, but, separately, it -- it

21   places limitations on shares held by affiliates of a company.

22   Q.   If the holder of shares or other securities complies with

23   all the requirements of Rule 144, can the holder sell those

24   securities in a public marketplace in reliance on the rule?

08:51:46   25   A.   Yes.

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-187
21-CR-14-ABJ

1   Q.  What are restricted securities or restricted shares?

2   A.  These are shares that were issued by a company, a public

3   company, pursuant to an exemption.  And because of that, they

4   are not permitted to be traded in public securities markets.

08:52:14   5            And, again, they'll be stamped "Restricted," usually

6   in red letters.  And until the -- until Rule 144 conditions

7   are met, it can't be traded in the public markets.

8            MR. SZOTT:  Mr. Davila, would you please bring up

9   Exhibit 312.

08:52:55   10  BY MR. SZOTT:

11   Q.  Mr. Scoufis, are you able to see Exhibit 312 on your

12   monitor?

13   A.  Yes.

14   Q.  Would you take just a moment and look at this exhibit.

08:53:06   15   A.  Uh-huh.  Yep.

16   Q.  What -- generally, what is Exhibit 312?

17   A.  So this is a -- a stock certificate for EcoEmissions

18   Solutions for 5,100,000 shares, and it's stamped with the --

19   the red restrictive legend.

08:53:32   20           MR. SZOTT:  Your Honor, the Government conditionally

21   offers Exhibit 312, subject to additional foundation by a

22   later witness.

23           MR. FLEENER:  No objections.

24           MR. WARD:  No objection.

08:53:53   25           MR. JUBIN:  No objection.

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-188
21-CR-14-ABJ

1        THE COURT:  312 will be received -- is received.

2        MR. SZOTT:  Thank you, Your Honor.  I ask that it be

3   published.

4        THE COURT:  You may publish.

08:54:04   5   BY MR. SZOTT:

6   Q.  So, generally, Mr. Scoufis, would you explain to the jury

7   what they're seeing here in Exhibit 312.

8   A.  Yes.  This is a stock certificate for EcoEmissions

9   Solutions.  The owner of the stock is Chrysti Bluemel.

08:54:28   10        It's -- we can see in the upper right-hand corner,

11   "Shares, 5,100,000."  And then right below that is that red

12   restrictive legend saying that -- that this stock cannot be

13   traded in the public markets.

14        MR. SZOTT:  Mr. Davila, would you please magnify the

08:54:46   15   red text.

16   BY MR. SZOTT:

17   Q.  So, Mr. Scoufis, this -- on this certificate this would be

18   the restricted or restrictive legend?

19   A.  Yes.

08:55:07   20   Q.  In your experience, are there other ways that a

21   certificate might be marked with a restrictive legend?

22   A.  Other ways?

23   Q.  This one is a lot of small, fine print.  Are there other

24   formats that you've seen for a stock certificate to be marked

08:55:27   25   with that restrictive legend?

1   A.   Yes.  This is not put out by the SEC saying you have to

2   mark it this way.  It can -- it can look different.  Usually,

3   though -- or always -- it's stamped red, just to jump out at

4   you, or it could have different wording or it could say, in

08:55:47   5   big letters, "Restricted."

6   Q.   So if someone is holding restricted shares, can that

7   person sell that stock in a public market?

8   A.   No.

9   Q.   Let me ask you about free-trading securities or

08:56:05   10   free-trading shares.

11          What do those terms mean?

12   A.   Free-trading securities or free-trading shares are shares

13   that can be traded in the public markets.  If stock is already

14   trading in the public markets, that's, of course, free

08:56:23   15   trading.  But, really, once this legend is removed, it's --

16   it's free trading.  It can be traded in the public markets.

17   Q.   So let's say that a person is holding a stock certificate

18   with a restricted legend and they want to sell their shares.

19   What do they need to do?

08:56:52   20   A.   Commonly what happens is the individual with the

21   restricted shares will either use the issuer -- the public

22   company's -- attorney or find an attorney who will write an

23   attorney opinion letter stating that the conditions to remove

24   the restrictive legend have been met.  That is needed by the

08:57:20   25   transfer agent.

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-190
21-CR-14-ABJ

1      The transfer agent -- I know we talked about the

2  transfer agent yesterday.  They are -- that's the company that

3  has issued these securities -- you know, actually physically

4  issued these securities -- stamped it "Restricted," and

08:57:34  5  they're also the company that's going to remove that

6  restrictive legend if the conditions of Rule 144 have been

7  met.

8  Q.  I'm going to return and ask you some other questions,

9  Mr. Scoufis, about opinion letters later on.  First, I'd like

08:57:50  10  to ask you about another concept under Rule 144.

11      Would you explain to the jury, what are control

12  securities?

13  A.  Control securities are securities that are held by an

14  affiliate of a company, and control securities can be

08:58:14  15  free-trading securities.  They could also be restricted

16  securities.  But, importantly, Rule 144 places limitations on

17  what an affiliate of an issuer of a public company can -- can

18  do with those control securities.

19  Q.  And I'd like to emphasize something you said just there at

08:58:37  20  the end.  When we're talking about an affiliate, we're talking

21  about an affiliate of the company that issued the securities;

22  correct?

23  A.  That's correct.

24  Q.  So what does it mean to be an affiliate of such a company?

08:58:50  25  A.  An affiliate of an issuer of a public company is an

19-CR-26-ABJ         SCOUFIS - DIRECT - SZOTT         Vol. III-191
21-CR-14-ABJ

1  individual or entity that can influence or direct the policies

2  or management of a company.

3              It is a facts and circumstances analysis.  So, you

4  know, for each affiliate we need to look at what the actions

08:59:14  5  of that person have been, what they are, what they can do.

6              If a CEO, for example, is acting as a CEO, running

7  the day-to-day operations of the company, they're clearly an

8  affiliate.  Director, same thing.

9              We also commonly consider large shareholders or

08:59:36  10  shareholders that own more than 10 percent of a company's

11  stock to be an affiliate, somebody who can control the

12  company, and that's because they have voting rights to elect

13  directors and can influence a company that way.

14              But, again, we have to look at what the actual

08:59:58  15  abilities are of an individual, not just their title.

16  Q.  When you're analyzing someone's control of a company based

17  on percentage of share ownership, does that depend on whether

18  they own free-trading shares as opposed to restricted shares?

19  A.  No.  Importantly for -- for securities, we're looking at

09:00:22  20  voting rights, can -- can an individual or entity that owns

21  stock vote with that stock.

22              Even -- even -- we talked about convertible

23  promissory notes.  That -- that's converted into -- into

24  stock.

09:00:37  25              Even though that convertible promissory note may not

1    have voting rights, the ability to convert it into stock that

2    has voting rights may be enough, as well, to consider that

3    person an affiliate or a control person.

4    Q.  Let me ask you to explain that in a little more detail.

09:00:57    5            So under what circumstances, generally, would the

6    holder of a convertible promissory note be deemed to be an

7    affiliate of the issuing company?

8    A.  We're looking at the ability to convert quickly,

9    within days or immediately, into shares, into -- into shares

09:01:16    10   that have voting rights.  If a convertible promissory note

11   needed a year to -- to actually convert into -- into voting

12   stock, maybe that -- that says that they don't have as much

13   control.

14           But the idea is really that somebody with voting

09:01:31    15   rights can go to a director and -- and -- somebody on the

16   board of directors -- and say, "I want you to" -- to do

17   something, approve a contract, an acquisition -- "otherwise,

18   I'll vote you out."

19           If you have the ability to convert immediately, then

09:01:48    20   I think that threat would -- would most likely work.  And

21   that's why we would consider that person a control person or

22   an affiliate.

23   Q.  Is it pertinent the percentage of shares that are

24   implicated by the convertible promissory note?

09:02:03    25   A.  Yeah.  There's nothing set out in -- in law about what

1    percentage makes somebody a control person; again, it's facts

2    and circumstances.  But, generally, in the industry we're

3    looking at about 10 percent to -- to cross that threshold.

4    Q.  You mentioned earlier, Mr. Scoufis, that an entity can be

09:02:26    5    an affiliate of the issuing company.

6         Would you explain that a little more to the jury.

7    A.  Yeah.  An entity can be an affiliate just as much as an

8    individual can.  If an entity owns shares, they've got voting

9    rights.  Of course, there's people operating that entity, and

09:02:47    10    they might also be affiliates.

11         But if an entity can exert influence, control a

12    company, then they are an affiliate, as well.

13    Q.  What about the scenario where there is a person or an

14    entity -- I guess I'll stick with person -- who doesn't have

09:03:07    15    an official corporate title but is in de facto control of the

16    issuing company?

17         Would that person be considered an affiliate?

18    A.  Sure.  Again, it doesn't have to deal with titles.  I've

19    given an example of CEO, but that's because of the traditional

09:03:25    20    duties of a CEO that would make that individual a control

21    person.

22         If an individual wasn't named CEO but operated as the

23    CEO, had the decision-making power of a CEO, they would be --

24    they would be an affiliate.  We're just looking at the

09:03:43    25    individual person and how they can influence the company.

1    Q.   Before we continue with some other questions about

2    Rule 144, Mr. Scoufis, I'd like to ask you some questions

3    about market manipulations and pump and dump schemes.  Let me

4    start with the former.

09:04:02    5            What is a -- or what is "market manipulation"?

6    A.   "Market manipulation" is used to describe ways to

7    artificially increase or decrease a stock's price.  Common

8    examples would be match or wash trading or painting the tape,

9    also marking the open, marking the close.

09:04:28   10            It's just, basically, trading with -- with no real

11   purpose other than to artificially increase or decrease the

12   price of a stock or to create the appearance of volume for a

13   stock.

14            And I'm talking about this, but it's not legal --

09:04:47   15   market manipulation is not legal.

16   Q.   I'll ask you briefly to describe the concepts you've

17   mentioned, Mr. Scoufis.  So what is match or wash trading?

18   A.   Match or wash trading is trading where an individual or

19   individuals have decided to be on both sides of the

09:05:03   20   transaction.

21            So one -- it could be one person buying and selling

22   to themselves.  And, of course, there's no economic purpose to

23   that other than to manipulate the price.  If a stock has lower

24   volume, that's -- that's often where match or wash trading can

09:05:25   25   really change the stock price.

1          And the other reason that match or wash trading can

2     be helpful is to just create the appearance of volume.

3     I mentioned this before:  Investors like volume.  They like

4     liquidity.  They want to see that in stock.

5          And so match and wash trading creates the appearance

6     of that volume.

7     Q.  What about the other terms you mentioned or -- or -- the

8     other terms you mentioned, "marking the open," "marking the

9     close," "painting the tape."  What do those mean?

10    A.  Right.  So we're talking about kind of looking at

11    historical -- what investors look at in a historical basis to

12    judge whether a stock's price is a good investment.

13         So we'll commonly look at the last sale price of a

14    day to judge how the stock has performed historically.  So

15    marking the close would be intended to create a trade, a

16    manipulative trade, that has a higher price than a natural

17    trade.

18         So maybe a stock's trading at a dollar all day, right

19    around a dollar.  And then right at the end, somebody comes in

20    and buys and sells to themselves for a dollar 50.  And now,

21    when we look back historically, we see that the price is a

22    dollar 50, not that natural price of a dollar.

23         The same thing can happen in the morning.  As

24    investors go out through the day, they might look at what the

25    stark -- stock started at that day.  And if you -- if -- if

09:05:43
09:05:58
09:06:29
09:06:46
09:07:02

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-196
21-CR-14-ABJ

1    you have the first transaction, then that's what investors are

2    going to look at.

3    Q.   What is a pump and dump?

4    A.   All right.  A pump and dump is a type of securities fraud

09:07:20   5    where an individual or group of individuals -- and I'm going

6    to lay out generally -- generally what this is, but pump and

7    dumps can all look different.

8          But, generally, an individual or group of individuals

9    gains control of a company.  So that typically involves

09:07:39  10    acquiring most of the stock, a lot of the free-trading stock,

11    stock that can be traded in the public markets, and then doing

12    manipulative trading to drive investor demand, to get

13    investors to buy the stock, which raises the price.  They'll

14    also issue false and misleading news and promotions; again, to

09:08:07  15    drive investor demand for that pump.  They're pumping up the

16    stock.

17          And as the investor demand is there, the stock price

18    is up, then they take that stock that they previously

19    acquired, the individuals that are doing the pump and dump,

09:08:19  20    and sell it into the market at these inflated prices with all

21    of this demand that's been artificially created, and that's

22    the dump.  They're dumping out the stock.

23          And I'm talking about it, but this is also not legal.

24    Pump and dumps are not legal.

09:08:41  25    Q.   I'm going to follow up on a few of these concepts.

1          But to begin at the end, after the stock is dumped,

2    typically what happens to the price of that stock?

3    A.   Yeah.  We saw the price increase with the pump.  And as

4    the stock is dumped in there, usually that causes the price to

09:09:02    5    decrease as well as eventually investors catch on and the

6    price falls back down to its natural level, which is -- is

7    very low.  And that leaves a lot of investors holding,

8    essentially, worthless stock that they purchased at a high

9    price.  Now it's worthless and they can't sell it.  Even if

09:09:25    10   they wanted to, there's no demand.

11   Q.   In your experience, Mr. Scoufis, invest- -- investigating

12   pump and dump schemes, what, if any, role does a shell company

13   typically play in such schemes?

14   A.   Typically in pump and dumps individuals will find what's

09:09:47    15   called a public shell company.  And that's what they'll use

16   to -- to do the pump and dump.

17          Typically what I see is individuals or an individual

18   buy a public shell company and then issue press releases

19   announcing that they have, you know, a new business, they've

09:10:11    20   acquired businesses that are -- that are operating.  And

21   typically there's not much truth to that.

22   Q.   In your opinion, Mr. Scoufis, why would a public shell

23   company tend to be involved in a pump and dump as opposed to a

24   nonshell company?

09:10:29    25   A.   It's just return on investment.  A public shell company is

19-CR-26-ABJ        SCOUFIS - DIRECT - SZOTT        Vol. III-198
21-CR-14-ABJ

1    less expensive than an actual operating public company, a

2    company that has revenues and assets.

3            So, certainly, you can do it with an operating

4    company.  It would just cost more money to buy that company in

09:10:48    5    the first place.

6    Q.  In case it comes up later, Mr. Scoufis, would you explain

7    the term "reverse merger" to the jury.

8    A.  Reverse mergers are also used in pump and dumps but are

9    common in the industry.  But in the context of pump and dumps,

09:11:16    10    what will happen is individuals will buy the -- the public

11    shell company and announce that a private company, generally

12    with operations and assets, is going to be merged into the

13    public company.

14            And the idea is that this private company that has

09:11:34    15    operations and assets, that has shareholders, once it gets

16    merged into the public company, basically, the private shares

17    are exchanged for public shares.  And now the private company

18    is a public company, and they have access to the public

19    securities markets.

09:11:51    20    Q.  As a general matter, is it -- is it lawful to trade in a

21    shell company so long as all the requirements have been met?

22    A.  Yes.  Yes.  Shell companies can and do exist.  They are

23    legal.

24            And as I've mentioned a few times, it's all about

09:12:16    25    disclosure, disclosing what a company is.  If you disclose

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1    that it's a -- it's a shell company, there's no problem.

2          And I -- and I've mentioned reverse mergers.  Of

3    course, they're used in pump and dumps, but public shell

4    companies can be used to lawfully merge a private company into

09:12:36    5    a public company, reverse-merge the private company into the

6    public company.  Nothing wrong with public shells.

7    Q.  Mr. Scoufis, as part of a pump and dump scheme, why, in

8    your opinion, is it important for the perpetrator or

9    perpetrators of that scheme to acquire a large percentage of

09:12:57    10    the -- of the free-trading shares?

11    A.  With a -- with a pump and dump the individuals will want

12    to have a large portion or all of the free-trading shares

13    because, if they don't, what they're risking is that other

14    individuals who are not in on this pump and dump will see the

09:13:20    15    price being artificially high and taking their free-trading

16    shares and selling it into the market, which is going to

17    decrease the price.

18          Basically, the -- the people that aren't involved in

19    the pump and dump could drive the price down because they

09:13:38    20    could do the dump even though they're -- they aren't in on the

21    pump and dump.

22          So if you're doing a pump and dump, you'd want to

23    have all the free-trading shares.

24    Q.  Mr. Scoufis, I'd now like to return to Rule 144 and ask

09:13:53    25    you some questions about how it would apply to the sale of

1    unregistered securities in a public market.

2         MR. SZOTT:  Mr. Davila, would you please bring up

3    Exhibit 319.

4    BY MR. SZOTT:

09:14:27   5    Q.  Mr. Scoufis, I'd ask that you take a moment to look at 319

6    on your monitor.

7    A.  Okay.

8    Q.  Have you seen Exhibit 319 before?

9    A.  Yes.

09:14:42  10    Q.  Generally speaking, what is it?

11   A.  So this is a -- basically -- a flowchart that I created,

12   applying Rule 144 to removing restrictive legends on NuTech

13   stock.

14   Q.  And although the flowchart refers to NuTech, are these

09:15:07  15   concepts generally applicable?

16   A.  Yes, to companies like NuTech, nonreporting companies.

17   This would be applicable to those companies, as well.

18   Q.  And let me follow up on that just to make sure we're

19   narrowing the universe that we're talking about.

09:15:24  20        So this flowchart, would it apply to shares that are

21   registered with the SEC?

22   A.  No.  This would not apply to shares that are registered

23   with the SEC or to companies that are reporting companies.  It

24   would be a slightly different application of Rule 144 to those

09:15:44  25   companies.

1   Q.  Mr. Scoufis, do you believe it would assist the jury in

2   understanding Rule 144 if they were to view the flowchart as

3   you continue your testimony about the rule?

4   A.  Yes.

09:16:03   5        MR. SZOTT:  Your Honor, I would ask that the

6   flowchart be published to the jury as a demonstrative only.

7        MR. FLEENER:  I would object.  I'd ask permission to

8   approach, Judge.

9        (Proceedings held at sidebar with Prosecutor Szott

09:16:27  10   and all defense counsel.)

11        MR. FLEENER:  Judge, I -- I believe the -- this

12   Rule 144 line of examination goes into registration

13   irregularities, which would be covered by the Court granting

14   our motion in limine, rather than issues involving securities

09:16:48  15   fraud.

16        MR. SZOTT:  That's not my intent, Your Honor.

17        The provisions of Rule 144 are directly pertinent to

18   acquiring free-trading shares and/or selling those shares with

19   or without the control limitations of the rule.  I believe

09:17:10  20   it's -- it's going to be highly relevant to the Government's

21   proof in this matter.

22        Certainly, if I were to stray into territory that's

23   subject to the order, I would be happy to avoid it.  I mean,

24   these, again, I think are -- I don't see that as an issue.

09:17:29  25        MR. FLEENER:  Okay.

1          I'll withdraw my objection now.  But I am concerned.

2    And -- and I'm going to probably jump up in a second.

3          But -- thank you.  Withdrawn.

4          THE COURT:  Very well.

09:17:46    5      (Sidebar concluded.)

6          MR. FLEENER:  No objections.

7          MR. WARD:  No objection at this time.

8          MR. JUBIN:  I don't have any objection.

9          THE COURT:  It may be received for the limited

09:18:18    10   purpose that you have just described, as a demonstrative

11   exhibit.

12          This means that it is a document that was created by

13   this witness to illustrate his testimony.  It is not evidence

14   in this case.

09:18:40    15         MR. SZOTT:  Your Honor, thank you.

16   BY MR. SZOTT:

17   Q.   Mr. Scoufis, generally what does Exhibit 319 illustrate?

18   A.   This is a flowchart, basically yes/no answers in applying

19   Rule 144 to NuTech restricted stock.

09:19:02    20   Q.   And when you were talking about NuTech -- or, also,

21   really, any company that would fit under the flowchart --

22   would that also include a predecessor entity that had a

23   different name?

24   A.   Sure.  Yeah.  I mean, in -- when we're looking at

09:19:23    25   companies, a predecessor entity would just be considered the

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-203
21-CR-14-ABJ

1    same as the current iteration.  You know, if it's a name

2    change, it's -- it's the same as whatever the company was

3    named previously.  So, yeah, we'd treat it all the same.

4    Q.  If a company's transfer agent is trying to decide whether

09:19:51    5    to issue free-trading shares in this scenario, would these

6    steps in Exhibit 319 be relevant to that transfer agent?

7    A.  Yes.

8    Q.  And what about a holder of securities -- restricted

9    securities -- who is seeking to get that restricted or

09:20:10    10    restrictive legend removed?  Would these steps be pertinent

11    for them?

12    A.  Yes.

13    Q.  Let me ask you, Mr. Scoufis, about the first blue box.

14          What is that requirement of Rule 144, as illustrated

09:20:26    15    in the flowchart?

16    A.  So the question asks "Does NERG" -- and I don't know if

17    we've mentioned this, but that is the ticker symbol for

18    NuTech, so that's how it would be traded on the public

19    markets.

09:20:38    20          So "Does NERG have operations and assets?"  And

21    that's a question of whether a company is a shell company.

22    Shell companies are -- if you hold restricted stock of a shell

23    company, Rule 144 cannot be used to remove that restriction,

24    restrictive legend.

09:20:55    25          And so if you answer no, you can't obtain

1   free-trading shares and sell into the public markets, which is

2   this red -- red box on the right-hand side.

3   Q.  So if the answer's no, you're in the red box.  But if the

4   answer is yes, what is the next question, Mr. Scoufis, in

09:21:18   5   terms of applying Rule 144 in this scenario?

6   A.  All right.  Next, we're wondering whether NERG has made

7   required company information publicly available.  In order to

8   rely on Rule 144, companies need to make what's called

9   adequate public -- current public information.  Basically,

09:21:43   10   just talking about who is running the company, large

11   shareholders, what the company does, as well as some

12   financials about the company.

13          So, at that point in time, the -- they need to be

14   current in their -- in their public information requirements.

09:22:02   15   Q.  You testified earlier about the OTC Pink Current

16   designation.

17          In your experience, if a company is OTC Pink Current,

18   would that be sufficient to move down the flowchart to the

19   next blue box?

09:22:18   20   A.  Yes, it would.

21   Q.  And just to, I guess, state the obvious, if a company has

22   not made the required public -- or required company

23   information publicly available, can a restrictive legend be

24   removed from that company's stock?  Under Rule 144.

09:22:41   25   A.  No.  We're going to move to the right.  No, it can't be

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-205
21-CR-14-ABJ

 1   relied upon to remove that restriction.

 2          If they have made the information public, then we can

 3   move on to the next question, next requirement of Rule 144.

 4   Q.  Focusing on that third, the largest of those blue boxes,

 5   "Has at least one year passed since the securities were last

 6   acquired from NERG or an affiliate of NERG, including any

 7   applicable tacking period?"

 8          Would you explain that, please, to the jury.

 9   A.  Yes.  That is -- this holding period requirement is part

10   of Rule 144.  For companies like NuTech that aren't reporting

11   companies, individuals need to hold the restricted securities

12   for one year before the restriction can be removed.

13          And then in parentheses it says "including any

14   applicable tacking period."  What that refers to is that if an

15   individual acquires restricted securities from somebody else,

16   under certain conditions you can tack onto that prior holder's

17   holding time.  That is, so long as they are not an affiliate,

18   which is the next question.

19   Q.  And, Mr. Scoufis, when you talk about "securities" in this

20   box, what about the scenario where somebody may have acquired

21   shares by exchanging them for a convertible promissory note?

22          Could they -- could that holding period be related

23   back to an earlier issuance date in that scenario?

24   A.  Yes.  For converting securities into stock, as long as all

25   you have to do is -- is just say, "All right.  I'm" -- for

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-206
21-CR-14-ABJ

1    example -- "converting this debt into stock, that's it," you

2    can use the holding period of the convertible instrument, the

3    convertible debt, as if it were stock the whole time.

4          And we'll kind of treat them the -- as if they're the

09:24:48    5    same security.

6    Q.   So, Mr. Scoufis, if the holder has not satisfied the

7    one-year period, can he get the restrictive legend removed?

8    A.   No.

9    Q.   Let's move down, then, to the last of the blue boxes.

09:25:11    10    What does that betoken in terms of Rule 144's requirements?

11    A.   So we talked about removing a restriction as one part of

12    Rule 144.  And then the other part of Rule 144 is the control

13    limitations that apply to an affiliate, and that's what this

14    box is asking, "Is the holder an affiliate of NERG?"

09:25:34    15          If they are not an affiliate, if they're not a

16    control person, then you just get to disregard those

17    limitations.  And if they are an affiliate, you have to comply

18    with the control limitations, which include how you sell the

19    free-trading securities, how many you can sell, so you have to

09:25:59    20    sell through a brokerage firm in a public market transaction.

21    You can only sell 1 percent of the -- the total amount of

22    shares -- the total amount outstanding from the company during

23    any 90-day period, so you can't just sell everything at once.

24    And you may need to, if you hit certain thresholds, file a

09:26:24    25    form with the SEC notifying them.

1          And, again, that only applies to control people, to

2    affiliates.  And if you're not, you don't have to worry about

3    any of -- of those limitations.

4    Q.   In your experience, Mr. Scoufis, in your opinion, how

09:26:35  5    might these control securities limitations in the yellow box

6    operate to prevent the execution of a pump and dump scheme?

7    A.   Well, with Rule 144, the key to it is if the rules are

8    followed a pump and dump cannot really be successful.  It

9    can't be profitable.  And that's because part of a pump and

09:27:03  10   dump is controlling a company, is being an affiliate.  So you

11   have these limitations applied to you.

12         And the biggest limitation is the amount of shares

13   that you can sell, and part of the pump and dump during the

14   dump is to sell as many shares as you can into the public

09:27:21  15   markets.  But if you're a control person, you're not allowed

16   to.  And so in pump and dumps, you'll see individuals do

17   anything they can to not be seen as control persons.

18   Q.   And in your experience, Mr. Scoufis, what sorts of things

19   might people do in a pump and dump scheme in order to mask or

09:27:47  20   conceal their status as an affiliate of the issuing company?

21   A.   There's two things that come to mind:  One is not being --

22   not hold a position in the company that -- where you'd

23   commonly be considered an affiliate, a control person, so not

24   being named CEO.

09:28:08  25         And the second is because you can be an affiliate

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-208
21-CR-14-ABJ

1    through owning a certain amount of shares, so splitting up the

2    ownership of shares into nominee individuals or entities so

3    that it does not appear that you own or control more than

4    10 percent of the company's underlying shares.

09:28:33    5    Q.   Mr. Scoufis, are you familiar with something called a

6    nonaffiliation statement?

7    A.   Yes.

8    Q.   Generally speaking, what's a nonaffiliation statement?

9    A.   Nonaffiliation statements are used in the context of

09:28:51    10   Rule 144 for removing restrictions.  They can be used by

11   transfer agents, by brokerage firms when they're accepting

12   free-trading securities, and they're relied upon to -- for

13   transfer agents and brokerage firms to understand that the

14   person who owns these shares is saying they're not an

09:29:20    15   affiliate, just kind of helpful to them, gives security to a

16   reason -- to the reason to not remove the restriction.  But --

17   and there's a lot of moving parts in Rule 144, the two -- the

18   two parts of Rule 144.

19        Removing the restriction is one part, and then

09:29:36    20   control limitation is the other.  So an affiliate could have

21   the restrictive legend removed, but they're still subject to

22   the control limitations.  And so a brokerage firm might accept

23   an affiliate's free-trading shock with the understanding that

24   the volume -- the amount of shares that they can sell -- is

09:29:56    25   limited.

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-209
21-CR-14-ABJ

1    Q.  Mr. Scoufis, the mere fact that someone signs a

2    nonaffiliation statement and submits it, does that mean that

3    they're automatically not an affiliate?

4    A.  No.  Again, facts and circumstances.

09:30:12    5          Just because somebody isn't named a CEO doesn't mean

6    they don't have the duties of a CEO.  Just -- somebody could

7    be a figurehead of a company and not have any real duties, and

8    they might not be an affiliate.  So we always need to look at

9    the underlying facts.

09:30:37    10   Q.  Mr. Scoufis, did you and I prepare some examples to

11   illustrate how Rule 144's holding period might apply in basic

12   hypothetical scenarios?

13   A.  Yes.

14   Q.  Do you believe it would be useful for the jury to see the

09:30:52    15   text of those examples as we go through them?

16   A.  I do.

17          (Mr. Fleener no longer present.)

18          MR. SZOTT:  Mr. Davila, I'd ask that you bring up

19   Example A.

09:31:03    20          THE COURT:  Could you hold up for just a second?

21          One of the attorneys is out of the courtroom.

22          MR. SZOTT:  Your Honor, thank you.

23          THE COURT:  This would be a good time to stand and

24   stretch.

13:36:16    25          (Mr. Fleener present.)

```
19-CR-26-ABJ        SCOUFIS - DIRECT - SZOTT        Vol. III-210
21-CR-14-ABJ
```

1            MR. FLEENER:  Judge, I'm sorry.  There was a witness

2    issue.

3            THE COURT:  I understand.

4            MR. SZOTT:  May I have a moment with counsel,

09:31:58  5    Your Honor.

6            THE COURT:  You may.

7        (Discussion held among counsel.)

8            THE COURT:  Please be seated, ladies and gentlemen.

9            MR. SZOTT:  Your Honor, thank you.  I've confirmed

09:32:45  10   there's no objection to the publication of these hypothetical

11   examples, and I'll -- I'll move through them quickly, and

12   these will not be offered as evidence.

13   BY MR. SZOTT:

14   Q.  So, Mr. Scoufis, would you please read -- would you please

09:33:04  15   read Example A.

16   A.  Yes.

17           THE COURT:  These are examples -- I caution you that

18   these are examples only; they are not directly related to this

19   case, but they're to illustrate the testimony of this witness.

09:33:19  20          MR. SZOTT:  Right.

21   A.  (Continuing.)  "On January 1, 2010, a nonreporting company

22   sells 1 percent of its stock to a nonaffiliate investor in an

23   unregistered sale.  The company's transfer agent should issue

24   restricted shares to the investor.  If the investor wants to

09:33:37  25   sell the shares on the over-the-counter markets under

1  Rule 144, the investor must wait until January 1, 2011.  At

2  this point the one-year holding period is satisfied."

3  BY MR. SZOTT:

4  Q.  And just the obvious question, Mr. Scoufis:  Why is the

09:33:57   5  one-year holding period satisfied as of January 1, 2011?

6  A.  We're just waiting a year.  The -- the investor has held

7  the shares for a year, January 1, 2010, to January 1, 2011,

8  and now it's satisfied.

9        MR. SZOTT:  Mr. Davila, would you switch to

09:34:20  10  Example B.

11  BY MR. SZOTT:

12  Q.  Mr. Scoufis, would you please read Example B to the jury.

13  A.  "On January 1, 2010, a nonreporting company sells

14  1 percent of its stock to an affiliate investor in an

09:34:34  15  unregistered sale.  The company's transfer agents should issue

16  restricted shares to the investor.

17        "If the investor wants to sell the shares on the

18  over-the-counter markets under Rule 144, the investor must

19  wait until January 1st, 2011.  At this point the one-year

09:34:50  20  holding period is satisfied; however, Rule 144's control

21  limitations will apply."

22  Q.  So the fact that this investor is an affiliate, that

23  doesn't affect his ability to obtain free-trading shares after

24  one year?

09:35:09  25  A.  That's correct.  Affiliates can obtain free-trading

1  shares.  They are just subject to the control limitations.

2  Q.  So if this investor wanted to sell a lot -- or wanted to

3  just sell all of his free-trading shares, he would

4  nevertheless be subject to those control limitations?

09:35:31  5  A.  Yes.

6       MR. SZOTT:  Mr. Davila, would you please switch to

7  Example C.

8  BY MR. SZOTT:

9  Q.  Mr. Scoufis, would you read this to the jury.

09:35:39  10  A.  Yes.

11       "On January 1st, 2010, a nonreporting company sells

12  1 percent of its stock to a nonaffiliate investor in an

13  unregistered sale.  The company's transfer agent should issue

14  restricted shares to the investor.

09:35:50  15       "On September 1st, 2010, the investor sells these

16  shares to a nonaffiliate purchaser.  If the purchaser wants to

17  sell these shares on the over-the-counter markets under

18  Rule 144, the purchaser must wait until January 1st, 2011.  At

19  this point the one-year holding period is satisfied."

09:36:12  20  Q.  Mr. Scoufis, since the investor -- or the -- the

21  purchaser; excuse me -- in the second bullet point has only

22  held these shares since September, how come that purchaser

23  doesn't have to wait until next September before obtaining

24  free-trading shares?

09:36:29  25  A.  This is the -- the tacking period that we discussed

1    earlier, where, if a nonaffiliate investor purchases from

2    another nonaffiliate investor, then that -- that second

3    purchaser can use the first holder's holding period.  It --

4    but it has to be -- the original purchaser needs to be a

09:37:03   5    nonaffiliate.

6         MR. SZOTT:  Mr. Davila, would you bring up Example D.

7    BY MR. SZOTT:

8    Q.  Mr. Scoufis, would you please read Example D.

9    A.  "On January 1st, 2010, a nonreporting company sells

09:37:15   10   1 percent of its stock to an affiliate investor in an

11   unregistered sale.  The company's transfer agent should issue

12   restricted shares to the investor.

13        "On September 1st, 2010, the investor sells these

14   shares to a nonaffiliate purchaser.  If the purchaser wants to

09:37:30   15   sell these shares on the over-the-counter markets under

16   Rule 144, the purchaser must wait until September 1st, 2011.

17   At this point the one-year holding period is satisfied."

18   Q.  So why is this purchaser treated differently under

19   Rule 144 than that purchaser in the last example who was able

09:37:50   20   to tack on back to that January date?

21   A.  Here, the key is that the first holder of the securities,

22   first purchaser, is an affiliate, and you can't tack onto an

23   affiliate's holding period.  So the nonaffiliate can purchase

24   these securities, but they need to hold them, then, for

09:38:11   25   one year.

19-CR-26-ABJ         SCOUFIS - DIRECT - SZOTT         Vol. III-214
21-CR-14-ABJ

1       MR. SZOTT:  Lastly, Mr. Davila, would you switch,

2    please, to Example E.

3    BY MR. SZOTT:

4    Q.   Mr. Scoufis, would you read this example to the jury,

09:38:20   5    please.

6    A.   "On January 1st, 2010, an investor lends money to a

7    nonreporting company in exchange for a convertible promissory

8    note.

9         "On September 1st, 2010, the investor exercises his

09:38:31  10    option to convert the note into 1 percent of the company's

11    stock.  The company's transfer agent should issue restricted

12    shares to the investor.

13         "If the investor wants to sell these shares on the

14    over-the-counter markets under Rule 144, the investor must

09:38:45  15    wait until January 1st, 2011.  At this point the one-year

16    holding period is satisfied."

17    Q.   And, again, Mr. Scoufis, the investor has only had his

18    shares since September of 2010.  Why does he get to get

19    unrestrict- -- why does he get free-trading shares in

09:39:10  20    January rather than having to wait all the way until the next

21    September?

22    A.   The key here is that the investor held convertible

23    notes -- a convertible note -- for the -- the -- from

24    January 1st to September 1st.  And we're going to be able to

09:39:29  25    treat that convertible note that was later converted into

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-215
21-CR-14-ABJ

1    shares as the same security for purposes of the holding

2    period.

3            MR. SZOTT:  And that's the last example, so I believe

4    we can mute the monitors.

09:39:48    5            And I'm close to being done, Your Honor.

6    BY MR. SZOTT:

7    Q.  Mr. Scoufis, just some more questions about Rule 144 and

8    how it operates.

9            The first one I've already asked you, so I won't ask

09:40:02    10    you again.

11            So if a company's transfer agent is trying to decide

12    whether those requirements of Rule 144 are met that we saw in

13    the flowchart, what types of materials and information might

14    the company's transfer agent rely on in ascertaining whether

09:40:24    15    those requirements are satisfied?

16    A.  We've talked about the nonaffiliation statement, so you'll

17    usually see that, that the transfer agent has required that.

18    They might also ask for supporting documents as to when the

19    shares were obtained.

09:40:45    20            But a key part of the transfer agent's

21    determination -- they're not going out and investigating

22    whether these conditions have been met on their own.  They

23    largely rely on what's called an attorney opinion letter,

24    and -- which is stating that the conditions of Rule 144 have

09:41:05    25    been met and that it's proper to remove the restriction, that

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-216
21-CR-14-ABJ

1    the holding period's been met.  And oftentimes that the

2    company's not a shell, that it makes information public, and

3    that they're not an affiliate.

4    Q.  You mentioned this before but would you remind the jury.

5    Who is it typically who's writing these attorney opinion

6    letters that would then be submitted to the transfer agent?

7    A.  There's no firm requirement on the attorney that writes

8    the attorney opinion letter.  It could be a company attorney

9    or it could be a separate attorney that's hired by the

10   investor to write -- write the attorney opinion letter.

11   Q.  Regardless of which attorney writes it, why is it

12   important to the system that it be an attorney that's writing

13   that opinion letter?

14   A.  Over time the industry, the securities industry, has come

15   to use that attorney opinion letter, the attorney in that

16   situation, as a gatekeeper.  Like I said with Rule 144, if the

17   rule is followed, a pump and dump can't happen, and so that's

18   important that we have measures in place to make sure it's

19   followed.

20           And so the -- the securities world trusts the

21   attorneys to make sure that all of the conditions have been

22   met.

23   Q.  And in crafting an opinion letter under Rule 144, what

24   should an attorney do in order to comply with his duties as a

25   lawyer?

09:41:26
09:41:45
09:42:03
09:42:23
09:42:44

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-217
21-CR-14-ABJ

1   A.   You know, with attorneys and with transfer agents, the key

2   is not ignoring red flags.  Neither attorneys nor transfer

3   agents are going out and verifying everything that's in the

4   opinion letter.  But if something looks off, they are required

09:43:03   5   to, you know, make note of that, look into that, that sort of

6   thing.

7        So, again, you know, they might look -- they might

8   ask for some underlying documents to verify.  Maybe they need

9   to go further.  So it kind of just depends on the situation.

09:43:21   10   Q.   How would an attorney's duty to act in good faith and duty

11   not to make misrepresentations relate to an attorney opinion

12   letter addressing Rule 144?

13   A.   Of course, an attorney can't, you know, look past red

14   flags or -- or allow misrepresentations.

09:43:49   15   Q.   In terms of Rule 144's requirements, Mr. Scoufis, that we

16   saw on the flowchart, what, if any, role do broker-dealers

17   play in making sure that those limitations and requirements

18   are satisfied?

19   A.   Similar to transfer agents, they need to ensure that

09:44:14   20   the -- the conditions have been met.  You know, unlike

21   transfer agents -- transfer agents are accountable to the SEC.

22   Brokerage firms are accountable to FINRA and the SEC, so

23   they -- they require these same documents or perhaps more

24   to -- to ensure that all of the conditions of Rule 144 have

09:44:37   25   been met.  So you'll commonly see the same documents that a

19-CR-26-ABJ          SCOUFIS - DIRECT - SZOTT          Vol. III-218
21-CR-14-ABJ

1    transfer agent has with a brokerage firm.

2    Q.  Would it be fair to say that broker-dealers are more --

3    are subject to more restrictions and oversight than transfer

4    agents?

09:44:57    5    A.  Yes.  And they will say that.

6    Q.  So what might happen to a broker-dealer who is found to

7    be selling shares, conducting trades in violation of

8    Rule 144's requirements?

9    A.  Broker-dealers, they can be fined; they can be barred from

09:45:22    10    the industry; they can be suspended.  And, yeah, certainly,

11    it's -- it's a huge liability for them, so they -- they take

12    that very seriously because if -- if FINRA bars you, you can't

13    operate in the industry anymore.

14    Q.  And just as a very general matter -- let me strike that.

09:45:47    15          MR. SZOTT:  May I have a moment, Your Honor.

16          THE COURT:  You may.

17    (Discussion held at counsel table.)

18    BY MR. SZOTT:

19    Q.  I think my last question, Mr. Scoufis, at this time just

09:47:09    20    relates to transfer agents.

21          If a transfer agent is found or discovered to be

22    willy-nilly or carelessly disregarding the requirements of

23    Rule 144, what, if any, consequences professionally might flow

24    to that transfer agent?

09:47:28    25    A.  From my experience the main issue for transfer agents is,

1   if this comes up a lot, they would face a lawsuit by the SEC.

2          Transfer agents are not accountable to FINRA.

3   Transfer agents do have to be -- not a member of the SEC, but

4   they do need to file an application to be a transfer agent

09:47:52    5   with the SEC although they're not -- they're not examined.

6   They don't have the same level of oversight that broker-

7   dealers have.

8          MR. SZOTT:  Your Honor, I have no further questions

9   on direct.  I'd pass this witness for cross.

09:48:06   10          I would note the Government is intending to recall

11   Mr. Scoufis for additional testimony that's more case specific

12   later in the trial.

13          THE COURT:  Very well.

14          MR. FLEENER:  Your Honor, when are you interested in

09:48:36   15   taking the midmorning break?

16          THE COURT:  About ten o'clock.

17          MR. FLEENER:  That's fine.  I'll find a place to

18   quit.

19          Thank you, Judge.

09:49:02   20          Mr. Scoufis, good morning.

21          THE WITNESS:  Good morning.

22          MR. FLEENER:  Excuse me real quick.

23          My name is Tom Fleener.  I'm a lawyer from Laramie.

24   It's nice to meet you.

09:49:14   25          THE WITNESS:  Nice to meet you.

19-CR-26-ABJ          SCOUFIS - CROSS - FLEENER          Vol. III-220
21-CR-14-ABJ

1                           **CROSS-EXAMINATION**

2    BY MR. FLEENER:

3    Q.  I have -- I'm going to break my questions up in a couple

4    different places, but I'm going to try to be -- I know you're

5    coming up again to get into the specifics in NuTech as --

6    I assume.  Correct?

7    A.  That's my understanding, yes.

8    Q.  So I'm going to try to focus generally on some of the big

9    issues involving the stock market, investments, things like

10   that, sort of like Mr. Szott, and then we'll come back later

11   and -- and discuss things in detail.

12        I mean, the truth is -- is that you've worked your

13   entire time as an attorney with FINRA; correct?

14   A.  Yeah.  I started with FINRA after law school.  I haven't

15   been an attorney the whole time.  I started immediately after

16   law school, yes.

17   Q.  And what I mean -- and what I mean by that is that you've

18   never worked in private practice on behalf of -- in a

19   securities firm taking companies public, doing reverse

20   mergers, things like that?

21   A.  I have not.

22   Q.  And your entire time in FINRA has been -- and FINRA is --

23   it's not a governmental organization; correct?

24   A.  Correct.

25   Q.  But it's a -- it's close?  It's sort of a

19-CR-26-ABJ          SCOUFIS - CROSS - FLEENER          Vol. III-221
21-CR-14-ABJ

1    quasigovernmental organization?  You'd concede that?

2    A.  Correct.

3    Q.  And the reason I say that is because you spend -- I mean,

4    FINRA spends a lot of its time working with the SEC, which is

09:50:35    5    a governmental organization?

6    A.  Complicated with the wording.

7         The SEC does oversee FINRA.  FINRA doesn't work with

8    the SEC, though.

9    Q.  But you work with -- and I understand.  But you -- you or

09:50:49    10    FINRA will -- will refer cases to the SEC for -- for

11    prosecution, for instance?

12    A.  Correct.

13    Q.  And FINRA -- I mean, you're working right now with -- with

14    the US Attorney's Office, and that's certainly a governmental

09:51:03    15    organization?

16    A.  Correct.

17    Q.  In your role with -- with FINRA, you're in the CPAG?

18    That's the Criminal --

19    A.  -- Prosecution Assistance Group.

09:51:14    20    Q.  All right.  And your role right now with CPAG is to assist

21    prosecutors prosecuting securities fraud violations; correct?

22    A.  Correct.

23    Q.  And when you're doing that, you're not working with the

24    defense -- defense attorneys; correct?

09:51:30    25    A.  That's correct.

1   Q.  You're working with prosecutors -- Federal prosecutors,

2   attorneys with the SEC -- putting together cases involving

3   securities fraud?

4   A.  Correct.

09:51:41    5   Q.  And you're -- and so you would certainly concede -- and

6   I'm -- and I appreciated some of your -- some of your -- some

7   of your testimony on direct examination about, you know, you

8   don't receive bonuses based on pros- -- on convictions and

9   I appreciate that.

09:52:00    10          And that's true; correct?

11   A.  Correct.

12   Q.  But it's also true that one of your jobs is to see --

13   you -- and I -- I've read some of your transcripts.

14          One of your -- one of your jobs is to try to get

09:52:15    15   convictions against people you're -- when you're testifying

16   for the United States?

17   A.  That's the mission of FINRA.  That's the mission of CPAG,

18   yes.

19   Q.  Okay.  To assist prosecutors to get convictions?

09:52:26    20   A.  Yes.

21   Q.  All right.  And so as you sit here, then, I just want to

22   make sure it's clear to -- to everybody in the courtroom --

23   I mean, you're not an impartial person?  You are -- you have

24   an interest in this case?  You're working with the

09:52:39    25   United States Attorney's Office in prosecuting this case?

1          MR. SZOTT:  Your Honor, I'd object to the "impartial"

2   term.

3          THE COURT:  Overruled.

4   A.  I am assisting the Government with this case.  But I --

09:52:54   5   I don't work for the Government.  Everything I do is on

6   my own.

7   BY MR. FLEENER:

8   Q.  Understood.  But you're not -- you're not a -- you're not

9   a free agent where you play with both sides?  You -- you play

09:53:07   10   for one team, the United States?

11   A.  Yes.  But I'm not forced to work on any case.

12   Q.  I understand.  It's just that you're not going to be

13   working on -- on my side of the case ever; correct?

14   A.  As long as I work for FINRA, no.

09:53:21   15   Q.  Okay.  And that's all I -- that's all I want to make sure

16   we understand is that as your -- in your role as an attorney

17   for FINRA and CPAG, you assist prosecutors?  That's it?

18   A.  That's correct.

19   Q.  Okay.  And going back to -- and in this -- well, in this

09:53:39   20   particular case -- you've done more work in this case than

21   just testifying?  I mean, you actually -- I believe there's

22   terabytes of discovery.

23          You -- you've reviewed some discovery in this case;

24   correct?

09:53:55   25   A.  Correct.

1   Q.  And how long have you been assigned to the NuTech case?

2   A.  I began working on this matter roughly right around the

3   beginning of 2018.

4   Q.  Okay.  So you've had this thing coming up on four years?

09:54:15   5   A.  Yes.

6   Q.  And during that time you've had a chance to review reports

7   and interviews and trading documents and things of that

8   nature; correct?

9   A.  Correct.

09:54:27   10   Q.  And you've actually sat in on some witness interviews with

11   the United States?  I believe you have.  Is that correct?

12   A.  That's correct.

13   Q.  Okay.  And when you -- when you -- when you got into FINRA

14   and -- and FINRA was right after law school.  And you

09:54:47   15   testified that you've -- you've never been a private

16   securities attorney; correct?

17   A.  Correct.

18   Q.  And so you've never been involved, actually involved, in a

19   reverse merger, for instance?  I mean, you're talking about

09:54:59   20   how they work.  But you've never actually sat at the table and

21   done one?

22   A.  Correct.

23   Q.  And you've never written a registration statement;

24   correct?

09:55:06   25   A.  Correct.

1    Q.  You've never written an attorney letter where the attorney

2    actually has to sit down and provide the letter either to --

3    to -- to OTC Markets and get it uploaded?  You've never had to

4    do that; correct?

09:55:17   5    A.  That's correct.

6    Q.  And I know -- you've reviewed plenty I assume.

7    A.  Sure.

8    Q.  But you've never actually had to sit down and work with a

9    private company to do all the things necessary to take that

09:55:28   10    company public?

11    A.  Correct.

12    Q.  And . . . and the simple truth is you never -- you've

13    never, ever represented a client?  You've always worked for

14    FINRA?

09:55:44   15    A.  I've always worked for FINRA.

16    Q.  The -- one of the -- one of the -- the things that you

17    mentioned on direct examination was this concept of a shell

18    company and how shell companies are needed -- well, the shell

19    companies are needed for lots of reasons.  But one thing you

09:56:03   20    discussed was this shell company needed to -- for a pump and

21    dump.

22         Is that true, that you need a shell company in order

23    to conduct a pump and dump?

24    A.  No.  I don't think that I -- I said that earlier, either.

09:56:17   25    But in my experience shell companies are usually used in pump

19-CR-26-ABJ         SCOUFIS - CROSS - FLEENER        Vol. III-226
21-CR-14-ABJ

 1   and dumps.

 2   Q.  And why is that?

 3          And I may have misspoke, and I think I probably did

 4   misspeak, so I do apologize for making that statement because

 09:56:33   5   I think you're right.

 6   A.  Sure.  Yeah.

 7          Shell companies are usually used because they're less

 8   expensive than an operating company.  So it's just cheaper

 9   to -- to buy a shell company.

 09:56:46   10   Q.  And one of the things you testified to on direct

 11   examination is -- which I appreciate, as well -- is that

 12   you -- you know, shell companies aren't -- when people think

 13   of -- when folks think of shell companies, you tend to think

 14   of shell games, like you're hiding something.

 09:57:02   15          But shell companies are simply legal entities,

 16   I think is how you described it.  Correct?

 17          They exist as a legal entity only?

 18   A.  That's correct.

 19   Q.  And there's many reasons that it's advantageous for public

 09:57:17   20   companies -- putting aside any company that's -- wants to

 21   engage in a pump and dump.  Let's just talk about a regular

 22   private company that wants to go public.

 23          There's a couple different ways that a private

 24   company can become public; correct?

 09:57:29   25   A.  Correct.

19-CR-26-ABJ          SCOUFIS - CROSS - FLEENER        Vol. III-227
21-CR-14-ABJ

1   Q.  And one of the ways that they can do it is through an IPO,

2   an initial public offering; correct?

3   A.  Correct.

4   Q.  And if you're trying to take a private company public

5   through an IPO, there is a host of expenses you're going to

6   incur?

7   A.  Yes.

8   Q.  And individuals and organizations you're going to have to

9   be working with?  Lawyers?  FINRA, for instance?

10  A.  Yes.  Uh-huh.

11  Q.  And you would agree that with -- with a shell company, if

12  you're a -- what -- another way that you can take a company

13  public is if you're a private company and you purchase the

14  shell company; correct?

15  A.  Correct.

16  Q.  And the shell company already is the public company;

17  right?

18  A.  Yes.

19  Q.  In -- in that example.

20  A.  Yeah.  It would be a public shell.

21  Q.  And there's a whole bunch of normal, big companies that

22  have -- that have done this purchasing of a shell company and

23  merging their large, private company into the shell; right?

24  A.  Yes.

25  Q.  I mean, the -- Berkshire Hathaway is one?

09:57:42 (line 5)
09:57:56 (line 10)
09:58:09 (line 15)
09:58:16 (line 20)
09:58:34 (line 25)

 1   A.  I wouldn't know.  I don't know.

 2   Q.  Burger King -- there's -- well, I'll leave -- I'll leave

 3   it alone.

 4        But there's companies that the jury's certainly heard

09:58:46   5   of that were private companies that purchased a public shell

 6   and rolled their private company into the public shell and it

 7   now just trades as a -- as a company that folks may have stock

 8   in their 401(k)s?

 9   A.  That's correct.

09:59:02  10        MR. FLEENER:  All right.

11        Judge, now may be a good time.

12        THE COURT:  Very well.

13        We'll take our midmorning recess, ladies and

14   gentlemen.  We'll stand in recess for 15 minutes.

09:59:58  15   (A recess was taken from 9:59 a.m. to 10:21 a.m.

16   Proceedings outside the jury's presence.)

17        THE COURT:  Please bring the jury in.

18   (Proceedings within the jury's presence at 10:22 a.m.)

19        THE COURT:  Thank you.  Please be seated, ladies and

10:22:56  20   gentlemen.

21        Please proceed, Mr. Fleener.

22        MR. FLEENER:  Thank you, Your Honor.

23   BY MR. FLEENER:

24   Q.  Mr. Scoufis, we were just talking about shell corporations

10:23:14  25   and -- or shell companies; excuse me -- and I'm going to --

19-CR-26-ABJ        SCOUFIS - CROSS - FLEENER        Vol. III-229
21-CR-14-ABJ

1   I'm going to move on now to -- to talk about markets and

2   manipulation of markets.

3           You're familiar with -- with the markets; correct?

4   A.  Correct.

10:23:29   5   Q.  And you've got the New York -- and you're familiar with

6   the various --

7           THE COURT:  Excuse me.

8           Do you have the mic on?

9           THE WITNESS:  I do have the mic.

10:23:39   10          MR. FLEENER:  That's right; we're not hearing you.

11          There it is.

12          THE WITNESS:  Okay.  Can you hear me?

13          MR. FLEENER:  We're good now.

14          THE WITNESS:  All right.

10:23:44   15   BY MR. FLEENER:

16   Q.  And the -- you have the New York Stock Exchange; correct?

17   A.  Correct.

18   Q.  And you have the Nasdaq, which is another stock exchange?

19   A.  Correct.

10:23:54   20   Q.  And Over the Counter Markets is not -- is -- is it

21   technically an exchange or no?

22   A.  It is technically not an exchange.

23   Q.  Okay.  What is it?  Is it just a place where people go to

24   buy and sell stock?

10:24:09   25   A.  Yes.

19-CR-26-ABJ          SCOUFIS - CROSS - FLEENER          Vol. III-230
21-CR-14-ABJ

1   Q.   What makes that not an exchange?

2          And I -- well, one of the things we're not supposed

3   to do is ask experts open-ended questions that we know the

4   answer to.

10:24:18   5          But I'm curious.  What's the difference between the

6   New York Stock Exchange, Nasdaq, and the Over the Counter

7   Market website?

8   A.   Right.

9          So from an investor's point of view, they -- they do

10:24:31   10   have companies, public companies, where you can go and buy

11   shares of an exchange-listed company, a company that trades on

12   the New York Stock Exchange, or an over-the-counter company.

13          But exchanges have, I guess, certain absolutes.  They

14   are listed with an exchange, meaning they are reporting.

10:24:56   15   Every listed company is a reporting company.

16   Q.   Apple, for instance?  Apple files annual reports, its

17   quarterly reports; correct?  That's an example of a public

18   company?

19   A.   That's correct, yeah.

10:25:07   20          If it's -- if it is listed on an exchange, it has to

21   file class -- it has to register a class of securities with

22   the SEC.  So, yeah, it's reporting.

23          But then, generally for investors, what you see with

24   exchange-traded companies are that they're larger and that

10:25:25   25   there's robust trading; there's a lot of liquidity.

19-CR-26-ABJ          SCOUFIS - CROSS - FLEENER         Vol. III-231
21-CR-14-ABJ

1          Certainly, that can exist in the over-the-counter

2    markets, but it doesn't always exist.  It often does not

3    exist.  They're smaller companies.  They don't file with the

4    SEC.  Not always but often they don't file with the SEC, and

10:25:44   5    there's just lower liquidity, lower volume.

6    Q.  And this -- and I appreciate that explanation.

7          It's safe to say, again, that -- folks who have

8    401(k)s, IRAs, most of the time you're dealing with companies

9    that are listed in one of the two exchanges; correct?

10:25:58   10   A.  I think that's usually the case, yeah.

11   Q.  And this Over the Counter Markets, while -- there are some

12   big companies that are in the over-the-counter markets;

13   correct?

14   A.  Yeah.

10:26:08   15   Q.  And I'm trying to -- Volkswagen may be one.  Are you

16   familiar with that, whether it is?

17   A.  I'm not familiar with whether it is.

18          But, I mean, just to that point, a lot of large

19   foreign companies might not be listed but have their shares

10:26:24   20   traded over the counter.

21   Q.  Nestlé, I think, may be one, for instance.

22   A.  Could be.

23   Q.  Okay.  But the -- but, generally, as investors -- as

24   investors who have -- who aren't sophisticated traders who

10:26:36   25   deal with maybe a brokerage account or -- or a 401(k) or an

19-CR-26-ABJ          SCOUFIS - CROSS - FLEENER          Vol. III-232
21-CR-14-ABJ

1   IRA or a Thrift Savings Plan or something like that, they --

2   they're dealing with -- even if they're owning mutual funds,

3   these mutual funds are generally buying these stocks that are

4   in these two large exchanges?

10:26:52   5   A.  I would say, generally, that would be the case.

6   Q.  And I -- I mean, we can get in the weeds but I'm just --

7   I -- where I'm trying to make -- make sure that we're on the

8   same sheet of music is that you have the two large exchanges

9   and then you have this penny stock or you have this other --

10:27:09   10   what do you call it?  You don't call the OTC an exchange.

11   What do you call it?

12   A.  Just Over the Counter Markets.

13   Q.  Okay.  So you have the two exchanges, New York Stock

14   Exchange and Nasdaq, and then you have Over the Counter

10:27:22   15   Markets, this other thing where these other stocks trade?

16   A.  Correct.

17   Q.  All right.  All of them are public companies; right?

18   A.  Correct.

19   Q.  Whether you're in the New York Stock Exchange, the Nasdaq,

10:27:33   20   or the over-the-counter markets, we're all dealing with public

21   companies?  It's just whether they're registered companies and

22   whether they have certain different filing requirements?

23   A.  Pretty much.

24   Q.  All right.  And when you're -- one of the -- one of the

10:27:53   25   problems that -- that you're -- you investigate -- one of the

1   issues you investigate is -- is illegal market manipulation;

2   correct?

3   A.   Correct.

4   Q.   Is all market manipulation illegal?

10:28:05   5   A.   Yes.

6   Q.   Okay.  What -- and I -- because the markets -- why -- why

7   would -- oh, because of the word "manipulation," I assume.

8   Correct?  Is that what makes all market manipulations illegal?

9   A.   It's a tough question to answer.

10:28:23   10           Market manipulations are illegal.

11   Q.   I want to talk about GameStop.  You're familiar with

12   GameStop; correct?

13   A.   I am.

14   Q.   And GameStop was a company that for -- for a decade and a

10:28:37   15   half was worth about a billion dollars, give or take, in

16   market cap?  Do you quibble with that?

17   A.   I -- I could not tell you.

18   Q.   Okay.  But you know what happened to GameStop in -- in

19   2021, in January; correct?

10:28:56   20   A.   I know just as much as anybody that reads the news.  I've

21   not been involved in any sort of investigation.  I -- I'm not

22   prepared to talk about GameStop.

23   Q.   Well, GameStop went from just a couple dollars a share to

24   almost $400 a share in 15 trading days.  Does that surprise

10:29:17   25   you?

1          Do -- do the figures -- do you quibble with my

2    figures?

3          MR. SZOTT:  Your Honor, I object.  It's beyond the

4    scope of direct and beyond the witness' expertise.

10:29:28    5          THE COURT:  Sustained.

6    BY MR. FLEENER:

7    Q.  The bottom line is that not every -- that some stocks

8    move -- oftentimes stocks move based simply on momentum.

9    Stock prices move based on momentum, not necessarily

10:29:46    10    manipulation?

11    A.  Certainly.

12    Q.  And the stock -- the way a stock moves may not necessarily

13    have anything, really, to do with the intrinsic value of the

14    underlying stock; right?

10:30:05    15    A.  No, I don't think that's true.  A stock price is always

16    incorporating its intrinsic value.

17    Q.  But you'll -- you'll agree that there are many investors

18    that will invest in a stock, will buy a stock -- what's a

19    day trader?

10:30:27    20    A.  A day trader is generally a person who buys and sells

21    securities, buys and sells stock pretty quickly, oftentimes

22    buying and selling within the same day, minutes.

23          Usually, they'll end the day with no positioning in

24    securities.  They're just trying to make money off short-term

10:30:50    25    movements in the stock price.

19-CR-26-ABJ        SCOUFIS - CROSS - FLEENER        Vol. III-235
21-CR-14-ABJ

1    Q.  And day traders look for -- for momentum, for a lot of

2    volume in stocks; correct?  Generally.

3    A.  Sure.  Yeah.

4    Q.  And the reason -- and -- and you say the game -- the day

10:31:03    5    trader, he's not the person who's buying the stock and holding

6    it?  He's just somebody looking for a whole bunch of volume

7    that he can buy and then sell and make a little bit of money

8    and get out; correct?

9    A.  Yeah.  That's part of it, yeah.

10:31:15    10    Q.  And he may not -- he or she.  I don't mean to sound

11    sexist.

12        He or she may not really know anything about the

13    underlying company?  They would just see a stock that has --

14    it's soaring in volume, it's got a lot of liquidity,

10:31:29    15    therefore, "I can get in and get out, make a few bucks and

16    move on"?  Whatever the underlying company may be, it may not

17    matter to the day trader?  That's true?

18    A.  That could be a reason a day trader trades.  But they

19    could trade for other reasons, as well.

10:31:43    20    Q.  Sure.  But --

21        THE COURT:  What is "momentum"?  Is that a technical

22    term?

23        THE WITNESS:  I suppose it is.

24        It's not a term I normally use, but I would just

10:31:55    25    describe it as a stock price going up over a period of time.

19-CR-26-ABJ          SCOUFIS - CROSS - FLEENER          Vol. III-236
21-CR-14-ABJ

1    And investors might see that and -- and like it.  It could be

2    any sort of period of time.

3    BY MR. FLEENER:

4    Q.  But momentum's important in a pump and dump, too; right?

10:32:13    5          I mean, you testified that in a pump and dump the

6    whole goal is to create mo- -- is to create the upward

7    movement in the stock for the people to then sell on the --

8    sell at -- at the high point; right?

9    A.  I guess in a sense momentum is important, but momentum is

10:32:33    10   not the reason why a stock price is increasing or it's not

11   the -- a major reason, even though investors might identify

12   momentum.

13          THE COURT:  I think this is -- let's not use

14   "momentum."  It's a term -- it doesn't have a definition.  And

10:32:52    15   I -- it hasn't been introduced until just now, and I'm not

16   sure what it is.

17          MR. FLEENER:  Yes, sir.

18          THE COURT:  "Momentum" I think of as a -- an

19   automobile going 30 miles an hour down the road.

10:33:08    20          MR. FLEENER:  Yes, sir.  I -- I -- I understand.

21   BY MR. FLEENER:

22   Q.  You would agree with me, would you not, that many, many --

23   when we talk about penny stocks -- I mean, I -- I -- I hopped

24   on otcmarkets.com, which is their website.

10:33:37    25          You know their website; correct?

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

19-CR-26-ABJ          SCOUFIS - CROSS - FLEENER          Vol. III-237
21-CR-14-ABJ

1    A.  Correct.

2    Q.  And I -- and I hopped on -- I've hopped on a bunch in the

3    last year, more than I've ever looked in my life, ever.

4            But when we're talking about penny stocks, there's

10:33:49  5  actually thousands of stocks that are worth way less than a

6    penny that are traded on OTC markets?

7    A.  I don't know the -- any sort of exact number, but there's

8    certainly plenty of stocks that trade for fractions of

9    pennies.

10:34:09  10  Q.  And when we're talking about fractions of pennies, I mean,

11   we could be talking like 6 -- 6/100 of a penny, 6/1000 of a

12   penny, where it would take a whole bunch of shares of stock to

13   even make a penny; correct?

14           These stocks exist on the OTC markets?

10:34:31  15  A.  Correct.

16   Q.  And in the OTC markets, you would agree with me -- would

17   you not? -- that -- that when -- when people -- when the

18   average -- we're talking about, you know, investors relying --

19   part of your -- your testimony and part of the Government's

20:34:44  20  theory is -- I'm certain -- certain -- certain -- is going to

21   be, you know, what investors rely on when they make decisions.

22           That's why we have reporting requirements and things

23   of that nature; correct?

24   A.  Correct.

10:34:55  25  Q.  I mean, the reason why -- the reason why companies have to

19-CR-26-ABJ          SCOUFIS - CROSS - FLEENER         Vol. III-238
21-CR-14-ABJ

1    file these things -- these documents, these financial

2    statements, these attorney letters -- the -- the reason --

3    one reason they have to do that is to try and protect the

4    public so the public, in theory, can know what they're -- what

10:35:11    5    they're investing in; right?

6    A.   I may be a little confused.

7         You said attorney letters protecting investors?

8    Q.   Sure.

9    A.   Yeah.  I guess that's part of the reason why there's

10:35:26    10   attorney letters.

11   Q.   And -- and same with financial statements?  I mean, the

12   reason why you have financial requirements and reporting

13   requirements is so that somebody -- some investor, if they

14   ever had enough time to actually read this stuff -- could, in

10:35:39    15   theory, dig into either OTC Markets or the -- or the company's

16   financial filings and understand sort of what's going on with

17   the company?

18        That's -- the reason why we have these filing

19   requirements is to protect investors, in theory?  Or in

10:35:54    20   practice?

21   A.   Yeah.  I mean -- to protect investors, I'm not sure that's

22   maybe the best term to use.  It's so that investors can judge

23   a stock's price on, I guess, its fundamentals, so they know

24   something about the stock.  It's just putting information in

10:36:12    25   the public's hands.

1   Q.  Well, and why -- I'm back on OTC Markets looking around,

2   and there -- there is some of these companies that are

3   selling, you know, 800 million shares a day, and it's got a

4   big stop sign sitting next to it, which would indicate to me

10:36:30   5   that someone shouldn't be buying this -- buying or selling

6   this company, but investors are still buying -- or somebody's

7   buying -- 800,000 shares of some of these companies.

8         Does that surprise you?

9   A.  No.

10:36:42   10   Q.  Okay.  So if there's a company on OTC Markets that sells

11   800 million shares a day with a big stop sign next to it, why

12   are investors buying that?  If there's a stop sign that's --

13   I would assume the stop sign on OTC Markets means "Warning,

14   warning, warning, warning."  Isn't that what the stop sign

10:37:05   15   means?

16   A.  Yes.

17   Q.  Then why are 800 million shares trading on a company that

18   says "Warning, warning, warning, warning"?

19         MR. SZOTT:  Your Honor, I'll object.  That calls for

10:37:14   20   speculation.  We don't have foundation for that opinion.

21         THE COURT:  Sustained.

22   BY MR. FLEENER:

23   Q.  But you would agree that -- that stock prices can move for

24   many different reasons?

10:37:48   25         Correct?

1   A.   Correct.

2   Q.   And it can move because news comes out that's -- that is

3   truthful news that makes the company look good?  That may

4   drive a stock price up?

10:38:02   5   A.   I mean -- I just want to point out that investors believe

6   that all news is truthful.  That's part of being a public

7   company, whether exchange, whether you're listed, whether

8   you're over the -- over the counter.

9        There's antifraud provisions.  All information needs

10:38:18  10   to be truthful.  They're always -- it's -- they always believe

11   it's truthful.

12   Q.   But you would also agree with -- would you not? -- that

13   sometimes it doesn't even matter what is coming out that --

14   that -- you've heard of the -- the term "FOMO," the fear of

10:38:39  15   missing out?

16   A.   Sure.

17   Q.   Okay.  And if -- if a bunch of folks are sitting on

18   OTC Markets and they see the volume increase unbelievably and

19   the -- the stare -- excuse me -- the share price increase

10:38:59  20   500 percent in a day, that that, in and of itself, just the

21   fact that the price is going up and just the fact that there's

22   now a billion shares being traded -- that -- people -- people

23   buy based simply on that oftentimes?

24   A.   I couldn't tell you oftentimes.  People trade for many,

10:39:23  25   many reasons.  But I'm sure some investors trade on -- on that

19-CR-26-ABJ          SCOUFIS - CROSS - WARD          Vol. III-241
21-CR-14-ABJ

1    reason, certainly.

2    Q.   These stocks that are penny stocks that are, you know,

3    valued at -- their -- with their share price -- maybe, you

4    know, 6/100 or 6/1000 of a penny, the -- wouldn't you agree

10:39:56   5    with me that the people that are buying these stocks -- these

6    are more like lottery tickets or speculators?  These aren't --

7    these aren't investors?  These aren't folks that are buying

8    this company because they may necessarily believe in the

9    technology?

10:40:10   10          These guys are buying lottery tickets, hoping that

11   the stock that is priced at 6/1000 of a penny is going to go

12   up to be worth 6/100 of a penny?

13          MR. SZOTT:  Same objection, Your Honor; speculation,

14   no foundation for that opinion.

10:40:25   15          THE COURT:  Sustained.

16          MR. FLEENER:  No further questions.  Thank you.

17          MR. WARD:  Good morning, Mr. Scoufis.  My name is

18   Zenith Ward.  I represent Charles Winters.

19          THE WITNESS:  Good morning.

10:40:48   20                    **CROSS-EXAMINATION**

21   **BY MR. WARD**:

22   Q.   NERG was a Delaware corporation; correct?

23   A.   Correct.

24   Q.   And Delaware law allows a one-person board of directors;

10:40:59   25   correct?

19-CR-26-ABJ            SCOUFIS - CROSS - WARD            Vol. III-242
21-CR-14-ABJ

1      MR. SZOTT:  Your Honor, I will object.  This is

2  beyond the scope of direct.

3      THE COURT:  It is.  I think you'll have your chance

4  later on to raise those issues.

10:41:09     5      MR. WARD:  All right.

6  BY MR. WARD:

7  Q.  You talked about FINRA's mission being to protect

8  investors; correct?

9  A.  Correct.

10:41:18    10  Q.  And you testified that the primary manner in which

11  investors can be protected is to ensure that there is reliable

12  information available to investors; correct?

13  A.  Yes.

14  Q.  And you can actually trade NuTech or NERG stock today;

10:41:44    15  right?

16  A.  I'm not sure of the exact way that you would trade NuTech.

17  I know that there's certain restrictions that OTC Markets has

18  placed on companies like NuTech, and I -- I really couldn't

19  tell you today how or whether it's tradeable.

10:42:01    20  Q.  So you -- you don't know if NuTech is still trading today?

21  A.  I -- I don't know if it's still trading or how it would be

22  traded.

23  Q.  Wouldn't that be an important thing for the jury to know?

24  A.  I -- so I reviewed primarily trading in 2015 and 2016.

10:42:21    25  Q.  Okay.  So you're not aware that over the last year NERG

19-CR-26-ABJ          SCOUFIS - CROSS - WARD          Vol. III-243
21-CR-14-ABJ

1  has had an average daily volume of over 2.5 million shares

2  traded per day?

3         MR. SZOTT:  Your Honor, again, objection; beyond the

4  scope of direct.

10:42:35  5         THE COURT:  I want to caution the jury the questions

6  asked by attorneys -- the attorney is not a witness.  He's not

7  under oath.  I'll sustain the objection.

8  BY MR. WARD:

9  Q.  All right.  You testified that obtaining control of a

10:42:59  10  company is part of a pump and dump; is that correct?

11  A.  Yeah.  That's typically part of a pump and dump.

12  Q.  Not always part of a pump and dump but typically?

13  A.  In my experience it always has been, but there's no rules

14  on -- on pump and dumps, so that's why I say "typically."

10:43:19  15  Q.  Okay.  And people gain control of companies all the time,

16  though; right?

17  A.  Sure.

18  Q.  And for reasons entirely unrelated to a pump and dump?

19  A.  Of course.

10:43:34  20  Q.  And, you know, once you've obtained control of a company,

21  you can do legitimate things, like then vote in a board of

22  directors?

23  A.  Correct.

24  Q.  And you testified that shell companies are legal?

10:43:54  25  A.  Correct.

1    Q.   And reverse mergers are legal?

2    A.   Correct.

3    Q.   And both of those things are used all the time for

4    entirely legitimate business?

10:44:05    5    A.   Yeah.

6    Q.   One of the reasons you testified that it would be

7    important to gain control of a company as part of a pump and

8    dump is because if you didn't have control of the company,

9    people that had nothing to do with the pump and dump might

10:44:26    10    sell on the pump; right?

11    A.   That's right.

12    Q.   And there's nothing illegal about doing that; correct?

13    A.   Yeah.  As long as you're separated from the people that

14    are pumping up the stock, you could sell your -- your

10:44:44    15    free-trading shares into the market.

16    Q.   And there would be absolutely nothing illegal about that;

17    right?

18    A.   In that situation, no.

19    Q.   Right.  So if I -- if I own shares in a company and I see

10:44:56    20    the price of that company going up, it makes sense for me to

21    maybe sell my shares; right?

22    A.   Right.

23    Q.   And if it turns out that the reason that price was going

24    up was because of false statements being put out by others

10:45:14    25    that I play no part in, I've done nothing wrong; right?

19-CR-26-ABJ          SCOUFIS - CROSS - WARD          Vol. III-245
21-CR-14-ABJ

1   A.  I mean, I think -- yeah, as long as -- as you -- you are

2   not part of that.  You know, there -- there is the risk of --

3   of you knowing if they -- if they're false, that could be an

4   issue.

10:45:33  5          But, generally, yeah, you could sell your shares.

6   Q.  You testified earlier about holding periods for

7   convertible notes.  Do you recall that?

8   A.  Yes.

9   Q.  All right.  So if a convertible note was created or -- or

10:46:02  10  executed in, let's say, 2008, for instance -- right?

11         So in 2008 I get a convertible note representing that

12  I'm owed a debt that I can convert to shares of a company.

13  The -- the one-year holding period begins to run at that point

14  in time; right?

10:46:24  15  A.  So the one -- one thing to keep in mind with convertible

16  notes -- there's more than one thing but specifically here --

17  the note that -- the debt needs to be actually drawn down.  It

18  can't just be an agreement for an investor to, you know, allow

19  the company to borrow money.  The money actually needs to be

10:46:46  20  borrowed.  Once all of the money is borrowed, then that

21  holding period would start.

22         That's the only complication there.

23  Q.  Sure.  So it begins to run from the date of the note or

24  the date that the consideration is provided, whichever occurs

10:47:03  25  later?

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

1    A.   Correct.

2    Q.   Okay.  And that's -- that doesn't change if that note

3    changes hands; correct?

4    A.   Could you repeat that?

10:47:21    5    Q.   Okay.  The convertible note -- let's say I have the

6    convertible note and the time period has run and then

7    I transfer that note to someone else.

8         The holding period doesn't start over; right?

9    A.   Yeah.  Well, we discussed this earlier, and there's one

10:47:36    10   thing that's important here, is who the initial holder was and

11   whether they were an affiliate or nonaffiliate.

12        If they were an affiliate, then the holding period

13   would start again, as soon as it's transferred.  If they're a

14   nonaffiliate, then you could tack the holding period back on

10:47:58    15   to the -- to the first holder.

16   Q.   In connection with the rules about affiliates, you said

17   that in order to -- these rules are designed to prevent pump

18   and dumps to a certain extent?  Not -- that's not the only

19   reason for the rule, but if the rules are followed for

10:48:20    20   affiliates, that's going to prevent someone from executing a

21   pump and dump; correct?

22   A.   Yeah.  It's my view and my experience that if the rules --

23   if Rule 144 is followed, practically speaking, a pump and dump

24   is not going to be profitable.  It just won't work.

10:48:38    25   Q.   And so if -- someone being in control of a company but

1  have -- having someone else hold the title, that undermines

2  the affiliate rule; right?

3  A.  Certainly, yeah.  That's -- I mean, we're looking kind of

4  at nominees and -- yeah.  If we're concealing the true owners

10:49:03  5  of a company, then that would subvert the purposes -- or that

6  would subvert Rule 144's requirements.

7  Q.  So if -- if Bob Mitchell, in fact, is making all the

8  decisions for NERG, is controlling all of the day-to-day

9  operations, but he's had Kevin Trizna serve as a nominee CEO,

10:49:25  10  that's undermining the affiliate rule; correct?

11  A.  If, in your example, Bob Mitchell is not named in the

12  filings as a control person in some way and the named CEO is

13  not making decisions that a CEO would normally make, then,

14  certainly, that would be -- I mean, that would be fraud just

10:49:54  15  to the public for -- for that concealment.  But it also would

16  probably subvert Rule 144's requirements.

17  Q.  As part of your work in this case, are you familiar with

18  FINRA's investigation into High Plains Gas?

19       MR. SZOTT:  Objection, Your Honor; beyond the scope

10:50:23  20  of direct.

21       THE COURT:  Overruled.

22       You may answer.

23  A.  I don't believe I am familiar with FINRA's investigation

24  of High Plains Gas.

10:50:32  25       And I don't think that this was mentioned before, but

19-CR-26-ABJ          SCOUFIS - CROSS - WARD          Vol. III-248
21-CR-14-ABJ

 1    CPAG is completely walled off from the rest of FINRA.  FINRA

 2    has its own operations.  I don't see anything that they do.

 3          So unless it's public, what I would receive would be

 4    from the Government, not from internally within FINRA.

10:50:58    5    BY MR. WARD:

 6    Q.  And I apologize if you answered the question and then kind

 7    of expanded.

 8          But -- so you're not familiar with FINRA's

 9    investigation into High Plains Gas?

10:51:07   10    A.  I don't believe so.  I -- I'm not surprised that there is

11    one, and I have heard of High Plains Gas, but it's not

12    something that I focused on at all.

13    Q.  You're aware that Bob Mitchell was involved in High Plains

14    Gas and NERG though; correct?

10:51:23   15    A.  Again, I -- I just -- it's not been the focus of -- of

16    what I've done here.  I -- I don't know.

17    Q.  Well, so -- my question isn't what your focus has been.

18    It's about what you're aware of.

19          So as we sit here today, are you aware that

10:51:42   20    Bob Mitchell was involved in High Plains Gas and NERG?

21    A.  No, not High Plains Gas one way or the other but yes to

22    NERG.

23    Q.  And you said you were aware of High Plains Gas or you've

24    heard some things.  What do you understand about what's going

10:51:58   25    on with High Plains Gas?

19-CR-26-ABJ        SCOUFIS - CROSS - WARD        Vol. III-249
21-CR-14-ABJ

 1   A.  I -- I really have nothing to say about High Plains Gas.

 2   Q.  Okay.  So you've just heard of them, but you don't really

 3   know anything substantive about them?

 4   A.  Yeah.

 5   Q.  Okay.  Do you know how many companies trade on the over-

 6   the-counter markets?

 7   A.  I do not.

 8   Q.  Does -- more than 13,000 companies, does that sound right?

 9   A.  Could be.  I couldn't tell you.

10   Q.  Are you aware that companies like Nestlé trade on the

11   over-the-counter markets?

12   A.  It was mentioned earlier.  I don't know.

13   Q.  Volkswagen?

14   A.  I don't know.

15   Q.  Do you know about how much money worth of stock gets

16   traded on the OTC markets in -- in a day?

17   A.  I do not.

18   Q.  If I told you that as of noon today -- noon in New York --

19   that over $2.8 billion worth of stock has been traded on the

20   OTC markets, would that surprise you or sound atypical?

21   A.  It sounds like it could happen.

22        MR. WARD:  May I have just a moment, Your Honor.

23       (Discussion held at counsel table.)

24        MR. WARD:  Those are all the questions I have,

25   Your Honor.

10:52:12
10:52:32
10:52:43
10:53:08
10:53:31

1          Thank you.

2          MR. JUBIN:  Good day, ladies and gentlemen.

3          Mr. Scoufis, my name is Tom Jubin.  I represent

4   Ian Horn.  I just have a couple questions for you.

5                      **CROSS-EXAMINATION**

6   BY MR. JUBIN:

7   Q.  You testified that the securities industry relies on

8   attorneys to write these opinion letters because the attorneys

9   have a credential that's trusted; is that accurate?

10  A.  Yeah.  As a gatekeeping function, attorneys are trusted,

11  yeah.

12  Q.  So one obvious way to commit fraud -- you talked about

13  different ways in which a person could commit fraud.

14          One obvious way to commit fraud would be to create

15  fictitious documents and make it look as if an attorney had

16  signed an opinion letter?  Would you agree?

17  A.  That could be a way to commit fraud, certainly.

18          MR. JUBIN:  I don't have any further questions.

19          Thank you, Your Honor.

20          MR. SZOTT:  Your Honor, just briefly on redirect.

21          THE COURT:  Yes, sir.

22                    **REDIRECT EXAMINATION**

23  BY MR. SZOTT:

24  Q.  Mr. Scoufis, you mentioned -- or it was mentioned the term

25  "nominee" during cross-examination.

10:53:52
10:54:09
10:54:27
10:54:54
10:55:09

1    I would ask if you could explain, in the context of

2    what you've been testifying about, what is a "nominee"?

3    A.  So "nominee" refers to an individual or entity that is

4    named -- there's a few different ways to look at this.  But

10:55:32    5    one with stock -- an individual or entity who's named as the

6    owner of the stock but doesn't receive actual economic

7    benefits of the stock; somebody else does.  And that person or

8    entity would be called the beneficial owner.

9    And they also aren't able to vote, using the stock's

10:55:51    10    rights to vote.  The beneficial owner would be.

11    Nominees exist both lawfully and commonly in the

12    securities industry, as -- and an example is in DTC for

13    clearing stock.  You'll often see stock put into a nominee

14    name to facilitate easy transfers of stock, though the true

10:56:16    15    owner of the stock is recorded elsewhere.  So that's a common

16    way that we'll see it.

17    But, of course, in pump and dumps nominees are

18    commonly used to conceal control, and that would be an illegal

19    way to use a nominee.

10:56:35    20    And you'll also hear of nominees in terms of officers

21    and directors of companies.  Somebody might be named a nominee

22    officer, but they don't actually have the duties of what you

23    would expect that officer to do.

24    Nominee -- and then -- yeah.  Basically, those two

10:56:57    25    different ways.

19-CR-26-ABJ        SCOUFIS - REDIRECT - SZOTT        Vol. III-252
21-CR-14-ABJ

1    Q.  Now, Mr. Scoufis, Mr. Fleener asked you some questions

2    related to what we're -- what -- the price of a stock

3    increasing or the fear of missing out.

4          How, if at all, might manipulative or market

10:57:16    5    manipulation, such as marking the open, marking the close --

6    how, if at all, might such market manipulations contribute to

7    that upward trajectory that Mr. Fleener was asking you about?

8    A.  That's the whole point of -- of a pump and dump, is to get

9    the stock price to increase.

10:57:38    10          So to the extent that investors are trading on

11    momentum or just the fear of missing out, the stock price is

12    increasing, that has to start somewhere.  It has to have a

13    driving force.  And in my experience, that's usually, you

14    know, exaggerated, false, and misleading filings, press

10:58:00    15    releases, email promotions, or manipulative trading.

16    Q.  And to be clear, that's within the context of a pump and

17    dump scheme?

18    A.  Sure.

19          MR. SZOTT:  Nothing further on redirect, Your Honor.

10:58:12    20          Thank you.

21          THE COURT:  You may step down.

22          THE WITNESS:  All right.

23          MR. HEIMANN:  Your Honor, the United States of

24    America calls Special Agent Jason Berryhill.

10:59:22    25          THE COURT:  Please raise your right hand and be

 1    sworn.

 2         (Witness sworn.)

 3              THE COURTROOM DEPUTY:  Please take a seat.

 4              Please state and spell your name for the record.

 5              THE WITNESS:  Jason Loy Berryhill.  That's J-a-s-o-n

 6    L-o-y B-e-r-r-y-h-i-l-l.

 7    **JASON LOY BERRYHILL, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

 8    **BY MR. HEIMANN:**

 9    Q.  How are you employed?

10    A.  I'm currently a special agent with the Department of the

11    Interior, Office of Inspector General, in the computer crimes

12    unit.

13    Q.  So you're a Federal law enforcement officer?

14    A.  I am.

15    Q.  Do you have prior law enforcement experience?

16    A.  Yes.  Prior to the OIG -- and I've been there almost

17    6 years -- I was in the Secret Service for 16 years and served

18    as a digital forensic examiner since 2001 and, also, a special

19    agent with -- with Secret Service.

20    Q.  So you were a digital forensic examiner with Secret

21    Service, and you -- you continued that with the Department of

22    Interior's OIG?

23    A.  Yes, sir.

24    Q.  And when we say "OIG," that's the Office of Inspector

25    General?

11:00:12 (line 5)
11:00:25 (line 10)
11:00:36 (line 15)
11:00:55 (line 20)
11:01:10 (line 25)

 1    A.   Office of Inspector General.

 2    Q.   What is a digital forensics examiner?

 3    A.   Right.  What we do is -- we're special agents.  We're

 4    criminal investigators.  And, simply put, we have special

 5    training in the identification, the preserving, acquiring --

 6    which is also sometimes referred to as collecting --

 7    analyzing, and examining digital evidence.

 8         In sum, it's the collection and analysis of digital

 9    evidence.

10    Q.   Describe your training to the jury.

11    A.   Well, my initial course was in May of -- actually,

12    April through May of 2001.  And that course was called BCERT.

13         And, again, I was in the Secret Service since 1999 --

14    that's when I started, in December of '99.  So about a year

15    and a half after starting in the Secret Service as just a -- a

16    traditional financial crimes investigator, I started into the

17    digital forensics field.

18         And the course was called BCERT, Basic Computer

19    Evidence Recovery Training, a four- to five-week course,

20    pretty intense.  But, honestly, it's just the beginning.  You

21    know, technology's always changing; it's evolving.  You know,

22    you start in that course.  That's when you're allowed to do

23    digital exams, but the training and learning never stops.

24    You're always going to conferences and follow-on training

25    throughout the years.

11:01:24   (line 5)
11:01:40   (line 10)
11:02:00   (line 15)
11:02:17   (line 20)
11:02:34   (line 25)

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN      Vol. III-255
21-CR-14-ABJ

1    Q.  So you've attended continuing education courses?

2    A.  That is required by our quality management system.  We're

3    required to have at least 120 hours every three years, so

4    40 hours a year of mandatory training.  But I can tell you

5    that we're always well above that.

6    Q.  When you say "digital evidence," what do you mean?

7    A.  Electronically stored data.  You know, data that you might

8    find on a hard drive, a flash drive, a mobile device such as a

9    phone.

10   Q.  Do you play a role in the execution of search warrants

11   where digital devices may be seized?

12   A.  Yes.  Absolutely.

13          And when I described the process, the first two

14   things I believe I said was identification and preservation.

15   Those are the two big things that come into play during a

16   search warrant, being there to identify what may, you know,

17   contain electronic evidence of -- of interest and then being

18   able to preserve it.

19          And a good example of preservation is you -- you're

20   going to take a cell phone -- right? -- a mobile device?  What

21   we typically always try to do is if we can't turn off -- you

22   know, put it into airplane mode to cut it off from -- you

23   know, to isolate it from the network -- we'll put it into

24   what's called a Faraday bag, and that blocks the signals.

25          And the purpose -- the reason for that is if you

11:02:53 (line 5)
11:03:05 (line 10)
11:03:22 (line 15)
11:03:38 (line 20)
11:03:57 (line 25)

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-256
21-CR-14-ABJ

 1   don't do that, somebody from the outside could hypothetically

 2   remote into that device and wipe everything.

 3         So that's just an example of preserving evidence

 4   until we can get it back to the lab.

11:04:11    5   Q.  When you get a physical device back to the lab, what do

 6   you do?

 7   A.  Well, the first thing we do -- you know, we have a --

 8   there is a chain of custody, of course, and this goes into the

 9   evidence vaults, into our evidence system.

11:04:21   10         We sign it out from the evidence room; we bring it to

11   the computer forensics lab.  It's right down the hall.  And

12   the first step of the -- sort of the examination process is

13   you have to get that exact copy.  That's the acquisition

14   phase.  We use special hardware and software to do that.

11:04:39   15         And I'd give you an example of -- let's just say a

16   hard drive.  We extract a hard drive out of a tower or out of

17   a laptop.  We'll connect this hard drive to special equipment,

18   to a special piece of hardware typically -- there's software

19   that does this, too, but typically we use hardware.  And this

11:04:56   20   hardware has a feature built into it called a write-blocking

21   feature.  So, in other words, it protects it -- it prevents it

22   from writing into the media.

23         So the hard drive that we want to acquire, we

24   consider that the source; right?  So we're going to connect

11:05:09   25   that to the proper side of this piece of equipment so that

19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-257
21-CR-14-ABJ

1    write-blocking feature is enabled and we're not going to make

2    any alterations or modifications.

3            Then we connect another drive called the destination

4    drive that's -- that's my drive.  That's the drive that we

11:05:23  5    forensically sanitized.  There's nothing on it.

6            And we also connect that to this device, and the

7    device simply acquires it.  And what that means is it makes an

8    exact copy, called a bit for bit.  An older term is "mirror

9    copy," but that's really not a relevant term anymore.  But

11:05:42  10   it's just considered as an exact copy, read only.

11           And after we have that, the original evidence goes

12   back to the evidence vault or evidence room, and then we have

13   our working copy for examination purposes.

14   Q.   That working copy, is that sometimes called an image?

11:05:58  15   A.   It is an image, right.

16   Q.   And it's an exact copy of the electronically stored

17   information that was on the original device?

18   A.   It is.

19   Q.   What role do you play in search warrants for email

11:06:14  20   accounts?

21   A.   Oftentimes what we'll -- we'll do is we'll assist the --

22   the case agent with some of the verbiage, you know, for the

23   subpoena or the search warrant.

24   Q.   So what I really want to know about is when a search

11:06:29  25   warrant's been issued to an Internet service provider and

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-258
21-CR-14-ABJ

1    they're providing records or electronically stored information

2    to law enforcement.  What is your role in that?

3    A.  Well, when we receive it, generally the case agent will

4    receive the search warrant data from the provider, Yahoo!,

11:06:52   5    Google, you know, Apple, whoever.  And that will be

6    assigned -- you know, that will be put into our evidence

7    system.

8           And just like any other piece of evidence, we'll sign

9    for it, we'll get the computer request, forensic request,

11:07:06   10   we'll acquire it.

11          You know, oftentimes these email search warrants

12   produce, you know, thousands, millions of emails, so you have

13   these emails compressed into these zip files, saved to, let's

14   say, a flash drive.

11:07:21   15          And then along with that flash drive there's some

16   administrative files with subscriber information, just

17   information about the customer, who owned that account.  But

18   the majority of the -- you know -- the information on these --

19   these drives -- or CD or DVD -- they may send that, just

11:07:40   20   depends on how much data there is.

21          But the majority of it is just these emails

22   compressed in these massive zip files.

23   Q.  Whatever media -- disk, thumb drive, flash drive -- do you

24   acquire it the same way you would a cell phone or an external

11:07:54   25   hard drive or a computer?

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN      Vol. III-259
21-CR-14-ABJ

1   A.   Yes.

2   Q.   The same process you described before?

3   A.   Same process.

4   Q.   And that creates, then, a -- an exact copy of the records

11:08:04    5   that the Internet service provider sent in response to the

6   search warrant?

7   A.   It does.

8   Q.   As part of your work, do you -- do you create review tools

9   for case agents?

11:08:27   10   A.   Well, we use review tools.

11          And one of our popular tools is called a portable

12   case.  And one of our primary forensic tools is called a

13   magnet axiom, and it's one of the features of the forensic

14   application.  It generates these portable cases.

11:08:46   15          And, again, those are review tools for investigators,

16   for attorneys, for other external stakeholders, and that

17   allows the -- the investigator to -- to review a subset of the

18   data.  Sometimes agents say "Give us everything" and we put

19   everything on a -- in a portable case.  But typically it's a

11:09:04   20   subset of the data where they can do their own searching, they

21   can do their own -- you can call it tagging or bookmarking,

22   files that they think might be important to their case.

23          They can -- they can add notes.

24   Q.   The portable case, when you create that, that's also an

11:09:20   25   exact copy of whatever set of records the agent wanted put

1    onto that case?

2    A.  It is.

3    Q.  And that portable case, does it have a similar

4    write-blocking feature so that nothing can be changed on it,

11:09:36   5    only tagged or identified?

6    A.  Yeah.  They're read-only files.  And, you know, you can --

7    like I said, you can tag and bookmark files.  Those are

8    just -- you know, it's like putting a sticky note next to

9    something.  You're not changing any of the data.  That's --

11:09:51   10    that's not -- that's not possible.

11    Q.  So the point of this whole process is to create copies of

12    the original electronic information so that it can be

13    reviewed, identified, and used in investigations?

14    A.  Exactly.

11:10:06   15    Q.  And those copies are reliable copies of what was

16    originally provided or originally seized?

17    A.  They are, yeah.

18    Q.  In your work do you sometimes have to filter out

19    potentially privileged information?

11:10:25   20    A.  Yes.  And that happens quite a bit in the OIG, where the

21    subject of an investigation, you know, may have some kind of

22    a -- you know -- an attorney -- there may be some privileged

23    attorney-client information on that drive or on that phone or

24    any -- any piece of digital evidence.

11:10:42   25         So the first thing that we would do is probably get

19-CR-26-ABJ       BERRYHILL - DIRECT - HEIMANN       Vol. III-261
21-CR-14-ABJ

1   with the investigator and get a keyword list of what to kind

2   of look for -- not look for but filter for.  Examples are

3   names, phone numbers, email addresses.  And we can scan the

4   entire digital evidence, and, you know, we'll get hits, and we

11:11:06   5   can -- we can exclude those items that may be potentially

6   privileged.  We segregate that information.  We don't look

7   at it.

8         And then it goes to a case agent or another agent who

9   is designated as a -- a privilege review investigator and the

11:11:24   10   AUSA and then eventually to a Magistrate.

11   Q.  The privilege review agent -- if there's an attorney for

12   the Government involved in that privilege review, they are

13   separate from the case team; right?

14   A.  They are, yeah.

11:11:40   15   Q.  And then I -- after you've done that segregation, is that

16   when you would create the portable case that's available to

17   the case agents?

18   A.  Typically.  Sometimes the case agents have a keyword list

19   of other items that they want us to search for, so that may

11:11:57   20   generate a portable case, or it may just be everything that

21   wasn't excluded as potentially privileged.  It just depends.

22   Q.  Okay.  So that keyword searching process can be used to

23   identify particular electronic information to give to the

24   agents?  It also can be used to cut out information that may

11:12:17   25   be potentially privileged?

19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-262
21-CR-14-ABJ

1   A.   Exactly.  It's just a way to organize and, you know,

2   vector in on what data may be relevant.

3   Q.   And regardless of the filtering process, whatever copy

4   goes to the agents, whether it's the privilege review agent or

11:12:33   5   the case agents, that is an exact copy that cannot be changed

6   of what was originally seized?

7   A.   That's correct.

8   Q.   Are you familiar with the digital evidence gathered in the

9   NuTech investigation?

11:12:47   10   A.   Yes.

11   Q.   Was a search warrant issued to Oath Holdings for email

12   accounts connected to Justin Herman and Chuck Winters?

13   A.   It was.

14   Q.   And what did you receive in response to that search

11:13:01   15   warrant?

16   A.   For the Oath Holdings, the case agent received a Lexar

17   flash drive with -- which contained all the email and some of

18   those administrative files I spoke of with subscriber

19   information.

11:13:14   20         And from there, again, the process, you know, ensues.

21   It goes into our evidence system; we get the forensic request;

22   we sign for it from the evidence custodian; we bring it to the

23   lab.  We acquire it; we analyze it, you know, process it.

24   Q.   In this case were potentially privileged documents and

11:13:37   25   communications segregated out of the Oath Holdings materials?

19-CR-26-ABJ         BERRYHILL - DIRECT - HEIMANN      Vol. III-263
21-CR-14-ABJ

1    A.   Yes.

2    Q.   Were they provided to a privilege review team?

3    A.   They were.

4    Q.   Did you then create a portable case for the agents?

11:13:50    5    A.   Yes.

6    Q.   Let's talk about the subscriber information.

7             MR. HEIMANN:  Your Honor, may I approach the witness?

8    I have a set of paper copies of the exhibits that I think may

9    help with his testimony.

11:14:08    10            THE COURT:  You may.

11   BY MR. HEIMANN:

12   Q.   Special Agent Berryhill, I'm going to ask you to look at

13   what's been marked as 1006 --

14   A.   Okay.

11:14:44    15   Q.   -- and we're going to pull that up on the screens.

16            Do you recognize this document?

17   A.   I do.

18   Q.   Generally, what is it?

19   A.   It's the -- again -- one of these administrative files

11:15:15    20   that contain subscriber information about the customer here.

21   In this case, it's Mr. Chuck Winters.

22   Q.   Was this provided in response to -- was this provided by

23   Oath Holdings in response to the search warrant we just

24   discussed?

11:15:28    25   A.   Yes.

---

19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-264
21-CR-14-ABJ

1    Q.  And as you said, it relates to email accounts connected to

2    Chuck Winters; correct?

3    A.  Yes.

4          MR. HEIMANN:  Your Honor, the Government moves to

5    admit 1006 as a certified business record.

6          MR. WARD:  No objection from Defendant Winters.

7          MR. FLEENER:  No objections.

8          MR. JUBIN:  No objection, Your Honor.

9          Do you want us to expressly state "no objection" or

10   only object if there is one?

11         THE COURT:  It might save time if we only object if

12   there is one.

13         MR. JUBIN:  That's kind of what I thought.

14   Thank you.

15         THE COURT:  We'll receive it.

16     (Government's Exhibit 1006 received into evidence.)

17         MR. HEIMANN:  We'll publish that to the jury.

18   BY MR. HEIMANN:

19   Q.  Special Agent Berryhill, this is entitled "Yahoo! Account

20   Management Tool."  And the birth date is redacted; correct?

21   Down at the middle.

22   A.  Yes.

23   Q.  So I've covered -- you indicated the log-in name.

24         What does that show?

25   A.  That's the primary email account.

11:15:38 (line 5)
11:15:58 (line 10)
11:16:07 (line 15)
11:16:20 (line 20)
11:16:51 (line 25)

```
19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN      Vol. III-265
21-CR-14-ABJ
```

1  Q.  And there are other identities that I've listed down here.

2  What are those?

3  A.  Just secondary email addresses.

4       It's not uncommon to be able to have, you know, four

11:17:05  5  or five different email accounts under a single primary

6  account.

7  Q.  One of those -- well, the primary account here is

8  chuckwinters@rocketmail.com?

9  A.  Yes.

11:17:17  10  Q.  And one of these other accounts is chuck@ichcorp.net?

11  A.  Yes.

12  Q.  What's the full name of the person who controls this

13  account?

14  A.  Mr. Chuck Winters.

11:17:29  15  Q.  All right.

16       MR. HEIMANN:  We can take that down.  And we'll look

17  at 1008.

18  BY MR. HEIMANN:

19  Q.  Do you recognize this document?

11:17:57  20  A.  I do.

21  Q.  Generally, what is it?

22  A.  Just like before, it's subscriber information.  But in

23  this case, it's for Mr. Justin Herman.  And the log-in name

24  here is justin_herman_2000.

11:18:09  25  Q.  Is this some of the subscriber information that was

```
19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-266
21-CR-14-ABJ
```

1    provided by Oath Holdings?

2    A.  It was.

3         MR. HEIMANN:  Your Honor, the Government moves to

4    admit 1008.

11:18:22    5         THE COURT:  It is received.

6        (Government's Exhibit 1008 received into evidence.)

7         MR. HEIMANN:  And publish that, please.

8    BY MR. HEIMANN:

9    Q.  As we look at this, there are a couple black boxes here.

11:18:36    10   Are those redactions for the residential address and part of

11   the birth date?

12   A.  Yes, they are.

13   Q.  Oath Holdings provided the unredacted information; right?

14   A.  They did.

11:18:48    15   Q.  As you said, the log-in name here, that's

16   justin_herman_2000.

17         And then in the middle of the page, "Other

18   Identities," what's indicated there?

19   A.  Oh, the -- oh, okay.  Yes.

11:19:07    20        Again, the justin_herman_2000.  It's the Yahoo!

21   primary account email, and then there's a justin@ichcorp.net,

22   support@wallaceconsulting.com --

23   Q.  We don't need to read all of them.  But these are the

24   other email accounts that are connected -- or email

11:19:28    25   addresses -- connected with this account; right?

```
19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN      Vol. III-267
21-CR-14-ABJ
```

1    A.  Yes, connected to the primary account.

2    Q.  Okay.  And the full name on this?

3    A.  Mr. Justin Herman.

4           MR. HEIMANN:  We can take that down.

11:19:38   5    BY MR. HEIMANN:

6    Q.  Oath Holdings, did it provide email content as well as the

7    subscriber information?

8    A.  Yes.

9           MR. HEIMANN:  Okay.  Let's look at Exhibit 100.

11:20:10   10   BY MR. HEIMANN:

11   Q.  Is this one of the emails that was provided by Oath

12   Holdings?

13   A.  Yes.

14   Q.  And do you recognize it?

11:20:19   15   A.  I do.

16   Q.  What's the subject?

17   A.  Subject is "ECMZ history."

18   Q.  And who is it from?

19   A.  This is from Thomas L. Crom.

11:20:34   20   Q.  On what date?

21   A.  11/24/2014.

22   Q.  Who was it to?

23   A.  And to Justin Herman.

24          That's justin@icorp -- or ichcorp.net.

11:20:49   25          MR. HEIMANN:  Your Honor, the Government moves to

19-CR-26-ABJ          BERRYHILL - DIRECT - HEIMANN          Vol. III-268
21-CR-14-ABJ

 1    admit 100.

 2             THE COURT:  It is received.

 3        (Government's Exhibit 100 received into evidence.)

 4             MR. HEIMANN:  We'll publish that to the jury.

11:21:10    5    BY MR. HEIMANN:

 6    Q.  So we see at the top here the information at -- in the top

 7    heading.  That's the information you read off before it was

 8    admitted; correct?

 9    A.  Yes.

11:21:19   10    Q.  Okay.  And there's a statement under the words "read

11    this."  What is that?

12    A.  It says, "ECMZ was pumped and dumped."

13             MR. HEIMANN:  Can we go to the next page, please --

14    oh, before we do that.

11:21:36   15    BY MR. HEIMANN:

16    Q.  So there's -- formattingwise here, it talks about

17    "Attachments."  What does that indicate?

18    A.  Well, it indicates that a file was attached to the email.

19    Q.  And below that, "simon case.docx," is that the file name

11:21:56   20    of the attachment?

21    A.  That is the file name of the attachment, and you also see

22    the size of that file.

23    Q.  When you say "size," that's the kilobytes on the right?

24    A.  27.9 kilobytes.

11:22:08   25    Q.  And this is the format that we'll see in the email that

19-CR-26-ABJ       BERRYHILL - DIRECT - HEIMANN       Vol. III-269
21-CR-14-ABJ

 1   was extracted from Oath Holdings, for the most part?

 2   A.  Yes.  For the most part, yes.

 3        MR. HEIMANN:  If we go to page 2.

 4   BY MR. HEIMANN:

11:22:24   5   Q.  This would then be that attachment; is that right?

 6   A.  That is correct.

 7        MR. HEIMANN:  Okay.  We can take that down.

 8        Exhibit 101.

 9   BY MR. HEIMANN:

11:22:49   10   Q.  Special Agent Berryhill, do you recognize this exhibit?

11   A.  I do.

12   Q.  Generally, what is it?

13   A.  This is an email chain.  It's --

14   Q.  And how many -- how many messages are here?

11:23:05   15   A.  Well, there's a parent email, and within the parent email

16   there appears to be two forwarded messages or two internal

17   emails.

18   Q.  If we look at the oldest of those messages, who is it

19   from?

11:23:19   20   A.  The original email's from Justin Herman,

21   justin@ichcorp.net.

22   Q.  What is the subject of the original email?

23   A.  The subject is "Eco Purchase Wire Instructions."

24   Q.  And who is it to?

11:23:34   25   A.  It's to ianhornlaw@gmail.com.

1    MR. HEIMANN:  Your Honor, the Government moves to

2    admit 101.

3    THE COURT:  It is received.

4    (Government's Exhibit 101 received into evidence.)

11:23:47  5    MR. HEIMANN:  And publish that.  Thank you.

6    BY MR. HEIMANN:

7    Q.  So when we talk about the original email, is that what is

8    seen on the bottom two-thirds -- or begins at the bottom

9    two-thirds of the page?

11:24:08  10    A.  That's correct.

11    Q.  Correct?

12    A.  Yes.

13    MR. HEIMANN:  Can we go to page 2, please?

14    BY MR. HEIMANN:

11:24:16  15    Q.  And it continues onto the second page?

16    A.  It does.

17    Q.  There's a redaction here for an account number.  The email

18    that was provided by Oath Holdings was unredacted?

19    A.  It was unredacted, correct.

11:24:31  20    MR. HEIMANN:  Let's go back up to page 1.

21    BY MR. HEIMANN:

22    Q.  Now, you said "the parent email."  Which one is that?

23    A.  That's at the very top.  That's the parent email that was

24    sent on -- you see the -- the 12/3/2018 date.

11:24:49  25    Q.  And then the -- you said it was -- there's another forward

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN       Vol. III-271
21-CR-14-ABJ

1   here.  Is that that -- that's the third message in the middle

2   there from Ian Horn?

3   A.  It is.  It is, from Ian Horn to stevenmillslaw@gmail.com

4   [sic].

11:25:06   5   Q.  What is the original -- what's the date of the original

6   email?

7   A.  Starting from the bottom?

8   Q.  Yes, please.

9   A.  Yeah.  "Eco Purchase Wire Instructions."

11:25:18  10   Q.  The date?

11   A.  Is Friday, December 2nd -- or excuse me -- 12th -- 2014.

12   Q.  When was this message first forwarded by Ian Horn to

13   stevemillslaw@gmail?

14   A.  Reading up, it appears to be on October 23rd, 2018, at

11:25:41  15   1:04.

16   Q.  And the parent email, when was that sent?

17   A.  That was sent on December 3rd, 2018, in the afternoon.

18   Q.  From whom?

19   A.  From Ian Horn, ianhornlaw@gmail.com, to Justin Herman at

11:26:03  20   justin@ichcorp.net.

21         MR. HEIMANN:  We can take that down.  Let's look at

22   Exhibit 5.1.

23   BY MR. HEIMANN:

24   Q.  Special Agent Berryhill, is Exhibit 5.1 an email provided

11:26:25  25   by Oath Holdings in response to the search warrant we've been

```
19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-272
21-CR-14-ABJ
```

1    discussing?

2    A.  Yes, it was.

3    Q.  Is this also a string of three emails?

4    A.  It is.

11:26:43    5    Q.  The original email, who's it from?

6    A.  The original email, starting from the bottom working our

7    way up, is from Justin Herman, justin@ichcorp.net to

8    ianhornlaw@gmail.com.

9    Q.  What is its subject?

11:27:02    10    A.  Subject is "wire."

11        MR. HEIMANN:  Your Honor, the Government moves to

12    admit Exhibit 5.1.

13        THE COURT:  It is received.

14        (Government's Exhibit 5.1 received into evidence.)

11:27:13    15    BY MR. HEIMANN:

16    Q.  So the original email, again, is -- that's the bottom

17    two-thirds of this first page is where it starts?

18    A.  That's where it starts.

19    Q.  And then that original email continues down onto the

11:27:28    20    second page?

21    A.  It does.

22    Q.  And as before -- and it's going to be true for any

23    redaction we see -- the original provided by Oath Holdings was

24    not redacted; right?

11:27:42    25    A.  That is correct.  There were no redactions.

19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-273
21-CR-14-ABJ

1              MR. HEIMANN:  Let's go up to page 1.

2      BY MR. HEIMANN:

3      Q.  And like the last email we looked at, this one was

4      forwarded on October 23rd of 2018 from Ian Horn to

5      stevemillslaw@gmail.com?

6      A.  Yes.

7      Q.  And then on December 23rd, 2018, from Ian Horn to

8      justinherman@- -- just- -- justin@ichcorp.net; is that right?

9      A.  That's correct.

10             MR. HEIMANN:  Let's go to 5.2.

11     BY MR. HEIMANN:

12     Q.  Is 5.2 an email that was provided by Oath Holdings?

13     A.  It was.

14     Q.  Like the other two we've looked at, is this a string of

15     emails between -- mostly between Justin Herman and Ian Horn?

16     A.  Yes, it is.

17             MR. HEIMANN:  Your Honor, the Government moves to

18     admit 5.2.

19             THE COURT:  It is received.

20      (Government's Exhibit 5.2 received into evidence.)

21     BY MR. HEIMANN:

22     Q.  As with the others, the original email begins about

23     two-thirds of the way down the first page; is that right?

24     A.  That's correct.

25             MR. HEIMANN:  If we go to page 2.

11:27:57 (line 5)
11:28:12 (line 10)
11:28:38 (line 15)
11:28:50 (line 20)
11:29:05 (line 25)

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-274
21-CR-14-ABJ

1   BY MR. HEIMANN:

2   Q.  That original email then continues on page 2 of this

3   exhibit?

4   A.  It does.

5            MR. HEIMANN:  Go back to page 1.

6   BY MR. HEIMANN:

7   Q.  When was this original email sent?

8   A.  Sent on December 23rd, 2014.

9   Q.  From whom to whom?

10  A.  Justin Herman -- from Justin Herman at justin@ichcorp.net

11  to ianhornlaw@gmail.com.

12  Q.  Was this email forwarded by Mr. Horn in October of 2018?

13  A.  Yes, it was.

14  Q.  To whom?

15  A.  To stevenmillslaw@gmail.com.

16  Q.  And was it forwarded by Mr. Horn on December 3rd of 2018

17  to Justin Herman?

18  A.  Yes.

19  Q.  Okay.

20           MR. HEIMANN:  Let's move on to 5.4.

21  BY MR. HEIMANN:

22  Q.  Is this an email that was provided by Oath Holdings?

23  A.  Yes, it was.

24  Q.  As the other ones we've looked at, is it an original email

25  that was then forwarded twice?

11:29:12
11:29:24
11:29:43
11:29:54
11:30:16

19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-275
21-CR-14-ABJ

1    A.   Yes.

2    Q.   The original email, what date was it sent on?

3    A.   January 2nd, 2015.

4    Q.   From whom to whom?

11:30:34    5    A.   From Justin Herman, justin@ichcorp.net, to

6    ianhornlaw@gmail.com.

7    Q.   What's the subject?

8    A.   "Liability."

9         MR. HEIMANN:  Your Honor, the Government moves to

11:30:48   10    admit 5.4.

11        THE COURT:  It is received.

12        (Government's Exhibit 5.4 received into evidence.)

13   BY MR. HEIMANN:

14   Q.   The information you were reading about the original

11:30:56   15   message, that, again, is -- starts at two-thirds of the way

16   down the first page; right?

17   A.   It does.

18        MR. HEIMANN:  Let's go to page 2.

19   BY MR. HEIMANN:

11:31:05   20   Q.   And that message continues onto page 2?

21   A.   Yes.

22        MR. HEIMANN:  We're back to page 1.

23   BY MR. HEIMANN:

24   Q.   On this series of exhibits we've been talking about the

11:31:16   25   message being forwarded.

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-276
21-CR-14-ABJ

1       Does this message have the same forwards, at least in

2   terms of October 2018 from Ian Horn to Steve Mills Law and

3   December of 2018, Ian Horn to Justin Herman?

4   A.   Yeah.  It's the same -- same pattern.

5       MR. HEIMANN:  Let's go to 5.5.

6   BY MR. HEIMANN:

7   Q.   Is this an email that was provided by Oath Holdings?

8   A.   It was.

9   Q.   Is this also a -- an original email that was forwarded

10  twice?

11  A.   Yes.

12  Q.   The original email, from whom to whom?

13  A.   Original email from Justin Herman -- it's

14  justin@ichcorp.net -- to ianhornlaw@gmail.com, and then

15  there's a courtesy copy sent to jillian.hickory@bmo.com.

16  Q.   What is the subject?

17  A.   "Justin Herman PADL/ECMZ Transaction/Ian Horn."

18      MR. HEIMANN:  The Government moves to admit 5.5.

19      THE COURT:  It is received.

20   (Government's Exhibit 5.5 received into evidence.)

21  BY MR. HEIMANN:

22  Q.   That original email, again, we're talking about the bottom

23  two-thirds of this page; right?

24  A.   Yes.

25  Q.   And the text of that email was "This transaction needs to

11:31:35
11:32:04
11:32:22
11:32:47
11:32:59

19-CR-26-ABJ          BERRYHILL - DIRECT - HEIMANN          Vol. III-277
21-CR-14-ABJ

1    close today"?

2    A.   That is correct.

3    Q.   There's an attachment here.  And as before, that's

4    indicated below the "Attachments" line?

11:33:15   5    A.   It is.

6    Q.   That attachment is also on the forwarded email; right?

7    A.   Yes.

8    Q.   Okay.  And like the others, this particular email was

9    forwarded in October of 2018 from Ian Horn to Steve Mills Law?

11:33:32   10   A.   Yes.

11   Q.   And in December of 2018 from Ian Horn to Justin Herman?

12   A.   It was.

13        MR. HEIMANN:  Let's go to page 2.

14   BY MR. HEIMANN:

11:33:44   15   Q.   Is this that attachment?

16   A.   Yes, the driver's license.

17   Q.   There's a couple redaction boxes there on the exhibit.  As

18   with the others, there were no redactions in the Oath Holdings

19   material that was provided?

11:33:59   20   A.   That's correct.  There were no redactions.

21        MR. HEIMANN:  We can take that down.

22        Let's look at 5.13.

23   BY MR. HEIMANN:

24   Q.   Is this an email that was provided by Oath Holdings?

11:34:26   25   A.   It was.

```
19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN      Vol. III-278
21-CR-14-ABJ
```

 1   Q.  Like the others, is this an original email that was

 2   forwarded twice?

 3   A.  Yes.

 4   Q.  The original email, from whom and to whom?

11:34:40   5   A.  The original email was from Justin Herman,

 6   justin@ichcorp.net, to Louis Weezing -- Weissing -- that's

 7   associated with the email ianhornlaw@gmail.com.

 8        MR. HEIMANN:  Your Honor, the Government moves to

 9   admit 5.13.

11:35:03   10        THE COURT:  Received.

 11      (Government's Exhibit 5.13 received into evidence.)

 12   BY MR. HEIMANN:

 13   Q.  Special Agent Berryhill, the structure of this exhibit is

 14   the same as the rest we've been looking at; right?

11:35:13   15   A.  It is.

 16   Q.  So the original email starts at two-thirds and continues

 17   down from there?

 18   A.  Yes.

 19   Q.  And the indication that it was forwarded is in the top, in

11:35:28   20   these two blocks of text at the top?

 21   A.  Yes.

 22   Q.  It appears that there's a couple other forwards here, as

 23   well.

 24        If we look at the bottom of the page, starting "On

11:35:54   25   January 12, 2015," do you see that spot?

---

Melanie Sonntag, RDR, CRR, CRC              MelanieSonntagCRR@gmail.com

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-279
21-CR-14-ABJ

1    A.  I do.

2    Q.  Are those other forwards?  Or is that part of that

3    original forwarded message?

4    A.  I believe that's a part of the original message.

11:36:10    5    Q.  So there's a section here, "On January 12th, 2015,

6    ianhornlaw@gmail.com wrote 'Who are these people and why are

7    we wiring them money?'"

8    A.  Right.  Because if you see the -- the original message in

9    this email chain starting from the bottom, working our way up

11:36:31    10    from Justin Herman to ianhornlaw@gmail.com, this is a

11    response -- you know, "RE, colon, last two wires."  So

12    probably that's -- that's part of some previous

13    communications.  That's just part of that, that email.

14    Q.  Okay.  So this is a -- an email thread, basically?

11:36:52    15    A.  It is.

16    Q.  And, again, there were redactions that were not on the

17    original Oath Holdings material?

18    A.  That's correct.

19         MR. HEIMANN:  Let's go to 11.1.

11:37:14    20    BY MR. HEIMANN:

21    Q.  Is this an email that was provided by Oath Holdings?

22    A.  Yes.

23    Q.  What's the subject?

24    A.  "How do we add date?"

11:37:40    25    Q.  Who is it from?

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-280
21-CR-14-ABJ

1   A.   It's from Justin Herman, justin@ichcorp.net.

2   Q.   Who is it to?

3   A.   Chuck Winters.  That's chuck@ichcorp.net.

4        MR. HEIMANN:  Your Honor, the Government moves to

11:37:53   5   admit 11.1.

6        THE COURT:  It is received.

7        (Government's Exhibit 11.1 received into evidence.)

8   BY MR. HEIMANN:

9   Q.   Special Agent Berryhill, what's the date and time on this

11:38:06   10   email?

11   A.   July 27th, 2015, 10:02 a.m.

12   Q.   Now, 10:02 a.m., what time zone would that be?

13   A.   This is a parent email, and that would be a Mountain Time

14   Zone.

11:38:23   15   Q.   Why would the parent email be in a Mountain Time Zone?

16   A.   Well, that was part of the request, and that's something

17   that we can actually set with our forensic applications.

18        So we can set the time zone for these parent emails,

19   but all these internal, concatenated emails we cannot.

11:38:44   20   Q.   So this would be true for 11.1 and the prior exhibits,

21   that the very first email is going to be in Mountain Time?

22   A.   Right, the top date and time.

23   Q.   Is it possible to tell what the other email messages --

24   say the forwarded messages -- what their time stamp is?

11:39:04   25   A.   Not just by looking at these emails the way they

1    stand, no.

2    Q.  Okay.  So you can compare the parent -- the time stamp of

3    the parent email across exhibits, but you can't reliably

4    compare the time stamp on the parent email and any forwarded

11:39:20    5    email in these exhibits?

6    A.  Right.  The internal emails would mean you'd have to know

7    where that person was when they were sending the email.

8    There's header -- email header analysis that you can do, but

9    that was not part of this -- this request.

11:39:36    10    Q.  So we have this email, 11.1.  And what is the attachment

11    to this email?

12    A.  The attachment's called "ECMZ debt assignment signed.pdf."

13    It's an Adobe PDF file.

14          MR. HEIMANN:  Let's go to page 2.

11:39:55    15    BY MR. HEIMANN:

16    Q.  Is this where the attachment begins?

17    A.  It is where it begins.

18    Q.  So the rest of the pages of this exhibit are that file?

19    A.  Correct.

11:40:04    20    Q.  Okay.  If we go all the way down to the last two pages --

21    so -- okay.  We're going to come back to these pages.  Right

22    now I want to go to 11.2.

23          Is this an email that was provided by Oath Holdings?

24    A.  Yes.

11:40:40    25    Q.  Who is it from?

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-282
21-CR-14-ABJ

1    A.   This is from Chuck Winters, chuckwinters@rocketmail.com.

2    Q.   Who is it to?

3    A.   It's to Justin Herman, justin@ichcorp.net.

4    Q.   And what is attached to it?  What's the file name?

11:40:57    5    A.   The attachment name is "Debt assignment.pdf."  It's

6    another Adobe PDF form.

7         MR. HEIMANN:  Your Honor, the Government moves to

8    admit 11.2.

9         THE COURT:  It's received.

11:41:12    10    (Government's Exhibit 11.2 received into evidence.)

11         MR. HEIMANN:  What I'd like to do is put 11.2 and

12    11.1 on the screen at the same time.  And let's put 11.2 on

13    the right if we can, 11.1 on the left.

14    BY MR. HEIMANN:

11:42:03    15    Q.   Okay.  So we have 11.1 on the left-hand side, 11.2 on the

16    right.

17         Based on the time stamps, how much time elapsed

18    between when the 11.1 email -- "How do we add date?" -- was

19    sent from Justin Herman to Chuck Winters and 11.2 -- that

11:42:34    20    email with no subject -- was sent back from Chuck Winters to

21    Justin Herman?

22    A.   Oh, looks like about 51 minutes.

23    Q.   So 10:02 a.m. as opposed to 10:53 a.m.?

24    A.   Yes.

11:42:50    25         MR. HEIMANN:  And let's go to the second-to-last

---

Melanie Sonntag, RDR, CRR, CRC                MelanieSonntagCRR@gmail.com

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-283
21-CR-14-ABJ

1   page, please, on both.

2   BY MR. HEIMANN:

3   Q.  So on the left-hand side, we have the first email from

4   Chuck Winters -- from Justin Herman to Chuck Winters.

11:43:24   5        What's the handwritten date next to the -- underneath

6   the name "Gordon Pardy" to the left of the signature?

7   A.  That would be 1-2-15.

8   Q.  On 11.2 on the right-hand side of the screen --

9   A.  1 dash --

11:43:42   10   Q.  -- what's that date?

11   A.  -- 2 dash 14.

12        MR. HEIMANN:  Go to the next page on each exhibit.

13   BY MR. HEIMANN:

14   Q.  There's -- under the name "David Rodgers" at the top left,

11:44:05   15   do you see that handwritten date?

16   A.  I do.  That's 1/8/15.

17   Q.  And the same date on 11.2?

18   A.  That's 1/8/14.

19   Q.  There's an "E-Pro Systems" line.  Do you see that?

11:44:23   20   A.  Yes.

21   Q.  And that appears on both documents.  On the 11.1 on the

22   left-hand side, what's that date, handwritten?

23   A.  That's 1/8/15.

24   Q.  And what is the date that appears on 11.2 in that same

11:44:40   25   place?

19-CR-26-ABJ          BERRYHILL - DIRECT - HEIMANN          Vol. III-284
21-CR-14-ABJ

1    A.  1/8/14.

2    Q.  So it's been changed?

3    A.  It has.

4    Q.  If we look at the "EcoEmissions Solutions, Inc.," in the

11:44:49    5    middle of the page, there's a handwritten date there on 11.2

6    on the left-hand side.  What is that date?

7    A.  That is 12/30/14.

8    Q.  If we look at 11.2 on the right-hand side, that same

9    handwritten date under "EcoEmissions Solutions," what is it

11:45:12    10    now?

11    A.  This is 12/30/13.

12    Q.  There's a handwritten date under "EcoEmissions Systems."

13    Do you see that?

14    A.  I do.

11:45:22    15    Q.  On the left-hand side, 11.1.

16    A.  That is also 12/30/14.

17    Q.  And if we look at 11.2, it's been changed to 12/30/13; is

18    that right?

19    A.  It has, 12/30/13 for 11.2.

11:45:41    20    Q.  Okay.  I'm going to draw your attention then, to the very

21    bottom on 11.1.  There's a footer down there.

22          Do you see that?  It's hard -- it's faded.  Can you

23    read that?

24    A.  I do.  I can see that.

11:45:53    25    Q.  What does it say?

19-CR-26-ABJ         BERRYHILL - DIRECT - HEIMANN      Vol. III-285
21-CR-14-ABJ

1    A.  You're referring to the footer; correct?

2    Q.  The footer, please.

3    A.  "Debt Assignment Agreement dated December 31, 2014."

4    Q.  Does that same footer appear on 11.2?

11:46:09   5    A.  No.  It's -- it's absent from that 11.2 document.

6    Q.  So the document's been changed?

7    A.  They have.

8    Q.  And the change makes it appear it was signed one year

9    prior to when it originally was dated?

11:46:29   10   A.  Yes.

11          MR. HEIMANN:  Okay.  Let's take that down and look

12   at 15.2.

13   BY MR. HEIMANN:

14   Q.  Is this an email that was provided by Oath Holdings?

11:46:57   15   A.  It was.

16   Q.  What's the subject?

17   A.  Subject is "fix."

18   Q.  Who's it from?

19   A.  It's from Justin Herman.  That's justin@ichcorp.net.

11:47:11   20   Q.  To whom?

21   A.  To Chuck Winters, chuck@ichcorp.net.

22   Q.  Is there an attachment?

23   A.  Yes, there is one attachment.

24   Q.  And that's a file called "Consideration NERG.pdf"; right?

11:47:25   25   A.  Yes.

```
        19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-286
        21-CR-14-ABJ
```

 1  Q.  And that attachment appears on the following pages of this

 2  exhibit?

 3  A.  It does.

 4         MR. HEIMANN:  Your Honor, the Government moves to

11:47:35  5  admit 15.2.

 6         THE COURT:  15.2 is received.

 7      (Government's Exhibit 15.2 received into evidence.)

 8         MR. HEIMANN:  We're going to look at this in

 9  combination with the next exhibit, so let's look now at 15.3.

11:48:05 10  BY MR. HEIMANN:

11  Q.  Is this an email that was provided by Oath Holdings?

12  A.  Yes.

13  Q.  What's the subject?

14  A.  "N-e-r-g" -- n-e-r-g -- "wire."

11:48:15 15  Q.  Who's it from?

16  A.  Chuck Winters.  That's chuckwinters@rocketmail.com.

17  Q.  To whom?

18  A.  To Justin Herman, justin@ichcorp.net.

19  Q.  Is there an attachment?

11:48:27 20  A.  There is a single attachment called "wire.pdf."

21  Q.  And that appears on the next page of this exhibit; right?

22  A.  It does.

23  Q.  Okay.

24         MR. HEIMANN:  Your Honor, the Government moves to

11:48:38 25  admit 15.3.

1    THE COURT:  It is received.

2    (Government's Exhibit 15.3 received into evidence.)

3    MR. HEIMANN:  And I want to publish 15.2 and 15.3

4  side-by-side.

11:48:56    5  BY MR. HEIMANN:

6  Q.   Okay.  So we're looking at 15.2 on the left, 15.3 on the

7  right.

8    What is the time stamp on 15.2, the first email?

9  A.   That's 8/19/2015 at 1:28 p.m.

11:49:31   10  Q.   And what's the time stamp on the second email, 15.3?

11  A.   8/19/2015 at 1:41 p.m.

12  Q.   And as you testified previously, those are comparable

13  dates because they're both parent emails -- or comparable

14  times?  Sorry.

11:49:47   15  A.   Correct.  They're both in Mountain Time.

16  Q.   So about 13 -- 15.3 came back about 13 minutes after?

17  A.   13 minutes.

18  Q.   Let's look at the attachments.

19    MR. HEIMANN:  And I want to blow up that on 15.2.

11:50:13   20  BY MR. HEIMANN:

21  Q.   So on 15.2 we've -- we've magnified a section in the

22  middle, "Wire Amount Source of Funds."

23    What's the amount, US dollars, there?

24  A.   $80,000.

11:50:50   25    MR. HEIMANN:  And take that down, the magnification.

```
19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-288
21-CR-14-ABJ
```

1    BY MR. HEIMANN:

2    Q.   And this is -- the name of both of these documents is

3    "Wire Transfer Services Outgoing Wire Transfer Request"; is

4    that right?

11:51:04    5    A.   Are you talking about the attachment names?

6    Q.   Yes, sir.

7    A.   Because in 15.2 --

8    Q.   I'm sorry.  I'm not talking about the file name.  My

9    mistake.  I wasn't clear with you.  Thank you.

11:51:20    10    A.   It's okay.

11    Q.   If we just look at the document that's reproduced in each

12    file, this is a -- they're both outgoing wire transfer

13    requests?

14    A.   They are.

11:51:29    15    Q.   And the date is in the upper left on each one.  What

16    is it?

17    A.   12/23/2014.

18    Q.   Are the amounts different on these two documents?

19    A.   Yes.  The -- the amount on the 15.3 document is $280,000,

11:51:58    20    rather than the 80 on the first one.

21    Q.   And we -- we see that in that same spot on the document;

22    right?

23    A.   Yes, under the "Amount" in US dollars.

24    Q.   There's an "Information/Comments" on both of these

11:52:15    25    documents.  What does that say?

---

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

```
        19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN       Vol. III-289
        21-CR-14-ABJ
```

 1   A.   They both say "ECMZ Debt Conversion."

 2   Q.   And we see that in the -- on the left side about

 3   two-thirds of the way down the page; right?

 4   A.   Yes.

11:52:27  5   Q.   Okay.  Very good.

 6              MR. HEIMANN:  Let's go to 19.1.

 7   BY MR. HEIMANN:

 8   Q.   Is this an email that was provided by Oath Holdings?

 9   A.   It was.

11:53:00  10   Q.   What's the subject?

11   A.   The subject is "Ian Horn."

12   Q.   Who is it from?

13   A.   From Justin Herman, justin@ichcorp.net.

14   Q.   Who is it to?

11:53:10  15   A.   Chuck Winters, chuck@ichcorp.net.

16              MR. HEIMANN:  Your Honor, the Government moves to

17   admit 19.1.

18              THE COURT:  It is received.

19      (Government's Exhibit 19.1 received into evidence.)

11:53:17  20   BY MR. HEIMANN:

21   Q.   And is there an attachment to this email?

22   A.   No.

23              MR. HEIMANN:  So let's look at now 19.2.

24   BY MR. HEIMANN:

11:53:51  25   Q.   Is this an email that was provided by Oath Holdings?

```
         19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-290
         21-CR-14-ABJ
```

1    A.  It was.

2    Q.  The parent email, what's the subject?

3    A.  Subject is "RE, colon" -- reply -- "Ian Horn."

4    Q.  Who is it from?

11:54:08    5    A.  From Chuck Winters, chuck@ichcorp.net.

6    Q.  Who is it to?

7    A.  Justin Herman, justin@ichcorp.net.

8    Q.  This particular exhibit, does it also include the email

9    that we saw in 19.1?

11:54:23    10    A.  It does.

11    Q.  And is there an attachment?

12    A.  There is.

13    Q.  What's it called?

14    A.  "Horn and assoc" -- associate -- "letterhead.docx."

11:54:35    15         MR. HEIMANN:  Your Honor, the Government moves to

16    admit 19.2.

17         THE COURT:  It is received.

18      (Government's Exhibit 19.2 received into evidence.)

19         MR. HEIMANN:  So let's go to page 2.

11:54:48    20    BY MR. HEIMANN:

21    Q.  Is this the attachment?

22    A.  It is.

23         MR. HEIMANN:  Let's move to 20.

24    BY MR. HEIMANN:

11:55:08    25    Q.  Is this an email that was provided by Oath Holdings?

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-291
21-CR-14-ABJ

1   A.   Yes.

2   Q.   The parent email here, what's the subject?

3   A.   This is a forward, "FW, colon, Ian Horn."

4   Q.   Who is it from?

11:55:20   5   A.   Chuck Winters, chuck@ichcorp.net.

6   Q.   Who is it to?

7   A.   Justin Herman, justin@ichcorp.net.

8   Q.   You said it was a forward, so there are also forwarded

9   email within the body of this?

11:55:32   10   A.   Yes, there -- there are a couple.

11   Q.   Is there an attachment?

12   A.   There is.

13   Q.   What's the attachment called?

14   A.   "Horn and assoc" -- a-s-s-o-c -- "letterhead.docx."

11:55:53   15        MR. HEIMANN:  Your Honor, the Government moves to

16   admit 20.

17        THE COURT:  It is received.

18     (Government's Exhibit 20 received into evidence.)

19        MR. HEIMANN:  Publish that.

11:56:03   20        And let's go to the second page.

21        Page 2, please.

22   BY MR. HEIMANN:

23   Q.   So this is where we see the name of the attachment; right?

24   A.   At the very top there, yeah.

11:56:14   25   Q.   So these first two pages are still the captured email?

             1   A.   It is.

             2   Q.   And then page 3?

             3   A.   Is the actual attachment.

             4   Q.   Okay.  Very good.  Thank you.

11:56:24     5        MR. HEIMANN:  Let's move to 24.1.

             6   BY MR. HEIMANN:

             7   Q.   Is this an email that was provided by Oath Holdings?

             8   A.   Yes.

             9   Q.   What's the subject?

11:56:47    10   A.   "Call u in two."

            11   Q.   Who's it from?

            12   A.   Justin Herman, justin@ichcorp.net.

            13   Q.   Thank you.  Who is it to?

            14   A.   Chuck Winters, chuck@ichcorp.net.

11:56:56    15   Q.   Is there an attachment?

            16   A.   There is a single attachment.

            17   Q.   And that attachment, does that appear on the

            18   following pages of the exhibit?

            19   A.   It does.

11:57:05    20        MR. HEIMANN:  Your Honor, the Government moves to

            21   admit 24.1.

            22        THE COURT:  It is received.

            23     (Government's Exhibit 24.1 received into evidence.)

            24        MR. HEIMANN:  We're going to publish this with the

11:57:16    25   next two, so let's move to 24.2.

1    BY MR. HEIMANN:

2    Q.   Is this an email that was provided by Oath Holdings?

3    A.   Yes.

4    Q.   What's the subject?

11:57:40   5    A.   "Doc edit."

6    Q.   Who is it from?

7    A.   From Justin Herman, justin@ichcorp.net.

8    Q.   Who is it to?

9    A.   To Chuck Winters, chuck@ichcorp.net.

11:57:51   10    Q.   Is there an attachment?

11    A.   No attachment.

12    Q.   Just text?

13    A.   Just text.

14         MR. HEIMANN:  Your Honor, the Government moves to

11:57:58   15    admit 24.2.

16         THE COURT:  It is received.

17    (Government's Exhibit 24.2 received into evidence.)

18         MR. HEIMANN:  And, again, we're going to publish this

19    with 24.1 and 24.3, so let's look at 24.3.

11:58:18   20    BY MR. HEIMANN:

21    Q.   Is this an email that was provided by Oath Holdings?

22    A.   It was.

23    Q.   What is the subject?

24    A.   "E-pro."

11:58:40   25    Q.   Who is it from?

19-CR-26-ABJ          BERRYHILL - DIRECT - HEIMANN          Vol. III-294
21-CR-14-ABJ

1   A.   From chuckwinters@ -- chuck@i -- @ichcorp.net.

2   Q.   Who is it to?

3   A.   Justin Herman, justin@ichcorp.net.

4   Q.   Is there an attachment?

11:58:51  5   A.   There's a single attachment.

6   Q.   And in this exhibit does that attachment begin on page 2

7   and continue to the end?

8   A.   Yes.

9         MR. HEIMANN:  Your Honor, the Government moves to

11:59:00  10  admit 24.3.

11        THE COURT:  It is received.

12        (Government's Exhibit 24.3 received into evidence.)

13        MR. HEIMANN:  So let's publish 24.1 and 24.2

14  side-by-side.

11:59:11  15  BY MR. HEIMANN:

16  Q.   So as we look at these -- again, these are both parent

17  emails, so the time stamps are comparable?

18  A.   They are.

19  Q.   24.1, "Subject:  Call u in two" from Justin Herman to

11:59:47  20  Chuck Winters, that was sent at 8:28 Mountain Time, in the

21  morning?

22  A.   That's correct, Mountain Time.

23  Q.   And then the "doc edit" email in 24.2, that was sent from

24  Justin Herman to Chuck Winters on September 23rd, 2015, at

12:00:04  25  8:54 a.m. Mountain Time?

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-295
21-CR-14-ABJ

1    A.   That's correct.

2    Q.   I'm not going to try to do that math, about 30 minutes.

3    A.   Okay.

4         MR. HEIMANN:   Let's look at the second -- the

12:00:18   5    first page of the attachment, so the second page of 24.1.

6    BY MR. HEIMANN:

7    Q.   If -- do you see on 24.1 there's a section that begins,

8    "In consideration for"?

9    A.   Yes.

12:00:36   10   Q.   And that -- the section we're both looking at is

11   bold-type, all caps, "In consideration"?

12   A.   Yes.

13   Q.   Okay.   There's some text on 24.2 on the right side.

14        The -- and that -- in the email in 24.2, the text

12:01:04   15   there begins with the same bold face, all caps, "In

16   consideration"; right?

17   A.   It does.

18   Q.   The paragraph that follows on 24.1's attachment, is it

19   different from the paragraph that's in the email?

12:01:19   20   A.   Well, the amount's the same.   We're talking about the same

21   280,000.

22   Q.   But there's some text that's different; right?

23   A.   There is a difference, yes.

24        MR. HEIMANN:   Okay.   So let's now put up 24.2

12:01:41   25   and 24.3.

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN      Vol. III-296
21-CR-14-ABJ

1   BY MR. HEIMANN:

2   Q.  So 24.2, we already talked about the time stamp, 8:54 a.m.

3   Mountain Time.  What's the date and time on 24.3?

4   A.  That's September 23rd, 2015, at 9:13 a.m.

12:02:23   5   Q.  And that's the email from Chuck Winters back to

6   Justin Herman?

7   A.  Yes.

8   Q.  Let's look at the first page of the attachment on 24.3.

9        There's a similar "In consideration" paragraph on

12:02:42   10   24.3.  Do you see that?

11   A.  I do.

12   Q.  If you'd take a minute and compare the text on 24.3's

13   attachment and the text of the email in 24.2, my question is,

14   are they the same for that paragraph?

12:02:59   15   A.  Yes.

16        MR. HEIMANN:  Okay.  Let's now compare 24.1 and 24.3,

17   please, if we can put 24.1 on the left.

18        And if we go to the last page of each attachment --

19   sorry -- second-to-last page.

12:03:55   20        Thank you.

21   BY MR. HEIMANN:

22   Q.  Special Agent Berryhill, there's a signature block on each

23   of these pages; right?

24   A.  There is.

12:04:09   25   Q.  On the original, 24.1 on the left, there don't appear to

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-297
21-CR-14-ABJ

1    be any handwritten signatures; right?

2    A.  Correct, no signatures.

3    Q.  No digitally pasted signatures?

4    A.  No.  No.

12:04:26    5    Q.  On the right there's a different signature block; right?

6    A.  Yes.  They're different.

7    Q.  So on the bottom left it appears "E-Pro Tech, LLC," is

8    different?

9    A.  It is.

12:04:41    10    Q.  And then there's a signature line for a David Rodgers?

11    A.  Correct.

12    Q.  And that appears to have either a scanned copy or a

13    handwritten signature?

14    A.  Yes, it does.

12:04:53    15    Q.  There's handwriting above it; right?

16    A.  There is handwriting above it.

17    Q.  And below that there's a -- a line has been added,

18    "Gordon Pardy"?

19    A.  "Gordon Pardy, License Holder."

12:05:06    20    Q.  And it -- what appears to be a signature on that line?

21    A.  Yes.

22    Q.  And, similarly, on the right-hand side there's some

23    spacing differences and -- and a "Larry Lorenz" has been added

24    with some handwritten -- or apparently handwritten

12:05:23    25    signatures --

19-CR-26-ABJ          BERRYHILL - DIRECT - HEIMANN          Vol. III-298
21-CR-14-ABJ

1    A.  Yeah.

2    Q.  -- is that right?

3    A.  That's correct.

4              THE COURT:  Can I interrupt you?

12:05:29    5              MR. HEIMANN:  You may, Judge.

6              THE COURT:  Okay.  Would this be a good time to take

7    the noontime break?

8              MR. HEIMANN:  Your Honor, I have one more exhibit out

9    of the Oath Holdings search warrant.

12:05:38   10              THE COURT:  Let's do it.

11              MR. HEIMANN:  And then we're moving -- let me do that

12    with your permission.

13              THE COURT:  Very well.

14              MR. HEIMANN:  Thank you, sir.

12:05:45   15              Let's move to 515.

16    BY MR. HEIMANN:

17    Q.  Is this an email that -- attachment -- that was provided

18    by Oath Holdings?

19    A.  Yes.

12:06:05   20    Q.  What's the subject?

21    A.  "All Docs."

22    Q.  Who is it from?

23    A.  This is from Dan Hefner, a danshirlh@msn.com.

24    Q.  So the email address is d-a-n-s-h-i-r- --

12:06:19   25    A.  -- -s-h-i-r-l-h@msn.com.

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN      Vol. III-299
21-CR-14-ABJ

1   Q.   Who is it to?

2   A.   It's to Justin Herman.  That's justin@wallace

3   consulting.com.  Courtesy copy to Ian Horn at

4   ianhornlaw@gmail.com.

12:06:37   5   Q.   Is there any text?

6   A.   There is no text.

7   Q.   There was an attachment?

8   A.   There is one large attachment.

9   Q.   What's it called?

12:06:43   10   A.   "IanHornKingdom.pdf."

11   Q.   And that's what follows on the -- from page 2 to the end

12   of this exhibit?

13   A.   Yes.

14         MR. HEIMANN:  Your Honor, the Government moves to

12:06:53   15   admit 515.

16         THE COURT:  It is received.

17         MR. FLEENER:  Judge, can I have a second, please?

18         THE COURT:  You may.

19         MR. FLEENER:  No objections, Judge.

12:07:44   20         THE COURT:  It is received.

21      (Government's Exhibit 515 received into evidence.)

22         MR. HEIMANN:  All right.

23   BY MR. HEIMANN:

24   Q.   And when was this email sent from Mr. Hefner to

12:07:52   25   Justin Herman and Ian Horn?

19-CR-26-ABJ          BERRYHILL - DIRECT - HEIMANN       Vol. III-300
21-CR-14-ABJ

1    A.   This was on March 15th, 2016, 3/15/2016.

2    Q.   Okay.  And because this is a parent, that time stamp is

3    Mountain Standard Time?

4    A.   That is a Mountain -- right -- Standard Time.

12:08:10   5    Q.   Okay.  Let's look at the second page of this document,

6    first page of the attachment.

7             What's the title of this -- what's the title on top

8    of this first page?

9    A.   "Attorney Letter Agreement."

12:08:26   10    Q.   And in the upper left?

11    A.   "OTC Markets."

12    Q.   Thank you.

13             MR. HEIMANN:  Let's go to the next page.

14    BY MR. HEIMANN:

12:08:34   15    Q.   There's some handwritten information on the middle right.

16    Do you see that?

17    A.   I do.

18    Q.   There's a "The Attorney," "Name of the Firm."  What's

19    written in there in handwriting?

12:08:49   20    A.   "Law Offices of Ian Horn, LLC."

21    Q.   And a little bit further down there's a "Name of Attorney

22    (print)."  What name is there?

23    A.   "Ian Horn."

24    Q.   That's in handwriting?

12:09:03   25    A.   It is.

19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-301
21-CR-14-ABJ

1   Q.  And there's an email there in handwriting.  Can you read

2   that?

3   A.  Yes.  That says "ianhornlaw@gmail.com."

4         MR. HEIMANN:  Your Honor, that's all I have with this

12:09:20  5   exhibit, and this would be a very good stopping place.

6         THE COURT:  Very well.

7         Ladies and gentlemen, we'll stand in recess until

8   1:30 o'clock.  Again, I remind you not to discuss the case

9   with anyone or permit anyone to discuss it with you.

12:09:47  10        Do not attempt to learn about this case from sources

11  outside of the courtroom, including Blackberry, Twitters,

12  Internet, any electronic sources, books, dictionaries,

13  encyclopedias -- you name it -- newspapers, magazines.  Don't

14  attempt to investigate the case on your own.  If anyone

12:10:13  15  attempts to contact you, please let us know.

16        Everyone in the courtroom should be sensitive.  These

17  jurors will be -- likely to be found in restaurants and

18  eateries in and around the courthouse.  So if you end up in

19  the same spot, maintain not only social distance but any

12:10:34  20  distance where anybody can overhear you, any conversations

21  that go on during the noon hour.

22        We'll stand in recess until 1:30.

23        THE COURTROOM DEPUTY:  All rise.

24     (A recess was taken from 12:11 p.m. to 1:33 p.m.

13:33:06  25  Proceedings outside the jury's presence.)

---

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-302
21-CR-14-ABJ

1    THE COURT:  I hope we have our jurors.

2    (Proceedings within the jury's presence at 1:34 p.m.)

3    THE COURT:  Thank you, ladies and gentlemen.  Please

4  be seated.

13:34:49  5    When we recessed for the noon hour, we were hearing

6  the testimony of Special Agent Berryhill under the direct

7  examination of Mr. Heimann.

8    MR. HEIMANN:  Thank you, Your Honor.

9  BY MR. HEIMANN:

13:35:03  10  Q.  Special Agent Berryhill, you understand that you are still

11  under oath?

12  A.  I do.

13  Q.  We were talking about email that came out of a search

14  warrant to an Internet service provider called Oath Holdings.

13:35:17  15    Was a search warrant also issued to an Internet

16  provider called Endurance Group -- or Endurance International

17  Group?

18  A.  Yes.

19  Q.  Did that search warrant require that ISP to provide

13:35:34  20  administrative files and email content for email addresses

21  related to NuTech Energy Resources?

22  A.  Yes.

23  Q.  Did you receive those files in the same manner as the Oath

24  Holdings files or was it different?

13:35:48  25  A.  I'm having a hard time remembering.

```
          19-CR-26-ABJ       BERRYHILL - DIRECT - HEIMANN      Vol. III-303
          21-CR-14-ABJ
```

```
 1    Q.  Did you process it in the same way?

 2    A.  I did, yeah.

 3    Q.  So you ended up with the same portable case copies that

 4    you were able to then --

 5    A.  That's correct.

 6    Q.  -- search through, tag?

 7    A.  Sure.

 8    Q.  And they were true and correct copies of the original

 9    material?

10    A.  They were.

11    Q.  Did you provide a portable case to agents including that

12    information?

13    A.  I believe I did, yeah.

14         MR. HEIMANN:  So let's look at Exhibit 516.

15    BY MR. HEIMANN:

16    Q.  Special Agent Berryhill, is this an email, including

17    attachment, that was in the email records provided by

18    Endurance Internet Group?

19    A.  Yes, it was.

20    Q.  What is the subject line?

21    A.  "Attorney letter."

22    Q.  Who is it from?

23    A.  It's from Kevin and that's kevin@nutechenr.com.

24    Q.  Who is it to?

25    A.  It's to gareth@otcmarkets.com.
```

Timestamps in left margin:
- 13:36:04 (line 5)
- 13:36:12 (line 10)
- 13:36:44 (line 15)
- 13:37:02 (line 20)
- 13:37:14 (line 25)

1   Q.  And what's the name of the attachment?

2   A.  "OTC Market, Ian Horn, A-T-T-Y" -- attorney --

3   "letter.pdf."

4            MR. HEIMANN:  Your Honor, the Government moves to

13:37:29   5   admit 516.

6            THE COURT:  It is received.

7       (Government's Exhibit 516 received into evidence.)

8   BY MR. HEIMANN:

9   Q.  So the information that we were just discussing about to

13:37:44   10   and from and the subject line, attachment, that's at the top

11   of this particular email; correct?

12   A.  It is.

13            MR. HEIMANN:  If we can go to the second page.

14   BY MR. HEIMANN:

13:37:57   15   Q.  This is where the attachment begins?

16   A.  That's correct.

17   Q.  And what is the title on the page of this attachment?

18   A.  "OTC Markets, Attorney Letter Agreement."

19            MR. HEIMANN:  Let's move down one page -- stop.

13:38:13   20   BY MR. HEIMANN:

21   Q.  Right before the break for lunch, you were testifying

22   about Exhibit 515, the handwriting -- handwritten portion

23   that's in -- from "The Attorney."

24            Do you see that?

13:38:40   25   A.  I do.

1   Q.  And it goes down to "Name of Attorney (print)," and it

2   says "Ian Horn" in handwriting.

3   A.  Yes.

4   Q.  That section, does that appear to be the same as it was

13:38:49   5   on 515?

6   A.  Yes, as I remember it.

7   Q.  There's some additional handwriting here; correct?

8   A.  There is.

9   Q.  And that's what we see in the different-color ink, "Title

13:39:05   10   "Issuer Name."  What's the issuer name written in handwriting?

11   A.  "NuTech Energy Resources, Inc."

12   Q.  Very good.  Let's --

13          MR. HEIMANN:  You can take that down.

14   BY MR. HEIMANN:

13:39:19   15   Q.  Special Agent Berryhill, did you participate in a search

16   of Bob Mitchell's home in Colorado on September 7th of 2017?

17   A.  I did.

18   Q.  Were computers and other electronic devices seized

19   that day?

13:39:37   20   A.  Yes, there were.

21   Q.  Did you process those devices in the way that you

22   described earlier in your testimony?

23   A.  Yes.  We processed all those in our lab.

24   Q.  Your lab's in Denver?

13:39:47   25          Or -- where is your lab?

1    A.   Lakewood, Colorado, yeah, outside of Denver.

2    Q.   So you created an image and then a portable case file for

3    the agents?

4    A.   A portable case file is what we generally provide, yes.

13:40:04   5    Q.   Okay.  Do you remember if there was a privilege review

6    segregation for that material?

7    A.   I believe there was, yes.

8    Q.   So the agents would have gotten the -- the segregated

9    material would have gone to a privilege review team?

13:40:23   10   A.   Correct.

11   Q.   And the other material would have gone to the agents?

12   A.   Everything else goes to the investigators.

13   Q.   All right.  I want you to take a look at 28.34.

14        Do you recognize that exhibit?

13:40:43   15   A.   I do.

16   Q.   What is it?

17   A.   It's a very long list of Skype instant messages.

18   Q.   Where did you find this?

19   A.   This came off one of the laptops we took at Bob Mitchell's

13:40:56   20   residence.  It was an HP Envy laptop, Evidence No. 3368.

21   Q.   So Exhibit 28.34, that's a printout of Skype chats?

22   A.   It's a printout, right.  And these Skype chats were

23   extracted with our forensic software from a file called

24   "Main.db."  And that's a database file.  It contained all

13:41:21   25   this.

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN      Vol. III-307
21-CR-14-ABJ

1   Q.  So this would be a record of Skype chats that were done

2   with that particular computer?

3   A.  Yes.

4        MR. HEIMANN:  Your Honor, the Government moves to

13:41:30   5   admit 28.34.

6        MR. FLEENER:  Objection; hearsay.

7        MR. JUBIN:  Join.

8        MR. HEIMANN:  Your Honor, we'll move to admit with

9   another witness.  Thank you.

13:41:45   10        THE COURT:  Very well.

11   BY MR. HEIMANN:

12   Q.  Did you participate in a search of Justin Herman's home on

13   September 7th of 2017?

14   A.  Yes.

13:41:53   15   Q.  I'm sorry.  That's the wrong date.

16        It was in 2019; right?  Or 2018?

17   A.  Justin?  June 26th, I believe.

18   Q.  Of 2019?

19   A.  2019.

13:42:03   20   Q.  Thank you.

21        Where was that?  Where was the warrant served?

22   A.  Canonsburg, Pennsylvania.

23   Q.  Okay.  Were computers and other electronic devices seized?

24   A.  Yes, there were.

13:42:21   25   Q.  Did you seize an iPhone from Justin Herman?

19-CR-26-ABJ          BERRYHILL - DIRECT - HEIMANN          Vol. III-308
21-CR-14-ABJ

1   A.   We did.

2   Q.   You said your lab was in Lakewood?

3   A.   It's in Lakewood, Colorado.

4   Q.   How did you transport those devices from Canonsburg,

13:42:37    5   Pennsylvania, where they were seized, to your lab?

6   A.   Right.  What we did is we use -- we call them Pelican

7   cases, and Pelican is actually the brand name.  But they're

8   large, heavy-duty plastic containers, airtight, watertight.

9   We apply double locks to them.

13:42:54   10         And we brought the evidence in those containers to a

11   FedEx store outside of Pittsburgh, and what couldn't fit in

12   the Pelican cases we watched them package up appropriately.

13   But that's how we did it, FedEx'd it back to our lab.

14         At that point the evidence custodian receives it,

13:43:17   15   actually puts it in the evidence vault.  And then just like

16   everything else, we go through the evidence custodian, sign

17   for the evidence, bring it to the lab, and process it.

18   Q.   Were there potentially privileged materials that were

19   segregated out from those devices?

13:43:35   20   A.   Yes.  That process remains constant right now.

21   Q.   Okay.  And then was a portable case provided to the case

22   agents of the other material?

23   A.   Yes.

24         MR. HEIMANN:  Let's look at Exhibit 102.

25   ///

1    BY MR. HEIMANN:

2    Q.   Do you recognize this exhibit?

3    A.   I do.

4    Q.   What is it?

13:44:17   5    A.   This is a text message conversation thread.

6    Q.   And where was this taken from?

7    A.   This was taken off an external hard drive.

8    Q.   So this is a set of text messages that would have

9    originally been sent from a phone or some other -- some other

13:44:38   10   device?

11   A.   Most likely a phone.

12        The data was then saved to a computer, and then,

13   subsequently, somewhere down the road, that data on the

14   computer was backed up.

13:44:51   15   Q.   To the hard drive?

16   A.   To the hard drive.

17   Q.   Where you found it?

18   A.   Yes.   That's where we found it.

19   Q.   And that hard drive was the hard drive of -- found in the

13:45:01   20   house of Justin Herman?

21   A.   Yes.   It was found in the main office adjacent to -- in

22   the proximity of the iMac.

23   Q.   There are -- this is a text message stream that includes

24   two parties; right?

13:45:21   25   A.   That's correct.

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-310
21-CR-14-ABJ

1   Q.  So one party is identified as a local user.  That would be

2   the person whose phone it is?

3   A.  That would be the -- the local -- you know, the handset,

4   the phone.

13:45:33   5   Q.  The other -- do you recognize the phone number of the

6   other person from your other analysis?

7   A.  Yes, I do.

8   Q.  And whose phone number -- has that -- what -- who has that

9   been linked to from other analysis?

13:45:50   10   A.  This phone number associates with Mr. Ian Horn.

11         MR. HEIMANN:  Your Honor, the Government moves to

12   admit 102.

13         THE COURT:  It is received.  102.

14      (Government's Exhibit 102 received into evidence.)

13:46:07   15   BY MR. HEIMANN:

16   Q.  So as we look at this, it's color coded.  We talked about

17   the handset, and we talked about the phone number of Ian Horn.

18         The blue boxes, which is that?

19   A.  Well, that would be the -- the user, you know, if this --

13:46:24   20   whoever was using the phone, the local device.

21   Q.  All right.  And so it's a local user.  And then the text

22   of that is -- for example, the first text, the text -- the

23   substance of the actual text, what -- where -- what was that?

24   A.  Well, the first one is "Did the wire hit?"

13:46:47   25   Q.  Great.  And then the date and time, isn't that what's on

```
19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-311
21-CR-14-ABJ
```

1   the right side?

2   A.   That's correct.

3   Q.   And it says "Sent" because that went out of -- that

4   handset out?

13:46:56   5   A.   The local user was sending a message.

6   Q.   Got it.

7            There's a gray box in the middle here where the

8   substance of the text is "Don't know where you wired the

9   money."

13:47:09   10            Does that indicate the phone that's connected to

11   Ian Horn?

12   A.   Right.   That's still -- that's the local handset receiving

13   an email from this phone number, Ian Horn.

14   Q.   A text message?

13:47:20   15   A.   A text message.   Excuse me.

16   Q.   Yes.   And we know it's receiving because it says

17   "Received" in the top right?

18   A.   Right.   That's exactly right.

19   Q.   And then the time stamp is there below "Received"?

13:47:31   20   A.   That is correct.

21            MR. HEIMANN:   Okay.   Let's go to the next page.

22   BY MR. HEIMANN:

23   Q.   And this is that text stream continued?

24   A.   Yes.

13:47:41   25   Q.   Okay.

1    A.  It's several pages.

2            MR. HEIMANN:  All right.  Let's move, then, to 5.3.

3    BY MR. HEIMANN:

4    Q.  Do you recognize 5.3?

13:48:09    5    A.  I do.

6    Q.  Is this another text message that was found on that

7    external hard drive from Justin Herman's home?

8    A.  Yes, it was.

9    Q.  And this is a single text; right?

13:48:18    10    A.  Right, a single text that was received by that phone

11    number.

12    Q.  And that's this -- received from the same phone number as

13    Ian Horn?

14    A.  It is.

13:48:25    15            MR. HEIMANN:  Your Honor, the Government moves to

16    admit 5.3.

17            THE COURT:  It's received.

18        (Government's Exhibit 5.3 received into evidence.)

19    BY MR. HEIMANN:

13:48:38    20    Q.  So the text of this -- the substance of this text is where

21    it begins "Need to resend emails"?

22    A.  Yes.

23    Q.  And that runs through "I have email for person at bank"?

24    A.  Uh-huh.  Correct.

13:48:50    25    Q.  And then the technical information, time stamp, it was

```
19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-313
21-CR-14-ABJ
```

1  received -- that's in the right-hand corner?

2  A.  Yes.

3  Q.  And then that phone number where it came from, that's in

4  the left?

13:49:00  5  A.  Yes.

6  Q.  All right.

7        MR. HEIMANN:  Let's go to -- then -- to 305.

8  BY MR. HEIMANN:

9  Q.  This external hard drive where the text messages were

13:49:25  10  found, did you also find email messages backed up on that hard

11  drive?

12  A.  Yes, I did.

13  Q.  Exhibit 305, is that one of those emails?

14  A.  Yes.

13:49:38  15  Q.  Who's it from?

16  A.  This is from Justin Herman, justin@ichcorp.net.

17  Q.  Who is it to?

18  A.  It's to Joslyn Claiborne, joslyn@pacificstocktransfer.com.

19  Q.  What's the subject?

13:49:54  20  A.  "NERG" -- N-E-R-G -- "opinion letter to go with issuance."

21  Q.  And the attachment -- there's an attachment; correct?

22  A.  There is an attachment.

23  Q.  What's the name of that file?

24  A.  "Stock Option" [sic] and then, in parentheses, "Debt

13:50:07  25  Conversion.docx."

1    Q.  Beginning on page 2 of this exhibit, is that the

2    attachment?

3    A.  Yes.  That's where it starts.

4            MR. HEIMANN:  The Government moves to admit 305.

13:50:22    5            THE COURT:  305 is received.

6        (Government's Exhibit 305 received into evidence.)

7    BY MR. HEIMANN:

8    Q.  So the information about the email is there in the upper

9    left corner --

13:50:34    10   A.  Yes.

11   Q.  -- is that right?

12   A.  That is correct.

13   Q.  Okay.

14           MR. HEIMANN:  Can we go to page 2?

13:50:37    15   BY MR. HEIMANN:

16   Q.  And then this is where the attachment starts?

17   A.  That is correct.

18   Q.  Okay.  What's the title of this attachment?

19           And what I mean by that is there's an RE colon

13:50:54    20   section at the top of this letter.  What does that say?

21   A.  "Supporting Legal Opinion for Request to Issue Free

22   Trading Shares of Common Stock of NuTech Energy Resources,

23   Inc."

24   Q.  There's a letterhead on the upper right corner.  What's

13:51:14    25   the name that's there?

```
19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN    Vol. III-315
21-CR-14-ABJ
```

1    A.   "Ian Horn & Associates."

2    Q.   And the date of this letter?

3    A.   Is July 10th, 2015.

4         MR. HEIMANN:   Can we go to the next page?

13:51:29   5         And the next?

6    BY MR. HEIMANN:

7    Q.   Is this the last page?

8    A.   Yes.

9    Q.   Okay.  And there's a name at the bottom, what appears to

13:51:41  10    be a signature, either digital -- or a digital copy.

11         What's the name down there?

12    A.   "Ian Horn, Esquire."

13         MR. HEIMANN:   Let's go to 306.

14    BY MR. HEIMANN:

13:51:52  15    Q.   Is this another email that was found on that external hard

16    drive?

17    A.   Yes, it was.

18    Q.   Who's it from?

19    A.   This is from Justin Herman, justin@ichcorp.net.

13:52:24  20    Q.   Is it to Joslyn Claiborne?

21    A.   It is.  And also Brooks Tuyn.

22    Q.   What's the subject?

23    A.   "NERG" -- N-E-R-G -- "Opinion."

24    Q.   And is there an attachment?

13:52:43  25    A.   There is.

Melanie Sonntag, RDR, CRR, CRC              MelanieSonntagCRR@gmail.com

1   Q.   What's that file called?

2   A.   "NERG Opinion.docx."

3   Q.   And on this particular exhibit the attachment begins on

4   page 2?

13:52:55   5   A.   That is correct.

6          MR. HEIMANN:   Your Honor, the Government moves to

7   admit 306.

8          THE COURT:   Exhibit 306 is received.

9   (Government's Exhibit 306 received into evidence.)

13:53:08   10   BY MR. HEIMANN:

11   Q.   So when was this email sent from Justin Herman to

12   Joslyn Claiborne?

13   A.   July 17th, 2015.

14   Q.   And that's the sent date in the upper left; yes?

13:53:25   15   A.   That's correct.

16          MR. HEIMANN:   Let's move to page 2.

17   BY MR. HEIMANN:

18   Q.   And, again, where it -- RE colon, what's the title that's

19   on this particular document, the attachment?

13:53:40   20   A.   It's "Supporting Legal Opinion for Request to Issue Free

21   Trading Shares of Common Stock of NuTech Energy Resources,

22   Inc."

23   Q.   What's the date?

24   A.   July 17th, 2015.

13:53:55   25   Q.   Is that the same Ian Horn & Associates letterhead we saw

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-317
21-CR-14-ABJ

1    in the last one?

2    A.  Yes.

3           MR. HEIMANN:  Let's move to the last page.

4           THE WITNESS:  Let me take a -- I'm just verifying the

13:54:11   5    address from . . .

6           They appear to be the same.

7    BY MR. HEIMANN:

8    Q.  The letterhead?

9    A.  Yes, the letterhead.

13:54:27  10           MR. HEIMANN:  Let's go to the last page.

11   BY MR. HEIMANN:

12   Q.  The name that's in the signature block on this last page?

13   A.  "Ian Horn, Esquire."

14           MR. HEIMANN:  Let's move to 307.

13:54:59  15   BY MR. HEIMANN:

16   Q.  Is this an email that was found on that external hard

17   drive?

18   A.  Yes, it was.

19   Q.  All right.  Who is it from?

13:55:13  20   A.  Justin Herman, justin@ichcorp.net.

21   Q.  Is it also to Joslyn Claiborne?

22   A.  It is.

23   Q.  What's the subject?

24   A.  "Legal Opinion."

13:55:23  25   Q.  And what's the name of the attachment?

```
        19-CR-26-ABJ      BERRYHILL - DIRECT - HEIMANN      Vol. III-318
        21-CR-14-ABJ
```

           1   A.   "NERG" -- N-E-R-G -- "Legal Opinion.docx."

           2   Q.   That document that's attached, does that begin on page 2

           3   of the exhibit?

           4   A.   It does.

13:55:39   5   Q.   And runs through the end?

           6   A.   Yes.

           7         MR. HEIMANN:  Your Honor, the Government moves to

           8   admit 307.

           9         MR. FLEENER:  Can we have a second, Judge?

13:55:50  10         THE COURT:  You may.

          11         MR. FLEENER:  No objection.

          12         MR. WARD:  No objection.

          13         THE COURT:  307 is received.

          14      (Government's Exhibit 307 received into evidence.)

13:56:36  15   BY MR. HEIMANN:

          16   Q.   So when was this email sent?

          17   A.   July 23rd, 2015.

          18         MR. HEIMANN:  Go to the second page, please.

          19   BY MR. HEIMANN:

13:56:56  20   Q.   Is this where the attachment begins?

          21   A.   Yes.

          22   Q.   Is that -- is that the same title on this letter as the

          23   last two?

          24   A.   Yes.

13:57:10  25   Q.   What's the date?

1    A.  July 23rd, 2015.

2    Q.  Is that the same letterhead?

3    A.  Yes.

4          MR. HEIMANN:  Let's go to the last page.

13:57:20    5    BY MR. HEIMANN:

6    Q.  And does that appear to be the same signature block for

7    Ian Horn, Esquire?

8    A.  It does.

9          MR. HEIMANN:  Let's go to 603.

13:57:40   10    BY MR. HEIMANN:

11    Q.  You testified earlier that you seized a cell phone, an

12    iPhone, from Justin Herman when the search warrant was

13    executed at his home in June of 2019?

14    A.  Yes.

13:58:10   15    Q.  603, is that a text message exchange that was found on

16    that phone?

17    A.  It was.

18    Q.  Who are the participants in this text message exchange?

19    A.  The two participants were Ian Horn at that phone number,

13:58:27   20    (813) 35 -- sorry -- (813) 545-1067, and the local user,

21    meaning the owner of the handset.

22    Q.  So the person who had the iPhone that was seized from

23    Justin Herman in June?

24    A.  Correct.

13:58:44   25    Q.  And the first -- this text message exchange, when does it

19-CR-26-ABJ          BERRYHILL - DIRECT - HEIMANN          Vol. III-320
21-CR-14-ABJ

1    begin?

2    A.  It began on October 16th, 2018.

3    Q.  And if you flip to the last page of the exhibit you have,

4    the paper copy, when's the last message that's on this

13:59:08    5    exhibit?

6    A.  I have January 18th, 2019.

7    Q.  Does this exhibit contain all of the messages that were

8    between this handset and Ian Horn's phone number between that

9    time period that you actually found on the phone?

13:59:38    10    A.  Yes.  Yes.

11          MR. HEIMANN:  Your Honor, the Government moves to

12    admit 603.

13          MR. FLEENER:  May we have a minute, please, Judge.

14          THE COURT:  You may.

14:01:06    15    (Discussion held at counsel table.)

16          MR. FLEENER:  Can I speak with the other attorneys,

17    Judge?

18          THE COURT:  You may.

19    (Discussion held among counsel.)

14:01:18    20          THE COURT:  Again, this is your chance to stand and

21    stretch.

22          MR. FLEENER:  Your Honor, could we have a sidebar,

23    please?

24          THE COURT:  Yes, you may.

25    ///

 1    (Proceedings held at sidebar with Prosecutor Heimann

 2  and all defense counsel.)

 3         MR. FLEENER:  Your Honor, I -- these particular --

 4  these particular email messages are dated in 2018.  They're

14:02:19   5  outside the scope, time -- charged time frame of the

 6  securities fraud.  Therefore, I think they -- they may -- are

 7  emails from where -- between -- between -- certainly, the --

 8  the statements between -- statements made by Ian Horn would

 9  violate Justin Herman's confrontation rights against Ian Horn.

14:02:39  10         And I believe that Mr. Jubin would probably object

11  and join my objection to say that *Bruton* works the other way

12  and that they're offering Herman's statements against Ian Horn

13  that he won't be able to cross -- he won't be able to confirm,

14  as well, but I'll let Tom speak.

14:02:56  15         MR. JUBIN:  I do make that objection.  I think

16  Mr. Fleener explained it.

17         Mr. Herman makes statements here.  It's after the

18  conspiracy and certainly -- the conspiracy as it's alleged --

19  so it would violate *Bruton* to introduce Herman's statements

14:03:14  20  when I can't have -- cross-examine him.

21         MR. HEIMANN:  Your Honor, *Bruton* only applies to

22  directly inculpatory statements.  These are not that.  They

23  have relevance to consciousness of guilt.  They are the text

24  messages that happened between two defendants, so they're

14:03:35  25  statements of party opponents.  They happened during the

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-322
21-CR-14-ABJ

1    investigation and discussed responding to the subpoena.

2           They are directly relevant to the perjury charges,

3    and they're definitely relevant to the conspiracy even though

4    they happened afterwards.

14:03:53    5           THE COURT:  The objections are denied and the exhibit

6    will be received.

7           MR. JUBIN:  I'd like a standing objection.

8           THE COURT:  You may have a standing objection.

9           MR. FLEENER:  The same?

14:04:01    10           THE COURT:  Yes.

11           MR. FLEENER:  Thank you, Judge.

12           THE COURT:  All of you.

13           MR. WARD:  Thank you.

14       (Sidebar concluded.)

14:04:16    15           MR. FLEENER:  One second, please, Judge.

16           THE COURT:  Yes.

17           MR. FLEENER:  Thank you.

18           THE COURT:  Please proceed.

19           MR. HEIMANN:  Your Honor, my understanding is, from

14:04:32    20    the sidebar, that you have received the exhibit and it may be

21    published.

22           THE COURT:  The exhibit is received.

23       (Government's Exhibit 603 received into evidence.)

24    BY MR. HEIMANN:

14:04:42    25    Q.  We're going to go through the substance of some of these

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

19-CR-26-ABJ        BERRYHILL - DIRECT - HEIMANN        Vol. III-323
21-CR-14-ABJ

1   text messages with another witness.  What I want to do right

2   now is just make sure we understand the format of this

3   exhibit.

4          When we looked at a previous exhibit with text

14:04:54   5   messages from the external hard drive, the blue text boxes

6   were the local user --

7   A.  Correct.

8   Q.  -- the handset.

9          Is that true on this exhibit, as well?

14:05:06   10   A.  It's the same format.

11   Q.  So the gray boxes are the incoming text messages from that

12   phone number related to Ian Horn?

13   A.  Correct.

14   Q.  And the outgoing from the actual handset that was taken

14:05:18   15   from Justin Herman are in the blue boxes?

16   A.  Yes.

17   Q.  On this particular exhibit "Ian Horn" shows up in

18   parentheses.  Did you add that to this exhibit for clarity?

19   A.  I did.

14:05:35   20          MR. HEIMANN:  As I said, Judge, we'll publish the

21   rest of that with another witness.

22          May I have a moment.

23          THE COURT:  You may.

24       (Discussion held at counsel table.)

14:06:22   25          MR. HEIMANN:  Your Honor, I have no other questions

```
19-CR-26-ABJ          BERRYHILL - CROSS - JUBIN          Vol. III-324
21-CR-14-ABJ
```

1    on direct.

2              MR. FLEENER:  Can we have a minute, please, Judge?

3              THE COURT:  You may.

4              MR. FLEENER:  Thank you.

14:07:24    5       (Discussion held at counsel table.)

6              MR. FLEENER:  No questions, Your Honor.

7              MR. WARD:  No questions from Mr. Winters, Your Honor.

8              THE COURT:  Okay.  Thank you, Mr. Ward.

9              MR. JUBIN:  Good afternoon, ladies and gentlemen.

14:08:03   10         Good afternoon, Mr. Berryhill.

11              THE WITNESS:  Good afternoon.

12              MR. JUBIN:  My name is Tom Jubin.  I represent

13    Ian Horn.  I probably have quite a few questions for you, sir.

14                        **CROSS-EXAMINATION**

14:08:07   15   **BY MR. JUBIN:**

16    Q.  Some of these emails that you've found on Justin Herman's

17    computer referenced somebody named Steve Mills.

18              Do you know who that is?

19    A.  I know Steve Mills is an attorney.

14:08:39   20   Q.  Was he the attorney who was involved with Justin Herman in

21    terms of determining whether or not to claim privilege on

22    matters?

23    A.  I don't remember.

24    Q.  If you could take a look at . . . Exhibit 603 that we just

14:09:17   25   had up.

```
      19-CR-26-ABJ        BERRYHILL - CROSS - JUBIN      Vol. III-325
      21-CR-14-ABJ
```

             1      Do you see in the -- the lower gray box where it's

             2  Mr. Horn texting back?  Do you see that?

             3  A.  Yes.

             4  Q.  He talks --

14:09:54     5  A.  On 10/21?

             6  Q.  Yes, on 10/21.

             7  A.  Okay.

             8  Q.  He talks about going through to see "what needs to be

             9  produced" and what does not need to produce and "it would be

14:10:10    10  helpful" to speak to an attorney.

            11      Do you see that?

            12  A.  I do.

            13  Q.  Okay.  It also says "I don't want to cause you any harm,

            14  but I also don't want to cause myself any harm."

14:10:30    15      Have you seen anything else that describes what's

            16  meant by that?

            17  A.  Could you tell me what page that's on?

            18  Q.  I'm looking in that very same --

            19  A.  Oh, same.

14:10:44    20  Q.  -- we're on the same page.

            21      You don't know what that means; right?

            22  A.  I really didn't analyze the content of these -- these

            23  messages, sir.

            24      I was -- I was merely presenting them to the

14:10:56    25  investigator for their review.

 1   Q.   Right.

 2   A.   So I don't know all the -- what they were thinking,

 3   per se, when they were sending each other text messages.

 4   Q.   Okay.  So you'd really have to speculate to try to put

14:11:09    5   some context to that, wouldn't you?

 6   A.   Right.  It would be some guesswork but --

 7   Q.   Okay.

 8        MR. JUBIN:  Okay.  You can take that down.

 9        Let's take a look at Exhibit 5.1.

14:11:36   10   BY MR. JUBIN:

11   Q.   And if you'll notice in -- on October 23rd, the forwarded

12   message there, the message on October 23rd was from Ian Horn

13   to somebody named stevemillslaw@gmail; right?

14   A.   That's correct.

14:12:12   15   Q.   Okay.  And this was -- October 23rd was six days after a

16   subpoena was served on Ian Horn?  Is that your understanding?

17   A.   I wasn't aware of that.

18   Q.   Okay.  And, apparently, there's some instructions to

19   Ian Horn that you mentioned earlier.  The "Keep 3,000 for

14:12:40   20   yourself" would be the payment for the escrow?  Is that your

21   understanding?

22   A.   Again, sir, other than what it says, "Keep 3,000 for

23   yourself," I don't want to speculate on what that was for.

24   I didn't analyze the content or the meanings of these

14:13:03   25   messages.  I was merely recovering these messages for

1     investigator review.

2     Q.  Right.  I can appreciate that.  Thank you, sir.

3          MR. JUBIN:  Let's pull up 5.4.

4     BY MR. JUBIN:

14:13:43   5     Q.  Now, this is something that you see -- the underlying

6     message from January 2nd of 2015 was sent by Justin Herman to

7     Ian Horn; correct?

8     A.  Yes.

9     Q.  And so the contents of that email from Justin Herman to

14:14:09  10     Ian Horn would be something that would be informing Ian Horn?

11     Is that your understanding of what you pulled up?

12     A.  Could you repeat that again, sir?

13     Q.  So the contents of what Ian Horn was given by

14     Justin Herman in this email is what Ian Horn would be

14:14:27  15     receiving as information; is that correct?

16     A.  Well, this message was from Justin Herman to Ian,

17     Ian Horn.

18     Q.  Okay.  And that one, too, was forwarded to this attorney,

19     Steve Mills, on October 23rd?

14:14:45  20     A.  It was.

21     Q.  And it looks like Mr. Horn also -- sometime later -- also

22     forwarded it to Justin Herman.

23     A.  Right.  On the top there, December 3rd of 2018.

24     Q.  Okay.

14:15:03  25          MR. JUBIN:  Okay.  You can turn that off.

```
        19-CR-26-ABJ         BERRYHILL - CROSS - JUBIN        Vol. III-328
        21-CR-14-ABJ
```

         1              Let's pull up 5.13.

         2    BY MR. JUBIN:

         3    Q.  And this is the one where Ian Horn asks -- right here --

         4    "Who are these people and why are we wiring them money?"

14:15:50 5              MR. JUBIN:  I have to figure out how to turn this

         6    off.

         7    BY MR. JUBIN:

         8    Q.  And the response is "They hold debt in the company and

         9    this purchases the debt from them, thus completing the entire

14:16:00 10   transaction."

         11             And this is something you found on -- that was

         12   January 12 of 2015?

         13   A.  Correct.

         14   Q.  That's when those communications took place?

14:16:10 15   A.  And it came from the Oath Holdings Yahoo! email search

         16   warrant return.

         17   Q.  And that was a search of Justin Herman's -- or -- or that

         18   was a search of a company that held Justin Herman's emails?

         19   A.  Correct.  Yeah, the provider, the email provider.

14:16:26 20   Q.  I have been not clear.  Is it "oath," o-a-t-h, or o-a-k?

         21   A.  -t-h.

         22   Q.  -t-h?

         23   A.  "Oath."

         24   Q.  Okay.  Thank you.

14:16:47 25             So that email might help tell us what Ian Horn knew

19-CR-26-ABJ          BERRYHILL - CROSS - JUBIN          Vol. III-329
21-CR-14-ABJ

1   and what he was told?  Would you agree?

2   A.   Well, I would agree to the fact that Justin Herman is

3   his -- passing this information on to -- to

4   ianhornlaw@gmail.com, but, again, the ins and outs of it --

14:17:10   5   I didn't analyze the contents in that manner, sir.

6   Q.   Understood.

7            MR. JUBIN:  You can turn that off.

8            Let's pull up 11.1.

9   BY MR. JUBIN:

14:17:26   10   Q.   Now, this is an exhibit where --

11            MR. JUBIN:  Can you close that on the right side?

12   I don't know what that's about.  Thank you.

13   BY MR. JUBIN:

14   Q.   This is an exhibit which is an email between Justin Herman

14:17:49   15   and Chuck Winters; correct?

16   A.   Yes.  Sent by Justin Herman to Chuck Winters.

17   Q.   And when you pulled that off of the -- the document that

18   you received, certainly, if Ian Horn was on that email, you

19   would have seen that; correct?

14:18:11   20   A.   Correct.  Ian Horn was not on this particular email.

21   Q.   Okay.  Okay.

22            MR. JUBIN:  Let's -- you can turn that off.

23            It's going to be 11.2.

24   BY MR. JUBIN:

14:18:36   25   Q.   And, again, this is another email between Chuck Winters

19-CR-26-ABJ          BERRYHILL - CROSS - JUBIN          Vol. III-330
21-CR-14-ABJ

1    and Justin Herman.  And, again, Ian Horn was not on the email;

2    correct?

3    A.  That's correct.

4    Q.  And this is the one, if we scroll down -- let's go to the

5    last page -- where we've got some dates here.  And I believe

6    the Government lawyer showed you some changes that had been

7    made in this document.

8         These altered documents that were backdated, Ian Horn

9    was not included on those emails where that occurred?  That's

10   true, isn't it?

11   A.  I'd like to look at the other email with this same

12   attachment -- or altered attachment.

13        MR. JUBIN:  I think it's 11.1.

14        THE WITNESS:  Is it 11.1 and 11.2?

15        MR. JUBIN:  Go ahead and scroll down to the last

16   page.

17        So that's the one with the same . . . signatures.

18        Okay.  Back up to the first page.

19   BY MR. JUBIN:

20   Q.  So Ian Horn's not on this email?

21   A.  He's not.

22        MR. JUBIN:  Okay.  Let's go to 15.2.

23   BY MR. JUBIN:

24   Q.  Again, Ian Horn's not on the email; right?

25   A.  He is not.

14:19:04
14:19:25
14:19:46
14:19:59
14:20:26

1                   MR. JUBIN:  15.3.

2    BY MR. JUBIN:

3    Q.  Again, Ian Horn's not on the email; correct?

4    A.  That's correct.

14:20:49  5                   MR. JUBIN:  19.1.

6    BY MR. JUBIN:

7    Q.  This is that September 8th, 2015, request from

8    Justin Herman to Chuck Winters to send a blank Word document

9    with Ian Horn's letterhead.  Do you see that?

14:21:12  10   A.  I do.

11   Q.  And, again, Ian Horn doesn't know about this based on this

12   communication because he's not on the email; correct?

13   A.  Right.  He's not in the communication chain here.

14                   MR. JUBIN:  Let's go to 19.2.

14:21:30  15   BY MR. JUBIN:

16   Q.  This is the response from Mr. Winters with an attachment

17   that says "Horn & Associates letterhead document."

18                   That email, as well -- there's no Ian Horn on that

19   email; correct?

14:21:58  20   A.  That is correct.

21   Q.  But if we go to the attachment that is on the next page,

22   there's a document that has a presigned Ian Horn signature on

23   it; correct?

24   A.  It does.

14:22:31  25                   MR. JUBIN:  Let's go to Exhibit 20.

```
19-CR-26-ABJ        BERRYHILL - CROSS - JUBIN       Vol. III-332
21-CR-14-ABJ
```

1    BY MR. JUBIN:

2    Q.   Again, these communications don't have Ian Horn in the

3    email; correct?

4    A.   They do not.

14:22:50   5    Q.   But the subject is "Ian Horn"; right?

6    A.   That is correct.

7    Q.   So it's Mr. Herman and Mr. Winters exchanging this -- this

8    document, Herman requesting and Winters providing a document

9    with Ian Horn's signature already on it; right?

14:23:10   10   A.   That's what the communications reveal.

11             MR. JUBIN:   Let's take a look at 24.1.

12   BY MR. JUBIN:

13   Q.   Now, this is another communication between Justin Herman

14   and Chuck Winters; correct?

14:23:33   15   A.   It is.

16   Q.   And it occurred on September 23rd of 2015; right?

17   A.   Yes.

18   Q.   And it included an attachment that was called "Assignment

19   Bravo E-Pro"; correct?

14:23:47   20   A.   Correct.

21   Q.   Again, Ian Horn is not on this document; correct?

22   A.   No, he's not.

23   Q.   He wasn't party to the email?

24   A.   Is he a part of the attachment?  I don't believe so, but

14:24:00   25   I would need to look again --

19-CR-26-ABJ          BERRYHILL - CROSS - JUBIN          Vol. III-333
21-CR-14-ABJ

1    Q.  Let's scroll down and make sure there isn't any evidence

2    that Ian Horn received it.  Okay?

3    A.  Right.  He's not in the communication chain.  No, you're

4    correct.

14:24:11    5    Q.  Okay.

6             MR. JUBIN:  And how about 24.2?

7    BY MR. JUBIN:

8    Q.  Now, this is that document that you talked with the

9    Government lawyer about, alteration of some of the wording

14:24:37    10    that the Government showed it then went into another, longer

11    document.

12             And this, again, is an email exchange between

13    Justin Herman and Chuck Winters; correct?

14    A.  Yes, that's correct.

14:24:49    15    Q.  And Ian Horn is not a party to that?

16    A.  He's not on this email.

17             MR. JUBIN:  How about 24.3?

18    BY MR. JUBIN:

19    Q.  Similarly, Ian Horn was not a party to this email;

14:25:15    20    correct?

21    A.  That's correct.

22             MR. JUBIN:  Let's go to Exhibit 515.

23    BY MR. JUBIN:

24    Q.  Now, this is the one where Dan Hefner sent something to

14:25:46    25    Justin Herman and he copied Ian Horn with it; right?

19-CR-26-ABJ         BERRYHILL - CROSS - JUBIN         Vol. III-334
21-CR-14-ABJ

1    A.   Yes.

2    Q.   So Ian Horn has actually received a copy of this email;

3    right?

4    A.   He did.

14:25:55    5    Q.   Okay.  And there was an attachment to the email; correct?

6    A.   Yes.

7            MR. JUBIN:  And let's take a look at that -- the next

8    page of this attachment.

9            There we go.

14:26:10    10   BY MR. JUBIN:

11   Q.   So this is an attorney letter agreement from OTC Markets.

12           MR. JUBIN:  And if we scroll down on this document --

13   there we go.

14   BY MR. JUBIN:

14:26:20    15   Q.   We see some writing there that has sort of a left-hand

16   slant; right?

17           I should say "correct," not "left/right."

18   A.   Right.  What line are you looking at in particular, sir?

19   Q.   I'm looking at the handwriting that's underneath the words

14:26:40    20   "The Attorney" and then there's the "Law Offices of Ian Horn,

21   LLC," the PO box, the phone number, the email, the signature,

22   and the printed name.

23           Do you see that?

24   A.   I do.

14:26:52    25   Q.   And that's all done with kind of a left-hand slant; right?

19-CR-26-ABJ        BERRYHILL - CROSS - JUBIN        Vol. III-335
21-CR-14-ABJ

1   A.  I'm not a handwriting forensic expert, sir, but, yes, it's

2   leaning a little bit to the left.  I would agree with that.

3   Q.  Okay.  And if you look at the bottom where it says

4   "Attorney Letter Agreement, Version 2.5, January 3, 2013," do

14:27:14   5   you have any information about that?

6   A.  No, sir.

7   Q.  Okay.  I'll ask someone else.

8           But this appears to be some sort of form from

9   OTC Markets that an attorney would have filled out?

14:27:26   10   A.  Appears to be.

11   Q.  Okay.  And you don't have any information as to when that

12   was filled out?

13   A.  No, sir.

14   Q.  Okay.

14:27:57   15           MR. JUBIN:  Let's take a look at 516.

16   BY MR. JUBIN:

17   Q.  Okay.  This is that email that you showed from Kevin

18   Trizna to someone at OTC Markets.

19           And it talks about taking a few days "to get ahold of

14:28:18   20   our attorney."  Do you know who that attorney is?

21   A.  No, not in particular.

22   Q.  Okay.  In fact, you wouldn't even know if that's true;

23   right?

24   A.  Again, I was recovering the email communication, sir.

14:28:33   25   I wasn't analyzing the content or trying to read into it or

1    speculate.

2    Q.   Right.  And so we -- this could have come from -- the

3    information came from somebody else, and it may have been

4    untrue for all you know; right?

14:28:48    5    A.   What I can see here is the "From" and the "To," the

6    "kevin@nutechenr.com" to the "gareth@otcmarkets.com."

7             And this email was recovered or provided via a search

8    warrant to the email provider Endurance International Group,

9    so that's where we -- we got this information from.

14:29:11    10    Q.   Uh-huh.

11             Again, Ian Horn doesn't have anything to do with

12    this; right?

13    A.   Well, he's not in the header here.

14             MR. JUBIN:  Let's take a look at 305.

14:29:31    15    BY MR. JUBIN:

16    Q.   Now, this is an email that you found from Justin Herman to

17    Joslyn Claiborne; right?

18    A.   Yes.

19    Q.   And Joslyn Claiborne, at least according to this, is

14:29:56    20    somebody who is at Pacific Stock Transfer?

21    A.   It appears to be from that email domain, yeah.

22    Q.   And it contains a brief statement, "I hope your well

23    today.  Finally I got a copy of the document.  Talk to you

24    soon."

14:30:13    25             So that's what Justin Herman wrote on that; correct?

1   A.  Yes.

2   Q.  And as the person who recovered it and that's simply it,

3   you wouldn't know if this is information provided to

4   Ms. Claiborne to lull her in some way or if it's accurate;

14:30:34   5   correct?

6   A.  I would be speculating, sir.  I -- I can read what's

7   there.

8        But I don't want to interpret.

9   Q.  But you didn't -- did you find anything on Justin Herman's

14:30:47   10   computer to show that he actually received the attached

11   document from Ian Horn?

12   A.  I don't remember.  I believe this document came from the

13   external hard drive that we found in Justin Herman's residence

14   during the search warrant in June of 2019.

14:31:17   15   Q.  As an investigator, would you agree that it would be

16   really important if, in fact, this attached stock opinion

17   document had come from Ian Horn, that you would want to know

18   that?  And you'd provide that to the case agent; right?

19   A.  I don't want to put my- -- myself in -- in the place of

14:31:42   20   the investigators on this case, sir.  Again, I was presented

21   with a list of relevant information for exhibits, and it was

22   my job to forensically recover that in a sound manner.

23   Q.  And -- and you pulled off everything that you could find

24   that contained those search terms?

14:32:05   25   A.  I pulled off what was provided to me from the

19-CR-26-ABJ          BERRYHILL - CROSS - JUBIN          Vol. III-338
21-CR-14-ABJ

1    investigative team that they wanted to use as future --

2    possibly -- future exhibits.

3    Q.  Did the investigative team indicate to you that they were

4    interested in knowing if Ian Horn had sent documents to

14:32:23    5    Justin Herman?

6    A.  I -- I don't remember that -- that conversation happening.

7    Q.  Would you presume, since these gentlemen are sitting here

8    as defendants in a criminal case, that they wanted to know

9    what these guys talked about together, what communications

14:32:41    10    they had?

11    A.  I think, again, sir, you're asking me to speculate.

12    I mean, perhaps, but it really wasn't my function here.

13    Q.  I understand, sir.

14          Again, Ian Horn's not on this email; correct?

14:33:00    15    A.  He's not.

16    Q.  To your knowledge, did you provide anyone with an email

17    or -- or a correspondence or some sort of communication where

18    Ian Horn provided this document to Justin Herman, the

19    attachment?

14:33:19    20          MR. HEIMANN:  Your Honor, asked and answered.

21          THE COURT:  Sustained.

22          MR. JUBIN:  Let's take a look at 306.

23    BY MR. JUBIN:

24    Q.  Now, this is the July 17, 2015, correspondence from

14:33:45    25    Justin Herman to Joslyn Claiborne.

```
19-CR-26-ABJ        BERRYHILL - CROSS - JUBIN        Vol. III-339
21-CR-14-ABJ
```

1     Again, Ian Horn's not on this email; correct?

2  A.  That's correct.

3  Q.  And if we take a look at the attached opinion --

4         MR. JUBIN:  Let's scroll down.

14:33:56  5  BY MR. JUBIN:

6  Q.  -- this has sort of a squashed signature there -- down

7  there -- that looks like "Ian Horn"?

8  A.  It does.

9  Q.  Did you do any kind of comparison between signatures or

14:34:15  10  that's outside your bailiwick?

11  A.  No.  That would require a special type of multimedia still

12  image type of forensic examination --

13  Q.  Okay.

14  A.  -- beyond the scope of what we were doing here with

14:34:27  15  this -- this -- in the forensic process.

16  Q.  Okay.  Do you know if you found anything on Justin

17  Herman's computer to indicate that this attached NuTech

18  opinion was ever sent to Ian Horn in 2015 when this was

19  occurring?

14:34:51  20  A.  I can't say either way, sir.  I don't -- I don't recall

21  seeing anything.  But, again, I was recovering what the

22  investigative team asked me to recover.

23  Q.  Fair enough.

24         MR. JUBIN:  Let's take a look at 307.

25  ///

19-CR-26-ABJ          BERRYHILL - CROSS - JUBIN          Vol. III-340
21-CR-14-ABJ

1   BY MR. JUBIN:

2   Q.  This is another letter from Justin Herman -- or email --

3   from Justin Herman to Joslyn Claiborne; correct?

4   A.  Yes.

14:35:19   5   Q.  And, again, there's a NERG -- that would be the NuTech

6   Energy -- legal opinion attached?

7   A.  Yes.

8   Q.  And, again, Ian Horn's not on this email?

9   A.  He's not.

14:35:31   10   Q.  And if you -- if we take a look at the last page with the

11   signature, there's that same signature again; right?

12   A.  That's correct.

13   Q.  I'm going to ask you the same question, and I think I know

14   your answer; I just want to make sure.

14:35:57   15        Did you find anything on Herman's computer that this

16   email and the attached letter back in 2015 were ever sent to

17   Ian Horn?

18   A.  I don't recall finding any artifacts about that, sir, no.

19   But, again, if I'm not looking for something specific . . .

14:36:17   20   Q.  Sure.

21        Do you recall --

22        MR. JUBIN:  You can take that down.  Thank you.

23   BY MR. JUBIN:

24   Q.  Do you recall seeing any documents related to attorney

14:36:47   25   opinion letters in 2017?

1    A.  Outside of what we've already presented today as far as

2    exhibits?

3    Q.  Well, none of those things were in 2017.  They were all in

4    2015.

14:37:05    5    A.  I thought one of those emails with attachments were from

6    2017.

7    Q.  It might be that one of the emails was.  But I'm wondering

8    if any of the opinion letters --

9    A.  I don't recall, sir, no.

14:37:17    10    Q.  Okay.  I know you had an opportunity to prepare with the

11    Government as to what you were going to testify to in this

12    courtroom.  Correct?

13    A.  That's correct.

14    Q.  So you had the chance to kind of go through and figure

14:37:32    15    out, "Okay.  We've got this exhibit we want to introduce

16    because this came off the computer, and we've got this

17    exhibit," and you had a chance to look at it, perhaps reformat

18    it, add, in parentheses, who's referred to, that sort of

19    thing; correct?

14:37:49    20    A.  Part of the reporting process is to make it more

21    user-friendly --

22    Q.  Right.

23    A.  -- easier to digest.  So, yeah, some of those formatting

24    functions are part of the job.

14:38:02    25    Q.  Right.

19-CR-26-ABJ          BERRYHILL - CROSS - JUBIN          Vol. III-342
21-CR-14-ABJ

1      So you and I haven't had an opportunity to do that

2  with any documents because you're on the Government team;

3  right?

4  A.   That's correct.

14:38:10    5  Q.   So if I showed you documents, do you think you would say,

6  "Oh, okay, that is one that came off Justin Herman's computer"

7  or would you not know?

8  A.   Well, I can tell you that what you have, if it's from

9  discovery, came off these evidence items.

14:38:32   10      Whether I ever saw them or not, that's a whole

11  different story.  You know, we're talking about thousands of

12  files.

13  Q.   Right.

14      MR. JUBIN:  Becky, this is not to be published.

14:38:54   15  Okay?

16      Will you pull up IH-1081.

17  BY MR. JUBIN:

18  Q.   Agent Berryhill, is this something that you recognize that

19  is formatted in the way that it came from the Government's

14:39:16   20  discovery?

21  A.   Yes.  I recognize that format.

22      One of our computer applications that we use helps

23  put reports in this kind of a format.

24  Q.   Okay.  Looking at that, are you comfortable stating that

14:39:36   25  this did, in fact, come from -- from Justin Herman's computer?

19-CR-26-ABJ          BERRYHILL - CROSS - JUBIN          Vol. III-343
21-CR-14-ABJ

1  A.  I'm not sure -- well, I -- let's see.  I'm looking at the

2  bottom.

3         That "R26" signifies it was Request No. 26.  I'd have

4  to look at my notes.  I believe that was -- I'd have to check

14:40:09   5  my notes, what piece of evidence that request is associated

6  with.

7  Q.  So you're not sure if this came from Herman's computer or

8  something else?

9  A.  Correct.

14:40:18   10  Q.  Okay.  I have a series of documents that I have questions

11  for you like that, but I suspect I'm going to get the same

12  answer.

13         Would you agree?

14  A.  Most likely.

14:40:38   15         Again, sir, I would need to look up what Request 26

16  entailed, you know, what piece of evidence we were analyzing.

17  Q.  Okay.  Do you have those notes with you by chance?

18  A.  Not -- not on my person, no.

19  Q.  Okay.

14:40:53   20  A.  No.

21         MR. JUBIN:  Well, I -- I gave you a subpoena, so

22  I guess I'd ask you to remain under the subpoena.  And in the

23  meantime I'll try to get with you and with Mr. Heimann and

24  give you some of these documents so you can verify that some

14:41:10   25  of these things came from that computer.

1        Let me see if there's anything else here I have

2   to . . . I think I have no further questions at this time.

3        Thank you, Agent.

4        THE WITNESS:  Thank you.

14:41:53    5        MR. HEIMANN:  No further questions, Your Honor.

6        THE COURT:  You may step down.

7        THE WITNESS:  Thank you.

8        THE COURT:  We're going to wipe down the witness --

9   witness box now.

14:42:40   10        MR. HEIMANN:  Your Honor, the United States calls

11   Sonia Hacker.

12      (Witness sworn.)

13        THE COURTROOM DEPUTY:  Please take a seat.

14        Please state and spell your name for the record.

14:43:44   15        THE WITNESS:  Sonia Hacker, S-o-n-i-a H-a-c-k-e-r.

16     **SONIA HACKER, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

17   **BY MR. HEIMANN:**

18   Q.  How are you employed?

19   A.  I'm a postal inspector.

14:43:57   20   Q.  What are your duties as a postal inspector?

21   A.  I investigate crimes involving the mail, such as mail

22   theft, child exploitation, narcotics trafficking, burglaries,

23   robberies, and also mail fraud.

24   Q.  How many years have you worked as a postal inspector?

14:44:14   25   A.  Approximately nine.

19-CR-26-ABJ          HACKER - DIRECT - HEIMANN          Vol. III-345
21-CR-14-ABJ

1   Q.  Were you involved in the investigation of suspected

2   securities fraud involving NuTech Energy Resources?

3   A.  I was.

4   Q.  When did the investigation begin?

14:44:27  5   A.  In December of 2015.

6   Q.  And when did you join the investigation?

7   A.  Not until October of 2016.

8   Q.  Was the grand jury for the District of Wyoming involved in

9   this investigation?

14:44:40  10   A.  They were.

11   Q.  How?

12   A.  They heard testimony from witnesses, and they issued

13   subpoenas for records.

14   Q.  When was the first subpoena issued?

14:44:52  15   A.  In -- December 30th, 2015.

16   Q.  When did the grand jury investigation end?

17   A.  With the return of the second superseding indictment,

18   which was in November of 2019.

19   Q.  Are you familiar with that indictment?

14:45:11  20   A.  I am.

21   Q.  I want to talk about just some of -- some evidence that

22   was gathered.

23        Overt Act 3 of the indictment alleges a wire of

24   $20,000 from Gillette, Wyoming.  There's an NM named in that

14:45:34  25   overt act.

19-CR-26-ABJ          HACKER - DIRECT - HEIMANN          Vol. III-346
21-CR-14-ABJ

1          Who is NM?

2    A.   NM is Nadine McCreery.

3    Q.   As part of the investigation, did the First Bank -- First

4    National Bank of Gillette provide records to the grand jury

14:45:50   5    related to a wire transfer from Nadine McCreery to

6    Bob Mitchell?

7    A.   They did.

8          MR. HEIMANN:  Let's look at Exhibit 3.1.

9    BY MR. HEIMANN:

14:46:23  10    Q.   Are you familiar with this exhibit?

11    A.   I am.

12    Q.   Generally, what is it?

13    A.   Which -- these are records from First National Bank of

14    Gillette for Barbara Nadine McCreery.

14:46:38  15    Q.   Do they show a $20,000 wire transfer made on December 22nd

16    of 2014?

17    A.   They do.

18          MR. HEIMANN:  Your Honor, the Government moves to

19    admit 3.1.

14:46:53  20          THE COURT:  3.1 is received.

21        (Government's Exhibit 3.1 received into evidence.)

22    BY MR. HEIMANN:

23    Q.   Okay.  There's a redaction in the upper right corner

24    that's covering up an account number.  The original documents

14:47:11  25    are not reacted; we just redacted the account numbers on this

19-CR-26-ABJ          HACKER - DIRECT - HEIMANN          Vol. III-347
21-CR-14-ABJ

1   exhibit; right?

2   A.   Correct.

3        MR. HEIMANN:   Let's go to page 2.

4   BY MR. HEIMANN:

14:47:23   5   Q.   And what do we see on this record?

6   A.   This is a wire transfer request.

7   Q.   For how much?

8   A.   For $20,000 on December 22nd, 2014.

9   Q.   Who's receiving this request, according to this record?

14:47:40   10   A.   The instructions are to send the $20,000 to a Wells Fargo

11   account under the name of Bravo 20 Partners, LLC.

12   Q.   And that account number is one that ends in 5707?

13   A.   It does.

14   Q.   And who's sending it?

14:48:04   15   A.   Barbara Nadine McCreery.

16   Q.   This is going from Gillette, Wyoming?

17   A.   It is.

18   Q.   And what's the address for Bravo 20 Partners?

19   A.   8090 South Monaco Circle in Centennial, Colorado.

14:48:24   20   Q.   Do you recognize that address?

21   A.   I do.

22   Q.   How do you recognize it?

23   A.   That is Bob Mitchell's residence, and that's where we

24   interviewed Mr. Mitchell and also executed a search warrant.

14:48:40   25   Q.   Is that the same search warrant that Special Agent

19-CR-26-ABJ          HACKER - DIRECT - HEIMANN          Vol. III-348
21-CR-14-ABJ

1   Berryhill was talking about when we were talking about the

2   chat messages?

3   A.   Yes.   We seized multiple electronics during that search

4   warrant.

14:48:52   5   Q.   Okay.   Did investigators request records from Wells Fargo

6   Bank for this account number ending in 5707?

7   A.   We did.

8          MR. HEIMANN:   So let's look at Exhibit 1002.

9   BY MR. HEIMANN:

14:49:16   10   Q.   Inspector Hacker, do you recognize this exhibit?

11   A.   I do.

12   Q.   Is this the business account application for that account

13   number ending in 3707?

14   A.   It is.

14:49:35   15          MR. HEIMANN:   Your Honor, the Government moves to

16   admit 1002.

17          THE COURT:   1002 is received.

18      (Government's Exhibit 1002 received into evidence.)

19   BY MR. HEIMANN:

14:49:46   20   Q.   As with the other exhibits, the account numbers have been

21   redacted down to the last four digits.   The actual record is

22   unredacted; correct?

23   A.   Correct.

24   Q.   Have you compared the two unredacted records, 3.1 and

14:50:01   25   1002, to see if that 5707 number is the same account number?

19-CR-26-ABJ          HACKER - DIRECT - HEIMANN          Vol. III-349
21-CR-14-ABJ

 1   A.  Yes, I have.  They are the same.

 2   Q.  And at the bottom, where it says "Customer Name," who's

 3   identified as the customer for this business account?

 4   A.  Robert W. Mitchell.

14:50:25   5   Q.  That's Customer Name 2?

 6   A.  Bravo Two Zero Partners.

 7   Q.  So those are the two names at the bottom there; right?

 8   A.  Yes.

 9   Q.  Okay.

14:50:42   10        MR. HEIMANN:  And let's go one page down.  And one

11   more.

12        And one more.

13   BY MR. HEIMANN:

14   Q.  So who's the authorized signer on this account?

14:50:54   15   A.  Robert Mitchell.

16   Q.  Is there anybody else authorized to sign this account?

17   A.  Not according to this record.

18        MR. HEIMANN:  So let's go, then, to Exhibit 22.1.

19   BY MR. HEIMANN:

14:51:13   20   Q.  As we pull that up, Overt Act 22 of the fraud indictment

21   alleges that two emails were sent on September 18th of 2015

22   from Herman to Pacific Stock Transfer with some documents

23   attached.

24        Exhibit 22.1, is that a copy of one of those emails

14:51:34   25   that was -- that the grand jury received from Pacific Stock

```
19-CR-26-ABJ          HACKER - DIRECT - HEIMANN          Vol. III-350
21-CR-14-ABJ
```

1    Transfer Company in response to a subpoena?

2    A.  It is.

3    Q.  What's the subject of this email?

4    A.  "NERG First Email."

14:51:46    5    Q.  The first page is the email itself, and then the next

6    pages of this exhibit are the attachments; is that right?

7              THE WITNESS:  Would you mind scrolling down?

8    A.  Yes.

9              MR. HEIMANN:  Your Honor, the Government moves to

14:52:12   10    admit 22.1.

11              MR. FLEENER:  Can I have a second, Judge, please?

12              THE COURT:  You may.

13              MR. FLEENER:  Objection, Your Honor; hearsay.

14              MR. HEIMANN:  Your Honor, statement of a party

14:52:48   15    opponent.

16              THE COURT:  Objection's overruled.

17              MR. FLEENER:  May I make a record, please, Judge.

18              THE COURT:  You may.

19              MR. FLEENER:  The attachment is full of statements

14:52:55   20    made by -- we have no idea who these statements and signatures

21    are, so I'd object to foundation for those.  And hearsay to

22    the attachment.

23              MR. JUBIN:  Join in the objection.

24              MR. WARD:  As do I.

14:53:09   25              MR. HEIMANN:  Your Honor, the attachments are signed

```
           19-CR-26-ABJ        HACKER - DIRECT - HEIMANN        Vol. III-351
           21-CR-14-ABJ
```

            1   documents.  They're offered for the fact they were signed.

            2           THE COURT:  It will be received.

            3           The objection is overruled.

            4       (Government's Exhibit 22.1 received into evidence.)

14:53:32    5   BY MR. HEIMANN:

            6   Q.  So Overt Act 22 -- sorry -- includes some initials in it,

            7   "NM."

            8   A.  "Nadine McCreery."

            9   Q.  Same -- same Nadine McCreery we saw in the last overt act?

14:53:47   10   A.  Yes.

           11   Q.  "CJH"?

           12   A.  "Cameron J. Hollenbeck."

           13   Q.  Where's Mr. Hollenbeck live?

           14   A.  In Gillette, Wyoming.

14:53:56   15   Q.  "KM"?

           16   A.  "Kelley McCreery."

           17   Q.  Is Kelley McCreery related to Nadine McCreery?

           18   A.  Yes.

           19   Q.  How?

14:54:07   20   A.  They are married.

           21   Q.  And Kelley McCreery, does he live in Gillette with Nadine

           22   McCreery?

           23   A.  Yes.

           24           MR. HEIMANN:  Let's go to page 2.

14:54:31   25           And page 3.

1   BY MR. HEIMANN:

2   Q.  Kelley McCreery, is his full name Patrick Kelley McCreery?

3   A.  Yes, it is.

4          MR. HEIMANN:  Page 4.

14:54:56   5          And page 8.

6   BY MR. HEIMANN:

7   Q.  What's the title of the document that's shown on page 8 of

8   this exhibit?

9   A.  "Statement of Nonaffiliation for Reporting or Nonreporting

14:55:11   10   Issuers."

11   Q.  All right.  And who does it say it's from?

12   A.  This one is from Bravo 20 Partners Investments, LLC,

13   8090 South Monaco, Denver, Colorado.

14   Q.  And who has signed it on behalf of Bravo 20?

14:55:30   15   A.  Bob Mitchell.

16   Q.  Look at page 10.  What's the title of this -- the page of

17   this document?

18   A.  "Statement of Nonaffiliation for Reporting or Nonreporting

19   Issuers."

14:55:48   20   Q.  Who's it from?

21   A.  This is from EY II, LLC, in Bradenton, Florida.

22   Q.  Do you know where EY II, LLC, was created, what state?

23   A.  In Wyoming.

24   Q.  Who signed on behalf of EY II?

14:56:10   25   A.  Chuck Winters.

19-CR-26-ABJ          HACKER - DIRECT - HEIMANN          Vol. III-353
21-CR-14-ABJ

1           MR. HEIMANN:  Will you go to page 14?

2    BY MR. HEIMANN:

3    Q.  Is this another statement of nonaffiliation?

4    A.  It is.

5    Q.  And who is -- what company is this one from?

6    A.  Intrepid Capital Holdings Corporation out of Bradenton,

7    Florida.

8    Q.  Who signed on behalf of Intrepid Capital?

9    A.  Chuck Winters.

10   Q.  What does he say his title is?

11   A.  CEO.

12          MR. HEIMANN:  Let's go to page 18.

13   BY MR. HEIMANN:

14   Q.  Is this another statement of nonaffiliation?

15   A.  It is.

16   Q.  From whom?

17   A.  T Bell Financial, 8090 South Monaco Circle -- oh, no

18   "Circle" on this one.

19   Q.  Other than no "Circle," that's the same address that was

20   Bob Mitchell's?

21   A.  Yes.

22   Q.  Who signed on behalf of T Bell?

23   A.  Bob Mitchell.

24          MR. HEIMANN:  Let's go to 27.1.

25   ///

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

19-CR-26-ABJ          HACKER - DIRECT - HEIMANN          Vol. III-354
21-CR-14-ABJ

1    BY MR. HEIMANN:

2    Q.  So Overt Act 27 alleges an email on 20 -- September 28th

3    of 2015 that Herman made to Pacific Stock Transfer with some

4    documents attached.

14:57:41    5          Do you recognize Exhibit 27.1?

6    A.  I do.

7    Q.  What is -- what is -- is this an email from the Pacific

8    Stock Transfer Company provided to the grand jury?

9    A.  Yes.  This came from Pacific Stock Transfer.

14:58:02   10          MR. HEIMANN:  And let's scroll down.

11   BY MR. HEIMANN:

12   Q.  Does it include the attachments?

13   A.  It does.

14          MR. HEIMANN:  Okay.  Your Honor, the Government moves

14:58:11   15   to admit 27.1.

16          MR. FLEENER:  May I have a second, Judge.

17          THE COURT:  You may.

18          MR. FLEENER:  No objections.

19          THE COURT:  27.1 will be -- is received.

14:58:31   20     (Government's Exhibit 27.1 received into evidence.)

21   BY MR. HEIMANN:

22   Q.  Inspector Hacker, who is this email from?

23   A.  From Justin Herman, justin@ichcorp.net.

24   Q.  Who is it to?

14:58:46   25   A.  Joslyn Claiborne.

19-CR-26-ABJ          HACKER - DIRECT - HEIMANN          Vol. III-355
21-CR-14-ABJ

1   Q.  When was it sent?

2   A.  September 28th, 2015.

3   Q.  What's the subject?

4   A.  It's a reply to NuTech.

14:59:01   5   Q.  On the first page here, "Shipping Address" and then a --

6   there's a redaction.

7        Have you reviewed the unredacted copy?

8   A.  I have.

9   Q.  What's been redacted?

14:59:16   10   A.  Mr. Herman's address.

11   Q.  So his street address?

12   A.  Yes.

13        MR. HEIMANN:  Let's go, then, to page 2.

14   BY MR. HEIMANN:

14:59:31   15   Q.  What's the title of the document on page 2 as an

16   attachment?

17   A.  "Corporate Resolution of Authorization."

18   Q.  Overt Act 27 includes the initials KM.

19        Is that Kelley McCreery again?

14:59:53   20   A.  Yes, it is.

21   Q.  And that's the person whose signature appears to be on

22   this document?

23   A.  Yes.

24        MR. HEIMANN:  Let's go to page 3.

25   ///

```
19-CR-26-ABJ        HACKER - DIRECT - HEIMANN        Vol. III-356
21-CR-14-ABJ
```

1   BY MR. HEIMANN:

2   Q.  So Overt Act 27, again, includes the initials CJH.

3          Is that the same Cameron J. Hollenbeck that we talked

4   about in the last overt act?

15:00:25   5   A.  Yes, it is.

6   Q.  Who's a resident of Wyoming?

7   A.  Yes.

8   Q.  And on this page 3 -- it's very difficult to read.  But

9   does it appear that that's the name that's written in there in

15:00:39   10   handwriting or pasted in?

11   A.  Yes.  The signature does appear to say "Cameron J.

12   Hollenbeck."

13   Q.  Okay.

14          MR. HEIMANN:  Your Honor, those are all the questions

15:01:00   15   I have for Inspector Hacker at this time.

16          I'd inform the Court that we intend to call Inspector

17   Hacker a number of times during this trial.  We're also likely

18   to insist that cross-examination be limited to the scope of

19   that direct, at least until the last one.

15:01:16   20          THE COURT:  Very well.

21          MR. FLEENER:  No cross, Judge.  Thank you.

22          MR. WARD:  Good afternoon, Ms. Hacker --

23          THE WITNESS:  Good afternoon.

24          MR. WARD:  -- or Inspector Hacker, I suppose.

15:01:45   25          Do you have a preference?

19-CR-26-ABJ          HACKER - CROSS - WARD          Vol. III-357
21-CR-14-ABJ

1    THE WITNESS:  Between the two, no.  It's fine.

2                          **CROSS-EXAMINATION**

3   **BY MR. WARD:**

4   Q.  The $20,000 that you just testified about that was wired

15:01:52   5   from Nadine McCreery, that was wired to Bob Mitchell; correct?

6   A.  It was.

7   Q.  And you have no evidence that my client Chuck Winters ever

8   received any portion of that $20,000; correct?

9   A.  That is incorrect.

15:02:09   10   Q.  That $20,000 went to Mr. Winters?

11   A.  Not directly.

12   Q.  What do you mean by that?

13   A.  Well, later on we will talk about additional wires that

14   happened after that one, the -- the one from Nadine McCreery.

15:02:29   15   Q.  Okay.  I suppose we'll -- we'll wait until that testimony

16   comes out.

17        The account that that $20,000 went into was a

18   Bravo 20 account; correct?

19   A.  It was.

15:02:43   20   Q.  And that account was controlled exclusively by

21   Bob Mitchell; correct?

22   A.  It was.

23        MR. WARD:  Those are all the questions I have.

24        MR. JUBIN:  I will be brief.

15:03:02   25        Inspector Hacker, my name is Tom Jubin.  I represent

19-CR-26-ABJ          HACKER - CROSS - JUBIN          Vol. III-358
21-CR-14-ABJ

1    Ian Horn.

2          THE WITNESS:  Hi, Mr. Jubin.

3          MR. JUBIN:  We haven't had the opportunity to

4    meet yet.

15:03:10    5                    **CROSS-EXAMINATION**

6    BY MR. JUBIN:

7    Q.  These -- you testified there were a couple emails from

8    Justin Herman to someone named Joslyn Claiborne?

9    A.  Yes.

15:03:19    10   Q.  Ian Horn wasn't a party to those emails; am I correct?

11   A.  The emails that we -- that -- that I was just shown now?

12   Q.  Right.

13   A.  Ian Horn was not on those emails.

14         MR. JUBIN:  Okay.  That's all I have for now.

15:03:31    15   Thank you.

16         THE WITNESS:  Okay.

17         THE COURT:  You may step down -- unless there's

18   redirect.

19         MR. HEIMANN:  There is not, Your Honor.

15:03:40    20         THE COURT:  Very well.

21         Time for the midafternoon break, ladies and

22   gentlemen.  We'll stand in recess for 15.

23     (A recess was taken from 3:04 p.m. to 3:27 p.m.

24   Proceedings outside the jury's presence.)

15:28:19    25         THE COURT:  It's good to see Steve Miller again.

1              How are you doing, Steve?

2              MR. MILLER:  Pretty good, Your Honor.

3          (Proceedings within the jury's presence at 3:29 p.m.)

4              THE COURT:  Thank you, ladies and gentlemen.

15:29:57    5              Mr. Szott.

6              MR. SZOTT:  Thank you, Your Honor.

7              The Government calls Nadine McCreery.

8          (Witness sworn.)

9              THE COURTROOM DEPUTY:  Please have a seat.

15:31:01   10              Please state and spell your name for the record.

11              THE WITNESS:  Nadine McCreery.

12              THE COURTROOM DEPUTY:  Please spell it.

13              THE WITNESS:  N-a-d-i-n-e M-c capital C-r-e-e-r-y.

14              MR. SZOTT:  Mrs. McCreery, good afternoon.

15:31:25   15              THE WITNESS:  Good afternoon.

16      **NADINE McCREERY, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

17    **BY MR. SZOTT:**

18    Q.  What is your given first name?

19    A.  Barbara Nadine McKenzie McCreery.

15:31:36   20    Q.  And you typically go by "Nadine"?

21    A.  Yes.

22    Q.  Mrs. McCreery, are you -- and I'm using the prefix "Mrs."

23          So are you married?

24    A.  Yes.

15:31:49   25    Q.  What's your husband's name?

1   A.  Patrick Kelley McCreery.

2   Q.  And what name does your husband go by?

3   A.  Kelley.

4   Q.  Without giving an address, where do you and Kelley live?

15:32:07   5   A.  Gillette, Wyoming.

6   Q.  And how long have you lived in Gillette?

7   A.  We were both raised there, born and raised.

8   Q.  And what do you and your husband do for a living?

9   A.  We ranch.

15:32:25   10  Q.  What kind of a ranching operation is it?

11  A.  We run yearlings for another person.

12  Q.  And for someone like me who doesn't immediately know what

13  a yearling is, what does that mean?

14  A.  It's a year-old cow.

15:32:47   15  Q.  Do you and your husband have children?

16  A.  Yes.

17  Q.  Is one of -- is one of your husband's children named

18  Patrick John McCreery?

19  A.  Yes.

15:33:08   20  Q.  Now, is Patrick John your son by blood?

21  A.  No.  He's my stepson.

22  Q.  Mrs. McCreery, I would like to ask you some questions

23  about your family's investments in connection with a person

24  named Robert Mitchell or Bob Mitchell.

15:33:31   25          Have you met Bob Mitchell in person?

1    A.   Yes, once.

2    Q.   And where did you meet Mr. Mitchell?

3    A.   It was at Granny's restaurant in Gillette.

4    Q.   Why were you meeting Mr. Mitchell at Granny's restaurant

15:33:52   5    in Gillette?

6    A.   He was asking for investors for High Plains Gas Company.

7    Q.   Were there other people who were involved in trying to get

8    investors for High Plains Gas?

9    A.   Yes.

15:34:14  10    Q.   Do you remember any of their names?

11    A.   Yes.  Red Luken, Richard Shupick, Jay Hollenbeck.

12    Q.   You mentioned High Plains Gas.

13         Did you and your husband have High Plains Gas wells

14    on your property?

15:34:38  15    A.   Yes.

16    Q.   In relation to Mr. Mitchell, what did the term "shell

17    step" mean to you during the time frame of this High Plains

18    Gas venture?

19    A.   It was something to do with the stock market, to generate

15:35:06  20    money to be able to shell -- sell shares to generate money to

21    run High Plains.

22    Q.   At some point did you and your husband make the decision

23    to invest in this High Plains venture?

24    A.   Yes.

15:35:40  25    Q.   How did that decision to invest get made?

1    A.  We went home and discussed it and decided to invest.

2    Q.  Did you, in fact, invest?

3    A.  Yes.

4    Q.  Mrs. McCreery, are you aware of other meetings that

15:36:11    5    happened in relation to this High Plains Gas venture?

6    A.  Yes.  They met several mornings a week at Granny's for

7    coffee and discussed various things.

8    Q.  Did you attend any of those other meetings?

9    A.  A few of them.

15:36:30    10    Q.  Was there a point where you stopped attending the

11    meetings?

12    A.  Yes.

13    Q.  And just so we're clear, there was one time that

14    Mr. Mitchell was there?

15:36:41    15    A.  Yes.

16    Q.  At least where you were there, as well?

17    A.  Correct.

18    Q.  You mentioned you and your husband decided to invest.

19         At the time what did you understand that the money

15:36:55    20    that you invested was going to be used for?

21    A.  I believe it was attorneys' fees, accountant fees to get

22    the shell step -- make sure it was a legitimate shell step and

23    get it up and running.

24    Q.  At some point did you have an expectation that you would

15:37:21    25    receive some sort of shares to reflect your investments with

1    this venture?

2    A.  Yes.

3    Q.  Mrs. McCreery, have you ever heard of an entity called

4    Bravo Two Zero Partners?

15:37:40    5    A.  Yes.

6    Q.  And who was associated with Bravo Two Zero Partners?

7    A.  Bob Mitchell.

8    Q.  And what was your understanding of Bravo Two Zero

9    Partners' role in this investment venture?

15:38:07    10    A.  Our understanding was that it was the account that we sent

11    the investments to.  We wired money from our bank to this

12    account, and it was kind of like a holding account until they

13    did whatever they did.

14    Q.  I'd like to ask you some questions about a particular wire

15:38:33    15    of $22,000 in December of 2014.

16          MR. SZOTT:  Mr. Davila, could we please bring up

17    Exhibit 3.1.

18    BY MR. SZOTT:

19    Q.  Mrs. McCreery, on the monitor in front of you should be

15:39:25    20    the first page of Government Exhibit 3.1.

21          Are you able to see that okay?

22    A.  Yes.

23          MR. SZOTT:  Will you advance, please, to page 2.

24    BY MR. SZOTT:

15:39:50    25    Q.  Mrs. McCreery, are you able to see the second page of the

1    exhibit?

2    A.   Yes.

3    Q.   Toward the bottom there are three black boxes where

4    information is redacted.  The lowest of the three, after that

15:40:05    5    are the digits "3038."

6             Do you see that?

7    A.   Yes.

8    Q.   Whose bank account is that?

9    A.   That was Kelley and I's account.

15:40:14    10    Q.   And what financial institution did you have the account

11    with?

12    A.   First National Bank of Gillette.

13    Q.   And at the risk of asking an obvious question, where is

14    First National Bank of Gillette located?

15:40:32    15    A.   Gillette, Wyoming.

16    Q.   The address information that's here at the top of page 2,

17    is that accurate in terms of where the -- the bank is located?

18    A.   Yes, 319 South Gillette Avenue.

19    Q.   And the -- and, obviously, this is an electronic copy.

15:40:54    20             But whose signature is at the lower left of page 2 of

21    the exhibit?

22    A.   Mine.

23    Q.   Did you, in fact, sign the original version of this

24    document?

15:41:10    25    A.   Yes, I did.

19-CR-26-ABJ         N. McCREERY - DIRECT - SZOTT       Vol. III-365
21-CR-14-ABJ

1   Q.   Where were you when you signed this?

2   A.   At the bank.

3   Q.   And why were you at the bank?

4   A.   We wired the 20- -- went there to wire the 20,000 to

15:41:23   5   Bravo Two Zero.

6   Q.   The remainder of the handwriting here on page 2,

7   Mrs. McCreery, is that your handwriting or is that someone

8   else's?

9   A.   Someone else's.

15:41:35   10   Q.   And do you know how the rest of this form got filled out?

11   A.   The gal at the bank filled it out.

12   Q.   Who provided the gal at the bank with the information

13   about Wells Fargo, the routing number, Bravo Two Zero, and

14   then Bravo's account number?

15:41:57   15   A.   We did.  Red Luken had, I believe, texted Kelley the

16   information, where to send the money.

17   Q.   And that's -- that's to the best of your recollection?

18   A.   Yes.

19   Q.   Do you recall whether you actually spoke with Mr. Mitchell

15:42:24   20   about this $20,000 wire transfer?

21   A.   No.

22   Q.   Meaning you -- you don't recall?

23   A.   I don't recall that we did, no.

24   Q.   And did this $20,000 actually get sent to Bravo Two Zero

15:42:47   25   Partners?

1    A.   Yes.

2    Q.   Mrs. McCreery, I'd now like to ask you about some stock

3    certificates that you and your family received.

4              MR. SZOTT:  Can we bring up, Mr. Davila, please,

15:43:08   5    Exhibit 309.

6              I believe this is not yet admitted.

7    BY MR. SZOTT:

8    Q.   Mrs. McCreery, on the monitor is Government Exhibit --

9    what's been marked for identification as Government

15:43:31   10    Exhibit 309.

11              Can you see that on your monitor?

12    A.   Yes.

13    Q.   What is it?

14    A.   It is a printed certificate with the shares that we

15:43:46   15    received from -- to my knowledge -- the Bravo Two Zero.

16    Q.   And this actually appears to be a photograph?

17    A.   It is.  It is a photograph of one that I had that the

18    Department of Justice took when they came to talk to us about

19    this.

15:44:11   20    Q.   Or -- in any event, by "the Department of Justice," you

21    mean the people who were investigating this case?

22    A.   Yes.

23              MR. SZOTT:  Can we go to 310?

24    BY MR. SZOTT:

15:44:38   25    Q.   Again, Mrs. McCreery, what are you seeing here in 310?

1    A.  It would be Kelley's certificate for the shares for him.

2    Q.  And 309 was yours?

3    A.  Yes.

4         MR. SZOTT:  Mr. Davila, can we go to 311, please?

15:44:50    5    BY MR. SZOTT:

6    Q.  And, Mrs. McCreery, what is Government Exhibit 311?

7    A.  This is the one for our son Patrick.

8    Q.  These pictures -- and this is a -- this is a photograph,

9    as well, a picture?

15:45:13    10    A.  Yes.

11    Q.  To the best of your knowledge, Mrs. McCreery, do these

12    pictures fairly and accurately capture the appearance and

13    content of the actual certificates?

14    A.  Yes.  The actual certificate I received through email and

15:45:36    15    printed it on my printer.  We never received an official

16    certificate on certificate paper.

17         MR. SZOTT:  Your Honor, the Government would offer

18    309, 310, and 311.

19         THE COURT:  309, 310, and 311 are received.

15:46:00    20    (Government's Exhibits 309, 310, 311 received

21    into evidence.)

22         MR. SZOTT:  Thank you, Your Honor.

23         Mr. Davila, can we return to 309?

24    BY MR. SZOTT:

15:46:17    25    Q.  So I've brought back -- or we've brought back up,

19-CR-26-ABJ          N. McCREERY - DIRECT - SZOTT      Vol. III-368
21-CR-14-ABJ

 1   Mrs. McCreery, Exhibit 309, which has your name on it.

 2          What was your understanding as to -- when you

 3   received this certificate, what was your understanding of why

 4   you were receiving this stock certificate?

15:46:33  5   A.  It was an -- in exchange for the investment that we made,

 6   the 20 -- on my part -- the 20,000.

 7          MR. SZOTT:  If we can go to 310.

 8   BY MR. SZOTT:

 9   Q.  Now, this certificate has the name of Patrick Kelley

15:47:07 10   McCreery.

11          Had you and your husband or -- either jointly or just

12   your husband -- you'd made other investments besides just that

13   20,000 that we saw in the other exhibit?

14   A.  Yes.

15:47:18 15          MR. SZOTT:  Let's turn to 311.

16   BY MR. SZOTT:

17   Q.  And now 311's on the screen.  Now, this is for Patrick

18   John McCreery.

19          Did Patrick John also invest?

15:47:37 20   A.  Yes.

21   Q.  Mrs. McCreery, did you ever try to sell your shares that

22   we saw in Exhibit 309?

23   A.  No.  We were told they were restricted for like six months

24   and could not sell them until after that time.

15:47:59 25   Q.  And you never -- you never tried to sell them or do

1   anything with them?

2   A.  No.

3   Q.  I'd like to ask you, Mrs. McCreery, about some entities,

4   McKenzie Financial and PK Financial.  Do you recognize those

15:48:14   5   names?

6   A.  Yes, I do.

7   Q.  What are McKenzie Financial and PK Financial?

8   A.  They were accounts that we set up with a brokerage,

9   I believe, that -- I don't remember if it was Bob advised us

15:48:41   10   to or Red Luken advised us to -- that when we did get a chance

11   to sell, that the money would have an account to go into, was

12   my understanding.

13   Q.  And so these, supposedly, were going to be business

14   organizations?

15:48:59   15   A.  Yes.

16   Q.  So who -- what individual person is McKenzie Financial

17   associated with?

18   A.  That is me.

19   Q.  And what individual person is PK Financial associated

15:49:16   20   with?

21   A.  That is Kelley.

22   Q.  Mrs. McCreery, were you ever a shareholder of Bravo

23   Two Zero Partners?

24   A.  Not to my knowledge.

15:49:33   25   Q.  Was -- McKenzie Financial, that entity, was it ever a

19-CR-26-ABJ          N. McCREERY - DIRECT - SZOTT        Vol. III-370
21-CR-14-ABJ

1   shareholder of Bravo Two Zero Partners?

2   A.  Not to my knowledge.

3         MR. SZOTT:  Mr. Davila, will you bring up

4   Exhibit 22.1, please, and we'll need to go to page 4.

15:49:49   5   BY MR. SZOTT:

6   Q.  Mrs. McCreery, are you able to see page 4 of Government's

7   Exhibit 22.1 on your screen?

8   A.  Yes.

9   Q.  This is electronic, but have you seen the original copy of

15:50:24   10   this document?

11   A.  Yes.

12   Q.  And at the bottom of the document, where it says

13   "Signed" -- I'll -- there next to that blue line -- whose

14   signature is that?

15:50:46   15   A.  That is mine.

16   Q.  Did you sign the original copy of this document?

17   A.  Yes.

18   Q.  The remainder of the handwriting on this document, is that

19   your handwriting?

15:50:57   20   A.  No.

21   Q.  Do you recall what you did after you signed the original

22   of this document?

23   A.  When I received it, it was blank.  I signed it and then

24   I emailed it back to Bob Mitchell.

15:51:19   25         MR. SZOTT:  If we can go to page 3.

19-CR-26-ABJ       N. McCREERY - DIRECT - SZOTT       Vol. III-371
21-CR-14-ABJ

1        (Discussion held at counsel table.)

2   BY MR. SZOTT:

3   Q.  And before I continue, Mrs. McCreery, when you emailed

4   that to Bob Mitchell, do you recall what state you were

15:51:38   5   located in?

6   A.  Wyoming.

7   Q.  Now -- we've now pulled up page 3.

8        Do you recognize the signature that's under the

9   "Signed" toward the bottom of the page?

15:51:53   10   A.  Yes.

11   Q.  Whose signature is that?

12   A.  Kelley's.

13   Q.  Are you familiar with your husband's handwriting?

14   A.  Yes.

15:51:59   15   Q.  The remainder of the handwriting on this document, is that

16   your husband's handwriting?

17   A.  No.

18   Q.  Do you know, Mrs. McCreery, what happened to this form or

19   this document, the original, after your husband signed it?

15:52:18   20   A.  We received everything together, signed it together, and

21   I sent it all back together through the email.

22        MR. SZOTT:  If we could go to page 2.

23   BY MR. SZOTT:

24   Q.  Mrs. McCreery, are you familiar with a man named

15:52:42   25   Jay Hollenbeck?

 1  A.  Yes.

 2  Q.  Who is Jay Hollenbeck?

 3  A.  He is one of the guys that was sitting at the coffee -- at

 4  Granny's.  We had met him previous to that and knew who he

15:53:00  5  was.

 6          MR. SZOTT:  Your Honor, may I have a moment.

 7          THE COURT:  You may.

 8      (Discussion held at counsel table.)

 9  BY MR. SZOTT:

15:53:49  10  Q.  Just one last question, Mrs. McCreery:  To your knowledge,

 11  did -- either you or your husband, Kelley, or your son

 12  Patrick John, did any of you ever get a return on your

 13  investments with this venture?

 14  A.  No.  None.

15:54:07  15          MR. SZOTT:  Your Honor, nothing further on direct.

 16  I will pass the witness for cross-examination.

 17          MR. FLEENER:  Can we have a second, please, Judge?

 18          THE COURT:  You may.

 19          MR. FLEENER:  Your Honor, can we approach?

15:54:32  20          THE COURT:  Yes, you may.

 21      (Proceedings held at sidebar with Prosecutor Szott

 22  and all defense counsel.)

 23          MR. WARD:  Your Honor, at this time I would like to

 24  renew our motion to compel the Government's investigative

15:55:04  25  files into High Plains Gas.

1          This is a Government witness, and she just testified

2     that her involvement in this case related to an investment in

3     High Plains Gas, that when she met with Mr. Mitchell he was

4     seeking an investment in High Plains Gas.

15:55:22   5          And so I just don't know how us, as defendants, are

6     in a fair situation to proceed with even examining this

7     witness, knowing that there are extensive investigative files

8     into High Plains Gas that may contain statements from this

9     witness.

15:55:35  10          And so I would renew the motion to compel that

11    information at this time.

12          MR. JUBIN:  I join.

13          MR. FLEENER:  I join.

14          MR. SZOTT:  I need Mr. Heimann to weigh in on this,

15:55:51  15    Your Honor.  I don't think it would add anything to any

16    examination of this witness, but I'm not familiar with what

17    may be -- I'm just not familiar with that.

18          THE COURT:  I can't think of what -- what it's going

19    to hurt to produce it.

15:56:02  20          (Mr. Heimann present at sidebar.)

21          MR. HEIMANN:  I was able to read it on the realtime.

22          Your Honor, High Plains Gas records from the SEC were

23    never a part of this investigation, ever.  And the fact that

24    that's the name that Bob Mitchell used to defraud this family

15:56:29  25    doesn't make those records exculpatory, relevant, or

```
19-CR-26-ABJ        N. McCREERY - DIRECT - SZOTT      Vol. III-374
21-CR-14-ABJ
```

1    discoverable.  And they're not in the possession of the

2    prosecution team.

3           This, again, is simply an attempt to delay this

4    trial.

15:56:47   5           MR. WARD:  Well --

6           THE COURT:  Has the defense sought to subpoena the

7    records you want?

8           MR. WARD:  Have we sought to subpoena the High

9    Plains -- the SEC investigative files into High Plains Gas?

15:57:01  10   No.

11           But I don't -- I think what the Government is saying

12   is "We know these records exist but we haven't looked at

13   them," so they don't know if there is exculpatory material;

14   they don't know if there are statements from the witness in

15:57:11  15   there.  And just because they haven't looked at them doesn't

16   mean they're not in the Government's possession.

17           MR. HEIMANN:  I don't know that High Plains Gas

18   investigative files exist.  I don't know if there was an SEC

19   investigation.  It was never part of our investigation.

15:57:31  20           So, again, this is a fishing expedition.  Its only

21   purpose is to delay this trial.  And if they wanted these

22   things, Judge, they should have tried to subpoena them.  This

23   case has been going on for two years, and it was absolutely

24   clear from the start that these folks started with High Plains

15:57:54  25   Gas as the vehicle for the fraud committed by Bob Mitchell.

19-CR-26-ABJ          N. McCREERY - CROSS - FLEENER          Vol. III-375
21-CR-14-ABJ

1    This fraud is about EcoEmissions and NuTech.

2          MR. FLEENER:  Your Honor, we attached to our brief --

3    or to our motion to compel -- that -- the fact that the DOI

4    referred this case -- referred High Plains Gas out to the SEC

15:58:19   5    and said "You need to investigate this."

6          To act as if there's no files on High Plains Gas --

7    High Plains Gas was also -- well, they're delisted.  High

8    Plains Gas was delisted --

9          THE COURT:  I think what we'll do is, rather than

15:58:32  10   argue here, I'll give you all night tonight to argue.  But we

11   need to hear witnesses during the day.

12         MR. FLEENER:  Yes, sir.

13         MR. WARD:  Okay.  Thank you, Judge.

14       (Sidebar concluded.)

15:59:07  15         MR. FLEENER:  Ms. McCreery, how are you, ma'am?

16         THE WITNESS:  I'm good.  How are you today?

17         MR. FLEENER:  I'm well.

18         My name is Tom Fleener.  I'm a lawyer from Laramie.

19   It's nice to meet you.

15:59:11  20                    **CROSS-EXAMINATION**

21   BY MR. FLEENER:

22   Q.  You don't know Justin Herman, do you?

23   A.  No.

24   Q.  Have you ever heard of him?

15:59:16  25   A.  No.

1    Q.  When you were investing with -- when you were -- well,

2    you -- you think Bob Mitchell and Red Luken stole your money?

3    A.  Yes.

4    Q.  Okay.  And when you were giving your money to Bob Mitchell

15:59:28    5    and Red Luken, again, you didn't know anything about

6    Justin Herman; correct?

7    A.  No.

8    Q.  And it was your understanding when you were giving your

9    money to Bob Mitchell and Red Luken that you were getting some

15:59:38    10    investment in High Plains Gas; correct?

11    A.  Yes.

12    Q.  And the -- the -- the -- the shares that you got --

13    I think it was like 117 million or something -- some-odd

14    million -- in your name?

15:59:57    15    A.  Yes.

16    Q.  And that was for the $20,000 that you personally invested,

17    ma'am?

18    A.  Yes.

19    Q.  So the rest of the shares that -- I was looking at the

16:00:06    20    three stock certificates, and I came up to 430 million.  Is

21    that -- give or take?

22    A.  Yeah.  We never did really add the shares up because they

23    kind of changed every so often.

24    Q.  I mean, you were -- okay.

16:00:24    25          MR. FLEENER:  I'm not going to ask that question

                1   because I don't know the answer.

                2        I appreciate your time.  I have no further questions.

                3        MR. WARD:  Good afternoon, Ms. McCreery.

                4        My name is Zenith Ward.  I represent Charles Winters.

16:00:55        5                    **CROSS-EXAMINATION**

                6   BY MR. WARD:

                7   Q.  Have you ever met Charles Winters?

                8   A.  No.

                9   Q.  When you invested money, was -- what was your

16:01:13       10   understanding of the investment initially?  Was it related to

               11   any kind of tool or any kind of gas-production tool?

               12   A.  I'm not really sure.  When all that was discussed, I was

               13   not attending the meetings.  It was my husband.

               14   Q.  Okay.  But if you didn't hear about it at the meeting, do

16:01:38       15   you have an understanding of what -- what the -- what you were

               16   investing in or why you would have been investing in this

               17   company?

               18   A.  Initially, we thought that Kelley and Patrick would be

               19   first in line to get work as -- such as the dirt work and

16:02:00       20   whatever goes along with methane companies.

               21   Q.  The $20,000 investment that we've discussed today, was

               22   that the first time your family invested money with either

               23   Bob Mitchell or Ed Pressley?

               24   A.  No.

16:02:19       25   Q.  Okay.  When was the first time your family invested money

1   with either of those folks, Bob Mitchell or Ed Pressley, in

2   comparison to the $20,000 investment?

3   A.  It was sometime in 2013.  I'm not sure what the date was.

4   Q.  Okay.  And when you were investing in 2013, was that to

16:02:44    5   purchase shares of High Plains Gas?

6   A.  Yes.

7   Q.  Okay.  And what was -- what kind of business was High

8   Plains Gas doing at that time?

9   A.  They were maintaining the methane wells.

16:02:57   10   Q.  Extracting natural gas from wells?

11   A.  Yes.

12   Q.  And were they using any kind of particular technology to

13   do that?

14   A.  That I don't know.

16:03:07   15   Q.  Okay.  And did you get share certificates for High Plains

16   Gas similar to those that we saw for EcoEmissions?

17   A.  No.

18   Q.  Okay.  What documentation of your investment in High

19   Plains Gas did you receive?

16:03:25   20   A.  None.

21   Q.  Okay.  So you invested money -- you understood it to be in

22   High Plains Gas -- but you never got a document that said

23   anything about it?

24   A.  That's correct.

16:03:35   25   Q.  How did that investment go in terms of -- who did you give

1   the money to?  Or how did the money get to the -- the company

2   you were investing in?

3   A.  It was sent to Bob Mitchell, and it was usually Red Luken

4   that would tell Kelley that they needed more money to deal

16:03:55   5   with lawyers or accountants or this and that.  I'm not sure

6   what all the particulars were.

7   Q.  So Red Luken would talk to your husband and -- and say,

8   "Look, the company needs money for lawyers, accountants," and

9   then you and your husband would wire money to Bob Mitchell?

16:04:14   10   A.  Correct.

11   Q.  Was it to that same Bravo 20 account back in 2013?

12   A.  Yes.

13   Q.  Okay.  And so it sounds like when you invested back in

14   2013 it was really the exact same situation that it was with

16:04:33   15   the $20,000 except in 2013 it's called High Plains Gas and

16   with the $20,000 -- what was your understanding of what you

17   were investing in there?

18   A.  With the 20,000?

19   Q.  Right.

16:04:46   20   A.  I wasn't really sure.  I don't really remember.  That's

21   been a long time ago.

22   Q.  Was it no longer High Plains Gas?  Or for all you knew,

23   you were still investing in High Plains Gas?

24   A.  They had went through so many different names thrown at us

16:05:01   25   that we weren't -- I wasn't sure which one was which.

19-CR-26-ABJ          N. McCREERY - CROSS - WARD          Vol. III-380
21-CR-14-ABJ

1  Q.  But the -- the setup was always the same; right?  It was

2  the same business?

3  A.  Yes.

4  Q.  Meaning they were doing the same activity?  It had to do

16:05:15  5  with extracting natural gas from coalbed methane wells?

6  A.  Correct.

7  Q.  Okay.  You said that they went through so many names.

8        And so we've talked about High Plains Gas.  Your --

9  the stock certificates we saw a little bit ago were for

16:05:31  10  EcoEmissions; right?

11  A.  Yes.

12  Q.  All right.  What other company names are you aware of

13  that -- that this company transformed through?  What were the

14  other names of companies?

16:05:43  15  A.  I believe one was MCF Energy.  Somewhere along the line

16  there was First NRG, Incorporated, I believe it was.

17  Q.  Would it -- oh, I'm sorry.  I didn't mean to stop you if

18  there was another.

19  A.  Those were all that I can remember right now.

16:06:06  20  Q.  What about Mitchell Resources?  Does that ring a bell?

21  A.  That was mentioned, yes.

22  Q.  RWM?

23  A.  I don't remember that one.

24  Q.  What about CHAMA?

16:06:17  25  A.  I remember that one.

1   Q.  Okay.  So these were all iterations of the same business

2   model but names of different companies; right?

3   A.  I think so, yes.

4   Q.  And you said that you and your husband are -- are ranchers

16:06:31    5   and you own property?  You own a ranch?

6   A.  Yes.

7   Q.  And do you actually have High Plains Gas wells on your

8   property?

9   A.  Yes.

16:06:38    10  Q.  Okay.  Do you have wells on your property for any entities

11  other than High Plains Gas?

12  A.  Yes.  We had, at one time, five different companies.

13  Q.  What were those five companies?

14  A.  Oh, Pinnacle, JM Huber, Torch.  I don't remember the rest

16:07:09    15  of them now.  That's been a long time ago.

16  Q.  All you can testify to is what you remember.

17  A.  Yeah.

18  Q.  You talked about meeting Bob Mitchell, at one point in

19  time that you actually met him in person; right?

16:07:23    20  A.  Yes.

21  Q.  Okay.  In comparison to the $20,000 investment, when was

22  that in-person meeting with Bob Mitchell?

23  A.  That was before our first investment in 2013.

24  Q.  And when you met with Bob Mitchell in person, was that the

16:07:41    25  first time that you were introduced to this whole investment

19-CR-26-ABJ          N. McCREERY - CROSS - WARD          Vol. III-382
21-CR-14-ABJ

1    idea?  Or had you already been introduced to it by Red Luken

2    or anyone else?

3    A.  They had talked about it at coffee, I believe.

4    Q.  Okay.  So before you met Bob Mitchell in person, you were

16:08:00    5    already aware of this idea of investing money in something to

6    extract natural gas; is that true?

7    A.  Yes.

8    Q.  Okay.  Do you know Richard Shupick?

9    A.  Yes.  Yes.

16:08:13   10    Q.  How does he play into this?

11    A.  He was always there at coffee.

12    Q.  Okay.  And tell us a little bit about what -- what was

13    going on at coffee?

14         I mean as far as Red Luken and Richard Shupick.

16:08:28   15    A.  Just discussing -- I've got to say -- guy stuff.  I --

16    I went just to go, just to help Kelley try to remember stuff.

17    And then after a while I quit going.

18    Q.  And when you were going, would the kind of thing that

19    Red Luken and Richard Shupick and maybe Jay Hollenbeck be

16:08:51   20    discussing was this technology for extracting natural gas from

21    these coalbed methane wells?

22    A.  Yes.

23    Q.  Okay.  Was the pitch of this technology that they were

24    going to be able to extract the gas from the wells without

16:09:05   25    needing electricity and without having to dispose of water?

 1          MR. SZOTT:  Your Honor, I'll object.  It's -- it's

 2    beyond the scope of direct.  And to the extent that Mr. Ward

 3    wants to pursue this line of examination, I'd ask that he ask

 4    open-ended, rather than leading questions.

16:09:20   5          THE COURT:  Overruled.

 6          Proceed.

 7          THE WITNESS:  Could you repeat the question, please?

 8          MR. WARD:  Sure.

 9    BY MR. WARD:

16:09:31  10    Q.  My question was, the conversations you heard at the

11    coffee -- at coffee about what was going to be going on, were

12    those -- from Red and Shupick and Jay Hollenbeck -- were they

13    discussing the fact that they were going to be working to

14    extract gas from the wells without electricity and without

16:09:49  15    having to dispose of the well water and that was going to

16    reduce the costs?

17    A.  I don't remember.

18    Q.  Okay.  At any point in time, did the investment you made

19    into High Plains Gas get transferred over into another

16:10:21  20    company?

21    A.  I'm not sure of that.

22    Q.  Now, at some point in time, you all wanted to know whether

23    Red Luken had actually invested money into this venture;

24    correct?

16:10:44  25    A.  I believe my husband had asked him at one point.

1    Q.  And Red refused to -- to tell your husband how much money,

2    if any, he had invested; correct?

3    A.  That I don't know.

4    Q.  Red Luken bought a new supercharged Ford pickup truck

16:11:03    5    shortly after your investments, and that was concerning to

6    you; right?

7    A.  That I'm not sure of.

8    Q.  And part of the promises that were made to your family

9    that helped entice you to invest were that not only would you

16:11:22    10    be buying a piece of this company -- not only would you be

11    investment -- investing in the company -- but it was also

12    going to lead to a lot of work for both your husband and your

13    son; right?

14    A.  Yes.

16:11:34    15    Q.  Your -- your husband was told that he was going to be the

16    landman for the company; right?

17    A.  I think I remember something about that, yeah.

18    Q.  And do you know what a landman does, generally?

19    A.  Yes.

16:11:48    20    Q.  Okay.  A landman is a guy who researches ownership

21    interests in the surface rights and -- and reports that back

22    to the party that wants to extract oil or gas; right?

23    A.  Yes.

24    Q.  And so your husband --

16:12:05    25        MR. SZOTT:  Your Honor, same objection to this

 1    line of questioning.  Counsel's essentially testifying.

 2              THE COURT:  He can ask leading questions.

 3              MR. WARD:  I couldn't hear you, Your Honor.

 4              THE COURT:  I'm sorry.  You may ask the question.

 5              MR. WARD:  So can you read back the question so

 6    I don't say it a different way, please?

 7              THE COURT REPORTER:  "Question:  A landman is a guy

 8    who researches ownership interests in the surface rights and

 9    reports that back to the party that wants to extract oil or

10    gas; right?

11              "Answer:  Yes.

12              "Question:  And so your husband --"

13              MR. WARD:  Okay.

14    BY MR. WARD:

15    Q.  And the fact that you were being promised work in addition

16    to the ownership interest, that made the investing all the

17    more enticing; correct?

18    A.  Yes.

19    Q.  Part of the pitch that got you all to invest was that

20    there were some wells that they referred to as "the Black

21    Diamond wells"; correct?

22    A.  I believe so, yes.

23    Q.  And then are you aware that at some point in time

24    Red Luken goes out to where these Black Diamond wells

25    supposedly are and he actually kicks over the wellhead and

1    there's no hole in the ground, that the wells were fake?

2    A.  I'm not aware of that.

3           MR. WARD:  May I have just a moment, Your Honor.

4           THE COURT:  Yes, you may.

16:14:07    5       (Discussion held at counsel table.)

6    BY MR. WARD:

7    Q.  Are you familiar with the Throne Ranch?

8    A.  Yes.

9    Q.  Are you familiar with Mike Perry?

16:14:31   10    A.  No.

11    Q.  Do you know if Red is still in this same line of business?

12    You know, getting investors for natural gas extraction ideas.

13    A.  I don't know.

14    Q.  You invested in other ventures with Bob Mitchell that were

16:14:53   15    unrelated to natural gas extraction; right?

16    A.  No.

17    Q.  Did you ever invest in a -- a company called DEAC?

18    A.  Not to our knowledge.

19           MR. WARD:  Those are all the questions I have,

16:15:18   20    Your Honor.

21           MR. JUBIN:  I have no questions, Your Honor.

22    Thank you.

23    ///

24    ///

25    ///

```
19-CR-26-ABJ      N. McCREERY - RECROSS - FLEENER      Vol. III-387
21-CR-14-ABJ
```

                    1          MR. SZOTT:  One follow-up question, Mrs. McCreery,

                    2    just to make sure that we're clear.

                    3                      REDIRECT EXAMINATION

                    4    BY MR. SZOTT:

16:15:39            5    Q.  Mr. Fleener asked you, I believe, if you had ever heard of

                    6    Justin Herman.  Do you remember that question?

                    7    A.  Yes.

                    8    Q.  Now, I just want to make sure that we're more precise

                    9    about that.

16:15:51           10          Did you mean that you'd never heard of him like

                   11    during the time frame of your investments or that you'd never

                   12    heard of him, period?

                   13    A.  I don't believe I ever heard his name until the lawsuits

                   14    came up.

16:16:07           15    Q.  So you -- you had heard his name before today?

                   16    A.  Yes.

                   17          MR. SZOTT:  Nothing further, Your Honor.

                   18          MR. FLEENER:  One follow-up, Judge?

                   19          THE COURT:  Yes.

16:16:16           20                      RECROSS-EXAMINATION

                   21    BY MR. FLEENER:

                   22    Q.  And, ma'am, when you say you haven't heard his --

                   23    I apologize.

                   24          When you say that you haven't heard his name before

16:16:27           25    the lawsuit, you hadn't heard Justin Herman's name until this

1    prosecution began; correct?

2    A.   Correct.

3    Q.   Other -- and so for -- for years and years you'd never

4    heard of Justin Herman?

16:16:38    5    A.   Correct.

6              MR. FLEENER:  Thank you, ma'am.

7              THE COURT:  Ms. McCreery --

8              THE WITNESS:  Yes.

9              THE COURT:  -- you may step down.

16:17:02    10             MR. WARD:  Your Honor, at this time we have an

11   agreement -- the defense is actually going to call

12   Kelley McCreery out of order to accommodate the McCreerys in

13   terms of their travel down here for testimony.

14             THE COURT:  Very well.

16:17:29    15             MR. SZOTT:  Your Honor, may we retrieve the exhibits

16   from the witness stand?

17             THE COURT:  Yes, you may.

18             MR. SZOTT:  Thank you.

19             THE COURT:  Please raise your right hand and be

16:18:10    20   sworn.

21        (Witness sworn.)

22             THE COURTROOM DEPUTY:  Please take a seat.

23             THE COURT:  You may remove the mask if you wish.

24             THE WITNESS:  Pardon?

16:19:07    25             THE COURT:  You may remove the mask to speak.

1            THE WITNESS:  Oh, good.

2            THE COURTROOM DEPUTY:  Please state and spell your

3    name for the record.

4            THE WITNESS:  My name is Patrick Kelley McCreery.

16:19:26    5            THE COURTROOM DEPUTY:  Would you please spell your

6    name.

7            THE WITNESS:  You want me to spell it?

8            THE COURTROOM DEPUTY:  Please.

9            THE WITNESS:  P-a-t-r-i-c-k K-e-l-l-e-y

16:19:39   10    M-c capital C-r-e-e-r-y.

11            MR. WARD:  Good afternoon, Mr. McCreery.

12        My name is Zenith Ward.  I represent Charles Winters.

13        **PATRICK KELLEY McCREERY, DEFENDANT WINTERS' WITNESS**

14                       **DIRECT EXAMINATION**

16:19:47   15    **BY MR. WARD:**

16    Q.  You and I have never met before; correct?

17    A.  Correct.

18    Q.  Have you and I ever spoken to each other before?

19    A.  No.

16:20:01   20    Q.  How did you first become involved in investing money in

21    companies related to natural gas extraction?

22    A.  I was approached by a man that lived in Gillette named

23    Richard Shupick, who I had known a little bit, not very well,

24    through the Catholic church, but I ended up quitting that.

16:20:36   25            And I could see him around once in a while.  But he

1   came up to me and asked if we had methane wells on our ranch

2   and if any of them were operated by High Plains Gas.  In

3   the -- and I said, yes, that they were quitting.

4          And he said, "Well, we're in a deal where we're going

16:21:01   5   to be trying to take that over" and, if I was interested,

6   would I be willing to listen to what they were doing.  And

7   that started it.

8   Q.  All right.  When you -- you said that he asked if you had

9   High Plains Gas wells on your property and you said that you

16:21:24   10   did and that they were quitting.

11          What did you mean by that?

12   A.  At this time a lot of the methane companies, at least on

13   our place, that had started all this stuff up -- and we had

14   approximately a hundred wells on our ranch.  And because of

16:21:43   15   rules and regulations and things, they -- they started

16   quitting and -- and selling to -- to lesser companies.  That's

17   how High Plains got it.

18          Western Gas owned the leases at the start of it,

19   which is a very rich gas company, sold it to that, ended up --

16:22:05   20   they sold it to Jim's Water Service -- and I forget what

21   exactly his company name was.  But then they sold it to High

22   Plains Gas.  They ended up taking over it.

23          So I don't know if they sold it or if they just took

24   over.  The gas is winding down.  We didn't make much money off

16:22:25   25   the royalties anyway because we had a lot of Federal-owned

1   leases.  We made money mostly off the land damage.

2        But if we could keep them going, they could pay for

3   the land damage, and at this point they had quit paying

4   everything.

16:22:41  5   Q.  And you -- you said something about rules and regulations

6   that were kind of putting pressure on the operators to stop

7   producing gas; is that right?

8   A.  The EPA did not like the methane gas companies pumping

9   water out on the ground, and they would make them line the

16:23:02  10   pits -- sometimes with plastic, sometimes with limestone --

11   because of the iron oxide that was in the water, which is the

12   thing that turns it -- oh, your clothes orange or something

13   like this.  It doesn't bother the livestock or wildlife.  In

14   my opinion, it was a waste.

16:23:23  15        But they -- if they didn't do it, they fined them or

16   shut them down.

17   Q.  And so you said that Richard Shupick asked you -- he said

18   that they were getting ready to take over High Plains Gas; is

19   that right?

16:23:42  20   A.  Yes.

21   Q.  And when he said "they," did you know who he meant by

22   "they"?

23   A.  I did.  It was Richard Shupick and the guy that he sat

24   with in the coffee shop all the time, who was Red Luken.

16:23:56  25   Q.  And so they asked you if you would hear them out on -- on

1    what they were going to do.  And did you?

2    A.  Yes.

3    Q.  Okay.  Tell us about that.  What -- what did you learn

4    during that meeting?

16:24:11    5    A.  What I learned is that they were trying to get investors

6    to come together to take over this methane company where they

7    could be the operator and -- and do the operating because they

8    knew of someone that had a special tool that could keep the

9    water in the well but let the gas out.

16:24:41    10            At that time it was called a Gazmo tool.

11    Q.  Okay.  And this -- so Red Luken and Richard Shupick, did

12    they have a -- a company name?  I mean, were -- were they a

13    company?  Or were they just Red Luken and Richard Shupick?

14    A.  They had no company name at that time.

16:25:03    15    Q.  And they were trying to take over High Plains Gas; is that

16    right?

17    A.  Yes.  It was going to be called New High Plains Gas.

18    Q.  They were going to call their entity New High Plains Gas?

19    A.  Yes.

16:25:16    20    Q.  Okay.  And you told us a little bit about this tool, the

21    Gazmo.  Did you ever see a Gazmo tool?

22    A.  I saw a video of it.

23    Q.  Tell us about this video.

24    A.  This video was made by the guy that claimed to own it,

16:25:36    25    whose name was Ed Pressley.  And he had been in touch with

1    Red Luken.  They knew each other before this.

2          The tool was made out of PVC pipe, and it had fabric

3    built into it that would hold the water back and let the gas

4    out.  And I thought it was questionable.

16:26:01    5    Q.  Okay.  And -- and you saw a video and you said it -- was

6    the guy in the video Ed Pressley?

7    A.  Yes.

8    Q.  Okay.  Now, what time period was this?  When, about, was

9    this meeting, your first meeting, with Red and Richard

16:26:25    10    Shupick?

11    A.  Oh, this -- I believe -- was in August, it seemed --

12    I don't remember for sure on what month it was.  I'd have to

13    look and see exactly what year it was, 2013 or something like

14    that.

16:26:47    15    Q.  Okay.  And did you see the video of the Gazmo before or

16    after you invested?

17    A.  We had invested some already.

18    Q.  How much had you invested already?

19    A.  I'm guessing because I don't know for sure, but I'm

16:27:12    20    guessing by that time it was around 40,000.

21    Q.  Okay.  Do you remember, the very first time you invested

22    any money into this, how much you invested?

23    A.  Yes.  I think that I did 10,000 and Nadine, my wife, did

24    10,000, which was 20,000 total.

16:27:33    25    Q.  And tell us about that investment.  First, who was the

1  money going to?  Was it going to Red Luken and Richard

2  Shupick?

3  A.  No.

4  Q.  Who was that initial investment going to?

5  A.  It was going to an account they called Bravo 2 account,

6  which Bob Mitchell had access to the money in this account

7  where he could take money out to pay the attorneys and the

8  accountants to clean up these companies where we, the

9  investors and them, could take it over and have a clean --

10  they called it a shell step that people could invest in that

11  wanted to invest in this thing, also.

12  Q.  All right.  And was the shell going to be High Plains Gas?

13  A.  Yes.

14  Q.  Okay.  And after you invest this initial $20,000 between

15  you and your wife -- well, actually, let me back up.

16       How physically did the money get to Bob Mitchell?

17  A.  We wired it to this account in a bank in Denver.

18  Q.  How did you know what account to wire it to?

19  A.  They told us which account it was and -- and how to mark

20  it where it got to the right place.

21  Q.  Who is "they"?

22  A.  Red Luken.

23  Q.  And so you make that initial $20,000 investment.  And do

24  you get anything physical in return?

25       Do you get a receipt, a stock certificate, anything

 1   like that?

 2   A.  No.

 3   Q.  You must have had some trust in Red Luken and Richard

 4   Shupick.

16:29:38   5   A.  I did.

 6   Q.  Was there anything about Red Luken and/or Richard Shupick

 7   that caused you to have trust for them?

 8   A.  It sounded good.  I wanted the -- the thing to work so

 9   bad, looking back, that I would -- I trusted them and -- and I

16:30:03   10   believed that the investment thing would eventually pay back

 11   somehow.

 12       The thing to where I couldn't lose is that I was

 13   promised that I -- when they got this going -- that they would

 14   hire me and what my son owned -- which we own some belly

16:30:28   15   dumps -- actually, just two and a dump truck, and I had a

 16   backhoe -- so we could start working our equipment and earn

 17   money back to where it was kind of a couldn't-lose situation

 18   because if they did anything -- since I invested, I would get

 19   first chance to do this stuff.

16:30:47   20   Q.  And did they also represent to you that they would hire

 21   you as a landman?

 22   A.  It was mentioned one time.  You know, because I knew

 23   landowners and they needed to have a good rapport with

 24   landowners or they would not be allowed on people's land to do

16:31:12   25   this because, by this time, a lot of landowners did not trust

19-CR-26-ABJ          P. McCREERY - DIRECT - WARD          Vol. III-396
21-CR-14-ABJ

 1   anybody in the methane field.

 2   Q.   If you would, explain to the jury a little bit about what

 3   a landman does.

 4   A.   A landman goes to the landowner, representing the company,

 5   and says "We'll make sure that your roads get fixed up and

 6   that we will kill any noxious weeds and that we will take care

 7   of your land for you if you will let us come on for a certain

 8   price."

 9   Q.   And when you say "come on," you mean come onto your

10   property and drill for oil or gas; right?

11   A.   Come on their property and start operating the methane

12   wells that were already there.

13   Q.   Okay.  So you invest 20,000.  When is the next investment?

14   A.   When they told us that High Plains wasn't going to work

15   out because it ended up having things wrong with it and

16   couldn't be cleaned up where we could take it over because

17   then -- for one thing, we're liable for all the debt that

18   High Plains had acquired up until then, which was in the

19   millions.  And we didn't have millions.  So we were going to

20   have to name it something else.

21   Q.   And other than High Plains Gas, did you ever hear of other

22   names of -- of business entities that were -- were trying to

23   do this process of -- of deploying this tool to extract gas?

24   A.   I'm not sure what you're asking.

25   Q.   Did you ever hear of a company called CHAMA?

19-CR-26-ABJ      P. McCREERY - DIRECT - WARD      Vol. III-397
21-CR-14-ABJ

1    A.   I heard of a company called CHAMA.

2    Q.   What was your understanding of what CHAMA was?

3    A.   CHAMA was actually before my time.

4         DEAC is one of the companies that was towards the end

16:33:13   5    of it.  EcoEmissions was one -- I think the next one in line

6    after High Plains Gas.

7    Q.   Did you ever hear about Mitchell Resources?

8    A.   I -- I heard someone call Mitchell Resources "Mitchell

9    Resources" at the -- at the end of all this investment thing,

16:33:34   10   when -- when things were not really looking good.

11   Q.   What about RWM?  Did you ever hear of a company called

12   RWM?

13   A.   Not that I remember.

14   Q.   And did you ever hear about any versions of that Gazmo

16:33:51   15   tool before it was the Gazmo?

16   A.   No.

17   Q.   Did you ever hear about it referred to as the Sierra tool?

18   A.   The name sounds familiar so possibly.

19   Q.   How much total money over the whole -- from the first

16:34:16   20   20,000 through the -- the total end did you invest into this?

21   A.   Me and Nadine, of our --

22   Q.   And your son, if his are included and you know.

23   A.   His -- his was 5,000.  Me and Nadine's was 160,000.

24   Q.   160,000 total?

16:34:37   25   A.   Total.

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

19-CR-26-ABJ       P. McCREERY - DIRECT - WARD       Vol. III-398
21-CR-14-ABJ

1   Q.  Did you ever get a penny back on your investments?

2   A.  No.

3   Q.  When was the first time you got something physical back

4   from your investment?

16:35:03    5            We just heard you never got cash back or you never

6   got money back.  But at some point did you get a share

7   certificate or any kind of a document that -- that represented

8   your investment?

9   A.  Yes, we did.  We got one from EcoEmissions, from -- made

16:35:18   10   out by Bob Mitchell.  We got one for DEAC, saying that we had

11   invested.  And we had, for our investment, 3 million --

12   I'm not -- I don't remember the exact number of shares, but it

13   was in the millions of shares for doing that.

14   Q.  Now, when you invest -- and was that a $20,000 investment

16:35:48   15   that resulted in your receiving the -- the share certificates?

16   A.  No.

17   Q.  What -- what was the investment that was followed by the

18   share certificates?

19   A.  It varied.  It depended on what they needed for attorneys

16:36:05   20   and the accountants at the time.

21   Q.  When you received the EcoEmissions share certificates,

22   were those supposed to be representative of all the money you

23   had invested up to that point?

24   A.  Yes.

16:36:23   25   Q.  So when you initially invest in High Plains Gas -- because

19-CR-26-ABJ          P. McCREERY - DIRECT - WARD        Vol. III-399
21-CR-14-ABJ

 1    that's what the company was when you first invested; right?

 2    A.  Yes.

 3    Q.  And so that investment was included in the shares you

 4    received from EcoEmissions?

 5    A.  Yes, to my understanding.

 6    Q.  Now, after you invested -- and I believe shortly after you

 7    invested, but it sounds like you invested multiple times

 8    but -- you see Red Luken driving a new supercharged Ford

 9    pickup truck; right?

10    A.  It was a Power Stroke Ford pickup.

11    Q.  And was that concerning to you?

12    A.  It made me question, you know, why or how.  And I asked

13    him about it.

14    Q.  Yeah.  So tell us about that.  I mean, what -- why did

15    it -- why did it make you question things?

16          And then what did Red say?

17    A.  Well, the timing made me question that, and he told me

18    that he had worked in the methane fields as a driller -- as a

19    hand and then a driller and then a consultant -- which

20    consultants at that time were getting 800, approximately,

21    dollars a day -- and that he had saved his money and he had

22    enough money to buy whatever he wanted.

23    Q.  Did you -- and did that make sense to you or no?

24    A.  It made sense to me.

25    Q.  Okay.  At some point in time, though, you wanted to know

19-CR-26-ABJ        P. McCREERY - DIRECT - WARD        Vol. III-400
21-CR-14-ABJ

1    whether Red had actually invested money into this project;

2    right?

3    A.  Yes.

4    Q.  And did you ask him about that?

16:38:28    5    A.  Yes, I did.

6    Q.  Okay.  Tell us about that.

7         How did that -- how did that go?

8    A.  I said, "I'd like to see some kind of proof that you

9    actually put money in this stuff you're asking us to put money

16:38:40   10    into."

11    Q.  And what -- what was the response?

12    A.  He -- his response was -- is that no one has invested more

13    than he has, including me.  But he never showed me anything

14    whatsoever to prove that.

16:39:01   15    Q.  Did you ever ask him specifically like, "I want to see a

16    bank statement or a wire transfer"?

17    A.  I did ask that.

18    Q.  And what was his response?

19    A.  That, no, he wasn't going to show anybody anything.

16:39:14   20    Q.  Did Red represent himself and carry himself as a guy who

21    had spent a lot of time working in the field, in the

22    production side of things?

23    A.  Mostly.

24    Q.  Now, is -- to your knowledge, is Red still involved in

16:39:44   25    this business, this natural gas extraction, to this day?

1    A.   To the knowledge I have, yes.

2    Q.   Okay.  And what's the -- what's the basis of that

3    understanding?

4    A.   The basis of that understanding is -- is there's a methane

16:40:04   5    company called Emerald Operating.  It's owned by Mike Perry

6    out of Denver.

7          Nadine has a cousin named John Hines who used to be a

8    representative from Campbell County who leases land, and the

9    land is on the Throne Ranch.  And I would get to go help them

16:40:29   10   with cattle once in a while, and I saw the methane people in

11   there.  And when they told me that they were running some gas

12   wells on the Throne Ranch, I knew right where it was and --

13   and the wells that were -- that they were talking about

14   because they were trying to get the pipeline stuff

16:40:57   15   straightened out so they could ship methane.

16         Because the way it was when I was still talking to

17   Red Luken, they couldn't send gas anywhere because

18   everything -- the -- the pipeline companies, which is --

19   Bear Paw is a name I remember -- and some of these things need

16:41:14   20   to be paid for transporting gas, and nobody had paid them.  So

21   they were actually shutting their compressors down and one

22   thing and another.  But Red was trying to get it where they

23   could sell some gas because it was important for everything to

24   be shipping some gas.

16:41:35   25   Q.   Now, we talked about the Gazmo and that it was -- it was

 1    made out of PVC pipe.

 2         Did you ever -- are you aware of any subsequent forms

 3    of the tool?

 4    A.   Yes.

16:41:47    5    Q.   Okay.  Tell us about that.  What -- what -- what did you

 6    know?

 7    A.   From what I was told is that Red Luken invented another

 8    one that was made out of steel, wasn't PVC pipe.  Basically,

 9    did the same thing but much improved over the Gazmo tool.

16:42:10    10    Q.   Did you ever see that physical tool?

 11    A.   He showed me pictures of it.

 12    Q.   And do you recall what it looked like?  I mean in terms of

 13    color and size.

 14    A.   It -- it looked like a joint of approximately, oh,

16:42:33    15    4 1/2-inch pipe, you know, possibly 5, had perforations in it.

 16    And was roughly 15 feet long to 20 feet, threaded on the end

 17    where you can hook tubing on it where you can get water or gas

 18    out of it.

 19    Q.   Was there ever a point in time where you wanted to call or

16:43:06    20    talk to Mike Perry directly about this whole gas issue?

 21    A.   There was a time when I talked to Red and I said, "I'd

 22    like to talk to Mike Perry himself to see what he says about

 23    the possibility of actually moving some -- some gas."

 24    Q.   And were you ever able to talk to Mike Perry directly?

16:43:33    25    A.   No.

19-CR-26-ABJ        P. McCREERY - DIRECT - WARD        Vol. III-403
21-CR-14-ABJ

1    Q.  Why not?

2    A.  I didn't aggressively try to get his phone number.

3    I tried to get it from Red Luken, and then he told me not to

4    call Mike Perry.

16:43:43    5    Q.  Why wouldn't he want you talking to Mike Perry?

6    A.  That I don't know.

7    Q.  Now, we've talked a little bit about Bob Mitchell.  He was

8    involved in all of this; right?

9    A.  Yes.

16:44:00    10    Q.  And what were your interactions with Bob Mitchell?

11    A.  There are times when they would need money for accountants

12    or attorneys -- it was always pretty much the same thing.  And

13    I know one time he called me up and said just -- you know,

14    "This is going to be a quick-term deal.  If you invest in

16:44:32    15    this, we -- we will be making something off this new shell

16    step within three to six weeks."

17    Q.  You said "new shell step."  Explain to us what that is.

18    A.  Dealing in the -- to my understanding -- the penny stocks,

19    to where, if it goes on this stock market thing, that people

16:44:54    20    from all over the United States or wherever can invest in this

21    company as soon as you get it approved by the investment

22    deals, whoever they are, that it's on the up-and-up and people

23    can invest in it.

24            It has to be approved, and that was Bob Mitchell's

16:45:16    25    job, was to get things approved where we could actually own

---

19-CR-26-ABJ          P. McCREERY - DIRECT - WARD      Vol. III-404
21-CR-14-ABJ

1   shares that we could sell.

2   Q.  The share certificates you got in EcoEmissions, could you

3   sell those?

4   A.  Those -- no.  Those were restricted shares.

16:45:36
5   Q.  What was your understanding or what were you told about

6   the restriction?

7   A.  The restriction was that there was -- to my

8   recollection -- a waiting period for this company to get all

9   approved to where then we were on the up-and-up and actually

16:45:52
10  could start trading on the stock market.

11        Being restricted, you couldn't sell any shares.  They

12  were in lockdown, basically, from the people checking these

13  companies out, these shells out.

14  Q.  Did NuTech ever have an office in Gillette?

16:46:22
15  A.  Yes.

16  Q.  Are you aware of how the rent for that office was paid?

17  A.  Yes.

18  Q.  How was the landlord compensated for the -- the NuTech

19  office space?

16:46:36
20  A.  The landlord was a friend of mine, Rebecca Painter, who

21  was willing to invest a little in this, but the rest of the

22  time she wanted money.

23        And so I know I personally paid two months' rent at

24  one time, and the rest of the time Red Luken paid the rent for

16:47:00
25  the office.

```
            19-CR-26-ABJ      P. McCREERY - DIRECT - WARD      Vol. III-405
            21-CR-14-ABJ
```

1   Q.   Did the landlord ever receive shares --

2   A.   Yes.

3   Q.   -- in exchange for rent?

4   A.   Yes.

16:47:09   5   Q.   For how many months?

6   A.   I believe she give them 10 months.

7   Q.   So for the -- and was that the first 10 months of rent?

8   A.   Yes.

9   Q.   And then after 10 months of just getting shares for -- for

16:47:21   10   rent, she said "I need -- I need money"?

11   A.   Yes.  And I don't know if it was 10 months.  It was a

12   space in time, 6 to -- around 6 to 10, as I recall.

13   Q.   Are Red and -- and Richard Shupick still having coffee in

14   the morning and -- and still pitching this idea out there

16:47:49   15   about the natural gas extraction?

16   A.   They're still having coffee in the mornings that I see.

17   Q.   Do you know if they're still talking about the natural gas

18   extraction?

19   A.   No, I don't.

16:48:04   20   Q.   Do you have a brother that invested, as well?

21   A.   Yes.

22   Q.   Do you know how much he invested?

23   A.   He invested 80,000, if I remember right.

24   Q.   Now, there were some -- what were referred to as "the

16:49:02   25   Black Diamond wells"; right?

1    A.  I heard of them, yes.

2    Q.  Tell us what you heard of them.

3    A.  Black Diamond was a company that was a methane company, so

4    as far as everybody believes, they were drilling and producing

16:49:27    5    methane.  Red Luken was familiar with Black Diamond.  I'm not

6    sure but if he didn't drill some of the wells, was a driller

7    on the rig that drilled some of them wells.

8             As near as -- as I can put two and two together, when

9    he was doing that is when he met Bob Mitchell.  And I don't

16:49:47    10    know how they met.  I don't know what the circumstances were,

11    but it had something to do with Black Diamond.

12    Q.  And are you aware of whether or not the -- the Black

13    Diamond wells are actually real wells?

14    A.  I've -- I heard of one instance where Red was checking up

16:50:14    15    on these wells and went out there -- and there was a wellhead

16    on the ground which looked like a methane well -- and kicked

17    the wellhead and it fell over.  There was no pipe underneath

18    it or anything.  It hadn't been drilled.

19    Q.  How did that make you feel to hear that story?

16:50:32    20    A.  There are deceivers around that do things that are not on

21    the up-and-up.

22    Q.  Do you feel like Red Luken should have been prosecuted for

23    his role in this investment?

24             MR. HEIMANN:  Objection, Your Honor.

16:50:52    25             THE COURT:  Sustained.

19-CR-26-ABJ        P. McCREERY - CROSS - HEIMANN      Vol. III-407
21-CR-14-ABJ

1           MR. WARD:  May I have just a moment.

2           MR. FLEENER:  I have no questions, Judge.

3           MR. WARD:  And I have no further questions, Your

4   Honor.  Thank you.

16:51:35   5           MR. JUBIN:  No questions.

6                       **CROSS-EXAMINATION**

7   **BY MR. HEIMANN:**

8   Q.  Mr. McCreery, have we met before?

9   A.  Yes.

16:51:51   10  Q.  A number of times; right?

11  A.  Yes.

12  Q.  I came up to Gillette a couple times, once for an

13  interview; right?

14  A.  Yes.

16:52:00   15  Q.  And a few months ago to meet with some of the people

16  you're talking about who lost money?

17  A.  Yes.

18  Q.  Sorry, sir?

19  A.  Yes.

16:52:12   20  Q.  Thank you.

21           You testified for the grand jury as part of this

22  investigation in January of 2019?

23  A.  Yes.

24  Q.  Were you treated fairly during your grand jury testimony?

16:52:26   25  A.  Yes.

1                   MR. WARD:  Objection; relevance.

2                   THE COURT:  Overruled.

3                   MR. HEIMANN:  I want to show you a document, sir.

4           Can we bring up 27 -- or I'm sorry -- 22.1.

16:53:25  5           And let's -- this document has been admitted into

6    evidence, so let's go to page 3.

7    BY MR. HEIMANN:

8    Q.  Mr. McCreery, can you see that on the monitor there?

9    A.  Yeah.

16:53:46  10   Q.  Do you recognize that document?

11   A.  Yes, I do.

12   Q.  Is that your signature at the bottom?

13   A.  Yes.

14   Q.  When you signed it, were -- the rest of the handwriting

16:54:07  15   there, was it filled out?

16   A.  At the bottom?

17   Q.  Well, your signature's there where it says "Signed";

18   right?

19   A.  Yes.

16:54:20  20   Q.  The rest of the handwriting -- so, for example, the --

21   I've drawn a box around -- through the upper third here

22   where -- appears to be PK Financial handwriting and then

23   "pkmccreery@gmail.com" written in by hand and an address.

24           Is that your handwriting, too, or just the signature?

16:54:47  25   A.  Just the signature.

19-CR-26-ABJ          P. McCREERY - REDIRECT - WARD        Vol. III-409
21-CR-14-ABJ

1    Q.  Who asked you to sign this document?

2    A.  I don't remember.

3    Q.  Do you remember where you were when you signed it?

4    A.  I think it -- I think I was at home.

16:55:04    5    Q.  In Gillette?

6    A.  Yeah.

7    Q.  Do you know where it was sent after you signed it?

8    A.  Not for sure.

9    Q.  Do you know what this document is meant to communicate?

16:55:20    10    A.  I thought it was the justification of what we were doing

11    so it -- it, you know, made sense of the money being spent.

12    Q.  There's a date at the bottom, September 8th of 2015.

13        Is that -- do you know if that's -- do you remember

14    if that's the date when you signed it?

16:56:10    15    A.  I don't.

16        (Discussion held at counsel table.)

17        MR. HEIMANN:  Sir, it's good to see you again.

18        I have no other questions.

19        MR. WARD:  Just briefly, Your Honor.

16:56:50    20        THE COURT:  Do you want the exhibit to be left up?

21        MR. WARD:  Please.

22                    REDIRECT EXAMINATION

23    BY MR. WARD:

24    Q.  All right.  So PK Financial, what is that?

16:57:41    25    A.  That's the name of the account where the money was

19-CR-26-ABJ          P. McCREERY - REDIRECT - WARD        Vol. III-410
21-CR-14-ABJ

1   supposed to go.

2   Q.   Was it your idea to set up an account for the money to go

3   into, or did that come from someone else?

4   A.   That came from someone else.

16:58:10   5   Q.   Do you know who it came from?

6   A.   Red Luken told me about it, but I don't know where -- if

7   he was told by somebody else or not.

8   Q.   Sure.  But -- and so was PK Financial just like a -- a

9   bank account?  Or was it a company?

16:58:29   10   A.   Just a bank account.

11   Q.   And do you know why you needed something called

12   PK Financial versus just your -- your regular bank account?

13   A.   To my understanding, we were advised to have an account

14   such as this to where when we -- when they sold the shares for

16:58:55   15   us, that they could direct the money into these accounts -- or

16   this account -- depending on whose shares they were selling at

17   the time.  Because they did not want us selling shares.

18   Q.   Why didn't they want you selling your own shares?

19   A.   Our shares were restricted.  And if the day came when they

16:59:19   20   were unrestricted -- everybody that had invested money was all

21   going to sell shares and get their money back -- it would have

22   flooded the thing and killed it, according to my understanding

23   of what they were telling us.

24          So they wanted to regulate it, and I don't know how

16:59:36   25   they were going to do this, whether they went alphabetical

19-CR-26-ABJ                                              Vol. III-411
21-CR-14-ABJ

1    order or by who invested the most or -- that was never really

2    discussed or cleared up.  But I figured we were on the top

3    rung of the ladder because we were at least having an account

4    where the money could go.

17:00:01    5    Q.  And none of this was your idea?  This was what you got

6    from Red Luken?

7    A.  Yes.

8            MR. WARD:  Those are all the questions I have.

9            Thank you, Mr. McCreery.

17:00:13    10           MR. HEIMANN:  I don't have anything else, Your Honor.

11           MR. JUBIN:  No questions.

12           THE COURT:  Mr. McCreery, you're excused.

13           THE WITNESS:  Thank you.

14           THE COURT:  It's five o'clock.

17:00:57    15           Ladies and gentlemen, I'll just briefly -- remember

16   the admonition that I give you when we recess for the evenings

17   about not discussing the case or permit anyone to discuss it

18   with you, not attempting to investigate the case or go to any

19   outside authorities concerning this matter.  By the end of

17:01:20    20   this case, you will have the information you need to decide it

21   in the form of the evidence and the Court's instructions.

22           Drive carefully, eat well, rest, and, for those of

23   you continuing -- those of you continuing to work, go easy.

24           We'll see you at 8:30 tomorrow morning.

17:01:40    25           THE COURTROOM DEPUTY:  All rise.

19-CR-26-ABJ                                              Vol. III-412
21-CR-14-ABJ

1    (Proceedings outside the jury's presence at 5:01 p.m.)

2         THE COURT:  Thank you.  Please be seated.

3         I'll be happy to hear the arguments at this point

4    if -- if the parties are prepared to submit them on -- at this

5    point, as I understand it, the position is that you're

6    renewing your motion to compel the Government to cause the SEC

7    to deliver up its files on other activities that may have been

8    investigated by them relating to CBM in Campbell County.

9         MR. WARD:  I'll come up here so I can . . . may it

10   please the Court.

11        THE COURT:  Yes.

12        MR. WARD:  Your Honor, the testimony today from the

13   Government's witness, as well as the defense witness that we

14   called out of order, establishes clearly that the investments

15   that are the subject of this case are intricately tied to

16   investments in a company called High Plains Gas, and we know

17   that the Government, through the SEC and maybe other similar

18   investigative agencies, have investigative files and documents

19   and likely statements from witnesses, such as the witnesses we

20   heard from today, that directly relate to the same subject

21   matter, this -- this series of investments and series of what

22   the Government alleges to be fraud.

23        And what I've heard from the Government thus far is

24   "We don't have to turn it over because we haven't looked at it

25   as part of the investigation in this case."  But that's not

19-CR-26-ABJ                                                      Vol. III-413
21-CR-14-ABJ

1   the way the law operates.

2          And if we don't get these files, you know, we're --

3   we're going to be in a position of, you know, potentially a

4   *Brady* violation or the -- the work that we do over the --

17:04:43   5   the weeks of this trial being undone because something wasn't

6   produced that should have been.

7          So I think the only safe course of action is to

8   compel the Government to disclose these documents.  I mean,

9   what's the harm?

17:04:58   10          Thank you.

11          THE COURT:  Have you -- how long have you known about

12   this High Plains Gas?

13          MR. WARD:  I mean, the -- there's references to High

14   Plains Gas throughout the discovery that we received.

17:05:16   15          But, you know, in a criminal case, we -- we don't

16   really have a means of requiring production.  I mean, we could

17   subpoena -- we could have subpoenaed these documents,

18   I suppose; however, if there are *Brady* material in them, then

19   the Government's burden is to disclose them whether we ask

17:05:35   20   or not.

21          So, again, I think there's such a close connection

22   and -- you have the Government's witnesses saying "We invested

23   in High Plains Gas" and the Government's saying, "Well, we've

24   never looked at the High Plains Gas investigation to see if

17:05:49   25   there's any *Brady* material in there."

19-CR-26-ABJ                                              Vol. III-414
21-CR-14-ABJ

1    So I think we're setting ourselves up for a big

2    problem if the Court doesn't order the Government to produce

3    to us the High Plains Gas files.  The -- again, there's --

4    there's no harm.

17:06:01    5    And, you know, really, until the witnesses testify --

6    you know, that's what crystallizes just how important this is.

7    I mean, as we were preparing for trial we obviously filed the

8    motion and we had a good sense.  But when the Government's

9    first victim witness comes up and testifies and says

17:06:22    10    "I invested in High Plains Gas," it becomes crystal clear that

11    these documents need to be produced.

12    THE COURT:  Well, I suppose the significance of the

13    fact they invested in High Plains Gas is the fact it -- it

14    took away their resistance to investing more money in other

17:06:43    15    schemes.

16    MR. WARD:  Certainly, potentially one of the reasons.

17    THE COURT:  Yeah.  Anything else you can think of?

18    MR. WARD:  No.  Mr. Fleener may have some follow-up,

19    but that's all I can think of, Your Honor.

17:07:04    20    MR. FLEENER:  Well, I -- you know, part of -- part --

21    part of our defense, Your Honor, is that the individuals who

22    are involved in High Plains Gas -- Bob Mitchell, Red Luken,

23    this Ed Pressley -- committed fraud in High Plains Gas,

24    committed fraud in NuTech and Eco Systems, and that our

17:07:28    25    clients were duped by -- by the folks who were involved in

 1    High Plains Gas.  And our clients weren't -- weren't at all

 2    involved in High Plains Gas.

 3         If the SEC has investigated -- which we believe they

 4    have because FINRA has referred two cases to the SEC -- then

17:07:42   5    that evidence -- that we're allowed to -- to point to the jury

 6    that other people committed the fraud and we are not --

 7    they -- it's exculpatory as to us because "Somebody else is to

 8    blame for your loss."  I mean, that's -- that's *Brady*

 9    material.

17:08:03   10         MR. JUBIN:  I join.

11         MR. HEIMANN:  Your Honor, we've just wasted

12    45 minutes because the case we're trying has nothing to do

13    with Bob Mitchell's scheme that was charged in Counts One

14    through Twelve except in the fact that a victim of it,

17:08:37   15    Nadine McCreery, wired money out of Wyoming to Bob Mitchell to

16    facilitate this conspiracy, the one that's actually on trial.

17    The defendants haven't established that they were duped

18    because they haven't made it relevant yet.

19         The SEC is not part of the prosecution team.  We did

17:08:59   20    not coordinate our investigations.  I don't even know what the

21    SEC did, if anything, regarding High Plains Gas.

22         Whatever we received from FINRA or the SEC we turned

23    over.  The defendants have known about High Plains Gas and

24    said nothing until the day before trial.

17:09:23   25         They are creating this red herring.  They are going

19-CR-26-ABJ                                        Vol. III-416
21-CR-14-ABJ

1   to prosecute Bob Mitchell for Counts One through Twelve if you

2   let them, and that's not a defense.

3        THE COURT:  I notice they've subpoenaed Bob Mitchell.

4        MR. HEIMANN:  Your Honor, and they listed off a

5   whole -- they listed off Richard Shupick and Red Luken.  And

6   then we get, basically, a witness interview in front of a jury

7   where they haven't even bothered to try to meet with the

8   witness and prep him.

9        And so, Your Honor -- I don't know what's going to

10  happen at the close of the Government's case, But if this is

11  the defense case, the Government's going to be objecting

12  because this is a waste of time.

13       And unless and until they can make it relevant, we

14  shouldn't be subjecting a jury to someone else's fraud that

15  has very little to do with the crime we're charge -- we've

16  charged them with.

17       And let's say, for example, that Bob Mitchell stole

18  money from Nadine McCreery and her husband and her sister and

19  her brother -- and their brother.  He's -- he's pled guilty to

20  that.  That's been resolved.  And nothing the defendants have

21  said suggests that any SEC investigation of High Plains Gas is

22  relevant to this crime.

23       And here's how we know:  If they really cared about

24  whether Kelley McCreery had been interviewed by the SEC and

25  there might be statements there, they would ask him.  If they

17:09:44
17:10:09
17:10:29
17:10:52
17:11:17

19-CR-26-ABJ                                            Vol. III-417
21-CR-14-ABJ

1    really cared whether Nadine McCreery had been interviewed by

2    the SEC, they'd ask her.

3            They have had investigators out interviewing

4    witnesses, and they can't tell you, Judge, that any of them

17:11:37   5    have been talked to by the SEC.  This is an attempt to prevent

6    this trial from being completed and the defendants convicted.

7            Your Honor, there's absolutely no reason to grant

8    this motion because all it's going to do is extend this trial

9    another year for no reason.  They have not established

17:12:03   10   relevance, and what we just went through proves it.

11           I can answer any questions you have, Your Honor.

12           THE COURT:  Thank you.  I'll give you your answer

13   tomorrow morning.

14           We'll stand in recess.

17:12:25   15   (Proceedings concluded 5:12 p.m., September 23, 2021.)

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4

5          I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14          Dated this 10th day of January, 2022.

15

16

17

18                      /s/ Melanie Humphrey-Sonntag

19          _____

20                  MELANIE HUMPHREY-SONNTAG
                         RDR, CRR, CRC
21              Federal Official Court Reporter

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF WYOMING

3    _____

4

UNITED STATES OF AMERICA,          DOCKET NO. 19-CR-026-ABJ
5                                   DOCKET NO. 21-CR-014-ABJ
          Plaintiff,
6                                   VOLUME IV of XIV
          vs.                       (Pages 418 through 522)
7
JUSTIN HERMAN, CHARLES W.           Cheyenne, Wyoming
8    WINTERS, JR., a/k/a Chuck       Friday, September 24, 2021
Winters, and IAN HORN,              8:33 a.m.
9
          Defendants.
10

11   _____

12

13              TRANSCRIPT OF TRIAL PROCEEDINGS

14

15         BEFORE THE HONORABLE ALAN B. JOHNSON
              UNITED STATES DISTRICT JUDGE
16        and a jury of twelve and four alternates

17

18

19

20

21

22       *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*
              *Federal Official Court Reporter*
23     *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
          *630.452.6236 * MelanieSonntagCRR@gmail.com*
24
     *Proceedings reported with digital stenography; transcript*
25        *produced with computer-aided transcription.*

```
 1   APPEARANCES:
     For the Plaintiff:        ERIC J. HEIMANN
 2                             THOMAS A. SZOTT
                               ASSISTANT UNITED STATES ATTORNEYS
 3                             DISTRICT OF WYOMING
                               2120 Capitol Avenue, Fourth Floor
 4                             Cheyenne, WY 82001

 5   For the Defendant         THOMAS A. FLEENER
     Herman:                   FLEENER LAW
 6                             506 South Eighth Street
                               Laramie, WY 82073
 7
     For the Defendant         ZENITH S. WARD
 8   Winters:                  BUCHHAMER & WARD
                               1821 Logan Avenue
 9                             Cheyenne, WY 82001

10   For the Defendant         THOMAS B. JUBIN
     Horn:                     JUBIN & ZERGA
11                             2614 Pioneer Avenue
                               Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Vol. IV-420

1                     I N D E X

2       GOVERNMENT WITNESSES:
                                              PAGE
3        SONIA HACKER
         Further Direct Examination by Mr. Heimann    426
4        Further Direct Examination by Mr. Heimann    507

5        MICHAEL S. PERRY
         Direct Examination by Mr. Szott              444
6        Cross-Examination by Mr. Ward                463
         Redirect Examination by Mr. Szott:           500
7        Cross-Examination by Mr. Fleener             503

8                     E X H I B I T S
                                     IDENTIFIED   RECEIVED
9       GOVERNMENT'S EXHIBITS
             3.2   Wire Transfer                441       442
10           12    Email Chain                  507       508
             15.1  Email Chain                  510       511
11           16.1  Email Chain                  512       513
             16.2  Debt Assignment Agreement    514       514
12           16.3  Wire Transfer Request        514       515
             16.4  Notice of Conversion Filings 516       516
13           16.5  Screenshot of Excel Spreadsheet 517    518
             40.4  Press Release                433       433
14           40.7  Press Release                433       434
             40.8  Press Release                434       435
15           40.9  Press Release                435       435
             40.12 Press Release                435       436
16           205   Email Chain                  427       428
             206   Email Chain                  428       429
17           207   Press Release                430       430
             408   Press Release                436       437
18           409   Press Release                437       438
             410   Press Release                438       438
19           411   Press Release                438       439
             422   Press Release                439       440
20           423   Press Release                431       433
             424   Email Chain                  500       --
21           500   Press Release                431       431

22      DEFENDANT WINTERS' EXHIBITS
             CW-N  Audio Recording              499       --
23

24

25

19-CR-26-ABJ                                                    Vol. IV-421
21-CR-14-ABJ

1      (Proceedings commenced 8:33 a.m., September 24, 2021,

2  in the presence of all defendants, outside the jury's

3  presence.)

4          THE COURT:  Please be seated.

08:34:26      5          The Court has had time to think about the issues that

6  we were left with last night concerning the renewed motion to

7  compel discovery of the -- if any -- of the SEC's

8  investigation into High Plains Gas and its principals.

9          The case that is before the Court today arises out of

08:35:00     10  an alleged securities fraud, and the defendants, of course,

11  are Mr. Herman, Mr. Winters, and Mr. Horn, and it is their

12  conduct that is at issue in the proceedings before the Court.

13          The indictment in this mass -- matter -- contains --

14  the second superseding indictment -- contains 19 related

08:35:30     15  charges, 7 of which are against these defendants, and there

16  are 2 additional charges of false declarations made before the

17  grand jury against Mr. Horn under a separate indictment.

18          The request in this matter would seek to provide

19  documents in possession of the Securities and Exchange

08:36:00     20  Commission regarding High Plains Gas, Incorporated, an

21  operation that was commenced by persons who may have some

22  connection with this litigation by way of being potential

23  witnesses or not, and, certainly, a matter that historically

24  is in the background of what we are concerned with here.

08:36:34     25          The defendants argue these documents relating to the

1    SEC investigation will be relevant and exculpatory to the

2    Defendant Herman and/or other defendants.  According to

3    Mr. Herman, insofar as the Government contends that Mr. Herman

4    was the mastermind of the NERG scheme, the NuTech scheme in

08:37:04    5    this case, the fact that at least one of NERG's principals had

6    experience in conducting such schemes long before Mr. Herman's

7    involvement here would be probative and exculpatory and

8    legitimate impeachment material.

9         The Government has objected, arguing that the

08:37:18    10    materials in question will not be *Brady* or *Giglio* materials

11    and claims that the conduct involved is a different type of

12    scheme likely, although the goal is to raise money, and can be

13    spent for the benefit of the schemers.  Additionally, the

14    actions of the people involved in that activity, whatever it

08:37:54    15    might be, are not relevant to the guilt or innocence of the

16    current defendants.

17         And as it argued -- and, finally, the Government

18    argues, again last night, that this is all late in surfacing

19    and is information that was long within the possession of --

08:38:19    20    of defense counsel in this matter and ample opportunity

21    existed for the -- for subpoenas to be issued if that was felt

22    to be necessary.

23         The current defendants are charged with conduct

24    covered in Counts Thirteen through Nineteen.  The defendants

08:38:39    25    are charged with their own conduct and participation in the

1    alleged scheme to defraud investors.

2          Whether they were fooled by an unnamed third person

3    into their actions or not, that third person's involvement in

4    a separate scheme is not at issue in this case, is not

08:39:00    5    exculpatory as to the actions of the current defendants

6    relating to the scheme at issue in the current trial.  Whether

7    or not the scheme or any scheme was already in motion by a

8    third person related to High Plains Gas, the current

9    defendants are charged for their own involvement in the

08:39:23    10    alleged pump and dump scheme relating to NuTech Energy

11    Resources, Incorporated.  Their actions are at issue

12    regardless of when and with which company the scheme began.

13          Because the defendants' motion is presented so close

14    to trial, because the requested information would not yield

08:39:48    15    exculpatory information due to the nature of the specific

16    counts charged against the current defendants, the motion to

17    compel will be denied.

18          I will find that the discussion of the details of

19    the -- High Plains Gas is irrelevant and unnecessary in this

08:40:13    20    case.  We will be scrutinizing in front of the jury the

21    conduct of these defendants, not Enron, not High Plains Gas,

22    not any other schemes.

23          Who are we going to hear today?

24          MR. HEIMANN:  Your Honor, the Government's going to

08:40:56    25    call Sonia Hacker to introduce some exhibits that relate to

 1   our witness to follow, Mike Perry.

 2          And I don't know if that will get us through the noon

 3   hour.  We will put Inspector Hacker back on the stand to put

 4   on additional exhibits to get us to at least noon.  The

08:41:23   5   Government will then ask that the Court recess until Monday.

 6          THE COURT:  Very well.

 7          I would indicate we will be available if you wanted

 8   to go into the afternoon for further testimony of someone else

 9   or if we should get stalled this morning.

08:41:42  10          Very well.

11          Do we have jurors?

12          THE COURTROOM DEPUTY:  Yes.

13          MR. SZOTT:  Your Honor, before we bring in the jury,

14   I did have one just evidentiary issue I wanted to raise with

08:41:53  15   the Court and defense counsel outside the jury's presence.

16          Mr. Perry, I anticipate, will be subject to

17   cross-examination as part of the defendants advancing their

18   theory of the case.  And the Government does not object to

19   that, of course, so long as it's relevant.

08:42:15  20          But I would draw the Court and defense counsel's

21   attention to Rule 611(b) under the Federal Rules of Evidence,

22   which provides cross-examination should not go beyond the

23   subject matter of the direct examination and matters affecting

24   the witness' credibility.  The Court may allow inquiry into

08:42:31  25   additional matters as if on direct examination.

19-CR-26-ABJ                                                      Vol. IV-425
21-CR-14-ABJ

1    And I raised a similar concern yesterday, Your Honor,

2    and I wanted to raise it again for Mr. Perry.  To the extent

3    the questioning goes beyond the scope of direct, it really

4    should be treated as the defendants or defense counsel

08:42:49    5    conducting direct examination.  I think that would be not only

6    consistent with the rule but, really, more consistent with the

7    truth-seeking process and presenting the witness' testimony to

8    the jury.

9    So that's -- that's the Government's request,

08:43:02    10    Your Honor, that we proceed in accordance with Rule 611(b).

11    THE COURT:  I'll rely upon you to make appropriate

12    objections when you see them straying.

13    MR. SZOTT:  Your Honor, thank you.

14    THE COURT:  At the suggestion of Becky and Zigmas, a

08:43:58    15    table was placed for the defendants' paralegal and others to

16    use.  If it's a problem, let us know.  If it's a help, then

17    thank them for observing that the table could be provided.

18    MR. WARD:  We appreciate that, Your Honor.

19    THE COURT:  All right.

08:44:26    20    MR. FLEENER:  Your Honor, I'm sorry.  Can I say

21    something, as well?

22    THE COURT:  Sure.

23    MR. FLEENER:  I think that -- whether we --

24    THE COURT:  I think maybe we better wait until --

08:44:40    25    MR. FLEENER:  To the jury -- until a break?  That's

1   fine, Judge.

2           THE COURT:  -- until we get a break.

3           MR. FLEENER:  Yes, sir.

4           THE COURTROOM DEPUTY:  All rise.

08:44:48   5       (Proceedings within the jury's presence at 8:44 a.m.)

6           THE COURT:  Good morning, ladies and gentlemen.

7           JURY MEMBERS:  Good morning.  Good morning.

8           THE COURT:  Welcome to Friday.  Please be seated.

9           Mr. Heimann, the Government may call its next

08:45:52  10   witness.

11           MR. HEIMANN:  Thank you, Your Honor.

12           The United States calls Inspector Sonia Hacker.

13           **SONIA HACKER, GOVERNMENT'S WITNESS**

14                 **FURTHER DIRECT EXAMINATION**

10:13:53  15   **BY MR. HEIMANN:**

16   Q.  Inspector Hacker, do you understand that you are still

17   under oath?

18   A.  I do.

19           THE WITNESS:  Did you hear that?

08:46:28  20           THE COURT REPORTER:  Yes.

21           THE WITNESS:  Okay.

22   BY MR. HEIMANN:

23   Q.  Inspector Hacker, you were here when Special Agent

24   Berryhill testified regarding the portable case that he

08:46:39  25   created with some of the electronically -- electronically

1  stored information that was seized; right?

2  A.  Yes.

3  Q.  And did you receive that portable case so that you could

4  review its contents?

08:46:53  5  A.  I did.

6         MR. HEIMANN:  Let's look at Exhibit 205.

7  BY MR. HEIMANN:

8  Q.  Do you recognize this exhibit?

9  A.  Yes, I do.

08:47:31  10  Q.  Generally, what is it?

11  A.  This is an email from Justin Herman to Bob Mitchell.

12  Q.  And what is the subject?

13  A.  "Pr - needs editing."

14  Q.  Is there an attachment?

08:47:46  15  A.  Yes, "ECMZ Name Change announcement.doc."

16  Q.  And that attachment, is it included on pages 2 through the

17  end of this exhibit?

18         THE WITNESS:  Would you mind scrolling down?

19  A.  Yes, it is.

08:48:03  20  BY MR. HEIMANN:

21  Q.  Then it appears that there's some metadata at the very

22  bottom; is that right?

23  A.  Yes.

24  Q.  Okay.  Is this an email and attachment that you found in

08:48:16  25  that portable case from the electronic -- from the seized

1    electronic evidence?

2    A.  It is.

3    Q.  All right.  And what set of evidence was it -- was it

4    found in?

08:48:31    5         Was it found on an external hard drive?

6    A.  Yes.

7         MR. HEIMANN:  So, Your Honor, the Government moves to

8    admit 205.

9         MR. FLEENER:  No objections.

08:48:42   10         THE COURT:  It will be received.

11    (Government's Exhibit 205 received into evidence.)

12    BY MR. HEIMANN:

13    Q.  Okay.  So, Inspector Hacker, when was this email sent from

14    Justin Herman to Bob Mitchell?

08:48:56   15    A.  On June 26th, 2015.

16    Q.  And if we scroll to the second page where the attachment

17    is, what's the title of -- what's the title on this page?

18    A.  "NuTech Energy Resources Debuts on OTC Markets."

19    Q.  And then it includes a couple paragraphs regarding the

08:49:20   20    name change and what claims to be a quote from the CEO,

21    Kevin Trizna?

22    A.  Yes.

23         MR. HEIMANN:  Let's go now to Exhibit 206.

24    BY MR. HEIMANN:

08:49:49   25    Q.  Do you recognize this document?

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. IV-429
21-CR-14-ABJ

1  A.  Yes.  This is a response email from Bob Mitchell to

2  Justin Herman.

3  Q.  Does it also include an attachment?

4  A.  It does, "ECMZ Name Change announcement.doc."

08:50:06   5          MR. HEIMANN:  Let's scroll down.

6  BY MR. HEIMANN:

7  Q.  That attachment, then, is included on the second page of

8  the exhibit; right?

9  A.  Yes.

08:50:13  10  Q.  And was this also found on the external hard drive?

11  A.  Yes, it was.

12          MR. HEIMANN:  Your Honor, the Government moves to

13  admit 206.

14          THE COURT:  It will be received and is received.

08:50:29  15      (Government's Exhibit 206 received into evidence.)

16  BY MR. HEIMANN:

17  Q.  So, Inspector Hacker, when was this email sent from

18  Bob Mitchell back to Justin Herman?

19  A.  On the same day, June 26th, 2015, at 2:27 p.m.

08:50:42  20          MR. HEIMANN:  Let's go down to the attachment.

21  BY MR. HEIMANN:

22  Q.  So this particular page has been edited, but it still has

23  the title on it, "NuTech Energy Resources Debuts on

24  OTC Markets"; is that right?

08:51:01  25  A.  Correct.

1    Q.  Yes?

2    A.  Yes.

3          MR. HEIMANN:  Let's now go to Exhibit 207.

4    BY MR. HEIMANN:

08:51:06    5    Q.  While we're pulling that up, did a company called

6    West Corp provide records in response to a grand jury subpoena

7    in this investigation?

8    A.  Yes.

9    Q.  Exhibit 207, is this one of those records?

08:51:27    10   A.  Yes, it is.

11         MR. HEIMANN:  Your Honor, the Government moves to

12   admit 207.

13         MR. FLEENER:  May I have a second, please, Judge.

14         THE COURT:  Yes.

08:51:45    15         MR. FLEENER:  No objections.

16         THE COURT:  207 is received.

17    (Government's Exhibit 207 received into evidence.)

18   BY MR. HEIMANN:

19   Q.  Inspector Hacker, is this a press release that was put out

08:52:00    20   via Marketwired on July 1st of 2015?

21   A.  It is.

22   Q.  And what's its title?

23   A.  "NuTech Energy Resources Debuts Trading on OTC Markets."

24   Q.  The text of this, is it similar to the emails we looked at

08:52:13    25   earlier going between Bob Mitchell and Justin Herman?

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. IV-431
21-CR-14-ABJ

1   A.  It is.

2   Q.  And on the by-line, where does it claim this was released

3   from?

4   A.  Gillette, Wyoming.

08:52:29   5   Q.  All right.  Let's talk a little bit about some other press

6   releases.  You said that West Corp provided grand jury

7   records.

8           MR. HEIMANN:  Let's look at Exhibit 500.

9   BY MR. HEIMANN:

08:53:04   10   Q.  Is this another one of the press releases that the grand

11   jury received from West Corp?

12   A.  Yes.

13   Q.  And what is its title?

14   A.  "NuTech Energy Resources, Inc., Announces Removal of

08:53:16   15   Caveat Emptor Status."

16   Q.  What date is on it?

17   A.  April 25th, 2016.

18           MR. HEIMANN:  Your Honor, the Government moves to

19   admit 500.

08:53:30   20           MR. FLEENER:  No objection.

21           THE COURT:  500 is received.

22       (Government's Exhibit 500 received into evidence.)

23           MR. HEIMANN:  And we'll publish that with another

24   witness.

08:53:42   25           Let's go, then, to Exhibit 423.

1    (Discussion held between counsel.)

2        MR. HEIMANN:  Oh, very good.  Let's -- let's do

3    publish it for a second.

4        Okay.  I just want to clarify one thing.  I'm not

08:54:18    5    sure if I heard you say "April 25th" or 26th of 2016 was the

6    date on this.  Let's make sure we clarify it one way or the

7    other.

8    BY MR. HEIMANN:

9    Q.  What is the date that this was released?

08:54:32    10    A.  According to what's on the press release, April 25th,

11    2016.

12    Q.  Thank you.

13        MR. HEIMANN:  Let's look at 423.

14    BY MR. HEIMANN:

08:54:53    15    Q.  Do you recognize this exhibit?

16    A.  Yes.

17    Q.  Is this another press release the grand jury received from

18    West Corp?

19    A.  Yes.

08:55:01    20    Q.  What's its title?

21    A.  "NuTech Energy Resources, Inc., Acquires 2,000 Additional

22    Wells, Pending Regulatory Approval."

23    Q.  And what is the date on the release?

24    A.  December 3rd, 2015.

08:55:18    25        MR. HEIMANN:  Your Honor, the Government moves to

1    admit 423.

2         THE COURT:  It is received.

3       (Government's Exhibit 423 received into evidence.)

4         MR. HEIMANN:  We'll publish that with another

08:55:29    5    witness.  Thank you.

6         We're going to look at 40.4.

7    BY MR. HEIMANN:

8    Q.  Is this a -- do you recognize this document?

9    A.  I do.

08:55:58    10   Q.  Is this a press release the grand jury received from

11   West Corp?

12   A.  It is.

13   Q.  What's its title?

14   A.  "NuTech Energy Resources Receives Buyout Offer."

08:56:09    15   Q.  What's the date on it?

16   A.  May 10th, 2016.

17        MR. HEIMANN:  Your Honor, the Government moves to

18   admit 40.4.

19        MR. FLEENER:  No objections.

08:56:19    20        THE COURT:  40.4 is received.

21       (Government's Exhibit 40.4 received into evidence.)

22        MR. HEIMANN:  We will publish that with another

23   witness.

24        Let's look at 40.7.

25   ///

1    BY MR. HEIMANN:

2    Q.  Is 40.7 another press release received from West Corp?

3    A.  Yes, it is.

4    Q.  What's its title?

08:56:54    5    A.  "NuTech Energy Resources to Accept Buyout Offer."

6    Q.  What date is on it?

7    A.  May 11th, 2016.

8        MR. HEIMANN:  Your Honor, the Government moves to

9    admit 40.7.

08:57:10    10        THE COURT:  40.7 is received.

11        (Government's Exhibit 40.7 received into evidence.)

12        MR. HEIMANN:  We'll publish that with another

13    witness.

14        Let's look at 40.8.

08:57:19    15    BY MR. HEIMANN:

16    Q.  Is this a press release that was received from West Corp?

17    A.  It is.

18    Q.  What's its title?

19    A.  "NuTech Energy Resources Update on TechnoInvest Buyout

08:57:48    20    Offer."

21    Q.  What's the date?

22    A.  May 11th, 2016.

23    Q.  May 11th or May 12th?

24    A.  May 12th, 2016.

08:57:56    25        MR. HEIMANN:  Okay.  Your Honor, the Government moves

1  to admit 40.8.

2         THE COURT:  40.8 is received.

3      (Government's Exhibit 40.8 received into evidence.)

4         MR. HEIMANN:  We'll publish that through another

08:58:04   5  witness.

6         Let's look at 40.9.

7  BY MR. HEIMANN:

8  Q.  Is this another press release we received from West Corp?

9  A.  It is.

08:58:39  10  Q.  When I say "we," I should refer to the grand jury.  Right?

11  A.  Yes.

12  Q.  What's the title?

13  A.  "NuTech Energy Resources to Host Nationwide Teleconference

14  Monday, May 16th, 2016."

08:58:54  15  Q.  What's the date on it?

16  A.  May 13th, 2016.

17         MR. HEIMANN:  The Government moves to admit 40.9.

18         THE COURT:  40.9 is received.

19      (Government's Exhibit 40.9 received into evidence.)

08:59:08  20         MR. HEIMANN:  And we will publish that with another

21  witness, as well.

22         Pull up 40.12.

23  BY MR. HEIMANN:

24  Q.  Is this a press release the grand jury received from

08:59:32  25  West Corp?

1    A.   It is.

2    Q.   What's its title?

3    A.   "NuTech Energy Provides Clarification to Questions

4    Presented at Teleconference."

08:59:42    5    Q.   What's the date?

6    A.   May 18th, 2016.

7             MR. HEIMANN:   The Government moves to admit 40.12.

8             THE COURT:   40.12 is received.

9        (Government's Exhibit 40.12 received into evidence.)

09:00:02    10            MR. HEIMANN:   And we will publish that with another

11   witness.

12   BY MR. HEIMANN:

13   Q.   In addition to West Corp, did the grand jury receive

14   records from a company called PR Newswire?

09:00:15    15   A.   Yes.

16            MR. HEIMANN:   Let's look at Exhibit 408.

17   BY MR. HEIMANN:

18   Q.   Is 408 one of the press releases -- is -- well, let me ask

19   it this way:  Do you recognize this document?

09:00:43    20   A.   I do.

21   Q.   What is it?

22   A.   It is a press release issued by PR Newswire for NuTech

23   Energy.

24   Q.   What's the title?

09:00:51    25   A.   "NuTech Energy Resources, Inc., Enters Agreement to

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. IV-437
21-CR-14-ABJ

1    Acquire Emerald Operating and Rocky Mountain Exploration

2    Wells."

3            MR. HEIMANN:  The Government moves to admit 408.

4            THE COURT:  408 is received.

09:01:11    5        (Government's Exhibit 408 received into evidence.)

6            MR. HEIMANN:  We'll publish that with another

7    witness.

8            THE COURT:  Do we have a date?

9            MR. HEIMANN:  Excuse me, Your Honor.

09:01:21   10    BY MR. HEIMANN:

11    Q.  Inspector Hacker, what is the date on this release?

12    A.  November 19th, 2015.

13            MR. HEIMANN:  Let's look at 409.

14    BY MR. HEIMANN:

09:01:49   15    Q.  Is this a press release -- I have my notes out of order.

16            409, is this a press release that was received from

17    West Corp?

18    A.  Yes.

19    Q.  What's the title?

09:02:05   20    A.  "NuTech Energy Resources, Inc., Executes Plan to Take

21    Ownership of Additional 7,000 Wells."

22    Q.  What's the date on it?

23    A.  December 7th, 2015.

24            MR. HEIMANN:  The Government moves to admit 409.

09:02:27   25            THE COURT:  Exhibit 409 is received.

19-CR-26-ABJ     HACKER - FURTHER DIRECT - HEIMANN     Vol. IV-438
21-CR-14-ABJ

1          (Government's Exhibit 409 received into evidence.)

2               MR. HEIMANN:  And we'll publish that with a later

3     witness.

4               410, please.

09:02:38    5     BY MR. HEIMANN:

6     Q.   Okay.  We're back to PR Newswire.

7               Do you recognize 410?

8     A.   I do.

9     Q.   All right.

09:02:55   10     A.   It's a press release issued by PR Newswire for NuTech

11     Energy.

12     Q.   What's the title?

13     A.   "NuTech Energy Resources, Inc., Announces Acquisition of

14     Pipeline Assets Exceeding 400 Miles."

09:03:10   15     Q.   And what date is on it?

16     A.   December 10th, 2015.

17               MR. HEIMANN:  The Government moves to admit 410.

18               THE COURT:  410 is received.

19          (Government's Exhibit 410 received into evidence.)

09:03:22   20               MR. HEIMANN:  We will publish that with a later

21     witness.

22               So let's look at 411.

23     BY MR. HEIMANN:

24     Q.   Is 411 also a press release received by the grand jury

09:03:51   25     from PR Newswire?

1    A.   It is.

2    Q.   What's the title?

3    A.   "NuTech Energy Resources, Inc., Reveals Corporate Advisory

4    Board Confirmation on Assessment that Company's Asset Base

09:04:04    5    Substantiates Advancement to the NASDAQ."

6    Q.   That's a mouthful.

7    A.   It is.

8    Q.   What's the date?

9    A.   December 17th, 2015.

09:04:14    10         MR. HEIMANN:  The Government moves to admit 411.

11         THE COURT:  411 is received.

12    (Government's Exhibit 411 received into evidence.)

13         MR. HEIMANN:  We will publish that with a later

14    witness.

09:04:22    15         So let's look at 422, which is the last of our press

16    releases.

17         At least for now.

18    BY MR. HEIMANN:

19    Q.   422, is this a press release that the grand jury received

09:04:46    20    from West Corp?

21    A.   It is.

22    Q.   What's the title?

23    A.   "NuTech Energy Resources, Inc., Fulfills Reporting

24    Requirements and Modernizes Image."

09:04:58    25    Q.   What's the date on it?

1    A.  November 10th, 2015.

2    Q.  November 10?

3    A.  November 10.

4    Q.  Thank you.

09:05:07    5              MR. HEIMANN:  All right.  The Government moves to

6    admit 422.

7              THE COURT:  422 is received.

8              MR. FLEENER:  Actually, Your Honor --

9              THE COURT:  I'm sorry.

09:05:21    10             MR. FLEENER:  Can I have a second, please, Judge?

11             THE COURT:  You can take --

12             MR. FLEENER:  Mr. Heimann, can you show me the second

13   page of that?  Or is it just a one-page exhibit?

14             Okay.  Thank you.

09:05:35    15             No objections.  Thank you.

16             THE COURT:  It is received.

17        (Government's Exhibit 422 received into evidence.)

18   BY MR. HEIMANN:

19   Q.  Okay.  Let's move on to a record that relates to Overt

09:05:45    20   Act No. 3.  Overt Act No. 3 alleges some wire transfers on

21   December 22nd, including a transfer from an individual

22   identified as MP to Bob Mitchell.

23             Inspector Hacker, who is "MP," as identified in the

24   indictment?

09:06:04    25   A.  Mike Perry.

1          MR. HEIMANN:  Let's look at Exhibit 3.2.

2     BY MR. HEIMANN:

3     Q.  You testified earlier that records were subpoenaed from

4     Wells Fargo for an account ending in 5707.

09:06:33   5          Remind us.  Whose account is that?

6     A.  That account belongs to Bravo Two Zero Partners and

7     Bob Mitchell.

8     Q.  Do you recognize Exhibit 3.2?

9     A.  I do.

09:06:45  10     Q.  Is that a record received from Wells Fargo Bank regarding

11     a wire transfer into that account ending in 5707?

12     A.  Yes, it is.

13     Q.  There are some redactions on the exhibit itself.  Was the

14     original record unredacted?

09:07:08  15     A.  It was.

16          MR. HEIMANN:  Your Honor, the Government moves to

17     admit 3.2.

18          MR. FLEENER:  Can we have a second, please, Judge?

19          THE COURT:  Yes, you may.

09:07:36  20          MR. FLEENER:  Your Honor, may I voir dire the witness

21     briefly on foundation?

22          THE COURT:  Yes.

23          MR. HEIMANN:  Tom, it was certified.

24          MR. FLEENER:  Fine.

09:07:54  25          No objections.

1      THE COURT:  Exhibit 3.2 is received.

2      (Government's Exhibit 3.2 received into evidence.)

3      MR. HEIMANN:  Let's publish this one.

4  BY MR. HEIMANN:

09:08:04    5  Q.  Inspector Hacker, what -- what are we looking at here?

6  A.  This is a -- a full transaction report from Wells Fargo.

7  And it shows on December 22nd, 2014, a wire of $100,000 from

8  Emerald Operating in Denver, Colorado, to Bravo 20 Partners in

9  Centennial, Colorado.

09:08:32   10  Q.  So we know where we see this information, at the top in

11  the middle there's a section that I've highlighted that says

12  "For December 22nd, 2014," and then, below that, "SND date:

13  14/12/22."

14      That's how we know the date; right?

09:09:02   15  A.  Yes.

16  Q.  And where do we see the amount?

17  A.  The amount's going to be on the left and the right.

18      The debit from -- is on the left, for Emerald

19  Operating -- actually, if you would -- see the "DBT"?  That's

09:09:21   20  the account that's being debited.

21      And right underneath that it says "Amount" --

22  A-M-T -- "100,000."

23  Q.  And then how do we know where it's going?

24      Is that to the right there?

09:09:35   25  A.  That's to the right, under "Credit."

1  Q.  So -- here?

2  A.  Correct.

3  Q.  And it's indicated there it's going to Bravo Two Zero

4  Partners?

09:09:47   5  A.  Yes.

6  Q.  Good.

7  A.  Yes.

8        MR. HEIMANN:  Okay.  Your Honor, that's all I have

9  for Inspector Hacker right now.  We will be recalling her for

09:10:06   10  other -- for other exhibits and other testimony.

11        THE COURT:  You may step down.

12        THE WITNESS:  Thank you.

13        THE COURT:  Unless there are questions.

14        And I don't -- I don't know -- there's been no

09:10:18   15  objections so far.

16        MR. JUBIN:  I have no questions, Your Honor.

17        MR. FLEENER:  No, sir.

18        MR. WARD:  No questions, Your Honor.  Thank you.

19        THE COURT:  Thank you, Mr. Ward.

09:10:46   20        MR. SZOTT:  Your Honor, at this time the United

21  States calls Mike Perry.

22        THE COURTROOM DEPUTY:  Please raise your right hand.

23      (Witness sworn.)

24        THE COURTROOM DEPUTY:  Please take a seat.

09:12:21   25        Please state and spell your name for the record.

```
19-CR-26-ABJ          PERRY - DIRECT - SZOTT          Vol. IV-444
21-CR-14-ABJ
```

1       THE WITNESS:  Michael S. Perry, M-i-c-h-a-e-l S.

2   P-e-r-r-y.

3       MR. SZOTT:  Mr. Perry, good morning.

4       THE WITNESS:  Good morning.

10:13:53   5   **MICHAEL S. PERRY, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

6   **BY MR. SZOTT:**

7   Q.  Without providing an address, where do you reside?

8   A.  I reside in Denver, Colorado.

9   Q.  What do you do for a living?

09:12:47  10   A.  I have a small operating company that is active in

11   Wyoming.

12   Q.  What's the name of the company?

13   A.  Emerald Operating Company.

14   Q.  Who owns Emerald Operating Company?

09:12:58  15   A.  It's a privately owned S corporation, and it's owned by my

16   wife and myself.

17   Q.  About how long have you and your wife been associated with

18   Emerald Operating Company?

19   A.  Since its inception in like 1993.

09:13:20  20   Q.  What does Emerald Operating Company do?

21   A.  Participate in oil and gas activities in Wyoming.

22   Q.  Are you familiar with an entity called Rocky Mountain

23   Exploration?

24   A.  I am.

09:13:40  25   Q.  What is Rocky Mountain Exploration?

19-CR-26-ABJ           PERRY - DIRECT - SZOTT           Vol. IV-445
21-CR-14-ABJ

1    A.   Rocky Mountain Exploration is another small oil and gas

2    company who was a partner with Emerald Operating for over

3    20 years in most all ventures that each company did.

4    Q.   Was Rocky Mountain Exploration doing similar activities as

09:14:04   5    Emerald Operating?

6    A.   Yes.

7    Q.   Mr. Perry, thinking back to approximately 2014, in that

8    time frame, that general time frame, would you describe for

9    the jury Emerald's and Rocky Mountain's assets in the state of

09:14:27   10   Wyoming.

11   A.   At that point in time, the active assets that we had in

12   Wyoming were 200 and -- I can't remember the exact number;

13   let's just say 235 -- shallow coalbed methane wells.

14   Q.   And just to be clear, is that an approximation when you

09:14:53   15   give the number?

16   A.   Yes.  It's probably 10 to 15 either way.  I can't remember

17   the exact number.

18        But in 2013 and 2014 we began plugging all the

19   inactive wells in Wyoming, so we ended up plugging all but

09:15:10   20   about 75 of the wells.

21   Q.   I'd like to ask you some questions about your involvement

22   with a man named Bob Mitchell and an entity called NuTech

23   Energy Resources.

24        Let me start with Mr. Mitchell.  Are you familiar

09:15:30   25   with Bob Mitchell?

19-CR-26-ABJ          PERRY - DIRECT - SZOTT          Vol. IV-446
21-CR-14-ABJ

1    A.  I am.

2    Q.  How did you become acquainted with Bob Mitchell?

3    A.  I was led to Bob Mitchell by an attorney that we use out

4    of Sheridan who was led to Bob Mitchell by another gentleman

09:15:48    5    out of Sheridan who had had some business with him.

6          And we were looking for some different-than-

7    conventional funding mechanisms to help a project that we had

8    started.

9    Q.  What was the attorney's name?

09:16:04    10    A.  The attorney is called -- is named Tom Throne.

11    Q.  Mr. Perry, at some point did you meet Mr. Mitchell in

12    person?

13    A.  Yes.  I did meet him in person in Denver.

14    Q.  Now, you alluded to a -- I believe -- a nontraditional

09:16:24    15    source of funding.  What was the overall business objective --

16    just generally, what was the overall business objective of

17    your association with Mr. Mitchell?

18    A.  We formed a loose rela- -- business relationship initially

19    with -- with Mr. Mitchell so that we could find a publicly

09:16:47    20    traded entity which was not currently traded and needed to be

21    cleaned up.

22          And we would use that, basically, that penny stock,

23    as a mechanism to raise funds to restart and start reproducing

24    coalbed methane wells in northeast Wyoming.

09:17:04    25    Q.  Mr. Perry, in relation to this overall venture, was there

1  a new or potentially patentable technology that was involved?

2  A.  Yes, there was, and it was not really new.  There was an

3  existing patent which described the process.

4       And that was brought to everyone's attention by

5  Mr. Ed Pressley, who also resides in Sheridan.  And the -- the

6  way it was described by Mr. Pressley to me --

7  Q.  Let me cut you off, Mr. Perry, before we get into a

8  narrative response.

9  A.  Okay.

10 Q.  Generally speaking, this technology that you allude to,

11 without regard to fine distinctions between its various

12 iterations, what was this technology?

13 A.  This -- in -- in sum, this was a technology where we would

14 be able to produce natural gas from these shallow coalbed

15 methane wells without having to produce, lift, and dispose of

16 vast quantities of the potable water that resides in these

17 coal formations.

18 Q.  And was this technology referred to as a downhole tool or

19 words to that effect?

20 A.  Yes.

21 Q.  At some point during your association with this venture,

22 did Emerald Operating begin developing its own downhole tool?

23 A.  Yes, we did.

24 Q.  Was Mr. Chuck Winters at all involved in that process?

25 A.  Yes, he was.

09:17:29  (line 5)
09:17:47  (line 10)
09:18:07  (line 15)
09:18:23  (line 20)
09:18:46  (line 25)

19-CR-26-ABJ          PERRY - DIRECT - SZOTT          Vol. IV-448
21-CR-14-ABJ

1   Q.   How was Mr. Winters involved in that process?

2   A.   Emerald contracted with Mr. Winters through Bob Mitchell

3   to make the first generation of tools, which he did so, and we

4   shipped them up to Gillette.

09:19:05    5   Q.   Did Emerald compensate Mr. Winters for that service?

6   A.   Yes, we did.

7   Q.   Did Emerald deploy the tools that Mr. Winters had provided

8   and that were shipped?

9   A.   Yes, we did.

09:19:21   10   Q.   Did Emerald subsequently make modifications or engage in

11   the creation of modifications to that tool?

12   A.   Yes, we did, very early on.

13   Q.   And you mentioned a first generation.  Did Emerald

14   subsequently develop yet another iteration of the tool?

09:19:42   15   A.   Yes.  We have several other iterations of the tool.

16   Q.   Why did Emerald -- why did Emerald continue developing the

17   tool after Mr. Winters had -- or those versions that

18   Mr. Winters had created were shipped to Wyoming?

19   A.   He could see the potential, and we felt, with some

09:20:15   20   modifications, we could make the tool much more effective.

21   Q.   Mr. Perry, who owned the tools that Mr. Winters -- or that

22   were shipped -- let me strike that and try to ask it better.

23          With respect to the tools that Mr. Winters had

24   created that you paid him for -- that Emerald paid him for --

09:20:36   25   A.   Yes.

19-CR-26-ABJ          PERRY - DIRECT - SZOTT          Vol. IV-449
21-CR-14-ABJ

1    Q.  -- when those were shipped to Wyoming, who owned those

2    tools?

3    A.  Well, we owned them.  We paid for them.

4         We instructed Chuck in a -- I wouldn't say in fine

09:20:47   5    detail but in the gross detail how to make them, and we always

6    assumed they were property of Emerald since Emerald had paid

7    for them.

8    Q.  I'd like to ask you some questions about NuTech Energy

9    Resources.  So let me ask you, first, as -- as part of your

09:21:04   10   association with Mitchell -- with Mr. Mitchell, Bob

11   Mitchell -- do you recall an entity called NuTech Energy

12   Resources?

13   A.  Yes, I do.

14   Q.  What was NuTech's intended role in this venture?

09:21:20   15   A.  The way it was proposed, NuTech's role would be a fund- --

16   a funding mechanism through the public markets to fund the

17   acquisition of dormant coalbed methane wells that we could

18   then equip with one of our tools and bring it back on

19   production.  And the -- NuTech was a vehicle to provide the

09:21:45   20   funding for that.

21   Q.  Did you have discussions with Mr. Mitchell about NuTech?

22   A.  Yes.

23   Q.  What was your understanding of Mr. Mitchell's role with

24   NuTech and this venture?

09:22:00   25   A.  Mr. Mitchell's role was such that he was pretty -- he was

1    in charge of all aspects of the publicly traded entity NuTech.

2    Q.   Mr. Perry, in connection with this venture, does the

3    phrase "cleaning up the shell" mean anything to you?

4    A.   Yes.

09:22:25    5    Q.   What does that mean to you in connection to NuTech?

6    A.   Well, it's a common practice -- with these penny stocks

7    especially -- to have a shell, a company that had not met all

8    its filing requirements with the OTC.

9         And so then it becomes an untradable asset or a shell

09:22:47   10    that, with the correct amount of legal documentation and

11    accounting documentation, you are able to get it back into a,

12    you know, free-trading status.

13    Q.   So that was your understanding during the time frame we're

14    discussing?

09:23:04   15    A.   Yes.

16    Q.   Mr. Perry, did you lend money to Mr. Mitchell in

17    association with this venture?

18    A.   Emerald Operating lent money, yes.

19    Q.   How much did Emerald Operating lend to Mr. Mitchell?

09:23:21   20    A.   A hundred thousand dollars.

21    Q.   What was the purpose of that loan?

22    A.   The purpose of that loan was to locate a -- you know -- a

23    shell that could be cleaned up and brought back into an active

24    trading status.

09:23:38   25    Q.   And was Mr. Mitchell supposed to repay Emerald's loan?

1    A.   Yes, he was.

2    Q.   What security or assurance did Emerald have that

3    Mr. Mitchell would repay that loan?

4    A.   We have a note.

09:24:01    5          MR. SZOTT:  Mr. Davila, would you please bring up

6    Exhibit 3.2, which was previously admitted into evidence.

7    BY MR. SZOTT:

8    Q.   Mr. Perry, you're seeing on your screen -- the screen in

9    front of you -- what has been previously admitted as

09:24:42    10   Government Exhibit 3.2.

11          Are you able to see that?

12   A.   Yes, I am.

13          MR. SZOTT:  Mr. Davila, would you please magnify this

14   section of the exhibit.  It's the upper left -- thank you.

09:24:51    15   BY MR. SZOTT:

16   Q.   So the magnified portion on the screen now has "Report

17   Number" in the upper left, "Amount," a hundred thousand.  The

18   bottom of the magnified portion has a phone number ending in

19   8338.

09:25:09    20          Mr. Perry, are you able to see that magnified

21   portion?

22   A.   Yes, I am.

23   Q.   Four lines from the bottom where it says "Emerald

24   Operating Company," is that your company?

09:25:18    25   A.   That's us, yes.

1  Q.  The bank account information where we can see an account

2  that appears to end in 2624, Citizens Bank, Kilgore, Texas,

3  whose bank account is that?

4  A.  That would be Emerald Operating Company's bank account.

09:25:35  5  Q.  And the hundred thousand dollars is -- what -- what is

6  that?

7  A.  That is the amount that we loaned to Bravo and

8  Bob Mitchell to find a shell and clean up a shell.

9          MR. SZOTT:  Mr. Davila, would you remove the

09:25:52  10  magnification, please.

11  BY MR. SZOTT:

12  Q.  So, in fact, Mr. Perry, this money was sent to Bravo?

13  A.  Yes, it was.

14  Q.  How did you know where to -- where and how to send the

09:26:05  15  money?

16  A.  I think I was provided the wiring instructions by

17  Bob Mitchell.

18  Q.  And how does Bob Mitchell relate to Bravo Two Zero

19  Partners?

09:26:24  20  A.  That was -- that was -- Bob Mitchell had several different

21  entities he used for business purposes, and that was one of

22  them.

23  Q.  And, Mr. Perry, how did you -- or who initiated, I should

24  ask -- who initiated this hundred-thousand-dollar wire

09:26:49  25  transfer?

1    A.  I did.

2    Q.  How did you do that?

3    A.  Citizens Bank is a small bank in East Texas, and I'd been

4    banking there quite a while.  So I just called Margaret, who

09:27:00    5    works there, and told her I would be sending her an email with

6    some wiring instructions and please make sure it happens.

7    Q.  So where are you when you make that phone call?

8    A.  In Denver.

9    Q.  Did you, in fact, send an email?

09:27:13    10    A.  I can't remember.  But I -- that would be normal.

11    Q.  You mentioned the note that Mr. Mitchell gave you as

12    security for the repayment of this loan.

13           What, if anything, about that note made you a little

14    uneasy?

09:27:34    15    A.  Well, we had obviously discussed this note prior to, you

16    know, sending him the money.  And, you know, I -- I assumed

17    the note would be -- the term on the note would be some kind

18    of simple interest and was very comfortable with that.

19           And once I saw the actual note, I can remember

09:27:57    20    sitting in Starbucks going, "Well, you've got $200,000 as the

21    repayment of this note."

22           And he goes, "Yeah.  You're going to double your

23    money by doing this."

24           And I'm -- you know, I just immediately --

09:28:09    25           MR. FLEENER:  Objection; best evidence and hearsay.

19-CR-26-ABJ          PERRY - DIRECT - SZOTT          Vol. IV-454
21-CR-14-ABJ

 1              THE COURT:  Sustained.

 2              MR. SZOTT:  Your Honor, I'd ask that the objected-to

 3   response be stricken and disregarded by the jury.

 4              THE COURT:  So instructed.

09:28:27  5              Ladies and gentlemen, please disregard the response.

 6   BY MR. SZOTT:

 7   Q.  Mr. Perry, did you ever receive a NuTech stock certificate

 8   for shares of NuTech?

 9   A.  No, we did not.

09:28:46  10   Q.  I'd like to ask you now, Mr. Perry, about some press

11   releases.

12              Let me ask you, first, are you aware that press

13   releases -- or were you aware at the time that press releases

14   were being issued in -- in the name of or on behalf of NuTech

09:29:09  15   Energy Resources?

16   A.  Yes.

17   Q.  What, if any, role did you play in creating those press

18   releases?

19   A.  I -- I didn't create the -- any of the press releases.

09:29:22  20   But I was occasionally asked for production figures that

21   they -- I assume -- they would use in the press releases.

22   Q.  And who would ask you for those production figures?

23   A.  Bob Mitchell.

24              MR. SZOTT:  Mr. Davila, would you please bring up

09:29:46  25   Exhibit 408.

Melanie Sonntag, RDR, CRR, CRC              MelanieSonntagCRR@gmail.com

19-CR-26-ABJ          PERRY - DIRECT - SZOTT          Vol. IV-455
21-CR-14-ABJ

1   BY MR. SZOTT:

2   Q.  Mr. Perry, are you able -- and I'll magnify the text in

3   just a moment.

4        Are you able to see Exhibit 408 --

09:30:25   5   A.  Yes.

6   Q.  -- on your screen?

7        MR. SZOTT:  Mr. Davila, would you please magnify the

8   caption and the first paragraph as I've indicated.

9   BY MR. SZOTT:

09:30:41   10   Q.  Mr. Perry, are you able to see that magnified portion?

11   A.  I am.

12   Q.  Would you read the title of the press release.

13   A.  "NuTech Energy Resources, Inc., Enters Agreement to

14   Acquire Emerald Operating and Rocky Mountain Exploration

09:30:57   15   Wells."

16   Q.  Mr. Perry, did Emerald have some sort of agreement or

17   arrangement with NuTech related to the acquisition of wells?

18   A.  Yes.

19   Q.  And would you explain that to the jury.

09:31:12   20   A.  Emerald and NuTech entered into an option agreement so

21   that at the point NuTech was able to provide funding, Emerald

22   at that point and Rocky Mountain at that point would assign

23   their interest in the wells and the leases of these

24   74 producing wells into NuTech.

09:31:32   25   Q.  Until that option is triggered, who owns the wells, the

 1   74 wells and the 42 other wells?

 2   A.   Emerald owned them.

 3          MR. SZOTT:  Mr. Davila, would you remove the

 4   magnification, please.

 5          Mr. Davila, would you now magnify the second

 6   paragraph, please.

 7   BY MR. SZOTT:

 8   Q.   Mr. Perry, would you please read the first two sentences

 9   of that second paragraph.

10   A.   "Emerald Operating currently has 27 of NuTech Energy's

11   state-of-the-art IGOR tools installed on location.  Gas from

12   this location is being produced and sold using the

13   Company's patented, proprietary Natural Gas Production

14   Technology, but no production results are available as of

15   yet."

16   Q.   Mr. Perry, in very general terms, what does the "IGOR

17   tool" refer to?

18   A.   I think it's the first-generation tool.

19   Q.   Mr. Perry, who owned the first-generation tool?

20   A.   Emerald owned those tools.

21          MR. SZOTT:  Mr. Davila, would you please remove the

22   magnification.

23          And now would you please magnify the fourth

24   paragraph as I've indicated.

25   ///

1    BY MR. SZOTT:

2    Q.   Mr. Perry, would you please read the first two sentences

3    of this section of the press release after the colon, "About

4    NuTech Energy Resources, Inc."

09:33:37    5    A.   "NuTech Energy Resources, Inc. (OTC Markets, NERG) is a

6    natural gas and oil exploration and development company that

7    has developed a patented technology for the production of

8    coalbed methane (CBM) without the need to pump water."

9    Q.   And the next sentence, please.

09:33:58    10   A.   "NuTech currently operates wells in the Powder River Basin

11   area of northern Wyoming and has commitments to acquire

12   thousands of additional wells."

13   Q.   Thank you, Mr. Perry.

14        MR. SZOTT:  Mr. Davila, would you remove the

09:34:11    15   magnification, please.

16   BY MR. SZOTT:

17   Q.   If you can see it, Mr. Perry, what is the date on this

18   press release?  It's at the top of the first paragraph.

19   A.   November 19th, 2015.

09:34:22    20   Q.   To your knowledge, was NuTech operating wells in the

21   Powder River Basin area in November of 2015?

22   A.   No.

23   Q.   To your knowledge, Mr. Perry, did NuTech ever operate

24   wells in the state of Wyoming?

09:34:44    25   A.   No.

19-CR-26-ABJ          PERRY - DIRECT - SZOTT          Vol. IV-458
21-CR-14-ABJ

1          MR. SZOTT:  Mr. Davila, can we please bring up

2    Exhibit 423?

3          May I have a moment, Your Honor.

4          THE COURT:  You may.

09:35:13    5      (Discussion held at counsel table.)

6          MR. SZOTT:  And, Mr. Davila, would you please magnify

7    the headline and the first two paragraphs, please.

8    BY MR. SZOTT:

9    Q.  Mr. Perry, you're able to see that magnified portion?

09:35:30   10    A.  Yes.

11    Q.  Would you please read the headline.

12    A.  "NuTech Energy Resources, Inc., Acquires 2,000 Additional

13    Wells, Pending Regulatory Approval."

14    Q.  And then I would ask that you read -- I would just ask,

09:35:51   15    Mr. Perry, that you please read what's magnified here in the

16    press release.

17    A.  Certainly.

18          "Gillette, Wyoming, Marketwired, December 3, 2015.

19    NuTech Energy Resources, Inc., (OTC: NERG), a natural gas and

09:36:03   20    oil exploration and development company, is pleased to

21    announce that the Company has received approval by its board

22    of directors and proceeds to finalize the acquisition of

23    Emerald Operating Company and Rocky Mountain Exploration

24    Wells, an operation comprised of 74 existing wells and their

09:36:21   25    underlying lease agreements.  Moreover, the Company has taken

19-CR-26-ABJ          PERRY - DIRECT - SZOTT          Vol. IV-459
21-CR-14-ABJ

1    ownership of an additional 2,000 wells in that territory and

2    is in the final stages of obtaining regulatory approval."

3    Q.  And then the next paragraph, please.

4    A.  Oh, yeah.

09:36:36    5         "The 2,000 wells being acquired have been shut in for

6    numerous years, and the equipment has been idle.  Once the

7    wells are retrofitted and rehabitulat- -- habitulated" --

8    whatever -- "with any necessary pipeline repair, these

9    properties have the potential of producing a hundred MCF

09:36:54    10   day -- hundred MCF per day, per well.  At a five-year average

11   baseline of just in the range of $4 per MCF, this could

12   translate to right in the arena of $288 million in gross sales

13   with a rewarding potential profit margin in the range of

14   $180 million."

09:37:20    15   Q.  Mr. Perry, as you were reading, I noticed a couple of

16   slight discrepancies with the actual text.

17        You'd agree that what's written here is the text of

18   the press release?

19   A.  Yes.

09:37:34    20   Q.  Do you recall seeing this language at the time?

21   A.  No, I do not.

22   Q.  I want to call your attention to the second

23   paragraph there.

24        Or, actually, let me just . . . yeah, let me call

09:38:04    25   your attention to the second paragraph, where it says "these

19-CR-26-ABJ              PERRY - DIRECT - SZOTT              Vol. IV-460
21-CR-14-ABJ

1   properties have the potential of producing a hundred MCF

2   per day."

3          Do you know what "MCF" is?

4   A.  Yes.  That's a thousand standard cubic feet.

09:38:17   5   Q.  I'd like to move on.

6          MR. SZOTT:  You can take that down, Mr. Davila.

7   Thank you.

8   BY MR. SZOTT:

9   Q.  Mr. Perry, now I'd like to move forward in time and ask

09:38:47  10   you some questions about a purported offer by a Russian

11   company to acquire NuTech.

12          Do you recall that?

13   A.  Yes, I do.

14   Q.  How did you hear about that?

09:38:58  15   A.  I think Bob Mitchell told me this.

16   Q.  What was your assessment when Mr. Mitchell told you that?

17   A.  I was flabbergasted.

18   Q.  Why?

19   A.  Well, it was a substantial offer.  It was a significant

09:39:25  20   amount of money.  And NuTech had no assets.

21   Q.  Had NuTech done anything to trigger that option to acquire

22   Emerald's assets?

23   A.  No.

24   Q.  Did NuTech ever do anything to trigger that option?

09:39:43  25   A.  Never.

```
19-CR-26-ABJ          PERRY - DIRECT - SZOTT          Vol. IV-461
21-CR-14-ABJ
```

1          MR. SZOTT:  Mr. Davila, would you please bring

2    up 40.4.

3          And, Mr. Davila, would you please magnify the

4    headline and the first paragraph.

09:40:15    5    BY MR. SZOTT:

6    Q.  Mr. Perry, would you please read the headline and then

7    read the first paragraph that's magnified there on the screen.

8    A.  Certainly.

9          "NuTech Energy Resources Receives Buyout Offer.

09:40:39   10          "NuTech" --

11   Q.  And then the paragraph, please.

12   A.  Okay.

13          "NuTech Energy Resources, Inc., NERG, a natural gas

14   and oil technology and development company, is pleased to

09:40:49   15   announce that the Company has received an unsolicited tender

16   offer for the purchase of the Company's outstanding shares at

17   2.5 cents per share from Tech- -- Techno- -- TechnolInvest Oil

18   and Gas Limited located in Moscow, Russia.  Techno is seeking

19   to capture and build on NuTech's patented coalbed methane

09:41:15   20   production technology and take advantage of the company's

21   coalbed methane assets currently in place."

22   Q.  Mr. Perry, as of May of 2016, to your knowledge, did

23   NuTech have any patented coalbed methane production

24   technology?

09:41:34   25   A.  No.

19-CR-26-ABJ              PERRY - DIRECT - SZOTT              Vol. IV-462
21-CR-14-ABJ

1   Q.  Did NuTech have any coalbed methane assets currently in

2   place?

3   A.  Not to my knowledge, no.

4        MR. SZOTT:  Thank you, Mr. Davila.  We can take that

09:41:59   5   down.

6   BY MR. SZOTT:

7   Q.  Mr. Perry, I'd like to ask you just a couple of questions

8   about an investor conference call in May of 2016.

9        Did you participate in that call?

09:42:16   10  A.  Yes, I did.

11  Q.  Did you speak as part of that call?

12  A.  I did.

13  Q.  Was that call related to NuTech?

14  A.  Yes, it was.

09:42:27   15  Q.  After that call how did you feel about having participated

16  in the call?

17  A.  I felt like it was probably not in my best interests.

18  Q.  And that was after it had happened?

19  A.  Yes.

09:42:42   20  Q.  Were you concerned about what was said on the call?

21  A.  Yes.

22       MR. SZOTT:  May I have a moment, Your Honor.

23    (Discussion held at counsel table.)

24       MR. SZOTT:  Your Honor, thank you.  No further

09:44:02   25  questions on direct.  I'll pass the witness for cross.

1          MR. WARD:  Good morning, Mr. Perry.

2          THE WITNESS:  Good morning.

3          MR. WARD:  My name is Zenith Ward, and I represent

4    Charles Winters.

09:44:26    5                    **CROSS-EXAMINATION**

6    **BY MR. WARD**:

7    Q.  I'd like to talk a little bit about your -- what you did

8    to prepare for your testimony today.  Okay?

9    A.  Sure.

09:44:55   10    Q.  Did you meet with the attorneys for the Government to

11    prepare for your testimony this morning?

12    A.  Uh-huh.  Yes, I did.

13    Q.  Okay.  How many times did you meet with the attorneys for

14    the Government?

09:45:06   15    A.  We met twice.

16    Q.  Okay.  And when were those meetings?

17    A.  The last one was last night, and the first time I think

18    was like two weeks ago today.

19    Q.  Okay.  Were those in person or over the phone?

09:45:20   20    A.  No, they were in person.

21    Q.  And who all did you meet with?  Who all was present for

22    those meetings?

23    A.  Thomas and Sonia and then there was another inspector --

24    I can't remember his name -- at the one in Denver.

09:45:35   25    Q.  Okay.  And did you do anything else to help prepare

1   yourself for your testimony?

2   A.  I did not.

3   Q.  And in addition to the meetings that you had with the

4   Government last night and then two weeks ago, you also gave a

09:45:57   5   recorded interview to Inspector Hacker and other agents back

6   in 2017; right?

7   A.  Right, at my office.

8   Q.  And do you recall that recorded meeting?

9   A.  Parts of it, certainly, yeah.

09:46:15   10   Q.  Were you truthful during your initial meeting that was

11   recorded with the Government back in 2017?

12   A.  Yes, I was.

13   Q.  I want to talk a little bit about your experience in the

14   oil and gas industry in general.

09:46:38   15        Tell us about that experience, if you would, please.

16   A.  I have -- I went into the oil industry right out of

17   college.  I have a master's degree and a bachelor's in science

18   from the University of Kansas.

19   Q.  When did you graduate college?  I don't mean to interrupt.

09:46:54   20   A.  I got my bachelor's degree in 1978 and got my master's

21   degree in 1980.

22   Q.  So -- gosh.  I don't want to do math on the spot but --

23   40 years?

24   A.  Yeah.  I've got 41 years of experience.

09:47:09   25   Q.  Okay.  And I interrupted you.  Please continue on with

 1  your experience in the oil and gas industry.

 2  A.  First 10, 13 years of my career I worked for other

 3  companies, mostly small, independents, and then, in 19- --

 4  early 1990s -- I think it was '91, actually -- I went out on

 5  my own and started looking and doing oil and gas deals on my

 6  own.

 7       And then in 1993 Emerald was formed.

 8  Q.  Okay.  And -- so you've been in the oil and gas industry

 9  for over 40 years?

10  A.  Yes.

11  Q.  Would you consider yourself pretty experienced in the oil

12  and gas industry?

13  A.  In certain aspects of it.

14  Q.  And for a long time your -- your company, Emerald, you

15  focused on coalbed methane wells; right?

16  A.  We have focused on many different things.  But from, I'd

17  say, 1996 to 2009 we were very focused on coalbed methane.

18  And then we gave it a rest until, basically, 2013 into 2014

19  and then started up being -- again working coalbed methane.

20  Q.  Okay.  So from 19- -- did you say 1998 forward?

21  A.  '96, 1996.

22  Q.  -- 1996 forward until -- what year did you say you took a

23  break?

24  A.  In 2009.

25  Q.  2009.

19-CR-26-ABJ          PERRY - CROSS - WARD          Vol. IV-466
21-CR-14-ABJ

1      And then when did you start back up again in --

2  focusing on that?

3  A.  Late 2013.

4  Q.  Late 2013.  Okay.

09:48:42   5      And when did you become first involved with any kind

6  of technology or tool that was focused on or for the purpose

7  of extracting gas from coalbed methane wells without having to

8  remove the potable water?

9  A.  Probably sometime in 2014.

09:49:08  10  Q.  Okay.  And how did you -- how -- what was your first

11  introduction to this kind of technology or anything having to

12  do with it?

13  A.  Well, it was through Tom Throne, the attorney who I knew

14  in Sheridan, and he had some contact with a gentleman named

09:49:23  15  Ed Pressley, who supposedly had a -- a patent that he had

16  picked up which had a tool that would allow people to produce

17  gas without moving all the water off of these coals.

18  Q.  And Ed Pressley got that tool from Kit Jennings; right?

19      Or the patent -- the patent.  Correct?

09:49:45  20  A.  They were -- I mean, I don't know exactly what -- their

21  relationship, but they knew each other and worked together,

22  yes.

23  Q.  Do you recall telling the investigators during that

24  recorded interview in 2017 that Kit Jennings had obtained

09:49:58  25  this patent from a garage sale?

19-CR-26-ABJ                 PERRY - CROSS - WARD                Vol. IV-467
21-CR-14-ABJ

1          MR. SZOTT:  Objection, Your Honor; hearsay.

2    A.  Actually, I thought --

3          MR. WARD:  Hold on a sec, Mr. Perry.  I'm sorry.

4          Allow the Judge to rule on the objection and then

09:50:12   5    we'll go forward or --

6          THE COURT:  It is hearsay.

7    BY MR. WARD:

8    Q.  What was --

9          THE COURT:  I think you can ask him how --

09:50:23   10         MR. WARD:  Yeah.

11   BY MR. WARD:

12   Q.  What was your understanding of how this patent came into

13   the possession of Ed Pressley?

14   A.  You know, actually, I'd forgotten that it -- I was told it

09:50:32   15   was bought at a yard -- a garage sale.

16         And so -- but that's how I thought he got it.

17   Q.  Okay.  And so you -- and so your first dealings were with

18   Ed Pressley; right?

19   A.  Yes.

09:50:51   20   Q.  All right.  And what year is this where you start dealing

21   with Ed Pressley?

22   A.  It -- probably 2014.

23   Q.  Okay.  And you said you met Ed Pressley through

24   Tom Throne; correct?

09:51:02   25   A.  Yes.

19-CR-26-ABJ                PERRY - CROSS - WARD              Vol. IV-468
21-CR-14-ABJ

1    Q.  All right.  And Emerald Operating Company currently owns

2    leases to wells on Tom Throne's property; is that correct?

3    A.  Yes, we do.

4    Q.  Okay.  What is the -- what is the arrangement for those

09:51:19    5    leases in terms of -- what do you pay or what have you paid

6    Tom Throne for those leases on his property?

7    A.  He gets royalties on the gas production, and he also gets

8    an annual surface use agreement payment.

9    Q.  Okay.  What is the amount of that annual surface use

09:51:38   10    agreement?

11    A.  It's 13,000.

12    Q.  Okay.  So you pay 13,000 a year for the surface use

13    agreement?

14    A.  Yes.

09:51:43   15    Q.  And then how much money has been paid to Tom Throne for

16    royalties for production of gas on those wells since 2013

17    forward?

18    A.  I don't -- I don't have an exact number.

19    Q.  Best estimate or range.

09:52:02   20    A.  10 -- 10- to 12 grand.

21    Q.  10- to $12,000 per year?

22    A.  Yes.

23    Q.  And that's just the royalty that Tom Throne gets; right?

24    A.  Yes.

09:52:12   25    Q.  Okay.  And of the total revenue that comes from those

1    wells, how -- what percentage is the royalty?

2    A.  Well, the -- the revenues that we get from these wells is

3    from a bunch of different leases.  The wells that are on Tom's

4    minerals are only doing, you know, maybe one-quarter of the

09:52:35    5    total gas that we sell every day.  Right?

6            So the Federal government, by and large, gets the --

7    the biggest royalty payments every month.  Okay?  Because they

8    account for probably 60 to 75 percent of our gas sales, is

9    Federal gas every month.

09:52:53    10    Q.  All right.  What I'm trying to understand is -- so there's

11    these -- these wells on Tom Throne's property; right?

12    A.  Right.

13    Q.  And the royalty payment only happens if gas is produced

14    from the well; right?

09:53:04    15    A.  Exactly.

16    Q.  Okay.  And so you said Tom Throne gets -- oh, I'm going to

17    misquote you.

18            Did you say 10- to 12,000 a year?

19    A.  Yeah, in royalty.

09:53:16    20    Q.  In royalty?

21            And so there has to be substantially more than 10- to

22    $12,000 worth of gas coming out of those wells for him to get

23    a 10- to $12,000 royalty; right?

24    A.  Well, yeah.  I mean, the royalties is usually -- we'll

09:53:28    25    just use general terms -- an eighth, like 12.5 percent.

1  Q.  Okay.  So if -- if Tom Throne is getting 10- to 12,000

2  a year, you know, conservatively you might say 80- to $90,000

3  worth of gas is being produced out of those wells in a year?

4  A.  Yes.

09:53:47  5  Q.  Okay.

6        Let's talk about your current oil and gas -- or your

7  current natural gas production work.

8        Are you currently producing gas with technology that

9  is at all similar to what we've been talking about in terms of

09:54:10  10  this downhole tool that produces gas without extracting the

11  water?

12  A.  Yes.

13  Q.  So as we sit here today, you're doing this?

14  A.  Yes.

09:54:20  15  Q.  Are you successful at it?

16  A.  We are -- we are breaking even, yes.  We're not making a

17  lot of money, but, yeah, we are breaking even and keeping our

18  heads above water.

19  Q.  All right.  And Red Luken, is he still working on contract

09:54:35  20  with you?

21  A.  Yes, he is.

22  Q.  Okay.  In 2017, I believe, you had said he was making

23  about --

24        MR. SZOTT:  Objection, Your Honor.  This is hearsay.

09:54:44  25        THE COURT:  Sustained.

1   BY MR. WARD:

2   Q.  How much do you pay Red Luken for the work he does

3   for you?

4   A.  A monthly retainer of $3500.

09:54:53   5   Q.  How does the monthly retainer work?  Does he get the $3500

6   a month, or does he have to do a certain amount of work?

7   A.  No.  He gets $3500 a month.

8   Q.  Okay.  And Ed has a lot of experience in the oil -- or in

9   the natural gas extraction business; right?

09:55:11   10   A.  Did you say "Ed" or "Red"?

11   Q.  I'm sorry.  Red.

12   A.  Yes, Red does.

13   Q.  I think I said "Ed."  I meant "Red."

14   A.  Okay.

09:55:21   15   Q.  All right.  But let's talk a little bit about Ed Pressley.

16        What was the company that Ed Pressley was associated

17   with when you met Ed Pressley?

18   A.  Boy, I cannot remember what he called his entity.

19   Q.  Was -- does "CHAMA" ring a bell?

09:55:37   20   A.  Yeah.

21   Q.  Okay.  And Ed Pressley was introduced to you through

22   Tom Throne; correct?

23   A.  Yes.

24   Q.  All right.  And you met with Ed Pressley, and the reason

09:55:49   25   for the introduction was you had these leases for these wells

 1   on Tom Throne's property and some other places; right?

 2   A.   Yeah -- well, yes.

 3   Q.   All right.  And some of those wells were shut in; right?

 4   A.   Yes.

09:56:06   5   Q.   But some of them were not shut in, and you were looking

 6   for a way to develop the gas that was left in those wells

 7   without the expense of removing the water and having to run

 8   electricity to the wells; right?

 9   A.   Yes.

09:56:19   10   Q.   Okay.  So you're interested in that.  When did your

11   interest in that business, you know, model or idea first --

12   first kind of pique?

13   A.   Well, the wells in question, those wells had significant

14   gas reserves left in them.  And there's -- we'll just say --

09:56:40   15   74 of them, of which some were on Tom Throne's minerals.  Many

16   are not.  And, you know, we always thought there was quite a

17   valuable resource left in the ground on those wells if we

18   could just figure out a way to produce them with less

19   operational expenses.

09:56:55   20   Q.   And so through Tom Throne, you hear about Ed Pressley

21   having, you know, this potential technology that could do what

22   you were looking for; right?

23   A.   Yes.

24   Q.   Okay.  And so you get hooked up with Ed, and you go -- you

09:57:12   25   have a meeting with him at the Village Inn up in Sheridan;

1    right?

2    A.  Yeah -- yes.

3    Q.  And you told -- and am I correct that after your initial

4    meeting with Ed Pressley at the Village Inn in Sheridan, it

09:57:25    5    was one of those meetings that you felt like you wanted to

6    take a shower afterwards?  Right?

7    A.  That's exactly what I said.

8    Q.  And why is that?

9    A.  Ed is a kind of -- a very interesting character.  And he

09:57:37   10    did not strike me as a -- being very truthful.

11    Q.  Okay.  So when you said "take a bath" -- I mean, you felt

12    dirty after meeting with him?

13         You felt like he was pretty questionable; right?

14    A.  I felt like I was being hustled.

09:57:53   15    Q.  Okay.  Now, you felt like -- and what year, if you -- you

16    know, unless you can be specific to maybe the month --

17    I mean -- about when did this meeting take place?

18    A.  Well, it was early on in the project so -- I mean, I can't

19    tell you an exact year even but probably 2014 would make the

09:58:10   20    most sense, probably the first half of the year.

21    Q.  All right.  So -- and at this meeting does he show you

22    his -- his patent for this technology, or does he just talk to

23    you about it?

24    A.  Yeah, we just talked about it.  I was not shown anything.

09:58:29   25    Q.  Okay.  And aside from the fact that you thought -- didn't

19-CR-26-ABJ                PERRY - CROSS - WARD              Vol. IV-474
21-CR-14-ABJ

1   think super highly of Ed, the person, you felt like after that

2   meeting that, from a scientific and a technical standpoint,

3   the tool was valid?

4   A.   Yeah.   The principles -- you know, the physical principles

09:58:43   5   behind the operation of the tool are -- are valid, and that's

6   why I've stuck with it.   I mean, it's -- I mean, it -- it

7   works.

8   Q.   And -- and you're no spring chicken to the gas industry;

9   right?

09:58:57   10         At this point you had been in the oil and gas

11   industry since 19- -- '88 or '98?

12   A.   '80, 1980.

13   Q.   1988.

14         So you had a lot of -- you had a lot of experience;

09:59:09   15   right?

16   A.   Yes, yes.

17   Q.   And you hear about this tool, and you felt like, "Hey,

18   this has some real promise"; right?

19   A.   Yes.

09:59:24   20   Q.   And so, again, despite your feeling about Ed, you wanted

21   to go ahead and buy some tools from him; right?

22   A.   Yes.

23   Q.   And so it took quite a while -- it took like three years

24   before you could finally get some tools from Ed Pressley.

09:59:37   25   But, eventually, you did pay $20,000 for three of

Melanie Sonntag, RDR, CRR, CRC              MelanieSonntagCRR@gmail.com

1   Ed Pressley's tools; right?

2   A.  Yes, we did.

3   Q.  Now, you get these tools from Ed, and, again, you're

4   probably thinking back to that meeting at the Village Inn

09:59:54  5   because these tools you get from Ed were made out of materials

6   from Lowe's; right?

7   A.  In that sense, yes.

8   Q.  They were not well-done tools; correct?

9   A.  Right.

10:00:03  10   Q.  And in the oil and gas industry, if you're going to be

11   extracting coalbed methane, you need heavy-duty, you know,

12   probably military-grade materials that are going to be able to

13   withstand the wear and tear that is going to be put on them

14   from the operation and all the guys in the field working on

10:00:19  15   the tool; right?

16   A.  Yes.

17   Q.  Okay.  So you get these tools from Ed.  And do you deploy

18   them in your wells?

19   A.  Yes, we did.

10:00:29  20   Q.  Okay.  And they didn't really work; right?

21   A.  They did not work at all.

22   Q.  They didn't work at all?

23       But, still, you had a strong feeling like, "Hey, this

24   technology has promise"; right?

10:00:41  25   A.  Yes.

1   Q.  Okay.  And so at some point you hook up with Bob Mitchell;

2   right?

3   A.  Yes.

4   Q.  Okay.  And when you -- when you hook up with Bob Mitchell,

10:00:57   5   he actually gives you a copy of the patent; correct?

6   A.  Yes.

7   Q.  Okay.  And at that point the patent is 18 years old;

8   right?

9   A.  Yep.

10:01:06   10   Q.  And it's in the public realm; right?

11          You've got to answer --

12   A.  Yes.

13   Q.  -- audibly --

14   A.  I'm sorry.  Sorry.

10:01:11   15   Q.  -- just for the record.

16   A.  Yes.

17   Q.  You're all right.

18          And so you get this patent.  And you've got Red Luken

19   working for you at that time; right?

10:01:21   20   A.  Yes.

21   Q.  Okay.  And you and Red both have extensive experience with

22   filters; correct?

23   A.  Yes, we do.

24   Q.  Because that's really kind of what this technology comes

10:01:33   25   down to; right?

19-CR-26-ABJ            PERRY - CROSS - WARD            Vol. IV-477
21-CR-14-ABJ

1          The idea is a tube with a -- a -- a membrane filter

2    that will allow gas to pass through but not water; right?

3    A.  Yes.

4    Q.  All right.  And so you -- you know this idea is out there

10:01:50  5    that has promise, you've had one guy try to actually build the

6    tool -- and that's Ed Pressley but he turned out not to be a

7    good builder; the tool he built didn't work -- but you were

8    still interested in pursuing this idea; right?

9    A.  Yes.

10:02:04  10   Q.  Okay.  And through Bob you get connected with Justin

11   Herman; right?  Because the idea with Bob is that you guys are

12   going to -- that Bob's going to get a shell and that's going

13   to assist in raising money that's going to be necessary to

14   develop and deploy this tool; right?

10:02:24  15   A.  Exactly, yes.

16   Q.  All right.  And as part of that process, Bob is working

17   with Justin Herman; correct?

18   A.  Yes.

19   Q.  And Justin Herman tells you, "Hey, I've got a guy in

10:02:35  20   Florida that is like a builder/inventor type, and he can build

21   anything"; right?

22   A.  Yes.

23   Q.  And who is that guy?

24   A.  That would be Chuck.

10:02:45  25   Q.  Charles Winters; right?

1    A.   Yes.

2    Q.   Goes by "Chuck"?   "Chuck Winters"?

3    A.   Right.

4    Q.   And so Chuck ends up making an aluminum tool; correct?

10:03:03    5    A.   Yes.

6    Q.   And it's -- it's of a much higher quality than the

7    Ed Pressley tool; right?

8    A.   Oh, certainly.   Yes.

9    Q.   I mean, did -- did you get the sense at all that -- that

10:03:16    10    Chuck's tool was not a meaningful attempt to make this

11    technology work?

12    A.   No.   I looked at it -- exactly what we asked for is a

13    first-generation try at making a tool we could use to do this.

14    Q.   And so you paid Chuck -- what was it? -- $23,000 for

10:03:42    15    23 tools?

16    A.   I believe it was like that, yes.

17    Q.   And in the process of working with Chuck Winters on this

18    tool, you're communicating with him; right?

19    A.   Occasionally, yes.

10:03:55    20    Q.   Okay.   You're talking about this.

21            And when you got Chuck's tool, everything about the

22    tool was high quality except one thing about it didn't work

23    right; is that correct?

24    A.   Well -- I mean, the tool itself was a well-thought-out

10:04:12    25    filter; right?   For what we wanted.

                1          But its manufacture -- we -- I had to hire someone in

                2   Gillette to rebuild all the tools.  All right?

                3          So they -- I mean, it was a good idea.  They -- it

                4   was a good start, but we had to redo it.

10:04:30        5          MR. WARD:  And, Judge, I don't know -- in terms of a

                6   morning break -- if you want to still take a break around

                7   10:00 or I can keep going.  Up to you.

                8          THE COURT:  Tell me, when's a good place to break

                9   from your standpoint?

10:04:40       10          MR. WARD:  I think this is a good place.

               11          THE COURT:  All right.  Maybe we can move on.

               12          THE COURTROOM DEPUTY:  All rise.

               13      (Proceedings outside the jury's presence at 10:04 a.m.)

               14          THE COURT:  Please be seated.

10:05:28       15          You can step down, Mr. Perry.

               16          Mr. Fleener, you had something you wanted to

               17   bring up?

               18          MR. FLEENER:  I'm sorry, Judge.  I'd forgotten.

               19          Yeah.  My -- my concern, Judge, is -- is if -- if we

10:05:54       20   are -- let me -- everything that -- that Mr. Ward's done so

               21   far has certainly been within the scope of the direct.  My

               22   concern is I don't want to be in a position where -- I don't

               23   want to try -- I don't want to be in a position to have to

               24   bring witnesses back twice.

10:06:08       25          And so, you know, if the United States is going to

1    insist on a very narrow scope on cross, I would ask that their

2    witnesses not be released from subpoena.  We didn't subpoena

3    them based on the understanding of who the United States was

4    going to bring.  We were trying to save the Court money, save

10:06:24   5    the United States money -- since these are all indigent

6    defendants -- and so we were hoping to get them up here just

7    one time.

8           That's why we didn't subpoena Mr. Perry, for

9    instance.  We were going to but we saw he was on the

10:06:34   10   United States witness list.

11          So either we would like to have some latitude on

12   cross or we'd need to keep -- I guess -- keep them under

13   subpoena and bring them back.

14          And that's what I was wanting to mention, Judge.

10:06:45   15          THE COURT:  I think the answer was given to you by --

16   and the proper answer was given to you in the context of

17   Rule 611 with the suggestion that you came -- when you arrive

18   at that point that you're going to go beyond the -- the topic

19   into whatever you want to talk about, you're going to do it on

10:07:08   20   direct.

21          MR. FLEENER:  Okay.  That's fine.

22          THE COURT:  You can't ask leading questions.

23          MR. FLEENER:  Yes, sir.

24          THE COURT:  Is that what you had in mind, Mr. Szott?

10:07:17   25          MR. SZOTT:  Yes, Your Honor, it is.

1            MR. FLEENER:  Thank you, Judge.

2            MR. WARD:  And just to clarify, so you mean we would

3    do it now with the witness, but we'd have to shift from asking

4    leading questions to open-ended questions?

10:07:28   5            THE COURT:  Yes.

6            MR. WARD:  Okay.

7            THE COURT:  That's correct.

8            MR. FLEENER:  Thank you.

9            THE COURT:  And I would mention we spent a lot of

10:07:33  10   time talking about this tool, and all he knows is there's a

11   tool and that Mr. Winters had a hand in it.

12            We could have done that in about two minutes, and

13   we've spent about a half hour on it.  We don't want to get

14   locked up on stuff.  I think the jury can make the note --

10:07:56  15   although I don't see a lot of note-taking occurring.

16            THE COURTROOM DEPUTY:  All rise.

17       (A recess was taken from 10:08 a.m. to 10:25 a.m.)

18            THE COURTROOM DEPUTY:  Court is now in session.

19       (Proceedings within the jury's presence at 10:26 a.m.)

10:27:40  20            THE COURT:  Thank you, ladies and gentlemen.  Please

21   be seated.

22            We're continuing with Mr. Ward's cross-examination

23   for his client Mr. Winters of Mr. Perry.

24            MR. WARD:  Thank you, Judge.

25   ///

|     |     |
| --- | --- |
|  | BY MR. WARD: |
| 1 | Q.  Now, you and Bob Mitchell had a loan agreement for the |
| 2 | hundred thousand dollars that you gave to Bob for the purpose |
| 3 | of buying a shell company; correct? |
| 4 | A.  Yes. |

BY MR. WARD:

Q.  Now, you and Bob Mitchell had a loan agreement for the
hundred thousand dollars that you gave to Bob for the purpose
of buying a shell company; correct?

10:28:17  A.  Yes.

Q.  All right.  And you've met with the investigators for the
United States a number of times; right?

A.  I think I only met with them once in my office.

Q.  Okay.  And -- well, you met with them in your office, and
10:28:32  then you met with them twice to prepare for your testimony?

A.  Yes.

Q.  And have you ever produced that loan agreement to the
Government?

A.  I gave -- I think it was Eric -- one of the
10:28:44  investigators -- after the first meeting in my office in 2017,
I gave them all my emails and all my correspondence with Bob
Mitchell.

Q.  How about the loan agreement that you testified about
earlier?

10:28:54  A.  Yeah.  I gave them all -- I gave them all the contracts.

Q.  Okay.  And during your first -- during that interview with
the Government in 2017, you guys talked about the loan
agreement then; right?

A.  I believe so.  I don't -- I can't remember specifically,
10:29:12  but I would be surprised if we didn't.

19-CR-26-ABJ          PERRY - CROSS - WARD          Vol. IV-483
21-CR-14-ABJ

    1   Q.  Well, and when you talked to the investigators about it,

    2   you said that you had a loan agreement with Bob?

    3          MR. SZOTT:  Your Honor, objection; hearsay.

    4          THE COURT:  Sustained.

10:29:35  5          MR. WARD:  Your Honor, I don't believe it's hearsay

    6   if I'm asking about a prior inconsistent statement.

    7          THE COURT:  There's no inconsistency at this point.

    8          MR. WARD:  Okay.

    9   BY MR. WARD:

10:29:46  10  Q.  Well, when you talked to the investigators about the

   11  specifics of your loan agreement with Bob, you never said you

   12  were concerned about the fact that there was a hundred

   13  thousand dollars of interest that was going to be paid to you;

   14  correct?

10:29:57  15  A.  I don't remember saying that at all, no.

   16  Q.  What you did tell the investigators was that you and Bob

   17  had a -- a very short loan agreement and that you wanted to

   18  keep it short because it doesn't matter how long the loan

   19  agreement is going to be; if you're going to end up suing each

10:30:13  20  other, you're going to end up suing each other?  Right?

   21  A.  Yes.

   22  Q.  And you said that you had -- at that time you were

   23  involved in some litigation that had involved hundreds of

   24  thousands of pages of discovery about a contract and even all

10:30:23  25  that paper doesn't make that much of a difference; if there's

1    going to be a lawsuit, there's going to be a lawsuit?  Right?

2    A.  Yes.  Correct.

3    Q.  Now, why were you concerned that you were going to get

4    paid a hundred thousand dollars of interest?

10:30:44    5        I mean, that seems like a good thing to you.

6    A.  Well, in this situation it seemed like it was way

7    overbroad, too much.

8    Q.  Again, but in business -- I mean, usually I don't have

9    people saying "I don't want to make more money."

10:31:00    10        Why -- what was concerning?

11    A.  Well, it -- to me, it was -- I've never been involved in a

12    situation doing a business deal where someone immediate --

13    just doubles what they're going to pay for the product.

14    Q.  But you went forward with the whole deal anyways; right?

10:31:18    15    A.  Yes, I did.

16    Q.  Okay.  And so the hundred thousand dollars you gave Bob --

17    or you loaned to Bob -- was for the specific pur- --

18    purchase -- purpose of acquiring a shell; right?

19    A.  Yes.

10:31:34    20    Q.  Have you worked with shells previously in your career?

21    A.  Never.

22    Q.  Okay.  So this was your first foray into shells.  But

23    Bob's job with this was going to be to get the shell and then

24    to clean up the shell and then to get it publicly trading;

10:31:48    25    right?

1    A.   Yes.

2    Q.   Okay.  And Bob was going to do all of that?

3    A.   That was Bob's part of the situation, yes.

4    Q.   Okay.  And after this all happens, you become aware that

10:32:00    5    Bob does that?  He gets a shell, he cleans it up, and it

6    starts trading; right?

7    A.   Yes.

8    Q.   And you knew that it was trading; right?

9    A.   Yes, I did.

10:32:09    10    Q.   Red Luken would tell you, "Hey, it's going crazy today;

11    shares are trading like crazy"; right?

12    A.   Yes.

13    Q.   And your concern, though, was that the stock was being

14    traded, but the money was never making it back to Gillette,

10:32:23    15    meaning back into the company to pursue the project; right?

16    A.   Yes.

17    Q.   And you were supposed to get shares of the company; right?

18    A.   Once the option agreement had vested, yes.

19    Q.   Okay.  And you wanted this whole deal to work; right?

10:32:39    20    A.   I still do.

21    Q.   Okay.  Now, as of 2017 when you were first interviewed by

22    the Government, your wells still had 11 billion cubic feet of

23    gas in them; right?

24    A.   As of the last professional engineering reserve evaluation

10:33:03    25    we had done, yes.

1  Q.  And when was that professional engineering reserve

2  evaluation?

3  A.  Probably -- I'm not going to be exact here but probably

4  2007 to 2008.

10:33:12    5  Q.  And so -- that's a lot of gas; right?

6  A.  Yeah.  Yes.

7  Q.  And a lot of potential money to be made; right?

8  A.  Yes.

9  Q.  And you didn't want to give up on those wells where that

10:33:26   10  11 billion cubic feet of gas was?  You wanted to figure out a

11  way to make money off of it?

12  A.  Yes.

13  Q.  Now, you talked a little bit about ownership of things in

14  your direct examination with the Government, like specifically

10:33:47   15  that, you know, NuTech never owned the tool; right?

16  A.  Right.

17  Q.  Okay.  At some point in time, the tool was owned by High

18  Plains Gas; right?

19  A.  No.  Not -- not our tool, no.

10:34:07   20  Q.  Well, the -- the Ed Pressley tool was owned by High Plains

21  Gas?

22  A.  Yes, it was.  I believe so, yes.

23  Q.  Okay.  And now, when you say "our tool," do you mean the

24  tool that Chuck Winters machined and -- and manufactured?

10:34:25   25  A.  That was one version of it.  And there are several more

1  at -- in primary use right now.

2  Q.  Okay.  Oh, so you said NuTech never owned a tool.  Did

3  NuTech ever own a version of a tool?

4  A.  No.

10:34:36  5  Q.  Okay.  And that's because you felt like you owned it

6  because you paid for it for Chuck to create?

7  A.  Yes.

8  Q.  Okay.  Did you have a written agreement with Chuck about

9  that?

10:34:47  10  A.  No, we did not.

11  Q.  Okay.  So do you agree that that's maybe open to

12  interpretation if Chuck felt like he owned it, you feel like

13  you owned it, kind of a gray area?

14  A.  No.

10:34:56  15  Q.  Okay.  You -- you paid for the material costs and you paid

16  for it, so you felt like you owned it?

17  A.  Yeah.  I paid for its shipping and -- we paid all costs,

18  installation, testing, remaking.

19  Q.  But you never had any agreement with Chuck about who was

10:35:11  20  going to own this thing he was building?

21  A.  No.

22  Q.  Now, Chuck all along was very concerned about being on

23  the patent; correct?

24  A.  Yes.  I believe he wanted to be on the patent.

10:35:24  25  Q.  And you actually did file a provisional patent for Chuck's

19-CR-26-ABJ                PERRY - CROSS - WARD              Vol. IV-488
21-CR-14-ABJ

1   tool; correct?

2   A.  Yes, we did.

3   Q.  And Chuck was on that provisional patent?

4   A.  On the -- on the first version, yes, he was.

10:35:37   5   Q.  But, nonetheless, he was still concerned because when you

6   sent him a copy of that patent, he didn't see his name on

7   there and that was very upsetting to Chuck; right?

8   A.  I don't know what it was to Chuck because I don't think

9   I ever heard from him.

10:35:49   10   Q.  Okay.  Did you tell the investigators in 2017 that Chuck

11   was concerned because he didn't see his name on the

12   first patent?

13   A.  I did not.

14   Q.  Okay.  Now -- so there was a patent out there that had

10:36:05   15   Chuck's name on it?

16   A.  A provisional application with Chuck's name on it, yes.

17   Q.  Okay.  Don't you think that could cause him to reasonably

18   believe maybe he had an ownership interest in this patent if

19   his name's on the provisional patent?

10:36:20   20        MR. SZOTT:  Objection; Your Honor; calls for

21   speculation.

22        THE COURT:  Sustained.

23   BY MR. WARD:

24   Q.  Are you aware that Chuck currently holds a patent to this

10:36:30   25   technology?

19-CR-26-ABJ          PERRY - CROSS - WARD          Vol. IV-489
21-CR-14-ABJ

1    A.  No, I am not aware of that.

2    Q.  Do you currently hold a patent to this technology?

3    A.  Yes, we do.

4    Q.  Now, you -- you lend Bob this hundred thousand dollars to

10:36:46    5    buy a shell; right?

6    A.  Yes.

7    Q.  And you've got an agreement with him that says he's going

8    to pay you back $200,000; right?

9    A.  Yes.

10:36:54    10   Q.  And he never pays you back a dime; right?

11   A.  Yes.

12   Q.  But you never do anything about that?

13   A.  Yes, that's true.  You can't get blood out of a turnip.

14   There was -- Bob had no money.

10:37:08    15   Q.  Sure.  And all oil and gas deals like this have a lot of

16   risk; right?

17   A.  Oh, yes.

18   Q.  But they also have huge upsides; right?

19   A.  Yes.

10:37:19    20   Q.  And that's why you're probably in -- in the business.

21   Right?  It's risky but it's got a huge upside?

22   A.  Yes.

23   Q.  And people in the -- in the business who have experience

24   are going to know this; right?

10:37:31    25   A.  Yes.

1   Q.  All right.

2        So at some point in time you hear about the Russian

3   buyout offer; correct?

4   A.  Yes.

10:37:56  5   Q.  And you first hear about it from Red Luken; right?

6   A.  I believe it was either Red or Bob.  But yes.

7   Q.  And once you're -- once you've heard about it, you

8   actually talk to Bob on the telephone about the Russian buyout

9   offer; correct?

10:38:12  10   A.  Yes.

11   Q.  And after that conversation with Bob, you're left with the

12   impression that Bob has talked directly to the company that

13   would be buying out NuTech; right?

14   A.  Yes.

10:38:25  15   Q.  And the terms of that deal were -- was going to be over a

16   billion dollars; correct?

17   A.  Yeah.  It was substantial, yes.

18   Q.  And what you did after you talk to Bob and he tells you

19   about this deal is you multiply the per-share figure that Bob

10:38:48  20   gave you by the number of outstanding shares, and you come up

21   with this gigantic number of over a billion dollars; right?

22   A.  Yes.

23   Q.  And right away you knew -- "Okay.  This is -- this is not

24   right?  "This is fishy"; right?

10:39:04  25   A.  Yes.

1    Q.   Immediately?

2    A.   Oh, yeah.

3    Q.   And you -- you knew there was no way a company would ever

4    pay the amount of money Bob said they offered for the company

10:39:17   5    NuTech that they were going to supposedly buy?

6    A.   Yes.

7    Q.   Okay.  And this is immediate, right after you get off the

8    phone with Bob and punch the numbers in the calculator; right?

9    A.   I mean -- actually, I think Red did the math and told me

10:39:32   10   what the value was and that's where I got the number.  But,

11   yeah, it was outrageous.

12   Q.   And -- all right.  Let's -- and -- and I think what you

13   told the investigators -- you knew right away this was a pump

14   and dump?

10:39:47   15   A.   What it looked like to me.

16   Q.   That's what it looked like to you as soon as you knew

17   about the offer?

18   A.   Right.

19   Q.   And that's when you first hear about the offer, is -- is

10:39:58   20   through Red and/or Bob; right?

21   A.   Yes, yes.

22   Q.   In light of -- just conversations between the two of you?

23   A.   Yes.

24   Q.   Okay.  Now -- and you're also aware at this time that

10:40:11   25   there's a penny stock company; right?

19-CR-26-ABJ            PERRY - CROSS - WARD            Vol. IV-492
21-CR-14-ABJ

1          Well, I mean, by the time you hear about the Russian

2    deal, Bob's already got the -- the -- has bought the shell,

3    cleaned up the shell, and the shares are trading?

4    A.   Sure.  But the offer was for that entity from the

5    Russians.  Wasn't it?

6    Q.   Well, the -- what I'm saying is -- so you had -- I'm

7    trying to establish what knowledge you had.

8          You were aware of the Russian offer?

9    A.   Yes.

10   Q.   And at that time you knew that the company that the

11   Russian offer was supposedly about was already trading

12   publicly?

13   A.   TechnoInvest?

14   Q.   No, NuTech.

15   A.   Oh, yeah.  Definitely NuTech was trading at that point,

16   yes.

17   Q.   NuTech was trading publicly, so you knew there was public

18   investors out there; right?

19   A.   Yes.  It was being traded.

20   Q.   It was being traded.

21          And so then we get to the -- the investor conference

22   call; right?

23   A.   Yes.

24   Q.   All right.  And you've been in business long enough, you

25   can understand -- what's the purpose of an investor conference

10:40:28

10:40:40

10:40:50

10:40:59

10:41:14

1   call?

2   A.   That's the first and only one I've ever participated in.

3   But my role in the call was -- at least I thought it was --

4   was to inform the people listening in as to what was happening

10:41:31   5   in the field operationally.

6   Q.   And who would be listening in?  The investing public;

7   right?

8   A.   Yeah, exactly.

9   Q.   All right.  So you knew there were going to be potential

10:41:40   10   investors that were listening to this conference call for the

11   purposes of deciding whether they wanted to invest in NuTech;

12   right?

13   A.   Yes, I did.

14   Q.   Okay.  And do you think it's important for the -- the

10:41:50   15   investing public to have accurate information?

16   A.   Yes.

17   Q.   Okay.  And so when this conference call begins,

18   Kevin Trizna speaks on the conference call; right?

19   A.   Right.

10:42:07   20   Q.   All right.  And, now, you also knew at this point in time,

21   though, that Kevin Trizna was just a figurehead CEO; right?

22   A.   Yes.

23   Q.   You were fully aware that Bob was running every aspect of

24   the company?  And that Kevin Trizna had been put in place for

10:42:22   25   the specific purpose of hiding Bob's true role?  Right?

 1   A.   Yes.

 2   Q.   Did that cause you any concern?

 3   A.   Yes.  It all happened about the exact same time.

 4   Q.   Did you realize there was something inherently dishonest

10:42:40    5   about having Kevin Trizna as the figurehead CEO when, really,

 6   Bob was running the show and doing all of the day-to-day

 7   operations?

 8   A.   Yes.

 9   Q.   And so -- now, you knew before you got on the conference

10:42:54   10   call that you were going to be on the conference call; right?

11   A.   Oh, yes.

12   Q.   Okay.  So it was a planned-out thing?  You knew it was

13   coming?

14   A.   (Moved head up and down.)

10:43:02   15   Q.   Right?

16   A.   Yes.  Sorry.

17   Q.   And you -- you get on the call -- and I'm assuming you

18   listened to the whole call.  Right?

19   A.   Yes, I did.

10:43:10   20   Q.   Okay.  And so Kevin Trizna gets on this call, and he

21   starts talking about the Russian deal; right?

22   A.   I believe that's right, yes.

23   Q.   And when he talked about the Russian deal, he said, "Look,

24   we received this unsolicited offer"; correct?

10:43:28   25   A.   Yes.

```
        19-CR-26-ABJ          PERRY - CROSS - WARD         Vol. IV-495
        21-CR-14-ABJ
```

 1   Q.  And he said he knew that the conference -- or the Russian

 2   offer was what was on everybody's mind; right?

 3          Do you remember that?

 4   A.  I do now, yes.

10:43:36    5   Q.  Okay.  He said "I" -- you know, "I know it's on

 6   everybody's mind; it's -- it's the Russian -- it's the Russian

 7   offer and we" -- and he said "I was approached by a Russian

 8   company"; right?

 9          MR. SZOTT:  Your Honor, I might object to foundation

10:43:50   10   just for the witness' personal knowledge of -- of these

11   matters.

12          MR. WARD:  I'm asking if he remembers Kevin Trizna

13   saying that on the conference call that he was on.

14   A.  I --

10:44:01   15          THE COURT:  Proceed.

16   A.  (Continuing.)  I don't remember that.  It could have

17   happened easily.

18   BY MR. WARD:

19   Q.  Okay.  Well, you wouldn't remember if people were saying

10:44:08   20   things that would have been false to you on the conference

21   call?

22          It seems like a big deal to me.

23   A.  Well, at that point in time, the whole situation was still

24   a little gray as to how bogus this offer was.

10:44:22   25          It felt bogus, it looked bogus but -- you know,

1   I don't think we had done any detective work on TechnoInvest

2   to determine if they were real or not.

3   Q.  Well, hold on.  You've got to help me here.  Because just

4   a moment ago I asked you a couple of times and you said right

10:44:41   5   away, as soon as you heard about this Russian deal, you knew

6   it was bogus.

7   A.  Well, yeah.  It had all the earmarks of being bogus.  But

8   that's not like -- I mean, I like to make sure that it's

9   bogus, have some evidence that it's bogus.

10:44:55   10   Q.  Well, and so now you're on this conference call and you

11   hear Kevin Trizna talking about the offer.  And you would

12   agree with me that he said that the offer was bona fide and

13   that they were going to accept the offer; right?

14   A.  That is very much within the tone of the whole discussion,

10:45:11   15   yes.

16   Q.  And he actually -- do you remember this?

17        He had the gall to say, you know, "The offer's for

18   about $2 billion, and, you know, we've thought about it, and

19   we actually think it might undervalue us a little bit; but

10:45:24   20   we're going to go ahead and accept the offer because we care

21   about you, the shareholder"?

22   A.  Yeah.  That -- that's right in line with the way things

23   went.

24   Q.  And Kevin Trizna talked on this conference call before you

10:45:39   25   did; right?

19-CR-26-ABJ          PERRY - CROSS - WARD          Vol. IV-497
21-CR-14-ABJ

 1  A.  I think he was the first speaker, if I'm not mistaken.

 2  Q.  And so you've got Kevin Trizna on this call saying --

 3  I mean -- and so he even takes it one step further.  He says

 4  "2 billion might not even be enough for NuTech."  That had to

 5  strike you as, "Oh, my gosh, this is crazy."

 6  A.  Yes, I'm sure it did.

 7  Q.  And so then the conference call continues on, and -- and

 8  Kevin Trizna says all this stuff about the Russian offer.  And

 9  you knew the investing public is listening to this call?

10  A.  Yeah.  Certainly.

11  Q.  So then you start talking on the conference call; right?

12  A.  Yeah.  I don't know if I followed immediately after Kevin,

13  but I came after him for sure.

14  Q.  Okay.  Why didn't you say something?

15  A.  In retrospect, I probably should have.

16  Q.  But you didn't and, instead, you went on to talk about the

17  promise of this technology; right?

18  A.  Yes.

19  Q.  Now, wouldn't you agree with me that's only bolstering the

20  credibility of what Kevin Trizna had said about the Russian

21  buyout offer?

22         Because now we have Mike Perry, owner of Emerald

23  Operating, who's been in the oil and gas business for

24  40 years -- 38 or something at that point in time -- and

25  you're vouching for the credibility of what Kevin said.

10:45:55 (line 5)
10:46:10 (line 10)
10:46:25 (line 15)
10:46:45 (line 20)
10:47:00 (line 25)

19-CR-26-ABJ          PERRY - CROSS - WARD          Vol. IV-498
21-CR-14-ABJ

 1  A.  The way I remember my participation in that call, I was

 2  giving everyone an update on how the tool was working in the

 3  field.

 4  Q.  And you said nothing but positive things; right?

10:47:14  5  A.  Well, that's all we had -- the tool does work great.  We

 6  were very happy with where we were at that point in time with

 7  our field operations.

 8  Q.  Okay.  And so can't you -- what do you think the

 9  impression left with the investing public would have been

10:47:26  10  after hearing Kevin Trizna pitch this Russian offer that you

11  knew was bogus and then you get on right afterwards and you

12  start saying, you know, "The field operations for this tool

13  are just great"?

14          MR. SZOTT:  Objection, Your Honor; argumentative and

10:47:41  15  calls for speculation.

16          THE COURT:  Sustained.

17  BY MR. WARD:

18  Q.  In addition to Kevin Trizna, yourself, Tom Throne also got

19  on that conference call, didn't he?

10:48:11  20  A.  I -- I can't remember but that would make sense.

21  Q.  You don't -- do you remember Tom Throne getting on the

22  conference call and saying, you know, "I'm a -- I'm an oil and

23  gas lawyer in Wyoming and I've been practicing for 40 years"?

24          Do you remember that?

10:48:25  25  A.  I don't but that -- that would probably be part of it.

```
19-CR-26-ABJ          PERRY - CROSS - WARD          Vol. IV-499
21-CR-14-ABJ
```

1    MR. WARD:  Your Honor, I think at this time what

2  I would like to do is I'd like to move to admit the -- the

3  conference call as evidence and play it for the jury.

4    MR. SZOTT:  May I have a moment, Your Honor.

10:48:52   5    (Discussion held at counsel table.)

6    MR. SZOTT:  No objection, Your Honor.

7    THE COURT:  Proceed.

8    MR. WARD:  Just a brief moment, Your Honor.

9    (Discussion held between counsel and the Courtroom Deputy.)

10:50:52  10    MR. WARD:  And so I'd identify this as CW Exhibit --

11  let's call it N, as in "Nancy."

12    MR. SZOTT:  No objection to its receipt, Your Honor.

13    (Defendant Winters' Exhibit CW-N played.)

14    MR. WARD:  I'm not sure what happened, Your Honor.

11:07:12  15  I'm just going to go back a little bit.  It stopped playing.

16    Do you know, Becky?

17    THE COURTROOM DEPUTY:  I didn't change anything.

18    (Defendant Winters' Exhibit CW-N played.)

19    MR. WARD:  Thank you, Judge.  That's all the

11:28:46  20  questions I have for the witness.

21    MR. FLEENER:  One second.

22    (Discussion held at counsel table.)

23    MR. FLEENER:  No questions.  Thank you, Judge.

24    THE COURT:  Thank you.

11:29:27  25    MR. JUBIN:  No questions.  Thank you.

 1            MR. SZOTT:  Your Honor, I have just some brief

 2   redirect.

 3            Mr. Davila, would you bring up Exhibit 423 again,

 4   please.

 5            And, Mr. Davila, if you would please magnify the

 6   headline and the first two paragraphs.

 7                      **REDIRECT EXAMINATION**

 8   **BY MR. SZOTT:**

 9   Q.  So, Mr. Perry, do you see that this press release was

10   apparently issued on December 3rd, 2015?

11   A.  Yes.

12   Q.  And do you recall -- when I was asking you questions

13   before -- you said you couldn't remember whether you'd seen it

14   at the time?

15   A.  Yes.

16   Q.  Would it refresh your recollection or potentially refresh

17   your recollection to review correspondence from that

18   time frame?

19   A.  I mean, possibly.

20            MR. SZOTT:  Your Honor, may I approach the witness?

21            THE COURT:  You may.

22   BY MR. SZOTT:

23   Q.  Mr. Perry, I've just handed you what's been marked for

24   identification as Government's Exhibit 424.  I'd like you to

25   take just a moment and review that exhibit thoroughly and

11:30:07 (line 5)
11:30:45 (line 10)
11:31:00 (line 15)
11:31:14 (line 20)
11:31:43 (line 25)

1   please place it facedown on the witness stand in front of you.

2          Without explaining what it is, do you recognize

3   what's --

4   A.  Yes.

11:31:58   5   Q.  -- in Exhibit 424?

6   A.  Yes.

7   Q.  Does that refresh your recollection as to whether you had

8   seen this press release at the time?

9   A.  Yeah.  Yes, it does.

11:32:09   10   Q.  Well, let me be precise about this.

11          Does that jog your memory, or are you just basing it

12   on what you saw?

13   A.  No, it -- I mean, in both of them this -- there are many

14   other emails similar to this one.

11:32:22   15   Q.  All right.  Well, let me -- without, again, talking about

16   what's in the exhibit, has your recollection been refreshed in

17   terms of whether you saw this press release at the time?

18   A.  Yes.

19   Q.  I'd call your attention to the 100 MCF per day, which is

11:32:40   20   three lines from the bottom.  Do you see that?

21   A.  I do.

22   Q.  And, Mr. Perry, we were just listening to the investor

23   conference call from May of 2016, and I believe you used

24   the -- or said the phrase "10 MCFD."

11:32:59   25          Did I hear that correctly?

1    A.  Yes, you did.

2    Q.  Is that -- is that referring to the same thing?  That's

3    10 MCF per day?

4    A.  Per well, yes.  As opposed to a hundred, yes.

11:33:11   5    Q.  So on the call you said "10 MCF per day"?

6    A.  Yes.

7    Q.  Did you believe that was accurate?

8    A.  I did.  And still do.

9    Q.  How do you feel and how did you feel about 100 MCF per

11:33:26  10    day?

11    A.  It made me mad.

12    Q.  Do you think 100 MCF per day is -- and I would note that

13    that's now been highlighted.

14         100 MCF per day, would you say that's feasible?

11:33:46  15    A.  I'd say no.

16    Q.  It's 10 times more than what you gave on the call;

17    correct?

18    A.  Yes.

19    Q.  Mr. Perry, you'd testified about providing figures to

11:33:59  20    Mr. Mitchell in connection with these press releases.

21         Do you recall that?

22    A.  Yes, I do.

23    Q.  Do you recall whether your figures were always accurately

24    translated into these press releases?

11:34:13  25    A.  I had no way to make sure that happened.

```
19-CR-26-ABJ          PERRY - CROSS - FLEENER          Vol. IV-503
21-CR-14-ABJ
```

1    Q.  So fair to say that sometimes they would come out with

2    different figures than you provided?

3    A.  Yes.

4    Q.  And I don't -- I don't want to put words in your mouth.

11:34:31    5         Is that what you recall?

6    A.  Yes.

7         MR. SZOTT:  May I have a moment, Your Honor.

8         THE COURT:  You may.

9    (Discussion held at counsel table.)

11:34:40   10    BY MR. SZOTT:

11    Q.  Mr. Perry, how much money did you make selling NuTech

12    shares?

13    A.  Zero.

14         MR. SZOTT:  No further questions, Your Honor.

11:35:02   15         MR. FLEENER:  I have some cross-examination based on

16    the Government's questions.

17         THE COURT:  You may.

18                      **CROSS-EXAMINATION**

19    BY MR. FLEENER:

11:35:20   20    Q.  Mr. Perry, you -- when you were showed that -- when you

21    were shown that press release where it said a hundred MCFD,

22    your testimony is that -- that at the -- at the time you saw

23    it, it made you mad because it's just not true?

24    A.  Yes.

11:35:35   25    Q.  And that press release was in -- I think I had down as --

1    December of 2015?

2    A.   Yes.

3    Q.   And in -- the conference call was in May of 2016?

4    A.   Yes.

11:35:48  5    Q.   You never corrected the 100 MCFD?  If you knew it was bad,

6    then you could have corrected it in the conference call.

7    A.   I guess.  But I -- I don't work for NuTech.

8    Q.   You were on the conference call though; right?

9    A.   Well, I was on the conference call because NuTech had an

11:36:07  10    option agreement to acquire Emerald's assets.

11    Q.   I understand.  And you were -- you had -- at the time you

12    were on the conference call, you were flabbergasted by the

13    Russian offer; correct?

14    A.   Yes.

11:36:19  15    Q.   You didn't believe it to be true?

16    A.   It -- it was fishy --

17    Q.   Okay.

18    A.   -- for sure.

19    Q.   You had -- were aware of a press release in December 2015,

11:36:30  20    six months earlier, and had expressed your concern with some

21    of the content in that press release?

22    A.   Yes, I did.

23    Q.   Yet you still participated in the conference call and

24    vouched for the operational aspect of NuTech Energy right

11:36:44  25    after Kevin Trizna spoke about the Russian deal, didn't you?

19-CR-26-ABJ          PERRY - CROSS - FLEENER          Vol. IV-505
21-CR-14-ABJ

 1   A.   I felt like I was vouching about the operational integrity

 2   of Emerald.

 3   Q.   You say you didn't have any -- actually, strike that.

 4          MR. FLEENER:   May I speak with opposing counsel for a

 5   moment.

 6      (Discussion held at counsel table.)

 7   BY MR. FLEENER:

 8   Q.   And your testimony just a second ago is that you -- did

 9   you ever have shares of NuTech?

10   A.   Never.

11   Q.   But you were supposed to have like a billion shares?

12   That's what you had told the investigators when you were

13   interviewed initially?

14   A.   It was a large number of shares, yes.

15   Q.   And you were supposed to have those shares; correct?  You

16   were -- you were promised shares in NuTech?

17   A.   Well, if they performed their part of the option

18   agreement, I would get shares, yes.

19   Q.   Okay.  But they didn't perform -- so at the time --

20   certainly, during the conference call, you believed that the

21   share -- you believed that you were going to, hopefully,

22   receive shares of NuTech?  Safe to say?

23   A.   At some time in the future, yes.

24          MR. FLEENER:   Thank you.

25          THE WITNESS:   Okay.

11:37:04 (line 5)
11:38:17 (line 10)
11:38:25 (line 15)
11:38:39 (line 20)
11:38:50 (line 25)

19-CR-26-ABJ                                              Vol. IV-506
21-CR-14-ABJ

1    MR. SZOTT:  Your Honor, nothing further from the

2  Government.  I ask that Mr. Perry be released from his

3  subpoena.

4    THE COURT:  Mr. Perry, you are released from your

11:39:04  5  subpoena and you may step down.

6    THE WITNESS:  Thank you.

7    THE COURT:  Take off the mic.

8    THE WITNESS:  Good call.

9    MR. HEIMANN:  Your Honor, the Government's prepared

11:39:29  10  to call its next witness.  We are 20 minutes from the noon

11  hour, so I don't know if you want us to call and begin a new

12  witness this close to lunchtime.

13    And as I told Your Honor this morning, the Government

14  will request that we recess at the lunch hour and return on

11:39:49  15  Monday.

16    THE COURT:  If we worked a little into -- how long do

17  you think this witness will take?

18    MR. HEIMANN:  Your Honor, it's Inspector Hacker.

19  We're going to -- we can work on exhibits as long as you

11:40:09  20  desire.

21    THE COURT:  Let's hear her until noon.  We've got to

22  use our time.

23    MR. HEIMANN:  Your Honor, the United States calls

24  Inspector Sonia Hacker.

25  ///

1    SONIA HACKER, GOVERNMENT'S WITNESS

2    FURTHER DIRECT EXAMINATION

3    BY MR. HEIMANN:

4    Q.  Inspector Hacker, you realize and understand that you're

5    still under oath?

6    A.  I do.

7    Q.  We're going to look at Exhibit 12.

8         Inspector Hacker, do you recognize Exhibit 12?

9    A.  I do.

10   Q.  Is that an email that was provided to the grand jury by a

11   company called Pacific Stock Transfer Company?

12   A.  It is.

13   Q.  What's the subject of the email?

14   A.  "NERG."

15   Q.  Who is it from?

16   A.  Justin Herman.

17   Q.  Who is it to?

18   A.  Joslyn Claiborne.

19   Q.  Who is Joslyn Claiborne?

20   A.  She's an employee at Pacific Stock Transfer.

21   Q.  Are there attachments to this email?

22   A.  Yes.  There are two and a dot-text file.

23        MR. HEIMANN:  The notice -- well, let's go through

24   the pages, please.

25        And the next page and scroll to the end.

11:41:23 (line 5)
11:42:12 (line 10)
11:42:25 (line 15)
11:42:35 (line 20)
11:42:59 (line 25)

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. IV-508
21-CR-14-ABJ

1   BY MR. HEIMANN:

2   Q.  Were you able to see all those pages?

3   A.  Yes.

4   Q.  Is this the email and then two of the attachments?

11:43:12   5   A.  It is.

6         MR. HEIMANN:  Let's go back to the first page.

7   BY MR. HEIMANN:

8   Q.  What are the names of the two attachments that are

9   included in this exhibit?

11:43:23   10   A.  "Notice of Conversion Filings.pdf," "Debt assignment.pdf."

11         MR. HEIMANN:  Your Honor, the Government moves to

12   admit 12.

13         MR. FLEENER:  May we have a moment, please, Judge.

14         THE COURT:  Yes, you may.

11:43:42   15   (Discussion held at counsel table.)

16         MR. FLEENER:  No objections.

17         THE COURT:  Exhibit 12 is received.

18   (Government's Exhibit 12 received into evidence.)

19   BY MR. HEIMANN:

11:44:25   20   Q.  What's the date that this email was sent?

21   A.  July 27th, 2015.

22   Q.  Is this the email and attachments that's related to the

23   allegations in Overt Act 12 of the fraud indictment?

24   A.  It is.

11:44:42   25         MR. HEIMANN:  Let's go to page 3.

19-CR-26-ABJ     HACKER - FURTHER DIRECT - HEIMANN     Vol. IV-509
21-CR-14-ABJ

1    BY MR. HEIMANN:

2    Q.   Is this the beginning of the debt assignment.pdf

3    attachment?

4    A.   It is.

11:45:01    5         MR. HEIMANN:  Let's go to page 6.

6    BY MR. HEIMANN:

7    Q.   Inspector Hacker, do you remember when, through Special

8    Agent Berryhill, we brought in Exhibit 11.2, which was the

9    backdated debt assignment agreement emailed from Chuck Winters

11:45:18    10   to Justin Herman?

11   A.   Yes.

12         MR. HEIMANN:  Let's put that exhibit next to this

13   one, 11.2.  Put 11.2 on the left if we can.

14         Okay.  So we have 11.2 on the left from Chuck Winters

11:46:00    15   to Justin Herman, and then we have 12 on the right from

16   Justin Herman to Joslyn Claiborne.  Both emails are dated

17   July 27th of 2015.

18         If we can go to the second-to-last page of each

19   exhibit.

11:46:31    20   BY MR. HEIMANN:

21   Q.   Does that appear to be the same page?

22   A.   Yes.

23   Q.   So the same altered --

24         MR. FLEENER:  Objection as to comments on the

11:46:46    25   evidence.

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1           THE COURT:  Sustained.

2           MR. HEIMANN:  Go to the next page.

3   BY MR. HEIMANN:

4   Q.  Do those appear to be the same pages?

11:46:59   5   A.  They do.

6           MR. HEIMANN:  Let's go to Exhibit 15.1.

7   BY MR. HEIMANN:

8   Q.  When Special Agent Berryhill was testifying, do you

9   remember the wire request that went from Justin Herman to

11:47:22  10  Chuck Winters and then back from Chuck Winters to

11  Justin Herman but the amount wired changed from 80 to 280?

12  A.  I do.

13  Q.  Take a look at 15.1.  And let's -- if we can -- is this an

14  email that you recognize?

11:47:41  15  A.  It is.

16  Q.  All right.  Where did you find this?

17          Let me ask it this way:  Was this in the portable

18  case that was provided to you by Special Agent Berryhill?

19  A.  Yes, it was.

11:47:57  20  Q.  And was that -- is this one of the email messages that was

21  found on the external hard drives' --

22  A.  Yes.

23  Q.  -- data?

24          Yes?

11:48:05  25  A.  Yes.

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. IV-511
21-CR-14-ABJ

1    Q.   Thank you.

2         Who is this -- who sent this email?

3    A.   Bob Mitchell.

4    Q.   To whom?

11:48:12    5    A.   Justin Herman.

6    Q.   On what day -- date?

7    A.   July 23rd, 2015.

8    Q.   Are there attachments?

9    A.   Yes.

11:48:22    10   Q.   How many?

11   A.   Two.

12   Q.   What are the file names?

13   A.   "Ecmz debt conversion wire.pdf" and "Bravo wire

14   activity.pdf."

11:48:35    15        MR. HEIMANN:  Let's scroll through the exhibit

16   slowly.

17   BY MR. HEIMANN:

18   Q.   Page 2 through the end, are those copies of those

19   attachments?

11:49:00    20   A.   They are.

21        MR. HEIMANN:  Okay.  Let's go to the first page.

22        The Government moves to admit 15.1.

23        MR. FLEENER:  No objection, Judge.

24        THE COURT:  15.1 is received.

11:49:18    25        (Government's Exhibit 15.1 received into evidence.)

1   BY MR. HEIMANN:

2   Q.  So the email is up on the screen.  It appears there is no

3   text or subject on this email; is that right?

4   A.  Correct.

11:49:44   5       MR. HEIMANN:  Let's go to the second page.

6   BY MR. HEIMANN:

7   Q.  And do you recognize this document that's one of the

8   attachments?

9   A.  I do.

11:49:55   10   Q.  What is it?

11   A.  This is an outgoing wire transfer request for the Bravo

12   Two Zero account.

13   Q.  Does this appear to be the same outgoing wire transfer

14   request for 80,000 that Justin Herman sent to Chuck Winters?

11:50:11   15   A.  Yes.

16   Q.  I don't know if you've testified to this.

17       Did you participate in the search of Bob Mitchell's

18   residence in Colorado on September 7th of 2017?

19   A.  I did.

11:50:27   20   Q.  Did you find the paper copy of this during that search?

21   A.  I did.

22       MR. HEIMANN:  Let's look at Exhibit 16.1.

23   BY MR. HEIMANN:

24   Q.  Do you recognize 16.1?

11:51:02   25   A.  Yes.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. IV-513
21-CR-14-ABJ

1    Q.   Is that an email that was provided to the grand jury by

2    Pacific Stock Transfer Company?

3    A.   It is.

4    Q.   Who is it from?

11:51:11   5    A.   Justin Herman.

6    Q.   Who is it to?

7    A.   Joslyn Claiborne.

8    Q.   What is the subject?

9    A.   "Forward: NERG."

11:51:20   10    Q.   Are there attachments?

11    A.   Yes.

12         MR. HEIMANN:   Those attachments are marked

13    separately, so we will move to admit 16.1.

14         MR. FLEENER:   No objection.

11:51:36   15         THE COURT:   It is received.

16      (Government's Exhibit 16.1 received into evidence.)

17    BY MR. HEIMANN:

18    Q.   When was this email sent?

19    A.   August 19th, 2015.

11:51:52   20    Q.   There's a sentence in the middle there --

21         MR. HEIMANN:   Let's -- let's blow up just the text

22    portion of this.

23    BY MR. HEIMANN:

24    Q.   Can you -- could you read the sentence that begins "All

11:52:17   25    the free"?

1   A.   "All the free trading shares are being issued on

2   percentage basis of ownership from the cumulative dollar

3   consideration which was pretty good number of $280,000."

4   Q.   This email and its attachments, are they related to the

5   allegations in Overt Act 16 of the fraud indictment?

6   A.   They are.

7        MR. HEIMANN:  Let's look at 16.2.

8   BY MR. HEIMANN:

9   Q.   Do you recognize 16.2?

10  A.   I do.

11  Q.   All right.  Is this the same debt assignment agreement

12  that we saw previously in your testimony?

13  A.   It is.

14       MR. HEIMANN:  Your Honor, the Government --

15  BY MR. HEIMANN:

16  Q.   Is this what was attached to the email we just saw in

17  16.1?

18  A.   Yes.

19       MR. HEIMANN:  The Government moves to admit 16.2.

20       MR. FLEENER:  No objections.

21       THE COURT:  It is received.

22     (Government's Exhibit 16.2 received into evidence.)

23       MR. HEIMANN:  Scroll to the bottom.

24       Let's move now to 16.3.

25  ///

11:52:43 (line 5)
11:53:13 (line 10)
11:53:26 (line 15)
11:53:34 (line 20)

1    BY MR. HEIMANN:

2    Q.  Is this the wire.pdf attachment to the email we saw in

3    16.1?

4    A.  Yes, it is.

11:54:28    5             MR. HEIMANN:  The Government moves to admit 16.3.

6             THE COURT:  It is -- 16.3 is received.

7         (Government's Exhibit 16.3 received into evidence.)

8             MR. HEIMANN:  And let's blow up the section where it

9    talks about the amount, all the way down to "Information and

11:54:53   10    Comments."

11    BY MR. HEIMANN:

12    Q.  What's the amount that's listed on this outgoing wire

13    transfer request?

14    A.  $280,000.

11:55:20   15    Q.  And what do the information and comments say?

16    A.  "ECMZ Debt Conversion."

17    Q.  Does this appear to be the same altered outgoing wire

18    transfer request that Chuck Winters sent to Justin Herman?

19             MR. FLEENER:  Objection to the word "altered" and the

11:55:37   20    comments on the evidence.

21             THE COURT:  Sustained.

22    BY MR. HEIMANN:

23    Q.  Does this appear to be the same wire transfer request that

24    claims to have -- that $280,000 was wired that went from

11:55:49   25    Chuck Winters to Justin Herman?

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. IV-516
21-CR-14-ABJ

1    A.  Yes.

2           MR. HEIMANN:  I'm going to move to admit the -- well,

3    let's look at 16.4.

4    BY MR. HEIMANN:

11:56:25    5    Q.  Do you recognize this?

6    A.  I do.

7    Q.  Is this the notice of conversion filings.pdf file that was

8    attached to the email we saw in 16.1?

9    A.  It is.

11:56:36    10          MR. HEIMANN:  The Government moves to admit 16.4.

11          MR. FLEENER:  No objections.

12          THE COURT:  It is received.

13       (Government's Exhibit 16.4 received into evidence.)

14   BY MR. HEIMANN:

11:56:47    15   Q.  There's a redaction on the exhibit between where it says

16   "Justin Herman" and "Canonsburg, Pennsylvania."  Do you see

17   that?

18   A.  I do.

19   Q.  The original email attachment, was it redacted on there?

11:57:05    20   A.  It was not.

21   Q.  Have you looked at the unredacted copy?

22   A.  I have.

23   Q.  Without saying what it is, whose address is that?

24   A.  Justin Herman's residence.

11:57:14    25   Q.  Was there a spreadsheet attached to the email in

```
19-CR-26-ABJ     HACKER - FURTHER DIRECT - HEIMANN     Vol. IV-517
21-CR-14-ABJ
```

1  Exhibit 16.1 called "August 19 Shares.xlsx"?

2  A.  There was.

3  Q.  Let's look at --

4          MR. HEIMANN:  Bring up 16.5.

5          MR. JUBIN:  Your Honor, may I voir dire briefly?

6  I don't see any reference to an attachment here.

7          THE COURT:  Yes, you may.

8          Unless Mr. Heimann lays the foundation.

9          MR. HEIMANN:  Let's bring back up 16.1.

10      (Discussion held among counsel.)

11          MR. HEIMANN:  So -- this can be up because it's

12  published -- or it's already been admitted.

13          Let's blow up the header on this email.

14  BY MR. HEIMANN:

15  Q.  Inspector Hacker, what's the first attachment to this

16  email?

17  A.  "August 19 Shares.xlsx."

18          MR. HEIMANN:  Let's bring up Exhibit 16.5.

19  BY MR. HEIMANN:

20  Q.  Do you recognize 16.5?

21  A.  I do.

22  Q.  What is it?

23  A.  This is a screenshot of the original Excel spreadsheet

24  that was attached to the emails.  The only difference is that

25  we hid some empty columns that had nothing in them, and then

11:57:40 (line 5)
11:57:55 (line 10)
11:58:41 (line 15)
11:59:08 (line 20)
11:59:24 (line 25)

1  we hid a column that had social security numbers and addresses

2  in order to protect that personal information.

3  Q.  Did we do that in part to make it possible to look at on a

4  single screen?

11:59:44    5  A.  Yes.

6  Q.  Other than hiding those columns or adjusting column sizes,

7  have any alterations been made to the original spreadsheet or

8  the information that was in it?

9  A.  None.

11:59:56    10  Q.  And on this exhibit one can see the column headings and

11  the row headings, so it's possible to see which columns have

12  been hidden?

13  A.  Yes.

14          MR. HEIMANN:  Your Honor, the Government moves to

12:00:08    15  admit 16.5.

16          MR. FLEENER:  No objections.

17          THE COURT:  16.5 is received.

18      (Government's Exhibit 16.5 received into evidence.)

19          THE COURT:  I'm looking at the clock, Counsel.

12:00:22    20          MR. HEIMANN:  And, Your Honor, that's perfect.

21          THE COURT:  I told you going in, ladies and

22  gentlemen, that we would -- especially for you that have to

23  travel -- that we'll try, if we can, to give you the

24  afternoons on Friday to be able to move.  I don't make a

12:00:56    25  guarantee in that regard.  It will depend on how we are doing,

19-CR-26-ABJ                                                Vol. IV-519
21-CR-14-ABJ

1   but it appears we are generally on time at this point with the

2   presentation of evidence.

3          Before you go, again, I want to reiterate please do

4   not talk to anyone about this case or discuss it.  Should

12:01:24   5   anyone attempt to discuss it with you, inform them you're a

6   juror and can't talk about it.  And if they persist at all,

7   let us know so that we can do something about it.

8          When you are outside the courtroom over the weekend,

9   do not let anyone tell you anything about the case or about

12:01:46   10   anyone involved with it until the trial has ended.  Don't try

11   to speak to any of the parties or their attorneys or the

12   witnesses in this matter or attempt to investigate them.  We

13   certainly don't want to put you in that awkward position of

14   being a witness to evidence or nonevidence, really.

12:02:13   15          Avoid any news stories or articles about this case --

16   I don't know that there will be any -- and avoid using your

17   BlackBerrys or iPhones or consulting Twitter or Google or any

18   other of the websites that may be available to you and that

19   you use daily because, certainly, they are not under oath nor

12:02:47   20   at all trustworthy, and the evidence in this case is what

21   you'll hear and see in this courtroom.

22          The Court appreciates the patience of each and every

23   one of you.  I can't tell you how important you become as this

24   case progresses through the court, the difficulty we would

12:03:19   25   encounter, and the sheer expense of repeating the steps that

19-CR-26-ABJ                                                    Vol. IV-520
21-CR-14-ABJ

 1    have taken so far, and, of course, you've been along with us

 2    every step of the way.

 3            So take good care of yourselves, drive carefully,

 4    rest, eat well, catch up on work to the extent that you're

 5    able to do so, and we'll see you again on Monday.

 6            I think we'll start a little bit later to make sure

 7    everybody can get here on time.  How does nine o'clock sound

 8    on Monday morning?

 9            Very well.  We'll stand in recess -- excuse me,

10    Mr. Jubin.

11            MR. JUBIN:  Your Honor, I have one other thing.  May

12    we have a quick sidebar?

13            Thank you.

14        (Proceedings held at sidebar with Prosecutor Heimann

15    and all defense counsel.)

16            MR. JUBIN:  Your Honor, it's been my experience that

17    the Court customarily tells the jury to keep an open mind and

18    don't decide anything in your minds until you've heard all the

19    evidence.

20            I know the cautionary instruction that the Court did

21    yesterday omitted that, and it's been thus far omitted today.

22    I would ask that the Court give that.  Thank you.

23            THE COURT:  All right.

24        (Sidebar concluded.)

25            THE COURT:  The last advice I give you would be to

19-CR-26-ABJ                                              Vol. IV-521
21-CR-14-ABJ

1    keep your minds open.  Frequently, the last witness in the

2    case may have something that will bear upon your decision.  It

3    would not be helpful to any of you at this point to blurt out

4    or declare that you're standing for one position or one

12:05:16    5    finding or another without hearing all the evidence in the

6    case.

7         And, certainly, a person who has declared themselves

8    early on really is forced into the position of having to

9    defend that position throughout.  And if your minds are open

12:05:35    10    and you haven't said anything at this point, you're free to

11    speak and deliberate freely when that time comes.

12         So enjoy your weekend.  I hear the weather's going to

13    be beautiful, and this is your chance.  These days are

14    special.

12:05:54    15         We'll stand in recess.

16         THE COURTROOM DEPUTY:  All rise.

17         THE COURT:  Nine o'clock Monday morning.

18    (Proceedings outside the jury's presence at 12:06 p.m.)

19         THE COURT:  For the rest of you, the same words go:

12:06:42    20    Get a little extra sleep this weekend.  I know that you'll all

21    be probably thinking about this case and working on it but --

22    as you will be for the next few weeks.

23         But take care as to what you do, avoid large crowds,

24    wear your masks when you go to church this Sunday, and do

12:07:09    25    everything you can to maintain good health and avoid possible

19-CR-26-ABJ                                                    Vol. IV-522
21-CR-14-ABJ

1    infection.

2         We'll stand in recess.  Thank you, Counsel.

3      (Proceedings concluded 12:07 p.m., September 24, 2021.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5         I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14         Dated this 10th day of January, 2022.

15

16

17

18         /s/ Melanie Humphrey-Sonntag

19         _____

20              MELANIE HUMPHREY-SONNTAG
                    RDR, CRR, CRC
21            Federal Official Court Reporter

22

23

24

25

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF WYOMING

3    _____

4
     UNITED STATES OF AMERICA,          DOCKET NO. 19-CR-026-ABJ
5                                       DOCKET NO. 21-CR-014-ABJ
            Plaintiff,
6                                       VOLUME V of XIV
            vs.                         (Pages 523 through 736)
7
     JUSTIN HERMAN, CHARLES W.          Cheyenne, Wyoming
8    WINTERS, JR., a/k/a Chuck          Monday, September 27, 2021
     Winters, and IAN HORN,            9:06 a.m.
9
            Defendants.
10
11   _____

12

13              TRANSCRIPT OF TRIAL PROCEEDINGS

14

15        BEFORE THE HONORABLE ALAN B. JOHNSON
               UNITED STATES DISTRICT JUDGE
16        and a jury of twelve and four alternates

17

18

19

20

21

22       *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*
                *Federal Official Court Reporter*
23    *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
           *630.452.6236 * MelanieSonntagCRR@gmail.com*
24
     *Proceedings reported with digital stenography; transcript*
25         *produced with computer-aided transcription.*

```
 1   APPEARANCES:
     For the Plaintiff:        ERIC J. HEIMANN
 2                             THOMAS A. SZOTT
                               ASSISTANT UNITED STATES ATTORNEYS
 3                             DISTRICT OF WYOMING
                               2120 Capitol Avenue, Fourth Floor
 4                             Cheyenne, WY 82001

 5   For the Defendant         THOMAS A. FLEENER
     Herman:                   FLEENER LAW
 6                             506 South Eighth Street
                               Laramie, WY 82073
 7
     For the Defendant         ZENITH S. WARD
 8   Winters:                  BUCHHAMER & WARD
                               1821 Logan Avenue
 9                             Cheyenne, WY 82001

10   For the Defendant         THOMAS B. JUBIN
     Horn:                     JUBIN & ZERGA
11                             2614 Pioneer Avenue
                               Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Vol. V-525

1                    I N D E X

2    GOVERNMENT WITNESSES:
                                                PAGE
3    SONIA HACKER
     Further Direct Examination by Mr. Heimann      529
4    Cross-Examination by Mr. Jubin                 548
     Cross-Examination by Mr. Fleener              573
5    Recross-Examination by Mr. Jubin              573
     Recross-Examination by Mr. Fleener            574
6    Further Recross-Examination by Mr. Jubin      576
     Further Direct Examination by Mr. Heimann     690
7    Further Cross-Examination by Mr. Jubin        730

8    GORDON PARDY
     Direct Examination by Mr. Heimann             577
9    Cross-Examination by Mr. Jubin                587
     Cross-Examination by Mr. Fleener              588
10   Cross-Examination by Mr. Ward                 592
     Redirect Examination by Mr. Heimann           602
11   Recross-Examination by Mr. Fleener            603

12   THOMAS LeROY CROM, III
     Direct Examination by Mr. Heimann             604
13   Cross-Examination by Mr. Ward                 635
     Cross-Examination by Mr. Jubin                645
14   Cross-Examination by Mr. Fleener              654
     Redirect-Examination by Mr. Heimann           655
15   Recross-Examination by Mr. Fleener            659

16   DAVID RODGERS
     Direct Examination by Mr. Heimann             671
17   Cross-Examination by Mr. Ward                 684
     Redirect Examination by Mr. Heimann           690
18

19                    E X H I B I T S
                                  IDENTIFIED   RECEIVED
20   GOVERNMENT'S EXHIBITS
          1.1   Endurance International      703        704
21              Group Record
          1.2   Endurance International      705        705
22              Group Record
          2     Screenshot, NuTech Website   706        707
23        2.1   Screenshot, NuTech Website   705        706
          6     Certificate of Amendment to  531        532
24              Articles of Incorporation
          7     OTC Markets Record           709        710
25        8     Attorney Opinion Letter      710        711

Vol. V-526

1            E X H I B I T S    C O N T I N U E D
                                    IDENTIFIED    RECEIVED
2      GOVERNMENT'S EXHIBITS

| | | | IDENTIFIED | RECEIVED |
|---|---|---|---|---|
| 9.1 | Email Chain | | 712 | 713 |
| 10 | Email Chain | | 691 | 692 |
| 17 | Email Chain | | 693 | 695 |
| 18.1 | Email Chain | | 533 | 534 |
| 18.2 | Email Attachment | | 535 | 536 |
| 18.3 | Email Attachment | | 535 | 536 |
| 18.4 | Email Attachment | | 535 | 536 |
| 18.5 | Email Attachment | | 535 | 536 |
| 18.6 | Email Attachment | | 535 | 536 |
| 18.7 | Email Attachment | | 535 | 536 |
| 18.8 | Email Attachment | | 535 | 536 |
| 18.9 | Email Attachment | | 535 | 536 |
| 18.10 | Email Attachment | | 535 | 536 |
| 18.11 | Email Attachment | | 535 | 536 |
| 18.12 | Email Attachment | | 535 | 536 |
| 22.2 | Email Chain | | 696 | 696 |
| 22.3 | Email Attachment | | 696 | 697 |
| 22.4 | Email Attachment | | 696 | 697 |
| 22.5 | Email Attachment | | 696 | 697 |
| 22.6 | Email Attachment | | 696 | 697 |
| 22.7 | Email Attachment | | 696 | 697 |
| 22.8 | Email Attachment | | 696 | 697 |
| 25.1 | Email Chain | | 537 | 538 |
| 25.2 | Email Attachment | | 538 | 539 |
| 25.3 | Email Attachment | | 538 | 539 |
| 26.1 | Email Chain | | 545 | 546 |
| 27.2 | Certificate Transaction Journal | 699 | 700 |
| 27.3 | Original Stock Certificates | 700 | 701 |
| 28.5 | Email Chain | | 728 | -- |
| 28.6 | Email Chain | | 729 | -- |
| 28.7 | Email Chain | | 729 | -- |
| 28.9 | Email Chain | | 729 | -- |
| 28.10 | Email Chain | | 729 | -- |
| 28.14 | Email Chain | | 729 | -- |
| 28.15 | Email Chain | | 729 | -- |
| 28.16 | Email Chain | | 729 | -- |
| 28.17 | Email Chain | | 729 | -- |
| 28.18 | Email Chain | | 729 | -- |
| 28.19 | Email Chain | | 730 | -- |
| 28.20 | Email Chain | | 730 | -- |
| 28.21 | Email Chain | | 730 | -- |
| 28.23 | Email Chain | | 730 | -- |
| 28.24 | Email Chain | | 730 | -- |
| 28.25 | Email Chain | | 730 | -- |
| 28.29 | Email Chain | | 730 | -- |
| 28.30 | Email Chain | | 730 | -- |

Vol. V-527

1            E X H I B I T S   C O N T I N U E D
                                    IDENTIFIED   RECEIVED
2      GOVERNMENT'S EXHIBITS
            28.31  Email Chain                730        --
3           28.32  Email Chain                724       724
            29.3   NuTech Press Release       724       725
4           30.2   NuTech Press Release       726       726
            34.1   Attorney Opinion Letter    714       714
5           34.3   OTC Markets Record         715       715
            36.1   Attorney Opinion Letter    718       718
6           37.1   Email Chain                722       723
            38     Email Chain                723       724
7           103    Wire Transfer Record       708       709
            108    Summary Purchase Agreement 613       614
8           201    Consent to Act As Officer  633       634
                   and Director
9           202    Email Chain                529       530
            203    Email Chain                716       716
10          300    Email Chain                690       691
            301    Email Chain                543       544
11          400    NuTech Press Release       726       727
            414    Email Chain                721       721
12          1000   Personal Signature Card    707       708

13     DEFENDANT HORN'S EXHIBITS
            IH-1014   Email Chain             648       649
14          IH-1015B  Letter, Crom to Bank,   650       651
                      12/31/14
15          IH-1025   Email Chain             652       653
            IH-1029   Letter, Horn to Whom It May  556   --
16                    Concern, 8/31/15
            IH-2209   Text Message Chain      559       561
17

18

19

20

21

22

23

24

25

19-CR-26-ABJ                                                    Vol. V-528
21-CR-14-ABJ

 1       (Proceedings commenced 9:06 a.m., September 27, 2021,

 2  in the presence of all defendants, outside the jury's

 3  presence.)

 4            THE COURT:  Thank you.  Are we ready for the jury?

 5            MR. HEIMANN:  Your Honor, I had one thing I wanted to

 6  take care of before the jury's called.

 7            Your Honor, last week we admitted into evidence

 8  Exhibit 515.

 9            THE COURT:  Uh-huh.

10            MR. HEIMANN:  Mr. Jubin pointed out to me that it was

11  unredacted, even though it had social security

12  number, birthday, some other information that really should be

13  redacted.

14            We've provided a redacted version of 515.  We would

15  ask that it be replaced -- or it go into the record as that

16  exhibit and the unredacted be taken out.

17            THE COURT:  Motion is granted.  Unless there's

18  objection.

19            MR. WARD:  No objection from Mr. Winters.

20            MR. FLEENER:  No, sir.

21            MR. JUBIN:  Thank you, Your Honor.

22            MR. HEIMANN:  And we've provided the redacted copy to

23  defense counsel this morning.

24            THE COURT:  Thank you.

25            I might mention while we're just gathered here I was

1   just informed by Becky we have a juror who's having a -- a

2   little issue.  And we're going to place her at this end of the

3   jury box so that she can run to the bathroom when she needs

4   to, and we'll just all stop at that point and . . . I might do

09:07:46   5   the same.

6       (Proceedings within the jury's presence at 9:08 a.m.)

7           THE COURT:  Well, good morning, ladies and gentlemen.

8   I hope you had a relaxing Wyoming weekend.  The aspens are

9   changing and there are lots of opportunities to get out over

09:09:12   10   the weekend to enjoy the fresh air and the sunshine.

11           We'll get started this morning at nine o'clock.

12   Please be seated.

13           Mr. Heimann.

14           MR. HEIMANN:  The United States recalls Sonia Hacker.

10:13:53   15   **SONIA HACKER, GOVERNMENT'S WITNESS, FURTHER DIRECT EXAMINATION**

16   **BY MR. HEIMANN:**

17   Q.  Inspector Hacker, do you realize -- do you understand that

18   you are still under oath?

19   A.  Yes, I do.

09:10:11   20   Q.  Let's begin this morning by looking at some exhibits that

21   we'll use later today.

22           MR. HEIMANN:  Can we pull up Exhibit 2.2 -- I'm

23   sorry -- 202.

24   Q.  Do you recognize this exhibit?

09:10:55   25   A.  I do.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. V-530
21-CR-14-ABJ

1    Q.  Is this an email thread that you found in the Oath

2    Holdings emails that were seized that we talked about last

3    week?

4    A.  It is.

09:11:04  5    Q.  How many emails are in this thread?

6    A.  Four.

7    Q.  What day were they all sent?

8    A.  January 14th, 2015.

9    Q.  And there's a subject -- it's the subject of at least

09:11:27  10   three of these emails -- "ECMZ."

11   A.  Yes.

12       MR. HEIMANN:  Your Honor, the Government moves to

13   admit 202.

14       MR. FLEENER:  One second, please, Judge.

09:11:42  15       No objections.

16       THE COURT:  202 is received.

17   (Government's Exhibit 202 received into evidence.)

18   BY MR. HEIMANN:

19   Q.  The initial email, do you see that at the bottom of the

09:12:05  20   page?

21   A.  Yes.

22   Q.  What was the date of that email?

23   A.  January 14th, 2015.

24   Q.  Who was it from?

09:12:13  25   A.  Justin Herman.

1    Q.   And where -- to who is it sent?

2    A.   issuers@otcmarkets.com and cecilia@otcmarkets.com.

3    Q.   The second email, getting halfway up the page, is also

4    from Justin Herman.

09:12:34    5              Who is that to?

6    A.   Crom, tomcrom@theriver.

7    Q.   And what is the message from Mr. Herman to Mr. Crom?

8    A.   "Tom, I would email cecilia@otcmarkets.com to confirm that

9    the officer changes are real.  That you will be staying on as

09:12:59    10   the CFO and this is" -- sorry -- "this not a hijack shell

11   situation."

12   Q.   There's a response, then, from Mr. Crom.  "I need Kevin's

13   address on the signed form"; yes?

14   A.   Yes.

09:13:20    15   Q.   And then there's a redacted street address at the top; is

16   that right?

17   A.   Yes.

18   Q.   Okay.  The original email was not redacted?

19   A.   Correct.

09:13:31    20   Q.   Let's move -- we'll talk about this exhibit with another

21   witness, so let's move now to Exhibit 6.

22              Overt Act No. 6 in the indictment alleges that

23   Mitchell and Herman directed TC to amend EcoEmissions'

24   articles of incorporation to change the name of the company.

09:13:59    25              The "TC" in the indictment, is that "Tom Crom"?

19-CR-26-ABJ        HACKER - FURTHER DIRECT - HEIMANN        Vol. V-532
21-CR-14-ABJ

1    A.  It is.

2    Q.  So Exhibit 6, do you recognize this document?

3    A.  Yes.

4    Q.  Is this a certification of amendment to articles of

09:14:10   5    incorporation provided to the grand jury by Pacific Stock

6    Transfer Company?

7    A.  Yes.

8    Q.  It's a two-page exhibit; correct?

9            THE WITNESS:  Could you scroll down?

09:14:22  10    A.  Yes, it is.

11            MR. HEIMANN:  Your Honor, the Government moves to

12    admit 6.

13            MR. FLEENER:  Just a second, please, Judge.

14            No objections.

09:14:39  15            THE COURT:  6 is received.

16        (Government's Exhibit 6 received into evidence.)

17    BY MR. HEIMANN:

18    Q.  What is the effect of this document?

19    A.  It changes the name of the company from EcoEmissions

09:14:55  20    Solutions, Inc., to NuTech Energy Resources, Inc.

21    Q.  And we see that in paragraph 1; right?

22    A.  Yes.

23    Q.  Paragraph 2, what's the effect of that "Fourth Article-

24    Shares"?

09:15:09  25    A.  It allows the issue of 60 billion shares --

1    Q.   New shares?

2    A.   -- of common stock.

3    Q.   Of common stock.   New shares; right?

4    A.   Yes.   Yes.

09:15:22    5    Q.   All right.

6         MR. HEIMANN:   Let's move now to Exhibit 18.1.

7    BY MR. HEIMANN:

8    Q.   And Overt Act 18 in the indictment alleges an email on

9    September 2nd of 2015 from Mr. Herman to Pacific Stock

09:15:39    10   Transfer with various attachments.

11        18.1, is this an email that was provided to the grand

12   jury by Pacific Stock Transfer?

13   A.   It is.

14   Q.   What's the -- the parent email, what's the date on that?

09:15:58    15   A.   April 16th, 2019.

16   Q.   Is that forwarding another email and the attachments to

17   that email?

18   A.   Yes.

19        MR. HEIMANN:   All right.   Let's -- can we scroll

09:16:11    20   partway down so we can capture the bottom there?

21        There you go.   Great.

22   BY MR. HEIMANN:

23   Q.   The email that's being forwarded, what's its date?

24   A.   September 2nd, 2015.

09:16:25    25   Q.   Who is it from?

1    A.  Justin Herman.

2    Q.  Who is it to?

3    A.  Joslyn Claiborne.

4    Q.  And then there's a forwarded message, as well; right?

09:16:35    5    A.  There is.

6          MR. HEIMANN:  Let's scroll down.

7    BY MR. HEIMANN:

8    Q.  The email is split out onto a number of pages.  Do you

9    know why that is?

09:16:50    10    A.  Because there were .txt files attached to the amendment.

11    Q.  So those were text to the email but they came through as

12    attachments?

13    A.  Correct.

14          MR. HEIMANN:  Let's go back to the top, please.

09:17:00    15    BY MR. HEIMANN:

16    Q.  Those are the .htm files; right?

17    A.  Yes, .htm files.

18          MR. HEIMANN:  Your Honor, the Government moves to

19    admit 18.1.

09:17:20    20          MR. FLEENER:  No objections.

21          THE COURT:  18.1 is received.

22      (Government's Exhibit 18.1 received into evidence.)

23    BY MR. HEIMANN:

24    Q.  So at the top, that's where we see the April 16th, 2019,

09:17:30    25    email that forwarded everything else; is that right?

1  A.  Yes.

2  Q.  And those .htm files, those are the ones that begin "ATT"?

3  A.  Yes.

4         MR. HEIMANN:  If we scroll down so that we capture

09:17:43  5  the -- the September 2nd email that's being forwarded.

6  BY MR. HEIMANN:

7  Q.  It begins here on the very bottom of the first page from

8  Justin Herman; is that right?

9  A.  It does.

09:17:58  10        MR. HEIMANN:  And if we scroll down so we can show

11  the jury how the text came through.

12  BY MR. HEIMANN:

13  Q.  Basically, those ATT files show up on each page?

14  A.  They do.

09:18:13  15  Q.  Okay.  Exhibits 18.2 through 18.12, are you familiar with

16  those?

17  A.  Yes.  Those are the attachments to this email.

18        MR. HEIMANN:  Your Honor, the Government moves to

19  admit 18.2 through 18.12.

09:18:27  20        MR. FLEENER:  Your Honor, I'm going to need a minute,

21  please.

22        THE COURT:  You have it.

23     (Discussion held at counsel table.)

24        MR. FLEENER:  No objections.

09:20:49  25        THE COURT:  18.2 through 18.12 are received.

19-CR-26-ABJ        HACKER - FURTHER DIRECT - HEIMANN        Vol. V-536
21-CR-14-ABJ

1    (Government's Exhibits 18.2 through 18.12 received into

2    evidence.)

3    BY MR. HEIMANN:

4    Q.  Let's look at 18.2.

09:21:06    5         Is this an attachment to the amendment entitled

6    "Assignment Bravo Wells to Eco Signed.pdf"?

7    A.  Yes.

8            MR. HEIMANN:  And we scroll down to the second page.

9            And now let's look at 18.3.

09:21:18    10   BY MR. HEIMANN:

11   Q.  Do you recognize this account from your investigation?

12   A.  Yes.

13   Q.  Whose account is it?

14   A.  Bravo Two Zero Partners.

09:21:56    15   Q.  And that's controlled by Bob Mitchell?

16   A.  It is.

17           MR. HEIMANN:  This is, I think, two pages, so let's

18   go down.

19           And can we magnify where the arrow is, that -- yeah.

09:22:06    20   BY MR. HEIMANN:

21   Q.  So this purports to show a $280,000 wire on 12/23 of 2014?

22   A.  Yes.

23   Q.  To Ian Horn?  Do I read that right?

24   A.  You do.

09:22:34    25           MR. HEIMANN:  So let's look at 18.4.

1    BY MR. HEIMANN:

2    Q.  We've seen versions of this outgoing wire transfer request

3    dated 12/23 of 2014.

4        MR. HEIMANN:  Let's blow up the -- excuse me.

09:23:01  5        Let's magnify the section "Wire Amount and Source of

6    Funds" down through "Information and Comments."

7    BY MR. HEIMANN:

8    Q.  And this is one of the versions that shows a $280,000 wire

9    transfer; right?

09:23:19  10    A.  Yes.

11        MR. HEIMANN:  Okay.  Your Honor, we're not going to

12    publish the other exhibits at this time.

13        So let's move on to Exhibit 25.1.

14    BY MR. HEIMANN:

09:23:44  15    Q.  Now, Overt Act 25 of the indictment alleges an email from

16    Mr. Herman to Pacific Stock Transfer on September 23rd of

17    2015.  There are a couple initials in that allegation.

18        "DR," who is that?

19    A.  David Rodgers.

09:24:00  20    Q.  And "GP"?

21    A.  Gordon Pardy.  With a -d.

22    Q.  With a --

23    A.  -- -d, as in "dog."

24    Q.  P-a-r-d-y?

09:24:11  25    A.  Yes.

1   Q.  Thank you.

2           25.1, do you recognize that?

3   A.  Yes.

4   Q.  Is that an email provided to the grand jury by Pacific

09:24:25   5   Stock Transfer?

6   A.  It is.

7   Q.  What's the subject?

8   A.  "N-E-R-G."

9   Q.  Who is it from?

09:24:32   10   A.  Justin Herman.

11   Q.  Who is it to?

12   A.  Joslyn Claiborne.

13   Q.  Is Joslyn Claiborne an employee of Pacific Stock Transfer?

14   A.  She is.

09:24:45   15   Q.  And what's the date on the email?

16   A.  September 23rd, 2015.

17           MR. HEIMANN:  Your Honor, the Government moves to

18   admit 25.1.

19           MR. FLEENER:  No objections.

09:24:58   20           THE COURT:  25.1 is received.

21       (Government's Exhibit 25.1 received into evidence.)

22           MR. HEIMANN:  And let's scroll down, if we can --

23   it's a single-page email.  Okay.

24   Q.  Exhibits 25.2 and 25.3, are you familiar with those?

09:25:21   25   A.  Yes.

19-CR-26-ABJ       HACKER - FURTHER DIRECT - HEIMANN       Vol. V-539
21-CR-14-ABJ

1   Q.  Are they the attachments to this email?

2   A.  They are.

3   Q.  So one is the "NERG Legal Opinion Sep 23, 2015.pdf"?

4   A.  Yes.

09:25:32   5   Q.  And the other is the "Assignment Bravo E-Pro.pdf"?

6   A.  Correct.

7           MR. HEIMANN:  Your Honor, the Government moves to

8   admit 25.2 and 25.3.

9           MR. FLEENER:  One moment, please, Judge.

09:26:13   10      (Discussion held at counsel table.)

11          MR. FLEENER:  Judge, may I have a minute, please.

12          THE COURT:  Yes.

13          MR. FLEENER:  We would object and argue

14  confrontation.

09:27:14   15          Can we have a sidebar, Judge?

16          THE COURT:  Sure.

17      (Proceedings held at sidebar with Prosecutor Heimann

18  and all defense counsel.)

19          MR. FLEENER:  Withdrawn.

09:27:31   20          I'm sorry.

21      (Sidebar concluded.)

22          THE COURT:  The exhibits are received, 25.2 and 25.3.

23      (Government's Exhibits 25.2 and 25.3 received into

24  evidence.)

09:27:47   25          MR. HEIMANN:  Let's put up 25.2.

1   BY MR. HEIMANN:

2   Q.  This is the first attachment to the email?

3   A.  It is.

4   Q.  What's the written title on this document?

09:28:05   5   A.  "Supporting Legal Opinion for Request to Issue Free

6   Trading Shares of Common Stock of NuTech Energy Resources,

7   Inc."

8   Q.  And the date?

9   A.  September 23rd, 2015.

09:28:21   10   Q.  Whose letterhead?

11   A.  Ian Horn & Associates.

12        MR. HEIMANN:  If we go down to the last page.

13        Second-to-last page.  Sorry.

14   BY MR. HEIMANN:

09:28:38   15   Q.  There's a name on the signature block.  Who is that?

16   A.  Ian Horn.

17        MR. HEIMANN:  Let's look at 25.3.

18   BY MR. HEIMANN:

19   Q.  What's the printed title of this document?

09:29:04   20   A.  "Purchase and Assignment of Interest in Wells and Leases."

21        MR. HEIMANN:  Let's go to the next page.

22   BY MR. HEIMANN:

23   Q.  There are four signature blocks here.  Who are -- who are

24   the people named in those four signature blocks?

09:29:25   25   A.  David Rodgers, Gordon Pardy, Robert Mitchell, and

1    Larry Lorenz.

2         MR. HEIMANN:  Last week we saw Exhibit 24.3.  Let's

3    put that on the screen with 25.3.

4    BY MR. HEIMANN:

09:30:10    5    Q.  Okay.  So 24.3 is an email and attachment from

6    Chuck Winters to Justin Herman on September 23rd of 2015.

7    25.3 is the purchase and assignment of interest in wells and

8    leases attached to the email from Justin Herman to Pacific

9    Stock Transfer.

09:30:33    10         If we go to the second page of 24.3, Inspector

11    Hacker, do you note a difference in the footer on these

12    documents?

13    A.  Yes.

14    Q.  And what is that?

09:30:53    15    A.  There is a footer on 25.3, and there is not a footer on

16    24 point -- I don't recall the exhibit number.

17    Q.  24.3.

18    A.  -- 24.3.

19    Q.  On the left?

09:31:09    20    A.  On the left.

21         MR. HEIMANN:  Okay.  Can we just blow up that footer

22    that begins with "Macintosh"?

23    BY MR. HEIMANN:

24    Q.  So it's this footer you're talking about, begins with

09:31:22    25    "Macintosh," ends with "E-Pro.docx"?

1   A.   Yes.

2   Q.   Now, there's another mark down at the bottom underneath

3   the exhibit sticker on 25.3, begins with "PST."

4          Do you see that?

09:31:36   5   A.   I do.

6   Q.   What is that number?

7   A.   That's a Bates number that Pacific Stock Transfer put on

8   all of their records that were provided to the grand jury

9   subpoena.

09:31:43   10   Q.   So that's an identification number that wasn't on the

11   original document in their business records, to your

12   knowledge?

13   A.   Excuse me?

14   Q.   That's an identification number for what they submitted to

09:31:52   15   the grand jury?

16   A.   Yes.

17          MR. HEIMANN:   Okay.  Let's go to the signature

18   page on each.

19   BY MR. HEIMANN:

09:32:11   20   Q.   And the difference here is that same footer, beginning

21   with "Macintosh"?

22   A.   Yes.  That's one of the minor differences.

23   Q.   What other difference did you note?

24   A.   On 24.3, which is on your left, it says "E-Pro Tech, LLC,"

09:32:30   25   whereas on your right it has been changed to "E-Pro Systems,

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN       Vol. V-543
21-CR-14-ABJ

 1    LLC."

 2            MR. HEIMANN:  So why don't we magnify the signature

 3    block on the left in each document where Mr. Pardy and Rodgers

 4    signed.

09:32:47   5    BY MR. HEIMANN:

 6    Q.  So you're talking about this "E-Pro Tech"?

 7    A.  I am.

 8    Q.  So that was on the emailed version from Mr. Winters to

 9    Mr. Herman?

09:32:56  10    A.  Yes.

11    Q.  And "E-Pro Systems," 25.3, that was on the version

12    Mr. Herman sent to Pacific Stock Transfer?

13    A.  Correct.

14    Q.  Okay.

09:33:14  15            MR. HEIMANN:  Okay.  Let's go to Exhibit 301.

16    BY MR. HEIMANN:

17    Q.  Do you recognize this document?

18    A.  I do.

19    Q.  This is an email that was seized from the Oath Holdings

09:33:44  20    email accounts?

21    A.  It is.

22    Q.  Who's it from?

23    A.  Chuck Winters.

24    Q.  And who is it to?

09:33:51  25    A.  Justin Herman.

19-CR-26-ABJ     HACKER - FURTHER DIRECT - HEIMANN     Vol. V-544
21-CR-14-ABJ

1   Q.  What's the subject?

2   A.  "Debt Conversion."

3   Q.  Is there an attachment to this email?

4   A.  Yes.

09:33:59   5   Q.  What's the name of that file?

6   A.  "Convert Note Pardy.pdf."

7           MR. HEIMANN:  Let's go to the second page.

8   BY MR. HEIMANN:

9   Q.  Is this where the attachment begins?

09:34:16   10   A.  It is.

11           MR. HEIMANN:  Your Honor, the Government moves to

12  admit 301.

13           MR. FLEENER:  No objections.

14           THE COURT:  301 is received.

09:34:28   15       (Government's Exhibit 301 received into evidence.)

16           MR. HEIMANN:  We'll go to the first page.

17  BY MR. HEIMANN:

18  Q.  What is the text of this email from Mr. Winters to

19  Mr. Herman?

09:34:38   20  A.  "Need name and address of other conv" -- c-o-n-v, which

21  I believe means "convertible" -- "assigner."

22           MR. HEIMANN:  And let's page down.

23           And one more.

24           And one more.

09:35:01   25           Let's go to the end.  Okay.

1    BY MR. HEIMANN:

2    Q.  So on the attached document, on the last page, it looks

3    like there are references to Gordon Pardy.

4    A.  Correct.

09:35:15    5    Q.  Okay.

6        MR. HEIMANN:  Okay.  Let's go now to 26.1.

7    BY MR. HEIMANN:

8    Q.  There's an allegation, Overt Act 26 in the indictment,

9    that Mr. Herman emailed a statement of nonaffiliation to

09:35:42    10    Pacific Stock Transfer on September 26th of 2015.  And that

11    that statement is alleged to have contained the forged and

12    unauthorized digital signatures of DR and GP.

13        Who is "DR" in that allegation?

14    A.  David Rodgers.

09:36:03    15    Q.  And "GP"?

16    A.  Gordon Pardy.

17    Q.  Do you recognize 26.1?

18    A.  I do.

19    Q.  Is that an email that was provided to the grand jury by

09:36:15    20    Pacific Stock Transfer?

21    A.  It is.

22    Q.  And there's an attachment to that email?

23    A.  There is.

24        It's called "E-Pro Systems Non-AF.pdf."

09:36:30    25    Q.  And is there also an ATT -- another attachment that begins

1    with "ATT"?

2    A.   Yes.

3    Q.   What's the subject?

4    A.   I will spell it, "N-o-f, space, A-f letter."

09:36:51    5    Q.   Who's it from?

6    A.   Justin Herman.

7    Q.   And who is it to?

8    A.   Joslyn Claiborne.

9         MR. HEIMANN:   Your Honor, the Government moves to

09:37:03   10    admit 26.1.

11         MR. FLEENER:   No objection.

12         THE COURT:   It is received.

13      (Government's Exhibit 26.1 received into evidence.)

14    BY MR. HEIMANN:

09:37:09   15    Q.   So I don't know if I asked you this.  When was this email

16    sent?

17    A.   September 26th, 2015.

18    Q.   And the attachments are listed there in the -- in the blue

19    text across from "Attachments"; correct?

09:37:29   20    A.   Correct.

21         MR. HEIMANN:   Let's go to the second page.

22         And then let's go to the third.

23    BY MR. HEIMANN:

24    Q.   So this third attachment, that's the ATT file; right?

09:37:42   25    A.   It is.

1  Q.  So this is really the rest of the text to that email?

2  A.  Yes.

3          MR. HEIMANN:  Okay.  Let's go to the second.

4  BY MR. HEIMANN:

09:37:50  5  Q.  And then this is the attachment that -- the attachment,

6  the --

7          MR. HEIMANN:  Let's go back to the first.

8  BY MR. HEIMANN:

9  Q.  Let's get the name right.

09:38:02  10          This is the "E-Pro Systems Non-AF.pdf" attachment?

11  A.  It is.

12  Q.  On page 2?

13  A.  Yes.

14          MR. HEIMANN:  So let's go there.

09:38:10  15  BY MR. HEIMANN:

16  Q.  And who is -- whose names are on these signature block?

17  A.  David Rodgers and Gordon Pardy.

18          MR. HEIMANN:  Your Honor, that's what I need to do

19  with Inspector Hacker at this time.  We'll recall her for

09:38:35  20  additional exhibits.

21          MR. FLEENER:  I have no cross, Judge.

22          MR. WARD:  I have nothing, Your Honor.

23          MR. JUBIN:  Good morning, ladies and gentlemen.

24          JURY MEMBERS:  Good morning.

09:39:17  25          MR. JUBIN:  Good morning, Inspector Hacker.

```
19-CR-26-ABJ          HACKER - CROSS - JUBIN          Vol. V-548
21-CR-14-ABJ
```

1           THE WITNESS:  Good morning.

2           MR. JUBIN:  Let me see if Danielle's ready for me.

3                        **CROSS-EXAMINATION**

4    BY MR. JUBIN:

09:39:44   5    Q.  You talked about Exhibit 12 on Friday.

6           MR. JUBIN:  If we could pull up Government's

7    Exhibit 12.

8           This is admitted; correct?

9           THE COURTROOM DEPUTY: (Moved head up and down.)

09:40:13  10           MR. JUBIN:  It's displayed to all?

11           THE COURTROOM DEPUTY:  Yes.

12           MR. JUBIN:  Thank you.

13    BY MR. JUBIN:

14    Q.  Now, you testified about this Justin Herman email to

09:40:22  15    Joslyn Claiborne; right?

16    A.  This is an email from Justin Herman to Joslyn Claiborne.

17    Q.  Right.

18           And you've shown a number of these documents over the

19    last course of your testimony here on Friday and then into

09:40:38  20    today; correct?

21    A.  Yes.

22    Q.  And these communications between Justin Herman and

23    Joslyn Claiborne do not include Ian Horn as somebody who was a

24    party to the email; correct?

09:40:52  25    A.  Correct.

```
19-CR-26-ABJ          HACKER - CROSS - JUBIN          Vol. V-549
21-CR-14-ABJ
```

 1    Q.  And that would be something that the jury would want to

 2    know about in order to evaluate what Mr. Horn might know?

 3              MR. HEIMANN:  Objection; argument.

 4              THE COURT:  Sustained.

09:41:08  5              The jury will disregard the comment.

 6    BY MR. JUBIN:

 7    Q.  Would you agree that the email documents showing who sent

 8    and who received and who was copied on an email exhibit --

 9    that speaks for itself?

09:41:25  10              MR. HEIMANN:  Objection; argument.

11              THE COURT:  It is.

12              Sustained.

13    BY MR. JUBIN:

14    Q.  Well, then I -- I will go through each one, then, to

09:41:39  15    identify which ones include Ian Horn and which ones don't,

16    then.  Or most of them, anyway.

17              Let's take a look at Exhibit 15.1.

18         (Discussion held at counsel table.)

19              MR. JUBIN:  If I may have a moment, Your Honor.

09:42:42  20              THE COURT:  You may.

21              MR. JUBIN:  I didn't give Danielle enough preparation

22    for that one.

23              Do you have 15.1?

24    BY MR. JUBIN:

09:43:29  25    Q.  And this is an email from Mitchell to Herman; correct?

19-CR-26-ABJ          HACKER - CROSS - JUBIN          Vol. V-550
21-CR-14-ABJ

1    A.  It is.

2    Q.  And it was sent on July 23rd of 2015?

3    A.  Yes.

4    Q.  And it's sending some document labeled "ECMZ debt

09:43:42    5    conversion wire.pdf, Bravo wire activity"; right?

6         Those two documents?

7    A.  Yes.

8    Q.  And this email does not include Ian Horn; correct?

9    A.  It does not.

09:43:52    10    Q.  And those attachments, if we recall correctly, were the --

11    sending this $80,000 wire from Mitchell's Bravo Two Zero bank

12    account to Ian Horn; correct?

13    A.  Yes.

14    Q.  So Herman got from Mitchell, the sender of this wire to

09:44:28    15    Ian Horn, the sender, Mitchell's, bank statement; correct?

16    A.  Could you repeat that?

17    Q.  So Herman received from Mitchell, who was the sender of

18    the wire -- he received the sender, Mitchell's, bank

19    statement; right?

09:44:45    20    A.  He received his outgoing wire transfer request and wire

21    records.  I don't see his statement in this email.

22    Q.  Okay.  Not -- not in this one, but there was another one

23    where he got it; right?

24         Where he got the bank statement.

09:45:00    25    A.  I don't recall that.

1         MR. JUBIN:  Okay.  And if you -- let's show that wire

2  request -- no -- same document, scroll -- scroll down.

3         There we go.

4  BY MR. JUBIN:

09:45:23  5  Q.  And that's where the amount shows $80,000; right?

6  A.  Yes.

7  Q.  Okay.  And, later on, you've shown the jury documents

8  where this was altered by someone to show $280,000; right?

9  A.  Yes.

09:45:49  10  Q.  And on those emails exchanged between these individuals,

11  Mitchell and Herman, Ian Horn's not on any of those emails;

12  correct?

13  A.  Are you referring to the altered wire transfer record?

14         MR. FLEENER:  Objection to the comment.

09:46:08  15         THE COURT:  Well, it's a question.

16  BY MR. JUBIN:

17  Q.  The question is, in sending -- in the transmission of the

18  documents that have to do with the alteration from the 80,000

19  to the 280,000, Ian Horn's not on those emails, is he?

09:46:27  20  A.  Ian Horn is not.

21         MR. JUBIN:  Let's take a look at 16.1.

22  BY MR. JUBIN:

23  Q.  This is that email from Justin Herman to Joslyn Claiborne

24  where he's talking about the $280,000 being a pretty good

09:46:51  25  number for the price for this conversion.

```
19-CR-26-ABJ          HACKER - CROSS - JUBIN          Vol. V-552
21-CR-14-ABJ
```

1             Do you recall that?

2    A.  Yes.

3    Q.  And Ian Horn is not a party to this email; correct?

4    A.  Correct.

09:47:00    5             MR. JUBIN:  Take a look at 16.2.

6    BY MR. JUBIN:

7    Q.  And that's the attachment to 16.1; right?

8    A.  It is one of the attachments in the email, yes.

9             MR. JUBIN:  Okay.  Let's take a look at 16.3.

09:47:13   10    BY MR. JUBIN:

11    Q.  And that's the attachment to this email where Ian Horn is

12    not a party to it that shows this document now saying

13    $280,000; right?

14    A.  Ian Horn's not on that email.

09:47:36   15    Q.  Right.  And -- and the document that we're looking at now

16    is $280,000; right?

17    A.  Yes.

18             MR. JUBIN:  And 16.4.

19    BY MR. JUBIN:

09:47:59   20    Q.  That was another attachment to this email?

21    A.  Yes.

22             MR. JUBIN:  Let's take a look at Exhibit 202 that you

23    discussed this morning.

24    BY MR. JUBIN:

09:48:36   25    Q.  Now, this is that email from Justin Herman to Tom Crom

---

1  regarding EcoEmissions; correct?

2  A.  Yes.

3  Q.  And would you agree with me that Ian Horn is not a party

4  to this email or any of its -- any of its email string?

09:49:18   5  A.  I would agree.

6        MR. JUBIN:  Let's look at Exhibit 6.

7  BY MR. JUBIN:

8  Q.  You talked about this.  This is Mr. Crom's change of the

9  ECMZ articles of incorporation; correct?

09:49:51   10  A.  Yes.

11  Q.  Changing the name to NuTech Energy?

12  A.  Yes.

13  Q.  And you don't have any information that Ian Horn was

14  associated with that, do you?

09:50:06   15  A.  I don't.

16        MR. JUBIN:  Let's take a look at 18.1.

17  BY MR. JUBIN:

18  Q.  This is something from -- both -- down below here, it

19  shows where there's an email from Justin Herman to -- let's

09:50:40   20  see if I can -- it's Justin Herman to Joslyn Claiborne; right?

21  A.  It is.

22  Q.  And it does not include Ian Horn; correct?

23  A.  Correct.

24  Q.  And if you look below, again, it's communications

09:51:12   25  between --

19-CR-26-ABJ          HACKER - CROSS - JUBIN          Vol. V-554
21-CR-14-ABJ

1              MR. JUBIN:  Scroll up.  Stop.

2    BY MR. JUBIN:

3    Q.  You see it's communications between Justin Herman and

4    Joslyn Claiborne; right?

09:51:21   5    A.  I do see that.

6    Q.  That's what's being forwarded?

7    A.  Yes.

8    Q.  No Ian Horn on this communication; correct?

9    A.  Correct.

09:51:32   10   Q.  There came a time when you asked Ian Horn about these

11   transactions; correct?

12             MR. HEIMANN:  Objection; Your Honor, outside the

13   scope of direct.

14             THE COURT:  Sustained.

09:52:08   15             MR. JUBIN:  Okay.  We'll come back to that.

16             Let's take a look at 25.1.

17   BY MR. JUBIN:

18   Q.  This is another one of the communications that you just

19   showed us that is between Justin Herman and Joslyn Claiborne;

09:53:00   20   correct?

21   A.  Correct.

22   Q.  And Ian Horn is not on this communication?

23   A.  He is not.

24   Q.  And this is attaching and sending to Ms. Claiborne at

09:53:15   25   Pacific Transfer a NERG legal opinion; correct?

1    A.  Yes.

2    Q.  And you showed us that legal opinion.  Is it attached to

3    this?

4            MR. JUBIN:  Does it scroll down to it?

09:53:29    5            Does not.  Okay.

6    BY MR. JUBIN:

7    Q.  So Justin Herman's sending Joslyn Claiborne a legal

8    opinion; right?

9    A.  Yes.

09:53:39   10    Q.  And that legal opinion, as you've shown us, contains a

11    signature that looks like "Ian Horn"; right?

12    A.  Yes.

13    Q.  And so would it be really important for you to know if

14    there was communication between Justin Herman and Horn leading

09:53:58   15    up to September 23rd when this email was sent?

16    A.  Yes.

17    Q.  And the nature of that communication would assist you, as

18    an investigator, in determining or substantiating Herman's

19    claims that Attorney Horn actually had a role in this letter

09:54:20   20    he was attaching to Ms. Claiborne; correct?

21    A.  Could you repeat that?

22    Q.  The nature of the communication you would be looking for

23    between Mr. Horn and Mr. Herman would help you substantiate

24    whether or not Mr. Horn actually had some role in this letter

09:54:35   25    that Mr. Herman was sending to Ms. Claiborne; correct?

1    A.   Yes.

2         MR. JUBIN:  Well, let's look at what happened in that

3    time frame.

4         This is not yet introduced.

09:54:59  5         Could you pull up 1029?

6    BY MR. JUBIN:

7    Q.   Do you recognize this?

8    A.   I believe it was in our opening.

9    Q.   Uh-huh.  Is this a document you saw in the course of your

09:55:21  10   investigation, the "Ian the Crackhead Horn," letter?

11   A.   I don't recall if it was this exact one.

12   Q.   All right.  Do you recall one that was found on

13   Justin Herman's computer?

14   A.   I don't recall.

09:55:46  15   Q.   Was there more than one "Ian the Crackhead Horn" letter on

16   Justin Herman's computer?  Or just one?

17   A.   I don't recall.

18   Q.   Would it be important for you, as an investigator, to know

19   if someone was using another person's identity?

09:56:06  20   A.   Yes.

21   Q.   Critical, in fact, isn't it?

22   A.   Very important.

23   Q.   So if you find a letter that says "Ian Horn, letterhead,

24   124 Florida Avenue," and has some stuff related to a $280,000

09:56:29  25   transaction and the signature is "Very best regards, Ian the

19-CR-26-ABJ        HACKER - CROSS - JUBIN        Vol. V-557
21-CR-14-ABJ

1  Crackhead Horn," that would be tremendously important for you

2  to try to ascertain whether or not the individual who's the

3  subject of that letter was being used or was in on it;

4  correct?

09:56:46  5  A.  May I share what I think when I see this?

6  Q.  You can answer the question.

7  A.  Okay.  Could you repeat it?

8       MR. JUBIN:  Can you read that one back?

9       THE COURT REPORTER:  "Question:  So if you find a

10  letter that says 'Ian Horn, letterhead, 124 Florida Avenue,'

11  and has some stuff related to a $280,000 transaction and the

12  signature is 'Very best regards, Ian the Crackhead Horn,' that

13  would be tremendously important for you to try to ascertain

14  whether or not the individual who's the subject of that letter

09:57:34  15  was being used or was in on it; correct?"

16  A.  No.

17  BY MR. JUBIN:

18  Q.  Okay.  Okay.  Doesn't matter to you?

19  A.  This specific letter, no.

09:57:51  20  Q.  Okay.  And this was dated August 31, 2015?  That's when it

21  was found?

22       MR. HEIMANN:  Your Honor, we're beyond foundation

23  here.  Counsel's simply testifying as to what's in a letter

24  that hasn't been admitted.

09:58:11  25       THE COURT:  Sustained.

Melanie Sonntag, RDR, CRR, CRC        MelanieSonntagCRR@gmail.com

1    MR. JUBIN:  I'll move on.

2    BY MR. JUBIN:

3    Q.  That same day, August 31 of 2015, is the day -- the date

4    of the letter you found on Herman's computer replacing this

09:58:30    5    Crackhead Horn letter, claiming the $280,000 escrow that was

6    then sent to Claiborne; correct?

7    MR. HEIMANN:  Objection; facts not in evidence.

8    MR. JUBIN:  It's a question.

9    THE COURT:  It is a question.

09:58:50    10    THE WITNESS:  Could you repeat the question?

11    MR. JUBIN:  Sure.

12    BY MR. JUBIN:

13    Q.  Well, there's this -- on August 31st, that's the same day

14    that you found a replacement for this "Ian the Crackhead Horn"

09:59:08    15    letter claiming that this $280,000 in escrow -- or this

16    200,000 -- $280,000 transaction -- it was a -- the letter that

17    ultimately went to Ms. Claiborne; right?

18    A.  I don't know what letter you're referring to.

19    Would you be able to refresh my memory by showing me

09:59:31    20    what letter?

21    Q.  I might.

22    MR. JUBIN:  I think it's something we're going to

23    have to come back to.

24    BY MR. JUBIN:

09:59:57    25    Q.  Suffice it to say about this same time there was a letter

1   with the same subject -- same basic body as this "Ian the

2   Crackhead Horn" letter -- that actually went from

3   Justin Herman to Liz Claiborne [sic], but it was cleaned up;

4   right?

10:00:11   5   A.  I don't recall that.

6   Q.  You didn't find any text or emails with Mr. Horn with this

7   confirmation of the escrow of the $280,000 with ECMZ, did you?

8   A.  I did not.

9   Q.  And then Mr. Horn and Mr. Winters exchanged messages about

10:00:51   10   this phony document; correct?

11   A.  Could you repeat that?

12        MR. JUBIN:  Well, let's take a look at 2209.

13   BY MR. JUBIN:

14   Q.  Have you seen this, these text exchanges between

10:01:09   15   Mr. Winters and Mr. Herman?

16   A.  Yes.

17   Q.  Okay.  So on --

18        MR. JUBIN:  I'd move to admit IH-2209.

19        MR. WARD:  May I have a moment, Your Honor.

10:01:32   20        MR. HEIMANN:  Your Honor, the -- lack of foundation

21   at the moment.  He may be able to get there, but I've seen

22   these text messages as insufficient.

23        MR. FLEENER:  I would join that objection.

24        MR. JUBIN:  I'll lay additional foundation, Your

10:02:01   25   Honor, if the witness is willing to give it.

1   BY MR. JUBIN:

2   Q.   The text messages that are before you labeled IH-2209, you

3   say you've seen these; correct?

4   A.   Yes.

10:02:13   5   Q.   Where did the text messages come from that you were --

6   that you're looking at?

7   A.   That I don't know.

8   Q.   Did you conduct any -- any searches or review of any

9   computers or other information in this case?

10:02:34   10   A.   I did, a lot.

11   Q.   You did a lot.

12        Have you just forgotten where you got this from?

13   A.   There could be multiple sources where text messages were

14   found.  I don't recall which source it came from.

10:02:46   15   Q.   Okay.  Would you agree that the text messages you're

16   reviewing are true and accurate reflections of what the

17   Government provided us in discovery?

18   A.   These four lines are accurate, yes, to my memory.

19   Q.   So it accurately reflects the text messages between

10:03:15   20   Chuck Winters and Justin Herman?

21   A.   Yes.

22        MR. JUBIN:  I'd move for the admission of Ian Horn

23   2209.

24        MR. HEIMANN:  No objection.

10:03:25   25        THE COURT:  2209 is received, IH-2209.

19-CR-26-ABJ          HACKER - CROSS - JUBIN          Vol. V-561
21-CR-14-ABJ

1    (Defendant's Exhibit IH-2209 received into evidence.)

2          MR. JUBIN:  Please publish.

3    BY MR. JUBIN:

4    Q.  So, remember, we were looking at that "Ian the Crackhead

10:03:52    5    Horn" email that you were talking about?  And that was dated

6    the 31st of August; correct?

7          MR. HEIMANN:  Your Honor, counsel is testifying.

8    He's testifying about a document that hasn't been admitted.

9          MR. JUBIN:  It's a question.

10:04:01    10         MR. HEIMANN:  We are beyond foundation.  If -- once

11   it's admitted, these are appropriate questions.  It's not

12   admitted.

13         THE COURT:  Sustained.

14   BY MR. JUBIN:

10:04:10    15   Q.  What's the date of the email from Chuck Winters that says

16   "If Ian's doc is okay, save in PDF before you send it"?

17   A.  An e- -- could you repeat that?  I thought you said an

18   email.

19   Q.  I meant text message, yes.  Thank you.

10:04:29    20         The very first text message was sent on August 13th,

21   2015; correct?

22   A.  Yes.

23   Q.  And Mr. Winters' "Don't send in Word," that was sent on

24   August 31st, 2015; correct?

10:04:47    25   A.  Yes.

```
19-CR-26-ABJ        HACKER - CROSS - JUBIN        Vol. V-562
21-CR-14-ABJ
```

1    Q.  And, still, there's no communication in this time frame

2    regarding Ian Horn; correct?

3    A.  Ian Horn is not part of this text chat, correct.

4    Q.  He wasn't, was he?

10:05:20    5    A.  He wasn't.

6    Q.  And then on September 8th, you talked about --

7                MR. JUBIN:  Has Government 19.1 been admitted?

8                THE COURTROOM DEPUTY:  Yes.

9                MR. JUBIN:  Let's take a look at Government 19.1.

10:05:57    10                THE COURT:  It's been admitted.

11    BY MR. JUBIN:

12    Q.  Now, this is -- this is one where Justin Herman is

13    requesting from Chuck Winters in an email a blank Word

14    document with Ian Horn's letterhead; correct?

10:06:22    15    A.  Correct.

16    Q.  Let's take a look at -- well, let me just ask the

17    question:  And this was forwarded by Mr. Winters -- again --

18    or Mr. Winters gave a response, a reply to this, and sent a

19    document with Ian Horn's letterhead and signature; correct?

10:06:44    20    A.  Yes.

21    Q.  And eight days later, on the 16th of September --

22    A.  I don't recall the date.

23    Q.  Okay.  It was forwarded again to Justin Herman?  Do you

24    recall that?

10:06:55    25    A.  From Chuck Winters?

1    Q.   From Chuck Winters.

2    A.   Yes.

3    Q.   He sent that letterhead again; right?

4    A.   Yes.

10:07:01    5    Q.   Okay.  And, still, during that time period, there wasn't

6    any evidence of communication about that with Ian Horn;

7    correct?

8    A.   Correct.

9    Q.   And we know that there were two opinion letters that were

10:07:51   10    subsequently submitted, the first one dated September 16 of

11    2015; correct?

12    A.   To Pacific Stock Transfer, yes.

13    Q.   And it had that familiar Ian Horn signature, the one that

14    was sent from Chuck Winters to Justin Herman, didn't it?

10:08:15   15    A.   I -- I recall that it had Ian Horn's signature on it or a

16    signature that said "Ian Horn."

17    Q.   Yeah.  You don't recall if it's the same one that you saw

18    in all of these -- the same electronic reproduced signature

19    that you saw in all of these letters?

10:08:36   20    A.   Correct.  I don't recall if it's the same one in all of

21    them.

22    Q.   Did you or the Government ever engage in any kind of

23    effort to ascertain whether or not that signature was

24    identical on all of those letters?

10:08:52   25    A.   We did not.

```
19-CR-26-ABJ           HACKER - CROSS - JUBIN           Vol. V-564
21-CR-14-ABJ
```

1              MR. JUBIN:  Let's take a look at 25.1.

2     BY MR. JUBIN:

3     Q.  So this is an email from Justin Herman to

4     Joslyn Claiborne; correct?

10:09:33   5     A.  Correct.

6     Q.  And he's attaching a legal opinion dated September 23rd of

7     2015; correct?

8     A.  Correct.

9     Q.  And he makes a representation in this email that "This

10:09:46   10    legal has been paid for by the word written and is much easier

11    to read."

12              Do you see that?

13    A.  I do.

14    Q.  Did you find any evidence other than this statement itself

10:09:57   15    that any opinion letter was ever "paid for by the word"?

16    A.  I did not investigate that, whether something was paid for

17    by the word.

18    Q.  Okay.  But you saw this in this email; right?

19    A.  Yes.  I see it.

10:10:19   20    Q.  And you didn't find anything to suggest that that was

21    true; correct?

22    A.  I didn't investigate it.

23    Q.  So it could be true; it could be false?  Is that your

24    testimony?

10:10:32   25    A.  That would be accurate.

1    Q.  And so it would be important for you in an investigation

2    to know if there were communications with Ian Horn about this

3    letter; correct?

4    A.  Yes.

10:11:04    5    Q.  And it would be important for you to know if Ian Horn said

6    anything about the creation of this letter; correct?

7    A.  Yes.

8    Q.  And, in fact, you would expect, if Ian Horn had a role in

9    it, that he would have communicated with Justin Herman about

10:11:30   10   that?

11            MR. HEIMANN:  Objection; argument.

12            MR. JUBIN:  It's cross-examination, Your Honor.

13            THE COURT:  You can lead.

14            MR. JUBIN:  Pardon?

10:11:40   15            THE COURT:  You may lead.

16            MR. JUBIN:  Okay.

17            Did you hear the question?

18            THE WITNESS:  Would you mind repeating it?

19            MR. JUBIN:  Could you, please?

10:11:48   20            Thank you.

21        (Pending question read.)

22   A.  Yes, I would expect Ian Horn to have communicated with

23   Mr. Herman.

24   BY MR. JUBIN:

10:12:10   25   Q.  Okay.  Well -- so in the course of your investigation,

1    I presume you did something along the lines of some sort of

2    time line.  Am I right?

3    A.  For every communication?

4    Q.  Something that would assist you in determining whether or

10:12:29   5    not these communications occurred.

6    A.  I did not create a time line.

7    Q.  Well, we'll go through them individually, then.

8        You -- you've agreed that Ian Horn was not involved

9    at all in the texts or the communications here that we've

10:12:52   10    discussed; right?

11   A.  Yes.

12   Q.  And, in fact, you found computer records that his name and

13   letterhead was being traded by other persons; correct?

14   A.  I found email messages.

10:13:06   15   Q.  Email messages?

16   A.  Yes.

17        THE COURT:  Could I interrupt you?

18        Good place to break for a moment, 10:15, midmorning

19   break?

10:13:16   20        MR. JUBIN:  Sure.  Thank you.

21        THE COURT:  We'll stand in recess for 15 minutes.

22        THE COURTROOM DEPUTY:  All rise.

23      (A recess was taken from 10:13 a.m. to 10:29 a.m.

24   Proceedings outside the jury's presence.)

10:30:51   25        THE COURTROOM DEPUTY:  Ready for jurors?

1          THE COURT:  We're ready.

2      (Proceedings within the jury's presence at 10:31 a.m.)

3          THE COURT:  Thank you, ladies and gentlemen.  Please

4   be seated.

10:32:42    5          Please continue, Mr. Jubin.

6          MR. JUBIN:  Thank you, Your Honor.

7   BY MR. JUBIN:

8   Q.  Ms. Hacker, we've talked a little bit about these two

9   opinion letters, September 16th of 2015 and September 23rd of

10:33:00   10   2015, and the evidence leading up to that, the exchange of --

11   of information between Mr. Herman and Mr. Winters leading up

12   to that.

13          MR. JUBIN:  Let's take a look now at Exhibit 25.2,

14   the September 23rd, 2015, opinion letter itself.

10:33:17   15   BY MR. JUBIN:

16   Q.  I draw your attention to the address there where it says

17   "Pacific Stock Transfer Company."

18          Do you see that there are different fonts in the

19   address for Pacific Stock Transfer Company?

10:33:39   20   A.  Yes.

21   Q.  And you see this is a letter dated September 23rd, 2015;

22   right?

23   A.  Yes.

24   Q.  Okay.  I draw your attention to the word "Dear sirs."

10:33:53   25          Do you see that?

19-CR-26-ABJ          HACKER - CROSS - JUBIN          Vol. V-568
21-CR-14-ABJ

1   A.  I do.

2   Q.  It's a different font than the -- than the text directly

3   underneath it; correct?

4   A.  It does appear so.

10:34:03   5   Q.  And then, as you go further in that first paragraph, it

6   seems to go back to a different font again; correct?

7   A.  After -- where it says "2008"?

8   Q.  Right.  It's -- then it says "There were separate

9   contracts" and goes on, and that part is in a different font,

10:34:23   10   maybe Times New Roman?

11   A.  It is a different font.  I don't know which one.

12   Q.  Okay.  Fair enough.

13         MR. JUBIN:  Go ahead and scroll down.

14         And keep scrolling.

10:34:43   15   BY MR. JUBIN:

16   Q.  And at the very end there, we get to a signature; right?

17         So on this letter that's had its fonts cobbled

18   together like, we find a signature that says "Ian Horn,

19   Esquire"; right?

10:35:03   20   A.  The text says "Ian Horn, Esquire," yes.

21   Q.  Right.  And the signature itself says "Ian Horn"; right?

22   A.  Yes.

23   Q.  And that's a pretty familiar signature; right?

24         Because it's the same one that's on all of these

10:35:16   25   letters; right?

19-CR-26-ABJ          HACKER - CROSS - JUBIN          Vol. V-569
21-CR-14-ABJ

 1   A.  It looks similar.

 2   Q.  And in the time leading up to the creation of this letter

 3   that you've testified, you don't have any evidence that

 4   Ian Horn had communications with Mr. Herman or Mr. Winters

10:35:44   5   leading up to the creation of this letter; correct?

 6   A.  I would disagree a little about that.

 7   Q.  Maybe based on things that Mr. Horn himself told you?

 8   A.  No.  Based on text messages.

 9   Q.  There's text messages with Ian Horn relating to this

10:36:14   10   letter?

11   A.  Your -- I believe your question was about just

12   communication leading up to this date.

13        That's how I understood it.

14   Q.  Okay.  Well, let me be clear, then.  You didn't do a

10:36:32   15   time line; right?

16   A.  Correct.

17   Q.  But we do know, in the correspondence and communications

18   between Mr. Herman and Mr. Winter leading to the creation of

19   this letter, that Ian Horn was not on those communications;

10:36:49   20   right?

21   A.  I don't know what -- let's see.  How's best to explain

22   this?

23        I --

24   Q.  Well, let me ask it this way:  You went through all the

10:37:09   25   emails.  Ian Horn wasn't on them; correct?

19-CR-26-ABJ          HACKER - CROSS - JUBIN          Vol. V-570
21-CR-14-ABJ

1   A.   Correct.

2   Q.   If you had text messages, you'd show them to us; correct?

3   A.   Text messages relating to drafting of the opinion letter.

4   Q.   The creation of this letter.

10:37:27   5   A.   Yes.

6   Q.   Okay.  And there are none; true?

7   A.   Drafting an opinion letter, there are no text messages,

8   correct.

9          MR. JUBIN:  Let's take a look at 25.3.

10:38:12   10         And scroll down.

11   BY MR. JUBIN:

12   Q.   You showed us those signatures earlier; right?

13   A.   Yes.

14         MR. JUBIN:  Let's take a look at 24.3.

10:38:23   15   BY MR. JUBIN:

16   Q.   And those were the -- that's the email transmitting that

17   assignment that we just looked at; is that right?

18   A.   This is the email transmitting an assignment.

19         As I pointed out, there were minor differences

10:39:04   20   between this one and the one that was submitted to Pacific

21   Stock Transfer.

22   Q.   Okay.  And Ian Horn wasn't on these communications;

23   correct?

24   A.   Correct.

10:39:12   25         MR. JUBIN:  Let's go to 301.

```
19-CR-26-ABJ          HACKER - CROSS - JUBIN          Vol. V-571
21-CR-14-ABJ
```

1  BY MR. JUBIN:

2  Q.  And this is Mr. Winters sending Mr. Herman that

3  convertible note that you introduced and talked about;

4  correct?

10:39:37  5  A.  Yes.

6  Q.  Again, Mr. Horn was not on this communication; correct?

7  A.  Correct.

8         MR. JUBIN:  Let's take a look at 26.1.

9  BY MR. JUBIN:

10:40:00  10  Q.  This is a letter from Justin Herman to Joslyn Claiborne at

11  Pacific Transfer.  Do you recall this?

12  A.  I do.

13  Q.  And there's a -- some sort of nonaffiliation letter that

14  Mr. Herman sent to Ms. Claiborne?

10:40:14  15  A.  Yes.

16  Q.  And, again, Ian Horn wasn't a party to this communication;

17  correct?

18  A.  Correct.

19  Q.  You showed us a document a little bit ago that was a -- a

10:40:37  20  wire transfer document that had Ian Horn's name on it.

21         Do you recall that?

22  A.  The Wells Fargo wire transfer?

23  Q.  From Bravo Two Zero in the amount of -- well, you showed

24  us one that had $80,000, which was the amount that was really

10:40:53  25  wired; right?

---

19-CR-26-ABJ              HACKER - CROSS - JUBIN              Vol. V-572
21-CR-14-ABJ

1    A.  Yes.

2    Q.  And you showed us one that was faked to look like it said

3    200- --

4          MR. FLEENER:  Objection to the question, form of the

5    question.

6          THE COURT:  Sustained.

7    BY MR. JUBIN:

8    Q.  You had one that had the number 280,000 in it; correct?

9    A.  Yes.

10   Q.  And both of those documents showed that -- had Ian Horn's

11   name on it; right?

12   A.  Yes.

13   Q.  But Ian Horn received the $80,000 to escrow; correct?

14   A.  He did.

15         MR. JUBIN:  I don't have anything further at this

16   time.

17         MR. HEIMANN:  No redirect, Your Honor.

18         THE COURT:  Very well.

19         MR. FLEENER:  Your Honor --

20         THE COURT:  You may step down.

21         MR. FLEENER:  -- I have some brief questioning based

22   on Mr. Jubin's.

23         THE COURT:  You may.

24         MR. FLEENER:  Ma'am, good morning.

25         THE WITNESS:  Good morning.

10:41:00
10:41:07
10:41:25
10:41:45
10:41:59

1                    **CROSS-EXAMINATION**

2   BY MR. FLEENER:

3   Q.  Mr. Jubin went through the -- in excruciating detail --

4   the lack of communications on -- on various documents between

5   Justin Herman and his client Ian Horn; correct?

6   A.  He did.

7   Q.  But it's true they could have talked on the phone?

8   A.  Yes.

9   Q.  And that's certainly one -- one means -- or one way that

10  people communicate?  Justin Herman could have picked up the

11  phone and talked to Ian Horn about the contents of the emails?

12  You wouldn't know any different?

13  A.  Correct.

14  Q.  They could have been FedExing opinion letters back and

15  forth?  You wouldn't know that, either?

16  A.  Correct.

17          MR. FLEENER:  Thank you very much.

18                   **RECROSS-EXAMINATION**

19  BY MR. JUBIN:

20  Q.  Agent Hacker, did you find any evidence that there was

21  FedExing of opinion letters back and forth?  You didn't find

22  that evidence, did you?

23  A.  I did not investigate that.

24          MR. JUBIN:  Thank you.

25          MR. FLEENER:  One follow-up?

1    THE COURT:  We're getting --

2                    **RECROSS-EXAMINATION**

3  **BY MR. FLEENER**:

4  Q.  But you did find evidence that Ian Horn received payments

10:43:19    5  from NuTech; correct?  There were wires into his account and

6  there's -- there's -- you received information that Ian Horn

7  was paid out of those wires?

8  A.  Ian Horn did receive wires, not from an account with the

9  name of NuTech.

10:43:38   10  Q.  No, but he received wires in relation to NuTech and the

11  funding of NuTech and the purchasing of the EcoEmissions

12  shell?

13  A.  That's correct.

14  Q.  And from the purchase of the EcoEmissions shell, there

10:43:49   15  were communications and evidence that Ian Horn received money

16  from that?

17  A.  Yes.

18  Q.  And if he wasn't writing legal opinions -- well, let me

19  ask you this:  What evidence did you find that legal --

10:44:01   20  that -- excuse me -- that Ian Horn did any other legal work

21  other than possibly writing the legal opinions?

22  A.  Could you repeat that?

23  Q.  Did you find any evidence that Ian Horn ever did any

24  other -- any legal work in this case?

10:44:14   25  A.  Did I find evidence that Ian Horn did any legal work --

1    Q.  Yes.

2    A.  -- in this case?

3          MR. HEIMANN:  Your Honor, it's ambiguous.  "Any legal

4    work in this case"?  All of that's ambiguous.

10:44:32    5          MR. FLEENER:  I can rephrase.

6          THE COURT:  You may.

7    BY MR. FLEENER:

8    Q.  Did you -- I want you to put the legal opinions that

9    Mr. Jubin discussed aside for the moment.  Okay?

10:44:44    10    A.  Okay.

11    Q.  Relating to the purchase of the EcoEmissions shell, which

12    was then, you know, converted to -- to NuTech, did you find

13    any evidence that -- that Ian Horn did any legal work

14    involving that?

10:44:58    15    A.  I'm not sure if it qualifies as legal work because I'm not

16    an attorney.  But he did act as escrow --

17    Q.  Okay.

18    A.  -- and money went into his escrow account, and then he

19    disseminated it.

10:45:09    20    Q.  Right.  So he was either -- he received money in his

21    escrow and he disseminated it out; correct?

22    A.  Yes.

23    Q.  And he kept some money?

24    A.  Yes.

10:45:16    25          MR. FLEENER:  Okay.  Thank you.

---

19-CR-26-ABJ       HACKER - FURTHER RECROSS - JUBIN       Vol. V-576
21-CR-14-ABJ

1                    **FURTHER RECROSS-EXAMINATION**

2    BY MR. JUBIN:

3    Q.   Agent Hacker, did you conduct an investigation to

4    ascertain whether or not Mr. Horn filed lawsuits on behalf of

10:45:33   5    Justin Herman?

6    A.   I believe that Mr. Horn talked about that during his

7    interview.

8    Q.   Okay.  Did you go to the Florida counties where he filed a

9    lawsuit involving a patent?

10:45:50  10    A.   No, I did not.

11   Q.   Did you look at the court file to see those documents?

12   A.   I did not.

13   Q.   So -- how about a lawsuit involving a real estate dispute?

14   Did you see that?

10:46:02  15   A.   No.

16   Q.   Did you do any investigation that related to a trust he

17   created for someone that Justin Herman referred to him?

18   A.   No.

19   Q.   Okay.  So these are things all -- that you don't really

10:46:14  20   have any knowledge about because you didn't investigate;

21   correct?

22   A.   Correct.

23            MR. JUBIN:  Okay.  Thank you.

24            THE COURT:  You can step down.

10:47:04  25            MR. HEIMANN:  Your Honor, the United States of

1  America calls Gordon Pardy.

2        THE COURTROOM DEPUTY:  Please raise your right hand.

3    (Witness sworn.)

4        THE COURTROOM DEPUTY:  Please take a seat.

10:47:53   5        And please state and spell your name for the record.

6        THE WITNESS:  Gordon Pardy, G-o-r-d-o-n P-a-r-d-y.

7    **GORDON PARDY, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

8    **BY MR. HEIMANN:**

9    Q.  How old are you?

10:48:07  10   A.  I am 64 years old.

11   Q.  Where were you born and raised?

12   A.  Regina, Saskatchewan, Canada.

13   Q.  Where do you live now?

14   A.  I live in Phoenix, Arizona.

10:48:14  15   Q.  What is the highest legal of education you have obtained?

16   A.  Two years of college.

17   Q.  What is your current occupation?

18   A.  I own -- co-own an insurance company.

19   Q.  I'm sorry?

10:48:25  20   A.  I co-own an insurance company.

21   Q.  Do you know a man named Tom Crom?

22   A.  I do.

23   Q.  Did Mr. Crom contact you in December of 2014?

24   A.  Yes, he did.

10:48:41  25   Q.  Why did he contact you at that time?

19-CR-26-ABJ          PARDY - DIRECT - HEIMANN          Vol. V-578
21-CR-14-ABJ

1   A.   To acquire a -- a shell that E-Pro had in place to take a

2   company public.

3   Q.   Okay.  So let's unpack that.

4        You said "to acquire a shell that E-Pro had in

5   place."  What is E-Pro?

6   A.   E-Pro is a company that was formed to market emission

7   products and a patent technology.  That eventually we signed

8   agreements with others to acquire those patents.

9   Q.   Who's "we"?

10  A.   David Rodgers and myself.

11  Q.   Was this an LLC?

12  A.   Yes, it was.

13  Q.   Were you the managing members?

14  A.   I was -- I was the managing member.  Sorry.

15  Q.   And there was Mr. David Rodgers who was the other member?

16  A.   Correct.

17  Q.   And you -- you testified that Mr. Crom wanted to acquire a

18  shell.

19       What do you mean by that?

20  A.   We had acquired a clean public shell in the hopes that

21  someday we would take the company public.  By 2014 we had

22  given up on those hopes, and Mr. Crom asked if he could

23  acquire that shell.

24  Q.   What was the name of the shell?

25  A.   I believe it was EcoEmissions.

1   Q.  Did EcoEmissions owe you money?

2   A.  EcoEmissions -- it owed me money personally.  They owed

3   David Rodgers money, and they owed Kat Quevado money.

4   Q.  Did you have a convertible promissory note that was

10:50:17    5   evidence of what was owed to you?

6   A.  Yes, I did.

7   Q.  When was that promissory note given to you by

8   EcoEmissions?

9   A.  I believe it would have been in 2008.  In that time range.

10:50:32   10   Q.  How much did the company owe you?

11   A.  A hundred thousand dollars plus shares.

12   Q.  Was that note conver- -- was that debt convertible into

13   shares?

14   A.  Yes, it was.

10:50:46   15   Q.  Did you enter an agreement with Mr. Crom to release that

16   debt?

17   A.  I had a third party negotiate that.  I did not want to

18   deal with Mr. Crom at that time.

19   Q.  Okay.  So who negotiated it for you?

10:50:59   20   A.  Alan Lobock.

21   Q.  Is Mr. Lobock deceased?

22   A.  Yes, he is.

23   Q.  When did he pass?

24   A.  A little more than a year ago.

10:51:12   25   Q.  What agreement did you negotiate through Mr. Lobock with

1   Mr. Crom?

2   A.   The agreement was to pay $15,000.  Alan talked to

3   David Rodgers; David did not want part of it, so Alan and

4   I agreed to split the $15,000.

10:51:34   5   Q.   Okay.  How was the money to be split?

6   A.   Equally.

7   Q.   I'm sorry?

8   A.   Equally, 7500 each.

9   Q.   Okay.  And in exchange for this $15,000, what were you

10:51:51   10   going to do?

11   A.   Release our debt assignments on their notes.

12   Q.   And that includes -- was money owed to David Rodgers

13   separately?

14   A.   Yes.

10:52:01   15   Q.   So part of this agreement was that Mr. Rodgers would also

16   release his debt?

17   A.   Correct.

18        MR. HEIMANN:  So let's look at 11.1.

19   BY MR. HEIMANN:

10:52:11   20   Q.   And, Mr. Pardy, while that's coming up, was there a

21   written debt assignment agreement?

22   A.   There was a written debt assignment agreement.

23   Q.   Okay.  Sir, you have paper copies of the exhibits, so if

24   you need to look at those in front of you, you can.  They will

10:52:31   25   also show up on the screen.

19-CR-26-ABJ         PARDY - DIRECT - HEIMANN         Vol. V-581
21-CR-14-ABJ

1   A.  There's nothing on the screen -- oh, there we go.

2   Q.  There we go.

3        MR. HEIMANN:  So let's go to the next page.

4   BY MR. HEIMANN:

10:52:42   5   Q.  Okay.  So you have the same exhibit there.

6        You can look through the pages, 2 through 6.  Does

7   this appear to be a copy of the debt assignment agreement?

8   A.  Yes, it does.

9   Q.  Who drafted this agreement?

10:53:00   10   A.  I believe that would have been Alan Lobock.

11   Q.  There's some initials in the lower right-hand corner of

12   page 2 of the exhibit, first page of the agreement.

13        Do you recognize any of those handwritten initials?

14   A.  I recognize the top one as mine.

10:53:18   15   Q.  So the one that's kind of an oval?

16   A.  Yes.

17        MR. HEIMANN:  Let's go to page 5.

18   BY MR. HEIMANN:

19   Q.  There's a signature block there on the bottom of this

10:53:35   20   page for Gordon Pardy.  Did you sign that document?

21   A.  I did.

22   Q.  So is that your signature we see in the lower right-hand

23   corner?

24   A.  I believe it to be, yes.

10:53:45   25   Q.  You believe it to be.  You signed it; right?

1  A.  I signed it.

2  Q.  Okay.

3  A.  This is a copy.

4          I always sign in blue -- or I try.

10:53:51   5  Q.  I'm sorry?

6  A.  I always try to sign my agreements in blue.  So this is a

7  copy.

8  Q.  Understood.  Thank you.

9          You remember signing the debt -- the debt assignment

10:54:00  10  agreement, though?

11  A.  I do.

12  Q.  There's a date there, "1-2-15."  Did you write that in?

13  A.  I did.

14  Q.  What date does that stand for?

10:54:14  15  A.  January 2nd, 2015.

16  Q.  Is that when you signed the original of this document?

17  A.  I believe it to be.

18  Q.  And logistically how did you put your signature on this

19  document?

10:54:26  20  A.  I believe I would have signed it and scanned it and sent

21  it back to Alan.

22  Q.  Did you eventually receive the $7500?

23  A.  Yes, I did.

24  Q.  How did you receive that money?

10:54:51  25  A.  I believe it was transferred into my account.

1   Q.  Wire transfer?

2   A.  I believe so.

3   Q.  Did you provide wiring instructions to someone?

4   A.  I believe I would have provided that to Alan.

10:55:02   5   Q.  Do you know who wired the $7500 to you?

6   A.  I do not.

7         MR. HEIMANN:  Let's look at 11.2, please.

8         And let's do it this way:  Let's put 11.1 on the left

9   side and 11.2 on the right.

10:55:31   10   BY MR. HEIMANN:

11   Q.  So 11.1 we just looked at.  It's on the left-hand side of

12   the screen.  Do you see that?

13   A.  Yes, I do.

14         MR. HEIMANN:  Let's go to the second-to-last page on

10:55:58   15   that.

16         THE WITNESS:  Of 11.1?

17         MR. HEIMANN:  Yeah.  We're going to scroll up.

18         THE WITNESS:  Okay.  Thank you.

19   BY MR. HEIMANN:

10:56:11   20   Q.  So the signature block we see, that's the one we just

21   talked about; right?

22   A.  Yes, sir.

23   Q.  Okay.

24         MR. HEIMANN:  On 11.2 let's go to that same page.

25   ///

1   BY MR. HEIMANN:

2   Q.  So on 11.2, instead of "1-2-15," we see "1-2-14."

3       Did you ever sign a copy of that debt assignment

4   where you dated it in 2014?

10:56:40   5   A.  No, sir.

6   Q.  Did you ever authorize anybody to change the date for your

7   signature on this document?

8   A.  No, sir.

9   Q.  I'm sorry?

10:56:52   10   A.  No, sir.

11       MR. HEIMANN:  Let's put up 25.3.

12   BY MR. HEIMANN:

13   Q.  Okay.  Do you see this exhibit on your screen?

14   A.  Yes, I do.

10:57:20   15   Q.  Okay.  It's entitled "Purchase and Assignment of Interest

16   in Wells and Leases."

17       There's a company listed there, Bravo 20 Partners.

18   Do you recognize that company name?

19   A.  I saw this document when this investigation began.  I've

10:57:37   20   never seen the document before.

21   Q.  Have you ever seen that company name outside of this

22   investigation?

23   A.  Never.

24   Q.  Did you ever do any business with a company called

10:57:46   25   Bravo 20 Partners?

19-CR-26-ABJ              PARDY - DIRECT - HEIMANN              Vol. V-585
21-CR-14-ABJ

1   A.   Never that I'm aware of.

2   Q.   And E-Pro Systems, LLC, that's the company we talked about

3   earlier, E-Pro; right?

4   A.   Yes, sir.

10:57:57   5   Q.   "Yes"?

6   A.   Yes, sir.

7   Q.   Okay.  Do you see the paragraph beginning "In

8   consideration"?

9   A.   Yes, sir.

10:58:05   10   Q.   Did you ever enter an agreement where you were to be paid

11   $280,000 and given an assignment of wells and leases in

12   exchange for signing debt instruments, consulting agreements,

13   and shares of EcoEmissions?

14   A.   No, sir, I never did.

10:58:24   15        MR. HEIMANN:  Let's go to page 2.

16   BY MR. HEIMANN:

17   Q.   Do you see that signature block in the lower left with

18   your name on it?

19   A.   I do.

10:58:31   20   Q.   Did you sign that document?

21   A.   No, sir, I did not.

22   Q.   Did you authorize anyone to sign it for you?

23   A.   No, sir, I did not.

24        MR. HEIMANN:  Let's go to 26.1.

10:58:53   25        MR. FLEENER:  What number, 26.1?

|  |  |
|---|---|
| 1 | MR. HEIMANN:  26.1. |
| 2 | MR. FLEENER:  Thank you. |
| 3 | MR. HEIMANN:  Okay.  Let's go to the second page. |
| 4 | BY MR. HEIMANN: |
| 10:59:08  5 | Q.  Okay.  This is entitled "Statement of Nonaffiliation." |
| 6 | Outside this investigation, have you ever seen this document |
| 7 | before? |
| 8 | A.  No, sir, I have not. |
| 9 | Q.  Do you know what a statement of nonaffiliation -- |
| 10:59:25  10 | A.  No, sir, I do not. |
| 11 | Q.  Let me finish my question. |
| 12 | A.  I'm sorry. |
| 13 | Q.  Do you know what a statement of nonaffiliation is for? |
| 14 | A.  No, sir, I do not. |
| 10:59:34  15 | Q.  It says "From:  E-Pro Systems, LLC."  So that's your |
| 16 | company; right? |
| 17 | A.  That is correct. |
| 18 | Q.  Or it was.  Is it still in business? |
| 19 | A.  I can't answer that. |
| 10:59:50  20 | Q.  Do you see where it says "Issuer" -- about one-third of |
| 21 | the way down -- "NuTech Energy Resources"? |
| 22 | A.  I -- I see that. |
| 23 | Q.  Do you know -- have you had any business dealings with a |
| 24 | NuTech Energy Resources? |
| 11:00:12  25 | A.  No, I never have. |

1  Q.  Do you see the signature block at the bottom, where it has

2  your name?

3  A.  I do.

4  Q.  Did you sign this document?

11:00:22    5  A.  No, sir, I did not.

6  Q.  Did you authorize anyone to sign it for you?

7  A.  No, sir, I did not.

8        MR. HEIMANN:  I have no further questions on direct.

9        MR. JUBIN:  Good morning, Mr. Pardy.

11:01:11   10        THE WITNESS:  Good morning.

11        MR. JUBIN:  My name is Tom Jubin.  I represent

12  Ian Horn.  He's somebody seated over here.

13                    **CROSS-EXAMINATION**

14  **BY MR. JUBIN**:

11:01:16   15  Q.  You've never met him; correct?

16  A.  I have never met Ian Horn.

17  Q.  Okay.  But you apparently received some money that was

18  wired from an account that had -- that bore his name; correct?

19  A.  I -- again, I -- I don't remember who the money was wired

11:01:30   20  from.  I did see his name on the document.

21  Q.  Okay.  So you don't have any information about what

22  instructions he may have been given to wire you funds;

23  correct?

24  A.  No, sir, I do not.

11:01:43   25  Q.  You just know that you agreed to accept $7500 and the

1   money was wired to you as agreed?

2   A.  All of my conversations were with Alan Lobock.

3   Q.  Okay.

4   A.  And so I shared all my information with Alan Lobock.  How

5   he shared that with other people I do not know.

6   Q.  I understand.

7            MR. JUBIN:  Thank you, sir.

8            MR. FLEENER:  Sir, good morning.  How are you?

9            THE WITNESS:  Good morning.  I'm fine.

10                      **CROSS-EXAMINATION**

11   **BY MR. FLEENER:**

12   Q.  You -- and I'm going to try to make this a little bit

13   simpler.

14            You negotiated with Alan Lobock to essentially sell

15   the debt that -- in Eco Systems; correct?

16   A.  I gave Alan the authority to negotiate.

17   Q.  Okay.  And so -- and so when -- you wanted Alan to do what

18   he needed to do to get you your $7500?

19   A.  If I was to get $7500, that was fine.  I -- at that point

20   it was five or six years after I spent a year with cancer.

21   I was -- you know, that -- this wasn't a financial interest.

22   It was an offer and I told Alan to go ahead and -- and do it

23   if he could.

24   Q.  And he did?

25   A.  He did.

```
19-CR-26-ABJ          PARDY - CROSS - FLEENER          Vol. V-589
21-CR-14-ABJ
```

1   Q.  And in 2015 -- I think it was 2015 -- you received your

2   $7500 that you'd asked for; correct?

3   A.  I received $7500.

4   Q.  Say it again.  I'm sorry, sir?

11:03:38   5   A.  I did receive $7500.

6   Q.  And that was what you -- that was what you were expecting

7   to get?

8   A.  That is correct.

9   Q.  And -- I mean, the truth is, as far as signatures not

11:03:46   10   being yours, dates being changed, all of these things, you had

11   no idea about any of this until the investigators came to you;

12   correct?

13   A.  That is correct.

14   Q.  So for three years, give or take, you thought the deal was

11:04:02   15   done, you'd contracted -- given -- you'd given Mr. Lobock

16   authority to get the deal done, and you -- and he got the deal

17   done and you'd been paid?

18   A.  That is correct.

19   Q.  And you were never an officer of EcoEmissions; correct?

11:04:18   20   A.  I was never an officer of EcoEmissions.

21   Q.  And do you know what it means to be an affiliate or a

22   nonaffiliate?

23   A.  No, sir, I do not.

24        Sir, do you mind?  I -- you never introduced

11:04:46   25   yourself.

---

Melanie Sonntag, RDR, CRR, CRC              MelanieSonntagCRR@gmail.com

```
19-CR-26-ABJ          PARDY - CROSS - FLEENER          Vol. V-590
21-CR-14-ABJ
```

             1    Q.  Oh, sure.  I'm -- oh, I didn't.  I'm sorry.  My name is

             2    Tom Fleener.  I apologize.

             3          I represent Justin Herman.  I'm a lawyer from

             4    Laramie, sir.

11:04:54     5    A.  Thank you.

             6    Q.  I apologize.  I usually do introduce myself.  I'm sorry.

             7          The -- and as far as -- as -- your testimony is that

             8    you never signed a couple of those documents; correct?

             9    A.  There are a couple of documents I did not ever see before.

11:05:13    10    Q.  But -- but other than the signature being placed on those

            11    documents, which you say that you didn't -- that you didn't

            12    sign -- I mean, is -- to the best of your understanding . . .

            13    no one took out a -- a line of credit in your name; correct?

            14          MR. HEIMANN:  Objection; irrelevant.

11:05:35    15          THE COURT:  Sustained.

            16    BY MR. FLEENER:

            17    Q.  No one took credit cards out in your name; correct?

            18          MR. HEIMANN:  Objection; irrelevant.

            19          THE COURT:  Sustained.  The jury will disregard.

11:05:41    20    BY MR. FLEENER:

            21    Q.  You didn't know that this had ever happened until they

            22    came to you; correct?

            23    A.  That is correct.

            24    Q.  You got what you'd bargained for, the $7500; correct?

11:05:55    25    A.  In the debt assignment, that is correct.

19-CR-26-ABJ          PARDY - CROSS - FLEENER          Vol. V-591
21-CR-14-ABJ

1   Q.   And your . . . your -- your debt was convertible debt?

2   A.   The original agreements done in, I believe, 2008 were for

3   cash and stock, and that cash was convertible into stock at

4   some point in the future.

11:06:37   5   Q.   And you only -- I think you only owned like 140,000

6   shares, total, of Eco Systems.  Correct?  Something like that?

7   A.   That -- that sounds in the range.  I -- I don't know that

8   number off the top of my head.

9   Q.   And Eco Systems had millions upon millions of shares?

11:06:52   10   You didn't own 10 percent of EcoEmissions shares; correct?

11   A.   I -- I don't know how many outstanding shares there was.

12   Q.   And you -- and like I -- and I said this before.  I just

13   want to reiterate.

14        You were never an officer or director of

11:07:04   15   EcoEmissions?

16   A.   No, sir, I was not.

17   Q.   And the truth is you don't know what -- Mr. Lobock is now

18   deceased; correct?

19   A.   That is correct.

11:07:19   20   Q.   And so you can't speak as to what he -- what instructions

21   he gave to others regarding making this deal happen?

22   A.   I cannot.

23   Q.   But you did get the -- but you did get the benefit of your

24   bargain?  You got your $7500?

11:07:37   25   A.   I did get --

```
19-CR-26-ABJ          PARDY - CROSS - WARD          Vol. V-592
21-CR-14-ABJ
```

1    Q.  Thank you.

2    A.  -- $7500.

3    Q.  Thank you.

4         MR. FLEENER:  No further questions, Judge.

11:08:20    5         MR. WARD:  Good morning, Mr. Pardy.

6         My name is Zenith Ward, and I represent

7    Chuck Winters.

8                        **CROSS-EXAMINATION**

9    **BY MR. WARD**:

11:08:24   10    Q.  I introduced myself to you in the hallway just a moment

11   ago; is that right?

12   A.  Yes, you did.

13        Good morning again.

14   Q.  And that is the first time that you and I have ever

11:08:34   15   spoken; correct?

16   A.  Yes, sir.

17   Q.  Now, you said just a moment ago that you gave Alan Lobock

18   authority to negotiate the transaction in which you sold your

19   interest in the Eco shell; correct?

11:09:02   20   A.  That is correct.

21   Q.  And you didn't just give him authority?  You gave him full

22   authority; correct?

23   A.  That is correct.

24   Q.  And, in fact, you sent him an email -- actually, you sent

11:09:18   25   Tom Crom an email in which you said "We have given Alan full

1    authority"; correct?

2    A.   I -- I believe I did.

3    Q.   Now, I want to go over the history of your interest in the

4    EcoEmissions shell a little bit.

11:09:45    5         And how did that interest come about?  How did you

6    end up with an interest in the Eco shell?

7    A.   I don't remember all the details.  I'm -- I had very

8    little communication with Tom Crom.  When Dave and I were

9    working together, David had most of the conversations with

11:10:06    10   Tom.

11   Q.   Okay.

12   A.   I -- I --

13   Q.   So you formed a business with David Rodgers called E-Pro;

14   correct?

11:10:12    15   A.   That is correct.

16   Q.   And what was the purpose of that business that you formed,

17   E-Pro?

18   A.   We wanted to market a patent technology.

19   Q.   And what was that patent technology about?  Just describe

11:10:26    20   it for us a little bit.

21   A.   It was to reduce emissions on diesel engines.

22   Q.   And when did you first become interested in marketing this

23   technology?

24   A.   Well, my interest in the technology began in 2004, when

11:10:42    25   I was president of Emissions Technology.  I left there in 2006

19-CR-26-ABJ                PARDY - CROSS - WARD              Vol. V-594
21-CR-14-ABJ

1   and was reintroduced to the technology and the opportunity to

2   acquire it in 2007 or 2008.

3   Q.  All right.  And when you were involved with Emissions

4   Technology in 2004, Emissions Technology was in the business

11:11:06  5   of selling this -- this technology that would improve

6   emissions on diesel engines; correct?

7   A.  That is correct.

8   Q.  And what was your role at that company?

9   A.  I was brought in as president a year or year and a half

11:11:22  10  after the company was formed.

11  Q.  And as president of the company, what did you do?

12  A.  I directed sales and marketing, and we were in the -- the

13  fund-raising mode, and so I was the -- the primary person out

14  trying to raise capital for the company.

11:11:44  15  Q.  And so to raise capital for that company, what would folks

16  get in return for their investment of capital into Emissions

17  Technology?

18  A.  They would receive equity in Emissions Technology.

19  Q.  So they would receive shares?

11:12:02  20  A.  That is correct.

21  Q.  Was Emissions Technology a publicly traded company?

22  A.  No, it was not.

23  Q.  So these were shares of a private company?

24  A.  That is correct.

11:12:10  25  Q.  And the investors in Emissions Technology, were their

19-CR-26-ABJ                PARDY - CROSS - WARD               Vol. V-595
21-CR-14-ABJ

 1   shares ever worth anything?  Did any of the investors ever

 2   make money on their investment?

 3   A.  No, sir, they did not.

 4   Q.  So as the president of Emissions Technology, you obtained

11:12:35   5   investments into Emissions Technology, but those investments

 6   ultimately were always worthless to the investor?

 7   A.  I don't think that's a fair categorization.

 8   Q.  Well, the investors never made any money on their

 9   investments?

11:12:48   10   A.  I was removed from the company long before the company

11   went out of business.

12   Q.  All right.  So you were removed from the company when?

13   A.  2006.

14   Q.  Okay.  And then --

11:13:04   15        MR. HEIMANN:  Your Honor, I'm going to object to this

16   line of questioning as irrelevant.

17        MR. WARD:  I haven't asked a question yet.

18        MR. HEIMANN:  The whole line, Your Honor, regarding

19   Emissions Technology.

11:13:16   20        THE COURT:  Sustained.

21        MR. WARD:  May I have a moment, Your Honor.

22        THE COURT:  Yes, you may.

23     (Discussion held at counsel table.)

24   BY MR. WARD:

11:14:03   25   Q.  At some point in time -- so when does E-Pro acquire

19-CR-26-ABJ                PARDY - CROSS - WARD                Vol. V-596
21-CR-14-ABJ

1   interest in the diesel engine technology?

2   A.  I believe that would have been 2008.

3   Q.  And then you transfer the interest in that technology to

4   Tom Crom and a company he had; correct?

11:14:45   5   A.  We did consulting agreements and convertible debt

6   agreements in exchange for those patents.  Those debts were

7   never paid.  It was never a consummated deal.

8   Q.  Right.

9        So to transfer the Eco patent rights to Tom Crom and

11:15:08   10   his company, you got a note saying that you were owed a

11   hundred thousand dollars?  And that was a convertible note

12   that you could have converted into shares of Tom Crom's

13   company; right?

14   A.  And there were also shares included in that agreement, as

11:15:22   15   well.

16   Q.  So it was a hundred thousand dollars that could be

17   converted into shares and then actually just some shares?

18   A.  That's my recollection.

19   Q.  Okay.  And did you have an agreement with Tom Crom that

11:15:35   20   you were supposed to be paid a portion of the money he raised

21   with those patent rights?

22   A.  I don't believe we ever had anything in writing.  We had

23   verbal conversations.

24   Q.  And those verbal conversations were that you were supposed

11:15:51   25   to be getting paid a percentage of the money he raised;

1   correct?

2   A.   That is my recollection, correct.

3   Q.   And he screwed you over on that deal; correct?

4        MR. HEIMANN:   Objection, Your Honor; characterization.

11:16:03   5        THE COURT:   Sustained.

6   BY MR. WARD:

7   Q.   There was a time that you considered suing Tom Crom

8   because he didn't follow through on that verbal agreement;

9   correct?

11:16:13   10   A.   We had conversations.   I don't know that we were really

11   serious about it.   Tom did not have money, and the other

12   principal was in Canada, so we couldn't get to him so -- there

13   was conversation but it was never pursued.

14   Q.   And you had invested a substantial amount of your own

11:16:33   15   money into this endeavor; correct?

16   A.   I had.

17   Q.   You had taken out a second mortgage on your home in order

18   to come up with the capital to invest; right?

19   A.   I did.

11:16:44   20   Q.   And you found out that Tom Crom had raised the money with

21   the technology and hadn't paid you what he had promised you;

22   correct?

23   A.   Yes, I did.

24   Q.   Nonetheless, though, you were still willing to sell your

11:17:05   25   rights in that EcoEmissions shell back to Tom Crom in 2014;

1   correct?

2   A.   That is correct.

3   Q.   And you got Alan Lobock involved to assist in the

4   negotiation; correct?

11:17:20   5   A.   I did.

6   Q.   And Alan Lobock is a pretty -- or was a pretty successful

7   businessman during his lifetime; correct?

8   A.   To me, he was a very successful businessperson.

9   Q.   He was one of the -- the cofounders of SkyMall; correct?

11:17:39   10   A.   That is correct.

11   Q.   And that's part of why you gave him full authority to

12   negotiate this deal on your behalf; correct?

13   A.   Can you clarify the question?

14   Q.   Well, I just mean that -- you're a business guy yourself;

11:17:57   15   correct?

16   A.   Correct.

17   Q.   You said you currently own -- I don't know if you said you

18   owned it individually or own a -- own a portion of an

19   insurance company.

11:18:05   20   A.   I own a portion of it.

21   Q.   You -- you have experience with business; correct?

22   A.   Yes.

23   Q.   You negotiate deals all the time; correct?

24   A.   I try.

11:18:14   25   Q.   And for this deal, though, you trusted Alan Lobock; right?

1  A.  On this particular deal I trusted Alan, as I had on many

2  deals we did in the past.

3  Q.  And you didn't have any reason not to trust Alan?

4  A.  I had no reason not to trust Alan.

11:18:30  5  Q.  You knew he would look out for your interests?

6  A.  He always had.

7  Q.  And so you gave him full authority?

8  A.  That is correct.

9  Q.  And when the deal was consummated, you expected that

11:18:45  10  $15,000 was going to be paid from Tom Crom to you and

11  Alan Lobock and that you and Alan Lobock were going to split

12  that $15,000; correct?

13  A.  I wasn't aware of the exact mechanics.  But in general,

14  yes, you are correct that there was $15,000 to be split

11:19:01  15  between Alan and myself.

16  Q.  And what you were giving up in exchange for that $15,000

17  was you were giving up the interest in the shell that Tom Crom

18  had; correct?

19  A.  That is correct.

11:19:17  20  Q.  And you were aware that the reason Tom Crom needed your

21  interest extinguished was that he could -- so that he could

22  sell that shell to someone else?

23  A.  That is correct.

24  Q.  And so if you still had interests in that shell that were

11:19:35  25  not fully extinguished, the deal wouldn't have been complete;

1    right?

2    A.   I'm not sure I understand your question.

3    Q.   All right.  You were aware that why you were being paid

4    money was that your interests needed to be fully extinguished;

11:19:55    5    correct?

6    A.   Yes, sir.

7    Q.   Because if they were not, when Tom Crom went to sell this

8    shell to a third party, if you had any remaining interest,

9    that buyer wouldn't -- wouldn't be getting the shell they were

11:20:10    10    expecting; right?

11    A.   That is correct.

12    Q.   So if additional documents needed to be executed in order

13    to fully extinguish your interests in that shell, that would

14    have been necessary to complete the deal; right?

11:20:25    15    A.   Again, I'm not sure I understand the exact question you're

16    asking, sir.

17    Q.   Well, you signed some documents in order to attempt to

18    extinguish your interests; correct?

19    A.   I believe I signed one document.

11:20:38    20    Q.   Okay.  And my question is -- and it's kind of a

21    hypothetical question.

22        But let's say if that -- that one document you signed

23    didn't fully extinguish your interest in the EcoEmissions

24    shell -- are you following me?

11:20:54    25    A.   To this point I am.

19-CR-26-ABJ                PARDY - CROSS - WARD            Vol. V-601
21-CR-14-ABJ

1    Q.   Okay.  So you've signed one document with the intent to

2    extinguish your interests.  But let's say that document was

3    incomplete and didn't fully extinguish your interest.

4           Then the deal wouldn't have been completed; right?

11:21:08    5    A.   I -- I would assume so.  But, again, I was not involved in

6    the mechanics.  And at this point there was six years under

7    the bridge and --

8    Q.   I absolutely understand.

9           And the person that was involved in the mechanics

11:21:23   10    would have been Alan Lobock; correct?

11    A.   Would have been Alan and Tom.

12    Q.   Okay.  And you would have been fine with additional

13    documents being executed in order to fully extinguish your

14    interest in the Eco shell?

11:21:40   15    A.   I've never contemplated that question.

16    Q.   Well, contemplate it now for me.

17    A.   I guess it depends on what the -- the documents would say.

18           I think the debt assignment totally covered what

19    I had to do.

11:21:53   20    Q.   Well --

21    A.   I don't understand the need for other documents or

22    hypothetical other documents that would have to be there.

23    Q.   And so it's a -- it's a specific hypothetical.

24           It's -- if additional documents were necessary in

11:22:04   25    order to allow Tom to sell the shell, which was the intended

1  transaction, you would have been okay with that; correct?

2  A.  I -- he would have talked to Alan and Alan would have

3  advised me on it.  I -- I was not going to get involved in

4  dealing with Tom Crom.

11:22:18   5  Q.  Right.  And you had Alan Lobock that was involved with

6  dealing with Tom Crom?

7  A.  Correct.

8  Q.  And you had given full authority to Alan Lobock to deal

9  with Tom Crom?

11:22:30  10  A.  Correct.

11        MR. WARD:  May I have just a moment, Your Honor.

12     (Discussion held at counsel table.)

13        MR. WARD:  Those are all the questions I have, Your

14  Honor.

11:23:30  15                    **REDIRECT EXAMINATION**

16  BY MR. HEIMANN:

17  Q.  Mr. Pardy, you were asked about additional documents, if

18  they were necessary to extinguish your interest.

19        If I understood your testimony correctly, you

11:23:56  20  believed the debt assignment agreement was -- extinguished

21  your entire interest?

22  A.  I believe that.  I'm not a lawyer.  But I was led to

23  believe that was true.

24  Q.  If another document was required, would you have expected

11:24:10  25  it to come back to you for a signature?

1    A.  Yes, I would.

2        (Discussion held at counsel table.

3            MR. HEIMANN:  No other questions, Your Honor.

4            MR. FLEENER:  One question in follow-up?

11:24:25   5            THE COURT:  One question.

6                      **RECROSS-EXAMINATION**

7    **BY MR. FLEENER**:

8    Q.  But -- this is Tom Fleener again, sir.

9            But the truth is you don't know what took place

11:24:38  10    between Alan Lobock, Tom Crom, and the people purchasing

11    the -- the debt, what conversations took place?

12    A.  I was not in those conversations.

13            MR. FLEENER:  Thank you.

14            THE COURT:  You may step down.

11:24:53  15            THE WITNESS:  Thank you, Your Honor.

16            MR. HEIMANN:  United States of America calls

17    Tom Crom.

18            THE COURTROOM DEPUTY:  Please raise your right hand.

19        (Witness sworn.)

11:26:22  20            THE COURTROOM DEPUTY:  Please take a seat.

21            Please state and spell your name for the record.

22            THE WITNESS:  Thomas LeRoy Crom, III.  T-h-o-m-a-s

23    capital L small -e capital -R-o-y C-r-o-m and the Roman

24    numeral III.

25    ///

```
         19-CR-26-ABJ      CROM - DIRECT - HEIMANN        Vol. V-604
         21-CR-14-ABJ
```

           1    **THOMAS LeROY CROM, III,**

           2        **GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

           3    BY MR. HEIMANN:

           4    Q.  Mr. Crom, do you go by "Tom"?

11:27:16   5    A.  Yes.

           6    Q.  How old are you?

           7    A.  56 -- sorry -- 65.

           8    Q.  Where were you born and raised?

           9    A.  I was born in Compton, California; I grew up in Orange

11:27:27  10    County.

          11    Q.  Where do you live now?

          12    A.  Payson, Arizona.

          13    Q.  What's the highest level of education you have obtained?

          14    A.  I have a master's degree in taxation.

11:27:38  15    Q.  What is your current occupation?

          16    A.  I'm semiretired.  I'm -- I'm an accountant.  I'm also the

          17    CFO of a profit called Miracle Food Network based out of

          18    Washington, the state of Washington.

          19    Q.  Profit?  Nonprofit?

11:27:56  20    A.  Nonprofit, charity.

          21    Q.  When you were working full-time, were you working mostly

          22    as an accountant?

          23    A.  Yes.

          24    Q.  Were you ever a CPA?

11:28:08  25    A.  Certified public accountant.  I was also a certified

19-CR-26-ABJ          CROM - DIRECT - HEIMANN          Vol. V-605
21-CR-14-ABJ

1    management accountant.

2    Q.   Are you familiar with a defendant in this case named

3    Justin Herman?

4    A.   Yes.

11:28:17  5   Q.   How do you know Mr. Herman?

6    A.   I've spoken to him on numerous occasions on the telephone.

7    Q.   Did you do business with him?

8    A.   Yes.

9    Q.   During what time period?

11:28:29  10   A.   Oh, I'm going to say 2010, 2014 time frame.

11   Q.   Did you ever meet with him in person or just talk to him

12   over the phone?

13   A.   Never met him in person, spoke to him only on the phone.

14   Q.   Exchange email?

11:28:47  15   A.   Yes.

16   Q.   Did Justin Herman contact you in November of 2014

17   regarding a public shell?

18   A.   He contacted me regarding a public company.

19   Q.   Thank you.

11:29:07  20        And why did Mr. Herman want a public company?

21        MR. FLEENER:  Objection; speculation.

22   BY MR. HEIMANN:

23   Q.   Why did Mr. Herman contact you regarding a public company?

24   A.   He was looking on behalf of somebody to purchase control

11:29:18  25   of a public vehicle.  Or a public company.

1    Q.   Okay.  When you say "vehicle," you mean a company?

2    A.   Correct.

3    Q.   What do you mean when you say "a public company"?

4    A.   A public company that's been duly incorporated in the

11:29:38    5    state that it is publicly traded.

6    Q.   All right.  At that time, in November of 2014, were you

7    involved with a publicly traded company called EcoEmissions

8    Solutions, Incorporated?

9    A.   Yes.

11:29:55    10    Q.   Did that company have shares trading on the public market?

11    A.   They were available for trading.  I don't believe it was

12    actively trading.

13    Q.   What was its ticker symbol?

14    A.   E-C-M-Z.

11:30:13    15    Q.   What was your relationship to ECMZ?

16    A.   I was one of two directors and the chief financial

17    officer.

18    Q.   Who was the other director?

19    A.   Larry Lorenz.

11:30:24    20    Q.   Was Mr. Lorenz also an officer?

21    A.   He was also the president of the company, correct.

22    Q.   Okay.  Were there any other officers?

23    A.   No.

24    Q.   Any other directors?

11:30:34    25    A.   No, not at that time.

1    Q.  How long had you -- how long had you been the CFO for

2    ECMZ?

3    A.  Probably from 2014 until the date of my resignation in

4    late 2014 or '15.

11:30:54  5    Q.  So you said 2014 to 2014 or '15?

6    A.  Well -- I -- I resigned either late 2014 or early 2015.

7    Q.  When did you --

8    A.  I don't -- I don't remember the exact date.

9    Q.  When did you begin as the CFO?

11:31:07  10   A.  2008, approximately.

11   Q.  Did the company pay you a salary?

12   A.  I had an employment contract that would have paid me

13   $10,000 a month.  Periodic payments were made in 2008, 2009.

14   I was never paid my full amount due.  In -- and payments

11:31:36  15   stopped in the 2009 time frame.

16   Q.  So between 2009 and 2014 you weren't being paid?

17   A.  Correct.

18   Q.  In November of 2014, when Justin Herman called you, did

19   ECMZ have any revenue?

11:31:54  20   A.  No.

21   Q.  Besides you and Mr. Lorenz, were there any employees?

22   A.  No.

23   Q.  No payroll?

24   A.  No.

11:32:04  25   Q.  Did the company have an office?

19-CR-26-ABJ         CROM - DIRECT - HEIMANN         Vol. V-608
21-CR-14-ABJ

1    A.  It had an office where I was working.

2    Q.  Wherever you happened to be that day?

3    A.  Correct.  Well, that -- I -- I would say where I was

4    working, which -- I was working at home.

11:32:21   5    Q.  Okay.  Did they have a manufacturing facility?

6    A.  No.

7    Q.  A warehouse?

8    A.  No.

9    Q.  Any inventory?

11:32:28   10    A.  No.

11    Q.  Any tangible assets?

12    A.  No.

13    Q.  Did the company have a bank account?

14    A.  No.

11:32:34   15    Q.  Did the company have debts?

16    A.  Yes.

17    Q.  What did the company owe?

18    A.  The company owed money to various debenture holders which

19    the company had used, you know, to finance the business.  The

11:32:50   20    company had debts to its corporate stock transfer agent.  The

21    company had debts to me.  The company had debts to Mr. Lorenz.

22         It had debts to Gordon Pardy, David Rodgers, E-Pro.

23    And it had debts to the State of Nevada.

24    Q.  Was EcoEmissions Solutions a reporting company under SEC

11:33:18   25    regulations at that time?

```
19-CR-26-ABJ          CROM - DIRECT - HEIMANN          Vol. V-609
21-CR-14-ABJ
```

1  A.  Yes.

2  Q.  Was the company up-to-date on its reports?

3  A.  No.

4  Q.  How far behind were they?

11:33:25  5  A.  Approximately two years.

6  Q.  Was ECMZ listed with OTC Markets in November of 2014?

7  A.  Yes.

8  Q.  What was its status on OTC Markets at that time?

9  A.  I believe OTC Markets has three -- three classifications,

11:33:49  10  stop, yield, and green, "green" being you're current, "yield"

11  meaning they have questions and/or concerns that needed to be

12  clarified, and a stop sign meaning no current information

13  available.

14      ECMZ at that time had a stop symbol.

11:34:06  15  Q.  But what did you tell Justin Herman about ECMZ's business

16  situation when he asked you about acquiring a public company?

17  A.  I told him that it was inactive and had debts associated

18  with the company.

19  Q.  Did Mr. Herman express any reservations about a company

11:34:30  20  that was basically -- had no business but owed a lot of money?

21  A.  Oh, I -- I disclosed the debt.  Whether or not he had

22  reservations, he would have conveyed that to the ultimate

23  purchaser for them to consider.

24  Q.  He didn't --

11:34:52  25  A.  He did not express it to me, no.

19-CR-26-ABJ                CROM - DIRECT - HEIMANN              Vol. V-610
21-CR-14-ABJ

1          MR. HEIMANN:  Okay.  Let's look at Exhibit 100.

2   BY MR. HEIMANN:

3   Q.  This is in evidence so you should be seeing it on your

4   monitor.

5   A.  I do.

6   Q.  And you have a paper copy in the stack of papers there if

7   that works better for you.

8          Did you send this email --

9   A.  I did.

10  Q.  Hold on.  Let me finish.

11  A.  Oh.

12  Q.  Did you send this email to Justin Herman in November of

13  2014?

14  A.  Yes, I did.

15  Q.  Now, this email's dated November 24th of 2014.

16          Do you know, relative to that date, when Mr. Herman

17  first contacted you about acquiring a public company?

18  A.  This email that I sent to Mr. Herman would have occurred

19  after he expressed interest in Eco.

20  Q.  Do you know --

21  A.  "Eco" meaning ECMZ.

22  Q.  Do you know how much after?

23  A.  No.  I don't recall.

24  Q.  If you would, read the message you sent him.

25  A.  "Read this.  ECMZ was pumped and dumped."

1   Q.  So --

2   A.  And then it says "Attachments:  Simon case" --

3   Q.  Okay.

4   A.  -- "dot docx."

11:36:45   5            MR. HEIMANN:  And let's go to the second page.

6   BY MR. HEIMANN:

7   Q.  Is this that attachment?

8   A.  Yes.

9   Q.  Okay.  So it recites an SEC litigation release?

11:36:57   10  A.  Yes.

11           MR. HEIMANN:  Go back to the first page.

12  BY MR. HEIMANN:

13  Q.  Why did you tell Mr. Herman that the company had been

14  pumped and dumped?

11:37:07   15  A.  I thought that was relevant information for a potential

16  buyer of control of the company should be aware of.

17  Q.  Why?

18  A.  Because the stock had been pumped and dumped.  And, you

19  know, that would be of interest to somebody looking for a

11:37:23   20  public vehicle --

21  Q.  Would it make the vehicle --

22  A.  -- in my opinion.

23  Q.  Would it make the vehicle more or less valuable?

24  A.  Less valuable.

11:37:31   25  Q.  Were you involved in this pump and dump?

```
        19-CR-26-ABJ        CROM - DIRECT - HEIMANN        Vol. V-612
        21-CR-14-ABJ
```

1    A.   No.  Well -- I'm sorry.  Clarify the question.

2    Q.   Did you pump and dump ECMZ?

3    A.   No.

4    Q.   What response, if any, did you get from Mr. Herman when

11:37:50  5  you informed him that this public vehicle had been pumped and

6    dumped in the past?

7    A.   He didn't express any concern.

8    Q.   Was Justin Herman working with another person to buy

9    control of EcoEmissions?

11:38:08  10  A.   Could you clarify "working with"?

11   Q.   Was it your understanding that the money was coming from

12   Justin Herman?

13   A.   It was my understanding the money was not coming from

14   Justin Herman, that he was negotiating on behalf of somebody

11:38:25  15  else.

16   Q.   Do you know who that person was?

17   A.   Not at that particular time.

18   Q.   Did you eventually learn who it was?

19   A.   Yes.

11:38:32  20  Q.   Who?

21   A.   Bob Mitchell.

22   Q.   Did you learn that after it was sold?

23   A.   Yes.

24   Q.   Did you have any contacts with Bob Mitchell during the

11:38:45  25  negotiation process for Justin Herman and Bob Mitchell to buy

19-CR-26-ABJ          CROM - DIRECT - HEIMANN          Vol. V-613
21-CR-14-ABJ

1   control of ECMZ?

2   A.  No.

3   Q.  Did you talk to anyone other than Justin Herman about this

4   transaction?

11:38:59   5   A.  Yes.

6   Q.  Who else?

7   A.  I would have talked to Larry Lorenz, who was president and

8   director of the company.  The transaction also required

9   purchase of debt from Gordon Pardy, David Rodgers, and E-Pro,

11:39:14   10   so I would have had communications with both Gordon Pardy and

11   Dave Rodgers.

12   Q.  Did you have communications with anybody other than

13   Justin Herman from his side of the transaction?

14   A.  Not at that time.

11:39:28   15   Q.  Did you make an agreement with Justin Herman to buy

16   control -- for him to buy control of ECMZ?

17   A.  An agreement was ultimately reached, yes.

18   Q.  Okay.  Generally, what were the terms of that agreement?

19   A.  A sum of cash, resignations from the company as officer

11:39:52   20   and director from myself and Mr. Lorenz, transfer control of

21   the voting shares that Mr. Lorenz and myself owned in the

22   company.

23        MR. HEIMANN:  Let's look at Exhibit 108.

24        This has not been admitted.

25   ///

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

```
         19-CR-26-ABJ           CROM - DIRECT - HEIMANN         Vol. V-614
         21-CR-14-ABJ
```

 1   BY MR. HEIMANN:

 2   Q.  Mr. Crom, do you see that document marked 108 on your

 3   screen?

 4   A.  Yes.

11:40:32  5   Q.  It's a one-page document.  Do you recognize it?

 6   A.  Yes.

 7   Q.  Did you write this?

 8   A.  Yes.

 9   Q.  And is your signature on it?

11:40:43  10   A.  Yes.

11   Q.  What's the title across the top of this?

12   A.  "Summary Purchase Agreement for control of EcoEmissions

13   Solutions, Inc."

14   Q.  Does this document contain your memorialization of your

11:40:57  15   agreement with Justin Herman for Bob Mitchell to buy

16   EcoEmissions?

17   A.  It reflected an outline of the transaction, yes.

18        MR. HEIMANN:  Your Honor, the Government moves to

19   admit 108.

11:41:12  20        MR. FLEENER:  No objections.

21        THE COURT:  Exhibit 108 is received.

22      (Government's Exhibit 108 received into evidence.)

23        MR. HEIMANN:  If we could magnify the top half of the

24   page.

25   ///

1    BY MR. HEIMANN:

2    Q.   So what was the total amount of money to be paid?

3    A.   $100,000.

4    Q.   With a $20,000 deposit?

11:41:40   5    A.   Yes.

6    Q.   So the total payment was a hundred?

7    A.   Correct.

8    Q.   In Bullet Point No. 1, it describes some resignations and

9    that "Undated and signed resignations will be delivered to the

11:42:02   10   escrow agent, Ian Horn, Esquire."

11            What was your understanding of Mr. Horn's role in

12   this transaction?

13   A.   Mr. Horn would be serving as the escrow agent, meaning he

14   would receive certain documentation from me concerning the

11:42:20   15   transaction and he would be receiving the cash.

16   Q.   It talks about "Sale of current operating business Evine"

17   under Bullet Point 5.

18            What's Evine?

19   A.   Evine is a state of Washington corporation.  This line is

11:42:46   20   probably poorly worded.  It's the sale of EcoEmissions'

21   current operating business to Evine.

22   Q.   You said earlier that EcoEmissions didn't have any

23   operations.

24   A.   Correct.

11:43:03   25   Q.   So was there any business actually being sold?  Or --

1    A.   No.   The company had intangible intellectual property --

2    Q.   Okay.

3    A.   -- but nothing was being done with it.

4    Q.   So when it says "Sale of current operating business,"

11:43:18    5    that's the intangible intellectual property?

6    A.   Correct.

7    Q.   And I don't know if you said this or not.   But who

8    controls Evine?

9    A.   Larry Lorenz.

11:43:26    10    Q.   Let's come back to the entire agreement.

11            And then that's your signature on this document?

12    A.   Yes.

13    Q.   To whom did you send this agreement?

14    A.   This was sent to Justin Herman.

11:43:48    15    Q.   How did you send it to him?

16    A.   Via email.

17    Q.   Now, No. 3 here says "Complete debt settlement with

18    purchase."

19            What does that refer to?

11:43:58    20    A.   That referred to the debt purchase -- the debt settlement

21    between ECMZ, Gordon Pardy, Dave Rodgers, and E-Pro.

22    Q.   The debt owed to Gordon Pardy, David Rodgers, and E-Pro,

23    was that convertible into stock?

24    A.   Portions of it, yes.

11:44:23    25    Q.   The other debts you talked about that EcoEmissions owed,

19-CR-26-ABJ            CROM - DIRECT - HEIMANN            Vol. V-617
21-CR-14-ABJ

1    were any of them convertible into stock?

2    A.   They were convertible debentures held by third parties.

3    They were, by language of the agreement, convertible into --

4    into shares of ECMZ.  Other debt, like the debt to the stock

5    transfer agent, State of Nevada, those were not convertible

6    into shares.

7    Q.   When this agreement talks about "Complete debt

8    settlement," it's only referring, however, to the debt owed to

9    Mr. Pardy and Mr. Rodgers?

10   A.   That is correct.

11           MR. WARD:  Objection; leading.

12           THE COURT:  Sustained.

13   BY MR. HEIMANN:

14   Q.   The "Complete debt settlement with purchase," which debts

15   does that refer to?

16   A.   That referred to the debt owed by ECMZ to Gordon Pardy,

17   Dave Rodgers, and E-Pro.

18   Q.   And only those debts?

19   A.   Correct.

20   Q.   Did you reach out to Gordon Pardy or David Rodgers to try

21   to complete a debt settlement?

22   A.   Yes.

23   Q.   How did you do that?

24   A.   Via telephone initially and then I'd be following up via

25   email.

1    Q.  Did you call Mr. Pardy or Mr. Rodgers directly?  Or did

2    you have someone else do it for you?

3    A.  I called them directly.

4    Q.  All right.  Both of them or just one or the other?

11:45:52    5    A.  I probably would have spoken to both of them.

6    Q.  Were they willing to negotiate an agreement?

7    A.  Yes.

8    Q.  How was that agreement negotiated?

9    A.  By telephone and by email.

11:46:07    10    Q.  Was there a third-party intermediary?

11    A.  Not on my side.

12    Q.  On their side?

13    A.  I'm aware that Alan Lobock was somehow involved with

14    E-Pro, Gordon Pardy, Dave Rodgers.  I don't know in what

11:46:25    15    context.

16    Q.  Did you negotiate with Mr. Lobock?

17    A.  No.  He wasn't a party to the settlement.

18    Q.  Did you, in fact, receive a deposit payment in December of

19    2014?

11:46:42    20    A.  Ian Horn received a -- the deposit and I received a

21    portion of that -- the -- of that proceeds.

22           MR. HEIMANN:  Let's look at Exhibit 101.

23           This is in evidence.  Let's scroll down so that we

24    capture just the top of the December 12th, 2014, email and

11:47:22    25    below.

19-CR-26-ABJ          CROM - DIRECT - HEIMANN          Vol. V-619
21-CR-14-ABJ

1    BY MR. HEIMANN:

2    Q.   Okay.  Mr. Crom, do you see that?

3    A.   Yes.

4    Q.   There's a Bullet Point 2, "Wire Instructions for Eureka

5    Ventures, Inc., $10,750."  Do you see that?

6    A.   Yes.

7    Q.   What is Eureka Ventures, Inc.?

8    A.   Eureka Ventures, Inc., is a wholly owned company owned by

9    myself.

10   Q.   Did you send those wire instructions to someone?

11   A.   I would have provided the wiring instructions to

12   Justin Herman.

13   Q.   Did you then receive the $10,750?

14   A.   Yes.

15   Q.   How?

16   A.   Via wire transfer.

17   Q.   Did Justin Herman take a portion of the deposit?

18   A.   Yes.

19   Q.   Did you know he was going to do that?

20   A.   Yes.

21   Q.   This email was sent from Justin Herman to

22   ianhornlaw@gmail.com.

23        Did you know that Ian Horn was going to take a

24   portion of the deposit payment?

25   A.   Yes.

11:47:34

11:47:48

11:48:01

11:48:19

11:48:39

```
19-CR-26-ABJ          CROM - DIRECT - HEIMANN          Vol. V-620
21-CR-14-ABJ
```

1    MR. HEIMANN:  Let's look at Exhibit 5.1.

2    And, again, let's scroll up so we start with the

3    initial email -- there we go.  Thank you.

4    BY MR. HEIMANN:

11:49:09    5    Q.  So, again, if we look through this, there's a No. 3 bullet

6    point, "Wire Instructions for Eureka Ventures, Inc., $22,500."

7    That was your portion of the second payment?

8    A.  Correct.

9    Q.  Did you know that Justin Herman was going to take a

11:49:31    10    portion of the second payment?

11    A.  Yes.

12    Q.  Did you know that Ian Horn was going to take a portion of

13    the second payment?

14    A.  Yes.

11:49:41    15    MR. HEIMANN:  Let's pull up 5.2.

16    We don't need to scroll on this one.

17    BY MR. HEIMANN:

18    Q.  "Wire Instructions for Evine Trading, LLC."  Do you see

19    that?

11:50:06    20    A.  Yes.

21    Q.  Evine, you testified earlier, that's Larry Lorenz's

22    company?

23    A.  Correct.

24    Q.  Did you send these wire instructions to Justin Herman?

11:50:14    25    A.  Yes.

```
19-CR-26-ABJ          CROM - DIRECT - HEIMANN          Vol. V-621
21-CR-14-ABJ
```

1              MR. HEIMANN:  Let's look at 5.13.

2              And let's scroll up -- there we go.

3              Back down so we capture the header on this -- the

4    first email.  Thank you.

11:50:43   5    BY MR. HEIMANN:

6    Q.  So this is an email, January 12th of 2015, from

7    Justin Herman to ianhornlaw@gmail.

8              "Subject: Re: Last two wires."

9              Did you send wiring information to Justin Herman for

11:51:01  10    the $7500 to Gordon Pardy?

11   A.  Yes.

12   Q.  And then there's a $7500 to Theresa Jones.  Do you see

13   that?

14   A.  Yes.

11:51:10  15    Q.  Who is Theresa Jones?

16   A.  Somehow she's affiliated with Dave Rodgers.

17   Q.  Did you send that wiring information to Justin Herman

18   along with the information for Gordon Pardy?

19   A.  Yes.

11:51:28  20    Q.  Did you send this directly to Ian Horn, as well?

21   A.  Not that I recall.

22   Q.  Okay.  Was the second payment delayed?

23   A.  Yes.

24   Q.  Why?

11:51:50  25    A.  Ian Horn had some sort of issue with his escrow account.

19-CR-26-ABJ          CROM - DIRECT - HEIMANN          Vol. V-622
21-CR-14-ABJ

1   The original escrow account was being closed.  I don't know

2   exactly why.

3         And he needed to open up a new escrow account at a

4   different bank.

11:52:17   5   Q.  Did you try to help get the money -- this problem solved

6   so the money could be wired?

7   A.  I wanted to be aware of it.  There's nothing I could do to

8   help Ian Horn with opening up a bank account in the state of

9   Florida.

11:52:31   10   Q.  The wires we just talked about for the second payment, did

11   you eventually receive your money?

12   A.  Yes.

13   Q.  So eventually the problem was solved?

14   A.  Yes.

11:52:48   15         MR. HEIMANN:  Your Honor, we are eight minutes to the

16   noon hour, and this is something of a natural break.

17         THE COURT:  Ladies and gentlemen, remember to keep an

18   open mind.  Do not attempt to learn about the case from

19   sources outside of the courtroom.  Remember the rest of the

11:53:03   20   Court's admonition.

21         Enjoy your lunch hour, and we'll see you back here at

22   1:15.  1:15.

23         THE COURTROOM DEPUTY:  All rise.

24     (A recess was taken from 11:53 a.m. to 1:33 p.m.

13:23:37   25   Proceedings outside the jury's presence.)

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

 1              THE COURT:  Thank you, everyone.  Please be seated.

 2              Well, are we ready to proceed?

 3              MR. HEIMANN:  We are, Your Honor.

 4              THE COURT:  Very well.

13:33:17  5     Becky, would you bring the jury in.

 6      (Proceedings within the jury's presence at 1:34 p.m.)

 7              THE COURT:  Please be seated, ladies and gentlemen.

 8      Mr. Heimann, you can continue with the direct

 9      examination of Mr. Crom.

13:35:32 10             MR. HEIMANN:  Thank you, Your Honor.

11              Mr. Crom, you understand you are still under oath?

12              THE WITNESS:  Yes, I do.

13              MR. HEIMANN:  So we're going to look at an exhibit

14      now, 11.1.

13:36:17 15             Let's go to page 2 of this exhibit.

16              Mr. Crom, you have a paper copy here.  We can also

17      scroll through this for you.

18      BY MR. HEIMANN:

19      Q.  Does this appear to be the debt assignment agreement

13:36:36 20     created to resolve the debt that we were talking about before

21      the break?

22      A.  Yes.

23      Q.  I'm sorry?

24      A.  Yes, it is.

13:36:46 25     Q.  Thank you.

```
1              Who drafted this agreement?

2     A.   I would have drafted the agreement.

3     Q.   There's some initials -- or handwriting -- down in the

4     lower right-hand corner.

5              Do you see that?

6     A.   Yes.

7     Q.   Are your initials there?

8     A.   Yes.  I'm the "TC."

9     Q.   So the ones all the way down?

10    A.   Correct.

11    Q.   Almost looks like an "R"?

12    A.   That's a "TC."

13             MR. HEIMANN:  Let's go to page 5.  And let's magnify

14    the "Notices" section.

15    BY MR. HEIMANN:

16    Q.   So there's a section here, 4.13, titled "Notices."  What's

17    the purpose of this section?

18    A.   "Notices" is there to have a means of communicating with

19    either side and gives them an official place to provide that

20    notice.

21    Q.   Who is listed as a notice to receiving party?

22    A.   Justin Herman, care of Ian Horn, Esquire.

23    Q.   You drafted this document I think you said.

24    A.   Yeah.

25    Q.   Were you given that information by someone to put into it?
```

13:36:58 — line 5
13:37:06 — line 10
13:37:23 — line 15
13:37:56 — line 20
13:38:11 — line 25

1    A.  That information in particular comes from Justin.

2              MR. HEIMANN:  Let's come back out to the whole

3    document.

4    BY MR. HEIMANN:

13:38:27    5    Q.  There's a signature block for Gordon Pardy.

6              Do you know how Mr. Pardy's signature got onto this

7    document?

8    A.  I would have sent him an email of -- of the complete

9    agreement, and he would have printed it out, signed it, and

13:38:41    10   emailed -- scanned it, emailed it back to me.

11   Q.  Did you do that in early January of 2015?

12   A.  I probably would have done it in 2014, late 2014.

13   Q.  In December?

14   A.  Correct.

13:38:54    15             MR. HEIMANN:  Let's go to the next page.

16   BY MR. HEIMANN:

17   Q.  There's a signature block for EcoEmissions Solutions and

18   then EcoEmissions Systems, NV.

19             Did you sign for those companies?

13:39:12    20   A.  Yes.

21   Q.  There is a date there.  What date is that?

22   A.  December 30th, 2014.

23   Q.  Is that when you signed the document?

24   A.  Yes.

13:39:20    25   Q.  There's then a signature up above, a signature block for

19-CR-26-ABJ            CROM - DIRECT - HEIMANN            Vol. V-626
21-CR-14-ABJ

1  David Rodgers and E-Pro Systems, appears to have the same

2  signature there.

3       How did that signature get onto the document?

4  A.  I would have sent the document to Dave Rodgers, and he --

13:39:39  5  you know, it would have been sent as an email.  He would have

6  done the same thing, printed it, scanned it, and sent it to me

7  back by email.

8  Q.  When you completed the document, when you had all the

9  signatures, what did you do with it?

13:39:52  10  A.  I would have forwarded it on to Ian Horn.

11  Q.  Justin Herman -- there's a -- there's a place for

12  Justin Herman to sign.

13       When you had this and were putting the signatures

14  together, was Mr. Herman's signature on there?

13:40:08  15  A.  I don't recall.

16       MR. HEIMANN:  Let's look at 11.2.

17       And go to the second page.

18  BY MR. HEIMANN:

19  Q.  Does this appear to be the same debt assignment agreement?

13:40:41  20  A.  Actually, no.  It's virtually identical, but if you look

21  at the footer -- and I just noticed this, that if you look at

22  the prior agreement where I'm kind of highlighting, there was

23  a footer there.

24       MR. HEIMANN:  So let's take a minute.  Let's put up

13:40:59  25  11.1 and 11.2 next to each other.

```
19-CR-26-ABJ          CROM - DIRECT - HEIMANN          Vol. V-627
21-CR-14-ABJ
```

                    1            Okay.  So 11.1 is on the left-hand side.  That's the

                    2    one we just looked at.  11.2 is on the right.  Let's go to the

                    3    second page of each document.

                    4    BY MR. HEIMANN:

13:41:33            5    Q.  And so you were saying that there's a footer on the

                    6    11.1 document that does not appear on the 11.2 document?

                    7    A.  Correct.  And if you look at the very bottom, it says

                    8    "Debt Assignment Agreement dated December 31st, 2014."

                    9            And for me on the document on the right, there's no

13:41:51           10    such footer.

                   11    Q.  So the -- what you just read, "dated December 31, 2014,"

                   12    that's on 11.1?

                   13    A.  Yes.

                   14    Q.  And it's not on 11.2?

13:42:04           15    A.  Correct.

                   16            MR. HEIMANN:  All right.  Let's go to the last

                   17    page of both documents.

                   18    BY MR. HEIMANN:

                   19    Q.  If you look at your signature block, do you see a

13:42:23           20    difference in the dates?

                   21    A.  Yes.

                   22    Q.  What's the difference that you see?

                   23    A.  The '14 has been changed to a 1-3.

                   24    Q.  So where the date is written in across from your

13:42:37           25    signature, it now would suggest that this was signed in

```
19-CR-26-ABJ         CROM - DIRECT - HEIMANN          Vol. V-628
21-CR-14-ABJ
```

1  December of 2013 rather than December of 2014?

2  A.  Correct.

3  Q.  Did you authorize anyone to either change this document or

4  backdate it?

13:42:54    5  A.  No.

6          MR. HEIMANN:  You can take that down.

7  BY MR. HEIMANN:

8  Q.  After the debt assignment agreement was executed and you

9  sent it on and you received your -- the money we talked about

13:43:11    10  earlier, did you continue to do some work for ECMZ?

11  A.  Yes.

12          MR. HEIMANN:  Let's look at Exhibit 6.  This has been

13  admitted into evidence.

14          Okay.  You have a -- you have a written copy there.

13:43:39    15          Let's scroll down to the second page so he can see

16  both pages.

17          And then back up.

18  BY MR. HEIMANN:

19  Q.  So this is entitled "Certificate of Amendment to Articles

13:43:49    20  of Incorporation of EcoEmissions Solutions, Inc."

21          Did you prepare this document?

22  A.  Yes.

23  Q.  And what is the effect of this document?

24  A.  The effect of this document is to change the name of the

13:44:05    25  company from EcoEmissions Solutions, Inc., to NuTech Energy

```
19-CR-26-ABJ          CROM - DIRECT - HEIMANN          Vol. V-629
21-CR-14-ABJ
```

1    Resources, Inc.  You'll see it there in Article 1 in bold

2    print.

3    Q.   Okay.  So let's slow down for a minute.

4         MR. HEIMANN:  So if we magnify Paragraph No. 1.

13:44:19   5    BY MR. HEIMANN:

6    Q.   This is the section you're talking about?

7    A.   Correct.

8    Q.   Where it's changing the name to NuTech Energy Resources?

9    A.   Yes.

13:44:34   10   Q.   Who told you to change the name?

11   A.   That would have come from Justin Herman.

12   Q.   Did he give you the name to change it to, as well?

13   A.   Yes.

14        MR. HEIMANN:  Let's go look under No. 2.

13:44:49   15        So if we just do No. 2 -- yes.

16   BY MR. HEIMANN:

17   Q.   So we've magnified a paragraph labeled "2."

18        What's the effect of this paragraph?

19   A.   This changes the number of authorized shares, both common

13:45:08   20   and perhaps the preferred.

21   Q.   Okay.  How many shares of common stock are now authorized?

22   A.   60 billion.

23   Q.   Who told you to make that change?

24   A.   Justin Herman.

13:45:34   25        MR. HEIMANN:  Let's come back out.

19-CR-26-ABJ          CROM - DIRECT - HEIMANN          Vol. V-630
21-CR-14-ABJ

1   BY MR. HEIMANN:

2   Q.  There's a file stamp in the upper right corner.

3        Did you file this document with the Secretary of

4   State for Delaware?

13:45:46   5   A.  I don't believe so.  I -- I may have.  I just don't

6   recall.

7   Q.  Okay.  There's initials in the lower right.  Are those

8   your initials?

9   A.  Yes.

13:45:56   10        MR. HEIMANN:  And let's move to the second page.

11   BY MR. HEIMANN:

12   Q.  Your signature?

13   A.  Yes.

14   Q.  So you were still an officer at this point?

13:46:07   15   A.  Yes.

16   Q.  You testified that ECMZ was on OTC Markets?

17   A.  Yes.

18   Q.  In January of 2015 were you authorized to communicate with

19   OTC Markets about ECMZ?

13:46:24   20   A.  I don't recall specifically.  At some point I was no

21   longer authorized.  I don't know exactly when, though.

22   Q.  Okay.

23   A.  It would have been around this time frame, though.

24   Q.  Okay.  And did you communicate with E- -- with OTC Markets

13:46:44   25   about ECMZ?

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

```
        19-CR-26-ABJ         CROM - DIRECT - HEIMANN        Vol. V-631
        21-CR-14-ABJ
```

1    A.  I don't believe so.

2         I'm sorry.  Could you repeat that question?

3    Q.  Yes.

4         Did you communicate with OTC Markets regarding ECMZ

13:47:03    5    during this transition period?

6    A.  I don't believe so, no.

7         MR. HEIMANN:  Okay.  Let's look at 201.  This hasn't

8    been admitted -- well, actually, let's look at 202 first.

9    This has been admitted.

13:47:27    10        And let's scroll down to the second page so we can

11   see everything.  Okay.  And back up.

12   BY MR. HEIMANN:

13   Q.  So the first email in this chain, do you see that at the

14   bottom?

13:47:39    15        Justin Herman to a couple email accounts at

16   otcmarkets.com?

17   A.  Yes.

18   Q.  And then there's an email in the middle.

19        From Justin Herman to Tom Crom.

13:47:54    20   A.  Yes.

21   Q.  Is that your email address?

22   A.  Yes, it is.

23   Q.  Okay.

24   A.  Whoops.  That is my email address.  It's actually an old

13:48:04    25   email address that I've discontinued using at some point.

1      I don't know if it was -- I -- I'm going to guess it

2   was probably still active in 2015.  I don't recall

3   specifically when it was discontinued.

4   Q.  Okay.  Does -- do you remember this email exchange?

13:48:22   5   A.  I -- I remember the -- the -- the substance of it, which

6   was whether or not the officer changes were real.

7   Q.  And that middle email from Mr. Herman, "Tom, I would email

8   cecilia@otcmarkets.com to confirm that the officer changes are

9   real."

13:48:49   10      Did you do that?

11   A.  I would have communicated to anybody that, you know, the

12   changes were real.

13   Q.  And then there's another section where you're asking

14   "I need Kevin's address on the signed form."

13:49:03   15      Do you see that?

16   A.  No, I don't.

17   Q.  So there's a section there right under --

18   A.  Oh, there we go.  Thank you.

19   Q.  -- "Sent from my iPad"?  Yeah.

13:49:14   20      Who's Kevin?

21   A.  That would be Kevin Trizna.

22   Q.  Who was Kevin Trizna?

23   A.  Kevin Trizna was to be an officer and director of -- and

24   part of the new management of EcoEmissions, soon to be NuTech

13:49:32   25   Energy.

1    Q.   Did you ever speak to Mr. Trizna directly?

2    A.   I remember speaking to him.  I don't recall when or what

3    I was communicating about, but, certainly, I wanted his

4    information and confirmation that he was going to be an

13:49:50    5    officer and director of the company.

6    Q.   You also got some information from Justin Herman about

7    Mr. Trizna; right?

8    A.   Yes.

9          MR. HEIMANN:  Now let's go to 201, which has not been

13:50:02   10    admitted.

11    BY MR. HEIMANN:

12    Q.   Do you recognize this document?

13    A.   Yes.

14    Q.   Other than the redaction box, did you create this

13:50:23   15    document?

16    A.   Yes.

17    Q.   What's its title?

18    A.   "Consent to Act as Officer and Director."

19    Q.   And for what company?

13:50:32   20    A.   It's NuTech Energy Resources, FKA -- is the abbreviation

21    for "formerly known as" -- EcoEmissions Solutions, Inc.

22          MR. HEIMANN:  Your Honor, the Government moves to

23    admit 201.

24          MR. FLEENER:  No objections.

13:50:47   25          THE COURT:  201 is received.

1      (Government's Exhibit 201 received into evidence.)

2    BY MR. HEIMANN:

3    Q.  What is the purpose of this document?

4    A.  It's a document placed in the corporate files to ensure

13:51:00      5    the person who's coming on board as an officer and director

6    consents to that position.

7    Q.  It's dated January of 2014, but the transition -- the

8    documents we saw earlier, the debt assignment agreement, was

9    dated in January of 2015.

13:51:28     10          Do you know why this one's dated 2014?

11    A.  No.  I have no idea.  I didn't notice the date discrepancy

12    before.  If I prepared the document, it would have been 2015.

13    Q.  Mr. Trizna's signature appears to be on this document.

14          How did you get the signature to put on this

13:51:45     15    document?

16    A.  I would have sent him the document via email, and it would

17    have come back via email.

18    Q.  Okay.  Is that true for the other information here?

19    A.  Yes.

13:51:58     20          MR. HEIMANN:  If we put 201 and 202 on together,

21    please.

22    BY MR. HEIMANN:

23    Q.  Mr. Crom, you should have in front of you the unredacted

24    versions of these on paper, if you can pull those out for me.

13:52:30     25          201 and 202.  Should be near the end.

1   A.  Okay.

2   Q.  So if you look at the address that's been redacted on each

3   of these exhibits -- don't say the street address.  But is it

4   the same address on both?

13:52:55   5   A.  Yes.

6           Wait a minute.

7           What . . . yes.  It appears to be the same.

8           MR. HEIMANN:  May I have a moment, Your Honor.

9           THE COURT:  Yes.

13:53:22  10   (Discussion held at counsel table.)

11          MR. HEIMANN:  No further questions on direct,

12   Your Honor.

13          MR. WARD:  Good afternoon, Mr. Crom.  My name is

14   Zenith Ward.  I represent Charles Winters.

13:54:06  15                   **CROSS-EXAMINATION**

16   **BY MR. WARD:**

17   Q.  You and I have never met before; correct?

18   A.  That's correct.

19   Q.  And we've never spoken before?

13:54:14  20   A.  No.

21   Q.  Mr. Heimann for the Government asked you on direct if you

22   were involved in the pump and dump of ECMZ; correct?

23   A.  I -- I remember a question on it, yes.

24   Q.  And you were the CFO at the time it was pumped and dumped;

13:54:43  25   correct?

19-CR-26-ABJ                CROM - CROSS - WARD               Vol. V-636
21-CR-14-ABJ

1   A.  Yes.

2   Q.  Okay.  So if you were the CFO, how was it pumped and

3   dumped without your involvement?

4   A.  I have no idea.  I mean, I can speculate but --

13:55:06   5   Q.  And the -- you were interviewed by agents from the

6   Government, including Postal Inspector Hacker on April 30th of

7   2018; correct?

8   A.  I believe that's correct, yes.

9   Q.  And when they began to speak to you, the -- they told you

13:55:32   10   they were there to talk to you about EcoEmissions; correct?

11   A.  Yes.

12   Q.  And nowhere in that interview did you ever mention that

13   EcoEmissions had been pumped and dumped?

14   A.  I don't recall that it was.

13:55:48   15   Q.  You don't recall ever mentioning that EcoEmissions was

16   pumped and dumped?

17   A.  That's correct.

18   Q.  Even though you knew that's what the Government was there

19   to talk to you about, the company EcoEmissions?

13:55:59   20   A.  No.  They were asking me questions.  I'm answering their

21   questions.  I didn't understand the purpose of the questions

22   or the -- or -- or where the conversations were headed.

23   Q.  Okay.  Now, the agreement that you wrote up for the sale

24   of EcoEmissions to Bob Mitchell included a term that all debt

13:56:29   25   would be -- complete debt settlement with purchase; correct?

19-CR-26-ABJ                  CROM - CROSS - WARD              Vol. V-637
21-CR-14-ABJ

1   A.  Your statement included a phrase -- an agreement I drafted

2   for Bob Mitchell.

3          At the time that I'm drafting the agreement, I did

4   not know specifically that it was for Bob Mitchell.

13:56:55   5   Q.  Okay.

6   A.  At some point I became -- Mitchell was aware of.  But

7   the -- the point -- and the agreement you're referring to is

8   the outline?

9   Q.  Yeah.  Let me -- I'm just going to grab -- so I can

13:57:12   10   publish that exhibit to you where this is discussed.  I think

11   that will make that easier.

12          So just one moment.

13      (Discussion held between Mr. Ward and the Courtroom

14   Deputy.)

13:59:50   15   BY MR. WARD:

16   Q.  All right.  So this is Exhibit 108 that has previously

17   been admitted.  And it says "Complete debt settlement with

18   purchase"; correct?

19   A.  That's what the -- the line says, correct.

14:00:15   20   Q.  All right.  But this document isn't entirely accurate

21   because the only debts that were settled with the purchase

22   were the debts of Rodgers, Pardy, and E-Pro; correct?

23   A.  The document is not correct in -- in the sense that, yeah,

24   it -- it only relates to the E-Pro, Pardy, Rodgers agreement.

14:00:41   25   Q.  Because there were numerous, numerous other individuals

 1   who had debt interests in EcoEmissions, the public company;

 2   correct?

 3   A.   Correct, including the State of Nevada and the corporate

 4   stock transfer agent.

14:01:01   5   Q.   And all of the investors who had debentures and invested

 6   money in EcoEmissions; correct?

 7   A.   That is correct.

 8   Q.   Why didn't you take care of those debts?

 9   A.   I wasn't asked to.

14:01:15  10   Q.   Now, No. 6 here says, "Payment in full with Transfer

11   Agent"; correct?

12   A.   Correct.

13   Q.   And so you were aware that a transfer agent was going to

14   have to get involved in this transaction; correct?

14:01:35  15   A.   I recognized the transfer agent needed to be paid.  They

16   didn't need to be involved in this -- in -- in the change of

17   control.  They just needed to be paid.

18        MR. WARD:  Okay.  You can mute the screens.  I'm done

19   with the exhibit.

14:02:03  20   BY MR. WARD:

21   Q.   Now, Eco was a private company at one time; correct?

22   A.   There were several different Ecos.

23        The public company, prior to becoming EcoEmissions

24   Solutions, Inc., previously was known as Resource Group,

14:02:32  25   I believe.  And the origins of Resource Group I don't -- I was

1  not a part of them.  I don't recall if it was ever a private

2  company.

3  Q.  Do you recall telling the agents from the Government when

4  you were interviewed in April of 2018 that Eco was a private

14:02:49  5  company and that Resource Group was a public vehicle and that

6  Eco became the wholly owned subsidiary of Resource Group?

7  A.  I don't recall that specifically, but that sounds to be

8  accurate, yes.

9  Q.  Okay.  And you -- this is typical, using shell companies

14:03:08  10  in -- to raise funds for a company that has an idea with some

11  technology; correct?

12  A.  I wouldn't use the phrase "shell company."  I'd call them

13  public vehicles.

14  Q.  And by "public vehicle," you mean a company that has

14:03:25  15  publicly traded shares but doesn't have ongoing business and

16  you transfer that vehicle from one business model to another

17  in order to allow that subsequent business model to use the

18  public vehicle to raise money; correct?

19  A.  That's a long sentence.  Could you break it down into

14:03:45  20  smaller components?

21  Q.  Well, sure.

22       Using a public vehicle that doesn't have any ongoing

23  business and selling that public vehicle to an interested

24  party is -- is commonplace in your experience in business;

14:04:03  25  correct?

1  A.  I wouldn't use the phrase no "ongoing business" because

2  you run into issues with shell company issues, and those are

3  fraught with, you know, special rules.  I would use the

4  phrase -- instead of that -- "limited operations."

14:04:20    5  Q.  Well, in -- all right.  What is the difference between

6  "limited operations" and "no ongoing business"?

7  A.  "Limited" means few.  "No" means zero.

8  Q.  Okay.  And that's how you avoid additional regulatory

9  scrutiny that comes from a transaction involving a shell

14:04:44   10  company?

11  A.  Correct.

12  Q.  And so you would agree that Eco had limited business and

13  was not a shell company?

14  A.  Yes.

14:04:53   15  Q.  On -- do you recall an email from Gordon Pardy in

16  December of 2014 advising you that Gordon had given

17  Alan Lobock full authority to work with you?

18  A.  I don't recall the specifics, but I remember at some time

19  that happened, yes.

14:05:35   20  Q.  Okay.  And was it your understanding that David Rodgers

21  was agreeable to relinquishing his rights but he was not going

22  to receive any money?

23  A.  Yes.

24  Q.  When you testified on direct, you testified about a

14:06:00   25  payment to Theresa Jones.  Do you recall that?

1    A.  Yes.

2    Q.  Would you agree with me that that $7500 payment to

3    Theresa Jones represented Alan Lobock's portion of the total

4    payment?

14:06:16   5    A.  I have no idea.

6    Q.  You testified about the $7500 that went to Gordon Pardy;

7    correct?

8    A.  Yes.

9    Q.  And the total amount that went to the E-Pro folks was

14:06:30  10    $15,000; correct?

11    A.  That is correct.

12    Q.  And you just agreed with me that David Rodgers was getting

13    nothing; correct?

14    A.  He basically transferred that right to Theresa Jones.

14:06:41  15    Q.  Okay.  Now, when you received your consideration for the

16    sale, your portions of the payment went to a company called

17    Eureka Ventures, Inc.; correct?

18    A.  Yes.

19    Q.  And why was it that you had those payments go to Eureka

14:07:17  20    Ventures, Inc., as opposed to directly to Tom Crom?

21    A.  Eureka Ventures, Inc., is my wholly owned company.

22    I conduct all my personal -- all my business transactions

23    through Eureka.

24    Q.  And there's nothing untoward about that; right?

14:07:36  25    A.  No.

1  Q.  Happens all the time, that people use a company versus

2  having payments come to them individually?

3  A.  I would say it would happen frequently.  I can't say that

4  it would happen all the time.

14:07:45  5  Q.  Frequently, though?

6  A.  Yes.

7  Q.  And Larry Lorenz did the same thing?  He had his payments

8  go to Irvine Trading, LLC; right?

9  A.  Evine, yes, that's correct.

14:08:02  10  Q.  Evine.  Excuse me.

11       And you testified about the corporate name change

12  from Eco to NuTech.  Do you recall that?

13  A.  Yes.

14  Q.  And nothing untoward about changing the name of a company

14:08:14  15  in a transaction like this; correct?

16  A.  Relatively common.

17  Q.  Common?

18  A.  Yes.

19  Q.  And you got stock as part of this transaction; correct?

14:08:41  20  A.  What transaction are you referring to?

21  Q.  Selling the Eco shell to Bob Mitchell.

22  A.  No, I didn't, did not get stock.

23  Q.  Well, you had stock in EcoEmissions; correct?

24  A.  That's correct.

14:08:56  25  Q.  And once the public vehicle was sold to Bob Mitchell and

 1  the name was changed to NuTech, that Eco stock you were

 2  holding was now NuTech?

 3  A.  That's correct.

 4  Q.  So you had NuTech stock?

14:09:09   5  A.  Correct.

 6  Q.  How much?

 7  A.  I don't recall.

 8  Q.  Over a billion shares?

 9  A.  Over a billion?  Absolutely not.

14:09:15   10  Q.  So how many did you have?

11  A.  There would be shareholder records to it.  Boy, as best

12  I recall, the company Eco had approximately 250 million shares

13  outstanding.  If I had to take a guess, 10, 15 million, maybe.

14  Q.  You would agree that Pardy and Rodgers were nonaffiliates

14:10:02   15  of Eco; correct?

16  A.  That's not for me to say.  That would be for them to say.

17        But according to the information I had, no, I don't

18  believe they were affiliates.

19  Q.  And, again, according to the information you had, if it

14:10:22   20  was represented that they were nonaffiliates, that would have

21  been a truthful representation?

22  A.  I wouldn't have had the information to know if it was

23  truthful or not.

24  Q.  But you just said, based on the information you had --

14:10:34   25  A.  Well, the information that I had at that point in time.

19-CR-26-ABJ                 CROM - CROSS - WARD                Vol. V-644
21-CR-14-ABJ

 1    Time changes; circumstances change.  So it all depends on when

 2    they're making the representation.

 3            If they were making the representation when I was an

 4    officer and director of ECMZ, I -- I could say, yes, that was

14:10:51  5    a truthful repr- -- you know -- statement.  After I left

 6    I don't know what happened.

 7    Q.  The documents that transferred the Rodgers and Pardy debt

 8    were sent to you by David Rodgers; correct?

 9    A.  Yes.  As well as Gordon Pardy, yes.

14:11:21 10    Q.  And those documents transferred the debt, but there were

11    some blanks in those documents; correct?

12    A.  You'd have to show me the agreement.  I -- I don't recall

13    blanks in it but there could be.

14    Q.  And the meaning of this transaction that involved Rodgers

14:11:46 15    and Pardy was for them to give up their rights in -- their

16    debt rights, basically, their rights to payment -- so that you

17    could then go on and sell that public vehicle; correct?

18    A.  They were part of that transaction, correct.

19    Q.  Well, they were part of it.  And what specifically needed

14:12:05 20    to happen to their interests?

21    A.  Their -- their net -- the -- the net effect would have

22    been their debt needed to be in control by the purchase -- by

23    the -- by the people purchasing control of the public vehicle.

24    Q.  And you ultimately became aware that the purchase --

14:12:26 25    people purchasing that public vehicle, that was Bob Mitchell;

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

1    right?

2    A.   Yes.

3    Q.   And so Rodgers' and Pardy's rights needed to be

4    extinguished so that they didn't have an interest in the

14:12:40    5    company that -- that Bob Mitchell was going to have at the end

6    of the transaction?

7    A.   Correct.

8              MR. WARD:   May I have just a moment, Your Honor.

9              THE COURT:   You may.

14:13:32   10        (Discussion held at counsel table.)

11              MR. WARD:   Those are all the questions I have,

12    Your Honor.

13              MR. FLEENER:   I have no -- I don't think I have

14    questions.

14:14:11   15              Go ahead, Tom.

16              MR. JUBIN:   Oh, go ahead.

17              MR. FLEENER:   No, I have no questions right now.

18              MR. JUBIN:   Good afternoon, ladies and gentlemen.

19              Good afternoon, Mr. Crom.

14:14:32   20                     **CROSS-EXAMINATION**

21    BY MR. JUBIN:

22    Q.   There's been this discussion about Ian Horn being an

23    escrow agent.  Is this something that happens with some

24    regularity in business transactions?

14:14:45   25    A.   Yes.

19-CR-26-ABJ              CROM - CROSS - JUBIN              Vol. V-646
21-CR-14-ABJ

1    Q.  Explain that.

2    A.  Well, particularly in -- in a purchase/sell-type

3    agreement, there's always concern on both sides that they

4    won't get what's been promised to them.  "If you send the

14:15:00    5    money first, do I get the documents?"  "Do I get what's

6    promised to me in the purchase transaction?"

7            So an escrow agent is very commonly used.  The escrow

8    agent receives the money, disburses it as -- as required, and

9    receives the elements of the purchase; in this case, you know,

14:15:18    10    resignations, share certificates, you know, whatever --

11    whatever's covered under the escrow agreement.

12    Q.  Documents and money?

13    A.  Correct.

14    Q.  And frequently the -- the person who would act as an

14:15:31    15    escrow agent might be an attorney because the parties would be

16    inclined to trust that person?

17    A.  Correct.

18            MR. JUBIN:  Let's take a look at Exhibit 108.

19    BY MR. JUBIN:

14:16:03    20    Q.  So if we look at the -- No. 1 here, it says that there

21    will be some items and documents "delivered to the escrow

22    agent, Ian Horn, Esquire"; right?

23    A.  Correct.

24    Q.  I'm Tom Jubin.  I am Ian Horn's lawyer.

14:16:23    25            So looking at this, you'd say this would be typical

---

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1   or unexpected -- or not unexpected in a business transaction;

2   correct?

3   A.  Not unexpected.

4   Q.  And in the course of -- of this sort of service as an

14:16:40   5   escrow agent, would you expect that the escrow agent would

6   charge for those services?

7   A.  Yes.

8        MR. JUBIN:  Let's take a look at 101.

9   BY MR. JUBIN:

14:16:59   10   Q.  Do you see there, kind of halfway down in the middle of

11   the page, it says "Keep $1,250 for yourself"?

12        This is an email from Justin Herman to Ian Horn.

13        So this sort of payment for the escrow services would

14   be expected?

14:17:19   15   A.  Yes.

16   Q.  And it --

17        MR. JUBIN:  If we could scroll down on this.  Okay.

18   BY MR. JUBIN:

19   Q.  This "Wire Instructions for Eureka Ventures, $10,750,"

14:17:40   20   who's that?

21   A.  Eureka Ventures is my wholly owned company.

22   Q.  So that's what you were to get out of this transaction?

23   A.  That's correct.

24   Q.  And you received that money as directed?

14:17:51   25   A.  Yes.

1    Q.  And so it was Ian Horn that sent you that money, so far as

2    you know?

3    A.  Yes.

4          MR. JUBIN:  Let's take a look at 11.1.

14:18:15   5    BY MR. JUBIN:

6    Q.  Before we talk about that document -- now, there were

7    other instructions that Ian Horn was given, and that was to

8    pay these guys who had the convertible debt; right?

9    A.  It was to be making payments for Gordon Pardy and

14:18:43  10    Dave Rodgers, which ended up being Theresa, yes.

11    Q.  Right.  So they were each to get $7500 out of this

12    agreement?

13    A.  That's correct.

14    Q.  And to your knowledge, did they get their $7500 each?

14:18:56  15    A.  They did.

16    Q.  And that was money that was wired by Ian Horn as the

17    escrow agent?

18    A.  That's correct.

19          MR. JUBIN:  Oh, I think I -- let's scroll down in

14:19:18  20    11.1.

21          Well, this is not very helpful.  I think we'll skip

22    11.1.

23          Let's pull up -- this is not admitted -- IH-1014.

24    BY MR. JUBIN:

14:19:54  25    Q.  Do you see Exhibit IH-1014?

1   A.  Yes.

2   Q.  Do you recognize it?

3   A.  Yes.

4   Q.  What is it?

14:20:00   5   A.  It's an email sent by me to Justin Herman.

6   Q.  And what's the subject?

7   A.  I needed Ian Horn's address.

8   Q.  And when did you send this?

9   A.  This is dated December 30th, 2014.

14:20:17  10          MR. JUBIN:  I'd move for the admission of IH-1014.

11          MR. HEIMANN:  Your Honor, may I have a moment with

12  counsel.

13          THE COURT:  You may.

14      (Discussion held between counsel.)

14:20:37  15          MR. HEIMANN:  No objections.

16          THE COURT:  It is received.

17      (Defendant Horn's Exhibit IH-1014 received into evidence.)

18  BY MR. JUBIN:

19  Q.  You needed Ian Horn's address so you could send documents

14:20:51  20  pursuant to Ian Horn holding the escrow; right?

21  A.  I'm sorry.  Say that question again.

22  Q.  You wanted Ian Horn's address because you needed it to

23  send the documents to him as the escrow agent; correct?

24  A.  Correct.

14:21:09  25  Q.  Because he was the guy who was going to hold the documents

19-CR-26-ABJ             CROM - CROSS - JUBIN           Vol. V-650
21-CR-14-ABJ

 1   and hold the money and then move it on; right?

 2   A.   Right.

 3   Q.   Pay the people to whom the money was owed?

 4   A.   Correct.

14:21:36  5   Q.   There came to be a problem at some point, you testified,

 6   concerning Mr. Horn's bank account.  Do you recall that

 7   testimony earlier?

 8   A.   Yes.  It was his same company account which -- you know,

 9   it's a special bank account.

14:21:51 10   Q.   It was a bank account that Ian Horn was using to escrow

11   funds?

12   A.   Correct.

13          MR. JUBIN:  Let's take a look at -- oh, before

14   I forget, let's move for the admission of Ian Horn 1014 --

14:22:01 15   it's already been admitted; right?

16          THE COURTROOM DEPUTY:  Yes.

17          THE COURT:  It is.

18          MR. JUBIN:  Okay.

19          Let's take a look at IH-1015B.  And this is not

14:22:11 20   admitted yet.

21   BY MR. JUBIN:

22   Q.   During the course of this problem with the bank, were you

23   requested to -- by Justin Herman -- to write letters or a

24   letter to the bank to explain what was going on?

14:22:33 25   A.   I don't know if it was by Justin Herman or -- or Ian Horn.

```
19-CR-26-ABJ          CROM - CROSS - JUBIN          Vol. V-651
21-CR-14-ABJ
```

 1             But I'm -- I'm looking at the letter.  And it's been

 2    a long time since I've looked at it.

 3             But, yeah, I believe that's my letter, and it sounds

 4    like something I did.

14:22:54    5    Q.  And you were addressing your letter to the bank?

 6    A.  Correct.

 7    Q.  And this was December 31 of 2014?

 8    A.  Correct.

 9             MR. JUBIN:  I'd move for the admission of IH-1015B.

14:23:05   10             MR. HEIMANN:  Your Honor, I need to see the next

11    two pages.

12             No objection.

13             THE COURT:  1015B is -- IH-1015B is received.

14        (Defendant Horn's Exhibit IH-1015B received into evidence.)

14:23:32   15             MR. JUBIN:  Ask that it be published.

16             THE COURT:  It will be published.

17    BY MR. JUBIN:

18    Q.  And so you wrote this letter to the bank to support the

19    release of the funds from the escrow; correct?

14:23:44   20    A.  Yes.

21    Q.  Because you wanted this deal to take place; right?

22    A.  Correct.

23    Q.  You wanted Mr. Pardy to get paid; right?

24    A.  Yes.

14:23:52   25    Q.  And you wanted Mr. Rodgers to get paid?

19-CR-26-ABJ          CROM - CROSS - JUBIN          Vol. V-652
21-CR-14-ABJ

1   A.  Yes.

2   Q.  You wanted the deal to happen?

3   A.  Yes.

4   Q.  And so you assisted in writing to the bank to explain some

14:24:10  5   of the transaction and what was going on; correct?

6   A.  Correct.

7   Q.  And you represented that there was recently $80,000 that

8   were wired to Mr. Horn's escrow account; correct?

9         I'm sorry?

14:24:26  10  A.  What was the question?

11  Q.  And you -- you wrote to the bank that there were recently

12  $80,000 in funds that were wired to Mr. Horn's escrow account;

13  correct?

14  A.  That's what the letter states, correct.

14:24:37  15  Q.  And you didn't tell them 280,000?  You told them 80,000;

16  right?

17  A.  Yes.

18  Q.  Okay.  And you attached some documents to your letter to

19  the bank to basically say, "Hey, look, this is a -- this is a

14:25:02  20  real deal here; we need to get these people paid"; right?

21  A.  Correct.

22         MR. JUBIN:  Let's take a look at IH-1025.  This is

23  not yet admitted.

24  BY MR. JUBIN:

14:25:25  25  Q.  Do you recognize this document?

Melanie Sonntag, RDR, CRR, CRC                MelanieSonntagCRR@gmail.com

19-CR-26-ABJ              CROM - CROSS - JUBIN              Vol. V-653
21-CR-14-ABJ

1    A.  Yes.

2    Q.  And what is it?

3    A.  It's a letter -- it's an email from me with wiring

4    instructions on how to pay $15,000.

14:25:45   5    Q.  And you sent this to Ian Horn with a copy to

6    Justin Herman?

7    A.  Yes.

8    Q.  And you did this on January 8th of 2015?

9    A.  Yes.

14:25:54  10    Q.  So you were providing some wiring instructions to Ian Horn

11    with respect to the people -- with respect to how to get the

12    money to Mr. Pardy and Mr. Rodgers' representative,

13    Theresa Jones; correct?

14    A.  Correct.

14:26:21  15         MR. JUBIN:  Can we scroll down to page 2?

16         Right, back up to page 1.

17         I'd move for the admission of IH-1025.

18         MR. HEIMANN:  No objection.

19         THE COURT:  IH-1025 is received.

14:26:38  20    (Defendant Horn's Exhibit IH-1025 received into evidence.)

21    BY MR. JUBIN:

22    Q.  And -- so you gave Ian Horn your thanks for helping in the

23    transaction; right?

24    A.  Yes.

14:26:49  25    Q.  And you said, "What a pain in the" -- question marks?

```
19-CR-26-ABJ          CROM - CROSS - FLEENER          Vol. V-654
21-CR-14-ABJ
```

1      That was because the bank sort of held up the thing

2  for a while; right?

3  A.   Yes.

4  Q.   And then you gave the specifics as to where the $7500 each

14:27:02    5  was to go to Pardy and Rodgers?

6  A.   That's correct.

7          MR. JUBIN:  Okay.  You can take it back down.

8          I don't have any further questions at this time.

9          Thank you, Mr. Crom.

14:27:31   10          MR. FLEENER:  I just have, I think, two, Judge.

11          Mr. Crom, my name is Tom Fleener.  I represent

12  Justin Herman.

13          It's nice to meet you, sir.

14          THE WITNESS:  Good to meet you.

14:27:35   15                    **CROSS-EXAMINATION**

16  **BY MR. FLEENER:**

17  Q.   Real quick:  You weren't -- you were the CFO of -- of

18  ECMZ; correct?

19  A.   Correct.

14:27:54   20  Q.   Eco Systems.  But you weren't an investor at Eco Systems?

21          You just had sweat equity in the company; correct?

22  A.   I might have written out a few small checks to Eco, but

23  your basic premise is correct.  It was all -- predominantly

24  sweat equity, correct.

14:28:14   25          MR. FLEENER:  One moment, please.

---

1    Thank you, sir.

2                    **REDIRECT EXAMINATION**

3    BY MR. HEIMANN:

4    Q.  Mr. Crom, on cross-examination Mr. Ward asked you about

14:28:35    5    other people owed money.  Do you remember that?

6    A.  Yes.

7    Q.  And you said "I wasn't asked to" in response to whether or

8    not you took care of for -- the debt purchase involved other

9    debts besides those to Mr. Pardy, Mr. Rodgers, and E-Pro.

14:28:54    10    A.  The -- the -- I'm sorry.

11          The -- the debts that I needed to take care of

12    were -- the debt assignment covered Gordon Pardy,

13    Dave Rodgers, and E-Pro.  The -- the two debts that I said

14    I would take care of would be to the State of Nevada and to

14:29:14    15    the stock transfer agent.

16    Q.  Okay.  If I understood your original testimony and

17    cross-examination, there were other people -- there were other

18    debentures and other people owed money.

19    A.  There was other creditors, correct.

14:29:27    20    Q.  And your response was "I wasn't asked to."

21    A.  Correct.

22    Q.  Who asked you to take care of the debt owed to Mr. Pardy

23    and Mr. Rodgers?

24    A.  It was part of the discussions and negotiations.

14:29:42    25    Q.  With?

1   A.   Justin Herman.

2   Q.   Mr. Ward also asked you about stock that you owned.  Was

3   that stock restricted or free trading?

4   A.   All the stock I had was restricted.

14:29:56   5   Q.   Did you ever consider having the restriction removed?

6   A.   I'm sure I would have considered it.  But as an officer

7   and director, I was subject to insider trading rules,

8   disclosure requirements.  Then after I resigned, I was still

9   providing assistance to the company, so I was concerned about

14:30:23   10   inside information, and I didn't want to be trading on any

11   hint of insider information.

12          So I thought about it, and the answer is, no, I never

13   sold any stock.

14   Q.   Did you follow the company online?

14:30:35   15   A.   Absolutely.

16   Q.   What did you see?

17   A.   I saw news releases that the company periodically made,

18   and I reviewed and looked at their disclosure statements and

19   filings, you know, after they made them -- sometimes I might

14:30:53   20   have looked at them beforehand.  But that's -- I'm certainly

21   looking at their information.

22   Q.   But when you say you looked at some of them beforehand,

23   what do you mean?

24   A.   I -- I believe I looked at some financial statement

14:31:06   25   disclosures.  And I had some questions about, you know, how

19-CR-26-ABJ          CROM - REDIRECT - HEIMANN          Vol. V-657
21-CR-14-ABJ

1    things were being disclosed and accuracy of information,

2    I suppose.

3    Q.  Were you asked to be -- were you asked to look at these

4    disclosures?

14:31:22    5    A.  Yes.

6    Q.  Who asked you to do that?

7    A.  That would have been Justin Herman.

8    Q.  Where would you go to find the disclosures?

9    A.  OTC.

14:31:36    10    Q.  And news releases, where would you find those?

11    A.  That would be online.  I believe they were -- you know,

12    they would have been issued by some news release agencies.

13    You could have viewed them on any number of financial websites

14    by simply, you know, typing in "ECMZ news releases."

14:32:01    15    Q.  When you read some of these news releases, were you

16    concerned?

17    A.  I certainly had questions.  Absolutely.  And some news

18    releases gave rise to more concern than others.

19    Q.  When you had these questions -- I mean, what kind of

14:32:17    20    concerns did you have?

21    A.  Well, in some there was just lack of details.  For

22    example, there was an IP licensing agreement that the company

23    had reached, but there was no disclosure on the nature of

24    that -- what kind of fees were due, what kind of royalties

14:32:37    25    were due, what kind of payments were involved, what was the

19-CR-26-ABJ          CROM - REDIRECT - HEIMANN          Vol. V-658
21-CR-14-ABJ

1    consideration for the transaction.

2        I thought it was probably a material transaction;

3    I thought it should have been disclosed in the financial

4    statements.

14:32:47    5    Q.  But you didn't see that disclosure?

6    A.  I didn't see that.

7    Q.  Who would you contact when you had these concerns?

8    A.  I had other concerns, as well.  But when -- when I had

9    concerns, I probably would have called Justin Herman.  On

14:33:01    10    occasion I would speak to their PR representative, I believe

11    was Steffan Dalsgaard.

12    Q.  Did you actually speak to Mr. Herman about your concerns?

13    Or did you just call and not get a call back?

14    A.  It would -- it would have been a telephone call.

14:33:19    15    Q.  Do you remember a conversation where you actually talked

16    to him about any of these concerns?

17    A.  I remember one conversation.  It was regarding a news

18    release the company had made regarding an acquisition by a

19    Russian company.

14:33:35    20    Q.  What were your concerns?

21    A.  It was a very large transaction, large numbers.  And I --

22    I was concerned about the accuracy of -- of that news release.

23    Q.  What was Mr. Herman's response?

24    A.  That the company had to put it out.

14:33:53    25    Q.  I'm sorry?

Melanie Sonntag, RDR, CRR, CRC                MelanieSonntagCRR@gmail.com

1    A.   The company had to put it out.

2    Q.   "Put it out"?  What did you take that to mean?

3    A.   Issue the news release.

4    Q.   Did he say why?

14:34:03    5    A.   Well, I -- I don't recall whether it was directly from

6    Justin Herman or the conversation that I had with

7    Steffan Dalsgaard.  But I -- I was told that they had spoken

8    to OTC Markets and they were told by OTC Markets that --

9              MR. FLEENER:  Objection; hearsay.

14:34:23    10             THE COURT:  Sustained.

11   BY MR. HEIMANN:

12   Q.   You were asked on cross-examination about the fact that

13   the debt -- the Pardy, Rodgers, E-Pro debt -- needed to be

14   controlled by the people purchasing the company.

14:34:59    15             Who is the receiving party identified in the debt

16   assignment?

17   A.   Justin Herman.

18             MR. HEIMANN:  May I have a moment, Your Honor.

19             THE COURT:  You may.

14:35:32    20             MR. HEIMANN:  I have no other questions, Your Honor.

21             MR. FLEENER:  Questions based on the Government's?

22             THE COURT:  Proceed.

23                    **RECROSS-EXAMINATION**

24   BY MR. FLEENER:

14:35:49    25   Q.   Mr. Crom, how many times were you interviewed in this

1  case?  Many?  Several?

2  A.  I would say several.

3  Q.  Okay.  And you -- you started to be interviewed when?

4  2018?

14:36:01  5  A.  That sounds right.

6  Q.  And you were interviewed by, I assume, Ms. Hacker and

7  other agents of the United States.

8  A.  There was two agents; Sonia Hacker was one of them.

9  Q.  You testified before the grand jury, as well; right?

14:36:16  10  A.  Yes.

11  Q.  You've -- were interviewed by our investigator, the young

12  lady in the back, a couple weeks ago?

13  A.  Yes.

14  Q.  You've been interviewed by -- how many times have you met

14:36:27  15  with the United States to -- like Mr. Heimann and -- and the

16  attorneys with the United States?

17  A.  I met with him prior to the grand jury and then sometime

18  in Phoenix, probably within the last three months.

19  Q.  And then you met with them -- and then you met with him

14:36:47  20  again, I assume, yesterday.

21  A.  On Sunday, correct.

22  Q.  With the exception of Sunday, I -- I've scrubbed your --

23  I've scrubbed your records of the interviews.  There's no

24  mention at all ever of Mr. Crom talking to Justin Herman about

14:37:06  25  the Russian buyout release.

19-CR-26-ABJ          CROM - RECROSS - FLEENER          Vol. V-661
21-CR-14-ABJ

1          Is the first time you said that yesterday?

2     A.  I -- I don't recall.

3     Q.  Well, you were -- you testified before the grand jury and

4     never mentioned a word about it.  Do you quibble with me on

14:37:27  5   that?

6     A.  If -- if that's what the record shows, no.

7     Q.  And you were -- you gave a long, lengthy interview about

8     the grand -- about the -- when you were interviewed in

9     April of 2018.

14:37:49  10        MR. FLEENER:  Well, may I have a second, Judge.

11         (Discussion held at counsel table.)

12         THE COURT:  Again, ladies and gentlemen, this is a

13    chance to stand and stretch if you'd like to.

14         You, too, Mr. Crom.

14:38:54  15        MR. FLEENER:  I'm ready.

16         THE COURT:  Are you ready?

17         MR. FLEENER:  Sorry.

18         THE COURT:  Okay.

19    BY MR. FLEENER:

14:39:22  20   Q.  Your interview with the United States when the agents came

21    to visit you in 2018, that lasted for a couple hours; correct?

22    A.  That sounds about right.

23    Q.  And if I told you it was from 12:58 p.m. to 2:24 p.m. on

24    April 30th, 2018, at -- I'm not going to give your address

14:39:48  25   away but -- in Payson, Arizona, that sounds correct?

19-CR-26-ABJ                CROM - RECROSS - FLEENER              Vol. V-662
21-CR-14-ABJ

1    A.   That would be -- sounds correct.

2    Q.   And during that interview do you recall -- do you recall

3    talking about the Russian press conference?

4    A.   Specifically no.

14:40:10    5    Q.   Would it -- would it refresh your recollection to hear

6    the -- the minute or two that you did talk about the Russian

7    press -- press conference in order to answer these questions

8    going forward?

9    A.   Sure.

14:40:23    10         MR. FLEENER:  Your Honor, I'd like to play

11    two minutes of an interview outside the presence of the jury

12    to the witness, and I don't know how the Court wants to do it.

13         But I'd like to refresh his recollection about

14    whether or not he mentioned Justin Herman during this

14:40:39    15    particular time.  It's a prior inconsistent statement.

16         THE COURT:  Is there a transcript --

17         MR. FLEENER:  There is not.

18         THE COURT:  -- he could refer to?

19         MR. FLEENER:  It's only a minute and a half, Judge.

14:40:53    20    (Discussion held between counsel.)

21         MR. FLEENER:  So I -- I have a -- a -- a short

22    recording that the -- that the witness could listen to.

23    I don't know how the Court wants to handle it with the jury

24    here.

14:41:13    25         THE COURT:  All right.  Why don't we do it at the

19-CR-26-ABJ              CROM - RECROSS - FLEENER          Vol. V-663
21-CR-14-ABJ

1    regular break and -- let's do it.  We'll call the witness back

2    and you can ask him the questions.

3              MR. FLEENER:  Okay.  I have -- okay.  I don't have

4    any other questions other than that, though, Judge.  Do you

14:41:30   5    want to take a break early, or how do you want to handle

6    it, sir?

7              THE COURT:  What does the Government want to do

8    witnesswise?

9              MR. HEIMANN:  Your Honor, I think it would be best

14:41:48  10    just to finish this witness so he can be on his way.

11              It's -- if we were to take a break now, we'd end up

12    at three o'clock, and I think two hours is a reasonable amount

13    of time to sit without a break.

14              So I think it -- halfway this afternoon is probably

14:42:07  15    later than 3:00 -- than now -- but we'll wind up with

16    two hours, which I think is --

17              THE COURT:  Well, we'll take 15 minutes to set up the

18    machine and make it work and so forth.  All right.

19              MR. HEIMANN:  And I don't know what -- how much time

14:42:23  20    it's going to take for Mr. Fleener to do the mechanics of it.

21              But those are my thoughts.

22              MR. FLEENER:  Well, it won't take long at all, Judge.

23    What I was -- I apologize.  I didn't mean to speak over the

24    United States.

14:42:33  25              Your Honor, what I was planning on doing -- I mean,

Melanie Sonntag, RDR, CRR, CRC                MelanieSonntagCRR@gmail.com

19-CR-26-ABJ           CROM - RECROSS - FLEENER          Vol. V-664
21-CR-14-ABJ

 1   I wasn't intending to actually -- I'm not going to be offering

 2   this exhibit.  It's -- it's to impeach.  So I was going to

 3   just play it --

 4          THE COURT:  It's to refresh recollection.

 5          MR. FLEENER:  Judge?
14:42:44
 6          THE COURT:  It's really to refresh recollection,

 7   isn't it?

 8          MR. FLEENER:  Correct.  I can -- I'm just going to

 9   play it from my laptop.  It will take five minutes and I'll be
14:42:51
10   done doing that, maybe three minutes.

11          THE COURT:  All right.

12          Let's -- Ms. Harris, would you please take charge of

13   the jury and take them to the jury room.

14          THE COURTROOM DEPUTY:  All rise.
14:43:05
15     (Proceedings outside the jury's presence at 2:43 p.m.)

16          THE COURT:  Please be seated.

17          What was the witness' last answer?

18          THE COURT REPORTER:  The question was: "Would it

19   refresh your recollection to hear the minute or two that you
14:40:18
20   did talk about the Russian press conference in order to answer

21   these questions going forward?

22          "Answer:  Sure."

23          THE COURT:  Thank you.

24          MR. FLEENER:  Your Honor, with the Court's
14:44:23
25   permission, I'm just going to approach the witness and push --

1    I've got the volume loud as can be.  He'll be able to hear it.

2    It only takes a minute.

3              THE COURT:  Or else you can hold it to the

4    microphone.

14:44:33    5              MR. FLEENER:  Or I can do that, too.

6         (Audio recording played.)

7              MR. FLEENER:  After listening to -- and I'll get a

8    commitment, Judge, and then we bring the jury back in and do

9    it again, I suppose.

14:46:16    10              THE COURT:  Proceed.

11   BY MR. FLEENER:

12   Q.   Mr. Crom, that was you; correct?

13   A.   Yes, sir.

14   Q.   And that was your interview with Ms. Hacker and agents

14:46:23    15   when they came to visit you?

16   A.   Yes.

17   Q.   And you'd agree, would you not --

18              THE COURT:  The question -- you're not asking the

19   right question.

14:46:29    20              The question is, does it refresh your recollection?

21              THE WITNESS:  Yes, it refreshed my recollection.

22   BY MR. FLEENER:

23   Q.   Okay.  And now that your recollection is refreshed --

24   freshed -- do you recall that you never mentioned

14:46:43    25   Justin Herman -- Justin Herman during this Russian press

 1    release discussion with Ms. Hacker?

 2    A.   That is correct.

 3              MR. FLEENER:   That's what I'm going to do in front of

 4    the jury, Judge.

14:46:54   5              THE COURT:   Very well.

 6              He did mention Dalsgaard, and he wasn't certain

 7    whether it was Dalsgaard or Herman in his earlier testimony.

 8              MR. FLEENER:   Well, his testimony was Dalsgaard, and

 9    then he also went into Justin Herman with all due respect,

14:47:06  10    Your Honor.

11              THE COURT:   All right.

12              MR. FLEENER:   I'm ready to cross -- to continue

13    cross -- and I'll be done at three o'clock, Judge, so --

14              THE COURT:   All right.   Let's bring the jury in.

14:47:44  15              Do you have the transcript of -- words of what he

16    said?

17              MR. FLEENER:   No, Judge.

18              THE COURT:   We could read that back.

19              MR. FLEENER:   I can play it during a break or now

14:47:52  20    or -- because I don't think that was being transcribed.

21              Was it?

22              THE COURT REPORTER:   No.   I did not write that.

23              THE COURT:   We could go back to it, though.

24              MR. FLEENER:   Would the Court like me to play it

14:48:04  25    again?

19-CR-26-ABJ          CROM - RECROSS - FLEENER          Vol. V-667
21-CR-14-ABJ

 1           THE COURT:  I'm thinking about, if you're using it to

 2    impeach, what you're impeaching.

 3           MR. FLEENER:  You're right.

 4           I don't think I need to go into detail in the

 5    impeachment, Judge.  I'm just going to get the commitment from

 6    the witness, hopefully, that he never said this before.

 7           THE COURT:  All right.

 8        (Proceedings within the jury's presence at 2:51 p.m.)

 9           THE COURT:  Thank you, ladies and gentlemen.  Please

10    be seated.

11           Mr. Fleener, you may continue.

12           MR. FLEENER:  Thank you, Your Honor.

13    BY MR. FLEENER:

14    Q.  Mr. Crom, you had the opportunity to listen to a portion

15    of your interview, the lengthy interview that you had with the

16    agents back in 2018, did you not?

17    A.  Yes, I did.

18    Q.  I apologize.  I didn't mean to --

19    A.  Yes, I did.

20    Q.  Okay.  And during that interview you listened to the

21    portion where you talked about the -- the press release and

22    conference call with the Russian -- the Russian pump and dump;

23    correct?

24    A.  I -- I would say it was the -- the terms of the Russian

25    acquisition.

14:48:25 (line 5)
14:52:21 (line 10)
14:52:31 (line 15)
14:52:40 (line 20)
14:52:54 (line 25)

19-CR-26-ABJ              CROM - RECROSS - FLEENER          Vol. V-668
21-CR-14-ABJ

1    Q.  All right.  I apologize.  The Russian acquisition.

2         But that was the portion of the interview you just

3    listened to?

4    A.  That's correct.

14:53:00    5    Q.  And on direct examination you testified that you had some

6    conversation with Justin Herman about -- about the Russian

7    acquisition and that he had mentioned -- that he had said that

8    OTC Markets apparently just wanted the press release out,

9    something like that.

14:53:17    10    A.  I -- I said I -- and, again, I -- I know the details are

11    important.  But I thought I lumped Justin Herman together with

12    Dalsgaard.

13    Q.  But the truth is you never mentioned Justin Herman in the

14    Russian press release when you were talking to the agents

14:53:33    15    in 2018 --

16    A.  That is correct.

17    Q.  And you never mentioned Justin Herman and the Russian

18    press release during your grand jury transcript?  You admitted

19    that already if the records show?

14:53:42    20    A.  That's correct.

21    Q.  You never mentioned Justin Herman and the Russian press

22    release when you spoke with our investigator over there?

23    A.  I don't know if -- I don't recall any specific questions

24    she asked me about it but -- okay.

14:53:52    25    Q.  And, in fact, the only time -- the first mention of the

19-CR-26-ABJ            CROM - RECROSS - FLEENER            Vol. V-669
21-CR-14-ABJ

1  Russian press release, truth be told, came from your

2  discussion with these guys yesterday when you were preparing

3  for trial; correct?

4  A.  No.

14:54:04    5  Q.  Okay.  When did it come before, then?

6          Because I looked at all the records, and I haven't

7  seen it at all.

8          THE COURT:  Well, I want to caution you, ladies and

9  gentlemen.

14:54:13   10          He cannot testify.  He's not under oath.  He can't be

11  cross-examined.

12  BY MR. FLEENER:

13  Q.  Who did you tell and when about Justin Herman's

14  involvement in the Russian press release?

14:54:23   15  A.  I -- well, from -- now that my memory is refreshed and --

16  and all that, it would appear that the first time I've

17  mentioned Justin's name in relationship to the Russian

18  acquisition would have been today.

19  Q.  Okay.

14:54:45   20          All right.  So in the last three years that you were

21  involved in this case, you apparently never mentioned

22  Justin Herman with the Russian press release?

23  A.  Correct.

24  Q.  And you mentioned it for the very first time today?

14:54:55   25  A.  Yes.

19-CR-26-ABJ          CROM - RECROSS - FLEENER          Vol. V-670
21-CR-14-ABJ

1    Q.  And so how does your memory work compared to other --

2    to -- well, let me just ask you this:  How does your memory

3    work?  Does it get better with age, or does it get worse

4    with age?

14:55:06    5    A.  I -- you know, in general, events and details are lost

6    with time.

7    Q.  Right.  And so you would agree that when you were

8    interviewed in 2018, that was closer to the event of the

9    Russian press release and acquisition?

14:55:22    10   A.  Timewise, yes.

11   Q.  And you would agree that when you met with agents of the

12   United States throughout this case, those would have all been

13   closer in time than today?

14   A.  That's correct.

14:55:33    15   Q.  When you met with our investigator two weeks ago, that

16   would have been closer in time than today?

17   A.  That's correct.

18   Q.  In fact, every meeting you had with anybody involving in

19   this case would have been closer in time than today?

14:55:46    20   A.  Yes.

21   Q.  And the way our memory ordinarily works is that the closer

22   in time is -- the closer in time, we remember more details

23   than we do later on; correct?

24   A.  That -- that would be a generalization, yes.

14:56:00    25   Q.  Thank you.

          1              MR. FLEENER:  No further questions, Judge.

          2              MR. HEIMANN:  I have no other questions for this

          3    witness.

          4              THE COURT:  Mr. Crom, you're excused.

14:57:03  5              MR. HEIMANN:  The United States of America calls

          6    David Rodgers.

          7         (Witness sworn.)

          8              THE COURTROOM DEPUTY:  Please take a seat.

          9              Please state and spell your name for the record.

14:58:12  10             THE WITNESS:  David Rodgers, D-a-v-i-d R-o-d-g-e-r-s.

          11      **DAVID RODGERS, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

          12    **BY MR. HEIMANN:**

          13    Q.  Mr. Rodgers, how old are you?

          14    A.  I just turned 60.

14:58:21  15    Q.  Where were you born and raised?

          16    A.  Salt Lake City, Utah.

          17    Q.  Where do you live now?

          18    A.  Gilbert, Arizona.

          19    Q.  What is the highest level of education you have obtained?

14:58:30  20    A.  I graduated from -- from the University of Utah with a

          21    juris doctor degree.

          22    Q.  That's a law degree?

          23    A.  Yeah.

          24    Q.  Did you practice as a lawyer?

14:58:39  25    A.  For a while.

1  Q.   From -- from when to when?

2  A.   1992 to about 2006.

3  Q.   What do you do now?

4  A.   I'm a real estate investor, and I own another business.

14:58:53    5  I'm self-employed, basically.

6  Q.   Self-employed doing what?

7  A.   I -- I do a lot of real estate investing, and I own some

8  Airbnbs.  Occasionally, I will do some brief writing for

9  lawyer friends for a contract basis.  But mostly it's general

14:59:10   10  real estate investing.

11  Q.   I want to take you back to 2014, November, December.

12           Were you contacted by a friend of yours named

13  Alan Lobock?

14  A.   I was.

14:59:23   15  Q.   What did Mr. Lobock talk to you about at that time?

16  A.   He said that there was a deal on the table to make

17  a little bit of money.  We were -- we were owed money from a

18  company from four or five years earlier, and he said if we

19  would relinquish our rights or give up the debts that we were

14:59:46   20  owed, that there was a little bit of money to be made.

21           I think he mentioned $14,000 if I recall right.

22  Q.   What company?

23  A.   The company that owed us money was called EcoEmissions.

24  I think -- Incorporated -- EcoEmissions, Inc., I think it was.

15:00:01   25  Q.   You say "us," "owed us money."

1          Who is "us"?

2    A.   There was a company, E-Pro Systems, LLC, that I was a part

3    owner of, and then the company also owed me money directly and

4    also owed money to a gentleman named Gordon Pardy.

15:00:19   5    Q.   Was Mr. Pardy your partner in E-Pro Systems?

6    A.   Yeah.  He was a -- he was the only other member in the

7    LLC, which -- in layman's terms, he was my partner.

8    Q.   Did you have a convertible promissory note that documented

9    the debt EcoEmissions owed you?

15:00:38  10    A.   That was part of the debt they owed to me, the convertible

11   promissory note, yes.  There was other things, too.

12   Q.   How much was owed on the convertible note?

13   A.   I don't -- mine was a -- I think $130,000.  Give or take.

14   Q.   When was the convertible note executed?

15:00:53  15    A.   I think it was around 2010, maybe late 2009.

16          I . . . if I remember right.

17   Q.   Several years before you were contacted by Mr. Lobock?

18   A.   Yes.

19   Q.   This particular business venture, E-Pro Systems, was it

15:01:14  20   defunct in 2014?

21   A.   Yes.  Completely.

22          We'd -- the investment had failed and I had given up

23   on any hope of collecting any money.

24   Q.   Did you agree to release the debt?

15:01:29  25    A.   Yeah.  I can't remember if we released it or transferred

1    it, but I agreed to give it up.

2    Q.  What were you going to get in exchange for that?

3    A.  Well, I was offered a share of the $14,000, and I said,

4    "You and Gordon can keep that, just -- you know, I -- I don't

5    need any money; I'll be happy to release it.  Just make sure

6    that if -- if -- if you do end up owing Kat Quevado any money,

7    that you take care of that and I don't have to pay any of

8    that."

9    Q.  Who was Kat Quevado?

10   A.  Kat Quevado was somebody who came into EcoEmissions after

11   we formed and brought some money in, I think in the $25,000

12   range, to help deal with some expenses we had.  And I hadn't

13   talked to her for a couple years but -- I didn't know if she

14   was owed money or not.  I just said, "If she is, you have to

15   take care of that.  Since I'm not going to take any money,

16   I don't want to have to deal with that part of the deal."

17   Q.  So if I understand correctly, you were willing to release

18   or sign your -- the debt owed to you -- you weren't going to

19   take any money?

20   A.  That's correct.

21   Q.  Okay.  Did you negotiate this agreement through

22   Mr. Lobock?

23   A.  There was a written agreement that I worked with

24   Mr. Lobock to -- to say the things that I needed that were

25   important in there.

19-CR-26-ABJ          RODGERS - DIRECT - HEIMANN          Vol. V-675
21-CR-14-ABJ

1      So if that's a negotiation, yes.

2  Q.  Why were you going through Mr. Lobock?

3  A.  Well, he was the one who approached me.  Gordon and I had

4  had a falling-out a couple years earlier.  It wasn't awful but

15:03:07  5  Alan was a very good friend, and he was the one who was

6  facilitating the deal.  He also said he was going to get some

7  of the money for helping facilitate the deal.

8      So he did the work and I worked with him.

9  Q.  Was a man named Tom Crom also involved in this agreement?

15:03:22  10  A.  Tom Crom had been involved in the EcoEmissions situation

11  in 2010.

12      And Alan Lobock told me he was involved, but I don't

13  have any personal knowledge if he was or not.

14      MR. HEIMANN:  Let's go to Exhibit 11.1.

15:03:49  15      THE WITNESS:  I have the hard copy in front of me.

16      MR. HEIMANN:  Very good.  I'm going to pull it up,

17  too.  If you would, while we're pulling it up, look at pages 2

18  through 6.

19  BY MR. HEIMANN:

15:04:26  20  Q.  Have you had a chance to look through those pages?

21  A.  Yes, sir.

22  Q.  You mentioned earlier there was a -- an agreement signed

23  regarding this debt.  Does this appear to be that agreement?

24  A.  Yes, sir.

15:04:39  25      MR. HEIMANN:  Let's go to page 6.

1   A.  I have page 5 of 5 as the last page.

2           Is that the sixth page of the exhibit?

3   BY MR. HEIMANN:

4   Q.  Sixth page of the exhibit, 5 of 5 of the attachment to the

15:04:53  5   email.

6   A.  Thank you, sir.

7   Q.  So there is a signature block at the top of this page with

8   "David Rodgers" on it.  Do you see that?

9   A.  Yes, sir.

15:05:05  10   Q.  And then a signature off to the right.  Is that your

11  signature?

12  A.  It is.

13  Q.  There is a date there.  Did you write that onto --

14  A.  I did.

15:05:12  15   Q.  I'm sorry?

16  A.  Yes, sir.

17  Q.  So you wrote that on there.  What's the date?

18  A.  1/8/15.

19  Q.  So January 8th of 2015?

15:05:21  20   A.  Correct.

21  Q.  Is that the date you signed this document?

22  A.  I believe so.

23  Q.  There's an E-Pro Systems, LLC, signature block.  Is that

24  also your signature?

15:05:29  25   A.  Correct.

1   Q.   So you're signing on behalf of the LLC, as well?

2   A.   That's right.

3   Q.   And, again, that was done January 8th of 2015?

4   A.   Yes, sir, one right after the other.

15:05:39   5   Q.   Logistically, how did you put your signature on this

6   agreement?

7   A.   I -- I think Alan printed it and brought it to me for

8   signing in person.

9        It's possible I printed it out.  But we met in

15:05:54   10   person, there was a hard copy there, and I signed it.  And

11   gave it to him and he left with it.

12   Q.   When you signed this, were there other signatures on it?

13   A.   I don't recall.

14        MR. HEIMANN:  Let's go, then, to 11.2.  And let's put

15:06:12   15   them up together.

16        THE WITNESS:  I have the hard copy in front of me.

17        MR. HEIMANN:  You can look at that if you wish.

18   We're going to put up the pages I want you to look at in a

19   second here.

15:06:35   20        So 11.1 is the document we just looked at.  11.2 --

21   if we go to the second page of each document . . . similar

22   titles.

23        Let's go to the signature page, last page of the

24   exhibit, page 5 of the attachment.

25   ///

1   BY MR. HEIMANN:

2   Q.   Do you see a difference in the dates for your signature on

3   these two documents?

4   A.   Well, a 5's been changed to a 4.   Otherwise, it looks the

15:07:10   5   same to me.

6   Q.   So on 11.2, the one on the right, what used to be "15" is

7   now "14"?

8   A.   Yeah.   It looks like only the 4 has been changed from the

9   5, if I look closely at it.

15:07:22   10   Q.   Did you agree to let someone backdate your signature on

11   this document?

12   A.   Absolutely not.

13        MR. HEIMANN:   Let's look at 5.13.

14        Sir, I don't think you have this up there, but that's

15:07:40   15   going to be okay.

16        And let's scroll down so we capture just the

17   January 12 email that's shown on this exhibit.   Okay.

18   BY MR. HEIMANN:

19   Q.   So, sir, you don't need to look at the rest of this.   What

15:07:52   20   I want you to do is look down -- do you see where the No. 2 is

21   and the name "Theresa Jones"?

22   A.   Yes.

23   Q.   Do you recognize that name?

24   A.   I think that was Alan Lobock's girlfriend, but I am a

15:08:08   25   little fuzzy on that memory.   I think that was his girlfriend.

19-CR-26-ABJ          RODGERS - DIRECT - HEIMANN          Vol. V-679
21-CR-14-ABJ

1    Q.   Okay.  You don't have any connection to Ms. Jones, do you?

2    A.   Never met her.

3    Q.   Okay.  It says here she's supposed to get $7500.

4         You never got any money from her?

15:08:21    5    A.   I did not.

6         MR. HEIMANN:  Let's go to 25.3.

7         You do have this one if you want to look at it on

8    paper.

9         THE WITNESS:  I have it in front of me.

15:08:34    10   BY MR. HEIMANN:

11   Q.   Okay.  So this is entitled "Purchase and Assignment of

12   Interest in Wells and Leases."

13        There's a company there, two lines -- two paragraphs

14   down -- Bravo 20 Partners.  Do you see that?

15:08:49    15   A.   Yes, sir.

16   Q.   Do you recognize that company name?

17   A.   No.

18   Q.   Did you ever do any business with a company by that name?

19   A.   Not to my recollection.

15:08:55    20   Q.   "E-Pro Systems, LLC," that's the E-Pro Systems you were

21   talking about earlier?

22   A.   Yes, sir.

23   Q.   Do you see the paragraph right below that, where it starts

24   "In consideration"?

15:09:07    25   A.   I see the paragraph.

```
        19-CR-26-ABJ        RODGERS - DIRECT - HEIMANN        Vol. V-680
        21-CR-14-ABJ
```

         1   Q.  Did you ever enter an agreement where you were paid

         2   $280,000 and received an assignment of wells and leases in

         3   exchange for turning over debt instruments, consulting

         4   agreements, and shares of EcoEmissions?

15:09:20 5   A.  No.

         6        MR. HEIMANN:  Let's go to the next page.

         7   BY MR. HEIMANN:

         8   Q.  Do you see the signature block at the bottom --

         9   A.  I do.

15:09:29 10  Q.  -- where it says your name?

         11  A.  Yes, sir.

         12  Q.  Did you sign this document?

         13  A.  No, sir.

         14  Q.  Did you authorize anyone to sign it for you?

15:09:35 15  A.  Absolutely not.

         16  Q.  Before investigators showed you this document, had you

         17  ever seen it before?

         18  A.  No, sir.

         19        MR. HEIMANN:  Let's go to 26.1.

15:09:54 20        THE WITNESS:  I have it.

         21        MR. HEIMANN:  Second page.

         22  BY MR. HEIMANN:

         23  Q.  So the second page of this exhibit, titled on top

         24  "Statement of Nonaffiliation," there's a "From: E-Pro

15:10:09 25  Systems."

```
19-CR-26-ABJ       RODGERS - DIRECT - HEIMANN       Vol. V-681
21-CR-14-ABJ
```

1              Do you see that?

2    A.  Yes, sir.

3    Q.  Again, that's the E-Pro Systems we were talking about

4    earlier?

15:10:15    5    A.  Yeah.

6    Q.  And "Issuer: NuTech Energy Resources."

7              Before you were contacted by investigators in this

8    case, had you ever heard of that company?

9    A.  No.

15:10:25    10   Q.  Do you see the signature block at the bottom --

11   A.  Yes, sir.

12   Q.  -- where it has your name?

13   A.  I see that.

14   Q.  Did you sign this document?

15:10:33    15   A.  No.

16   Q.  Did you authorize anyone to sign it?

17   A.  No, sir.

18        MR. HEIMANN:  I have no other questions on direct.

19        MR. FLEENER:  Your Honor, could we have -- is now a

15:10:55    20   decent time for a break?  I could use a break.

21        THE COURT:  All right.  We'll take our 15-minute

22   midafternoon break, stand in recess for 15.

23     (A recess was taken from 3:11 p.m. to 3:28 p.m.

24   Proceedings outside the jury's presence.)

15:28:50    25        THE COURT:  I think we're ready.

1          MR. SZOTT:  Your Honor, I wanted to mention something

2    briefly before we bring in the jury.

3          I filed a motion today, Your Honor, seeking a hearing

4    related to the admission of out-of-court statements by

15:29:15    5    Mr. Horn, and this is something I've spoken about with the

6    defense attorneys.

7          We were hoping, Your Honor, to have that hearing

8    shortly in time before Inspector Hacker takes the stand for

9    the last time, which we're thinking will be Friday, although,

15:29:30   10    obviously, that depends on how things go.

11          So nothing we're looking to have now, Your Honor, and

12    I know that additional time would probably benefit everyone,

13    but I just wanted to bring that to the Court's attention

14    and -- I guess we'll resolve it in due course.

15:29:45   15          THE COURT:  Do you want to do it tonight, this

16    evening?

17          MR. JUBIN:  I don't think we're prepared for that,

18    Your Honor.  I haven't even seen the motion.

19          THE COURT:  Oh.

15:29:54   20          MR. FLEENER:  We're not prepared, Your Honor.

21          THE COURT:  Well, you deserve to see it.

22          MR. JUBIN:  Yeah.  It's a lengthy pleading.  I mean,

23    I think -- Wednesday, Thursday, hopefully.

24          I may respond -- I don't know if I have a dog in

15:30:03   25    the -- I think I actually have the ultimate dog in the fight,

19-CR-26-ABJ                                              Vol. V-683
21-CR-14-ABJ

 1   but I may not have a dog in the fight as far as the motion

 2   goes.

 3           We need a couple days, Judge.

 4           THE COURT:  Fair enough.  If everybody's comfortable

 5   with that, that's what we'll do.

 6           MR. FLEENER:  Right.

 7           MR. JUBIN:  Yes.

 8           THE COURT:  Maybe plan on it Wednesday after work --

 9   after 5:00 -- or something like that.

10           MR. HEIMANN:  So, Your Honor, we're hoping to do this

11   like Friday.  We have witnesses who are traveling in the day

12   before we expect them to testify, and we think this may be

13   lengthy, in that there's going to be a significant amount of

14   audio recording for the Court to listen to.  We could submit

15   it before the hearing, perhaps, in order to speed up the court

16   time.

17           But we're really -- we're going to finish our case

18   either Friday or Monday at the pace we're going.

19           And so, you know, Friday afternoon would be a good

20   time if we're going to end up in Monday with Inspector

21   Hacker's final testimony.  Otherwise, if we're ready for her

22   on Friday, we're -- we just need to do it before she gets on

23   the stand.

24           So, Your Honor, I think we're talking about the end

25   of the week.  We filed it now to give everybody notice of what

```
19-CR-26-ABJ         RODGERS - CROSS - WARD         Vol. V-684
21-CR-14-ABJ
```

1   we're asking for and so that -- we've gotten a number of -- of

2   excerpts that Mr. Jubin has proposed are necessary under

3   Rule 106.  We may be getting more because those came out of

4   one interview, and there are two interviews and grand jury

15:31:48   5   testimony, so I think we're really talking about Friday.

6           MR. JUBIN:  I'm working on that.

7           THE COURT:  Very good.

8           Well, you tell me when everybody's ready.  Maybe

9   that's the better way, rather than me just saying we'll do it

15:32:03   10   then.

11           MR. HEIMANN:  Thank you, Judge.

12           MR. JUBIN:  Yeah, thank you.

13           THE COURT:  All right.

14       (Proceedings within the jury's presence at 3:33 p.m.)

15:33:33   15           THE COURT:  Thank you, ladies and gentlemen.  Please

16   be seated.

17           MR. WARD:  Good afternoon, Mr. Rodgers.

18           My name's Zenith Ward.  I represent Charles Winters.

19           THE WITNESS:  Good afternoon.

15:34:19   20                   **CROSS-EXAMINATION**

21   BY MR. WARD:

22   Q.  You and I have never spoken before; correct?

23   A.  No.

24           And can you hear me okay?  Oh, there it is.

15:34:24   25           No, we have not.

---

1  Q.  When you were approached about releasing E-Pro's rights to

2  payment from EcoEmissions, you didn't want to receive any of

3  the money that would have been coming to E-Pro for that

4  transaction; correct?

15:34:54  5  A.  Well, I'm not sure your question was exactly right.  It

6  was E-Pro, but I think I was also owed some money.  So just

7  to -- a slight clarification on your question.

8          The answer's yes with that clarification.

9  Q.  The convertible note that was held that -- that

15:35:11  10  represented the money owed from EcoEmissions was to

11  David Rodgers individually as opposed to E-Pro?

12  A.  I'm not sure.  See, there was a convertible note.  There

13  was a consulting agreement.  Some was to E-Pro; some was to

14  David Rodgers.  And I apologize if I don't have those details

15:35:28  15  right here.

16  Q.  And -- and for my purposes -- or my question really gets

17  at the fact that you knew some consideration in terms of cash

18  was being offered.  But you didn't want to receive any of

19  that -- those funds; right?

15:35:40  20  A.  That's right.

21  Q.  And you said that initially you and Gordon Pardy were

22  partners in E-Pro; correct?

23  A.  In layman's terms, we were partners.

24  Q.  And then you brought in a third partner, and that was

15:35:57  25  Kat Quevado; correct?

1    A.  I don't remember if -- the terms of her deal, whether she

2    was a member of the LLC or whether she had a loan -- I --

3    I don't remember.  But she came in as an investor in some

4    capacity.

15:36:10    5    Q.  Sure.

6            And so when you started E-Pro with Gordon Pardy,

7    you -- there had to be an outlay of -- of funds, of capital,

8    to purchase the licensing rights for Joel Robinson's patent to

9    the catalytic converter technology; correct?

15:36:28   10    A.  I agree with everything under there except the word

11   "purchase."  We rented them.

12   Q.  Sure.  You didn't -- you didn't purchase the rights

13   indefinitely?  You purchased the right to sell them for a

14   period of time?

15:36:39   15    A.  That's correct.

16   Q.  And those payments were reoccurring?  I mean, it was an

17   ongoing bill?  You were going to have to keep making payments

18   to Joel Robinson if you wanted to keep having the rights to --

19   licensing out the -- the technology; correct?

15:36:51   20    A.  Correct.

21   Q.  And at some point -- and Gordon Pardy refinanced his home

22   to -- in order to make those Joel Robinson payments?

23   A.  That's right.

24   Q.  You invested a substantial amount of your own money in

15:37:04   25   order to make those payments?

         1   A.  I did.

         2   Q.  And at some point in time, between you and Gordon, there's

         3   no more money to make the payments, and that's when

         4   Kat Quevado invests money in order to allow you to make

15:37:15 5   another payment?

         6   A.  That's right.

         7   Q.  And Kat Quevado had a convertible note; correct?

         8   A.  I'm not sure.

         9   Q.  Are you aware if Kat Quevado had a consulting agreement?

15:37:29 10  A.  I just don't remember the terms of her deal very well.

         11  And it's been a long time.

         12         I'm -- it's quite possible.

         13  Q.  And, ultimately, though, when it came to your attention

         14  that -- and the only person that you dealt with in this

15:37:45 15  relinquishing-rights transaction was with Alan Lobock;

         16  correct?

         17  A.  That's correct.

         18  Q.  You and Gordon Pardy were not speaking to each other?

         19  A.  That's right.

15:37:53 20  Q.  He was accusing you of -- of taking money from him in

         21  another business deal; right?

         22  A.  That's incorrect.  I've never heard that accusation.

         23  We -- I fired him and that's the last we heard of it.  I don't

         24  know where this is coming from.

15:38:06 25  Q.  Sure.  You guys had a falling-out and you weren't on

```
 1   speaking terms?
 2   A.   I fired him and he stopped talking to me.
 3   Q.   And when you agreed -- but, nonetheless, despite that, you
 4   were agreeable to allowing him to make some money and
 5   Alan Lobock to make some money in -- in this deal; right?
 6   A.   That's right.
 7   Q.   And you did, though, want to be indemnified; correct?
 8   A.   Yes.
 9   Q.   And that was because you didn't want anyone coming after
10   you if you were going to relinquish your rights in the debt
11   you were owed from EcoEmissions?
12   A.   It wasn't anyone.  It was specific to Kat Quevado.
13   Q.   You were worried about Kat Quevado coming after you?
14   A.   "If she's owed some money" -- and I didn't know if she was
15   or not -- "you guys pay that.  I'm not getting any money;
16   I'm not going to pay it.  I don't know if she's owed money.
17   You take care of that."
18   Q.   And explain a little bit to the jury, if you would,
19   what -- what "indemnification" means in that context.
20   A.   It means that if, at some point in time, I were to owe her
21   money, Gordon has to pay me -- or has to cover that.  It's
22   kind of like an insurance type of a situation.
23   Q.   And you did sign some documents to accomplish you
24   relinquishing your rights so that Gordon Pardy and Alan Lobock
25   could get the payment from Tom Crom; right?
```

15:38:22
15:38:36
15:38:49
15:39:00
15:39:22

1   A.  I think it was just one document but yes.

2   Q.  And I think you might have already covered this.

3        But Theresa Jones, that was not anyone associated

4   with you; right?

15:39:42   5   A.  No.  I'd simply heard the name as Alan Lobock's

6   girlfriend.  And I'm not a hundred percent sure that's true

7   today.

8   Q.  Sure.  But Theresa Jones -- the money that went to

9   Theresa Jones didn't end up with you; right?

15:39:57   10   A.  Correct.

11   Q.  And you never dealt with Tom Crom directly in this deal;

12   right?

13   A.  Not in the 2014-'15 time frame at all.

14   Q.  You only dealt with Alan Lobock?

15:40:18   15   A.  That's correct.

16   Q.  And you never dealt with Gordon Pardy in that time frame?

17   You only dealt with Alan Lobock; right?

18   A.  That's correct.

19        MR. WARD:  May I have just a moment, Your Honor.

15:40:32   20        Those are all the questions I have.

21        MR. JUBIN:  I have no questions for Mr. Rodgers.

22   Thank you for coming, sir.

23        THE WITNESS:  Thank you.

24        MR. FLEENER:  And neither do I, Judge.

15:40:44   25        THE WITNESS:  Thank you.

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. V-690
21-CR-14-ABJ

1              REDIRECT EXAMINATION

2   BY MR. HEIMANN:

3   Q.  You testified on cross-examination that you signed one

4   document to relinquish your rights to that debt?

15:41:01   5   A.  I think it was one document, as I recall.

6   Q.  Was that the debt assignment agreement we looked at with

7   the --

8   A.  Yeah.

9   Q.  -- 2015 date on it?

15:41:09  10   A.  Yes.

11          MR. HEIMANN:  No other questions, Your Honor.

12          THE COURT:  Mr. Rodgers, you're excused.

13          THE WITNESS:  Your Honor, thank you very much.

14          MR. HEIMANN:  The United States of America calls

15:41:56  15   Sonia Hacker.

16          SONIA HACKER, GOVERNMENT'S WITNESS.

17          FURTHER DIRECT EXAMINATION

18   BY MR. HEIMANN:

19   Q.  Inspector Hacker, you understand that you're still under

15:42:22  20   oath?

21   A.  I do.

22          MR. HEIMANN:  Let's pull up Exhibit 300.  This has

23   not been admitted.

24   BY MR. HEIMANN:

15:42:47  25   Q.  We're going to look at some documents related to Pacific

1    Stock Transfer.

2            Do you recognize Exhibit 300?

3    A.  I do.

4    Q.  Is this an email provided to the grand jury by Pacific

15:42:59   5    Stock Transfer Company?

6    A.  Yes.

7    Q.  What's the subject?

8    A.  "NuTech."

9            MR. HEIMANN:  Your Honor, the Government moves to

15:43:04  10    admit 300.

11            MR. FLEENER:  One second, please, Judge.

12            Judge, I'm going to need a second, please.

13        (Discussion held at counsel table.)

14            MR. FLEENER:  No objections, Judge.

15:44:32  15            THE COURT:  Exhibit 300 is received.

16        (Government's Exhibit 300 received into evidence.)

17    BY MR. HEIMANN:

18    Q.  Inspector Hacker, who's this email from?

19    A.  Joslyn Claiborne.

15:44:46  20    Q.  Who is it to?

21    A.  Justin Herman.

22    Q.  And what's the date?

23    A.  July 17th, 2015.

24    Q.  We will talk about that exhibit with another witness, so

15:44:59  25    let's move on to Exhibit 10.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. V-692
21-CR-14-ABJ

1              Do you recognize this document?

2    A.  Yes.

3    Q.  Is this a copy of an email with attachments provided to

4    the grand jury by Pacific Stock Transfer?

15:45:22    5    A.  It is.

6    Q.  What's the subject?

7    A.  "Here you go, dot, dot, dot, for a second time, dot, dot,

8    dot, on NERG."

9    Q.  Who is it from?

15:45:34    10   A.  Justin Herman.

11   Q.  Who is it to?

12   A.  Joslyn Claiborne.

13   Q.  And there are, looks like, two files attached that are

14   PDFs or one PDF and an Excel file?

15:45:48    15   A.  Yes.

16         MR. HEIMANN:  The Government moves to admit 10.

17         MR. FLEENER:  I'm -- just a second, please, Judge.

18         No objections.

19         THE COURT:  Exhibit 10 is received.

15:46:26    20      (Government's Exhibit 10 received into evidence.)

21   BY MR. HEIMANN:

22   Q.  What is the sent date on this email?

23   A.  July 10th, 2015.

24         MR. HEIMANN:  Let's look at page 2.

25   ///

1   BY MR. HEIMANN:

2   Q.  Is this one of the attachments?

3   A.  It is.

4   Q.  And it's entitled "Resolution of the Board of Directors."

15:46:56   5           MR. HEIMANN:  We will . . . let's focus in on --

6   well, no.  We'll publish this with another witness.

7           So let's go to page 3.  And . . . let's see if we can

8   magnify that particular column.

9   BY MR. HEIMANN:

15:47:32   10  Q.  What's the title of the -- can you read the title of that

11  column?

12  A.  I cannot.

13  Q.  Can't?  All right.

14          Can you read at least the entries at the bottom of

15:47:48   15  that center column there?

16  A.  Yes.  It says, "Restricted" or "Free Trading."

17  Q.  So the entries in that column are either restricted or

18  free trading?

19  A.  Yes.

15:48:05   20          MR. HEIMANN:  So we can jump out of that.

21          Let's go, then, to Exhibit 17.

22  BY MR. HEIMANN:

23  Q.  The indictment alleges Overt Act 17, which alleges that

24  Mr. Herman sent an email to Pacific Stock Transfer on

15:48:26   25  October 22nd of 2015.

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. V-694
21-CR-14-ABJ

1          Do you recognize Exhibit 17?

2    A.  I do.

3          MR. HEIMANN:  And let's page down and see if there

4    are multiple pages.

15:48:40    5    BY MR. HEIMANN:

6    Q.  So is this an email thread?

7    A.  Yes.

8    Q.  Okay.  Was this provided to the grand jury by Pacific

9    Stock Transfer?

15:48:51    10    A.  Yes.

11    Q.  If we're looking on the second page, the original message,

12    do you see that there?

13    A.  Yes.

14    Q.  Who's that from?

15:49:05    15    A.  Justin Herman.

16    Q.  Who is it to?

17    A.  Joslyn Claiborne.

18          MR. HEIMANN:  The Government moves to admit 17.

19          MR. FLEENER:  Just a second, Judge.

15:49:28    20          MR. HEIMANN:  And I need to make one correction.

21          When I was talking about the allegation in the

22    indictment, I said "October."  I should have said

23    "August 22nd."

24          MR. FLEENER:  No objections.

15:50:13    25          THE COURT:  Exhibit 17 is received.

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

1       (Government's Exhibit 17 received into evidence.)

2    BY MR. HEIMANN:

3    Q.   So the first email in this chain is on page 2.

4          Let me make sure of that.

5    (Discussion held at counsel table.)

6    BY MR. HEIMANN:

7    Q.   So, actually, the first is on page 4, dated August 21st of

8    2015.

9          MR. HEIMANN:   Let's move up one page.

10   BY MR. HEIMANN:

11   Q.   And we have another email dated August 21st of 2015; is

12   that right?

13   A.   Yes.

14          MR. HEIMANN:   And one more page up.

15   BY MR. HEIMANN:

16   Q.   Okay.   This is the one I wanted to talk about.

17          What's the date on this email that's in the bottom

18   half of page 2?

19   A.   August 22nd, 2015.

20   Q.   It's from Mr. Herman to Ms. Claiborne.   If you would, do

21   you see the short paragraph beginning with "In case"?

22   A.   I do.

23   Q.   Could you read that, please?

24   A.   "In case you were confused, all the parties getting the

25   stock via debt conversion are shareholders of Bravo 20 and

15:50:36

15:50:47

15:50:57

15:51:10

15:51:27

1  it's a distribution to its ownership.  That's how the 280 was

2  used to buy that particular debt."

3  Q.  Is that the email that's alleged in Overt Act 17?

4  A.  Yes.

15:51:46  5    MR. HEIMANN:  Let's go, then, to 22.2.

6  BY MR. HEIMANN:

7  Q.  While we pull that up, Overt Act 22 of the indictment

8  alleges two email messages from Justin Herman to Pacific Stock

9  Transfer on September 18th of 2015.

15:52:03  10    Do you recognize 22.2?

11  A.  Yes.

12  Q.  Is that the second email alleged in the overt act?

13  A.  Yes.

14  Q.  What's the subject?

15:52:15  15  A.  "NERG 3rd Email."

16    MR. HEIMANN:  The Government moves to admit 22.2.

17    MR. FLEENER:  No objections.

18    THE COURT:  22.2 is received.

19    (Government's Exhibit 22.2 received into evidence.)

15:52:34  20  BY MR. HEIMANN:

21  Q.  So this particular email lists a number of attachments.

22  Are those attachments marked 22.3 through 22.8?

23  A.  Yes.

24    MR. HEIMANN:  Your Honor, the Government moves to

15:52:45  25  admit 22.3 through 22.8.

19-CR-26-ABJ        HACKER - FURTHER DIRECT - HEIMANN        Vol. V-697
21-CR-14-ABJ

1       MR. FLEENER:  I need a minute, please, Judge.

2       THE COURT:  What overt act is this again?

3       MR. HEIMANN:  Overt Act 22, Your Honor.

4   (Discussion held between counsel.)

15:54:28   5       MR. FLEENER:  No objections.

6       THE COURT:  Exhibits 22.3 through 22.8 are received.

7   (Government's Exhibits 22.3 through 22.8 received into

8   evidence.)

9       MR. HEIMANN:  Let's publish 22.5.

15:54:53   10  BY MR. HEIMANN:

11  Q.  Inspector Hacker, is this one of the attachments to that

12  email?

13  A.  Yes.

14  Q.  And what's the title of this document as it appears on

15:55:03   15  this first page?

16  A.  "Supporting Legal Opinion for Request to Issue Free

17  Trading Shares of Common Stock of NuTech Energy Resources,

18  Inc."

19  Q.  And what's the date on it?

15:55:15   20  A.  September 16th, 2015.

21  Q.  Whose letterhead?

22  A.  Ian Horn & Associates.

23  Q.  You see the -- the second full paragraph beginning "The

24  noteholder/contract holder"?

15:55:33   25  A.  I do.

```
19-CR-26-ABJ     HACKER - FURTHER DIRECT - HEIMANN        Vol. V-698
21-CR-14-ABJ
```

1   Q.   There's a place where the font changes and it reads "On

2   January 14, 2014."  Do you see that?

3   A.   Yes.

4   Q.   Could you just read the next two -- three sentences?

15:55:56   5   A.   "On January 14th, 2014, all of the contracts were assigned

6   to Bravo 20 Partners, LLC.  The contracts were subject to a

7   transaction that included a cash and asset component.  The

8   cash component consisted of a $280,000 payment, and the asset

9   component of which consisted of oil/gas field wells, leases,

15:56:25   10   and a pipeline."

11            MR. HEIMANN:  Can we go to the bottom of this

12   document, last page?

13   BY MR. HEIMANN:

14   Q.   The signature block, whose name is there?

15:56:41   15   A.   Ian Horn.

16            MR. HEIMANN:  Let's go to 22.6.

17   BY MR. HEIMANN:

18   Q.   This is a one-page document; right?

19   A.   Yes.

15:56:54   20   Q.   And what is the -- how is it titled, the "Re" colon?

21   A.   "NERG Issuance."

22   Q.   And the date?

23   A.   September 16th, 2015.

24   Q.   In that second full paragraph, does it contain the same

15:57:15   25   three sentences beginning "On January 14"?

1         And the same three sentences as you just read in

2   22.5.

3   A.  It does.

4   Q.  So it's reciting a $280,000 cash payment?

15:57:39   5   A.  Correct.

6   Q.  And it alleges that this transaction occurred in

7   January of 2014?

8   A.  It does.

9         MR. HEIMANN:  Let's go now to Exhibit 27.2.

15:57:49  10   BY MR. HEIMANN:

11   Q.  Overt Act No. 27 of the indictment alleges that Mr. Herman

12   emailed documents to Pacific Stock Transfer on September 28th

13   of 2015 and that 13 -- approximately 13 billion free-trading

14   shares of NuTech were issued by Pacific Stock Transfer on that

15:58:20  15   day.

16         Do you recognize Exhibit 27.2?

17   A.  I do.

18   Q.  Is that a certificate transaction journal for NuTech

19   Energy Resources that was provided to the grand jury by

15:58:35  20   Pacific Stock Transfer Company?

21   A.  It is.

22         MR. HEIMANN:  The Government moves to admit 27.2.

23         MR. FLEENER:  One moment, please, Judge.

24         No objections.

15:59:03  25         THE COURT:  27.2 is received.

19-CR-26-ABJ        HACKER - FURTHER DIRECT - HEIMANN        Vol. V-700
21-CR-14-ABJ

 1    (Government's Exhibit 27.2 received into evidence.)

 2         MR. HEIMANN:  We will talk about this record in some

 3    more detail with another witness.

 4         For now I'm going to pull up -- magnify -- this

15:59:33    5    middle section from "T Bell Financial" down to "McKenzie

 6    Financial."

 7    BY MR. HEIMANN:

 8    Q.  Inspector Hacker, I think you've testified previously that

 9    you helped to search Bob Mitchell's residence in Colorado on

15:59:57   10    September 7th of 2017 under authority of a search warrant.

11    A.  I did.

12    Q.  Do you have an exhibit marked 27.3?

13    A.  Yes.

14    Q.  What is that?

16:00:10   15    A.  These are original stock certificates that were recovered

16    from Bob Mitchell's residence.

17    Q.  Okay.  How many are there?

18    A.  Three.

19    Q.  And did they -- are they stock certificates for NuTech

16:00:25   20    Energy Resources stock?

21    A.  Yes.

22         MR. HEIMANN:  The Government moves to admit 27.3 as a

23    physical document.

24         MR. JUBIN:  Am I correct that this is the unredacted

16:00:37   25    version that's getting admitted?

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. V-701
21-CR-14-ABJ

1          THE COURT REPORTER:  Excuse me?

2      (Reporter seeks clarification.)

3          MR. JUBIN:  Am I correct that this is the unredacted

4  version that is being admitted?

16:00:44   5          MR. HEIMANN:  Your Honor, with your permission I'll

6  retrieve the exhibit from the witness and I'll allow defense

7  counsel to inspect it.

8          THE COURT:  You have my permission.

9          MR. HEIMANN:  Thank you.

16:01:05   10      (Discussion held at counsel table.)

11          MR. JUBIN:  Thank you.

12      (Discussion held at counsel table.)

13          MR. FLEENER:  No objection, Judge.

14          THE COURT:  Exhibit 27.3 is received.

16:02:39   15      (Government's Exhibit 27.3 received into evidence.)

16          MR. HEIMANN:  So, Your Honor, prepandemic I would

17  have asked to publish by passing it around.  I think I'll just

18  ask the witness to hold it up and the jury can decide how they

19  want to handle it --

16:02:51   20          THE COURT:  If she wants --

21          MR. HEIMANN:  -- once the case is theirs.

22  BY MR. HEIMANN:

23  Q.  So, Inspector Hacker, you said there were three

24  certificates in there?

16:03:00   25  A.  Yes.

1    Q.   Let's take the first one.  So -- which one is that?

2    A.   This is for B & J Ranch Partners Investments.

3    Q.   How many shares?

4    A.   10,020,000.

16:03:24    5    Q.   And so that matches what we see on 27.2 for the entry of

6    B & J Ranch Partners?

7    A.   Correct.

8    Q.   You were here when Mr. Scoufis testified about restrictive

9    legends?

16:03:39    10    A.   Yes.

11    Q.   And you -- you're familiar with those legends and -- from

12    your investigation?

13    A.   Yes.

14    Q.   Does this one have a restrictive legend on it?

16:03:49    15    A.   It does not.

16    Q.   Okay.  What's the next one?

17    A.   PK Financial, LLC.

18    Q.   How many shares?

19    A.   10,020,000.

16:04:08    20    Q.   Is there a number on that certificate?

21    A.   Yes.

22    Q.   What is it?

23    A.   4531.

24    Q.   So that matches the number we see in the fourth column

16:04:21    25    on 27.2?

19-CR-26-ABJ       HACKER - FURTHER DIRECT - HEIMANN      Vol. V-703
21-CR-14-ABJ

1   A.  Yes, the third column that's exposed on our screen.

2   Q.  Okay.  Does that one have a restrictive legend?

3   A.  It does not.

4   Q.  What's the third one that you found in Mr. Mitchell's

5   home?

6   A.  McKenzie Financial, LLC.

7   Q.  How many shares?

8   A.  10,020,000.

9   Q.  And the number on the certificate?

10  A.  4532.

11  Q.  Matches up the entry -- with the entry we have on 27.2;

12  right?

13  A.  Yes.

14  Q.  Does that one have a restrictive legend?

15  A.  It does not.

16  Q.  So these are all free-trading shares?

17  A.  Correct.

18      MR. HEIMANN:  Okay.  After all this time, we're going

19  to go to the beginning.  Let's look at Exhibit 1.1.

20  BY MR. HEIMANN:

21  Q.  So Overt Act No. 1 alleges the creation of a

22  kevin@nutechenr email account on November 25th of 2014.

23      Do you recognize Exhibit 1.1?

24  A.  I do.

25  Q.  Is this one of the records that was provided by Endurance

16:04:41 (line 5)
16:04:52 (line 10)
16:05:06 (line 15)
16:05:20 (line 20)
16:05:57 (line 25)

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. V-704
21-CR-14-ABJ

 1   International Group in response to a search warrant?

 2   A.  Yes.

 3          MR. HEIMANN:  Move to admit.

 4          MR. FLEENER:  A second, please.

 5          No objections.

 6          THE COURT:  Exhibit 1.1 is received.

 7       (Government's Exhibit 1.1 received into evidence.)

 8          MR. HEIMANN:  So let's magnify the upper right column

 9   and a half -- or half of that column.

10   BY MR. HEIMANN:

11   Q.  Does this indicate three emails that were created through

12   Endurance International Group?

13   A.  It indicates four emails.

14   Q.  Four.  Thank you.  I can't count.

15          Is one of those kevin@nutechenr.com?

16   A.  Yes.

17   Q.  Is there a date created listed?

18   A.  Yes, November 25th, 2014.

19          MR. HEIMANN:  Let's come out of that magnification.

20   BY MR. HEIMANN:

21   Q.  Is there a member name in the upper left corner?

22   A.  Yes.

23   Q.  And what's listed there?

24   A.  bmitchell1495@gmail.com.

25   Q.  Do you recognize that email address?

16:06:54  (line 5)
16:07:11  (line 10)
16:07:29  (line 15)
16:07:41  (line 20)
16:08:00  (line 25)

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. V-705
21-CR-14-ABJ

1    A.  I do.

2    Q.  Whose is it?

3    A.  Bob Mitchell's.

4         MR. HEIMANN:  Let's go, then, to Exhibit 1.2.

16:08:05    5    BY MR. HEIMANN:

6    Q.  Is this another record that was received from Endurance

7    International Group?

8    A.  Yes.

9    Q.  And it looks like "Modify Contact Information" is one

16:08:33    10    section?

11    A.  Yes.

12    Q.  And then the bottom section is "Modify Billing

13    Information"?

14    A.  Yes.

16:08:39    15    Q.  Or "Info," actually.

16         MR. HEIMANN:  Move to admit, Your Honor, 1.2.

17         MR. FLEENER:  No objections.

18         THE COURT:  1.2 is received.

19       (Government's Exhibit 1.2 received into evidence.)

16:08:46    20    BY MR. HEIMANN:

21    Q.  What is the first and last name connected with that email

22    address that was the member name bmitchell1495?

23    A.  Robert Mitchell.

24    Q.  Okay.

16:09:04    25         MR. HEIMANN:  Let's pull up 2.1.

1  BY MR. HEIMANN:

2  Q.  Overt Act 2 of the indictment -- fraud indictment --

3  alleges creation of a website.

4        Do you recognize 2.1?

16:09:27  5  A.  Yes.

6  Q.  What is that?

7  A.  This is a screenshot of the NuTech website as it appears

8  on the Wayback Machine online.

9  Q.  On what date is this archived shot?

16:09:44  10  A.  July 25th, 2015.

11        MR. HEIMANN:  The Government moves to admit 2.1.

12        MR. FLEENER:  No objections, Judge.

13        THE COURT:  Exhibit 2.1 is received.

14     (Government's Exhibit 2.1 received into evidence.)

16:09:59  15  BY MR. HEIMANN:

16  Q.  Inspector Hacker, where do we see the date that shows when

17  this was captured?

18  A.  On the top in the black with the yellow font.

19  Q.  It's right there in the middle?

16:10:12  20  A.  Yes.

21        MR. HEIMANN:  Let's pull up 2.

22  BY MR. HEIMANN:

23  Q.  Is this that same screenshot but without the Wayback

24  Machine header?

16:10:33  25  A.  It is.

1   Q.  So you can actually see the full logo and the full

2   website?

3   A.  Yes.

4           MR. HEIMANN:  The Government moves to admit 2.

16:10:43   5           MR. FLEENER:  May I have a second, Judge.

6           THE COURT:  Yes.

7           MR. FLEENER:  No objections.

8           THE COURT:  It is received.

9       (Government's Exhibit 2 received into evidence.)

16:10:54   10  BY MR. HEIMANN:

11  Q.  Okay.  Let's talk about some bank accounts before we jump

12  into another overt act.

13          MR. HEIMANN:  So Exhibit 1000.

14  BY MR. HEIMANN:

16:11:11   15  Q.  While we're pulling that up, Inspector Hacker, during your

16  investigation was a bank account identified at BMO Harris Bank

17  related to Ian Horn?

18  A.  Yes.

19  Q.  Do you recognize Exhibit 1000?

16:11:28   20  A.  I do.

21  Q.  What is it?

22  A.  This is the personal signature card for Ian Horn.

23  Q.  And this is an account at BMO Bank?

24  A.  Yes.

16:11:42   25  Q.  And that account number ends in 5825?

1    A.  Yes.

2            MR. HEIMANN:  The Government moves to admit 1000.

3            MR. JUBIN:  No objection.

4            THE COURT:  It is received, 1000.

16:12:09    5    (Government's Exhibit 1000 received into evidence.)

6    BY MR. HEIMANN:

7    Q.  So there's an account title at the top.

8            What's the account title for this?

9    A.  "Ian Horn."

16:12:18    10    Q.  And then a signature line below; is that right?

11    A.  "Ian Horn."

12    Q.  And is he the only authorized signer according to this

13    record?

14    A.  Yes.

16:12:32    15            MR. HEIMANN:  Let's look at Exhibit 103.

16    BY MR. HEIMANN:

17    Q.  Do you recognize 103?

18    A.  I do.

19    Q.  What is it?

16:12:50    20    A.  This is a wire transfer record.

21    Q.  From BMO Harris Bank?

22    A.  Yes.

23    Q.  And does it relate to that same account ending in 5825?

24    A.  It does.

16:13:10    25            MR. HEIMANN:  The Government moves to admit 103.

19-CR-26-ABJ       HACKER - FURTHER DIRECT - HEIMANN       Vol. V-709
21-CR-14-ABJ

1          MR. JUBIN:  No objection.

2          THE COURT:  It is received.

3      (Government's Exhibit 103 received into evidence.)

4    BY MR. HEIMANN:

16:13:18    5    Q.  What -- this indicates a wire transfer.  How much money

6    was involved?

7    A.  $20,000.

8    Q.  And we know that from the "A-M-T"?

9    A.  Yes.

16:13:31    10   Q.  Is the date indicated?

11   A.  I believe it's down below, where you see above

12   Kevin Trizna's name, "December 12th, 2014."

13   Q.  Way down here?

14   A.  Yes.

16:13:57    15   Q.  Okay.  So in the "Common Data" box, three lines up?

16   A.  Yes.

17   Q.  We'll talk more about that with another witness.

18          This is a wire transfer into Mr. Horn's 5825 account?

19   A.  Yes.

16:14:17    20          MR. HEIMANN:  Okay.  Let's look at Exhibit 7.

21   BY MR. HEIMANN:

22   Q.  While we pull that up, Overt Act 7 alleges that

23   Chuck Winters created a log-in account at OTC Markets on

24   March 24th of 2015.

16:14:34    25          Do you recognize Exhibit 7?

1   A.   I do.

2   Q.   Is that a record that was provided by OTC Markets in

3   response to a grand jury subpoena?

4   A.   It is.

16:14:46   5            MR. HEIMANN:   Move to admit 7.

6            MR. WARD:   No objection.

7            THE COURT:   The exhibit is received.

8        (Government's Exhibit 7 received into evidence.)

9   BY MR. HEIMANN:

16:15:05  10   Q.   We're going to talk more about this with another witness.

11   But for now, what are the first and last name listed on this

12   "Update MFA Users" document?

13   A.   Chuck Winters.

14   Q.   There's a phone number here, (941) 725-4377.  Do you

16:15:25  15   recognize that number?

16   A.   I do.

17   Q.   Did you interview Chuck Winters in October of 2018?

18   A.   I did.

19   Q.   What, if anything, did he tell you about that phone

16:15:35  20   number?

21   A.   He confirmed it was his phone number.

22            MR. HEIMANN:   Let's go now to Exhibit 8.

23   BY MR. HEIMANN:

24   Q.   So Overt Act 8 alleges -- well, Overt Act 9 alleges the

16:16:04  25   uploading of an attorney letter onto otcmarkets.com on

1    May 19th of 2015.

2              Do you recognize Exhibit 8?

3    A.  I do.

4    Q.  What is that?

16:16:15    5    A.  This is an attorney opinion letter addressed to

6    OTC Markets on May 19th, 2015.

7    Q.  How did you get this letter?

8    A.  I downloaded it from otcmarkets.com under the NuTech

9    page and their "Disclosures" tab.

16:16:35    10    Q.  So this exhibit is what was posted on OTC Markets'

11    website?

12    A.  Yes.

13    Q.  When did you go get it?  Or when did you pull it off that

14    website?

16:16:48    15    A.  June, July, or August of this year.

16    Q.  So sometime this summer?

17    A.  Sometime this summer.

18              MR. HEIMANN:  The Government moves to admit 8.

19              MR. FLEENER:  No objections.

16:17:20    20              THE COURT:  Exhibit 8 is received.

21        (Government's Exhibit 8 received into evidence.)

22    BY MR. HEIMANN:

23    Q.  So what is the title of this document as it appears on

24    this first page?

16:17:33    25    A.  "NuTech Energy Resources, Inc. (Formerly Known As

1   EcoEmissions Solutions, Inc.) Initial Information and

2   Disclosure Statement Dated February 28th, 2015, and Posted on

3   May 14th, 2015."

4   Q.   And what is the date of the letter as it appears in the

16:17:55   5   upper left?

6   A.   May 19th, 2015.

7   Q.   Whose letterhead?

8   A.   Ian Horn & Associates.

9        MR. HEIMANN:  Scroll down, please, to the last page.

16:18:10   10        Thank you.

11   BY MR. HEIMANN:

12   Q.   There's a signature block at the bottom.  Whose name is on

13   that?

14   A.   Ian Horn.

16:18:24   15        MR. HEIMANN:  Let's pull up Exhibit 9.1.

16   BY MR. HEIMANN:

17   Q.   Inspector Hacker, is 9.1 an email thread provided to the

18   grand jury by OTC Markets?

19   A.   It is.

16:18:53   20   Q.   Let me double-check.

21        MR. HEIMANN:  Is there a second page?  Okay.  Let's

22   go back to the first.

23   BY MR. HEIMANN:

24   Q.   What's the date of the original email in this chain?

16:19:10   25   A.   May 20th, 2015.

1    Q.   What is the subject?

2    A.   "Information Posted to OTCMarkets.com for Current

3    Disclosure-EcoEmissions Solutions, Inc.-ECMZ."

4             MR. HEIMANN:   The Government moves to admit 9.1.

5             MR. FLEENER:   No objections, Judge.   Sorry.

6             THE COURT:   Exhibit 9.1 is received.

7        (Government's Exhibit 9.1 received into evidence.)

8    BY MR. HEIMANN:

9    Q.   There's two emails in this chain.   The one we talked

10   about, the first one, is on the bottom half.

11            The first sentence of that email -- well, who's it

12   addressed to in terms of the -- just the informal address, the

13   name?

14   A.   Chuck.

15   Q.   Chuck?

16            And what's the first sentence?

17   A.   "We have finished processing your attorney letter for the

18   period ending February 28th, 2015."

19   Q.   There's a responding email at the top.   Who is it from?

20   A.   Chuck Winters.

21   Q.   Has that same (941) 725-4377 number; right?

22   A.   Yes.

23   Q.   Did OTC Markets provide to the grand jury a spreadsheet

24   showing when financial reports and other things were posted

25   onto NuTech's website -- or NuTech's page on their website?

16:19:54
16:20:08
16:20:26
16:20:42
16:21:06

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. V-714
21-CR-14-ABJ

1    A.   Yes.

2             MR. HEIMANN:  Let's look at 9.2.

3         (Discussion held at counsel table.)

4             MR. HEIMANN:  All right.  We're having technical

16:21:49  5    difficulties, so we're going to skip that one for now.

6             Let's go down to 34.1.

7    BY MR. HEIMANN:

8    Q.   Do you recognize 34.1?

9    A.   I do.

16:22:05  10    Q.   What is that?

11    A.   This is an attorney opinion letter addressed to

12    OTC Markets, and it's dated March 7th, 2016.

13    Q.   Where did you get this?

14    A.   From OTC Markets' website under the NuTech page under the

16:22:26  15    "Disclosure" tab.

16             MR. HEIMANN:  The Government moves to admit 34.1.

17             MR. FLEENER:  No objections.

18             THE COURT:  34.1 is received.

19         (Government's Exhibit 34.1 received into evidence.)

16:22:51  20    BY MR. HEIMANN:

21    Q.   Whose letterhead is this on?

22    A.   Ian Horn & Associates.

23    Q.   We talked about the date, March 7th, 2016.  That's the

24    date in the upper left?

16:23:04  25    A.   Yes.

19-CR-26-ABJ       HACKER - FURTHER DIRECT - HEIMANN       Vol. V-715
21-CR-14-ABJ

1    Q.   What's the title as it appears on this document?

2    A.   "NuTech Energy Resources, Inc. (Formerly Known As

3    EcoEmissions Solutions, Inc.) Initial Information and

4    Disclosure Statement Dated November 30th, 2015, and Posted on

16:23:24    5    March 4th, 2016."

6            MR. HEIMANN:  Let's go to the bottom of this

7    document.

8    BY MR. HEIMANN:

9    Q.   Whose name appears in the signature block?

16:23:39    10    A.   Ian Horn.

11            MR. HEIMANN:  Let's pull up 34.3.

12    BY MR. HEIMANN:

13    Q.   Do you recognize this document?

14    A.   Yes.

16:23:56    15    Q.   Is this a record from OTC Markets that was provided to the

16    grand jury?

17    A.   It is.

18            MR. HEIMANN:  The Government moves to admit 34.3.

19            MR. FLEENER:  Can I have a second, please?

16:24:31    20            No objections, Judge.

21            THE COURT:  34.3 is received.

22        (Government's Exhibit 34.3 received into evidence.)

23    BY MR. HEIMANN:

24    Q.   There's an email address listed here.  What is that email

16:24:43    25    address?

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. V-716
21-CR-14-ABJ

1    A.   kevin@nutechenr.com.

2    Q.   Is that one of the email addresses we saw created in

3    November of 2015 in Exhibit 1.1?

4    A.   I don't remember the date, but it was referenced and

16:25:01   5    created on Exhibit 1.1.

6              MR. HEIMANN:   Let's go down to 203.

7    BY MR. HEIMANN:

8    Q.   Is Exhibit 203 an email provided to the grand jury by

9    OTC Markets?

16:25:30   10    A.   Yes.

11    Q.   Actually, it's a thread of email.

12         (Discussion held at counsel table.)

13    BY MR. HEIMANN:

14    Q.   There's only one page so this is, what, two messages?

16:25:43   15    A.   Yes.

16    Q.   And what's the subject?

17    A.   "EcoEmissions Solutions."

18    Q.   And that appears in both email; right?

19    A.   Yes.

16:25:56   20              MR. HEIMANN:   The Government moves to admit 203.

21              MR. WARD:   I think I'd object that it's hearsay.

22              MR. HEIMANN:   Your Honor, it's a business record;

23    it's certified.

24              THE COURT:   It will be received.

16:26:17   25         (Government's Exhibit 203 received into evidence.)

19-CR-26-ABJ        HACKER - FURTHER DIRECT - HEIMANN        Vol. V-717
21-CR-14-ABJ

1    BY MR. HEIMANN:

2    Q.   So the original email is from Chuck Winters to Issuer

3    Services on March 24th of 2015?   It appears on the bottom

4    half; right?

5    A.   Yes.

6    Q.   There's no text here except "Regards: Chuck Winters" and

7    some phone numbers?

8    A.   Yes.

9    Q.   The response back to Chuck Winters, what's the date of

10   that?

11   A.   March 25th, 2015.

12   Q.   All right.   And can you read the first sentence?

13   A.   "I just wanted to inform you that EcoEmissions Solutions,

14   Inc., ECMZ, is currently considered an SEC reporting company

15   because the company has not deregistered from being an SEC

16   filer."

17   Q.   And then at least the first part of the next sentence,

18   "Your filings through our service will not change your tier

19   unless the company has deregistered."   Did I read that

20   correctly?

21   A.   Yes.

22   Q.   That was only part of the sentence; right?

23   A.   Yes.

24   ///

25   ///

16:26:26

16:26:34

16:27:12

16:27:30

1             MR. HEIMANN:  Let's go now to 36.1.

2    BY MR. HEIMANN:

3    Q.  Do you recognize 36.1?

4    A.  I do.

16:27:50    5    Q.  What is it?

6    A.  This is an attorney opinion letter addressed to

7    OTC Markets dated April 3rd, 2016.

8    Q.  Where did you get it?

9    A.  Off of OTC Markets' website on the NuTech page under the

16:28:07   10   "Disclosure" tab.

11             MR. HEIMANN:  The Government moves to admit 36.1.

12             MR. FLEENER:  No objections.

13             THE COURT:  36.1 is received.

14        (Government's Exhibit 36.1 received into evidence.)

16:28:20   15   BY MR. HEIMANN:

16   Q.  Whose letterhead is this on?

17   A.  Ian Horn & Associates.

18   Q.  And the date of the letter in the upper left corner,

19   April 3rd, 2016.  Would you read the title as it appears on

16:28:36   20   this first page.

21   A.  "NuTech Energy Resources, Inc. (Formerly Known As

22   EcoEmissions Solutions, Inc.) Amended Initial Information and

23   Disclosure Statement Dated November 30th, 2015, and Posted on

24   March 1st, 2016."

16:28:57   25             MR. HEIMANN:  Let's go to the bottom of this, last

---

1   page.

2   BY MR. HEIMANN:

3   Q.   Whose name is in the signature block?

4   A.   Ian Horn.

16:29:13    5            MR. HEIMANN:   Let's compare 34.1 and 36.1.

6   BY MR. HEIMANN:

7   Q.   These two letters, one dated March 7th, 2016, the other

8   April 3rd of 2016, based on their titles, are they both --

9   well, actually . . . are they both dated in that title

16:30:22   10   November 30th of 2015?

11   A.   Yes.   The disclosure is for the -- the period ending

12   November 30th, 2015.

13   Q.   So they both cover the same period?

14   A.   Yes.

16:30:32   15            MR. HEIMANN:   So let's go to page 3 of each document.

16   Let's grab a little bit of page -- yeah.  So -- so let's --

17   let's magnify here.

18   BY MR. HEIMANN:

19   Q.   So "With respect to any of the company's control persons

16:31:14   20   that is an entity and any parent entity of any control person,

21   this letter provides the information for each control person

22   of such entity or parent entity."

23            Who's then listed in the box?

24   A.   Kevin Trizna.

16:31:30   25   Q.   And the address has been -- the street address has been

19-CR-26-ABJ       HACKER - FURTHER DIRECT - HEIMANN       Vol. V-720
21-CR-14-ABJ

1   redacted, but what city does it list?

2   A.   Gillette, Wyoming.

3   Q.   Where's Mr. Trizna live?

4   A.   In Colorado, Highlands Ranch.

16:31:45    5   Q.   What title is he listed with?

6   A.   Chairman of the board/CEO.

7          MR. HEIMANN:   Okay.   Let's go back to the main

8   letter.

9          There's a similar box over on the right side, so

16:31:59   10   let's, yeah, magnify down to the bottom of that box on 36.1,

11   page 3.

12   BY MR. HEIMANN:

13   Q.   Mr. Trizna's listed here, as well; right?

14   A.   He is.

16:32:14   15   Q.   Who else is listed on this second letter?

16   A.   Gerald Luken, Arnold Guttenberg, Steffan Dalsgaard/Everest

17   Corporate Advisors, and SJM Holdings, Inc.

18          MR. HEIMANN:   We can go back to the main page.

19   BY MR. HEIMANN:

16:32:37   20   Q.   Does either letter list Bob Mitchell as a control person?

21   A.   No.

22   Q.   Justin Herman?

23   A.   No.

24   Q.   Chuck Winters?

16:32:45   25   A.   No.

19-CR-26-ABJ       HACKER - FURTHER DIRECT - HEIMANN       Vol. V-721
21-CR-14-ABJ

1   Q.   Does -- does either letter list Bravo Two Zero Partners?

2   A.   No.

3   Q.   Intrepid Capital Holdings?

4   A.   No.

16:32:59   5        MR. HEIMANN:  Let's go, then, to 414.

6   BY MR. HEIMANN:

7   Q.   Is this an email provided to the grand jury by OTC Markets

8   Group?

9   A.   Yes.

16:33:20   10  Q.   What is the subject of the email?

11  A.   "NuTech Energy Resources, Inc. (NERG)-Caveat Emptor."

12  Q.   What's the date?

13  A.   January 29th, 2016.

14       MR. HEIMANN:  The Government moves to admit 414.

16:33:50   15       MR. WARD:  Your Honor, I would object.  I believe

16  it's hearsay.

17       MR. HEIMANN:  Your Honor, it's a business record.

18       THE COURT:  It will be received.

19     (Government's Exhibit 414 received into evidence.)

16:34:03   20       MR. HEIMANN:  So let's magnify the header down to the

21  bottom of that paragraph that says "Public Interest Concern."

22  BY MR. HEIMANN:

23  Q.   Who received this message?

24  A.   kevintrizna@gmail.com and chuck@ichcorp.net.

16:34:31   25  Q.   This is informing them that OTC Markets -- Markets has

1    designated NERG with caveat emptor as a warning?

2    A.  Yes.

3    Q.  And where it says "Public Interest Concern," can you just

4    read that paragraph for me?

16:34:56    5    A.  Yes.

6            "There is unusual or unexplained trading activity in

7    your security and there is no adequate current information

8    available for investors.  In addition, we are reviewing a

9    number of press releases regarding your imminent plans to list

16:35:13    10    on Nasdaq as well as other corporate developments.  The caveat

11    emptor symbol (a skull and crossbones icon) will remain on the

12    company profile until the company qualifies for either OTC

13    pink current information or OTCQB and until OTC Market Group

14    believes there is no longer a public interest concern."

16:35:44    15    Q.  Thank you.

16            MR. HEIMANN:  Let's move to 37.1.

17    BY MR. HEIMANN:

18    Q.  Is this an email provided to the grand jury by

19    OTC Markets?

16:36:07    20    A.  It is.

21    Q.  What is the subject?

22    A.  "NuTech Energy Resources, Inc. (NERG)-OTC Pink Current

23    Information."

24            MR. HEIMANN:  The Government moves to admit 37.1.

16:36:24    25            MR. FLEENER:  A moment, Judge, please.

19-CR-26-ABJ     HACKER - FURTHER DIRECT - HEIMANN     Vol. V-723
21-CR-14-ABJ

 1          No objections.

 2          THE COURT:  It's received, No. 37.1.

 3      (Government's Exhibit 37.1 received into evidence.)

 4          MR. HEIMANN:  I'll give the jury a moment to -- to

16:37:04   5   read the text.  We'll talk more about this exhibit with a

 6   later witness.

 7          Let's go, then, to Exhibit 38.

 8   BY MR. HEIMANN:

 9   Q.  Is 38 an email --

16:37:35  10          MR. HEIMANN:  Let's scroll down.

11          Keep going.

12   BY MR. HEIMANN:

13   Q.  Is this an email chain we received from OTC -- well, the

14   grand jury received -- from OTC Markets?

16:37:50  15   A.  Yes.

16   Q.  And does this thread involve NuTech?

17          THE WITNESS:  Could you scroll up?

18   A.  Yes, it does.

19          MR. HEIMANN:  The Government moves to admit 38.

16:40:44  20          MR. FLEENER:  Are you waiting on me?

21          MR. HEIMANN:  I think so.

22          MR. FLEENER:  Oh, I'm sorry.  I didn't realize that.

23          Did you offer 38?

24          THE COURT:  Yes.

16:40:50  25          MR. HEIMANN:  Yes, I did.  Yes.

 1              MR. FLEENER:  No objections.  I apologize.

 2              THE COURT:  38 is received.

 3         (Government's Exhibit 38 received into evidence.)

 4              MR. HEIMANN:  We'll go through this email with

16:41:02   5   another witness.

 6              Let me move on to 28.32.

 7   BY MR. HEIMANN:

 8   Q.  Is 28.32 another email provided to the grand jury by

 9   OTC Markets?

16:41:25  10   A.  It is.

11   Q.  Who is it to?

12   A.  chuck@ichcorp.net.

13   Q.  And does the subject refer to NuTech Energy Resources?

14   A.  It does.

16:41:44  15              MR. HEIMANN:  The Government moves to admit 28.32.

16              MR. WARD:  No objection.

17              THE COURT:  28.32 is received.

18         (Government's Exhibit 28.32 received into evidence.)

19   BY MR. HEIMANN:

16:42:07  20   Q.  We saw an email earlier that had similar text.  Is this

21   informing Chuck Winters that a disclosure has been processed?

22   A.  Yes.

23   Q.  All right.

24              Let's do three press releases, 29.32 -- or

16:42:31  25   I'm sorry -- 29.3.

1    I'm going to show you all three, and then we'll

2    establish a foundation for them.

3    A.  Okay.

4    Q.  Take a look at that.

16:42:47    5         MR. HEIMANN:  Would you scroll through it, please.

6    Let's look, then, at 30 point -- no, 29.3.  We can go back to

7    the top.

8         I'm just going to do them one at a time.

9    BY MR. HEIMANN:

16:43:11   10   Q.  What's the title of this?

11   A.  "NuTech Energy Resources, Inc., to Convene for Majority

12   Shareholder Vote on Stock Repurchase Agreement in Preparation

13   for Nasdaq Listing."

14   Q.  And the date?

16:43:26   15   A.  January 28th, 2016.

16   Q.  Is this a press release that was provided to the grand

17   jury by PR Newswire?

18   A.  It is.

19        MR. HEIMANN:  The Government moves to admit 29.3.

16:43:40   20        MR. FLEENER:  One moment, please, Judge.

21        No objections.

22        THE COURT:  29.3 is received.

23      (Government's Exhibit 29.3 received into evidence.)

24   BY MR. HEIMANN:

16:44:09   25   Q.  While we have it up, what location or what city is

 1    identified in the by-line?

 2    A.   Gillette, Wyoming.

 3            MR. HEIMANN:  Let's look at 30.2.

 4            Scroll through that.

16:44:47   5            And let's go back to the top.

 6    BY MR. HEIMANN:

 7    Q.   Is this a press release provided to the grand jury by

 8    PR Newswire?

 9    A.   It is.

16:44:55  10    Q.   What's the title?

11    A.   "NuTech Energy Resources, Inc., Acquires FlowPower, LLC,

12    Creator of Revolutionary Green Power Generating Technology, to

13    Generate Additional 15- to $20 Million in Revenues Per Year."

14    Q.   What's the date?

16:45:16  15    A.   January 29th, 2016.

16            MR. HEIMANN:  The Government moves to admit 30.2.

17            MR. FLEENER:  One moment, please.

18            No objections.

19            THE COURT:  30.2 is received.

16:45:45  20       (Government's Exhibit 30.2 received into evidence.)

21            MR. HEIMANN:  Let's do the last of the press releases

22    in this series, 400.

23            Scroll down.  A one-page document.

24    BY MR. HEIMANN:

16:46:11  25    Q.   All right.  Is this another press release that was

1    provided to the grand jury by PR Newswire?

2    A.  No.

3    Q.  No?  Who is it provided by?

4    A.  West Corp.

16:46:22    5    Q.  How do you know that?

6    A.  Because it was issued by Marketwired.

7    Q.  What's the title?

8    A.  "NuTech Energy Resources, Inc., Imminent Nasdaq Listing."

9    Q.  And the date?

16:46:36    10    A.  January 13th, 2015.

11          MR. HEIMANN:  The Government moves to admit 400.

12          MR. FLEENER:  One moment, please.

13          No objections.

14          THE COURT:  400 is received.

16:47:11    15    (Government's Exhibit 400 received into evidence.)

16    BY MR. HEIMANN:

17    Q.  And when you were talking about Marketwired, you were

18    talking about the by-line up here in the upper left; right?

19    A.  Yes.

16:47:21    20    Q.  Sorry about that.  I misspoke earlier.

21          MR. HEIMANN:  So, Your Honor, it's close to 5:00.

22    I have one more set of exhibits.  There's about 20 of them.

23          And so I can try to get through them or we can call

24    it a day.  It's up to you, Your Honor.

16:47:49    25          THE COURT:  You choose.

19-CR-26-ABJ       HACKER - FURTHER DIRECT - HEIMANN        Vol. V-728
21-CR-14-ABJ

1          MR. HEIMANN:  I can get through them quickly because

2    we're not going to publish or -- or talk about them with this

3    witness.

4          THE COURT:  Very well.  Proceed.

16:47:58    5    BY MR. HEIMANN:

6    Q.   Inspector Hacker, we talked about OTC Markets providing

7    various records to the grand jury.

8          Did they provide a set of email that was sent from

9    various senders regarding NuTech?

16:48:24    10    A.   Yes.

11          MR. HEIMANN:  And let's pull one up, 28.5.

12    BY MR. HEIMANN:

13    Q.   Is this one of those email?

14    A.   It is.

16:48:45    15    Q.   Who was it sent from?

16    A.   info@pennystock101.org.

17    Q.   And what's the subject?

18    A.   "NERG is our [tiny float, subpenny alert] for Friday."

19    Q.   Is the "To" on this email empty?

16:49:07    20    A.   It is.

21    Q.   What's your understanding about how OTC Markets gathered

22    this email?

23    A.   OTC Markets subscribed to multiple news sources, and they

24    would receive emails related to their clients' stocks that are

16:49:30    25    listed on OTC Markets' website.

1    MR. FLEENER:  Objection.  This -- Judge, this is

2 hearsay.  And speculation.  Lack of foundation.

3    THE COURT:  I'll give you the last --

4    MR. HEIMANN:  I'm sorry, Your Honor?

16:49:46 5    THE COURT:  The last portion of the objection I think

6 is one that I'd like to hear anything on.

7    MR. HEIMANN:  So, Your Honor, let me do this:  Let me

8 establish the foundation for how we received each of these

9 numbers, and then we'll have another witness explain exactly

16:49:59 10 how OTC Markets gathered them.

11    MR. FLEENER:  No objections to that.

12    THE COURT:  I expected as much.

13    MR. HEIMANN:  So, Your Honor, unfortunately, I'm just

14 going to have to read off a number of exhibit numbers.

16:50:08 15 BY MR. HEIMANN:

16 Q.  So, Inspector Hacker, we're looking at 28.5.

17    This is an email that was provided to the grand jury

18 by OTC Markets?

19 A.  Yes.

16:50:23 20 Q.  And it was amongst the records they sent that were

21 certified?

22 A.  Yes.

23 Q.  Is that true for Exhibit 28.6, 28.7, 28.9, 28.10?

24 A.  Yes.

16:50:37 25 Q.  Is it also true for 28.14, 28.15, 28.16, 28.17, 28.18,

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. V-730
21-CR-14-ABJ

1    28.19, 28.20, and 28.21?

2    A.   It is.

3    Q.   Is that also true for 28.23, 28.24, and 28.25?

4    A.   Yes.

16:51:04    5    Q.   And, lastly, is that true for 28.29, 28.30, and 28.31?

6    A.   Yes.

7           MR. HEIMANN:  Your Honor, that's what I have to do

8    with Inspector Hacker this afternoon.

9           Our next witness flew in today and will be ready to

16:51:29    10   testify first thing tomorrow morning.

11           THE COURT:  Very well.  Thank you.

12           Any questions, Counsel?

13           MR. FLEENER:  No, Your Honor.

14           MR. JUBIN:  Your Honor, I have a lot of questions for

16:51:50    15   Inspector Hacker, but I don't know that you want me to start.

16   Maybe we can start in the morning.  It might be more efficient

17   that way.

18           THE COURT:  Well, you've got 5 minutes -- 10 minutes.

19           MR. JUBIN:  I'll use it if you'd like.

16:52:10    20           THE COURT:  Sure.

21           MR. JUBIN:  Good afternoon, Inspector Hacker.

22           THE WITNESS:  Good afternoon.

23                   **FURTHER CROSS-EXAMINATION**

24   BY MR. JUBIN:

16:52:44    25   Q.   You know you introduced a number of exhibits that came

19-CR-26-ABJ    HACKER - FURTHER CROSS - JUBIN    Vol. V-731
21-CR-14-ABJ

1    from OTC Markets that were attorney opinion letters bearing

2    Ian Horn's signature.  Do you recall that?

3    A.  Yes.

4    Q.  I won't go through all the exhibit numbers here, but there

16:53:00    5    were a bunch of them, April 3rd, March 7th, September 23rd of

6    2015, September 16 of 2015 -- if I said "'13," I meant "'15"

7    just now.

8         Have you had the opportunity to compare the signature

9    on those letters?

16:53:28    10    A.  I have not compared the signature on those letters.

11    Q.  Do you know if anyone from the prosecution team has

12    compared those signatures?

13    A.  I'm not aware of anyone who has compared the signatures.

14    Q.  All right.  Those letters all came from OTC Markets;

16:53:52    15    right?

16    A.  Yes.

17    Q.  And there were other sources where you found drafts of

18    those letters; correct?

19    A.  Of the OTC Markets letters?

16:54:03    20    Q.  Right, those attorney opinion letters that looked like

21    Ian Horn wrote them.

22    A.  I don't recall finding drafts of them.

23    Q.  Were you involved in any kind of a search or looking at

24    the documents that came off Justin Herman's computer?

16:54:22    25    A.  Yes.

19-CR-26-ABJ       HACKER - FURTHER CROSS - JUBIN        Vol. V-732
21-CR-14-ABJ

1    Q.  Did you familiarize yourself with the documents that came

2    from that computer?

3    A.  I did review them.

4    Q.  Surely you remember seeing these attorney opinion letters

16:54:37    5    on Justin Herman's computer.  Correct?

6    A.  I don't specifically recall seeing them one way or the

7    other on Mr. Herman's computer.

8    Q.  Do you think it would be important to your investigation

9    to determine who wrote an attorney opinion letter?

16:54:59   10    A.  Yes.

11    Q.  And one of the ways you could do that is if you found one

12    on Justin Herman's computer?  You could look to see who the

13    author was on that document in its metadata; correct?

14    A.  Yes, you could.

16:55:14   15    Q.  The Government's produced to us some documents that show

16    those that came from Justin Herman's computer as --

17          MR. HEIMANN:  Counsel's testifying, Your Honor.

18          MR. JUBIN:  I'm about to ask a question.

19          THE COURT:  You can ask the question.

16:55:33   20    BY MR. JUBIN:

21    Q.  -- as Justin Herman.  Did you see that?

22    A.  Could you repeat that question?

23    Q.  The Government has provided attorney opinion letters

24    dated, like the one you saw, that came from Justin Herman's

16:55:52   25    computer rather than OTC Markets, and it shows the author as

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. V-733
21-CR-14-ABJ

1    Justin Herman.

2            Is that something that you saw?

3    A.  I don't recall.

4    Q.  Do you and the other investigators involved in this case

5    and the attorneys share information?

6    A.  We do.

7    Q.  But you don't recall if anyone here shared with you the

8    fact that Justin Herman had on his computer these very letters

9    showing that he was the author?

10   A.  I don't recall a specific conversation about that.

11   Q.  And you don't recall seeing the letter, either?

12   A.  I don't recall seeing specific letters such as the ones

13   from OTC Markets that I pulled off of their website.

14   Q.  Is it that you didn't look?  Or are you saying "Maybe they

15   were there and I just don't remember"?

16   A.  I don't know that I saw them because all of the records

17   went through a privilege review.  So certain items would have

18   been culled out, and I was unable to see everything that was

19   on the computer.

20   Q.  Once the items went through the privilege review, did you

21   review those items that survived that review and came to the

22   Government -- to this prosecution team?

23   A.  I did.

24   Q.  Okay.

25           Let's talk for a minute about that privilege review.

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. V-734
21-CR-14-ABJ

1   So there came a period of time when the Government went to

2   Justin Herman's home and seized evidence; right?

3   A.   Yes.

4   Q.   And because Justin Herman was represented by a lawyer,

16:57:55    5   there was concern that there might be what's called

6   "privileged information" on his computer; correct?

7   A.   Yes.

8   Q.   And the privilege is that when someone's represented by a

9   lawyer, they have a right to expect the lawyer to keep their

16:58:13   10   information confidential; right?

11   A.   I am not an expert on, you know, privileged materials.

12   I was just able to review what was given to me after the

13   privilege review was completed.

14   Q.   Okay.  And so I'm just trying to get an understanding of

16:58:34   15   what -- of your understanding with respect to this privilege

16   review.

17   A.   That would be very little.

18   Q.   Okay.  Suffice it to say you're aware that the Government

19   couldn't simply give you everything they took because, first,

16:58:47   20   it had to be vetted to see if any of the information was

21   attorney-client privilege; right?

22   A.   Yes.

23   Q.   And in order to do that, the Government set up a separate

24   team of lawyers and perhaps others to go through that

16:59:05   25   information to see what could be turned over to you and to

Melanie Sonntag, RDR, CRR, CRC                MelanieSonntagCRR@gmail.com

1    Mr. Heimann and to Mr. Szott and to Mr. Pikas in -- in the

2    course of your investigation?

3    A.  Yes.

4    Q.  So you got some things but other things may have been

5    withheld from you?  Is that your understanding?

6    A.  Things that were privileged --

7    Q.  Right.

8    A.  -- would have been withheld from me, yes.

9    Q.  Okay.  To your knowledge, was anything determined to be

10   privileged and withheld from you?

11   A.  I don't know.

12   Q.  Okay.

13   A.  I was on the other side of that wall.

14   Q.  Okay.  And you weren't in the courtroom when the Judge

15   decided that you get everything?

16   A.  No, I was not.

17   Q.  Okay.  And as you sit here today, you have no memory of

18   seeing attorney opinion letters that came from Justin Herman's

19   computer?

20   A.  I have no specific memory.

21        MR. JUBIN:  Your Honor, now -- now might be a good

22   time to stop, and perhaps the witness can refresh her

23   recollection and we can take up tomorrow.

24        THE COURT:  Very well.  Thank you.

25        MR. JUBIN:  Thank you.

16:59:25 (line 5)
16:59:39 (line 10)
16:59:48 (line 15)
17:00:10 (line 20)
17:00:25 (line 25)

19-CR-26-ABJ                                                    Vol. V-736
21-CR-14-ABJ

1        THE COURT:  Well, ladies and gentlemen, it looks --

2   it appears that we've used up our time.

3        I'll leave you with the admonition not to discuss the

4   case with anyone, permit anyone to discuss it with you, don't

5   attempt to investigate the case on your own.  If anyone

6   attempts to talk to you outside the presence of this

7   courtroom, please let us know.  Inform them that you're a

8   juror and cannot speak.

9        And, Counsel, I wish you would police your own

10  witnesses and yourselves and the parties in this matter to

11  avoid any unwarranted conversations that might be overheard in

12  various places here in Cheyenne.

13       MR. JUBIN:  Thank you, Your Honor.

14       THE COURT:  With that, we'll stand in recess until

15  8:30 tomorrow morning.

16       THE COURTROOM DEPUTY:  All rise.

17     (Proceedings outside the jury's presence at 5:01 p.m.)

18       THE COURT:  I just wanted to let you know that it was

19  reported to me that some of the jurors were, I think, eating

20  at the café over at the library and they heard somebody

21  talking about the jury panel.  They immediately avoided it

22  and -- and left.  But somebody was saying something about the

23  jurors.

24       So be careful.  There are lots of ears out there.

25     (Proceedings concluded 5:03 p.m., September 27, 2021.)

1                    C E R T I F I C A T E

2

3

4

5          I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14          Dated this 10th day of January, 2022.

15

16

17

18          /s/ Melanie Humphrey-Sonntag

19          _____

20                MELANIE HUMPHREY-SONNTAG
                       RDR, CRR, CRC
21              Federal Official Court Reporter

22

23

24

25

1             IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF WYOMING

3     ————————————————————————————————————————

4

5   UNITED STATES OF AMERICA,     DOCKET NO. 19-CR-026-ABJ
                           DOCKET NO. 21-CR-014-ABJ

6        Plaintiff,
                           VOLUME VI of XIV

7        vs.                (Pages 737 through 989)

8   JUSTIN HERMAN, CHARLES W.    Cheyenne, Wyoming
   WINTERS, JR., a/k/a Chuck     Tuesday,
   Winters, and IAN HORN,       September 28, 2021

9                          8:30 a.m.
        Defendants.

10

11    ————————————————————————————————————————

12

13             TRANSCRIPT OF TRIAL PROCEEDINGS

14

15        BEFORE THE HONORABLE ALAN B. JOHNSON
             UNITED STATES DISTRICT JUDGE

16      and a jury of twelve and four alternates

17

18

19

20

21

22     *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*
          *Federal Official Court Reporter*

23  *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
     *630.452.6236 * MelanieSonntagCRR@gmail.com*

24

25  *Proceedings reported with digital stenography; transcript*
     *produced with computer-aided transcription.*

Vol. VI-738

```
1    APPEARANCES:
     For the Plaintiff:        ERIC J. HEIMANN
2                              THOMAS A. SZOTT
                               ASSISTANT UNITED STATES ATTORNEYS
3                              DISTRICT OF WYOMING
                               2120 Capitol Avenue, Fourth Floor
4                              Cheyenne, WY 82001

5    For the Defendant         THOMAS A. FLEENER
     Herman:                   FLEENER LAW
6                              506 South Eighth Street
                               Laramie, WY 82073
7
     For the Defendant         ZENITH S. WARD
8    Winters:                  BUCHHAMER & WARD
                               1821 Logan Avenue
9                              Cheyenne, WY 82001

10   For the Defendant         THOMAS B. JUBIN
     Horn:                     JUBIN & ZERGA
11                             2614 Pioneer Avenue
                               Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2       GOVERNMENT WITNESSES:

                                                    PAGE
3         SONIA HACKER

          Further Cross (Continued) by Mr. Jubin        743
4         Redirect Examination by Mr. Heimann          765
          Recross-Examination by Mr. Jubin             767
5         Further Direct Examination by Mr. Heimann    944
          Voir Dire Examination by Mr. Fleener         963
6         Further Direct (Continued) by Mr. Heimann    964
          Further Cross-Examination by Mr. Jubin       980
7

          JOSLYN CLAIBORNE
8         Direct Examination by Mr. Heimann            770
          Cross-Examination by Mr. Fleener             797
9         Cross-Examination by Mr. Jubin               805

10        CHARLES IVES
          Direct Examination by Mr. Heimann            808
11

          KEVIN TRIZNA, SR.
12        Direct Examination by Mr. Heimann            814
          Cross-Examination by Mr. Ward                841
13        Cross-Examination by Mr. Jubin               870
          Cross-Examination by Mr. Fleener             871
14        Redirect Examination by Mr. Heimann          900
          Recross-Examination by Mr. Fleener           901
15

          CHARLES LINHART
16        Direct Examination by Mr. Szott              904
          Cross-Examination by Mr. Ward                915
17        Cross-Examination by Mr. Fleener             922

18        CHASE LINHART
          Direct Examination by Mr. Szott              925
19        Cross-Examination by Mr. Ward                928

20        CHRYSTEEN BLUEMEL
          Direct Examination by Mr. Szott              929
21        Cross-Examination by Mr. Ward                941
          Redirect Examination by Mr. Szott            941
22

          MOTION FOR MISTRIAL
23        Argument by Mr. Fleener                      836
          Argument by Mr. Heimann                      838
24        Argument by Mr. Fleener                      839
          Ruling by the Court                          840

25

Vol. VI-740

1                       E X H I B I T S
                                    IDENTIFIED   RECEIVED
2     GOVERNMENT'S EXHIBITS
        9.2    Screenshot, OTC Markets      977        978
3               Excel Workbook
        13     Email Chain                  944        946
4       14.1   Email Chain                  946        947
        14.2   Kingdom Trust New Account    948        948
5               Records
        28.2   Email Chain                  957        --
6       28.3   Email Chain                  957        --
        28.4   Email Chain                  958        959
7       28.22  Email Chain                  957        --
        28.26  Email Chain                  960        960
8       28.27  Email Chain                  960        961
        28.28  Email Chain                  957        --
9       28.33  Email Chain                  958        --
        29.1   Email Chain                  971        972
10      29.2   Email Attachment             972        973
        29.4   Excerpt of Recorded Call     973        --
11      29.5   Excerpt of Recorded Call     974        --
        30.1   Email Chain                  975        976
12      32.1   Screenshot, NuTech Energy    978        979
                Financial
13      304    Email Chain                  934        935
        308    Stock Certificate            906        907
14      312    EcoEmissions Stock Certificate --      932
        401    E-Trade Account Statements   910        911
15      402    Email Chain                  949        951
        403    Email Chain                  951        952
16      404    TD Ameritrade Statements     937        938
        405    Email Chain                  952        954
17      406    Email Chain                  954        955
        407    Withdrawal Request           955        956
18      412    Email Chain                  976        976
        425    Linhart Chart                927        --
19      1007   Screenshot, Microsoft        962        964
                Account Records
20      1007.1 Microsoft Account Record     965        965
        1007.2 Microsoft Account Record     965        966
21      1007.3 Microsoft Account Record     966        967
        1007.4 Microsoft Account Record     967        968
22      1007.5 Microsoft Account Record     968        969

23

24

25

Vol. VI-741

```
 1              E X H I B I T S   C O N T I N U E D
                                   IDENTIFIED   RECEIVED
 2    DEFENDANT HERMAN'S EXHIBITS
         A      Entire Mistrial Exhibit      943        --
 3       B      Email Chain                  873        874
         C      Investigator's Report        943        --
 4
      DEFENDANT HORN'S EXHIBITS
 5     IH-36.1a  Screenshot, Attorney        754        --
                 Opinion Letter
 6     IH-1090  Attorney Opinion Letter      762        --
       IH-2209  Text Message Chain           751        --
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

19-CR-26-ABJ                                          Vol. VI-742
21-CR-14-ABJ

1      (Proceedings commenced 8:30 a.m., September 28, 2021,

2    in the presence of all defendants, outside the jury's

3    presence.)

4            THE COURT:  Good morning.  Are we ready to proceed?

08:30:53    5            MR. JUBIN:  I believe so.

6            MR. HEIMANN:  Yes.

7            THE COURT:  Very well.  Let's bring the jury in.

8        (Proceedings within the jury's presence at 8:31 a.m.)

9            THE COURT:  Good morning, ladies and gentlemen.

08:32:26   10            JURY MEMBERS:  Good morning.

11            THE COURT:  Welcome, again, to the Federal courtroom

12    in Cheyenne, Wyoming.

13            When we recessed last evening, you'll recall that

14    Mr. Jubin was conducting cross-examination of Special Agent

08:32:42   15    Hacker, and we'll pick up right where we left off if we'll all

16    be seated.

17            MR. JUBIN:  Good morning, ladies and gentlemen.

18            JURY MEMBERS:  Good morning.

19            MR. JUBIN:  Good morning, Agent Hacker.

08:33:11   20            THE WITNESS:  Good morning.

21            MR. JUBIN:  You recall you're under oath?

22            THE WITNESS:  Yes.

23    ///

24    ///

25    ///

```
19-CR-26-ABJ      HACKER - FURTHER CROSS - JUBIN      Vol. VI-743
21-CR-14-ABJ
```

1       **SONIA HACKER, GOVERNMENT'S WITNESS,**

2          **FURTHER CROSS-EXAMINATION (Continued)**

3    BY MR. JUBIN:

4    Q.  Let's take a look at Exhibit 202.

08:33:41    5          Now, this is that email from Justin Herman to

6    Tom Crom, who testified yesterday; correct?

7    A.  Yes.

8    Q.  And Ian Horn's not on that email; correct?

9    A.  No, he is not.

08:33:54   10          MR. JUBIN:  Let's take a look at 18.1.

11    BY MR. JUBIN:

12    Q.  And this is that -- looks like it's a -- an April 6th --

13    there we go -- down below here, as you scroll down -- you

14    see -- we're past it -- you see there's some communications

08:34:46   15    between Justin Herman and Joslyn Claiborne at Pacific Stock

16    Transfer?

17          Do you see that?

18    A.  I do.

19    Q.  On September 2nd?

08:34:54   20    A.  Yes.

21    Q.  And Ian Horn's not part of that email chain, is he?

22    A.  He is not.

23          MR. JUBIN:  Let's take a look at 18.3.

24    BY MR. JUBIN:

08:35:24   25    Q.  And this is that Bravo Two Zero bank statement; right?

1    A.  A portion of it.

2    Q.  A portion of it?  Okay.

3          And that Bravo Two Zero's an account associated with

4    Bob Mitchell; correct?

08:35:46    5    A.  It is.

6    Q.  And this is that exhibit that has the arrow showing

7    $280,000 that were -- was supposedly wired into Ian Horn's

8    account; right?

9    A.  Yes.

08:36:00    10    Q.  And we saw other documents that demonstrate that this

11    $280,000 is a -- some sort of a forgery or it's not accurate;

12    correct?

13          MR. FLEENER:  Objection.

14          THE COURT:  Sustained.

08:36:14    15    BY MR. JUBIN:

16    Q.  We saw the documents showing -- from the bank itself --

17    showing that this was an $80,000 transaction, not a $280,000

18    transaction; correct?

19    A.  Yes.

08:36:28    20    Q.  Now, there was a -- you found some email around the time

21    of this document's submission to Ms. Claiborne from

22    Justin Herman requesting Ian Horn for his bank statement;

23    correct?

24    A.  If you would show me what you're talking about, it might

08:37:02    25    refresh my memory.

1   Q.  It might take me a minute.  I think we'll move on.

2        At some point when you interviewed Ian Horn, you

3   showed him this document with this "$280,000"; right?

4        MR. HEIMANN:  Objection; outside the scope of direct.

08:37:39   5        MR. JUBIN:  It's about this document that the

6   Government introduced, Your Honor.

7        THE COURT:  Overruled.

8   BY MR. JUBIN:

9   Q.  You showed Ian Horn this document, didn't you?

08:37:49   10  A.  I don't recall showing him this document.

11  Q.  Do you recall talking with him about the $280,000 that

12  this document suggests?

13  A.  Yes.

14  Q.  And he expressed to you some puzzlement --

08:38:07   15        MR. FLEENER:  Objection; confrontation.

16        MR. HEIMANN:  Objection; hearsay, no exception.

17        THE COURT:  Sustained.

18  BY MR. JUBIN:

19  Q.  Let's take a look at 18.4.  This is that wire transfer

08:38:40   20  document showing the 280,000; right?

21  A.  Yes.

22  Q.  That's inconsistent with the bank records that you

23  obtained from the bank; correct?

24  A.  Yes.

08:38:49   25  Q.  Where did you get this wire transfer?

19-CR-26-ABJ      HACKER - FURTHER CROSS - JUBIN       Vol. VI-746
21-CR-14-ABJ

1   A.  If you would show me -- I believe 18.4 -- is this an

2   attachment to an email?

3           If you would show me the source document, I could

4   tell you where I obtained it from.

08:39:09   5   Q.  And what -- what would be the source document?  What do

6   you mean by that?

7   A.  Well, the records you're showing, the -- before this,

8   18.3 was the Wells Fargo Bank statement.

9   Q.  Showing the 280?

08:39:30   10   A.  Yes.  I believe that was an attachment to an email.

11   Q.  Okay.  And was this an attachment to an email, as well?

12   A.  I believe so.

13   Q.  And who was the email from?

14   A.  I don't know.  That's why I would like to see the email.

08:39:45   15   Q.  Okay.  Do you recall who the email was to?

16   A.  I don't.

17       (Discussion held at counsel table.)

18   BY MR. JUBIN:

19   Q.  I'm going to show you -- apparently, it hasn't been

08:40:29   20   admitted.

21           I'm going to show you what's been marked as

22   Government's Exhibit 18.1.

23           MR. HEIMANN:  It's been admitted.

24           MR. JUBIN:  It has been admitted?

08:40:40   25           MR. HEIMANN:  Yeah.  You've shown it to her earlier

1    today.

2              MR. JUBIN:  Okay.

3              MR. HEIMANN:  It's the second document you showed her

4    this morning.

08:40:45   5  BY MR. JUBIN:

6    Q.  Do you see 18.1?

7    A.  Yes.

8    Q.  Is that the source document you're talking about?

9    A.  It is.

08:41:00  10  Q.  Okay.  And so the way this is labeled, we were just

11   looking at 18.4, so it's -- it's one of the -- this series of

12   attachments to this email?

13   A.  Yes.

14   Q.  And so 18 -- let's -- so 18.4 came from this email from

08:41:21  15  Joslyn Claiborne to Ashlee Canady?

16   A.  Yes.

17   Q.  Okay.  And it's in a string of an email that originated

18   with Justin Herman to -- to Joslyn Claiborne; correct?

19   A.  Yes.

08:41:36  20  Q.  All right.

21              Let's take a look at Exhibit 25.1.  This is an email

22   from Justin Herman to Joslyn Claiborne on September 23 of

23   2015; correct?

24   A.  It is.

08:42:21  25  Q.  And he's attached a legal opinion of that same date,

1    September 23, 2015; correct?

2    A.   That's what the name of the file is.

3    Q.   Have you -- I believe you testified as to Government's

4    Exhibit 25.2, which is that September 23rd, 2015, opinion

08:42:49    5    letter.

6          Do you recall that?

7    A.   Yes.  I would just want to make sure that the date matches

8    what you said.

9    Q.   Okay.  Let's take a look at 25.2.

08:43:06    10          Is that it?

11    A.   That appears to be it.

12    Q.   Okay.  Let's go back to 25.1.

13          Now, Ian Horn's not on this email, is he?

14    A.   No.

08:43:15    15    Q.   But there's this language "This legal has been paid for by

16    the word written," and that's on -- do you know what that's

17    about?

18    A.   I do not.

19    Q.   Do you know if Ian Horn ever saw that?

08:43:39    20    A.   I do not.

21    Q.   So it would be important to determine if there's -- if

22    there's any communication between Ian Horn and Justin Herman

23    in the lead-up to the creation of that document that was

24    attached; correct?

08:43:56    25    A.   Yes.

19-CR-26-ABJ       HACKER - FURTHER CROSS - JUBIN       Vol. VI-749
21-CR-14-ABJ

1  Q.  Well, let's look at what happened.

2          I'm going to show you Ian Horn 1029, not yet

3  admitted, I believe.

4          Do you recall this document?

08:44:25   5          MR. HEIMANN:  Your Honor, I have a 403 objection.

6  May we approach?

7          THE COURT:  You may.

8     (Proceedings held at sidebar with Prosecutor Heimann

9  and all defense counsel.)

08:44:59  10          MR. HEIMANN:  Your Honor, counsel put this same

11  document up last night.  The witness says she doesn't know

12  where it came from.  So that's my first objection to this.

13  We've already gone through it.

14          Number two, it's going to happen again, I think, when

08:45:19  15  counsel's trying to get evidence in with this witness when she

16  can't establish the foundation.  There were thousands and

17  thousands of computer files.  This is a waste of time.

18          If Mr. Jubin wants to get these documents in, he has

19  an investigator who can testify to finding them in discovery.

08:45:39  20  This is a waste of time and I object to it.

21          MR. JUBIN:  The stated basis for the objection was

22  Rule 403.  I would note that the text of the document contains

23  a paragraph concerning Bravo Zero Two [sic], which was found

24  on Mr. Herman's computers.

08:46:02  25          It is highly relevant; it is an extremely unique and

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. VI-750
21-CR-14-ABJ

1   memorable document.  If this witness testifies that she has no

2   recollection of this document, so be it and I won't be able to

3   introduce it.  But it's certainly relevant to the nature of

4   the investigation or its deficiencies if she's unable to

08:46:23    5   identify it, and it's highly relevant if she's able to

6   identify it.

7            MR. HEIMANN:  Your Honor, he already asked her last

8   night.  It's a waste of time.

9            THE COURT:  Well, it's early today.

08:46:32   10            You can ask her that question.  And that will be the

11   end of it if she does not recollect it.

12            MR. JUBIN:  Sure.

13        (Sidebar concluded.)

14            MR. JUBIN:  Would you read back the question, please.

08:44:23   15            THE COURT REPORTER:  Question:  "Do you recall this

16   document?"

17   A.  You showed me this document yesterday.

18   BY MR. JUBIN:

19   Q.  Do you recall seeing it from your investigation?

08:47:17   20   A.  I do not.

21   Q.  Okay.  Do you recall a Government document showing the

22   same language about this $280,000 funds being held by Ian Horn

23   in -- in another letter that was created?

24   A.  I recall the 280 coming up in other documents, yes, but

08:48:08   25   I don't recall the part about "This is confirmation that

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. VI-751
21-CR-14-ABJ

1    I acted as escrow agent."  I don't recall seeing that in other

2    documents.

3        (Discussion held at counsel table.)

4            MR. JUBIN:  Let's take a look at Ian Horn 2209.

08:48:40    5    BY MR. JUBIN:

6    Q.  Do you recall seeing this text exchange between

7    Mr. Winters and Mr. Herman?

8            MR. HEIMANN:  Your Honor, I object to the relevance

9    of this.  This is an admitted document.  Whether the inspector

08:49:31   10    remembers it or not doesn't seem relevant.

11            MR. JUBIN:  I'll withdraw it.

12            THE COURT:  You may answer.  Overruled.

13            MR. JUBIN:  I'll withdraw the question.  We'll

14    move on.

08:50:28   15            Let's take a look at 25.3.  And let's scroll down to

16    the signature.

17            And let's take a look at 24.3.  Scroll down to the

18    signature.  Back up to the top.

19    BY MR. JUBIN:

08:51:19   20    Q.  Ian Horn wasn't in any of the emails or text

21    communications concerning these documents, was he?

22    A.  Ian Horn's not on this email.

23            Are you asking -- the text message you just

24    showed me?

08:51:37   25    Q.  Well, we looked at -- we looked at a couple documents that

---

Melanie Sonntag, RDR, CRR, CRC                MelanieSonntagCRR@gmail.com

19-CR-26-ABJ       HACKER - FURTHER CROSS - JUBIN       Vol. VI-752
21-CR-14-ABJ

1   you presented yesterday.  And I'm just asking you, does

2   Ian Horn show up in any texts or emails related to the

3   creation of those documents?

4   A.  No, he does not.

08:52:05   5   Q.  You talked about Exhibit 8.

6             MR. JUBIN:  Let's take a look at Exhibit 8.

7   BY MR. JUBIN:

8   Q.  And you see the date on there, May 19, 2015?

9   A.  I do.

08:52:48   10   Q.  When is the last text or email communication between

11   Ian Horn and Justin Herman before this letter shows up on

12   May 19th?

13   A.  I don't know.

14   Q.  Do you recall an Easter greeting that occurred on April 5

08:53:11   15   between Justin Herman and Ian Horn by text message?

16   A.  I don't.

17   Q.  Do you recall an email -- or I'm sorry -- a text message

18   between -- or from Ian Horn in early April asking Justin what

19   was going on, he thought he was going to have something that

08:53:33   20   was important for him to do?

21   A.  I don't.

22   Q.  So I'm clear, you don't have any evidence of text messages

23   or email communications between Justin Herman and Ian Horn in

24   the month and a half leading up to the creation of this

08:54:14   25   letter?

---

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1              MR. HEIMANN:  Asked and answered, Your Honor.

2              MR. JUBIN:  It's a slightly different question.

3              THE COURT:  It is.

4              You may answer.

08:54:25    5    A.  I don't recall the text messages that you were

6    referencing.  We do have text messages and many emails.

7    I don't recall the dates or the time periods when they started

8    and when they ended.

9    BY MR. JUBIN:

08:54:39    10    Q.  Okay.  So as you sit here today, you can't give us any

11    evidence of communications in the month and a half leading up

12    to this letter?

13              MR. HEIMANN:  Asked and answered, Your Honor.

14              THE COURT:  Sustained.

08:54:50    15    BY MR. JUBIN:

16    Q.  Now, there were five more opinion letters over the next

17    couple months that were introduced through you.

18              Do you recall your testimony in that regard?

19    A.  I do recall additional opinion letters.

08:55:10    20    Q.  Okay.  And those -- the dates are on them; right?  We know

21    that occurred sort of in the next five months from when this

22    is; right?

23    A.  Yes, into 2016.

24    Q.  Into 2016.

08:55:39    25              Do you have any records during those months -- or do

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. VI-754
21-CR-14-ABJ

 1    you have any -- let me see.

 2            Are you aware of any communications during

 3    those months leading up to those -- the creation of those

 4    letters --

08:55:54    5            MR. HEIMANN:  Your Honor, this question has been

 6    asked and answered.

 7            MR. JUBIN:  This is --

 8            MR. HEIMANN:  She doesn't recall text messages or

 9    emails from specific periods.

08:56:03   10            MR. JUBIN:  I haven't gotten the question out yet,

11    Your Honor, but it is different.  It's asking about all these

12    other letters.

13            THE COURT:  You may ask the next question.

14    BY MR. JUBIN:

08:56:14   15    Q.  Do you have any evidence in the form of text messages or

16    email communications between Justin Herman and Ian Horn

17    leading to the creation of these other several letters that

18    were created after the one we just looked at?

19    A.  Could you repeat the question?

08:56:36   20            MR. JUBIN:  Could you read it back, please?

21            Thank you.

22        (Pending question read.)

23    A.  No.

24    BY MR. JUBIN:

08:57:34   25    Q.  I'd like to show you Exhibit IH-36.1a.

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. VI-755
21-CR-14-ABJ

1              Do you recognize this document?

2    A.  It looks familiar.

3    Q.  Would it refresh your recollection if you looked at your

4    report referencing this document?

08:58:05    5    A.  Yes.

6              MR. JUBIN:  Your Honor, may I approach?

7              THE COURT:  You may approach.

8              THE WITNESS:  Thank you.

9              Okay.

08:58:43    10   BY MR. JUBIN:

11   Q.  Have you had an opportunity to review your report?

12   A.  Yes.

13   Q.  Does it refresh your recollection?

14   A.  Yes.

08:58:48    15   Q.  So what is this document?

16   A.  This is a screenshot of the April 3rd, 2016, opinion

17   letter for NuTech off -- downloaded off of otcmarkets.com

18   website.  And it shows the document properties for that

19   opinion letter on OTC Markets' website.

08:59:17    20             MR. JUBIN:  Move for the admission of IH-36.1A.

21             MR. HEIMANN:  No objection, Your Honor.

22             MR. FLEENER:  Objection; foundation.

23             THE COURT:  Where did you see it?

24             THE WITNESS:  On otcmarkets.com.

08:59:40    25             THE COURT:  Very well.

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. VI-756
21-CR-14-ABJ

1      MR. FLEENER:  May I approach, Judge.

2      (Proceedings held at sidebar with Prosecutor Heimann

3  and all defense counsel.)

4      THE COURT:  Can you tell me, Mr. Jubin, where I can

09:00:06    5  find this?

6      MR. JUBIN:  I just got it last night, pulled it up.

7  So I don't think you have that.  I'm going to have to add it

8  to the JERS.

9      MR. FLEENER:  We're talking about 36.1?

09:00:33   10      MR. JUBIN:  36.1A.

11      It's -- it's the screenshot that shows who the -- it

12  shows the metadata that -- the author of the document is

13  Justin Herman.

14      MR. FLEENER:  That's my objection, Judge.  There's no

09:00:45   15  foundation for anybody to establish what the metadata of the

16  document is.  It's -- it's hearsay.

17      And it's -- there's no foundation that describes how

18  the document was produced, what the metadata means.  It's just

19  a -- a block with words on it with metadata that -- no one

09:01:00   20  knows what it means.

21      MR. HEIMANN:  Your Honor, I think this is identical

22  to the Government's 36.1.

23      MR. FLEENER:  Has that been admitted?

24      THE COURT:  Yes.

09:01:14   25      MR. HEIMANN:  I don't think so.  Not yet.

19-CR-26-ABJ       HACKER - FURTHER CROSS - JUBIN       Vol. VI-757
21-CR-14-ABJ

1           MR. JUBIN:  That's probably where the number came

2    from.

3           MR. FLEENER:  I would object to that one, too.

4           THE COURT:  Yeah, it's been received.

09:01:42  5           MR. FLEENER:  Then I withdraw my objection.

6           THE COURT:  All right.

7        (Sidebar concluded.)

8           MR. HEIMANN:  Your Honor, can I just get one minute

9    to confirm something?

09:02:00  10           THE COURT:  Yes.

11           MR. HEIMANN:  Thank you.

12        (Discussion held at counsel table.)

13           MR. HEIMANN:  Your Honor, we need to approach again.

14    I'm sorry.

09:02:14  15           THE COURT:  Very well.

16        (Proceedings held at sidebar with Prosecutor Heimann

17    and all defense counsel.)

18           MR. HEIMANN:  It has been but without the document

19    properties.

09:02:26  20           MR. FLEENER:  Without the metadata?

21           Yeah, that's my problem.  Because I thought I'd seen

22    the document.  I hadn't seen the metadata.  I thought I was

23    losing my mind.

24           MR. HEIMANN:  So, Your Honor, 36.1 is the letter

09:02:37  25    itself, without the document properties.

```
19-CR-26-ABJ      HACKER - FURTHER CROSS - JUBIN      Vol. VI-758
21-CR-14-ABJ
```

1       And I will say to my knowledge -- I don't know if

2   Inspector Hacker has pulled the document properties on this.

3       I will repeat my objection from previously, that

4   Mr. Jubin has an investigator who pulled this down for him and

09:03:02    5   is the appropriate witness to establish foundation for it.

6   This is a waste of time, trying squeeze out of the case agent

7   testimony that he can easily get from his investigator when

8   it's his turn.

9       MR. JUBIN:  This witness testified that she did this

09:03:22   10   document -- that she did the examination of this data to see

11   who the author was, and that's why I gave her her report, to

12   refresh her recollection, and she admits having done so so

13   here it is.  It comes from the Government's evidence.

14       MR. HEIMANN:  But she didn't do this one.

09:03:41   15       MR. JUBIN:  I don't know that that's true or not.

16   She says she did.

17       MR. FLEENER:  And I renew my objection to foundation

18   because I don't think she has the foundation -- that

19   Mr. Jubin's laid the proper foundation through this witness to

09:03:57   20   admit the document.  Maybe he can.

21       I tend to agree with Mr. Heimann that if he's got an

22   investigator to do it, it's probably easier to do it that way.

23   But unless this witness can lay the foundation -- and I don't

24   believe she has yet -- I would object to foundation.

09:04:10   25       THE COURT:  Well, I'll deny the offer at this point.

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. VI-759
21-CR-14-ABJ

1          (Sidebar concluded.)

2              MR. JUBIN:  May I retrieve your report, please.

3              THE WITNESS:  Yes.

4     BY MR. JUBIN:

09:04:54    5     Q.  Do you know if this is a document which you reviewed the

6     metadata for to ascertain who the author was?

7     A.  I reviewed the document properties.

8     Q.  And what does reviewing the document properties do?

9     A.  It gives you additional information about the document.

09:05:25    10    Q.  Does that information include the name of the person

11    associated with the computer from which it was created?

12    A.  I don't know.

13    Q.  Does it give you something that's labeled as the author?

14    A.  Yes.

09:05:41    15    Q.  And what's your understanding of what that means?

16    A.  I don't have an understanding of what that means other

17    than the document properties say that the author is that

18    person listed.

19    Q.  Okay.  Other than it says "author," you don't know how

09:06:02    20    that comes to identify a particular person?  Is that what

21    you're saying?

22    A.  No.  I'm saying I don't know what the term "author"

23    specifically means in document properties other than on its

24    face value, that the title is "Author."

09:06:24    25    Q.  Okay.  So you don't know, for instance, if -- if a

1  document has the words "Justin Herman" as author -- if that's

2  the last person who looked at it and made changes to it or if

3  that's the person who originated it or -- you're saying

4  you don't know that?

09:06:42   5  A.  I would agree --

6  Q.  Okay.

7  A.  -- yes, that I don't know.

8         MR. JUBIN:  I'll withdraw the document.

9         Let's take a look at Exhibit 28.32.

09:07:36  10  BY MR. JUBIN:

11  Q.  Take a look at a few of them, and then I'll ask you some

12  questions about them.

13         This is that email to Chuck Winters talking about --

14  from someone at OTC Markets -- talking about moving NuTech to

09:08:14  15  the Pink information tier at the market open; right?

16  A.  Yes.

17         MR. JUBIN:  And let's take a look at 29.3.

18  BY MR. JUBIN:

19  Q.  And that's a press release that went out on January 28th

09:08:33  20  of 2016 concerning NuTech; correct?

21  A.  Yes.

22  Q.  And it was a favorable press release; correct?

23  A.  Favorable to NuTech?

24  Q.  Favorable to NuTech; right?

09:08:52  25  A.  Yes, yes.

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. VI-761
21-CR-14-ABJ

1   Q.  Something that might increase its price?

2   A.  Yes.

3          MR. JUBIN:  Let's take a look at 30.2.

4   BY MR. JUBIN:

09:09:16   5   Q.  And that's another press release the very next day; again,

6   favorable?

7   A.  Yes.

8   Q.  Might increase NuTech's price; correct?

9   A.  Yes.

09:09:26   10   Q.  There's no evidence that Ian Horn was responsible for

11   these or any of the other press releases; correct?

12   A.  Correct.

13          THE COURT:  Have these been received?

14          MR. JUBIN:  They have.  They were being shown to the

09:09:45   15   jury; correct?

16          THE COURTROOM DEPUTY:  (Moved head up and down.)

17          THE COURT:  Do you show them as having been offered

18   and received, Counsel?

19          MR. JUBIN:  I believe they were --

09:09:57   20          MR. HEIMANN:  We do, Your Honor.

21          MR. JUBIN:  They were introduced yesterday,

22   Your Honor.  It's hard to keep it all straight.

23   ///

24   ///

25   ///

19-CR-26-ABJ      HACKER - FURTHER CROSS - JUBIN      Vol. VI-762
21-CR-14-ABJ

1    MR. HEIMANN:  Your Honor, I -- that's correct.  We

2    have them marked as admitted, and I remember offering them

3    through this witness yesterday.

4    BY MR. JUBIN:

09:10:19    5    Q.  So let's step back just a second.

6         So there's no evidence that Ian Horn was responsible

7    for this press release; correct?

8    A.  Correct.

9    Q.  And there's no evidence that Ian Horn read this press

09:10:34    10    release in January of 2016; correct?

11    A.  I wouldn't know if he read it.  I haven't seen anything to

12    show that he read it.  There's no messages talking about it.

13    Q.  Okay.  Fair enough.

14         And -- and, in fact, there's no evidence to show that

09:10:53    15    Ian Horn even knew about this; correct?

16    A.  I never asked him about this so I --

17    Q.  The question is, do you have evidence?

18    A.  No.  No.

19    Q.  I'm going to show you what's been marked as -- and this is

09:11:20    20    not admitted -- IH-1090.

21         I asked you yesterday if you had an opportunity to

22    compare any of the signatures of these opinion letters and

23    various documents that you testified to contained a signature

24    that -- that was Ian Horn's.

09:11:46    25         Do you recall that?

19-CR-26-ABJ      HACKER - FURTHER CROSS - JUBIN      Vol. VI-763
21-CR-14-ABJ

1   A.  Yes.

2   Q.  And in the break did you have the opportunity to look at

3   any of those signatures to conduct any kind of a comparison,

4   or do we need to do that today in open court?

09:12:03   5   A.  I did not have a chance to do any type of comparisons.

6   Q.  Okay.  When you -- when you see there's something that's

7   labeled "Government's Exhibit 8," will you look at that

8   carefully?

9          MR. JUBIN:  And then let's go to Government's

09:12:22   10   Exhibit 8 and look at the Ian Horn signature.

11          MR. HEIMANN:  Your Honor, I object; 403.

12          May we approach?

13          THE COURT:  Yes, you may.

14      (Proceedings held at sidebar with Prosecutor Heimann

13:40:34   15   and all defense counsel.)

16          THE COURT:  I can't find --

17          MR. JUBIN:  That was created for this examination so

18   it's new.

19          MR. HEIMANN:  Your Honor, apparently Mr. Jubin has

09:13:00   20   had some members of his staff clip out signature blocks from

21   various Government's exhibits.  This witness doesn't know

22   anything about that.  She cannot verify this.

23          So what we're about to do, apparently, is walk

24   through and have her eyeball these things.

09:13:17   25          She's still not going to be able to say "That's a

19-CR-26-ABJ      HACKER - FURTHER CROSS - JUBIN      Vol. VI-764
21-CR-14-ABJ

 1   cutout of that exhibit."  This is a waste of time.

 2          THE COURT:  She's not an expert on signature

 3   identification; right?

 4          MR. HEIMANN:  Well, that's true, too.  But whoever

 5   made this is the person that needs to come up to establish a

 6   foundation for it, assuming it's relevant.

 7          THE COURT:  I expect Mr. Fenoff will be testifying.

 8          MR. JUBIN:  He will.  But, at the same time, these

 9   are all pieces of exhibits that have been entered and to show

10   them side by side is informative to the jury.  It might be

11   informative to the witness.

12          MR. HEIMANN:  Your Honor, we don't know that.  We

13   don't know if these came off the Government's exhibits because

14   the witness who made it isn't on the witness stand.

15          THE COURT:  I'll sustain the objection.

16          MR. JUBIN:  Thank you.

17     (Sidebar concluded.)

18   BY MR. JUBIN:

19   Q.  Agent Hacker, is there a reason that you didn't do

20   signature comparisons?

21   A.  Yes.

22   Q.  And that reason is because Ian Horn told you he signed the

23   letters?

24   A.  Correct.

25   Q.  And you took that for what it's worth?

09:13:35   5
09:13:54   10
09:14:06   15
09:14:46   20
09:14:53   25

19-CR-26-ABJ       HACKER - REDIRECT - HEIMANN       Vol. VI-765
21-CR-14-ABJ

1    A.  I did.

2             MR. JUBIN:  I have no further questions.

3             THE COURT:  Counsel, questions?

4             MR. FLEENER:  One second.

09:15:27    5       (Discussion held between counsel.)

6             MR. FLEENER:  No questions at this time, Judge.

7    Thank you.

8             And Mr. Ward?

9             MR. WARD:  No questions, Your Honor.

09:15:39    10                **REDIRECT EXAMINATION**

11   **BY MR. HEIMANN:**

12   Q.  Inspector Hacker, on cross-examination you were lost --

13   asked a number of questions about what you remembered from

14   your investigation, so I think it's worth asking a couple

09:16:01    15   questions about how much evidence was actually gathered in

16   this investigation.

17             Approximately how many subpoenas were issued?

18   A.  150.

19   Q.  How many files do you have on your case file in your

09:16:21    20   computer?

21   A.  Over a hundred thousand.

22   Q.  Does that include the email evidence and the computer

23   files that were seized and analyzed?

24   A.  No.  Those are separate.

09:16:39    25   Q.  How many email accounts, approximately, were seized during

1    the investigation?

2    A.   We got search warrants for 10 email accounts.

3    Q.   From three Internet service providers?

4    A.   Correct.

09:16:54   5    Q.   What's the approximate number of digital devices,

6    computers, external hard drives that were seized and had

7    electronically stored information taken from them for

8    analysis?

9    A.   I don't recall the number seized, but I know that

09:17:12  10    I reviewed approximately half a dozen devices and their

11    contents.

12    Q.   And when we say "device," we mean computers, external hard

13    drives?

14    A.   Cell phones, too.

09:17:26  15    Q.   There was a search warrant issued to an ISP provider,

16    Oath Holdings?

17    A.   Yes.

18    Q.   How many email messages were seized out of those accounts

19    that you had to -- that you were reviewing?

09:17:41  20    A.   Over 80,000.

21    Q.   And that -- many of those, did they include attachments?

22    A.   Yes.

23    Q.   As we've gone through the trial, we've seen multiple

24    copies of the same document from different places.  Is that

09:18:00  25    what you saw in your analysis of the evidence in this case?

1    A.   Yes.

2    Q.   So if you were to look at a document, just on its face you

3    may not know where it came from?

4    A.   That's correct.

09:18:26    5         MR. HEIMANN:  That's all I have, Your Honor.

6         Thank you.

7                        RECROSS-EXAMINATION

8    BY MR. JUBIN:

9    Q.   Agent Hacker, that raises a couple issues.

09:18:45   10         So in the course of assembling all these voluminous

11    documents, your investigation never really stopped, did it?

12    A.   It stopped after the final indictment in 2021.

13    Q.   You just quit working on the case?

14    A.   No.

09:19:09   15    Q.   Okay.  I've frequently heard agents refer to it as "It's

16    an ongoing investigation," including during the trial.  Right?

17    A.   Yes.  We are preparing for trial every day.

18    Q.   Okay.  And the investigation to find and identify

19    information that might be pertinent continues; correct?

09:19:30   20    A.   I would say that after the final indictment we were just

21    looking for trial exhibits and preparing for trial.  I wasn't

22    reviewing new material.

23    Q.   Okay.  So once the indictment issues, that's it?  You

24    decide "This is what we're doing" and it's closed?  Or are you

09:19:54   25    still open to finding information that might bear upon the

1    facts of the case?

2    A.  I'm definitely open to finding additional information.  We

3    just wouldn't issue any more grand jury subpoenas for records.

4    Q.  Grand jury subpoenas would be foreclosed because the grand

09:20:15   5    jury's done?  It's issued its indictment; right?

6    A.  Yes.

7    Q.  But you sometimes still do interviews; right?

8    A.  Yes.

9    Q.  And, in fact, in this case, additional interviews have

09:20:24   10    occurred and there's been additional information passed on;

11    right?

12         MR. HEIMANN:  Your Honor, I think we're outside the

13    scope of redirect.

14         MR. JUBIN:  No, we're not.

09:20:34   15         THE COURT:  I don't think so.  Overruled.

16    A.  Yes, we conducted interviews.

17    BY MR. JUBIN:

18    Q.  Okay.  And, in fact, additional items that were seized in

19    prior search warrants continue to be looked at; right?

09:20:47   20    A.  Yes.  I continually look at the evidence.

21    Q.  Right?

22    A.  Uh-huh.

23    Q.  Do you recall, in fact, in this case there were a number

24    of letters that were disclosed to the defense lawyers in this

09:21:14   25    case on the 15th of September of 20- -- of 2021?  Correct?

1          MR. HEIMANN:  Objection, Your Honor.  What is the

2    relevance of this?

3          THE COURT:  Sustained.

4    BY MR. JUBIN:

09:21:29    5    Q.  As the case agent, you talked about all this evidence.

6          Did you play a role in obtaining and looking at new

7    information from Mr. Herman's Apple devices relating to the

8    letters that were -- that he transmitted to Pacific Stock

9    Transfer?

09:21:49   10    A.  Yes.  I reviewed the evidence on Mr. Herman's computer.

11    Q.  And that just happened a week ago; right?

12    A.  That I reviewed the evidence?

13    Q.  That --

14    A.  No.

09:21:58   15    Q.  The new stuff?

16    A.  No.

17    Q.  Two weeks ago?

18    A.  I don't know what "new stuff" you're referring to.

19    Q.  Do you recall that there were attachments located -- to

09:22:32   20    include email communications related to three attorney opinion

21    letters submitted to Pacific Stock Transfer in July 2015 --

22    that were found on Mr. Herman's iMac that were not previously

23    provided but were recently?

24    A.  I don't recall that.

09:22:54   25    Q.  You don't know about that?

19-CR-26-ABJ         CLAIBORNE - DIRECT - HEIMANN        Vol. VI-770
21-CR-14-ABJ

1   A.  No.

2   Q.  That's not something that Mr. Heimann included you on?

3   A.  He must not have.

4         MR. HEIMANN:  Your Honor, I object to that question.

5         THE COURT:  Sustained.                                    09:23:06

6         MR. HEIMANN:  It's not relevant.

7         THE COURT:  The jury will disregard the answer.

8         MR. JUBIN:  I don't have any further questions.

9         Thank you, Agent.

10        MR. HEIMANN:  I don't have anything else, Your Honor.    09:23:23

11        THE COURT:  You may step down.  Temporarily.

12        MR. HEIMANN:  The United States of America calls

13  Joslyn Claiborne.

14        THE COURTROOM DEPUTY:  Please raise your right hand.

15    (Witness sworn.)                                              09:24:34

16        THE COURTROOM DEPUTY:  Please take a seat.

17        Please state and spell your name for the record.

18        THE WITNESS:  Joslyn Claiborne, J-o-s-l-y-n

19  C-l-a-i-b-o-r-n-e.

20        MR. HEIMANN:  Good morning, Ms. Claiborne.               09:25:42

21    **JOSLYN CLAIBORNE, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

22  **BY MR. HEIMANN:**

23  Q.  How old are you?

24  A.  61.

25  Q.  Where were you born and raised?                            09:25:45

```
             1   A.   Chicago, Illinois.

             2   Q.   Where do you live now?

             3   A.   Henderson, Nevada.

             4   Q.   What is the highest legal of education you've obtained?

09:25:56     5   A.   12th grade.

             6   Q.   Graduated high school?

             7   A.   Yes.

             8   Q.   Where are you employed?

             9   A.   Pacific Stock Transfer.

09:26:04    10   Q.   And what is your position at that company?

            11   A.   Managing director.

            12   Q.   What is Pacific Stock Transfer's business?

            13   A.   It is a stock transfer company that keeps records.

            14   Q.   What kinds of records does Pacific Stock Transfer keep?

09:26:19    15   A.   Records for the companies that are -- we -- that are part

            16   of our clientele.

            17   Q.   So your clients are companies?

            18   A.   Correct.

            19   Q.   Public companies?  Private companies?

09:26:34    20   A.   Both.

            21   Q.   For public companies do you keep records of stock that's

            22   been issued?

            23   A.   Yes.

            24   Q.   And to whom it's been issued?

09:26:43    25   A.   Yes.
```

19-CR-26-ABJ          CLAIBORNE - DIRECT - HEIMANN          Vol. VI-772
21-CR-14-ABJ

1    Q.  For these public companies, are they large companies?

2    Medium sizes? small companies?  Or all across the spectrum?

3    A.  All across the spectrum.

4    Q.  As a transfer agent for securities, is Pacific Stock

09:27:16    5    Transfer Company regulated by the Securities and Exchange

6    Commission?

7    A.  Yes.

8    Q.  Okay.  Do you have specialized training for your work at

9    Pacific Stock Transfer?

09:27:26    10   A.  Yes, on-the-job training.

11   Q.  So you learned how to do it at the company?

12   A.  Yes.

13   Q.  How long have you worked there?

14   A.  13 years.

09:27:35    15   Q.  You said you're a managing director.  What are your

16   duties now?

17   A.  I manage the workflow.

18   Q.  Workflow for -- which -- which type of workflow are we

19   talking about?

09:27:48    20   A.  The transfer agents.

21   Q.  Okay.  Do you train them?

22   A.  Yes.

23   Q.  Before you were the managing director, what was your

24   position?

09:27:59    25   A.  Director of securities and shareholder services.

1  Q.  Is that the section that -- where the transfer agent work

2  is done?

3  A.  Yes.

4  Q.  Before you were in that position, were you a transfer

5  agent yourself?

6  A.  Yes.

7  Q.  Have you reviewed Pacific Stock Transfer business records

8  related to the issuance of free-trading shares of NuTech

9  Energy Resources in 2015?

10  A.  Could you repeat that, please?

11  Q.  I can.

12        Have you reviewed Pacific Stock Transfer business

13  records related to the issuance of free-trading shares of

14  NuTech Energy Resources?

15  A.  Yes.

16  Q.  And did that happen in 2015?

17  A.  Yes.

18  Q.  Were you involved in that issuance?

19  A.  Yes.

20  Q.  Do you specifically remember working on that issuance?

21  A.  Yes.

22  Q.  What was your role?

23  A.  Transfer agent.

24  Q.  So if you would, describe for the grand jury -- as a

25  transfer agent, what are you doing?

1    A.  I don't understand.

2    Q.  As you work as a transfer agent, do you gather documents?

3    A.  Yes.

4    Q.  From the company that's asking for stock to be issued?

09:29:30    5    A.  Yes.

6    Q.  Do you then review those documents to see if they're

7    complete?

8              MR. WARD:  Objection; leading.

9              MR. HEIMANN:  Doesn't suggest the answer, Your Honor.

09:29:45    10             THE COURT:  You -- she may answer the question.

11   A.  Yes, I review.

12   BY MR. HEIMANN:

13   Q.  Okay.  Do you request additional documents when necessary?

14   A.  Yes.

09:30:00    15             MR. HEIMANN:  Let's look at Exhibit 10.

16             This has been admitted into evidence.

17   BY MR. HEIMANN:

18   Q.  Ms. Claiborne, you have some paper copies in front of you.

19   It will also show up on the screen for you.

09:30:36    20        (Discussion held at counsel table.)

21   BY MR. HEIMANN:

22   Q.  While we're waiting for that to come up, Ms. Claiborne, is

23   there a difference in the process when someone requests

24   restricted shares versus unrestricted shares?

09:31:35    25   A.  Yes.

1    Q.  What is the difference?

2    A.  Restricted shares are just issued with a board resolution

3    authorizing the issuance of those shares.  Free-trading shares

4    need additional documentation.

09:32:01    5    Q.  So there's more information you need if someone's

6    requesting free-trading shares?

7    A.  Yes.

8    Q.  Why is that?

9    A.  Because free-trading shares have not been registered, in

09:32:13    10   most cases, by the SEC.

11   Q.  And if they're not registered, then there's additional

12   information to have them be free trading?

13   A.  Yes.

14   Q.  Okay.  So let's look at Exhibit 10.

09:32:28    15        Do you see that on the screen?

16   A.  Yes.

17   Q.  Is this an email from Justin Herman to you in July of

18   2015?

19   A.  Yes.

09:32:38    20   Q.  And let's go to -- well, you said you remember working on

21   the issuance.  Do you remember Justin Herman?

22   A.  Yes.

23   Q.  Did you ever meet him in person?

24   A.  No.

09:32:53    25   Q.  Did you talk to him on the phone?

```
 1   A.   Yes.

 2   Q.   Were most of your communications via email?

 3   A.   No.

 4   Q.   Most of --

 5   A.   They were via phone and email.

 6   Q.   Okay.  So let's look on page 2.

 7          So you mentioned board resolution when we were

 8   talking about restricted versus unrestricted.  Why is a board

 9   resolution important?

10   A.   Because it is coming from a director or an officer of the

11   company authorizing Pacific Stock Transfer to issue the

12   shares.

13          MR. HEIMANN:  So let's magnify the first paragraph of

14   this one.

15   BY MR. HEIMANN:

16   Q.   So this describes a meeting on a particular date, no less

17   than two directors were present.  Talking about board

18   resolutions in general, if you knew that a board meeting had

19   not happened, would you proceed with the issuance?

20   A.   No.

21   Q.   If you knew that the board resolution recited a certain

22   number of directors but that number wasn't present, would you

23   proceed with the issuance?

24   A.   No.

25   Q.   So these resolutions matter to a transfer agent when
```

09:33:06
09:33:26
09:33:42
09:34:16
09:34:33

1    they're deciding to move forward or not with a request for

2    free-trading shares?

3    A.  Yes.

4          MR. HEIMANN:  Let's come back to the page.

09:34:55    5          And let's move now to 306.

6    BY MR. HEIMANN:

7    Q.  Ms. Claiborne, is this another message from Justin Herman

8    to you in July of 2015?

9    A.  Yes.

09:35:22   10    Q.  And there's an attachment, so let's go to page 2.

11          So this is entitled the "Supporting Legal Opinion for

12    Request to Issue Free Trading Shares of Common Stock of NuTech

13    Energy Resources, Inc."

14          In general, are attorney opinion letters important to

09:35:53   15    your work as a transfer agent?

16    A.  Yes.

17    Q.  Why?

18    A.  To issue free-trading shares, we rely -- Pacific Stock

19    Transfer relies on the opinion letter from counsel.

09:36:04   20    Q.  When you get an opinion letter, do you research the

21    attorney before you choose to rely on it?

22    A.  Yes.

23    Q.  How do you do that?

24    A.  Google search.

09:36:27   25    Q.  Look them up, see if they're on the Internet?

```
19-CR-26-ABJ        CLAIBORNE - DIRECT - HEIMANN        Vol. VI-778
21-CR-14-ABJ
```

1   A.  Yes.

2   Q.  Did you research -- well, on this exhibit the letterhead

3   is Ian Horn & Associates.

4        Did you research Ian Horn when you received this

09:36:43  5   opinion letter for NuTech?

6   A.  Yes.

7   Q.  Do you remember what you found?

8   A.  Nothing.

9   Q.  "Nothing" meaning you don't remember finding a website or

09:36:56  10   anything like that?

11   A.  I don't remember finding anything derogatory.

12   Q.  I see.  So nothing that would cause you to not rely on it?

13   A.  Correct.

14   Q.  Okay.  So speaking about opinion letters in general, if

09:37:14  15   you knew that an opinion letter contained a false statement,

16   would you proceed with the issuance?

17   A.  No.

18   Q.  If you knew that a legal opinion had not been written by

19   an attorney, would you proceed with the issuance?

09:37:31  20   A.  No.

21   Q.  If you knew that the attorney let someone else write it

22   and just put their name on it, would you proceed?

23   A.  No.

24        MR. HEIMANN:  Let's look at Exhibit 300.

25   ///

1    BY MR. HEIMANN:

2    Q.   Is this an email from you to Justin Herman in July of

3    2015?

4    A.   Yes.

09:38:11    5    Q.   What are you asking for here?

6    A.   I am asking for additional documentation and a revised

7    legal opinion.

8    Q.   So let's talk about documentation.

9         As a transfer agent, what documentation do you need

09:38:32    10    when there's a request for free-trading shares?

11    A.   The documentation that counsel has written or talked about

12    in the opinion letter that he reviewed to write his opinion

13    letter.

14    Q.   Is it unusual for you to have to ask for additional

09:38:55    15    documentation?

16    A.   No.

17    Q.   You said, then, this also is requesting a revised legal

18    opinion?

19    A.   Yes.

09:39:04    20    Q.   What kinds of circumstances would require a revision to

21    the -- a legal opinion?

22    A.   When the legal opinion doesn't speak to Rule 44 --

23    Rule 144, the provisions of it.

24    Q.   And Rule 144, what's your understanding of that rule?

09:39:28    25    What does that determine?

19-CR-26-ABJ        CLAIBORNE - DIRECT - HEIMANN        Vol. VI-780
21-CR-14-ABJ

1   A.   It's the safe harbor where shares are able to be cleared

2   if the company qualifies for that exemption.

3   Q.   Okay.  And when you say "cleared," does that mean they can

4   be issued free trading?

09:39:43   5   A.   Yes.

6           MR. HEIMANN:  Let's go, then, to Exhibit 12.

7   BY MR. HEIMANN:

8   Q.   This is an email from Justin Herman to you on July 27th of

9   2015.

09:40:15   10          MR. HEIMANN:  And let's go to page 3.

11  BY MR. HEIMANN:

12  Q.   You have this on paper in front of you.  It's entitled

13  "Debt Assignment Agreement."

14          Do you remember what this debt assignment agreement

09:40:38   15  was for regarding the request to issue free-trading shares for

16  NuTech?

17  A.   Not specifically.

18  Q.   Okay.  Let's just talk generally, then.

19          As a transfer agent, do you get requests for shares

09:40:59   20  to be issued that are based on a convertible debt?

21  A.   Yes.

22  Q.   What is your understanding of a convertible debt?

23  A.   That someone has invested and they have a promissory note

24  and now they are converting the debt because the note was not

09:41:20   25  paid back in cash.

1    Q.  So they're converting the debt into shares?

2    A.  Yes.

3    Q.  When there's a request for free-trading shares and it's

4    based on a convertible note, do you need a copy of that note

09:41:35    5    in your package?

6    A.  Yes, you need a copy of the note.

7    Q.  If the note's -- do you know what a debt assignment is?

8    A.  Yes.

9    Q.  What is that?

09:41:45    10   A.  That means that the debt from the note has been assigned

11   to someone else.

12   Q.  If a convertible note's been assigned to another person

13   and that person is requesting shares --

14   A.  Yes.

09:41:57    15   Q.  -- do you need the debt assignment agreement in the

16   package?

17   A.  Yes.  And the promissory note.

18   Q.  And the original note?

19   A.  Yes.

09:42:05    20           MR. HEIMANN:  Okay.  So let's go on this exhibit

21   to pages 5 and 6.

22           I want to capture the -- all right.  So let's start

23   here.

24   BY MR. HEIMANN:

09:42:18    25   Q.  Do you see the signature there on the bottom?

1    A.   Yes.

2    Q.   By the name "Gordon Pardy"?

3    A.   Yes.

4         MR. HEIMANN:   And let's go to the next page.

09:42:24    5    BY MR. HEIMANN:

6    Q.   Do you see the rest of the signature blocks?

7    A.   Yes.

8    Q.   Based on the dates here, when was this assignment

9    agreement executed?

09:42:42    10    A.   In 2014.

11    Q.   So January 2014?

12    A.   Yes.

13    Q.   At least one signature from December of 2013?

14    A.   Yes.

09:42:50    15    Q.   Talking about agreements in general, convertible notes,

16    debt assignments, if you knew that a -- an assignment

17    agreement had been backdated, meaning the dates for the

18    signatures were moved one year earlier than it was actually

19    signed, would you rely on that document to proceed with the

09:43:23    20    issuance of shares?

21    A.   No.

22    Q.   Is when a document is signed -- let me ask you a better

23    question.

24         Does the length of time -- from the assignment of a

09:43:41    25    convertible note to the issuance of shares, does that length

1   of time matter?

2   A.   Yes.

3   Q.   How does it matter for your work as a transfer agent?

4   A.   It matters to show whether the holding period has been met

5   for the shares to be issued free trading.

6   Q.   So if a -- an assignment agreement is backdated one year,

7   that could change your decision about whether shares should be

8   issued free trading or not?

9   A.   Yes.

10        MR. HEIMANN:  Let's go to 16.1.

11        Let's go to page 2.

12        Okay.  So -- back to page 1.

13  BY MR. HEIMANN:

14  Q.   We have an email here from Justin Herman to you, and

15  there's a sentence in the middle of this paragraph beginning

16  with "All the free trading shares."

17        Do you see that sentence?

18  A.   Yes.

19  Q.   So "All the free trading shares are being issued on

20  percentage basis of ownership from cumulative dollar

21  consideration which was pretty good number of 280,000."

22        Did I read that correctly?

23  A.   Yes.

24  Q.   When you are evaluating or putting together the package

25  for issuing free-trading shares, does it matter how much a

```
19-CR-26-ABJ       CLAIBORNE - DIRECT - HEIMANN        Vol. VI-784
21-CR-14-ABJ
```

1  person paid for, say, the assignment of -- of a convertible

2  note?

3  A.  Yes.

4  Q.  How so?

09:45:40  5  A.  It matters that the numbers match with the opinion letter.

6  Q.  So the amount paid is not as important as the fact that

7  all the documents match up?

8  A.  All the documents match up and evidence of funding to show

9  that that amount of money was actually received or paid to

09:46:07  10  someone.

11        MR. HEIMANN:  Let's look at 16.3.

12  BY MR. HEIMANN:

13  Q.  This is an attachment to the email we just looked at.

14  It's an outgoing wire transfer request, Wells Fargo Bank.

09:46:34  15        Is this the kind of documentation you need when

16  you're trying to verify that a transaction was actually

17  completed?

18  A.  Yes.

19        MR. HEIMANN:  Let's magnify the "Wire Amount and

09:46:48  20  Source of Funds" down to "Information/Comments."

21  BY MR. HEIMANN:

22  Q.  So when you're looking at a package, you're looking to see

23  that the amount of a wire matches what's described in the

24  opinion letter; right?

09:47:10  25  A.  Yes.

```
19-CR-26-ABJ      CLAIBORNE - DIRECT - HEIMANN      Vol. VI-785
21-CR-14-ABJ
```

1    Q.  If you're looking at this kind of documentation and you

2    knew that the documents you're looking at, the bank record

3    you're looking at had been changed to make it look like a

4    different amount of money had been wired, would you proceed

09:47:35    5    with that package?

6    A.  No.

7            MR. HEIMANN:  Let's go, then, to 17.

8            And if we would, let's magnify the paragraph -- this

9    is --

09:48:06    10    BY MR. HEIMANN:

11    Q.  First of all, Exhibit 17 is an email from you to

12    Justin Herman in August of 2015; right?

13    A.  Yes.

14            MR. HEIMANN:  Let's look at -- magnify the

09:48:20    15    paragraph beginning with "The evidence of funding."

16    BY MR. HEIMANN:

17    Q.  We talked about additional requests -- well, we talked

18    about requests for additional documentation.  This

19    paragraph here, "The evidence of funding is a request for wire

09:48:41    20    services, it doesn't detail or state that the wire was

21    actually executed."

22            That particular paragraph, is that an example of a

23    request for additional information or documentation?

24    A.  Yes.

09:48:56    25    Q.  And at the end you say, "Also there should be a bank

---

19-CR-26-ABJ          CLAIBORNE - DIRECT - HEIMANN          Vol. VI-786
21-CR-14-ABJ

 1   statement showing the receipt of funds."

 2          Did I read that right?

 3   A.  Yes.

 4   Q.  So at this point you're actually asking for a bank

 5   statement?

 6   A.  Yes.

 7          MR. HEIMANN:  If we go to 18.1.

 8   BY MR. HEIMANN:

 9   Q.  So, first of all, I just want to clear something up.

10          There's this email from you to Ashlee Canady dated

11   Tuesday, April 16th of 2019.  Do you see that at the top?

12   A.  Yes.

13   Q.  Were you forwarding this email to Ms. Canady in April?

14   A.  Yes.

15   Q.  And the email you were forwarding --

16          MR. HEIMANN:  If we scroll down -- let's capture the

17   bottom of the first page -- top -- and then -- there you go.

18   BY MR. HEIMANN:

19   Q.  The email you were actually forwarding is the one we see

20   at the bottom of the first page dated September 2nd of 2015?

21   That email string is what you were forwarding?

22   A.  Yes.

23   Q.  If we go all the way to the top, the attachments that are

24   on your message to Ms. Canady, those are the attachments to

25   that original email in September -- on September 2nd of 2015;

09:49:18 5
09:49:45 10
09:50:02 15
09:50:16 20
09:50:34 25

```
19-CR-26-ABJ        CLAIBORNE - DIRECT - HEIMANN        Vol. VI-787
21-CR-14-ABJ
```

1    right?

2    A.  Yes.

3         MR. HEIMANN:  Okay.  So let's go, then, to -- well,

4    if we go down to page 2.

09:50:45    5    BY MR. HEIMANN:

6    Q.  So the email in September of 2015 -- there's two of them.

7         And the August one's being forwarded, and Bullet

8    Point No. 1, "You will find the consideration (outgoing wire

9    form-which you already have seen) and the account statement.

09:51:10   10   Check page 2 where the arrow is."

11         Did I read that right?

12   A.  Yes.

13         MR. HEIMANN:  Let's go, then, to 18.3.

14   BY MR. HEIMANN:

09:51:54   15   Q.  So 18.3, this is an attachment to the email we just

16   looked at.

17         Let's go to the second -- well, and, first, standard

18   sort of -- appears to be a bank statement page; right?

19   A.  Yes.

09:52:09   20         MR. HEIMANN:  And let's go down one page.

21   BY MR. HEIMANN:

22   Q.  The email mentioned page 2.  This is page 2 of that

23   attachment, the red arrow.

24         What --

09:52:22   25         MR. HEIMANN:  Let's magnify the transaction there.

19-CR-26-ABJ       CLAIBORNE - DIRECT - HEIMANN        Vol. VI-788
21-CR-14-ABJ

1   BY MR. HEIMANN:

2   Q.  What's being indicated on the line where the red arrow's

3   pointing?

4   A.  It's a wire transfer in the amount of $280,000.

09:52:44   5   Q.  If you got bank statements demonstrating that a wire

6   actually had been executed out of an account or into an

7   account and you knew that bank statement had been altered to

8   show a different amount, would you rely on it to continue to

9   go forward with the issuance of free-trading shares?

09:53:08   10   A.  No.

11            MR. HEIMANN:  Let's go to 25.1.

12   BY MR. HEIMANN:

13   Q.  So this is in evidence.  It's an email from Justin Herman

14   to you on September 23rd of 2015.

09:53:44   15            And do you see that there's an attachment, "Bravo

16   E Pro.pdf" under "Attachments"?

17   A.  Yes.

18            MR. HEIMANN:  Let's look at 25.3.

19   BY MR. HEIMANN:

09:54:05   20   Q.  25.3 is that attachment.

21            MR. HEIMANN:  And if we scroll to page 2 -- first,

22   let's stay on page 1 for one second.

23   BY MR. HEIMANN:

24   Q.  So this is entitled "Purchase and Assignment of Interest

09:54:19   25   in Wells and Leases."  If we go to page 2, we have signature

1    blocks.

2        This was provided to you to support the request for

3    free-trading shares of NuTech.  If you knew that a document

4    like this contract -- if you knew that one or more signatures

09:54:46    5    on that document had been forged, would you go forward with

6    the issuance of free-trading shares based on that document?

7    A.  No.

8    Q.  If you knew that a signature had been scanned and pasted

9    into the document without the authorization of the person

09:55:07    10    whose name is on the document, would you go forward?

11    A.  No.

12        MR. HEIMANN:  Let's go to 26.1.

13    BY MR. HEIMANN:

14    Q.  This is an email from Mr. Herman to you, September 26th of

09:55:35    15    2015.

16        Do you see there's an attachment, "E-Pro Systems

17    Non-AF.pdf"?

18        Do you see that?

19    A.  Yes.

09:55:50    20        MR. HEIMANN:  Let's go to page 2.

21    BY MR. HEIMANN:

22    Q.  This is that attachment.  It's entitled "Statement of

23    Nonaffiliation for Reporting or Nonreporting Issuers."

24        In your business as a transfer agent, what is a

09:56:03    25    statement of nonaffiliation?

1   A.   It's a statement from one of the shareholders or the debt

2   holder that states that they are not an affiliate of the

3   company.

4   Q.   What's your understanding of an affiliate?

09:56:20   5   A.   An affiliate is an officer or director of the company or a

6   10 percent shareholder who is an affiliate by share

7   percentage.

8   Q.   In your work as a transfer agent, does it matter if the

9   person is an affiliate?

09:56:36   10   A.   Yes.

11   Q.   Why?

12   A.   Because they have to report their sale to the Commission.

13   Q.   The SEC?

14   A.   Yes.

09:56:45   15   Q.   Does it also matter for whether shares can be issued as

16   free trading?

17   A.   Yes.

18   Q.   Is it easier to get free-trading shares if you're not an

19   affiliate?

09:57:05   20   A.   Yes.

21   Q.   So this particular statement -- if you knew on a statement

22   like -- I don't want to talk about this one in particular.

23   Let's just talk in general.

24          If you knew a statement of nonaffiliation had a

09:57:23   25   forged signature on it, would you proceed with issuing the

1    free-trading shares?

2    A.  No.

3    Q.  If you knew that a statement of nonaffiliation -- the

4    signature on it had been cut and pasted out of some other

09:57:38    5    document, put on the statement of nonaffiliation without the

6    permission of the person whose name was on it, would you

7    proceed to issue free-trading shares?

8    A.  No.

9            MR. HEIMANN:  Let's look at 27.2.

09:57:52    10    BY MR. HEIMANN:

11    Q.  So this is entitled "Certificate Transaction Journal,"

12    upper left corner, for -- and it's NuTech Energy Resources,

13    Inc.

14            What's shown on this record?

09:58:22    15    A.  It's a transaction journal of the shares that have been

16    issued, who the shareholders are, the number of the

17    certificates, and the amount of shares that were issued to

18    these shareholders.

19    Q.  You testified at the beginning that Pacific Stock Transfer

09:58:42    20    keeps records for companies.  Is this a kind of record Pacific

21    Stock Transfer will keep for a company?

22    A.  Yes.

23    Q.  So when were these -- when were the shares shown on this

24    record issued?

09:58:59    25    A.  On September 28th of 2015.

19-CR-26-ABJ        CLAIBORNE - DIRECT - HEIMANN        Vol. VI-792
21-CR-14-ABJ

1   Q.  And we see that in the transaction date in the upper right

2   corner?

3   A.  Yes.

4   Q.  And there are -- there are columns here.  Starting on the

09:59:14   5   left, the "Registration" column, what's shown in that column?

6   A.  That's the name and address of the registered shareholder.

7   Q.  That's the name that goes onto the certificate?

8   A.  Yes.

9   Q.  There's a "C-e-r-t-i-f. N-o." column -- looks like

09:59:34   10   two sets of numbers.

11           What's that column show?

12   A.  The class of stock and the certificate number.

13   Q.  So in this particular document, let's look at Bravo 20 --

14   that entry -- Partners.

09:59:54   15           Do you see that, Bravo 20?

16   A.  Yes.

17   Q.  If we go across, "CS1," what does that stand for?

18   A.  "Common shares."

19   Q.  So that's whether it's a common stock or preferred, for

10:00:05   20   example?

21   A.  Correct.

22   Q.  Then there's a number, "4533" -- there's actually four

23   numbers in a row.  What are those?

24   A.  That's the certificate number.

10:00:14   25   Q.  That's printed on the certificate?

1   A.   Yes.

2   Q.   And then all the way over, under "Issued," it looks like

3   250 million in that column for Bravo 20 Partners.

4          What does that indicate?

10:00:31   5   A.   It indicates 250 million shares.

6   Q.   So that particular certificate had 250 million shares?

7   A.   Yes.

8   Q.   So let -- let me be clear.

9          There's a Certificate 4533 --

10:00:50   10          MR. HEIMANN:  Let's actually magnify, then, the entry

11   for Bravo Two Zero.

12   BY MR. HEIMANN:

13   Q.   Can you see that on the screen?

14   A.   250 million.

10:01:08   15   Q.   And that's Certificate No. 4533?

16   A.   Correct.

17   Q.   The fact that there's four certificates listed here for

18   this one -- what did you call it again?  Under "Registration."

19          It was the --

10:01:18   20   A.   The shareholder?

21   Q.   -- shareholder.  Thank you.  I'm surprised I forgot that

22   but I did.

23          So because there's four listed in the -- across from

24   the shareholder, those are four separate certificates,

10:01:33   25   250 million shares on each certificate?

```
           19-CR-26-ABJ       CLAIBORNE - DIRECT - HEIMANN       Vol. VI-794
           21-CR-14-ABJ
```

             1   A.  Correct.

             2   Q.  So 1 billion shares were issued of NuTech to Bravo

             3   Two Zero Partners on September 28th of 2015?

             4   A.  Correct.

10:01:49     5   Q.  Similarly, if we look at any of the rows going across for

             6   "Shareholder," we could determine how many shares they were

             7   issued that day?

             8   A.  That is correct.

             9         MR. HEIMANN:  We can go back to the page.

10:02:00    10   BY MR. HEIMANN:

            11   Q.  Looking at this document on its face, can you tell if

            12   these are free trading or restricted?

            13   A.  They're free trading.

            14   Q.  How do you know?

10:02:14    15   A.  I believe but I don't quite remember -- we don't use this

            16   transaction journal anymore -- that there may have been an

            17   asterisk that would -- that would designate that these were

            18   restricted shares.

            19   Q.  So back in 2015 this system would indicate with an

10:02:36    20   asterisk, perhaps, or some other symbol whether it was free

            21   trading or not?

            22   A.  Correct.

            23   Q.  And you remember the system well enough to know these are

            24   free trading?

10:02:46    25   A.  Correct.  I do.

19-CR-26-ABJ        CLAIBORNE - DIRECT - HEIMANN        Vol. VI-795
21-CR-14-ABJ

1        MR. HEIMANN:  Let's go to page 2 of this.

2   BY MR. HEIMANN:

3   Q.  All right.  So this is page 2.  We know that if we look in

4   the upper right, "page 2 of 2."

10:03:08   5        And how many shares, total, were issued to these

6   listed shareholders on September 28th of 2015?

7   A.  13,035,060,000 shares.

8   Q.  And we see that number because that's underneath the

9   "Issued" column at the bottom there; right?

10:03:32   10   A.  Correct.

11        MR. HEIMANN:  Okay.  And let's go one more page.

12   BY MR. HEIMANN:

13   Q.  What do we see here?

14   A.  This is a made-available log sheet.

10:03:48   15   Q.  And what does a made-available log sheet indicate?

16   A.  That the transaction has been completed.  It gives the

17   transaction number, the date that it was completed, how the

18   shares were delivered -- FedEx -- the FedEx tracking number,

19   and where the shares were sent to.  And the certificates that

10:04:15   20   would be in that package.

21   Q.  Okay.  So the certificate numbers are at the far bottom?

22   A.  Correct.

23   Q.  And this was sent to Justin Herman?

24   A.  Correct.

10:04:25   25   Q.  There's a "JC" here, "Assigned To."

1            Does that indicate it was you who did this packet?

2   A.  Yes.  Those are my initials.

3   Q.  Okay.  And at the top, does that indicate when the request

4   was made?

10:04:45  5   A.  Yes.

6   Q.  How it was received?

7   A.  Yes.

8   Q.  And it looks like "Contents:  Free-Trading T" -- is it

9   "TI" or "T1"?

10:04:52  10   A.  "TI," "treasury issuance."

11   Q.  Does that indicate it was a request for free-trading

12   shares?

13   A.  Yes.

14            MR. HEIMANN:  May I have a moment, Your Honor.

10:05:06  15            THE COURT:  You may.

16        (Discussion held at counsel table.)

17   BY MR. HEIMANN:

18   Q.  When shares are issued, that's actually a physical

19   certificate; right?

10:05:41  20   A.  Yes.

21   Q.  As the transfer agent, do you sign them?

22   A.  Yes.

23   Q.  Why is that?

24   A.  All certificates that are printed, in order for them to be

10:05:51  25   valid, must be countersigned by a transfer agent.

19-CR-26-ABJ          CLAIBORNE - CROSS - FLEENER          Vol. VI-797
21-CR-14-ABJ

1  Q.  Very good.

2          MR. HEIMANN:  I have no other questions on direct.

3          THE COURT:  Thank you.

4          Ladies and gentlemen, we'll take our midmorning break

10:06:06  5  at this time.  We'll stand in recess for 15 minutes.

6          THE COURTROOM DEPUTY:  All rise.

7      (A recess was taken from 10:06 a.m. to 10:23 a.m.

8  Proceedings outside the jury's presence.)

9          THE COURTROOM DEPUTY:  Court is now in session.

10:25:30  10    (Proceedings within the jury's presence at 10:25 a.m.)

11          THE COURT:  Thank you, ladies and gentlemen.  Please

12  be seated.

13          MR. FLEENER:  Ms. Claiborne, good morning, ma'am.

14  How are you?

10:26:18  15          THE WITNESS:  Good morning.

16          MR. FLEENER:  You can take your mask off, at least.

17          Thank you very much.

18                        CROSS-EXAMINATION

19  BY MR. FLEENER:

10:26:23  20  Q.  And is your last name -- it's Claiborne?

21  A.  Yes.

22  Q.  Like C-l-a-i-b-o-r-n-e?

23  A.  Yes.

24  Q.  Okay.  Ma'am, my name is Tom Fleener.  I'm a lawyer from

10:26:33  25  Wyoming here.  I represent Justin Herman.

1              How are you, ma'am?

2    A.   Fine.

3    Q.   Do you -- do you live in -- you live in Las Vegas now?

4    A.   Henderson.

10:26:41   5    Q.   I'm sorry?

6    A.   Henderson, Nevada.

7    Q.   Henderson.  I'm sorry.  Outside of Vegas?

8    A.   Yes.

9    Q.   And that's where Pacific Stock Transfer's located,

10:26:50   10   Las Vegas?

11   A.   Yes.

12   Q.   Can you do me a favor?  Is there a microphone you can pull

13   a little bit close -- are you wearing a microphone or --

14   A.   Yes.

10:27:36   15   Q.   And we'll just test it.

16              How far is Henderson from Las Vegas?

17   A.   Across the street.

18   Q.   Across the street?

19   A.   Yes.

10:27:41   20   Q.   Okay.  Thank you, ma'am.

21              Do me a favor and try to speak just a little bit

22   louder into the microphone if you don't mind.

23              And that's fine.  You may need to hold it up.  Thank

24   you, ma'am.

10:27:51   25              Your name is Joslyn Claiborne?

1    A.  Yes.

2    Q.  Much better.  Thank you, ma'am.

3         The -- I -- one of your -- a lot of your testimony

4    was -- was fairly technical.

10:28:06    5         You're not an attorney; correct?

6    A.  Correct.

7    Q.  Do you have -- and I don't know the answer to this.

8         Do you have an in-house attorney at Pacific Stock

9    Transfer?  Do you have one?

10:28:16    10    A.  Yes.

11    Q.  Okay.  How many attorneys do you have in your office?  Is

12    it one or is it more?

13    A.  None.

14    Q.  You -- oh, you have zero?

10:28:24    15    A.  Zero.

16    Q.  Okay.  I thought -- I'm sorry.  I thought you said you

17    had one.

18    A.  We --

19    Q.  I -- do you work with attorneys at Pacific Stock Transfer?

10:28:30    20    A.  Yes.

21    Q.  So -- and I'm not talking about the attorneys for the --

22    the -- the folks -- not -- I'm not talking about attorneys for

23    your clients.

24         I'm talking about the -- like does Pacific Stock

10:28:42    25    Transfer have its own attorneys?

1    A.  Yes.

2    Q.  Okay.  Do -- do they get involved with -- when you guys

3    have securities law issues that -- that you and the other

4    folks don't understand necessarily?

10:29:00    5    A.  Yes.

6    Q.  And -- because you would agree, would you not, that some

7    of this stuff is -- is highly complicated and -- and

8    intricate?

9    A.  Yes.

10:29:10    10    Q.  And detailed?

11    A.  Yes.

12    Q.  And . . . I mean, for instance, there are -- there are

13    different provisions of securities law that you can receive

14    exemptions for filing requirements; correct?

10:29:28    15    A.  Yes.

16    Q.  But you -- you spoke to Rule 144; correct?

17    A.  Yes.

18    Q.  But there's also like a Rule 4(a)(1) point -- or excuse

19    me.  4(a)(1) is a different issue -- or a different area of

10:29:42    20    securities law that also provides an exemption; correct?

21    A.  Yes.

22    Q.  And if you have questions about the various applications

23    of securities law, you try to talk to your lawyers to make

24    sure you're giving the correct information out?

10:29:59    25    A.  Yes.

```
19-CR-26-ABJ        CLAIBORNE - CROSS - FLEENER        Vol. VI-801
21-CR-14-ABJ
```

1  Q.  And you testified, I think on direct -- I just want to

2  make -- make it -- make sure it's clear.

3          Specifically in this case you dealt with

4  Justin Herman; correct?

10:30:15  5  A.  Yes.

6  Q.  Did you deal with anybody else regarding taking NuTech

7  public, or is it just Justin?

8          To the best of your recollection.

9  A.  I don't understand.

10:30:25  10  Q.  Did you deal with anybody else involving this company

11  other than Mr. Herman?

12  A.  No.

13  Q.  Okay.  And you would agree, would you not -- well, you saw

14  that -- you've seen a couple different emails -- right? --

10:30:40  15  between you and Mr. Herman where you're asking for things and

16  he's providing you things?  Correct?

17  A.  Yes.

18  Q.  And -- and I think Mr. Heimann showed you a few of these

19  emails today.  Correct?

10:30:50  20  A.  Yes.

21  Q.  The truth is -- is that you also had many phone

22  conversations with Mr. Herman; correct?

23  A.  Yes.

24  Q.  And, in fact, it's not uncommon for -- well, let me -- let

10:31:05  25  me break down this next set of questions.

19-CR-26-ABJ          CLAIBORNE - CROSS - FLEENER          Vol. VI-802
21-CR-14-ABJ

1       First of all, in general, dealing with -- with --

2  I'm -- I'm asking a too-terrible question, so I'm going to

3  start over.

4       What do you call the folks that you deal with, people

10:31:24    5  like the -- like NuTech Energy, people that are trying to take

6  their companies public?  Are they clients of yours?  Are they

7  customers?  What do you refer to them as?

8  A.  Issuers.

9  Q.  Issuers.  Thank you.  That was my -- that was a question

10:31:38   10  I had.

11       Okay.  When you're -- when you're dealing with just

12  issuers in general, folks who are trying to take their

13  companies public and make their shares free trading --

14       MR. HEIMANN:  Your Honor, I object.

10:31:51   15       Counsel keeps saying "take their company public."

16  That's not what the testimony was.  Mischaracterizing prior

17  testimony.

18       MR. FLEENER:  I'll rephrase.

19       THE COURT:  Uh-huh.

10:32:02   20  BY MR. FLEENER:

21  Q.  When you are --

22       THE COURT:  Proceed.

23  BY MR. FLEENER:

24  Q.  When you're dealing with issuers who are wanting you to

10:32:12   25  work with -- work with them to make their shares, for

19-CR-26-ABJ          CLAIBORNE - CROSS - FLEENER          Vol. VI-803
21-CR-14-ABJ

1    instance, free trading, it's not uncommon for you to have

2    back-and-forth conversations with the issuers where you're

3    telling them things that you need, things they need to do

4    differently, things that their opinion letters need to say;

5    correct?  That's common?

6    A.  Correct.

7    Q.  And that was what happened with Mr. Herman's case, as

8    well; correct?

9    A.  Correct.

10   Q.  I mean, you had conversations with Mr. Herman?  You had

11   emails with Mr. Herman where you were telling him what Pacific

12   Stock Transfer needed and he was trying to comply with what --

13   your emails and requests; correct?

14   A.  Correct.

15   Q.  And it's not uncommon -- I mean, one of the emails that

16   I believe Mr. Heimann showed you spoke -- it -- it talked

17   about things that you wanted the attorney opinion letter

18   to say.

19        Do you remember that email?

20   A.  Yes.

21   Q.  And that's -- and that was an email that you sent to

22   Mr. -- Mr. Herman; correct?

23   A.  Yes.

24   Q.  Telling him that "We need the attorney opinion letter to

25   address" -- you know -- these three or four things, whatever

19-CR-26-ABJ          CLAIBORNE - CROSS - FLEENER          Vol. VI-804
21-CR-14-ABJ

1    you put in there.  Right?

2    A.  Yes.

3    Q.  And that's not uncommon to do -- to do with your issuers,

4    as well; right?

10:33:43    5          For you to sit down and tell them what issues the

6    attorney opinion letters need to address.  In general.

7          You've done that before with other issuers?

8    A.  Correct.

9    Q.  And so it's not uncommon, is it, for you to get different

10:33:59   10   versions of attorney opinion letters, a first one and then

11   maybe a second one that addresses your concerns and then maybe

12   a third one that addresses all the concerns?  That's not

13   uncommon?

14   A.  Correct.

10:34:19   15          MR. FLEENER:  May I have a second, Judge.

16          THE COURT:  Yes, you may.

17      (Discussion held at counsel table.)

18          MR. FLEENER:  I have no further questions.

19   Thank you.

10:34:36   20          THE COURT:  Thank you.

21          MR. FLEENER:  Mr. -- these other two may, though,

22   ma'am.  Hold on.

23          THE COURT:  We'll hold on.

24          MR. WARD:  No questions, Your Honor.

10:34:48   25          MR. JUBIN:  Good morning, Ms. Claiborne.  My name is

19-CR-26-ABJ          CLAIBORNE - CROSS - JUBIN          Vol. VI-805
21-CR-14-ABJ

 1   Tom Jubin.  I'm a lawyer here and I'm representing Ian Horn,

 2   who sits over here.

 3              THE WITNESS:  Hi.

 4              MR. JUBIN:  I just have a few questions for you.

 5              Could you pull up 17, please?

 6                      **CROSS-EXAMINATION**

 7   **BY MR. JUBIN:**

 8   Q.  This is that email that you sent to Justin Herman

 9   requesting additional information.  Do you recall looking at

10   this earlier this morning?

11   A.  Yes.

12   Q.  Now, one of the things you asked for here is -- in that

13   second paragraph -- is the recipient, Ian Horn's, receipt of

14   the -- of the funds; right?

15   A.  Yes.

16   Q.  And the reason you asked for that is because you'd

17   received documents indicating that there had been this wire

18   transfer from Bravo Two Partners to Ian Horn, and so you

19   wanted to verify that he got that money; right?

20   A.  Yes.

21   Q.  And so you asked for Ian Horn's bank statement?

22   A.  Yes.

23   Q.  But you didn't get Ian Horn's bank statement; right?

24              Instead -- well, first of all, let me ask this:  You

25   don't know what efforts, successful or unsuccessful, Justin

10:35:16 (line 5)
10:35:35 (line 10)
10:36:05 (line 15)
10:36:24 (line 20)
10:36:38 (line 25)

```
19-CR-26-ABJ          CLAIBORNE - CROSS - JUBIN          Vol. VI-806
21-CR-14-ABJ
```

1    Herman might have made to get Ian Horn's bank statement;

2    right?

3    A.   I'm sorry?

4    Q.   Do you know what efforts Justin Herman made to get

10:36:53    5    Ian Horn's bank statement?

6    A.   No.

7    Q.   Okay.  So you don't know if he tried or didn't try;

8    correct?

9    A.   Correct.

10:36:59    10    Q.   All you know is that what you got, instead, was --

11          MR. JUBIN:  Let's take a look at 18.3.

12          We'll scroll back to where the arrow is.

13    BY MR. JUBIN:

14    Q.   -- this document, showing the $280,000 was wired out of an

10:37:22    15    account belonging to --

16          MR. JUBIN:  Let's go to the top.

17    BY MR. JUBIN:

18    Q.   -- Bravo Two Zero Partners; right?

19    A.   Yes.

10:37:33    20    Q.   So you didn't get what you asked for exactly, but you got

21    some evidence of this transaction from Justin Herman; right?

22    A.   Yes.

23    Q.   And was that sufficient to satisfy you?

24    A.   Yes.

10:37:42    25    Q.   Okay.  The Government's asked you a series of questions

19-CR-26-ABJ          CLAIBORNE - CROSS - JUBIN          Vol. VI-807
21-CR-14-ABJ

1    about whether you would have gone forward if you knew certain

2    signatures were forged or falsified.

3             Do you recall those questions?

4    A.  Yes.

5    Q.  If you knew that the signature of an attorney on an

6    opinion letter had been forged and applied without authority,

7    would you have gone forward then?

8    A.  No.

9             MR. JUBIN:  Thank you.  Nothing further.

10            Thank you, Ms. Claiborne.

11            THE WITNESS:  Okay.

12            MR. HEIMANN:  No redirect, Your Honor.

13            THE COURT:  Do you wish this witness to be excused?

14            MR. HEIMANN:  I do, Your Honor.

15            THE COURT:  Ms. Claiborne, you're excused to return

16   to Henderson, Nevada.

17            THE WITNESS:  Thank you.

18            MR. HEIMANN:  The United States of America calls

19   Charles "Bo" Ives.

20            THE COURTROOM DEPUTY:  Please raise your right hand.

21       (Witness sworn.)

22            THE COURTROOM DEPUTY:  Please take a seat.

23            Please state and spell your name for the record.

24            THE WITNESS:  Charles Ives, C-h-a-r-l-e-s I-v-e-s.

25   ///

10:37:58 (line 5)
10:38:16 (line 10)
10:38:33 (line 15)
10:39:38 (line 20)

1    CHARLES IVES, GOVERNMENT'S WITNESS, DIRECT EXAMINATION

2    BY MR. HEIMANN:

3    Q.  Mr. Ives, do you go by "Bo"?

4    A.  It's a nickname but yes, sir.

10:40:23    5    Q.  B-o?

6    A.  Yes, sir.

7    Q.  How old are you?

8    A.  45.

9    Q.  Where were you born and raised?

10:40:29    10    A.  I was born in Perryton, Texas, and raised in several

11    places in -- in Texas.

12    Q.  Where do you live now?

13    A.  Murray, Kentucky.

14    Q.  What is the highest level of education you have obtained?

10:40:41    15    A.  A bachelor's in accounting.

16    Q.  Where did you go to school?

17    A.  University of Phoenix.

18    Q.  Where are you employed?

19    A.  Kingdom Trust Company.

10:40:51    20    Q.  What's your position there?

21    A.  Currently?

22    Q.  Yes.

23    A.  Copresident.

24    Q.  How long have you been -- how long have you worked for

10:41:01    25    Kingdom Trust Company?

19-CR-26-ABJ          IVES - DIRECT - HEIMANN          Vol. VI-809
21-CR-14-ABJ

1   A.   12 years.

2   Q.   What is Kingdom Trust's business?

3   A.   It's a directed custodian for alternative assets into --

4   inside of predominantly retirement accounts, but we hold any

10:41:15   5   custodial accounts, taxable accounts.  But we'll hold

6   alternative assets.

7   Q.   When you say "alternative assets," what do you mean?

8   A.   Private notes, private stocks, real estate, precious

9   metals, things like that.

10:41:29   10   Q.   So like gold bars, for example?

11   A.   Yes, sir.

12   Q.   You said "directed custodian."  Do you hold these assets

13   in retirement accounts?

14   A.   Predominantly, yes, sir.

10:41:44   15   Q.   So it's like a 401(k) but it's one of these less usual

16   assets?  I'm sorry, not a 401(k).  Like an IRA?

17   A.   It's like an IRA, yes.  But usually assets that you

18   couldn't buy at a Fidelity or Schwab.

19   Q.   The other part of your business -- you said "taxable,"

10:42:08   20   I think.

21        The nonretirement account part of your business,

22   describe that.

23   A.   It operates the same.

24        It's just not a retirement account.

10:42:18   25        It's a custodial account, can be in the name of a

19-CR-26-ABJ            IVES - DIRECT - HEIMANN         Vol. VI-810
21-CR-14-ABJ

1   company or an institution.

2   Q.   Okay.  Does it have to be in the name of a company or

3   institution?

4   A.   It doesn't have to be.

10:42:26    5   Q.   Okay.  The retirement accounts, though, have to be in the

6   name of an individual?

7   A.   They would.

8   Q.   Does Kingdom Trust hold stock certificates for its

9   clients?

10:42:41   10   A.   We do.

11   Q.   When a client brings you a stock certificate and it has a

12   restrictive legend on it, what do you do with it?

13   A.   Put it in a vault for safekeeping.

14   Q.   What do you -- when I say "restrictive legend," what's

10:42:59   15   your understanding of that?

16   A.   Restrictive stock usually has a -- a stamp on it letting

17   you know that it's restricted.

18   Q.   So you get the actual piece of paper from your client and

19   it's got a restricted stamp, you put it in the vault?

10:43:14   20   A.   Yes, sir.

21   Q.   If you get a stock certificate and it's not restricted,

22   what do you do with it then?

23   A.   Kingdom uses a -- what's called a subcustodian.  And we'll

24   send it off to them for -- to be deposited into our omnibus

10:43:30   25   account so that it goes -- what's known as -- called book

```
19-CR-26-ABJ        IVES - DIRECT - HEIMANN        Vol. VI-811
21-CR-14-ABJ
```

1    entry form.

2         You send it off, deposit it into a firm called DTC,

3    which is a transfer agent.

4    Q.  Why is it important to get it into book entry form?

10:43:43  5    A.  It's easier to execute trades and move to -- from us to a

6    Fidelity or a Schwab.

7    Q.  Why does Kingdom Trust use a subcustodian rather than go

8    directly to DTC to get book entry for your clients?

9    A.  We're not a direct DTC participant.

10:44:02  10   Q.  Why not?

11   A.  The cost involved.

12   Q.  So you go to the subcustodian; they put it in book entry?

13   A.  Yes, sir.

14   Q.  In 2015 who was Kingdom Trust's subcustodian?

10:44:16  15   A.  2015.

16         We've used a few.  I think 2015 would have been

17   either Fifth Third or Northern Trust.

18   Q.  Either way, it would work the same?

19   A.  Yes, sir.

10:44:27  20   Q.  Does Kingdom Trust act as a broker-dealer when your

21   clients want to sell shares of certificates that you have in

22   custody?

23   A.  No, sir.  We're not a broker-dealer.

24   Q.  So if a client wants to sell shares, what do they do?

10:44:44  25   A.  You have to execute that through a firm.  So like we would

19-CR-26-ABJ          IVES - DIRECT - HEIMANN          Vol. VI-812
21-CR-14-ABJ

 1    use a subcustodian, or they may have a relationship, depending

 2    on if they have a firm that could execute the trade.

 3    Q.  When you say "a firm," you mean a broker-dealer?

 4    A.  Yes, sir.

10:44:59
 5    Q.  In 2015 did Kingdom Trust have a relationship with a

 6    particular broker-dealer?

 7    A.  Yes, sir.

 8    Q.  Who was that?

 9    A.  FinTech.

10:45:09
10    Q.  So if a client wanted to sell some of the shares from a

11    certificate that was in your custody, your company's custody,

12    they could use FinTech to make that sale?

13    A.  They could.

14    Q.  If they make that sale, what process was used to figure

10:45:31
15    out which client had sold it and to keep track of what account

16    any proceeds should go to?

17    A.  Well, Kingdom has a record-keeping system that we utilize.

18         So as the certificate or the assets are sent into the

19    account, they're keyed into that account, and then the client

10:45:51
20    or the account-designated representative would instruct us

21    which account to execute the trade out of.

22    Q.  If a client has an institutional account, are they allowed

23    to withdraw portions of that account, whether proceeds from

24    sales or the assets itself -- themselves?

10:46:12
25    A.  Yes, sir.

```
19-CR-26-ABJ         IVES - DIRECT - HEIMANN         Vol. VI-813
21-CR-14-ABJ
```

1    Q.  How would a client do that?

2    A.  Would either send us an email or we have a form they could

3    use, either/or.

4    Q.  Do some of your clients ask you to custody penny stocks or

10:46:44    5    stocks sold through OTC?

6    A.  Yes, sir.

7    Q.  Is that a big part of your business?

8    A.  No, sir.

9            MR. HEIMANN:  Your Honor, that's all I have.

10:47:06   10            MR. FLEENER:  No questions for Mr. Herman, sir.

11            MR. WARD:  No questions.

12            MR. JUBIN:  I have no questions.  Thank you,

13    Your Honor.

14            MR. HEIMANN:  This witness may be excused,

10:47:17   15    Your Honor.

16            THE COURT:  Mr. Ives, you are excused.

17            THE WITNESS:  Thank you.

18            MR. HEIMANN:  The United States of America calls

19    Kevin Trizna.

10:48:39   20        (Witness sworn.)

21            THE COURTROOM DEPUTY:  Please take a seat.

22            Please state and spell your name for the record.

23            THE WITNESS:  Kevin Trizna, Sr., K-e-v-i-n

24    T-r-i-z-n-a.

25    ///

 1    **KEVIN TRIZNA, SR., GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

 2    **BY MR. HEIMANN:**

 3    Q.   Mr. Trizna, how old are you?

 4    A.   56.

10:49:27   5    Q.   Where were you born and raised?

 6    A.   I was born in Iowa and I was raised in Virginia.

 7    Q.   Where do you live now?

 8    A.   I live in Parker, Colorado.

 9    Q.   What's the highest level of education you have obtained?

10:49:40  10    A.   I have a bachelor's of science in hotel and restaurant

11    management.

12    Q.   From what university?

13    A.   Virginia Tech.

14    Q.   How are you employed?

10:49:51  15    A.   I'm self-employed.

16    Q.   In what business?

17    A.   The roofing business.

18    Q.   How long have you been self-employed in the roofing

19    business?

10:49:59  20    A.   Since 1991.

21    Q.   Have you ever worked as a stockbroker?

22    A.   Yes.

23    Q.   When?

24    A.   As soon as I got out of college in 1988.

10:50:10  25    Q.   For how long?

```
19-CR-26-ABJ        TRIZNA - DIRECT - HEIMANN        Vol. VI-815
21-CR-14-ABJ
```

1   A.  About two months.

2   Q.  Why did you leave so quickly?

3   A.  That industry wasn't for me, or at least the company I was

4   working for.  We didn't see eye to eye.

10:50:26   5   Q.  Are you familiar with a man named Bob Mitchell?

6   A.  Yes.

7   Q.  When did you meet Mr. Mitchell?

8   A.  I met him in 2000- and -- I believe it was '14.

9   Q.  How did you meet him?

10:50:42   10   A.  I met him through his twin brother; his twin brother

11   worked for me.

12   Q.  In your roofing company?

13   A.  Yes.

14   Q.  Did Mr. Mitchell ask you to invest in a natural gas

10:50:58   15   venture?

16   A.  Yes.

17   Q.  Did you invest?

18   A.  Yes, I did.

19   Q.  When did you make your first investment?

10:51:10   20   A.  I believe it was shortly after I met -- met him, maybe a

21   few months after that.

22   Q.  Did you periodically -- did he -- let me start over.

23       Did Mr. Mitchell periodically come back to you and

24   ask for more money?

10:51:23   25   A.  Yes.

19-CR-26-ABJ            TRIZNA - DIRECT - HEIMANN            Vol. VI-816
21-CR-14-ABJ

1   Q.  How much money did you invest with Mr. Mitchell?

2   A.  The total was about 200,000.

3   Q.  How much did you lose?

4   A.  All of it.

10:51:36   5   Q.  The natural gas venture, did it have different company

6   names attached to it over time?

7   A.  Yes.

8   Q.  What company names do you remember?

9   A.  I remember a company called CHAMA.  There was

10:51:59   10   EcoEmissions.  There was one -- I think Black Diamond.  And

11   then NuTech.

12   Q.  According to Mr. Mitchell, how were you going to make

13   money off your investments?

14   A.  Once the company got up and running -- we all were given

10:52:18   15   shares for the money that we put in, and then, when those

16   shares became available to sell, that's where we would make

17   our money.

18   Q.  That's what Mitchell told you?

19   A.  Yes.

10:52:28   20   Q.  You say "we."  Did you know other investors with

21   Mr. Mitchell?

22   A.  I knew there were some.  I didn't personally meet any of

23   them.

24   Q.  Okay.  Did you receive any stock certificates from

10:52:42   25   Mr. Mitchell?

1    A.   Yes.

2    Q.   For what companies?

3    A.   I believe the first one was from the company called CHAMA.

4    Q.   Did you get a second one?

10:52:52    5    A.   No.

6    Q.   Did you have any shares in EcoEmissions, for example?

7    A.   I think they converted over every time there was a change

8    in company.  But I never received any.

9    Q.   You don't remember getting a certificate?

10:53:07    10    A.   No.

11    Q.   And I should be clearer about my question.

12           You don't remember getting a certificate for

13    EcoEmissions?

14    A.   Correct.

10:53:14    15    Q.   Your CHAMA certificate, was it restricted?

16    A.   I believe so, yes.

17    Q.   So your understanding was you just go to a broker-dealer

18    and sell it?

19    A.   Correct.

10:53:30    20    Q.   Did you ever attempt to lift the restriction?

21    A.   No.

22    Q.   Why not?

23    A.   Because I think the way that the money would be made is

24    the company had to be operational and then the value of the

10:53:46    25    stock would be worth so much more money.

1  Q.  And there was never an operational company?

2  A.  No.

3  Q.  Did Mr. Mitchell ask you to be the chief executive officer

4  of a company called NuTech Energy Resources?

10:54:07  5  A.  Yes.

6  Q.  When did he do that?

7  A.  That was probably within the year that I first invested.

8  Q.  So you testified earlier your first investment was in

9  2014, you thought?

10:54:22  10  A.  Uh-huh.  Yes, sir.

11  Q.  So sometime in 2015?

12  A.  Correct.

13  Q.  Why did Bob Mitchell ask you to be CEO of NuTech?

14  A.  Because he needed somebody that could present a good image

10:54:41  15  and have somebody that he could trust in making things happen.

16  Q.  At this time did you have any experience in the oil or gas

17  business?

18  A.  No.

19  Q.  Did Mr. Mitchell know that?

10:54:55  20  A.  Yes.

21  Q.  What were your duties going to be?

22  A.  Nothing other than maybe signing some documents to get the

23  company to proceed the way he wanted it.

24  Q.  Were you going to make decisions for NuTech?

10:55:13  25  A.  No.

1    Q.  Were you going to manage the company?

2    A.  No.

3    Q.  So you were going to be -- well, let me put it this way:

4    Was it your understanding that Mr. Mitchell wanted to use your

10:55:35    5    name as CEO while he continued to control the company?

6    A.  Yes.

7    Q.  Did Mr. Mitchell tell you why he needed to use your name?

8              MR. FLEENER:  Hearsay.

9              MR. HEIMANN:  Effect on the hearer, Your Honor.

10:55:56    10             THE COURT:  Pardon me?

11             MR. HEIMANN:  Nonhearsay purpose, Your Honor, effect

12   on the hearer.

13             THE COURT:  I'd caution the jury the statements that

14   are being referred to are not received for any truth or as

10:56:11   15   evidence of truth but simply as -- on how that affected this

16   person who heard the statement.

17   BY MR. HEIMANN:

18   Q.  So I'll ask you the question again.

19             Did Mr. Mitchell tell you why he needed to use your

10:56:41   20   name?

21   A.  In a roundabout way, yes.

22   Q.  What did he tell you?

23   A.  He had talked to -- or spoke about some situation in

24   the -- I think -- the late '80s or early '90s where he got

10:57:04   25   involved in a mess -- I guess is the best way to put it --

 1   with the securities industry.  And as a result, couldn't hold

 2   any position of being a director of any company.

 3   Q.  Why did you agree to let Mr. Mitchell use your name as the

 4   CEO of NuTech when you weren't really the CEO?

 5   A.  Well, it was a -- it was an opportunity for me to be

 6   involved in what I thought was maybe a once-in-a-lifetime

 7   opportunity.  And being in that position, I would be able to

 8   be very closely tied with what was going on and understanding

 9   what was happening.

10   Q.  Were you concerned about your investment?

11   A.  Not necessarily because I -- from what they laid out -- or

12   Bob laid out -- it made perfectly good sense and was actually

13   excited.

14   Q.  So at the point this happened, you were still hoping to

15   get some return on your investment?

16   A.  Oh, yeah.  Oh, yeah.

17   Q.  Did Bob Mitchell create an email account,

18   kevin@nutechenr.com?

19   A.  Yes.

20   Q.  Did you use that account?

21   A.  No.

22   Q.  Did you have access to it?

23   A.  I think he gave me the password one time.

24   Q.  Did you look at it periodically to see what was going on?

25   A.  Not necessarily.

```
19-CR-26-ABJ        TRIZNA - DIRECT - HEIMANN        Vol. VI-821
21-CR-14-ABJ
```

1    Q.  You knew, though, that Bob Mitchell was using the account?

2    A.  Yes.

3    Q.  When he used the account, was he pretending to be you?

4    A.  Yes.

10:59:19   5          MR. HEIMANN:  Let's look at 34.3.

6    BY MR. HEIMANN:

7    Q.  While that's coming up, I will ask you, do you know if

8    anyone else had access to the kevin@nutechenr.com email

9    account?

10:59:34   10   A.  No.  I think it was just Bob.

11   Q.  So if you look at this document, I want to draw your

12   attention to the telephone number by the text entry.  Do you

13   see that?

14   A.  Yes.

11:00:05   15   Q.  Do you recognize that telephone number?

16   A.  Yes.

17   Q.  Whose is it?

18   A.  That's Bob's.

19   Q.  Bob Mitchell's?

11:00:12   20   A.  Yes, sir.

21          MR. HEIMANN:  Okay.  We can take that down.

22   BY MR. HEIMANN:

23   Q.  Did Bob Mitchell ever pay you any return on your

24   investment?

11:00:21   25   A.  He did give me some money in -- around the holiday time.

1   Q.  Was that in 2014?

2   A.  I believe so, yes.

3   Q.  How much money?

4   A.  It was around 20,000.

11:00:34    5   Q.  Why did he give you that money?

6   A.  Because I was getting a little irritated that he kept

7   making all these promises and -- that money was going to be

8   flowing in.  And so a little bit of me was saying, "Well,

9   produce some money and it will make me feel a little better."

11:00:58   10   Q.  Was this around the same time that you agreed to let him

11   use your name as CEO?

12   A.  Yes.

13   Q.  Was -- was it before or after the agreement?

14   A.  This, I believe, was after the agreement.

11:01:11   15   Q.  Okay.  In December of 2014 did Bob Mitchell ask you to

16   wire $20,000 to a man named Ian Horn?

17   A.  Yes.

18   Q.  How long after he had given you the 20,000 did he ask you

19   then to wire 20,000 to Mr. Horn?

11:01:36   20   A.  I think it was probably within a week or so.  It wasn't

21   very long.

22   Q.  According to Mr. Mitchell, why did you need to wire

23   $20,000 to Ian Horn?

24   A.  Because Ian Horn was the gentleman taking care of a lot of

11:01:50   25   the legal issues that we had to overcome in order for the

 1   venture to keep moving forward.

 2   Q.  Did you wire $20,000 to Ian Horn?

 3   A.  Yes.

 4   Q.  Who gave you the wire instructions?

11:02:04   5   A.  Bob did.

 6        MR. HEIMANN:  Let's look at Exhibit 8.  And let's go

 7   to page -- well, first, this is an opinion letter dated

 8   May 19th of 2015.

 9        Let's go to page 3.

11:02:47  10        And if we can blow up the table and the first

11   sentence of the paragraph following.  "Blow up" -- magnify,

12   please.

13        Just grab to the bottom, then.  There we go.

14   BY MR. HEIMANN:

11:03:07  15   Q.  Okay.  Do you see where it says "The undersigned"?

16   A.  Yes.

17   Q.  So "The undersigned has made -- undersigned -- has made

18   specific inquiry of each of the persons listed above."  And

19   then the signature block says "Ian Horn"?

11:03:31  20   A.  Uh-huh.  Yes, sir.

21   Q.  You -- you are listed in the table above.  It says

22   "Gillette, Wyoming."

23        Did you ever live in Gillette?

24   A.  No.

11:03:47  25   Q.  Did you ever speak to Mr. Horn about NuTech?

```
            19-CR-26-ABJ      TRIZNA - DIRECT - HEIMANN        Vol. VI-824
            21-CR-14-ABJ
```

1    A.   No.

2    Q.   Ever exchange email with him?

3    A.   No.

4    Q.   There's another name here, Stephen Cummins.

11:04:02    5         Do you know who Stephen Cummins is?

6    A.   No.

7    Q.   Have you ever met him?

8    A.   No.

9    Q.   Did you ever have any meetings with him?

11:04:09    10    A.   No.

11    Q.   You had testified that you had agreed to let your name be

12    used, and you said in your duties as CEO you were going to

13    sign some documents.

14         Did you, in fact, sign documents as NuTech's CEO?

11:04:34    15    A.   Yes.

16    Q.   Who would bring you documents to sign?

17    A.   Bob Mitchell.

18    Q.   All right.  Did you know what these documents were doing?

19    A.   Not specifically, just -- again, in the big picture --

11:04:51    20    house duties, things that need to get taken care of in order

21    for everything to move forward.

22    Q.   Did you sign them when Mr. Mitchell asked you to?

23    A.   Yes.

24    Q.   Did you always sign them in person, in ink?

11:05:11    25    A.   Yes.

---

1    Q.  Did you give Mr. Mitchell a copy like of your digital

2    signature?

3    A.  He asked for it one time, yes.

4    Q.  Did you give it to him?

11:05:20    5    A.  I did.

6         MR. HEIMANN:  Let's look at 10.

7         Go to page 2.

8    BY MR. HEIMANN:

9    Q.  This is entitled "Resolution of Board of Directors of."

11:06:01    10        Does that appear to be your signature?

11    A.  Yes.

12    Q.  Do you remember signing this specific document?

13    A.  I remember signing documents he would bring into the

14    office, yes.

11:06:13    15    Q.  You're not sure if this is one of those documents or not?

16    A.  It could have been, uh-huh.

17        MR. HEIMANN:  Let's magnify that first paragraph.

18    BY MR. HEIMANN:

19    Q.  This first paragraph talks about a meeting of the board of

11:06:33    20    directors of NuTech.  Were there ever any meetings of boards

21    of -- of the board of directors?

22    A.  No.

23    Q.  To your knowledge, were there any other board members?

24    A.  No, just me.

11:06:45    25    Q.  This says "said meeting no less than two directors were

---

19-CR-26-ABJ          TRIZNA - DIRECT - HEIMANN          Vol. VI-826
21-CR-14-ABJ

1    present and voting throughout."

2              So that would be false; right?

3    A.   Correct.

4    Q.   And any resolution on a document like this would be false

11:07:06    5    because there were never any board meetings; right?

6    A.   Correct.

7              MR. FLEENER:  Objection; leading.

8              THE COURT:  Overruled.

9              MR. HEIMANN:  Let's go to Exhibit 414.

11:07:40   10              And let's magnify down through -- from the header

11   down through the paragraph entitled "Public Interest Concern."

12   BY MR. HEIMANN:

13   Q.   Mr. Trizna, on the "To" line of this email it says

14   "kevintrizna@gmail.com."  Do you see that?

11:08:07   15   A.   Yes.

16   Q.   Is that your email account?

17   A.   Yes.

18   Q.   Is that your personal one that you used?

19   A.   Yes.

11:08:12   20   Q.   Do you remember getting this email in January of 2016?

21   A.   No.

22   Q.   There's a -- a CC here, chuck@ichcorp.net.

23              Do you know whose email address that is?

24   A.   I don't know the individual other than his name's Chuck.

11:08:35   25   Q.   Okay.  Well, you don't even know that; right?

```
19-CR-26-ABJ         TRIZNA - DIRECT - HEIMANN         Vol. VI-827
21-CR-14-ABJ
```

1    A.  Right.

2    Q.  It's just the -- it's just the address?

3    A.  Right.

4    Q.  So you don't know whose email address that is?

5    A.  No, I don't.

6    Q.  Do you remember a time when NuTech stock could not be

7    traded?

8    A.  Yes.

9    Q.  Who told you that?

10   A.  Bob and Red.

11   Q.  Red?

12   A.  Luken.

13   Q.  Do you know why the stock couldn't be traded at that time?

14   A.  I believe it had something to do with the unusual activity

15   that was going on with the stock.

16   Q.  According to Bob and Red?

17   A.  Correct.

18   Q.  Was it Bob and Red who said that?  Just Bob?  Just Red?

19   A.  Probably both just because there were lots of

20   conversations.

21   Q.  Did you have to get on the phone around that time to tell

22   somebody that they could talk to Bob Mitchell about NuTech

23   business?

24   A.  Yes.

25   Q.  Do you remember who you were talking to?

11:08:45 (line 5)
11:08:58 (line 10)
11:09:12 (line 15)
11:09:26 (line 20)
11:09:39 (line 25)

 1   A.  I don't remember the name.

 2   Q.  Do you remember what company they were with?

 3   A.  It was somebody in the regulation industry that was going

 4   to help us get that lifted.

11:09:54   5            MR. HEIMANN:  Okay.  Let's go to Exhibit 38.

 6   BY MR. HEIMANN:

 7   Q.  This string of email --

 8            MR. HEIMANN:  And let's go down to page 2.

 9   BY MR. HEIMANN:

11:10:26  10   Q.  So at the very bottom of this page there's an email from

11   kevin@nutechenr.com.  That's the email account we talked about

12   earlier that Bob was using in your name; right?

13   A.  Correct.

14   Q.  "We have a very big issue that's come up."

11:10:46  15            And then the response from a Gareth Colglazier:

16   "Sure thing.  Tomorrow probably works best for me."

17            Were you involved in a meeting with Mr. Colglazier

18   from OTC Markets about an announcement?

19   A.  No.

11:11:08  20            MR. HEIMANN:  Let's go up to the top.

21   BY MR. HEIMANN:

22   Q.  So the parent email here from Kevin -- you didn't send

23   this, did you?

24   A.  No.

11:11:21  25   Q.  "Below is a cut and paste of our announcement."

1          And then there's a -- what appears to be a block of

2     text entitled "NuTech Energy Resources Receives Buyout Offer."

3          Were you involved in writing this press release?

4     A.   No.

11:11:35    5     Q.   Did you appear on a conference call in May of 2016 for

6     NuTech?

7     A.   Yes.

8     Q.   Was there a script for your remarks?

9     A.   Yes.

11:11:55    10    Q.   Who wrote that?

11    A.   Probably Bob.

12    Q.   Did you write it?

13    A.   No.

14    Q.   Did you contribute to it at all?

11:12:06    15    A.   I edited it a little bit on my personal background.

16    Q.   The statements about the company you did not write?

17    A.   No.

18    Q.   Were you concerned about that script when you read it?

19    A.   Yes and no.

11:12:32    20    Q.   Why yes and why no?

21    A.   Well, yes, because -- I was concerned because it seemed

22    like the -- the Russian offer seemed a little -- just odd or

23    off.

24          And then, no, that was the plan all along, was to get

11:12:57    25    this company up and moving.  And that's what we were there for

19-CR-26-ABJ          TRIZNA - DIRECT - HEIMANN          Vol. VI-830
21-CR-14-ABJ

1     so --

2     Q.  Who told you about the Russian offer?

3     A.  Bob.

4     Q.  Did you ever sell any NuTech stock?

11:13:19    5     A.  No.

6     Q.  Did you ever have any to sell?

7     A.  No.

8     Q.  Other than the $20,000 you talked about earlier that you

9     got from Bob shortly before he asked you to send 20,000 to

11:13:34   10     Ian Horn, did you get paid any other money from Bob Mitchell?

11     A.  No.  None.

12     Q.  Did you get paid any money from anyone else for your

13     involvement with NuTech?

14     A.  No.

11:13:45   15     Q.  Did you eventually resign as NuTech's CEO?

16     A.  I did.

17     Q.  When was that?

18     A.  I believe that was shortly after that whole Russian buyout

19     offer.

11:14:01   20     Q.  How did you do it?

21     A.  Well, I had to send myself an email saying I resigned

22     because I was the only board member.

23     Q.  Did you copy anyone else on that email?

24     A.  I think I told Bob about it.

11:14:15   25     Q.  Did you get a response?

1    A.   Yeah.

2    Q.   What was the response?

3    A.   He kind of exploded and got pretty angry.

4    Q.   But you resigned and you were done at that point?

11:14:30    5    A.   That's correct.

6    Q.   When you were acting as NuTech's CEO, did you participate

7    in the creation of any promotional emails for the company?

8    A.   No.

9    Q.   Did you provide quotes that could be used in promotional

11:14:51    10    emails?

11    A.   No.

12    Q.   Was a part of your agreement with Bob Mitchell that he

13    could use your name in promotional emails?

14    A.   We didn't specifically have a conversation about that.  He

11:15:05    15    just would go and do it.

16    Q.   Did you know it was happening?

17    A.   After the announcements came out is kind of when I found

18    out.

19    Q.   Let's -- I want to separate this out.  Promotional emails.

11:15:20    20    Did you know your name was being used in promotional emails?

21    A.   No.

22    Q.   You said when the "announcements came out."  Are you

23    talking about press releases?

24    A.   Yes.

11:15:28    25    Q.   Did you see press releases online for NuTech?

19-CR-26-ABJ          TRIZNA - DIRECT - HEIMANN          Vol. VI-832
21-CR-14-ABJ

1   A.  Yes.

2   Q.  Did some of those press releases include your name and a

3   quote from you?

4   A.  Yes.

11:15:34   5   Q.  Did you write any of those quotes?

6   A.  No.

7   Q.  Were you involved in the writing of any of the press

8   releases?

9   A.  No.

11:15:41   10   Q.  Let's look at one of those.

11          MR. HEIMANN:  Exhibit 30.2.

12   BY MR. HEIMANN:

13   Q.  So the title of this press release, "NuTech Energy

14   Resources, Inc., Acquires Flowpower, LLC, Creator of

11:16:18   15   Revolutionary Green Power Generating Technology, to Generate

16   Additional 15 to 20 Million Dollars in Revenues Per Year"

17   issued on January 29th of 2016.

18          Did you have any involvement in writing or releasing

19   this statement?

11:16:39   20   A.  No.

21   Q.  There's a company here, Flowpower, LLC.  Have you ever

22   heard of that company?

23   A.  No.

24          MR. HEIMANN:  Let's go to page 2.

11:16:57   25          And can we go -- bottom paragraph of page 2, top

1   paragraph of page 3.  Okay.

2   BY MR. HEIMANN:

3   Q.  So do you see where it says, "We are extremely

4   enthusiastic"?

11:17:14   5   A.  Yes.

6   Q.  Is that a quote with your name on it?

7   A.  Yes.

8   Q.  Is that a quote you actually wrote or participated in

9   writing?

11:17:25   10   A.  No.

11   Q.  It talks about "We are taking steps to further lower our

12   overall operating costs."  Do you see that phrase?

13   A.  Yes.

14   Q.  I read it correctly?

11:17:38   15   A.  Yes.

16   Q.  On January 20 -- in January of 2016 did NuTech have any

17   operations at all?

18   A.  No.

19        MR. HEIMANN:  Scroll down to page 3.

11:17:52   20   BY MR. HEIMANN:

21   Q.  Do you see there's that last paragraph -- well, the middle

22   paragraph there, "NuTech Energy Resources has recently

23   announced"?

24        Was there ever a point where you were involved in

11:18:12   25   trying to organize a meeting between NuTech's board of

19-CR-26-ABJ          TRIZNA - DIRECT - HEIMANN          Vol. VI-834
21-CR-14-ABJ

1   directors and its majority shareholders?

2   A.  No.

3   Q.  Was there any effort that you were aware of to list NuTech

4   on Nasdaq?

11:18:26   5   A.  I think Bob mentioned he was working on it.

6   Q.  Was there an advisory board that was supposed to be

7   helping NuTech?

8   A.  Not that I knew of.

9   Q.  Okay.  It talks about financial reports in this paragraph.

11:18:51  10       When you were the named CEO of NuTech, did you ever

11   see a financial report?

12   A.  No.

13   Q.  To your knowledge, were there any revenues?

14   A.  There were none that I knew of.

11:19:05  15   Q.  No operations, no revenue.

16       Did NuTech own pipeline?

17   A.  No.

18   Q.  Did they own any wells?

19   A.  Not that I knew of, no.

11:19:22  20   Q.  So no board of directors except you?

21   A.  Correct.

22   Q.  No advisory board?

23       Did the company have a bank account?

24   A.  They didn't until I pushed to be a little proactive in

11:19:37  25   case we started having revenues.  I opened up a Wells Fargo

19-CR-26-ABJ          TRIZNA - DIRECT - HEIMANN          Vol. VI-835
21-CR-14-ABJ

1   account.

2   Q.  You opened up an account?

3   A.  I think Red and I did, so there were two signers on the

4   account.

11:19:45   5   Q.  Okay.  How much money was ever in that account?

6   A.  I put in 50 bucks.

7   Q.  Any other deposits into that account?

8   A.  No.

9   Q.  Did NuTech have any employees?

11:19:55   10   A.  No.

11   Q.  Payroll?

12   A.  No.

13   Q.  There was simply no business there; right?

14   A.  Correct.

11:20:14   15       MR. HEIMANN:  I have no other questions on direct,

16   Your Honor.

17       MR. FLEENER:  Your Honor, something has come up on

18   direct I need to speak with the three defense attorneys about.

19       Can we have a -- a second to huddle up?

11:20:36   20       THE COURT:  Certainly.  Absolutely.

21     (Discussion held at counsel table.)

22       THE COURT:  Good.

23       MR. FLEENER:  Judge, there's an issue we need to take

24   up outside the presence of the jury.  It's going to require

11:22:57   25   more than simply a bench conference.

 1              THE COURT:  Very well.

 2              Please take charge of the jury.

 3              THE COURTROOM DEPUTY:  All rise.

 4       (Proceedings outside the jury's presence at 11:23 a.m.)

11:23:46     5              THE COURT:  Do you wish the defendant -- the witness

 6   to be present?

 7              MR. FLEENER:  No, sir.  He needs to be excused, as

 8   well, Judge.

 9              THE COURT:  Very well.

11:23:56    10       (Witness Trizna no longer present.)

11              THE COURT:  Please be seated.

12              MR. FLEENER:  Well, I -- I can't believe I'm -- I'm

13   doing this, but I think the United States has knowingly put on

14   perjured testimony, and we'd move for a mistrial.

11:24:33    15              This witness testified on direct examination about

16   the email account Kevin NuTech -- kevin@nutechenr.com.  He

17   said that Bob Mitchell created the email account, yes.

18              "Did you use that email account?"

19              "No."

11:24:54    20              "Did you have access to it?"

21              "I think he gave me the password one time."

22              In the Government's discovery -- I'm looking at it

23   and I'll show the Court -- I'm looking at an MOI prepared by

24   Sonia Hacker --

11:25:15    25         (Discussion held at counsel table.)

1                  MR. FLEENER:  It's plugged in.

2                  Can you see it, Judge, yet?

3                  THE COURT:  No.

4                  MR. WARD:  And you might have to sit --

11:25:56    5                  THE COURT:  I see a football player.

6                  MR. FLEENER:  That's Tamba Hali.  He's no longer with

7        the Chiefs.

8                  Thank you.

9                  Judge, this MOI -- and I'll let the Court read it.

11:26:42   10                  And -- and the emphasis should be on this second

11       paragraph where it says, "Trizna stated he had two brothers

12       who lived in Maryland and Virginia.  Trizna stated the week of

13       NuTech's investors conference call in May of 2016 he attended

14       his sister-in-law's 50th birthday in the DC area."

11:26:58   15                  And I'm going to scroll down now -- if I can -- this

16       is an email dated May of 2016 starting "Mike and Red."  As the

17       Court can see, it comes from kevin@nutechenr.com.

18                  It reads, "Mike and Red, we definitely need to get

19       some clarification what's going on with the patent.  We kind

11:27:29   20       of said conflicting statements and will need to address it on

21       Tuesday.  I talked to Tom Throne afterwards but didn't have

22       time to chat as I'm attending my sister-in-law's 50th birthday

23       here in the DC area."

24                  Judge, what happened is that the United States saw

11:27:44   25       this email after they'd interviewed Mr. Trizna a couple

19-CR-26-ABJ                ARGUMENT - HEIMANN                Vol. VI-838
21-CR-14-ABJ

1    different times and after he testified before the grand jury

2    and asked -- met with Mr. Trizna.  And the only reason for

3    this MOI has to be a meeting to see whether or not he was on

4    that email and they -- because they asked him about whether he

5    has family in Virginia or Maryland.

11:28:07

6         So when the United States today asked that witness in

7    front of the jury "Do you use that email?" -- whatever they

8    said; "Do you have -- do you use that email account?" -- they

9    knew that was false.  They knew he'd used this email, and that

10   was perjured testimony and they knew it, Judge.

11:28:21

11        We'd move for a mistrial.

12        MR. HEIMANN:  Your Honor, it's a prior inconsistent

13   statement.  It's not -- the Government didn't present

14   knowingly perjured testimony.  We provided defendants with the

15   prior statements, and this witness -- that's what he remembers

16   today.

11:28:40

17        If every time a witness got up and made an

18   inconsistent statement, if that was knowingly offering

19   perjury, there would never be a finished trial with any

20   compromised witnesses.

11:29:01

21        This is merely a prior inconsistent statement, so,

22   Your Honor, the motion should be denied.  They can

23   cross-examine Mr. Trizna on that.

24        MR. FLEENER:  May I respond briefly, Judge?

25        MR. JUBIN:  While Mr. Fleener's walking up, I will

11:29:18

19-CR-26-ABJ          ARGUMENT - FLEENER          Vol. VI-839
21-CR-14-ABJ

1    say, as with any other motions by other defendants, to the

2    extent it inures to Mr. Horn's benefit, I join.

3              MR. WARD:  As do I, Your Honor.

4              THE COURT:  Thank you, Mr. Jubin.

11:29:30    5    MR. FLEENER:  This isn't a prior inconsistent

6    statement.

7              It would be had the United States not -- not gone

8    back on May of -- or on July 9th of 2019, as the Court is

9    looking at -- and the only thing in this MOI, Judge -- the

11:29:44   10   only thing attached to this MOI -- and I'll make it an exhibit

11   when I figure out how to do it -- is this email.

12             They went to the -- they went to him specifically

13   because they recognized that by looking at this email -- and

14   I could put Sonia Hacker on.  I'd be happy to ask her the

11:30:04   15   questions.

16             I would imagine that she went to him specifically

17   because they saw this top email where it says "I'm in --

18   attending my sister-in-law's 50th birthday here in the DC

19   area."

11:30:13   20             They knew that he had said consistently, "Oh, I've

21   never used this email address," so they went specifically to

22   ask him that and realized that, "Oh, yes, he lives in the DC

23   area."

24             So they know.  This isn't a prior inconsistent

11:30:26   25   statement.  As he testifies there now, they know that he wrote

19-CR-26-ABJ                    ARGUMENT - FLEENER              Vol. VI-840
21-CR-14-ABJ

1    this email, that he sent this email.  And then they asked him,

2    "Do you ever use this email address?"

3          "No, I don't."

4          They put on perjured testimony, Judge.  And I never

11:30:39  5    made this motion before.  But I don't know what -- this isn't

6    a prior inconsistent statement.  This isn't where the witness

7    says one thing and then says another and I get to beat him up.

8          They knew that -- that this was -- they knew that

9    what he testified here wasn't true because they know that he

11:30:53  10    sent this email because he has a sister in the DC area, yet

11    they put it on anyway in front of the jury.  This isn't a

12    prior inconsistent statement.  It's perjured testimony.

13          So I -- and I'll mark this as an exhibit.  But I'd

14    move for a mistrial, and I'll answer the Court's questions if

11:31:12  15    the Court has questions.

16          THE COURT:  The motion's denied.

17          Shall we bring the jury back?

18          MR. FLEENER:  Is the Court going to go into any more

19    detail as to why?  Or is it just that it's denied?

11:31:40  20          THE COURT:  I think we can go into detail later on.

21    If you want an opinion, we'll write an opinion.

22          MR. FLEENER:  Thank you, Judge.  I would.

23          THE COURT:  We've got a jury waiting.

24          MR. FLEENER:  I understand, Judge.  Thank you.

25    ///

 1     (Witness Trizna present.  Proceedings within the

 2   jury's presence at 11:33 a.m.)

 3          THE COURT:  Please be seated, ladies and gentlemen.

 4          Mr. Ward.

 5          MR. WARD:  Good afternoon, Mr. Trizna.  My name is

 6   Zenith Ward, and I represent Charles Winters.

 7                    **CROSS-EXAMINATION**

 8   **BY MR. WARD:**

 9   Q.  You and I haven't ever spoken before today; correct?

10   A.  Correct.

11   Q.  Have you had any conversations with the Government in this

12   case about you being charged with any crimes related to your

13   involvement in NuTech?

14   A.  No.

15   Q.  Have you been given immunity from the Government in

16   exchange for your testimony today?

17   A.  No.

18   Q.  Have you ever discussed immunity?

19   A.  No.

20   Q.  And so you have no deals or agreement with the Government

21   regarding your cooperation in this case or your testimony?

22   A.  Correct.

23   Q.  You were first interviewed by the Government in this case

24   in September of 2017; is that correct?

25   A.  I believe so, yes.

11:34:42
11:34:51
11:35:03
11:35:14
11:35:41

1   Q.  And you were interviewed by Postal Inspector Hacker;

2   correct?

3   A.  Yes.

4   Q.  Okay.  And others but she was present during the

11:35:52    5   interview?

6   A.  Correct.

7   Q.  And during that interview you said that you had first

8   invested with Bob a couple years prior to your interview;

9   correct?

11:36:04   10   A.  Yes.

11   Q.  And you also testified in front of the grand jury in this

12   case; correct?

13   A.  Yes.

14   Q.  And during your grand jury testimony, you testified that

11:36:14   15   your first investment with Bob was into a company called

16   High Plains Gas; correct?

17   A.  Correct.

18   Q.  And that was a publicly traded company; correct?

19   A.  I'm not sure.

11:36:30   20   Q.  What was your understanding when you invested in High

21   Plains Gas as to what you were investing in?

22   A.  It had something to do with wells and trying to get the

23   wells up and running again to be profitable and have shares in

24   the company that was going to make money.

11:36:55   25   Q.  And the way they were -- that you were going -- did you --

19-CR-26-ABJ                TRIZNA - CROSS - WARD              Vol. VI-843
21-CR-14-ABJ

1    were you at -- or did you know how they were -- what the plan

2    was to get these wells up and running?

3    A.   A general idea about the -- the tool, yes.

4    Q.   And what was the tool?

11:37:12    5    A.   It was a tool that they had come up with -- I think it was

6    called the IGOR and it changed names, Gazmo -- and that was

7    going to revitalize the wells.

8    Q.   And were there other companies that your investment got

9    transferred to out of the High Plains Gas initial investment?

11:37:38    10    A.   I believe so, yes.

11    Q.   What were some of those other companies' names?

12    A.   I'm not sure of the order but CHAMA, EcoEmissions, and

13    then NuTech.

14    Q.   Were you ever invested in Mitchell Resources?

11:37:54    15    A.   I don't believe so, no.

16    Q.   How about RWM?

17    A.   I don't believe so.

18         THE COURT:  You mentioned Black Diamond earlier.

19         THE WITNESS:  Correct.

11:38:05    20         THE COURT:  Is that one of the --

21         THE WITNESS:  That was -- I think that was one of the

22    ones in the beginning.

23    BY MR. WARD:

24    Q.   One of the whats in the beginning?  The companies that you

11:38:13    25    were invested in?

1    A.   Correct.

2    Q.   And what was Ed Pressley's role in High Plains Gas?

3    A.   I don't know for sure, but I believe he was the one that

4    invented the tool.  But I can't remember exactly what his

11:38:34   5    role was.

6    Q.   Now, you just talked about EcoEmissions and NuTech.

7    EcoEmissions was a company that then became NuTech; is that

8    correct?

9    A.   I believe so, yes.

11:38:48   10   Q.   And so your initial investments with Bob Mitchell would

11   have come in 2013, 2014?  Is that the time frame?

12   A.   Probably after 2013.  I don't think it was ever in 2013.

13   Q.   So maybe --

14   A.   It was after -- after --

11:39:10   15   Q.   -- early 2014?

16   A.   Probably mid.

17   Q.   And how much did you invest initially?

18   A.   I think I initially put in a hundred thousand.

19   Q.   And your most recent investment with Bob Mitchell came in

11:39:27   20   February of 2017; correct?

21   A.   I believe so, yes.

22   Q.   And at that time you invested $10,000, and that was into a

23   company called DEAC; correct?

24   A.   Yes.

11:39:41   25   Q.   And that was not an oil and gas company?

19-CR-26-ABJ          TRIZNA - CROSS - WARD          Vol. VI-845
21-CR-14-ABJ

1    A.  I don't believe so, no.

2    Q.  That was a company that was going to have something to do

3    with vending machines at gyms --

4    A.  Correct.

11:39:52    5    Q.  -- correct?

6    A.  Correct.

7    Q.  Okay.  And when you made that investment in DEAC in

8    February of 2017, that was years after the Russian conference

9    call; correct?

11:40:07    10    A.  I believe so, yes.

11    Q.  And so years after the Russian conference call, you were

12    still giving Bob Mitchell money as an investment?

13    A.  Yes.

14    Q.  And you were told that the DEAC investment would be the --

11:40:25    15    the key to the whole EcoEmissions and NuTech deal; right?

16    A.  Correct.

17    Q.   And it was going to be the key because you were going to

18    be able to raise money and then that was going to make the

19    EcoEmissions/NuTech deal work?

11:40:41    20    A.   Correct.

21    Q.  And you understood DEAC to be a shell company; correct?

22    A.  I don't know.  I don't recall that.

23    Q.  Now, you are an experienced businessman; isn't that true?

24    A.  I've run my business for 30 years, yes.

11:41:07    25    Q.  You have a college degree?

19-CR-26-ABJ                    TRIZNA - CROSS - WARD                Vol. VI-846
21-CR-14-ABJ

1   A.  Correct.

2   Q.  Doesn't sound like you ever put much use into your

3   specialty from your -- your degree in the restaurant business.

4   But you've been a successful businessman; correct?

11:41:21   5   A.  I don't know what your definition of "successful" is.

6   I've had my own business.

7   Q.  Well, let's talk about your -- well, first, I want to

8   continue with your education for a moment.

9        You passed the Series 7 exam, which is the exam that

11:41:36   10   you have to pass in order to be a licensed stockbroker;

11   correct?

12   A.  Yes.

13   Q.  Same way an attorney has to pass a bar exam, licensed

14   stock brokers have to pass the Series 7 exam; correct?

11:41:48   15   A.  Correct.

16   Q.  And that's a difficult exam, isn't it?

17   A.  Yes.

18   Q.  Not just something anybody off the street can take and

19   pass?  You've got to put some work in, don't you?

11:41:57   20   A.  Correct.

21   Q.  And you passed that exam?

22   A.  I did.

23   Q.  And as it relates to your experience as a businessman,

24   you've -- you've owned your own roofing company since 1991;

11:42:08   25   correct?

```
19-CR-26-ABJ          TRIZNA - CROSS - WARD          Vol. VI-847
21-CR-14-ABJ
```

1    A.   Yes.

2    Q.   How many employees do you have at M4 Roofing today?

3    A.   One or two.

4    Q.   How many --

11:42:14    5    A.   Myself and one other person.

6    Q.   Okay.

7         How -- what is the most recent year that you have

8    completed -- so I guess it would be 2020 if you've completed

9    your financials for '22 -- what was the annual revenue for

11:42:33    10    M4 Roofing?

11    A.   In 2020 I believe it was around 3 million.

12    Q.   And what was the best year that you can remember for

13    M4 Roofing?

14    A.   I believe it was around 6 million.

11:42:48    15    Q.   Do you get paid a salary?

16    A.   Yes.

17    Q.   What's that salary?

18    A.   Around 75,000.

19    Q.   And then do you get other financial compensation from the

11:43:00    20    company?

21    A.   If there's a profit, yes.

22    Q.   Was there a profit in 2020 when your revenue was

23    3 million?

24    A.   No.

11:43:08    25         MR. HEIMANN:  Your Honor, I object to the relevance

---

19-CR-26-ABJ          TRIZNA - CROSS - WARD          Vol. VI-848
21-CR-14-ABJ

             1   of this line of questioning.  We're talking about 2020 and his

             2   business.

             3             MR. WARD:  I'll -- I'll move on from this subject

             4   area.

11:43:25     5             THE COURT:  All right.

             6   BY MR. WARD:

             7   Q.  Now, over the course of your investments with

             8   Bob Mitchell, how much total money did you invest with

             9   Bob Mitchell?

11:43:34    10   A.  I believe it was around 200,000, maybe another 10,000 for

            11   the DEAC, so 210.

            12   Q.  So over $200,000 you invested with Bob Mitchell?

            13   A.  Yes.

            14   Q.  You also agreed to be the CEO of that company for

11:43:54    15   Bob Mitchell; right?

            16   A.  Correct.

            17   Q.  And when you agreed to be CEO, you understood that you

            18   weren't really going to be CEO?  You were just going to be a,

            19   quote, "puppet CEO"; correct?

11:44:07    20   A.  Correct.

            21   Q.  And you agreed to do that?

            22   A.  Correct.

            23   Q.  And you agreed to say false statements during the investor

            24   conference call, didn't you?

11:44:19    25   A.  Repeat the question again.

19-CR-26-ABJ            TRIZNA - CROSS - WARD            Vol. VI-849
21-CR-14-ABJ

1   Q.  You agreed to make false statements during the investor

2   conference call, didn't you?

3   A.  I don't know what false statements, so I'm not sure

4   I understand that.

11:44:39   5   Q.  You don't know what false statements you made during the

6   investor conference call?

7   A.  Correct.

8   Q.  Okay.  Did you say you had been approached by a Russian

9   company and an offer had been made to you?

11:44:52   10   A.  I believe I said that, yes.

11   Q.  That was false, wasn't it?

12   A.  Yes.  Uh-huh.

13   Q.  You said that you had -- after conducting due diligence,

14   it appeared the Russian company had the ability to close?  You

11:45:05   15   said that during the conference call, didn't you?

16   A.  I said that we, I believe, on that statement.

17   Q.  Okay.  And "we" would include you as one of the "we";

18   right?

19   A.  Yes.

11:45:19   20   Q.  You had absolutely zero information that would indicate to

21   you in any way that a Russian company had ability to close a

22   $2.5 billion deal; isn't that true?

23   A.  No.

24   Q.  You had some information that indicated the Russian

11:45:34   25   company had the ability to close a $2.5 billion deal?

1    A.  Bob was saying that this is what we have in front of us,

2    so that was the information I was going on.

3    Q.  Okay.  But you -- and when it came to that Russian

4    conference call, you had the script of the call before the

11:45:54    5    call happened; right?

6    A.  Correct.

7    Q.  And in the script was the statement that you had been

8    approached by a Russian company and that an offer had been

9    made to you; correct?

11:46:04    10   A.  Correct.

11   Q.  And we just agreed that was false?

12   A.  Correct.

13   Q.  So back to -- my original question is, you agreed to make

14   false statements during an investor conference call for Bob,

11:46:18    15   didn't you?

16   A.  Yes.

17   Q.  And that was all because Bob is so cunning and persuasive,

18   isn't it?

19   A.  Correct.

11:46:29    20        MR. HEIMANN:  Characterization, Your Honor.

21        THE COURT:  Overruled.

22   BY MR. WARD:

23   Q.  Bob is good at what he does, isn't he?

24   A.  Yes.

11:46:39    25   Q.  And that's how he was able to convince you to do all these

                1  things that I take it you normally wouldn't do.  Correct?

                2  A.  Correct.

                3  Q.  Now, let's talk about you being a puppet CEO.  Why

                4  couldn't Bob be the CEO?

    11:46:56    5  A.  I believe he was barred by the Government based on his

                6  activities in previous years.

                7  Q.  And you knew that when you agreed to be the puppet CEO,

                8  didn't you?

                9  A.  Yes.

    11:47:09   10  Q.  Pretty big red flag, wouldn't you agree?

               11  A.  I didn't think so at the time, no.

               12  Q.  You didn't think it was odd that someone who had been

               13  barred from the -- serving as the CEO was going to have you be

               14  a puppet CEO?

    11:47:26   15  A.  Correct.

               16  Q.  And, again, that's because Bob is so manipulative and

               17  cunning; isn't that true?

               18  A.  Yes.

               19  Q.  Now, there was a time when you and Bob were trying to get

    11:47:40   20  stock cleared from OTC Markets because it had a skull and

               21  bones on it; correct?

               22  A.  Yes.

               23  Q.  And you were at Bob's house; right?

               24  A.  Yes.

    11:47:50   25  Q.  And Bob had you call OTC Markets to authorize them to

19-CR-26-ABJ                TRIZNA - CROSS - WARD              Vol. VI-852
21-CR-14-ABJ

1    speak with Bob; correct?

2    A.   Correct.

3    Q.   And then you subsequently sent an email to OTC Markets

4    from kevin@nutech verifying your identity; correct?

11:48:14   5    A.   I don't recall that.

6    Q.   Okay.  Do you remember logging on to your email during

7    that meeting when you were with Bob at his house and you were

8    dealing with OTC Markets to get the skull and bones off the

9    stock?

11:48:31   10   A.   I did not log in, no.

11   Q.   And -- well, do you remember talking to investigators

12   about this?

13   A.   I don't remember specifically talking to them about it.

14   Q.   What did you tell investigators about your use of the

11:48:54   15   kevin@nutech email?

16   A.   I think I told them I didn't use it for any purposes for

17   the NuTech company.

18   Q.   And you told them that you only logged on to it once and

19   that was with Bob Mitchell at Bob Mitchell's house; correct?

11:49:13   20   A.   Correct.

21   Q.   And that was during this time where you were trying to get

22   the skull and bones off the stock; correct?

23   A.   Correct.

24   Q.   And this instance we're talking about where you're at

11:49:26   25   Bob's house and you're talking to OTC Markets on the phone,

1    that's all well before the Russian announcement; correct?

2    A.  I believe it was, yes.

3    Q.  And what was your understanding at that time of why it was

4    important to get the skull and bones off the stock?

11:49:46    5    A.  I believe they were trying to sell stock at that time to

6    raise money to continue to have the company move forward.

7    Q.  Okay.  I want to talk a little bit about Red Luken.

8         The first time that the Government came to interview

9    you in September of 2017, you told the investigators that you

11:50:08    10    had talked to Red that morning; correct?

11    A.  I don't recall saying that, but I very well could have.

12    Q.  When was the last time you talked to Red prior to your

13    testimony today?

14    A.  Probably three months ago.

11:50:19    15    Q.  And do you remember what you were talking to Red about the

16    morning of your testimony -- the morning of your interview

17    with the Government in September of 2017?

18    A.  Actually, let me back up just a minute.

19         I didn't talk to Red a couple months ago.  I just

11:50:39    20    texted him.

21    Q.  What did you text him?

22    A.  We were bringing up the subject of Bob Mitchell and him

23    admitting to guilt.

24         MR. HEIMANN:  Objection, Your Honor; 403.

11:50:54    25         THE COURT:  Sustained.

1          MR. WARD:  All right.

2    BY MR. WARD:

3    Q.  I apologize if you already answered this but I'm not sure.

4          The morning of -- in September of 2017 when you were

11:51:08   5    first interviewed by Postal Inspector Hacker, do you recall

6    what you were talking to Red about that morning?

7    A.  No.

8    Q.  Are you and Red still friendly?

9    A.  I guess.  We texted each other a couple months ago.  We

11:51:30   10   never had a falling-out.

11   Q.  Red is actually who got you to make that investment in

12   DEAC in February of 2017; isn't that true?

13   A.  He brought it up initially, yes.

14   Q.  When you invested that $10,000 into DEAC, that was into a

11:51:53   15   bank account that was controlled by Bob Mitchell and

16   Red Luken; correct?

17   A.  I believe it was, yes.

18   Q.  So not only did Red bring up the investment to you, your

19   investment actually went into a bank account that Red

11:52:05   20   controlled with Bob?

21   A.  I believe so, yes.

22   Q.  What was the DEAC pitch?

23   A.  The pitch was they had another way of trying to raise some

24   money that would allow the money then to go to the bigger

11:52:26   25   picture.

1    Q.   What was that way?

2    A.   Excuse me?

3    Q.   What was that way of raising money?

4    A.   I guess the DEAC needed funds to maybe get it off the

11:52:36    5    ground, purchase some vending machines into these various gyms

6    around the country.

7    Q.   And Red is a -- a field guy; right?

8    A.   Correct.

9    Q.   Why would you call him a field guy?

11:52:50    10    A.   Because of the conversations that I had with him and he

11    told me that that's what he did for a living.  And I actually

12    went up one time and met with him and drove through the oil

13    fields and looked at various wells.  And he showed me and

14    talked about how it all worked.

11:53:11    15    Q.   And your understanding is that Red has spent his entire

16    career working out in the fields on oil wells; right?

17    A.   Correct.

18    Q.   That's what Red's told you?

19    A.   Correct.

11:53:24    20    Q.   And would you agree that's how Red carries himself?  He

21    presents as a field guy; right?

22    A.   Yes.  Uh-huh.

23    Q.   Are you aware that Red is still working with Mike Perry

24    and pumping gas from the Emerald wells on Tom Throne's

11:53:44    25    property?

19-CR-26-ABJ          TRIZNA - CROSS - WARD          Vol. VI-856
21-CR-14-ABJ

1   A.  I'm not sure about the property, but I think he's still

2   trying to make a living and doing what he does.

3   Q.  And when you say "trying to make a living and doing what

4   he does," that has to do with trying to utilize this

11:53:59   5   technology to pump natural gas out of wells without removing

6   the water; correct?

7   A.  I believe that's one of the things that he's doing, yes.

8   I don't know of other ways that he's working.

9   Q.  Do you know if he's still involved with raising investor

11:54:16   10   money to execute or to put that tool into production?

11   A.  I do not know.

12   Q.  Now, when you went out with Red into the field in Gillette

13   to look at wells, you said you drove through some fields.

14        Did you get out and look at wells?

11:54:40   15   A.  Yes.

16   Q.  Okay.  And what did you see?

17   A.  I saw the -- Red describing these wells and showed me the

18   valve where you opened it up; you could hear gas coming out

19   of it.

11:54:57   20   Q.  And when was this -- this trip to Gillette where you saw

21   wells in person?

22   A.  I don't remember exactly.

23   Q.  Before or after the Russian announcement?

24   A.  I'm sure it was before.

11:55:13   25   Q.  Before or after you invested your initial investment with

1    Bob Mitchell?

2    A.   It was after.

3    Q.   And so you're out there.  Did you see the tool?

4    A.   I -- on that trip I believe I saw the tool in the office,

11:55:30    5    yes.

6    Q.   What does the tool look like?

7    A.   It's a -- I believe it's a 3- or 4-foot-long PVC pipe with

8    whatever they have inside of it.

9    Q.   Did you ever see a -- an aluminum version of the tool?

11:55:45    10    A.   I don't recall.

11    Q.   The one you saw when you were up in Gillette and you were

12    in the office, that was the PVC version?

13    A.   I believe that's what it was, but I'm not sure exactly.

14    Q.   And you said "the office."  Tell us about the office.

11:56:06    15    A.   The office was -- from what I understood and what it

16    looked like -- someone else's office that they were working

17    out of.

18              THE COURT:  Who are the "they" and --

19              THE WITNESS:  Whoever Red was with at the time in the

11:56:21    20    office.  I couldn't -- maybe they -- it was an oil and gas,

21    I believe, company or guys that worked in the field, is what I

22    recollected.

23    BY MR. WARD:

24    Q.   And why did you believe this was Red working out of

11:56:38    25    someone else's office as opposed to this being a NuTech

19-CR-26-ABJ                TRIZNA - CROSS - WARD              Vol. VI-858
21-CR-14-ABJ

1   office?

2   A.   Because NuTech never really -- they never did anything out

3   of any office.

4   Q.   Now, Red told you that somebody was poking around in

11:56:58   5   Gillette, an investigator, after the Russian deal; is that

6   right?

7   A.   He might have said that, but I don't really recall.

8   Q.   Well, tell us what you do recall about him telling you

9   this.

11:57:11   10   A.   Other than what you just said, nothing.  "Someone's poking

11   around."

12   Q.   But your understanding was that that was some sort of a

13   governmental investigative agency looking into things after

14   the Russian announcement?

11:57:24   15   A.   Probably so, yes.

16   Q.   Okay.  Let's talk a little bit about Mike Perry.

17        Mike Perry has a proven track record in the oil

18   business; isn't that true?

19   A.   I believe so, yes.

11:57:40   20   Q.   What was your understanding of how much money Mike Perry

21   or his company, Emerald Operating, had invested into

22   developing and deploying the IGOR tool?

23   A.   I -- well, there might be two situations.

24        One, I know -- or at least I was told -- that he had

11:58:01   25   invested $675,000 into his efforts to make things work, but

1   I can't say for sure that that was directly with the tool

2   because there was lots of other moving parts to the business

3   that had to be taken care of in order for everything to work.

4   Q.   Are you still in touch with Mike Perry?

11:58:27   5   A.   No, I'm not.

6   Q.   When was the last time you talked to him?

7   A.   It's been a couple years ago.

8   Q.   Now, Bob kept things in NuTech very compartmentalized,

9   didn't he?

11:58:37   10   A.   I believe he did, yes.

11   Q.   He tried to keep everyone separated so that he could

12   maintain control; right?

13   A.   Correct.

14   Q.   He didn't want you talking to people operating other parts

11:58:48   15   of the business; correct?

16   A.   Correct.

17   Q.   He was -- I believe you called him at one point in time a

18   control freak.  Right?

19   A.   Yes, sir, that's correct.

11:58:58   20   Q.   And that was effective at carrying out his scheme,

21   wasn't it?

22   A.   I don't really know for sure.

23   Q.   Well, if you would have been talking to more people, more

24   of these working parts, don't you think you might have figured

11:59:17   25   out what was going on a little earlier?

 1   A.  I might have.

 2   Q.  Let's go back to Red for a minute.  You knew that Red was

 3   getting investor money from people in Gillette, didn't you?

 4   A.  I knew he had in the past raised some money, yes.

11:59:36   5   Q.  What was your understanding about how that money was

 6   raised?

 7   A.  How it was raised?

 8   Q.  Yeah.  Like what -- what led people to giving Red Luken

 9   money for Bob Mitchell?

11:59:44   10   A.  I think Red knew a lot of people up in Gillette.  And the

11   current situation with that tool, he was pretty excited and

12   wanted the whole operation to work.  So he was looking for

13   people to raise -- get money to invest.

14   Q.  Were you aware that him and Richard Shupick would -- would

12:00:06   15   have coffee in the mornings at a restaurant and they'd talk

16   about the tool and that was what led a lot of people to

17   investing?

18   A.  I don't recall any of that at all.

19   Q.  Okay.  Do you know who Richard Shupick is?

12:00:17   20   A.  No.

21   Q.  All right.

22       I want to talk about the press releases that the

23   Government went through with you on direct examination.  The

24   Government went through and pointed out numerous things in the

12:00:34   25   press release that was not true; correct?

19-CR-26-ABJ             TRIZNA - CROSS - WARD          Vol. VI-861
21-CR-14-ABJ

 1   A.   Yes.

 2   Q.   And many of those implicated you directly, quotes from you

 3   that you had never said; right?

 4   A.   Correct.

12:00:42    5   Q.   And you saw that press release after it was released;

 6   correct?

 7   A.   Correct.

 8   Q.   And so right there you had an opportunity to do something

 9   about all this, didn't you?

12:00:56   10   A.   Yes.

11   Q.   You could have -- and you knew that people were going to

12   rely on those press releases and potentially invest their

13   money in the company?

14   A.   Correct.

12:01:11   15   Q.   And you knew that they would be making that investment

16   based on lies?

17   A.   I didn't necessarily think there were lies in some of

18   those press releases, that Bob was doing what he was doing --

19   Q.   Sure.

12:01:28   20   A.   -- and it was what it was -- needed to be done in order to

21   keep the thing moving forward.

22   Q.   So when -- when you see that you're being quoted in a

23   press release as saying things that you never said, you -- you

24   kind of maintained some trust, "Well, maybe there -- maybe

12:01:46   25   there's truth in the underlying matter and the quoting of me

19-CR-26-ABJ            TRIZNA - CROSS - WARD            Vol. VI-862
21-CR-14-ABJ

1   is just kind of a technicality"?

2   A.   Correct.

3   Q.   Kind of a white lie; right?

4   A.   Correct.

12:01:56   5   Q.   Okay.  But then we get to the Russian conference call, and

6   at that point there's no more room for this to just be a white

7   lie, is there?

8   A.   Correct.

9   Q.   And so you get an email from Bob Mitchell that has a

12:02:15  10   script for you to say during the conference call written out

11   paragraph by paragraph; right?

12   A.   Correct.

13   Q.   And that's before the conference call?

14   A.   Yes.

12:02:28  15   Q.   And you read in that script that you're going to say "I've

16   been approached by a Russian company"; right?

17   A.   Correct.

18   Q.   Red flag goes off?  It must.

19   A.   Correct.

12:02:37  20   Q.   But you don't do anything about it?

21   A.   Not at that time, no.

22          THE COURT:  Is this a good time to take your noon

23   break?

24          MR. WARD:  No.  I've got about maybe 10 more -- you

12:02:47  25   know, 5, 10 more minutes at the most and so I --

1       THE COURT:  The problem is I've got another hearing

2   that's set for noon with people on the telephone.

3       MR. WARD:  Then we'll finish up after the lunch

4   break, Your Honor.  Thank you.

12:02:58   5       THE COURT:  All right.  Ladies and gentlemen, we'll

6   stand in recess until -- let's make it 1:15.

7       THE COURTROOM DEPUTY:  All rise.

8   (Proceedings outside the jury's presence at 12:03 p.m.)

9       THE COURT:  Sorry to interrupt you.

12:03:28   10       MR. WARD:  It's fine.

11   (A recess was taken from 12:03 p.m. to 1:17 p.m.)

12       THE COURT:  Thank you.

13   (Proceedings within the jury's presence at 1:19 p.m.)

14       THE COURT:  Thank you, ladies and gentlemen.

13:19:46   15       Mr. Ward will continue with his cross-examination.

16       MR. WARD:  Thank you, Judge.

17   BY MR. WARD:

18   Q.  Mr. Trizna, you recognize that you're still under oath?

19   A.  Yes.

13:19:57   20   Q.  Before lunch we were just starting to talk about the

21   Russian announcement.

22       And you first heard about the Russian announcement

23   from Bob Mitchell; correct?

24   A.  I believe so, yes.

13:20:09   25   Q.  And what does he tell you when he tells you about the

19-CR-26-ABJ               TRIZNA - CROSS - WARD           Vol. VI-864
21-CR-14-ABJ

1   Russian announcement for the first time?

2   A.  I can't really recall exactly what his words were.

3   Q.  Do you remember where you were?

4   A.  No, I do not.

13:20:23   5   Q.  Okay.  Do you remember how long of a conversation it would

6   have been?

7   A.  Probably no more than 5 or 10 minutes.

8   Q.  So what did he tell you in that call?

9   A.  I don't recall exactly.  But probably something to the

13:20:38   10   effect of that "We have an offer to get purchased."

11   Q.  Did he tell you anything about what the amount of the

12   offer was?

13   A.  I don't recall, no.

14   Q.  When do you first realize -- well, I think when you

13:20:57   15   were -- talked to the investigators, you said you found out

16   about the Russian offer and when you did the math, it was like

17   billions of dollars.  Right?

18   A.  I don't recall.

19   Q.  Do you recall, after Bob told you about the Russian deal,

13:21:08   20   doing some math and realizing that, based on what Bob had told

21   you, the offer he supposedly got was to purchase NuTech for

22   over a billion dollars?

23   A.  I believe that at some point, yeah, I did the math on it

24   to figure out what the offer was.

13:21:22   25   Q.  And who was your understanding of -- or what was your

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1    understanding about who approached Bob with this offer?

2    A.   I guess the Russians, some -- some Russian guy.

3    Q.   Is that what he -- is that the terminology you think he

4    used with you, some -- "a Russian company" or "some Russians"?

13:21:41   5    A.   Correct.

6    Q.   And then after you find out about this Russian offer, you

7    attempt to do some research into the company he told you was

8    going to make -- that was making the offer; right?

9    A.   Correct.

13:21:52   10    Q.   And so you get on Google, and it's a black hole; right?

11    A.   Correct.

12    Q.   Meaning you couldn't find anything to verify the existence

13    of this company that Bob Mitchell told you was making this

14    offer?

13:22:07   15    A.   That's correct.

16    Q.   Okay.  And, nonetheless, though, on the conference call

17    you say "We've done due diligence"?

18    A.   When I say "We've done due diligence," I was referring to

19    Bob or a team that was representing NuTech.

13:22:23   20    Q.   Why didn't you say that on the conference call?  Why

21    didn't you say "Bob Mitchell's done due diligence and he says

22    this -- it's legit"?

23    A.   Because he gave me the script and I just read off the

24    script.

13:22:36   25    Q.   And so that's when you first learn about the -- the

19-CR-26-ABJ          TRIZNA - CROSS - WARD          Vol. VI-866
21-CR-14-ABJ

1   Russian offer.  And how long was that before the conference

2   call?

3   A.  I'm not sure.  I don't remember.

4   Q.  Now, when you got the script, there were some blanks in it

13:23:01   5   for you to fill in like when you got your college degree;

6   right?

7   A.  I believe so, yes.

8   Q.  And at that point in time, you could have said, "Bob, I've

9   done research; I can't find the company that you're talking

13:23:12   10  about.  This script says that $2.5 billion might be not enough

11  for our company.  These things are clearly false, misleading,

12  designed to trick investors into investing something based on

13  a lie."  And you could have put a stop to it, couldn't you?

14  A.  I don't believe at that point I was taking any control

13:23:35   15  over the script other than what was my part on who I was.

16  Q.  Well, who was going to read the script?

17  A.  I was going to read it.

18  Q.  So you had control over that?

19  A.  I had a control over reading it, yes.

13:23:47   20  Q.  Right.

21       And you could have said, "Bob, I'm not going to say

22  things on this call that aren't true"?

23  A.  I didn't know at the time that they weren't true.

24  Q.  You thought the $2.5 billion might have been a little

13:24:03   25  light in terms of purchasing NuTech?

19-CR-26-ABJ          TRIZNA - CROSS - WARD          Vol. VI-867
21-CR-14-ABJ

1   A.   From what Bob told me, yes.

2   Q.   What did Bob tell you?

3   A.   That it might be more than what they're contemplating on

4   the offer.

13:24:16   5   Q.   I don't understand that.  That what might have been more?

6   A.   When you said it could be lighter -- it could be light and

7   it could be more.  There wasn't, I don't think, a definite

8   number.

9   Q.   Right.  But what you said on the conference call was the

13:24:29   10   offer amount that you had received might not have been enough,

11   that NuTech might have been worth more than the billions of

12   dollars that you were supposedly being offered.

13   A.   That's what the script said, so I was just reading the

14   script.

13:24:41   15   Q.   Well, and you knew that was false at the time?  You knew

16   that NuTech was not worth more than $2 billion?

17   A.   I didn't -- at that time I wasn't the one to calculate

18   what a company was worth as far as what it can be worth to a

19   company in the future.  So I wasn't one to judge it.

13:25:01   20   Q.   What did Bob tell you about the -- the buyer having the

21   ability to close?

22   A.   We never really discussed that.

23   Q.   So when you said on the conference call that it appeared

24   the buyer had the ability to close, you and Bob hadn't talked

13:25:25   25   about that; right?

 1    A.  Correct.  Correct.

 2    Q.  And you had done nothing to verify whether this buyer had

 3    the ability to close other than Google them and find out

 4    you didn't even think they existed?

13:25:35   5    A.  Correct.

 6    Q.  Okay.  So that's a knowingly false statement.  And

 7    you knew that the investor conference call was to inform the

 8    investing public about this company; right?

 9    A.  Among other things on the call, yes.

13:25:52  10    Q.  Okay.  You knew that people who had worked hard for money

11    and were going to look to invest it somewhere were going to

12    rely on what was being said during that conference call?

13              MR. HEIMANN:  Objection; argument.

14              THE COURT:  Sustained.

13:26:13  15    BY MR. WARD:

16    Q.  If you would have told the truth on the conference call,

17    you could have stopped this whole thing in its tracks; right?

18              MR. HEIMANN:  Objection; argument.

19              THE COURT:  Sustained.

13:26:26  20    BY MR. WARD:

21    Q.  Had you been honest on the conference call, what would

22    that have looked like?

23    A.  Based on the information that I had at the time, I didn't

24    think what I was saying wasn't true.  Given the information

13:26:39  25    from Bob, that's what I was going on.

1          So just because I didn't find something on the

2    Internet didn't necessarily mean that I was believing the

3    company did not exist.

4    Q.   Okay.  But you did know you hadn't been approached?

13:26:58    5    A.   Correct.

6    Q.   You could have clarified that?  You could have been honest

7    about that; right?

8    A.   I could have but I just stuck to the script.

9    Q.   Right.  Knowing the script was a lie?

13:27:08    10   A.   Correct.

11   Q.   And the reason you were willing to lie was because you

12   wanted to make back the money you had invested?

13   A.   We wanted the whole operation to play out and be

14   profitable and -- and be successful and -- which was our point

13:27:29    15   from the very beginning.

16   Q.   And it sounds like at this point you didn't care how that

17   happened?  Even if it was accomplished through lies, you

18   wanted it to be successful because you wanted to make your

19   money back?

13:27:43    20   A.   Not necessarily.

21   Q.   What do you mean?

22   A.   Well, I didn't -- at the time I didn't think that I was

23   going to take any measures necessary and lie, knowing

24   information that I didn't have at the time wasn't necessarily

13:27:58    25   true or false.

1   Q.  Do you wish somebody would have told you the truth about

2   all this before you invested your money?

3           MR. HEIMANN:  Objection, Your Honor; relevance and

4   distortion --

13:28:20   5           THE COURT:  Sustained.

6           MR. WARD:  Those are all the questions I have,

7   Your Honor.  Thank you.

8           THE COURT:  Thank you, Mr. Ward.

9           MR. JUBIN:  Good afternoon, ladies and gentlemen.

13:28:45   10           JURY MEMBERS:  Good afternoon.

11           MR. JUBIN:  Good afternoon.  Mr. Trizna, my name is

12   Tom Jubin.  I represent Ian Horn.  He's a lawyer that you've

13   talked about just a little bit in -- in brief passing.

14                        CROSS-EXAMINATION

13:28:49   15   BY MR. JUBIN:

16   Q.  To the best of your knowledge, you never talked with

17   Mr. Horn about anything, did you?

18   A.  No, I did not.

19   Q.  And, basically, what happened was Bob Mitchell told you

13:29:13   20   that Ian Horn was the guy who was going to take care of some

21   money things; right?

22   A.  Correct.

23   Q.  And so when you wired some money, you wired it to Ian Horn

24   at Bob Mitchell's direction?

13:29:24   25   A.  That's correct.

```
19-CR-26-ABJ          TRIZNA - CROSS - FLEENER          Vol. VI-871
21-CR-14-ABJ
```

1  Q.  And you just assumed he would take care of things as

2  Bob Mitchell told you?

3  A.  Correct.

4          MR. JUBIN:  Okay.  I don't have anything further.

13:29:33  5          Thank you.

6          MR. FLEENER:  Mr. Trizna, my name is Tom Fleener.

7  I represent Justin Herman.

8          How are you, sir?

9          THE WITNESS:  Good.  Thank you.

13:29:56  10                  **CROSS-EXAMINATION**

11  **BY MR. FLEENER:**

12  Q.  The -- you testified before the grand jury in this case;

13  correct?

14  A.  Yes, I did.

13:30:08  15  Q.  And that would have been on -- if I told you it was

16  January 16th of 2019, would you agree with me?

17  A.  That could be true.  I don't remember exactly the day.

18  Q.  And when you -- you also met with agents many, many times?

19  Several times?

13:30:29  20  A.  Yes.

21  Q.  And they would ask questions of you about your involvement

22  with NuTech Energy; correct?

23  A.  Correct.

24  Q.  And then they'd come back maybe and follow up on specific

13:30:39  25  questions; correct?

19-CR-26-ABJ               TRIZNA - CROSS - FLEENER           Vol. VI-872
21-CR-14-ABJ

1   A.   That's correct.

2   Q.   And one of the areas that -- that they were asking you

3   questions on and that you testified under direct examination

4   is, you know, who controlled the email account

5   kevin@nutechenr.com.

6        You recall being asked those questions on direct

7   examination?

8   A.   Yes, I do.

9   Q.   You recall being asked those questions by the agents, of

10  course, too?

11  A.   I believe so, yes.

12  Q.   And -- and it -- it's been your testimony that you did not

13  have control of that account?

14  A.   That's correct.

15  Q.   And that Bob Mitchell had control of the account?

16  A.   Correct.

17  Q.   You weren't sending emails from that account?

18  A.   That's correct.

19  Q.   And you -- I think you've test- -- you may have said to

20  the grand jury that you may have checked the account once or

21  twice, maybe?

22  A.   I think once I checked it.

23  Q.   Okay.  But, again, it was Bob Mitchell's account?  You

24  never sent emails?

25  A.   That's correct.

13:30:53 (line 5)
13:31:01 (line 10)
13:31:10 (line 15)
13:31:21 (line 20)
13:31:35 (line 25)

1       (Discussion held at the podium.)

2    BY MR. FLEENER:

3    Q.  During the conference call, though, you were in Virginia

4    or DC; correct?

13:32:39    5    A.  That's correct.

6    Q.  And you have in-laws in DC?

7    A.  My folks live in Virginia.

8          MR. FLEENER:  Can you please show this witness -- I'm

9    showing the witness what I've marked as Herman Exhibit B.

13:33:01   10    I sent it to the United States over lunch.

11    BY MR. FLEENER:

12    Q.  You can see the email; correct?

13    A.  Yes, I can see it.

14    Q.  And the first -- that email -- the top of that email

13:33:25   15    string is one of the kevin@nutechenr.com -- it's from

16    kevin@enr- -- kevin@nutechenr.com; right?

17    A.  That's correct.

18    Q.  And it's to Mike Perry; right?

19    A.  Yes.

13:33:39   20    Q.  And it's to Red Luken, red@nutechenr.com; right?

21    A.  Correct.

22    Q.  Why don't you read the body of that email, just the first

23    email, and then you can stop after "Thanks, Kevin."

24    A.  "We" --

13:33:52   25          MR. HEIMANN:  Your Honor, this isn't in evidence.

---

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1            THE COURT:  Sustained.

2            Read it to yourself.

3    BY MR. FLEENER:

4    Q.  Read it to yourself.

13:34:07  5            And you can look at me when you're done reading it.

6    A.  (Indicating.)

7    Q.  Okay.  You would agree that that email's from you?

8    A.  I think so, yes.

9    Q.  Okay.  And you agree with that because it talks about your

13:34:35  10   sister-in-law's 50th birthday "here in DC"?

11   A.  Correct.

12   Q.  And you recognize that now as your email?

13   A.  Yes.

14            MR. FLEENER:  I'd offer into evidence Defense

13:34:44  15   Exhibit B -- Herman's Exhibit B.

16       (Discussion held at the podium.)

17            MR. HEIMANN:  No objection.

18            THE COURT:  It is received.

19       (Defendant Herman's Exhibit B received into evidence.)

13:35:02  20            MR. FLEENER:  Permission to publish?

21            THE COURT:  You may publish.

22   BY MR. FLEENER:

23   Q.  Now, that email -- I thought you just told this jury that

24   you never sent an email.  I asked that exact question:  "You

13:35:19  25   never sent an email from that account?" and your answer was

1  something to the effect of "That's correct."

2          Do you recall me asking you that question?

3  A.  Yes.

4  Q.  Why did you ask that question when you knew you had sent

13:35:27   5  an email from that account?

6  A.  Because I didn't realize or remember that I had sent this

7  email.

8  Q.  Okay.  Well, how many emails from that account have you

9  also not realized that you've sent that you've -- well, let me

13:35:38   10  ask it a couple different ways.

11          How many emails from that account have you sent?  Is

12  this the only email from that account?

13  A.  I believe that's the only one that I can recall, yes.

14  Q.  How did you -- how were you able to log in to that email

13:35:50   15  if you were in DC?  I thought you didn't use this email

16  account that much -- or ever.

17  A.  I had -- must have had the log-in information with me at

18  the time.

19  Q.  Okay.  And this email is directly related to the -- this

13:36:01   20  Russian -- this Russian conference call; correct?

21  A.  Yes.

22  Q.  And if you read through the body of this email, you can

23  see you have an investor who's concerned about the patents;

24  correct?

13:36:16   25  A.  Yes.

19-CR-26-ABJ              TRIZNA - CROSS - FLEENER              Vol. VI-876
21-CR-14-ABJ

1    Q.  Down here at the bottom, some guy named Daniel; right?

2    A.  Yes.

3    Q.  And that email was to Mike Perry, which would appear to be

4    the -- following up on the conference call; right?

13:36:46    5    A.  That he was following up, yes.

6    Q.  And -- and then Perry's reaching out to Kevin; right?

7            "Kevin, need to put our heads together on this.  What

8    happened is NuTech did buy the patent" -- you see that in the

9    middle of there, May 16th, 2016, at 6:07?

13:37:08    10    A.  Correct.

11    Q.  All right.  Now, you've told this jury before that you're

12    not Kevin, that Bob Mitchell is the guy who's Kevin.  You've

13    told them that?

14    A.  Correct.

13:37:15    15    Q.  But that's not true.  You're Kevin, at least in this

16    email.

17    A.  The one that I sent, yes.

18    Q.  All right.  So the truth is you actually got on your email

19    account as kevin@nutechenergy.com; correct?

13:37:28    20    A.  It would appear so, yes.

21    Q.  And you sent an email as the CEO of kevin@nutechenergy.com?

22    A.  Yes.

23    Q.  And you, of course, told the jury something completely

24    different for the last two hours, that you never had access to

13:37:42    25    your email, never sent emails to -- from this account;

1    correct?

2    A.   That's what I said, yes.

3    Q.   And even in the body of this email, what's interesting is

4    you don't seem to be concerned about the investor losing a

13:37:53    5    bunch of money.  You're concerned about -- talking about

6    clearing up some patent concerns.

7    A.   Well, I believe at the time, when I sent it, I was done

8    with the information in the conference call and went on to the

9    activities we had at the house.

13:38:10    10    Q.   But the truth is you had access to your email account?

11    This story about Bob Mitchell sending all your emails,

12    receiving all your emails, signing your names, giving -- doing

13    all the things, -- you had -- you were doing this stuff, sir.

14    You had access to everything.

13:38:24    15    A.   I disagree a hundred percent that --

16    Q.   Oh.

17    A.   -- I sent those -- all those other emails for sure.

18    Q.   So every other act -- every other email that was sent or

19    received you had nothing to do with; correct?

13:38:34    20    A.   That's correct.

21    Q.   But just this one I happened to find is the one that you

22    happened to have something to do with?

23    A.   That's correct.

24          MR. FLEENER:  You can make that go away.

25    ///

1   BY MR. FLEENER:

2   Q.  And during the conference call, your -- your -- you had a

3   script in front of you; right?

4   A.  That's correct.

13:39:03   5   Q.  But let me -- I want to make sure that everybody is clear.

6       You were the CEO of NuTech Energy?

7   A.  On paper, yes.

8   Q.  Well, you were the CEO of NuTech Energy?  You'd signed

9   papers saying that you were the CEO of NuTech Energy?

13:39:19   10   A.  Correct.

11   Q.  And you had a fiduciary duty -- you -- well, you're also

12   on the board of directors.  You're a one-person member of the

13   board of directors.  That's true, as well?

14   A.  Correct.

13:39:30   15   Q.  And you had a fiduciary duty to the shareholders of NuTech

16   Energy; correct?

17   A.  Correct.

18   Q.  And then you flat-out lied during a conference call?

19   A.  Correct.

13:39:41   20   Q.  And you lied over and over during this conference call;

21   correct?

22   A.  I don't know what your definition of "over and over" is.

23   Q.  More than once?

24   A.  The one -- the only time I think I wasn't a hundred

13:39:58   25   percent accurate was when I said that I was approached.  Other

19-CR-26-ABJ              TRIZNA - CROSS - FLEENER          Vol. VI-879
21-CR-14-ABJ

 1   than that -- there were "we."  And Bob being the team, I feel

 2   that was not false.

 3   Q.   Okay.  So you think you only lied one time during this

 4   conference call?  I want you to know, sir, we've all listened

 5   to the conference call.

 6   A.   That's fine.

 7   Q.   Okay.  You said that "In addition, we have approximately

 8   $15,000 on deposit with a CPA firm out of Florida that we hope

 9   will represent us as our auditor."

10          Was that true or false?

11   A.   At the time I was taking it as true.

12   Q.   Was it true or false?

13   A.   I don't know.

14   Q.   Let me ask you this:  As the CEO and the person that you

15   admit had fiduciary duty to the shareholders, what did you do

16   to confirm whether this was true or false?

17   A.   I --

18   Q.   Let me guess.  Nothing?

19   A.   I didn't doing anything, no.

20   Q.   And "We have acquired approximately 2,000 wells from a

21   company that was and is in distress."  True or false?

22   A.   I believe they were working on that, yes, that's true.

23   Q.   Okay.  That's a true statement?

24   A.   I believe it is.

25   Q.   As you sit here --

19-CR-26-ABJ              TRIZNA - CROSS - FLEENER              Vol. VI-880
21-CR-14-ABJ

1   A.  From what I --

2   Q.  I apologize.

3   A.  From what I was told, yes.

4   Q.  All right.  What did you -- as you sit here today, do you

5   believe that to be true or false?

6   A.  I believe at the time it was true, yes.

7   Q.  As you sit here today?

8   A.  Uh-huh.

9   Q.  As you sit here today, do you believe that statement --

10  A.  What's the -- can you repeat the statement?

11  Q.  Sure.  I'd be happy to.

12      "We have acquired approximately 2,000 wells from a

13  company that was in distress."  As you sit here today, do you

14  believe that statement was true or false?

15  A.  I -- I -- honestly, I don't know.

16  Q.  What did you do -- and I'm going to guess the answer is

17  nothing -- to confirm whether this statement was true or false

18  when you said it during the conference call?

19  A.  I didn't do anything to confirm it.

20  Q.  And, again, you're the CEO?

21  A.  That's correct.

22  Q.  The only person on the board of directors?

23  A.  Correct.

24  Q.  And you admit this was -- you admit that this was a --

25  just a flat-out lie:  "Several weeks ago I was approached by a

13:41:16
13:41:23
13:41:33
13:41:48
13:41:57

19-CR-26-ABJ              TRIZNA - CROSS - FLEENER            Vol. VI-881
21-CR-14-ABJ

1    third party that inquired about our openness to be acquired."

2            Do you recall saying that?

3    A.  Yes.

4    Q.  And you recall that and you know that's just -- that's

5    just an absolute lie?

6    A.  Correct.

7    Q.  Because you were never approached at all?

8    A.  Correct.

9    Q.  And you knew when you said it it was lie?

10   A.  Yes.

11   Q.  And you knew that when you said that lie that people were

12   listening on the conference call?

13   A.  Yes.

14   Q.  And you knew that investors may very well rely on that lie

15   from the -- from the CEO of NuTech Energy?

16   A.  Correct.

17   Q.  And you said it anyway?

18   A.  That's correct.

19   Q.  Why?

20   A.  Because, again, I felt like it was a team effort.  And

21   when Bob says he's been approached, then we've been

22   approached.  So as far as I was concerned, whether I was

23   approached or the team, to me, we were still approached.

24           So I didn't think, at the time, that that was

25   anything that was very significant.

```
19-CR-26-ABJ          TRIZNA - CROSS - FLEENER          Vol. VI-882
21-CR-14-ABJ
```

1  Q.  Well, let's -- I want to make sure -- I want to unravel

2  that a bit.

3  A.  Okay.

4  Q.  Was it a lie when you said it or was it this weird

13:43:00  5  explanation -- I apologize.  I -- strike the word "weird."

6        Was it a lie when you said it?  Did you know it to be

7  false?  Or was it this explanation that you just tried to --

8  gave, which sort of explained away the lie?

9  A.  Say that again, please.

13:43:13  10  Q.  Sure.

11        When you were -- when you said the following words:

12  "Several weeks ago I was approached by a third party that

13  inquired about our openness to be acquired" -- do you recall

14  saying that statement?

13:43:27  15  A.  Yes.

16  Q.  Okay.  Who is "I"?  What does "I" mean to you?

17  A.  That means me.

18  Q.  Okay.  Now I'm going to ask again.  Were you ever

19  approached?

13:43:36  20  A.  No.

21  Q.  All right.  So if "I" means you -- correct?

22  A.  Yes.

23  Q.  -- and you were never approached --

24  A.  Correct.

13:43:42  25  Q.  -- and you said that "I was approached," that would be

19-CR-26-ABJ          TRIZNA - CROSS - FLEENER          Vol. VI-883
21-CR-14-ABJ

1   a lie?

2   A.   Correct.

3   Q.   All right.  Is the differ- -- is the thing that you

4   differentiate lies from maybe not being lies the word "we"?

13:43:57   5   Is that what -- is that what you like to hold onto, is the

6   word "we," because that gives you other people that you can

7   bring into your statements?

8   A.   Well, that's what was going on, is -- when I say "we," the

9   team, Bob was approached as -- from what -- that was my

13:44:11   10   understanding.  So, again, I -- my focus was more about being

11   approached rather than actually who was approached.

12   Q.   Sure.

13        Because you said, well, then, "We have been

14   approached over the years many times to purchase our assets as

13:44:23   15   well as license our technology."

16        Do you recall saying that?

17   A.   Well, if it's in there, yes, uh-huh.

18   Q.   And that's absolutely not true?

19   A.   Not necessarily because Bob is talking to many, many

13:44:34   20   people on different fronts throughout this whole time.

21   Q.   Good.  As the CEO of the corporation, I know it's

22   important -- I know you think it's important to put out

23   truthful information.  Correct?

24   A.   Yes.

13:44:42   25   Q.   Explain to the jury what due diligence you did to confirm

19-CR-26-ABJ            TRIZNA - CROSS - FLEENER          Vol. VI-884
21-CR-14-ABJ

1   that statement.

2        I'll give you the statement again, and then you can

3   explain to the jury what you did to confirm that as CEO.

4        The statement:  "We have been approached over

13:44:53   5   the years many times to purchase our assets as well as license

6   our technology."  Explain to them what you did to confirm that

7   statement as the CEO.

8   A.   As the CEO at the time, I wasn't doing anything in the

9   operations of the company.  Bob was doing all the infor- --

13:45:11  10   was doing all the -- the legwork.  And we would have

11   conversations, and he would keep me up-to-date as to what --

12   if there was any progress.

13        So when we said we were doing due diligence or -- my

14   only due diligence was discussions with Bob because he was the

13:45:25  15   one that was our main point of contact through this whole

16   process.

17   Q.   Thank you.

18        You went on and you said "The right offer never came

19   along until this one."  And then you said, "When I received

13:45:37  20   it, I did not believe it to be bona fide."

21        What does that mean to you?  First of all, do you

22   recall saying that?

23   A.   If it's in the transcript, then, yes, I said it.

24   Q.   Okay.  And now this -- there's no "we" in here.  It says,

13:45:49  25   "When I received the offer" -- again, you're speaking of the

19-CR-26-ABJ          TRIZNA - CROSS - FLEENER          Vol. VI-885
21-CR-14-ABJ

1  offer you never received; correct?

2  A.  Correct.

3  Q.  And you say that you did not believe it to be bona fide.

4  What does that mean?

13:45:57  5  A.  It means it's not true.  Or valid.

6  Q.  And then you went on to say, "However, as we conducted our

7  due diligence, the first thing that occurred to us is that the

8  party making the offer appeared to have the ability to close."

9          You told shareholders that, that "the party making

13:46:15  10  the offer appeared to have the ability to close"; correct?

11  A.  Yes.

12  Q.  You told the shareholders that?

13  A.  That's what the script said, yes.

14  Q.  Right.  And what -- so you talked about the due diligence

13:46:26  15  as you -- "as we conducted our due diligence."

16          What due diligence did you do other than logging on

17  to some Russian site to see if this company actually existed

18  and was willing to pay you $2.5 billion for a company with no

19  assets?

13:46:39  20          What due diligence did you do?

21  A.  Conferring with Bob and everything that he had to give us.

22  That was our -- that was the due diligence that I did.

23  Q.  Okay.  And based on your confirmations with Bob -- your

24  confirmations with Bob -- of course, Bob -- you knew that Bob

13:46:59  25  couldn't have an ownership interest or couldn't be an officer

1   of a corporation; correct?

2   A.   Correct.

3   Q.   Because Bob had been in all sorts of trouble with the SEC?

4   A.   He had been in some.  I didn't know exactly what it was.

13:47:10   5   Q.   Well, why are you taking your information from the guy who

6   can't be the -- an officer in a company?  Why is that your

7   guy?  Why is he the guy who's giving you the information

8   rather than somebody maybe who's -- who could be an officer in

9   a corporation?

13:47:22   10   A.   Because at the time Bob was the one that brought -- he had

11   the knowledge and the expertise.  And the infractions that he

12   did was over 25 years ago.  And so at the time everything

13   seemed to be on the up-and-up.

14   Q.   You went on in the conference call and you said "Once we

13:47:44   15   got past that hurdle" -- the "hurdle" being due diligence and

16   the ability to close -- "we thought about the price."

17        Do you recall saying that?

18   A.   It's in there.

19   Q.   And you said, again, "This was a little high, but once we

13:47:56   20   thought about our ideas of evaluation, it made sense."  Do you

21   recall saying that?

22   A.   Yes.

23   Q.   And so you thought -- based on your conversations with the

24   guy who couldn't be a public officer of a company, you

13:48:08   25   thought -- or an officer of a public company -- you thought,

19-CR-26-ABJ            TRIZNA - CROSS - FLEENER          Vol. VI-887
21-CR-14-ABJ

  1    "Gosh, maybe that price is -- it starts to makes sense,

  2    $2.5 billion for this company"; right?

  3    A.   Correct.

  4    Q.   Truth is during this time you were giving -- during this

13:48:22   5    conference call and immediately after this conference call,

  6    all you wanted to do was make money; true?

  7    A.   Not necessarily.  We wanted to make sure everything was on

  8    the up-and-up and --

  9    Q.   The up-and-up?

13:48:37  10    A.   Yes, sir.

 11    Q.   You think this was the up-and-up?  You think this

 12    conference call that you -- where you flat-out lied was the

 13    up-and-up?

 14    A.   From what I had said before, yes.

13:48:48  15    Q.   You haven't had any conversations about criminal

 16    prosecution?

 17    A.   No.

 18    Q.   You then went on and said "The next section is purely

 19    speculative.  But once we put a technology in our wells and

13:49:09  20    the title and regulatory issues are cleaned up, this offer may

 21    be too low."

 22            You said that, too?

 23    A.   Apparently so, yes.

 24    Q.   And so the $2 1/2 billion offer for the company with no

13:49:19  25    assets, you told the people listening on that conference call

1   that that offer may actually be too low?

2   A.   If that's what is in there, that's what I said, yes.

3   Q.   I mean, the truth is you hoped all this was real; correct?

4   A.   Well, absolutely.  Sure.

13:49:34   5   Q.   So you could get money?

6   A.   That was the whole point of going into the investment.

7   Q.   And you -- and you -- while you were -- and that's why

8   you didn't correct anybody -- or correct any of these

9   statements?

13:49:45   10   A.   Not necessarily, no.

11   Q.   You -- why -- well, you -- you learned later that these

12   statements were false?  You had questions?  I know you

13   testified before the grand jury where . . . you were asked

14   before the grand jury -- you recall testifying before the

13:50:11   15   grand jury?

16   A.   Yes.

17   Q.   And you were brought in, you were sworn to tell the truth,

18   the whole truth, and nothing but the truth, kind of like

19   today?

13:50:18   20   A.   Yes.

21   Q.   And you were questioned by Mr. Heimann, I believe.

22   A.   I believe so, yes.

23   Q.   And he asked you a series of questions, and you knew it

24   was going to be transcribed, and you knew that you were giving

13:50:30   25   sworn testimony?

19-CR-26-ABJ           TRIZNA - CROSS - FLEENER        Vol. VI-889
21-CR-14-ABJ

1    A.  Correct.

2    Q.  And you were asked, "Did you believe this offer was real?"

3            And you answered "Part of me said yes; part of me

4    said no."

13:50:40    5            Do you recall that answer?

6    A.  Yes.

7    Q.  Okay.  Which part says yes and which part says no?  I want

8    to unravel that a little bit.

9            Is it the part that wanted -- that you wanted to make

13:50:52   10    the money said yes but the part that actually knew -- where

11    you kind of thought what the truth was that said no?

12    A.  Precisely.

13    Q.  Okay.  So -- and I appreciate you saying that.

14            The truth is you wanted to -- you'd already -- by

13:51:02   15    this point in time you'd already given Bob -- Bob Mitchell a

16    couple hundred thousand dollars?

17    A.  Correct.

18    Q.  And you were hoping and praying that in one of these

19    investments that Bob Mitchell got you involved with you'd

13:51:12   20    finally strike it rich?

21    A.  Sure.

22    Q.  And you hoped that it would be -- NuTech Energy would be

23    the one you struck -- that you'd strike it rich?

24    A.  That was the main one we were working on, yes.

13:51:22   25    Q.  And that's why you were on the conference call pitching

19-CR-26-ABJ              TRIZNA - CROSS - FLEENER           Vol. VI-890
21-CR-14-ABJ

 1  this stuff?

 2  A.   That was correct.

 3  Q.   Even though you knew it wasn't true?  The -- the

 4  businessperson inside your head, the one who exercises the

 5  logic -- not the one who wants the money, the one who

 6  exercises the logic -- that part of you knew that was

 7  absolutely not true?

 8  A.   No, that's incorrect.

 9  Q.   You hoped it was true?

10  A.   Correct.

11  Q.   All right.  But you were suspicious?

12  A.   There was a little bit, sure.

13  Q.   And you thought it was falsely generated?  You were

14  concerned that the offer was falsely generated at the time it

15  came out?

16  A.   At the time I was more concerned about just the call

17  itself, more -- rather than getting into the -- the -- the

18  source of the information.

19  Q.   And you were concerned about the call itself because you

20  were concerned that you were giving false information --

21  A.   No.

22  Q.   -- in a public conference call?

23  A.   No.  It was concerned about being the one that was giving

24  the -- the -- being on the call and making sure I did a good

25  job.

```
             1   Q.  Well, you did a good job for Mr. Mitchell.

             2          Right?  I mean, you did -- did you think you did a

             3   good job for the share- -- for people who were relying on that

             4   information as you with the fiduciary duty to shareholders?

13:52:41     5   Do you think that was a good job?

             6   A.  If the information that Bob had given me was true, yes.

             7   Q.  I appreciate you wanting to blame Bob Mitchell.

             8          How old are you, sir?

             9   A.  56.

13:52:51    10   Q.  And you -- you have a college degree, I believe, from --

            11   somewhere.

            12   A.  Yes.

            13   Q.  Where?

            14   A.  Virginia Tech.

13:52:57    15   Q.  All right.  In hotel management or something of that --

            16   hospitality and hotel management?

            17   A.  Correct.

            18   Q.  And you've been a businessperson your entire life;

            19   correct?

13:53:08    20   A.  Yes.

            21   Q.  Made millions of dollars?

            22   A.  Oh, I -- I wish I had, sir.

            23   Q.  Sure.  But the bottom --

            24   A.  I didn't --

13:53:16    25   Q.  -- but you've had employees --
```

```
19-CR-26-ABJ          TRIZNA - CROSS - FLEENER          Vol. VI-892
21-CR-14-ABJ
```

1    A.  No -- but the answer to that is, no, I have not made

2    millions of dollars.

3    Q.  Okay.  You -- but you've certainly made decisions that --

4    that -- you've got to make business decisions, hiring and

13:53:29    5    firing over the years?

6    A.  Sure.

7    Q.  Entered into contracts?

8    A.  Yes.

9    Q.  Made important decisions on your family's welfare and

13:53:37    10    well-being?

11    A.  Made decisions, yes.

12    Q.  Sure.  Bought houses, bought cars, made investment

13    decisions, things of that nature?

14    A.  Yes and no.

13:53:45    15    Q.  You've never done these?

16    A.  I've bought cars.  Bought a house two years ago.

17    Q.  Okay.  Well, you've also made investment decisions because

18    you gave Bob Mitchell 200-some-odd-thousand dollars.

19    A.  Yeah, which turned out not to be a real good investment.

13:53:58    20    Q.  I didn't say it was a good investment; I just said you

21    made investment decisions.

22    A.  Correct.

23    Q.  Okay.  And so you've -- you're blaming Bob Mitchell for

24    all of this.  But you were a grown man in 2015; correct?

13:54:13    25    A.  Yes.

19-CR-26-ABJ            TRIZNA - CROSS - FLEENER         Vol. VI-893
21-CR-14-ABJ

 1    Q.  Do the math.  You were 50 years old, give or take?

 2    A.  Correct.

 3    Q.  Don't you think you have a responsibility, as a grown man

 4    and the CEO, to do more than just listen to a guy, Bob

13:54:27   5    Mitchell, feeding you information?  Don't you think you have

 6    more responsibility than that?

 7              MR. HEIMANN:  Argument, Your Honor.

 8              THE COURT:  Sustained.

 9    BY MR. FLEENER:

13:54:46  10    Q.  You actually noticed that there was a spike in the stock

11    price in December of 2015, did you not?  You and Bob Mitchell

12    talked about it?

13    A.  Yes.

14    Q.  And this was before the conference call?

13:54:58  15    A.  I believe so, yes.

16    Q.  And what did -- Bob Mitchell told you why the spike -- the

17    stock -- the -- the stock -- why he believed the stock spiked,

18    didn't he?

19    A.  Yes.

13:55:13  20    Q.  He told you that promoters who do their job, they promote

21    the stock and people buy it; right?

22    A.  That's correct.

23    Q.  So if -- during the time of the conference call you knew

24    that Bob Mitchell was -- was certainly aware of how promoters

13:55:29  25    promote stock?

 1    A.  I was aware, yes.

 2    Q.  And this is the guy you're getting your information and

 3    passing on to the public in the public's sphere?

 4    A.  Correct.

13:55:41   5    Q.  And you talked, I believe, with Mr. Horn -- or excuse me.

 6    Mr. Horn, I apologize.

 7              -- Mr. Ward about opening up -- opening up -- excuse

 8    me -- a NuTech bank account.  Right?

 9    A.  That's correct.

13:55:56  10    Q.  And you put 50 bucks in it?

11    A.  Yes.

12    Q.  And you were the -- you were one of the signers on the

13    account; correct?

14    A.  Correct.

13:56:07  15    Q.  And you would agree that was an action that you took as

16    a -- a -- you were -- you were more than just a name in this

17    operation?  You were on the bank account.

18    A.  It was a bank account that had $50 of my money in it.  So

19    I opened it up, but that's all that ever happened with it.

13:56:25  20    Q.  Well, you hoped it would have a lot more than $50 in it

21    after the end of all this -- after the end of this scheme;

22    correct?

23    A.  Sure.

24    Q.  You hoped NuTech would make a whole bunch of money during

13:56:36  25    this -- during this -- during this operation and that NuTech

19-CR-26-ABJ            TRIZNA - CROSS - FLEENER        Vol. VI-895
21-CR-14-ABJ

1   bank account would have much more than your $50 in it?

2   A.   That's correct.

3   Q.   Okay.  And you -- you also made a -- I think you made a

4   phone call to OTC Markets where you had to identify yourself

13:56:54   5   as the CEO.  Correct?

6   A.   That's correct.

7   Q.   And you -- so -- and this was another act that you took as

8   the CEO?  Not Bob Mitchell but you made the phone call?

9   A.   Bob asked me to come over to his house and instructed me

13:57:07   10   to -- to be with him and get this situation with the OTC that

11   he could be explaining to the guy on the other end what needed

12   to happen.

13        So Bob was the one that was orchestrating that.

14   Q.   And you identified -- I apologize for speaking over you.

13:57:24   15        And you identified yourself as the CEO of NuTech?

16   A.   Correct.

17   Q.   And cleared up whatever needed to be cleared up to get

18   NuTech shares trading again?

19   A.   I just talked to the gentlemen and told him that I was

13:57:35   20   giving him authorization to talk to Bob so that they could

21   talk their language and get any issues resolved they needed to

22   get resolved.

23   Q.   When you read -- and I don't recall your testimony on

24   this.  I'm sorry.

13:57:57   25        I believe your testimony was that we -- when

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1   Mr. Heimann took you through some of the press releases, that

2   you saw that you had quotes in there.  Correct?

3   A.  That's correct.

4   Q.  And you never made quotes?

13:58:13   5   A.  Not the ones in those press releases, no.

6   Q.  But they didn't bother you?  They didn't bother you when

7   you saw them?

8   A.  A little bit did, yes.

9   Q.  Well, I think that's not what you told the grand jury.

13:58:38   10   A.  Okay.

11         MR. FLEENER:  I'm going to strike my prior comment.

12   BY MR. FLEENER:

13   Q.  You did read these press releases when they came online,

14   some of them?

13:59:41   15   A.  Yes.

16   Q.  And did you believe the information at the time was true

17   or false?  Which one?

18   A.  Which -- which one are you talking about?  I --

19   Q.  Any of the press releases.  Press releases were -- were --

14:00:01   20   NuTech did press releases for roughly a year? six months?

21   nine months?

22   A.  I'm not sure what the time frame was.

23   Q.  How many -- well, you recall seeing several press

24   releases?

14:00:12   25   A.  Maybe one or two, to the best of my knowledge.

19-CR-26-ABJ             TRIZNA - CROSS - FLEENER          Vol. VI-897
21-CR-14-ABJ

1   Q.  Okay.  Were the -- the press releases you did see, were

2   they -- did they contain truthful information or information

3   that you knew at the time not to be truthful?

4   A.  I believed that they were true.

14:00:23   5   Q.  Okay.  So the -- as you sit here today, there was -- you

6   don't believe there was anything wrong with the press releases

7   as far as the information in them?  You believe the

8   information in those press releases is true?

9   A.  I believe that's true.

14:00:44   10   Q.  And on -- going back to the Russian -- the Russian

11   conference call, you said you were handed a script; right?

12   A.  Correct.

13   Q.  But the truth is you edited that script a little bit;

14   correct?  You added some information about yourself?

14:00:58   15   A.  Just about myself, my personal background, yes.

16   Q.  But to do that, that means you had to have read the

17   transcript -- or read the -- read the -- read what was handed

18   to you in order to put your own words in there.  Right?

19   A.  I was more focused on my personal background since that

14:01:16   20   was the one that they wanted me to make sure was correct.

21   Q.  You weren't concerned about the stuff that was material at

22   the end?  You were more concerned with where you went to

23   school?

24   A.  I was more concerned about my responsibility for that

14:01:29   25   script.

Melanie Sonntag, RDR, CRR, CRC              MelanieSonntagCRR@gmail.com

19-CR-26-ABJ          TRIZNA - CROSS - FLEENER          Vol. VI-898
21-CR-14-ABJ

1    Q.  And that's -- and that's the word.  You were reading from

2    a script?

3    A.  Correct.

4    Q.  And the script wasn't prepared by you; correct?

14:01:37    5    A.  Correct.

6    Q.  It was prepared -- you think it was prepared by Bob, but

7    you don't really -- but the truth is you have no idea who

8    actually was responsible for it?

9    A.  My belief was that Bob was responsible for it, yes.

14:01:48    10    Q.  Right.  But you don't know that?  You didn't see Bob

11    typing the script?

12    A.  No.  He emailed it to me, but I did not see him typing the

13    script, no.

14    Q.  But you read the script?

14:01:57    15    A.  Yes.

16    Q.  And then you read it online?

17    A.  Correct.

18    Q.  And after -- after NuTech died, for lack of a better term,

19    you still -- you invested again with Bob Mitchell?

14:02:28    20    A.  Ashamingly, yes.

21    Q.  Good.  And you gave him $10,000; correct?

22    A.  Yes.

23    Q.  And the -- the truth is the reason you gave Bob Mitchell

24    $10,000 is that you were still hoping to get all your money

14:02:40    25    back that you'd lost over the years in these investments?

```
19-CR-26-ABJ          TRIZNA - CROSS - FLEENER       Vol. VI-899
21-CR-14-ABJ
```

 1   A.   Absolutely.

 2   Q.   So you gave the guy that had fed you -- now, by that point

 3   in time you knew the information that -- that Bob had given

 4   you was just nonsense; correct?

14:03:03    5   A.   Some of it was, yes.

 6   Q.   Yet, you -- the truth is you weren't concerned whether

 7   DEAC -- DEAC was the investment that you gave $10,000 to

 8   Bob Mitchell on afterwards; correct?

 9   A.   Correct.

14:03:19   10   Q.   The truth is you weren't concerned at all whether DEAC was

11   on the level? off the level?  All you wanted to do was get

12   your money back?

13   A.   There was really no question on the DEAC being right or

14   wrong.  It was "This is how we're going to do it," so I went

14:03:39   15   ahead and invested, mostly from what Red said, not necessarily

16   Bob, because Red was the one that brought it to my attention.

17   Q.   And this is -- but this is just like NERG?  All you cared

18   about was making money?  You didn't care about anything else;

19   agreed?

14:03:58   20   A.   I'm not sure when you say -- the question what else was

21   there to care about.  It was either invest and make the money

22   or --

23           MR. FLEENER:  No further questions.  Thank you.

24   ///

25   ///

1        REDIRECT EXAMINATION

2   BY MR. HEIMANN:

3   Q.   Looking back, did Bob Mitchell lie to you about the

4   natural gas investment?

5   A.   I think so, yes.

6   Q.   You testified on direct that you invested 200,000,

7   somewhere in that range?

8   A.   Correct.

9   Q.   Mr. Ward asked you about your revenues and your business.

10  There were a couple years where you made more than a million

11  dollars in your business.

12         Was that gross revenue or was that profit?

13  A.   Oh, that was just gross revenue.

14  Q.   If I heard correctly, you were taking home a salary of

15  like around 75,000.

16  A.   Correct.

17  Q.   Where did you get the money that you invested with

18  Bob Mitchell?

19  A.   My wife passed away of cancer, and there was an insurance

20  policy.

21  Q.   Was it the insurance money that you lost to Bob?

22  A.   Yes.

23  Q.   When you were reading off the script for the conference

24  call, were you relying on Bob's information?

25  A.   Yes.

19-CR-26-ABJ          TRIZNA - RECROSS - FLEENER          Vol. VI-901
21-CR-14-ABJ

1    Q.  Did you have any shares of NuTech at that time?

2    A.  I believe I did, yes.

3    Q.  Were they restricted or free trading?

4    A.  Restricted.

14:06:55  5    Q.  So you weren't able to sell them?

6    A.  No.

7    Q.  And you didn't sell them?

8    A.  I did not sell them, no.

9    Q.  Nobody paid you after the conference call?

14:07:04  10   A.  Excuse me?

11   Q.  Did anybody pay you after the conference call?

12   A.  No.

13   Q.  I'm sorry?

14   A.  No, sir.

14:07:17  15          MR. HEIMANN:  I have no other questions, Your Honor.

16          MR. FLEENER:  Based on the Government's . . .

17          THE COURT:  If you've got some evidence.

18          MR. FLEENER:  I'm sorry?

19          THE COURT:  If you have some evidence.

14:07:37  20                    **RECROSS-EXAMINATION**

21   BY MR. FLEENER:

22   Q.  I'm going to show you Defendant's -- Herman's Exhibit B,

23   which has been admitted into evidence.

24          I'm going to show you the second part of it.

14:08:04  25          (Discussion held at the podium.)

19-CR-26-ABJ          TRIZNA - RECROSS - FLEENER          Vol. VI-902
21-CR-14-ABJ

1       MR. FLEENER:  My screen's up now -- well -- my

2   screen's up now.

3   BY MR. FLEENER:

4   Q.  Sir, you can see Herman's Exhibit B up there; correct?

14:08:55   5   A.  Yes.

6   Q.  And the -- the bottom of that page starts with a

7   forwarding message from Daniel Amoruccio.  You see that;

8   correct?

9   A.  Yes.

14:09:09   10   Q.  Why don't you -- why don't you read the last four -- the

11   last four lines of Herman's Exhibit B.

12   A.  You want me to read it?

13   Q.  Please.  Out loud.

14   A.  Excuse me?

14:09:26   15   Q.  Out loud.

16   A.  "Mike, I'll be honest with you . . . I'm a struggling 30s

17   male, married with kids . . . I believe in NERG and want to

18   see the good in all of this.  I'm getting slammed left and

19   right saying this is a scam but refuse to believe it -- and

14:09:40   20   I have my life savings into this stock since last year."

21   Q.  Go ahead and finish with the second page here.

22   A.  "I'm looking to you, man to man, hoping to God that I'm

23   not making the wrong decision here.  I simply wouldn't know

24   what to do if it were otherwise.  Any information regarding

14:09:55   25   the patent would be helpful, as it would help calm my nerves

1    and put the naysayers to rest.  Respectfully, Danny

2    Amoruccio."

3    Q.  I appreciate that you lost money to Bob Mitchell, sir.

4    I really do.  However, your statements in that conference call

14:10:14   5    led this man to lose money, apparently.  You would agree with

6    that?

7    A.  No.

8    Q.  Oh, okay.  Why not?

9          You don't think your con- -- you don't think the

14:10:30   10    statements --

11          MR. HEIMANN:  Your Honor, the defense -- the witness

12    should be allowed to answer the question.

13    BY MR. FLEENER:

14    Q.  Answer the question.  Why not?

14:10:36   15    A.  Because at the time the information that was given to me

16    was what I went on and didn't know that it was false.

17    Q.  Are we going to go through all those statements again that

18    you said -- that you admitted were not true about "I received

19    offers"?  We don't need to do that again; right?

14:10:53   20    A.  I think the -- the information that I/we were given is

21    what I was going off of.  The statement that I received the

22    information, to me, was not as important as . . .

23          MR. FLEENER:  Thank you.  No further questions.

24          MR. HEIMANN:  Nothing else, Your Honor.

14:11:23   25          THE COURT:  Mr. Trizna, you are excused.

19-CR-26-ABJ          LINHART - DIRECT - SZOTT          Vol. VI-904
21-CR-14-ABJ

1      MR. SZOTT:  Your Honor, at this time the Government

2   calls Charles Linhart.

3          THE COURTROOM DEPUTY:  Please raise your right hand.

4      (Witness sworn.)

14:12:21   5          THE COURTROOM DEPUTY:  Please take a seat.

6          Please state and spell your name for the record.

7          THE WITNESS:  It's Charles Linhart.  That's

8   C-h-a-r-l-e-s L-i-n-h-a-r-t.

9          MR. SZOTT:  Mr. Linhart, good afternoon.

14:13:10  10          THE WITNESS:  Good afternoon.

11    **CHARLES LINHART, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

12   **BY MR. SZOTT:**

13   Q.  Without giving the address, where do you live?

14   A.  I live in Dayton, Wyoming.

14:13:17  15   Q.  And where is Dayton, Wyoming?

16   A.  Just north of Sheridan about 20 miles.

17   Q.  About how long have you lived in Dayton?

18   A.  Oh, 20 -- about 26 years, I think.

19   Q.  What do you do for a living?

14:13:35  20   A.  I'm a fencing contractor.

21   Q.  How long have you been doing that sort of work?

22   A.  About -- pretty close to the same, 25 years, probably, for

23   sure.

24   Q.  Does your contracting company have an office?

14:13:50  25   A.  Yes.

1    Q.  Where is the office?

2    A.  It's in Sheridan.

3    Q.  Mr. Linhart, when you traveled to court for your

4    testimony, did you come with anyone else?

14:14:03   5    A.  I did.

6    Q.  Who did you come with?

7    A.  My son Chase Linhart and Chrysti Bluemel.

8    Q.  And what, if any, relationship do you have with

9    Ms. Bluemel?

14:14:14  10    A.  We've been -- she's my fiancée.  We've been together for

11    10 years.

12    Q.  And how did you and your son and Ms. Bluemel travel down

13    to Cheyenne for your testimony today?

14    A.  We flew in my plane.

14:14:34  15    Q.  And who was doing the flying?

16    A.  My son and I both.  He has his pilot license, also.

17    Q.  Mr. Linhart, I'd like to ask you some questions now about

18    a company called NuTech Energy Resources or NERG.

19         How did you first learn about an investment

14:15:01  20    opportunity that was related to what would eventually be

21    NuTech?

22    A.  It was -- well, a couple of different ways that I'd

23    learned about it.

24         There was an article in the Casper Star-Tribune that

14:15:15  25    I had first read that talked about this technology, and then,

19-CR-26-ABJ          LINHART - DIRECT - SZOTT          Vol. VI-906
21-CR-14-ABJ

 1  also, the lady that does my books also does the books for a

 2  guy by the name of Ed Pressley.

 3        And between what I had read in the paper and then

 4  meeting this Ed Pressley through my bookkeeper is how I'd got

 5  acquainted with it.

 6  Q.  So did you speak with Mr. Pressley about this investment

 7  venture?

 8  A.  Yes.

 9  Q.  Ultimately, did you invest money with Mr. Pressley?

10  A.  I did.

11  Q.  At that time, related to this venture, how much did you

12  invest with Mr. Pressley?

13  A.  $5,000.

14        MR. SZOTT:  Mr. Davila, would you please bring up

15  Exhibit 308.

16  BY MR. SZOTT:

17  Q.  Mr. Linhart, would you take just a moment and look at

18  Government's Exhibit 308, which is now appearing on your

19  monitor.

20  A.  Okay.

21  Q.  Do you recognize that document?

22  A.  Yes.

23  Q.  What is it?

24  A.  It was a -- shares of -- that -- with my $5,000

25  investment, I was promised through Ed Pressley that I would

14:15:37 (line 5)
14:15:52 (line 10)
14:16:12 (line 15)
14:16:48 (line 20)
14:17:01 (line 25)

19-CR-26-ABJ          LINHART - DIRECT - SZOTT          Vol. VI-907
21-CR-14-ABJ

1   get these shares of this EcoEmissions Solutions.

2   Q.  From what you can see -- well, let me -- let me strike

3   that and ask a better question.

4        How did you receive this certificate?

14:17:18   5   A.  It was hand delivered to my office from Ed Pressley.

6   Q.  From what you can see on your monitor, Mr. Linhart, does

7   this digital copy appear to be a true and exact copy of the

8   physical certificate that you received?

9   A.  Yes, it does.

14:17:34   10       MR. SZOTT:  Your Honor, the United States would offer

11   Exhibit 308.

12       MR. FLEENER:  No objections.

13       THE COURT:  Exhibit 308 is received.

14   (Government's Exhibit 308 received into evidence.)

14:17:44   15   BY MR. SZOTT:

16   Q.  Mr. Linhart, after you received this stock certificate

17   from Mr. Pressley, did you ever attempt to sell these

18   7.65 million shares of EcoEmissions Solutions?

19   A.  I did not.

14:18:05   20   Q.  At the time were you thinking you would ever be able to

21   sell these shares?

22   A.  According to Ed, these were supposed to be converted into

23   the -- the new company, which was -- would have been

24   NuTech Energy.

14:18:21   25   Q.  Mr. Linhart, I'd like to ask you some questions about

19-CR-26-ABJ              LINHART - DIRECT - SZOTT          Vol. VI-908
21-CR-14-ABJ

1    NuTech Energy.

2           What, if anything, did you do to gain information

3    about NuTech Energy and follow the company's apparent

4    progress?

14:18:39    5    A.  Well, after -- after I had talked to Ed, I researched

6    NuTech because, knowing that it was going to be the -- the

7    company replacing this EcoEmissions Solutions -- or

8    EcoEmissions -- I started researching NuTech, got onto their

9    website and then following the different news articles that

14:19:03   10    came out on my E*Trade account and then, also, on Yahoo

11    Finance.

12    Q.  What, if anything, do you remember about -- seeing on

13    NuTech's website in particular?

14    A.  It was just -- mostly just an overview of their company.

14:19:16   15    There wasn't anything that really stood out.

16    Q.  Now, you mentioned, I believe, monitoring press releases.

17    Is that right?

18    A.  That's correct.

19    Q.  And what platforms would you use to monitor those press

14:19:29   20    releases?

21    A.  They come out on E*Trade anytime there was news out and

22    then, also, on Yahoo Finance.

23    Q.  Just in general, Mr. Linhart, what do you remember about

24    the nature of the press releases that you read on E*Trade

14:19:43   25    and/or Yahoo Finance?

```
19-CR-26-ABJ         LINHART - DIRECT - SZOTT         Vol. VI-909
21-CR-14-ABJ
```

```
              1   A.  They would give updates on status of the company.  As it

              2   progressed, they talked about how they were acquiring fields

              3   and infrastructure, such as compressors and pipelines and --

              4   and stuff like that so --

14:20:04      5   Q.  What, if anything, did you do to monitor the stock price

              6   of the NERG stock?

              7   A.  Oh, at that time I was watching it pretty closely, about

              8   on a daily basis, so --

              9   Q.  How were you watching it?

14:20:18     10   A.  Through my E*Trade account.

             11   Q.  Ultimately, Mr. Linhart, did you ever decide to purchase

             12   NERG shares?

             13   A.  What do you mean by "ultimately"?

             14   Q.  Let me strike that.

14:20:32     15        At some point did you decide to purchase shares of

             16   NERG, N-E-R-G?

             17   A.  Yes.

             18   Q.  Do you recall what made you make that decision?

             19   A.  Just from what I understood about the technology.

14:20:46     20   Q.  Did you purchase NERG shares on more than one occasion?

             21   A.  Yes, multiple occasions.

             22   Q.  How would you purchase those shares?

             23   A.  Through my E*Trade account.

             24   Q.  And, logistically, how -- if you are going to buy stock on

14:21:06     25   your E*Trade account, what do you do?
```

19-CR-26-ABJ          LINHART - DIRECT - SZOTT          Vol. VI-910
21-CR-14-ABJ

1    A.  You can put in -- type in the ticker symbol and then put

2    an order in, either a buy or a sell order, usually good for a

3    day so --

4    Q.  And, technologicallywise, how are you telling E*Trade how

14:21:21    5    much you want to buy?

6    A.  You punch in the amount of shares that you would like to

7    purchase so --

8    Q.  On the computer?

9    A.  Yes.

14:21:46    10          MR. SZOTT:  Mr. Davila, would you please bring up

11    Exhibit 401.

12          May I have a moment, Your Honor.

13          THE COURT:  You may.

14       (Discussion held at counsel table.)

14:22:17    15          MR. SZOTT:  Your Honor, may I approach the witness.

16          THE COURT:  You may approach the witness.

17    BY MR. SZOTT:

18    Q.  Mr. Linhart, I've just handed you what's been marked for

19    identification as Government's Exhibit 401.  I'll ask that you

14:22:40    20    take just a moment and page through the 11 pages of that

21    document.

22    A.  That is from my account, and those do look accurate.

23    Q.  And when you say "my account," with what institution is

24    that account?

14:23:56    25    A.  Through E*Trade.

19-CR-26-ABJ        LINHART - DIRECT - SZOTT        Vol. VI-911
21-CR-14-ABJ

 1   Q.  I'd ask that you look at the first page of the exhibit,

 2   the address block in the upper right.

 3          Is that your name and address?

 4   A.  It is.

14:24:07   5   Q.  Looking on your monitor, Mr. Linhart, I'll note that

 6   there's a redaction.  Apart from the redaction in your address

 7   block and then at the bottom where there's the account

 8   number -- I guess there's another one in the lower left where

 9   there's your account number -- otherwise, does that appear to

14:24:24  10   be the same document on the first page?

11   A.  It does.  It does, yes.

12          MR. SZOTT:  The Government would offer 401,

13   Your Honor.

14          MR. FLEENER:  No objections.

14:24:32  15          THE COURT:  401 is received.

16      (Government's Exhibit 401 received into evidence.)

17   BY MR. SZOTT:

18   Q.  Just to give a little more details about Exhibit 401,

19   Mr. Linhart, the first 6 pages of that 11-page exhibit, did

14:24:52  20   those pages appear to be a -- an account statement from

21   April 1, 2016, through May 31, 2016?

22   A.  That is correct.

23   Q.  I'd ask that you turn to page -- actually, I'll bring up

24   on your monitor --

14:25:25  25          MR. SZOTT:  Mr. Davila, would you please bring up

1    page 5 of the exhibit.

2              I'm sorry.  It was right in front of me the whole

3    time.

4              Mr. Davila, would you please magnify this portion of

14:27:01   5    the exhibit.

6    BY MR. SZOTT:

7    Q.  Mr. Linhart, as of May 31st, 2016, how many shares of NERG

8    did you own?

9    A.  5 million shares.

14:27:18   10   Q.  Since May 31st of 2016, have you sold any?

11   A.  Yes.  I recently have.

12   Q.  And how did you do that?

13   A.  Through my E*Trade account.

14             MR. SZOTT:  Let's go to page 7.

14:27:38   15             And, Mr. Davila, would you please magnify this

16   portion of the exhibit.

17   BY MR. SZOTT:

18   Q.  Mr. Linhart, what is the jury seeing here in the magnified

19   portion of page 7 of Government's Exhibit 401?

14:28:00   20   A.  Just that I had bought 5,000 -- yeah -- 5,000 shares on

21   9/30 of -- of 2015 and then, also on 9/30/2015, I bought

22   9500 shares.

23             MR. SZOTT:  Mr. Davila, would you bring up page 8,

24   please.

14:28:37   25             And please magnify that portion.

19-CR-26-ABJ         LINHART - DIRECT - SZOTT         Vol. VI-913
21-CR-14-ABJ

1    BY MR. SZOTT:

2    Q.  Mr. Linhart, what is the jury seeing here in the magnified

3    portion, which is trade date 10/30/15 and trade date 11/19?

4    A.  On trade date 10/30/15 I had bought 40,000 shares and then

14:29:03   5    on 11/19 of 2015 I bought 28,500 shares.

6         MR. SZOTT:  Page 9, please, Mr. Davila.

7         If you'd please magnify --

8    BY MR. SZOTT:

9    Q.  Mr. Linhart, fair to say that on the trade dates indicated

14:29:43  10    you purchased 25,000, 40,000, 500,000, and 80,000,

11    respectively, of NERG?

12    A.  That is correct.

13         MR. SZOTT:  Page 10, please, Mr. Davila.  I think

14    it's the next page.

14:30:13  15         Please magnify that portion.

16    BY MR. SZOTT:

17    Q.  Mr. Linhart, what are we seeing for trade date 1/13/2016?

18    A.  I bought 900,000 shares.

19         MR. SZOTT:  Page 11 or the next page, Mr. Davila.

14:30:37  20         If we could magnify that portion there.

21    BY MR. SZOTT:

22    Q.  Same question, Mr. Linhart:  What are we seeing here on

23    trade dates 2/5/16 and 2/8/2016?

24    A.  On 2/5/16 I bought 372,000 shares and on 2/8/16, I bought

14:30:58  25    1 million shares.

19-CR-26-ABJ        LINHART - DIRECT - SZOTT        Vol. VI-914
21-CR-14-ABJ

1      MR. SZOTT:  Then, lastly, Mr. Davila, can we go back

2  to page 6?

3      If we could magnify trade date 5/4/16.

4  BY MR. SZOTT:

14:31:25   5  Q.  Mr. Linhart, what's the jury seeing here on trade date

6  5/4/16?

7  A.  I had purchased 2 million shares.

8  Q.  We've gone through, Mr. Linhart, these various purchases

9  you had during various periods of time.

14:31:37  10      What do you recall about your motivation for making

11  these various purchases at -- on these various dates?

12  A.  Most of it was based on the news articles that were coming

13  out.

14  Q.  So would you explain that just a little further?

14:31:56  15  A.  Well, every time there was a -- excuse me.

16      Mostly every time that there was a positive news

17  article that would come out, I would be inclined to purchase

18  more shares.

19  Q.  Mr. Linhart, I'd like to ask you briefly about an investor

14:32:26  20  conference call in May of 2016.

21      Do you recall that conference call?

22  A.  I do.

23  Q.  How did you learn about that conference call?

24  A.  It was through one of the news articles through -- it was

14:32:38  25  either E*Trade or Yahoo Finance.

19-CR-26-ABJ          LINHART - CROSS - WARD          Vol. VI-915
21-CR-14-ABJ

1   Q.  Did you listen to the call?

2   A.  I did.

3          MR. SZOTT:  May I have a moment, Your Honor.

4          THE COURT:  You may.

14:32:50   5   (Discussion held at counsel table.)

6   BY MR. SZOTT:

7   Q.  Mr. Linhart, the transactions we've looked at in

8   Exhibit 401, do you recall where you were when you made those

9   trans- -- when you made those purchases?

14:33:18   10  A.  I believe I was in my office.

11  Q.  And that's in Sheridan?

12  A.  Yes.

13  Q.  Is that typically where you do your trading on E*Trade?

14  A.  Yes.

14:33:30   15         There possibly could have been one -- one or two on

16  my phone.  I have access to that account on my phone, also.

17  But -- but the majority of them were -- would have definitely

18  been in my office.

19         MR. SZOTT:  I would pass the witness for

14:33:41   20  cross-examination, Your Honor.  Thank you.

21         MR. WARD:  Good afternoon, Mr. Linhart.  My name is

22  Zenith Ward, and I represent Charles Winters.

23                    **CROSS-EXAMINATION**

24  BY MR. WARD:

14:34:10   25  Q.  Have you ever had any contact with Charles Winters?

1   A.  I have not.

2   Q.  You -- you said that you came down for your testimony

3   today in a plane from Sheridan?

4   A.  That's correct.

14:34:25   5   Q.  One of the cool things about Wyoming, people can still

6   commute -- commute by small plane.  That's great.

7           You said that the reason that you invested in this

8   natural gas technology was because of Ed Pressley; right?

9   A.  That's correct.

14:34:45   10   Q.  And when was that, year -- yearwise or as specific as you

11   can be?

12   A.  Oh, I want to say it probably started around 2014.

13   Q.  And were you approached by Ed Pressley?  Did you know him

14   previous?

14:35:03   15   A.  I did not, no.

16   Q.  So how did -- how did you end up talking to Ed Pressley?

17   A.  Through my -- my bookkeeper.  She also does the books for

18   him.

19           And we had talked about the article that was in the

14:35:16   20   Casper Star-Tribune about his technology, and then I told her

21   that I was very interested in it, so that's how I got

22   acquainted with Ed.

23   Q.  And the article you're talking about in the Casper

24   Star-Tribune, was that about High Plains Gas?

14:35:34   25   A.  I think Ed might have still been working for High Plains.

1    I'm not sure, though.

2    Q.   And that article, it sounds like, was specific to the

3    technology that was going to -- was supposed to allow you to

4    extract the natural gas from the coalbed methane wells without

14:35:53   5    removing the water.

6    A.   That's correct.

7    Q.   Would you have bought any of these -- do you think you

8    would have made any of the purchases of NERG if you hadn't

9    have been introduced to the technology by Ed Pressley?

14:36:04   10   A.   No.  I would have never known about it.

11   Q.   And when you made that initial investment with

12   Ed Pressley, you actually handed him cash; is that right?

13   A.   A check.

14   Q.   It was a check?

14:36:15   15        And who was it made out to?

16   A.   That I don't -- I don't remember exactly.

17   Q.   Was it Ed Pressley or was it a business entity?

18   A.   I don't know if it was Ed or BSR Group.  It was one of

19   the two.

14:36:27   20   Q.   You don't happen to have your checkbook with you today,

21   do you?

22   A.   I don't, no.

23   Q.   Now, after -- so what did Ed Pressley tell you when you

24   talked to him about this technology?

14:36:44   25   A.   He just kind of give a brief overview of what it did or

           1   what it was supposed to do.

           2        And I'm a fencing independent contractor, so we did a

           3   lot of work in the methane.  And then, of course, the news

           4   that came out on a daily basis was what to do with the

14:37:01   5   extracted water out of the wells.

           6        So when I was informed that they potentially had a

           7   device that would extract the gas without the removal of the

           8   water, it, to me, was a no-brainer so --

           9   Q.  And when you say the news was coming out every day, those

14:37:18  10   were news articles about the problems inherent in the --

          11   the -- or are you telling me -- what were those news articles

          12   about?

          13   A.  Yeah, just local news through the paper and on the radio

          14   about what -- you know, DEQ issues with the water.

14:37:33  15   Q.  So those weren't -- those weren't articles that were

          16   promoting any -- any kind of technology?  They were about

          17   problems with the wells and the water?

          18   A.  That's correct, yes.

          19   Q.  And do you know, do those articles -- did those articles

14:37:50  20   relate to High Plains Gas?

          21   A.  No.

          22   Q.  Now, are you familiar with OTC Markets?

          23   A.  Yes.  Vaguely but yes.

          24   Q.  Did you ever look at any documents on OTC Markets in order

14:38:06  25   to make a decision about whether or not to buy NERG stock?

19-CR-26-ABJ          LINHART - CROSS - WARD          Vol. VI-919
21-CR-14-ABJ

1   A.  I believe -- if -- if I remember right, before they went

2   to the -- OTC is over the counter.  They go on a pink slip and

3   they're issued to the prospective bidder or whatever.  I --

4   I believe it was traded on a -- a different platform before

14:38:29   5   the -- it went to the OTC.

6   Q.  So I guess to -- to my question, you never went on

7   OTC Markets and looked at documents that were uploaded

8   associated with NERG to make an investment decision?

9   A.  Not from the OTC, I don't believe, no.

14:38:46   10   Q.  Okay.  Would it have -- you never made an investment

11   decision about NERG based on whether a debt assignment

12   agreement involving David Rodgers or Gordon Pardy was dated in

13   2013 or 2014, did you?

14   A.  No.  I've never heard of that.

14:39:09   15   Q.  And it wouldn't have made a difference to you in making a

16   decision to buy NERG stock whether or not Bravo 2.0 had

17   purchased Dave Rodgers' and Gordon Pardy's convertible notes

18   for either 80 or $280,000?

19   A.  No.

14:39:32   20   Q.  It wouldn't have made a difference to you in making an

21   investment decision whether or not Gordon Pardy or Dave

22   Rodgers had signed statements of nonaffiliation, would it?

23   A.  No.

24   Q.  Okay.  You said you recently sold NERG stock; right?

14:39:51   25   A.  Correct.

1   Q.   How recent?

2   A.   Just earlier this spring.

3   Q.   And what price did you sell that stock at?

4   A.   I don't remember exactly.  It was just -- it was hovering

14:40:02   5   around -- my 5 million shares was between 550 and 500 for the

6   last seven or eight years, and I think it jumped up to 5,000,

7   so I thought it's time to see if I can't recoup some of my

8   investment.

9   Q.   All right.  I want to make sure I understand what you're

14:40:19   10   saying.

11       So the NERG stock you owned normally was worth

12   between 500 and $550; is that right?

13   A.   $5 and 500.

14   Q.   $5 and $500 for the last several years?

14:40:32   15   A.   Correct.

16   Q.   And then just recently -- this last spring; correct?

17   A.   Yes, sir.

18   Q.   -- is when it jumped up to $5,000?

19   A.   Yes.

14:40:41   20   Q.   Do you have any idea what would have caused that jump in

21   the NERG stock price?

22   A.   That's usually influenced by day traders.

23   Q.   So not having anything to do with press releases; right?

24   A.   Right.  Correct.

14:40:55   25   Q.   And you're aware that NERG certainly hasn't been doing any

19-CR-26-ABJ          LINHART - CROSS - WARD          Vol. VI-921
21-CR-14-ABJ

 1  kind of business for several years; right?

 2  A.   Correct.

 3  Q.   But the price can still jump that much, a hundred to

 4  10 times, just by day traders?

14:41:10  5  A.   Correct.

 6  Q.   So after you -- so did you sell all your NERG stock for

 7  5,000?

 8  A.   No.  I was -- I could only sell just bits of it at a time

 9  because you have to have a buyer on the other end of your

14:41:28  10  trade to purchase it so --

 11  Q.   Sure.

 12  A.   -- I would throw a number out there and see if somebody

 13  would bite on it so --

 14  Q.   And so how many shares did you own?

14:41:35  15  A.   I had 5 million.

 16  Q.   And how many of those 5 million were you able to sell?

 17  A.   All of -- I think all but 500,000 shares.

 18  Q.   So -- oh, gosh.  I'm going to get in trouble trying to do

 19  the math here.  But maybe 90 percent?

14:41:50  20  A.   Yeah, pretty close.

 21  Q.   And so you -- I would imagine you netted -- what? --

 22  4500 bucks from that transaction maybe?

 23  A.   No.  Maybe about -- oh, I think maybe 1600 at the most.

 24  Q.   Okay.  So for 90 percent of your NERG stock, you got about

14:42:11  25  1600 bucks?

```
19-CR-26-ABJ       LINHART - CROSS - FLEENER       Vol. VI-922
21-CR-14-ABJ
```

1    A.  Yes.

2    Q.  And do you know what your -- your cost basis was or how

3    much you -- how many dollars you had put into it, your NERG

4    stock, combining all your purchases?

14:42:23    5    A.  It was around $8,000, I believe, originally.

6    Q.  And so you'd still be down maybe --

7    A.  $6200.

8    Q.  -- $6200?

9         MR. WARD:  Those are all the questions I have,

14:42:48    10    Your Honor.

11         Thank you.

12         MR. JUBIN:  I have no questions for Mr. Linhart.

13    Thank you.

14         THE COURT:  Thank you, Mr. Jubin.

14:43:33    15         MR. FLEENER:  Sir, how are you?

16         THE WITNESS:  I'm good.

17         MR. FLEENER:  My name is Tom Fleener.  I'm a lawyer

18    from Laramie.  It's nice to meet you, sir.

19                          **CROSS-EXAMINATION**

14:43:30    20    **BY MR. FLEENER:**

21    Q.  After your investments with NERG, you -- you invested

22    again with Ed Pressley -- right? -- in BSR?

23    A.  Yes.

24    Q.  How much was that?

14:43:47    25    A.  It was another 5,000.

```
         19-CR-26-ABJ        LINHART - CROSS - FLEENER      Vol. VI-923
         21-CR-14-ABJ
```

           1   Q.  Did you get your money back from Ed on that one --

           2   A.  No.

           3   Q.  -- or no?

           4   A.  No.

14:43:52   5   Q.  Are you investing any more with Ed Pressley?

           6   A.  No.

           7   Q.  It's probably wise?

           8   A.  Yeah.

           9          MR. FLEENER:  The witness nodded and smiled.

14:44:01  10          Thank you, sir.

          11   BY MR. FLEENER:

          12   Q.  And the truth is -- I mean, I've looked at -- through

          13   your -- through your E*Trade account.  I mean, it's --

          14   penny -- you know -- you understand that penny stocks are a

14:44:10  15   risky, risky investment; correct?

          16   A.  Very risky.

          17   Q.  And you're either going to win or you're going to lose

          18   probably?

          19   A.  (Moved head up and down.)

14:44:16  20          MR. FLEENER:  And the witness is nodding.

          21          And I'm sorry.  I had to say that because she has to

          22   record your answers when you nod.

          23          THE WITNESS:  Oh, sorry.

          24          MR. FLEENER:  That's all right.

          25   ///

19-CR-26-ABJ          LINHART - CROSS - FLEENER          Vol. VI-924
21-CR-14-ABJ

1    BY MR. FLEENER:

2    Q.   But penny stocks are very risky investments?

3    A.   They are, yes.

4              MR. FLEENER:  No further questions.  Thank you.

5              MR. SZOTT:  Nothing on redirect, Your Honor.

6              I'd ask that the witness be excused.

7              THE COURT:  Mr. Linhart, you are excused.

8              THE WITNESS:  Thank you.

9              MR. SZOTT:  Your Honor, the next witness will be

10   short.  I might ask the Court if I could have a -- maybe a

11   60-second stretch break to speak with defense counsel.

12             THE COURT:  Let's stretch.

13             Thank you, Mr. Szott.

14             MR. SZOTT:  Your Honor, thank you.

15             The Government now calls Chase Linhart.

16             THE COURTROOM DEPUTY:  Please raise your right hand.

17        (Witness sworn.)

18             THE COURTROOM DEPUTY:  Please take a seat.

19             Please state and spell your name for the record.

20             THE WITNESS:  Chase Linhart, C-h-a-s-e L-i-n-h-a-r-t.

21             MR. SZOTT:  Mr. Linhart, good afternoon.

22             THE WITNESS:  Good afternoon.

23             MR. SZOTT:  Let me ask you to speak up so we make

24   sure that the microphone captures your response.

25             THE WITNESS:  Yes.

14:44:35 (line 5)
14:45:07 (line 10)
14:45:59 (line 15)
14:46:51 (line 20)
14:47:07 (line 25)

1          MR. SZOTT:  Okay.  Good.

2     **CHASE LINHART, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

3   **BY MR. SZOTT:**

4   Q.   Mr. Linhart, where do you live?

14:47:11  5   A.   Dayton, Wyoming.

6   Q.   And where in Wyoming is that?

7   A.   North central.

8   Q.   How long have you lived there?

9   A.   Three months.

14:47:25  10  Q.   How long have you lived in that area of Wyoming?

11  A.   25 years.

12  Q.   And how old are you?

13  A.   25.

14  Q.   What's your relationship with Charlie Linhart?

14:47:40  15  A.   He's my father.

16  Q.   What do you do for a living?

17  A.   I'm a fence construction foreman.

18  Q.   Do you work for your dad?

19  A.   Yes.

14:47:50  20  Q.   Mr. Linhart, I'd like to ask you some questions about your

21  investments in NuTech Energy Resources or NERG.

22          How did you first learn about NERG as an investment

23  opportunity?

24  A.   My dad told me about it.

14:48:11  25  Q.   Did you invest any money with a man named Ed Pressley?

1  A.  No, not directly.

2  Q.  Did you purchase any NERG stock?

3  A.  Yes.

4  Q.  What, if anything, did you do to learn more about the

14:48:35  5  company before making those investment decisions?

6  A.  Through E*Trade, did some research, read some articles,

7  and took advice from my dad.

8  Q.  Did you -- were you also able to monitor the stock price

9  on E*Trade?

14:48:51  10  A.  Yes.

11  Q.  And what other research were you doing in order to learn

12  more about the company?

13  A.  Just articles, reading articles.  We listened to the phone

14  call and just conversing with my dad, strategizing with him.

14:49:15  15  Q.  The articles you're talking about, was that online?

16  A.  Online, yes, through E*Trade.

17  Q.  I'd like to ask you about some investments that you made

18  in NERG between January and May of 2016.

19        Do you remember making those investments?

14:49:36  20  A.  Yes.

21  Q.  And in preparation for your testimony today, did you

22  review anything to refresh your recollection on some of the

23  more specific details --

24  A.  Yes.

14:49:49  25  Q.  -- of those investments?

1    A.  Yes.

2              MR. SZOTT:  May I approach the witness, Your Honor.

3              THE COURT:  You may.

4    BY MR. SZOTT:

14:49:59    5    Q.  Mr. Linhart, I've handed you what's been marked for

6    identification only as -- give me a moment -- Exhibit 425.

7              Without talking about the specific content, what is

8    Government Exhibit 425?

9    A.  This is the amount of money that I invested in NuTrade --

14:50:15    10   or in NuTech, total.

11   Q.  And did you bring that with you to the courthouse today?

12   A.  Yes.

13   Q.  I'd ask that you set it facedown on the witness stand in

14   front of you.

14:50:26    15             Approximately how much did you invest in shares of

16   NuTech?

17   A.  About $753.

18   Q.  Where did you get that money?

19   A.  My deceased great-grandfather left me an inheritance.  And

14:50:38    20   I used that to invest.

21   Q.  Mechanically what did you do in order to purchase shares

22   of NuTech?

23   A.  Just purchased through E*Trade, so just traded through the

24   E*Trade site.

14:50:53    25   Q.  And is that like an app or a program on your computer?

```
19-CR-26-ABJ         LINHART - CROSS - WARD          Vol. VI-928
21-CR-14-ABJ
```

1    A.  It's -- it's a program on the computer or website on the

2    computer.

3    Q.  Do you recall where you were when you made these

4    investments in NuTech?

14:51:04    5    A.  Sheridan, Wyoming.

6    Q.  And you invested on several occasions; correct?

7    A.  Correct.

8    Q.  Looks like four different occasions?

9    A.  Yes.

14:51:13    10    Q.  Did you ever sell your NuTech shares?

11    A.  No.

12    Q.  Why not?

13    A.  The stock plummeted and was basically valueless.

14          MR. SZOTT:  May I have a moment, Your Honor.

14:51:26    15          THE COURT:  Yes, you may.

16       (Discussion held at counsel table.)

17          MR. SZOTT:  I would pass the witness for

18    cross-examination, Your Honor.

19          MR. FLEENER:  Nothing from the -- Defendant Herman,

14:52:03    20    sir.

21          MR. WARD:  Good afternoon, Mr. Linhart.  My name is

22    Zenith Ward.  I represent Charles Winters.

23                       **CROSS-EXAMINATION**

24    **BY MR. WARD:**

14:52:21    25    Q.  Did you -- were you ever able to sell any of your NuTech

1   stock?

2   A.  No.

3   Q.  Did you ever try?

4   A.  No.

14:52:30    5          MR. WARD:  Those are all the questions I have.

6          MR. JUBIN:  No questions.  Thank you.

7          MR. SZOTT:  Your Honor, no redirect.  I'd ask that

8   the witness be excused.

9          THE COURT:  You are excused, Mr. Linhart.

14:53:48   10          MR. SZOTT:  Your Honor, at this time the United

11   States calls Chrysti Bluemel.

12      (Witness sworn.)

13          THE COURTROOM DEPUTY:  Please take a seat.

14          Please state and spell your name for the record.

14:54:50   15          THE WITNESS:  Chrysteen Bluemel, C-h-r-y-s-t-e-e-n

16   B-l-u-e-m-e-l.

17          MR. SZOTT:  Ms. Bluemel, good afternoon.

18          THE WITNESS:  Hi.

19          MR. SZOTT:  I would ask that you remove your mask.

14:55:07   20          THE WITNESS:  Oh, thank you.

21    CHRYSTEEN BLUEMEL, GOVERNMENT'S WITNESS, DIRECT EXAMINATION

22   BY MR. SZOTT:

23   Q.  Ms. Bluemel, where do you live?

24   A.  Dayton, Wyoming.

14:55:14   25   Q.  How long have you lived in Dayton?

1   A.   Almost 10 years.

2   Q.   What do you do for a living?

3   A.   I run a plumbing business.

4   Q.   How long have you run that plumbing business?

14:55:33   5   A.   More than 20 years.

6   Q.   And what's your relationship with Charles or

7   Charlie Linhart?

8   A.   He's my fiancé.

9   Q.   Ms. Bluemel, I'd like to ask you about an investment that

14:55:55   10   you made with a man named Ed Pressley.

11        How do you know Ed Pressley?

12   A.   He walked into my office and introduced himself.  Charlie

13   sent him to my office.

14   Q.   Was that the first time you'd met him?

14:56:12   15   A.   Yes.

16   Q.   When Mr. Pressley came to your office, what sort of

17   conversation ensued?

18   A.   "I have a great idea.  This new technology is going on;

19   here's a video of it.  This is the company that's going to be

14:56:31   20   using this technology and it's pretty exciting."  That was

21   kind of how it went.

22        And I wrote him a $10,000 check and he went out the

23   door.

24   Q.   Did you see the video?

14:56:46   25   A.   Yes.

19-CR-26-ABJ          BLUEMEL - DIRECT - SZOTT          Vol. VI-931
21-CR-14-ABJ

14:57:15

14:57:34

14:57:51

14:58:30

14:58:48

1   Q.   And you mentioned your office.  Where is that office?

2   A.   48 East Fifth Street in Sheridan, Wyoming.

3   Q.   Did you have an office on Main Street in Sheridan?

4   A.   So -- yes.  I -- the shop where the guys mostly have all

5   of our materials are stored at the East Fifth property, but

6   for a very long time I had an office inside of 753 North Main

7   Street in Sheridan.  That was where I did the bookkeeping.

8   Q.   Do you remember where you had this conversation with

9   Mr. Pressley?

10  A.   At that location.

11  Q.   The Main Street?

12  A.   753 North Main Street.

13  Q.   Did you have any understanding, either then or

14  subsequently, that you would receive stock in exchange for

15  that $10,000 investment?

16  A.   Yes.

17       MR. SZOTT:  Mr. Davila, would you please bring up

18  Exhibit 312.

19  BY MR. SZOTT:

20  Q.   Ms. Bluemel, you should in a moment see on the monitor in

21  front of you what's been marked for identification as

22  Government Exhibit 312.  I'd ask -- I would ask that you take

23  just a moment and look at that document.

24  A.   This is what Ed Pressley brought into my office with a

25  letter.

19-CR-26-ABJ          BLUEMEL - DIRECT - SZOTT          Vol. VI-932
21-CR-14-ABJ

1         And it also said that EcoEmissions Solutions was

2    going to probably get a new symbol, but it was about to go on

3    the stock market and -- under a company called NuTech.

4    Q.   Okay.  Before we get there, what -- what is Exhibit 312?

14:59:11    5    Just what you're seeing on your monitor.

6    A.   A little bit over half a million -- or a little bit over

7    5 million shares.

8    Q.   And the document itself is a certificate?

9    A.   Yes.

14:59:21   10    Q.   Now, this is an electronic document.  Do you have the

11    original hard copy of this?

12    A.   I absolutely do.

13         MR. SZOTT:  Your Honor, the Government would offer

14    312.

14:59:35   15         MR. FLEENER:  No objections, Your Honor.

16         THE COURT:  It is received.

17      (Government's Exhibit 312 received into evidence.)

18    BY MR. SZOTT:

19    Q.   You mentioned this, Ms. Bluemel, but how did you receive

14:59:43   20    the hard copy of Government's Exhibit 312?

21    A.   From Ed Pressley's hand.  He came into my office and

22    handed to me.

23    Q.   And you said that was accompanied by a letter?

24    A.   Yes.

15:00:00   25         MR. SZOTT:  Mr. Davila, would you please magnify the

1   red legend there in the upper right of the exhibit.

2   BY MR. SZOTT:

3   Q.   Ms. Bluemel, do you remember looking at this red typeface

4   that was stamped on the stock certificate?

15:00:16   5   A.   Yes.

6   Q.   What did you understand that red typeface to mean?

7   A.   Well, it was some kind of application.  They were in

8   transition and they did not have the IPO symbols, so I had go

9   through this stock transfer agent.

15:00:36   10        And he gave me that information, and I got ahold of

11   her, and -- her name was Ashlee -- and I'm probably going to

12   pronounce her last name wrong but it was -- Canady who was

13   helping me.  And she said I needed to get a -- an opinion from

14   a securities attorney to see if it was valid or not.  And

15:00:57   15   I may be messing up the exact wording because I don't have my

16   note in front of me.

17        But that later on was found out to be not a

18   possibility, that she said that she wouldn't even -- it was

19   not acceptable, which, basically, I took it to mean that

15:01:13   20   somebody else did go and try and get one and it was not valid.

21   Q.   Let me stop you there.  Let's -- let's take that step by

22   step briefly.

23        MR. SZOTT:  Mr. Davila, would you zoom out, please.

24   BY MR. SZOTT:

15:01:27   25   Q.   So, Ms. Bluemel, was it your understanding that you could

1   not sell the shares that are represented on this particular

2   certificate until you took some further action?

3   A.  Yes.  I had to go to that transfer company -- it's

4   actually listed right there on the bottom, the Pacific Stock

15:01:44   5   Transfer Company, actually.

6   Q.  How did you know that you had to go to the stock transfer

7   company?

8   A.  Ed Pressley.

9           MR. SZOTT:  Mr. Davila, would you bring up

15:01:54   10  Exhibit 304.

11  BY MR. SZOTT:

12  Q.  And, Ms. Bluemel, this should also be on the witness stand

13  in front of you.

14          I'd ask that you take just a moment and examine

15:02:11   15  what's been marked for identification as Government

16  Exhibit 304.

17  A.  Yes.  This is the email that I received and that

18  I forwarded as proof of the only communication that I ever got

19  in regards to the transfer of it.

15:02:35   20  Q.  Before we talk about the content of it at all, the

21  original message to you, who was that from?

22  A.  Pardon me?

23  Q.  The original email message to you --

24  A.  Yeah.

15:02:46   25  Q.  -- who sent that message?

```
19-CR-26-ABJ         BLUEMEL - DIRECT - SZOTT        Vol. VI-935
21-CR-14-ABJ
```

              1    A.   Ashlee Canady.  I don't know how you say her last name,

              2    but she was the one that was helping me from the Pacific Stock

              3    Transfer Company.

              4    Q.   And then later on you forwarded this email to someone

15:03:00      5    named Greg Wenning?

              6    A.   Yes.

              7    Q.   And that was at my request; correct?

              8    A.   Yes.

              9         MR. SZOTT:  The Government would offer 304,

15:03:11     10    Your Honor.

             11         MR. FLEENER:  Can I have a second, please, Judge?

             12         THE COURT:  Yes.

             13    (Discussion held between counsel.)

             14         MR. FLEENER:  No objections.

15:03:40     15         THE COURT:  Exhibit 304 is received.

             16    (Government's Exhibit 304 received into evidence.)

             17         MR. SZOTT:  Mr. Davila, would you please magnify this

             18    portion; basically, the center of the exhibit.

             19    BY MR. SZOTT:

15:04:02     20    Q.   So, Ms. Bluemel, you'll see down there the third bullet

             21    point -- well, let me -- let me go back to the top.

             22         "Below are the requirements for a legend removal,"

             23    and then there's a bullet list.  The third bullet point,

             24    "Legal opinion from company counsel or a securities attorney

15:04:17     25    of your choosing."

19-CR-26-ABJ          BLUEMEL - DIRECT - SZOTT          Vol. VI-936
21-CR-14-ABJ

 1          Did you investigate the possibility of obtaining a

 2    securities lawyer to help you remove that restricted

 3    requirement from your stock certificate?

 4    A.  I did.  And I discovered that there's very few securities

 5    attorneys even in the whole United States of America.

 6    Q.  Did you ever actually engage a securities lawyer to work

 7    with you on this?

 8    A.  I called one that was in Nevada, and they said they

 9    were -- somebody else before me had contacted them and they

10    would let me know if anything changed but they did not think

11    that it was going to go through.  It was not going to be

12    valid.

13    Q.  Ultimately, did you ever sell any of those EcoEmissions

14    shares that we saw that are listed on that certificate?

15    A.  No.

16    Q.  I'd like to ask you now about your purchase of shares in

17    NuTech or NERG.

18          Ms. Bluemel, what, if anything, did you do to stay

19    apprised of what was going on with Ed Pressley's venture and

20    EcoEmissions and NuTech?  Where were you getting your

21    information?

22    A.   Charlie.  I was actually upset with Mr. Pressley because

23    he had not returned a number of phone calls.

24          And Charlie says, "Well, if it goes off, I -- they're

25    listed on it."

15:04:32 (line 5)
15:04:49 (line 10)
15:05:03 (line 15)
15:05:23 (line 20)
15:05:39 (line 25)

```
19-CR-26-ABJ          BLUEMEL - DIRECT - SZOTT          Vol. VI-937
21-CR-14-ABJ
```

1    And I said, "Oh, no."  And it was -- there was an

2    NERG that was -- had an ISO.  And so I thought, "Well, I'll

3    try it for a few hundred dollars and see what it does."

4         MR. SZOTT:  Mr. Davila, would you pull up, please,

15:05:54  5    Exhibit 404.

6    BY MR. SZOTT:

7    Q.  Ms. Bluemel, this should appear on your monitor in just a

8    moment.

9    A.  That's it.

15:06:10  10       That's after I bought them.  That's my certificate

11   of -- that I -- when I bought the actual stocks through my

12   Ameritrade account.

13   Q.  So this is a record from TD Ameritrade?

14        THE WITNESS:  Is that better?  No.

15:06:33  15        MR. HEIMANN:  I think it's off.

16        THE WITNESS:  Is that better?

17        MR. SZOTT:  Now I can hear you -- I can hear you

18   well, I should say.

19   BY MR. SZOTT:

15:06:38  20   Q.  Looking in the upper left of the exhibit, Ms. Bluemel --

21   and the original should be on the witness stand in front of

22   you -- whose name and address is on this document?

23   A.  That is mine.

24   Q.  Is this a reference to your Ameritrade account?

15:06:51  25   A.  Yes.  That is from -- that is notice of a trade.

19-CR-26-ABJ            BLUEMEL - DIRECT - SZOTT           Vol. VI-938
21-CR-14-ABJ

1          MR. SZOTT:  Your Honor, may I have a moment with

2    defense counsel.

3          THE COURT:  You may.

4      (Discussion held between counsel.)

15:08:04    5          MR. SZOTT:  Thank you, Your Honor.

6          The Government will offer Exhibit 404.  I believe

7    this is unopposed, Your Honor.

8          MR. FLEENER:  Yeah.  No objections.

9          MR. WARD:  No objections.

15:08:22   10          THE COURT:  404 is received.

11      (Government's Exhibit 404 received into evidence.)

12          MR. SZOTT:  Mr. Davila, would you please magnify the

13    center portion of the exhibit, the black box and then

14    "Confirmation Notice."

15:08:40   15    BY MR. SZOTT:

16    Q.  Ms. Bluemel, what is the jury seeing here in the magnified

17    portion of Exhibit 404?

18    A.  That is the exact description of when I traded.  That's

19    the confirmation that I received from Ameritrade for that

15:08:55   20    trade.

21    Q.  So 50,000 shares of NERG for $300; trade date, 11/9/2015;

22    settlement, 11/13/2015?

23    A.  That's correct, yes.

24    Q.  Mechanically, Ms. Bluemel, how did you purchase these

15:09:15   25    shell -- or these shares?

1    A.   Pardon me?

2    Q.   Mechanically what did you do in order to make this trade

3    happen?

4    A.   Well, I was sitting at my computer desk at my office, and

15:09:25    5    I just bought them from my account.

6          You can either buy them -- in this particular case --

7    either in quantity or a dollar amount, and I just did the

8    dollar amount, and then it figured it out.  It just happened

9    to be even.

15:09:40    10          And then there's a fee.  As you can see, every time

11    you trade it's $9.99.

12    Q.   And so you're online doing this through your Ameritrade

13    account?

14    A.   Yes.

15:09:50    15    Q.   And you mentioned being in your office.  Where is that

16    office located?

17    A.   753 North Main Street in Sheridan, Wyoming.

18          And the reason I know I was there, because that's the

19    only computer that I had at that time.

15:10:02    20    Q.   Ms. Bluemel, did you ever sell these NuTech shares?

21    A.   No.

22          MR. SZOTT:  May I have a moment, Your Honor.

23          THE COURT:  You may.

24    (Discussion held at counsel table.)

25    ///

1    BY MR. SZOTT:

2    Q.  Ms. Bluemel, this trade in November of 2015, what, if

3    anything, do you remember about what caused you to actually

4    pull the trigger and purchase these 50,000 shares at the time?

15:11:17    5    A.  That was just after Ed had come into my office and given

6    me my letter with my actual things, and he said things were

7    looking good, it was going well, I would -- we were going to

8    see something soon.

9    Q.  So at some point before you bought these shares is when

15:11:38    10    Mr. Pressley provided you with that certificate?

11    A.  Yes.

12    Q.  Do you remember in this time frame what, if any,

13    conversations you would have with your fiancé about NuTech?

14    A.  Just at dinnertime, after-work kind of stuff.  He was --

15:11:59    15    he is much slower workwise in the winter, so he reads a lot

16    more.

17              And I -- I go year-round.  I don't really stop.

18              So if he reads something interesting, then he was --

19    he would just tell me about it, but I didn't go and do my own

15:12:16    20    research.

21              MR. SZOTT:  I would pass the witness for cross,

22    Your Honor.

23              MR. FLEENER:  Nothing, sir.

24              MR. WARD:  Good afternoon, Ms. Bluemel.  My name is

15:12:32    25    Zenith Ward.  I represent Charles Winters.

19-CR-26-ABJ          BLUEMEL - REDIRECT - SZOTT          Vol. VI-941
21-CR-14-ABJ

1                        **CROSS-EXAMINATION**

2     BY MR. WARD:

3     Q.  You said that when Ed Pressley came and talked to you he

4     said "This is the company that will be doing the technology."

15:12:48    5            What company was that?

6     A.  NuTech.

7     Q.  Okay.  And you never got a return on your $10,000

8     investment to Ed Pressley, did you?

9     A.  No.

15:13:04   10     Q.  And I'm assuming you never sold any of the 300 -- $300 of

11     NERG stock that you bought through Ameritrade.

12     A.  No.

13            MR. WARD:  Those are all the questions I have,

14     Your Honor.

15:13:25   15            THE COURT:  Thank you, Mr. Ward.

16            MR. WARD:  Thank you.

17            MR. JUBIN:  No questions.  Thank you.

18            MR. SZOTT:  Your Honor, just briefly on redirect.

19                       **REDIRECT EXAMINATION**

15:13:34   20     BY MR. SZOTT:

21     Q.  Ms. Bluemel, that stock certificate that we saw was in the

22     name of a company called EcoEmissions.

23            Is it possible that when Mr. Pressley first pitched

24     this scheme to you that he mentioned some other company apart

15:13:52   25     from NuTech or apart from EcoEmissions?

```
19-CR-26-ABJ          BLUEMEL - REDIRECT - SZOTT          Vol. VI-942
21-CR-14-ABJ
```

 1          Do you specifically remember what Mr. Pressley said

 2    in terms of the company name?

 3    A.  I don't.  I remember him calling it some funny name.

 4    Gazmo or something like that was what he called his

15:14:06  5    contraption.  That was all I remember.

 6          But I know for sure that he said that EcoEmissions --

 7    that's how they had to issue the stocks but the company that

 8    was going to implement it was NuTech.

 9          That was all.

15:14:21 10    Q.  And is it -- those conversations, did they happen in

11    connection with that certificate that we saw?

12    A.  Yes.

13          MR. SZOTT:  Your Honor, nothing further.  Thank you.

14          I ask that Ms. Bluemel be excused from and released

15:14:42 15    from her subpoena.

16          THE COURT:  Your request is granted.

17          And you are excused.

18          THE WITNESS:  Thank you.

19          THE COURT:  Time for our midafternoon recess, ladies

15:14:52 20    and gentlemen.  We'll stand in recess for 15.

21          THE COURTROOM DEPUTY:  All rise.

22       (A recess was taken from 3:15 p.m. to 3:32 p.m.

23    Proceedings outside the jury's presence.)

24          THE COURTROOM DEPUTY:  Court is now in session.

15:33:05 25          THE COURT:  I understand that you had a matter you

19-CR-26-ABJ                                           Vol. VI-943
21-CR-14-ABJ

1    wished to bring up.

2           MR. FLEENER:  Judge, I -- all I wanted to do is --

3    I marked what -- the exhibit that I used in my motion for a

4    mistrial, I marked it as Defense -- or Herman's Exhibit A.

15:33:19    5           And I just wanted to --

6           THE COURT:  No, B.

7           MR. FLEENER:  I'm sorry?

8           THE COURT:  I thought it was B.

9           MR. FLEENER:  No.  It's A.  B was the email -- I've

15:33:26   10    split the exhibit into three parts.  A is the entire exhibit,

11    B is the email, C is -- is the investigator's report.

12           So at this time I know A's not going to go back to

13    the jury, but I think it needs to be part of the record, so

14    I'd offer it for that purpose.

15:33:42   15           THE COURT:  It is received.

16           MR. FLEENER:  And that's all I have, Judge.

17    Thank you.

18           THE COURT:  Very well.

19           MR. HEIMANN:  Your Honor, we're ready to call our

15:33:57   20    next witness.

21           THE COURT:  Thank you.

22           MR. HEIMANN:  I can also tell the Court that we're

23    moving faster than we expected.

24           THE COURT:  Good.

15:34:05   25           MR. HEIMANN:  Depending on travel, we may get

 1   finished with our lay witnesses, our nonprosecution team

 2   witnesses, tomorrow.  It does depend on travel.

 3        (Proceedings within the jury's presence at 3:35 p.m.)

 4            THE COURT:  Thank you.  Please be seated, ladies and

15:36:03  5   gentlemen.

 6            MR. HEIMANN:  The United States of America recalls

 7   Sonia Hacker.

 8    **SONIA HACKER, GOVERNMENT'S WITNESS, FURTHER DIRECT EXAMINATION**

 9   **BY MR. HEIMANN:**

15:36:42 10   Q.  Inspector Hacker, do you understand you're still under

11   oath?

12   A.  I do.

13            MR. HEIMANN:  Let's look at Exhibit 13.

14   BY MR. HEIMANN:

15:36:51 15   Q.  Overt Act 13 of the indictment alleges Bob Mitchell

16   emailed an application to Kingdom Trust Company on August 18th

17   of 2015.

18            Do you recognize Exhibit 13?

19   A.  I do.

15:37:25 20   Q.  Is this an email that was provided to the grand jury by

21   Kingdom Trust Company?

22   A.  It is.

23   Q.  And --

24            MR. HEIMANN:  Let's go ahead and scroll through it.

25   ///

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VI-945
21-CR-14-ABJ

1    BY MR. HEIMANN:

2    Q.  Do you recognize that email and its attachments?

3    A.  I do.

4           MR. HEIMANN:  Let's go back to the top.

15:37:59   5    BY MR. HEIMANN:

6    Q.  What's attached to this email?

7    A.  A Kingdom Trust application and Secretary of State records

8    for Bravo Two Zero.

9    Q.  The application is also for Bravo Two Zero?

15:38:16  10    A.  Yes.

11    Q.  Who is it from?

12    A.  The original email on August 18th, 2015, is from

13    Bob Mitchell to Tara Bogard.

14    Q.  Was that original email then forwarded?

15:38:32  15    A.  Yes.

16    Q.  From whom to whom?

17    A.  From Tara Bogard to Charles Ives.

18    Q.  Ms. Bogard is an employee of Kingdom Trust?

19    A.  Yes.

15:38:45  20           MR. HEIMANN:  The Government moves to admit 13.

21           MR. FLEENER:  One second, please, Judge.

22           I'd object.  Both documents contain hearsay, Judge,

23    the documents and the emails, the attachments and the emails.

24           MR. HEIMANN:  Your Honor, this is a certified

15:40:05  25    business record.

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1          MR. FLEENER:  Is the email certified, as well,

2    Your Honor?

3          MR. HEIMANN:  It is.

4          MR. FLEENER:  I maintain my objection.

5          THE COURT:  I'll overrule the objection and receive

6    the document.

7       (Government's Exhibit 13 received into evidence.)

8          THE COURT:  You may have a continuing objection for

9    that.

10   BY MR. HEIMANN:

11   Q.  So the original email in this chain, is that what we see

12   at the bottom quarter of the page?

13   A.  Yes.

14         MR. HEIMANN:  Can we scroll up so we get that email

15   and whatever continues on the next page?

16         Okay.  We will go now to 14.1.

17   BY MR. HEIMANN:

18   Q.  Overt Act 14 of the indictment alleges Chuck Winters

19   emailed an application to Kingdom Trust to open an account for

20   Intrepid Capital Holdings.

21         MR. HEIMANN:  Exhibit 14.1, let's scroll through it.

22   BY MR. HEIMANN:

23   Q.  So, Inspector Hacker, do you recognize that email?

24   A.  I do.

25   Q.  Is that an email that was provided to the grand jury by

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VI-947
21-CR-14-ABJ

1    Kingdom Trust?

2    A.   It is.

3    Q.   And there's a --

4         MR. HEIMANN:   Let's scroll down so we capture the

15:41:58    5    first email here.

6    BY MR. HEIMANN:

7    Q.   This is a two-email thread?

8    A.   It is.

9    Q.   The original email, who's it from?

15:42:07    10   A.   Chuck Winters.

11   Q.   To?

12   A.   Tara Bogard and Justin Herman.

13   Q.   And the top email?

14        THE WITNESS:   Could you scroll up?

15:42:28    15   A.   It's from Tara Bogard to Chuck Winters, Justin Herman, and

16   carbon copied to info@kingdomtrust.com.

17        MR. HEIMANN:   The Government moves to admit 14.1.

18        MR. WARD:   No objection.

19        THE COURT:   It is received -- 14.1 is received.

15:42:54    20   (Government's Exhibit 14.1 received into evidence.)

21   BY MR. HEIMANN:

22   Q.   So, basically, the top email is saying "I have provided

23   the application to our processing team."  Did I read that

24   correctly?

15:43:01    25   A.   Yes.

Melanie Sonntag, RDR, CRR, CRC                MelanieSonntagCRR@gmail.com

1    Q.   And that is from Ms. Bogard to Chuck Winters and

2    Justin Herman?

3    A.   Yes.

4           MR. HEIMANN:  Let's look at 14.2.

15:43:34    5           If you can scroll through the document, please.

6           And back to the top.

7    BY MR. HEIMANN:

8    Q.   Do you recognize this exhibit?

9    A.   I do.

15:43:56    10   Q.   Is that a new account checklist and account agreement and

11   a welcome letter that was provided to the grand jury by

12   Kingdom Trust?

13   A.   It is.

14   Q.   And what client are these all related to?

15:44:11    15   A.   Intrepid Capital Holdings Corp.

16   Q.   Who are the signers on the account application?

17   A.   Justin Herman and Chuck Winters.

18           MR. HEIMANN:  The Government moves to admit 14.2.

19           MR. FLEENER:  No objection.

15:44:41    20           THE COURT:  14.2 is received.

21      (Government's Exhibit 14.2 received into evidence.)

22   BY MR. HEIMANN:

23   Q.   So this is the checklist on the first page.

24           MR. HEIMANN:  If you scroll down the page.

25   ///

19-CR-26-ABJ        HACKER - FURTHER DIRECT - HEIMANN      Vol. VI-949
21-CR-14-ABJ

1    BY MR. HEIMANN:

2    Q.  Is this the welcome letter that we referred to in terms of

3    inviting or part of the package for the account and the record

4    we received?

15:45:04    5    A.  Yes.

6              MR. HEIMANN:  And one more page.

7              The account agreement begins on the third page.

8              And let's go to the signature page.  Stop.

9    BY MR. HEIMANN:

15:45:21    10   Q.  These are the signatures you referred to?

11   A.  They are.

12             MR. HEIMANN:  Okay.  We will talk more about that

13   with another witness.

14             Let's go now to 402.

15:45:56    15             Let's try to scroll down, see if it's one or

16   two pages.  There we go.

17   BY MR. HEIMANN:

18   Q.  So it's a two-page document, 402.  Do you recognize this

19   document?

15:46:05    20   A.  I do.

21   Q.  Is this an email provided to the grand jury by

22   Kingdom Trust?

23   A.  It is.

24   Q.  And does it relate to NuTech Energy Resources?

15:46:15    25   A.  It does.

1      MR. HEIMANN:  The Government moves to admit 402.

2      MR. WARD:  I'm not quite sure how it's relevant.  So

3  that would be my objection.

4      MR. HEIMANN:  Your Honor, I can lay additional

5  foundation if necessary.

6      THE COURT:  Proceed.

7  BY MR. HEIMANN:

8  Q.  There are two emails here; right?

9  A.  Yes.

10  Q.  The first one in time, the bottom one on the page, who is

11  it from?

12  A.  Chuck Winters.

13  Q.  Who is it to?

14  A.  Donnie Hendrix.

15  Q.  And the top one, is that Donnie Hendrix forwarding this

16  email to a Mahauta Reed?

17  A.  Yes.

18  Q.  Mr. Hendrix and Ms. Reed -- well, first, the dates on

19  these email, they're both on November 4th of 2015?

20  A.  They are.

21  Q.  Mr. Hendrix and Ms. Reed, were they both employees of

22  Kingdom Trust at that time?

23  A.  They were.

24  Q.  In the original email, the one that's being forwarded,

25  does this relate to a sell order for NuTech Energy Resources

1   shares?

2   A.  It does.

3        MR. HEIMANN:  Your Honor, the Government moves to

4   admit 402.

15:47:57  5        THE COURT:  402 is received.

6   (Government's Exhibit 402 received into evidence.)

7        MR. HEIMANN:  So if we magnify the bottom message.

8   BY MR. HEIMANN:

9   Q.  This is what you were referring to as a sell order?

15:48:19  10   A.  Yes.

11        MR. HEIMANN:  Let's look at 403.

12   BY MR. HEIMANN:

13   Q.  Do you recognize 403?

14   A.  I do.

15:48:51  15   Q.  Is this an email that was provided to the grand jury by

16   Kingdom Trust?

17   A.  It is.

18   Q.  Is this email similar to the email we just looked at in

19   402, in that it has two emails in the thread?

15:49:10  20   A.  Yes.

21   Q.  The original email, who was it from?

22   A.  Chuck Winters.

23   Q.  Who is it to?

24   A.  Mahauta Reed.

15:49:19  25   Q.  What's the subject?

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VI-952
21-CR-14-ABJ

1    A.   "Bravo 20 trading."

2    Q.   Was that email then forwarded from Ms. Reed to

3    Mr. Hendrix?

4    A.   It was.

15:49:33   5    Q.   And what is the day that these two emails were sent?

6    A.   November 5th, 2015.

7            MR. HEIMANN:   The Government moves to admit 403.

8            MR. WARD:   No objection.

9            THE COURT:   It is received.

15:49:52   10       (Government's Exhibit 403 received into evidence.)

11           MR. HEIMANN:   Let's magnify that bottom message.

12   BY MR. HEIMANN:

13   Q.   There are a couple black boxes on this exhibit.  Are those

14   redactions to reduce an account number to the last four

15:50:14   15   digits?

16   A.   They are.

17   Q.   The original wasn't redacted; right?

18   A.   Right.

19   Q.   And the subject you read off earlier, "Bravo 20 trading,"

15:50:25   20   we see it in this magnified section?

21   A.   Yes.

22           MR. HEIMANN:   Let's go, then, to 405.

23           Very good.

24   BY MR. HEIMANN:

15:50:55   25   Q.   So this is a two-page exhibit.  It's, again, a string of

```
19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. VI-953
21-CR-14-ABJ
```

1    email; correct?

2    A.  Yes.

3    Q.  Provided by Kingdom Trust to the grand jury?

4    A.  Yes.

15:51:04    5            MR. HEIMANN:  Go down to the second page.

6    BY MR. HEIMANN:

7    Q.  The initial email, who's it from?

8    A.  Chuck Winters.

9    Q.  Who is it to?

15:51:14    10    A.  Mahauta Reed.

11    Q.  And what's the subject?

12    A.  "Chronos Wire."

13    Q.  Was that sent again by Mr. Winters?  It looks like . . .

14    there's a forward there; right?  Above it --

15:51:33    15    A.  Yes.

16    Q.  -- the other heading?

17            MR. HEIMANN:  Let's go up to the top.

18    BY MR. HEIMANN:

19    Q.  Ms. Reed replies then to Mr. Winters --

15:51:47    20    A.  Yes.

21    Q.  -- regarding the wire?

22            Yes?

23    A.  Yes.

24    Q.  Thank you.

15:51:50    25            And then the final is from Mr. Winters to Ms. Reed.

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. VI-954
21-CR-14-ABJ

1    And these are all -- at least the last two are dated

2   13 November 2015?

3   A.  Yes.

4         MR. HEIMANN:  The Government moves to admit 405.

15:52:08  5         MR. WARD:  No objection.

6         THE COURT:  405 is received.

7      (Government's Exhibit 405 received into evidence.)

8         MR. HEIMANN:  We will publish -- we'll put it up

9   quickly.  We'll go through this email with another witness.

15:52:22  10         Let's bring up 406.

11         Scroll down to the second page.

12         Okay.  Scroll back up.

13   BY MR. HEIMANN:

14   Q.  Is this an email thread provided to the grand jury by

15:52:53  15   Kingdom Trust?

16   A.  Yes.

17   Q.  How many emails are in this thread?

18   A.  Two.

19   Q.  The original one, who's it from?

15:53:02  20   A.  Justin Herman.

21   Q.  Who is it to?

22   A.  Mahauta Reed and Kristi Hobbs.

23   Q.  Does that email relate to a wire for Chronos?

24   A.  Yes.

15:53:21  25   Q.  The parent email, is that a reply from Ms. Reed to

1    Mr. Herman?

2    A.  It is.

3         MR. HEIMANN:  The Government moves to admit 406.

4         MR. FLEENER:  One second, please, Judge.

15:53:36    5         No objections.  Thank you.

6         THE COURT:  Thank you.  It is received.  406 is

7    received.

8        (Government's Exhibit 406 received into evidence.)

9         MR. HEIMANN:  If we'd go down to the -- magnify the

15:53:55   10    original email.

11    BY MR. HEIMANN:

12    Q.  This is November 13 of 2015:  "Thank you for helping me

13    with that stupid wire for Chronos (Kada, K-a-d-a)."

14         Do you remember the Skype chat --

15:54:22   15    A.  I do.

16    Q.  -- that Special Agent Berryhill testified he found that

17    was taken from Bob Mitchell's computer?

18    A.  Yes.

19    Q.  The name "Kada," does that relate to that Skype chat?

15:54:39   20    A.  It does.

21    Q.  How?

22    A.  Kada Mesli was on the Skype chat.

23         MR. HEIMANN:  Let's go, then, to 407.

24         I think this is one-page but let's try to scroll

15:55:17   25    down.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VI-956
21-CR-14-ABJ

1    BY MR. HEIMANN:

2    Q.   How many pages are in this document?

3    A.   Three.

4    Q.   Do you recognize 407?

15:55:25    5    A.   Yes.

6    Q.   What is it?

7    A.   This is a withdrawal request provided from Kingdom Trust.

8    Q.   And does it include, then, wire information, as well?

9    A.   Yes.

15:55:38    10        MR. HEIMANN:  The Government moves to admit 407.

11        MR. FLEENER:  Just a second, please, Judge.

12        THE COURT:  Yes.

13        MR. WARD:  No objection, Your Honor.

14        THE COURT:  407 is received.

15:57:03    15    (Government's Exhibit 407 received into evidence.)

16    BY MR. HEIMANN:

17    Q.   We will look at this again with another witness.  But for

18    now, Inspector Hacker, if we look in Section 1 across from

19    "Bravo 20 Partners, LLC," is that a redaction for the account

15:57:22    20    number?

21    A.   It is.

22    Q.   And then the same thing below, a redaction for the --

23    looks like -- the bank account number?

24    A.   Yes.

15:57:29    25    Q.   The original document was not redacted; right?

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. VI-957
21-CR-14-ABJ

1    A.   Correct.

2            MR. HEIMANN:   I need to identify some records related

3    to Overt Act 28.  We're not going to move to admit these right

4    now, but I do want to identify them, Exhibits 28.2.

15:57:54    5            Let's pull that up.

6    BY MR. HEIMANN:

7    Q.  What I'm going to do is I'm going to have you take a look

8    at each of these, and I'll just ask you some questions about

9    the whole group.

15:58:11   10    A.   Okay.

11    Q.  So you see 28.2?

12    A.   Yes.

13            MR. HEIMANN:   I don't know if this is two pages --

14    let's scroll down if we can.

15:58:22   15            Several pages.

16            28.3.

17    BY MR. HEIMANN:

18    Q.  Do you recognize 28.3?

19    A.   Yes.

15:58:53   20            MR. HEIMANN:   28.22.

21    BY MR. HEIMANN:

22    Q.  Do you recognize 28.22?

23    A.   I do.

24            MR. HEIMANN:   28.28.

25    ///

Melanie Sonntag, RDR, CRR, CRC            MelanieSonntagCRR@gmail.com

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. VI-958
21-CR-14-ABJ

1    BY MR. HEIMANN:

2    Q.  Do you recognize 28.28?

3    A.  I do.

4         MR. HEIMANN:  And, lastly, 28.33.

15:59:57    5         All right.  This is one page.

6    BY MR. HEIMANN:

7    Q.  Do you recognize 28.33?

8    A.  Yes.

9    Q.  So these exhibits, 28.2, 28.3, 28.22, 28.28, and 28.33,

16:00:12    10    were they provided to the grand jury by a company called

11    FinTech?

12    A.  Yes.

13         MR. HEIMANN:  Your Honor, we'll move to admit those

14    with another witness.

16:00:19    15    BY MR. HEIMANN:

16    Q.  You've testified previously regarding email messages -- or

17    email -- messages, attachments that you seized from

18    justin@ichcorp.net and other email accounts provided by

19    Oath Holdings.

16:00:45    20    A.  Yes.

21         MR. HEIMANN:  Let's look at 28.4.

22    BY MR. HEIMANN:

23    Q.  As this is being pulled up, the Oath Holdings records,

24    they included an email address, chuckwinters@rocketmail.com?

16:01:04    25    A.  Yes.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VI-959
21-CR-14-ABJ

1    MR. HEIMANN:  28.4, let's magnify the top half so

2   it's easier to read.

3   BY MR. HEIMANN:

4   Q.  Is this one of the email that you seized from the

16:01:22    5   Oath Holdings email accounts?

6   A.  Yes.

7   Q.  Who is it from?

8   A.  chuckwinters@rocketmail.com.

9   Q.  Who is it to?

16:01:32    10   A.  justin@ichcorp.net.

11   Q.  What's the sent date?

12   A.  November 3rd, 2015.

13   Q.  And the subject?

14   A.  "nerg orders."

16:01:48    15    MR. HEIMANN:  Let's come -- well, leave it there.

16    The Government moves to admit 28.4.

17    MR. FLEENER:  No objection.

18    THE COURT:  28.4 is received.

19   (Government's Exhibit 28.4 received into evidence.)

16:02:00    20   BY MR. HEIMANN:

21   Q.  We're going to talk about this with another witness.  But

22   there's some redacted -- an account number that's redacted to

23   the last four digits.

24    The original email was not redacted; right?

16:02:14    25   A.  Correct.

1          MR. HEIMANN:  Let's look at 28.26.

2    BY MR. HEIMANN:

3    Q.  Is this an email that you seized from the Oath Holdings

4    email accounts?

16:02:41    5    A.  It is.

6    Q.  Who is it from?

7    A.  justin@ichcorp.net.

8    Q.  Who is it to?

9    A.  chuck@ichcorp.net.

16:02:52    10    Q.  The sent date?

11    A.  November 9th, 2015.

12    Q.  And the subject?

13    A.  "NERG Trades."

14          MR. HEIMANN:  The Government moves to admit 28.26.

16:03:06    15          MR. FLEENER:  No objections.

16          THE COURT:  It is received; 28.26 is received.

17    (Government's Exhibit 28.26 received into evidence.)

18    BY MR. HEIMANN:

19    Q.  "40 percent Chronos."  Is that the same spelling of

16:03:28    20    "Chronos" that was on the Kingdom Trust email we saw

21    previously?

22    A.  Yes.  That's Kada Mesli's company.

23          MR. HEIMANN:  Let's look at 28.27.

24    BY MR. HEIMANN:

16:03:54    25    Q.  Is this an email that you seized from the Oath Holdings

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VI-961
21-CR-14-ABJ

1    email accounts?

2    A.  Yes.

3    Q.  Who is it from?

4    A.  justin@ichcorp.net.

16:04:01    5    Q.  Who is it to?

6    A.  chuck@ichcorp.net.

7    Q.  What's the date?  Sent date.

8    A.  November 9th, 2015.

9    Q.  And the subject?

16:04:16    10    A.  "trades."

11    Q.  Does the text refer to NERG, N-E-R-G, shares?

12    A.  Yes.

13          MR. HEIMANN:  The Government moves to admit 28.27.

14          MR. FLEENER:  No objection.

16:04:31    15          THE COURT:  28.27 is received.

16      (Government's Exhibit 28.27 received into evidence.)

17          MR. HEIMANN:  And we will spend some more time with

18    that email with another witness.

19          Let's go now to some records that Microsoft provided.

16:04:45    20          THE WITNESS:  Okay.

21    BY MR. HEIMANN:

22    Q.  Did Microsoft provide records related to Skype accounts in

23    response to a grand jury subpoena?

24    A.  They did.

16:05:04    25    Q.  The records that -- the account records that we have, are

---

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1   they related to the Skype chat that was found on Bob

2   Mitchell's computer?

3   A.   They are.

4   Q.   How?

5   A.   We requested subscriber records for each of the

6   individuals listed on the Skype chat that we found on

7   Bob Mitchell's computer.

8           MR. HEIMANN:   Okay.   Let's pull up 1007.

9   BY MR. HEIMANN:

10  Q.   Okay.   Do you recognize this exhibit?

11  A.   Yes.

12  Q.   Is this one of the account records we received in -- from

13  Microsoft regarding Skype?

14  A.   This is a screenshot of one of the Excel spreadsheets that

15  were -- that was provided by Microsoft.

16  Q.   So the records were provided by Microsoft in a

17  spreadsheet?

18  A.   Yes.

19  Q.   And this is a screenshot for -- what's the sign-in name

20  for this particular account?

21  A.   bmitchell1495@hotmail.com.

22  Q.   When you made this screenshot -- you made it; right?

23  A.   Yes.

24  Q.   When you made this, other than making sure everything fit

25  on the screen, you didn't modify any of the contents of the

16:05:21 (line 5)
16:05:53 (line 10)
16:06:09 (line 15)
16:06:25 (line 20)
16:06:39 (line 25)

1    record?

2    A.  I did not.

3            MR. HEIMANN:  Your Honor, the Government moves to

4    admit 1007.

16:06:53  5            MR. FLEENER:  May I voir dire the witness briefly,

6    Judge.

7            THE COURT:  Yes, you may.

8            MR. FLEENER:  I can do it from here, Eric.

9                    **VOIR DIRE EXAMINATION**

16:07:02  10   BY MR. FLEENER:

11   Q.  Agent, you created this document?

12   A.  This screenshot, yes.

13   Q.  And how did you do that?

14   A.  I brought up the Excel spreadsheet provided by Microsoft.

16:07:20  15   And if you see below, there are multiple tabs.  I just have

16   the second tab open.

17            And then I used a snippet tool which is on my laptop

18   that just allows you to take a screenshot of whatever you'd

19   like that's on your screen.

16:07:40  20   Q.  All right.  So this -- this exhibit we're looking at right

21   now is not the complete record provided by Microsoft?  It's

22   just a portion of the record that you snipped?

23   A.  This is one tab of the Excel workbook that was provided by

24   Microsoft.

16:08:01  25            MR. FLEENER:  Are you off- -- may I speak with

 1    counsel.

 2         (Discussion held between counsel.)

 3         MR. FLEENER:  I would object, Your Honor, as to

 4    foundation.  This isn't a business record; it's a snippet of

16:08:48   5    the investigator's stuff.

 6         MR. HEIMANN:  Your Honor, it's an exact copy of

 7    what's in the record in a format that we can actually present

 8    to the grand jury.  Otherwise, we're standing here with a

 9    disk.

16:09:13  10         THE COURT:  I'll overrule the objection and receive

11    1007.

12         (Government's Exhibit 1007 received into evidence.)

13              **FURTHER DIRECT EXAMINATION (Continued)**

14    **BY MR. HEIMANN:**

16:09:27  15    Q.  Inspector Hacker, you testified that this is one of the

16    accounts that was involved in the Skype chat that was seized

17    from Bob Mitchell's computer?

18    A.  Yes.

19    Q.  And what is the first and last name listed here on this

16:09:40  20    account?

21    A.  Bob Mitchell.

22    Q.  Do you recognize that email address at hotmail.com?

23    A.  Yes.

24    Q.  All right.  Whose email is that?

16:09:54  25    A.  Bob Mitchell's.

1              MR. HEIMANN:  Let's go to 1007.1.

2   BY MR. HEIMANN:

3   Q.  Is this another account record that was made in the same

4   way as the last one we saw?

16:10:25   5   A.  Yes.

6   Q.  Which account is this?  Sign-in name.

7   A.  donkeyk007.

8   Q.  This was one of the accounts that was involved in the

9   Skype chat that was found on Bob Mitchell's computer?

16:10:43   10   A.  Yes.

11              MR. HEIMANN:  The Government moves to admit 1007.1.

12              MR. FLEENER:  Same objection, Judge.

13              THE COURT:  It will be received.

14       (Government's Exhibit 1007.1 received into evidence.)

16:10:52   15              MR. HEIMANN:  Let's look at 1007.2.

16   BY MR. HEIMANN:

17   Q.  1007.2, is this one of the account records from Microsoft

18   regarding a Skype sign-in name, justin@wallaceconsulting.com?

19   A.  Yes.

16:11:32   20   Q.  Did you make this the same way you made the last two?

21   A.  Yes.

22   Q.  And in the process of making it, other than fitting it to

23   the screen, no changes were made in the underlying data?

24   A.  Correct.

16:11:50   25              MR. HEIMANN:  The Government moves to admit 1007.2.

1          MR. FLEENER:  Same objection, Your Honor.

2          THE COURT:  Overruled.

3          1007.2 is received.

4      (Government's Exhibit 1007.2 received into evidence.)

16:12:06   5  BY MR. HEIMANN:

6  Q.  So in this one, the requested account, what was it?

7  A.  justin@wallaceconsulting.com.

8  Q.  That's a sign-in name; right?

9  A.  Yes.

16:12:20  10  Q.  And then if we look above, in the box, you've requested

11  account gamecock71?

12  A.  Game -- yes.

13  Q.  And that's the account that's in the Skype chat?

14  A.  Yes.

16:12:32  15  Q.  First and last name of the -- on that account?

16  A.  Justin Wallace Herman.

17          MR. HEIMANN:  Let's go to 1007.3.

18  BY MR. HEIMANN:

19  Q.  1007.3, is this, like the others, a Microsoft record

16:13:13  20  regarding the Skype account mesli_mk?

21  A.  It was made in the same way as the others, yes.

22  Q.  Okay.  And it relates to that account?

23  A.  Yes.

24  Q.  So other than fitting it on the page, no modification was

16:13:32  25  made to the underlying data?

1    A.   Correct.

2            MR. HEIMANN:   The Government moves to admit 1007.3.

3            MR. FLEENER:   Same objection, Your Honor.

4            THE COURT:   It is received.

16:13:47    5    (Government's Exhibit 1007.3 received into evidence.)

6    BY MR. HEIMANN:

7    Q.   Inspector Hacker, do you remember the Kingdom Trust email

8    about the wire to Chronos?

9    A.   Yes.

16:13:58    10   Q.   And it had a -- in parentheses -- capital K-a-d-a.  You

11   testified that was related to Kada Mesli.  Is this the basis

12   for that?

13           Let me ask you a different question.

14           Kada, K-a-d-a, is that the first name on this

16:14:29    15   account?

16   A.   Yes.

17   Q.   And the last name is Mesli?

18   A.   Yes.

19           MR. HEIMANN:   Let's go, then, to 1007.4.

16:14:32    20   BY MR. HEIMANN:

21   Q.   Is this an account record -- a Skype account record from

22   Microsoft like the others we've been talking about?

23   A.   This is a screenshot -- this is a screenshot of an account

24   record that we received from Microsoft --

16:15:05    25   Q.   Thank you.

1   A.  -- yes.

2   Q.  I appreciate that.

3            Did you make it in the same way you made the other

4   screenshots?

16:15:11   5   A.  I did.

6   Q.  The underlying data was not changed?

7   A.  Correct.

8   Q.  And this is account information for one of the accounts on

9   that Skype chat?

16:15:25   10  A.  Yes.

11           MR. HEIMANN:  The Government moves to admit 1007.4.

12           MR. FLEENER:  Same objection, Your Honor.

13           THE COURT:  1007.4 is received.

14           Objection overruled.

16:15:37   15  (Government's Exhibit 1007.4 received into evidence.)

16           MR. HEIMANN:  And the last one of these, 1007.5.

17  BY MR. HEIMANN:

18  Q.  Was this a screenshot of the account record -- Skype

19  account record -- we received from Microsoft for a sign-in

16:16:16   20  name mr_clark1495?

21  A.  It is.

22  Q.  Was this made in the same way as the others we've been

23  talking about?

24  A.  Yes.

16:16:24   25  Q.  Other than fitting it on the screen, no change has been

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VI-969
21-CR-14-ABJ

1    made to the underlying data?

2    A.   Correct.

3            MR. HEIMANN:   The Government moves to admit 1007.5.

4            MR. FLEENER:   Same objection, sir.

16:16:35   5            THE COURT:   1007.5 is received.

6            Objection is overruled.

7        (Government's Exhibit 1007.5 received into evidence.)

8            MR. HEIMANN:   Your Honor, the Government now moves to

9    admit 28.34, which was previously identified as the Skype chat

16:16:48   10   seized from Bob Mitchell's computer.

11           MR. FLEENER:   One second, please, Your Honor.

12           I would object that the document is primarily hearsay

13   if it's not involving Mr. Herman or Mr. Mitchell.  This

14   appears to be a lot of people's statements that would be

16:17:48   15   hearsay, Judge.

16           MR. HEIMANN:   Your Honor, Mr. Herman's texts on this

17   chat are party opponent statements and nonhearsay.

18           MR. FLEENER:   Agreed.

19           MR. HEIMANN:   At this time the other statements, the

16:18:05   20   people involved in conversation with him, are admissible for

21   their effect on the hearer or reader, specifically Mr. Herman.

22           MR. FLEENER:   Your Honor, you can't have

23   500,000 chats and then offer all of them to get one line of

24   Justin Herman's message and say it's the effect on the

16:18:24   25   listener.

 1          And I'm exaggerating here but you have -- you have

 2   many, many people's statements who -- there's really no

 3   foundation for who these folks are except for a couple of

 4   them, that their statements -- not all their statements could

16:18:37   5   be offered for the effect on Mr. Herman because he's not

 6   responding to these folks, not all of them.

 7          There has to be some sort of narrow application of

 8   that.  You can't offer the entire world and say it's an effect

 9   on Mr. Herman.

16:18:49   10          MR. HEIMANN:  Your Honor, the -- there is a discrete

11   conversation going on inside this chat log, and Mr. Herman is

12   an active participant.

13          THE COURT:  Well, I'm going to need to look at it.

14   I haven't seen it yet.

16:19:11   15          MR. HEIMANN:  Your Honor, it is -- what we'll need to

16   do is get another witness.  It's not very readable in the

17   current form.  Our intention was to use it in a summary

18   exhibit.

19          Your Honor now has 28.34.  We were going to summarize

16:19:33   20   these, and that's our reason for admitting it.

21          So if you want more detail on the actual chats we're

22   going to use, we'll need to prepare that and do it through

23   another witness.

24          THE COURT:  If you would, please.  It would help me.

16:19:46   25          MR. HEIMANN:  Thank you, Judge.

1  BY MR. HEIMANN:

2  Q.   Inspector Hacker, did a company called JW Korth & Company

3  provide documents and other records to the grand jury?

4  A.   They did.

16:20:19  5       MR. HEIMANN:  Let's look at 29.1.  This is a one-page

6  document.

7  BY MR. HEIMANN:

8  Q.   Is this an email that was provided by JW Korth to the

9  grand jury?

16:20:54  10  A.   It is.

11  Q.   Who is it from?

12  A.   justin@ichcorp.net.

13  Q.   Who is it to?

14  A.   mgibbons@jwkorth.com and Donnie Hendrix and Holly

16:21:09  15  MacDonald-Korth.

16  Q.   The last two are hard copied?

17  A.   Yes.

18  Q.   What's the subject?

19  A.   "Data."

16:21:16  20  Q.   The first attachment on this, what's the title of it?

21  A.   "KW Data NERG pack.pdf."

22       MR. HEIMANN:  Okay.  The Government moves to

23  admit 29.1.

24       MR. FLEENER:  I'd object to the second paragraph,

16:21:33  25  Judge.  It appears to be not relevant, beginning with the word

---

1   "You."  No objection to the first paragraph.  I think the

2   second paragraph should be redacted as not being relevant.

3           THE COURT:  Sustained -- I'm sorry.  Motion

4   overruled.

16:22:01   5           The exhibit will be received.

6       (Government's Exhibit 29.1 received into evidence.)

7           MR. HEIMANN:  So let's have that up.

8           Let's magnify just that first paragraph, beginning

9   with "Good Morning."

16:22:12   10  BY MR. HEIMANN:

11  Q.  Inspector Hacker, if you would, read the second sentence

12  starting with "Enclosed" and third sentence.

13  A.  "Enclosed you will find a data pack on NERG.  This is the

14  same base data pack that Pacific Stock Transfer reviewed and

16:22:46   15  accepted to issue the shares.  Also please note that Kingdom

16  Trust, Fifth Third Bank, and DTC have the data."

17  Q.  That's good enough.  Thank you.

18          MR. HEIMANN:  Let's look now at 29.2.

19  BY MR. HEIMANN:

16:23:24   20  Q.  Is this a long document containing many of the same

21  records that went to Pacific Stock Transfer?

22          THE WITNESS:  Would you mind scrolling through?

23  A.  Yes, it is.

24  BY MR. HEIMANN:

16:23:42   25  Q.  And this is that attachment to the email we just looked at

1    entitled "KW Data NERG pack.pdf"?

2    A.  Yes.

3            MR. HEIMANN:  The Government moves to admit 29.2.

4            MR. FLEENER:  No objection.

16:23:56    5            THE COURT:  29.2 is received.

6        (Government's Exhibit 29.2 received into evidence.)

7    BY MR. HEIMANN:

8    Q.  We will publish that with another witness.

9            Amongst the records that KW -- JW Korth provided,

16:24:14    10    were there recorded phone calls?

11    A.  There were.

12    Q.  Are you familiar with Exhibit 29.4?

13    A.  Yes.

14    Q.  Is that an excerpt of a phone call on January 28 of 2016?

16:24:29    15    A.  It is.

16    Q.  You've interviewed Justin Herman; right?  Or arrested him?

17    A.  Correct.  I arrested him.  I did not interview him.

18    Q.  During the course of the arrest, did you hear him speak?

19    A.  Yes.

16:24:46    20    Q.  The -- one of the voices on this phone call, is it

21    Justin Herman's?

22    A.  It is.

23    Q.  Who's the other person on the call?

24    A.  Holly MacDonald-Korth.

16:25:00    25            MR. HEIMANN:  Your Honor, the Government moves to

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VI-974
21-CR-14-ABJ

1    admit 29.4.  We are not going to publish it with this witness.

2          MR. FLEENER:  One moment, please, Your Honor.

3       (Discussion held at counsel table.)

4          MR. FLEENER:  Your Honor -- I'm sorry.  I apologize.

16:25:40    5          I assume you're going to do 29.5 next.  These are two

6    audio clips.

7          I would ask that the Court withhold ruling on their

8    admissibility until I can listen to them again and maybe --

9    since they're not being published, I don't know if it's

16:25:56   10    necessary to admit them at this time.

11          I guess I would object and ask for the opportunity to

12    listen to them before they're -- before they're admitted.

13          THE COURT:  Sounds like a reasonable request to me.

14          MR. HEIMANN:  Your Honor, I don't think it's

16:26:11   15    unreasonable.  I just would note the Government provided these

16    excerpts to Mr. Fleener the week before trial.

17          MR. FLEENER:  Along with another terabyte of data.

18          THE COURT:  True.  I think everybody was under a lot

19    of pressure at that point.

16:26:31   20          MR. HEIMANN:  Your Honor, then I'll just establish a

21    foundation for 29.5.

22          THE COURT:  Please.

23    BY MR. HEIMANN:

24    Q.  Are you familiar with Exhibit 29.5?

16:26:37   25    A.  Yes.

19-CR-26-ABJ     HACKER - FURTHER DIRECT - HEIMANN     Vol. VI-975
21-CR-14-ABJ

1   Q.  Is that an excerpt of another recorded call on

2   January 28th of 2016 that was provided to the grand jury --

3   the whole call was provided to the grand jury by JW Korth?

4   A.  Yes.

16:26:52    5   Q.  Justin Herman is on that call?

6   A.  Yes.

7   Q.  And Holly MacDonald-Korth?

8   A.  Correct.

9           MR. HEIMANN:  Let's look at 30.1.

16:27:12   10   BY MR. HEIMANN:

11   Q.  Inspector Hacker, is this an email provided to the grand

12   jury by JW Korth?

13   A.  It is.

14   Q.  Who is it from?

16:27:38   15   A.  justin@ichcorp.net.

16   Q.  Who is it to?

17   A.  Holly MacDonald-Korth.

18   Q.  So we're clear, Ms. MacDonald-Korth is an employee of

19   JW Korth & Company?

16:27:57   20   A.  Yes.

21   Q.  When was this email sent?

22   A.  January 29th, 2016.

23   Q.  And the first two words of the message itself?

24   A.  "Sell NERG."

16:28:11   25           MR. HEIMANN:  The Government moves to admit 30.1.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VI-976
21-CR-14-ABJ

1      MR. WARD:  No objection.

2      THE COURT:  It is received.

3      (Government's Exhibit 30.1 received into evidence.)

4  BY MR. HEIMANN:

16:28:27   5  Q.  We'll talk more about this with another witness.  I do

6  want to note the "Subject" line.

7      What is the "Subject" line, Inspector Hacker?

8  A.  "Intrepid Capital."

9      MR. HEIMANN:  Let's finally look at 412.

16:28:39  10  BY MR. HEIMANN:

11  Q.  Is this another email provided by JW Korth to the grand

12  jury?

13  A.  It is.

14  Q.  Who is it from?

16:29:09  15  A.  justin@ichcorp.net.

16  Q.  Who is it to?

17  A.  Holly MacDonald-Korth.

18  Q.  What is the subject?

19  A.  "test trade of NERG."

16:29:18  20      MR. HEIMANN:  The Government moves to admit 412.

21      MR. WARD:  No objection.

22      THE COURT:  412 is received.

23      (Government's Exhibit 412 received into evidence.)

24  BY MR. HEIMANN:

16:29:36  25  Q.  The date on this email that it was sent?

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

19-CR-26-ABJ       HACKER - FURTHER DIRECT - HEIMANN       Vol. VI-977
21-CR-14-ABJ

1   A.  January 28th, 2016.

2   Q.  Okay.  Let's move to a record provided by OTC Markets.

3           MR. HEIMANN:  Can we pull up Exhibit 9.2?

4   BY MR. HEIMANN:

16:30:05   5   Q.  Do you recognize 9.2?

6   A.  Yes.

7   Q.  What is that?

8   A.  This is a screenshot of an Excel workbook that was

9   provided by otcmarkets.com -- or OTC Markets Group.

16:30:22   10   Excuse me.

11   Q.  OTC Markets Group is the name of the company?

12   A.  Yes.

13   Q.  Okay.  So this is similar to that Microsoft record.  It

14   was provided as an Excel spreadsheet or workbook?

16:30:33   15   A.  Yes.

16   Q.  Which worksheet within the workbook are we seeing?

17   A.  This is the "Financials Posted" tab.

18   Q.  Is this a true and correct copy of the records that are in

19   that tab that were provided by OTC Markets Group?

16:30:57   20   A.  It is.

21   Q.  Other than sizing columns to make sure things fit, has any

22   change been made to the substance of the records?

23   A.  No.

24   Q.  It goes from Row 1 where there's a title row down to 25.

16:31:17   25           Is that the last row that had any content in this

---

```
          1   worksheet?

          2   A.   Yes.

          3        MR. HEIMANN:  Your Honor, the Government moves to

          4   admit 9.2.

16:31:29  5        MR. WARD:  No objection.

          6        THE COURT:  9.2 is received.

          7   (Government's Exhibit 9.2 received into evidence.)

          8        MR. HEIMANN:  And, Judge, we will use that exhibit

          9   with another witness.

16:31:41 10        Let's finally look at 32.1.

         11   BY MR. HEIMANN:

         12   Q.   Inspector Hacker, do you recognize 32.1?

         13   A.   Yes.

         14   Q.   What is it?

16:32:05 15   A.   This is a screenshot of a NuTech Energy financial that was

         16   posted on otcmarkets.com on the NuTech page.  And this shows

         17   the document properties of that financial disclosure.

         18   Q.   Where did you get this?

         19   A.   I obtained the information from otcmarkets.com.

16:32:36 20   Q.   So you went there online and basically took a screenshot

         21   of a document that's available there?

         22   A.   Yes.

         23   Q.   Let's talk about document properties.

         24        How do you access the document properties?

16:32:49 25   A.   Typically, you can just right-click on a document and then
```

 1    choose "Document Properties" and this box pops up.

 2             MR. HEIMANN:  The Government moves to admit 32.1.

 3             MR. WARD:  No objection.

 4             THE COURT:  The jury should remember the discussion

16:33:13   5    that occurred earlier concerning document properties.  We

 6    don't know, when it says "Author," who actually did the work

 7    or made the entries or so forth from what computer.

 8             MR. JUBIN:  Thank you, Your Honor.

 9             THE COURT:  It is -- 32.1 is received.  I'm sorry.

16:33:44  10        (Government's Exhibit 32.1 received into evidence.)

11             MR. HEIMANN:  Your Honor, may we approach?

12             THE COURT:  Yes.

13        (Proceedings held at sidebar with Prosecutor Heimann

14    and all defense counsel.)

16:34:16  15             MR. HEIMANN:  Your Honor, before I pass this witness

16    for cross-examination, I just wanted to let everybody know

17    that we moved much faster today than I expected.  And so when

18    this witness is done, I don't have another witness to call

19    until tomorrow morning.

16:34:32  20             And as I said, I expect we may be able to get through

21    our lay witnesses tomorrow, assuming travel works out, and we

22    would then be left with just Alex Scoufis and Inspector

23    Hacker's final testimony.

24             So I just wanted to let everybody know that.  I'm not

16:34:54  25    sure what cross-examination will look like.

             1        THE COURT:  You mean Fleener and Ward decided to go

             2    easy on Trizna?

             3        MR. FLEENER:  I don't think -- I don't think I'll go

             4    as hard on Sonia Hacker.

16:35:11     5        MR. WARD:  Regarding documents.

             6        MR. HEIMANN:  So thank you, Judge.

             7        THE COURT:  You're welcome.  Thank you.

             8      (Sidebar concluded.)

             9        MR. HEIMANN:  Your Honor, the Government will pass

16:35:31    10    this witness for cross-examination.

            11        MR. FLEENER:  We have no questions -- I have no

            12    questions.

            13        MR. WARD:  No questions at this time.

            14        MR. JUBIN:  I guess I always have questions for

16:35:53    15    Inspector Hacker.

            16        Good afternoon.

            17              **FURTHER CROSS-EXAMINATION**

            18    BY MR. JUBIN:

            19    Q.  You recall you're under oath?

16:36:00    20    A.  I do.

            21    Q.  I just have a few questions, though.

            22        You were shown some of these NERG trading documents

            23    with respect to individuals who were trading in NuTech shares.

            24        Do you recall that?

16:36:14    25    A.  Yes.

1    Q.   There are no such documents related to Ian Horn; true?

2    A.   Correct.

3    Q.   That's because Ian Horn never owned NuTech shares; right?

4    A.   Not to my knowledge.

16:36:25    5    Q.   So he never bought any?

6    A.   I don't know that.

7    Q.   Never sold any?

8    A.   I don't know that.

9    Q.   But, to your knowledge, he never owned any?

16:36:39    10   A.   Correct.  I believe I asked him during our interview.

11   Q.   And you learned he never had any interest in NuTech;

12   right?

13   A.   He told me he didn't have any shares in NuTech.  I don't

14   know about his interest.

16:36:54    15   Q.   Shares are ownership interest; right?

16   A.   Okay.  Yes.

17   Q.   Does that --

18   A.   I agree.

19   Q.   No shares?

16:37:02    20   A.   No shares.

21   Q.   Certainly, you didn't take his word for it, did you?

22   A.   That he didn't own any stock?

23   Q.   Right.  You looked at the records; right?

24   A.   I saw the issuance records on September 28th of 2015 that

16:37:17    25   we talked about today with Joslyn Claiborne.  But I didn't go

19-CR-26-ABJ                                              Vol. VI-982
21-CR-14-ABJ

 1    back to verify whether or not Mr. Horn had shares issued to

 2    him after that.

 3    Q.   Okay.  Are you suggesting to this jury that he did?

 4    A.   No.  I just -- I'm clarifying that I didn't verify whether

16:37:33    5    or not he had shares.

 6    Q.   Okay.  I just want to be clear.

 7            The Government doesn't have any evidence that you're

 8    aware of that Mr. Horn ever owned any piece of NuTech;

 9    correct?

16:37:43   10    A.   Correct.

11            MR. JUBIN:  All right.  Nothing further.  Thank you.

12            THE COURT:  Thank you.

13            MR. HEIMANN:  No redirect, Your Honor.

14            THE COURT:  You may step down.

16:38:07   15            MR. HEIMANN:  Your Honor, we have moved faster than

16    I expected today.  The Government will be prepared to call its

17    next witness tomorrow morning.

18            We may get -- I expect to get through almost all of

19    our remaining witnesses tomorrow --

16:38:28   20            THE COURT:  When would you like --

21            MR. HEIMANN:  -- with the exception of two.

22            THE COURT:  When would you like to start tomorrow?

23            MR. HEIMANN:  I -- I would like to try to get done

24    with as many as I can so 8:30.

16:38:37   25            THE COURT:  Very well.

19-CR-26-ABJ                                                    Vol. VI-983
21-CR-14-ABJ

1          Ladies and gentlemen, again, I remind you of the

2   Court's admonition.  I think everybody's accepted -- and

3   I thank you for it -- the restrictions that we've imposed upon

4   you throughout this far in the trial, and you've -- I don't

5   know anybody who opposes Zac Fisher, our supervisor in the

6   Clerk's office -- what a delightful person he is -- in taking

7   your temperature in the morning.

8          I want you to know all of us have had our

9   temperatures taken each morning, as well, and I take it -- get

10  it taken anyway.

11         Hopefully, someday we'll all be past this, but we

12  still are not.  I worry about you and I know that everybody

13  here worries about you.  I can't tell you how important you

14  are at this point because of the information you have heard

15  and your participation each and every day of this trial.

16         It would be expensive beyond belief to think about

17  redoing all this in front of another -- another group and

18  another assembly of attorneys and -- gathered again together

19  and these plaintiff's and defendants' representatives having

20  to go through the -- the difficulty of this experience.

21         So please take good care of yourselves, drive safely,

22  and -- and pamper yourselves as best you can.  I realize that

23  some of you are trying to work at night or to catch up on

24  things left undone at the offices and other places, but give

25  yourself a break and be careful where you find yourself.  And

16:39:03

16:39:26

16:39:50

16:40:21

16:40:48

19-CR-26-ABJ                                                    Vol. VI-984
21-CR-14-ABJ

1    when you are in crowds, as best you can, put on your mask,

2    I guess.

3            I was told today from my strong right arm here,

4    Ziggy, that flu has been almost nonexistent this past year

16:41:15   5    because of the mask.  It works.  Get your flu shots, though,

6    when you get a chance.  That would be a good idea in any

7    event.

8            Again, I remind you not to discuss this case with

9    anyone, permit anyone to discuss it with you.  If anyone

16:41:32   10    approaches you or attempts to engage you in conversation

11    about the case, tell them you can't discuss it; you're a

12    juror.  And let us know about it so that we can do something

13    about it, at least issue warnings and, if necessary, a

14    contempt citation from this Court if it's a persistent sort of

16:41:59   15    activity.

16            The temptation always exists for one to go to the

17    Internet.  It gets us into trouble.  But it is -- it is a

18    social access point, it is not well policed, and, certainly,

19    what is there is not under all of the safeguards that we have

16:42:27   20    in -- in court.

21            And you've had this afternoon as a pretty good

22    example of those kind of safeguards.  What you see on the

23    Internet doesn't go through cross-examination, and

24    cross-examination can be pretty -- pretty difficult from time

16:42:49   25    to time in order to seek at least a better understanding of

19-CR-26-ABJ                                                    Vol. VI-985
21-CR-14-ABJ

 1   how much weight to give testimony and so forth.  And you will

 2   be judging those things as we go forward and looking to the

 3   past, too, and it wouldn't put you in a position of being a --

 4   a witness in the case.

16:43:15   5        Above all, keep your minds open until the last

 6   witness has testified.  That evidence may be helpful to you in

 7   resolving the issues in this case.

 8        I'm not going to hold you any longer.  We'll --

 9   I notice it's a quarter to 5:00 anyway.  We haven't gained

16:43:30  10   that much.  At this point we'll stand in recess until 8:30

11   tomorrow morning.

12        THE COURTROOM DEPUTY:  All rise.

13      (Proceedings outside the jury's presence at 4:43 p.m.)

14        THE COURT:  I wanted to -- I wanted to ask

16:44:16  15   everyone -- Thomas gave me a big, thick thing; I looked at it

16   last night.  And we were going to -- you were going to let me

17   know when we want to set that time, and that may be Thursday

18   instead of Friday?

19        MR. HEIMANN:  So, Your Honor, I can give you a little

16:44:34  20   more detail on our -- what we're looking at.

21        We have four witnesses that were scheduled to be here

22   tomorrow.  We have two witnesses that are flying in, and we're

23   going to do everything we can to get them here so they're

24   available and we can, hopefully, get through all six.

16:44:54  25        At that point the Government will have two witnesses

19-CR-26-ABJ                                              Vol. VI-986
21-CR-14-ABJ

 1   left in its case in chief.  Alex Scoufis will come back to

 2   testify and summarize some records, and Inspector Hacker will

 3   come back to testify regarding more of the substance of her

 4   investigation.

16:45:15  5          It is in -- it is then that we have to have some

 6   decision or -- or the issue of completeness and additional

 7   recordings is likely to come up.

 8          So if there's a travel problem, we're into Thursday

 9   with some of our lay witnesses.  If there's no travel problem

16:45:37 10  and it moves quickly, we may get them all done.  We'll still

11   have Mr. Scoufis and Inspector Hacker in that order.

12          How long do you think Alex is?

13     (Discussion held between counsel.)

14          MR. HEIMANN:  Excuse me, Your Honor.

16:45:58 15          Your Honor, we expect Mr. Scoufis' testimony on

16   direct is something like two hours.  It's not short.

17          The other thing I wanted to bring up is the

18   Government can provide the Court a digital copy of that Skype

19   chat that would allow for the -- for it to be magnified such

16:46:24 20  that the Skypes can actually -- the text messages can be read.

21   We can provide that to Your Honor.

22          I believe the defendants have long had a similar

23   version, but we can provide it to Your Honor if it will help

24   you with the admissibility decision.

16:46:42 25          THE COURT:  Thank you.

1          MR. HEIMANN:  And we can email that if that's all

2     right with you.

3          THE COURT:  Will it break down my computer?

4          MR. HEIMANN:  I'm sorry, Judge?

16:46:51     5          THE COURT:  Will it -- will it fill up the computer?

6          MR. HEIMANN:  I don't think it's a large file in

7     terms of like kilobytes, megabytes.  So I don't think so.  No

8     promises.

9               (Discussion held between counsel.)

16:47:16     10          MR. HEIMANN:  So Mr. Szott tells me that what you

11    have in JERS, you should be able to zoom in and see the chats.

12    And so I guess we don't need to provide that to you if you

13    have access to what's in JERS.

14          THE COURT:  Well, Becky -- Becky may.  I have to rely

16:47:32     15    on her for --

16          MR. HEIMANN:  Okay.  Your Honor, I can coordinate

17    with Ms. Harris and make sure you get a version you can work

18    with.

19          THE COURT:  Thank you.

16:47:48     20          MR. JUBIN:  Your Honor, I did want to let the Court

21    know that today, for the first time -- I didn't have time last

22    night to look at the Government's memorandum that they filed

23    regarding the rule of completeness on matters, but I got a

24    chance to read it today.

16:48:03     25          I've -- I've begun working on a response, and I would

 1    let the Court know that a large portion of the response is

 2    likely to be that this is not hearsay because it's not the --

 3    the recordings or cross-examinations would not be to prove the

 4    truth of the matter asserted.

16:48:23   5         It's really sort of an unusual situation, extremely

 6    unique, I think, because the issue here is statements made by

 7    Mr. Horn that I'm not offering to show that they're true.  I'm

 8    offering the statements in the context to prove precisely the

 9    opposite, that they were not true and -- or not accurate.

16:48:51  10    It's -- it's to prove that they're not true.  And so the

11    notion that hearsay as a definitional concept applies to many

12    of these statements is simply wrong.

13         And then -- and I'll brief it, Your Honor.

14         And then, of course, there's the -- the mental state

16:49:12  15    exception, which has its own exception, which is to prove the

16    truth of the -- of the underlying information.  And, again, it

17    goes the other way in this case.

18         And so it's -- it's a pretty interesting and academic

19    evidentiary issue, but it's not governed by what we typically

16:49:35  20    see because it's sort of the flip side.  But I'll brief it.

21         THE COURT:  I'm going to look forward to it.

22         Anything else?

23         MR. FLEENER:  Not from me, Judge.

24         MR. JUBIN:  Thank you, Judge.

16:49:58  25         THE COURT:  Thank you, Counsel.

19-CR-26-ABJ                                                    Vol. VI-989
21-CR-14-ABJ

1          THE COURTROOM DEPUTY:  Court will stand in recess

2    until tomorrow at 8:30.

3         (Proceedings concluded 4:50 p.m., September 28, 2021.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3

4

5          I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14          Dated this 11th day of January, 2022.

15

16

17

18                  /s/ Melanie Humphrey-Sonntag

19          _____

20                  MELANIE HUMPHREY-SONNTAG
                         RDR, CRR, CRC
21              Federal Official Court Reporter

22

23

24

25

1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF WYOMING

3  _____

4

UNITED STATES OF AMERICA,       DOCKET NO. 19-CR-026-ABJ

5                    DOCKET NO. 21-CR-014-ABJ

        Plaintiff,

6                    VOLUME VII of XIV

        vs.               (Pages 990 through 1202)

7

JUSTIN HERMAN, CHARLES W.     Cheyenne, Wyoming

8  WINTERS, JR., a/k/a Chuck    Wednesday,

  Winters, and IAN HORN,       September 29, 2021

9                    8:30 a.m.

        Defendants.

10

11  _____

12

13            TRANSCRIPT OF TRIAL PROCEEDINGS

14

15       BEFORE THE HONORABLE ALAN B. JOHNSON

            UNITED STATES DISTRICT JUDGE

16     and a jury of twelve and four alternates

17

18

19

20

21

22      *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*

           *Federal Official Court Reporter*

23  *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*

     *630.452.6236 * MelanieSonntagCRR@gmail.com*

24

  *Proceedings reported with digital stenography; transcript*

25     *produced with computer-aided transcription.*

```
 1   APPEARANCES:
     For the Plaintiff:        ERIC J. HEIMANN
 2                             THOMAS A. SZOTT
                               ASSISTANT UNITED STATES ATTORNEYS
 3                             DISTRICT OF WYOMING
                               2120 Capitol Avenue, Fourth Floor
 4                             Cheyenne, WY 82001

 5   For the Defendant         THOMAS A. FLEENER
     Herman:                   FLEENER LAW
 6                             506 South Eighth Street
                               Laramie, WY 82073
 7
     For the Defendant         ZENITH S. WARD
 8   Winters:                  BUCHHAMER & WARD
                               1821 Logan Avenue
 9                             Cheyenne, WY 82001

10   For the Defendant         THOMAS B. JUBIN
     Horn:                     JUBIN & ZERGA
11                             2614 Pioneer Avenue
                               Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2        GOVERNMENT WITNESSES:

                                                    PAGE
3        GARETH COLGLAZIER

4          Direct Examination by Mr. Heimann          996
           Cross-Examination by Mr. Fleener          1028
           Cross-Examination by Mr. Ward             1032
5          Cross-Examination by Mr. Jubin            1039

6        TARA BOGARD
           Direct Examination by Mr. Heimann         1043
7
         MAHAUTA REED
8          Direct Examination by Mr. Heimann         1049
           Cross-Examination by Mr. Ward             1058
9
         SONIA HACKER
10         Further Direct Examination by Mr. Heimann   1060
           Further Cross-Examination by Mr. Ward       1078
11         Further Cross-Examination by Mr. Fleener    1082
           Further Direct Examination by Mr. Heimann   1126
12         Voir Dire Examination by Mr. Fleener        1130
           Further Direct (Continued) by Mr. Heimann   1131
13         Voir Dire Examination by Mr. Jubin          1158
           Further Direct (Continued) by Mr. Heimann   1159
14         Further Cross-Examination by Mr. Jubin      1161
           Further Cross-Examination by Mr. Ward       1178
15
         RAYMOND LEE MOORE, JR.
16         Direct Examination by Mr. Szott            1085
           Cross-Examination by Mr. Fleener           1092
17         Cross-Examination by Mr. Ward              1096
           Redirect Examination by Mr. Szott          1097
18         Recross-Examination by Mr. Ward            1098

19       THOMAS SCOTT GILLELAND
           Direct Examination by Mr. Heimann         1101
20         Cross-Examination by Mr. Ward             1123

21       HOLLY MacDONALD-KORTH
           Direct Examination by Mr. Heimann         1180
22         Cross-Examination by Mr. Fleener          1188

23

24

25

Vol. VII-993

```
 1                    E X H I B I T S
                                      IDENTIFIED   RECEIVED
 2       GOVERNMENT'S EXHIBITS
             4.1   Bank Statement          1136       1136
 3           4.2   Wire Transfer           1138       1138
             4.3   Bank Statement          1139       1140
 4           4.4   Wire Transfer           1140       1141
             4.5   Bank Statement          1142       1142
 5           5.6   Withdrawal              1143       1143
             5.7   Bank Statement          1145       1146
 6           5.8   Canceled Cashier's Check 1146      1147
             5.10  Screenshot, PNC Records 1147       1148
 7           5.11  Withdrawal              1152       1153
             5.12  Wire Transfer           1155       1155
 8           5.14  Bank Statement          1156       1156
             28.2  Email Chain             1102       1106
 9           28.3  Email Chain             1111       1112
             28.5  Email Chain             1014       1018
10           28.6  Email Chain             1015       1018
             28.7  Email Chain             1015       1018
11           28.8  Email Chain             1015       1018
             28.9  Email Chain             1015       1018
12           28.10 Email Chain             1015       1018
             28.11 Email Chain             1060       1061
13           28.12 Email Chain             1062       1063
             28.13 Email Chain             1116       1118
14           28.14 Email Chain             1015       1018
             28.15 Email Chain             1015       1018
15           28.16 Email Chain             1015       1018
             28.17 Email Chain             1015       1018
16           28.18 Email Chain             1015       1018
             28.19 Email Chain             1015       1018
17           28.20 Email Chain             1015       1018
             28.21 Email Chain             1016       1018
18           28.22 Email Chain             1113       1114
             28.23 Email Chain             1016       1018
19           28.24 Email Chain             1016       1018
             28.25 Email Chain             1016       1018
20           28.29 Email Chain             1016       1018
             28.30 Email Chain             1016       1018
21           28.31 Email Chain             1016       1018
             29.4  Excerpt of Recorded Call  --       1185
22           29.5  Excerpt of Recorded Call  --       1185
             40.2  Email Chain             1064       1065
23           40.3  Email Chain             1065       1065
             40.5  Email Chain             1066       1067
24           40.6  Email Chain             1067       1068
             40.10 Email Chain             1068       1068
25
```

Vol. VII-994

1            E X H I B I T S   C O N T I N U E D
                                     IDENTIFIED    RECEIVED
2     GOVERNMENT'S EXHIBITS
         40.11  Email Chain                        1069        1069
3        40.14  Email Chain                        1069        1070
         40.15  Wells Fargo Bank Statement         1070        1071
4        41.1   Wire Transfer                      1072        1073
         41.2   Bank Statement                     1074        1074
5        104    Cash Withdrawal                    1128        1129
         105    Wire Transfer                      1129        1131
6        106    Wire Transfer                      1132        1132
         107    Bank Statement                     1133        1133
7        109    Hacker Chart                       1126        --
         110    Hacker Chart                       1157        --
8        501    Screenshot of E*Trade Records      1075        1077
         517    Rat Pac Business Records           1089        --
9        518    Rat Pac Business Records           1089        --
         519    Rat Pac Business Records           1089        --
10       1001   Personal Signature Card            1073        1074
         1004   Account Registration and           1144        1145
11                Agreement
         1005   Business Signature Card            1154        1154
12

13    DEFENDANT HORN'S EXHIBITS
         IH-1012 Email Chain                       1166        1167
14

15

16

17

18

19

20

21

22

23

24

25

19-CR-26-ABJ                                           Vol. VII-995
21-CR-14-ABJ

 1        (Proceedings commenced 8:30 a.m., September 29, 2021,

 2   in the presence of all defendants, outside the jury's

 3   presence.)

 4              THE COURTROOM DEPUTY:  Court is now in session.

 5              THE COURT:  Thank you.  Go ahead and continue with

 6   what you're doing to get ready.

 7        (Discussion held at counsel table.)

 8              MR. HEIMANN:  We're ready, Your Honor.  Thank you for

 9   the couple minutes.

10              THE COURT:  Very well.  Bring them in.

11        (Proceedings within the jury's presence at 8:33 a.m.)

12              THE COURT:  Thank you, ladies and gentlemen.  Please

13   be seated.

14              The Court notes that the jury has been present in

15   open court throughout the course of this trial.

16              Mr. Heimann.

17              MR. HEIMANN:  Your Honor, the United States of

18   America calls Gareth Colglazier.

19              THE COURTROOM DEPUTY:  Please raise your right hand.

20        (Witness sworn.)

21              THE COURTROOM DEPUTY:  Please take a seat.

22              And please state and spell your name for the record.

23              THE WITNESS:  Gareth Colglazier, G-a-r-e-t-h

24   C-o-l-g-l-a-z-i-e-r.

25   ///

Melanie Sonntag, RDR, CRR, CRC              MelanieSonntagCRR@gmail.com

08:30:42
08:32:25
08:33:56
08:34:25

19-CR-26-ABJ       COLGLAZIER - DIRECT - HEIMANN       Vol. VII-996
21-CR-14-ABJ

1   **GARETH COLGLAZIER, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

2   **BY MR. HEIMANN:**

3   Q.  Mr. Colglazier, how old are you?

4   A.  I'm 35.

5   Q.  Where were you born and raised?

6   A.  Baltimore, Maryland.

7   Q.  Where do you live now?

8   A.  Washington, DC.

9   Q.  What is the highest level of education you have obtained?

10  A.  College.

11  Q.  What degree?

12  A.  I have a bachelor of arts in economics.

13  Q.  Where are you employed?

14  A.  OTC Markets Group.

15  Q.  What is OTC Markets Group's business?

16  A.  We operate a trading platform for over-the-counter

17  securities.  It's equity securities that aren't traded on a

18  national exchange like New York Stock Exchange or Nasdaq.

19  Q.  Is the platform online?

20  A.  Yes.  Yes.

21  Q.  It's available online?

22  A.  You can see pricing information online, yes.

23  Q.  At what website?

24  A.  Our website, otcmarkets.com.

25  Q.  How long have you worked for OTC Markets?

08:35:10
08:35:17
08:35:27
08:35:46
08:36:01

1   A.   A little over 10 years.

2   Q.   What is your current position?

3   A.   I'm a senior vice president.

4   Q.   Of?

08:36:15  5   A.   Issuer compliance is the department that I'm in.

6   Q.   What does issuer compliance do?

7   A.   So we have three business lines.  And the issuer

8   compliance department is part of our business department

9   called issuer services, meaning we work with the companies

08:36:31  10   that have their securities traded on our platform.

11        There are two other business lines, one of which, you

12   know, operates the actual trading platform, where

13   broker-dealers connect and actually, you know, make the

14   transactions happen.  And then a market data business

08:36:48  15   line that, you know, sort of tabulates and aggregates our data

16   and sells it to other market participants.

17   Q.   What kind of work do you do with the companies who are on

18   otcmarkets.com?

19   A.   So we -- issuer compliance makes sure that issuers, the

08:37:11  20   companies, are actually complying with our rules.  You know,

21   we are not a regulator, but we do have certain rule sets and

22   guidelines that companies have to comply with if they're on

23   our markets.

24        And we actually, you know, review things like their

08:37:28  25   disclosure or other company characteristics to make sure that

1    they're in compliance.

2    Q.  Is OTC Markets Group regulated by the SEC?

3    A.  So -- yes.  We have a subsidiary which is the sort of

4    trading business I mentioned earlier.  They have a -- what's

08:37:48    5    called an alternative trading system.  It's regulated and it's

6    registered with the SEC.

7            MR. HEIMANN:  So let's look at Exhibit 503, which has

8    already been admitted.

9            THE WITNESS:  Thank you.

08:38:10    10    BY MR. HEIMANN:

11    Q.  Can you see that on the screen in front of you?

12    A.  Yes, I can.

13    Q.  And, sir, you have paper copies of the exhibits, as well,

14    if you need to look at them.

08:38:23    15    A.  Thank you.

16    Q.  So this is a screenshot of a webpage, otcmarkets.com,

17    taken November --

18        (Discussion held at counsel table.)

19            MR. HEIMANN:  Ms. Harris, I believe this has been

08:38:39    20    admitted.  Can we publish?

21            Thank you.

22            And let's magnify the actual part of this that is the

23    OTC Markets part.  So here.

24            We can see it a little better.

25    ///

1    BY MR. HEIMANN:

2    Q.  So this is a page that was taken off from November 21st of

3    2015.

4           What are we seeing here?

08:39:30    5    A.  So this is what we call a company profile.  It's got a

6    number of different sort of data pieces or -- it's an

7    information set about this company.

8    Q.  Is this information that's -- some of this information is

9    provided by the company?

08:39:50    10   A.  That's correct.

11   Q.  It's available online.  Is your website accessible

12   throughout the United States?

13   A.  Yes, it is.

14   Q.  Is it accessible in other countries?

08:40:04    15   A.  Yes, it is.

16          MR. HEIMANN:  Let's magnify the options that are up

17   in the upper left corner of the website itself.

18   BY MR. HEIMANN:

19   Q.  So there are some tabs here.  What's under the "Quote"

08:40:29    20   tab?

21   A.  So if one were to click on that "Quote" tab, what you

22   would see is pricing information about the market for a

23   company's securities.

24          So it depends on the service that an issuer pays for

08:40:48    25   because we don't show all the quotes.  But every issuer would

1  essentially have its best bid and best ask, which is the most

2  competitive prices for trading that security at the time.

3  Q.  How do the best bid and best ask get into OTC Markets'

4  website?  Where do they come from?

08:41:13  5  A.  So they're submitted by market makers, which are -- are

6  broker-dealers.  I mentioned the trading service -- I'm sorry;

7  excuse me -- our business line that does the trading platform

8  earlier.

9        They have subscribers which are registered

08:41:30  10  broker-dealers, and, essentially, those broker-dealers make

11  markets.  They submit quotes at prices they're willing to buy

12  at, prices they're willing to sell at.

13        Those quotes are often received by their

14  correspondents, which are, you know, investors interacting

08:41:47  15  with those broker-dealers to actually -- you know, from start

16  to finish -- get that quote up.  It represents someone's

17  interest in buying the security.

18  Q.  If a group of people conducted manipulative trades amongst

19  themselves and they actually completed those trades, would the

08:42:15  20  price and volume of those trades eventually show up under the

21  quotes in OTC Markets?

22  A.  Yes is the short answer to that.

23  Q.  And from there they could be seen by the investing public?

24  A.  Yes.

08:42:33  25  Q.  There's a tab for "News."  Do you see that?

19-CR-26-ABJ        COLGLAZIER - DIRECT - HEIMANN        Vol. VII-1001
21-CR-14-ABJ

1    A.  Yes, I do.

2    Q.  What shows up under that tab?

3    A.  So that tab is for any news, doesn't have to be material,

4    but any news that a company has disseminated through either a

08:42:53    5    newswire service or through one of our products called the

6    Disclosure and News Service, which companies subscribe to to

7    publish information to our website.

8    Q.  So, for example, if a press release were put out through

9    Marketwired, would it show up under "News"?

08:43:11    10    A.  Yes, it would.

11    Q.  If a press release were put out under PR Newswire, would

12    it show up under "News"?

13    A.  Yes, it would.

14    Q.  There's a tab for "Financials."  What's under there?

08:43:27    15    A.  So that tab actually displays data contained within

16    filings that have been published in us -- published through

17    our website; I'm sorry.

18         We actually use a vendor to extract sort of templated

19    financial information from reports published through us.  So

08:43:46    20    if one were to click on that "Financials" tab, you would see a

21    representation of the data contained in a company's balance

22    sheet or an income statement, which is a profit and loss

23    statement.

24         You wouldn't see the actual source document, though.

08:44:02    25    Q.  Where would you see the source documents?

19-CR-26-ABJ         COLGLAZIER - DIRECT - HEIMANN         Vol. VII-1002
21-CR-14-ABJ

1  A.  The source document would be in the "Filings and

2  Disclosure" tab.

3  Q.  What else would you see under "Filings and Disclosures"

4  besides balance sheets and profit and loss statements?

08:44:20  5  A.  So issuers publish a number of things under that tab.

6  They might publish -- we have something called a disclosure

7  statement, which is what we ask companies to post to qualify

8  for certain tiers of our market.

9          They may also publish things like attorney letters or

08:44:38  10  other sort of information about the company that helps

11  investors understand what it -- what it is.

12          MR. HEIMANN:  Let's go now to Exhibit 9.2.

13          And this has not been admitted -- or it has.  It has

14  been admitted.

08:44:57  15          Thank you.

16  BY MR. HEIMANN:

17  Q.  So, Mr. Colglazier, does OTC Markets keep track of what's

18  posted under the "Filings and Disclosures" by a subscribing

19  issuer?

08:45:28  20  A.  We do.

21  Q.  This was provided by your company to the grand jury.

22  I want to walk through what's here.  The tab we're looking at

23  is "Financials posted."

24          Is this where OTC Markets keeps track of what is

08:45:45  25  posted under "Financials and Disclosures"?

19-CR-26-ABJ        COLGLAZIER - DIRECT - HEIMANN        Vol. VII-1003
21-CR-14-ABJ

1    A.   This is a data set of that information, yes.

2    Q.   Kept by OTC Markets?

3    A.   Yes.

4    Q.   So if we look at the first column there entitled "User

08:46:00    5    Email," what information is provided there?

6    A.   So when -- when we actually -- when we have a company

7    that's subscribed to our service, they appoint what's called

8    an authorized user to log in to the system that lets them

9    publish information to our website.  The authorized user's

08:46:22   10    credentials is managed by email addresses, and that Column A

11    indicates that the user's email is the email that you see

12    there.

13    Q.   chuck@ichcorp.net?

14    A.   Yes, that's correct.

08:46:37   15    Q.   And then if we look down towards the bottom, beginning on

16    Row 22, then it's a different email address?

17    A.   That's correct.

18         Companies may have multiple users allowed to -- to

19    access the service.

08:46:50   20    Q.   "Report Type," what do we see there?

21    A.   So it's -- that is a selection that companies make when

22    they publish information through our service.

23         We have a number of different options in a drop-down

24    for them to select, just helps them describe what type of

08:47:08   25    information they're publishing so that if, you know, an end

1    user or a visitor to our website is trying to decide what they

2    want to see, that helps them.

3    Q.   So that's a drop-down menu when the person puts a

4    disclosure up on the website?

08:47:27    5    A.   Correct.

6    Q.   "Status," what do we see there?

7    A.   So, "Status," that indicates that -- an active status,

8    I should say -- indicates that this report displays on our

9    website currently.  And, conversely, an inactive status --

08:47:44    10    which we do have -- indicates that a user has taken some

11    action to deactivate it.

12        A report that has been deactivated and is inactive is

13    still publicly available.  They cannot delete a report, but it

14    means that they've taken some action to deactivate it.  It

08:48:03    15    may mean that they've chosen to replace it with a -- more

16    correct information or simply just don't want it on the active

17    tab any longer.

18    Q.   If I understood you correctly, the user can make a

19    disclosure active or inactive, but they can't -- once it's up,

08:48:22    20    they can't take it off?

21    A.   No.  The user cannot delete any information.

22    Q.   What information is in the "Title" column?

23    A.   So similar to the "Report Type" column, it just -- it's a

24    free text box that the user can choose to add more

08:48:39    25    descriptive, you know, text next to whatever the -- they are

19-CR-26-ABJ        COLGLAZIER - DIRECT - HEIMANN        Vol. VII-1005
21-CR-14-ABJ

1    publishing.

2    Q.   So that's filled in by the user?

3    A.   Correct.

4    Q.   "Release Date."

08:48:52    5    A.   Yeah.

6    Q.   What does that mean?

7    A.   So it's a time stamp that's captured by our system.  So

8    when a user logs in to this system and wants to publish

9    disclosure, as soon as they do make it to the end and decide

08:49:08    10   to publish something, that document is assigned, you know, a

11   time stamp.  And under the Column F, the "Creation Date,"

12   that's when the -- the document was originally published to

13   our system.

14        It is possible for a user to decide to delay

08:49:28    15   dissemination of that document, so Column E would indicate if

16   there were any difference between the creation date and the

17   release date.  That would indicate that they decided to delay

18   the dissemination of that report.

19   Q.   So "Created Date" is when it's uploaded to OTC Markets'

08:49:47    20   internal systems?

21   A.   Uh-huh.

22   Q.   Yes?

23   A.   Yes.

24   Q.   And the release date is that same date and time unless the

08:49:55    25   user sets a different release date?

19-CR-26-ABJ          COLGLAZIER - DIRECT - HEIMANN        Vol. VII-1006
21-CR-14-ABJ

1   A.   Correct.

2   Q.   So the release date is when it became available to the

3   public on your website?

4   A.   Yes.

08:50:02    5   Q.   What does "Modified Date" indicate?

6   A.   So it -- if a user were to interact with that report by

7   making it, for example, inactive, a modified date time stamp

8   would appear there.

9        In this case for that first row, there is no

08:50:25   10   different time stamp there, so the report has not been

11   modified.

12   Q.   And when you say "the report has not been modified," the

13   contents of the report can never be modified once they're

14   uploaded?

08:50:35   15   A.   That's correct.

16   Q.   The modification is to its status, for example?

17   A.   That's correct.

18   Q.   And so if we're going to read this, if we were to look at,

19   say, Rows 6 and 7 -- if we look at Row 6 -- so this indicates

08:51:09   20   the user, chuck@ichcorp, who then chose attorney letter with

21   respect to current information from the drop-down menu?

22        Yes?

23   A.   Yes.

24   Q.   It's been active -- is active?  Yes?

08:51:26   25   A.   Yes.

1   Q.   They titled it "2014 Disclosure Opinion"; right?

2   A.   Correct.

3   Q.   And it was both created and released on May 19th of 2015;

4   is that right?

08:51:39   5   A.   Yes.  Uh-huh.

6   Q.   Why would there be two entries with, basically, identical

7   information?  Do you know?

8   A.   I don't know.

9          MR. HEIMANN:  Let's go to Exhibit 7.

08:51:51   10   BY MR. HEIMANN:

11   Q.   On the last exhibit we were talking about the user.

12   A.   Uh-huh.

13   Q.   Yes?

14   A.   Yes.

08:52:25   15   Q.   What does this record show?

16   A.   So this is a security feature that's enabled for users who

17   access our system.  You know, similar to the way you might log

18   in to your banking or other online systems, we -- we set up an

19   option so that a secure PIN code is delivered to the user so

08:52:49   20   that they can use that PIN code to log in.

21          And this -- it's a screenshot of a user's delivery

22   methods or their options for how they want that PIN code

23   delivered.

24   Q.   This is for chuck@ichcorp, which email address we saw on

08:53:06   25   the last exhibit, so this is how that user would access the

1    system to upload disclosures?

2    A.   That's correct.

3             MR. HEIMANN:   Let's go back to 503.

4             So let's magnify where it says "OTC Pink" in the

08:53:35    5    upper right.

6    BY MR. HEIMANN:

7    Q.   What does "OTC Pink" indicate?

8    A.   So that's what we call a market tier.  We have three tiers

9    on our Pink market, and it's a representation of the sort of

08:53:59    10   recency and level of disclosure that the company is making

11   available on our website.

12   Q.   What are the three levels?

13   A.   So we have OTC Pink Current Information, OTC Pink Limited

14   Information, which is the intermediate level, and then at the

08:54:11    15   bottom we have something called OTC Pink No Information.

16   Q.   Is there a difference in the way that a company is treated

17   depending on what tier it's in?

18             Or -- well, "treated," that's ambiguous.

19             Is there a difference in the information a public

08:54:29    20   investor can get depending on what tier the company's in?

21   A.   Yes.

22   Q.   What are the differences?

23   A.   So, generally speaking, a company that's in current

24   information will be providing information pursuant to sort of

08:54:46    25   guidelines that we've put out.  And it may also be accompanied

 1   by an attorney letter.

 2          Companies in the limited information tier may have,

 3   you know, some of that but not all.  Or they might just have

 4   financial information available.

08:55:04   5          There are a lot of circumstances where a company can

 6   be short of qualifying for Pink Current Information but be

 7   Limited Information.

 8   Q.  Why pink?

 9   A.  It's our -- we were the pink sheets back in the day.  And

08:55:22  10   it's, you know, a sort of shout-out to our predecessor.

11   Q.  So back in history when this was done on paper, it was

12   pink paper?

13   A.  The quote information was printed on pink paper and

14   delivered daily, yeah.

08:55:35  15          MR. HEIMANN:  Let's go to 504.

16          And let's magnify the upper right part.

17   BY MR. HEIMANN:

18   Q.  You talked about limited information.

19          Is this an example of what it looks like when a

08:56:04  20   company is on the OTC Pink Limited Information tier?

21   A.  It is.

22   Q.  What is that symbol?

23   A.  It's a yield sign.

24   Q.  Why a yield sign?

08:56:16  25   A.  So it represents the fact that we think this company, you

  1   know, has not either met the requirements of Pink Current

  2   Information, and it's sort of a -- a notice to investors that

  3   it's somewhere in this intermediate tier, "You should check

  4   before proceeding," essentially.

08:56:38   5   Q.   What symbol is there if it's in the no information tier?

  6   A.   It's a stop sign.

  7   Q.   If you're in OTC Pink Limited -- we talked about quotes

  8   earlier.

  9   A.   Yes.

08:56:55  10   Q.   Will a company's quotes still appear on the website if

 11   it's in limited?

 12   A.   Yes.

 13   Q.   If it's in no information, will the quotes still appear?

 14   A.   Yes.

08:57:05  15   Q.   But with the stop sign or the yield sign?

 16   A.   Yes.

 17         MR. HEIMANN:  Let's go to Exhibit 203.

 18   BY MR. HEIMANN:

 19   Q.   This is an email from a compliance analyst at OTC Markets

08:57:40  20   to Chuck Winters on March 25th of 2015.  In the text of this

 21   email, it talks about ECMZ, EcoEmissions Solutions, being an

 22   SEC reporting company.

 23         What is the difference in how OTC Markets deals with

 24   SEC reporting companies and nonreporting companies?

08:58:07  25   A.   So SEC reporting companies, they actually have a reporting

 1   obligation to file certain information with the SEC.  That

 2   information gets filed with something called -- the acronym is

 3   EDGAR.  It's a publicly available source.  And similar to our

 4   website, investors can come, visit EDGAR, find information

08:58:30    5   about SEC reporting companies.

 6            We treat them differently, in that companies

 7   attempting to use our service to publish information -- we

 8   would not change their market tier based on information

 9   published with us because they have an obligation to publish

08:58:48   10   that information through the SEC's website.

11   Q.  So for a reporting company, would you change the tier only

12   based on the filing of reports with the SEC?

13   A.  That's correct.

14   Q.  And a nonreporting company, they can change their tier by

08:59:06   15   posting things onto OTC Markets?

16   A.  Yes.

17            MR. HEIMANN:  Let's go, then, to Exhibit 9.1.

18   BY MR. HEIMANN:

19   Q.  So when we look at the email at the bottom of this page,

08:59:35   20   it's from an employee of OTC Markets to -- it's addressed to

21   Chuck; there's no email address down there -- on May 20th of

22   2015.

23            The text, "We have finished processing your attorney

24   letter for the period ending February 28th, 2015.  Your

08:59:54   25   company will be moved to the OTC Pink Current Information tier

 1    at the next market open."

 2         What is the importance of attorney letters in

 3    deciding what tier a company will be with OTC Markets?

 4    A.  So for the most part, attorney letters are required for a

 5    company to qualify for Pink Current Information.  If they're

 6    not reporting with the SEC.

 7    Q.  And what -- generally, what substance do these letters

 8    have to have?

 9    A.  We have set out the -- a sort of set of criteria that

10    attorneys have to include in a letter to us.  It's essentially

11    a double-check on the company's information.  We're asking an

12    attorney who's, you know, sort of a gatekeeper in this space

13    to review the company's information and then provide an

14    opinion stating that it complies with our guidelines.

15    Q.  Why does OTC Markets rely upon opinion -- upon lawyers to

16    be gatekeepers in that way?

17    A.  They usually have experience as -- in this arena.

18    They're, you know, somewhat experts, especially if they've

19    practiced securities law.

20    Q.  When OTC Markets -- let me start it differently.

21         When a subscribing issuer uploads an attorney opinion

22    letter, does OTC Markets do anything to vet that attorney?

23    A.  So attorneys are required to submit something to us called

24    an attorney letter agreement.  We usually ask for it prior to

25    rendering an opinion, but that doesn't always happen, and

09:00:18
09:00:38
09:00:59
09:01:17
09:01:53

 1    there's nothing to prevent them from writing an opinion

 2    letter, giving it to the company, having that company post it.

 3             But in order for us to review that opinion letter, we

 4    ask for something called an attorney letter agreement.

09:02:07  5    Q.  If OTC Markets became aware that an attorney opinion

 6    letter had not really been written by an attorney, what would

 7    you do?

 8    A.  That would be concerning to us.  If we knew that for a

 9    fact, we have in the past kept a list of attorneys that we're

09:02:39 10    not willing to work with as a part of this process.  We might

11    add them to that list.

12    Q.  Would it affect your decision about what tier they should

13    be in?

14    A.  It would affect our decision as far as what tier to place

09:02:54 15    that company in.

16    Q.  And if OTC Markets learned that an attorney simply signed

17    a letter that was written by somebody else who wasn't an

18    attorney, would it be a similar result?

19    A.  I think so, yes.

09:03:16 20    Q.  You talked about issuers -- what section are you senior

21    vice president of?

22    A.  Issuer compliance.

23    Q.  Sorry?

24    A.  "Issuer compliance."

09:03:24 25    Q.  Issuer compliance.

19-CR-26-ABJ          COLGLAZIER - DIRECT - HEIMANN      Vol. VII-1014
21-CR-14-ABJ

1          As part of the work of issuer compliance, does

2   OTC Markets monitor promotional email?

3   A.  Yes, we do.

4   Q.  How do you do that?

09:03:40   5   A.  We have several methods.  I would like to keep them

6   proprietary.

7          But we try and keep track of this activity.  We --

8   you know, we might subscribe to certain sources that publish

9   promotional activity.

09:04:01  10          I'll leave it at that if that's okay.

11   Q.  As a result of this, does OTC Markets receive proportional

12   email?

13   A.  We do.

14   Q.  And do you maintain those in your records?

09:04:11  15   A.  We do.

16   Q.  As part of your witness preparation, did you review some

17   exhibits containing promotional emails received by OTC Markets

18   regarding NuTech?

19   A.  I did.

09:04:32  20   Q.  You have them in front of you.  I want to just walk

21   through the exhibit numbers with you to see what you've

22   received.

23          Did you look at Exhibit 28.5?

24   A.  I have it here.

09:04:45  25   Q.  Did you look at that one as part of your preparation?

1    A.   Yes, I did.

2    Q.   28.6?

3    A.   Yes.

4    Q.   28.7?

09:05:02    5    A.   Yes.

6    Q.   28.8?

7    A.   Yes.

8    Q.   28.9?

9    A.   Yes, I did.

09:05:14    10    Q.   28.10?

11    A.   Yes.

12    Q.   28.14?

13    A.   Yes.

14    Q.   28.15?

09:05:28    15    A.   Yes.

16    Q.   28.16?

17    A.   Yes.

18    Q.   28.17?

19    A.   Yes.

09:05:42    20    Q.   28.18?

21    A.   Yes.

22    Q.   28.19?

23    A.   Yes.

24    Q.   28.20?

09:05:52    25    A.   Yes.

1   Q.  28.21?

2   A.  Yes.

3   Q.  28.23?

4   A.  Yes.

09:06:01   5   Q.  28.24?

6   A.  Yes.

7   Q.  28.25?

8   A.  Yes.

9   Q.  28.29?

09:06:10   10   A.  Yes.

11   Q.  28.30?

12   A.  Yes.

13   Q.  28.31?

14   A.  Yes.

09:06:20   15   Q.  Are those all promotional emails that were gathered by OTC

16   and kept in its records regarding NuTech?

17   A.  Yeah, they are.

18        MR. HEIMANN:  Your Honor, the Government moves to

19   admit those exhibits.  I can read them off again if you wish.

09:06:34   20        THE COURT:  I think I've got them.

21        MR. FLEENER:  Objection; foundation and hearsay,

22   Judge.

23        MR. HEIMANN:  Your Honor, Inspector Hacker testified

24   that all of these exhibits were received from OTC Markets as

09:07:17   25   certified business records.  This witness has testified as to

19-CR-26-ABJ        COLGLAZIER - DIRECT - HEIMANN        Vol. VII-1017
21-CR-14-ABJ

1  OTC Markets' gathering of promotional emails and keeping them

2  in their records.  They are offered for the fact that they

3  went out to the investing public and, therefore, not for the

4  contents of the statements made inside them.  And, regardless,

09:07:41    5  they're business records and cause for the exception under the

6  hearsay rule.

7          MR. FLEENER:  The -- there certainly -- it's

8  certainly been authenticated, and I don't quibble with the

9  authenticity of them.

09:07:54    10          The question is whether there's a -- they contain

11  hearsay and whether there's a hearsay exception, and we would

12  argue that they are -- that there's not a foundation to show

13  where these letters came from and that the information inside

14  the letters is -- is entirely hearsay.  And they're not a

09:08:12    15  business record, Judge.

16          This company's not in the business of either

17  generating or creating these documents.  They just apparently

18  received them some -- in some form or fashion.

19          THE COURT:  They are documents from the testimony

09:08:29    20  here that are collected by OTC Markets, representing

21  information that goes out to the public investors so that they

22  can track what is occurring in that regard.  It doesn't mean

23  that these -- the information contained in each one of these

24  documents is -- is true or not.  They are what they purport to

09:08:56    25  be, simply promotional materials pertaining to these companies

19-CR-26-ABJ       COLGLAZIER - DIRECT - HEIMANN       Vol. VII-1018
21-CR-14-ABJ

 1   that have been received by OTC.

 2          Any further instruction that you feel is necessary?

 3          MR. HEIMANN:  I don't, Your Honor.

 4          MR. FLEENER:  No, sir.

 5          THE COURT:  They will be received for that purpose.

 6      (Government's Exhibits 28.5, 28.6, 28.7, 28.8,

 7   28.9, 28.10, 28.14, 28.15, 28.16, 28.17, 28.18,

 8   28.19, 28.20, 28.21, 28.23, 28.24, 28.25, 28.29,

 9   28.30, and 28.31 received into evidence.)

10          MR. HEIMANN:  We're going to work with these email

11   with another witness, but let's pull up one, 28.39 -- or 31.

12   Let's scroll through it so everybody has a chance to see the

13   different pages.

14          And then back to the top.

15   BY MR. HEIMANN:

16   Q.  Mr. Colglazier, as we look through that, there's a long

17   section of very small print at the back end.  What is that?

18   A.  It's a disclaimer.

19   Q.  The promotional part is the -- is the first part of the

20   email; is that right?

21   A.  Yes.

22   Q.  And the "From" here, "Equity Profile Report," that would

23   be the identified company or group of individuals who's

24   sending out -- at least the name they're using to send out

25   this kind of promotion?

09:09:11
09:09:17
09:09:57
09:10:19
09:10:40

1   A.  We call them the promoter, yeah.

2   Q.  Okay.  Is it often true that promote -- email addresses

3   that seem to be different promotors will be sending out the

4   same information at the same time?

09:10:55   5   A.  Yes.  That does happen.

6            MR. HEIMANN:  Let's go to Exhibit 414.

7   BY MR. HEIMANN:

8   Q.  We talked about three tiers.  Is there a status called

9   caveat emptor?

09:11:17   10  A.  Yes, there is.

11  Q.  What's the difference between caveat emptor and the three

12  information tiers we discussed earlier?

13  A.  So caveat emptor is a flag unto itself.  It kind of can

14  appear over top of any of the markets that we have so -- the

09:11:33   15  tiers.  It's its own thing.

16  Q.  How is a -- how does a company end up in caveat emptor

17  status?

18  A.  We usually call it a public interest concern.  OTC Markets

19  is concerned that there may be a public interest concern

09:11:50   20  associated with a company and its securities.

21  Q.  We'll come back to what public interest concerns there

22  are.

23           Once a company goes to caveat emptor, are its quotes

24  available?

09:12:04   25  A.  It has to be in our current information tier for the

 1    quotes to be available still.  If it is in that limited

 2    information tier or the no information tier, then you cannot

 3    see quoting information on our website.

 4    Q.   Okay.  What about the other filings, disclosures, that

09:12:24   5    sort of information?  Can investors still get to that when

 6    they're in caveat emptor?

 7    A.   That information remains always accessible, yeah.

 8    Q.   We're on 414, which is an email message from OTC Markets

 9    issuer services to kevintrizna@gmail.com and

09:12:45  10    chuck@ichcorp.net.

11         MR. HEIMANN:  Let's magnify the actual text of the

12    message.

13    BY MR. HEIMANN:

14    Q.   As we're doing that, Mr. Colglazier, this is from you;

09:12:55  15    right?

16    A.   That's correct.

17    Q.   What is the public interest concern that caused NuTech

18    Energy to be designated caveat emptor?

19    A.   I think it speaks for itself.  But there was what we

09:13:13  20    called unusual and unexplained trading activity while the

21    company did not have current information.

22         Go on to sort of expound on that, and we noticed that

23    there was a press release regarding the company's plans to

24    join the Nasdaq.

09:13:35  25    Q.   Why would you be concerned about a press release related

19-CR-26-ABJ          COLGLAZIER - DIRECT - HEIMANN      Vol. VII-1021
21-CR-14-ABJ

1    to Nasdaq?

2    A.   To be on a national exchange you have to -- you have to do

3    a number of things, but there are minimum listing criteria.

4    You have to demonstrate your ability to meet those minimum

09:13:58    5    listing criteria, and one of the ways that you do that is by

6    filing certain things with the SEC beforehand.

7            A company that has no information available clearly

8    can't demonstrate it's -- it's meeting this listing criteria.

9    And I -- that was our concern.

09:14:16   10    Q.   Generally, if a company is in the OTC markets and they

11   actually make the jump to Nasdaq, what happens to the stock

12   price?

13   A.   It depends.  It really does.

14           But one of their minimum listing criteria is based on

09:14:40   15   the stock price.  So a company would have to achieve a higher

16   stock price to even get there.

17   Q.   What do you mean by "unusual or unexplained trading

18   activities -- activity"?

19   A.   So every security that trades with us essentially has a

09:15:06   20   normal level of trading activity.  They have, you know,

21   historical averages, they have sort of a normal band of

22   volatility, that the stock price doesn't move too much up or

23   down in any given day, the volume doesn't move too much up or

24   down in any given day.

09:15:24   25           When we see sort of volumes or price movement outside

1    those normal changes, that's unusual.

2    Q.   So a large spike in volume, for example?

3    A.   That's correct, yeah.

4              MR. HEIMANN:  Let's look at Exhibit 505.

09:15:52    5              Let's magnify just the top third there.

6    BY MR. HEIMANN:

7    Q.   So this is a screenshot from the OTC Markets website for

8    NuTech Energy.  The skull and crossbones on the right, what

9    does that indicate?

09:16:15   10    A.   That indicates that we've designated the company with

11    caveat emptor.

12    Q.   So the email we just saw telling the company's

13    representatives that they've been moved to caveat emptor, this

14    is what somebody coming to the OTC market would then see on

09:16:33   15    the website?

16    A.   That's correct.

17    Q.   It says "OTC Pink Limited Information" under the skull and

18    crossbones.  Do you see that?

19    A.   Uh-huh.

09:16:44   20    Q.   Yes?

21    A.   Yes.

22    Q.   What effect would that have on being able to get quotes

23    for the stock?

24    A.   If you clicked on the "Quote" tab, you would not be able

09:16:55   25    to see quote information.

1  Q.  If the company's in this spot, they get the caveat emptor

2  designation, they're in Pink Limited Information, what do they

3  need to do to get back to OTC Pink tier, no skull and

4  crossbones?

09:17:11  5  A.  A number of things.  But, generally, you know, all

6  companies will have to qualify by providing the right set of

7  information published through our services.

8  Q.  So an appropriate opinion letter, financial disclosures,

9  whatever they're missing?

09:17:28  10  A.  Correct.

11  Q.  Do they have to do something else to take care of your

12  public interest concern?

13  A.  If -- depending on what, you know, the circumstances were

14  surrounding it, we would have to have comfort that a public

09:17:45  15  interest concern no longer existed.

16  Q.  So, minimum, you need to put out the information that

17  would get you to OTC Pink tier; right?

18  A.  All companies would have to do that.  And if we had other

19  concerns, we may ask the company to address those somehow.

09:18:03  20  MR. HEIMANN:  Let's look at 516.

21  BY MR. HEIMANN:

22  Q.  So this is an email on March 15th, 2016, so after they

23  were designated caveat emptor, from kevin@nutechenr.com to

24  you; right?

09:18:42  25  A.  Yes.

1  Q.  And there's an attachment, "OTC Market Ian Horn ATTY,

2  letter.pdf."

3          MR. HEIMANN:  If you scroll down to the second page.

4  BY MR. HEIMANN:

09:18:53  5  Q.  What do we see beginning of the second page?

6  A.  This is the first page of our attorney letter agreement.

7  Q.  Is this the attorney letter agreement that you were

8  talking about earlier?

9  A.  Yes.

09:19:07  10          MR. HEIMANN:  If we go to the second page, the

11  handwritten entry there under "The Attorney."

12  BY MR. HEIMANN:

13  Q.  What is that supposed to identify on your attorney letter

14  agreement?

09:19:19  15  A.  That's supposed to identify the name of the attorney's

16  firm.

17  Q.  Is the attorney themselves individually supposed to

18  identify themselves there?

19  A.  Yes.

09:19:31  20  Q.  And then, "Title, Outside Counsel, NuTech Energy

21  Resources, Inc."

22          Is that right?  I read that correctly?

23  A.  That's what I see, yeah.

24  Q.  And that identifies what company this attorney is going to

09:19:49  25  be writing opinion letters for?

1   A.   Correct.

2   Q.   There's a -- you see at the bottom of the page "2" and a

3   line and some handwriting above that?

4   A.   Yes.

09:20:00   5   Q.   What's supposed to go there?

6   A.   Those appear to be initials.  We don't require that they

7   initial that page.

8        MR. HEIMANN:  Okay.  So if we go to -- let's

9   page through this again.

09:20:16   10        So we'll stop here.

11   BY MR. HEIMANN:

12   Q.   There's a Florida bar card that appears on this page.

13        Does OTC Markets require an attorney to submit a bar

14   card or other proof that they are, in fact, licensed to

09:20:31   15   practice law?

16   A.   We require that they submit their -- a copy of their

17   identification.  And these let us know the jurisdictions where

18   they're licensed to practice.

19   Q.   Okay.  So this would fulfill that requirement?

09:20:46   20   A.   Yeah.

21        MR. HEIMANN:  Next page.  And we should take that

22   down.

23        Okay.  Let's go to Exhibit 21.

24   (Discussion held among counsel.)

09:21:52   25        MR. HEIMANN:  I'm sorry.  I wrote down a number that

 1    doesn't exist.

 2         38.  Let's go all the way to the bottom of this

 3    exhibit.

 4         And partway up so we capture the email that finishes

09:22:21    5    here.

 6    BY MR. HEIMANN:

 7    Q.  So this is an email thread.  I want to talk -- there

 8    you go.

 9         I want to talk about this email dated April 21st,

09:22:32    10    2016.  Mr. Gareth Colglazier wrote and it begins, "Dear

 11    Kevin."

 12         Do you see that?

 13    A.  Yes.

 14    Q.  That's an email from you to the representatives of NuTech?

09:22:47    15    A.  That's correct.

 16    Q.  And, basically, it's saying you finished processing

 17    disclosures, attorney letter, and NuTech will be moved back to

 18    OTC Pink Current Information?

 19         Did I summarize that appropriately?

09:23:03    20    A.  That's -- yes.

 21    Q.  So this is basically the end of that caveat emptor status?

 22    A.  Yes.

 23    Q.  If we then look at the email response that comes May 5,

 24    "We have a very big issue," they want to run it -- run this by

09:23:26    25    you guys.

19-CR-26-ABJ          COLGLAZIER - DIRECT - HEIMANN          Vol. VII-1027
21-CR-14-ABJ

 1            Do you remember a meeting with representatives of

 2   NuTech around the time period of this email?

 3   A.   I remember a phone call.

 4   Q.   Okay.  So a telephone call.  Do you know who was on the

09:23:42    5   call besides you?

 6   A.   I thought Kevin Trizna was on the call.

 7   Q.   Was there anybody else on the call?

 8   A.   I don't remember.

 9   Q.   Okay.  What was discussed?

09:23:58   10   A.   The company was planning to announce some kind of news,

11   and they were discussing that with me.

12   Q.   What was your impression of what they wanted?

13   A.   I believe -- although I don't think anyone ever said

14   anything -- that the company was seeking an assurance that if

09:24:26   15   they announced some kind of market-moving news they would not

16   end up in caveat emptor again.

17   Q.   At any point during that call, did you tell them they had

18   to release certain news?

19   A.   No.

09:24:39   20   Q.   Is that the sort of thing you would ever tell a

21   subscribing issuer?

22   A.   No.

23   Q.   If we go to the top of this, from Kevin to you, "Below is

24   a cut and paste of our announcement," and there then appears

09:24:54   25   some text beginning with "NuTech Energy Resources Receives

19-CR-26-ABJ       COLGLAZIER - CROSS - FLEENER       Vol. VII-1028
21-CR-14-ABJ

1    Buyout Offer."

2            Do you remember getting this email?

3    A.  Yes.

4    Q.  Did you respond?

09:25:10   5    A.  No.

6    Q.  Did you find this to be unusual?

7    A.  It's very unusual.

8    Q.  Why is that?

9    A.  Companies do not send us news, at least not to our

09:25:21  10    personal emails, and not before or after or -- you know,

11    during the process of submission.

12            MR. HEIMANN:  May I have a moment, Your Honor.

13            THE COURT:  You may.

14        (Discussion held between counsel.)

09:26:15  15            MR. HEIMANN:  I will pass this witness for

16    cross-examination.

17            MR. FLEENER:  Your last name is Colglazier?

18            THE WITNESS:  That's correct.

19            MR. FLEENER:  Okay.  Mr. Colglazier, my name is

09:26:56  20    Tom Fleener.  How are you?

21            THE WITNESS:  Well, thanks.  How are you?

22            MR. FLEENER:  I'm well.  Thanks.

23                        **CROSS-EXAMINATION**

24    **BY MR. FLEENER**:

09:27:01  25    Q.  I just have a few questions, first of all regarding the --

19-CR-26-ABJ         COLGLAZIER - CROSS - FLEENER      Vol. VII-1029
21-CR-14-ABJ

1   you know -- the email campaigns that you discussed.

2   A.  Yeah.

3   Q.  The -- and I'm -- I guess I'm going to ask questions sort

4   of that are in general regarding email campaigns and then try

09:27:20   5   to bring it to NuTech if you don't mind.

6           But at OTC Markets, you guys -- I assume you're

7   concerned about email campaigns.

8   A.  Yes, we are.

9   Q.  And you're concerned about email campaigns because that

09:27:35   10   could be a form of market manipulation?

11   A.  Yes.

12   Q.  All right.  And so I know you have proprietary systems in

13   place to try and figure out when email campaigns are

14   happening.  Correct?

09:27:50   15   A.  Yes.

16   Q.  All right.  I mean, the bottom line is you're able to --

17   you guys do your best to also receive the emails in these

18   email campaigns?

19   A.  We do our best to know about them.

09:28:02   20   Q.  I understand.  And so do you -- are you concerned with who

21   initiates the email campaign?  I mean, is that -- is that

22   something you guys want to know?

23   A.  It depends.

24   Q.  On?

09:28:19   25   A.  Why we're looking into the -- the -- the promotional

19-CR-26-ABJ        COLGLAZIER - CROSS - FLEENER        Vol. VII-1030
21-CR-14-ABJ

1   activity.

2   Q.   Okay.  And does it -- I mean, are there -- I mean --

3   explain, I guess -- I'm just going to ask an open-ended

4   question because I -- I think this is just important for

09:28:43   5   everyone to know.

6        How do email campaigns work?  Who are these people

7   sending out these emails promoting stocks like NERG and a

8   whole ton of others?

9        How do they work?  Who are these folks?

09:28:57  10   A.   I don't profess to know all the ins and outs of this

11   industry.

12   Q.   I understand.

13   A.   But, generally speaking, it's --

14   Q.   And -- and you can explain to the jury, please.

09:29:05  15   A.   Sure.

16        It's a way of attracting more eyeballs to your public

17   company.  It could be that the public company's officers or

18   directors are actually paying someone to send out emails on

19   their behalf talking about how great a company is.  It could

09:29:24  20   be a significant shareholder.  It could be someone for fun.

21   We don't always know who has a stake or why they're doing

22   this.

23        The fact of the matter is that some investors pay

24   attention to it, and sometimes it's correlated with higher

09:29:39  25   volumes and higher prices and -- and then a significant

1    drop-off where new investors who have bought shares in

2    response to these promotional -- these promotional campaigns

3    sort of get fleeced.  So that's why we're concerned with it.

4    Q.  And I appreciate that.

09:29:57    5         And so the -- these folks are called promotors in

6    your mind?

7    A.  Yeah.  That term has different definitions in securities

8    industry.  But, yes, we call them promotors.  Yeah.

9    Q.  All right.  Good.

09:30:09    10        And so you guys -- you -- you're the -- you're in

11    compliance; correct?

12    A.  That's correct.

13    Q.  All right.  So this is part of your area, trying to get

14    involved in monitoring the email campaigns?

09:30:23    15    A.  Yep.

16    Q.  All right.  And so you're -- you -- you're on the look for

17    these emails with the promotors sending out emails about NERG

18    and hundreds of other companies over the years; correct?

19    A.  We're surveilling for this type of activity across our

09:30:41    20    markets.

21    Q.  Did you ever find out in your -- in -- I'm going to call

22    it an investigation in NERG, but I don't necessarily know what

23    it is OTC Market Groups actually did within NERG.

24        But whatever it is that you guys have done with this

09:31:06    25    company -- I'm going to call it an investigation.  Did you

1    ever find out who the promote -- who paid the promoters in

2    this case?

3    A.  I don't think so.

4    Q.  And you -- you said on direct examination that you have --

09:31:26   5    and I found it on your website when I was poking around -- you

6    have a list of -- I guess the no-fly list of lawyers,

7    accountants, auditors that apparently you're not going to do

8    business with or not going to take their words or their --

9    their letters seriously.  Right?

09:31:43   10   A.  Right.  We have a list of service providers where we would

11   not accept their work for purposes of, you know, things like

12   establishing that there's current information.

13   Q.  Mr. Horn's not on that list; correct?

14   A.  I don't believe so.

09:32:00   15           MR. FLEENER:  Thank you.  No further questions.

16           MR. WARD:  Good morning, Mr. Colglazier.  My name is

17   Zenith Ward, and I represent Charles Winters.

18                        **CROSS-EXAMINATION**

19   BY MR. WARD:

09:32:26   20   Q.  You said that sometimes as a compliance officer or --

21   OTC Markets will be concerned with unusual trading activity;

22   right?

23   A.  Yes.

24   Q.  Okay.  We had testimony yesterday from a NERG stockholder

09:32:46   25   who testified that the price of his NERG stock went from being

19-CR-26-ABJ          COLGLAZIER - CROSS - WARD          Vol. VII-1033
21-CR-14-ABJ

1  around 50 to $500 and then this last spring jumped up to more

2  in the neighborhood of $5,000.

3          Are you following me so far?

4  A.  I'm sorry.  What were the time frames there and the price

09:33:07  5  amounts?

6  Q.  So he testified that his -- his NERG stock was worth 5 to

7  $500 for several years and then this last May -- or this last

8  spring of 2021 -- it jumped up to $5,000.

9  A.  The -- the total worth of his holdings?

09:33:24  10  Q.  Yeah, the worth of his holdings.  So they're worth --

11  A.  Yes.

12  Q.  -- $5 to $500 for a number of years and then just in this

13  last spring of 2021, the price jumped up to $5,000 so, you

14  know, a hundred -- a hundred-fold; right?

09:33:47  15          And NERG, of course, is not subject to any news

16  releases other than maybe news about this trial that's going

17  on.  Right?

18  A.  I don't know that.

19  Q.  How would you explain that kind of a massive jump in

09:33:59  20  the -- the price of a stock that is -- is the subject of a

21  criminal trial?

22  A.  It could be for any reason, honestly.  We've seen

23  speculation in all sorts of online mediums.

24          I don't put it past someone to start rumors for any

09:34:17  25  reason.

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1  Q.  The promotional materials that you testified that were

2  captured by OTC Markets and stored in your files that related

3  to NERG, to NuTech, those had no connection to Charles

4  Winters, did they?

09:34:41  5  A.  I don't know that.

6  Q.  Well, you have no reason to believe that Charles Winters

7  had anything to do with the dissemination of those promotional

8  activities?

9  A.  I -- I can't -- I'm in no position to make any call about

09:34:55  10  whether he was associated with them or not.

11  Q.  Okay.  So you just know there were promotional materials

12  about NERG; right?

13          And I guess the reason for my question is you

14  testified that chuck@ichcorp.net -- or whatever, that email --

09:35:12  15  was one of the people that uploaded information to OTC about

16  NERG.  Right?

17  A.  Yep.

18  Q.  That doesn't mean he had anything to do with dissemination

19  of promotional materials; right?

09:35:22  20          MR. HEIMANN:  Argument.

21          THE COURT:  Overruled.  I think it was really asked

22  and answered but . . .

23          THE WITNESS:  Sorry.  Do you want me to answer?

24          THE COURT:  You may answer.

09:35:35  25  A.  Just because he's publishing information on the company's

19-CR-26-ABJ          COLGLAZIER - CROSS - WARD          Vol. VII-1035
21-CR-14-ABJ

1   behalf does not mean he, you know, had anything to do with the

2   promotion.  But, at the same time, it doesn't mean he didn't

3   have anything to do with the promotion.

4          MR. WARD:  I understand that and I appreciate that.

09:35:53   5   Thank you.

6          May I have just a moment.  I want to pull up an

7   exhibit.

8       (Discussion held between counsel.)

9   BY MR. WARD:

09:37:17   10   Q.  All right.  I'd like you to take a look at Exhibit 516

11   that has been admitted, and it should be up on your monitor

12   here.

13   A.  I see the bottom of the page, yeah.

14   Q.  Okay.  And this is the email that -- where Kevin at NuTech

09:37:44   15   sends you the attorney agreement for Ian Horn?

16          Do you recall testifying about that a moment ago?

17   A.  Yes.

18   Q.  Okay.  Chuck Winters -- or an email of chuck@icorp is not

19   part of this email thread; correct?

09:37:59   20   A.  That's correct.

21       (Discussion held between counsel and the Courtroom Deputy.)

22   BY MR. WARD:

23   Q.  All right.  Now I'm going to have you take a look at

24   Exhibit 203 that's been admitted.

09:38:41   25          And this is an email from Nancy Rodriguez, who is at

19-CR-26-ABJ           COLGLAZIER - CROSS - WARD         Vol. VII-1036
21-CR-14-ABJ

1   OTC Markets, to Chuck Winters about the reporting status for

2   ECMZ; correct?

3   A.   Yes.

4   Q.   Okay.  And as we look at this email, this is just a

09:39:05  5   one-email exhibit.  And so this was something your company

6   sent to Mr. Winters?

7   A.   It looks like it, yeah.

8   Q.   And we don't have any email here indicating it was in

9   response to anything from Mr. Winters; right?

09:39:23  10  A.   I don't honestly know.  Usually that "RE" at the beginning

11  of a subject line indicates it's a reply.

12  Q.   Okay.  Or -- or it can mean that it's about?

13  A.   That's true.

14  Q.   And this is talking -- this email is letting Chuck Winters

09:39:46  15  know that because ECMZ is currently considered an SEC

16  reporting company, that their status on OTC won't change

17  unless they complete the Form 15; right?

18  A.   That's what it's saying, yeah.

19  Q.   And by completing the Form 15, then -- and a company to be

09:40:13  20  listed on OTC isn't required to be an SEC filer; right?

21  A.   No, they're not.

22  Q.   And so this is -- this is basically saying, "If you want

23  your status on OTC to change by filing documents with us, you

24  have to change from being an SEC filer to a non-SEC filer "?

09:40:35  25  A.   It's saying that that's the only scenario in which that

1   will happen, yeah.

2   Q.  All right.  And so it's actually kind of suggesting that

3   if you want your status to change on OTC Markets, you're going

4   to have to change your filing status from an SEC filer to a

09:40:50   5   non-SEC filer; right?

6   A.  I would contend that there's no imperative there, that we

7   are not suggesting they do anything.  That last line says you

8   may want to talk to your SEC attorney.

9          We are pretty good about not advising companies to do

09:41:06   10   anything.  It's their company.  They make the choices.

11   Q.  I think that's fair.

12          And so Chuck is on this email.

13          MR. WARD:  You can pull it down.

14   BY MR. WARD:

09:41:42   15   Q.  All right.  Now I'm going to show you what's been admitted

16   as Exhibit 38.

17          And this is the email from Kevin to you with the

18   press announcement; right?

19   A.  Yes.

09:42:09   20   Q.  And I think a moment ago you testified it was out of the

21   ordinary, or something to that effect, for the company to be

22   sending you a press release for your review to your personal

23   email.  Right?

24   A.  It's highly irregular.

09:42:25   25   Q.  "Highly irregular"?

19-CR-26-ABJ          COLGLAZIER - CROSS - WARD          Vol. VII-1038
21-CR-14-ABJ

1    A.  Yeah.

2    Q.  And you would agree with me here that Chuck Winters is not

3    on this email?

4    A.  I only see Kevin.

09:42:32    5    Q.  Right.  And you had no communication with Chuck about this

6    issue of this press release; is that correct?

7    A.  I don't remember.  It could have been something outside of

8    this.

9    Q.  Right.  And you said that when you talk -- that this was

09:42:45   10    followed up by a phone call; right?

11    A.  I believe the phone call occurred before this.

12    Q.  So you had a phone call and then you got this email that

13    you never responded to; right?

14    A.  That's my recollection of the order of the events, yeah.

09:43:05   15    Q.  Okay.  And on the phone call where you said your

16    recollection was the company was basically seeking assurance

17    that if they put out this information they weren't going to

18    get the skull and crossbones; right?

19    A.  That was my takeaway.

09:43:19   20    Q.  And the person you remember talking to about that was

21    Kevin Trizna; right?

22    A.  That's who I thought I was speaking with, yes.

23    Q.  And then you got an email from Kevin Trizna?

24    A.  Appears to be an email from Kevin Trizna.

09:43:31   25    Q.  And neither of those communication transactions involved

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1    Chuck Winters in any way; correct?

2    A.  I don't see anything here that says it did.

3    Q.  Well, not just not on the email but also in your

4    recollection of the telephone call.  It had nothing to do with

09:43:47    5    Chuck Winters; right?

6    A.  Yeah, I -- I honestly can't remember who was on the call

7    and who wasn't.

8    Q.  Okay.  Well, you remember someone that was on the call and

9    that was Kevin Trizna; right?

09:43:56    10    A.  I remember someone saying they were Kevin Trizna.

11            MR. WARD:  Okay.  Those are all the questions I have,

12    Your Honor.

13            MR. JUBIN:  Good morning, ladies and gentlemen.

14            JURY MEMBERS:  Good morning.

09:44:26    15            MR. JUBIN:  Good morning, Mr. Colglazier.

16            My name is Tom Jubin.  I represent Ian Horn.

17                        **CROSS-EXAMINATION**

18    BY MR. JUBIN:

19    Q.  You talked about getting these attorney letter agreements

09:44:36    20    from attorneys, hopefully before they do any work giving

21    opinion letters and that sort of thing.

22            Is this something that -- you require that agreement

23    for each company they're doing work for?  Or do you just get

24    one on file and that's good for any opinion letter that they

09:44:55    25    may do?

19-CR-26-ABJ        COLGLAZIER - CROSS - JUBIN        Vol. VII-1040
21-CR-14-ABJ

1   A.  Each company.

2   Q.  Each company?

3   A.  Yeah.

4   Q.  Okay.  So you -- you require that every company that an

09:45:01   5   attorney is going to write opinion letters for, they've got to

6   get one on file for that company --

7   A.  That's correct.

8   Q.  -- the agreement?

9   A.  Uh-huh.

09:45:11   10        MR. JUBIN:  All right.  Let's pull up No. 516.

11        (Discussion held between counsel.)

12        MR. JUBIN:  Our concern here is making sure we have

13   the redacted version.

14        THE WITNESS:  Okay.

09:45:33   15        MR. JUBIN:  We think that's what's going to get

16   pulled up here.  So if it's not, we'll turn it off quickly.

17        It's not?

18        (Discussion held at counsel table.)

19        MR. JUBIN:  Oh, thank you.

09:45:49   20        Mr. Davila will pull up a redacted version for us.

21        Thank you.

22   BY MR. JUBIN:

23   Q.  So at the top here we see this is that email to you from

24   someone who you understood to be Kevin Trizna; correct?

09:46:24   25   A.  Yes.

1   Q.  And attached to it was this -- this attorney

2   application --

3           MR. JUBIN:  Let's scroll down to page 3.

4   BY MR. JUBIN:

09:46:41   5   Q.  You note -- does it look to you like this is all done by

6   the same person in terms of the writing?

7   A.  I can't say.  I'm not --

8   Q.  Okay.  You see there's two -- two different types of ink;

9   right?

09:46:55   10   A.  I do see that.

11   Q.  And after the name "Ian Horn" that's printed -- well,

12   first of all, the top portion of this all seems to be slanted

13   to the left; right?

14   A.  I see that.

09:47:07   15   Q.  And if you look at the bottom portion filled out in the

16   blue -- blue ink, the different-colored ink, that seems to be

17   slanted to the right; correct?

18   A.  That appears to be the case, yes.

19   Q.  And so you don't know the timing of when this was

09:47:24   20   completed to identify Mr. Horn as outside counsel for NuTech

21   Energy Resources, Inc., do you?

22   A.  Not from this piece of paper, no.

23   Q.  And you don't know who completed that, do you?

24   A.  No.

09:47:38   25   Q.  Are you familiar with an attorney named Steve Mills who

19-CR-26-ABJ         COLGLAZIER - CROSS - JUBIN       Vol. VII-1042
21-CR-14-ABJ

1    was acting as the attorney for NuTech?

2    A.  I know Steve Mills, yes.  I'm familiar with that attorney,

3    yes.

4    Q.  Okay.  Do you have any information as to why he was not

5    the person who was providing the information for NuTech?

6    A.  I only know Steve Mills and his participation in -- in

7    this process generally.  I -- I don't know why he was or

8    wasn't involved with this company.

9    Q.  Okay.  And do you -- do you know if he was or was not

10   involved at all --

11   A.  I honestly can't remember.

12          MR. JUBIN:  Okay.  Thank you, sir.

13          I have no further questions.

14          MR. HEIMANN:  No redirect, Your Honor.

15          This witness may be excused.

16          THE COURT:  Mr. Colglazier, you are excused.

17          MR. HEIMANN:  The United States calls Tara Bogard.

18          THE COURT REPORTER:  Stand right there.

19          THE COURTROOM DEPUTY:  Please raise your right hand.

20       (Witness sworn.)

21          THE COURTROOM DEPUTY:  Please take a seat.

22          Please state and spell your name for the record.

23          THE WITNESS:  Tara Bogard, T-a-r-a B-o-g-a-r-d.

24   ///

25   ///

1     TARA BOGARD, GOVERNMENT'S WITNESS, DIRECT EXAMINATION

2    BY MR. HEIMANN:

3    Q.   Ms. Bogard, how old are you?

4    A.   38.

5    Q.   Where were you born and raised?

6    A.   Murray, Kentucky.

7    Q.   Where do you live now?

8    A.   Murray, Kentucky.

9    Q.   What's the highest level of education you've obtained?

10   A.   I have a master's degree.

11   Q.   In what?

12   A.   Organizational communication.  It's been a while.

13   Q.   Where are you employed?

14   A.   I'm employed at Kingdom Trust.

15   Q.   What is Kingdom Trust Company's business?

16   A.   Kingdom Trust is a qualified custodian.

17   Q.   What do you do there?

18   A.   I work -- I head up our business development team.

19   Q.   Were Justin Herman and Chuck Winters Kingdom Trust

20   clients?

21   A.   Yes.

22   Q.   How did they become clients?

23   A.   They became clients by calling in to our 800 number and

24   speaking with me as the business development person.

25   Q.   Who called?

1    A.   Justin.

2    Q.   When he called, what did he tell you he wanted?

3    A.   He said he was looking to open up an account for various

4    equity investments in stocks.

09:51:23    5    Q.   What kind of stocks?

6    A.   I didn't dive into that.  So -- stocks are something we

7    can hold, so I proceeded with on-boarding.

8    Q.   "On-boarding," does that mean bringing a new client on?

9    A.   Correct.

09:51:41    10        MR. HEIMANN:  Let's look at 14.2.

11    BY MR. HEIMANN:

12    Q.   Ms. Bogard, you have -- should have a copy of this on

13    paper with you on the witness stand.

14        This exhibit, first page is entitled "New Account

09:53:00    15    Checklist."

16    A.   Uh-huh.

17    Q.   What's the client name identified?

18    A.   Intrepid Capital Holdings Corp.

19    Q.   Does this exhibit include the custodial agreement that was

09:53:13    20    completed for Intrepid Capital Holdings?

21    A.   Yes.

22        MR. HEIMANN:  So let's go to page 2.

23    BY MR. HEIMANN:

24    Q.   Is this a welcome letter?

09:53:23    25    A.   Yes.

1          MR. HEIMANN:  And page 3.

2   BY MR. HEIMANN:

3   Q.  Is this where the account agreement begins?

4   A.  Correct.

09:53:28   5   Q.  All right.  There's a -- there's -- there's a Post-it

6   Note?

7   A.  Uh-huh.

8   Q.  What's written on there?

9   A.  "15" is the number that we would prefix the account number

09:53:39   10  with.

11  Q.  Why is that?

12  A.  It indicates to our team internally what fee structure

13  they're to be put on.

14  Q.  What fee structure does it indicate?

09:53:47   15  A.  Institutional, which is the "I-n-s-t" abbreviation.

16  Q.  What's the other option?

17  A.  Retail.

18  Q.  What does "custodial" mean?

19  A.  "Custodial" means that's the type of account that needs to

09:54:03   20  be opened.

21  Q.  What are the other options?

22  A.  IRAs.

23  Q.  So custodial or an individual retirement account of some

24  sort?

09:54:11   25  A.  Correct.

1   Q.   There's some other handwriting on there in blue ink,

2   "Trustees, Chuck Winters, Justin Herman."

3   A.   Uh-huh.

4   Q.   Do you recognize that handwriting?

09:54:23   5   A.   Yes.

6   Q.   Whose is it?

7   A.   That's the handwriting of Kristi Hobbs.

8   Q.   Is she another employee of Kingdom Trust at this time?

9   A.   Yes.  She's who I would pass the paperwork on to to

09:54:33   10   complete the process.

11   Q.   Okay.  What does it indicate that Chuck Winters and

12   Justin Herman are the trustees on this account?

13        What does it mean?

14   A.   Would you repeat the question?

09:54:42   15   Q.   What does it mean that Chuck Winters and Justin Herman are

16   the trustees --

17   A.   Oh.

18   Q.   -- on this account for Intrepid Capital Holdings?

19   A.   It means that they have the trustee-level permissions to

09:54:53   20   make decisions on the account.

21   Q.   So they can decide to deposit things into the account?

22   A.   Yes.

23   Q.   And withdraw from the account?

24   A.   Yes.

09:55:02   25        MR. HEIMANN:  Let's go to page 11.

1      Thank you.

2   BY MR. HEIMANN:

3   Q.  This is the signature page?

4   A.  Yes.

09:55:15    5   Q.  On this account what's the title indicated for

6   Charles "Chuck" Winters?

7   A.  On this particular page?

8   Q.  Yes.

9   A.  Applicant -- oh, CEO.  Sorry.

09:55:29   10   Q.  And what is the title for Justin Herman?

11   A.  CFO.

12      MR. HEIMANN:  If we go back to the first page of the

13   actual agreement, please.

14   BY MR. HEIMANN:

09:55:54   15   Q.  At the very top it says the agreement is effective 18 day

16   of 08 for month and 2015 year.

17      So this account was activated sometime around

18   August 18th of 2015?

19   A.  Yes.

09:56:08   20   Q.  After Mr. Winters -- Mr. Herman and Mr. Winters opened

21   this account for Intrepid Capital Holdings, what kind of stock

22   did they trade through it?

23   A.  I don't recall.

24   Q.  Okay.  Did Mr. Herman continue to call you about trades

09:56:31   25   and what he wanted to do?

1    A.  Yes.  He would call me initially.

2    Q.  Why?

3    A.  Most of the time people call me first because I'm the

4    first person they spoke with and am who on-boarded them.

09:56:46    5          But I don't work in the departments that handle the

6    trading and things of that nature, so I would redirect them to

7    my colleagues.

8    Q.  Which colleagues would you send Justin Herman to?

9    A.  Donnie Hendrix or Kristi Hobbs.

09:57:02    10   Q.  Was Mr. Hendrix the primary contact for Justin Herman and

11   Chuck Winters at Kingdom Trust?

12   A.  For anything related to their stocks or investments.

13   Q.  Is Mr. Hendrix deceased?

14   A.  Yes.

09:57:18    15   Q.  When did he pass?

16   A.  Early last summer.

17          MR. HEIMANN:  I'll pass this witness for

18   cross-examination.

19          MR. FLEENER:  No questions, Judge.

09:57:49    20          MR. WARD:  No questions.

21          MR. JUBIN:  No questions.  Thank you.

22          MR. HEIMANN:  Your Honor, may this witness be

23   excused.

24          THE COURT:  Ms. Bogard, you are excused.

09:58:02    25          THE WITNESS:  Thank you.

```
19-CR-26-ABJ          REED - DIRECT - HEIMANN          Vol. VII-1049
21-CR-14-ABJ
```

1    MR. HEIMANN:  Your Honor, it is 10:00.  I don't know

2  if you want me to call our next witness.  She's not long but

3  she is more than 15 minutes.

4    THE COURT:  Well, it's a good time to take our

09:58:34  5  midmorning recess.  Let's stand in recess for 15 minutes.

6    THE COURTROOM DEPUTY:  All rise.

7    (A recess was taken from 9:58 a.m. to 10:14 a.m.

8  Proceedings outside the jury's presence.)

9    THE COURTROOM DEPUTY:  Court is now in session.

10:16:04  10    (Proceedings within the jury's presence at 10:16 a.m.)

11    THE COURT:  Thank you.  Please be seated.

12    MR. HEIMANN:  The United States of America calls

13  Mahauta Reed.

14    Ms. Reed.

10:17:15  15    THE COURTROOM DEPUTY:  Please raise your right hand.

16    (Witness sworn.)

17    THE COURTROOM DEPUTY:  Please take a seat.

18    Please state and spell your name for the record.

19    THE WITNESS:  It's Mahauta Reed, M-a-h-a-u-t-a

10:18:02  20  R-e-e-d.

21    **MAHAUTA REED, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

22  **BY MR. HEIMANN:**

23  Q.  Ms. Reed, how old are you?

24  A.  Excuse me?

10:18:08  25  Q.  How old are you?

1    A.   41.

2    Q.   Where were you born and raised?

3    A.   Denver, Colorado.

4    Q.   Where do you live now?

10:18:15    5    A.   I live in Murray, Kentucky.

6    Q.   What is the highest level of education you've obtained?

7    A.   Associate's degree in college.

8    Q.   Were you employed by Kingdom Trust?

9    A.   I was.

10:18:27   10    Q.   During what years?

11    A.   28 -- 2013 to 2018.

12    Q.   What jobs did you hold at Kingdom Trust?

13    A.   Numerous.  Operations team lead, accounting manager.

14    Institutional custodial manager.

10:18:49   15    Q.   What job did you have in 2015?

16    A.   Operations team lead.

17    Q.   What did the operations team do at Kingdom Trust?

18    A.   Oh -- oh, we -- I oversaw the daily transactions of my

19    team members.

10:19:04   20    Q.   These transactions, would they originate with clients?

21    A.   They were.

22    Q.   Okay.  While working at Kingdom Trust, did you come into

23    contact with Justin Herman and Chuck Winters?

24    A.   I did.

10:19:22   25    Q.   In person or were these phone and email contacts?

1    A.   Phone and email.

2    Q.   Were they clients of Kingdom Trust?

3    A.   They were account designated representatives.

4    Q.   Is that abbreviated "ADR"?

10:19:35    5    A.   "ADR," yes, sir.

6    Q.   What's an ADR?

7    A.   It's -- it's -- it's an account designated representative

8    that can make decisions on behalf of the client holder of the

9    account.

10:19:47    10    Q.   Mr. Winters and Mr. Herman, were they ADRs for a number of

11    different accounts?

12    A.   They were.

13    Q.   Did Mr. Herman and Mr. Winters trade stocks through their

14    accounts?

10:20:09    15    A.   They did.

16    Q.   Were their stocks traded through some of the accounts that

17    they were ADRs for, as well?

18    A.   Yes.

19    Q.   Yes?

10:20:16    20    A.   Yes.

21    Q.   What kinds of stocks?

22    A.   The one that I recall the most of were penny stocks.

23    Q.   How did Kingdom Trust process penny stock transactions in

24    2015?

10:20:33    25    A.   Via email.

19-CR-26-ABJ        REED - DIRECT - HEIMANN        Vol. VII-1052
21-CR-14-ABJ

1    Q.   Did they go to a broker-dealer outside of the company?

2    A.   They did.

3    Q.   When the trade would happen through the broker-dealer,

4    what did Kingdom Trust have to do on its end?

10:20:50    5    A.   Send money.

6    Q.   Did you also have to reconcile accounts to figure out --

7    A.   We did.

8    Q.   -- to figure out which stocks were sold out of which

9    accounts?

10:20:59    10    A.   Yes.

11          MR. HEIMANN:  Let's look at Exhibit 402.

12    BY MR. HEIMANN:

13    Q.   While this is coming up, in 2015 when you were

14    operation -- operations team lead, would you also put in sell

10:21:24    15    orders for clients?

16    A.   I would.

17    Q.   Did you do that for Justin Herman and Chuck Winters?

18    A.   I did.

19    Q.   So if there was a sale of stock, it could be that you or

10:21:35    20    someone else at Kingdom Trust would put in the order?

21    A.   Yes.

22    Q.   That could happen; right?

23    A.   Yes.

24    Q.   Or an order could be put in by your client and then the

10:21:46    25    operations team is reconciling where that stock was sold from,

1  which account?

2  A.  Yes.

3  Q.  If you look at 402 at the bottom, Chuck Winters' email

4  sent on November 4th of 2015 to Donnie Hendrix, and there's a

5  grid there regarding NuTech shares.

6        Who is Donnie Hendrix?

7  A.  He was a -- he was one of my team members at Kingdom

8  Trust.

9  Q.  Did he work with Justin Herman and Chuck Winters?

10  A.  He did.

11  Q.  Is Mr. Hendrix deceased?

12  A.  He is.

13  Q.  This email was then forwarded from Mr. Hendrix to you.  Do

14  you see that?

15  A.  Yes.

16  Q.  Would you sometimes take care of Mr. Hendrix's clients

17  when he was not available?

18  A.  I would.

19  Q.  Including Mr. Herman and Mr. Winters?

20  A.  Yes.

21  Q.  All right.  Looking at this -- either from looking at it

22  or your memory, do you remember if this was a sell order that

23  you were supposed to put in or if this is an order that

24  happened that needed to be reconciled?

25  A.  To me, this would be a sell order.

1   Q.  Okay.

2          MR. HEIMANN:  Let's look at 403.

3   BY MR. HEIMANN:

4   Q.  As that's coming up, as a sell order you would then take

10:23:31   5   that and communicate that to the broker-dealer?

6   A.  Yes.

7   Q.  Do you remember who the broker-dealer was in November of

8   2015?

9   A.  To the best of my recollection, we used Fifth Third.

10:23:44  10   Q.  Okay.

11          MR. FLEENER:  I couldn't hear that answer.  I'm

12  sorry.

13          MR. HEIMANN:  "Fifth Third."

14          "Fifth Third."

10:23:56  15          MR. FLEENER:  "Fifth Third"?

16          MR. HEIMANN:  Yes.

17          MR. FLEENER:  Thank you.

18  BY MR. HEIMANN:

19  Q.  So 403, similarly, it has an email on the bottom,

10:24:08  20  Chuck Winters this time to you; "Subject:  Bravo 20 trading."

21          Do you remember an account for a Bravo Two Zero?

22  A.  I do.

23  Q.  Were Chuck Winters and Justin Herman ADRs for that

24  account?

10:24:25  25  A.  They were.

19-CR-26-ABJ          REED - DIRECT - HEIMANN          Vol. VII-1055
21-CR-14-ABJ

1    Q.  Now, this one says -- similar looking box -- it says

2    "11/4/2015, trading will settle."

3              Does this look like it's a sell order, or is this an

4    order that's being completed through the broker-dealer and

10:24:48   5    needs to be reconciled in Kingdom Trust's accounts?

6    A.  To me -- let's see.

7              It has a -- it's a -- it's a trade that -- the trade

8    request came in 11/4, and then it's supposed to settle on

9    11/9, and then we would reconcile it.

10:25:09  10    Q.  So this is probably a reconciliation?

11    A.  Yes.

12    Q.  Let's look -- let's talk now about withdrawals.

13              You said that the operations team would handle

14    withdrawals; right?

10:25:22  15    A.  Yes.

16    Q.  How could Kingdom Trust's clients request withdrawals in

17    2015?

18    A.  These type of withdrawals would be via email.

19              MR. HEIMANN:  So let's look at 405.

10:25:51  20              Scroll down to the second page.

21    BY MR. HEIMANN:

22    Q.  So this email thread begins with Chuck Winters sending you

23    an email on November 13th of 2015.  And there are two emails

24    there, one forwarded.

10:26:13  25              Wire -- "Here is today's wire from Chronos, 14K."  Is

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

19-CR-26-ABJ         REED - DIRECT - HEIMANN         Vol. VII-1056
21-CR-14-ABJ

1   this an example of a withdrawal request via email?

2   A.  This is.

3   Q.  Do you remember a client called Chronos?

4   A.  I do.

5   Q.  Were Chuck Winters and Justin Herman ADRs for that client?

6   A.  They were.

7   Q.  So the first message we see there, that's basically

8   requesting a withdrawal from that account?

9   A.  Yes.

10        MR. HEIMANN:  If we scroll up, the first page.

11  BY MR. HEIMANN:

12  Q.  You respond and then Mr. Winters that same day -- "I will

13  check on the account status.  He has another 13K clearing

14  today."

15        What does that second phrase mean to you?

16  A.  That he's going to check on the account status to see if

17  it should be closed.  And that there is another 13,000 worth

18  of funds that are supposed to either come in or go back out.

19        MR. HEIMANN:  Let's look now at 406.

20  BY MR. HEIMANN:

21  Q.  And look at the email that is at the bottom there that's

22  from Justin Herman to you on November 13th, 2015.  "Thank you

23  for helping me with that stupid wire for Chronos (Kada).  He

24  was very upsetting."

25        Do you remember this specific transaction?

10:26:31 (line 5)
10:26:45 (line 10)
10:27:11 (line 15)
10:27:36 (line 20)
10:28:19 (line 25)

19-CR-26-ABJ          REED - DIRECT - HEIMANN          Vol. VII-1057
21-CR-14-ABJ

1   A.  This specific one I can't recall.

2   Q.  In addition to email requests, did Kingdom Trust have a

3   withdrawal request form that was sometimes used?

4   A.  Yes.

10:28:33   5         MR. HEIMANN:  Let's look at 407.

6   BY MR. HEIMANN:

7   Q.  You have a paper copy, as well.  This is a three-page

8   exhibit.

9         Is this an example of a withdrawal request form?

10:29:04   10  A.  Yes.

11  Q.  Where is this money coming from, what account?

12  A.  Bravo 20 Partners, LLC.

13  Q.  There's some handwriting in the middle regarding the

14  amount in blue, I think.  Do you see that?

10:29:24   15  A.  I do.

16  Q.  Could you read that for me?

17  A.  "$3,700 per Chuck and Justin."

18  Q.  What does that mean to you?

19  A.  They requested that I change the amount of the wire going

10:29:37   20  out.

21  Q.  So they were ADRs on the Bravo 20 Partners account, and so

22  they were authorized to change the amount of a withdrawal?

23  A.  Yes.

24  Q.  They would also be authorized to request a withdrawal;

10:29:51   25  right?

```
19-CR-26-ABJ          REED - CROSS - WARD          Vol. VII-1058
21-CR-14-ABJ
```

1    A.  Yes.

2         MR. HEIMANN:  Your Honor, the Government will pass

3    this witness for cross-examination.

4         MR. WARD:  Good morning, Ms. Reed.  My name is

10:30:45    5    Zenith Ward, and I represent Charles Winters.

6                      **CROSS-EXAMINATION**

7    **BY MR. WARD**:

8    Q.  All right.  I'm looking here at Exhibit 402 that you just

9    discussed and that has been admitted.

10:31:47   10        This is a sell order, and it looks like it's for

11   150,000 shares of NERG at double 041 as the price; correct?

12   A.  Yes.

13   Q.  And so the dollar amount of this sale was for $584.99?

14   Less maybe the $30 fee and the -- maybe one penny for

10:32:21   15   something; is that right?

16        What do these numbers mean, the 30 and the one penny?

17   A.  Those I don't recall specifically.

18   Q.  Okay.  And -- but does the -- would the 150,000 shares at

19   double 041 come out to about $584?

10:32:45   20   A.  I'm -- I'm not sure.

21   Q.  Okay.  How about this -- this last box on the right,

22   "Bravo 20"?  What's the importance of that box?

23   A.  That is the account name and number.

24   Q.  The account name and number for what?

10:33:06   25   A.  For Bravo 20, LLC.

19-CR-26-ABJ                REED - CROSS - WARD            Vol. VII-1059
21-CR-14-ABJ

1   Q.  And so how does Bravo 20 play into this sale of shares?

2   A.  It's being requested to come from that account.

3   Q.  Okay.  So these are Bravo 20 shares that are being sold?

4   A.  Yes.

10:33:23   5   Q.  Okay.  And -- I'll pull up 403.  This has also been

6   admitted and that you discussed just a moment ago.

7           But, again, it looks like this time this was for

8   50,000 shares of NERG; correct?

9   A.  Yes.

10:33:42   10   Q.  And at that price of double 042 this time; right?

11   A.  Best that I can recall.

12   Q.  Well, and that's what the box on the exhibit says; right?

13   A.  Yes.

14   Q.  And I take it you're not -- you're not sure what the $10

10:34:02   15   and the one penny are in these next boxes, though; right?

16   A.  I don't recall that, no.

17   Q.  All right.  But, again, this is coming out of Bravo 20;

18   correct?

19   A.  Correct.

10:34:12   20   Q.  Okay.  And -- all right.

21           You said that Charles Winters and Justin Herman were

22   ADRs for the Bravo account.  That would be reflected on a

23   piece of paper somewhere, wouldn't it?

24   A.  There would be a scanned document giving them

10:34:51   25   authorization, yes.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN    Vol. VII-1060
21-CR-14-ABJ

1  Q.  But you haven't been shown that this morning; correct?

2  A.  This morning, no, I have not.

3  Q.  And take a look --

4         MR. WARD:  Can you mute my screen for just a sec?

10:35:10   5  BY MR. WARD:

6  Q.  All right.  This is Exhibit 407 that's been admitted.

7         And this is a withdrawal request, and there's the

8  notation here about Chuck and Justin.  But in terms of the

9  authorized signature for Bravo 20 Partners, here the

10:35:40  10  authorized signature is from Robert W. Mitchell; correct?

11  A.  Correct.

12         MR. WARD:  Those are all the questions I have.

13         MR. FLEENER:  I have no questions, Your Honor.

14         MR. JUBIN:  No questions.  Thank you.

10:36:08  15         MR. HEIMANN:  No redirect, Your Honor.  May this

16  witness be excused.

17         THE COURT:  Ms. Reed, you are excused.

18         THE WITNESS:  Thank you.

19         MR. HEIMANN:  The United States of America calls

10:37:05  20  Sonia Hacker.

21  **SONIA HACKER, GOVERNMENT'S WITNESS, FURTHER DIRECT EXAMINATION**

22  **BY MR. HEIMANN:**

23  Q.  Inspector Hacker, you understand you are still under oath?

24  A.  I do.

10:37:47  25         MR. HEIMANN:  Let's look at Exhibit 28.11.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN     Vol. VII-1061
21-CR-14-ABJ

1           And let's scroll down.

2    BY MR. HEIMANN:

3    Q.   Inspector Hacker, do you recognize this exhibit?

4    A.   I do.

10:38:26    5    Q.   Is this an email that you seized from the emails provided

6    by Oath Holdings?

7    A.   It is.

8    Q.   Who is it from?

9    A.   Scott Gilleland.  His email address is

10:38:40    10   scott@fintechsecurities.com.

11   Q.   Who is it to?

12   A.   Chuck Winters.  And his email address is

13   chuck@ichcorp.net.

14   Q.   What is the subject?

10:38:53    15   A.   It's "RE Intrepid."

16           MR. HEIMANN:  Let's go to the second page.

17   BY MR. HEIMANN:

18   Q.   In the body of this text does it reference "additional

19   order, NERG"?

10:39:07    20   A.   It does.

21           MR. HEIMANN:  The Government moves to admit 28.11.

22           MR. FLEENER:  No objection, Judge.

23           THE COURT:  28.11 is received.

24       (Government's Exhibit 28.11 received into evidence.)

25   ///

Melanie Sonntag, RDR, CRR, CRC              MelanieSonntagCRR@gmail.com

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. VII-1062
21-CR-14-ABJ

1    BY MR. HEIMANN:

2    Q.  So the first page has the email header that we were

3    reading from --

4    A.  Yes.

10:39:29    5    Q.  -- as we identified the exhibit.

6            MR. HEIMANN:  If we move to the second page.

7    BY MR. HEIMANN:

8    Q.  This is the text of that; is that correct?

9    A.  I believe this is the original email and the one above is

10:39:41    10    the parent email.

11    Q.  Very good.

12            So there is a header here and then some text?

13    A.  Yes.

14            MR. HEIMANN:  All right.  I'll let the jury read

10:39:57    15    that.

16            We'll move now to 28.12.

17            And scroll through it, please.

18    BY MR. HEIMANN:

19    Q.  Is this an email that was seized from the Oath Holdings

10:40:34    20    material?

21    A.  It is.

22    Q.  Who is it from?

23    A.  The parent email is from Justin Herman, justin@ichcorp.net.

24    Q.  Who is it to?

10:40:45    25    A.  Chuck Winters, chuck@ichcorp.net.

1    Q.   When was it sent?

2    A.   November 6th, 2015.

3    Q.   And what is the subject?

4    A.   This is a forward, "NERG."

10:41:01    5              MR. HEIMANN:   The Government moves to admit 28.12.

6              MR. FLEENER:   One second, please, Judge.

7              Still a minute, please, Your Honor.

8              No objections.

9              THE COURT:   28.12 is received.

10:41:50   10    (Government's Exhibit 28.12 received into evidence.)

11             MR. FLEENER:   Your Honor, may I speak with counsel.

12             THE COURT:   You may.

13    (Discussion held between counsel.)

14    BY MR. HEIMANN:

10:42:14   15    Q.   So, Inspector Hacker, the heading we read to identify

16    this, that's the smaller print at the top?

17    A.   Yes.

18    Q.   Then there's a forwarded message below that.  Who is that

19    from?

10:42:27   20    A.   Scott Gilleland.

21    Q.   To Justin Herman?

22    A.   Correct.

23             MR. HEIMANN:   If we scroll down to the next page.

24    BY MR. HEIMANN:

10:42:35   25    Q.   Is this the text that was found for that email?

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN    Vol. VII-1064
21-CR-14-ABJ

1    A.  Yes.

2    Q.  "Sell 1,500,000 NERG at .006."  Did I read that correctly?

3    A.  Yes.

4            MR. HEIMANN:  Let's go, then, to 28.34.  No, I'm

10:43:09   5    sorry.  That is the wrong number.

6            40.2.

7    BY MR. HEIMANN:

8    Q.  Inspector Hacker, do you recognize Exhibit 40.2?

9    A.  I do.

10:43:43   10    Q.  Is this an email that was seized from the Oath Holdings

11    search warrant materials?

12    A.  It is.

13    Q.  Who is it from?

14    A.  Justin@ichcorp.net.

10:43:58   15    Q.  Who is it to?

16    A.  Chuck Winters, chuck@ichcorp.net.

17    Q.  What is the sent date?

18    A.  May 9th, 2016.

19    Q.  And the subject?

10:44:14   20    A.  "woo nelly."

21    Q.  Does the first sentence of this email refer to NERG?

22    A.  It does.

23            MR. HEIMANN:  The Government moves to admit 40.2.

24        (Discussion held among counsel.)

10:45:46   25            MR. FLEENER:  No objections.

---

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

19-CR-26-ABJ     HACKER - FURTHER DIRECT - HEIMANN     Vol. VII-1065
21-CR-14-ABJ

 1           THE COURT:  40 -- 40.2 is received.

 2      (Government's Exhibit 40.2 received into evidence.)

 3           MR. HEIMANN:  Let's magnify just the header and that

 4    first sentence beginning with "I am really expecting to sell."

10:46:17   5    And I will just let the jury read that.

 6           Let's go, then, to 40.3.

 7    BY MR. HEIMANN:

 8    Q.   Inspector Hacker, do you recognize 40.3?

 9    A.   I do.

10:46:50  10    Q.   Is that an email seized from the Oath Holdings materials?

11    A.   Yes.

12    Q.   Are Justin Herman and Chuck Winters recipients of this

13    email?

14    A.   They are.

10:47:10  15    Q.   And does its text report trading activity for NERG with a

16    trade date of 5/9/2016?

17    A.   Yes.

18           MR. HEIMANN:  The Government moves to admit 40.3.

19           MR. FLEENER:  No objections.

10:47:25  20           THE COURT:  40.3 is received.

21      (Government's Exhibit 40.3 received into evidence.)

22           MR. HEIMANN:  Let's magnify just the message -- the

23    message and header.

24    BY MR. HEIMANN:

10:47:44  25    Q.   The sender of this email is identified as a William Rupp?

1   A.   Yes.

2   Q.   And according to the signature -- or not signature block

3   but the identifier at the bottom of the text -- it says

4   "Bayes Capital, LLC"; is that right?

10:48:08   5   A.   It does.

6   Q.   And then the NERG trade we were talking about, that's the

7   second row across on that table?

8   A.   Yes, it is.

9   Q.   How many shares does it indicate were sold on May 9th of

10:48:26   10   2016?

11   A.   16 million.

12          MR. HEIMANN:  Let's move now to 40.6.

13          Actually, 40.3 -- 40.5.

14   BY MR. HEIMANN:

10:49:06   15   Q.   Is this an email that was seized from the Oath Holdings

16   search warrant materials?

17   A.   It is.

18   Q.   Are Justin Herman and Chuck Winters among the recipients

19   of this email?

10:49:15   20   A.   They are.

21   Q.   Does it report trading activity for NERG on May 10th of

22   2016?

23   A.   It does.

24          MR. HEIMANN:  The Government moves to admit 40.5.

10:49:27   25          MR. FLEENER:  No objection.

19-CR-26-ABJ     HACKER - FURTHER DIRECT - HEIMANN    Vol. VII-1067
21-CR-14-ABJ

           1              THE COURT:  40.5 is received.

           2         (Government's Exhibit 40.5 received into evidence.)

           3              MR. HEIMANN:  Magnify the message and header.

           4    BY MR. HEIMANN:

10:49:44   5    Q.   This email is also from William Rupp?

           6    A.   Correct.

           7    Q.   And the 27 million -- well, the shares of NERG that were

           8    sold on May 10th of 2016, how many?

           9    A.   27 million.

10:50:04  10              MR. HEIMANN:  Now, let's look at 40.6.

          11         (Discussion held between counsel.)

          12    BY MR. HEIMANN:

          13    Q.   Inspector Hacker, do you recognize 40.6?

          14    A.   I do.

10:51:01  15    Q.   Is this an email that was seized from the Oath Holdings

          16    search warrant materials?

          17    A.   It is.

          18    Q.   Does it include Justin Herman and Chuck Winters as

          19    recipients?

10:51:14  20    A.   It does.

          21    Q.   And does it report trading activity of NERG stock on

          22    May 11th of 2016?

          23    A.   It does.

          24              MR. HEIMANN:  The Government moves to admit

10:51:28  25    Exhibit 40.6.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VII-1068
21-CR-14-ABJ

1      MR. FLEENER:  No objections.

2      THE COURT:  40.6 is received.

3      (Government's Exhibit 40.6 received into evidence.)

4      MR. HEIMANN:  Let's magnify the message and header.

10:51:38   5  BY MR. HEIMANN:

6  Q.  Inspector Hacker, according to this email, how many shares

7  of NERG were sold by Intrepid Capital Holdings on May 11th of

8  2016?

9  A.  10 million.

10:52:02  10      MR. HEIMANN:  Let's go down to 40.10.

11  BY MR. HEIMANN:

12  Q.  Is this an email seized from the Oath Holdings materials?

13  A.  Yes.

14  Q.  Was it sent to Justin Herman and Chuck Winters?

10:52:32  15  A.  Yes.

16  Q.  Does it report a lack of trading activity on May 13th of

17  2016 for NERG?

18  A.  It does.

19      MR. HEIMANN:  The Government moves to admit

10:52:52  20  Exhibit 40.10.

21      MR. FLEENER:  Just a second, please.

22      No objections.

23      THE COURT:  40.10 is received.

24      (Government's Exhibit 40.10 received into evidence.)

25  ///

1   BY MR. HEIMANN:

2   Q.   So the text that reports no activity that day, that is

3   "Justin, nothing done today on the NERG"?

4   A.   Correct.

5               MR. HEIMANN:  Let's look at 40.11.

6   BY MR. HEIMANN:

7   Q.   Is this an email that was seized from the Oath Holdings

8   search warrant materials?

9   A.   It is.

10  Q.   Was it sent to Justin Herman and Chuck Winters?

11  A.   Yes.

12  Q.   Does it report trading activity for NERG on May 16th of

13  2016?

14  A.   It does.

15               MR. HEIMANN:  The Government moves to admit 40.11.

16               MR. FLEENER:  A minute, please.

17               No objections.

18               THE COURT:  It is received.

19       (Government's Exhibit 40.11 received into evidence.)

20  BY MR. HEIMANN:

21  Q.   Per this email, how many shares of NERG stock were sold

22  from the Intrepid Capital Holdings account on May 16th of

23  2016?

24  A.   2,500,000.

25               MR. HEIMANN:  Let's look at 40.14.

10:53:23
10:53:48
10:54:00
10:54:27
10:54:47

```
                19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. VII-1070
                21-CR-14-ABJ
```

             1    BY MR. HEIMANN:

             2    Q.  Is this an email that was seized from the Oath Holdings

             3    materials?

             4    A.  It is.

10:55:12     5    Q.  Was it sent to Justin Herman and Chuck Winters?

             6    A.  Yes.

             7    Q.  Does it report sales of NERG shares on May 19th of 2016?

             8    A.  It does.

             9         MR. HEIMANN:  The Government moves to admit

10:55:30    10    Exhibit 40.14.

            11         MR. FLEENER:  A minute, please.

            12         No objections.

            13         THE COURT:  40.14 is received.

            14     (Government's Exhibit 40.14 received into evidence.)

10:55:58    15    BY MR. HEIMANN:

            16    Q.  According to this email, how many shares of NERG stock

            17    were sold from an Intrepid Capital Holdings account on

            18    May 19th of 2016?

            19    A.  10 million.

10:56:14    20         MR. HEIMANN:  Okay.  Let's shift gears a little bit

            21    here.

            22         40.15.  Let's scroll through it.

            23         MR. FLEENER:  I'm sorry, Counsel.  That's Exhibit 40

            24    point --

10:56:55    25         MR. HEIMANN:  -- 15.

```
        Melanie Sonntag, RDR, CRR, CRC            MelanieSonntagCRR@gmail.com
```

1          MR. FLEENER:  Thank you.

2   BY MR. HEIMANN:

3   Q.   Inspector Hacker, do you recognize 40.15?

4   A.   I do.

10:57:07   5   Q.   What is it?

6   A.   This is a Wells Fargo Bank statement for Bravo Two Zero

7   Partners that we received from a Wells Fargo -- well, that the

8   grand jury received from a Wells Fargo subpoena.

9   Q.   What time period?

10:57:22   10   A.   May 1st, 2016, to May 31st, 2016.

11          MR. HEIMANN:  The Government moves to admit 40.15.

12          MR. FLEENER:  A minute, please, Judge.

13          No objections.

14          THE COURT:  40.15 is received.

10:57:57   15   (Government's Exhibit 40.15 received into evidence.)

16          MR. HEIMANN:  So as you testified, this is a bank

17   account for Bravo Two Zero Partners.

18          If we scroll down one page.  One more.

19          If we stop there.  Please magnify that section.

10:58:13   20   BY MR. HEIMANN:

21   Q.   So we've magnified the transaction history for May 9th

22   through May 17 -- the first two entries of May 17th on the --

23   page 3 of 7 of this exhibit.

24          What is indicated on the row -- what transaction is

10:59:03   25   indicated on the row I've marked?

1    A.   On May 16th the Kingdom Trust Company deposited

2    $103,888.33 into this Bravo Two Zero Wells Fargo account.

3    Q.   And what's indicated on the row I've marked towards the

4    bottom, May 17th?

10:59:30    5    A.   On May 17th the Kingdom Trust Company deposited $28,944.44

6    into this Bravo Two Zero Wells Fargo account.

7              MR. HEIMANN:   Let's go back to the main page.

8              And one page down.

9    BY MR. HEIMANN:

11:00:09    10    Q.   So we are on page 4 of 7.  What transaction is indicated

11    on the row that I've marked on May 17th?

12    A.   On May 17th Bravo Two Zero sent $10,000 to Justin Herman's

13    Citizen Bank account.

14              MR. HEIMANN:   Let's go then, to 41.1.  This has not

11:00:51    15    been admitted.

16    BY MR. HEIMANN:

17    Q.   Inspector Hacker, do you recognize 41.1?

18    A.   Yes.

19    Q.   What is it?

11:01:12    20    A.   This is a Wells Fargo Bank full transaction report for the

21    wire we were just referencing.

22    Q.   The $10,000 wire to Justin Herman?

23    A.   Yes.

24              MR. HEIMANN:   The Government moves to admit 41.1.

11:01:26    25              MR. FLEENER:   No objection.

1          THE COURT:  41.1 is received.

2      (Government's Exhibit 41.1 received into evidence.)

3  BY MR. HEIMANN:

4  Q.  As on all the bank exhibits, there are some redactions on

11:01:40    5  what we're showing the jury.  The original documents were not

6  redacted; right?

7  A.  Correct.

8  Q.  So this indicates that $10,000 from Bravo Two Zero to

9  Justin Herman.  There's a bank account indicated, an account

11:02:03   10  over the beneficiary, and similarly -- where it says "BNF" --

11  this account ends in 5741.

12          Is that account an account at Citizens Bank?

13  A.  It is.

14  Q.  Did Citizens Bank provide the grand jury records related

11:02:23   15  to that account?

16  A.  They did.

17          MR. HEIMANN:  Let's go to 1001.  This has not been

18  admitted.

19  BY MR. HEIMANN:

11:02:42   20  Q.  Do you recognize 1001?

21  A.  Yes.

22  Q.  What is it?

23  A.  This is the personal signature card for the Citizens Bank

24  account ending 5741.

11:02:53   25          MR. HEIMANN:  The Government moves to admit 1001.

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. VII-1074
21-CR-14-ABJ

1      MR. FLEENER:  No objections.

2      THE COURT:  1001 is received.

3   (Government's Exhibit 1001 received into evidence.)

4  BY MR. HEIMANN:

11:03:04   5  Q.  Whose name is on this account?

6  A.  Justin Herman.

7  Q.  And who is the only signer indicated on this record?

8  A.  Justin Herman.

9      MR. HEIMANN:  Let's move now to 41.2.

11:03:15  10  BY MR. HEIMANN:

11  Q.  Is this a bank statement for that account ending in 5741

12  for April 26th of 2016 through May 24th of 2016?

13  A.  It is.

14      MR. HEIMANN:  The Government moves to admit 41.2.

11:03:54  15      MR. FLEENER:  One second, please, Judge.

16      No objections, Your Honor.

17      THE COURT:  41.2 is received.

18   (Government's Exhibit 41.2 received into evidence.)

19  BY MR. HEIMANN:

11:04:41  20  Q.  Okay.  What is the name on this bank statement?

21  A.  Justin Herman.

22  Q.  In addition to the account number, have we redacted a

23  street address?

24  A.  Yes.

11:04:52  25  Q.  The original record had that street address on it; right?

1    A.  Yes.

2          MR. HEIMANN:  Let's scroll down.

3          Again.

4          Again.

11:05:02   5    BY MR. HEIMANN:

6    Q.  So on this page -- it's Bates number ending in 00170,

7    4 of 7 on the exhibit itself -- there's a section for

8    "Deposits & Credits."

9          Does this indicate receipt of that $10,000 wire?

11:05:35  10    A.  It does.

11    Q.  And that's the second-to-last line there; right?

12    A.  Yes, on May 17th.

13          MR. HEIMANN:  Let's go to the next page.

14    BY MR. HEIMANN:

11:05:49  15    Q.  What's the daily balance in this account on May 16th?

16    A.  Negative $165.38.

17          MR. HEIMANN:  Let's go down to 302.

18      (Discussion held between counsel.)

19          MR. HEIMANN:  And let's . . . let's skip this one and

11:07:10  20    just go to 501.  501.

21      (Discussion held at counsel table.)

22    BY MR. HEIMANN:

23    Q.  Inspector Hacker, do you recognize 501?

24    A.  Yes.

11:07:31  25    Q.  What is that?

1   A.  This is a screenshot I made of E*Trade records pertaining

2   to NERG for Raymond Moore.

3   Q.  Were the E*Trade records provided in response to a grand

4   jury subpoena?

11:07:53   5   A.  Yes.

6   Q.  The records, are they similar to those Skype records and

7   OTC records that were provided in a spreadsheet itself?

8   A.  Yes.

9   Q.  This particular screenshot, have you modified the width of

11:08:10   10   the columns or the rows that report in order to fit the

11   information onto a single screen?

12   A.  Yes.

13   Q.  Other than changing column widths and selecting particular

14   rows, did you change any of the information reported in this

11:08:26   15   record?

16   A.  I did not.

17   Q.  And is this a true and accurate reflection of the

18   information in that spreadsheet?

19   A.  It is --

11:08:38   20   Q.  The substance -- I'm sorry.

21       The substance of the information.

22   A.  Yes.

23   Q.  So you've only reformatted?

24   A.  And I've only selected the section referring to

11:08:49   25   Raymond Moore.

1    Q.  So it's a selection of the spreadsheet.  That selection is

2    a true and correct copy of the information there?

3    A.  Yes.

4          MR. HEIMANN:  Your Honor, the Government moves to

11:09:01    5    admit 501.

6          MR. FLEENER:  May I speak to counsel, please.

7          THE COURT:  You may.

8      (Discussion held between counsel.)

9          MR. FLEENER:  No objections, Your Honor.

11:09:24   10          THE COURT:  501 is received.

11      (Government's Exhibit 501 received into evidence.)

12   BY MR. HEIMANN:

13   Q.  I want to do one other thing regarding Column T.

14          Did you make any assignment to Column T in order to

11:09:42   15   have it report an execution price that could be read on this

16   spreadsheet?

17   A.  Yes.  I formatted the cell to show four decimal places

18   because originally it only showed two, so everything showed up

19   as zero.

11:09:56   20   Q.  So, again, you changed the format, not the underlying

21   data?

22   A.  Correct.

23          May I --

24          MR. HEIMANN:  Your Honor, I'll pass this witness.

11:10:23   25          THE WITNESS:  May I say one more thing about this?

19-CR-26-ABJ      HACKER - FURTHER CROSS - WARD      Vol. VII-1078
21-CR-14-ABJ

1    MR. HEIMANN:  Yes.  Of course.

2    THE WITNESS:  The original spreadsheet was not

3  redacted.

4    MR. HEIMANN:  Very good.

11:10:30   5    Thank you for pointing that out.  I appreciate it.

6  BY MR. HEIMANN:

7  Q.  So what you're talking about is in Column A?

8  A.  Yes.

9  Q.  There's a black box running all the way down.  That's a

11:10:40  10  redaction of the account number to the last three digits?

11  A.  To the last four digits, yes.

12  Q.  Four digits.  Sorry.

13  A.  Yes.

14    MR. HEIMANN:  Thank you for pointing that out.

11:10:51  15  I appreciate it.

16    Your Honor, I'll pass this witness for

17  cross-examination.

18    MR. JUBIN:  I have no questions.

19    MR. WARD:  I do, Your Honor.  Just one moment.

11:11:13  20  I want to look at an exhibit.

21    Good morning, Inspector Hacker.

22    THE WITNESS:  Good morning.

23              **FURTHER CROSS-EXAMINATION**

24  **BY MR. WARD**:

11:12:27  25  Q.  All right.  So I have Exhibit 40.15 here pulled up that's

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

19-CR-26-ABJ        HACKER - FURTHER CROSS - WARD        Vol. VII-1079
21-CR-14-ABJ

1   been admitted.  And this is the Wells Fargo account for Bravo

2   Two Zero Partners, LLC; correct?

3   A.  Yes.

4   Q.  And in the course of your investigation, you are, of

11:12:48    5   course, familiar with the fact that this Bravo Two Zero

6   Partners, LLC, Wells Fargo account was controlled by one

7   person; correct?

8   A.  Yes.

9   Q.  And that one person was Bob Mitchell?

11:12:58    10  A.  Yes.

11  Q.  So when we see this $130,000 -- or 103,888.33 coming in

12  from Kingdom Trust and then this 29 -- 28,944 coming in from

13  Kingdom Trust, those are all funds going to Bob Mitchell?

14  A.  Yes.

11:13:21    15  Q.  And when you were testifying earlier -- or when we -- when

16  we saw exhibits and testimony earlier of shares of New Talk --

17  NuTech -- being sold out of the Bravo Two Zero account, the

18  proceeds of those sales went into this Wells Fargo account?

19  A.  Correct.

11:13:46    20  Q.  So if we follow the money, the -- the shares were being

21  sold by a DVP account associated with Charles Winters and

22  Justin Herman, but the money was going to Bob; correct?

23  A.  Yes.

24  Q.  And you talked about the $10,000 going out of this account

11:14:13    25  to Justin Winters -- Justin Herman -- on May 17th that we can

1    see here; correct?

2    A.  Yes.

3    Q.  Okay.  The 35,000 above that that went to Island Capital,

4    where was that going?

11:14:27    5    A.  To Island Capital.

6    Q.  And who -- who was associated with that account?

7    A.  I believe it was Anthony or Tony Baker.

8    Q.  Okay.  And what was Tony Baker's role -- why would he have

9    been receiving money from Bob?  Did your investigation reveal

11:14:49    10    that?

11    A.  He was a subject of this investigation.

12    Q.  And he was responsible for a good deal of the promotion of

13    the stock; correct?

14    A.  I do not know that.  I did not interview Mr. Baker.

11:15:02    15    Q.  Okay.  And the 21,251 above that, do you know where that

16    money is going?

17    A.  It shows it's going to Marvin Rowe.

18    Q.  And do you know who that is?

19    A.  I do not.

11:15:21    20    Q.  Did you investigate that?

21    A.  I did not.

22    Q.  Wasn't -- wasn't of interest to you that Bob has this

23    130,000 coming in and now he's paying out over $20,000 to

24    someone?  That wasn't of interest?

11:15:40    25    A.  I think it's all of interest.  I just did not interview

1    Mr. Marvin Rowe or do further investigation into that

2    transaction.

3    Q.  Why not?

4    A.  I would have to refresh my memory with Mr. Mitchell's

11:16:02    5    interview, but I might have asked him about it.

6    Q.  Okay.  Below the -- the 10,000 wired to Justin Herman, we

7    see 8,000 going to Throne Law Office; right?

8    A.  Yes.

9    Q.  Now, you know who that is; right?

11:16:18    10    A.  Yes.

11    Q.  Who's that?

12    A.  Tom Throne.

13    Q.  Okay.  And he's connected to NuTech; correct?

14        MR. HEIMANN:  Ambiguous, Your Honor.

11:16:32    15        THE COURT:  It is ambiguous.

16    BY MR. WARD:

17    Q.  Tom Throne spoke on the investor conference call,

18    didn't he?

19    A.  I don't recall.

11:16:46    20    Q.  Okay.  Did you investigate what this $8,000 was for?

21    A.  I interviewed Mr. Throne telephonically, and he said that

22    he had done some work, I believe.

23    Q.  He had done some work?  Did you investigate to find out

24    any more about that?

11:17:09    25    A.  No.

19-CR-26-ABJ      HACKER - FURTHER CROSS - FLEENER      Vol. VII-1082
21-CR-14-ABJ

1   Q.   Tom Throne's also whose property the wells that we've

2   heard about throughout this trial sit on; correct?

3   A.   That's what I've heard.  I didn't investigate that.

4   Q.   That wasn't important to your investigation?

11:17:32   5   A.   No.

6   Q.   Of this following the money trail that we've been doing

7   this morning, we haven't seen anything indicating money going

8   to Charles Winters; correct?

9   A.   Correct.

11:17:54   10          MR. WARD:  Those are all the questions I have.

11          MR. FLEENER:  Agent Hacker, good morning.

12          THE WITNESS:  Good morning.

13                **FURTHER CROSS-EXAMINATION**

14   BY MR. FLEENER:

11:18:35   15   Q.   The -- you recall the -- Exhibit 40.2, the email from

16   Justin Herman to Chuck Winters talking about and hoping to

17   sell hundreds of millions of shares of NERG "this week"?

18   A.   Yes.

19   Q.   The truth is they never sold hundreds of millions of

11:18:53   20   shares of NERG; correct?

21   A.   Could you clarify what you mean?

22   Q.   Well, they never sold hundred -- they never sold hundreds

23   of millions of shares of NERG?  Your -- you investigated the

24   sales; correct?

11:19:07   25   A.   Yes.

19-CR-26-ABJ      HACKER - FURTHER CROSS - FLEENER      Vol. VII-1083
21-CR-14-ABJ

1    Q.  And they never sold a hundred -- they never sold hundreds

2    of millions of shares of NERG stock; correct?

3    A.  Correct.

4    Q.  In fact, I was adding up the shares of NERG that were

11:19:20   5    actually sold in the Exhibits 40.3, 40.5, 40.6, 40.11, and

6    40.14.  You recall those exhibits; correct?

7    A.  Yes.

8    Q.  And when I was -- I was adding up, I came to 65 million

9    500 -- 65,500,000 shares that would have been sold during that

11:19:45   10   week time period.

11         Sound about right to you?

12   A.  Yes, it does.

13   Q.  And you don't know whether -- these 65,500,000 shares that

14   were sold during that time period, you don't know who

11:20:04   15   ultimately -- and I say "ultimately" -- who these shares

16   were -- were ultimately -- I'm going to rephrase this

17   question.

18         No, I'm not.  I'll withdraw that question.

19         You -- how many shares did these -- did Intrepid

11:20:38   20   Capital Holdings ultimately sell of NERG?

21   A.  I don't know the answer to that.

22   Q.  It wasn't hundreds of millions?  Agreed?

23   A.  In 2016?

24   Q.  And '15 -- ever.

11:20:50   25   A.  I would only be comfortable saying I know in 2016 that

19-CR-26-ABJ      HACKER - FURTHER CROSS - FLEENER      Vol. VII-1084
21-CR-14-ABJ

1    they did not sell hundreds of millions of shares.  I don't

2    recall what was sold in 2015, if that's fair.

3    Q.  Sure.  The truth is there -- they actually bought shares,

4    too, didn't they?

11:21:07   5    A.  Yes.  Yes.

6              MR. FLEENER:  Thank you.  No further questions.

7              Tom, do you have questions?

8              MR. JUBIN:  I have no questions.  I already passed.

9              MR. FLEENER:  Sorry.

11:21:37   10             MR. HEIMANN:  Are you through?

11             MR. FLEENER:  We're good.

12             MR. HEIMANN:  No redirect, Your Honor.

13             THE COURT:  You can step down.

14             MR. SZOTT:  May I have a moment with counsel,

11:22:12   15   Your Honor.

16             THE COURT:  You may.

17         (Discussion held among counsel.)

18             MR. SZOTT:  Thank you, Your Honor.  The United States

19   calls Raymond Moore.

11:23:39   20        (Witness sworn.)

21             THE COURTROOM DEPUTY:  Please take a seat.

22             Please state and spell your name for the record.

23             THE WITNESS:  Raymond Lee Moore, Jr.  R-a-y-m-o-n-d

24   L-e-e M-o-o-r-e, J-r.

11:24:47   25             MR. SZOTT:  Mr. Moore, good morning.

1          THE WITNESS:  Good morning.

2                    **RAYMOND LEE MOORE, JR.,**

3          **GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

4    BY MR. SZOTT:

11:24:49   5    Q.   How old are you?

6    A.   52 right now.

7    Q.   What do you do for a living?

8    A.   I run an oil field service business.

9    Q.   What is the name of your business?

11:25:01   10   A.   Rat Pac Enterprises.

11   Q.   Who owns Rat Pac Enterprises?

12   A.   My wife and I.

13   Q.   About how long have you been working with Rat Pac

14   Enterprises?

11:25:16   15   A.   Going on 16 years.

16   Q.   What sort of work does Rat Pac Enterprises do?

17   A.   So we do, basically, production equipment maintenance, and

18   we have an office in Texas and Wyoming, do basically the same

19   thing.

11:25:37   20   Q.   When you say "production equipment maintenance," what sort

21   of production equipment are you maintaining?

22   A.   So in the gas fields up here there is production

23   equipment, a separator, dehydration units; generally,

24   everything on an oil field location.

11:26:02   25          And we get called to maintain that equipment, tear it

1   apart, clean it out, put it back together, repair it.

2   Q.  Now, you mentioned having operations in Wyoming and in

3   Texas; is that correct?

4   A.  Correct.

11:26:13   5   Q.  I'd like you to think back to 2016.

6        In 2016 where was Rat Pac operating?

7   A.  We were operating in both states at that time.

8   Q.  Mr. Moore, I'd like to ask you about your investments in a

9   company with the symbol NERG.  Do you generally remember those

11:26:44   10   investments?

11   A.  Yes, sir.

12   Q.  How do you first hear about NERG or NuTech Energy

13   Resources as an investment opportunity?

14   A.  We were performing some work in the Douglas/Gillette area,

11:27:04   15   and the customer that we were doing the work for, I was asking

16   if he knew of any other companies that we could approach to

17   pick up some work in that area.

18        And he had mentioned that this company, NuTech, was

19   one of the companies that he thought we could approach.

11:27:26   20   Q.  When you heard about NuTech, what, if anything, did you do

21   to gain additional information about that company?

22   A.  I asked a couple of different people but nobody had heard

23   of it, and I did some research on the Internet, and that's how

24   I found their name and their ticker symbol and so forth.

11:27:55   25   Q.  Ultimately, did you decide to purchase some stock of

1    NuTech?

2    A.  Yes, sir.

3    Q.  What platform do you utilize -- or I should say, at the

4    time what platform were you utilizing to purchase stock?

11:28:10    5    A.  E*Trade Pro.

6    Q.  And did -- did you buy and sell other -- or were you

7    buying and selling other stock on E*Trade apart from NERG?

8    A.  Yes, sir.

9          MR. SZOTT:  Mr. Davila, would you please bring up

11:28:31    10   Exhibit 501.

11   BY MR. SZOTT:

12   Q.  And, Mr. Moore, you should have on the witness stand in

13   front of you an unredacted copy of Government's Exhibit 501.

14        Do you see that on the witness stand?

11:28:58    15   A.  Yes, sir.

16   Q.  Exhibit 501, whose E*Trade account does this relate to?

17   A.  That's mine.

18   Q.  Exhibit 501 is now on the -- on the monitor.

19        Generally, Mr. Moore, what is the jury seeing in

11:29:18    20   Exhibit 501?

21   A.  It looks to be a record of my purchases and sells of the

22   NERG stock.

23   Q.  And looking at the exhibit, are there also records of

24   attempted trades that did not go through?

11:29:39    25   A.  Yes.

19-CR-26-ABJ          MOORE - DIRECT - SZOTT          Vol. VII-1088
21-CR-14-ABJ

1   Q.  Let's look at the trades that were actually executed.

2           So I'm going to go through this, and I'll ask you to

3   follow along and confirm that I'm doing it accurately.

4           So on May 10th, 2016, an executed purchase of a

5   hundred thousand shares of NERG?  Did I get that right?

6   A.  Correct.

7   Q.  The third line, on May 11th, 2016, an executed sale of a

8   hundred thousand shares of NERG?  Did I get that right?

9   A.  Correct.

10  Q.  May 11th, 2016, an executed purchase of a hundred thousand

11  shares of NERG?  Did I get that correct?

12  A.  Yes.

13  Q.  May 12th, 2016, an executed sale -- I better clear that --

14  of a hundred thousand shares of NERG?  Did I get that correct?

15  A.  Correct.

16  Q.  May 16th, 2016, we have an executed purchase of

17  250,000 shares of NERG?  Did I get that correct?

18  A.  Yes, sir.

19  Q.  May 18th, 2016, an executed purchase of a hundred thousand

20  shares of NERG?  Did I get that correct?

21  A.  Yes, sir.

22  Q.  Ultimately, Mr. Moore -- let me strike that and -- and

23  ask -- so during that time frame that we've just discussed,

24  there were times when you both purchased and sold NERG stock;

25  is that right?

11:30:00
11:30:15
11:30:43
11:31:04
11:31:25

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

1    A.   Correct.

2    Q.   Ultimately, at the end of those series of trades I've

3    discussed, how many shares of NERG were you holding?

4    A.   After what we just discussed?

11:31:42   5    Q.   That's correct.

6    A.   350,000 shares.

7    Q.   How many shares of NERG do you own today?

8    A.   Still 350,000 shares.

9    Q.   Mr. Moore, I'd like to ask -- hopefully, not many

11:32:02   10   questions -- about where you were when you made the trades

11   that we're seeing here between May 10th of 2016, May 18th of

12   2016.

13        In preparation for your testimony today, did I ask

14   you to review materials that might suggest to you where you

11:32:22   15   were located?

16   A.   Yes, sir.

17   Q.   And did you, in fact, review business records of Rat Pac

18   that have revealed to you where you were when you made these

19   trades?

11:32:36   20   A.   Yes, sir.

21   Q.   Without -- well, let me ask you, first, on the witness

22   stand in front of you should be what have been marked for

23   identification only as Government's Exhibits 517, 518,

24   and 519.

11:32:50   25        I would ask you, Mr. Moore, to take just a moment and

1    review those documents.

2          Mr. Moore, are you familiar with those documents?

3    A.  Yes, sir.

4    Q.  Are those the business records that you -- are those

5    business records of Rat Pac that you consulted?

6    A.  Yes, sir.

7    Q.  Without saying specifically -- or without discussing

8    specifically the contents, what are Exhibits 518 and 519?

9    A.  They are invoices for jobs that we performed on or around

10   those dates, on or about those dates.

11   Q.  And, again, without getting into specific content, what is

12   Exhibit 517?

13   A.  It is a daily recap from our office manager to my wife.

14   Q.  Did that -- does that daily recap reference a specific

15   personnel decision or personnel action at Rat Pac?

16   A.  It does.

17   Q.  And do you specifically remember that personnel action?

18   A.  Yes.

19   Q.  And in relation to that personnel action, do you remember

20   where you were at the time that personnel action took place?

21   A.  I do.

22   Q.  And where were you?

23   A.  Pinedale, Wyoming.

24   Q.  And what was the date of that personnel action?

25   A.  May 13th, 2016.

19-CR-26-ABJ          MOORE - DIRECT - SZOTT          Vol. VII-1091
21-CR-14-ABJ

1   Q.  After that personnel action, where were you for the

2   next -- well, let me ask it this way:  Approximately how long

3   did you remain in Wyoming after May 13th of 2016?

4   A.  I couldn't honestly answer that to the date, but it was a

11:35:03   5   good amount of time, somewhere between two weeks and a month,

6   minimum.

7   Q.  And that's after May 13th of 2016?

8   A.  Correct.

9   Q.  And I guess there's no reason to be ambiguous here.

11:35:16  10          What was that personnel action that I've referred to?

11  A.  We were relieving our manager in the Pinedale office of

12  his duties.

13  Q.  And do you recall being in Wyoming for a period of time

14  before that person was relieved of his duties?

11:35:33  15  A.  Yes.

16  Q.  About how long would you say you were in Wyoming before

17  relieving that person of his duties?

18  A.  I would say at least a week.

19  Q.  When you were trading in NERG, as we saw in Exhibit 501,

11:35:58  20  what did you use in order to make those trades happen?

21  A.  As of the piece of equipment?  Laptop?

22  Q.  Yes, the piece of equipment.

23  A.  Laptop.

24  Q.  And you would do that through E*Trade on your laptop?

11:36:16  25  A.  Yes, sir.

```
19-CR-26-ABJ        MOORE - CROSS - FLEENER        Vol. VII-1092
21-CR-14-ABJ
```

                1           MR. SZOTT:  May I have a moment, Your Honor.

                2           THE COURT:  You may.

                3       (Discussion held at counsel table.)

                4           MR. SZOTT:  Your Honor, thank you.  I will pass the

11:36:45        5   witness for cross.

                6           MR. FLEENER:  Mr. Moore, good morning.

                7           THE WITNESS:  Good morning.

                8           MR. FLEENER:  My name is Tom Fleener.  I'm a lawyer

                9   from Laramie.  It's nice to meet you, sir.

11:36:52       10                       **CROSS-EXAMINATION**

               11   **BY MR. FLEENER**:

               12   Q.  You would agree with me, would you not -- I mean, you

               13   weren't investing in NERG?  You were just trading in NERG?

               14   A.  Actually, initially, I was looking at it as an investment.

11:37:38       15   I look at a lot of companies like that that are really small,

               16   you know.

               17   Q.  Yeah.  But you were jumping in and out of this thing every

               18   day, buying a hundred thousand shares, selling it maybe the

               19   same day?  Agreed?

11:37:52       20   A.  Correct.

               21   Q.  And you say you -- and these -- these sales of -- and

               22   purchases -- of a hundred -- hundred million -- or a hundred

               23   thousand shares -- I mean, I was doing the math, and this --

               24   these were -- these were very, very, very small moneywise

11:38:09       25   transactions; correct?

19-CR-26-ABJ          MOORE - CROSS - FLEENER          Vol. VII-1093
21-CR-14-ABJ

1    A.  Correct.

2    Q.  Couple hundred bucks?

3    A.  Correct.

4    Q.  And so your first transaction -- I know you saw

11:38:18    5    Government 501 in front of you.

6         Your first transaction on May 10th, you -- you bought

7    a hundred thousand shares at .0026, sold those same hundred

8    shares the next day at .0028, and the difference there is

9    20 bucks?

11:38:42    10   A.  Yes, sir.

11   Q.  And, less commission, that would have meant -- that would

12   have been -- you made 10 bucks on that transaction?

13        Commissions, I think, were 9.99 then.

14   A.  Yes, sir.

11:38:53    15   Q.  And they may have been 9.99 on the buy and 9.99 on the

16   sale, so that could have been -- actually been -- that whole

17   transaction could have been a wash?  Probably was a wash?

18   A.  4.95 per.

19   Q.  Do you have that exhibit in front of you?

11:39:10    20   A.  I do.

21   Q.  Look at V.  I think they're showing 9.99.

22   A.  It says that but I always recall being charged 4.95 for

23   that purchase.

24   Q.  Okay.  But the bottom line is -- is that for the period of

11:39:29    25   May 10th through May 18th, you were jumping in and jumping out

1   of NERG?

2   A.  Correct.

3   Q.  And you were jumping in and out and -- in and out of NERG

4   with very, very minimal gains; correct?

11:39:43   5   A.  Correct.

6   Q.  And you say right now that you own -- well, let me ask you

7   this.  I mean, I -- I assume that NERG wasn't -- you just said

8   that you -- you watch a lot of these small companies; right?

9   A.  Correct.

11:39:58   10   Q.  And you're an E*Trade Pro guy?

11   A.  Yes, sir.

12   Q.  Me, too.  And so, I mean, you can look for unusual volume

13   or which cheap stock is selling hundreds of millions of shares

14   or something like that?  You can see that on E*Trade?

11:40:14   15   A.  Exactly.

16   Q.  And you would agree that's one of the reasons that you --

17   one of -- I know you heard about NERG.  That's one of the

18   reasons that you decided to trade NERG -- and other

19   companies -- is because you saw a whole bunch of volume and

11:40:24   20   you can get in and out relatively easily?

21   A.  Correct.

22   Q.  And you own -- you say you still own 350,000 shares?

23   A.  That's correct.

24   Q.  Were you aware that in May of this last year that NERG

11:40:40   25   stock volume and price jumped a bunch?

```
19-CR-26-ABJ        MOORE - CROSS - FLEENER        Vol. VII-1095
21-CR-14-ABJ
```

             1   A.  I stopped looking at that stock a long time ago, sir.

             2   Q.  I understand.

             3         And the truth is your 350,000 shares of NERG, your

             4   basis -- which is the cost basis to you, what you paid for

11:40:58     5   it -- that's still probably way -- probably less than a

             6   thousand dollars?

             7   A.  Yes --

             8   Q.  Agreed?

             9         And you -- you have to -- I'm sorry.  You have to

11:41:08    10   answer, sir.

            11   A.  Yes, sir.

            12         MR. FLEENER:  And I don't mean to yell at you.

            13   I knew she was going to yell at me if I didn't yell at you.

            14         So I have no further questions.  Thank you, sir.

11:41:18    15         MR. JUBIN:  No questions.  Thank you.

            16         MR. FLEENER:  I do have one -- can I have a

            17   follow-up, Judge?

            18         THE COURT:  You may.

            19   BY MR. FLEENER:

11:41:56    20   Q.  Sir, I'm not going to commit you to knowing the exact

            21   number of the exact volume of NERG shares that traded in that

            22   week of 2016.  But it -- would it surprise you that there were

            23   almost a billion shares of NERG that traded that week when you

            24   were trading?

11:42:14    25         MR. SZOTT:  Objection; lack of personal knowledge.

---

1    MR. FLEENER:  That's why I asked the question.

2    THE COURT:  That's right.  Overruled.

3  BY MR. FLEENER:

4  Q.  Does that surprise you that there were --

11:42:24    5  A.  Nothing surprises me with a stock that small.

6    MR. FLEENER:  Thank you.  I appreciate it.

7    MR. WARD:  Good almost-afternoon, Mr. Moore.

8    My name is Zenith Ward.  I represent Charles Winters.

9                    **CROSS-EXAMINATION**

11:42:50   10  BY MR. WARD:

11  Q.  You testified you heard about NuTech or NERG from a person

12  that you were doing some work for; is that correct?

13  A.  Correct.

14  Q.  Do you know who that person -- what that person's name

11:43:05   15  was?

16  A.  I do.

17  Q.  Who was it?

18  A.  Ralph Trotter.

19  Q.  Okay.  Was -- Ralph Trotter, did he have money in NuTech?

11:43:15   20  A.  No.  They -- the company that he worked for had assets in

21  the Gillette area.  And he had heard through the grapevine,

22  basically, that it was a new company operating in that area.

23  Q.  All right.  And that's -- that's what got you interested

24  in the NERG stock?

11:43:33   25  A.  Correct.

                 1          MR. WARD:  Those are all the questions I have,

                 2   Your Honor.  Thank you.

                 3          Thank you.

                 4          MR. SZOTT:  May I have a moment, Your Honor.

11:43:56         5          THE COURT:  You may.

                 6      (Discussion held at counsel table.)

                 7          MR. SZOTT:  Mr. Davila, would you bring 501 up again,

                 8   please.

                 9      (Discussion held at the podium.)

11:45:20        10          MR. SZOTT:  Ms. Harris, can I have access to the --

                11   thank you -- or to the -- to counsel table.

                12          Mr. Davila, if you -- well, I don't know that that's

                13   amenable, really, to magnification.

                14                    **REDIRECT EXAMINATION**

11:44:48        15   **BY MR. SZOTT:**

                16   Q.  Mr. Moore, I didn't ask you before, but toward the end of

                17   the Exhibit 501 there are some entries for 2017, December

                18   2016, where it says "Cancel, Expired, Placed, Cancel,

                19   Expired," and there's -- 350,000 shares are listed in the

11:46:25        20   "Event Quantity."

                21          Would you explain to the jury what was going on with

                22   respect to your 350,000 NERG shares in that time frame?

                23   A.  So I had read some articles about the company failing, so

                24   I was looking to get rid of those shares for whatever I could

11:46:45        25   get rid of them for.

1   Q.  But you're still holding those shares today?

2   A.  Correct.

3   Q.  You also mentioned speaking with Mr. Trotter.  But before

4   purchasing NERG, you also did your own research; correct?

11:47:00   5   A.  Yes, sir.

6   Q.  And how, again, did you do that?

7   A.  Basic Internet searches.

8   Q.  Do you recall whether you researched it at all on the

9   E*Trade platform?

11:47:12   10   A.  I did.  I found their ticker symbol in a Google search,

11   which is -- I punched that into E*Trade Pro, and that's how

12   I found their stock.

13         MR. SZOTT:  Nothing further, Your Honor.  Thank you.

14         MR. WARD:  Judge, I just have one brief follow up.

11:48:03   15         Hello again, Mr. Moore.

16                    **RECROSS-EXAMINATION**

17   **BY MR. WARD:**

18   Q.  You were just asked about the -- the trades you placed --

19   or attempted to place in 2017, and I just want to clarify one

11:48:16   20   thing.  So I've got that exhibit, the redacted 501, up.

21         And so the -- your last two transactions with this

22   NERG stock were purchases; correct?  You purchased

23   250,000 shares and then you purchased a hundred thousand

24   shares; correct?

11:48:48   25   A.  Correct.

19-CR-26-ABJ          MOORE - RECROSS - WARD          Vol. VII-1099
21-CR-14-ABJ

1   Q.  And so -- and you purchased those shares at -- I'm sorry.

2   I'm just trying to track here.  All right.

3          So you purchased at double 019 and then you purchased

4   at double 012; correct?

11:49:11    5   A.  Yes, sir.

6   Q.  Okay.  And then when you tried to sell those shares in

7   January of 2017, you get to decide how much you want to try to

8   sell them at; correct?

9   A.  Yes, sir.

11:49:28    10  Q.  And so your first attempt here was to sell at .01; right?

11  A.  Yes, sir.

12  Q.  Which is 10 times, approximately, what you bought it for;

13  right?

14  A.  Yes.

11:49:47    15  Q.  And you weren't -- no one -- no one bought that sale order

16  that you put out there; correct?

17  A.  They did not.

18          MR. WARD:  Okay.  Those are all the questions I have.

19          MR. SZOTT:  Your Honor, I ask that the witness be

11:50:10    20  excused and released from his subpoena.

21          THE COURT:  Mr. Moore, you are excused and released.

22          Do you think it's a good time to take our noon

23  recess?

24          We'll stand in recess until -- today -- until 1:30

11:50:52    25  o'clock.

1           MR. FLEENER:  What time, Judge?  1:30?

2           THE COURT:  1:30.

3           MR. FLEENER:  Thank you, sir.

4           THE COURTROOM DEPUTY:  All rise.

11:51:02   5      (A recess was taken from 11:51 a.m. to 1:31 p.m.

6    Proceedings outside the jury's presence.)

7           THE COURTROOM DEPUTY:  All rise.  Court is now in

8    session.

9           THE COURT:  How are you doing?

13:31:41  10      MR. HEIMANN:  Very well, Your Honor.  Thank you.

11      (Proceedings within the jury's presence at 1:33 p.m.)

12           THE COURT:  Thank you, ladies and gentlemen.  Please

13   be seated.

14           When we recessed for lunch, we had just heard the

13:33:48  15   testimony of Raymond Moore, who runs an oil field service

16   organization called Rat Pac Enterprises.

17           Mr. Heimann, you may call the Government's next

18   witness.

19           MR. HEIMANN:  The United States of America calls

13:34:06  20   Scott Gilleland.

21      (Witness sworn.)

22           THE COURTROOM DEPUTY:  Please take a seat.

23           Please state and spell your name for the record.

24           THE WITNESS:  My name is Thomas Scott Gilleland,

13:34:59  25   G-i-l-l-e-l-a-n-d.

1    THOMAS SCOTT GILLELAND,

2    GOVERNMENT'S WITNESS, DIRECT EXAMINATION

3    BY MR. HEIMANN:

4    Q.  Mr. Gilleland, do you go by "Scott"?

5    A.  Yes, sir.

6    Q.  How old are you?

7    A.  48.

8    Q.  Where were you born and raised?

9    A.  I was born in Pittsburgh, Pennsylvania, and we moved

10   shortly after that to Raleigh, North Carolina, where

11   I grew up.

12   Q.  Where do you live now?

13   A.  I live in Atlanta, Georgia.

14   Q.  What is your occupation?

15   A.  I am currently a compliance officer.

16   Q.  For a broker-dealer?

17   A.  That's correct.

18   Q.  Have you worked as a stockbroker during your career?

19   A.  As a trader.

20   Q.  Trader?  Thank you.

21   A.  Yes, I have.

22   Q.  How long have you worked in the securities industry?

23   A.  This will be 26 years.

24   Q.  During your career did you work for a company called

25   FinTech Securities?

```
          19-CR-26-ABJ      GILLELAND - DIRECT - HEIMANN      Vol. VII-1102
          21-CR-14-ABJ
```

1    A.  Yes, sir.

2    Q.  When did you work for that company?

3    A.  2006 to 2018.

4    Q.  Is FinTech still in business?

13:35:55    5    A.  No, sir.

6    Q.  When did it go out of business?

7    A.  They were acquired in 2018 by a larger firm.

8    Q.  2018?

9    A.  Correct.

13:36:01    10    Q.  In 2015 did FinTech Securities perform stock trades for

11    clients of Kingdom Trust Company?

12    A.  Yes, sir.

13    Q.  As part of that business relationship, did FinTech perform

14    stock trades for Justin Herman and Chuck Winters?

13:36:30    15    A.  Yes, sir.

16    Q.  Did you communicate directly with Mr. Herman and

17    Mr. Winters about their trades?

18    A.  Mostly by email.  I believe there might have been phone

19    calls, but it was -- majority -- through email communication.

13:36:43    20    Q.  What kinds of stock did they trade?

21    A.  Primarily penny stocks.

22            MR. HEIMANN:  Let's look at 28.2.

23    BY MR. HEIMANN:

24    Q.  Mr. Gilleland, you have paper copies in front of you, as

13:37:04    25    well.  We've had prior testimony that Exhibit 28.2 was

 1   provided to the grand jury by FinTech during the course of

 2   this investigation.

 3          Mr. Gilleland, do you recognize what we're -- you're

 4   seeing on the first page of this exhibit?

13:37:46   5   A.  Yes.  This would be a copy of an email that was kept by

 6   the Global Relay Archive, which was our FINRA-approved

 7   compliance archive system.

 8   Q.  What did the Global Relay Archive do for FinTech?

 9   A.  They would sync with our Outlook system to capture all of

13:38:13   10   our emails, create a database.

11   Q.  So it would capture emails as you sent them and received

12   them?

13   A.  That's correct.

14   Q.  And then keep them; right?

13:38:21   15   A.  That's right.

16   Q.  Why?

17   A.  FINRA regulations require broker-dealers to keep all email

18   communications for a certain number of years.

19   Q.  The archived emails, were they -- it sounds like they were

13:38:36   20   kept just during the regular course of FinTech's business.

21   A.  That's correct.

22          MR. HEIMANN:  I'd like to look at page 2 of this

23   exhibit.

24   BY MR. HEIMANN:

13:38:51   25   Q.  That's a continuation of that email from the first page?

19-CR-26-ABJ        GILLELAND - DIRECT - HEIMANN        Vol. VII-1104
21-CR-14-ABJ

1    A.  Yes, sir.

2         MR. HEIMANN:  And page 3.

3    BY MR. HEIMANN:

4    Q.  So this is 3 and 4 that's on the screen.  You have 3 and 4

5    in your packet.

6         On page 3, the top half of the screen you're looking

7    at, what record are we looking at there?

8    A.  Page 3 is a copy of what the trade details would look like

9    if they're printed out from our internal, web-based system.

10   Q.  When you worked at FinTech, if you received an order --

11   sell order, buy order -- what would you do if you got it over

12   email?

13   A.  Typically we would enter it on the web-based system, and

14   that would automatically generate an email confirmation back

15   to whoever requested the trade.

16   Q.  Did you make the entries on the web-based system at the --

17   around the same time you received the email from your client?

18   A.  Yes.  That's correct.

19   Q.  The entries on the web-based system, were they maintained

20   by FinTech as part of its regularly conducted business?

21   A.  Yes.

22   Q.  On page 4, what record is shown there?

23   A.  That would be a printout from our internal accounting

24   system.

25   Q.  FinTech had an internal accounting system that kept track

13:39:04

13:39:25

13:39:45

13:40:00

13:40:18

1    of client transactions?

2    A.   That's correct.

3    Q.   That was maintained as part of FinTech's regular business?

4    A.   Yes.

13:40:32    5    Q.   If you compare the commission on the web-based record and

6    commission on the internal accounting record, is there a

7    difference on these two records?

8    A.   Yes.  The web-based system is just going to calculate

9    based on a default that's set up that we weren't able to

13:40:50    10    change at the time we entered it.  And the internal accounting

11    system shows the accurate commission after we had adjusted it

12    posttrade.

13    Q.   I want you to take -- just take a quick look on page 4,

14    the internal accounting.

13:41:06    15         Does that record for internal accounting purposes a

16    sale of NERG stock?

17    A.   Yes.  That's correct.

18    Q.   Looking at page 3, the web-based record, does that record

19    the corresponding -- the same sale of NERG stock?

13:41:26    20    A.   Yes, it is.

21         MR. HEIMANN:  If we go all the way to the top,

22    please.

23    BY MR. HEIMANN:

24    Q.   Is this the email that was recorded in the Global Relay

13:41:40    25    Archive for FinTech that resulted in the sell order for those

1    trades?

2    A.  Yes.  That's correct.

3         MR. HEIMANN:  Your Honor, the Government moves to

4    admit 28.2.

13:41:49    5         MR. FLEENER:  A moment, please, Judge.

6         No objections.  Thank you.

7         THE COURT:  Exhibit 28.2 is received.

8      (Government's Exhibit 28.2 received into evidence.)

9         MR. HEIMANN:  So let's magnify from the header of the

13:42:14   10   email down to "T. Scott Gilleland."

11   BY MR. HEIMANN:

12   Q.  Mr. Gilleland, is this an email that you received from

13   chuckwinters@rocketmail.com?

14   A.  Yes.

13:42:33   15   Q.  What's the date that it was sent to you?

16   A.  November 3rd, 2015.

17   Q.  What is the order that's being placed?

18   A.  To sell 150,000 shares of stock symbol NERG at a limit

19   price of .0041.

13:42:57   20   Q.  What is a limit price?

21   A.  We -- there's basically two types of stock orders.  You

22   can enter a market order, which will execute immediately at

23   whatever price that stock is trading at.

24        Or if you want to try to sell it at a limit price

13:43:12   25   higher than what it currently is, you can put in a limit -- or

19-CR-26-ABJ          GILLELAND - DIRECT - HEIMANN          Vol. VII-1107
21-CR-14-ABJ

1   if you only want to sell it at that price or higher -- you

2   would place a limit.

3   Q.  So the order would go out and say "I'm willing to sell at,

4   say, .0041" -- so that's, what, .41 cents?

13:43:33    5   A.  Right.

6   Q.  Okay.  And if the price gets to that level, someone

7   accepts the offer, then it's sold?

8   A.  Correct.

9   Q.  The subject on this is "RE: NERG.

13:43:52    10           "Please place the following order on NERG."  It

11   doesn't expressly say "sale."

12           If an email from a customer doesn't communicate to

13   you what they want to do, sell or buy, what would you do?

14   A.  We would try to contact them either through email or by

13:44:12    15   phone.

16   Q.  Okay.  Clarify what your customer wanted?

17   A.  That's correct.

18           MR. HEIMANN:  Okay.  Let's go back to that page.  And

19   let's scroll down to the internal accounting, so the last

13:44:30    20   page.

21           And let's magnify the entry there.

22   BY MR. HEIMANN:

23   Q.  So, Mr. Gilleland, what are we seeing in this internal

24   accounting entry?

13:44:43    25   A.  This would notify us -- it would show all the pertinent

---

Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

WYD 1152

1    trade details, the date, the time, the -- was it buy or sell,

2    number of shares, symbol, action, et cetera.

3    Q.   Okay.  So "Acct" on the far left, is that for "Account"?

4    A.   That's correct.

13:45:03    5    Q.   And so below -- it's off-centered but below that where

6    there's an account number ending in 5641, Bravo 20, is that

7    identifying the account from which this is being sold?

8    A.   Yes.  Typically that would identify the underlying

9    account, right.

13:45:22    10    Q.   On this particular record, then, 11/13/2015, that would be

11    the date?

12    A.   Right.

13    Q.   "SLD"?

14    A.   "Sold."

13:45:34    15    Q.   "ExQuan"?

16    A.   "Execution quantity."

17    Q.   Is that the number of shares?

18    A.   Yes, sir.

19    Q.   That were actually sold?

13:45:44    20    A.   Yes.

21    Q.   Is it possible for that to be different from the sell

22    order?

23    A.   Yes.  If you had a partial execution, it would just show

24    that amount.

13:45:53    25    Q.   And when you say "partial execution," what do you mean by

1   that?

2   A.   If you wanted to, say, sell 150,000 at that price but you

3   were only able to sell 50,000, it would reflect that amount.

4   Q.   "Symbol," that's the ticker symbol; right?

13:46:12   5   A.   Yes, sir.

6   Q.   And then, "Action," what does that mean?

7   A.   "Action" would show either the limit requested or it would

8   typically say "MKT," as in "market order."

9   Q.   "GTC," what does that stand for?

13:46:28   10   A.   You can either place the trade good for one day only or

11   good until canceled, which is "GTC."

12   Q.   If it's good until canceled, it's available for acceptance

13   until the person who made the offer comes in and says "Take it

14   off"?

13:46:46   15   A.   Right.  And each trade system has a different expiration

16   date.  Typically it's about 180 days.

17   Q.   "ExPrice"?

18   A.   "Execution Price."

19   Q.   So that's the price it actually sold for?

13:46:59   20   A.   Yes, sir.

21   Q.   "Principal"?

22   A.   That would be the execution quantity multiplied by the

23   execution price.

24   Q.   "Comm"?

13:47:10   25   A.   "Commission Charged."

19-CR-26-ABJ       GILLELAND - DIRECT - HEIMANN       Vol. VII-1110
21-CR-14-ABJ

1   Q.  So in the -- we're in the internal accounting at this

2   point, so the actual commission was $30?

3   A.  Yes, sir.

4   Q.  That's the money that FinTech received for making that

13:47:23   5   sale possible?

6   A.  Correct.

7   Q.  "SECFee"?

8   A.  The SEC charges a transaction fee on every equity sell

9   order.

13:47:35   10   Q.  So one penny in this case?

11   A.  Correct.

12   Q.  "NetMoney"?

13   A.  So then the net is just the principal minus the commission

14   and the SEC fee.

13:47:46   15   Q.  Okay.  "TradeDate"?

16   A.  That's the actual execution date of the order.

17   Q.  So that trade date could be different from the time we

18   talked about earlier; right?

19   A.  That's right.  If you place a good-until-canceled order

13:48:01   20   and it doesn't execute on that day you enter it, it could be a

21   separate date.

22   Q.  "SettleDate"?

23   A.  Typically trades settle in two business days.

24   Q.  What does it mean for a trade to settle in the securities

13:48:18   25   business?  In particular, with over-the-counter securities.

 1   A.  That's the date where the two custodians actually exchange

 2   the asset and the money for the trade.

 3         MR. HEIMANN:  Let's look, then, at 28.3.

 4   BY MR. HEIMANN:

 5   Q.  28.3, that first page, is that another email recorded in

 6   FinTech's archive?

 7   A.  That's correct.

 8   Q.  And it documents an email from chuckwinters@rocketmail.com

 9   to you on November 3rd of 2015?

10   A.  Yes.

11         MR. HEIMANN:  Let's scroll down.

12         And again and again.

13   BY MR. HEIMANN:

14   Q.  I lost count of the pages, but on the second-to-last

15   page of the exhibit, is this that web trade detail, including

16   the NERG order that was archived above?

17   A.  Yes.

18   Q.  And the last page, is that the internal accounting record

19   from FinTech?

20   A.  Yes.

21   Q.  For -- for that trade; right?

22   A.  That's correct.

23         MR. HEIMANN:  Your Honor, the Government moves to

24   admit 28.3.

25         MR. FLEENER:  No objection.

1          THE COURT:  Exhibit 28.3 is received.

2        (Government's Exhibit 28.3 received into evidence.)

3          MR. HEIMANN:  Let's go to the top.

4          And let's magnify just the very top one, from

13:50:32    5   "Hi, Scott," down to "Regards: Chuck Winters."

6          With the header.  Thank you.

7   BY MR. HEIMANN:

8   Q.   What trade order is being communicated here?

9   A.   To sell 150,000 shares of NERG at a limit of .0042.

13:50:58   10   Q.   And you say it's NERG because that's the subject?

11   A.   Correct.

12   Q.   And the note, is that indicating the account from which it

13   should be sold?

14   A.   Right.  And we actually would have one account for

13:51:17   15   Intrepid in this case, and that's more for their internal

16   records.  But, yes, that's correct.

17   Q.   So that note is for the internal records of --

18   A.   Right.

19   Q.   -- of Intrepid, you said?

13:51:26   20   A.   Right.  So they would see that on that email that goes

21   back to them.

22   Q.   Intrepid was the business through which Chuck Winters and

23   Justin Herman were selling these stocks?

24   A.   Correct.  That's correct.

13:51:38   25          MR. HEIMANN:  Let's go back to the main email, and

1    let's go down, then, to the internal accounting.

2          Let's magnify the entry there.

3    BY MR. HEIMANN:

4    Q.  So this, then is the internal accounting from that trade

5    order?

6    A.  Yes, sir.

7    Q.  And if we read it across, it looks like they sold

8    execution quantities of all 50,000; execution price, .0042.

9    So 42/100 of a penny each?

10   A.  Correct.

11   Q.  And the net money was $199.99?

12   A.  Yes.

13         MR. HEIMANN:  Let's look, then, at 28.22.

14   BY MR. HEIMANN:

15   Q.  First page here, is this another email from the Global

16   Relay Archive of FinTech?

17   A.  Yes, it is.

18   Q.  Who is it from?

19   A.  Chuck Winters.

20   Q.  It's to you on November 9th of 2015; is that right?

21   A.  Yes.

22         MR. HEIMANN:  Let's go down a page.

23   BY MR. HEIMANN:

24   Q.  The second page here, is that the web trade detail?

25   A.  Yes, it is.

19-CR-26-ABJ          GILLELAND - DIRECT - HEIMANN          Vol. VII-1114
21-CR-14-ABJ

1   Q.  And the third page, is that accounting -- the internal

2   accounting record for those trades?

3   A.  That's correct.

4          MR. HEIMANN:  Your Honor, the Government moves to

13:53:35   5   admit 28.22.

6          MR. FLEENER:  No objection.

7          THE COURT:  28.22 is received.

8      (Government's Exhibit 28.22 received into evidence.)

9          MR. HEIMANN:  So let's magnify the message itself.

13:53:56  10  BY MR. HEIMANN:

11  Q.  What's being communicated here?  What kind of sell order

12  is this?

13  A.  So that would be five different sell limit orders.  Of

14  NERG.

13:54:22  15  Q.  So help me understand what you get from the list of what's

16  listed under "Sell Orders."

17  A.  To sell 1 million shares at each of the individual prices

18  or limit prices.

19  Q.  Okay.  So does that mean as the price goes up to

13:54:52  20  .006 cents -- or not cents but dollars, I guess -- 6/10 of a

21  penny, then there's a million that could be sold?

22  A.  That's correct.

23  Q.  And then if it continues to go up, another million becomes

24  available for sale at the various -- .0063, 0065, 0067, 0069?

13:55:17  25  A.  Yes, that's correct.

1  Q.  "All Day orders," what does that mean to you?

2  A.  That's what we talked about, the difference between a day

3  order and a good until canceled.  They only wanted these good

4  for one trading day, and they would expire if they did not

13:55:31  5  execute.

6  Q.  Very good.

7          MR. HEIMANN:  Let's go back to that front page.

8          And move down to the internal accounting on the last

9  page.

13:55:52  10          And let's magnify the block of internal accounting.

11  BY MR. HEIMANN:

12  Q.  This internal accounting, then, would be the record of the

13  sales that resulted from that sell order; is that right?

14  A.  Yes, that's correct.

13:56:12  15  Q.  The -- and it's the bottom half here; right?  The NERG

16  sales.

17  A.  Right.

18  Q.  So the symbol at the very beginning, the first four rows,

19  is different.  So that would have been a different stock?

13:56:28  20  A.  Correct.

21  Q.  Different sell order?

22  A.  Right.

23  Q.  It's these bottom -- the bottom block that would be the

24  NERG orders described.

13:56:39  25          And there are various execution prices here; right?

1    A.  Yes.

2    Q.  Okay.  Good.

3          MR. HEIMANN:  Let's look, then, at 28.13.

4    BY MR. HEIMANN:

13:57:13    5    Q.  This is a different email.  Up in the upper left, it has

6    the name "Jack Curran."  Who was that?

7    A.  He was the president of FinTech Securities.

8    Q.  This is an email from chuckwinters@rocketmail.com to you?

9    A.  Yes.

13:57:34    10    Q.  November 6th of 2015?

11    A.  Correct.

12    Q.  In addition to the Relay Archive, did FinTech's email

13    system maintain copies of your email messages?

14    A.  Yes.  They would be maintained in the Outlook email

13:57:55    15    system.

16    Q.  Was the Outlook email system linked to the archive?

17    A.  Yes.

18    Q.  How is it linked?

19    A.  I'm not sure what the technical specifications are of

13:58:04    20    that.

21    Q.  What was the result of the linkage?

22    A.  That Global Relay could archive all of the emails that we

23    also kept internally.

24    Q.  So they'd be saved on Outlook?

13:58:16    25    A.  Correct.

19-CR-26-ABJ        GILLELAND - DIRECT - HEIMANN        Vol. VII-1117
21-CR-14-ABJ

1   Q.  And then also saved into the archive automatically?

2   A.  Correct.

3           MR. HEIMANN:  Let's go to the next page of this.

4   BY MR. HEIMANN:

13:58:31   5   Q.  This is that same web detail record that we saw earlier --

6   same kind of web detail record; right?

7   A.  Right.

8   Q.  And if we go back up to the email, the email's dated

9   November 6th of 2015.

13:58:50   10          If we go down to the web detail record, what date is

11  this for?

12  A.  November 6th, 2015.

13  Q.  We know that because the date's on that top row?

14  A.  Correct.

13:59:02   15  Q.  And it includes -- this web detail record includes NERG

16  trades?

17  A.  Yes, sir.

18          MR. HEIMANN:  If we go down one more page -- do we

19  have another page?

13:59:17   20          Okay.  The Government moves to admit 28.13.

21          MR. WARD:  Your Honor, I would object for the reason

22  that this only has the web-based page that has incorrect

23  commission amounts that -- it doesn't have the -- the third

24  page that the others have that show actually what happened, so

13:59:43   25  it's not accurate and it could be confusing.

19-CR-26-ABJ        GILLELAND - DIRECT - HEIMANN       Vol. VII-1118
21-CR-14-ABJ

1       MR. HEIMANN:  Your Honor, the witness has testified

2   to the consistent difference between the internal accounting

3   record, the web detail record.  He's testified that the web

4   detail record was maintained by FinTech as part of its regular

5   business and it was created at the time that a sell order was

6   submitted.

7       So the record is what it is.  It doesn't have the

8   internal accounting, but what is there were business records

9   of FinTech that meet all the requirements of the exception.

10      THE COURT:  Exhibit 28.13 is received.

11   (Government's Exhibit 28.13 received into evidence.)

12      MR. HEIMANN:  Let's magnify the -- the header and the

13   text of the email.

14  BY MR. HEIMANN:

15  Q.  The subject of this is "New order."

16      Mr. Gilleland, what's communicated to you by the text

17  of this email?

18  A.  To sell 900,000 shares of NERG at a limit of .0043.

19  Q.  You said "limit of .0043."  That's because, if it was

20  market, it would be -- it would say -- it wouldn't have a

21  number?  It would be --

22  A.  Or it would say "at market."

23      MR. HEIMANN:  Let's come back out.

24      Go down to the second page.

25      And let's magnify the NERG rows on that "Web Trade

14:00:01

14:00:19

14:00:43

14:01:06

14:01:21

Melanie Sonntag, RDR, CRR, CRC                MelanieSonntagCRR@gmail.com

1    Details."

2    BY MR. HEIMANN:

3    Q.  So that trade, then, is entered in this section through

4    your web-based trading portal?

14:01:44    5    A.  Yes.

6    Q.  And as you said before, the commission on this is going to

7    be wrong, and that's the column with the 3,390, 3,000,

8    et cetera?

9    A.  That's correct.

14:01:58    10    Q.  And the commissions would be much less based on the other

11    exhibits we've seen; right?

12    A.  Right.

13            MR. HEIMANN:  Let's look at 2828 -- 28.28.

14            We're going to skip this one.

14:02:27    15            Let's go to 28.33.

16            And we're going to skip that one, too.

17            Your Honor, may I have a moment.

18            THE COURT:  Yes, you may.

19        (Discussion held at counsel table.)

14:02:54    20    BY MR. HEIMANN:

21    Q.  Did FinTech have trouble with trades -- let me put it this

22    way:  Did FinTech have trouble with the business brought to

23    your company -- to that company -- by Justin Herman and

24    Chuck Winters?

14:03:59    25    A.  Yes, we did.

19-CR-26-ABJ        GILLELAND - DIRECT - HEIMANN        Vol. VII-1120
21-CR-14-ABJ

1    Q.   What kinds of problems?

2    A.   From what I recall, there were settlement issues with our

3    custodian receiving the shares on the settlement date.

4    Q.   So it was after the orders were in, they were executed, it

14:04:15    5    was then trying to get the final transaction done?

6    A.   Correct.

7    Q.   Did FinTech -- shortly after all the trades we saw, did

8    FinTech end its relationship with Mr. Herman and Mr. Winters?

9    A.   Yes.   That's correct.

14:04:29    10    Q.   Was it a result of those settlement problems?

11    A.   Yes, sir.

12        MR. HEIMANN:   I'll pass this witness for

13    cross-examination.

14        MR. WARD:   Your Honor, may I have a moment with

14:04:43    15    counsel.

16        THE COURT:   You may.

17     (Discussion held at counsel table.)

18        MR. HEIMANN:   Your Honor, speaking with counsel,

19    there's something else we need to do with 28.3.

14:07:54    20    BY MR. HEIMANN:

21    Q.   Mr. Gilleland, if you look at 28.3 on paper in front of

22    you, if you would just tell me -- page through it and let me

23    know if there are two sets of web trade details and two sets

24    of internal accounting.

14:08:28    25    A.   Yes, that's correct.

19-CR-26-ABJ         GILLELAND - DIRECT - HEIMANN         Vol. VII-1121
21-CR-14-ABJ

1    Q.  Okay.  We only talked about one set of the web trade

2    details and one set of the internal accounting.

3              The other two that are there, those are also from the

4    same process and were the same business records as the ones we

5    actually talked about; right?

6    A.  Correct.

7    Q.  So let's actually talk about what's on them so we can be

8    clear about it.

9              And we're just going to start again at the sell

10   order.  That's what's on front here.

11             Remind us what "GTC" means.

12   A.  That means "good until canceled."  So if the order does

13   not execute on the actual dates entered, it may stay out there

14   a certain number of days until it fills or it's canceled.

15             MR. HEIMANN:  Okay.  So let's -- scroll down to the

16   first web trade details.

17             And -- actually, go back up.  I want to make sure

18   I get a number in my head.

19             All the way up, please.

20   BY MR. HEIMANN:

21   Q.  And if I read this correctly, the sell order was up to

22   150,000.

23   A.  Correct.

24             MR. HEIMANN:  So let's go down to the first internal

25   accounting.

1          Okay.  And let's magnify that first internal

2    accounting again.

3    BY MR. HEIMANN:

4    Q.  All right.  We looked at this earlier.  And what we didn't

14:10:05   5    really talk about is the execution quantity compared to the

6    sell order.

7          So the sell order we saw had "150,000."  What's the

8    execution quantity of this first sale?

9    A.  That is 50,000.

14:10:18  10    Q.  So when you have a -- a GTC order -- so good-until-

11    canceled order, sell order for a certain number of shares --

12    if the first executed trade does not involve all of the shares

13    available, does the good-until-canceled order remain

14    available -- open for the remaining shares?

14:10:45  15    A.  Yes, it does.

16          MR. HEIMANN:  So let's go back to the page.

17          And we'll scroll down.

18          And I'll note just that what we just looked at was

19    November 4th.

14:10:57  20          So let's go down and look again at the second

21    internal accounting.  And we'll magnify that.

22    BY MR. HEIMANN:

23    Q.  What's the executed quantity on this executed order?

24    A.  That is 100,000 shares.

14:11:19  25    Q.  And the date?

1   A.  November 5th, 2015.

2   Q.  So this would have taken up the remaining hundred thousand

3   shares that was in the sell order for 150,000?

4   A.  Correct.  Yes.

14:11:33   5            MR. HEIMANN:  Okay.

6            All right.  Thank you, Your Honor, for letting me do

7   that.  I will pass this witness for cross-examination.

8            MR. WARD:  Good afternoon, Mr. Gilleland.  My name is

9   Zenith Ward.  I represent Charles Winters.

14:12:47   10                     **CROSS-EXAMINATION**

11  **BY MR. WARD**:

12  Q.  I want to talk about Exhibit 28.2 that has been admitted.

13            Here on the third page of this exhibit, this was --

14  this is the section that has the wrong commission amount, but

14:13:25   15  then on this far right column we have a column under "Notes"

16  that says "Bravo 20."

17            Do you see that?

18  A.  Yes, sir.

19  Q.  What is that column referring to?

14:13:37   20  A.  That "Notes" section was an area of the trade ticket where

21  we could put in any notes we wanted to, if it was details from

22  the email or who entered the trade, either.

23  Q.  And so the notes in this column that say "Bravo 20," what

24  do they mean with respect to this trade?

14:13:56   25  A.  That would have been input following the email

 1    instructions that indicated that on the trade order.

 2    Q.    And -- and so what does "Bravo 20" refer to?  I mean, what

 3    is that talking about?

 4    A.    That I don't know.  I would assume it was an internal

14:14:13    5    account at Intrepid.

 6    Q.    Okay.  And then here on the -- the last page, this shows

 7    the correct commission amount?  So this was a sale of

 8    150,000 shares of NERG at .0041 for a net amount of $615 less

 9    the $30 commission and the one penny SEC fee, resulting in

14:14:56   10    $584.99 being the net amount from the sale of those shares;

11    correct?

12    A.    Yes.

13    Q.    Okay.  And if we go up here to the -- back to this

14    internal page here, what does the "Submitted By" refer to?

14:15:25   15    A.    That was usually someone at the company who either

16    submitted the trade or wanted to receive a copy of the trade

17    details.

18    Q.    "Someone at the company," as in at FinTech?

19    A.    No, at the -- at our client, one of our clients.

14:15:41   20    Q.    Okay.  So was this trade submitted by justin@icorp, then?

21    A.    No.  I believe that trade was actually submitted by email

22    by Mr. Winters.  But from what I recall, Justin was requested

23    to receive copies of the trade execution details.

24    Q.    Sure.  All right.

14:16:09   25         MR. WARD:  And if we go to 28.13.

1    BY MR. WARD:

2    Q.   This is the exhibit that we don't have the actual correct

3    commissions for because all of these commissions are wrong;

4    correct?

14:16:25    5    A.   Correct.

6    Q.   Do you know what the correct commission amounts were for

7    each of those trades?

8    A.   Our typical policy was just to charge the minimum amount

9    we could to cover our costs with our clearing firm.  So there

14:16:46    10    wasn't a standard amount.  It really depended on what kind of

11    execution price and the net amount that came out of it.

12    Q.   But as we sit here, you can't tell us what the actual

13    commission amount was on any of these sales?

14    A.   No.

14:17:11    15         MR. WARD:  Okay.  Those are all the questions I have.

16         THE COURT:  Thank you.

17         MR. WARD:  Thank you.

18         MR. FLEENER:  No questions, Judge.

19         MR. JUBIN:  No questions.  Thank you.

14:17:24    20         MR. HEIMANN:  No redirect, Your Honor.

21         We would ask that this witness be excused from his

22    subpoena.

23         THE COURT:  Thank you.  You are excused,

24    Mr. Gilleland.

14:18:00    25         MR. HEIMANN:  The United States of America calls

1    Sonia Hacker.

2          Your Honor, if I may, for my planning purposes, when

3    does the Court wish to take its afternoon recess?

4          THE COURT:  Oh, approximately 3:15.

14:18:35    5          MR. HEIMANN:  Thank you, Judge.

6    **SONIA HACKER, GOVERNMENT'S WITNESS, FURTHER DIRECT EXAMINATION**

7    **BY MR. HEIMANN:**

8    Q.  Inspector Hacker, you understand that you are still under

9    oath?

14:18:53    10    A.  I do.

11    Q.  We're going to talk about some bank records.  I want to

12    put up an exhibit that has not been admitted, 109.  We're

13    going to talk about a set of transactions that occurred in

14    December of 2014.

14:19:24    15          Inspector Hacker, did you create 109 based on

16    Exhibits 103, 104, 105, 106, and 107?

17    A.  I did.

18    Q.  We haven't admitted those, but we're going to offer them

19    now.

14:19:44    20          Where did this -- well, is this a chart showing the

21    movement of money to different accounts?

22    A.  It is.

23    Q.  Would this chart assist the jury in understanding the bank

24    records we're going to be looking at?

14:20:03    25    A.  I believe so.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VII-1127
21-CR-14-ABJ

1         MR. HEIMANN:  Your Honor, the Government would

2    request the ability to publish Exhibit 109 to the jury and use

3    it as a demonstrative during this testimony.

4         (Discussion held among counsel.)

14:20:15   5         MR. FLEENER:  One moment, Judge.

6              One minute, please, Judge.

7         (Discussion held between the Court and the Courtroom

8    Deputy.)

9              MR. HEIMANN:  Your Honor, after talking to counsel,

14:21:50  10   I think I'm going to admit the exhibits first, and then we'll

11   put this up to explain.

12             So let's look at 103.

13   BY MR. HEIMANN:

14   Q.  Do you recognize Exhibit 103?

14:22:11  15   A.  Yes.

16   Q.  Is that a bank record provided by BMO Harris Bank

17   regarding a wire transfer?

18   A.  It is.

19   Q.  According to this record, who is this from?

14:22:31  20   A.  Mary M. Trizna or Kevin Trizna.

21   Q.  Who is it to?

22   A.  Ian Horn.

23   Q.  And is it on December 12th of 2014?

24   A.  Yes, it is.

14:22:43  25             MR. HEIMANN:  The Government moves to admit 103.

1           MR. FLEENER:  One moment, Judge.

2           THE COURT:  I think -- I show it as already admitted.

3           MR. FLEENER:  Judge?

4           THE COURT:  I see it is already admitted.

14:23:07    5    MR. HEIMANN:  Your Honor, I'm sorry.  I think we

6    admitted that with Mr. Trizna or already did it with Inspector

7    Hacker.

8           MR. FLEENER:  Oh.  Then no objection.

9           MR. HEIMANN:  I'm going to do 104 next.  I should

14:23:24    10   make sure it hasn't been admitted.

11          THE COURT:  You're okay.

12          MR. FLEENER:  Has 104 been admitted or no?

13          THE COURT:  No.

14          MR. FLEENER:  Thank you, Judge.

14:23:34    15   MR. HEIMANN:  Okay.  Let's look at 104.

16          103 was looking familiar as I talked about it but --

17   BY MR. HEIMANN:

18   Q.  So this is a one-page exhibit.  Do you recognize 104?

19   A.  Yes.

14:24:01    20   Q.  Is this a cash-out ticket provided to the grand jury by

21   BMO Harris Bank?

22   A.  Yes.

23   Q.  The handwritten name written on the cash -- the checking

24   withdrawal portion of this exhibit, what is it?

14:24:29    25   A.  "Ian Horn."

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN    Vol. VII-1129
21-CR-14-ABJ

1    Q.   And the date of the withdrawal that's on this?

2    A.   December 16th, 2014.

3          MR. HEIMANN:   The Government moves to admit 104.

4          MR. JUBIN:   No objection.

14:24:45    5          THE COURT:   104 is received.

6       (Government's Exhibit 104 received into evidence.)

7          MR. HEIMANN:   Let's just magnify the top half here

8    quickly.

9    BY MR. HEIMANN:

14:25:05   10    Q.   There's a couple redactions.  The original record was not

11   redacted; right?

12   A.   Correct.

13   Q.   How much money was withdrawn on December 16th, 2014, by

14   Ian Horn?

14:25:22   15   A.   $1,250.

16          MR. HEIMANN:   Let's go, then, to 105.

17   BY MR. HEIMANN:

18   Q.   Is 105 a wire transfer record provided to the grand jury

19   by BMO Harris Bank?

14:25:52   20   A.   It is.

21   Q.   Does it show a wire transfer for $10,750 from Ian Horn's

22   account to a Eureka Ventures?

23   A.   Yes.

24          MR. HEIMANN:   The Government moves to admit 105.

14:26:10   25          MR. FLEENER:   One second, please.

19-CR-26-ABJ        HACKER - VOIR DIRE - FLEENER        Vol. VII-1130
21-CR-14-ABJ

1              Judge, may I voir dire this witness, please.

2              THE COURT:  Yes.

3                         **VOIR DIRE EXAMINATION**

4    BY MR. FLEENER:

14:27:18   5    Q.  Ma'am, you have 105 in front of you?

6    A.  Yes.

7    Q.  And -- and Mr. Heimann asked that -- asked you about

8    whether this was a wire transfer from Ian Horn to Eureka

9    Ventures; correct?

14:27:44  10    A.  Yes.

11    Q.  And you said it was?

12    A.  I did.

13    Q.  How do you know that?  How do you learn that information

14    based on this document?

14:27:55  15    A.  Well, the amount is listed --

16    Q.  Agreed.

17    A.  -- on the top.

18         And then below it says "BMO Harris Bank, NA, ORG,"

19    which means "originator" --

14:28:17  20    Q.  Okay.

21    A.  -- "Ian Horn."

22         And then below -- on the third line it says "BNF,"

23    which is "beneficiary," "Eureka Ventures."

24    Q.  Okay.  Thank you.  I -- I wasn't able to get that from

14:28:30  25    that paragraph.

1        MR. FLEENER:  Thank you very much.

2        THE WITNESS:  You're welcome.

3        MR. FLEENER:  I have no objections.

4        THE COURT:  105 is received.

14:28:42   5    (Government's Exhibit 105 received into evidence.)

6            **FURTHER DIRECT EXAMINATION (Continued)**

7   **BY MR. HEIMANN:**

8   Q.  The paragraph you were referring to with Mr. Fleener,

9   that's the paragraph that's across from "Common_Data" on this

14:29:07   10   particular record?

11   A.  Yes.

12   Q.  So the "ORG" you're referring to is right up here?

13   A.  Yes.

14   Q.  And the "BNF" you referred to, that's there?

14:29:27   15   A.  Correct.

16       MR. HEIMANN:  Okay.  We can go back to the document,

17   and let's pull up 107.

18       THE COURT:  Did you want to --

19       MR. HEIMANN:  Excuse me, Your Honor?

14:29:53   20       THE COURT:  105 has been received.

21       MR. HEIMANN:  And 106, Your Honor?  We haven't done

22   106, have we?

23       THE COURT:  No.

24       MR. HEIMANN:  I'm off my game today, Judge.

14:30:07   25   I'm sorry.

1           Let's do 106 first.

2    BY MR. HEIMANN:

3    Q.  Do you recognize 106?

4    A.  I do.

14:30:25    5    Q.  Is that a wire transfer record provided by BMO Harris to

6    the grand jury?

7    A.  Yes.

8    Q.  Does it indicate a wire transfer of $7,950 from Ian Horn

9    to Justin Herman?

14:30:41    10    A.  It does.

11           MR. HEIMANN:  The Government moves to admit

12    Exhibit 106.

13           MR. JUBIN:  Can you show me where that amount is on

14    this document -- oh, there it is.  Never mind.

14:31:00    15           MR. FLEENER:  On behalf of Mr. Herman, we have no

16    objections.

17           MR. JUBIN:  No objection.

18           THE COURT:  106 is received.

19       (Government's Exhibit 106 received into evidence.)

14:31:15    20           MR. HEIMANN:  Let's magnify this part.

21    BY MR. HEIMANN:

22    Q.  I've magnified the rows, including "AMT" and "Currency

23    Code."

24           On this particular record, Inspector Hacker, "AMT,"

14:31:44    25    is that where we see the amount?

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN    Vol. VII-1133
21-CR-14-ABJ

1    A.  Yes.

2            MR. HEIMANN:  Let me go back to the document.

3            Okay.  Let's pull up, then, 109.

4            THE COURT:  107?

14:32:08    5            MR. HEIMANN:  Yes, Your Honor.  Let's look at 107.

6            Let's scroll through this document.

7            Okay.  And back to the top.

8    BY MR. HEIMANN:

9    Q.  Inspector Hacker, do you recognize 107?

14:32:41   10    A.  Yes.

11    Q.  What is that?

12    A.  It's a BMO Harris Bank statement for Ian Horn's account.

13    Q.  This was provided to the grand jury by BMO Harris?

14    A.  It was.

14:32:53   15    Q.  What's the time period?

16    A.  November 19th, 2014, to December 18th, 2014.

17            MR. HEIMANN:  The Government moves to admit 107.

18            MR. JUBIN:  No objection.

19            THE COURT:  It's received.

14:33:16   20        (Government's Exhibit 107 received into evidence.)

21            MR. HEIMANN:  And let's magnify this first page,

22    "Deposits and Other Credits," down to the entry for

23    December 16th under "Withdrawals and Other Debits."

24    BY MR. HEIMANN:

14:33:33   25    Q.  As we look at this bank statement, the $20,000 incoming

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VII-1134
21-CR-14-ABJ

 1  wire, is that what we see under "Deposits and Other Credits"?

 2  December 15th, it's labeled as "Incoming Wire."  Is that that

 3  same wire?

 4  A.   The originating documents, the wire said that it was sent

 5  on December 12th, 2014, so I believe the only discrepancy is

 6  that it might have not posted until December 15th.

 7  Q.   So other than that date difference, the amount's the same?

 8  A.   Yes.

 9  Q.   And the description of the transaction?

10  A.   Yes.

11  Q.   We looked at withdrawal and two wire transfers.  Do those

12  appear to be identified down here under "Withdrawals and Other

13  Debits"?

14  A.   Yes.

15       MR. HEIMANN:  Okay.  Now I think we're ready to look

16  at 109.

17       THE COURT:  Ladies and gentlemen, this is a

18  demonstrative exhibit.  It was created by this witness.  It is

19  not evidence, but it describes her analysis of the evidence

20  that you have just reviewed, the activities in the BMO Bank

21  that are reflected in Exhibits 103 through 107.

22       So in and of itself, it is not evidence but, really,

23  assists her in explaining to you her finding.

24       MR. HEIMANN:  Thank you, Your Honor.  May we publish

25  it to the jury?

14:33:53 (line 5)
14:34:07 (line 10)
14:34:31 (line 15)
14:35:14 (line 20)
14:35:40 (line 25)

1    THE COURT:  You may publish it to the jury.

2    BY MR. HEIMANN:

3    Q.  Inspector Hacker, what's represented by the -- the blue

4    rectangle on the far left of this diagram?

14:35:58    5    A.  This is the Triznas' account.

6    Q.  And the green arrow with the $20,000 labeled

7    "December 12th of 2014"?

8    A.  That was the $20,000 wire to Ian Horn's account.

9    Q.  So that's the initial wire that set off this chain of

14:36:12    10    transactions?

11    A.  Correct.

12    Q.  What do we see, then, at the far right?  Are those three

13    places that money went?

14    A.  Yes.

14:36:22    15    Q.  What's -- what are we looking at in the top arrow there?

16    A.  That is a cash withdrawal from Ian Horn's account for

17    $1,250.

18    Q.  And that's that deposit ticket we saw with Mr. Horn --

19    with the handwriting on it --

14:36:44    20    A.  Withdrawal ticket.

21    Q.  Withdrawal ticket.  Thank you.

22    "Cash out," I think it said.

23    A.  Yeah.

24    Q.  The middle one?

14:36:54    25    A.  That was the wire to Justin Herman's account for $7,950.

1    Q.   And the bottom?

2    A.   That was the wire to Eureka Ventures for $10,750.

3    Q.   So, effectively, on the right-hand side, we're seeing how

4    that $20,000 was distributed once it got to Mr. Horn's

14:37:23    5    account?

6    A.   Correct.

7         MR. HEIMANN:  Okay.  Let's go now to 3.1.

8         No, we already have that.

9         Let's go to 4.1.

14:37:52    10    BY MR. HEIMANN:

11    Q.   Do you recognize 4.1?

12    A.   Yes.

13    Q.   What is that?

14    A.   This is a Wells Fargo Bank statement for Bravo Two Zero's

14:38:06    15    account.

16    Q.   That's the account we saw -- we've seen earlier in the

17    case belonging to Bob Mitchell?

18    A.   Yes.

19         MR. HEIMANN:  The Government moves to admit 4.1.

14:38:24    20         MR. WARD:  Just a moment, Your Honor.

21         MR. FLEENER:  No objection.

22         THE COURT:  Exhibit 4.1 is received.

23       (Government's Exhibit 4.1 received into evidence.)

24    BY MR. HEIMANN:

14:39:31    25    Q.   What time period does this bank statement cover?

1    A.   December 1st through the 31st of 2014.

2            MR. HEIMANN:  Scroll down one page.

3            And another.  And another.

4            And another.  Again.  Okay.

14:39:59    5            Let's magnify the transactions listed on this page,

6    which is 6 of 11 for December 22nd down at the bottom.

7    BY MR. HEIMANN:

8    Q.   We're looking at transactions in this account from

9    December 19th of 2014 through at least part of December 22nd.

14:40:42   10            Inspector Hacker, what was the balance on

11   December 19, according to this record?

12   A.   Negative $439.98.

13   Q.   Where do we see -- well, there's a hundred-thousand-dollar

14   transaction.  What's -- what's shown on that line?

14:41:06   15   A.   On December 22nd this Wells Fargo account -- the Bravo

16   account -- received a deposit of $100,000 from Emerald

17   Operating.

18   Q.   And the transaction right after that, what is that?

19   A.   This is a $20,000 deposit into the Bravo account from

14:41:30   20   Barbara N. McCreery.

21            MR. HEIMANN:  We're back to that page.

22            Let's go down one page.

23            And let's magnify from the transaction on

24   December 23rd to the top of the page, capture -- please -- the

14:42:00   25   last transaction on December 23rd.

19-CR-26-ABJ     HACKER - FURTHER DIRECT - HEIMANN    Vol. VII-1138
21-CR-14-ABJ

1          And capture the column headings, please.

2    BY MR. HEIMANN:

3    Q.  So we're looking at transaction history continuing from

4    December 22nd.  There's a $10,000 transaction towards the

14:42:30    5    bottom of this list on December 23rd.

6          What's indicated on the statement for that

7    transaction?

8    A.  This is a $10,000 withdrawal from the Bravo account that

9    was sent to Justin Herman.

14:42:44   10    Q.  We've highlighted that so everybody knows which $10,000

11    we're talking about.

12          What's the next transaction?

13    A.  On December 23rd there's an $80,000 withdrawal from the

14    Bravo account, and that money was sent to Ian Horn.

14:43:06   15    Q.  Okay.  We're going to look at the details of some of those

16    transactions and come back to 4.1 perhaps.

17          Let's look at 4.2.  Do you recognize this?

18    A.  Yes.

19    Q.  What is it?

14:43:59   20    A.  This is a Wells Fargo full transaction report giving the

21    details of the $80,000 wire from Bravo Two Zero to Ian Horn.

22          MR. HEIMANN:  The Government moves to admit 4.2.

23          MR. JUBIN:  No objection.

24          THE COURT:  It is received, Exhibit 4.2.

14:44:32   25    (Government's Exhibit 4.2 received into evidence.)

19-CR-26-ABJ       HACKER - FURTHER DIRECT - HEIMANN      Vol. VII-1139
21-CR-14-ABJ

1    BY MR. HEIMANN:

2    Q.  We've seen these transaction reports before.  This

3    left-hand column, this is where we see where the wire's coming

4    from; right?

14:44:57    5    A.  Yes.

6    Q.  And the amount is listed there?

7    A.  Correct.

8    Q.  What is it?

9    A.  $80,000.

14:45:06    10   Q.  And across from that on the right, that's where it's going

11   to; is that right?

12   A.  That's right.

13   Q.  Is there information regarding what this is for?

14   A.  Yes.  Under the "Beneficiary" info towards the bottom of

14:45:28    15   the right-hand side block, it says "ECMZ Debt Conversion."

16   Q.  Is that the same information comment that we saw on that

17   outgoing wire request that we've seen in other exhibits, that

18   one-page document?

19   A.  Yes, it is.

14:45:54    20        MR. HEIMANN:  Let's look then at 4.2 -- I'm sorry.

21        4.3, Your Honor.  I -- I apologize.

22        THE COURT:  Fine.

23   BY MR. HEIMANN:

24   Q.  Is this a bank statement we received from BMO Harris Bank?

14:46:30    25   A.  It is.

1    Q.  Whose account is it for?

2    A.  Ian Horn's.

3    Q.  Is this the same account where we saw the bank statement

4    from earlier, the earlier transaction?

14:46:39    5    A.  Yes.

6    Q.  What time period is this statement for?

7    A.  This is for December 19th, 2014, to January 18th, 2015.

8         MR. HEIMANN:  The Government moves to admit 4.3.

9         MR. JUBIN:  No objection.

14:47:06    10         THE COURT:  It is received.

11    (Government's Exhibit 4.3 received into evidence.)

12    BY MR. HEIMANN:

13    Q.  Does this statement indicate an incoming wire of $80,000

14    on December 23rd?

14:47:24    15    A.  Yes, it does.

16    Q.  And we see that underneath the "Deposits and Credits"

17    section; is that right?

18    A.  Yes.

19    Q.  Let's look, then, at 4.4.

14:47:59    20         Is this a Wells Fargo full transaction report we

21    received -- or the grand jury received from Wells Fargo?

22    A.  Yes.

23    Q.  Does it indicate a $10,000 wire transfer on December 23rd,

24    2014?

14:48:19    25    A.  It does.

1  Q.  From what account?

2  A.  Bravo Two Zero Partners.

3  Q.  The 5707 account we saw the statement for earlier?

4  A.  Yes.

14:48:28  5  Q.  And where's it going?

6  A.  To Justin Herman's account.

7  Q.  At Citizens Bank?

8  A.  Yes.

9        MR. HEIMANN:  The Government moves to admit 4.4.

14:48:41  10       MR. FLEENER:  No objections.

11       THE COURT:  It is received.

12    (Government's Exhibit 4.4 received into evidence.)

13  BY MR. HEIMANN:

14  Q.  This is that same account that we saw in Exhibit 1001, the

14:49:15  15  personal signature card -- let me not ask it that way.

16        This is an account ending in 5741; is that right?

17  A.  I'm still viewing 4.4.

18  Q.  Agreed.  I want to be sure the wire transfer went to an

19  account at Citizens Bank ending in 5741.

14:49:30  20  A.  Yes.

21  Q.  Let's go to 1001.  So this has been admitted.

22        This is the signature card for that same bank; right?

23  A.  Yes.

24  Q.  Okay.  And we saw this earlier.  It's in Justin Herman's

14:50:06  25  name?

1    A.   Correct.

2    Q.   Okay.  Let's go, then, to 4.5.

3         Is this a statement we received from Citizens Bank

4    for that same account?

14:50:34    5    A.   Yes, it is.

6    Q.   What time period does this statement cover?

7    A.   November 27th, 2014, through December 23rd, 2014.

8         MR. HEIMANN:  The Government moves to admit 4.5.

9         MR. FLEENER:  One moment, please, Judge.

14:51:37    10        No objections.

11        THE COURT:  Exhibit 4.5 is received, as have been

12   4.4, 4.3, 4.2, and 4.1.

13      (Government's Exhibit 4.5 received into evidence.)

14        MR. HEIMANN:  We'll scroll down in this statement.

14:52:03    15        One more.

16        And one more.

17        Let's -- if we can, magnify the "Deposits & Credits"

18   section.

19   BY MR. HEIMANN:

14:52:23    20   Q.   Inspector Hacker, what's indicated at the bottom of the

21   "Deposits & Credits" section, that very last entry?

22   A.   A $10,000 incoming wire on December 23rd.

23        MR. HEIMANN:  Go back out.

24        Let's magnify the "Daily Balance" section.

25   ///

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN     Vol. VII-1143
21-CR-14-ABJ

1    BY MR. HEIMANN:

2    Q.  What was the daily balance in this account on December 2nd

3    of that year?

4    A.  $320.33.

14:53:03    5         MR. HEIMANN:  Go back out.

6         Let's skip now to 5.6.  And let's magnify in on the

7    top half there.

8    BY MR. HEIMANN:

9    Q.  Inspector Hacker, do you recognize 5.6?

14:53:43   10    A.  I do.

11    Q.  Is that a record provided to the grand jury by BMO Harris

12    Bank?

13    A.  It is.

14    Q.  Does it indicate an $80,016.29 withdrawal from Ian Horn's

14:53:58   15    account?

16    A.  It does.

17    Q.  On what day?

18    A.  On January 6th, 2015.

19         MR. HEIMANN:  The Government moves to admit 5.6.

14:54:43   20         THE COURT:  Exhibit 5.6 is received.

21      (Government's Exhibit 5.6 received into evidence.)

22    BY MR. HEIMANN:

23    Q.  It's somewhat distorted.  But "Customer Name" in that

24    upper left-hand box -- "General Ledger Debit" it's labeled --

14:55:06   25    is that where we see the customer name "Ian Horn"?

1    A.   Yes.

2    Q.   Does that also then appear in the lower left, the register

3    copy of what appears to be a cashier's check?

4    A.   "Pay to the order of Ian Horn"?

14:55:29    5    Q.   Yes.

6    A.   Yes.

7    Q.   And the amount is listed both on that register copy and on

8    the debit -- general ledger debit above; right?

9    A.   Yes.

14:55:39    10    Q.   And then, lastly, the dates in -- the dates on both those

11    documents -- probably easiest to read on the register copy?

12    A.   Yes, it is.

13    Q.   Very good.

14          Let's move, then, to 5.7.

14:55:56    15          Now, before we do that, let's move to 1004.

16          Inspector Hacker, do you remember -- during the

17    course of the investigation, did you identify an account that

18    Ian Horn held at PNC Bank?

19    A.   I did.

14:56:16    20    Q.   Did PNC Bank provide records to the grand jury about that

21    account?

22    A.   Yes, they did.

23    Q.   Do you recognize 1004?

24    A.   Yes.

14:56:36    25    Q.   Is that an account registration and agreement provided by

1   PNC Bank?

2   A.  It is.

3   Q.  Whose name is on the account?

4   A.  Ian Horn, Esquire.

14:56:48   5           MR. HEIMANN:  The Government moves to admit 1004.

6           MR. JUBIN:  No objection.

7           THE COURT:  It is received.  1004 is received.

8       (Government's Exhibit 1004 received into evidence.)

9   BY MR. HEIMANN:

14:57:10   10  Q.  So we see Ian Horn's name under "Legal Title" on the top

11  left; is that right?

12  A.  Correct.

13  Q.  And who is listed as the only authorized signer on this

14  account?

14:57:20   15  A.  Ian Horn.

16  Q.  To the right there's a signature line with a handwritten

17  signature, apparently handwritten signature; is that right?

18  A.  Yes.

19          MR. HEIMANN:  Let's go now to 5.7.

14:57:43   20          Scroll through.

21  BY MR. HEIMANN:

22  Q.  Is this a bank statement for that account provided by

23  PNC Bank to the grand jury?

24  A.  It is.

14:58:07   25  Q.  For what time period?

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. VII-1146
21-CR-14-ABJ

1   A.  For the time period December 5th, 2014, to January 7th,

2   2015.

3          MR. HEIMANN:  The Government moves to admit 5.7.

4          MR. JUBIN:  May I see the second page briefly.

14:58:30    5          No objection.

6          THE COURT:  5.7 is received.

7      (Government's Exhibit 5.7 received into evidence.)

8          MR. HEIMANN:  So let's scroll down one -- so on this

9   page let's magnify the section on "Deposits and Other

14:58:56   10   Additions."

11   BY MR. HEIMANN:

12   Q.  There's an entry there for 01/06.  What is that entry?

13   A.  That is a deposit for $80,016.29.

14   Q.  Is that the same amount we saw on the BMO Harris general

14:59:22   15   ledger debit?

16   A.  Yes.

17   Q.  Let's look now at 5.8.

18          Is this a canceled check provided by PNC Bank to the

19   grand jury?

14:59:49   20   A.  It is.

21   Q.  Does it indicate a deposit into the same account we just

22   looked at held by Ian Horn?

23   A.  Yes.

24          MR. HEIMANN:  The Government moves to admit 5.8.

15:00:01   25          MR. JUBIN:  No objection.

1    THE COURT:  It is received, 5.8.

2    (Government's Exhibit 5.8 received into evidence.)

3  BY MR. HEIMANN:

4  Q.  What's the amount of this cashier's check?

15:00:20   5  A.  $80,016.29.

6  Q.  Does there appear to be a handwritten signature on the

7  endorsement line?

8  A.  Yes.

9  Q.  And then what's the posting date?

15:00:32  10  A.  January 6th, 2015.

11    MR. HEIMANN:  Let's go now to 5 -- 5.10.

12  BY MR. HEIMANN:

13  Q.  While that's pulling up, the PNC Bank records provided to

14  the grand jury, did they include an Excel spreadsheet with

15:01:10  15  details regarding wire transfers to and from that account?

16  A.  Yes.

17  Q.  Exhibit 5.10, is this a screenshot that you made from that

18  Excel spreadsheet?

19  A.  Yes, it is.

15:01:30  20  Q.  Other than changing the sizes of columns and selecting

21  certain rows so that we could put all of these transactions

22  onto the screen, did you make any changes to the underlying

23  data?

24  A.  There were also some columns that were hidden.

15:01:59  25  Q.  Okay.

1    A.  But there were no changes to the substance.

2    Q.  And we can tell what columns have been hidden by looking

3    at the -- the letters running across the top of this

4    screenshot?

15:02:11  5    A.  Correct.

6    Q.  And you selected certain rows; right?

7    A.  Yes.

8    Q.  And we can tell -- we can tell which rows are not shown by

9    looking over on the -- the numbers on the left-hand side?

15:02:27  10    A.  Correct.

11    Q.  This screenshot, there are a couple redactions here.

12          Have you reduced the account numbers to the last four

13    digits?

14    A.  I didn't, personally, but someone did, yes.

15:02:42  15    Q.  You took the screenshot?  There were no redactions?

16    A.  Correct.

17    Q.  And then this copy has redactions?

18    A.  Yes.

19    Q.  So similar to all the other account records that we've

15:02:52  20    seen?

21    A.  Yes.

22          MR. HEIMANN:  The Government moves to admit 5.10.

23          MR. JUBIN:  No objection.

24          THE COURT:  5.10 is received.

15:02:59  25    (Government's Exhibit 5.10 received into evidence.)

1    BY MR. HEIMANN:

2    Q.    So, Inspector Hacker, what dates have you chosen to show

3    on this screenshot?

4    A.    January 8th through January 15th of 2015.

15:03:19    5    Q.    What transaction do we see on Row 19?

6    A.    This is a $19,000 debit to Mr. Horn's account, and the

7    money was sent to Intrepid Resources.

8    Q.    We see "Intrepid Resources" over on Column V, as in

9    "Victor," "Beneficiary Name Line 1"?

15:03:54    10    A.    Correct.

11    Q.    And we see the amount twice, Column M for "Amount," and

12    Column D also says "Amount"; is that right?

13    A.    Correct.

14    Q.    The date of the transaction, is that Column A?

15:04:04    15    A.    It is.

16    Q.    So January 8th of 2015?

17    A.    Yes.

18    Q.    I'm going to skip to 21.

19          What transaction do we see on Row 21?

15:04:21    20    A.    On January 8th -- oops.

21    (Discussion held at counsel table.)

22          MR. JUBIN:  Your Honor, it might be a good time for

23    the afternoon break.

24          MR. HEIMANN:  It may be, Judge.

15:04:56    25          MR. JUBIN:  We're getting pretty close.

                1          THE COURT:  It is getting kind of close.

                2          MR. HEIMANN:  And we're --

                3          THE COURT:  We'll stand in recess for 15 minutes.

                4          MR. HEIMANN:  Thank you, Judge.

15:05:04        5          THE COURTROOM DEPUTY:  All rise.

                6     (A recess was taken from 3:05 p.m. to 3:20 p.m.

                7     Proceedings outside the jury's presence.)

                8          THE COURTROOM DEPUTY:  Court is now in session.

                9     (Discussion held among the Court and counsel.)

15:22:06       10     (Proceedings within the jury's presence at 3:22 p.m.)

               11          THE COURT:  Please be seated, ladies and gentlemen.

               12          If you'd like to approach for a minute, I'll tell

               13     you why.

               14          MR. FLEENER:  I'm sorry, Judge?

15:22:48       15          THE COURT:  I'll tell you why.

               16          MR. FLEENER:  Yes, sir.

               17     (Proceedings held at sidebar with Prosecutor Heimann

               18     and all defense counsel.)

               19          THE COURT:  People who usually sit at that table are

15:23:01       20     in shackles.

               21          MR. FLEENER:  Oh, is that what it is?  That's got to

               22     be what it is.  Because the underside is just all torn to

               23     hell.

               24          MR. JUBIN:  What did they rub it with?

15:23:07       25          MR. WARD:  He's saying the people sitting there

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. VII-1151
21-CR-14-ABJ

1    usually have shackles.

2         MR. FLEENER:  Shackles.  And that's what tears up

3    that table.

4         MR. JUBIN:  Oh, sure.

15:23:13    5         MR. FLEENER:  Yeah, because the bottom side is --

6    both sides are just -- I mean, they just catch on your pants

7    and you've got to be careful.  That's interesting.

8         THE COURT:  We'll send somebody to sand it down.

9    That's what we'll do.

15:23:22   10         MR. FLEENER:  Yes.

11         MR. WARD:  Thank you.

12         MR. FLEENER:  Thank you, Judge.

13      (Sidebar concluded.)

14    BY MR. HEIMANN:

15:23:39   15    Q.  Inspector Hacker, do you understand you're still under

16    oath?

17    A.  I do.

18         MR. HEIMANN:  Let's look again at 5.11.

19         Or no -- I'm sorry.  5.12.

15:24:04   20         5.10.  This has been admitted.  Very good.

21    BY MR. HEIMANN:

22    Q.  We were going through a couple rows here.  I think we are

23    talking about Row 21.

24         What transaction is shown on Row 21?

15:24:32   25    A.  On January 8, 2015, $22,500 was sent from Ian Horn's

1    account to Eureka Ventures.

2    Q.   There are a pair of transactions on Row 20 and 22.  Are

3    they related to each other?

4    A.   Yes.  On Row 20 the $20,000 transaction was returned on

5    line 22.

6    Q.   Is there a later wire transfer on -- shown on Row 23?

7    A.   Yes.

8    Q.   What transaction is shown there?

9    A.   On January 9th, 2015, $20,000 was sent from Ian Horn's

10   account to Evine Trading, LLC.

11   Q.   Lines 24 and 25, what transactions do we see there?

12   A.   On line 24, January 15th, 2015, $7,500 was sent from

13   Ian Horn's account to Gordon Pardy's.

14   Q.   And Row 25?

15   A.   On January 15th, 2015, $7,500 was sent from Ian Horn's

16   account to Theresa Jones.

17   Q.   And before we leave this, I want to note the bank for

18   Intrepid Resources -- this is the wire transfer on Row 19 --

19   what bank did that $19,000 land in?

20   A.   SunTrust Bank, account ending 9106.

21   Q.   We'll come back to that in a minute.  But let's first look

22   at 5.11.

23       (Discussion held at counsel table.)

24   BY MR. HEIMANN:

25   Q.   So this is a three-page exhibit.  Did you get a chance to

1   see each page on the screen?

2   A.  Yes.

3   Q.  Do you recognize 5.11?

4   A.  I do.

15:27:19    5   Q.  Are these records related to a withdrawal made by Ian Horn

6   on January 6th of 2015?

7   A.  Yes.

8           MR. HEIMANN:  The Government moves to admit 5.11.

9           MR. JUBIN:  Your Honor, I have an objection on

15:27:46   10   relevance, but I guess we'll get to that on cross, so I have

11   no objection.

12           THE COURT:  Very well.  It's received, Exhibit 5.11.

13       (Government's Exhibit 5.11 received into evidence.)

14   BY MR. HEIMANN:

15:28:00   15   Q.  So the checking, savings, withdrawal at this particular

16   time we see here, what amount is being withdrawn?

17   A.  $2,321.97.

18   Q.  The handwritten name of the person who's taking it out?

19   A.  Ian Horn.

15:28:21   20           MR. HEIMANN:  Scroll down to the next page.

21   BY MR. HEIMANN:

22   Q.  This is a cash-out ticket.  What does it show?

23   A.  It shows that $2,000 cash was taken out of this.

24           MR. HEIMANN:  And the next page.

25   ///

1    BY MR. HEIMANN:

2    Q.   This is a payment ticket.   It shows a payment in the

3    amount of $321.97?

4           THE WITNESS:   Could you blow up that amount?

15:29:06    5    A.   Correct.

6           MR. HEIMANN:   Let's move now to 5.12.   So --

7    actually, before we do that, 1005.

8    BY MR. HEIMANN:

9    Q.   So when we were looking at the outgoing wires from

15:29:27    10    PNC Bank, we noted that there was an account where the

11    beneficiary name was Intrepid Resources at SunTrust Bank.

12    A.   Yes.

13    Q.   Did SunTrust Bank provide records to the grand jury?

14    A.   Yes.

15:29:45    15    Q.   Do you recognize Exhibit 1005?

16    A.   Yes.

17    Q.   Is this the business account signature card for that

18    account at SunTrust Bank ending in 1906?

19    A.   It is.

15:30:01    20           MR. HEIMANN:   The Government moves to admit 1005.

21           MR. WARD:   No objection.

22           THE COURT:   Exhibit 1005 is received.

23      (Government's Exhibit 1005 received into evidence.)

24    BY MR. HEIMANN:

15:30:17    25    Q.   The account title is "Intrepid Resources, LLC."  Who was

1    the authorized signer?

2    A.   Charles Winters.

3    Q.   Are there any other authorized signers listed on this

4    card?

15:30:26    5    A.   There are not.

6              MR. HEIMANN:  Let's go, then, to 512.

7              5.12.

8    BY MR. HEIMANN:

9    Q.   Exhibit 5.12, is this a transaction detail report from

15:31:07    10    that SunTrust account ending in 9106?

11    A.   It is.

12    Q.   And does it show a $19,000 wire transfer from Ian Horn

13    into this account?

14    A.   It does.

15:31:23    15              MR. HEIMANN:  The Government moves to admit 5.12.

16              MR. WARD:  No objection.

17              THE COURT:  5.12 is received.

18         (Government's Exhibit 5.12 received into evidence.)

19              MR. HEIMANN:  Let's just magnify the text portion of

15:31:42    20    this.

21    BY MR. HEIMANN:

22    Q.   Inspector Hacker, the amount -- is that shown, "AMT:

23    19,000," upper -- in the upper left here?

24    A.   It is.

15:32:00    25    Q.   And the send date, 150108?

1    A.  Yes.

2    Q.  Is that year, month, date -- day?

3    A.  Yes, it is.

4    Q.  The originator's listed on the left?

15:32:12    5    A.  Correct.

6    Q.  And the recipient, Intrepid Resources, is listed on the

7    right?

8    A.  Correct.

9    Q.  The last thing we need to do in this series is 5.14.

15:32:43    10         Is 5.14 a bank statement for Ian Horn's PNC Bank

11    account that was provided to the grand jury by the bank?

12    A.  It is.

13    Q.  What's the period that it covers?

14    A.  January 8th, 2015, to February 5th, 2015.

15:33:03    15    Q.  That includes the time period for the wires we talked

16    about?

17    A.  Yes.

18         MR. HEIMANN:  The Government moves to admit 5.14.

19         MR. JUBIN:  No objection.

15:33:18    20         THE COURT:  5.14 is received.

21    (Government's Exhibit 5.14 received into evidence.)

22         MR. HEIMANN:  Scroll down one page.

23    BY MR. HEIMANN:

24    Q.  Under "Deposits and Other Additions," where it says,

15:33:40    25    "01/08, Amount, $20,000 Fed Wire in," do you see that?

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. VII-1157
21-CR-14-ABJ

1    A.   Yes.

2    Q.   Is that the same date, amount where we had the reversal

3    that we talked about on the exhibit from the spreadsheet?

4    A.   I don't recall.

15:34:01    5         MR. HEIMANN:   Okay.   Let's move down one page.

6    BY MR. HEIMANN:

7    Q.   "Online and Electronic Banking Deductions," do you see

8    that section?

9    A.   Yes.

15:34:12    10   Q.   That shows wires out that correspond to some of the wires

11   we saw on the internal spreadsheet; right?

12   A.   Yes.

13        MR. HEIMANN:   I'd like to pull up now Exhibit 110.

14   BY MR. HEIMANN:

15:34:48    15   Q.   Inspector Hacker, did you create this chart from the

16   exhibits we've been talking about, including 3.1, 3.2, 4.1,

17   4.2, 4.3, 4.4, 4.5, 5.6, 5.7, 5.8, 5.10, 5.11, 5.12, and 5.14?

18   A.   Yes.

19   Q.   Does this summarize the movement of money indicated in

15:35:20    20   those bank records?

21   A.   It does.

22   Q.   Would it assist your testimony going forward if the jury

23   could see this?

24   A.   I believe so.

15:35:30    25        MR. HEIMANN:   Your Honor, the Government moves to use

19-CR-26-ABJ          HACKER - VOIR DIRE - JUBIN          Vol. VII-1158
21-CR-14-ABJ

 1   110 as a demonstrative.

 2          MR. JUBIN:  May I voir dire, Your Honor.

 3          THE COURT:  Yes, you may.

 4          MR. JUBIN:  Good afternoon, ladies and gentlemen.

 5          JURY MEMBERS:  Good afternoon.

 6          MR. JUBIN:  Good afternoon, Inspector Hacker.

 7                       **VOIR DIRE EXAMINATION**

 8   **BY MR. JUBIN:**

 9   Q.  You created this chart based upon this -- this $2,000 cash

10   withdrawal that you reflected -- that you saw in Ian Horn's

11   bank account; right?

12   A.  Yes.

13   Q.  Are you somehow attributing that cash withdrawal to

14   these -- the deposit of that $80,000?

15          MR. HEIMANN:  Objection, Your Honor.  This is outside

16   the scope of foundation.

17          THE COURT:  Sustained.

18          MR. HEIMANN:  It's more like cross-examination.

19          MR. JUBIN:  It is the foundation to see if the

20   document is accurately reflecting what occurred.

21          THE COURT:  I think we should go ahead and receive it

22   for demonstrative purposes and let her explain it, and then

23   you can cross-examine.

24          MR. JUBIN:  Okay.  That will be fine.

25          Thank you, Your Honor.

1    MR. HEIMANN:  Your Honor, will the Court receive this

2  and allow it to be published to the jury as a demonstrative?

3    THE COURT:  It has been published to the jury.

4    MR. HEIMANN:  Thank you, Your Honor.

15:37:26    5    **FURTHER DIRECT EXAMINATION (Continued)**

6  BY MR. HEIMANN:

7  Q.  Inspector Hacker, if you would, starting from the left,

8  just describe what we see here on this diagram.

9  A.  Beginning on the left, I show Nadine McCreery wired

15:37:49  10  $20,000 to Bob Mitchell at Bravo Two Zero Partners on

11  December 22nd, 2014.  On the same day Mike Perry with Emerald

12  Operating wired $100,000 to Bravo Two Zero Partners.

13  Q.  What do we see then happen -- the arrows going down?  What

14  are those indicating?

15:38:08  15  A.  Between December 22nd and December 23rd of 2014,

16  Bob Mitchell or the Bravo account had debits of approximately

17  $19,778.02, and there was also a transfer of $10,000 on

18  December 23rd, 2014, to Justin Herman's account.

19  Q.  What do we see, then, on December 23rd, that arrow for

15:38:45  20  $80,000?  What does that represent?

21  A.  That was an $80,000 wire to Ian Horn's BMO Harris account.

22  Q.  I don't know if I should ask this question now or if we

23  should go back to the statement.

24    Was that $80,000 wire possible without both the

15:39:09  25  $20,000 from Nadine McCreery and the hundred thousand dollars

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN    Vol. VII-1160
21-CR-14-ABJ

1    from Mr. Perry?

2    A.   It was not possible without the 20,000 and the hundred

3    thousand combined.

4    Q.   The money lands in Ian Horn's BMO Harris account.  What is

15:39:30    5    the $80,016.29 arrow dated 1/6/2015?  Which transaction is

6    that representing?

7    A.   This represents the bank check that was taken out of the

8    BMO Harris account and then deposited into Ian Horn's PNC bank

9    account.

15:39:54    10   Q.   The same day, January 6th, 2015, the $2,000 arrow to "cash

11   withdrawal," is that that cash-out ticket that we saw --

12   A.   Yes.

13   Q.   -- on that date?

14        Yes?

15:40:10    15   A.   Yes.

16   Q.   What do we see along the bottom, the arrows out from

17   Ian Horn's PNC bank account?  What are we seeing there, each

18   one?

19   A.   So these reflect the spreadsheet that we went through from

15:40:30    20   PNC Bank.  On January 8th, 2015, $19,000 was transferred from

21   Ian Horn's account to the Intrepid Resources account.

22   Q.   And you've put Chuck Winters on that particular account.

23   Is that because he is the only authorized signer on that

24   account?

15:40:50    25   A.   Correct.

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. VII-1161
21-CR-14-ABJ

1    Q.  And the others that we see here?

2    A.  On the same day, January 8th, 2015, $22,500 was sent from

3    Ian Horn's account to Eureka Ventures.

4    Q.  And on January 9th?

15:41:11    5    A.  $20,000 was sent from Ian Horn's account to Evine Trading.

6    Q.  And, lastly, on -- the two transactions on January 15th of

7    2015.

8    A.  $7,500 was sent from Ian Horn's account to Gordon Pardy,

9    and $7,500 was sent to Theresa Jones.

15:41:40    10    Q.  So this reflects the flow of money that we saw in the

11    various exhibits that are listed below?

12    A.  Correct.

13        MR. HEIMANN:  Your Honor, the Government will pass

14    this witness for cross-examination.

15:42:05    15        THE COURT:  Mr. Jubin, do you want to leave that

16    demonstrative exhibit up or not?

17        MR. JUBIN:  I think not.  Thank you, Your Honor.

18        I think not.  We'll come -- we'll come back to it in

19    a minute.  I think I'll start at the beginning so I don't

15:42:21    20    forget some things.  Thank you.

21                    **FURTHER CROSS-EXAMINATION**

22    **BY MR. JUBIN**:

23    Q.  You testified a little bit earlier about a $20,000 wire

24    from Mr. Trizna.

15:42:54    25        MR. JUBIN:  Let's take a look at Exhibit 101.

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

1   BY MR. JUBIN:

2   Q.   This is that email that the jury has seen from

3   Justin Herman to Ian Horn telling him about the plans for this

4   transaction where Mr. Horn was to receive funds in escrow to

5   complete the transaction.

6            Do you recall this?

7   A.   Yes.

8   Q.   And you see where it says, "Keep $1,250 for yourself";

9   right?

10  A.   Yes.

11  Q.   And it otherwise gave some instructions to wire $8,000 to

12  Justin Herman; correct?

13  A.   Correct.

14  Q.   And $10,750 to Eureka Ventures; correct?

15  A.   Correct.

16  Q.   And so if you add up the $1250, the 8,000, and the 10,750,

17  that would take care of the $20,000 wire that was expected;

18  correct?

19  A.   Yes.

20  Q.   And then -- so Ian Horn confirmed for you that this was

21  his fee for this escrow; right?  You talked to him about this;

22  right?

23            MR. HEIMANN:  Objection; calls for hearsay, no

24  exception.

25            THE COURT:  Sustained.

15:43:28
15:43:40
15:43:52
15:44:05
15:44:33

1   BY MR. JUBIN:

2   Q.  Did you uncover any evidence to suggest that Ian Horn was

3   not paid this $1250 for this work?

4   A.  No.

15:44:45   5   Q.  Let's take a look at -- well, we'll come back to that

6   later.

7          So let's take a look at 107.  And you saw those

8   instructions that said --

9          MR. JUBIN:  If we could blow up a little bit to where

15:45:18  10   the transactions are and go down -- there we go.

11   BY MR. JUBIN:

12   Q.  You saw --

13          MR. JUBIN:  Thank you, Danielle.

14   BY MR. JUBIN:

15:45:26  15   Q.  You saw the instructions said to wire $8,000 to

16   Mr. Herman; correct?

17   A.  Yes.

18   Q.  And then the wire come -- turns out to be there on

19   December 16th, $7,950; right?

15:45:40  20   A.  Yes.

21   Q.  So it's a little bit different.  In your investigation did

22   you assume that the difference was perhaps wiring fees?

23   A.  I did.

24   Q.  And you see that Ian Horn took the $1250 as a withdrawal,

15:46:01  25   exactly as directed; correct?

 1    A.   Yes.

 2    Q.   And other than the wire fees, he wired the $8,000 to

 3    Justin Herman; correct?

 4    A.   Yes.

15:46:08     5    Q.   And wired the $10,750 where it was supposed to go; right?

 6    A.   Yes.

 7         MR. JUBIN:  Let's take a look at Exhibit 5.1, which

 8    has been admitted in evidence.

 9    BY MR. JUBIN:

15:46:38    10    Q.   Now, this is that email from Justin Herman to Ian Horn

11    concerning where to send this $80,000; right?

12    A.   I don't see 80,000 referenced, but the time period would

13    make sense.

14    Q.   Okay.  These -- as best you can tell, this is the

15:47:01    15    instructions for the distribution of the $80,000 -- or at

16    least preliminary instructions; right?

17    A.   Yes.

18    Q.   Because, as you see, it says, "These instructions -- these

19    are the instructions are incomplete as we are awaiting

15:47:19    20    instructions for the remainder of the funds, should have those

21    soon"; right?

22    A.   Yes.

23    Q.   And here it tells Mr. Horn to keep $3,000 for himself as

24    his fee?

15:47:29    25    A.   Yes.  I see that.

19-CR-26-ABJ      HACKER - FURTHER CROSS - JUBIN      Vol. VII-1165
21-CR-14-ABJ

1    Q.   And then $19,000 is to go to Justin Herman; right?

2    A.   That's what it says.

3    Q.   22,500 is to go to Eureka Ventures; correct?

4    A.   Yes.

15:47:48    5    Q.   Let's take a look at Exhibit 510.

6            And this is that spreadsheet which showed the wires,

7    and there's the -- in line 19 -- the $19,000 that went to --

8    and I'm forgetting what I just saw.

9            Sorry about that.

15:48:23    10           MR. JUBIN:  Can we go back to the last one?

11           Okay.  The 19,000 out and the 22,500 out.

12           Let's go -- let's go back to the one we were just

13   looking at.

14   BY MR. JUBIN:

15:48:38    15   Q.   Okay.  So there's the -- in line 19 is the $19,000 out;

16   right?

17           THE COURT:  It went to a different party, it looks

18   like.

19           MR. JUBIN:  Yeah.

15:48:48    20   BY MR. JUBIN:

21   Q.   That one was supposed to go to Justin Herman; right?

22   A.   The email said it was.

23   Q.   Okay.  And what about the 22,500?

24           Did they get reversed?

15:49:01    25   A.   The 22,500 did not get reversed, no.

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN       Vol. VII-1166
21-CR-14-ABJ

1   Q.  I'm sorry.  I'm -- I misspoke.  Let me clarify.

2        So $19,000 was supposed to go to Justin Herman, but,

3   instead, it went to Intrepid Resources in line 19; right?

4   A.  Yes.

5   Q.  I'm just noticing this.

6        And in line 21 the $22,500 was supposed to go to who?

7   A.  In the email?

8   Q.  Eureka?

9   A.  Could you refresh my memory?

10       MR. JUBIN:  Let's go back to that --

11       THE COURT:  5.1.

12       MR. JUBIN:  -- 5.1.

13  A.  (Continuing.)  Yes, Eureka Ventures.

14       MR. JUBIN:  Let's show -- this is not for -- not

15  published yet -- IH-1012.

16       Scroll so we can see the top.  Thank you.

17  BY MR. JUBIN:

18  Q.  So this comes from the Government's discovery.  It's dated

19  December 23rd of 2014.

20       Did you find this email correcting where the funds

21  should go from Justin Herman to Ian Horn?

22  A.  I don't recall specifically finding it, but I do see what

23  you're saying here.

24  Q.  Okay.  So in the Government's discovery Mr. Herman

25  corrected where the $19,000 was to be sent?

15:49:19

15:49:39

15:50:04

15:50:35

15:50:54

---

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

19-CR-26-ABJ       HACKER - FURTHER CROSS - JUBIN       Vol. VII-1167
21-CR-14-ABJ

1          MR. HEIMANN:  Your Honor, I object to that question

2    when the exhibit hasn't been admitted.  We're not establishing

3    foundation anymore; we're talking about its contents.

4          MR. JUBIN:  Okay.  I'd move for the admission of --

15:51:19   5          THE COURT:  IH-1012?

6          MR. JUBIN:  -- IH-1012.

7          MR. HEIMANN:  Is there a second page to it?

8          MS. VENEGAS:  No.

9          MR. JUBIN:  That's all we got from you.

15:51:32  10          MR. HEIMANN:  Does the email continue on to another

11    page?

12          MR. JUBIN:  I have no idea.

13      (Discussion held at counsel table.)

14          MR. HEIMANN:  No objection.

15:51:58  15          THE COURT:  IH-1012 is received.

16      (Defendant Horn's Exhibit IH-1012 received into evidence.)

17          MR. JUBIN:  If you go down to the bottom of the page,

18    where we just were -- scroll down to the bottom of the page --

19    BY MR. JUBIN:

15:52:12  20    Q.  Do you see that line there which talks about OI-OG-15-008,

21    and there's an R26?

22          Does that help you in terms of figuring out where in

23    your investigation this came from?

24    A.  Yes.

15:52:34  25    Q.  So you can confirm that this is something that came from

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. VII-1168
21-CR-14-ABJ

1    your investigation?

2    A.  Yes.

3          MR. JUBIN:  Okay.  Let's scroll up.

4    BY MR. JUBIN:

15:52:47    5    Q.  So this is an email from Justin Herman to Ian Horn on

6    December 23rd which -- and what's the subject of it?

7    A.  "Wire Correction."

8    Q.  Okay.  And what did Mr. Herman tell Ian Horn in terms of

9    correcting the wiring instructions?

15:53:08   10    A.  "Send the funds mentioned for me to Intrepid Resources for

11    $19,000."

12    Q.  Okay.  And below?

13    A.  The address?  Do you want me to read it?

14    Q.  I'm wanting . . .

15:53:27   15          MR. JUBIN:  Let's scroll down a little bit.

16    BY MR. JUBIN:

17    Q.  Okay.  So there was a correction made in terms of the

18    instructions from Mr. Herman to Ian Horn as to where he should

19    send these escrowed funds?

15:53:42   20    A.  Yes.

21          MR. JUBIN:  Let's go back to 510.

22    BY MR. JUBIN:

23    Q.  So, based on that correction in line 19, then, we have the

24    $19,000 going to Intrepid Resources?

15:54:09   25    A.  Yes.

1    Q.  And in line 21 we've got the 22,500 going to Eureka

2    Ventures?

3    A.  Correct.

4    Q.  And as you discussed, lines 20 and 22 basically cancel

15:54:24    5    each other out; correct?

6    A.  Yes.

7    Q.  And then in line 23 Evine Trading gets $20,000; right?

8    A.  Yes.

9    Q.  Now, there were some additional instructions.  Do you

15:54:40   10    recall in -- in 5.1 that we just discussed it said that the --

11    the instructions were incomplete, more instructions were going

12    to be coming?

13    A.  Yes.

14    Q.  Do you recall the email from Mr. Herman to Mr. Horn

15:55:09   15    telling him where to send the Gordon Pardy and the Rodgers

16    money, the $7500 each?

17    A.  Yes.

18    Q.  Okay.  So there was a follow-up email, then, that -- that

19    came to Mr. Horn that said "Send this money to these people"?

15:55:31   20    A.  Yes.

21            MR. JUBIN:  Can you pull that up?  It's an admitted

22    exhibit.

23    BY MR. JUBIN:

24    Q.  So I'm showing you Exhibit 5.13.  Let's -- do you see

15:56:31   25    the --

1        MR. JUBIN:  Can you scroll down a bit?  Okay.

2    BY MR. JUBIN:

3    Q.  Okay.  So this shows that on January 12 Justin Herman

4    wrote to --

15:56:47    5        MR. JUBIN:  And let's see who that's to.

6        Can you show us who that's to, Danielle?

7        (Discussion held at counsel table.)

8    BY MR. JUBIN:

9    Q.  Okay.  Well, it's on the chain.  I guess we'll see at the

15:57:03    10   top.

11       But the instructions were send $7500 to Gordon Pardy;

12   right?

13   A.  Yes.

14   Q.  And $7500 to Theresa Jones; right?

15:57:15    15   A.  Yes.

16   Q.  And, now, this was just a few days after that big business

17   with the BMO Harris Bank sort of locking up the funds for a

18   while; right?

19   A.  Yes.

15:57:29    20   Q.  And then, eventually, when Ian Horn came back, he was able

21   to get that -- able to get that cashier's check that you've

22   shown us, and he deposited it into the PNC Bank account;

23   right?

24   A.  Yes.

15:57:45    25   Q.  And that PNC Bank account is the place from which the

 1   funds were then wired out to others?

 2          MR. HEIMANN:  Your Honor, I'm going to object to this

 3   as cumulative.

 4          We are repeating over and over and over testimony

15:57:58   5   regarding the same facts.  This is not relevant for

 6   credibility, and it's -- there's a 403 problem, as well, so

 7   I object to this cumulative presentation.

 8          MR. JUBIN:  Your Honor, if it has been cumulative, it

 9   has been the Government.  I'm about to explain my -- I had to

15:58:18   10   put -- put the facts in front of the question.

11          THE COURT:  Proceed.

12   BY MR. JUBIN:

13   Q.  Now, where were we?  Do we get to do it again?

14          In -- so as -- oh, this -- this was right after

15:58:43   15   the -- the money had been released and we got the -- the check

16   out of the BMO Bank and the money went into the PNC Bank from

17   which it was wired; right?

18   A.  Yes.

19   Q.  Okay.

15:58:57   20   A.  Yes.

21          MR. JUBIN:  Scroll up a little bit on this.

22   BY MR. JUBIN:

23   Q.  And at this point, after this big debacle with BMO Bank,

24   will you take a look at what Mr. Horn asked Justin Herman.

15:59:23   25   Can you read that for us?

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. VII-1172
21-CR-14-ABJ

1    A.   "Who are these people and why are we wiring money --

2    them -- why are we wiring them money?"

3    Q.   And then Mr. Herman responded, didn't he?

4         What was his response?

15:59:43    5    A.   "They hold debt in the company and this purchases the debt

6    from them, thus completing the entire transaction."

7              MR. JUBIN:  Okay.  You can take that down.

8    BY MR. JUBIN:

9    Q.   And then following this communication, Ian Horn did as

16:00:07    10   instructed and sent that money to Gordon Pardy and the person

11   who received it for Rodgers; correct?

12   A.   Yes.

13             MR. HEIMANN:  Misstates evidence, Your Honor, the

14   part about receiving it for Rodgers.  That wasn't the

16:00:20    15   testimony.

16             THE COURT:  It went to Theresa Jones.

17   BY MR. JUBIN:

18   Q.   It was Theresa Jones?

19   A.   Yes.  It was her account.

16:00:29    20   Q.   Okay.  And as -- correct me if I'm wrong.  As I understood

21   the testimony, she was getting this money instead of Rodgers.

22   A.   May I --

23             THE COURT:  Well, maybe instead of Lobock.

24             THE WITNESS:  Yeah.  May I clarify that?

16:00:42    25             Correct.

 1            MR. JUBIN:  Sure.

 2            THE WITNESS:  The Judge is correct.

 3    BY MR. JUBIN:

 4    Q.  Generally, Rodgers was the one who held the debt, and

16:00:48    5    somehow it ended up going to this Theresa Jones; right?

 6    A.  Mr. Rodgers gave his portion to Alan Lobock, and

 7    Alan Lobock had the money sent to Theresa Jones.

 8    Q.  Who was his girlfriend?

 9    A.  Yes.

16:01:06   10    Q.  Okay.

11            THE COURT:  "His" meaning Lobock's.

12            MR. JUBIN:  Lobock's girlfriend, right.

13    BY MR. JUBIN:

14    Q.  And so that -- that was paid to purchase that portion of

16:01:14   15    the debt, at least as far as the communication described it;

16    right?

17    A.  Yes.

18    Q.  So you've introduced some bank statements.

19            MR. JUBIN:  Let's take a look at 5.11.

16:01:50   20            Scroll to the top -- oh, that is the top.  Okay.

21    BY MR. JUBIN:

22    Q.  This is that withdrawal of the $2,321.97; right?

23    A.  Yes.

24    Q.  And you saw the bank account statement and know that

16:02:03   25    there -- there were a few thousand dollars in there apart from

 1   these wire transactions; correct?

 2   A.  I did not verify that.  I don't recall.

 3        MR. JUBIN:  Okay.  Let's take a look at 5.7.

 4        Scroll down to the last page.

16:02:20   5   BY MR. JUBIN:

 6   Q.  Okay.  There we've got the daily balance totals.

 7        Does that help you out?

 8   A.  Yes.

 9        MR. JUBIN:  Okay.  Let's scroll back up.

16:02:36   10   BY MR. JUBIN:

11   Q.  Okay.  Look on 12/23 on the deposits here.

12        $2,000, "Dru Claims Credit."  Did you investigate

13   what that was for?

14   A.  No.

16:02:58   15   Q.  Do you know what a Dru claims credit is?

16   A.  I don't.

17        MR. JUBIN:  Okay.  Let's go back to Exhibit 5.11 and

18   scroll down.

19   BY MR. JUBIN:

16:03:23   20   Q.  And so this cash out for $2,000, do you have any

21   information that this is or is not related to that credit?

22   A.  To the Dru claims credit?

23   Q.  Right.

24   A.  I would not -- I don't have any additional information if

16:03:40   25   it's connected.

1    Q.  Okay.  But, here, we've got this $2,000 in and then,

2    a little bit later, the $2,000 out; right?

3    A.  I thought that the deposit in was in December and then

4    this cash-out ticket is on January 6th, 2015, which is the

16:04:03    5    same day that the BMO Harris check for $80,016.29 was

6    deposited into the PNC Bank account.

7    Q.  Happened to be the same day that the money went out;

8    right?

9    A.  Yes.

16:04:17    10    Q.  But it was December 23rd when that $2,000 credit went in?

11    A.  Sometime in December.  I don't recall the date.

12    Q.  Okay.  But the amount's the same; right?

13    A.  2,000.

14    Q.  Right.

16:04:31    15        And you recall that on the instructions from

16    Justin Herman he told Ian Horn that his fee that he was

17    supposed to keep for this transaction was $3,000; right?

18    A.  Yes.

19        MR. JUBIN:  And let's go back to Exhibit 5.10.

16:04:50    20    BY MR. JUBIN:

21    Q.  If we take out line 20 and take out line 22, which offset

22    each other, we've got $19,000, $20,000 -- I'm sorry.

23    I confused myself.

24        $19,000, $22,500, $20,000, 7500, and 7500.  And if

16:05:29    25    you add that up, it comes out to $76,500; right?

19-CR-26-ABJ          HACKER - FURTHER CROSS - JUBIN          Vol. VII-1176
21-CR-14-ABJ

1    A.  Yes.

2    Q.  Okay.  So there's $3500 that are from this $80,000 check

3    that don't go anywhere; right?

4    A.  Yes.

16:05:46    5    Q.  And they simply remain in Ian Horn's bank account?

6    A.  Well, I would say that he withdrew 2,000 in cash.

7    Q.  Let's assume for a moment that that $2,000 in on

8    December 23rd and the $2,000 out on January 6th are -- offset

9    each other.  They're related.

16:06:17    10          Then what we would have is $3500 sitting in

11    Ian Horn's account that he didn't pay out to folks; right?

12    From the $80,000.

13          MR. HEIMANN:  Your Honor, this is argument.  It's not

14    a question.

16:06:31    15          THE COURT:  Overruled.

16    A.  I understand $3500 was left over.

17    BY MR. JUBIN:

18    Q.  Okay.  And did your investigation reveal any kind of

19    communications that indicated, "Yeah, you can keep that extra

16:06:49    20    $500"?

21    A.  Not that I recall.

22    Q.  Did your investigation reveal any kind of communications

23    telling Ian Horn, "Hey, give me that $500"?

24    A.  Not that I recall.

16:07:04    25    Q.  Instead, what your investigation found was wiring

---

1    instructions that said, "Here's the rest of the instructions:

2    Send 7500 to Pardy and 7500 to this other person"; right?

3    A.  Yes.

4           MR. JUBIN:  Let's take a look at that demonstrative.

5           I'm sorry.  Before we do that let's go back to 5.14.

6    BY MR. JUBIN:

7    Q.  I just wanted to make sure we looked at all the bank

8    accounts and the daily running balance -- all the bank

9    accounts that might be in the relevant time frame -- so you

10   can see that the balance shows that there was sufficient money

11   to take that $2,000 irrespective of any $80,000 wire.

12   Correct?

13   A.  I see the daily balance had more than $2,000.

14   Q.  Okay.  Thanks.

15          MR. JUBIN:  Now let's go to the demonstrative.

16   BY MR. JUBIN:

17   Q.  And so these green arrows here reflect the money that

18   Ian Horn was directed to wire out of his account from that

19   $80,000; right?

20   A.  Yes.

21   Q.  And the records reflect that he did as instructed?

22   A.  Correct.

23          MR. JUBIN:  I don't have any further questions at

24   this time.  Thank you.

25          MR. WARD:  Good afternoon, Inspector Hacker.

16:07:47
16:08:06
16:08:17
16:08:43
16:09:37

1              **FURTHER CROSS-EXAMINATION**

2    **BY MR. WARD**:

3    Q.  All of the transactions that we've been talking about this

4    afternoon and that are reflected in the two demonstrative

5    exhibits that you prepared, these all have to do with the

6    purchase of the shell or public vehicle between two private

7    parties; right?

8    A.  Yes.

9    Q.  Don't have -- these -- the money being changed hands is

10   not from any kind of sale of stock; right?

11   A.  Correct.

12   Q.  This is a private transaction where the public vehicle is

13   being sold from one party to the other?

14   A.  Yes.

15          MR. WARD:  Those are all the questions I have,

16   Your Honor.  Thank you.

17          MR. FLEENER:  I have no questions.

18          MR. HEIMANN:  No redirect, Your Honor.

19          THE COURT:  Thank you.

20          Please step down.

21          MR. HEIMANN:  Your Honor, before we call our next

22   witness, I would request a sidebar.

23     (Proceedings held at sidebar with Prosecutor Heimann

24   and all defense counsel.)

25          MR. HEIMANN:  Your Honor, the Government's next

16:09:50 (line 5)
16:10:11 (line 10)
16:10:25 (line 15)
16:10:36 (line 20)
16:11:11 (line 25)

 1   witness is Holly MacDonald-Korth.

 2            I previously informed defense counsel Ms. Korth has a

 3   felony conviction from the 2001 period.  Here's an expungement

 4   order that's been entered.

16:11:36  5            I would ask that defense counsel be particularly --

 6   defense counsel be prohibited from asking her about any felony

 7   conviction on cross-examination.

 8            It is also, to my knowledge, too old to qualify

 9   under 609.

16:11:59  10            MR. JUBIN:  What I can't figure out is how these

11   documents still exist when there's an expungement order.

12            MR. FLEENER:  I have nothing to say.

13            THE COURT:  Well, don't ask her about this unless you

14   come up here --

16:12:24  15            MR. FLEENER:  Roger.

16            THE COURT:  -- first.

17            MR. HEIMANN:  All right.  Thank you, Your Honor.

18       (Sidebar concluded.)

19            MR. HEIMANN:  Your Honor, if I haven't said it

16:13:47  20   already, the United States calls Holly MacDonald-Korth.

21       (Witness sworn.)

22            THE COURTROOM DEPUTY:  Please take a seat.

23            Please state and spell your name for the record.

24            THE WITNESS:  Holly MacDonald-Korth, H-o-l-l-y

16:14:45  25   M-a-c-D-o-n-a-l-d, dash, K-o-r-t-h.

```
19-CR-26-ABJ      MacDONALD-KORTH - DIRECT - HEIMANN    Vol. VII-1180
21-CR-14-ABJ
```

1                    **HOLLY MacDONALD-KORTH,**

2              **GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

3    BY MR. HEIMANN:

4    Q.   Ms. MacDonald-Korth, how old are you?

16:14:55    5    A.   45.

6    Q.   Where were you born and raised?

7    A.   Michigan.

8    Q.   Where do you live now?

9    A.   Miami, Florida.

16:15:02   10    Q.   What is your occupation?

11    A.   I am the president of Korth Direct Mortgage.

12    Q.   I'm sorry?

13    A.   Korth Direct Mortgage.

14    Q.   Is Korth Direct Mortgage related to JW Korth & Company?

16:15:20   15    A.   Yes.  JW Korth & Company started KDM.  But now KDM owns

16    JW Korth.

17    Q.   Are you a broker-dealer?

18    A.   JW Korth is a broker-dealer, yes.

19    Q.   Was Justin Herman a client of JW Korth?

16:15:47   20    A.   Yes.

21    Q.   How did he become a client?

22    A.   He called in to the firm and explained that he needed help

23    with some toxic assets that he was trying to unwind for some

24    clients that he managed the assets of that were famous people,

16:16:14   25    athletes and things like that, that had made bad investments

---

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

19-CR-26-ABJ    MacDONALD-KORTH - DIRECT - HEIMANN    Vol. VII-1181
21-CR-14-ABJ

1    and he needed help unwinding the positions.

2    Q.  According to Mr. Herman, were some of these toxic assets

3    penny stocks or microcap stocks?

4    A.  Yes.

5    16:16:30        MR. HEIMANN:  Let's look at Exhibit 29.1.  It has

6    been admitted into evidence.

7    BY MR. HEIMANN:

8    Q.  So this is an email that was provided by JW Korth &

9    Company to the grand jury.  It's been admitted into evidence.

10   16:16:54        Were you copied on this email?

11   A.  Yes.

12   Q.  And the date it was sent?

13   A.  January 28th, 2016.

14   Q.  There's an mgibbons@jwkorth.com.  Whose email address is

15   16:17:11   that?

16   A.  He's our compliance officer.

17   Q.  What does a compliance officer do at JW Korth & Company?

18   A.  So the compliance officer's responsible -- the chief

19   compliance officer's responsibility is to make sure we follow

20   16:17:28   all the rules and regulations required of a broker-dealer.  So

21   those are primarily FINRA regulations.

22   Q.  When you get a new client, is the compliance officer

23   involved in vetting that client or vetting the stocks they

24   want to sell?

25   16:17:50   A.  Typically the compliance officer is involved in the

1    account-opening process because they have to do a series of

2    checks, and the compliance officer is always involved if it's

3    anything different than our normal course of business.

4    Q.   The kinds of stocks that Mr. Justin Herman wanted to sell,

16:18:16    5    were they outside of JW Korth & Company's regular business in

6    2016?

7    A.   Yes.   JW Korth & Company primarily trades bonds, and he

8    wanted to sell penny stocks.

9    Q.   Why did you agree to take him on as a client if his

16:18:38    10    initial motivation was to do something your company doesn't do

11    very often?

12    A.   There were a series of persuasive phone calls, which led

13    me to believe that he was going to sell these toxic assets and

14    then invest in our -- one of our managed account programs that

16:19:00    15    we were marketing at the time.

16    Q.   And so he told you he was going to take these famous

17    people and put them into products that JW Korth offered?

18    A.   That's what I believed initially, yes.

19    Q.   In the process of doing compliance, will your compliance

16:19:15    20    officer sometimes review documents showing how a person

21    acquired a stock?

22    A.   Yes.

23         MR. HEIMANN:   Let's look at 29.2.

24    BY MR. HEIMANN:

16:19:43    25    Q.   So this is a long document that was attached to the email

---

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

19-CR-26-ABJ      MacDONALD-KORTH - DIRECT - HEIMANN      Vol. VII-1183
21-CR-14-ABJ

1    29.1.  You have copies of all the exhibits we're talking about

2    that are on paper with you on the witness stand.  This was

3    attached to that email that went to your compliance officer.

4           In general, if JW Korth & Company is asking for one

16:20:15    5    of these packets of data about -- or records -- about a

6    client's ownership of a stock, does that mean it's important

7    to the compliance decision or the decision to take them on as

8    a client?

9    A.  Yes.

16:20:30    10   Q.  So you rely on this information to make a decision about

11   whether you're going to --

12           MR. FLEENER:  Objection.  He's leading.

13           THE COURT:  Sustained.

14   BY MR. HEIMANN:

16:20:45    15   Q.  If you received a packet of data like this and it

16   contained altered bank statements or altered wire requests

17   which were significant for how a person says they acquired a

18   stock, would you rely on it to make them a customer?

19   A.  No.  We would not accept altered documents.

16:21:11    20   Q.  If you knew that documents in a packet like this had

21   forged signatures, would you rely on it to make them a client

22   of your company?

23   A.  Absolutely not.

24   Q.  If you knew that some of the signatures in a packet like

16:21:27    25   this had been cut out of one document, put into another

1  without the permission of the person whose signature it was,

2  would you rely on it to make them a client of your company?

3  A.  No.

4  Q.  You talked about phone calls with Justin Herman.  Does

16:21:53  5  JW Korth & Company record all its phone calls with clients?

6  A.  We do.

7  Q.  Prior to coming in to testify today, did you have an

8  opportunity to listen to two excerpts from phone calls?

9  A.  I did.

16:22:04  10  Q.  The woman's voice on those calls, is it yours?

11  A.  Yes.

12  Q.  The man's voice?

13  A.  I believe it's Justin Herman.

14  Q.  It's a person who said he was Justin Herman?

16:22:18  15  A.  Yes.

16  Q.  You've never met him in person?

17  A.  I have not.

18      MR. HEIMANN:  Your Honor, the Government has

19  previously offered testimony that 29.4 is an excerpt from a

16:22:26  20  call which was provided by JW Korth and the call is dated

21  January 28th of 2016.

22      The Government moves to admit that exhibit now, 29.4.

23      MR. FLEENER:  No objections.

24      MR. HEIMANN:  With the permission of the Court -- if

16:22:49  25  you -- if you accept it into evidence, we'd ask to play it.

19-CR-26-ABJ     MacDONALD-KORTH - DIRECT - HEIMANN    Vol. VII-1185
21-CR-14-ABJ

1           THE COURT:  Give me the number again.

2           MR. HEIMANN:  29.4, Your Honor.

3           THE COURT:  Thank you.

4           29.4 is received.

16:23:02   5      (Government's Exhibit 29.4 received into evidence.)

6      (Government's Exhibit 29.4 played.)

7  BY MR. HEIMANN:

8  Q.  The Government -- well, let me first ask you this, and

9  then we'll offer 29.5.

16:24:27  10      What's the first name of your compliance officer?

11  A.  Michael.

12          MR. HEIMANN:  Your Honor, the Government moves to

13  admit 29.5.  This is a -- already been established through

14  other testimony as a -- an excerpt of a call recorded by

16:24:43  15  JW Korth and provided to the grand jury.  The call is dated

16  January 28th of 2016.

17          MR. FLEENER:  No objections, Your Honor.

18          THE COURT:  Exhibit 29.5 is received.

19      (Government's Exhibit 29.5 received into evidence.)

16:25:17  20      (Government's Exhibit 29.5 played.)

21  BY MR. HEIMANN:

22  Q.  There's a reference to a "Scotty" in that call.  Do you

23  remember who that was?

24  A.  That was somebody that was supposedly at another firm that

16:26:13  25  was going to make markets in the stock.

1           But we didn't actually -- our execution didn't have

2    anything to do with him as far as I know.

3    Q.   Okay.  We're going to look at two more exhibits.

4           MR. HEIMANN:  Let's look at 412 first.  We'll do this

16:26:44    5    one second.

6    BY MR. HEIMANN:

7    Q.   So on the call it talked about a -- Mr. Herman wanting to

8    do a trade for 200,000 shares.

9           This is an email from justin@ichcorp.net to you;

16:27:06    10    right?

11    A.   Yes.

12    Q.   What's the subject?

13    A.   "test trade of NERG."

14    Q.   Why were you doing a test trade?

16:27:14    15    A.   So we hadn't executed in this way through this other

16    custodian.  He wasn't going to actually -- usually, when

17    somebody opens an account, they open an account with JW Korth

18    and they move their securities into our account.  And so when

19    we buy and sell, we know what's in the account.

16:27:41    20           In this case we were doing something called a DVP

21    trade where the securities actually existed somewhere else and

22    we were just selling them on his behalf.  So this was sort of

23    testing -- quote/unquote, "testing" -- the clearance process

24    of doing that trade because we had never worked with that

16:27:58    25    counterparty before.

19-CR-26-ABJ      MacDONALD-KORTH - DIRECT - HEIMANN     Vol. VII-1187
21-CR-14-ABJ

1   Q.  And this test trade is a -- basically, it's a sell order

2   for 200,000 shares of NERG at the market; right?

3   A.  Yes.

4          MR. HEIMANN:  Let's look at 30.1.

16:28:11   5   BY MR. HEIMANN:

6   Q.  This is an email from justin@ichcorp to you on

7   January 29th of 2016.  What's the subject?

8   A.  "Intrepid Capital."

9   Q.  What was your understanding of the relationship between

16:28:41   10  Justin Herman and Intrepid Capital?

11  A.  I don't remember.

12  Q.  Okay.  There's some text there, "Sell NERG.  1MM shares at

13  .0030 GTC."

14          What does that mean?

16:29:00   15  A.  He was entering an order with me to sell a million shares

16  of NERG at .3 cents per share.  And "GTC" means "good until

17  canceled."

18  Q.  Did you put this sell order in?

19  A.  Yes.

16:29:19   20  Q.  Shortly after this sell order -- no, first I want to ask

21  you about Chuck Winters.

22          Was Chuck Winters also contacting JW Korth regarding

23  Justin Herman's desire to sell these kinds of shares?

24  A.  Justin introduced us -- introduced me to Chuck Winters on

16:29:49   25  the phone, but I don't remember the timeline of when that

1   happened with respect to these trades.

2   Q.  Was Chuck Winters authorized by Justin Herman to put in

3   sell orders on their shares?

4   A.  After we did these trades, they sent in more paperwork,

16:30:15   5   and Chuck Winters, I believe, was going to have

6   authorization -- or was involved in some upcoming trades.  And

7   at that point we thought everything seemed fishy, and so we

8   shut down the account.

9   Q.  You ended the relationship shortly after January 29th of

16:30:39   10   2016?

11   A.  Yes.  I think just a couple of business days later.

12   Q.  Was that a decision you made or Michael from compliance

13   made or somebody else?

14   A.  It was a joint decision between me and compliance.

16:30:59   15         MR. HEIMANN:  I'll pass this witness for

16   cross-examination, Your Honor.

17         MR. FLEENER:  Ma'am, good afternoon.

18         My name is Tom Fleener.  I'm Mr. Herman's lawyer.

19                    **CROSS-EXAMINATION**

16:31:10   20   **BY MR. FLEENER**:

21   Q.  I want to make sure I understand correctly.

22         So the only trade you ever made was the million

23   shares you just discussed on behalf of Mr. Herman?

24   A.  No.

16:31:44   25   Q.  Plus the 200,000?

1  A.  Yes.  Plus some shares in another stock.

2  Q.  Okay.  But as far as NERG goes, you had a $200,000 test

3  trade; correct?

4  A.  Yes.

16:31:58  5  Q.  And you had this million-dollar trade at 3/10 of a cent a

6  share; correct?

7  A.  Yes.

8  Q.  And I did the math.  That's roughly $3,000 on

9  the million -- the million shares.

16:32:11  10      What was your company's commission on that?  Do you

11  know?

12  A.  I don't recall exactly.

13  Q.  You would agree that -- that your commission on this trade

14  would be more than your condition -- your commission -- on the

16:32:23  15  work you generally did, which was bonds?

16  A.  No.

17  Q.  You make -- you have a greater percentage commission on

18  your bond work than you do on stock work?

19  A.  My bond trades are typically larger trades, so they

16:32:39  20  generate more revenue.

21  Q.  I understand.  I'm talking about a percentage of the

22  trade, though.

23      As a percentage of the trade, you would agree that

24  your commission you made on this trade would have been greater

16:32:46  25  than the commission you made on a bond trade?

19-CR-26-ABJ        MacDONALD-KORTH - CROSS - FLEENER        Vol. VII-1190
21-CR-14-ABJ

1   A.  I don't remember.  We only made a few hundred dollars on

2   this trade.

3   Q.  I understand.

4        And you ultimately decided to stop doing business

16:33:01   5   with -- with Mr. Herman; correct?

6   A.  Yes.

7   Q.  And your company, JW Korth, was recently disciplined by

8   the SEC; correct?

9   A.  We settled a case with them.

16:33:29  10   Q.  Okay.  The SEC looked into your corporation -- or your

11   company -- because of some of the trading you made regarding

12   some of the bond work; correct?

13   A.  As a result of a routine audit, there were some technical

14   errors that, you know, we were cited for.

16:33:50  15   Q.  I understand.

16        And -- and I -- and the -- the truth is that the SEC

17   issued a cease and desist order against your firm?

18        Correct?

19   A.  Well, the cease and desist was to cease and desist from

16:34:04  20   continuing to make the technical error.

21   Q.  Correct.  And so -- and then you had to pay a -- you had

22   to pay a fine and pay some money back?

23   A.  Correct.

24        MR. FLEENER:  All right.  And that's all I have

16:34:15  25   to say.  Thank you, ma'am.

19-CR-26-ABJ      MacDONALD-KORTH - CROSS - FLEENER      Vol. VII-1191
21-CR-14-ABJ

1    Oh, I do have one more question.  May I follow up,

2  please.

3  BY MR. FLEENER:

4  Q.  And this -- the -- the technical violation that the SEC

16:34:29  5  disciplined you on, that wasn't related to Justin Herman?

6  That was related to your -- the -- the core of your business?

7  A.  It was related -- it was not related to Justin Herman.

8  Q.  Thank you.

9         MR. JUBIN:  No questions.

16:34:50  10         MR. WARD:  No questions.

11         MR. HEIMANN:  No redirect, Your Honor.

12         We ask that this witness be excused.

13         THE COURT:  Ms. MacDonald-Korth, you are excused.

14         THE WITNESS:  Thank you.

16:35:34  15         MR. HEIMANN:  Your Honor --

16         THE COURT:  Sir.

17         MR. HEIMANN:  -- it is 4:35.  The Government has,

18  I think, two more witnesses left in its case in chief.

19  They're both rather lengthy.

16:35:47  20         I don't know if you want to start at this point or if

21  we want to adjourn and start tomorrow morning so that all of

22  our next witnesses' testimony is in the same day.

23         MR. JUBIN:  Your Honor, may we approach?

24         THE COURT:  Please.

25  ///

19-CR-26-ABJ                                      Vol. VII-1192
21-CR-14-ABJ

 1      (Proceedings held at sidebar with Prosecutor Heimann

 2   and all defense counsel.)

 3           MR. JUBIN:  Your Honor, in between preparing for

 4   trial I've also been trying to do some legal research and

 5   respond to the Government's motion regarding 106 and other

 6   matters.

 7           I believe, after looking at some cases referencing

 8   the late Jack Weinstein on evidence, we -- we do have to have

 9   a hearing.  I think it's a fairly significant hearing.

10           And so before we went scheduling things, I thought

11   maybe we would talk about that.  It's something I think that

12   needs to be done before the upcoming witnesses testify, so

13   perhaps we could schedule a hearing in the morning on that.

14           I'm going to be working to try to get something

15   filed.  I'm sorry that it's so late.  I -- I filed an -- a

16   pretrial sort of notice of -- of the issue.  But in looking at

17   the Government's exhibits at this point, I'm trying to select

18   those portions of the transcripts that I think need to be

19   introduced simultaneously by the Government pursuant to

20   Rule 106 at the time that they make their introduction.

21           If we can figure that out in advance, I think it will

22   really help things go a little more smoothly.

23           THE COURT:  Well, there's also -- we have a -- a

24   motion from Mr. Fleener to not have the hearing.

25           MR. FLEENER:  Yes, sir.

16:36:30
16:36:50
16:37:08
16:37:32
16:37:51

19-CR-26-ABJ                                                    Vol. VII-1193
21-CR-14-ABJ

1        MR. WARD:  And I would join that motion.

2        THE COURT:  I'll give you an order on that.

3        I'm going to deny your motion, couldn't find any law

4   to support it.  I think I have discretion.

16:38:04    5        MR. JUBIN:  I think the Tenth Circuit sets out a

6   procedure for Rule 106 that I'm attempting to follow.

7        MR. HEIMANN:  Your Honor, what I can say is our next

8   witness is Alex Scoufis.  We expect his testimony on direct to

9   be a couple hours.

16:38:28   10        I think the 106 issue raised by Mr. Jubin comes up

11   during the testimony of Inspector Hacker, which will be our

12   final witness offered in our case in chief.  I don't know how

13   that affects our scheduling decision.

14        So the Government's prepared to put its -- will be

16:38:50   15   prepared to put both its witnesses on tomorrow.  We can start

16   with Mr. Scoufis and break for a hearing before Inspector

17   Hacker's testimony or we can do the hearing first, as long as

18   we have some notice from Your Honor as to what you want.

19        MR. JUBIN:  Thinking out loud, it might make more

16:39:09   20   sense if we did it first, did the hearing in the morning, and

21   didn't interrupt the jury.  So if we gave them like a later

22   start, say 10:30 or something like that, and then we could

23   conduct the hearing in the morning.

24        MR. WARD:  I thought the Court was denying the motion

16:39:26   25   for a hearing.  Maybe I wasn't following.

 1              THE COURT:  No.  I was denying Mr. Fleener's motion.

 2              MR. WARD:  Oh, to not have the hearing.

 3              MR. FLEENER:  To not have the hearing.

 4              MR. WARD:  I follow you, Judge.  I'm lost.

16:39:38  5     THE COURT:  We're all lost at this point.

 6         Well, I know the Government wants to get their

 7    witnesses on and finish this thing on Thursday.  Right?

 8              MR. HEIMANN:  We do, Your Honor, although both of our

 9    witnesses are members of the prosecution team at this point.

16:39:58 10   Our last civilian witness was just completed.  Unless

11    something odd happens.

12              MR. FLEENER:  Well -- and I'm just thinking out loud,

13    too.  I mean, the --

14              THE COURT:  Actually, we can start your 106 hearing

16:40:15 15   right now.

16              MR. JUBIN:  I think I need to do additional work on

17    that.  Part of it is identifying the precise portions of the

18    Government's exhibits that need to be modified to include

19    additional text.

16:40:30 20             THE COURT:  Okay.  I need, then -- this seems to be a

21    reasonable -- rather than you ambushing them --

22              MR. JUBIN:  Right.

23              THE COURT:  -- with something you've had for three or

24    four days, at least it seems to me maybe the hearing should be

16:40:45 25   before Ms. Hacker testifies.

19-CR-26-ABJ                                                Vol. VII-1195
21-CR-14-ABJ

1          So we'll start with your client, and we can give the

2    jury a long lunch hour.

3                MR. FLEENER:  Okay.

4                MR. HEIMANN:  Very good, Your Honor.

16:40:59    5                MR. JUBIN:  And I'll try to get something filed this

6    evening.

7                MR. FLEENER:  And I suppose while we're all up

8    here -- because I'm trying to -- that's going to be -- Eric,

9    you have these two witnesses and that's it?

16:41:13   10                MR. HEIMANN:  That's our intention.  Unless something

11    odd happens.

12                MR. FLEENER:  Okay.  I imagine those witnesses --

13                THE COURT:  There will be rebuttal.

14                MR. FLEENER:  Well, but then we have to start the

16:41:24   15    defense case.  So I'm just trying to plan out whether --

16                MR. HEIMANN:  Your Honor, can I make a suggestion?

17    If we're going to adjourn tonight, maybe we should let the

18    jury go and we can have this conversation somewhere other than

19    huddled around this.

16:41:38   20                MR. FLEENER:  Agree.

21                THE COURT:  I don't mind.  You guys asked for it.

22          (Sidebar concluded.)

23                THE COURT:  You're probably wondering what we're

24    talking about.

16:42:02   25                JURY MEMBERS:  Yeah.  Yeah.

19-CR-26-ABJ                                                    Vol. VII-1196
21-CR-14-ABJ

1          THE COURT:  Juries always do but we don't tell you.

2          JURY MEMBER:  We want to hear.

3          THE COURT:  Usually, those meetings that occur at

4    sidebar involve a discussion asking me to make a ruling on

5    some evidence.  That wasn't what we were talking about over

6    here.  We were talking about time, and we were talking about

7    you and how this case is going and decided we can discuss it

8    further outside of your presence this evening.

9          The case is moving along maybe ahead of schedule at

10   this point, you'll be glad to note -- and that doesn't

11   guarantee that it won't fall behind again but -- not again but

12   will -- will not fall behind at some point.  I hope it does

13   not because your time is valuable.

14         We are going to let you go at this point for the

15   evening, have you come back tomorrow morning at 8:30, and

16   we'll start with a Government's witness tomorrow morning.

17         I want to alert you we may be taking a longer break

18   tomorrow morning -- hopefully, the weather will be

19   a little bit warmer than 50 degrees we've had today with wind

20   blowing at 25 miles an hour.  And so we'll -- you might plan

21   a little bit in there if you had some research or work you

22   wanted to do or -- in that space of an hour to an hour and a

23   half.  We'll try to schedule it right around the lunchtime so

24   that you can fit that in, as well.

25         Again, I remind you of the Court's admonition.

19-CR-26-ABJ                                              Vol. VII-1197
21-CR-14-ABJ

 1   I'm not going to hold you longer to repeat everything.  You've

 2   heard it several times during the course of the trial so far.

 3              So we'll stand in recess until 8:30 tomorrow morning.

 4              THE COURTROOM DEPUTY:  All rise.

 5        (Proceedings outside the jury's presence at 4:44 p.m.)

 6              THE COURT:  Thank you, Counsel.

 7              I note the time is quarter to 5:00, so we have put in

 8   a pretty good day as it is.

 9              Mr. Jubin, you're standing there.  Do you have

10   something to say?

11              I think I've probably resolved most of the questions.

12              MR. JUBIN:  I think I was just the last to sit down.

13              THE COURT:  Yeah.

14              MR. JUBIN:  As I mentioned, I'll try to -- try to get

15   something out here pretty quickly this evening.

16              There are -- it's sort of tough to anticipate what

17   the Government might be intending to introduce with respect to

18   statements of my client made in a couple of interviews, and

19   I'm -- I'm going to take a look at that and be prepared to

20   respond as it goes, I suppose.

21              I do have specific transcripts from the grand jury

22   testimony that the Government intends to introduce, and that's

23   particularly useful.  I spent a little -- well, I spent

24   considerable time looking at that in the last couple days, and

25   I have some specific solutions that I will be recommending.

16:44:26 (line 5)
16:45:12 (line 10)
16:45:26 (line 15)
16:45:52 (line 20)
16:46:14 (line 25)

Melanie Sonntag, RDR, CRR, CRC              MelanieSonntagCRR@gmail.com

 1          I think what I'll do on my pleading is -- I had the

 2   interview transcripts -- or the interview recordings --

 3   transcribed by -- I want to say "Kathy Mulvaney," but I never

 4   remember her married name.

 5          THE COURT:  Kendrick.

 6          MR. JUBIN:  Kendrick.

 7          -- who -- who transcribed those for us, so I'll make

 8   those attachments to the pleading so that the Court and the

 9   Court's clerk has those things.

10          And I think the jury -- grand jury transcript, if

11   that isn't already in the record, I'll attach that to the

12   pleading, as well, for the Court's convenience.

13          THE COURT:  I think it was attached to the document

14   I received from -- that was prepared by Mr. Szott.

15          MR. SZOTT:  Your Honor, only the interview

16   transcripts from Mr. Jubin.  I did not attach the grand jury

17   transcripts.

18          THE COURT:  I thought it was.  There was something

19   attached that says "grand jury" on it.

20          MR. JUBIN:  With the Court's and the parties'

21   permission, I will make sure that I email that grand jury

22   transcript as an attachment to Court chambers so the Court has

23   the opportunity to review that --

24          THE COURT:  Thank you.

25          MR. JUBIN:  -- in connection with the pleadings.

1    THE COURT:  I did note that the grand jury portion

2  did not -- did not appear to be red lined, while the interview

3  portion was red lined as to both what you were proposing and

4  what the Government was proposing.

16:47:56   5    MR. JUBIN:  Right.  And perhaps I'll need to --

6  I don't know if the Court has a preference as to whether or

7  not those things should be highlighted or highlights omitted

8  or whatever.

9    But . . . I also noted that, as submitted, my

16:48:14  10  proposed exhibits included transcript materials beyond the

11  page and line of the recording that I identified, so I'll need

12  to make amendments to those, as well.

13    But in the big scheme of things, I think what I need

14  to do is really put this all to paper and get it in front of

16:48:35  15  the Court.

16    THE COURT:  Thank you.  We'd appreciate it.

17    MR. JUBIN:  Thank you.

18    MR. HEIMANN:  Your Honor, just so we have a clear

19  record, the Government has provided -- when we uploaded our

16:48:49  20  JERS exhibits for the Court, we then provided defendants with

21  copies of those exhibits, and those include three interview

22  excerpts regarding Mr. Horn, so Mr. Jubin should have those.

23    We marked more exhibits from the grand jury than we

24  expect to introduce, and we may modify those.  If we do so, we

16:49:19  25  are going to do it tonight, and we'll turn those over, as

19-CR-26-ABJ                                                    Vol. VII-1200
21-CR-14-ABJ

1   well.

2          THE COURT:  Okay.  They're relatively short.

3          MR. HEIMANN:  Your Honor, yes.  We've -- since the

4   time we did it, some things have changed, given the evidence

5   and the way it's come in.

6          THE COURT:  Very well.

7          MR. WARD:  I -- just on another kind of general

8   scheduling matter in terms of when we need to be prepared to

9   have witnesses I guess would be who -- you know, what

10  witnesses we start calling once the Government's closed their

11  case.

12         Based on the Court's previous ruling addressing order

13  of presentation, I would -- we were expecting that Mr. Jubin

14  was going to present his witnesses first after the -- the

15  prosecution closes their case.  I just wanted to make sure

16  that was still the plan in terms of, you know, scheduling our

17  witnesses to be here.

18         MR. JUBIN:  Your Honor, that was not my intent;

19  however, I have one witness who is extremely busy starting

20  next Monday.  And if I were able to get him in on -- on

21  Friday, that would be very welcome to that witness.

22         I have another one, Ms. Woodhouse, who is scheduled

23  to be bicycle racing out of town.  And if I remember right,

24  if she were able to go Friday, that would be of great benefit

25  to her.

16:49:35
16:49:53
16:50:09
16:50:28
16:50:56

1    And then perhaps we could turn it over to Mr. Fleener

2  and Mr. Ward and then I'd have some people later.

3            MR. FLEENER:  Yeah.

4            And this is -- this is Tom Fleener.  Of course, you

5  know it's me.  I'm standing in front of you.  I'm used to

6  having -- I'm used to being on all these status conferences.

7            And just so the Court -- the Court does remember,

8  I still have an opening statement to give, as well.  So --

9  I mean, I -- I would think -- as I'm listening to Mr. Jubin

10  talk -- and I know how long these two witnesses are going to

11  be tomorrow, along with the 106 hearing.

12            I think that our Friday would be probably an opening

13  statement by me, motions for judgment of acquittal, and his

14  witnesses and we may be there anyway.  So I just bring that

15  up, Judge.

16            THE COURT:  Well, I wondered -- do you wish to

17  persist or not with the noontime Friday?

18            MR. FLEENER:  Judge, I think so.

19            I mean, you -- and I'll let the Court know I -- you

20  know, Mr. -- I can't answer for Mr. Jubin because we have

21  different theories.  But Mr. Ward and I have been working

22  pretty hard trying to, one, not duplicate things but, also,

23  parse down our witness list.

24            And so we've -- we have issued -- the Court's signed

25  the order -- probably 13 subpoenas.  I think we may only have

19-CR-26-ABJ                                              Vol. VII-1202
21-CR-14-ABJ

1   four or five witnesses between Mr. Ward and myself so -- and

2   then we have to make decisions about the defendants testifying

3   and then rebuttal.

4          But I think -- you know, gosh, we probably -- I think

16:52:37   5   our case, Mr. Ward's and my case, may be a day and that may be

6   it.  So I -- I think we're fine.  I mean, I don't have any

7   witnesses to bring on Friday is the other problem, all --

8   because I anticipated only having witnesses here next week.

9          But I still think we'd be able to quit whenever Tom

16:52:57   10   got done with his witnesses on Friday and still be probably a

11   day or two ahead, for whatever it's worth.

12          THE COURT:  Thank you.

13          Well, I know that the Government will renew its

14   objections to Tom's witnesses, and we'll have to deal with

16:53:11   15   that, as well.

16          MR. FLEENER:  Right.

17          THE COURT:  What else -- what other damage can I do

18   for you today?

19          MR. FLEENER:  Nothing from the defense, Judge -- or

16:53:32   20   Mr. Herman.

21          MR. HEIMANN:  Nothing else, Your Honor.

22          THE COURT:  All right.  Thank you, Counsel, for your

23   hard work.

24          THE COURTROOM DEPUTY:  All rise.

16:53:46   25      (Proceedings concluded 4:53 p.m., September 29, 2021.)

1                   C E R T I F I C A T E

2

3

4

5          I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14         Dated this 11th day of January, 2022.

15

16

17

18         /s/ Melanie Humphrey-Sonntag

19         _____

20               MELANIE HUMPHREY-SONNTAG
                       RDR, CRR, CRC
21             Federal Official Court Reporter

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3    _____

4

UNITED STATES OF AMERICA,          DOCKET NO. 19-CR-026-ABJ
5                                   DOCKET NO. 21-CR-014-ABJ
          Plaintiff,
6                                   VOLUME VIII of XIV
          vs.                       (Pages 1203 through 1410)
7
JUSTIN HERMAN, CHARLES W.           Cheyenne, Wyoming
8    WINTERS, JR., a/k/a Chuck       Thursday,
Winters, and IAN HORN,             September 30, 2021
9                                   8:32 a.m.
          Defendants.
10

11   _____

12

13                TRANSCRIPT OF TRIAL PROCEEDINGS

14

15         BEFORE THE HONORABLE ALAN B. JOHNSON
                UNITED STATES DISTRICT JUDGE
16        and a jury of twelve and four alternates

17

18

19

20

21

22        *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*
                *Federal Official Court Reporter*
23   *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
          *630.452.6236 * MelanieSonntagCRR@gmail.com*
24
     *Proceedings reported with digital stenography; transcript*
25         *produced with computer-aided transcription.*

```
 1    APPEARANCES:
      For the Plaintiff:        ERIC J. HEIMANN
 2                              THOMAS A. SZOTT
                                ASSISTANT UNITED STATES ATTORNEYS
 3                              DISTRICT OF WYOMING
                                2120 Capitol Avenue, Fourth Floor
 4                              Cheyenne, WY 82001

 5    For the Defendant        THOMAS A. FLEENER
      Herman:                  FLEENER LAW
 6                             506 South Eighth Street
                               Laramie, WY 82073
 7
      For the Defendant        ZENITH S. WARD
 8    Winters:                 BUCHHAMER & WARD
                               1821 Logan Avenue
 9                             Cheyenne, WY 82001

10    For the Defendant        THOMAS B. JUBIN
      Horn:                    JUBIN & ZERGA
11                             2614 Pioneer Avenue
                               Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2    GOVERNMENT WITNESSES:
                                                    PAGE
3      ALEX SCOUFIS
       Further Direct Examination by Mr. Szott      1206
4      Voir Dire Examination by Mr. Szott           1249
       Voir Dire Examination by Mr. Fleener         1254
5      Further Direct (Continued) by Mr. Szott      1262
       Further Cross-Examination by Mr. Fleener     1324
6      Further Cross-Examination by Mr. Ward        1353
       Further Cross-Examination by Mr. Jubin       1372
7      Further Redirect Examination by Mr. Szott    1375

8                        E X H I B I T S
                                      IDENTIFIED   RECEIVED
9    GOVERNMENT'S EXHIBITS
         28.1   NERG Trading Analysis      1249      1301
10       28.34  Skype Chat Messages        --        1323
         40.1   NERG Trading Analysis      1301      --
11       313    Graph                      1207      --
         317    Graph                      1209      --
12       320    NuTech Shareholder List    1209      1212
         321    Transaction Journal for    1210      1212
13              NuTech Securities
         417    NuTech Stock Price and     1283      --
14              Volume Chart
         418    NuTech Stock Price and     1284      --
15              Volume Chart
         419    NuTech Stock Price and     1286      --
16              Volume Chart
         420    NuTech Stock Price and     1287      --
17              Volume Chart
         502    Retail Transactions Summary  1320    1321
18       506    Screenshot, OTC Markets    1306      1307
         507    Screenshot, OTC Markets    1312      1313
19       510    Retail Transactions Summary  1317    1318
         510.1  Retail Transactions Summary  1375    1376
20       511    NuTech Stock Price and     1314      1314
                Volume Chart
21       512    NuTech Stock Price and     1315      --
                Volume Chart
22       513    NuTech Stock Price and     1316      --
                Volume Chart
23       514    NuTech Stock Price and     1281      1283
                Volume Data
24       520    Excerpt of Blue Sheet Data  1288     1290
         614    Audio Recording            1389      --
25       1009   CD of Blue Sheet Data      1237      1238

19-CR-26-ABJ    SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1206
21-CR-14-ABJ

1    (Proceedings commenced 8:32 a.m., September 30, 2021,

2   in the presence of all defendants, outside the jury's

3   presence.)

4            THE COURTROOM DEPUTY:  Court is now in session.

5            THE COURT:  All right.

6    (Proceedings within the jury's presence at 8:33 a.m.)

7            THE COURT:  Thank you.  Please be seated, ladies and

8   gentlemen.

9            The Court notes that the jury's present.

10           Mr. Szott.

11           MR. SZOTT:  Your Honor, thank you.  The United States

12   calls Alexander Scoufis.

13    (Discussion held between the Court and Courtroom

14   Deputy.)

15           THE COURTROOM DEPUTY:  Please raise your right hand.

16    (Witness sworn.)

17           MR. SZOTT:  Good morning, Mr. Scoufis.

18           THE WITNESS:  Good morning.

19   **ALEX SCOUFIS, GOVERNMENT'S WITNESS, FURTHER DIRECT EXAMINATION**

20   **BY MR. SZOTT:**

21   Q.  I'd like to start this morning by asking you a series of

22   questions that are related to the issuance of free-trading

23   shares of NERG on September the 28th of 2015.

24           And I'd like to start by looking at some exhibits.

25           MR. SZOTT:  Mr. Davila, would you please bring up

1   Exhibit 313.

2         This has not been admitted.

3         THE COURT:  All right.  We're having a technical

4   problem right now.

5      (Discussion held between the Court and Courtroom

6   Deputy.)

7         THE COURT:  Do you think we could use a handheld in

8   the meantime?

9         THE COURTROOM DEPUTY:  No.  Can't turn them on,

10  either.

11        THE COURT:  Why don't we send the jury back to the

12  jury room, and I can explain what the issue is.

13        THE COURTROOM DEPUTY:  All rise.

14     (Proceedings outside the jury's presence at 8:39 a.m.)

15        THE COURT:  The problem is we don't have a mic to the

16  witness.  It's not functioning.

17        MR. SZOTT:  Oh, okay.

18        MR. FLEENER:  Judge, may I sit?

19        THE COURT:  Oh, please sit.

20        And there's not a --

21        MR. FLEENER:  I don't want to.  I prefer to stand but

22  I have to sit down.

23        THE COURT:  And the handheld mic isn't working, as

24  well.  Apparently, there's some problem with -- in the system.

25        My mic is working, I think.

1              It's working.

2              THE COURTROOM DEPUTY:  It's just the witness mic.

3         (A recess was taken from 8:40 a.m. to 8:47 a.m.)

4              THE COURT:  Let's get our jury in and get going.

5         (Proceedings within the jury's presence at 8:48 a.m.)

6              THE COURT:  Thank you for your patience, ladies and

7    gentlemen.  Please be seated.

8              MR. SZOTT:  May it please the Court.

9              THE COURT:  Mr. Szott.

10             MR. SZOTT:  Counsel.

11             MR. FLEENER:  Sir.

12             MR. SZOTT:  Mr. Davila, would you please bring up

13   Exhibit 313.  Again, this has not been admitted.

14   BY MR. SZOTT:

15   Q.  Mr. Scoufis, do you see Exhibit 313 on your monitor?

16   A.  I do.

17   Q.  Do you recognize it?

18   A.  Yes.

19   Q.  Without describing its contents, what is it?

20   A.  This is a -- a look at the September 28th, 2015, share

21   distribution in a pie chart.

22   Q.  Who created the pie chart?

23   A.  I did.

24   Q.  And the source for this pie chart was -- were numbers

25   obtained from what company?

1   A.  Pacific Stock Transfer.

2         MR. SZOTT:  Mr. Davila, would you pull up 317,

3   please.

4         THE COURT REPORTER:  Mr. Szott, pull that mic toward

5   you a little bit, please.  Thank you.

6   BY MR. SZOTT:

7   Q.  Mr. Scoufis, are you able to see 317 on your monitor?

8   A.  Yes.

9   Q.  Do you recognize it?

10  A.  Yes.

11  Q.  Without describing its contents in detail, what is it?

12  A.  This is a look at the free-trading shares as of

13  September 28th, 2015.  Again, in a pie chart format.

14  Q.  Who created this pie chart?

15  A.  I did.

16  Q.  And documents from what company were used or were relied

17  on in creating this pie chart?

18  A.  Pacific Stock Transfer.

19        MR. SZOTT:  Mr. Davila, would you please bring up

20  Exhibit 320.

21  BY MR. SZOTT:

22  Q.  Mr. Scoufis, the first page of Exhibit 320 is on your

23  monitor now.  In the upper right it indicates "page 1 of 37."

24        Do you recognize the document that's been marked for

25  identification as Government's Exhibit 320?

19-CR-26-ABJ      SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1210
21-CR-14-ABJ

1    A.  Yes.

2    Q.  Without -- again, without providing details about its

3    contents, what is that document?

4    A.  All right.  This is a shareholder list for 9 -- or for

5    September 30th, 2015, for NuTech stock.

6    Q.  And who provided this list?

7    A.  Pacific Stock Transfer.

8            MR. SZOTT:  Mr. Davila, would you please bring up

9    Exhibit 321.

10            MR. FLEENER:  Thomas --

11            MR. SZOTT:  May I have a moment, Your Honor.

12            THE COURT:  Yes.

13        (Discussion held between counsel.)

14            MR. SZOTT:  Your Honor, these were recently provided

15    to defense counsel, so that's -- that's the subject of our

16    discussion.

17    BY MR. SZOTT:

18    Q.  Mr. Scoufis, do you see Government -- what's been marked

19    as Government Exhibit 321 on your monitor?

20    A.  Yes.

21    Q.  In the upper right it indicates it's a 30-page PDF?

22    A.  Yes.

23    Q.  Without describing its contents in detail, what is

24    Exhibit 321?

25    A.  This is a transaction journal for NuTech securities for

1    the period of June 1st, 2008, through August 24th, 2017.

2    Q.   Who provided this transaction journal?

3    A.   Pacific Stock Transfer.

4    Q.   Mr. Scoufis, how do -- the documents from Pacific Stock

5    Transfer that are in 320 and 321, how do they relate to the

6    two pie charts that you looked at in Exhibits 317 and 313?

7    A.   Yeah.  Those two exhibits are the source for the pie

8    charts.  I relied on those pie charts for -- or on those

9    exhibits, the transfer journal and the shareholder list, to

10    create the pie charts.

11          MR. SZOTT:  Your Honor, at this time the

12    United States would offer Exhibits 320 and 321.

13          MR. FLEENER:  Your Honor, I need a minute.

14       (Discussion held at counsel table.)

15          MR. FLEENER:  I'm sorry, Your Honor.  We just got

16    these late.

17          THE COURT:  I realize.

18          MR. JUBIN:  Last night.

19          While they're looking at it, Your Honor, I'll simply

20    lodge an objection as to relevance as to Mr. Horn.

21          MR. FLEENER:  I apologize.  No objection, sir.

22          MR. SZOTT:  Your Honor, in terms of the relevance

23    objection toward Mr. Horn, whether or not it's relevant to him

24    will depend on evidence and testimony apart from these

25    exhibits, so it -- that really remains to be seen.

19-CR-26-ABJ      SCOUFIS - FURTHER DIRECT - SZOTT     Vol. VIII-1212
21-CR-14-ABJ

1          THE COURT:  They are received, Exhibit 320 and 321.

2      (Government's Exhibits 320 and 321 received into evidence.)

3          MR. SZOTT:  Mr. Davila, if we could return to 320

4  just briefly.

5  BY MR. SZOTT:

6  Q.  My only question about this, Mr. Scoufis, before we take

7  it down, is I would note there appear to be some redactions

8  here.

9          Do you recall that the original document from Pacific

10  Stock Transfer was unredacted?

11  A.  I do.

12          MR. SZOTT:  We can take that down.

13          Your Honor, at this time the United States offers

14  Exhibits 313 -- let me strike that and ask this.

15  BY MR. SZOTT:

16  Q.  Mr. Scoufis, do you believe it would be helpful for the

17  jury and assist you in presenting your testimony today for the

18  jury to see the pie charts you prepared that have been marked

19  as Exhibits 313 and 317?

20  A.  Yes.

21          MR. SZOTT:  Your Honor, the Government offers 313 and

22  317 as pedagogical charts or summaries.

23          MR. FLEENER:  No objections.

24          THE COURT:  They may be used as demonstrative

25  evidence in this matter.

19-CR-26-ABJ    SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1213
21-CR-14-ABJ

 1              MR. SZOTT:  So just so I understand, Your Honor, that

 2    means they can be shown but not received?

 3              THE COURT:  Correct.

 4              MR. SZOTT:  Thank you, Your Honor.

 5              If we could publish Exhibit 313.

 6    BY MR. SZOTT:

 7    Q.  Mr. Scoufis, what is the jury seeing -- I would note that

 8    313 is now published to the jury.

 9              What is the jury seeing here in Exhibit 313?

10    A.  All right.  So we're looking at shares on September 28th,

11    2015, which is the date that over 13 billion shares were

12    issued, NuTech shares were issued, and we see that in the blue

13    area.

14              And the previously held shares -- so prior to that

15    issuance on September 28th -- the almost 30 billion shares are

16    in the orange area.

17    Q.  So overall, drawing your attention to the lower right, how

18    many outstanding NERG shares are there as of September 28th,

19    2015?

20    A.  There are 42,758,575,781 shares outstanding.

21    Q.  And about what percentage of the total outstanding shares

22    is represented by that new issuance?

23    A.  About 30 percent.

24    Q.  And do you recall if this is common stock?

25    A.  Yes.  This is common stock.

1              MR. SZOTT:  If we could go to 317, please.

2    BY MR. SZOTT:

3    Q.  Mr. Scoufis, I'd note that Exhibit 317 is now on the

4    monitors.  What is the jury seeing here?

5    A.  Again, so we are looking at shares on September 28th,

6    2015.  Before we were looking at common stock but free-trading

7    and restricted shares.

8              Here, we're just looking at the free-trading shares.

9    So all of the 13 -- the over 13 billion shares that were

10   issued on September 28th were free-trading shares, and we see

11   that in the large blue portion, representing now 99 percent of

12   the free-trading shares and -- and the remaining shares,

13   those -- the shares that were held prior to this issuance,

14   under a hundred million, or 1 percent, of the total

15   outstanding shares.

16   Q.  Thank you.

17              MR. SZOTT:  We can take that down.

18   BY MR. SZOTT:

19   Q.  Mr. Scoufis, next I'd like to ask you some questions about

20   how Rule 144 might have applied to the issuance of

21   free-trading NERG shares on September 28th of 2015 or in

22   relation to that issuance.

23              First, can I ask you to remind the jury, please, what

24   is Rule 144?

25   A.  Rule 144 does two things.   It provides an exemption to

1   shareholders to remove a restriction, to have free-trading

2   shares, and it also -- separately but sometimes together --

3   limits what control individuals, what affiliates can do with

4   their shares.

5           MR. SZOTT:  Mr. Davila, would you please bring up

6   Exhibit 319.

7           Your Honor, this was previously published to the jury

8   as a demonstrative only.  So I'd ask that it be published once

9   again.

10          THE COURT:  Very well.

11  BY MR. SZOTT:

12  Q.  Again, briefly, Mr. Scoufis, would you remind the jury

13  what they're seeing here, which is now on the monitor and is

14  marked as Government Exhibit 319.

15  A.  Sure.

16          This is a flowchart with questions pertaining to

17  removing the -- the restrictive legend on NuTech shares, so it

18  just asks a series of questions to see if the shareholder has

19  qualified for the exemption.

20  Q.  Would these questions be pertinent to whether those

21  13 billion shares were properly issued in September of 2015 as

22  free-trading shares?

23  A.  Yes.

24          MR. SZOTT:  So I'd like to ask you, Mr. Davila, to

25  bring up, side-by-side with 319, Exhibit 25.2.

1          On your screen now, Mr. Scoufis, on the left side is

2    Government Exhibit 25.2, and then Exhibit 319 remains on the

3    right.

4          Exhibit 25.2 is already received in evidence.

5          It's an opinion letter dated September 23 of 2015.

6          Mr. Davila, can we please go to page 2 of

7    Exhibit 25.2?

8          And then, Mr. Davila, if you'd please magnify the

9    second paragraph there, paragraph 2 in the -- on page 2.

10   BY MR. SZOTT:

11   Q.  Mr. Scoufis, would you please read the sentence beginning

12   "The company is not" which I have marked there in paragraph 2.

13   A.  Sure.

14          "The company is not, and has never been, a 'shell

15   company,' as described in paragraphs Roman numeral (i)(1)(i)

16   and Roman numeral (ii) of Rule 144."

17   Q.  Thank you.

18          MR. SZOTT:  Mr. Davila, you can remove the

19   magnification, please.

20   BY MR. SZOTT:

21   Q.  Mr. Scoufis, how does that aspect of this letter relate to

22   the flowchart that was displayed on the right side of the

23   screen?

24   A.  So that's relating to the -- the shell company and the

25   requirement that under Rule 144 a company not be a shell

1    company, NuTech not be a shell company.

2          So we're looking at that first blue box, "Does NERG

3    have operations and assets?"

4    Q.  So if NuTech is, in fact, a shell company, where does that

5    end up on the flowchart?

6    A.  So you'd follow that -- that red line.  And we can see, in

7    the red box, "The holder may not sell the shares in a public

8    market."

9    Q.  So if we're in the red box, would it be proper to issue

10   free-trading shares in September of 2015?

11   A.  No.

12   Q.  I'd like to move now to -- we'll stay with this current

13   display.

14          MR. SZOTT:  Mr. Davila, would you once again magnify

15   paragraph 2 of the letter on the left side of the screen.

16   BY MR. SZOTT:

17   Q.  And I'm going to ask you to read another sentence,

18   Mr. Scoufis.

19          The one -- the sentence that I'm -- beginning here,

20   "NuTech Energy" at the right side of the paragraph that I've

21   indicated, would you please read that sentence.

22   A.  Sure.

23          "NuTech Energy satisfies the current public

24   information requirement by making 'publicly available' the

25   information specified in Rule 15c2-11(a)(5) Roman numeral (i)

1   to (xiv) and Roman numeral (xvi)" -- yes.

2   Q.  Thank you.

3        MR. SZOTT:  Mr. Davila, would you remove the

4   magnification, please.

5   BY MR. SZOTT:

6   Q.  Mr. Scoufis, how does that aspect of this opinion letter

7   relate to the flowchart that's on the right side of the

8   screen?

9   A.  Then we're just moving down to the second blue box that

10  says "Has NERG made required company information publicly

11  available?"

12  Q.  So if the answer to that question is no, where do we end

13  up on the flowchart?

14  A.  Yeah.  Again, we end up in the red box and shares cannot

15  be free trading under Rule 144.

16  Q.  But if the answer to that question is yes, then what do we

17  do on the flowchart?

18  A.  Yeah.  If information is publicly available, then we -- we

19  move down to the next box.

20  Q.  And would you reacquaint the jury with the significance

21  under 1 -- or Rule 144 of the question that's posed in that

22  third blue box.

23  A.  Yeah.  So it says "Has at least one year passed since the

24  securities were last acquired from NERG or an affiliate of

25  NERG (including any applicable tacking period)?"

1    Q.   Is that a reference to the holding period?

2    A.   Correct.  Yeah.  So for NERG, the holding period is

3    a year.  The shares must be held for a year.  The shares --

4    the -- a shareholder could tack onto somebody they acquired

5    the shares from if that prior holder was not an affiliate.

6         Otherwise, they would need to hold the shares, the

7    restricted shares, for a year.

8    Q.   And, Mr. Scoufis, would you remind the jury how the

9    holding period would work if someone is exchanging a

10   convertible promissory note and receiving shares.

11   A.   Yeah.

12        If a convertible promissory note is converted into

13   shares of that company, then we would just treat the -- the

14   converted shares, for purposes of Rule 144, as if they're the

15   same as the note, the converted -- the convertible note.  So

16   the holder of those shares can use the holding period of the

17   note, as well, to satisfy the holding period requirement.

18   Q.   So before I ask you questions about how Rule 144's holding

19   period might have applied to this situation, the NuTech

20   issuance, I'd like to review some of the facts that were

21   presented in connection with that issuance.

22        MR. SZOTT:  So, Mr. Davila, if you could go back to

23   page 1 of Exhibit 25.2, which is there on the left side, and

24   would you magnify, please, Mr. Davila, this portion of the

25   letter, the top about half under the greeting.

1   BY MR. SZOTT:

2   Q.  Mr. Scoufis, would you please read what's on the screen

3   here, begins with "The subject" which I've indicated there on

4   the screen.

5   A.  "The subject of this opinion are the 13,035,060,000 shares

6   of common stock to be issued upon conversion of a convertible

7   promissory note (the notes) originally issued in June of 2008.

8   There were separate contracts consisting of convertible notes

9   and consulting agreements issued by the company on June 8th,

10  2008.  The parties to those contracts were:  Gordon Pardy, a

11  single man residing in Maricopa County; and, 2, Arizona,

12  David Rodgers, a single man residing in Maricopa County,

13  Arizona; and, 3, E-Pro Systems, LLC -- Pardy and Rodgers

14  formed E-Pro Systems and assigned all convertible notes and

15  consulting agreements from themselves to their jointly formed

16  E-Pro Systems, LLC."

17  Q.  Thank you, Mr. Scoufis.

18       MR. SZOTT:  Mr. Davila, would you take down

19  Exhibit 25.2 and please bring up Exhibit 18.8.

20  BY MR. SZOTT:

21  Q.  So this has already been received in evidence,

22  Government's Exhibit 18.8.  Based on the top of the exhibit,

23  Mr. Scoufis, this convertible note bears what date?

24  A.  June 26th, 2008.

25  Q.  And who is the holder who's mentioned at the top of the

1  note?

2  A.  Gordon Pardy.

3          MR. SZOTT:  Let's go to 18.9.

4  BY MR. SZOTT:

5  Q.  Same questions, Mr. Scoufis:  What is the date?

6  A.  June 26th, 2008.

7  Q.  And who is the named holder?

8  A.  David Rodgers.

9          MR. SZOTT:  Mr. Davila, would you please bring up

10  Exhibit 18.1.

11          Would you scroll, please, to page 2.

12  BY MR. SZOTT:

13  Q.  Based on page 2, Mr. Scoufis, this appears to be an email

14  from Justin Herman to Joslyn Claiborne?

15  A.  Yes.

16          MR. SZOTT:  Mr. Davila, would you go to page 6,

17  please.

18  BY MR. SZOTT:

19  Q.  And, Mr. Scoufis, would you read the second sentence under

20  this number 5 which is here on page 6.

21  A.  "You will notice that the debt was with EcoEmissions,

22  which was/is, the issuer then and thus now."

23  Q.  Actually -- I'm sorry.  I was actually intending the prior

24  sentence after the ellipsis.

25  A.  Okay.  Sorry.  All right.

1          "The debt in this case is the Rodgers piece, which

2    upon acceleration, penalties, pricing, and well considerations

3    add up to the issuance."

4          MR. SZOTT:  Now, Mr. Davila, can we please bring up

5    22.8?

6    BY MR. SZOTT:

7    Q.  And I would note, Mr. Scoufis, you corrected the typo in

8    that when you read it.

9    A.  Yes.

10         MR. SZOTT:  Mr. Davila, would you please magnify the

11   top half of the exhibit.  This is Government's 22.8.

12   BY MR. SZOTT:

13   Q.   Mr. Scoufis, would you please read -- would you please

14   read the substance of this between the "Notice of Conversion"

15   and the date.

16   A.   "The undersigned, the holder of the convertible not [sic]

17   dated June 26th, 2008, hereby surrenders such for one note for

18   conversion into 13,035,060,000 shares of the nonrestricted

19   common stock of NuTech Energy Resources, Inc., in exchange of

20   the principal balance of the note and any and all unpaid and

21   accrued interest thereon representing the total unpaid

22   principal and interest amount of such note, and requests that

23   the certificates for such shares be issued as instructed in

24   the attached spreadsheet.  Note conversion rate is .0001 USD

25   share."

1  Q.  And what are the names that are listed below in the

2  respective signature blocks?

3  A.  Justin Herman and Robert Mitchell.

4  Q.  So, Mr. Scoufis, according to the notice of conversion,

5  how was it that these 13 billion, approximately, free-trading

6  shares were to be issued?

7  A.  So it appears that one note was converted into the

8  approximately 13 billion shares.

9         MR. SZOTT:  Mr. Davila, let's bring up Exhibit 11.1.

10        And, actually, let's wait for just a moment on --

11  never mind.

12        Let's go to page 2.

13        So this -- page 2 here, we see "Debt Assignment

14  Agreement."

15        Mr. Davila, if you would scroll down to capture the

16  signature portion of this -- this document.

17  BY MR. SZOTT:

18  Q.  Mr. Scoufis, are you able to see now what's displayed as

19  part of page 5, part of page 6 of Government Exhibit 11.1 with

20  dates and signatures?

21        Are you able to see that on your monitor?

22  A.  Yes.

23  Q.  When are the -- when are the signatures indicated by the

24  dates?

25  A.  I see dates for Gordon Pardy January 2nd, 2015;

1    David Rodgers, January 8th, 2015; E-Pro Systems, January 8th,

2    2015; EcoEmissions Solutions, December 30th, 2014; and

3    EcoEmissions Systems, December 30th, 2014.  And then, finally,

4    Justin Herman and -- I'm not seeing a date.

5    Q.  So for purposes of the questions I'm going to ask about

6    the holding period, I'd like to assume the following facts

7    based on these documents we just went through:  Assume that

8    Justin Herman and/or Bravo Two Zero Partners is exchanging one

9    of these E-Pro Systems convertible promissory notes for the

10   approximately 13 billion shares of NuTech stock and assume

11   that Justin Herman and/or Bravo Two Zero Partners has been

12   holding these notes since January of 2015.

13        Would you agree that that setup is generally

14   consistent with the documents we just reviewed?

15   A.  Yes.

16   Q.  So in this scenario, what would be the starting date for

17   the one-year holding period under Rule 144?

18   A.  Based on the document in front of us, this debt assignment

19   agreement, we'd look at the latest date of these signatures,

20   January 8th, 2015.  So that's the -- the acquisition, so the

21   one-year holding period would start on January 8th, 2015.

22        MR. SZOTT:  Now, let me ask you, Mr. Davila -- let's

23   bring up 319 again, side-by-side.

24   BY MR. SZOTT:

25   Q.  So, Mr. Scoufis, now on the right side of the screen is

1    319.  I'll draw your attention back to that third blue box.

2              In -- in giving your opinion that the holding period

3    would have started in January of 2015 with reference to this

4    third blue box, are you relying on a further opinion that has

5    to do with the affiliate status of E-Pro Systems and/or Gordon

6    Pardy and David Rodgers?

7    A.   Yeah.  I mean, if the holding period starts in January of

8    2015, then Rule 144 could not be relied upon to issue shares

9    on September 28th, 2015, because that's not a year.

10             So the only other possibility would be to try to tack

11   back to the prior holder and use the prior holder's period and

12   add it onto your own to satisfy that one-year holding period

13   requirement.

14   Q.   And the prior holder here is E-Pro Systems?

15   A.   Yes.

16   Q.   And so when you're trying to tack onto the prior holder,

17   what is the relevance, if any, of the prior holder's affiliate

18   status?

19   A.   Current holder can only tack onto a nonaffiliate prior

20   holder.  So E-Pro Systems -- in order to tack onto E-Pro

21   Systems' holding period, E-Pro Systems would have to not be an

22   affiliate.

23             MR. SZOTT:  Mr. Davila, can we bring up 313 on the

24   left side of the screen, please -- or let's just bring up 313.

25   ///

1  BY MR. SZOTT:

2  Q.  So, Mr. Scoufis, we now have 313 on the screen.

3       So you just mentioned that you can't tack onto the

4  holding period of an affiliate.  Based on your review of

5  materials in this case, why might a person who was looking at

6  this transaction have believed that E-Pro Systems and/or Pardy

7  and Rodgers were affiliates, which would prevent tacking onto

8  their holding period?

9  A.  Going back to what I think I testified the first time, an

10  affiliate is somebody who controls or is controlled by an

11  issuer.  And then to look at control, we're looking at people

12  that have the duties of CEO or directors or large

13  shareholders, generally, more than 10 percent owning or being

14  able to convert into more than 10 percent of the outstanding

15  shares.  You know, especially due to the voting rights of

16  stock.  They can control the company.

17       So when we look at the past documents and it looks

18  like one note was converted into 13 billion shares and that's

19  30 percent of the outstanding shares, that would make me think

20  whoever holds that note would be an affiliate.

21  Q.  And so if E-Pro Systems is an affiliate and those notes

22  were assigned to Justin Herman and/or Bravo Two Zero in

23  January of 2015, then how long before the one-year holding

24  period would have expired?

25  A.  In -- in January -- on January 1 of 2015 is the

19-CR-26-ABJ    SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1227
21-CR-14-ABJ

1    assignment?  Is that what you said?

2    Q.  Well, I -- I didn't say.  But let's just say that the --

3    the -- the notes are assigned to Bravo Two Zero and/or

4    Justin Herman in January of 2015.  And E-Pro Systems is an

5    affiliate.

6         Under that scenario, how long before the holding

7    period would have expired?

8    A.  So we'd have to wait a year because it's suggesting that

9    E-Pro, by holding that note that's convertible into 30 percent

10   of the outstanding shares, is an affiliate so we can't tack

11   back.  So the holding period starts January of 2015 and would

12   go to January of 2016.

13   Q.  So could -- under that scenario, could free-trading shares

14   be issued in September of 2015?

15   A.  No.

16        MR. SZOTT:  Mr. Davila, I'd like to ask you to bring

17   up side-by-side Exhibits 11.1 and 11.2.

18        And then let's please go to the signature portions of

19   each exhibit.

20   BY MR. SZOTT:

21   Q.  So, Mr. Scoufis, now let's say that someone looking at

22   this transaction is looking on the right, Exhibit 11.2, the

23   signature portion.

24        If someone looking at this believed that

25   Justin Herman and/or Bravo Two Zero had been holding these

1    notes since January of 2014, how would that person have

2    assumed the one-year holding period would have applied?

3    A.  If we go to January 2014, the notes would have been held

4    for a year in January of 2015.  Yeah, wouldn't have to wait

5    until 2016.  They'd be ready to go January 2015.

6    Q.  Mr. Scoufis, in your experience investigating issues

7    related to Rule 144, have you previously seen instances of

8    documents being backdated?

9    A.  Yes.

10   Q.  And in your experience, when we're talking -- when you're

11   dealing with a restriction under Rule 144, what would be the

12   reason for backdating a document by one year?

13   A.  It is to satisfy the one-year holding period.

14          MR. SZOTT:  Mr. Davila, would you bring up

15   Exhibit 22.5, please.  And we'll -- we'll be on page 1.

16          And this is Exhibit 22.5 on the monitor.  It's

17   previously been received in evidence, an opinion letter dated

18   September 16, 2015.

19   BY MR. SZOTT:

20   Q.  Mr. Scoufis, I'd like you to read just one sentence of

21   this opinion letter here in the second lengthy paragraph

22   beginning "On January 14."

23   A.  Right.

24          "On January 14th, 2014, all of the contracts were

25   assigned to Bravo 20 Partners, LLC."

1          Keep going?

2  Q.  No.  That's enough.  Thank you.

3          MR. SZOTT:  Mr. Davila, we can take that down,

4  please.

5  BY MR. SZOTT:

6  Q.  So, Mr. Scoufis, you've just been testifying based on the

7  premise that E-Pro Systems -- Gordon Pardy, David Rodgers --

8  is an affiliate; correct?

9  A.  Correct.

10 Q.  Now, is there an alternative scenario where a person might

11 have thought that Rule 144's one-year holding period started

12 much earlier, as early as June of 2008?

13 A.  So there's two things to look at with the holding period.

14 One is just how long the current holder has held the note, the

15 stocks, and if they've held it for a year.

16         And if they haven't, then you'd look to see -- at the

17 prior holder to see how long they've held it and if they're an

18 affiliate.  If they're not an affiliate, then the current

19 holder can use the prior holder's holding period, so that's

20 what we would look at.

21         MR. SZOTT:  Can we bring up Exhibit 25.2, please?

22         And let's go to page 2.  Or I guess let's start with

23 page 1.  I'm sorry.

24         So this, again, the opinion letter -- it's on the

25 monitors now dated September 23rd, 2015.

 1              Let's go to page 2, please, Mr. Davila.

 2              And if you would please magnify paragraph 4.

 3    BY MR. SZOTT:

 4    Q.  Mr. Scoufis, would you please read the last three

 5    sentences of paragraph 4, beginning where I've highlighted or

 6    underlined.

 7    A.  "NuTech Energy is a nonreporting entity, therefore the

 8    one-year holding period applies.  The holding period has been

 9    met for this issuance.  Notes and consulting agreements were

10    as of June of 2008."

11              MR. SZOTT:  Mr. Davila, would you now bring up

12    Exhibit 26.1, please.

13              This has previously been received in evidence, an

14    email from Mr. Herman to Ms. Claiborne dated September 26th,

15    2015.

16              Would you please scroll down, Mr. Davila.

17              And we now have page 2 showing on the monitors.

18    BY MR. SZOTT:

19    Q.  Mr. Scoufis, would you please read the bold caption at the

20    top of this document.

21    A.  "Statement of Nonaffiliation for Reporting or Nonreporting

22    Issuers."

23    Q.  And who does this purport to be from, according to the

24    header?

25    A.  E-Pro Systems, LLC.

1   Q.  And if you look at the bottom of the document, what are

2   the individual names that are listed below the signature

3   lines?

4   A.  David Rodgers and Gordon Pardy.

5   Q.  Mr. Scoufis, does a nonaffiliation statement like this --

6   well, actually, let me strike that.

7           MR. FLEENER:  Mr. Szott, what exhibit are we looking

8   at?  I'm sorry.

9           MR. SZOTT:  26.1.

10           MR. FLEENER:  Sorry.  I apologize.

11   BY MR. SZOTT:

12   Q.  So, Mr. Scoufis, let's suppose that someone looking at

13   this entire transaction believed that E-Pro Systems and/or

14   Mr. Rodgers and Mr. Pardy is not an affiliate of NuTech or

15   EcoEmissions.  So if they believed E-Pro is not an affiliate,

16   how would the one-year holding period appear to apply?

17   A.  If E-Pro Systems and Rodgers and Pardy are not

18   affiliates -- and just looking at this nonaffiliation letter

19   that they've signed -- you would think that the holding period

20   had started in June of 2008 when the notes were created.

21   Q.  Now, if someone has a private opinion that he's not an

22   affiliate and even were to sign a statement like this, would

23   that actually change his affiliate status or lack thereof?

24   A.  No.  It's important when we're looking at affiliates --

25   and what I like to say is facts and circumstances -- looking

1   at, really, what are the duties of a person.  You know, just

2   because they're named CEO doesn't make them necessarily an

3   affiliate, but having the duties of a CEO makes them an

4   affiliate.  You know, if you own over 10 percent of the

5   shares, very likely an affiliate.

6           And it doesn't matter that a nonaffiliation letter

7   was signed.  We're looking, really, at what happened.

8           MR. SZOTT:  Let's return to Exhibit 319, please.

9   BY MR. SZOTT:

10  Q.  So returning to the third box, Mr. Scoufis, based on what

11  you've just been -- based on the documents we've reviewed and

12  your testimony, what are the two ways in which this issuance

13  could continue moving down the blue side rather than ending up

14  in the red side vis-à-vis the one-year holding period?

15  A.  Yeah, so we're in that third box.  One-year holding period

16  has to be satisfied.

17          So if I were looking at these documents, potentially

18  it looks like the note was transferred in January of 2014.  So

19  by September 28th, 2015, it would appear the one-year holding

20  period has been satisfied.

21          If the notes had been acquired in January of 2015,

22  then we have to look back to the prior holder and so might

23  rely on the statement of nonaffiliation by E-Pro to understand

24  that the current holder of the note is able to tack back and

25  use the holding period of E-Pro Systems.

1        MR. SZOTT:  All right.  We can take that down.

2   Thank you, Mr. Davila.

3   BY MR. SZOTT:

4   Q.  So, Mr. Scoufis, now I'd like to transition.  You've been

5   testifying in relation to the issuance of free-trading shares.

6   Now I'd like to start asking questions related to the sale of

7   NERG shares beginning in November of 2015.

8        MR. SZOTT:  As a prelude to that, can we please bring

9   up Exhibit 317 again?

10  BY MR. SZOTT:

11  Q.  Mr. Scoufis, Exhibit 317, the demonstrative pie chart, is

12  now once again on the monitor.

13        Would you please explain the concept of controlling

14  the float as it would relate to what's depicted in

15  Government's Exhibit 317.

16  A.  Let me start with just with controlling the float.

17        You know, we talked about control of a company.

18  Controlling the float is very specific to having a lot or

19  control of a lot of the free-trading shares, shares that can

20  be traded through the public markets.

21        And it's important in a pump and dump that the

22  individuals doing the pump and dump have control of the float

23  because, if they don't, other individuals can -- can come in

24  and kind of take that artificially high price and sell into

25  the market and lower it.

1            So what we see here is, you know, with that 9/28 --

2    that September 28th, 2015, distribution of 13 billion shares,

3    now Bravo Two Zero -- or whoever owns that note or the --

4    now -- the converted shares -- has control of the float of

5    NuTech.

6    Q.   Before we continue, Mr. Scoufis, I'd like to ask you some

7    questions related to what are called blue sheets.

8            Just generally, what are blue sheets?

9    A.   Blue sheets are -- is -- refers to trading data.

10           It's a type of trading data that only FINRA and SEC

11   can request, and it's for a specific stock for a specific time

12   period.  They don't exist for all stocks and all time periods.

13   It has to be specifically requested.

14           In the blue sheet trading data for that specific

15   stock, specific time period, you'll see all of the trades

16   during that time period in that stock, down to customer-level

17   information.

18           So if I was buying shares of a company and blue sheet

19   data was requested, I would show up as having bought whatever

20   amount of shares, whatever price, proceeds.  It would include

21   my address, my account number.  Yeah, my brokerage firm,

22   everything.

23           So it's a very detailed look at trading.

24   Q.   And these data that are captured in the blue sheets, where

25   do these data come from?

19-CR-26-ABJ     SCOUFIS - FURTHER DIRECT - SZOTT     Vol. VIII-1235
21-CR-14-ABJ

1   A.  Yeah.  As I just mentioned, only FINRA and the SEC can

2   request it, so it has to come from FINRA or the SEC.  They

3   request it from the brokerage firms.

4         So once they do a blue sheet request, all the

5   brokerage firms that traded in that stock submit this

6   information to FINRA or the SEC, and then it's compiled into

7   just one spreadsheet.

8   Q.  Are brokerage firms required to comply with a request for

9   these data?

10  A.  Yes.

11  Q.  And how might investigators working for the SEC or FINRA

12  rely on blue sheet data?

13  A.  Well, blue sheet data provides a historical look at stock

14  trading.  So if they're looking -- you know, insider trading,

15  market manipulations, so -- you know, always going to start

16  with blue sheet data.

17  Q.  Now, in your position as a member of the CPAG portion of

18  FINRA, are you able, personally, to request blue sheet data?

19  A.  No, I'm not.  I'm walled off from the rest of FINRA.  I

20  can't see the blue sheets.  In my previous job, before I was

21  in this role, I was able to request blue sheets and did, but

22  currently I cannot see what FINRA has requested.

23  Q.  Would you explain to the jury any limitations or

24  imprecisions that may exist in blue sheet data based on your

25  experience in reading them.

1   A.   Yeah.  I mean, blue sheet data often is tens of thousands

2   of rows, hundreds of thousands of rows.  So as with anything,

3   there can be mistakes.

4        A common mistake that we'll see when reviewing blue

5   sheets is duplicated trades, and so you just kind of -- if

6   you're looking at individual trades, you can just identify

7   that, "Oh, it looks like the firm maybe submitted it twice."

8   But, otherwise, they're pretty -- pretty reliable.

9   Q.   Mr. Scoufis, if someone has experience in reviewing and

10  analyzing blue sheet data, is he or she generally able to

11  identify those duplicate entries and sort of just disregard

12  them or -- or make sure that you're looking at accurate data?

13  A.   Yeah.  It's just cleaning up the -- the blue sheets, yeah.

14  Once you identify it, you'll just figure out what's happening

15  and then can confirm it with the brokerage firm or request

16  additional documentation.

17       But, yeah, it's pretty easy to identify.

18  Q.   Mr. Scoufis, do blue sheet data reflect commissions that

19  may be paid in connection with a particular trade?

20  A.   No, not generally.

21       Yeah, it -- you know, trading shares, trading stock

22  isn't free.  You have to pay the brokerage firm.  Or in some

23  way the brokerage firm gets paid.  And blue sheets do not

24  reflect commissions.

25  Q.   Mr. Scoufis, did the SEC provide blue sheet -- blue sheet

1   data for ECMZ and NERG as part of this investigation?

2   A.  Yeah.  Think of it as the same set of blue sheet data

3   because the two -- two ticker symbols refer to the same

4   company.  There is just a change to NERG.

5   Q.  And do you recall what years are associated with these

6   blue sheet data?

7   A.  Yeah.  The SEC provided blue sheet data for 2015 through

8   2018, about midway through 2015 through midway through 2018.

9   Q.  Have you reviewed these data?

10  A.  Yes.

11  Q.  And did you rely on these data as part of your assistance

12  in this investigation?

13  A.  Yes.

14        MR. SZOTT:  Your Honor, may I approach the witness.

15        THE COURT:  Yes, you may.

16  BY MR. SZOTT:

17  Q.  Mr. Scoufis, I've handed you what's been marked for

18  identification as Government's Exhibit 1009.  Would you take

19  just a moment and examine that exhibit.

20  A.  Yep.

21  Q.  Do you recognize that?

22  A.  Yes.

23  Q.  What is it?

24  A.  It is a CD that contains the blue sheet data that we were

25  just discussing.  And I -- I watched the data get put on the

19-CR-26-ABJ     SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1238
21-CR-14-ABJ

1   CD.  Once it came out, I signed it, so this is it.

2   Q.  Mr. Scoufis, specifically the blue sheet data, what's the

3   file format that's contained on the CD?

4   A.  Excel.  It is a spreadsheet.

5           MR. SZOTT:  Your Honor, the Government offers

6   Exhibit 1009.

7           MR. FLEENER:  No objections.

8           THE COURT:  1009 is received.

9       (Government's Exhibit 1009 received into evidence.)

10          MR. SZOTT:  Your Honor, thank you.  May I have a

11  moment.

12          THE COURT:  You may.

13          MR. SZOTT:  Thank you.

14      (Discussion held at counsel table.)

15          MR. SZOTT:  Your Honor, thank you.  May I approach

16  the witness again.

17          THE COURT:  You may.

18  BY MR. SZOTT:

19  Q.  Mr. Scoufis, I've handed you what's been marked for

20  identification as Government's Exhibit 28.34.

21          MR. SZOTT:  Mr. Davila, would you please bring up the

22  first page on the monitors.  This is not yet in evidence.

23  BY MR. SZOTT:

24  Q.  Mr. Scoufis, I'd ask that you take just a moment and look

25  through the physical copy of 28.34, and then we'll probably

1    rely on the monitor when we discuss it a little more.

2    A.  Okay.

3         MR. SZOTT:  Mr. Davila, would you please magnify

4    again, for the witness only, about the top third of the page.

5    BY MR. SZOTT:

6    Q.  Mr. Scoufis, do you recognize what's been marked for

7    identification as Government Exhibit 28.34?

8    A.  Yes.

9    Q.  Generally, what is that exhibit?

10   A.  This is -- these are Skype chat messages between

11   Justin Herman, Robert Mitchell, Kada Mesli, and others

12   pertaining to trading in NuTech.

13   Q.  And I don't know how well you can see on the physical

14   copy.  It's not all that much better here.

15        But in the upper left here of page 1, can you see the

16   earliest date of the messages that are reflected in the

17   exhibit?

18   A.  Yeah, November 6th, 2015.

19        MR. SZOTT:  Mr. Davila, would you please remove the

20   magnification.

21        Go to page 8.

22        And if you would magnify, Mr. Davila, just that

23   narrow portion there in the lower left before the redaction.

24   BY MR. SZOTT:

25   Q.  Mr. Scoufis, could you see the date of the latest message

1    that's reflected in the exhibit?

2    A.  Yes, November 19th, 2015.

3    Q.  You mentioned the general subject matter.  Apart from

4    NERG, are there -- does the chat also reference UATG?

5    A.  Yeah.  There's a few references to UATG.

6    Q.  With respect to NERG, are there -- does the chat contain

7    references to specific trades of NERG?

8    A.  Yes.

9         MR. JUBIN:  Your Honor, I apologize for interrupting,

10   but it appears that that's not showing up on some of the

11   screens here.

12        MR. WARD:  These two.

13        MR. JUBIN:  These two monitors.

14    (Discussion held at counsel table.)

15        MR. WARD:  There we go.  Mine is.

16        THE COURT:  Thank you, Counsel.

17   BY MR. SZOTT:

18   Q.  Mr. Scoufis, have you reviewed the messages in

19   Government's Exhibit 28.34?

20   A.  Yes.

21   Q.  Does -- do the -- do the messages reflect at least some

22   discussions that appear to be occurring in realtime?

23   A.  Yes.

24   Q.  You mentioned references to specific trades of NERG.  Are

25   you aware that corresponding trades in NERG actually occurred?

1  A.  Yes.

2  Q.  And how do you know that?

3  A.  Comparing the messages, the information in the messages,

4  to the blue sheet trading data.

5  Q.  You mentioned some of the participants in the Skype chat.

6  To your knowledge, is Chuck Winters a participant in this

7  chat?

8  A.  No.

9  Q.  So he's not a participant so far as you know?

10  A.  Correct.

11      MR. SZOTT:  Your Honor, the Government would offer

12  Exhibit 28.34.

13      MR. FLEENER:  Objection; hearsay.

14      MR. SZOTT:  Your Honor, the -- the hearsay

15  objection's really not well-taken here.

16      THE COURT:  I think we need to argue this outside the

17  presence of the jury.

18      MR. SZOTT:  Happy to do so, Your Honor.

19      THE COURTROOM DEPUTY:  All rise.

20    (Proceedings outside the jury's presence at 9:55 a.m.)

21      THE COURT:  Please be seated.

22      I have a couple questions.

23      When was this document provided to the defense?

24      MR. SZOTT:  Your Honor, this was part of the

25  Government's initial discovery in this case.

1          THE COURT:  It was given to the defense?

2          MR. SZOTT:  Yes, Your Honor.

3          THE COURT:  Years ago?

4          MR. SZOTT:  I -- I'm not sure exactly when,

5    Your Honor, but it's been some time ago.

6          THE COURT:  At least last fall.

7          Was a notice provided concerning other issues of

8    reliability concerning this document?

9          MR. SZOTT:  I -- may I have a moment, Your Honor.

10         THE COURT:  Yeah.  Other indicia of reliability.

11         MR. HEIMANN:  Your Honor, if I may, prior testimony

12   has shown this document was taken from Bob Mitchell's

13   computer.  And we've shown through subscriber records who's

14   involved with the various names.

15         I don't know that I understand what sort of notice

16   you're asking about.

17         THE COURT:  Well, I assume you're asserting that this

18   has other indicia of reliability.

19         MR. HEIMANN:  Your Honor, I believe we are going to

20   end up with trade data from other sources that matches up with

21   texts here.  And in terms of reliability, it also will show up

22   in trading conversations here that are shown in the blue

23   sheets.

24         Is that what you're getting at, Your Honor?

25         THE COURT:  That's the kind of information.

1           MR. HEIMANN:  Yeah.  I mean, that's where we're going

2    to end up.

3           THE COURT:  All right.

4           MR. FLEENER:  I -- I objected, Your Honor --

5           THE COURT:  The hearsay objection you made.

6           MR. FLEENER:  I did.  And I'd also -- I mean,

7    I would -- you know, this document, whether it's admitted or

8    not, I would object to the foundation.

9           There -- it would appear to contain, on its face,

10   30 or so purported different Skypers, but there's been no

11   foundation laid as to who -- whether these people are even

12   real in the first place or whether it's the same person.  The

13   information that the alleged -- that these Skypers are saying

14   would be hearsay if they are, in fact, real people.  I mean,

15   I -- I understand why the United States want it and I -- wants

16   it -- into evidence and I would, too.

17          But it -- it contains hearsay without an exception,

18   and there's been no foundation.  I don't think they can lay a

19   foundation through this witness as to what all -- who all

20   these purported people are and what they're actually saying.

21          And they can't even lay a foundation.  I don't --

22   maybe they can lay a foundation that -- tangentially and

23   logically -- that one of them may be Justin Herman by what

24   Mr. Heimann and Mr. Szott said, that they could tie the -- the

25   conversations to trades.  Maybe.  They haven't done it yet.

1           But they still can't -- this entire document

2    doesn't -- the entire document itself is full of -- of things

3    that can't be identified and authenticated or done anything

4    else with.  So you'd have confrontation issues, as well,

5    without a right to confront any of these people about what

6    they say about any of this stuff.

7           MR. SZOTT:  Your Honor, I don't think any of this

8    would be testimonial.  So the confrontation issue, unless the

9    law has changed, I think is a nonstarter.  Many of

10   Mr. Fleener's points, Your Honor, go to weight rather than

11   admissibility.

12          There's no requirement that I'm aware of that

13   every -- every participant would be identified.  He's

14   certainly free to raise such arguments.

15          The foundation objections seem late.  The

16   Government's already laid the foundation.  The foundational

17   witnesses were here.  Mr. Scoufis is not a foundational

18   witness for this particular document.  But, again, that

19   foundation's been laid.

20          In terms of the hearsay, Mr. Herman's statements here

21   on the chat -- I think, certainly, the Government's provided

22   by -- it's more likely than not that individual is

23   Justin Herman.  Those statements would be admissible against

24   him.

25          He likely will ask the Court, Your Honor, to make the

1   coconspirator hearsay findings, which would permit other

2   people's statements involved in this chat to be offered

3   against any member of the conspiracy.

4        And, Your Honor, the other thing is we're talking

5   about conversations in realtime where assertions by other

6   people or whatever -- I'm not sure how you would have

7   fictitious people participating in a message but -- assertions

8   by whomever they may be would be offered for their effect on

9   other participants in the conversation, not necessarily the

10  truth of the matter asserted.

11       They may also come in under 803(3), the hearsay

12  exception, "A statement of the declarant's then-existing state

13  of mind, such as motive, intent, or plan, but not including a

14  statement of memory or belief to prove the fact remembered."

15  I ellipsed the parenthetical section there, Your Honor.

16       THE COURT:  You provide something here that I can't

17  even read, so I have no idea what's on this except for a small

18  portion that was blown up that involved one or a couple of

19  calls or Skypes between Mr. Herman and, I presume,

20  Mr. Mitchell.

21       MR. SZOTT:  Your Honor, I understand that the -- the

22  print is very small.  And in terms of presenting it, we

23  actually have a summary or pedagogical exhibit that will make

24  selected messages easier to read.  I think we'll probably need

25  to discuss that, too.

19-CR-26-ABJ      SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1246
21-CR-14-ABJ

1          This was the exhibit, Your Honor, we discussed

2    previously where we had provided it through JERS and the text

3    could have been magnified in PDF.  So it is possible with the

4    use of a computer to blow these up so that they're clearly

5    readable.  But I -- Your Honor, I agree.  The way it's

6    presented on the page is -- is difficult to read.

7          THE COURT:  It makes it very difficult for a Judge to

8    be able to make any conclusion from the -- what you've

9    provided me at this point.

10          And -- and I really don't know what you're talking

11    about in terms of other people on conversations.  Maybe give

12    me an example or something that you're talking about.

13          MR. SZOTT:  May I retrieve the exhibit, Your Honor.

14          THE COURT:  Pardon me?

15          MR. SZOTT:  May I retrieve the hard copy.  I think it

16    would help me if I could see it.

17          THE COURT:  Yeah.

18          MR. SZOTT:  Mr. Davila, if we could go to page 2,

19    please.

20          Let's try magnifying that.  Maybe only -- only this

21    portion.

22          So this is one section, Your Honor, just as a

23    representative example:

24          "Kada Mesli:  Justin, please put offer for 900K at

25    4.3."

 1          Mr. Herman:  ".0043," then question mark.

 2          "Mesli:  Yes.

 3          "Mesli:  900,000 shares offer at .0043."

 4          And then Mr. Herman:  "On with trade desk . . . .

 5   phone."

 6          And then the United States, again, from -- from -- as

 7   Mr. Heimann was mentioning -- from trading data will show that

 8   that trade actually took place.

 9          So that's the sort of -- that's the sort of

10   conversations we're talking about.  And that -- I mean,

11   conversations like that are throughout the -- throughout the

12   chat, Your Honor.  Obviously, not exactly the same but

13   comparable-type conversations about trading the stock.

14      (Discussion held at counsel table.)

15          THE COURT:  All right.  We'll stand in recess for a

16   short while -- let's make it 15 minutes, midmorning -- and

17   I'll rule.

18      (A recess was taken from 10:06 a.m. to 10:32 a.m.)

19          THE COURT:  Thank you.  Please be seated.

20          As an initial matter concerning the admissibility of

21   Exhibit 28.34, which is a summary of Skype conversations

22   reflected on -- that were discovered on the -- a computer

23   seized from Codefendant Bob Mitchell or Robert Mitchell, it

24   appears to me that there is a basis to receive this document

25   provided that the pertinent portions of these conversations

1   that are referred to by the Government are, in fact,

2   substantiated by activity or trades -- it doesn't have to be

3   trades necessarily but -- activity that can be independently

4   established under Rule 105.

5          I'll receive it under that kind of limited

6   arrangement, additionally finding in this case that at this

7   point in the evidence the Court is able to determine that this

8   conduct was -- at least facially there is evidence in the

9   record that would establish or -- or allow a finding by the

10  Court that these defendants were coconspirators, that this

11  conduct was occurring in the course of the conspiracy and in

12  furtherance of -- of the conspiracy that is alleged in the

13  second superseding indictment in this case, and -- and that

14  the comments were made -- or statements -- were made during

15  the period of the conspiracy.

16         So with that comment, I will receive the exhibit with

17  the limitation that I will strike it unless you are able to

18  tie it to other evidence, these comments.

19         MR. SZOTT:  Your Honor, I understand and -- there's

20  another issue I'd like to address with the Court before we

21  bring the jury in, and it relates really directly to the

22  Court's ruling.

23         As a means of presenting pertinent messages to the

24  jury and placing them in context with other evidence, all of

25  which I believe has been admitted, Mr. Scoufis prepared a

1   chart which has long been provided to defense counsel,

2   although, the final version, some date -- or some time stamps

3   were corrected very recently.

4        But in substance, they've had this for a long time,

5   which reflects pertinent messages and other events, which

6   I would intend to offer as a pedagogical chart.  It might --

7   well, that was my intent, Your Honor, at minimum as a

8   demonstrative.

9        So I think maybe before we bring the jury in if I --

10  again, I apologize for taking the additional time.  But if we

11  were to display that for the Court and Mr. Scoufis can briefly

12  explain it -- because my intent with the next phase of the

13  direct examination was to go through pertinent messages and

14  provide that additional context to link those messages to

15  other evidence in the case.

16        THE COURT:  Well, if it -- if nothing else, it would

17  be helpful to me.

18        MR. SZOTT:  Would you bring up 28.1, please,

19  Mr. Davila.

20        And may I voir dire the witness on the exhibit,

21  Your Honor.

22        THE COURT:  You may.

23                    **VOIR DIRE EXAMINATION**

24  **BY MR. SZOTT:**

25  Q.  Mr. Scoufis, are you able to see Exhibit 28.1 on your

 1   monitor?

 2   A.  Sorry.  I wasn't thinking.

 3        Yes.

 4        MR. SZOTT:  And, Mr. Davila, if we could scroll

 5   relatively slowly through the seven pages -- or click through

 6   them, I mean.  I think just a page at a time would be fine.

 7        THE COURT:  I would note, also, although it was not

 8   argued by any side of this case, there was some reference made

 9   in the arguments presented by counsel for the defendant

10   Mr. Herman, Mr. Fleener -- it seems to me that the statements

11   made by third persons in these conversations logically would

12   fall into the consideration by the Court under Rule 106 as

13   surrounding circumstances in connection with the conversation

14   to provide context.

15        Does that make sense?  I didn't say it very well.

16        MR. SZOTT:  I agree, Your Honor, and, obviously,

17   will -- it sounds like we'll get to know the rule of

18   completeness pretty well here later today.

19        THE COURT:  We're going to talk a lot about it maybe.

20   BY MR. SZOTT:

21   Q.  So, Mr. Scoufis, for the Court's benefit and defense

22   counsel's, we're on page 1 of the exhibit again.  Would you

23   explain the white rows on the exhibit.  What's in the white

24   rows?

25   A.  The white rows are Skype messages.

1  Q.  And did you take those from the Skype chat, Exhibit 28.34?

2  A.  Yes.

3  Q.  What about the rows where we see "Email Blast (OTC)"?

4  A.  Those are emails that came from OTC Markets.  My

5  understanding is that they re- -- they receive promotional

6  emails, and so I've included --

7          THE COURT:  "They receive," you say.  Who's "they"?

8          THE WITNESS:  OTC Markets received these promotional

9  emails, so I've included them as -- with just the day, time,

10  and that they're an email blast.

11          MR. SZOTT:  There was testimony from Mr. Colglazier

12  about that, I believe, Your Honor.  I believe that was where

13  he was mentioning the proprietary way that OTC Markets

14  monitors these things.

15          THE COURT:  How does that arrive here, though?

16  BY MR. SZOTT:

17  Q.  Mr. Scoufis, when you prepared this chart, you were

18  relying on exhibits, the Government's intended trial exhibits?

19  A.  Correct.

20          MR. SZOTT:  Your Honor, I believe that everything

21  reflected in here is already in evidence, that these are --

22  these are exhibits that have already been received.

23  BY MR. SZOTT:

24  Q.  Mr. Scoufis, the green lines where we see -- for example,

25  that first one, a stock purchase.  Where does that information

1   come from?

2   A.   That comes from the blue sheets.

3   Q.   These blue rows where we have an email, what did you do

4   to -- to insert those in the -- in the summary?

5   A.   So the emails, blue rows, that comes from FinTech

6   Securities or 20 -- Exhibits 28.26 and 28.27 for other emails.

7   There -- it's those two exhibits.

8   Q.   And, again, you're relying on the Government's trial

9   exhibits to put those in the chart?

10  A.   Correct.

11         MR. SZOTT:  Would you scroll down, please,

12  Mr. Davila.

13  BY MR. SZOTT:

14  Q.   The yellow lines here where we have stock sales that are

15  indicated, why, Mr. -- or where did you get that information,

16  Mr. Scoufis?

17  A.   Blue sheets.

18  Q.   Now, I note that on these yellow lines --

19         THE COURT:  And that's Exhibit 1009 --

20         MR. SZOTT:  That's correct, Your Honor.

21         THE COURT:  -- correct?

22         MR. SZOTT:  Please strike my answer to the question,

23  Your Honor.

24         THE WITNESS:  Yes, I've seen it.  1009.

25         THE COURT:  Go ahead.  Sorry.

1        MR. SZOTT:  I just didn't want to be a witness.

2   BY MR. SZOTT:

3   Q.  Mr. Scoufis, is there a reason there aren't time stamps on

4   these Intrepid stock sales that are in the yellow lines?

5   A.  Yes.  The blue sheets don't have time stamps for the stock

6   sales, so they just provide the date, and I just put them

7   at -- anything without a time stamp is just put at the end of

8   the day because we don't know.

9   Q.  And that's for Intrepid?

10  A.  That's for Intrepid, right.

11  Q.  What about the one immediately above it, the purchase in

12  the green lines?  Those do have time stamps.  Were those

13  available in blue sheets for those particular transactions?

14  A.  Yeah, that's right.

15        MR. SZOTT:  Would you scroll down, Mr. Davila.

16        May I have a moment, Your Honor.

17  BY MR. SZOTT:

18  Q.  If you're on page 6, Mr. Scoufis, there's a NERG press

19  release in that sort of peach color.  Where did that come

20  from?

21  A.  That comes from West Corporation, that they have --

22  they're the issuer of the -- not the issuer.  The -- they put

23  out the press release on behalf of NuTech.

24        MR. SZOTT:  Mr. Davila, would you please go back to

25  page 2, please.

1    BY MR. SZOTT:

2    Q.  So this --

3          MR. SZOTT:  I just would note, Your Honor, that the

4    second to the bottom we see that 900,000 NERG shares at .0043.

5    That's a transaction that actually occurred.

6          If we go back to the first place -- piece -- first

7    page, please, Mr. Davila.

8          This is that conversation I was bringing up,

9    Your Honor, on the actual Skype, where you can see at

10   11:09 a.m. "Put offer for 900K at 4.3," and then it's

11   clarified that they mean .0043.  There's some discussion of it

12   later, and then the trade actually happens, so that's the sort

13   of connecting information that's reflected here.

14   BY MR. SZOTT:

15   Q.  Mr. Scoufis, you selected messages from the Skype chat to

16   include in this summary; is that correct?

17   A.  That's correct.  It's not all of the Skype messages.

18         MR. SZOTT:  On voir dire, Your Honor, for this

19   exhibit I think that's all I have.

20         MR. FLEENER:  Thank you, Judge.

21                    **VOIR DIRE EXAMINATION**

22   **BY MR. FLEENER**:

23   Q.  As far as the -- the beginning of Exhibit 28.1, throughout

24   your investigation do you have any evidence that ties these

25   three defendants to any of the email blasts?  Or is the email

1  blast just because somebody somewhere sent emails?

2  A.   That's -- that's making me wrack my brain.

3  Q.   Because I don't think you do, but that's why I asked the

4  question, that you have no -- that there's no evidence that

5  ties any of these defendants to this -- to email blasts

6  at all.

7  A.   I don't think that I've seen anything.

8  Q.   And the -- you're saying that -- as far as the Skype

9  messages, Mr. Scoufis, the Skype messages in 28.1 you're

10  saying you pulled off of 28.34?

11  A.   Actually, let me -- can we back up to that last question?

12  Now that I think -- I --

13  Q.   Sure.

14  A.   I believe in this there is a Skype message that seems to

15  refer to an email blast, and I -- I think that that's probably

16  the only instance where we see something like that.

17  Q.   So there's a -- was it by these guys or was it --

18  A.   Yeah.  So I don't control this.

19       Okay.  Actually, yeah.  So if -- on this page --

20  we're on page 2.

21  Q.   Uh-huh.

22  A.   Towards the middle, on November 6th --

23  Q.   Yeah.  12:08?

24  A.   -- there's a Kada Mesli Skype message that says "Midday

25  coverage just went out.  Spoke to Mike and considering Herm

 1  actually captured a little" -- all right.  Let that go.

 2          But then two minutes earlier we see an email blast,

 3  and I believe that "midday coverage" refers to the email

 4  blast.

 5  Q.  Okay.  Do you know that for sure, or are you just --

 6  A.  No, I -- yeah.

 7  Q.  All right.  The --

 8          MR. FLEENER:  Can you go to -- please -- to page 1 of

 9  that exhibit?  I'm sorry.  I don't want to make you do my

10  work, but it's just easier for everybody, I think.

11  BY MR. FLEENER:

12  Q.  The -- the text mess- -- or excuse me; "the text

13  messages."

14          The Skype messages that are -- that you reflect here,

15  that information is taken from Exhibit 28.34, the -- the big

16  Skype?

17          The Skype messages that you have here --

18  A.  The one --

19  Q.  -- come from the big Skype exhibit?

20  A.  Correct.

21  Q.  And this could be just a matter of . . .

22          MR. FLEENER:  Give me just one second, please, Judge.

23  BY MR. FLEENER:

24  Q.  I'll just ask the question because we're just talking

25  about foundation.  I don't see the -- to me, the times don't

 1    match up.  I don't even see some of these messages.

 2           Like the very first message that you list on 28.1, it

 3    says 9:14:07 a.m. from Justin Herman Skype, "He wants to place

 4    orders."  I know there's time zone issues, as well, and

 5    conversions from one to another, but I don't see that

 6    message -- I don't see a 9:14:07, 8:14 -- I mean, I see

 7    nothing that relates to that in 28.34.

 8           Can you point where I'm wrong?

 9    A.  I don't have anything in front of me to --

10    Q.  You don't have 38 -- 28.34 in front of you?

11    A.  I don't.

12           But you're right that there are time zone issues, and

13    they're converted to Eastern from the Skype messages, the --

14    the PDF.

15    Q.  But I don't see -- I mean, for instance -- do you have

16    28.34 in front of you at all?

17    A.  I don't, no.

18           MR. FLEENER:  Do you want to give it to him?

19           Can -- can Mr. Szott give it to him?

20           THE COURT:  You may approach.

21           THE WITNESS:  And a magnifying glass.

22    BY MR. FLEENER:

23    Q.  Can you just -- there's -- and I know now you're going to

24    have -- it's a good thing you're young.

25           But just point out to me, please, where that 9:14:07

1  message that's in 28.1 -- I'm sure you didn't just make it up,

2  so I'd just like to know where it is in . . . 28.34.

3  A.  All right.  So it is Row 28 on -- in 28.34.

4  Q.  Okay.  You answered that question for me.  Thank you.

5          MR. FLEENER:  Can I approach and retrieve the

6  exhibit?

7          THE COURT:  You may.

8          MR. FLEENER:  Thank you.

9          THE WITNESS:  Thank you.

10          MR. FLEENER:  Your Honor, going back to the --

11  I guess voir diring the witness on -- I have nothing else to

12  voir dire the witness on on 28-1.

13          I would object to its use.  I believe that there's

14  not a proper foundation to tie these defendants to all this

15  email blast stuff.

16          I don't have a problem, necessarily, with the -- the

17  blue trading, the white -- I mean, I think that that's tied

18  clearly to exhibits that have been admitted into evidence.

19  For instance, in the middle of 28-1, you know, the email

20  Winters to Gilleland, I recall that email.  And so I think

21  that's probably a proper summation -- or -- or whether this is

22  going to be a summary or whether it's going to be just a

23  visual aid, I believe something like that would be

24  substantiated.

25          For them to -- for the United States to include all

1    the different email blasts -- and, really, the only -- the

2    only -- the only thing they have to tie any of these

3    defendants to an email blast wasn't even made by any of these

4    defendants.  It's the inference that "Midday coverage just

5    went out, spoke to Mike."  That's just not sufficient in order

6    to -- and it would violate 403, quite frankly, to allow the

7    email blasts in there.

8            They're trying to tie the email blasts to trading.

9    And while that may very well be true -- I have no idea -- the

10   evidence doesn't support that.

11           MR. SZOTT:  I would only say, Your Honor, that --

12   that all these have been admitted.  All the chart does is sort

13   of summarize their -- put them in time context.  I mean, the

14   email blasts themselves are already in evidence.

15           So, really, this is just a -- this would be a -- this

16   is just a -- well, I'm not -- I mean, it -- it helps to see

17   it.  But in terms of a presentation, it's a much more

18   efficient way to present all this rather than pulling up every

19   native exhibit or selected exhibits.

20           Anyway, the bottom line is, Your Honor, the

21   Government feels this is helpful, this would be helpful for

22   the jury to, at minimum, see it while Mr. Scoufis is

23   testifying about the time line.  And, again, it ties together

24   some of the concerns the Court had in conditionally receiving

25   that Skype chat.

1          THE COURT:  Exhibit 28.1 is helpful to the Court and

2    I believe it will be helpful to the jury given the limitations

3    of 28.34 in terms of being able to be understood and read just

4    by the size of the print, and I will receive 28.1 as a summary

5    exhibit.

6          What is that, under Rule 1006?  Something like that?

7          MR. SZOTT:  The summary rule is that one, Your Honor,

8    and then the pedagogy chart theory is under Rule 611(a) where

9    it's -- the theory would be that it's to explain other

10   evidence that's been admitted, rather than voluminous records

11   that can't be conveniently examined.

12         I -- I wasn't prepared to offer it under 1006.  I was

13   going to offer it under 611(a).

14         I certainly would offer the exhibit, Your Honor.

15         THE COURT:  It will be received under both.

16         To the extent it varies from what the jury finds,

17   they should disregard it.  I'll give them that limiting

18   instruction.

19         MR. SZOTT:  Your Honor, I believe the Government's

20   ready to proceed.

21         THE COURT:  Very well.

22         It is now about five minutes until 11:00.  Let's

23   bring the jury in.

24         Why don't you approach, Counsel.

25         I don't think this needs to go on the record.

```
19-CR-26-ABJ              SCOUFIS              Vol. VIII-1261
21-CR-14-ABJ
```

 1      (Sidebar not reported.)

 2      (Proceedings within the jury's presence at 10:55 a.m.)

 3              THE COURT:  Thank you, ladies and gentlemen.

 4          I'm sorry.  This case -- this matter took longer than

 5      expected, ladies and gentlemen, and I appreciate your

 6      patience.  I'll try, if we have these kind of situations in

 7      the future, to allow you to step outdoors and get a little

 8      Vitamin D, sunshine.

 9              The -- I have received Exhibit 28.34.  The Government

10      will be laying the foundation, I think, in front of you

11      concerning another exhibit, 28.1.  I have received that

12      exhibit, ladies and gentlemen, and you'll hear discussion

13      about it, but I want you to know that it is a document

14      prepared by this witness intended to assist you and -- and

15      educate you about Exhibit 28.34, which I found to be difficult

16      to read.

17              And to the extent that 28.1 -- which is prepared by

18      this witness -- differs in any respect from 28.34, it's

19      Document 28.34 that controls, and you should ignore that

20      portion that differs in 28.1.

21              Now, I've thoroughly confused you, and I'll repeat

22      this again after Mr. Szott proceeds.

23              MR. SZOTT:  Thank you, Your Honor.  May it please the

24      Court.

25              THE COURT:  Mr. Szott.

1      MR. SZOTT:  Mr. Davila, would you bring up the

2  first page of Government's Exhibit 28.1.

3              **FURTHER DIRECT EXAMINATION (Continued)**

4  **BY MR. SZOTT:**

5  Q.  Mr. Scoufis, do you see the first page of Government's

6  Exhibit 28.1 on your monitor?

7  A.  Yes.

8  Q.  What is Government's -- let me ask, do you recognize

9  Government's Exhibit 28.1?

10 A.  Yes.

11 Q.  What is it?

12 A.  It is a time line that I've created looking at promotional

13 emails, email blasts, Skype messages, trading, and emails and

14 press releases.

15 Q.  When you mentioned "Skype messages," are you referring to

16 the same messages that are reflected in Government's

17 Exhibit 28.34?

18 A.  Yes, but it's not all of those messages.  It's a portion

19 of what we see in 28.34.

20 Q.  I'm going to ask you about some specific aspects of the

21 exhibit, starting with the line in green, where it says,

22 "Stock Purchase."

23      Where did you get the information that's reflected in

24 this exhibit of stock purchases?

25 A.  That comes from blue sheet trading data.

1  Q.  And is that the information that was previously received

2  that's on the -- the disk?

3  A.  That's right.

4        MR. SZOTT:  Mr. Davila, could we go to the next page,

5  please?

6  BY MR. SZOTT:

7  Q.  Mr. Scoufis, I'll call your attention to the bottom of the

8  page.  The lines that are in the yellow bars there reflecting

9  "Stock Sale," where does that information come from?

10 A.  It also comes from the blue sheets.

11 Q.  And I would note here, Mr. Scoufis, there are no time

12 stamps associated with those stock sales.

13       Why not?

14 A.  In the blue sheets the Intrepid NERG stock sales do not

15 have time stamps, so we just have a date.

16 Q.  So when you just had a date but no time stamp, how did you

17 insert such actions into your time line?

18 A.  Yeah, I just put them at the end of -- of that day.  So

19 I didn't try to place them anywhere within the day.  It's --

20 just comes at the end.  We don't know exactly when the stock

21 sale occurred.

22 Q.  So such events could have been scattered at various points

23 in time during the day?

24 A.  Absolutely.

25       MR. SZOTT:  If we could move to the next page,

 1   please, Mr. Davila.

 2   BY MR. SZOTT:

 3   Q.  I'll note that there's an email reflected in a blue row.

 4            So, first question, Mr. Scoufis:  When you

 5   inserted -- when you included email in this time line, what

 6   were you relying on in order to get those emails?

 7   A.  So the emails come from FinTech Securities; otherwise, as

 8   noted at the bottom, Exhibits 28.26 and 28.27.

 9   Q.  Now, there was an earlier email, I believe, with a time

10   stamp.  I note that this one has no time stamp.

11            Why is there no time stamp -- or why might there be

12   no time stamp on an email in your chart?

13   A.  So for the emails without time stamps -- as I remember,

14   there -- there is a time listed; I just wasn't able to place

15   it in a certain time zone; I just couldn't figure it out,

16   so -- because I didn't know what time zone it was in -- and

17   what we're looking at with times is all Eastern -- I just put

18   it at the end of the day, just like with the -- the stock

19   sales that don't have time stamps.

20            MR. SZOTT:  And, Mr. Davila, could we return to

21   page 1, please?

22   BY MR. SZOTT:

23   Q.  Uh-huh.  And I should have asked this at the outset,

24   Mr. Scoufis.  But would you please explain each of the four

25   columns that are part of the time line?

19-CR-26-ABJ      SCOUFIS - FURTHER DIRECT - SZOTT     Vol. VIII-1265
21-CR-14-ABJ

1    A.   Yeah.  On the left-hand side, we see "Date," so this is

2    the date for, you know, each -- each row, each event.

3         Then moving over, "Time" in Eastern.  If -- again, if

4    there -- I couldn't figure out the time, it just was placed at

5    the end of the day.

6         "Type" refers to whether it's an email blast,

7    promotional email, trading, a different kind of email, press

8    release, Skype message.

9         And then, moving over, "Description" is looking at

10   what was in Skype messages and emails, detailed information --

11   super detailed but detailed information -- on the purchase

12   and -- purchases and sales.

13        And then you'll see with the email blasts that

14   there's -- there's no description, but, of course, there is

15   information in the email blasts.  I just didn't include it

16   here.

17   Q.   Mr. Scoufis, I'd like to go through the time line with

18   you.  I won't ask you about every entry in the time line, but

19   I'd like to ask about -- I'd like to ask you about certain

20   entries in the time line and, at times, maybe give the jury an

21   opportunity to read some of the -- some of the other entries.

22        Let me ask you, first, about the green -- the first

23   green row at 9:30:03 a.m.  What are we seeing there?

24   A.   Yeah.  So we just see one share, one NERG share,

25   purchasing at .0054.

 1          So the market opens at 9:30 a.m., so trading will

 2   start then.  And -- and we're seeing, yeah, just one share at

 3   9:30, three seconds after it opened.

 4   Q.  Would you remind the jury what the concept of "marking the

 5   open" means.

 6   A.  "Marking the open" is a type of market manipulation, and

 7   it relies on that investors use the opening price of a day to

 8   kind of track where the stock is going to go for that day.

 9   You know, as it increases or decreases throughout the day,

10   it's going to kind of be based on that opening trade.

11          So "marking the open" is intended to set an

12   artificial price, usually high, so, you know, at 9:30 and

13   3 seconds, one share at .0054 somewhat looks like that.

14          MR. SZOTT:  Mr. Davila, would you please bring up --

15   I'd like to have Exhibit 28.1 on the left.  On the right would

16   you please bring up Exhibit 28.14.

17          So Exhibit 28.14 is already in evidence, one of these

18   promotional emails.

19          Mr. Davila, would you please magnify those two lines,

20   please.

21   BY MR. SZOTT:

22   Q.  Mr. Scoufis, would you read the magnified portion of

23   Exhibit 28.14.

24   A.  Yes.

25          "The company was alerted last night at .0042, opened

19-CR-26-ABJ    SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1267
21-CR-14-ABJ

1  the session at .0054, and exploded up the chart to .0063

2  per share for a 51 percent gain."

3  Q.  So this reference to opening the session at .0054 from

4  this promotional email on November 6th, how does that . . . or

5  how does that compare with that one NERG share that was

6  purchased right after the market opened?

7  A.  Yeah.  So this is -- this is what I was talking about when

8  investors rely on that opening trade, and we see it here in

9  this email blast.  They're looking at .0054, and then, of

10  course, we see that trade at 9:30 and 3 seconds.

11  Q.  Mr. Scoufis, I note the first part of that says "The

12  company was alerted last night at .0042."  Do you know what

13  that means?

14  A.  Yeah.  It's kind of weird wording.  I did look at that and

15  look back at the closing last sale price -- so another

16  benchmark that investors use, the last price of a day -- and

17  that is what the stock -- what NERG closed at on the prior

18  trading day, .0042.

19          MR. SZOTT:  Let's return to just Exhibit 28.1,

20  please, Mr. Davila.

21  BY MR. SZOTT:

22  Q.  The next three messages, Mr. Scoufis, after the green

23  line, I'd like to give the jury just a moment to read those

24  next three lines.

25          Mr. Scoufis, in the first of those three lines, "Nice

1  open volume," what is "open volume"?

2  A.  That seems to refer to the amount of shares that have

3  traded already that morning or -- and/or the amount of orders

4  that are out, that have been placed.

5  Q.  And a reference to "orders" in the context of trading --

6  what is an order in the context of trading stock?

7  A.  When we see -- just like on here, when we see one NERG

8  share at .0054 in the green, that's an execution that -- but

9  executions don't just come out of nowhere.  They require an

10  order.

11       So kind of separately, whoever is placing -- placing

12  the order who wants to make a trade places the order, and then

13  perhaps we'll see an execution, kind of two different things

14  that are happening.

15  Q.  So is it the -- the shareholder who places the order?

16  A.  Yeah.  I mean, it's -- it's an individual or entity that

17  wants to either buy or sell stock that places the order.

18  Q.  I'd like to ask you about a particular order that's

19  reflected in the exhibit.  So I'd like to give the -- I'd like

20  you to start reading the messages beginning at 11:09:09 a.m.

21  It's just a little further down.

22  A.  "Justin, please put offer for 900K at 4.3."

23  Q.  And then the next message?

24  A.  ".0043."

25  Q.  Next is a question mark?

1   A.  Correct.

2   Q.  And then the next message?

3   A.  "Yes."

4   Q.  And what are we seeing here in the blue row that's

5   immediately below?

6   A.  I'm seeing discussions about placing an order.  We see --

7   it says, "Justin, please put offer," so that's an offer to

8   buy -- or I mean to sell, sorry, offer to sell -- "for 900K

9   at 4.3."

10          And then it's just -- because the stock is -- is not

11  trading at $4.30, it seems like there's clarification

12  messages.  So we see ".0043," question mark, and then it's

13  confirmed.

14  Q.  What about the email, then, in the blue bar, in the blue

15  row?

16  A.  All right.  So this is an email on November 6th at

17  11:11 a.m. from Winters to Gilleland, employee at FinTech, and

18  it says "Subject:  New order," and then we see in the body

19  "NERG 900,000 at .0043.  Regards: Chuck Winters," and then it

20  includes phone numbers.

21  Q.  Would you remind the jury what role FinTech is playing at

22  this point.

23  A.  In order to buy or sell shares in a public market, a

24  brokerage firm needs to be involved.  They are the ones that

25  are doing the executions.  So you place your order with a

1    brokerage firm.  Here, Winters is placing an order with his

2    brokerage firm, which is FinTech.

3    Q.  And then three rows down -- so four rows up from the

4    bottom -- the message at 11:44:42 a.m., would you please read

5    that message.

6    A.  "900k at 43."

7          MR. SZOTT:  Mr. Davila, can we go to page 2, please?

8    BY MR. SZOTT:

9    Q.  Here on page 2, Mr. Scoufis, what is the jury seeing in

10   the yellow row that is two from the bottom?

11   A.  All right.  On November 6th, 2015 -- and we don't have a

12   date but it's an NERG Stock Sale by Intrepid, and it's

13   900,000 NERG shares at .0043.

14   Q.  And you said, "We don't have a date."  You meant we don't

15   have a time?

16   A.  That is what I meant.  Sorry.

17   Q.  So this is a -- a sale that actually took place?

18   A.  Correct.  This is an executed trade.

19   Q.  I'd like to now draw your attention just to the -- toward

20   the top of this page, would you read the two messages

21   beginning at 11:45:37 -- that's the third message -- and then

22   the one right below that.

23   A.  Can you repeat that?

24   Q.  I'm sorry.

25          Would you start with the third message on the screen,

19-CR-26-ABJ      SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1271
21-CR-14-ABJ

1   11:45:37 a.m., read that message and then the message

2   immediately below that message.

3   A.  "1.5 mm at 61.

4          "1.5," question mark, "Oh, baby."

5          MR. SZOTT:  Mr. Davila, will you advance to page 3,

6   please.

7   BY MR. SZOTT:

8   Q.  Mr. Scoufis, what is the jury seeing from the fourth row

9   on the top, one of the yellow rows there towards the top of

10  page 3?

11  A.  On November 6th, 2015, we have an executed stock sale,

12  NERG stock sale by Intrepid, and it's a million 500,000 NERG

13  shares at .0061.

14         MR. SZOTT:  I'd like to go back to page 2,

15  Mr. Davila, please.

16         Let's magnify the section toward the middle here,

17  beginning at 11:57:55 a.m., concluding with the email blast at

18  12:13.

19  BY MR. SZOTT:

20  Q.  Mr. Scoufis, would you begin by reading -- skip the email

21  blast for now.

22         Would you please read the first four messages that

23  are at the top of the magnified portion beginning with the

24  message at 11:57:55.

25  A.  From Kada Mesli: "Justin, can you put one -- can you put

1   one last one at 0.0043 for 113K shares, that will be the last

2   for this AM."

3          Justin Herman:  "Another 113k at .0043."

4          Kada Mesli:  "I think I am going to like you a lot,

5   sir."

6          Robert Mitchell:  "Same here.  This is perfect.

7   Thanks for your efforts."

8          MR. SZOTT:  Mr. Davila, if we could remove the

9   magnification for just a moment and go to page 3.

10  BY MR. SZOTT:

11  Q.  Mr. Scoufis, what are we seeing on 11/06/2015, the last of

12  the yellow rows above the blue row?

13  A.  It's an Intrepid NERG stock sale, executed 113,000 NERG

14  shares at .0043.

15         MR. SZOTT:  Let's go back to page 2, Mr. Davila,

16  please.

17         And let's now magnify beginning with the 12:06 p.m.

18  email blast, continuing to the two other email blasts.

19  BY MR. SZOTT:

20  Q.  Mr. Scoufis, would you please read the Skype message at

21  12:08:16.

22  A.  All right.  So in -- it's a -- I think it's some sort of

23  emoji but "ss type equals wink" -- I'm going to skip that.

24         "Midday coverage just went out, spoke to Mike and

25  considering Herm actually captured a little -- dot, dot,

1   dot -- we thought it better to just let ir run, run, run and

2   take the expenses and the little profit and run with it, do

3   you agree or rather capture some more?"

4   Q.  The -- Mr. Scoufis, as reflected here in the exhibit, what

5   happened at 12:06.00 p.m.?

6   A.  Yeah.  Two rows above we can see an email blast went out.

7         MR. SZOTT:  Mr. Davila, would you please bring back

8   up Exhibit 28.14.

9         And would you please magnify the header.

10  BY MR. SZOTT:

11  Q.  Mr. Scoufis, does this appear to be that email blast

12  that's reflected in the chart?

13  A.  Yes.

14        MR. SZOTT:  And if we could return to 28.1, please.

15        And go to page 3.

16        I'm sorry.  Back to page 2.  My apologies.

17  BY MR. SZOTT:

18  Q.  Mr. Scoufis, would you read the message at 3:01:30 p.m.

19  A.  Yes.  This is from Kada Mesli:  "We're still up 30 percent

20  I think we're good as long as we continue the program, now

21  that we know everything that was coming at us or potential

22  pitfalls we know how to address next week.  IMHO, you tell me

23  your thoughts."

24  Q.  Mr. Scoufis, do you have an opinion as to what Mr. Mesli

25  meant by "the program"?

1   A.  Yeah.  It's interesting.

2        I think in context of everything else we see -- the

3   other messages, the promotions and with NuTech in general,

4   press releases -- I think "the program" refers to the pump and

5   dump.

6   Q.  Mr. Scoufis, let me call your attention to the two green

7   entries toward the bottom of page 2.  What are we seeing there

8   in those two green rows?

9   A.  Right.

10       So, first, at 3:56:36 p.m., "Mesli NERG Stock

11  Purchase," that's 10 shares at .0054 and again at 3:59 and

12  1 second, "Mesli Stock Purchase," 1,000 shares at .0055.

13  Q.  As a general matter, would you remind the jury of the

14  concept of "marking the close."

15  A.  Similar to marking the open, we're talking about a type of

16  market manipulation but, instead of marking the open, marking

17  the close, just trying to set an artificial price at the end

18  of the day that in the future investors will rely on.

19       The closing last sale price is -- is relied on in the

20  industry to track the movement of a stock's price over time.

21  Q.  In your opinion, is this reminiscent of marking the close?

22  A.  Yeah.  I mean, we're talking about the end of the day and

23  a relatively small amount of shares.  Because when somebody

24  looks back at the closing last sale price, they don't see how

25  many shares it is; it's just the price.

19-CR-26-ABJ      SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1275
21-CR-14-ABJ

1   Q.  Mr. Scoufis, as my -- I think my last couple of things on

2   this page for now, would you read the very first message at

3   the top of the page.

4   A.  "200 at 57."

5   Q.  And then I turn -- I ask -- I would direct your attention

6   to the yellow line three from the bottom.

7        What are we seeing there?

8   A.  All right.  November 6th, 2015, Intrepid sells

9   200,000 NERG shares at .0057.

10  Q.  I'm going to return to ask you about one other series

11  of -- of messages on that.

12       MR. SZOTT:  Let's go to page 3, please.

13  BY MR. SZOTT:

14  Q.  Mr. Scoufis, would you please read the two messages after

15  the email blasts, 8:06:39 a.m., 8:07:22 a.m.

16  A.  "I'm going to put new orders for today in here just so we

17  have them ready okay?"  That's from Kada Mesli.

18       And Justin Herman, "Yeah, but let's get on a call."

19  Q.  From the Skype messages, Mr. Scoufis, were you able to

20  ascertain or are you able to ascertain if there was, in fact,

21  a separate call?

22  A.  I don't -- I don't think so.  I don't know.

23  Q.  But it's alluded to here?

24  A.  Correct.

25  Q.  And then would you please read Mr. Mitchell's message at

1   the bottom of the page.

2   A.  "Just got off of the phone with Mike.  Like I said about

3   15 minutes ago, expenses first are good for Friday, as well as

4   going forward.  Friday turns out to be a almost free --

5   freebie and that's okay.  It'll work out going forward, I'm

6   confident.  Let them handle putting orders in.  Today, first

7   12.5 is expenses, then split.  Let's lose stk accordingly so

8   we get paid."

9   Q.  Mr. Scoufis, based on your experience in investigating

10  market manipulations, what sort of expenses might be involved

11  with a pump and dump program?

12  A.  So there could be a lot of expenses.  I mean, just looking

13  at this page, though, of course, email blasts, promotional

14  materials are not free.  That costs money.

15          And then, of course, we go to the company, costs

16  involved with the company, press releases, financials, that

17  sort of thing.  Of course, acquiring a public shell.

18          Among other expenses but those come to mind.

19          MR. SZOTT:  Would you go to the next page, please,

20  Mr. Davila.

21          And let's actually go now to page 5, please.

22  BY MR. SZOTT:

23  Q.  I'd like to ask you about some information related to

24  another transaction, Mr. Scoufis.  Would you please read the

25  three messages beginning on November 9th, 2015, at

 1  10:48:35 a.m.

 2          MR. SZOTT:  And if you'd like to, Mr. Davila, we can

 3  magnify those three messages, please.

 4  A.  All right.  From Justin Herman:  "Okay . . . how about 300

 5  at 6."

 6          Kada, Kada Mesli:  "If nothing comes we could adjust

 7  by going 5.8 and let it run from there when the afternoon

 8  volume comes in."

 9          Again, from Kada Mesli:  "Let's do 300 at 6 and see

10  what happens yeah."

11          MR. SZOTT:  Would you remove the magnification,

12  please, Mr. Davila.

13  BY MR. SZOTT:

14  Q.  Mr. Scoufis, looking at the -- looking at the bottom -- or

15  in the yellow bars -- what do we see in the yellow row that's

16  three rows from the bottom of page 5?

17  A.  We see an Intrepid NERG stock sale, 300,000 shares at

18  .006.

19  Q.  And just to make it clear, the -- all of the information

20  in the yellow rows that's shown here on page 5, what -- as a

21  general matter -- what is the jury seeing in these yellow

22  rows?

23  A.  We're seeing executions, actual trades for NERG stock, and

24  it's in the account of Intrepid.

25          MR. SZOTT:  Mr. Davila, would you return to page 2,

1    please.

2    BY MR. SZOTT:

3    Q.  I'd like to ask you now, Mr. Scoufis, about a series of

4    messages I alluded to a moment ago.

5        MR. SZOTT:  Let's, if you would, please, Mr. Davila,

6    magnify up through 11:48:05 a.m.

7    BY MR. SZOTT:

8    Q.  So, Mr. Scoufis, after the first six messages, which

9    reflect figures, would you please start reading the message at

10   11:46:12 a.m.

11   A.  From Kada Mesli:  "How much out of each account?"

12       Justin Herman:  "We can pend it any way we need to at

13   the end -- at end of the day."

14       Kada Mesli:  "Pend it," question mark.

15       Justin Herman:  "Attach trades to accounts."

16       Kada Mesli:  "Oh, okay, gotcha."

17   Q.  So, Mr. Scoufis, what -- what would it mean to "pend it"

18   or "attach trades to accounts" at the end of the day?

19   A.  In context of the messages that we see here, "pend it"

20   seems to refer to -- I guess divvy up the shares that were

21   sold by these individuals during that day.

22       MR. SZOTT:  If you could remove the magnification,

23   Mr. Davila, and return to page 5.

24   BY MR. SZOTT:

25   Q.  And I'd ask you, Mr. Scoufis, what is the jury seeing here

19-CR-26-ABJ       SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1279
21-CR-14-ABJ

1   in the email in the horizontal blue row at the bottom of

2   page 5?

3   A.  On November 9th, 2015, an email from Herman to Winters.

4   The subject is "NERG Trades."

5        And then the body says "40 percent Chronos,

6   20 percent BC Limited, 10 percent Bravo, 10 percent Intrepid.

7   Take care, Justin Herman."

8   Q.  Does that appear to be an accounting of where various --

9   let me strike the -- strike that.

10       What -- what's your opinion on what we're seeing here

11  in the -- in the email?

12  A.  Well, the subject is "NERG Trades," so thinking that this

13  pertains to NERG trading.

14       And then we see companies, and, to me, it suggests

15  that that's how they're divvying up the trades.  I will note,

16  though, we don't get to a hundred percent, so I don't -- but,

17  otherwise, it seems like they're divvying up trades.

18       MR. SZOTT:  Let's go to page 6.

19       And let's magnify the portion here beginning at

20  8:52:11 a.m., ending at 9:00 a.m.

21  BY MR. SZOTT:

22  Q.  Mr. Scoufis, would you read the first message at

23  8:52:21 a.m.

24  A.  From Justin Herman:  "What time is pr going out."

25  Q.  And then what happens at nine o'clock a.m. on that same

1   day?

2   A.  We can see in that -- in that orangish line, "NERG Press

3   Release" and -- goes out -- and the title of it is in the

4   description, "NuTech Energy Resources, Inc., Fulfills

5   Reporting Requirements and Modernizes Image."

6           MR. SZOTT:  You can remove the magnification.

7           Let's magnify the series of messages toward the

8   bottom of the page there, the Skype messages.

9   BY MR. SZOTT:

10  Q.  Would you just read this series of messages, please,

11  Mr. Scoufis.

12  A.  From Justin Herman:  "Quick sea change."

13          Mike B.:  "Calling."

14          Kada Mesli:  "Uh-oh should I be worried?"

15          Justin Herman:  "Not quite yet."

16          Mike B:  "No I am on phone with Justin."

17          Justin Herman:  "Standby."

18          Mike B.:  "Ty."

19          Justin Herman:  "Resolution in route -- route."

20          Robert Mitchell:  "Need our own setup."

21          Kada Mesli:  "By own setup you mean outside Kingdom?"

22          MR. SZOTT:  Would you remove the magnification,

23  please, Mr. Davila, and let's go to the last page.

24  BY MR. SZOTT:

25  Q.  Mr. Scoufis, what are we seeing at the very bottom of the

1  summary, the last blue row there?

2  A.  On November 10th, 2015, FinTech emails Kingdom Trust, and

3  the body, among other information, says "I have instructed our

4  trading desk to no longer accept trades in penny securities

5  coming from Intrepid or Kingdom Trust."

6  Q.  And as long as we're on the page, what are we seeing in

7  the email at -- at the top of the page at 11:57:40 a.m.?

8  A.  All right.  An email from Cecilia Schoenbaum at

9  OTC Markets -- she's at OTC Markets -- to Winters.  The

10 subject is "Information Posted to OTCMarkets.com for Current

11 Disclosure, NuTech Energy Resources, Inc., NERG."

12       And the body says, "Chuck, we have finished

13 processing your disclosure for the period ending August 31st,

14 2015.  Your company will be moved to the OTC Pink Current

15 Information tier tomorrow at market open.  Please do not

16 hesitate to contact me with any questions.  Best regards,

17 Cecilia."

18 Q.  And then what are we seeing in the next two lines?

19 A.  We see two OTC filings, one at 12:44 p.m., and it says,

20 "NERG Semiannual Report, Q2 2015 Disclosure."

21       And at 12:46 p.m., "NERG Quarterly Report, Q2 2015

22 Financial Report."

23 Q.  Thank you, Mr. Scoufis.

24       MR. SZOTT:  Mr. Davila, would you please bring up

25 Exhibit 514.

1           This has not yet been received, Your Honor.

2    BY MR. SZOTT:

3    Q.  Mr. Scoufis, can you see Exhibit 514 on your monitor?

4    A.  Yes.

5           MR. SZOTT:  Mr. Davila, would you please click

6    through the various pages of this exhibit.

7    BY MR. SZOTT:

8    Q.  Mr. Scoufis, do you recognize Government's Exhibit 514?

9    A.  Yes.

10   Q.  What is it?

11   A.  This is price and volume data for NuTech stock for the

12   period of January 2nd, 2015, through June 30th, 2016, which is

13   obtained from Bloomberg.

14   Q.  I'll ask you a couple of follow-up questions.

15          What is price/volume data?

16   A.  "Price/volume data" refers to the closing last sale price

17   for a given trading day as well as the total amount of shares

18   that traded hands that day, the total volume.  So "closing

19   last sale price" is price and "volume" is the total amount of

20   shares.

21   Q.  And what is Bloomberg?

22   A.  Bloomberg is a company in the financial industry that

23   basically aggregates a bunch of information for all -- I mean

24   all sorts of information -- for public companies and other

25   companies, and it includes -- some of the information that

1   they aggregate is what we see here, price/volume data.

2   Q.   In your work do you regularly rely on data -- this sort of

3   aggregation data from Bloomberg?

4   A.   Yes.

5   Q.   Do other professionals in the securities industry

6   regularly rely on this sort of aggregation data from

7   Bloomberg?

8   A.   Yes.

9           MR. SZOTT:  Your Honor, the Government would offer

10  Exhibit 514 under the hearsay exception contained in

11  Rule 803(17) of the Federal Rules of Evidence.

12          MR. FLEENER:  No objections.

13          THE COURT:  514 is received.

14     (Government's Exhibit 514 received into evidence.)

15          MR. SZOTT:  And we will not need to publish at this

16  time.

17          Mr. Davila, now, please, Exhibit 417 -- and we may

18  not publish that last one at all.

19  BY MR. SZOTT:

20  Q.   Mr. Scoufis, Exhibit 417 is now on your monitor.

21          What is the -- well, the jury's not seeing -- what is

22  Exhibit 417?

23  A.   This is a -- a price and volume chart visualizing the

24  price and volume for the period of September 15th, 2015,

25  through January 14th, 2016, for NuTech stock.

1    Q.   Who created this?

2    A.   I did.

3    Q.   What was your source data to create this chart?

4    A.   Bloomberg, what we just -- the last exhibit.

5    Q.   Was that --

6         MR. SZOTT:  Your Honor, I'd like to offer Exhibit 417

7    as a pedagogy chart or, at minimum, ask that it be published

8    as a demonstrative aid.

9         MR. FLEENER:  No objections.

10        THE COURT:  It is received and may be published.

11   BY MR. SZOTT:

12   Q.   Mr. Scoufis, what is the jury seeing here in Exhibit 417?

13   A.   Right.  So starting with that black continuous line that

14   runs across, that is the closing last sale price, the last

15   trade of a trading day, and it corresponds to the vertical

16   axis on the right.

17        And the red bars, that's the daily trading volume,

18   and that corresponds to the vertical axis on the left.  You'll

19   note towards the left side we don't really see any red bars

20   for some days, and there were shares that traded on that day.

21   They just -- there wasn't enough volume to actually show up on

22   this chart.

23        MR. SZOTT:  Let's bring up Exhibit 418, Mr. Davila.

24   BY MR. SZOTT:

25   Q.   Mr. Scoufis, do you recognize Exhibit 418?

19-CR-26-ABJ     SCOUFIS - FURTHER DIRECT - SZOTT     Vol. VIII-1285
21-CR-14-ABJ

1    A.  Yes.

2    Q.  What is it?

3    A.  All right.  So this is a price/volume chart, the same as

4    what we just looked at, but I have included some calculations

5    on the average volume and price increases.

6            MR. SZOTT:  Your Honor, I'd ask to publish this as a

7    demonstrative only.

8            MR. FLEENER:  May I have a second, please, Your

9    Honor.

10           THE COURT:  Yes.

11           MR. FLEENER:  No objections.

12           THE COURT:  It is received as a demonstrative.

13   BY MR. SZOTT:

14   Q.  Mr. Scoufis, would you please explain the -- the data or

15   the information that's reflected in the green box in the upper

16   right of Exhibit 418.

17   A.  Looking at the first row, that's average volume, so

18   November 5th, 2015, through January 4th, 2016, and I've done

19   just a calculation for the average volume for that period.

20   And so what we see are almost 12 million shares as the average

21   daily trading volume during that period.

22           And then below that, from November 5th, 2015, through

23   November 11th, 2015, there's a price increase of 255 percent.

24   And so that's looking at the closing last sale price on

25   November 5th to the closing last sale price on November 11th,

 1  and the price increased 255 percent.

 2          Again, from December 1st, 2015, to December 8th,

 3  2015, the closing last sale price between those two dates

 4  increased 151 percent.

 5          MR. SZOTT:  Let's bring up 419.

 6  BY MR. SZOTT:

 7  Q.  Mr. Scoufis, what is Exhibit 419?

 8  A.  This is a similar price/volume chart.  And what I've

 9  done -- to what we've just been looking at.  And what I've

10  done is add press releases, just visualizing them with

11  orange -- little orange squares.

12  Q.  And did you review those press releases?

13  A.  Yes.

14          MR. SZOTT:  Your Honor, I'd ask that Exhibit 419 be

15  published as a demonstrative only.

16          MR. FLEENER:  No objections.

17          THE COURT:  It may be published as a demonstrative.

18  BY MR. SZOTT:

19  Q.  Mr. Scoufis, would you explain to the jury again what

20  they're seeing here in Exhibit 419.

21  A.  You'll see that familiar price/volume chart, and then

22  these orange dots represent a press release, and I've just

23  placed them in time when it happened, just kind of looking at

24  the press releases, and we can -- we can see what's happening

25  in the price as well as the volume.

 1              MR. SZOTT:  And then lastly in this series let's

 2      bring up 420.

 3      BY MR. SZOTT:

 4      Q.  Same question, Mr. Scoufis.  What are you seeing here

 5      in 420?

 6      A.  Similar price/volume chart, and I've added promotional

 7      emails with small red boxes.

 8              MR. SZOTT:  Your Honor, I'd ask that this be

 9      published as a demonstrative only.

10              MR. FLEENER:  One second, please, Judge.

11              No objections.

12              THE COURT:  It may be published as a demonstrative.

13      BY MR. SZOTT:

14      Q.  Mr. Scoufis, what is the jury seeing here on Exhibit 420?

15      A.  We see that familiar price/volume chart.  And, here, I've

16      added the promotional emails, many of which we -- we saw

17      earlier in that Skype message chart, and now I've just placed

18      them in time, and we can see how that relates to the price and

19      the volume for each trading day.

20      Q.  And just to be clear, the dates in your Skype message

21      chart that was Exhibit 28.1, that is November 5 through

22      November 10th, as I recall.  Is that correct?

23      A.  That sounds right.

24              MR. SZOTT:  And, for the record, I drew a little blue

25      line at the bottom of the exhibit, but I will clear it.

1   I won't ask for that to be captured.

2   BY MR. SZOTT:

3   Q.  So, Mr. Scoufis, these red dots where it says "Promotional

4   emails sent on 11 days," on some of these -- on occasions here

5   there were multiple promotional emails sent on the same day;

6   correct?

7   A.  That's correct, yeah.  I'm just looking at the -- a

8   specific day.  But on some days, yes, there were more than one

9   email sent out.

10  Q.  So one box even if there are multiple emails that day?

11  A.  Correct.

12          MR. SZOTT:  We can take that down.

13          Next, Mr. Davila, would you please bring up

14  Exhibit 520.

15  BY MR. SZOTT:

16  Q.  Mr. Scoufis, can you see Exhibit 520 on your screen?

17  A.  Yes.

18  Q.  What is it?

19  A.  This is an excerpt from the blue sheet trading data

20  specifically for Intrepid Capital's trades and -- and I've

21  also limited the amount of columns to what I view as the most

22  relevant information.

23  Q.  So obvious question:  Who created this exhibit?

24  A.  I did.

25  Q.  What was your source data for this exhibit?

19-CR-26-ABJ      SCOUFIS - FURTHER DIRECT - SZOTT     Vol. VIII-1289
21-CR-14-ABJ

1    A.   Blue sheets.

2    Q.   Apart from -- and when you say you -- you said something

3    about limiting to pertinent.

4         Are you talking about the vertical columns that are

5    reflected here?

6    A.   Yes.  I am talking about the vertical columns because blue

7    sheets contains information for every single trader.  This is

8    just Intrepid.

9         But I've also limited it horizontally.  I'm just

10   guessing here.  There's something like 40 columns of data in

11   blue sheets.  All of it could be important in certain

12   instances, but this is what I view as the most important

13   information.

14   Q.   And apart from triaging it, as you've discussed, did you

15   alter the data that is contained within each cell from what

16   are reflected in the blue sheets?

17   A.   So as far as price, the pricing dollar amounts, no.

18   I have combined a -- some information like in the "Account"

19   column, where I've just kind of shortened up the account

20   number so it's easier to read.  We can see the brokerage firm

21   and the account number.

22        Other than that, no.

23   Q.   Do you believe this fairly and accurately represents the

24   pertinent information that's reflected in the blue sheets?

25   A.   Yes.

 1              MR. SZOTT:  Your Honor, the Government would offer

 2   Exhibit 520.

 3              MR. FLEENER:  May I have a second, please,

 4   Your Honor.

 5              No objections.

 6              THE COURT:  520 is received.

 7       (Government's Exhibit 520 received into evidence.)

 8   BY MR. SZOTT:

 9   Q.  Mr. Scoufis, now that the jury can see this --

10              MR. SZOTT:  And, Mr. Davila, would you please --

11   well, for now, yes, let's please magnify the portion with the

12   table and the title.

13   BY MR. SZOTT:

14   Q.  So, Mr. Scoufis, would you just explain to the jury what

15   each of these vertical columns pertains to.

16   A.  All right.

17              Starting on the left-hand side, "Trade Date," that's

18   the execution date of a trade.  A trade actually happened.

19   That is the -- the date that it happened.

20              Moving over, "Buy/Sell," this is whether the trade

21   was to buy stock or to sell stock.  And we'll -- I guess it's

22   "Buy/Sale."

23              "Quantity," this is the total amount of shares that

24   were traded.

25              "Price," that's the -- the price per share.

1            "Gross Amount" is the -- the total dollar figure, how

2     much that -- that trade was worth.

3            And then the "Account" -- this is what I was talking

4     about.  I've just shortened up two columns, the "Account" --

5     or the "Account Number" column and the "Brokerage Firm" column

6     into one.

7            So "C-H-A-S" refers to Charles Schwab, and then

8     "4981" are the last four of the account number.  "F-I-N-X,"

9     that's FinTech, "K-R-T-H" is Korth, and "B-A-Y-S" is Bayes

10    Capital.

11    Q.  So for -- for each time frame, if a person wanted to

12    tabulate Intrepid's total sales during that time frame, he or

13    she would simply need to add up the numbers that are contained

14    in the "Quantity" column?

15    A.  Correct.

16            MR. SZOTT:  All right.  We can take that down.

17    BY MR. SZOTT:

18    Q.  Mr. Scoufis, did you have occasion to review the blue

19    sheets for references to Wyoming-based investors in

20    November and December of 2015 and January of 2016?

21    A.  Yes.

22    Q.  Were there such investors during that time frame?

23    A.  Yes.

24    Q.  Now, to be clear, the -- do the blue sheets reveal what --

25    where the investor was physically located when he or she made

19-CR-26-ABJ      SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1292
21-CR-14-ABJ

1    the trade or merely an address associated with that investor?

2    A.   Just an address.

3         So when somebody opens up an account, they do an

4    application, where they live, and that's what would be

5    included in the blue sheet information.  There's no

6    information about, you know, what computer or phone it was --

7    the trade was placed.

8         MR. SZOTT:  Your Honor, I note that we're approaching

9    the noon hour.  This is -- this is a very natural break in

10   Mr. Scoufis' testimony.  We're also fairly close to being

11   finished.

12        I'm transitioning now to the spring of 2016.  There

13   is a similar exhibit that I would seek to offer, much

14   shorter -- or shorter, I should say -- than 28.1.  But I -- so

15   I think -- we don't have much left with this witness, but this

16   is a -- a very natural break in his testimony.

17        So I wanted to give that Court that information and

18   am prepared to proceed one way or the other.

19        THE COURT:  Very well.  We'll take our noon recess

20   and have the jury come back at 1:15.

21        Ladies and gentlemen, remember the Court's admonition

22   not to discuss the case with anyone or permit anybody to

23   discuss it with you.  Don't try to investigate the case on

24   your own or learn from -- the case from sources outside the

25   courtroom.  Keep an open mind.  Wear your mask in crowds.

1          We'll stand in recess.

2       (Proceedings outside the jury's presence at 11:51 a.m.)

3          THE COURT:  Counsel, I don't know when we'll get

4   around to the hearing, frankly, on the issues surrounding the

5   transcripts.  I assume -- or what we'll do.

6          We still have to cross-examine this witness and . . .

7   I guess we're just playing it by ear at this point.

8          Enjoy your lunch.

9          MR. SZOTT:  Thank you, Your Honor.

10         MR. FLEENER:  Judge, what time are we coming back?

11  I'm sorry.

12         THE COURT:  1:15.

13         MR. FLEENER:  Thank you, sir.

14         THE COURTROOM DEPUTY:  All rise.

15      (A recess was taken from 11:52 a.m. to 1:58 p.m.)

16         THE COURTROOM DEPUTY:  Court is now in session.

17         MR. SZOTT:  Your Honor, there's a -- there's one

18  brief matter I'd like to bring to the Court's attention --

19  I think that's going to maybe have some brief argument --

20  before we proceed.

21         I apologize for this, Your Honor.

22         Government's Exhibit 28.1 -- that's the chart that

23  Mr. Scoufis prepared and he's been testifying about -- we

24  noticed that the very last entry in the chart pertains to an

25  email that was not received in evidence, so we have prepared a

1    new version that deletes the reference to that email.

2         I would like to address that with the jury and then

3    move, you know, for the Court to instruct the jury to strike

4    any testimony related to that particular email.  It's a

5    relatively minor point in the overall scope of the exhibit,

6    Your Honor, but I believe that's the appropriate course.

7         I think Mr. Fleener would like to address it, as

8    well.

9         MR. FLEENER:  Yeah.

10         I -- it may be easier, Mr. Szott, if -- if the Court

11    can see the old 28.1 and the new 28.1.

12         Do you guys have the ability to make that happen

13    or . . .

14         MR. SZOTT:  I believe we can.

15         MR. FLEENER:  I mean, I --

16         THE COURT:  Be seated.

17         MR. SZOTT:  I might further clarify, Your Honor.

18         This was a -- this related to an exhibit that we had

19    marked, and it -- it was a contemplated trial exhibit.  It

20    simply was never offered.

21         That's right, isn't it?

22         It wasn't offered or received with the witness

23    yesterday.

24         MR. FLEENER:  I'll wait until -- I'm going to --

25    I'm going to -- on behalf of Defendant Herman -- and I assume

1  the others are probably going to join -- I'm going to ask that

2  the Court strike the entire exhibit and instruct the jury not

3  to consider any testimony that related to this exhibit, rather

4  than simply allowing the United States to substitute a new

5  exhibit that's already been admitted into evidence and has

6  already been discussed when it wasn't properly done so.

7       But I'll wait until the United States is able to pull

8  up both 28.1s so the Court can know what we're talking about.

9       MR. SZOTT:  That's the old one.

10      MR. FLEENER:  Okay.  Judge, can I approach?

11      THE COURT:  You may.

12      MR. FLEENER:  I can walk the Court through just with

13 this copy.

14      This is -- I'm handing the Court what the United

15 States handed me, which is 28.1, as admitted, 28.1.

16      If the Court would turn to the last page and the very

17 last entry on November 10th.

18      THE COURT:  10th.

19      MR. FLEENER:  Okay.

20      That -- you're looking at the -- at the one that was

21 entered -- or admitted.  And on the screen is the 28.1 the

22 United States proposes.

23      And you'll see that the last entry "Email, FinTech to

24 Kingdom Trust," is -- is not on the United States'

25 substitute -- proposed substituted 28.1.

1      And it's -- it's an important entry, Judge.  They --

2  it's the -- the final entry in the document where the

3  United States, through its expert, testified that, you know,

4  FinTech told Kingdom Trust "We're not instructing our trading

5  desk to accept it" -- you know -- "no longer accept penny

6  trades coming from Intrepid."

7      And it's -- it's -- it was a prejudicial text or

8  email because they included it on the exhibit, it indicates

9  that it -- that FinTech had taken an adverse action against --

10  against Intrepid Capital, which is Justin Herman and

11  Chuck Winters, and it was never admitted into evidence at all.

12      And so we don't think it's proper to simply pull that

13  provision out and instruct the jury that -- to ignore what --

14  to then draw an attention -- to then draw attention to it and

15  say, "Well, there was a sentence on there, members, that said

16  'I have instructed the trading desk' -- you can't -- you need

17  to ignore that."  All it does is draw attention to the thing.

18      So we think the proper remedy would be to strike the

19  testimony and the -- would be to -- to strike Exhibit 28.1 in

20  its entirety and the -- the testimony that came from

21  Mr. Scoufis about 28.1, the original 28.1.

22      That's what we propose.

23      MR. JUBIN:  Join.

24      MR. SZOTT:  Your Honor, I was not in the courtroom

25  yesterday.  I'm informed by Mr. Heimann that Mr. Gilleland

1    testified about stopping these trades.

2              So that information -- or testified in that vein.  So

3    that information is already before the jury.

4              This is a minor point in the overall scope of this

5    exhibit.  If all the testimony were stricken, I suppose we'd

6    have to go through it all again -- or at least the Government

7    would seek to.  Just -- as a proverbial matter, Your Honor, it

8    seems like, you know, the entire broadside has been run out

9    and fired again, and that seems to be what happens every time.

10             I just don't think it's that big -- I don't think it

11   warrants that severe a sanction, Your Honor.  So the

12   Government, again, would propose substituting the exhibit,

13   asking the jury to dis- -- to strike and disregard.

14             If we don't even show the original version again,

15   depending on how meticulous their notes are, they may not even

16   recall what that last one was.  So that's the Government's

17   proposal, Your Honor.

18             THE COURT:  Yes, Mr. Gilleland did so testify

19   yesterday.

20             MR. WARD:  Your Honor, I would join Mr. Fleener's

21   motion.

22             I believe what Mr. Gilleland testified to yesterday

23   was that the -- the reason they stopped dealing with Intrepid

24   was a settling issue.

25             And, as you can see in the exhibit, that was -- and

19-CR-26-ABJ     SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1298
21-CR-14-ABJ

1   this -- I believe -- and I'm -- I'm trying to go through the

2   realtime now to -- to see whether or not it was discussed in

3   the -- outside the presence of the jury in the context of

4   bringing in the exhibit or actually during the testimony.

5           But the email that -- the line of the exhibit in

6   question was discussed at some point.  Like I said, I haven't

7   found it yet in the realtime to determine if it was in front

8   of the jury or not.

9           But this says that "We've instructed our trading desk

10  to no longer accept trades in penny securities coming from

11  Intrepid or Kingdom Trust" without the explanation that

12  Mr. Gilleland provided that it was -- had to do with settling

13  issues versus something else.

14          So I think it is prejudicial, and I don't think

15  drawing the jury's attention to it and then telling them to

16  disregard is the appropriate remedy.  I think what Mr. Fleener

17  proposed would be appropriate.

18          THE COURT:  Thank you.  It's a nice argument.

19          I agree with you, Mr. Ward.  My note says, without

20  connecting it to a particular exhibit, that FinTech ended its

21  relationship due to problems obtaining settlement of trades

22  from Winters and Herman.

23          I will -- it is my opinion that Exhibit 28.1 should

24  remain in evidence.  Substantial discussion occurred on the

25  record concerning that exhibit.  And among that lengthy

1   discussion, among other things, there was reference to the

2   exhibit that was not received in this matter.  I think the

3   only thing the Court can do is receive the substitute exhibit

4   and instruct the jury to disregard the previous exhibit and

5   any reference to the email from FinTech to Kingdom Trust dated

6   November 10th, 2015.

7          MR. SZOTT:  And, Your Honor, my -- my intent was to

8   do that on the record, offer the substitute exhibit, ask the

9   Court to strike and instruct the jury to disregard and then

10  move on.

11         THE COURT:  Please.

12         We can have the jury.

13         While that's happening, any thoughts on when you wish

14  to have our hearing on the transcripts?

15         MR. SZOTT:  Your Honor, I think as soon as

16  Mr. Scoufis has finished his testimony would be the

17  appropriate time for that.  I'm close to being done with

18  direct, relatively speaking, and then we'll have the cross, of

19  course.

20         THE COURT:  Well, I notice it's 2:30.  My fault.

21         Or 10 after 2:00.  I'm sorry.

22     (Proceedings within the jury's presence at 2:09 p.m.)

23         THE COURT:  Thank you.  Please be seated.

24         Let me say one thing to the jury.  They've been

25  sitting in the jury room for a much longer period of time than

1    they normally do, waiting for us to react.

2              I want to tell you it's not due to any reason

3    attributable to any side of this case.  The reason for the

4    delay was an emergency motion in another case that came before

5    the Court that we had to rule on.

6              So nothing that the parties to this case did or their

7    attorneys asked for caused that delay.  It's all attributable

8    to the Court responding to that emergency motion.

9              Go ahead, Mr. Szott.

10             MR. SZOTT:  Your Honor, thank you.

11   BY MR. SZOTT:

12   Q.  Mr. Scoufis, after you concluded your testimony this

13   morning, did you become aware that your Exhibit 28.1, the last

14   entry, relied on an item that had not been received in

15   evidence?

16   A.  Yes.

17   Q.  Did you prepare a modified version of Exhibit 28.1 that

18   had that last entry removed?

19   A.  Yes.

20             MR. SZOTT:  Your Honor, at this time the

21   United States would move to substitute the original version of

22   Exhibit 28.1 with the modified version, which has been

23   provided to defense counsel.

24             And, Your Honor, I would ask the Court to instruct

25   the jury to strike Mr. Scoufis' testimony related to that last

19-CR-26-ABJ    SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1301
21-CR-14-ABJ

1   line only on the original Exhibit 28.1 and disregard that

2   line and any -- any associated testimony.

3           MR. FLEENER:  Objection already made, Judge.

4           Thank you, sir.

5           THE COURT:  Your objection remains.  It's been joined

6   by the other defendants.

7           I will overrule the objection and receive the

8   substituted document, Exhibit 28.1, and instruct you, ladies

9   and gentlemen, to strike and disregard the testimony of this

10  witness, Mr. Scoufis, concerning the last item on the original

11  document, which related to an email on November 10th of 2015.

12      (Government's Exhibit 28.1 received into evidence.)

13          MR. SZOTT:  Thank you, Your Honor.

14  BY MR. SZOTT:

15  Q.  Mr. Scoufis, I should have probably asked you at the

16  outset.

17          You understand that you are still under oath?

18  A.  I do.

19  Q.  I'd like to turn our attention now to the spring of 2016.

20          MR. SZOTT:  Mr. Davila, would you please bring up

21  Exhibit 40.1.

22          This has not yet been received in evidence or

23  offered.

24  BY MR. SZOTT:

25  Q.  Mr. Scoufis, can you see the first page of Exhibit 40.1 on

1    your monitor?

2    A.  Yes.

3          MR. SZOTT:  Mr. Davila, would you please click

4    through the exhibit.

5          MR. JUBIN:  Your Honor, we have a problem with our

6    monitor again.

7          THE COURT:  Thank you.

8          MR. JUBIN:  These two again, I believe.

9          THE COURT:  That . . .

10         THE COURTROOM DEPUTY:  Zenith, is yours on?

11         MR. WARD:  No.

12         THE COURTROOM DEPUTY:  Is there a blue light on it?

13         MR. WARD:  Yes.

14         MR. JUBIN:  Yes.

15         THE COURTROOM DEPUTY:  The only thing we can do is

16   have IT come and work under the table.

17         THE COURT:  I guess we have to.  I don't know why

18   we're having such problems today.

19         THE COURTROOM DEPUTY:  IT is on their way.

20      (Discussion held at counsel table.)

21         THE COURT:  Becky, in the meantime, why don't we let

22   the jury go back to their room.

23         THE COURTROOM DEPUTY:  Okay.

24         All rise.

25   ///

```
19-CR-26-ABJ      SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1303
21-CR-14-ABJ
```

 1      (A recess was taken from 2:23 p.m. to 2:39 p.m.

Proceedings outside the jury's presence.)

 3           THE COURT:  A thought just struck me.  As the

original 28.1, Becky's going to need to take it off of JERS,

put on the new one, and we need to preserve this one for your

objection.

 7           MR. FLEENER:  My objection.

 8           THE COURT:  Right?

 9           MR. WARD:  Yes, sir.

10           MR. FLEENER:  Yes, sir.

11      (Proceedings within the jury's presence at 2:41 p.m.)

12           THE COURT:  Thank you, ladies and gentlemen, for your

patience.

14           Mr. Szott.

15           MR. SZOTT:  Thank you, Your Honor.

16           THE COURT:  We're looking at 14.1 or -- or 40.1.

17   BY MR. SZOTT:

18   Q.  Mr. Scoufis, are you able to see Exhibit 40.1 on your

monitor?

20   A.  Yes.

21   Q.  What is Exhibit 40.1?

22   A.  This is a look at --

23           THE COURT REPORTER:  I'm sorry.

24           THE WITNESS:  All good?  Yeah?  All right.

25   A.  (Continuing.)  This is a look at emails, NuTech press

1  releases, and trading in NuTech stock during the period of

2  April 21st, 2016, through May 19th, 2016.

3  BY MR. SZOTT:

4  Q.  Is it formatted in a time line?

5  A.  It is.

6  Q.  And what source materials did you rely on to compile the

7  time line that's Exhibit 40.1?

8  A.  OTC Markets, blue sheets, West Corporation, and Oath

9  Holdings.

10        MR. SZOTT:  Your Honor, the Government would offer

11  40.1 as a pedagogical chart.

12        MR. FLEENER:  No objections.

13        THE COURT:  40.1 is received.

14        MR. SZOTT:  Thank you, Your Honor.

15  BY MR. SZOTT:

16  Q.  Mr. Scoufis, I'd like to start with -- well, let me ask

17  you:  As with Exhibit 28.1, if there's an entry with no time

18  stamp, what does that mean?  Or why is -- let me just ask:

19  What does it reflect if there is no time indicated in the

20  "Time" column on 40.1?

21  A.  So for the stock sales, again, I wasn't able to find a

22  time; I didn't have a time.  And then for emails I may have

23  had a time, but I wasn't able to find the correct time zone.

24        So for both -- just like what we saw before -- I've

25  put those entries at the end of a day.

19-CR-26-ABJ      SCOUFIS - FURTHER DIRECT - SZOTT      Vol. VIII-1305
21-CR-14-ABJ

1   Q.  Let me ask you first about the email dated 4/21/2016, the

2   first entry from Colglazier to kevin@nutechenr.com.

3          And I'd like you to read just one sentence of the

4   body of that email, where I've indicated here, which begins,

5   "We can remove."

6   A.  All right.  "We can remove the caveat emptor designation

7   as soon as you have submitted an updated verified company

8   profile, which includes at the very least the company's

9   updated service providers."

10          MR. SZOTT:  Mr. Davila, would you please bring up

11  Exhibit 505, which has already been admitted.  And would you

12  please magnify the top about third or 25 percent of the

13  exhibit as I've marked.

14          And let's include the time stamp at the very top,

15  please -- or the date stamp, I should say.

16  BY MR. SZOTT:

17  Q.   Mr. Scoufis, this was the screen capture from archive.org

18  for NuTech's page on OTC Markets' website March 1st, 2016.

19          And, at the time, what is the status designation that

20  appears in the lower right of the magnified version of this

21  exhibit?

22  A.  We see the skull and crossbones or caveat emptor

23  designation.

24          MR. SZOTT:  Let's bring up -- let's return to 40.1,

25  please.

1   BY MR. SZOTT:

2   Q.  I'd like to ask you about the entry -- the next entry

3   here, April 25th, 2016, at 11:57:15 a.m.  What is -- what's

4   that entry?

5   A.  All right.  This is a NuTech press release, and the title

6   is "NuTech Energy Resources, Inc., Announces Removal of Caveat

7   Emptor Status."

8           MR. SZOTT:  Mr. Davila, would you bring up

9   Exhibit 506, please.  This has not yet been offered.

10  BY MR. SZOTT:

11  Q.  Mr. Scoufis, are you able to see Exhibit 506 on your

12  screen?

13  A.  Yes.

14  Q.  What is it?

15  A.  This is a look at NuTech's webpage on otcmarkets.com, for

16  April 30th, 2016.

17  Q.  And on this particular capture, the "Quote" tab is

18  highlighted; correct?  On the left side of the exhibit.

19  A.  That's correct.

20  Q.  Mr. Scoufis, before your testimony today, did you have an

21  opportunity to compare Government Exhibit 506 with the same

22  URL as reflected on archive.org, the Internet archive Wayback

23  Machine?

24  A.  Yes.

25  Q.  And how did Government Exhibit 506 appear to compare with

1   what you observed on the actual Internet site?

2   A.   This is it.   506 is the same.

3           MR. SZOTT:   The Government would offer 506,

4   Your Honor.

5           MR. FLEENER:   No objections.

6           THE COURT:   506 is received.

7       (Government's Exhibit 506 received into evidence.)

8   BY MR. SZOTT:

9   Q.   So, Mr. Scoufis, what is the jury seeing here in terms of

10  the date stamp captured and then a designation in the upper

11  right of the -- the upper right section of the -- of the

12  capture?

13  A.   We're looking at April 30th, 2016.   And then where the --

14  the status goes, we can see now that NuTech is OTC Pink

15  Current.   So they have made public information available and

16  they've gotten that designation.

17          MR. SZOTT:   I'd like to return to 40.1, please.

18  BY MR. SZOTT:

19  Q.   And if we can go to page -- let's -- before we go --

20  before we move on -- again, what are we seeing here in the

21  yellow bars on this and other pages, 4/27/2016, 5/9/2016?

22  What does that -- what's the information in the yellow

23  rows reflecting?

24  A.   Again, just like what we saw before, the yellow

25  rows represent stock sales.

19-CR-26-ABJ      SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1308
21-CR-14-ABJ

1          This is -- in the first one on April 27th, 2016,

2    Intrepid's selling a million NERG shares at .0014, and then,

3    later on, on May 9th, we see Intrepid selling 16 million NERG

4    shares at .00206.

5    Q.  And what are we seeing in between those two yellow sales

6    there on 5/9/2016?

7    A.  This is an email, dated May 9th, 2016, between Herman and

8    Winters.  The subject is "woo nelly."  And the body --

9    Q.  Can you read just the first line of the email?

10   A.  "I am really expecting to sell several hundred million

11   shares of NERG this week."

12          MR. SZOTT:  Can we go to page 2, please, Mr. Davila?

13   BY MR. SZOTT:

14   Q.  The entry in the -- for 5/10/2016, nine o'clock a.m.,

15   "NERG Press Release," what is that?

16   A.  Right, press release titled "NuTech Energy Resources

17   Receives Buyout Offer."

18          MR. SZOTT:  Mr. Davila, would you bring up

19   Exhibit 40.4.

20          And, Mr. Davila, would you please magnify the first

21   paragraph along with the headline and other information as

22   I've indicated.

23   BY MR. SZOTT:

24   Q.  Mr. Scoufis, what is the jury seeing here in the magnified

25   portions and generally in Exhibit 40.4?

1  A.  This is the May 10th press release.  Title is "NuTech

2  Energy Resources Receives Buyout Offer" and then we can see in

3  the text that NuTech is announcing they've received an offer

4  to buy the outstanding shares at 2.5 cents per share from

5  TechnoInvest Oil and Gas, Ltd.

6  Q.  That offer to purchase -- let me just ask you more

7  generally:  An offer to purchase a company's outstanding

8  shares, what does that mean?

9  A.  That refers to all of the shares that have been issued.

10  So everybody that holds stock would receive 2.5 cents

11  per share if the company approved this deal, if NuTech

12  approved this deal.

13  Q.  What if a particular shareholder didn't want to sell his

14  stock?

15  A.  Well, that would depend on -- on the company and if the

16  company directors, shareholders, everybody approved of the

17  deal.  If a minority, perhaps, wasn't in favor of this, it

18  wouldn't matter; they would get cashed out all the same.

19  Q.  So based on this -- based on the information in this press

20  release, I'd like to talk -- or I'd like to ask you about just

21  how much this offer was actually purportedly worth.

22        MR. SZOTT:  Mr. Davila, would you please bring up

23  Exhibit 313.

24  BY MR. SZOTT:

25  Q.  And, Mr. Scoufis, I direct your attention to the bottom

1    cite of Exhibit 313.

2         MR. SZOTT:  Mr. Davila, would you magnify where I've

3    indicated.

4    BY MR. SZOTT:

5    Q.  So, Mr. Scoufis, at least as of September 28th, 2015, how

6    many outstanding shares of NERG common stock were there?

7    A.  Over 42 billion outstanding shares.

8    Q.  So at 2.5 cents per share, how much is this supposed

9    Russian offer purportedly worth?

10   A.  So approximately -- it's a bit over a billion dollars.

11        MR. SZOTT:  Let's return to Exhibit 40.1.  And let's

12   go to page 2.

13   BY MR. SZOTT:

14   Q.  Mr. Scoufis, what are we seeing on the third row of page 2

15   of Exhibit 40.1?

16   A.  On May 10th, 2016, Intrepid sold 27 million NERG shares at

17   a price of .002837.

18   Q.  Now, although there's no time stamp associated with this,

19   are you able to say whether that sale happened after that

20   nine o'clock a.m. press release?

21   A.  Yeah.  I mean, as I mentioned earlier this morning, the

22   stock market opens at 9:30, so we know that it -- it did

23   happen after 9:30.  And the press release is at 9:00 a.m. so

24   yeah.

25   Q.  So assuming -- assuming the press release is 9:00 a.m.

1    Eastern Time, the sale must have taken place later?

2    A.  Correct.

3    Q.  And just looking down the exhibit, does Intrepid continue

4    to sell shares in the succeeding time frame?

5    A.  Yes.

6    Q.  So let's focus just a little bit on this 27 million shares

7    that are sold on May 10th of 2016.

8         MR. SZOTT:  Mr. Davila, would you please bring up

9    Exhibit 520.

10        And, Mr. Davila, if you'd please magnify the

11   May 10th, 2016, sale there toward the bottom of this exhibit.

12   BY MR. SZOTT:

13   Q.  So, Mr. Scoufis, this sale of 27 million shares, what was

14   the gain from that sale?

15   A.  Intrepid received $76,599 for that sale.

16   Q.  And because this data -- because these data come from the

17   blue sheets, there would have been -- there might -- there

18   would be a commission that would be deducted from this;

19   correct?

20   A.  Correct.  If you're looking at profits, yeah, you'd deduct

21   the commission, the -- the cost to trade from this.

22        MR. SZOTT:  Let's return to Exhibit 40.1.

23   BY MR. SZOTT:

24   Q.  So we saw that the actual trade was between 76- and

25   $77,000.  Mr. Scoufis, how much would those 27 million shares

1   have been worth at 2.5 cents per share?

2   A.  Approximately $675,000.

3   Q.  Or even exactly $675,000?

4   A.  I think so.

5           MR. SZOTT:  Let's return to page -- page 2,

6   Mr. Davila.

7   BY MR. SZOTT:

8   Q.  So in the peach-colored rows we see here on -- on page 2,

9   Mr. Scoufis, what do those refer to?

10  A.  Looking at press releases.

11  Q.  And then we have email in the blue rows with the subject

12  captured on the right side there?

13  A.  Correct.

14  Q.  And I won't walk through all of these.  That is, I --

15  I won't walk through any of them.

16          Let's go to page 3.

17          And so this is the last email here on page 3?

18  A.  Correct.

19          MR. SZOTT:  Let's go to Exhibit 507.

20  BY MR. SZOTT:

21  Q.  Mr. Scoufis, can you see Exhibit 507 on your monitor?

22  A.  Yes.

23  Q.  What is it?

24  A.  This is a -- a look at NuTech's page on otcmarkets.com as

25  of May 28, 2016.  It's from the Wayback Machine.

19-CR-26-ABJ    SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1313
21-CR-14-ABJ

1  Q.  I think you said "May 28th."  It appears to be May 29th.

2  A.  Yes, May 29th.  I apologize.

3  Q.  Mr. Scoufis, before your testimony today were you able to

4  compare Government's Exhibit 507 with the same URL on the

5  Internet archive Wayback Machine actually on the Internet?

6  A.  Yes.

7  Q.  How did Government Exhibit 507 appear to compare with what

8  you saw online?

9  A.  This is the same.

10       MR. SZOTT:  Your Honor, the Government would offer

11  Exhibit 507.

12       MR. FLEENER:  No objections.

13       THE COURT:  507 is received.

14     (Government's Exhibit 507 received into evidence.)

15       MR. SZOTT:  Mr. Davila, would you please magnify as

16  I've marked, about the top third, including the date stamp on

17  the top of the exhibit.

18  BY MR. SZOTT:

19  Q.  So, again, the symbol -- what are we seeing in terms of a

20  symbol here, Mr. Scoufis?

21  A.  We see the skull and crossbones, caveat emptor, buyer

22  beware.

23  Q.  And then I note there's an indication of "Suspended"

24  toward the left side.  Do you know whether trading in NuTech

25  stock was actually suspended by the SEC during this

19-CR-26-ABJ      SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1314
21-CR-14-ABJ

1   time frame?

2   A.  Yes.  NuTech stock was suspended from trading starting

3   May 20th through, I believe, June 3rd.

4   Q.  And the suspension order, is that -- is that available on

5   the SEC's website today?

6   A.  Yes.  It's publicly available.

7        MR. SZOTT:  Mr. Davila, would you bring up

8   Exhibit 511, please.

9   BY MR. SZOTT:

10  Q.  Mr. Scoufis, what is Government Exhibit 511?

11  A.  This is a price/volume chart for NuTech stock for the

12  period of April 18th, 2016, through June 13th, 2016.

13  Q.  What were -- what were the source data that you relied on

14  to create -- or let me ask, who created this chart?

15  A.  I created this chart.

16  Q.  What source data did you use?

17  A.  Bloomberg.

18  Q.  And was that reflected in the prior exhibit, the Bloomberg

19  exhibit that was received this morning?

20  A.  Yes.

21        MR. SZOTT:  Your Honor, the Government offers 511.

22        MR. FLEENER:  No objections.

23        THE COURT:  511 is received.

24     (Government's Exhibit 511 received into evidence.)

25  ///

1    BY MR. SZOTT:

2    Q.  So, Mr. Scoufis, what is the jury seeing here in

3    Exhibit 511?

4    A.  We're seeing that familiar-looking price/volume chart with

5    the black line representing the closing last sale price and

6    the daily trading volume in the red bars.  This is for the

7    period of April 18th, 2016, through June 13th, 2016, so it's a

8    different period than what we were looking at before.

9         MR. SZOTT:  I'd like to go to Exhibit 512.

10   BY MR. SZOTT:

11   Q.   Mr. Scoufis, what are we seeing here?

12   A.   Price/volume chart with information related to the -- the

13   average volume for a certain period as well as price increase.

14   Q.   Where did the information come from?

15   A.   Bloomberg.

16        MR. SZOTT:  Your Honor, I'd ask that 512 be published

17   as a demonstrative only.

18        THE COURT:  Motion is granted.

19   BY MR. SZOTT:

20   Q.   So, Mr. Scoufis, would you explain, please, the annotation

21   in the green box in the upper right of the exhibit?

22   A.   The average daily trading volume between May 6th, 2016,

23   through June 7th, 2016, is a bit above 81 million shares

24   a day.  And then the price increased 288 percent from the

25   closing last sale price on May 4th, 2016, compared with

1    May 10th, 2016.

2         MR. SZOTT:  Can we bring up Exhibit -- let's go to

3    Exhibit 513.

4    BY MR. SZOTT:

5    Q.  Mr. Scoufis, what are we seeing here?

6    A.  Price/volume chart for the period of April 18th, 2016,

7    through June 13th, 2016, with NuTech press releases added with

8    the orange small squares.

9    Q.  Did you review those press releases?

10   A.  Yes.

11        MR. SZOTT:  Your Honor, again, I would offer this to

12   be published as a demonstrative only.

13        THE COURT:  It is received.

14   BY MR. SZOTT:

15   Q.  And, again, Mr. Scoufis, would you explain to the jury

16   what they're seeing now in 513.

17   A.  Now I've just added on press releases with those familiar

18   orange squares, and we're just looking at them as they relate

19   to the closing last sale price and then the daily trading

20   volume.

21        MR. SZOTT:  Let's go back to the Exhibit 520, please.

22   BY MR. SZOTT:

23   Q.  And we've seen this before.  But here on Exhibit 520,

24   Mr. Scoufis, is Intrepid's trading activity in May of 2016

25   reflected toward the bottom of the table that's on this

1  exhibit?

2  A.  Yes, it is.

3  Q.  There's an indication here at the bottom right, "No shares

4  sold short."

5       Would you explain to the jury the practice or concept

6  of short-selling when it comes to securities.

7  A.  With stock, you can buy it and you can sell it, and you

8  can also sell it short.  And selling short is a little bit

9  different.  Normally, we think about selling something we

10 already own.  With short-selling, we're actually selling

11 something that we don't own.  And in order to do that, you

12 have to borrow it from somebody else who does own the stock,

13 take it, you sell it into the market.

14       At some point later on, you have to return it to the

15 person you borrowed it from, and you're hoping to return it at

16 a -- you're hoping to buy it back later on at a lower price.

17 And so short-selling is just a bet against the stock.  It's a

18 bearish bet.

19 Q.  The indication here -- there was no short-selling involved

20 in the data that are reflected in Exhibit 520?

21 A.  That's correct.

22       MR. SZOTT:  I'd like to move to Exhibit 510, please.

23 BY MR. SZOTT:

24 Q.  Mr. Scoufis, are you able to see -- are you able to see

25 510 on your monitor?

1   A.  Yes.

2   Q.  What is Exhibit 510?

3   A.  This is a look at the ten individuals or entities that had

4   the highest net proceed by -- from trading in NuTech stock

5   during the period of June 2nd, 2015, through June 17th, 2016.

6   Q.  What is your source -- or did you create this document?

7   A.  Yes.

8   Q.  What is your source for this document?

9   A.  Blue sheets.

10  Q.  And that was the spreadsheet that's contained on the disk

11  that was received in evidence earlier today?

12  A.  Yes.

13          MR. SZOTT:  The Government would offer Exhibit 510.

14          MR. FLEENER:  No objections.

15          THE COURT:  510 is received.

16      (Government's Exhibit 510 received into evidence.)

17          MR. SZOTT:  Mr. Davila, I'd ask that you magnify the

18  top portion of the exhibit, basically reflecting the majority

19  of the text that's on the exhibit.

20  BY MR. SZOTT:

21  Q.  So, Mr. Scoufis, would you explain to the jury what

22  they're seeing here.

23  A.  Yes.

24          So the blue sheets -- I'm just going to go back to

25  the blue sheets.  They include every single trade.

1          And then what I've done here is sum up all of those

2    trades for a specific account, or, if it's the same entity or

3    individual that has multiple accounts, I'd sum up those

4    accounts, as well, and we can just read all of that trading in

5    one line.

6          So just using the first row as an example, we see

7    "SBM Securities."  That's the name of the account.

8          Then we can move over.  Under "Account" I've just

9    used an identifier for the brokerage firm plus the last four

10   of the account number.

11         And then the next two columns, "Shares Bought" and

12   "Shares Sold," look at during this time period, June 2nd,

13   2015, through June 17th, 2016, how many shares did that

14   individual or entity buy and how many shares did they sell.

15   So for SBM they bought 0 shares and sold over 124 million

16   shares.

17         Moving to the next two columns, those cover the

18   values, so the value of the shares bought and the value of the

19   shares sold.

20         Of course, because SBM did not buy any shares,

21   there's no value assigned, which is zero dollars.  But for

22   shares sold, we see a value of over $891,000.

23         And then the "Net Proceeds" is just the difference

24   between shares bought and shares sold, the value of shares

25   bought and shares sold.

 1           And then the "Date Range" is specifically when was

 2    the first trade for that account or those accounts and when

 3    was the last trade.

 4           And so these are the 10 individuals or entities that

 5    made the most money during this time period.

 6    Q.   And that's the most money selling NERG?

 7    A.   Correct.

 8    Q.   I direct your attention to the fourth line, the net

 9    proceeds for Intrepid Capital Holdings Corp.  What are the net

10    proceeds for Intrepid during this time frame selling NERG?

11    A.   $192,192.

12    Q.   And, again, the -- that amount includes commissions.  So

13    if the commissions were deducted, the actual figure would be

14    slightly lower; correct?

15    A.   This figure does not include the commissions.

16           But you are correct that the profits would be a bit

17    lower if we subtracted the commissions from this number.

18           MR. SZOTT:  Let's go to Exhibit 502.

19    BY MR. SZOTT:

20    Q.   Mr. Scoufis, what are we seeing here in Exhibit 502 -- or

21    I should ask, what's on your monitor as Exhibit 502?

22    A.   This is a look at the 10 individuals or entities that lost

23    the most money during the time frame of June 2nd, 2015,

24    through June 17th, 2016.

25    Q.   And that's -- what was the source for this exhibit?

```
19-CR-26-ABJ     SCOUFIS - FURTHER DIRECT - SZOTT    Vol. VIII-1321
21-CR-14-ABJ
```

1    A.   Blue sheets.

2    Q.   And who created the exhibit?

3    A.   I did.

4         MR. SZOTT:  The Government would offer 502,

5    Your Honor.

6         MR. FLEENER:  One second, please, Judge.

7         THE COURT:  One second.

8         MR. FLEENER:  Maybe more than one.

9         I have no objections.

10        THE COURT:  It is received.

11      (Government's Exhibit 502 received into evidence.)

12        MR. SZOTT:  Mr. Davila, would you please magnify the

13   primary text portion at the top third of the exhibit.

14   BY MR. SZOTT:

15   Q.   So, Mr. Scoufis, using the first entry as an example, will

16   you explain what the jury's seeing here on Exhibit 502.

17   A.   Yeah.  This is going to look very similar to what we were

18   looking at in the previous exhibit.

19        Here, we've got Zhuan Yin has an account at Charles

20   Schwab -- that's "C-H-A-S." -- account ending 6803.  We see

21   that almost 19 million shares were bought and almost

22   19 million shares were sold.

23        And then we, of course, have the values assigned to

24   the shares bought and the shares sold and then the net

25   proceeds, so the difference between shares-bought value and

1    shares-sold value.  And, again, the date range of trading for

2    the individual or entity.

3    Q.  And what is the net proceeds for that first listed

4    individual or entity?

5    A.  $133,677.

6    Q.  And that's negative?

7    A.  Yeah, as in Zhuan Yin lost $133,677.

8         MR. SZOTT:  You can remove the magnification.

9    Thank you, Mr. Davila.

10        I'd like to return to Exhibit 40.1.

11   BY MR. SZOTT:

12   Q.  One thing I neglected to ask on page -- I believe it's 2.

13        Mr. Scoufis, on the May 13th, 2016, entry -- it's an

14   NERG press release -- there's a nine o'clock a.m. and then

15   there's an asterisk on that.

16        Why did you place the asterisk for that particular

17   press release?

18   A.  For the NuTech press release on May 13th, there was a

19   correction.  And some of the records just listed the corrected

20   press release with the 9:00 a.m. time frame, but I had

21   other -- I saw other records that listed it a couple hours

22   later as being corrected.  It was, I believe, either the date

23   of the call or the time of the call was corrected.

24        So I just wanted to put that asterisk to be -- to --

25   to notify that there's a little discrepancy.

1            MR. SZOTT:  May I have a moment, Your Honor.

2            THE COURT:  You may.

3            MR. SZOTT:  Your Honor, before I pass this witness

4    and ask my last question or two, at this time the Government

5    would unconditionally offer Exhibit 28.34.  That's the Skype

6    chat that the Court received conditionally.

7            I would offer that now to be received

8    unconditionally.

9            MR. FLEENER:  No objections.

10            THE COURT:  It will be received.

11      (Government's Exhibit 28.34 received into evidence.)

12    BY MR. SZOTT:

13    Q.  So, Mr. Scoufis, just to close out --

14            MR. SZOTT:  And we can take the exhibit down.

15    BY MR. SZOTT:

16    Q.  In -- in your experience, how common is it for investors

17    to lose money trading securities?

18    A.  How common is it for investors to lose money?

19            You know, sometimes investors make money; sometimes

20    they lose.  I guess the long-term trend of the stock market is

21    upward so, in general, people make money.

22    Q.  But it's not uncommon for people to lose money?

23    A.  No.

24    Q.  What is the overarching purpose of this nation's

25    securities laws and regulations vis-á-vis investors?

1   A.  I mean, the -- the overarching policy for securities

2   regulations is disclosure, truthful disclosure, give investors

3   the information they need to make intelligent trades.

4          MR. SZOTT:  I'd pass the witness, Your Honor.

5                    **FURTHER CROSS-EXAMINATION**

6   **BY MR. FLEENER:**

7   Q.  You'd certainly admit, Mr. Scoufis, that there's a

8   difference between the average -- average investor's

9   expectation in trading -- buying Microsoft and buying penny

10  stocks.

11         Penny stocks are much more of a gamble than a blue

12  chip company that has been around for 80 years paying

13  dividends, that penny stocks are much more of a gamble or a

14  riskier -- risky investment than Microsoft?

15  A.  That's correct.

16  Q.  And so when you -- when you say that the up -- the -- the

17  stock market, in general, has an upward trajectory; correct?

18  A.  Correct.

19  Q.  And we're talking about the indexes.  If you're following

20  the S&P 500, you're following the Nasdaq, you're following the

21  Dow Jones, over decades they -- with dips and stuff -- they

22  tend to eventually go upward; correct?

23  A.  Correct.

24  Q.  And -- but with -- you would agree that with penny stocks

25  it's a much riskier investment?

1    A.   Correct.

2    Q.   All right.  And you -- you testified that -- and I -- and

3    Mr. Szott asked a -- kind of a big, philosophical question at

4    the end about the -- sort of the spirit of the American

5    securities regulatory industry, that the goal is transparency

6    and -- and providing the individual investor with as much

7    information as he or she can have to make a good investment

8    decision.

9    A.   That's right, yeah.  And truthful.

10   Q.   Truthful?

11   A.   Yeah.

12   Q.   But -- but do you know any investor that -- have you guys

13   been able to find anybody who's digging around in

14   OTC marketplace and was concerned about the date of the

15   convertible debt that was dealt with between Mr. Rodgers and

16   Mr. Pardy and EcoPro?  I mean, you would agree that -- I mean,

17   do you have anybody that relied on the information that was

18   posted in OTC Markets to make an investing decision in this

19   case?

20   A.   I don't think I'm the right person to answer that.  I --

21   I don't know.

22   Q.   Okay.  Well, you either know or don't know.

23        Do you know of anybody who -- who made an investing

24   decision in this case based on what was posted in OTC

25   marketplace?

1             Do you know?

2    A.  No.

3    Q.  Okay.  And I was looking at -- I'm going to try to do

4    better.

5             I'm going to show you Exhibit 510.  It's already been

6    admitted into evidence, and you -- you discussed it a few

7    minutes ago.

8             You recall Exhibit 510; correct?

9    A.  Yes.

10   Q.  And the first thing I want to do is talk about -- and you

11   can see my little -- my little hand -- I don't know how to do

12   the fancy stuff that Mr. Szott and Mr. Davila do.

13            But my hand, the little hand on the screen, is before

14   "Intrepid Capital Holdings"; correct?

15   A.  Correct.

16   Q.  All right.  And Intrepid -- the truth is -- so throughout

17   your investigation the -- the total amount of shares that

18   Intrepid Capital Holdings sold, at least according to the work

19   you did -- sir?

20   A.  One note.

21            This is not the -- the 510 that I was looking at

22   earlier.

23   Q.  Hm-m.

24   A.  I did create this but it changed over time due to

25   commissions so . . . this is -- the numbers here --

1    Q.  So this is not the -- this is not the 510 that you looked

2    at and was admitted?

3         (Discussion held between counsel.)

4              MR. FLEENER:  Okay.  May I have a second, Judge.

5              THE COURT:  Yes, sir.

6         (Discussion held between counsel.)

7              MR. FLEENER:  There have been various iterations of

8    documents and I apologize.  I apologize.

9              The United States is going to pull up my 510.  I do

10   appreciate Mr. Davila's help.

11   BY MR. FLEENER:

12   Q.  Okay.  This is the 510 that's been admitted?

13   A.  Yes.

14   Q.  All right.  And this 510 actually doesn't include -- that

15   actually is -- is -- when you say "Net Proceeds" on the --

16   basically -- the far right -- do you see where it says "Net

17   Proceeds"?

18   A.  Yes.

19   Q.  That really isn't net proceeds?  That is gross proceeds

20   before commissions are taken out?

21   A.  This does not incorporate commissions.

22   Q.  Right.  So the truth is that when you look at Intrepid

23   Capital Holdings on Exhibit 510, the 192,192, you actually

24   have -- there's actually about $10,000 in commissions that

25   didn't go to Intrepid Capital Holdings; correct?

19-CR-26-ABJ      SCOUFIS - FURTHER CROSS - FLEENER    Vol. VIII-1328
21-CR-14-ABJ

1    A.  I -- yeah.  It's something like that.  It's a -- yeah,

2    something like that.

3    Q.  And if I told you the net proceeds were $182,718, you

4    wouldn't quibble with me on that?

5    A.  Sounds about right.

6    Q.  Okay.  That was the exhibit I was given earlier from you

7    guys, so I assumed that your math was correct there.

8         Anyway, the 192,192 that we're seeing right now,

9    Mr. Scoufis, from Intrepid Capital Holdings -- you know,

10   I believe there's been a bunch of evidence that's been

11   presented that not all of that money went to Justin Herman and

12   Chuck Winters as far as ultimately following the money on the

13   trades.  Correct?

14        A bunch of it went to Bob Mitchell at Bravo 20?

15   A.  I really -- I can't confirm that.  I don't know where the

16   money went.

17   Q.  Okay.  And who is SBM Securities, the number one block?

18        And why aren't they sitting here?

19        MR. SZOTT:  Objection, Your Honor.

20   BY MR. FLEENER:

21   Q.  Who's SBM Securities?

22   A.  My understanding of who SBM Securities is is some sort of

23   financial firm in the country of Mauritius.

24        I may get that -- I may have gotten that country

25   wrong, and that -- that is all of my understanding.

1  Q.  And HBA Group, do you know who they are?

2  A.  HBA Group is a -- well, I know that they are a company

3  that received free-trading shares from the -- the 13 billion

4  share issuance, the September 28th issuance.

5  Q.  I assume it would be important to your testimony and the

6  overall investigation to find out who these other groups were

7  that made -- it looks like -- twice as much money in this --

8  this thing than -- than Intrepid Capital Holdings.  Correct?

9  A.  Sure.

10 Q.  Okay.  And so who -- who is HBA Group?

11 A.  You know, off the top of my head, I can -- I can say what

12 I know.  I --

13 Q.  Please.

14 A.  To say something, you know, really accurate, I'd want to

15 look at documents.

16 Q.  What do you know?

17 A.  I believe it's a -- there are individuals involved with

18 HBA Group, somebody named Alexander Albert.  That's the only

19 one that's coming to mind now, yeah.

20 Q.  What about Thomas Collins?

21 A.  Again, received free-trading shares from the

22 September 28th issuance.

23 Q.  Do you have any -- any evidence or have you reviewed any

24 evidence or seen any evidence that ties our clients to

25 Thomas Collins sending -- that our clients somehow sent shares

19-CR-26-ABJ      SCOUFIS - FURTHER CROSS - FLEENER    Vol. VIII-1330
21-CR-14-ABJ

1    to Thomas Collins, for instance?

2    A.   I mean, they all received shares from the 13 billion share

3    issuance.

4    Q.   Right.  I understand that.  But do you have anything that

5    has our clients sending shares?

6         I -- I understand our -- our clients' involvement in

7    the free-trading shares.  Right?  I mean, we were involved

8    in -- in the creation of free-trading shares; correct?

9    A.   Correct.

10   Q.   All right.  But I -- and I -- and I appreciate that.

11        And our clients received some free-trading shares;

12   correct?

13   A.   Correct.

14   Q.   And then a bunch of other free-trading shares ended up,

15   apparently, with SBM Securities, HBA Group, and

16   Thomas Collins; correct?

17        Because it says "Shares Bought, 0," which means they

18   had to have gotten their shares from somebody.

19   A.   That's what that suggests, yeah.

20   Q.   Okay.  Who's that somebody?

21        MR. SZOTT:  I might object, Your Honor.  These

22   factual questions are beyond the scope of the exhibit and

23   beyond the scope of direct.

24        THE COURT:  Sustained.

25        MR. FLEENER:  Well, Judge, this is their exhibit.  It

1   says "Shares Bought, 0," and they -- yes, sir.

2   BY MR. FLEENER:

3   Q.  All right.  The bottom line is you don't really know much

4   about numbers 1, 2, and 3 on this list; correct?

5   A.  I know a little.

6   Q.  Okay.  And your -- but your testimony here is focusing on

7   Intrepid Capital Holdings?

8   A.  That's correct.

9       MR. FLEENER:  510 can go away.  Thank you,

10  Mr. Davila.

11  BY MR. FLEENER:

12  Q.  I'm going to show you now -- I hope I have the right

13  iteration of 419.

14      MR. FLEENER:  Rachel.

15      I apologize.

16     (Discussion held at the podium.)

17  BY MR. FLEENER:

18  Q.  In a second 419 is going to come up, hopefully.

19      Do you have it in front of you, sir?

20  A.  I do.

21  Q.  Awesome.  This is the -- please tell me I have the

22  right -- well, it's gone.

23      Please tell me this is the right 419.

24  A.  I think so.

25  Q.  Awesome.  Okay.

 1          I mean -- and this is -- and 419 is the document that

 2     you created -- correct?

 3     A.  Correct.

 4     Q.  -- the chart?

 5          And what it -- what it -- what you intend to do --

 6     what you intended to do with this chart is to show both the

 7     volume and the price -- and the price movement of NuTech when

 8     various press releases came out; correct?

 9     A.  Yeah, in relation -- the press releases in relation to

10     the -- the price and the volume, yeah.

11     Q.  But when I look at this chart -- and tell me if I'm

12     wrong -- it appears that sometimes press releases came out and

13     the stock dropped in price, sometimes press releases came --

14     went out and the stock raised in price.

15          I mean, am I -- am I seeing this right?

16     A.  That's right.

17     Q.  And I -- I'll focus in particular where my hand is -- so

18     you can see the little hand there on the press release.  It

19     appears to be, oh, sometime around December 4th, maybe, of

20     2015.  It looks like a press release came out and the stock

21     price dropped.

22          Do you see my hand?

23     A.  Right.  Yes.  So --

24     Q.  I mean, is that true?

25          When a press release came out, the stock price didn't

1   necessarily go -- went up?  Sometimes it would go down?

2   A.   That's correct, yeah.

3   Q.   Thank you.

4        And I'm going to get rid of 419, and I'm going to

5   show you 420.

6        Okay.  And you're seeing 420; correct?

7   A.   Correct.

8   Q.   And 420 was another -- it will come back.

9        420 was another chart that -- that you created for

10  this trial; correct?

11  A.   Correct.

12  Q.   And -- and the difference between 419 and 420 is 419 dealt

13  with press releases; correct?

14  A.   Correct.

15  Q.   And 420, when it says "Promotion Analysis," "promotion" is

16  the emails?

17  A.   Correct.

18  Q.   And when I look at this document -- I mean, there appears

19  to be some days that emails came -- that email promotions came

20  out and the stock price went up.  Correct?

21  A.   Correct.

22  Q.   But there are other days that email promotions came out

23  and the stock price went down?

24  A.   Correct.

25  Q.   I'll go ahead and get rid of 420.

1      I'm going to show you Exhibit 514 that's already been

2  admitted, as well, and I think you prepared this.  It is

3  the -- it shows just the -- how NERG traded from January of

4  2015 to June 30th of 2016.  I think this is the document that

5  you received the data from Bloomberg and put it into about a

6  five-page document.

7      Do you recall the document?

8  A.  Uh-huh.  Yes.

9  Q.  I'm going to show that to you now.

10      And I'm on the first page of the document -- oops.

11  And we're back.

12      You recall this document; correct?

13  A.  Yes.

14  Q.  And this is the document you prepared, again, for this

15  trial?

16  A.  Yes.

17  Q.  And you prepared it using -- using data that you got from

18  Bloomberg, among other places, I assume.

19  A.  Nope.  This is just from Bloomberg.  It's just downloaded.

20  It looks like this -- I've just added some formatting so we

21  can easily identify what this data refers to.

22  Q.  I appreciate that.

23      And this basically covers 18 months worth of trades?

24  A.  It does.

25  Q.  The -- I'm on page 2.  And . . . you can see between

1  November 6th and November 17th -- I mean, there -- there are a

2  few big trading days, and that sort of tapers off; correct?

3  A.  Some days are a lot bigger than other days, yeah.

4  Q.  Sure.  November 17th, for instance, is a big day?

5  A.  Correct.

6  Q.  December 4th is a big day, 67 million shares; correct?

7  A.  Correct.

8  Q.  I'm down at January 13th where 50 million shares traded.

9  Do you see that?

10 A.  Yes.

11 Q.  Are you able to tell the jury that -- that there was some

12 either promotion or a press release that -- that triggered

13 these large trading days, all of them?

14 A.  No.

15 Q.  I mean, the truth is sometimes -- now, you -- you believe

16 this stock is manipulated; safe -- safe to say?  Correct?

17        I'm asking -- I'm throwing you a softball.

18 A.  Yes.

19 Q.  Okay.  I mean, I -- look.  I mean -- I'm just asking the

20 question.

21        But the truth is -- is that sometimes stocks just

22 have a whole bunch of volume without anything -- any news --

23 and I'm not talking about manipulated stocks.  I'm just

24 talking about stocks.

25        Sometimes stocks just move because they just move?

19-CR-26-ABJ        SCOUFIS - FURTHER CROSS - FLEENER    Vol. VIII-1336
21-CR-14-ABJ

1    And they have volume because they just have volume?

2    A.   I don't think that's -- I mean, there's always a reason

3    for volume.

4    Q.   People are buying and people are selling.  But there may

5    not always be an impetus other than simply people buying and

6    selling, which causes more buying and selling?

7            That's -- that's a -- a fair statement to make, isn't

8    it, that sometimes buying and selling creates more buying and

9    selling?

10   A.   Sure.

11   Q.   Okay.  And so sometimes when stocks move, it's not that

12   they're moving because of some underlying thing that's

13   happening to the particular company?

14           Sometimes they just move because people buy, people

15   sell, which creates more people buying and more people

16   selling?  That's true sometimes?

17   A.   I think that that could be true, sure.

18   Q.   And on some of these days where there's high volume --

19   I -- again, there was some -- some of these days where there's

20   high volume in this stock there weren't any promotions --

21   there weren't any email blasts and there weren't any press

22   releases and there weren't any conference calls.  The stock

23   just sold -- I say "sold" -- traded a whole bunch of shares;

24   correct?

25   A.   Yes.

1   Q.  And -- and consistent with what I just -- you agreed with

2   me on -- which is that sometimes stocks just trade and people

3   buy and people sell and people buy and people sell and the

4   stock price or volume may move really just based on people's

5   buying and selling habits -- that -- that happened to NuTech

6   in 2021, didn't it?

7   A.  I don't know.  And, also, I think you're overemphasizing

8   how much I agree with people just buying and selling and

9   buying and selling.  I think that that could happen.  I don't

10  think that that often happens.

11  Q.  You don't think that people just sit -- that -- that day

12  traders will sit in front of their -- their monitor and see a

13  company that they have no idea what it means that's trading on

14  20 times its average daily volume and see a decent spread

15  between the offer and the sell and jump in and jump out and

16  trade that stock just because everybody else has been trading

17  that stock and they think they can make some money?

18       You don't think that happens a lot?

19  A.  I think that that happens, but you're attributing that

20  buying and selling to an entire day's volume.

21       And the reason a volume could be high is perhaps not

22  because of a press release or a promotion.  It could be

23  because of some event that happened to the -- the US that --

24  Q.  Sure.

25  A.  -- affects an entire industry.

 1            So while buying and selling -- because buying and

 2    selling happens, there's usually an impetus.

 3    Q.  And sometimes the impetus has nothing to do with the

 4    under -- with whatever is happening with that particular

 5    company?  That's my -- that's what I'm trying to make you --

 6    see if you'll agree with me, that sometimes stocks move with

 7    nothing to do with the underlying company and what's happening

 8    with the underlying company and what news is being put out by

 9    the underlying company.  There's all sorts of reasons stocks

10    move?

11    A.  Yes.

12    Q.  Okay.  I'm going to go ahead and get rid of 514.

13            And . . . I'm going to show you -- this is another --

14    it's another -- now, this one I know has been modified a

15    couple different times.

16            520 you testified about, and it said "No shares sold

17    short" with the little asterisk on the bottom.  You recall

18    that?  520 is the Intrepid Capital Holdings -- all the trading

19    that Intrepid did in NERG.

20            You recall that document?

21    A.  Yes.

22    Q.  You prepared it; correct?

23    A.  Yes.

24    Q.  All right.  I'm going to show you that.

25            And you -- it usually blips on -- there it is.

1      And you recall this document; correct?  I'm -- and

2  I'm showing 520.

3  A.  Correct.

4  Q.  And this is -- document's already been admitted into

5  evidence.  This is -- this was prepared by you for this trial?

6  A.  Yes.

7  Q.  And it involves NuTech Energy and the numbers of shares

8  that Intrepid Capital -- well, it included the buy, but it

9  includes, essentially, all the sales -- all the trading that

10  Intrepid Capital did between November of 2015 and May 16th of

11  2016; correct?  This is a -- basically -- a trading table?

12  A.  Correct.

13  Q.  All right.  And in this trading table, there's one small

14  buy on November of -- November 2nd of 2015; right?

15  A.  Correct.

16  Q.  And then the rest were all sales of stock?

17  A.  Correct.

18  Q.  And that -- and you went through -- you remember going

19  through the Skype chat and tying the -- what those guys were

20  talking about in the Skype chat to the sales; correct?

21  A.  Correct.

22  Q.  And that was all on November 6th of 2015?

23      The Skype chat.

24  A.  No, it's not just November 6th.  It also includes dates,

25  I think, before and after.

1    Q.  But one of the dates was -- was on November 6th; correct?

2    A.  Correct.

3    Q.  And all of these -- and you can see my hand moving around

4    in the document.

5            These various sales, I -- you know, you -- on

6    November 6th of 2015, that was what you were -- I -- some of

7    those, at least -- you were sort of trying to match up --

8    I thought he was going to object.

9            You matched up with the Skype chat; correct?

10   A.  Correct.

11   Q.  And so with -- with -- with all of that, that discussion

12   on November 6th, we're still talking about less than $20,000

13   worth of proceeds on stock sales; correct?  Give or take.

14   A.  Yeah.  Maybe.

15           But, yeah, right around there.

16   Q.  And I don't want to quibble with you on the math.  You

17   know I -- the point I'm getting at.

18           We're talking -- we're talking $20,000, give or take,

19   of proceeds from sales of all the -- all the stock that these

20   guys were talking about on November 6th of 2015?

21   A.  Yes.

22   Q.  Okay.  And you would agree with me, would you not, that

23   when you're looking at the quantity of shares that -- that

24   Intrepid Capital sold on these various days and when you --

25   I assume you had the opportunity to compare the quantity that

1    Intrepid sold to the total volume of shares that were traded

2    and sold in a particular day.

3            Did you ever do that?

4    A.  Yeah.  I probably took a look, yeah.

5    Q.  I'm sure you did.  I did, too.  And I -- what I -- tell me

6    if you agree because I'm not going to try to compare -- bring

7    the two charts up because I'm not -- I don't have Mr. Davila

8    doing -- doing my work for me.

9            But you would agree with me, would you not, that

10   there was never a day in here where Intrepid Capital sold

11   30 or 40 or 50 percent of the -- of -- of -- controlled 30 or

12   40 or 50 percent of the market?

13           I think I found my biggest day of being like

14   11 percent, maybe.

15   A.  I don't disagree with you, but I -- I haven't looked

16   anytime recently.

17   Q.  And I appreciate that.  And that makes sense because when

18   we go back to -- if we went back to the exhibit that had

19   Intrepid Capital as being the fourth biggest seller of -- of

20   NERG -- you -- you remember that exhibit?

21   A.  Right.

22   Q.  I mean, the other -- the other three that were on top it

23   and certainly the number one, it looks like it had -- I don't

24   know -- 4 -- almost 4 times the proceeds -- maybe even more --

25   maybe even closer to 4 1/2 times the proceeds of its sales

1   compared to Intrepid Capital, that SBA or whatever it was.

2   A.   There were a lot more sales from those three, yes.

3   Q.   And I'm not trying to -- and I'm not trying to get you to

4   commit to anything other than simply the proposition that

5   Intrepid Capital Holdings was not selling -- that there were

6   other sellers that were selling a lot more shares than

7   Intrepid Capital -- Intrepid Capital Holdings throughout the

8   period that NERG was actively trading.

9   A.   Yes.

10   Q.   And I do want to point that out while I've got 520 --

11   520 posted.

12        And I -- and I do this to -- I know your -- your job

13   here is to inform the jury as an expert, which is important

14   and necessary and legal and everything else.  I -- but I --

15   I want to make sure that the jury is not misled, and I'm not

16   trying to say that you have misled the jury.

17        But when we see these quantities of shares being

18   traded -- and my hand -- my finger is right before -- or my --

19   I put the little hand on -- well, I'll put it on -- on

20   November 9th of 2015.

21        I mean, a million shares of stock sounds like a large

22   number of shares of stock, probably, to a normal person.  But

23   when that thing is -- is actually trading at 6/10 of a

24   penny -- I mean, a million shares of stock only leads to $6100

25   in gross proceeds; right?

1    A.   Correct.

2    Q.   And then from the gross proceeds you're going to take

3    whatever Kingdom Trust or whoever it was decided that -- that

4    conducted this transaction -- you're going to take -- I don't

5    know -- a couple hundred dollars from that?

6         That would be a fair -- a fair commission?  I know --

7    not an exact commission but a fair commission?

8    A.   Usually, commissions for trades are like 8 to 10 bucks.

9         I do recognize the -- the commissions here were quite

10   a bit higher than that.

11        What's fair?  I don't know.

12   Q.   I understand.

13        But you did -- and I appreciate you saying this,

14   Mr. Scoufis, because you recognize the commissions that these

15   guys were paying is a lot more than folks pay on E*Trade Pro

16   at 4.95 or -- now -- shoot, now most -- most -- a lot of -- a

17   lot of different places don't even have commissions anymore;

18   correct?

19   A.   Correct.

20   Q.   Right.  So these guys were certainly paying a healthy

21   commission, more than the -- more than the industry standard

22   for commissions?

23   A.   Seems so.

24   Q.   Okay.  And so when -- but when someone is selling

25   a million shares, while it sounds like -- and I'm not

1    quibbling with saying $6100 is a small amount.

2          But when someone's selling a million shares, I mean,

3    the truth is they were netting somewhere less than $6100 on

4    this transaction?

5    A.   Correct.

6    Q.   And all of the time that they were selling their shares of

7    stock -- people think of penny stocks as being valued in the

8    pennies.  I mean, the truth is I don't -- I don't think

9    I found any -- any trade out of this account that was really

10   greater than 6/10 of a cent.

11         Would that surprise you?  I think I have one that's,

12   you know, .63 percent of a cent.

13   A.   Yeah, that does not surprise me.

14   Q.   Okay.  And so the -- the stock that they were trading,

15   again, was worth much less -- it was never worth more --

16   really -- more than 60 -- 6/10 of a penny?  And sometimes a

17   lot less?

18   A.   Right.

19   Q.   And during this -- during this period that this stock is

20   being traded -- or that Intrepid Capital was actually trading

21   the stock -- the truth is is that they certainly didn't sell

22   at the high?  You would agree with me when you look at

23   Intrepid's stock price during that time period?

24   A.   Yeah.  There's -- there's a lot of times where the stock

25   price is high and they weren't selling.

1  Q.  I'll make 620 go away.

2       Oh, I'm sorry.  I apologize.

3       THE COURT:  520.

4       MR. FLEENER:  Judge?

5       THE COURT:  It was 520.

6       MR. FLEENER:  Oh, is it really?

7       THE COURT:  520 you made go away.

8       MR. FLEENER:  Oh, I thought it was 5:20.  I was like

9  "I have been going for a while."  I thought -- I figured

10  Thomas would jump up and hit me if I got -- went past

11  five o'clock.

12       I just have a couple other areas I want to talk

13  about, and then I'll pass the witness.

14  BY MR. FLEENER:

15  Q.  And I appreciate -- I appreciate your testimony,

16  Mr. Scoufis.

17       You know the name Kevin Trizna; correct?

18  A.  Correct.

19  Q.  And Kevin Trizna was -- whether he was or is -- if you

20  look at OTC Markets, I think it still says he's the CEO.  But

21  he was certainly the CEO of -- of NERG during 2015, 2016?

22  A.  He was the named CEO.

23  Q.  Right.  Well, he -- he was the CEO?  I mean, there wasn't

24  any other name -- there wasn't anybody else who was on the

25  paperwork as being the CEO?

 1   A.   There was nobody else.

 2   Q.   All right.  And I know -- I know your theory is that

 3   Bob Mitchell was -- was manipulating Kevin Trizna.

 4   I understand that.  But the truth is Kevin Trizna was the CEO,

 5   not Bob Mitchell?

 6   A.   Well, in this world there's nominee CEOs, so I would put

 7   him in that category.

 8   Q.   Well, you're aware that he was actually communicating --

 9   through the email that he said he never used before -- that he

10   was actually communicating to folks during the -- immediately

11   after the conference call?  You're aware of that?

12   A.   Yes.

13   Q.   Okay.  It doesn't sound like a nominee CEO.  It sounds

14   like a guy who was concerned about the conference call, sounds

15   like a CEO.

16        MR. SZOTT:  Argumentative, Your Honor.

17        THE COURT:  Sustained.

18   BY MR. FLEENER:

19   Q.   The -- but one of the things that Mr. Trizna testified

20   about was that he'd passed the Series 7 exam to be a licensed

21   stockbroker.  You're aware of that, that he testified to that?

22   A.   Yes.

23   Q.   But you went back and looked to see if Kevin Trizna was

24   ever a -- had ever passed the Series 7 exam?  You did, didn't

25   you?

1    A.   Yes.

2    Q.   And you found that he hadn't?  No record of Kevin Trizna?

3    A.   No, there is a record of Kevin Trizna.  There's just not

4    an indication that he took the Series 7.

5    Q.   So you can't pass the Series 7 like he testified about

6    unless you've taken the Series 7 presumably?

7    A.   Correct.

8    Q.   So you -- you actually found no evidence that Kevin

9    Trizna, who testified that he had took and passed the Series 7

10   exam, had ever even taken the thing?

11   A.   Correct.

12   Q.   And . . . it's true, is it not, that nearly all of the

13   security transactions in all the markets in this country are

14   conducted by use of one or more exemptions from registration?

15   A.   No, that's not --

16   Q.   I mean, for example, Section 4(a)(1) covers almost all the

17   transactions on the New York Stock Exchange?

18   A.   Correct.

19   Q.   And most of these exemptions were put in place back -- in

20   the Securities Act of 1933?

21   A.   Yeah.  And over time, yeah.

22   Q.   And there's nothing that's horrible or criminal for

23   someone relying on the exemption from registration in and of

24   itself?

25   A.   No.

19-CR-26-ABJ      SCOUFIS - FURTHER CROSS - FLEENER    Vol. VIII-1348
21-CR-14-ABJ

1  Q.  And people do it and institutions do it every day all day

2  long, rely on the exemptions that are created in the

3  securities laws from registration?

4  A.  That's right.

5  Q.  You testified early on about -- you recall the -- the

6  Pardy note that was the convertible note?

7  A.  Yes.

8  Q.  All right.  And you drew an inference that the Pardy

9  note -- did that -- did the Pardy note in and of itself --

10 were -- the Pardys, in your opinion, were they affiliates of

11 EcoEmissions, according to the securities laws?

12        Mr. Pardy.

13 A.  Oh, Mr. Pardy -- was Mr. Pardy?

14 Q.  Yeah.  Is your opinion that he was actually an affiliate?

15 A.  Yes.

16 Q.  And what is that opinion based on?

17 A.  So because Mr. Pardy or his company, E-Pro --

18 Q.  Right.

19 A.  -- that he may have assigned the note to, owned the

20 convertible promissory note, which was convertible into voting

21 stock and it appeared -- when it was converted on

22 September 28th -- to be convertible into 30 percent of the

23 outstanding shares, that would place it above the 10 percent

24 threshold.  And, generally, in the securities laws, when we're

25 looking at affiliate status, if a convertible note is able to

1  be converted within 30 to 60 days into shares, we would treat

2  it like it's already converted.

3          And so that would be my view on why Mr. Pardy is an

4  affiliate.

5  Q.  Okay.  Had it not been -- had -- had E-Pro Systems not

6  involved itself in the Pardy note, then Pardy would not have

7  been an affiliate?

8  A.  Well, I'm not sure I follow.

9  Q.  Okay.  We have a securities guy coming, too, so we'll deal

10  with -- we'll deal with that.  I appreciate it.

11          You said that -- you talked about the -- the blue

12  sheet data; right?  You mentioned -- you testified about blue

13  sheets?

14  A.  Yes.

15  Q.  And blue sheets -- explain to me again what blue sheets

16  are.  I don't trust my notes.

17  A.  Blue sheets refer to trading data for a specific time

18  period for a specific stock.  It's all of the trades that

19  happened during that time period.  And it can only be

20  requested by FINRA or the SEC.

21  Q.  Civilians can't get it?

22  A.  No.

23  Q.  All right.  And that comes from where?

24  A.  FINRA or the SEC.

25  Q.  I apologize.

 1            But there -- there is basic trading and some advanced

 2    trading that -- that normal investors can get; right?

 3            I mean, you know about Level II trading data, for

 4    instance?

 5    A.   Generally, yeah.

 6    Q.   And what is Level II trading data?

 7    A.   So as we go up the levels, we're talking about additional

 8    information.

 9            And you can see orders by market makers or -- or --

10    or -- yeah, orders that have been placed by market makers

11    generally.

12    Q.   Which gives you a little more -- which gives a

13    sophisticated investor a little more information about who's

14    out there trading the stock?

15            It doesn't give it to them by name of Bill Miller

16    buying shares, but it lets you at least -- the sophisticated

17    investor -- investor using Level II data is able to tell

18    whether they're dealing with a market maker or whether they're

19    just dealing with the general public when they're trading

20    stocks?

21    A.   I think, generally, yeah.

22    Q.   Which is a -- which is a -- if you're a sophisticated

23    investor, somebody who is -- knows what they're doing --

24    that's something they'd like to know, whether they're dealing

25    with a market maker or whether they're dealing with the

 1    general public when they're making a trade?

 2            Or you can't speak to that?

 3    A.  I -- yeah, I don't think I can.

 4    Q.  Does -- is Nasdaq operated by FINRA?

 5    A.  No.

 6    Q.  Okay.  But Nasdaq has the ability to -- excuse me.

 7            Nasdaq itself -- on Nasdaq you can find price,

 8    history, trade volume, things of that nature; correct?

 9    A.  Yes.

10    Q.  And relating to NERG -- I mean, FINRA has the ability to

11    shut down trading of a company?  I mean -- correct?

12            You can tell your brokers, who -- your affiliate

13    brokers, who are everybody -- that "You cannot trade in this

14    particular stock"; correct?

15    A.  The specifics of how that would work I'm not -- I'm not

16    aware of specifically how FINRA would shut down trading.

17    Q.  Okay.  But you're aware -- you may not know the specifics

18    of how they shut it down -- how they can -- or excuse me --

19    how they shut it down.  But they can shut it down?

20    A.  I mean, are you talking about like a -- a freeze on the

21    entire -- on an entire stock?

22    Q.  Yes.

23    A.  Yeah, I'm not familiar with that.  I'm familiar with the

24    SEC doing these freezes.  Of course, FINRA can take actions

25    against brokerage firms, and they can be involved in

1  suspensions.  But I'm not -- I'm not sure how it works further

2  than that.

3  Q.  Okay.  But FINRA's actually the company that gives

4  people -- or gives companies their stock symbol?

5  A.  Correct.

6  Q.  Can you revoke the stock symbol?

7  A.  Sure.  But I don't know the process to do that.  It's not

8  just like, you know, I'm taking it back.  I don't know how it

9  works exactly.

10  Q.  I understand.  And I don't want to get outside the scope

11  of your expertise.

12          I mean, the truth is that NERG is still trading

13  today?

14  A.  I believe so, in some --

15  Q.  And --

16  A.  In some form.  I don't know.

17  Q.  And there's not even a -- really -- a company left?

18  I mean, there's whatever you call NERG today.  There's no

19  active business as far as you know that NERG has?

20  A.  I don't know one way or the other.

21  Q.  Well, do you know -- you don't know whether there's any

22  business that NERG's conducting?  Really?

23  A.  Today?  No, I don't know what they're doing today.

24  Q.  Do you know who even any -- is -- do you know who NERG is

25  today?

1   A.  No.

2   Q.  But the stock still trades?

3   A.  I think it does.

4        MR. FLEENER:  May I have a second, please, Judge.

5        THE COURT:  Yes, sir.

6     (Discussion held at counsel table.)

7        MR. FLEENER:  Mr. Scoufis, again, it was nice to meet

8   you, sir.

9        THE WITNESS:  Nice to meet you.

10        MR. FLEENER:  I know you're a CSU Ram.  We struggle

11   with that in Wyoming, but --

12        THE WITNESS:  All right.

13        MR. FLEENER:  -- it was good to meet you.

14        THE WITNESS:  All right.  Nice to meet you.

15        MR. WARD:  Good afternoon, Mr. Scoufis.

16        THE WITNESS:  Good afternoon.

17              **FURTHER CROSS-EXAMINATION**

18   **BY MR. WARD**:

19   Q.  All right.  You testified at length earlier about the

20   Skype chats.  Do you recall?

21   A.  Yes.

22   Q.  Okay.  And you were clear about one thing, and that was my

23   client, Charles Winters, was not involved in the Skype chats;

24   correct?

25   A.  Yeah, I don't see -- I didn't see Charles Winters' name

1    show up.

2    Q.  So the answer is, yes, he was not involved in the Skype

3    chats?

4    A.  I can't answer whether he was involved or not involved.

5    I can just say that his name did not show up.

6    Q.  Well, he wasn't a participant in the Skype chats based on

7    anything that you saw; right?

8    A.  That's correct.

9    Q.  I want to talk about Exhibit 18.8 that has been admitted,

10   and this is the convertible note.

11        Do you recall testifying about the convertible note?

12   A.  Yes.

13   Q.  And do you have a hard copy of the exhibits still

14   available to you or no?

15   A.  No.

16   Q.  Well, I can scroll through the exhibit for you.  But this

17   is the convertible note that we're talking about; correct?

18   Exhibit 18.8.

19   A.  I think so.

20   Q.  Okay.  Based on looking at this document, there's nothing

21   in this document that would tell you whether or not the --

22   Gordon Pardy is an affiliate of EcoEmissions; correct?

23   A.  In making that determination, you would use information

24   from this document, the amount of --

25   Q.  But I'm asking, if you're looking at this note --

19-CR-26-ABJ      SCOUFIS - FURTHER CROSS - WARD      Vol. VIII-1355
21-CR-14-ABJ

1          THE COURT:  Have you completed your answer?

2          MR. WARD:  Oh, I apologize.

3          THE WITNESS:  I think so, yeah.  Yeah.

4          THE COURT:  All right.

5          MR. WARD:  I jumped in a little early.  I apologize

6   for that, Your Honor.

7   BY MR. WARD:

8   Q.  My question is just specific that -- by looking at this

9   note, can I determine if Gordon Pardy is an affiliate of

10  EcoEmissions?

11  A.  No.

12  Q.  And there's an analysis that would have to be conducted in

13  order to determine from this note -- by looking at this note

14  and other sources -- whether or not you would suspect

15  Gordon Pardy would be an affiliate; correct?

16  A.  Yeah.

17  Q.  And if someone was trying to make that determination,

18  don't you think it's likely they would rely on their attorney?

19  A.  Who's making the determination?

20  Q.  If a layperson, a nonattorney, wanted to make a

21  determination about whether Gordon Pardy was an affiliate, it

22  would be reasonable for that person to rely on their attorney,

23  wouldn't it?

24  A.  I'm struggling to think of the scenario.

25          I'm sorry.  I --

1   Q.  Well, you're an attorney; right?

2   A.  Yes.

3   Q.  And you're an expert in securities law?

4   A.  Yes.

5   Q.  The analysis to determine whether or not Gordon Pardy is

6   an affiliate of EcoEmissions requires specialized knowledge;

7   correct?

8   A.  Yes.

9   Q.  And, in fact, before someone like the OTC Markets or the

10  SEC will even accept a representation from someone about

11  whether or not someone is an affiliate, they're going to

12  require an attorney opinion letter, aren't they?

13  A.  No.  No.

14  Q.  So OTC Markets doesn't require attorney opinion letters

15  for statements of affiliation?

16  A.  I -- I don't know if they require attorney opinion letters

17  for statements of nonaffiliation.

18  Q.  Okay.  Gordon Pardy was not an officer or director of

19  EcoEmissions; correct?

20  A.  Not to my knowledge.

21  Q.  And hypothetically, if Gordon Pardy is not an affiliate,

22  then the holding period for the purchaser of this note tacks

23  back to 2008; correct?

24  A.  Correct.

25  Q.  All right.  We talked a little bit about Exhibit 510.

1    I'll pull that up.

2            All right.  This is Exhibit 510 that has been

3    admitted into evidence.  Do you see that?

4    A.  Yes.

5    Q.  And earlier when Mr. Fleener put up a prior version of

6    510, you immediately recognized that it was not the current

7    version of 510; correct?

8    A.  Yes.

9    Q.  So you originally made a version of this Exhibit 510 and,

10   in that exhibit, the commissions were taken out of the

11   shares-sold value; correct?

12   A.  Both bought and sold values, yeah; the commissions are

13   accounted for.

14   Q.  And so why did you add the commissions back in?

15   A.  So the blue sheets don't include commissions at all.  They

16   just include the kind of raw numbers.  And I was asked to

17   create this chart using blue sheet data.

18   Q.  And so what did you use to create the first version

19   of 510?

20   A.  When I had brokerage records for the accounts, I would use

21   those brokerage records -- like account statements or a

22   blotter -- which would include the commissions.

23   Q.  The real reason that you changed Exhibit 510 is that you

24   wanted to pump up the numbers and make it seem like the

25   defendants got more money than they did; isn't that true?

19-CR-26-ABJ       SCOUFIS - FURTHER CROSS - WARD      Vol. VIII-1358
21-CR-14-ABJ

1              MR. SZOTT:  Objection; Your Honor.

2              THE COURT:  Overruled.

3              You can ask the question.

4     A.  That is not true.

5     BY MR. WARD:

6     Q.  That was the effect, though?  The subsequent 510 made it

7     look like more money was sold by Intrepid Capital Holdings

8     than really was because, in fact, the commissions come out

9     before the money lands with the seller; isn't that true?

10    A.  These are completely accurate numbers.  They just don't

11    include commissions.

12    Q.  Who gets the commissions?

13    A.  The brokerage firm.

14    Q.  Okay.  Not the person -- people listed here on the left

15    side; right?

16    A.  That's -- that's right.  They pay the brokerage firm.

17    Q.  Okay.  But we don't have anywhere on here that shows what

18    amount of this number went to the brokerage firm, do we?

19    A.  No.

20    Q.  I'm going to go to Exhibit 40.1 that has been admitted.

21              All right.  You just testified about this document;

22    correct?

23    A.  Yes.

24    Q.  This is a -- a time line chart that you put together;

25    correct?

19-CR-26-ABJ         SCOUFIS - FURTHER CROSS - WARD      Vol. VIII-1359
21-CR-14-ABJ

1   A.  Correct.

2   Q.  All right.  And the first entry on this chart has to do

3   with an email from kevin@nutechenr.com; right?

4   A.  Yes.

5   Q.  And, really, we have no idea what that means as in who's

6   using kevin@nutech email; right?

7   A.  I don't know.

8   Q.  And the testimony that's been presented to the jury has

9   been -- has been absolutely unclear on that?  I mean,

10  Kevin Trizna testified he wasn't using his email.  It was

11  shown that he was; right?

12          MR. SZOTT:  Argumentative, Your Honor.

13          THE COURT:  Overruled.  It's a fair question.

14  A.  I haven't seen all the testimony -- testimony.

15          I did hear Kevin Trizna's testimony.  Based on that,

16  it sounds like Kevin had some access to his email, and I --

17  I do not know who kevin@nutechenr.com is in this instance.

18  BY MR. WARD:

19  Q.  One thing is clear about the kevin@nutech email, though?

20  We know absolutely it wasn't being used by Chuck Winters,

21  Justin Herman, or Ian Horn; correct?

22  A.  I do not know that.

23  Q.  Do you have any indication that any of those gentlemen

24  ever used the kevin@nutech email?

25  A.  No.

1  Q.  And this is an email being received by kevin@nutech;

2  correct?

3  A.  That's correct.

4  Q.  Now, you have on this chart here shares that you're

5  attributing to Intrepid; correct?

6  A.  Correct.

7  Q.  Now, you're aware, though, aren't you, that the majority

8  of these sales by Intrepid that are the list on here -- it's

9  not Intrepid shares that are being sold?  It's other people's

10  shares that are being sold and the sale is just going through

11  Intrepid's DVP account; right?

12  A.  No, I'm not aware of that.

13  Q.  Are you aware of whose shares are being sold in these

14  transactions?

15  A.  Yes.

16  Q.  Whose shares?

17  A.  Intrepid's.

18  Q.  So Intrepid owned all of the shares that were being sold?

19  A.  It's tough to answer.

20       I -- I have seen indications that the money was split

21  up, but as far as the records, it's Intrepid's shares being

22  sold.

23  Q.  Okay.  The shares are at Kingdom Trust; correct?

24  A.  Yes.

25  Q.  Okay.  And the -- the shares are split up into the owners

 1  of the shares at Kingdom Trust; correct?

 2  A.  I mean, different people own shares of NuTech at Kingdom

 3  Trust.

 4  Q.  And those different people are not all Intrepid; right?

 5  They're people other than Intrepid?

 6  A.  Right.

 7  Q.  But those other people's shares were being sold through

 8  Intrepid's DVP account; right?

 9  A.  I have seen indications that they are splitting up money.

10  But as far as whose shares are being sold, it's Intrepid's

11  shares that are being sold.

12  Q.  Are you sure about that?

13  A.  Yes.

14  Q.  And -- and what makes you sure?  Where do you see that

15  Intrepid owns all the shares that are being sold?

16  A.  Well, there's a rule in -- for brokerage firms -- that

17  require brokerage firms to know their customer.  And so the

18  shares that are being sold that are attributed to Intrepid

19  I am -- I am taking as being Intrepid's shares.

20        We see that in the blue sheets.  It's Intrepid.  As

21  well as the FinTech and the Bayes records.

22  Q.  You said "the FinTech and the Bayes records"?

23  A.  Uh-huh.

24  Q.  Were you here yesterday for the testimony from the FinTech

25  broker where it was Bravo 20 listed on the -- the records for

1    all those sales going through FinTech?

2    A.  No.

3    Q.  Okay.

4         All right.  If we -- I'm going to -- I'm going to

5    switch to Exhibit 512, which has also been admitted.

6         This is a chart you created; right?

7    A.  Yes.

8    Q.  Okay.  And at the top of this chart we see that from

9    May 6th to June 7th the average daily volume was 81,522,587

10   shares; correct?

11   A.  Correct.

12   Q.  So that's the average number of shares being traded per

13   day between May 6th and June 7th; correct?

14   A.  Correct.

15   Q.  And if we wanted to know how many shares were traded -- or

16   have a good sense of how many shares were traded -- between

17   May 6th and June 7th, we would multiply 81 million by the

18   number of days between May 6th and June 7th; correct?

19   A.  Correct.

20   Q.  And that would come out to about 2.592 billion shares;

21   correct?

22   A.  I don't know.

23   Q.  81 million times 32 is 2.592 billion; correct?

24   A.  Well, you're counting nontrading days.

25        This would only look at days where the market is open

19-CR-26-ABJ        SCOUFIS - FURTHER CROSS - WARD        Vol. VIII-1363
21-CR-14-ABJ

1    and where NuTech traded.  So it's not -- you know, the

2    market's not open on weekends, so we wouldn't use that day to

3    look at -- to include in some sort of average.

4    Q.  Okay.  So it would be a little less than -- than 32 days.

5    I mean -- you know, maybe eight days less than that to account

6    for the weekends in that one-month time period?

7    A.  And that's assuming that NuTech did trade every day but

8    yeah.  And that there weren't any holidays.  I think we would

9    cross Memorial Day.  The stock market's not open on Memorial

10   Day, as well.

11   Q.  Okay.  So it might be a little bit less than 2.5 billion.

12          But you would agree with me that -- and do you know

13   how many shares of NuTech went through Intrepid's DVP account

14   during this time period?

15   A.  Off of the top of my head, no.

16   Q.  We could -- we could determine that by looking back at

17   Exhibit 40.1 that we were just looking at and add up the

18   NuTech -- the DVP account sales; correct?

19   A.  Yeah.  It might be easier to just go to the blotter with

20   all of Intrepid's -- I don't know the -- I don't know any of

21   these exhibit numbers.

22          But -- and then they're just all listed one after

23   another.

24       (Discussion held between counsel.)

25          MR. WARD:  Mr. Szott has graciously suggested that

1    maybe it's 520, so let me pull that up and maybe we can get

2    through it a little more quickly.

3             Yeah.  I think 520.

4    BY MR. WARD:

5    Q.  And so we're looking at May 6th to June 7th, and so that

6    would be -- you know, to correlate it back to your other -- to

7    the earlier exhibit we were just looking at, so it would be 16

8    plus 27 plus 10 plus 2.5 plus 10, and that comes out to

9    65.5 million?

10   A.  Okay.  Yeah, that sounds right.

11   Q.  And when -- when we consider that amount as how much of

12   the total NuTech stock that is being, you know, bought and

13   sold in this time period, the -- the portion of that that's

14   being bought and sold by Intrepid is rather insignificant?

15   Certainly less than 5 percent, wouldn't you agree?

16   A.  What was the -- can we go back to that price/volume chart

17   to look at the --

18   Q.  Sure.

19   A.  So we've got 65.5, you said?

20   Q.  65.5 million -- oops.  That's the wrong one.

21             The price chart is 40.1 -- oh, no.  It is 512.

22             Okay.  So here's the price chart, and so we've --

23   we've got the days.  81 million is the average daily volume.

24   We would multiply that by the number of trading days?

25   A.  Yeah.  I agree with you that it's a relatively small

 1   amount.

 2   Q.  Okay.  So that means other than Intrepid, more than

 3   95 percent of the shares trading are being traded by people

 4   not through Intrepid's DVP account?

 5   A.  Right.

 6   Q.  Okay.  Were you here for Charles Linhart, Sr.'s testimony?

 7   A.  No.

 8   Q.  You've heard, I think, some from Mr. Fleener that

 9   Mr. Linhart testified to this jury that he sold his NERG stock

10   in the spring of 2021.

11          MR. SZOTT:  That's hearsay, Your Honor.

12          But I'll -- I'll withdraw the objection.

13          THE COURT:  Very well.

14          MR. WARD:  All right.

15   A.  I don't think I heard from Mr. Fleener anything.

16   BY MR. WARD:

17   Q.  Well, I think he talked to you a little bit about the

18   price of NERG stock shooting up in the spring of 2021.

19   A.  Okay.

20   Q.  And -- and that was based on Mr. Linhart told us that his

21   NERG stock, about 350,000 shares, had been worth between $5

22   and $500 for several years and then, in the spring of 2021,

23   the value of his shares jumped from between 5 and $500 up to

24   $5,000 and he was able to sell, I think he said, about $16 00

25   worth of it.

1          Are you following me?

2     A.   Roughly, yeah.

3     Q.   I want you to assume that that -- assume what I've told

4     you just in terms of -- that that's what happened to the --

5     the price of his NERG shares.

6          Why would that price have increased tenfold in the

7     spring of 2021?

8     A.   I -- I don't know.

9     Q.   Can you -- do you have any idea what would cause a price

10    jump like that?

11    A.   I mean, it could be a pump and dump.  I -- I really don't

12    know.

13         MR. WARD:  Go back to Exhibit 510.

14    BY MR. WARD:

15    Q.   I'm showing you Exhibit 510 that's been admitted.

16         The -- you said at the end of your direct examination

17    that the heart of the American securities law is to ensure

18    that there's truthful disclosure so people can make

19    intelligent trades and investment decisions; correct?

20    A.   Correct.

21    Q.   And in this case you would agree with me that what runs

22    afoul of that principle are false and misleading statements

23    about NERG; right?

24    A.   Right.  Yeah.

25    Q.   The press -- you know, press releases if they're false,

 1  statements during the investor conference call if they're

 2  false -- that's that information that the investing public is

 3  relying on that we need to ensure is reliable information;

 4  right?

 5  A.  Right.

 6  Q.  Okay.  So wouldn't you agree with me that it would be

 7  important to know who was behind the false information going

 8  out?

 9       Doesn't that get to the whole heart of the matter?

10  A.  Yeah.  I think overall in the investigation, yeah.

11  Knowing who's putting out false information, sure, that's

12  important.

13  Q.  All right.  And you're part of the prosecution team in

14  this case; correct?

15  A.  Correct.

16  Q.  All right.  So I would assume that's a team effort in

17  terms of getting to the bottom of the issues in this case.

18  Right?

19       MR. SZOTT:  Your Honor, I'll object.  This line of

20  questioning is irrelevant.

21       THE COURT:  Sustained.

22  BY MR. WARD:

23  Q.  Who is SBM Securities?  Who are the people behind

24  SBM Securities?

25       MR. SZOTT:  Objection, Your Honor; asked and

1    answered.

2              THE COURT:  Sustained.

3    BY MR. WARD:

4    Q.  Do you know who Tony Papa is?

5    A.  I know the name.

6    Q.  What do you know about the name?

7    A.  He is a vague or shadowy figure that has been mentioned by

8    some individuals involved here as being involved in -- in

9    this.

10   Q.  All right.  Do you -- are you aware that Tony Papa has

11   ties to the Canadian Mafia?

12   A.  I --

13             MR. SZOTT:  Again, I'll object to relevance,

14   Your Honor.

15             THE COURT:  Sustained.

16   BY MR. WARD:

17   Q.  Let me lay a little more foundation.

18             Are you aware who wrote all the press releases for

19   NERG?

20   A.  I've heard a name.  And I believe --

21             MR. SZOTT:  Your Honor, I'll object at this point.

22   The question calls for hearsay.

23             THE COURT:  Sustained.

24             MR. WARD:  I'm certainly not quibbling with the

25   Court's ruling.  My question is if he is aware of who wrote

 1   the press releases, the identity of the individual.

 2              THE COURT:  He said he heard.

 3              MR. WARD:  I'll rephrase, then, Your Honor.

 4   I apologize.

 5   BY MR. WARD:

 6   Q.  Are you aware of who wrote the press releases?

 7   A.  I'm not.  I mean -- like I said, I've heard of a name.

 8   That's -- that's it.

 9   Q.  Have you reviewed the emails between the writer of the

10   press releases and the people who were directing the drafting

11   of those press releases?

12              MR. SZOTT:  I'm sorry to keep objecting, Your Honor.

13   This is beyond the scope of direct.

14              THE COURT:  Overruled.

15   A.  No, I don't believe so.

16   BY MR. WARD:

17   Q.  I'm -- I'm trying to reconcile -- as part of your

18   investigation in this case, was it important to you to

19   determine who was responsible for false information about NERG

20   being put out to the public?

21   A.  Sure.  Yeah.

22   Q.  And so what did you do to investigate who was putting out

23   that false information?

24   A.  You know, I'm here for questions about -- not here but

25   I'm -- I assist the Government with questions about the

 1   securities industry.  Generally, specifics -- I can do

 2   research, but I can't go out on my own and do any sort of

 3   independent investigation, talk to people without the

 4   Government.  I can look at public information.

 5         So while I want to know a lot of things, a lot of

 6   that's beyond my control.

 7   Q.  So despite being a member of the prosecution team in this

 8   case, as we sit here today, you have no idea who was behind

 9   the press releases that were released from NERG?

10   A.  I mean, I view who was behind the press releases as the --

11   the same individuals who did the pump and dump.

12   Q.  And -- well, so wouldn't that be SBM Securities?  They're

13   the number one on the list.

14   A.  It could include the people behind SBM Securities.

15   Q.  I mean, it -- it could?  They are number one on the list.

16   891 --

17         MR. SZOTT:  Your Honor, objection.  That's been asked

18   and answered.

19         THE COURT:  What's your objection?

20         You were talking over him.

21         MR. SZOTT:  I apologize, Your Honor.

22   BY MR. WARD:

23   Q.  My -- my question was just -- SBM Securities, the number

24   one seller -- the number one dumper -- wouldn't you agree?

25   A.  Yes.

19-CR-26-ABJ        SCOUFIS - FURTHER CROSS - WARD     Vol. VIII-1371
21-CR-14-ABJ

1   Q.  Okay.  And so you think the people that were behind the

2   press releases are probably the same people that were the

3   dumpers, so wouldn't that be SBM Securities?

4   A.  The reason I said it could be is because I just don't have

5   enough information about SBM Securities.

6   Q.  What have you done to determine who SBM Securities is?

7   A.  Again, I can't do anything on my own.

8   Q.  What has the prosecution team done?

9          MR. SZOTT:  Again, relevance, Your Honor.

10          THE COURT:  Sustained.

11  BY MR. WARD:

12  Q.  Would you agree with me that investors are going to rely

13  on statements made during an investor conference call?

14  A.  Yes.

15  Q.  And would you agree with me that -- were you here when --

16  when we all listened to the investor conference call?

17  A.  No.

18  Q.  Have you listened to the investor conference call?

19  A.  I don't think so.

20  Q.  I mean, if the heart of the matter in this -- if the

21  reason that securities law exists in this country, according

22  to you, is to ensure there's been truthful disclosure to the

23  public so they can make intelligent investment decisions and

24  trades, wouldn't it be important to list -- listen to the

25  recorded investor conference call?

1         MR. SZOTT:  Relevance, Your Honor.

2         THE COURT:  Sustained.

3         MR. WARD:  Those are all the questions I have,

4    Your Honor.  Thank you.

5         MR. JUBIN:  Good afternoon, ladies and gentlemen.

6         Good afternoon, Mr. Scoufis.

7         THE WITNESS:  Good afternoon.

8         MR. JUBIN:  I will be brief.

9                     **FURTHER CROSS-EXAMINATION**

10   **BY MR. JUBIN**:

11   Q.  You -- during your direct testimony you made it a point to

12   note that Chuck Winters was not on these Skype chats.  Do you

13   recall that testimony?

14   A.  Yes.

15   Q.  Ian Horn wasn't on any of those Skype message chats,

16   was he?

17   A.  I'll say the same thing:  His name is not seen in -- in

18   those messages.

19   Q.  Okay.  And the charts that you -- you showed to the jury,

20   these various trades and things, they don't reflect any trades

21   by Ian Horn; correct?

22   A.  I don't believe so.

23   Q.  And I -- as I recall --

24   A.  Or any charts that I prepared, no, they don't.  Yeah,

25   Ian Horn's not on any of them.

1   Q.   Okay.  Because you -- as you testified earlier, he never

2   owned any NuTech stock?

3   A.   Not that I'm aware of.

4   Q.   Okay.  So when Mr. Fleener referred to "our clients

5   trading in freestanding shares," that excludes -- Ian Horn has

6   nothing to do with that; right?

7   A.   Can you repeat that?

8   Q.   When Mr. Fleener asked you questions about, "Well, our

9   clients trading in freestanding shares" and that sort of

10  thing, Mr. Horn was not somebody who was trading in

11  freestanding shares?

12  A.   I guess I -- I think I probably thought that he was

13  referring to everybody.  I don't know what he intended.

14  Q.   Sure.  You don't know what he intended by his question,

15  but I -- I'm just making sure that we're clear that Ian Horn

16  wasn't trading in any freestanding shares.

17  A.   Right.

18        MR. JUBIN:  Okay.  I don't have any further questions

19  for you.  Thanks for coming up.

20        MR. FLEENER:  Your Honor, could we approach briefly?

21        THE COURT:  Sure.

22     (Proceedings held at sidebar with Prosecutor Szott

23  and all defense counsel.)

24        MR. FLEENER:  Mr. Herman needs to go to the restroom

25  really, really bad.

 1          THE COURT:  Well, let's let that happen.

 2          We'll take a -- should we send the jury home after --

 3          MR. FLEENER:  I think so, Judge.

 4          MR. JUBIN:  I don't know if the Government has any

 5     redirect or not.

 6          MR. SZOTT:  I'll be brief.

 7          THE COURT:  Let's go ahead and take a short break.

 8          MR. FLEENER:  Thank you.

 9       (Sidebar concluded.)

10          THE COURT:  We're going to take a break for

11     10 minutes.

12          Will you take charge of the jury.

13          THE COURTROOM DEPUTY:  All rise.

14       (A recess was taken from 4:37 p.m. to 4:47 p.m.

15     Proceedings outside the jury's presence.)

16          THE COURTROOM DEPUTY:  Court is now in session.

17          THE COURT:  Thank you.

18       (Proceedings within the jury's presence at 4:49 p.m.)

19          THE COURT:  Thank you, ladies and gentlemen.  Please

20     be seated.

21          Mr. Szott.

22          MR. SZOTT:  Thank you, Your Honor.  May it please the

23     Court.

24          THE COURT:  Mr. Szott.

25          MR. SZOTT:  Counsel.

1          Mr. Davila, would you please bring up what's been

2    marked for identification as Government Exhibit 510.1.

3                    **FURTHER REDIRECT EXAMINATION**

4    BY MR. SZOTT:

5    Q.  Mr. Scoufis, would you take just a moment and look at this

6    exhibit.

7    A.  Okay.

8    Q.  Do you recognize that?

9    A.  Yes.

10   Q.  What is it?

11   A.  This is the -- the trading summary for the top 10 accounts,

12   but it is based not only on blue sheets but also on certain

13   brokerage records to account for commissions.

14   Q.  Is this the exhibit that Mr. Fleener originally showed you

15   before we switched to the updated version?

16   A.  I believe so.

17   Q.  What are the source materials for this exhibit?

18   A.  So we've got blue sheets and then brokerage firms,

19   specific brokerage firms including Alpine Securities, Charles

20   Schwab, JPMorgan Securities, JW Korth, FinTech Securities,

21   Bayes Capital, and Barrett.

22   Q.  And some of the numbers here, then, are based on the blue

23   sheets and would include commissions or not, but then some are

24   based on the brokerage records, so that would be different for

25   those; correct?

 1   A.  That's correct.

 2         MR. SZOTT:  Your Honor, if defense counsel will waive

 3   objections to hearsay and the underlying materials not all

 4   being in evidence, the Government would offer Exhibit 510.1.

 5         MR. FLEENER:  No objections.

 6         MR. JUBIN:  No objection.

 7         THE COURT:  It is received.

 8      (Government's Exhibit 510.1 received into evidence.)

 9   BY MR. SZOTT:

10   Q.  So let's look at the fourth line, Mr. Scoufis.

11         "Shares Sold Value," "Net Proceeds," what are we

12   seeing there?

13   A.  All right.  So the shares-sold value is $182,806.  Net

14   proceeds is $182,718.

15   Q.  And that is without whatever was removed for commission;

16   correct?

17   A.  This -- this includes the commissions.  In the

18   calculations we're accounting for the commissions here.

19   Q.  Just so I'm clear, Government Exhibit 510, the number is

20   192,000 and change, I believe.  Here it's 182,000 and change.

21   Whatever the difference is, that's the commission; correct?

22   A.  Correct.

23         MR. SZOTT:  Mr. Davila, would you please bring up

24   side-by-side Exhibit 505 and Exhibit 506.

25   BY MR. SZOTT:

1  Q.  Mr. Scoufis, in your experience, would public investors

2  tend to rely or tend to be influenced by those symbolic

3  designations we see in the upper right of each of these

4  exhibits?

5  A.  Yes.

6  Q.  Fair to say that investors are turned off by the skull and

7  crossbones?

8        MR. FLEENER:  Objection; leading.

9        MR. SZOTT:  I'll withdraw the question, Your Honor.

10        I'd like to pull up Exhibit 317, please.

11  BY MR. SZOTT:

12  Q.  Mr. Scoufis, according to this exhibit again, what

13  percentage of NERG's free-trading shares were implicated by

14  this September 28th distribution?

15  A.  99 percent.

16        MR. SZOTT:  We can take that down.

17  BY MR. SZOTT:

18  Q.  These various materials that are submitted to a transfer

19  agent -- underlying documentation, attorney opinion letters,

20  nonaffiliation statements -- in your -- et cetera.

21        In your experience, do transfer agents rely on such

22  materials in deciding whether to issue free-trading shares?

23  A.  Of course.

24  Q.  Is it possible that such materials might also be provided

25  to a broker-dealer?

 1  A.  Yes.

 2  Q.  And would a broker-dealer rely on such materials in

 3  deciding whether to conduct certain transactions?

 4  A.  Yes.

 5          MR. SZOTT:  May I have a moment, Your Honor.

 6          THE COURT:  You may.

 7      (Discussion held at counsel table.)

 8          MR. SZOTT:  Nothing further, Your Honor.  Thank you.

 9          MR. JUBIN:  Nothing from Mr. Horn.  Thank you.

10          MR. FLEENER:  I'll pass, Judge.

11          MR. WARD:  Nothing further, Your Honor.  Thanks.

12          THE COURT:  Thank you.

13          Ladies and gentlemen, for a -- a judicial officer, we

14  always hope for a -- in a jury trial -- for a 200-plus

15  page day on the transcript, and I'm sorry we were unable to

16  provide a 200, 250-page day to you of -- of evidence, not for

17  any reason chargeable to you but, certainly, chargeable to me

18  and to the technical breakdown, and we've had -- been

19  struggling with all day and the machinery that's available.

20          We're so dependent upon electronics and the digital

21  age.  They save us time and offer new avenues for attorneys to

22  do their work.  I wish you could have been here 20 years ago,

23  even, and seen these tables oftentimes stacked with pieces of

24  paper as attorneys pawed through box after box.  I have

25  actually seen this room pretty much filled with Bankers Boxes

1    in some of the cases that have come before me.

2           So there are good things and bad things about this

3    digital world that we live in.  I know the attorneys are

4    frustrated because they want to have a smooth, smooth trip and

5    presentation of their examination and cross-examination in the

6    case, and, hopefully, we'll be achieving that as we go

7    forward.

8           Again, before I let you go, don't discuss the case.

9    Don't attempt to learn about the case from sources outside of

10   the courtroom.  Avoid any contact with the parties, the

11   witnesses, the attorneys in this matter.

12          Don't attempt to read news articles about the case.

13   I've looked in our local paper and really haven't seen

14   anything thus far, but that doesn't mean someone hasn't popped

15   their head in here for five minutes and written a big article

16   about something they know nothing about.

17          You will have the information.  You are hearing the

18   evidence.  Avoid doing research on the case and don't consult

19   any electronic sources for information about the case.

20          That said, keep an open mind, drive carefully, eat

21   well.  Still, you shouldn't be worried.  We're pretty much on

22   time, it appears, in the presentation of this case, and

23   everybody's working hard to achieve that going forward.

24          Avoid crowds; wear your mask.  And we'll see you at

25   8:30 tomorrow morning.

 1              8:30 tomorrow morning.

 2              THE COURTROOM DEPUTY:  All rise.

 3         (Proceedings outside the jury's presence at 5:00 p.m.)

 4              MR. HEIMANN:  Your Honor, may the witness be excused?

 5              THE COURT:  You may step down, Mr. Scoufis.

 6              THE WITNESS:  Thank you.

 7              MR. HEIMANN:  Also, Your Honor, the Government's next

 8    witness is our last expected witness in our case in chief.

 9    Inspector Hacker will return to the stand to finish her

10    testimony.

11              The rule of completeness, self-serving hearsay issue

12    will come up during her testimony.  I don't know if -- how you

13    want to deal with that hearing.

14              THE COURT:  What do you anticipate?

15              MR. HEIMANN:  Your Honor, from the Government's point

16    of -- well, from the Government's side, we have, I think, four

17    recorded statements of Mr. Horn that we intend to offer.  They

18    are a total of about five minutes.

19              We have less -- five or less excerpts from the grand

20    jury transcripts we intend to offer.

21              We can provide the Court either copies via email to

22    review overnight or we can send the Court the JERS numbers if

23    you want to access them that way.  I think the corrected

24    transcript of the defendant's grand jury testimony -- we'll

25    probably need that.  We can provide all of that either via

1   email or on paper before we leave for the evening.

2          I -- I don't know what Mr. Jubin has or how he wishes

3   to present his proposed additions.

4          THE COURT:  Well, I -- you know, if you want to stay

5   tonight to do it, I'm certainly willing to do that.

6          I suspect that counsel certainly -- for Mr. Winters,

7   Mr. Herman -- would wish to be present during that hearing,

8   although their clients I don't think need to be present.

9          MR. WARD:  I -- I certainly take a position about it

10  on behalf of my client --

11         THE COURT REPORTER:  I'm sorry.  Find a microphone,

12  please.

13         MR. WARD:  I do take a position on the issue on

14  behalf of my client.  I think it's directly relevant to -- to

15  him, so I do take a position.

16         THE COURT:  Well, I would expect you to take a

17  position.  I'm just trying to think about them, if they need

18  rest or have physical illnesses or things to deal with.

19         I'm not going to insist that they be present.  You'll

20  make the decision.

21         MR. FLEENER:  I think they prefer to stay, Judge.

22         THE COURT:  That's perfectly all right with me.

23         So your pleasure is mine in terms of timing, if you

24  think it would be good to do it or we could take a -- a break

25  and -- I don't know if Melanie's available, but we can come

 1    back in an hour or whatever you felt was best.

 2            MR. HEIMANN:  Your Honor, we're prepared to do this

 3    tonight.  A break would probably -- probably be best so we

 4    could provide the Court paper copies of at least the grand

 5    jury transcripts and make sure that we've queued up our

 6    recorded exhibits -- the recorded exhibits -- so you can hear

 7    them.

 8            THE COURT:  I was misunderstanding last night when

 9    I said I thought I had the grand jury.  I had the second

10    interview, was what I was thinking of.

11            MR. HEIMANN:  Well, we can provide those and we'll

12    print copies.

13            I suspect that would not take a whole hour.  I don't

14    know how much time Mr. Jubin needs.

15            MR. JUBIN:  Your Honor, as attachments to my filing

16    last evening about 10:14 or so, I think it was, were the

17    two interview transcripts.

18            I don't recall if Mr. -- if the Government is

19    intending to introduce anything from the May transcript.  They

20    might be.

21            Based on what I understood the Government was

22    introducing, I added some things.  I believe your chambers got

23    an email from my assistant this afternoon with corrected

24    revisions.

25            I would note that Mr. Heimann has indicated to me

19-CR-26-ABJ                                          Vol. VIII-1383
21-CR-14-ABJ

 1   that he intends to withdraw the Exhibit 605, which is related

 2   to grand jury transcripts, but he has another one, 606, that's

 3   related to, essentially, the receipt and dissemination of

 4   grand jury -- of the materials that Mr. Horn received.

 5          So, really, my correction is related to 606 and 605,

 6   if it's at issue, but I have those things up side-by-side as

 7   they exist.  I'm prepared to go forward with that one.

 8          The other one is a little more lengthy.  I don't know

 9   that we need to queue anything up.  We have transcripts of all

10   of this.  I didn't include the grand jury transcript as an

11   attachment to my pleading because it is a grand jury

12   transcript.

13          And so I can certainly get the Court a copy of that

14   or the Government can if -- if we need to do that.  But,

15   really, I think we're looking at two corrections and with

16   additions to get the rest of the context and really, truly

17   understand what those quotes mean.  And beyond that I don't

18   think I have objections.

19          MR. WARD:  Maybe it would be helpful for me to state

20   my position.

21          My position is that if statements from Mr. Horn are

22   going to come in, anything from his recorded interviews, that

23   it's necessary for the jury to listen to the entirety of his

24   recording interviews.

25          The transcripts just don't cut it because there's

 1  additional context.  There are long breaks where he's reading

 2  and writing notes, and you -- you can't appreciate that by

 3  looking at a transcript, and I think that's all relevant.

 4        And my position is going to be that the rule of

 5  completeness requires the entirety of the recorded interviews

 6  to come in; otherwise, the jury hears, you know, the blurbs

 7  that are helpful to the Government.  The blurbs that are

 8  helpful to Mr. Horn and Mr. Winters and Mr. Herman, you know,

 9  are entirely prejudiced by that, and the jury gets a

10  misleading -- you know, snippets of information as opposed to

11  the full statement.

12        I believe the rule of completeness would require that

13  the jury have the opportunity to listen to the entirety of

14  both of those recorded interviews.

15        THE COURT:  You're not waiving any other objections?

16  Or are you waiving all other objections coming in?

17        MR. WARD:  Obviously, by, you know, taking that

18  position, I'm waiving the objection to the extent that

19  that's -- you know, to the -- the *Bruton* as respect to my

20  client.

21        MR. FLEENER:  And, Your Honor -- excuse me.

22        And, Your Honor, you might as well get my position,

23  which is I object to all of this.

24        The -- and just so the Court -- the Court knows sort

25  of what my analysis is, I've seen the United States'

1   submissions, and I've seen some of -- Mr. Jubin's submissions

2   keep changing, but I think I know where he's going.  I believe

3   it violates Mr. -- Mr. Herman's rights to confrontation.

4           And I -- and I -- and this is -- I started to think

5   about this as I was coming here this morning.  It's not

6   just -- this -- this isn't just Mr. -- Mr. Herman's, you know,

7   Sixth Amendment rights to confront versus Mr. Horn's Fifth

8   Amendment rights to remain silent.  We also have -- if -- if

9   Mr. -- if the United States plays what they want to play and

10  Mr. Jubin plays what he wants to play, I'm not sure they're --

11  and I'm going to assume that you don't let Mr. Ward play the

12  whole thing -- then what happens is you have two parties

13  playing snippets of Mr. Horn's statements not made in

14  furtherance of the conspiracy -- these are statements that

15  were made completely outside the scope of the conspiracy --

16  and we have parts of Mr. -- Mr. Horn's statements that --

17  I don't think we have a hearsay exception -- that we can't

18  admit, and the parts of the -- the statements that we would

19  like to admit are Mr. Horn admitting writing the opinion

20  letters, which is completely relevant to our defense.

21          So if you let the -- so it really is a -- a *Bruton*

22  issue.  And then you also have just the ability for us to

23  present -- at least Mr. -- speaking for Mr. Herman -- his

24  rights to remain silent versus our -- our guy's rights to

25  present a defense and for a fair trial.

1          And I -- I don't know how this is dealt with when

2     you -- when you join an indictment that deals with perjury

3     where the -- where the person's words -- not -- not

4     coconspirator hearsay but their -- their words taken outside

5     the scope of the conspiracy -- which are clearly admissible

6     against Mr. Horn as a statement by a party opponent -- I don't

7     know how we get through this mess.

8          And so I object to all of it, and I guess I'll --

9     I'll do it by -- by snippet.  But I want the Court to please

10    keep in mind that when you -- if -- if the Court goes back and

11    reads Mr. -- reads Mr. Horn's transcripts from his first

12    interview -- you can read the first ten pages; it takes a

13    minute and a half -- he says over and over again -- he's

14    looking at these documents, and he says, basically, "Yes,

15    I wrote this document; I signed this thing; I wrote this

16    opinion letter; I got this information speaking with

17    Justin Herman and others."

18         I'm not sure I can admit that evidence, which is kind

19    of weird but -- they could admit it but they're not going to.

20    He could admit it and he's not going to.

21         And so -- but it's -- it's our defense and I'm not

22    sure a hearsay exception exists for us to admit it, and that's

23    because it's been charged the way it's been charged.

24       (Discussion held between counsel.)

25         MR. FLEENER:  So -- anyway.  I -- I -- I'll be quiet.

1    Those -- those are my positions.

2          MR. JUBIN:  A word about mechanics, Your Honor.

3          Rule 106 doesn't contemplate -- well, you can do what

4    you -- how -- do it how you like.

5          But Rule 106 generally contemplates that when the

6    Government wants to offer a statement and a party says, "Hey,

7    this is a bit out of context" -- or is misleading because it

8    doesn't contain the context -- the requirement is that the

9    party offering -- i.e., the Government -- play the full

10   context rather than waiting until cross-examination because

11   Rule 106 contemplates at the time.

12         So what I've done is created exhibits, audios for the

13   Government to play that include the context I suggest must be

14   included.  I see Mr. Heimann shaking his head saying he

15   doesn't want to do that, but it kind of depends on what the

16   Court thinks is required in order to complete the statement.

17         THE COURT:  Well, I -- we can read the transcripts

18   and get a pretty good sense of what is context under 106.  And

19   I'll be frank with you at this point:  We've looked at it, and

20   I don't think there's a lot of context to the statements that

21   the Government has given us so far.

22         MR. HEIMANN:  Your Honor, we'll be prepared to

23   present it to the Court and make clear what we're offering and

24   make our position clear in terms of what we think is

25   admissible and isn't, whenever you're ready to start.

 1          THE COURT:  Melanie, what will you prefer?

 2          THE COURT REPORTER:  I'd prefer a short break, like

 3     10 minutes, and then go ahead.

 4          MR. HEIMANN:  If I'm going to print things, I'd

 5     prefer 20.

 6          THE COURT:  Very well.  We'll be ready.

 7          THE COURTROOM DEPUTY:  Court will stand in recess for

 8     20 minutes.

 9       (A recess was taken from 5:13 p.m. to 5:44 p.m.)

10          THE COURT:  Thank you.  Please be seated.

11          MR. JUBIN:  May I approach, Your Honor.

12          THE COURT:  Certainly.

13          MR. JUBIN:  We have a -- I don't know what version

14     you have things in, so I'm going to give you what the

15     latest is.

16       (Discussion held at the podium.)

17          MR. JUBIN:  Are you ready to proceed, Judge?

18          THE COURT:  I'm ready.

19          MR. JUBIN:  There are, so far as I can determine,

20     two, perhaps three excerpts that are at issue here.

21          The Government has an Exhibit 605 and 606.  One of

22     those, I believe, is going to be withdrawn, but the excerpts

23     that I would like to add to clarify and provide the context

24     around those two exhibits is the same.  It's --

25          MR. HEIMANN:  Your Honor, I can make this shorter.

1   We're not offering 606.

2           MR. JUBIN:  Okay.  So this relates to 605.

3           Becky, if you can display what's on my screen, that

4   might be helpful, too.

5           You will note there's a side-by-side comparison --

6           THE COURT:  Let's make sure I've got -- got

7   everything here.

8           MR. JUBIN:  Okay.

9           THE COURT:  Some of them I may have missed.

10          I've got Government's Exhibit 600, Government's

11  Exhibit 601, Government's 602, which is the recorded interview

12  on May 1st.

13          I seem to be missing -- haven't found 603.

14          Where is it?  What page?

15          MR. HEIMANN:  Your Honor, 603 is a chat text between

16  Mr. Horn and Mr. Herman.

17          My understanding is there's no issues regarding

18  either completeness or hearsay.  It's already been admitted,

19  as well.

20          MR. JUBIN:  The only ones that I think are at issue

21  here, Judge, are going to be 605 and an audio that the

22  Government informs is 614, which I have a transcript related

23  to.  And I think those are the only two that are at issue

24  because the Government has indicated it's withdrawing 605,

25  which I also had an issue with.

19-CR-26-ABJ                                            Vol. VIII-1390
21-CR-14-ABJ

 1              MR. HEIMANN:  606.  We're withdrawing 606.

 2              MR. JUBIN:  606.  I'm sorry.  I get those two

 3    confused.

 4              THE COURT:  Okay.  And I don't have in my possession

 5    606, I don't think.

 6              MR. JUBIN:  I think that's because it's audio.

 7         But you do have a transcript, and I'll show you where

 8    it is.

 9              THE COURT:  All right.

10              MR. JUBIN:  That should be -- if you --

11              THE COURT:  So 606 -- if it's not there, I'm not

12    going to worry about it.

13              MR. HEIMANN:  Your Honor, we're not offering 606.  So

14    it's good you don't have it.

15              THE COURT:  And I have 604, 605, 608, and 610.

16              MR. JUBIN:  605 is the one at issue --

17              THE COURT:  All right.

18              MR. JUBIN:  -- if I can show that on the screen.

19              THE COURTROOM DEPUTY:  It's publishing to lectern

20    HDMI.  Are you hooked up some other way?

21              MR. JUBIN:  I can't hear you.

22              THE COURTROOM DEPUTY:  It's publishing to lectern

23    HDMI.  Are you hooked up another way?

24              THE COURT:  I've got 605, which is page 16 of the

25    grand jury transcript.

1          MR. JUBIN:  Okay.

2          So as the Court can see, Government's 605 starts

3     on -- at line 1 on page 16 and goes through line 22.

4          The content of 605 is -- concerns the email that the

5     prosecutor questions Mr. Horn about, and he indicates --

6     I mean, the ultimate question is "Why don't you have any of

7     your email correspondence with Justin Herman regarding

8     NuTech?" and it ends with he doesn't have his email because

9     his computer crashed.

10         I don't know what happened to the -- oh.

11         There is a whole bunch of context surrounding the --

12    whether or not Mr. Horn has this email and produced it that is

13    relevant to understanding this information, and it begins --

14    it begins, if we look on the left, with -- on page 13,

15    line 13, where there's a discussion about what was produced

16    because that's what this is all about, is producing the emails

17    and "Did you -- do you have them?" and -- you know, so where

18    they came from, how it got produced is all relevant to

19    explaining -- and the questions leading up to it are relevant

20    to explaining Mr. Horn's understanding of the question.

21         And this is a -- a perjury indictment.  And as the

22    Court, I'm sure, is well aware, mistake or misunderstanding as

23    to what the question is about relates to that, so the context

24    is critically important.

25         I'll let the Court read that.

1          Your Honor, it's Mr. Horn's position that he misspoke

2     when he said he didn't have any emails because he did have

3     emails, but there were all these discussions about what was

4     being produced, how he got them.

5          And, of course, the central question to all the

6     preparation time -- and that's not contained in here but --

7     was these opinion letters that he then believed he wrote and

8     that would have been attached to the emails.  And, of course,

9     as it turns out, there are no emails relating to opinion

10    letters.

11         So that he misunderstood is critical to his defense.

12    It's a perjury charge, and the only way you can understand

13    that defense is to see the context in which that statement is

14    made.

15         And it would be prejudicial and unfair to him to take

16    out the references to what was going on and what was being

17    asked.

18         If you look at the -- the factors in *Williston*,

19    it's -- does it explain the admitted evidence?  Absolutely it

20    does.  Does it put the admitted evidence in context?

21    Absolutely it does.  Does it, itself, mislead the jury?  Not

22    at all.  And it ensures the jury can fairly and impartially

23    understand the evidence.

24         Now, I understand why the Government would want to

25    have this single statement out of context to say, "Did you

19-CR-26-ABJ                                           Vol. VIII-1393
21-CR-14-ABJ

1   have any emails?" but it wasn't just about emails.  It was

2   about all these other things.  And that's why it's critical.

3          And if you look at what -- I cited a case,

4   *United States v. Lopez*, 4 F.4th -- that's the first time I've

5   cited a Fed.4th case -- 706, it's a 2021 case -- that says

6   if -- if the information is substantially exculpatory -- and,

7   arguably, it is because it provides the context for his

8   understanding in making the statement -- or if it's

9   explanatory of or relevant to admitted passages, then it

10  should come in.

11         And, certain, this context does that, and it would be

12  no big deal for the Government to simply play the full context

13  of that statement.  It's not very long; it's not misleading;

14  it just gives the full context of the statement.  And I think

15  106 requires it in order to be fair to Mr. Horn.

16         Do you want me to go one at a time?  There's only one

17  other issue.  Or do you want me to proceed to the next one?

18         THE COURT:  Well, maybe we should do it ad seriatim.

19         MR. HEIMANN:  Your Honor, I can speak from here.

20         So the issue on the perjury count is about the email

21  because there's a couple of things that aren't disputed.

22         Mr. Horn's record production did not include email.

23  And he had email, as we've seen from our trial exhibits.

24         The part that's offered by Mr. Jubin confuses the

25  issue.  It doesn't clarify it.  There's nothing that distorts

 1   the meaning of the questioning that we've selected on page 16.

 2          It starts discretely with "Were there any email in

 3   your production?" and that's the first discussion of email.

 4          And it goes down through what he says about it,

 5   including that he had no access to it online, and then we move

 6   on to something else.

 7          There's nothing that distorts the meaning of the

 8   questioning or the situation, unlike the proposal from the

 9   defendant, which is to confuse the issue about the other

10   records that were produced.

11          The question on the perjury count is about records

12   that weren't produced.  And so, Your Honor, I don't think

13   the -- the rule of completeness doesn't require that we add

14   more to what we've done.

15          And the *Lopez* case doesn't help.

16          THE COURT:  The *Lopez* case, according to Ziggy, was a

17   pretty egregious situation where the police were editing, in

18   effect, the defendant's statements.

19          MR. HEIMANN:  Your Honor, the -- in *Lopez* the

20   prosecution truncated sentences --

21          THE COURT:  Yeah.

22          MR. HEIMANN:  -- like they put in something that

23   ends -- they'd stop at "but."  They'd take a little section

24   out of the middle of something where he's trying to say

25   something else.

19-CR-26-ABJ                                                    Vol. VIII-1395
21-CR-14-ABJ

1          THE COURT:  Pretty egregious, yeah.

2          MR. HEIMANN:  Yeah, that's not this.

3          And the rule of completeness -- the rule of

4    completeness is really reserved for this kind of situation in

5    *Lopez*, not for this kind of situation, where we have

6    identified a very discrete set of questions relating to email

7    and email only.

8          So, Your Honor, I think there's no reason under 106

9    to add any additional parts of the transcript to 605.

10         MR. JUBIN:  Your Honor, the problem is that this is a

11   perjury count.  It requires the context.  And this isn't

12   misleading; it just provides that context.

13         THE COURT:  Well, the perjury is him saying that his

14   computer crashed.  Isn't that it?

15         MR. HEIMANN:  Your Honor, it's the loss of emails

16   from computer crash and no online access.

17         MR. JUBIN:  It's true that his computer crashed, so

18   far as I know.  The question is whether he lost -- he didn't

19   lose emails, but he lost these other things he was -- he'd

20   been asked about and was asked to produce.  And so it's --

21   it's the context that provides the rest of the story for that

22   defense.

23         THE COURT:  I'll allow it.

24         MR. WARD:  Can I -- can I weigh in on how this

25   relates to my client, Your Honor?

19-CR-26-ABJ                                                    Vol. VIII-1396
21-CR-14-ABJ

1           THE COURT:  Please.  You're going to have to edit it

2      in order to do it.

3           MR. WARD:  Just -- can I weigh in as it relates to

4      this issue of the emails and whether the emails exist?

5      Because this is what gets at my client -- why my client has an

6      issue in this.

7           Mr. Horn's defense is going to be "I never had

8      anything to do with these people; I never gave them any legal

9      advice; I never had any emails."  And our defense is that --

10     my client's defense in part is that he was getting advice from

11     an attorney for NuTech as it related to the opinion letters at

12     issue.

13          And so I think this is a place where playing any

14     little snippet of this is totally without context because

15     Mr. Horn gave over three hours of recorded interviews where

16     his position on things shifted over time, and I think the only

17     way for the jury to understand that and not be misled is to

18     hear all of that, is to -- is to hear everything with the

19     context, hear everything he said about having emails, writing

20     opinion letters, and then make a determination about what

21     credibility they're going to give to -- to all of that.

22          If you play snippets, the jury is inherently being

23     misled because they're not hearing everything that was said on

24     any given topic.  And, you know, if you say one thing five

25     times and then you change your story and say something else

 1   one time, at the end you're going to be misled unless you've

 2   heard it all, unless you've heard how many times he repeats

 3   something because he changes his story on it.

 4        You also need to be able to hear -- I mean, what's

 5   going on in these interviews is the Government is saying

 6   "Here's -- here are some opinion letters.  Take a look at

 7   these."

 8        And then you've got, you know, 2 1/2, 3 minutes of

 9   silence where all we hear in the recorded interview is a pen

10   working on a piece of paper, and I'm assuming Sonia Hacker

11   would testify that that's Mr. Horn, you know, writing

12   contemporaneously as he's reading these letters that he's

13   being presented with.  And then, after having a -- a long

14   amount of time where he reads and considers the letters, then

15   he responds to the question and says, "Yeah, I wrote these;

16   yeah, I talked to this person" and did this and that.  That's

17   the context that will be lost if we allow snippets versus the

18   entire -- all of his statements about these issues.

19        So that's my client's position.

20        MR. JUBIN:  That's not a Rule 106 issue.

21        THE COURT:  Well, I don't think page 16 requires 106.

22        I mean, it's all -- it's all there.  I'm not sure

23   where that context comes in about opinion letters and other

24   things other than the emails.

25        MR. JUBIN:  So I misunderstood your ruling earlier.

19-CR-26-ABJ                                              Vol. VIII-1398
21-CR-14-ABJ

1    Did you say that this is to be modified to include the

2    context?

3              THE COURT:  No.  We'll just receive 116 -- 16 -- or

4    605.

5              MR. FLEENER:  Is the Court receiving it?

6              THE COURT:  Receiving 605.

7              MR. FLEENER:  I would object and argue confrontation.

8              THE COURT:  You may.

9              MR. HEIMANN:  Your Honor, this is not a directly

10   inculpatory statement, so there's no *Bruton* issue here.

11             It is equally possible that emails are about

12   legitimate things and illegitimate things.  This is not like

13   the statements Mr. Horn makes about writing the letters with

14   Mr. Herman, so this is not -- this is not a confrontation

15   issue.

16             An out-of-court statement that merely mentions a

17   codefendant in a statement that is not directly inculpatory

18   doesn't raise that issue.

19             MR. JUBIN:  If I may, Your Honor.

20             THE COURT:  And I agree.

21             Let's move on to the next one.

22             MR. JUBIN:  The other one is an audio, which -- for

23   which I have a transcript which really helps, I think, the

24   Court seeing what we're going after here.

25             As I understand the timing of this audio transcript,

1    it includes page 8, from lines 18 through 11.  I think my

2    brief might have said 18 through 9, but I think it's

3    through 11.

4            And what this concerns is -- it's a discussion about

5    this $280,000 payment from Bravo Two Zero to Mr. Horn's bank

6    account.  And he's questioned about it, and, in response to

7    the questioning, he says, "I'm sure I was provided something

8    that indicated the 280,000 was provided."

9            And, of course, the reason he's saying this is

10   because the investigator is there in front of him telling him

11   that he got this $280,000.

12           And he says, "Whether that was a bank statement or

13   deposit slip, I'm not sure which."

14           She says, "Okay."

15           And he assures her it was some sort of proof

16   provided, though.

17           And then it says "Did that -- did the 208" -- that's

18   actually a typo in the transcript; I listened to it; it does

19   say "280,000" -- "payment go through you as the attorney?" is

20   the question.

21           And he says, "No, no escrow or anything like that for

22   that kind of stuff.  This was strictly an opinion letter;

23   I was not involved in any level of the operations or as a

24   conduit for anything that went on between them."

25           And then the interview returns to the $280,000.

 1   After some other discussion it says, "Do you think this

 2   $80,000 had anything to do with the debt conversion and the

 3   opinion letter you wrote for the free-trading shares that

 4   referenced 280,000 being paid?"

 5          And Mr. Horn's response is, "Do you mean did it come

 6   from that?"

 7          And the inspector says "Or was it part of that?"

 8          Mr. Horn says "I don't know."

 9          And she says, "Was this partial payment of that?"

10          He says, "I don't -- I don't think so.  It was never

11   represented that way."

12          And then he says he doesn't know if it actually came

13   out of the 280,000 that was paid or what, but it definitely

14   went back -- "went back, I will tell you that" -- and of

15   course that's saying "I didn't get this money."

16          But he doesn't know if this 80,000 came out of the

17   280,000, so this discussion about the 280,000, it reveals his

18   understanding.  And -- and if you just leave it about the

19   280,000 earlier on page 8 and 9, you miss entirely what his

20   understanding about this is.

21          And then, you know, Mr. Horn goes on to say -- you

22   know, "I'm presuming you already know that I don't have this

23   stuff because it went to the bank."

24          And she says, "The money went back?"  He goes -- and

25   she says, "I don't see the money going back to Bravo Two

19-CR-26-ABJ                                          Vol. VIII-1401
21-CR-14-ABJ

 1    Zero."

 2            And he says "Let's put it this way:  It didn't stay

 3    with me."

 4            "Or back to Kevin Trizna?" she asks.  "Who did you

 5    send it to?"

 6            And he says, "I'm trying to think of who I would have

 7    sent it to."  And, of course, this $280,000 doesn't exist.

 8            But he says, "If I even would have sent it, it would

 9    have just happened by electronic transfer.  I don't know.

10    I don't know.  Offhand I don't know."

11            And she says, "I've got a bank wire from Wells Fargo;

12    it's kind of hard to read.  I'll point it out.  The originator

13    is Robert Mitchell, and the beneficiary is Ian Horn, and the

14    dollar amount is 280,000."

15            And he says, "I don't remember that much ever going

16    through my -- an account I had.  But if it says I -- it did,

17    it did.  I don't remember it, though."

18            And she says, "All right.  Possibly the 280 did" --

19    or he says "Possibly it went through my account although

20    I didn't realize it at the time if that was part of the

21    purchase price."

22            And she says, "Well, these are the records that are

23    provided as part of the debt conversion package to Pacific

24    Stock Transfer."

25            And he's going "Okay.  Uh-huh."

1            And this is the Wells Fargo statement from Bravo Two

2    Zero, and there's this line that says it goes to Horn for

3    280 -- 280,000.

4            And Horn's response is "I guess the question is why

5    would it go from Wells Fargo to BMO in the first place?  But

6    that sure sounds like it's the conversion price.  I stand

7    corrected.  I didn't realize.  I wasn't involved in the

8    negotiations or any of that, but the only way I would have

9    received that kind of money is if they decided that it would

10   go through me."

11           Now we're talking about what he said before, like

12   "I wasn't part of the escrow," and now he's saying, "Well,

13   I guess maybe it did, it went through me for whatever their

14   purposes were."

15           And then he reinforces that the money didn't stay

16   with him.  And follow the trail, especially that kind of

17   money.

18           And then the inspector says "Okay.  I don't show that

19   this happened."

20           "That what happened?"

21           "That 280,000 was transferred from the Bravo Two Zero

22   account into your account."

23           He goes, "Okay.  So, obviously, then, if there was

24   that much money in -- in my account, it came from somewhere

25   other than Bravo?  Is that what you're saying?"

1          And she says, "You have no recollection whether it

2    did or not come from Bravo?"

3          "No, I have no recollection."

4          "Or even make it into your account?"

5          "No.  It didn't stay there.  I'll tell you that."

6          This is all critical to understanding the $280,000

7    and whether he escrowed it, whether his understanding was --

8    whether he had any understanding about it at all.

9          And, of course, the $280,000 documents are fictitious

10   and he doesn't know that.  He's being led to believe that he

11   escrowed this money and he denied having done so.  So it goes

12   on to say "Is this a common occurrence?"

13         He goes, "Well, it doesn't -- no."

14         "Does it stick in your mind at all?"

15         "It happened a few times during that period in

16   connection with these dealings."

17         So he says he did, apparently, have money go through

18   his account, and he's saying that he did, so it's not fair to

19   say, "Well, it never did" and then -- and then have him --

20   have him also be explaining, saying, "Yeah, it happened a few

21   times," that he had money going through his account.

22         So it's critical to correct and not mislead the jury

23   as to what his knowledge and statements were about this

24   $280,000.

25         And as it continues on, you know, he -- he's talking

 1    about how -- what instructions he might have had as to where

 2    it was supposed to go.

 3            And he said, "Well, the people who gave it to me

 4    would have been the ones who did the instructions.  The only

 5    other person it could have been would have been Justin Herman,

 6    because that's how -- that's the only way I would know these

 7    other people in the companies."

 8            So he's presuming it was Justin Herman that directed

 9    it or Mr. Crom, which references one of the letters.

10            And from the fact that the 280 was sent from

11    Mitchell, I don't know if it was him, either.

12            So the only -- it would be terribly misleading to

13    just play this little snippet on page 8 and 9 and say, "Oh, so

14    you got this $280,000 and you didn't do any kind of an

15    escrow?"

16            And then there's this lengthy explanation about what

17    he's coming to believe about the $280,000 as he's told more

18    about it and shown documents or told about documents.  It

19    shows what the true state of his knowledge -- it would be

20    truly misleading to throw it out there and act as if those

21    statements on page 8 and 9 are all there is to the story.

22            And I -- I won't reiterate the -- the cases.  But,

23    basically, it's critical to not mislead the jury and fill out

24    the context of what he said.

25            MR. HEIMANN:  Your Honor, would it assist the Court

1    to listen to the Government's proposed exhibit?

2            THE COURT:  Pretty short?

3            MR. HEIMANN:  It is, Your Honor.

4            THE COURT:  I'm not sure it would --

5            MR. HEIMANN:  Okay.

6            THE COURT:  -- really help.

7            MR. HEIMANN:  Your Honor, what I will say is the

8    relevance of this exhibit is that Mr. Horn denies acting as an

9    escrow.  And his entire defense over the last week and a half

10   has been that he was just an escrow.

11           But he denied it.  That's the relevance of this.

12           And if you look at what we actually propose to do --

13   Inspector Hacker asks "Did the $280,000 payment go through you

14   as the attorney?"

15           And Mr. Horn says, "No.  No escrow or anything like

16   that for that kind of stuff, strictly an opinion letter, not

17   involved in any level of the operations or as a conduit for

18   anything that went on between them."

19           And we stop.  It's a complete thought.  The confusion

20   arises if we keep going.

21           And so the Government is offering this to show that

22   Mr. Horn denied being an escrow and denied moving money

23   through his accounts of any kind and this was only about

24   opinion letters.

25           So, Your Honor, I think our proposed exhibit is

 1    not -- does not distort the meaning of Mr. Horn's statements,

 2    and we would ask that additional parts of the recording not be

 3    included.

 4              MR. JUBIN:  The Government's argument shows precisely

 5    why it is so important that Mr. Horn -- the rest of Mr. Horn's

 6    statements come in, because they want to leave the jury with

 7    the impression that he denied escrowing money.  And in the

 8    totality of his statement, he did not deny escrowing money.

 9              THE COURT:  By way of your position, I would allow

10    you to add pages 26 and 27.

11              Do you see what I'm talking about?

12              MR. JUBIN:  I do.

13              The other thing that directly contradicts that

14    statement is . . . on page 31, line 10, "Where would you

15    receive -- so once the money comes into your account, who

16    tells you where to send it next?"

17              "Would have been somebody connected with the company,

18    I'm sure."

19              "And do they just call you up or do they send you an

20    email?"

21              "What?"

22              "How do you get instructions?"

23              "Would have been -- would have been phone

24    conversation as to where it went."

25              "You don't recall who would be telling you?"

 1          "If it wasn't somebody specifically we talked about

 2   with the company" -- blah, blah, blah -- "it would have been

 3   Justin Herman."

 4          Maybe -- maybe to 32, line 3, I think that's directly

 5   relevant to the issue Mr. Heimann brought up.

 6          THE COURT:  I think he's just speculating at that

 7   point.

 8          MR. JUBIN:  That's most of what he did in the

 9   interview.

10          But it does talk directly to what he was doing

11   with -- with the funds and -- and informs that statement.

12          THE COURT:  All right.  If you prefer not to do that,

13   that would be okay, as well.

14          I'll just receive --

15          MR. JUBIN:  No, I -- I would certainly take the --

16   take the modification you have -- you have proposed,

17   Your Honor, and add pages 26 and 27.  I was just maybe trying

18   to get a little bit more.

19          THE COURT:  All right.

20          MR. HEIMANN:  Your Honor, I don't know if we're done

21   with the issues regarding statements and rule of completeness

22   and the like.

23          If -- if we are, I had one other thing I wanted to do

24   this evening.  If we're not, then I'll sit down and let

25   whoever needs to propose something propose it.

1          THE COURT:  Proceed.

2          MR. HEIMANN:  Your Honor, the Government moves to

3   dismiss Count Two of the perjury indictment.

4          You may remember during Mr. Jubin's opening statement

5   that he presented an email that he claimed came from

6   Dan Hefner to his client on the same day that the subpoena was

7   served on Mr. Horn.

8          That was on Tuesday.  The Government was not provided

9   a copy of that prior to our opening statement or Mr. Jubin's

10  opening statement.

11         We finally got from Mr. Jubin the original email,

12  with attachments, so we could verify what was attached to it

13  and saw for the first time that Mr. Hefner provided Mr. Horn

14  some opinion letters from off the OTC Market website, and the

15  timing of the email is about 10 minutes after the interview

16  ended that morning and Mr. Horn was served.

17         So at this point, somewhere in 10 minutes' time,

18  Mr. Horn did, in fact, have some opinion letters, and we are

19  not wanting to go forward with trying to prove that it was

20  1 or 2 minutes before or after he got the subpoena.

21         So, Your Honor, with that production of evidence from

22  the defendant, we move to dismiss Count Two of the perjury

23  superseding indictment.

24         MR. JUBIN:  Of course, no objection.  Just for a

25  little clarification, Your Honor, as to -- I don't know if

 1  Your Honor remembers my opening statement, but I indicated

 2  that shortly before the agents showed up that those opinion

 3  letters arrived in -- they were sent to Mr. Horn.

 4          That email was opened from Pacific Time, and the

 5  metadata revealed -- which I only looked at because

 6  Mr. Heimann insisted I do so -- it revealed it was

 7  7:00-something Pacific, which turned out to be two hours

 8  different than our -- than what the email itself was time

 9  stamped opening it up from his account.

10          So it's -- Mr. Heimann is accurate that it was

11  somewhere just minutes after the interview ended that it

12  appears that it showed up.  I just wanted the Court to be

13  aware I certainly didn't intend to mislead anyone by relying

14  on the date stamp on an email as it appeared and was printed

15  from the computer.

16          So that's where we are with that.

17          THE COURT:  How would you like me to handle this with

18  the jury?

19          I don't know if there's anything that needs to be

20  said at this point but --

21          MR. HEIMANN:  Your Honor, I -- if -- with your

22  permission, I'd like to go back to my opening statement before

23  I suggest any instruction.

24          THE COURT:  Very well.

25          What else can we do tonight?

1          MR. JUBIN:  Go home.

2          MR. HEIMANN:  Leave, Your Honor?

3          THE COURT:  I just like being around you guys.  And

4    gals.

5          Now, just so I'm clear, the Government will be

6    offering into evidence all of the --

7          MR. HEIMANN:  Your Honor, I -- I can give you a list

8    of the exhibits that we'll introduce through Inspector Hacker

9    tomorrow.  This will also put the -- give each defendant a

10   list.

11         We will introduce Exhibits 600, 601, 603, 604, 605,

12   608, 610, 602 -- did I say that already?  I did not.

13         THE COURT:  No.

14         MR. HEIMANN:  Good.  We may offer 614.

15         MR. JUBIN:  And as I understand it, 614 would be

16   modified to include pages 26 and 27 if offered?

17         THE COURT:  Yes.

18         As we leave tonight, the Court will grant your motion

19   to dismiss Count Two of the second superseding -- no, of

20   the -- Count Two of Docket 21 --

21         MR. JUBIN:  14, Your Honor.

22         THE COURT:  -- 14.  That's right.  Thank you.

23         And we'll see everybody at 8:30 tomorrow morning.

24       (Proceedings concluded 6:28 p.m., September 30, 2021.)

25

1                        C E R T I F I C A T E

2

3

4

5            I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14           Dated this 12th day of January, 2022.

15

16

17

18                    /s/ Melanie Humphrey-Sonntag

19           _____

20                    MELANIE HUMPHREY-SONNTAG
                              RDR, CRR, CRC
21                    Federal Official Court Reporter

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3    _____

4

     UNITED STATES OF AMERICA,        DOCKET NO. 19-CR-026-ABJ
5                                      DOCKET NO. 21-CR-014-ABJ
             Plaintiff,
6                                      VOLUME IX of XIV
             vs.                       (Pages 1411 through 1582)
7
     JUSTIN HERMAN, CHARLES W.         Cheyenne, Wyoming
8    WINTERS, JR., a/k/a Chuck         Friday, October 1, 2021
     Winters, and IAN HORN,           8:35 a.m.
9
             Defendants.
10

11   _____

12

13              TRANSCRIPT OF TRIAL PROCEEDINGS

14

15          BEFORE THE HONORABLE ALAN B. JOHNSON
                UNITED STATES DISTRICT JUDGE
16          and a jury of twelve and four alternates

17

18

19

20

21

22        *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*
              *Federal Official Court Reporter*
23     *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
          *630.452.6236 * MelanieSonntagCRR@gmail.com*
24
     *Proceedings reported with digital stenography; transcript*
25        *produced with computer-aided transcription.*

```
 1   APPEARANCES:
     For the Plaintiff:        ERIC J. HEIMANN
 2                             THOMAS A. SZOTT
                               ASSISTANT UNITED STATES ATTORNEYS
 3                             DISTRICT OF WYOMING
                               2120 Capitol Avenue, Fourth Floor
 4                             Cheyenne, WY 82001

 5   For the Defendant         THOMAS A. FLEENER
     Herman:                   FLEENER LAW
 6                             506 South Eighth Street
                               Laramie, WY 82073
 7
     For the Defendant         ZENITH S. WARD
 8   Winters:                  BUCHHAMER & WARD
                               1821 Logan Avenue
 9                             Cheyenne, WY 82001

10   For the Defendant         THOMAS B. JUBIN
     Horn:                     JUBIN & ZERGA
11                             2614 Pioneer Avenue
                               Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2      GOVERNMENT WITNESSES:
                                                    PAGE
3        SONIA HACKER
         Further Direct Examination by Mr. Heimann     1414
4        Further Cross-Examination by Mr. Fleener      1463
         Further Cross-Examination by Mr. Jubin        1469
5        Further Cross-Examination by Mr. Ward         1526
         Redirect Examination by Mr. Heimann           1549
6        Further Recross-Examination by Mr. Jubin      1556

7        MOTION FOR JUDGMENT OF ACQUITTAL
         Argument by Mr. Fleener                       1560
8        Argument by Mr. Ward                          1560
         Argument by Mr. Jubin                         1560
9        Argument by Mr. Heimann                       1561

10                        E X H I B I T S
                                          IDENTIFIED   RECEIVED
11     GOVERNMENT'S EXHIBITS
              426    Bank Statement              1459      1461
12            427    Limited Liability Company   1457      1458
                     Certification
13            600    Horn Recording              1416      1416
              601    Horn Recording              1417      1418
14            602    Horn Recording              1455      1455
              604    Horn Grand Jury Testimony   1436      1437
15                   Excerpt
              605    Horn Grand Jury Testimony   1440      1450
16                   Excerpt
              608    Horn Grand Jury Testimony   1452      1453
17                   Excerpt
              610    Horn Grand Jury Testimony   1454      1454
18                   Excerpt

19     DEFENDANT WINTERS' EXHIBITS
              CW-B   Photograph                  1533       --
20            CW-P.1 Email Chain                 1540      1541

21     DEFENDANT HORN'S EXHIBITS
              IH-Q15a   Attorney Opinion Letter  1506      1507
22            IH-2206a  Verizon Record           1471       --

23

24

25

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. IX-1414
21-CR-14-ABJ

 1          (Proceedings commenced 8:35 a.m., October 1, 2021,

 2   in the presence of all defendants, outside the jury's

 3   presence.)

 4              THE COURTROOM DEPUTY:  Court is now in session.

 5              THE COURT:  Good morning, everyone.

 6              MR. HEIMANN:  Good morning.

 7              MR. JUBIN:  Morning, Judge.

 8              THE COURT:  Are we ready to go?

 9              All right.  We'll be hearing Ms. Hacker today?

10              MR. HEIMANN:  Yes, Your Honor.

11          (Proceedings within the jury's presence at 8:37 a.m.)

12              THE COURT:  Please be seated, ladies and gentlemen.

13              Mr. Heimann.

14              MR. HEIMANN:  Thank you, Your Honor.

15              The United States of America calls Inspector

16   Sonia Hacker.

17    **SONIA HACKER, GOVERNMENT'S WITNESS, FURTHER DIRECT EXAMINATION**

18    **BY MR. HEIMANN:**

19   Q.  Inspector Hacker, you understand you are still under oath?

20   A.  I do.

21   Q.  Did you attempt to interview Ian Horn on October 15th of

22   2018?

23   A.  I did.

24   Q.  Where?

25   A.  At his home in Brandon, Florida.

1    Q.  Who was with you?

2    A.  Special Agent Timothy Pikas.

3    Q.  Was Mr. Horn at home?

4    A.  He was not.

5    Q.  To whom did you and Special Agent Pikas speak?

6    A.  We spoke to Mrs. Horn.

7    Q.  What, if anything, did you tell her?

8    A.  We told her that we would like to speak to Mr. Horn about

9    NuTech.

10   Q.  Did you ask for him to call you back?

11   A.  Yes.  Agent Pikas left his business card with his phone

12   number on it.

13   Q.  Did Mr. Horn call you back?

14   A.  No.

15   Q.  Did he call -- were you able to schedule an interview the

16   next day?

17   A.  We didn't schedule one.

18   Q.  Okay.  Did you go back to Mr. Horn's home the next

19   morning?

20   A.  Yes.

21   Q.  So that was October 16th of 2018?

22   A.  Correct.

23   Q.  Did Mr. Horn agree to be interviewed?

24   A.  He did.

25   Q.  Where did you interview him?

19-CR-26-ABJ     HACKER - FURTHER DIRECT - HEIMANN     Vol. IX-1416
21-CR-14-ABJ

1   A.  In his living room.

2   Q.  Was the interview recorded?

3   A.  Yes.

4   Q.  What was the first question you asked Ian Horn during the

5   recorded interview?

6   A.  I asked Mr. Horn if he recalled working for a company

7   involving EcoEmissions or NuTech.

8   Q.  We have an Exhibit 600.

9          Is that a recording of your question and Mr. Horn's

10  answer?

11  A.  Yes.

12          MR. HEIMANN:  The Government moves to admit 600.

13          MR. FLEENER:  Objection; confrontation.

14          THE COURT:  Objection's overruled.  600 is received.

15      (Government's Exhibit 600 received into evidence.)

16  BY MR. HEIMANN:

17  Q.  So we're -- we give the jury a sense of what's coming

18  before we play it, what's the first question they're going to

19  hear?

20  A.  This is the beginning of the interview where I am starting

21  the recording, so I'm giving the date and the time and who is

22  in the room, that sort of thing.

23  Q.  Okay.  And approximately how long is the recording?

24  A.  It's short but I don't recall the exact amount of time.

25  Q.  Okay.  Very good.

 1            MR. HEIMANN:  With the Court's permission, we'll play

 2   that now.

 3            THE COURT:  Very well.

 4       (Government's Exhibit 600 played.)

 5   BY MR. HEIMANN:

 6   Q.  Before Mr. Horn volunteered that he had written opinion

 7   letters for NuTech, had you or Agent Pikas mentioned opinion

 8   letters?

 9   A.  No.

10            MR. HEIMANN:  Let's bring up Exhibit 25.2.

11   BY MR. HEIMANN:

12   Q.  So 25.2 is an opinion letter on Ian Horn's letterhead

13   dated September 23rd of 2015.

14   A.  Correct.

15   Q.  Did you show this letter to Mr. Horn during the interview?

16   A.  I did.

17   Q.  Did he deny writing it?

18   A.  No.

19            MR. HEIMANN:  Let's go down to the signature block.

20            And let's magnify the signature block.

21   BY MR. HEIMANN:

22   Q.  Did you ask Mr. Horn if this is how he usually signs his

23   name?

24   A.  I did.

25   Q.  Is Exhibit 601 a recording of your question and Mr. Horn's

19-CR-26-ABJ    HACKER - FURTHER DIRECT - HEIMANN    Vol. IX-1418
21-CR-14-ABJ

1   answer?

2   A.  It is.

3           MR. WARD:  Judge, our monitors aren't working.

4           MR. JUBIN:  Mine is up.

5           MR. WARD:  Maybe it's just mine wasn't turned on.

6   I apologize.

7           MR. JUBIN:  Now mine's off -- no.

8           MR. WARD:  Mine's working now, Your Honor.  Sorry.

9           THE COURT:  Thank you.

10  BY MR. HEIMANN:

11  Q.  I'll repeat my question.

12          Is Exhibit 601 a recording of your question and

13  Mr. Horn's answer?

14  A.  Yes, about his signature.

15          MR. HEIMANN:  The Government moves to admit 601.

16          MR. FLEENER:  Objection; confrontation.

17          MR. WARD:  Your Honor, I join the objection.

18          THE COURT:  The objections are overruled.

19          The exhibit is received.

20      (Government's Exhibit 601 received into evidence.)

21          MR. HEIMANN:  With the Court's permission, we will

22  publish this to the jury.

23  BY MR. HEIMANN:

24  Q.  And, Inspector Hacker, the first thing the jury will hear,

25  is it your question?

 1   A.  Yes.

 2       (Government's Exhibit 601 played.)

 3   BY MR. HEIMANN:

 4   Q.  Inspector Hacker, after the interview did you serve

 5   Mr. Horn a grand jury subpoena that required him to produce

 6   certain records and testify before the grand jury?

 7   A.  I did.

 8   Q.  Did the subpoena require production of all nonprivileged

 9   communications and documents related to the acquisition,

10   purchase, sale, or transfer of any ownership or controlling

11   interest in EcoEmissions?

12   A.  It did.

13   Q.  Did the subpoena also provide a definition of privileged

14   attorney-client communications?

15   A.  Yes.

16   Q.  Did the subpoena explain that a communication may include

17   privileged information and nonprivileged information

18   responsive to the subpoena?

19   A.  Yes.

20   Q.  Was Mr. Horn required to produce the nonprivileged

21   information and a privilege log explaining the reason for any

22   redactions or items withheld?

23       MR. JUBIN:  Objection to the extent it calls for a

24   legal conclusion.  It's also leading.

25       MR. HEIMANN:  Your Honor, it's regarding the text of

1    the subpoena.

2              THE COURT:  Overruled.  It's foundational.

3    BY MR. HEIMANN:

4    Q.  Do you remember the question?

5    A.  Yes.

6              It did include that language.

7    Q.  In response to the subpoena, did Ian Horn eventually

8    produce records to the grand jury?

9    A.  Yes.

10   Q.  Have you reviewed those records as part of the grand jury

11   investigation?

12   A.  Yes.

13   Q.  Did they include any email messages?

14   A.  No.

15   Q.  Was there a privilege log?

16   A.  No.

17             MR. HEIMANN:  Let's look now at Exhibit 603.  This

18   has been admitted into evidence.

19   BY MR. HEIMANN:

20   Q.  So as Special Agent Berryhill testified, this is a text

21   log that was found on a phone seized from Justin Herman.

22   Would you remind the grand jury when that phone was seized

23   from Mr. Herman.

24   A.  Yes.  We seized Mr. Herman's phone when we executed a

25   search warrant at his residence on June 26th, 2019.

1  Q.  Was the phone found on Mr. Herman's person?

2  A.  I believe so.

3  Q.  If we look at page 1 here, the text chat begins on

4  October 16th of 2018 with the text "Don't forget to send me a

5  copy of the opinion letters."

6        Is that the same day that you interviewed Mr. Horn at

7  his home?

8  A.  Yes.

9        MR. HEIMANN:  I want to magnify the second gray box,

10  10/21/2018.

11  BY MR. HEIMANN:

12  Q.  Inspector Hacker, if you would, just read that first

13  sentence.

14  A.  "It does seem like I have a lot of emails with a lot of

15  wiring instructions, a lot of agreements, and a lot of other

16  information that may be responsive to the subpoena which goes

17  back as far as 2014."

18  Q.  And would you read the last sentence beginning with

19  "I don't want."

20  A.  "I don't want to cause you any harm, but I also don't want

21  to cause myself any harm."

22  Q.  We've seen some email during the course of the trial, and

23  we've seen some email between Justin Herman and Ian Horn that

24  came from Oath Holdings' search warrant.

25        When did you get access to that email?

1   A.  After the privilege review.

2   Q.  So let's talk a little bit about the privilege review.

3           Special Agent Berryhill mentioned that, during his

4   testimony, that things were segregated out, that potentially

5   privileged communications were segregated out.

6           Were communications related to Ian Horn segregated

7   out?

8   A.  Yes.

9   Q.  They -- they went to the privilege review team?

10  A.  Correct.

11  Q.  When did you first start to get access to some of those

12  communications through the privilege review?

13  A.  In November of 2019.

14  Q.  When did you get access to this text message chat?

15  A.  Not until a year later, I think November of 2020.

16          MR. HEIMANN:  Let's look at Exhibit 101 and put it up

17  next to the chat.

18          And let's go down to page 2 of the chat.

19  BY MR. HEIMANN:

20  Q.  The messages we see here in blue on page 2 of the text of

21  603, what's the first date on them, on the day of the first

22  message here?

23  A.  October 21st, 2018.

24  Q.  And it runs down through what date?

25  A.  November 1st, 2018.

 1   Q.  These are all in blue.

 2           Are these all texts from the user of the phone?

 3   A.  Yes.

 4   Q.  To Mr. Horn?

 5   A.  Correct.

 6           MR. HEIMANN:  Let's look at 101.

 7   BY MR. HEIMANN:

 8   Q.  We've been -- we've seen this a number of times, and

 9   I want to change our focus to the first forwarded message

10   header.

11           What does that indicate?

12   A.  That indicates the original email that was dated

13   December 12th, 2014, was forwarded from Ian Horn to

14   Steven Mills Law on October 23rd, 2018.

15   Q.  So stevemillslaw@gmail is the recipient?

16   A.  Yes.

17   Q.  And, significantly, the date is October 23rd of 2018?

18   A.  Correct.

19   Q.  So that falls somewhere in the text messages we see on the

20   right?

21   A.  It does.

22           MR. HEIMANN:  Let's look now -- if we move on the

23   left side to put Exhibit 5.1 there, leaving Exhibit 603 on the

24   right.

25   ///

1   BY MR. HEIMANN:

2   Q.  So 5.1, again, we've seen this before.  I want to call our

3   attention to, again, the first forwarded message block.

4           What does that indicate?

5   A.  That indicates that the original email sent from

6   Justin Herman to Ian Horn on December 23rd, 2014, was

7   forwarded from Ian Horn to stevemillslaw@gmail.com on

8   October 23rd, 2018.

9   Q.  5.1, is that one of the emails you received through the

10  privilege review?

11  A.  It is.

12  Q.  And 101, that was, too; right?

13  A.  Yes.

14          MR. HEIMANN:  Let's put up 5.2 on the left.

15  BY MR. HEIMANN:

16  Q.  So 5.2, again, I want to call our attention to this first

17  forwarded message block.

18          What's indicated there?

19  A.  That Justin Herman -- that the original message --

20  sorry -- from Justin Herman to ianhornlaw@gmail.com dated

21  December 23rd, 2014, was forwarded from Ian Horn to

22  stevemillslaw@gmail.com on October 23rd, 2018.

23          MR. HEIMANN:  And let's do the last in this series,

24  5.13.

25  ///

1   BY MR. HEIMANN:

2   Q.   As we're changing that, 5.2, did you get that through the

3   privilege review?

4   A.   I did.

5   Q.   On 5.13, that first forwarded message block, what does it

6   indicate?

7   A.   It indicates that the original email from Justin -- well,

8   there's an email chain below.

9          So everything that was in the email chain below dated

10  January 12th, 2015, was forwarded from Ian Horn to

11  stevemillslaw@gmail.com on October 23rd, 2018.

12  Q.   On the 603 side --

13          MR. HEIMANN:   If we go down one page, please --

14  please magnify that first gray box, 11/6/2018.

15  BY MR. HEIMANN:

16  Q.   Inspector Hacker, would you read the first sentence of

17  this text or the -- actually, the first two sentences.

18  A.   "Justin, time is a-wasting.  I need to start preparing the

19  documents and any explanations I may have to send to Wyoming."

20  Q.   And there's a sentence -- one, two, three -- four lines

21  up, begins "I'm sure."

22          Do you see that?

23  A.   Yes.

24  Q.   Would you read that sentence, please.

25  A.   "I'm sure sending all the emails that I have will result

 1   in whole bunch of questions which will require me to be in

 2   Wyoming to answer."

 3           MR. HEIMANN:  Let's go to the next page on 603.

 4           And if you would, magnify the last gray box on this

 5   page, 11/9/2018.

 6   BY MR. HEIMANN:

 7   Q.  On that first sentence -- well, if you would read from

 8   the -- from "Humming."

 9   A.  "Humming getting to understand that I'm pretty much on my

10   own with the subpoena thing.  I'll do the best I can by way of

11   explanation for the emails I have obviously I can't explain

12   why I don't have the Pacific Transfer letters so I'll do what

13   I can but not getting a whole lot of feedback from you or

14   Steve Miller as to what I should be including or not including

15   and what type of information I should be adding to the

16   specific questions that they're asking."

17           MR. HEIMANN:  You can take that down, go one

18   page down.

19   BY MR. HEIMANN:

20   Q.  On this page there's a redaction.

21           Is that an address?

22   A.  Yes.

23   Q.  And there's a couple of these redactions in the text

24   messages; right?

25   A.  Correct.

1          MR. HEIMANN:  Next page, please.

2          If you would, magnify the bottom gray box,

3    11/15/2018.

4    BY MR. HEIMANN:

5    Q.  This is a text from Mr. Horn to Mr. Herman.

6          If you would, read the last sentence here, beginning

7    with "Do I print."

8    A.  "Do I print and supply the emails or is Steve and you

9    wedding the emails which I need to send and redacting the

10   parts that are privileged or confidential."

11         MR. HEIMANN:  Go one page down, please.

12   BY MR. HEIMANN:

13   Q.  I want to just clarify something.

14         There's a text here from -- in blue -- on 11/22/2018.

15   The time stamp is 10:31:50.

16         Do you see that one?

17   A.  I do.

18   Q.  There's just a square in that box.  The image that is in

19   that text, is that just the last page of this particular

20   exhibit?

21   A.  Yes.

22         MR. HEIMANN:  Okay.  Let's go one page down.

23         Magnify the larger gray box in the middle,

24   11/26/2018.

25   ///

1  BY MR. HEIMANN:

2  Q.  Inspector Hacker, would you read that text from Ian Horn

3  to Justin Herman.

4  A.  Yes.

5        "Can we schedule a time to talk to go over both

6  overnight packages that you sent me and any other emails and

7  bank statements that need to be included in our submission 2

8  the prosecutor in Wyoming.  Keep in mind if any explanation is

9  necessary and you may want to ask Steve about that I want to

10 include the explanation and I also want to redact any

11 confidential or privileged information on anything we're going

12 to send.  Please advise as to how to send the emails without

13 showing the stream of where the emails went to."

14        MR. HEIMANN:  Next page, please.

15        Please magnify the bottom -- the last gray box on

16 this page, 11/30/2018, time stamp 2:17.

17 BY MR. HEIMANN:

18 Q.  This is a text message from Ian Horn to Justin Herman.

19 Please read this.

20 A.  "Still in mediation but I really want to get a resolution

21 as to what I'm sending out what I am claiming privilege or

22 confidentiality on and what I'm not sending out.  I want to

23 get it overnighted as quickly as possible so they get the

24 whole package and then also I want to talk to you about the

25 ramifications, et cetera, cuz I got all the girls want to

1    protect me but I want to make sure you're okay."

2            MR. HEIMANN:  If we go to the next page, please,

3    on 603.

4    BY MR. HEIMANN:

5    Q.  What's the date of the first text?  On page 10 of 603.

6    A.  December 3rd, 2018.

7    Q.  And the last one on this page?

8    A.  December 13th, 2018.

9    Q.  I want to come back to 5.13, which is -- we see on the

10   left-hand side.

11           The very top email header, what's indicated there?

12   A.  It shows that Ian Horn sent Justin Herman this email

13   string on December 3rd, 2018.

14   Q.  So that happened around the time that the text messages

15   we're seeing on page 10 of 603 happened?

16   A.  Yes.

17           MR. HEIMANN:  If we could put 101 on the left-hand

18   side.

19   BY MR. HEIMANN:

20   Q.  What's indicated in the top email header of 101?

21   A.  That Ian Horn sent Justin Herman -- or I should correct

22   that.

23           Ian Horn forwarded to Justin Herman the email chain

24   on December 3rd, 2018.

25           MR. HEIMANN:  Let's pull up 5.1.

1   BY MR. HEIMANN:

2   Q.  What's indicated by the top email header on 5.1?

3   A.  That Ian Horn forwarded the email chain to Justin Herman

4   on December 3rd, 2018.

5            MR. HEIMANN:  And, lastly, Exhibit 5.2.

6   BY MR. HEIMANN:

7   Q.  What's indicated by the top email header of Exhibit 5.2?

8   A.  That Ian Horn forwarded to Justin Herman the email chain

9   shown below on December 3rd, 2018.

10           MR. HEIMANN:  Let's go now back to 603 and move one

11  page down.

12  BY MR. HEIMANN:

13  Q.  This is page 11.  I'm not going to have you read anything

14  off this.  I wanted to ask you a couple general questions

15  about the -- the text message chain we're looking at.

16           How many days does it cover?

17  A.  95.

18  Q.  Is that from your interview on October 16th through

19  January 18th of 2019?

20  A.  Yes.

21  Q.  How many text messages go between Mr. Herman and Mr. Horn

22  during those 95 days?

23  A.  Approximately 160.

24           MR. HEIMANN:  Let's move down to the next page on

25  603.

1          Please magnify the top text message on this

2    page dated 12/21 of 2018.

3    BY MR. HEIMANN:

4    Q.  Inspector Hacker, if you would, read this message from

5    "I'm going to."

6    A.  "I'm going to overnight documents tomorrow whether I hear

7    from you or not.  If there's anything you don't think should

8    go you better let me know.  I don't want to wait any longer

9    I'm trying to reduce the risk that I have to go to Wyoming in

10   January and then I would have to figure out how to handle the

11   grand jury testimony."

12         MR. HEIMANN:  Let's go back to the page and magnify

13   that second message on this page dated 12/22/2018.

14   BY MR. HEIMANN:

15   Q.  The jury can see the entire message.  But, Inspector

16   Hacker, I'd like you to read it from "If there's anything."

17   Forward.

18   A.  "If there's anything that you don't want me to send off

19   let me know.  Obviously I probably will need your assistance

20   if I am required to go to Wyoming as to how to answer

21   questions or not answer questions and I may need

22   Steve Miller's input and any other attorney that you know as

23   how to handle this grand jury investigation."

24         MR. HEIMANN:  Can we go back to the page, scroll to

25   the next page.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. IX-1432
21-CR-14-ABJ

1          And the next.

2          If you would magnify that top message, please, dated

3    1/3/2019.

4    BY MR. HEIMANN:

5    Q.  Inspector Hacker, if you would, please read from the

6    beginning -- one, two -- three sentences.

7    A.  "Were you able to get the documents prepared and sent for

8    overnighting or sent to Kinko's for printing?  The sooner

9    I get them the sooner we can go over them and make sure that

10   we're on the same page.  I'd like to run down everything they

11   ask for in the subpoena and what types of responses."

12          MR. HEIMANN:  Can we go back to the page?

13          And then let's go down one page.

14          And the next.  And the next.

15          And the next.  And one more.

16          Please magnify that long message at the end.

17   BY MR. HEIMANN:

18   Q.  Inspector Hacker, can you read the contents of this

19   message, please, sent from Ian Horn to Justin Herman on

20   January 11th of 2019?

21   A.  "You and I need to talk at length about the documents and

22   about the money that was dispersed from my account" --

23   Q.  "For"?  Is it "for my account"?

24   A.  Yes.

25   Q.  I thought I heard "from."  Sorry.

1   A.   Oh.   It is "was dispersed for my account and who directed

2   it and where it went those kind of things and why for that

3   matter great also exactly what role you played in all of this.

4   Cuz I'm sure they're going to ask about that.   And as of now

5   I'm thinking that you were like a conduit somebody was helping

6   helping to facilitate the deal that was going that was going

7   on but not a officer director or involved with the company's

8   but it may require some explanation as to how you came to be

9   involved with those companies then retain me to do the opinion

10  letters, et cetera, and disperse the money from the account.

11          "I spoke with Steve a little bit today I will be

12  speaking with him again on Sunday okay but I really want to go

13  pretty much document by document that is meaningful and go

14  over it with you.   This would include opinion letters the

15  attorney advice letter the if you know information regarding

16  the accounts the information regarding individuals that

17  I spoke with including Kevin, et cetera."

18          MR. HEIMANN:   So let's go back to the main page, down

19  one page.

20  BY MR. HEIMANN:

21  Q.   The messages here, what's the date of the first message?

22  A.   January 11th, 2019.

23  Q.   And the last one?

24  A.   January 13th, 2019.

25          MR. HEIMANN:   Let's move down one page.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. IX-1434
21-CR-14-ABJ

1    BY MR. HEIMANN:

2    Q.  Are these messages all on January 14th of 2019?

3    A.  Yes.

4         MR. HEIMANN:  Let's move down one more page.

5    BY MR. HEIMANN:

6    Q.  What are the dates -- dates of the first and last message

7    on this page?

8    A.  The first message is dated January 14th, 2019, and the

9    last text message is dated January 16th, 2019.

10        MR. HEIMANN:  Can we magnify the last message here?

11   BY MR. HEIMANN:

12   Q.  The other messages I've asked you to read all or part of

13   were from Mr. Horn to Mr. Herman.  Is this one from Mr. Herman

14   back to Mr. Horn?

15   A.  Yes.

16   Q.  Did Mr. Horn testify before the grand jury on January 16th

17   of 2019?

18   A.  Yes.

19   Q.  Would you read this message from Mr. Herman that morning.

20   A.  "Good luck.  I believe in you.  I know you will do great

21   today.  I am grateful for you, as a friend and as an attorney.

22   Take good care."

23        MR. HEIMANN:  And take that down.

24        I want to go one back.

25        No -- sorry.  Back on that same page.

1          One page down.

2     BY MR. HEIMANN:

3     Q.  This is the end of the substance of the text messages in

4     this exhibit?

5     A.  Yes.

6     Q.  And the last date here is January 18th of 2019?

7     A.  Correct.

8          MR. HEIMANN:  Okay.  I want to go back and do just

9     one more message on the page above this.

10          The third blue box down, could you magnify that,

11    please?

12    BY MR. HEIMANN:

13    Q.  This is a message from Mr. Herman to Mr. Horn the day

14    before Ian Horn was scheduled to testify.  What's the text of

15    this message?

16    A.  "Thank you for being a friend.  Most would have handled

17    this differently.  I am grateful."

18          MR. HEIMANN:  We can take down what's on the screen.

19    BY MR. HEIMANN:

20    Q.  You testified that Ian Horn testified before the grand

21    jury on January 16th of 2019.  In what city?

22    A.  Cheyenne.

23    Q.  So the grand jury for the District of Wyoming?

24    A.  Yes.

25    Q.  Were you in the room when Mr. Horn testified?

1    A.   No.

2    Q.   Where were you?

3    A.   I was in the courthouse but outside the grand jury room.

4    Q.   Are law enforcement officers allowed in the grand jury

5    room while a witness is testifying?

6    A.   No.

7    Q.   Who asked Mr. Horn questions during his testimony?

8    A.   You did, Assistant United States Attorney Eric Heimann.

9    Q.   Was his testimony transcribed?

10   A.   Yes.

11   Q.   Have you reviewed that transcription?

12   A.   Yes.

13          MR. HEIMANN:  Let's put up 604, which has not been

14   admitted.

15   BY MR. HEIMANN:

16   Q.   Do you recognize 604?

17   A.   Yes.

18   Q.   Is that the cover page and first five pages of Mr. Horn's

19   transcribed testimony --

20          THE WITNESS:  Could you --

21   Q.   -- on January 16th of 2019?

22          THE WITNESS:  I apologize.

23          Could you scroll through?

24   A.   Yes.

25          MR. HEIMANN:  Go back to page 1, which is the cover.

1          The Government moves to admit 604.

2          THE COURT:  604 is received over . . .

3      (Government's Exhibit 604 received into evidence.)

4  BY MR. HEIMANN:

5  Q.  The transcript here indicates grand jury proceedings,

6  District of Wyoming.  Where do we see the date and time of

7  Mr. Horn's testimony?

8  A.  On lines 7 and 8.

9  Q.  Okay.  And so we're clear with everybody, when you're

10  talking about lines, those are the numbers running down the

11  left-hand side?

12  A.  Correct.

13          MR. HEIMANN:  Next page, please.

14  BY MR. HEIMANN:

15  Q.  And, again, so we can orient ourselves, there's a "2" in

16  the upper right corner.

17          Do you see that?

18  A.  Yes.

19  Q.  What does that indicate?

20  A.  This is page 2 of the grand jury transcript.

21  Q.  Okay.  So we can indicate particular testimony or a

22  particular question by referencing the page and the

23  line number if we need to?

24  A.  Yes.

25  Q.  Okay.  Does this document that Mr. Horn was duly sworn by

1  the foreperson of the grand jury?

2          On lines 3 through 5.

3  A.  Yes.

4  Q.  If you look at lines 12 through 15 of this page, it says

5  that the grand jury is investigating various Federal crimes,

6  including investment and securities fraud.

7          At this time was the grand jury also investigating

8  mail fraud?

9  A.  Yes.

10  Q.  Wire fraud?

11  A.  Yes.

12  Q.  Identity theft?

13  A.  Yes.

14  Q.  What we see on the next pages -- well, let me be more

15  specific.

16          If we look at lines 16 and 17 and running, really,

17  through 23, in this section is Mr. Horn being advised of his

18  rights and responsibilities?

19  A.  He is.

20  Q.  Does he acknowledge that he understands he has to tell the

21  truth?

22  A.  He does.

23          MR. HEIMANN:  Can we go to the next page, please?

24  BY MR. HEIMANN:

25  Q.  If we look at lines 7 through 9, at that point do I ask

1  Mr. Horn to tell the grand jury if he does not understand a

2  question?

3         MR. JUBIN:  Your Honor, I object.  The document

4  speaks for itself.  This witness has testified she wasn't in

5  the room, so I don't know how she can describe what --

6         THE COURT:  Sustained.

7         MR. JUBIN:  -- what it means or doesn't mean.

8         THE COURT:  Sustained.

9         Well, I'll give the jury a chance to read 7

10  through 9.

11  BY MR. HEIMANN:

12  Q.  Inspector Hacker, while you were in the courthouse outside

13  the grand jury, was Mr. Horn's attorney waiting, as well?

14  A.  Yes.

15  Q.  Who was that?

16  A.  Gay Woodhouse.

17         MR. HEIMANN:  If we go to the next page, please.

18  BY MR. HEIMANN:

19  Q.  Was Ms. Woodhouse allowed in the grand jury room while

20  Mr. Horn testified?

21  A.  No.

22         MR. HEIMANN:  I'll call the jury's attention to

23  page 4, lines 2 through 8.

24         Let's move to page 5.  I will call the jury's

25  attention to lines 3 through 14 on page 5.

19-CR-26-ABJ      HACKER - FURTHER DIRECT - HEIMANN      Vol. IX-1440
21-CR-14-ABJ

1          Let's go from this exhibit to 605.  This is not in

2    evidence.

3          JUROR 28:  Your Honor, I don't want to interrupt.

4    I need to use the restroom.

5          THE COURT:  We'll stand in recess while we take a --

6    a refreshment break.

7          JUROR 28:  I apologize.  Thank you.

8          THE COURT:  No, don't apologize.  We want you to do

9    that.

10          THE COURTROOM DEPUTY:  All rise.

11      (Proceedings outside the jury's presence at 9:25 a.m.)

12          THE COURT:  Let's all take about 10 minutes, use the

13    restroom.

14      (A recess was taken from 9:25 a.m. to 9:41 a.m.)

15          THE COURT:  Counsel, why don't you approach.

16      (Proceedings held at sidebar with Prosecutor Heimann

17    and all defense counsel.)

18          THE COURT:  The purple-haired juror apparently bumped

19    her head getting into her car this morning and has been

20    throwing up and --

21          THE COURTROOM DEPUTY:  Right.  It's affecting her --

22          THE COURT:  And so the light -- these lights or --

23          THE COURTROOM DEPUTY:  Must be.

24          The nurse that's on the jury is in there talking to

25    her.  I don't know if they're worried -- I don't know if it

1    was when she was getting in her car.  They just said she hit

2    her head, so I don't know if she's worried that she has a

3    concussion and needs to go to the doctor -- I just came to get

4    advice from you before I went any further.

5           THE COURT:  Yeah.  It's hard for me to know if she

6    thinks she can go on or not.

7           Did she say she wanted to talk to the Court or --

8           THE COURTROOM DEPUTY:  No.  I -- they said they had

9    someone in there that's sick, and so they told me what

10   happened.  And then I just came back in here.

11          THE COURT:  Yeah.

12          MR. JUBIN:  Maybe we should find out more.  Hm-m?

13          THE COURT:  Yeah.  I think we need to find out more,

14   whether she thinks she can go on or not.

15          THE COURTROOM DEPUTY:  Do you want me to just go ask

16   her?

17          THE COURT:  Yeah.  I think that would be a good

18   start.

19          MR. JUBIN:  While we're here, how are we going to

20   handle this dismissal of the count which has already occurred?

21          You know, I don't really want the jury thinking that

22   they're considering a count while they hear evidence if it

23   doesn't exist anymore.

24          THE COURT:  The problem is they don't have a copy of

25   the indictment at this point.

1          MR. FLEENER:  They probably forgot that it was

2    charged.

3          MR. HEIMANN:  Well, they're not supposed to be

4    considering anything now except credibility of witnesses and

5    the like --

6          THE COURT:  Yeah.

7          MR. HEIMANN:  -- so I would really like to have a

8    chance to look through my opening statement before I suggest

9    an instruction to them regarding a count they don't have to

10   deliberate on.  They've been instructed they shouldn't start

11   deliberating or making up their minds.

12         THE COURT:  They'll be receiving the indictment.

13         THE COURTROOM DEPUTY:  She is having a hard time

14   looking at the evidence on the monitors.  When she looks at

15   the monitors, she starts feeling woozy.

16         She would like to go on but she's not sure she can

17   so --

18         THE COURT:  That's not an answer.

19         THE COURTROOM DEPUTY:  She's like laying back in her

20   chair in the jury room right now.

21         MR. JUBIN:  There's probably an alternate -- maybe

22   put the alternate.  We have four of them.

23         MR. HEIMANN:  That is why we have alternates,

24   Your Honor.

25         THE COURT:  That's exactly right.

1          THE LAW CLERK:  That's -- does anyone know about

2    medicine?  Is anyone malpractice attorneys?

3          MR. FLEENER:  Give her my card.

4          MR. JUBIN:  I can tell you that if she's nauseous,

5    she likely has a head injury.  If she has some visual

6    disturbances, it's possible.

7          THE COURT:  Well, she was a person, you'll remember,

8    who was under psychiatric care.

9          MR. WARD:  Yeah.  She said she had therapy and she'd

10   have to reschedule for outside the time.

11         THE COURT:  Yeah.  And was taking meds and --

12         MR. HEIMANN:  So, Your Honor, I don't know if you

13   need a motion, but I would ask that she be excused and we'd

14   move on to our first alternate.

15         MR. FLEENER:  Yeah.  I would join or not object.

16   I just don't know how -- do we -- are the alternates picked in

17   order?

18         THE COURT:  Yeah.

19         MR. FLEENER:  Are they?  Okay.  Then I don't know who

20   it is, but I guess I'll be surprised at the end and -- when

21   we're sitting there, maybe even in a few minutes.

22         MR. JUBIN:  I don't have any objection to that.

23         I do have one other thing I'd like to bring up.  It

24   may affect the manner in which I cross-examine this witness.

25         THE COURT:  Why don't we -- what's your position?

 1          MR. FLEENER:  You like her.

 2          MR. WARD:  I guess.

 3          I'd want to look and see who the first alternate

 4    was --

 5          MR. FLEENER:  I like her, too.

 6          MR. WARD:  -- to know, I guess, who we'd be --

 7          THE COURTROOM DEPUTY:  Do you want me to figure

 8    that out?

 9          THE COURT:  Yeah.

10          MR. WARD:  It's got to be --

11          MR. FLEENER:  It's the white-haired gal.

12          MR. JUBIN:  It's the nurse.

13          MR. WARD:  If it's the VA nurse, I'm not going to

14    object.

15          MR. JUBIN:  It's the nurse on the top left.

16          MR. WARD:  Do you remember who's the first?

17          MR. JUBIN:  I believe so.

18          Oh, there's four; right?  It's the white-haired girl,

19    the heavyset nurse, the guy with the mullet, and then the --

20    the girl --

21          MR. WARD:  The brown-haired girl that's been sitting

22    next to him outside of the box.

23          MR. JUBIN:  It's one of the two in the box, and it's

24    got to be the white-haired lady or the nurse.

25          THE COURTROOM DEPUTY:  My chart is confusing so this

 1    is our alternate selection that we have.  This is how they

 2    were sitting, our finals.  No. 50, No. 56 --

 3              MR. FLEENER:  It's the white-haired lady, I think.

 4              THE COURTROOM DEPUTY:  I think it would be 50

 5    because she was . . . the one on the left --

 6              MR. JUBIN:  The one who needed to move --

 7              THE COURTROOM DEPUTY:  -- the first one on the left.

 8              MR. JUBIN:  The one who needed to move to the right

 9    to be closer to the restroom?

10              MR. WARD:  Are you talking about this is how they

11    were seated in the --

12              THE COURTROOM DEPUTY:  That's how they were seated

13    when we voir dired them, so she would be --

14              MR. FLEENER:  That's who I think it is.

15              THE COURTROOM DEPUTY:  No.  50 is the young kid at

16    the table --

17              MR. FLEENER:  Oh.

18              THE COURTROOM DEPUTY:  -- because Judge didn't go by

19    the way they were picked.  He just let the two older ones

20    sit --

21              MR. FLEENER:  In the box.

22              THE COURTROOM DEPUTY:  -- in the box --

23              MR. FLEENER:  Oh, right.

24              THE COURTROOM DEPUTY:  -- and the two younger ones --

25              MR. FLEENER:  So the kid with the mullet.

1          THE COURTROOM DEPUTY:  -- at the table.

2          As far as I can tell, yes, because that would have

3  been . . . the way they were seated, he would have been the

4  first one.

5          MR. JUBIN:  But were they picked from the way they

6  were seated?

7          THE COURTROOM DEPUTY:  Well, I called them randomly

8  and seated them starting on the left.

9          I did four and four.

10          And then as we let them go, he would have been the

11  one that remained.

12          MR. FLEENER:  I would ask that the juror be excused

13  and the first alternate be sat.

14          MR. HEIMANN:  I agree.

15          MR. JUBIN:  I don't have any basis for an objection

16  that I can think of so . . .

17          MR. WARD:  Yeah, I won't object.

18          THE COURT:  Let's bring her in here, and I will

19  excuse her.

20          THE COURTROOM DEPUTY:  Okay.

21          MR. JUBIN:  Your Honor, while we're standing here,

22  can I address one other matter briefly?

23          It will affect the manner of my cross-examination,

24  perhaps.

25          I know we're not yet at the jury instruction phase,

1    but I'm wondering if the Court is planning to give an

2    instruction as to the attorney-client privilege common law in

3    Wyoming.

4            THE COURT:  I think was -- wasn't one of them -- was

5    there one submitted?

6            MR. JUBIN:  I did submit one, yes.

7            THE COURT:  I think it's in there.

8            MR. JUBIN:  I just don't know if the Court plans to

9    give it or not.

10           THE COURT:  Yeah, I haven't made my mind up.  But

11   I think I put it in the package.

12           MR. FLEENER:  I think it would be necessary because

13   this has got three or four different -- I mean, I -- three or

14   four different lawyers asserting privilege on things.  I mean,

15   I think that it would be something that would be helpful for

16   the jury to know how all that works.

17           MR. JUBIN:  Well . . .

18           MR. FLEENER:  And your client's a lawyer.

19           THE COURT:  What was she, No. 49?

20           MR. HEIMANN:  42, Your Honor, I believe.

21           THE COURT:  Second seat?

22           MR. HEIMANN:  Yes, sir.

23           MR. JUBIN:  So that's as much guidance as I'll get,

24   is "It's in the packet, likely to be given"?

25           THE COURT:  Yes.

 1            MR. JUBIN:  Okay.

 2            MR. HEIMANN:  Likely to be opposed, as well.

 3            MR. JUBIN:  It's the law.

 4        (Sidebar concluded.)

 5        (Proceedings within the jury's presence at 9:51 a.m.)

 6            THE COURT:  Thank you.  Please be seated.

 7            It's my understanding that, No. 42, that you are

 8    suffering an illness, you struck your head today and, as a

 9    consequence of that blow on your head, are feeling nauseous

10    and dizzy.

11            JUROR 42:  Yes, sir.

12            THE COURT:  We've discussed your situation and the

13    concern that your fellow jurors have had for you and

14    determined that you should be excused from this proceedings,

15    and we'll ask one of the alternates to step into your place.

16            And so it's -- I realize it's difficult to be

17    separated from the rest of the jury at this point and that you

18    wish to see this to the -- to the end, but, obviously, you

19    need to see a doctor and receive appropriate treatment.

20            Do you think you can make it to the doctor or

21    hospital?

22            I can call an ambulance -- we've done that in the

23    past -- if necessary to transport you or . . .

24            JUROR 42:  My dad actually works literally right down

25    the street, so I'm probably just going to call him and have

 1  him come get me.

 2          THE COURT:  Very well.

 3          The Clerk's office will certainly provide the -- or

 4  you probably have a cell phone --

 5          JUROR 42:  Yes, sir.

 6          THE COURT:  -- with you that you could use.  Very

 7  well.

 8          You are excused.  I appreciate your service and

 9  I'm sorry that you had the accident this morning that has

10  caused injury.

11          JUROR 42:  How do I get back out, Your Honor?

12          Thank you.

13      (Juror 42 no longer present.)

14          THE COURT:  And, Juror No. 50, please take the seat

15  here, if you would.

16          Mr. Heimann.

17          MR. HEIMANN:  Thank you, Your Honor.

18  BY MR. HEIMANN:

19  Q.  Inspector Hacker, do you understand you are still under

20  oath?

21  A.  I do.

22          MR. HEIMANN:  Let's bring up 605.  This has not been

23  admitted.

24  BY MR. HEIMANN:

25  Q.  Is 605 a true and correct copy of page 16, lines 1 through

1    22, of Ian Horn's grand jury testimony transcript?

2    A.  Yes.

3            MR. HEIMANN:  The Government moves to admit 605.

4            MR. JUBIN:  I renew my Rule 106 objection to the

5    exclusion of the rest of the story.

6            MR. FLEENER:  And I object as to confrontation.

7            MR. WARD:  I join the confrontation objection.

8            THE COURT:  Objections are overruled.

9            The exhibit will be received.

10       (Government's Exhibit 605 received into evidence.)

11           MR. HEIMANN:  Let's magnify just the text box there.

12   BY MR. HEIMANN:

13   Q.  The perjury indictment, Count One, alleges a knowing false

14   statement regarding email.

15           Is that contained in this excerpt from the transcript

16   down -- lines 14 through 21?

17   A.  Yes.

18           MR. HEIMANN:  Instead of magnifying, let's just

19   highlight 14 through 21.

20           Okay.  And give the jury a chance to read through

21   this excerpt.

22   BY MR. HEIMANN:

23   Q.  At the time of Mr. Horn's testimony, was Justin Herman a

24   subject of the grand jury's investigation?

25   A.  In 2018, yes.

1    Q.   2019, January?

2    A.   January 2019, yes.

3    Q.   At that time was it important for the grand jury and

4    investigators to know if Mr. Horn had any email with

5    Justin Herman regarding NuTech?

6    A.   Yes.

7    Q.   Why was it important to know if there were email?

8    A.   Sorry.  I had a tickle in my throat.  I thought I was

9    going to cough.  Could you repeat that?

10   Q.   Yes.

11        Why was it important to know if there were email?

12   A.   Well, as the jury has seen in this case, emails were

13   direct evidence of crimes in some instances --

14        MR. FLEENER:  Objection.

15        MR. JUBIN:  Objection, Your Honor.  May we approach.

16        THE COURT:  Yes, you may approach.

17        The answer is stricken and you will not consider it.

18   (Proceedings held at sidebar with Prosecutor Heimann

19   and all defense counsel.)

20        MR. JUBIN:  Your Honor, this Government witness, the

21   lead investigator in the case, just made a statement in the

22   presence of the jury telling them that the emails are evidence

23   of crimes that have been committed.

24        It's beyond prejudicial.  I move for a mistrial.

25        MR. FLEENER:  I would join.  And -- and -- well,

1    I join.

2              MR. WARD:  I join, as well.

3              MR. HEIMANN:  Your Honor, I oppose the motion.  It's

4    one statement.  And it can be, as you've already instructed,

5    stricken.

6              THE COURT:  It's an unfortunate statement in this

7    case, but we all know why we're here.

8              I will overrule the -- and deny the motion for

9    mistrial in this proceedings.  I'll, again, reinforce the

10   instruction to the jury to disregard the answer.

11             MR. WARD:  Your Honor -- oh, but just --

12             THE COURT:  Go ahead.

13             MR. WARD:  Briefly, I would just propose possibly

14   that we take a break to allow the Government to ensure that

15   their witness isn't going to make some other statements going

16   forward.

17             MR. HEIMANN:  We don't need a break, Your Honor.

18             THE COURT:  Very well.

19        (Sidebar concluded.)

20             THE COURT:  I want to again emphasize please

21   disregard the last answer.  It is stricken.

22             MR. HEIMANN:  Let's move on from this excerpt to

23   another.

24             Pull up 608, please.  It has not been admitted.

25   ///

1    BY MR. HEIMANN:

2    Q.  Inspector Hacker, take a look at 608.  And when you're

3    ready, we'll page down.

4            MR. HEIMANN:  Let's page down.

5            And back up, please.

6    BY MR. HEIMANN:

7    Q.  Is 608 an excerpt from Ian Horn's grand jury testimony

8    transcript, page 18, line 9, through page 20, line 4?

9            THE WITNESS:  Could you scroll to the end?

10   A.  Yes.

11   BY MR. HEIMANN:

12   Q.  In this excerpt does Mr. Horn talk about attorney opinion

13   letters and his understanding of who relies upon them?

14   A.  Yes.

15           MR. HEIMANN:  The Government moves to admit 608.

16           MR. FLEENER:  I would object to confrontation, Judge,

17   same objection.

18           MR. WARD:  I'd join the objection.

19           THE COURT:  608 is received.

20           Objection's overruled.

21      (Government's Exhibit 608 received into evidence.)

22           MR. HEIMANN:  I'll give the jury a chance to read

23   through this section regarding opinion letters.

24           If you look up when you're done, we'll move to the

25   next page.

1          I think we can scroll to the next page, please.

2          All right.  Let's move on to 610.  This has not been

3    admitted.

4    BY MR. HEIMANN:

5    Q.  Inspector Hacker, is 610 an excerpt from Ian Horn's grand

6    jury testimony transcript from page 36, line 23, through

7    page 37, line 25?

8    A.  Yes.

9    Q.  In this section is Mr. Horn answering questions regarding

10   the debt assignment agreement and the two different versions

11   of it with different dates?

12   A.  He is being asked about the debt conversion, when it was

13   completed, and the one-year holding period.

14          MR. HEIMANN:  Your Honor, the Government moves to

15   admit 610.

16          MR. FLEENER:  Objection; confrontation.

17          MR. WARD:  Join.

18          THE COURT:  The objection is overruled.

19          The exhibit is received.

20      (Government's Exhibit 610 received into evidence.)

21          MR. HEIMANN:  This is a one-page exhibit, so I'll

22   give the jury a chance to read this discussion of the holding

23   period.

24          Okay.  We can take that down.

25   ///

1   BY MR. HEIMANN:

2   Q.   Inspector Hacker, did you interview Ian Horn again on

3   May 1st of 2019?

4   A.   Yes.

5   Q.   By telephone?

6   A.   Yes.

7   Q.   Was that interview recorded?

8   A.   Yes.

9   Q.   During that interview did Mr. Horn again say that he

10   signed the NuTech opinion letters?

11   A.   He did.

12   Q.   Is Exhibit 602 a recording of that statement?

13   A.   Yes.

14           MR. HEIMANN:   The Government moves to admit 602.

15           MR. FLEENER:   Objection, Your Honor; confrontation.

16           MR. WARD:   Join.

17           THE COURT:   The objections are ruled and the exhibit

18   is received.

19       (Government's Exhibit 602 received into evidence.)

20           MR. HEIMANN:   With the Court's permission, we'll play

21   that.

22       (Government's Exhibit 602 played.)

23   BY MR. HEIMANN:

24   Q.   During that interview on May 1st, did Mr. Horn also say

25   that he discussed his grand jury testimony with Mr. Herman?

1           MR. FLEENER:  Objection; confrontation and hearsay.

2           MR. HEIMANN:  Your Honor, it's a nonhearsay purpose

3     for the fact he said it.

4           THE COURT:  The objection is overruled.

5           MR. HEIMANN:  I'll also say, Your Honor, party

6     opponent so that record's clear.

7     BY MR. HEIMANN:

8     Q.  The grand jury testimony was in January of 2019.  We've

9     talked about the search warrants for Oath Holding?

10    A.  Yes.

11    Q.  How much time passed between Mr. Horn's January grand jury

12    testimony and the search warrant for Oath Holdings?

13    A.  We executed the search warrant on the Oath Holdings email

14    accounts in June of 2019, six months.

15    Q.  Five months or so?

16    A.  Five months.

17    Q.  And how much time passed between Mr. Horn's grand jury

18    testimony and the search of Justin Herman's home?

19    A.  We searched Justin Herman's home on June 26th, 2019.

20    Q.  So, again, about five months?

21    A.  Yes.

22    Q.  Can email be deleted?

23    A.  Yes.

24    Q.  Can text messages be deleted?

25    A.  Yes.

1          MR. HEIMANN:  I want to bring up -- well, we're going

2    to move to a different subject.

3        (Discussion held between counsel.)

4    BY MR. HEIMANN:

5    Q.  Inspector Hacker, do you remember discussion yesterday

6    during Mr. Scoufis' testimony about HBA Group?

7    A.  Yes.

8    Q.  Do you have --

9          MR. HEIMANN:  Well, let's bring up Exhibit 27.2.

10   Let's go to the next page.

11   BY MR. HEIMANN:

12   Q.  27.2 is the transaction log where the free-trading shares

13   were issued?

14   A.  Correct.

15   Q.  They were issued by Pacific Stock Transfer at the request

16   of Justin Herman --

17   A.  Correct.

18   Q.  -- is that right?

19          Is HBA Group on this -- on page 2 of this transaction

20   journal?

21   A.  Yes.

22   Q.  How many free-trading shares did they get?

23   A.  200 million.

24   Q.  Do you have with you at the witness stand an exhibit

25   marked 427?

1    A.   I do.

2    Q.   Is that a document that was provided to the grand jury by

3    Pacific Stock Transfer?

4    A.   Yes.

5    Q.   What's its title?

6    A.   "Limited Liability Company Certification."

7    Q.   And what's the name of the limited liability company that

8    is listed on this document?

9    A.   HBA Group, LLC.

10           MR. HEIMANN:  The Government moves to admit 427.

11           MR. FLEENER:  No objections.

12           THE COURT:  Exhibit 427 is received.

13       (Government's Exhibit 427 received into evidence.)

14           MR. HEIMANN:  Ms. Harris, I need to publish that

15   through the ELMO.

16   BY MR. HEIMANN:

17   Q.   Okay.  So 427 -- so I zoomed in at the top third of that

18   page.

19           It -- you can see "HBA Group" under "Name of Limited

20   Liability Company."  Who are the listed members on this

21   certification?

22   A.   Alexander Albert, Nathan Hodge, Michael Baron.

23   Q.   Did you interview Alexander Albert as part of your

24   investigation?

25   A.   I did.

1   Q.   When?  Approximately.

2   A.   Approximately 2018.

3   Q.   Where?

4   A.   In Georgia.

5   Q.   Did you interview Nathan Hodge?

6   A.   Yes.

7   Q.   How was he interviewed?

8   A.   Telephonically.

9   Q.   Did you interview Michael Baron?

10  A.   No.

11  Q.   Why not?

12  A.   Mr. Baron lives in Canada, I believe.

13  Q.   Do you have a copy of Exhibit 426 with you on the witness

14  stand?

15  A.   I do.

16  Q.   What is that?

17  A.   This is a bank statement for Bravo Two Zero Partners from

18  Wells Fargo.

19  Q.   Is this the same 5707 account where we've seen bank

20  statements in the past?

21  A.   It is.

22  Q.   Was this also provided to the grand jury by Wells Fargo

23  Bank?

24  A.   Yes.

25  Q.   What is the time period covered by this bank statement?

19-CR-26-ABJ     HACKER - FURTHER DIRECT - HEIMANN     Vol. IX-1460
21-CR-14-ABJ

1    A.  January 1st, 2016, to January 31st, 2016.

2    Q.  And we have pages 1 through 7, which appear to be the

3    entire statement; correct?

4    A.  Yes.

5         MR. HEIMANN:  The Government moves to admit 426.

6         MR. FLEENER:  Objection; relevance.

7         Mr. Heimann, is this a certified document, a

8    self-authenticated document?

9         MR. HEIMANN:  Yes.

10         MR. FLEENER:  Still object to relevance, Judge.

11         MR. WARD:  Join.

12         MR. HEIMANN:  I can lay additional foundation,

13   Your Honor.

14         THE COURT:  You may.

15   BY MR. HEIMANN:

16   Q.  Inspector Hacker, if you look at page 2, do you see a

17   $41,000 deposit into this account on January 11th of 2016?

18   A.  I do.

19   Q.  Who is it from, according to this bank statement?

20   A.  Michael Baron.

21         MR. HEIMANN:  Let's turn to page 3.

22   BY MR. HEIMANN:

23   Q.  Do you see a wire out of the account for $20,500 that same

24   day, January 11th, 2016?

25   A.  Yes.

1   Q.  Who was it to?

2   A.  Justin Herman.

3          MR. HEIMANN:  Your Honor, the Government moves to

4   admit 426.  Relevance is to show the movement of money from

5   Mr. Baron through Mr. Mitchell to Mr. Herman.

6          MR. FLEENER:  Same objection, Your Honor.

7          THE COURT:  The objection's overruled.

8          The exhibit is received, Item 426.

9      (Government's Exhibit 426 received into evidence.)

10  BY MR. HEIMANN:

11  Q.  So we have 426 -- I'll zoom out.

12         So this is the first half of the statement; right?

13  The top half of the page.

14  A.  Yes.

15  Q.  I've highlighted an entry on January 11th, a $41,000

16  deposit.

17         Is that the wire transfer from Michael Baron to this

18  account?

19  A.  Yes.

20  Q.  And on page 3 I've highlighted the wire transfer out of

21  this account to Justin Herman for $20,500.  That's the one you

22  mentioned when we were laying the foundation for this; right?

23  A.  Yes.

24  Q.  These transfers in January of 2016, this is about

25  two months after that Skype chat that we saw yesterday; right?

 1  A.  Yes.

 2  Q.  Give or take a few days?

 3  A.  Correct.

 4         MR. HEIMANN:  Ms. Harris, you can take that off the

 5  screen.

 6         May I have a moment, Your Honor.

 7         THE COURT:  Yes, you may.

 8     (Discussion held at counsel table.)

 9  BY MR. HEIMANN:

10  Q.  Inspector Hacker, you testified that you conducted a

11  search of Justin's Herman's home in June of 2019.

12         Have you had -- over the course of this trial -- had

13  a chance to observe the defendant Justin Herman?

14  A.  Yes.

15  Q.  Is it the same man?

16  A.  Yes.

17  Q.  You've testified that you interviewed Ian Horn.  Have you

18  had a chance over the last week to observe the defendant in

19  this case Ian Horn who's in the courtroom?

20  A.  Yes.

21  Q.  Is it the same man?

22  A.  It is.

23  Q.  I believe you've testified -- if not, I'll just ask you.

24         Did you interview Chuck Winters during the course of

25  the investigation?

 1    A.  I did.

 2    Q.  When?

 3    A.  The day before I interviewed Ian Horn.

 4    Q.  Have you had a chance to observe the defendant

 5    Chuck Winters over the course of this trial?

 6    A.  Yes.

 7    Q.  Is it the same man?

 8    A.  Yes.

 9         MR. HEIMANN:  Your Honor, I'll pass this witness for

10    cross-examination.

11       (Discussion held among counsel.)

12         MR. FLEENER:  Agent Hacker, I have a short

13    cross-examination for you; I promise.  And I just want to make

14    sure that -- excuse me.

15         I just want to make sure that everything gets

16    explained.

17                      **FURTHER CROSS-EXAMINATION**

18    **BY MR. FLEENER**:

19    Q.  You discussed this concept of privilege review; right?

20    A.  Yes.

21    Q.  Okay.  I want to -- I want to make sure that the jury

22    knows what privilege review is.

23         To -- why don't you tell them, to the best of your

24    understanding, what "privilege review" is.

25    A.  What I know about it --

 1   Q.  Sure.

 2   A.  -- is that when we seized electronics, email, all of that

 3   was filtered by Special Agent Berryhill.

 4          And those records were given to the privilege review

 5   team, which I was not a part of, and then -- I don't know what

 6   happened after that.  I just know that in November 2019

 7   I started receiving some of the privilege review material to

 8   look at.

 9   Q.  And the -- the truth is the reason you have privilege

10   review teams is because when you're dealing -- when a subject

11   of an investigation -- when you're seizing his communications,

12   for instance, there may be communications between a subject

13   and a lawyer, for instance; correct?

14   A.  Yes.

15   Q.  And the lawyer has -- or if you're -- or if you're seizing

16   the lawyer's communications, the lawyer's communications with

17   a client may be privileged?

18   A.  Yes.

19   Q.  And -- and I don't want to -- I know you're not an

20   attorney, and I'm not trying to get into the weeds on this

21   with you.

22          But in this particular case, yeah, Mr. Horn is an

23   attorney; correct?

24   A.  Yes.

25   Q.  And through the course of your investigation, you saw

 1  communications between Mr. Herman and Mr. Horn; correct?

 2  A.   From the privilege review, yes.

 3  Q.   And you found -- and -- which at least ostensibly on their

 4  face would be between a lawyer and a purported client; right?

 5  A.   Yes.

 6  Q.   Okay.  And so someone would need to review these

 7  communications to determine whether they're -- they should be

 8  turned over to the prosecutors or not turned over to the

 9  prosecutors; right?

10  A.   Yes.

11  Q.   And you're not the one who's in charge of any of that?

12  A.   Correct.

13  Q.   Another -- another set of lawyers or -- or investigators

14  are; correct?

15  A.   Yes.

16  Q.   And then there -- like with -- with -- I just said with

17  Mr. Horn.

18       I mean, I assume you saw -- well, I know there's an

19  exhibit in there with -- with my name in there.  I think

20  there's a chat between Mr. Horn and Mr. Herman where they talk

21  about "Hi" -- you know -- "Tom Fleener would like to meet with

22  you and Gay" -- or something like that -- "when you're out for

23  the grand jury."

24       You recall something to that effect?

25  A.   Yes.

1  Q.  And, again, that's -- that's just another example of -- of

2  a document that -- because lawyers were involved and clients

3  have the right to have lawyers and lawyers have to give

4  advice -- those are more communications that need to be

5  reviewed by somebody to determine whether you guys get them?

6  A.  Yes.

7  Q.  And Steve Mills is another lawyer that was involved in

8  this case; correct?

9  A.  Yes.

10  Q.  And you saw his name several times?

11  A.  Yes.

12  Q.  Communications between parties and Steve Mills?

13  A.  Yes.

14  Q.  Tom Throne is a lawyer from Sheridan; correct?

15  A.  Yes.

16  Q.  And his --

17  A.  Well, I don't know if he's from Sheridan but from Wyoming,

18  yes.

19  Q.  That's fine.  I -- he's from Sheridan.

20  A.  Okay.

21  Q.  But -- and that's just another example of -- of an

22  attorney involved -- attorney and possible communications and

23  advice that needs to be reviewed by a different set of lawyers

24  and investigators before it gets turned over to you guys;

25  correct?

1   A.  Yes.

2   Q.  And there's nothing unusual or nefarious or -- or bad

3   about that -- that system?  That's just a system that's in

4   place to make sure that when the criminal investigators and

5   the criminal team gets communications that involve lawyers,

6   quite frankly, that -- that they've been vetted by somebody to

7   determine that it's proper for you guys to have them?

8   A.  That's my understanding.

9   Q.  And during this -- this process -- 2017, 2018, maybe even

10  going into 2019; I don't -- I don't remember -- Justin Herman

11  was also -- was also -- had also been served a grand jury

12  subpoena for his communications; correct?

13          Or for -- for items that you wanted -- you guys

14  wanted him to surrender to the grand jury?

15  A.  I believe the -- he was served a subpoena, and I believe

16  it was in relation to Intrepid, the Intrepid accounts.

17  Q.  I understand.  But the -- but the bottom line is that --

18  and I -- I mean, I can -- I can check when I was hired.

19          But in 2017 you -- you folks served Justin Herman --

20  whether it's Justin Herman or Intrepid Capital -- a grand jury

21  subpoena asking for certain records; right?

22  A.  Yes.

23  Q.  And then for the next year and a half or so, records

24  would -- would -- trickled in to you from Justin Herman's

25  response to the grand jury?

1           Or did they not get -- I know they got trickled in

2    from me and sent off to somewhere.  I don't know when you

3    actually got them.

4    A.  Oh, okay.  Those came through you.  Okay.  Now

5    I understand.

6    Q.  Yes?  So the answer's yes?

7    A.  Yes.

8    Q.  From, essentially, 2017 to 2019, Justin -- it's your

9    understanding that Justin Herman was supplying documents

10   through me to give to the -- give to you -- to the privilege

11   review folks that would ultimately get to you?

12   A.  Yes.

13           MR. FLEENER:  Okay.  No further questions.

14   Thank you.

15           I just have one question -- I'm sorry.  I apologize.

16   BY MR. FLEENER:

17   Q.  And some of the -- some of the documents and exhibits that

18   you guys -- "that you guys" -- I apologize -- that the

19   United States has offered into evidence actually came from

20   Justin Herman through me, through the grand jury or privilege

21   review team to you?

22           MR. HEIMANN:  Facts not in evidence, Your Honor.

23           MR. FLEENER:  It will be when she answers it.

24           THE COURT:  Overruled.

25   ///

1    BY MR. FLEENER:

2    Q.  True?

3    A.  Yes.

4            MR. FLEENER:  Thank you.

5            MR. JUBIN:  Good morning, ladies and gentlemen.

6            JURY MEMBERS:  Good morning.

7            MR. JUBIN:  Good morning, Ms. Hacker.

8                    **FURTHER CROSS-EXAMINATION**

9    **BY MR. JUBIN:**

10   Q.  So you had a number of interviews with Ian Horn; right?

11   A.  Yes.

12   Q.  You talked with him on October 16 of 2018; correct?

13   A.  Yes.

14   Q.  And the day before you had stopped by and he wasn't home;

15   right?

16   A.  Yes.

17   Q.  And so you talked to his wife, Marlene, who was there at

18   the house?

19   A.  Yes.

20   Q.  And Marlene told you that he wasn't there?

21   A.  I believe so.

22   Q.  Okay.  When did this occur?  When in the day?

23   A.  It would have been either the morning or the afternoon.

24   It wasn't in the evening that I recall.

25   Q.  Okay.  Was it the same day you went and talked to

1   Mr. Winters?

2   A.  Yes.

3   Q.  Okay.  So you might have stopped by in the morning at

4   Ian Horn's house beforehand and then went -- when he wasn't

5   around, then you went to go talk to Mr. Winters?

6   A.  It might have been.

7   Q.  Okay.  And then you talked again with Ian Horn on May 1st

8   of 2019, several months later?

9   A.  Yes.

10  Q.  And that was -- and he testified in front of the grand

11  jury in January, so it was roughly four months later?

12  A.  Yes.

13  Q.  Okay.

14          So there was a time period that passed between your

15  talking to Marlene Horn on the 15th of October and the

16  interview that you conducted with Ian Horn the following

17  morning, on the 16th of October; correct?

18  A.  Yes.

19  Q.  And what time did your interview start with Ian Horn on

20  the 16th?

21  A.  Approximately 8:43 a.m.

22  Q.  Okay.  Would you have expected Marlene Horn to tell her

23  husband that you had been by and told Ian Horn that you wanted

24  to talk with him about NuTech?

25  A.  Yes.

19-CR-26-ABJ     HACKER - FURTHER CROSS - JUBIN     Vol. IX-1471
21-CR-14-ABJ

1  Q.  Okay.  Did you take a look at -- well, let me ask it this

2  way:  You obtained phone records related to Justin Herman in

3  this case; right?

4  A.  Yes.

5  Q.  And you reviewed those phone records at some point; right?

6  A.  Yes.

7  Q.  And you saw that there was about an eight-minute call

8  between Ian Horn and Justin Herman that took place on the

9  evening of October 15th before you came to talk with Ian Horn?

10  A.  I don't recall reviewing them in detail like that.

11         MR. JUBIN:  Let's take a look at Exhibit . . . if

12  I may have a moment, Your Honor.

13  BY MR. JUBIN:

14  Q.  This has not been admitted.

15         If you'd take a look at Exhibit 2206a.  Is that

16  exhibit in the -- in the format that you recall the Government

17  obtained when it electronically downloaded and recorded what

18  was on Justin Herman's phone?

19  A.  I wouldn't be able to tell what this is from what's here.

20  Q.  Why -- why are you unable to determine what the

21  Government's records are?

22  A.  Are you saying this is a Government's record?

23  Q.  Yeah.  It's taken from it.

24  A.  I don't see any source information.  It looks like it's

25  possibly a screenshot or a portion of a spreadsheet.

1    Q.  A phone records spreadsheet?

2    A.  I don't know, just a spreadsheet.

3    Q.  You testified earlier -- just moments ago -- that you

4    reviewed those phone records.

5    A.  Yes.

6    Q.  Does this look like the phone records you reviewed?

7    A.  No.  The format doesn't.

8    Q.  The format doesn't look like it?

9    A.  No.

10   Q.  How is it different?

11   A.  Well, typically the records that we receive, say, from a

12   phone record company will have the record -- the name of the

13   phone company on them.

14   Q.  Okay.  I'm not asking you if this is the complete record.

15   I'm just asking you if this is the kind of spreadsheet snippet

16   that you would have seen in that record.

17          MR. HEIMANN:  Your Honor, I object; 403.  This

18   witness doesn't know what this is.

19          THE COURT:  Overruled.  I think that's reasonable --

20   what we're trying to find out.

21          MR. JUBIN:  Right.

22   A.  I don't recall this.

23   BY MR. JUBIN:

24   Q.  Okay.  You don't recall it?

25   A.  Correct.

1    Q.  Did -- did you in any way contrive to avoid looking at

2    documents that might inform the -- the inquiry here in the

3    courtroom?

4            MR. HEIMANN:  Objection; improper characterization.

5            May we approach, Your Honor?

6            THE COURT:  No.  Just keep going.  The objection is

7    sustained.

8            MR. JUBIN:  Well, we'll bring it in with another

9    witness.

10   BY MR. JUBIN:

11   Q.  Suffice it to say the Government doesn't have any

12   information -- or you don't have any information -- to refute

13   the notion that there was an eight-minute phone call between

14   Justin Herman and Ian Horn the night before you interviewed

15   Ian Horn?  Am I correct?

16   A.  Correct.

17   Q.  And since you don't recall the record, I suspect you don't

18   have any information about the content of that phone

19   conversation, either.  Correct?

20   A.  Correct.

21   Q.  And do you recall the phone calls that might have prompted

22   Mr. Herman to call Ian Horn back?  Is that something you

23   recall reviewing?

24   A.  Could you repeat that?

25   Q.  Do you recall reviewing documents showing that Mr. Horn

 1  called or left messages for Justin Herman to return his call?

 2  A.  I think there were text messages where Mr. Horn was trying

 3  to make arrangements to schedule a time to talk with

 4  Mr. Herman.

 5  Q.  On the evening of the 15th of October?

 6  A.  That I don't recall.

 7  Q.  Okay.  Let's talk a little bit about that conversation you

 8  had with Mr. Horn on the 16th of October.  In the course of

 9  meeting with Mr. Horn, you showed him a series of opinion

10  letters; correct?

11  A.  Yes, I did.

12  Q.  And that was -- the primary purpose you were there was to

13  find out if he had a role in these opinion letters that bore

14  his signature; correct?

15  A.  Yes.

16  Q.  I think you testified earlier that he confessed and told

17  you that he wrote them.

18          MR. HEIMANN:  Your Honor, improper characterization.

19  That is not the testimony.  The word "confession" was never

20  used.

21          THE COURT:  Sustained.

22  BY MR. JUBIN:

23  Q.  He told you he wrote the letters?

24  A.  Yes.

25  Q.  And you told the jury that he told you that; right?

1   A.  I believe so.

2   Q.  Well, I --

3   A.  Yes.  Yes.

4   Q.  Okay.  And you told the jury that in response to a

5   question as to why you didn't conduct any further

6   investigation concerning the authorship of the letters;

7   correct?

8           MR. HEIMANN:  Your Honor, that wasn't the testimony.

9   I don't know what he's referring to.  I did not ask her that

10  question.

11          THE COURT:  Well, the jury can recall the testimony.

12          MR. JUBIN:  The testimony was elicited on

13  cross-examination.

14  BY MR. JUBIN:

15  Q.  So when you met with him, you testified you showed him a

16  number of letters and you -- you said, "Hey, I've got one

17  dated September 16 of 2015.  This one is addressed to Pacific

18  Stock Transfer, and it relates to the legal opinion for a

19  request to issue free-trading shares of common stock of NuTech

20  Energy, and there's also a letter attached to the back.  Would

21  you mind looking at that?"  Correct?

22  A.  Yes.

23  Q.  And Mr. Horn agreed to do so?

24  A.  Yes.

25  Q.  And then you said, "Regarding this one, was this also

1    something that Justin hired you for?"  Right?

2    A.  Yes.

3    Q.  And he responded?

4         And then you asked him, "Can you kind of summarize

5    the point of this letter?  What were they trying to do?"

6    Right?

7    A.  I don't recall word-for-word.

8    Q.  Okay.  But that's generally what you were there for on

9    October 16th; right?

10   A.  Yes.

11   Q.  To have him read these letters and try to figure what

12   information he might have that bore on those letters; right?

13   A.  I was there asking him about the opinion letters.

14   Q.  Okay.  And so Mr. Horn gave you answers -- or referring to

15   the documents you were showing him; correct?

16   A.  Yes.

17   Q.  And then, as you went through the contents of the letter

18   with him and the various companies, you asked, "Do you recall

19   who you got this information from, the supporting

20   information?"  Right?

21   A.  Yes.

22   Q.  And then you tried -- you tried to help Mr. Horn remember,

23   and so you told -- it says here "Bravo Two Zero Partners is

24   the recipients of the contracts"; right?

25   A.  I don't recall word-for-word.

1  Q.  But you -- do you recall pointing out to Mr. Horn in the

2  documents who it might have been that you were -- that -- who

3  was the recipient of the contracts?

4  A.  I think I might have pointed out what was in the document.

5  Is that what --

6  Q.  Yeah.  That's right.

7  A.  I pointed out what was in the document.

8  Q.  Okay.  And -- and in response -- you said to Mr. Horn,

9  "You don't recall who was involved with Bravo, though?"  And

10  so you were responding to him based on his expressions of not

11  remembering?

12         MR. HEIMANN:  Objection; hearsay, no exception.

13         MR. JUBIN:  Its effect on the listener.

14         THE COURT:  Overruled.

15  BY MR. JUBIN:

16  Q.  And then you moved on to talk about this $280,000.  Do you

17  recall that?

18  A.  Yes.

19  Q.  And you said, "This letter says the cash component

20  consisted of a $280,000 payment."  You asked him about that;

21  right?

22  A.  Yes.

23  Q.  And you asked him if he had to get any type of proof for

24  that payment; right?

25  A.  I did.

1    Q.   And Mr. Horn gave you responses; right?

2    A.   Yes, he did.

3    Q.   And you didn't tell Mr. Horn initially that there was no

4    $280,000 transaction because you were trying to find out what

5    he knew about it; right?

6    A.   Yes.

7    Q.   Okay.  So, instead, you strung him along as if it was real

8    and asked this --

9             MR. HEIMANN:  Objection; improper characterization.

10            THE COURT:  Overruled.

11   BY MR. JUBIN:

12   Q.   -- "Did the $280,000 payment go through you as the

13   attorney?"

14            So you led him to believe that that was a $280,000

15   payment that you wanted him to explain; correct?

16   A.   I showed him the Bravo Two Zero wire transfer request that

17   lists Bravo Two Zero sent $280,000 to Ian Horn's account.  So

18   I showed him that document, and we were going through it.

19   Q.   Right.  And in the course of doing that, you asked him

20   whether that $280,000 payment went through him as the

21   attorney?

22   A.   Yes, I did.

23   Q.   Okay.  And at that point you knew there was no $280,000

24   payment; correct?

25   A.   Correct.

1  Q.  And then you asked him about another letter or a draft of

2  a letter, September 23rd of 2015, an opinion letter regarding

3  the free-trading shares of NuTech.  And attached to that one

4  there was a purchase and assignment of wells; correct?

5  A.  Yes.

6  Q.  And you provided to him the date of the letter -- of the

7  prior letter; right?

8  A.  Yes.  He asked me what the date of the prior letter was.

9  Q.  Right.  And so you told him, "Yeah, the one we were

10 looking at before was September 16th"; right?

11 A.  Yes.

12 Q.  Okay.  And that was so he could study and compare the

13 contents?

14 A.  The -- I gave him all the opinion letters to study before

15 he answered any of my questions.

16 Q.  Okay.  And -- and this is a recorded interview, so it's

17 the same recorded interview where you've got -- which have

18 been played through your testimony here a little bit earlier;

19 right?

20 A.  Yes.

21 Q.  Okay.  And during the course of that -- you've listened to

22 the tape probably pretty recently; right?

23 A.  Yes.

24 Q.  And there are these gaps, sometimes -- couple, three,

25 four minutes -- where you can hear Mr. Horn's dog making

1    noises and that sort of thing while he's reading these letters

2    that you've provided him; correct?

3    A.  Yes.

4    Q.  And so this September 23rd letter, you asked Mr. Horn, "Do

5    you have any idea where you got that from, the purchase and

6    assignment of wells?  Or did you draft that?"

7           Do you recall that?

8    A.  I do.

9    Q.  And you got an answer; right?

10   A.  Yes.

11   Q.  And, of course, Mr. Horn wasn't on that document relating

12   to the purchase and assignment of wells; correct?

13   A.  No.

14   Q.  All right.  And so Mr. Horn's response was to be helpful

15   and -- and say he wanted to look at the document; right?

16   A.  His res- -- sorry.

17   Q.  His response was to say "Well, let's look at the

18   document"?

19   A.  Are we talking about the purchase and assignment of wells?

20   Q.  Right.

21   A.  Yes.

22   Q.  To try to figure out who was involved in that?

23   A.  I believe he just told me he didn't draft it.

24   Q.  He not only told you he didn't draft it; he told you --

25           MR. FLEENER:  Objection; confrontation.

1          MR. HEIMANN:  And hearsay, no exception.

2          MR. JUBIN:  It's completeness at this point.

3          THE COURT:  Overruled.

4     BY MR. JUBIN:

5     Q.  At that point he said, "I'm assuming it was one of the

6     four people who signed on this, but I'm not sure who -- you

7     know, the people that were involved in the transaction";

8     right?

9     A.  Right.

10    Q.  And -- and Mr. Horn returned to studying the document;

11    right?

12    A.  I don't recall.

13    Q.  Okay.  And at some point in this interview you asked

14    Mr. Horn, "So once you would write this letter, you would send

15    it back to the company somehow, and then they would do with it

16    what they needed to?  Or you would actually submit it to

17    Pacific Stock Transfer or OTC Markets?"

18          Do you recall asking that?  Because that was

19    important for you to know; right?

20          Do you remember that?

21    A.  Yes.

22    Q.  And Mr. Horn told you what he was pretty sure happened,

23    and then you moved on to another letter; right?

24          MR. WARD:  Objection; compound.

25    ///

1            MR. JUBIN:  Okay.  We'll break it up.

2    BY MR. JUBIN:

3    Q.  Mr. Horn told you what he was pretty sure happened?

4    A.  With how he wrote the opinion letters?

5    Q.  In response to your question of whether he would send it

6    back to the company somehow and "they would do with it what

7    they needed to or would you actually submit it to Pacific

8    Stock Transfer or OTC Markets?"

9    A.  Yes, he answered that question.

10   Q.  Okay.  So he told you what he was pretty sure happened and

11   then -- correct?

12   A.  Yes.  He answered the question.

13   Q.  Do you recall if he -- if he was able to give you a

14   definitive answer?

15   A.  I don't recall.

16   Q.  Do you recall if he had some question about his answer?

17   A.  No, I don't recall that.

18   Q.  So then you moved on to the March 2016 opinion letter and

19   gave that to him and said "It's regarding NuTech initial

20   information and disclosure statement, and it's addressed to

21   OTC Markets."

22            Do you remember showing him that letter?

23   A.  Yes.

24   Q.  How many total letters did you have with you to show him?

25   A.  I believe five or six.

1  Q.  So this interview took some time?  It was about an hour

2  and 40 minutes or something like that?  Is that about right?

3  A.  Yeah.  It ended around 10:25 a.m., and it started at 8:43.

4  Q.  Okay.  So it was a good, long interview reviewing all

5  these letters and trying to decipher what was in them?

6  A.  Yes.  There were some breaks.

7  Q.  Okay.  Breaks to take the dog out because the dog was kind

8  of annoying?

9  A.  I think Riley was just excited for all the visitors.

10 Q.  Okay.  And was this dog in Mr. Horn's lap at times or not?

11 A.  I don't remember, but I remember the dog was coming over

12 to see me, and then it would go over and see Agent Pikas,

13 and -- and then it would, you know, hang out by Mr. Horn.

14 Q.  Okay.  During this interview was Mr. Horn writing

15 anything?  Or were you and Mr. Pikas the ones writing things?

16 A.  I --

17 Q.  Or was nobody writing anything?  Tell me what was

18 going on.

19 A.  No, I was taking notes.

20 Q.  Okay.

21 A.  And I believe Agent Pikas was taking notes.  I don't

22 recall Mr. Horn taking notes.  He was holding the, you know,

23 documents and reading them.

24 Q.  Okay.  And when you showed him this March 7th letter, you

25 asked him "For each letter would you have discussed updates to

 1   the company with someone?"

 2          Do you remember asking him that?

 3   A.  I don't.  But it sounds like the general line of

 4   questioning.

 5   Q.  Okay.  And you asked him, you know, who that was, do you

 6   recall, those sorts of things?

 7   A.  Yes.

 8   Q.  And he provided you information, generally, that was in

 9   front of him on the paper; right?

10   A.  I would -- wouldn't say that.

11   Q.  Well, the document -- one of the documents mentioned

12   Mr. Crom.

13   A.  Oh.  Well, what I was remembering is that he would say

14   that he remembered three-way phone calls.

15          MR. HEIMANN:  Objection; hearsay.

16          THE COURT:  Sustained.  It is hearsay.

17   BY MR. JUBIN:

18   Q.  And at periods of time when you asked him about who he

19   would have discussed things with, he was looking at the

20   documents and he would tell you "It would have been" -- and

21   then provide the answer; right?

22          MR. HEIMANN:  Again, objection; hearsay.

23          MR. JUBIN:  It's state of mind, Your Honor.

24          MR. HEIMANN:  Hearsay.

25          THE COURT:  Hearsay.  Sustained.

1    BY MR. JUBIN:

2    Q.  And then you wanted to know some details about the

3    transaction, and so you -- that was reflected in this

4    letter -- and you asked Mr. Horn, "And for the people who

5    would be control persons, how do you determine that or how do

6    you gather that information?  Is there some type of database

7    you can check or what's the process?"

8         Do you recall that?

9    A.  I was referring to what's in the opinion letter.

10   Q.  Right.  And Mr. Horn described the process?

11   A.  Yes.

12   Q.  And after that you asked -- asked him, "And the

13   individuals involved other than Crom and Trizna, who else

14   would that be?"

15        Do you recall that question?

16   A.  Not specifically.

17   Q.  But that would have been something that was based on the

18   contents of the letter?

19   A.  I'm not sure the context or where that's falling inside

20   the interview.

21   Q.  I can't hear you.  I'm sorry.

22   A.  Oh, sorry.

23        Maybe repeat the question.

24   Q.  You -- with reference to the -- the letter that you were

25   talking about with him, you asked him, "The individuals

1    involved, other than Crom and Trizna, who else would that be?"

2    A.   I don't recall that question or what I meant by it.

3    Q.   Okay.  Do you have the -- you don't claim not to have

4    asked him, though; correct?

5    A.   No.

6    Q.   Okay.  Did you get an opportunity to review the transcript

7    of the recording?

8    A.   No.

9    Q.   Okay.  And then at some point you showed Mr. Horn an

10   OTC Markets attorney letter agreement that you asked him to

11   look at.  "I'd like to -- for you to look through it."

12        Do you recall that?

13   A.   Yes.

14   Q.   And you pointed out to him that it had his driver's

15   license and his Florida bar card attached and that sort of

16   thing; right?

17   A.   Yes.

18   Q.   And then you also showed him the -- an amended initial

19   information and disclosure statement dated April 3rd, 2016,

20   addressed to OTC Markets; right?

21   A.   Sounds familiar, yes.

22   Q.   Okay.  And that's the one where you told him, "That one

23   lists quite a few more people under control person."  Do you

24   recall that?

25   A.   Yes.  I was comparing the two opinion letters.

 1   Q.   Okay.  And you were doing that with Mr. Horn at the same

 2   time; right?

 3   A.   Yes.

 4   Q.   And you asked him, "Looking at the names of these people,

 5   do you recall speaking to any of them?"

 6   A.   Yes.

 7   Q.   And Mr. Horn told you he probably would have spoken to --

 8              MR. HEIMANN:  Objection; hearsay.

 9              THE COURT:  Sustained.

10              The jury will disregard.

11        (Discussion held between counsel.)

12   BY MR. JUBIN:

13   Q.   And you asked Mr. Horn about how he was compensated or who

14   paid him for writing these attorney opinion letters; right?

15   A.   I did.

16   Q.   He provided you answers?

17   A.   About being paid?

18   Q.   Uh-huh.

19   A.   Yes.

20   Q.   And you asked if Justin Herman ever paid him; right?

21   A.   Yes.

22   Q.   He provided you answers?

23   A.   Correct.

24   Q.   And you asked him about that for NuTech work; right?

25   A.   Yes.

1    Q.  Okay.  And you showed him another opinion letter, and this

2    one has nothing to do with NuTech; correct?  It was one dated

3    May 10th of 2017 relating to some entity called PYTG?

4           Do you recall that?

5    A.  Yes.

6    Q.  So this 2017 one was far more recent; correct?

7    A.  2017 -- yes.  To the interview in 2018?  Correct.

8    Q.  Right.

9           So it -- I mean, the other letters and documents you

10   were showing him were all related to things that occurred back

11   in 2015 and 2016; right?

12   A.  Yes.

13   Q.  And so now you're showing him something much more recent;

14   right?

15   A.  It was a year later.

16   Q.  A year later.

17          And did you show him the signature on that one?

18   A.  I gave him the whole document.

19   Q.  Okay.  Have you --

20   A.  I don't remember if there was --

21   Q.  I'm sorry?

22   A.  I don't remember if there was a signature on that -- that

23   document.

24   Q.  Okay.  Fair enough.

25          Have you had an opportunity since then to compare the

1   signatures on those old NuTech-related letters compared to

2   this 2017 unrelated letter?

3   A.   No.

4   Q.   Okay.  And at some point you switched gears and started

5   talking about this $80,000; right?

6   A.   Yes.

7   Q.   You said, "Okay.  The next one I have, a wire coming from

8   Bravo Two Zero Partners into your BMO Harris Bank account for

9   $80,000.  Do you recall what that was about?"

10          You asked him that; right?

11  A.   Yes, when I showed him the bank statement.

12  Q.   Okay.  And you got a response; right?

13  A.   Yes.

14  Q.   And you -- and you jumped in to -- to help clarify and

15  said "I think there was a -- there was a memo that says 'ECMZ

16  Debt Conversion.'  Does that mean anything to you?"

17          Do you recall that?

18  A.   Yes.

19  Q.   And then you got a response.

20          And then you asked Mr. Horn, "The $80,000, do you

21  think that was refunded?"

22          And he responded and then you said, "So do you think

23  this $80,000 had anything to do with the debt conversion and

24  the opinion letter you wrote for the free-trading shares that

25  referenced $280,000 being paid?"

1         And Mr. Horn asked you a question at that point;

2    correct?

3    A.  I don't recall.

4    Q.  First of all, did you ask him that, "So do you think this

5    $80,000 had anything to do with the debt conversion in the

6    opinion letter you wrote for the free-trading shares that

7    referenced $280,000 being paid?"

8    A.  Yes.

9    Q.  Okay.  And following his question you said "Or was it part

10   of that?"  Do you recall that discussion?

11   A.  I recall the discussion in general, yes.  We were trying

12   to figure out what was going on with the $80,000.

13   Q.  And whether it was part of it because you followed up and

14   said, "Was this partial payment of that?"  Do you recall that?

15   A.  Was this partial payment of the 280,000?

16   Q.  Right --

17   A.  Yes.

18   Q.  -- was the 80,000 part of this 280 or what.  That's what

19   you were asking him; right?

20   A.  Yes.

21   Q.  And at this point you had bank statements; right?

22   A.  Yes.

23   Q.  So you knew what was going on with the money, and you were

24   just testing to see what he knew; right?

25   A.  I was asking him about the records, yes, to find out what

 1   Mr. Horn knew about the entire situation --

 2   Q.  Okay.

 3   A.  -- and the opinion letters.

 4   Q.  And in response to what he told you, you finally said,

 5   "Look; I don't see the money going back to Bravo Two Zero";

 6   right?

 7   A.  Yes, I said that.  Uh-huh.

 8   Q.  "Or money going back to Kevin Trizna"; right?

 9   A.  Yes.

10   Q.  So then you asked him, "Who did you send it to?"; right?

11        Because that's one of the things you wanted to know,

12   who he sent the money to; right?

13   A.  Yes.

14   Q.  And your response to his responses was "Now I'm getting a

15   little confused about it.  Other than I'm sure that it didn't

16   stay" -- oops, I'm sorry.  I'm reading the wrong line.

17        MR. HEIMANN:  Objection; move to strike.

18        THE COURT:  Sustained.

19        MR. JUBIN:  My mistake.

20   BY MR. JUBIN:

21   Q.  And then -- okay.  And then you asked Mr. Horn, "I have a

22   bank wire from Wells Fargo, and it's kind of hard to read so

23   I'll point it out to you.  But the originator, Robert

24   Mitchell, and the beneficiary is Ian Horn."

25        Do you recall that?

1    A.  Yes, I remember talking about that.

2    Q.  And you showed him this bank wire with the $280,000?

3    A.  Yes, the wire transfer record that I referred to earlier.

4    Q.  Okay.  A wire transfer record that at the point you knew

5    was not accurate; correct?

6    A.  Yes.

7    Q.  Okay.  And you told him "And the dollar amount is

8    $280,000.  The date is December 23, 2014."

9            And Mr. Horn responded; correct?

10   A.  Yes.

11   Q.  And your response to him was, "Well, these are records

12   that were provided."  What prompted your response to him to

13   say "These are records that were provided"?

14           MR. HEIMANN:  Your Honor, I think this is an attempt

15   to elicit hearsay.

16           MR. JUBIN:  It would be response -- it would be the

17   effect on the listener.

18           MR. HEIMANN:  It's an attempt to elicit hearsay,

19   Your Honor.

20           THE COURT:  Overruled.

21   BY MR. JUBIN:

22   Q.  What prompted your response, "Well, these are records that

23   were provided"?

24   A.  I said these were records that were provided to Pacific

25   Stock Transfer.  That's where I got it from.

1    Q.   Your testimony is that Ian Horn told you that he got this

2    from where?

3    A.   Oh, you're asking me where Ian Horn . . .

4             MR. FLEENER:  Objection; confrontation.

5             MR. WARD:  Join.

6    BY MR. JUBIN:

7    Q.   Maybe we can start this again.  I'll try to take you

8    through it.

9             So you brought -- you showed him this $280,000 record

10   of a -- of a transfer that -- that you knew was -- didn't

11   exist; right?

12   A.   Yes.

13   Q.   Okay.  And so you were asking him questions about that,

14   and you said, "I've got this bank wire from Wells Fargo.  It's

15   kind of hard to read.  I'll point it out.  It shows the

16   originator is Bob Mitchell and the beneficiary is Ian Horn."

17   Okay?

18             And he responds.  Okay.

19             And you say, "The dollar amount is $280,000.  The

20   date is December 23, 2014."

21             And then he makes a response, to which you reply,

22   "Well, these are the records that were provided."

23             What did he say that made you say, "Well, these are

24   the records that are provided"?

25             MR. HEIMANN:  Your Honor, counsel is attempting to

1   elicit hearsay --

2           MR. JUBIN:  It's the same --

3           MR. HEIMANN:  -- under a gamut that it's the

4   response -- that it's somehow resulting in the response from

5   the agent.

6           And it's either irrelevant on that basis or it's a

7   contrivance to get the statement before the jury.

8           MR. JUBIN:  The Court's already ruled.

9           MR. HEIMANN:  You've asked it again.

10          THE COURT:  I'll sustain the objection.

11          MR. JUBIN:  Your Honor, I understood you to deny the

12  objection earlier.

13          THE COURT:  It's hearsay.

14  BY MR. JUBIN:

15  Q.  What prompted you to say, "Well, these are the records

16  that were provided"?

17          MR. HEIMANN:  Your Honor, it's the same --

18          MR. FLEENER:  Objection; confrontation.

19          MR. HEIMANN:  -- question again.  Objection; hearsay.

20          MR. WARD:  Join.

21          THE COURT:  Sustained.

22  BY MR. JUBIN:

23  Q.  You told Mr. Horn, "Well, these are the records that were

24  provided as part of the debt conversion package to Pacific

25  Stock Transfer"; correct?

1    A.  Yes.

2    Q.  And then you showed him another document, a Wells Fargo

3    statement from Bravo Two Zero, and you said, "This is a Wells

4    Fargo statement from Bravo Two Zero Partners, and there's a

5    line item that appears to be going to BMO Harris Bank for

6    Ian Horn for $280,000"; right?

7    A.  Yes.

8    Q.  And Ian Horn responded to you but didn't provide you any

9    facts; right?

10   A.  I don't recall what his response was, but he did respond

11   to the question.

12   Q.  Okay.  And, finally, you know it's -- it's -- it didn't

13   happen, he's responding to you, and finally you tell him,

14   "Okay; I don't show this happened"; right?

15          So at some point you decide "I'm going to tell this

16   guy that I'm questioning about this $280,000" that you don't

17   show that it happened; right?

18          MR. WARD:  Objection; compound question.

19          THE COURT:  Can you answer the question?

20          THE WITNESS:  Yes.

21          THE COURT:  You may answer.

22          Overruled.

23   A.  I did -- I did tell him that.

24   BY MR. JUBIN:

25   Q.  Okay.  And you clarified because -- he wondered what you

 1   meant, and so you said, "That 280,000 was transferred from the

 2   Bravo Two Zero account into your account.  I don't show that

 3   happened."

 4            MR. JUBIN:  And, Your Honor, I'm intending to elicit

 5   Mr. Horn's response for a nonhearsay purpose.  I just wanted

 6   to alert the Court.

 7            MR. FLEENER:  I object to this.  It violates his

 8   confrontation rights, Mr. Herman's.

 9            MR. WARD:  Join.

10            MR. JUBIN:  Your Honor, maybe we should have a brief

11   conference outside the presence of the jury.

12        (Proceedings held at sidebar with Prosecutor Heimann

13   and all defense counsel.)

14            MR. JUBIN:  Your Honor, after Ms. Hacker asked -- or

15   told Ian Horn "Okay; I don't show this happened," then Horn

16   said "Then what happened?"  We're past that.

17            "The 280,000 was transferred from the Bravo Two Zero

18   account into your account."

19            And Mr. Horn said, "Okay.  So then, obviously, the

20   presumption is, if there was that much money in that account,

21   it came from somewhere other -- somewhere other than Bravo?

22   Is that what you're saying?"

23            So I would offer that statement not to show the truth

24   of what he's saying, that it came from somewhere other than

25   Bravo, but to -- but, rather, to show that the statement was

 1    made that he doesn't understand, which is followed by her

 2    saying "So you have no recollection of whether it did or not?"

 3            So it would be a nonhearsay purpose to -- to

 4    demonstrate his state of mind and not to prove the truth of

 5    his state of mind but, in fact, his state of mind is

 6    inaccurate.  So it's an 803(3) exception.

 7            And it's -- and it's defined as nonhearsay anyway

 8    because it's not to prove the truth of what he said.

 9            THE COURT:  It really doesn't prove his state of

10    mind.

11            MR. WARD:  And we have no opportunity to confront him

12    about any of this.

13            MR. HEIMANN:  Your Honor, I think there's a couple --

14    there's a -- there's a fundamental mistake that Mr. Jubin has

15    made throughout his discussion of this, of hearsay and his

16    attempt to get his client's statements in front of the jury

17    without his client testifying.  Something is not for a

18    nonhearsay purpose unless the only thing that matters is that

19    it was said.

20            He's admitted in his pleadings; he's admitting it

21    again.  He's trying to prove it false.  He wants the theory to

22    be that it's false, so that's about whether it's true or not.

23            This -- all this back-and-forth is -- is not going

24    towards some abusive conduct by this agent; it's not going

25    toward some -- elicitation of some false statement or a false

1   confession.  All this is is an attempt to get his hearsay

2   statements in front of the jury through this contrivance.

3          This isn't relevant, the way it's being presented.

4   There's no theory of relevance for this whole line of

5   questioning.

6          MR. JUBIN:  What the Government is ignoring is that

7   hearsay is defined as the statement by a declarant to prove

8   the truth of the matter asserted, and that's not at all the

9   purpose here, so it's not even defined as hearsay.

10          MR. HEIMANN:  A defendant who claims his confession

11   was false is not allowed to put in all the whole confession

12   and just say, "Oh, it wasn't true."  The advisory committee

13   notes say that the nonhearsay purpose must be limited to the

14   fact it was said.

15          THE COURT:  And it was really offered at the time for

16   the truth.

17          MR. HEIMANN:  And the whole theory that it's false,

18   Your Honor, can't just come out of counsel's mouth.  There has

19   to be some independent evidence to say it's false, and we

20   don't -- we don't have that yet and we may never.  I don't

21   know.

22          MR. JUBIN:  There is plenty of that.  The agent

23   herself has indicated that the -- the $280,000 was fictitious.

24          MR. HEIMANN:  We're talking about an interview,

25   Judge.  And, again, the theory doesn't seem to be that -- that

1    Inspector Hacker misled Mr. Horn; it doesn't seem to be that

2    she somehow cajoled a false confession out of him.  And then

3    why are we going through every question?

4          I don't think it's relevant, and it's -- I mean, it

5    has some marginal relevance.  It's a waste of time.

6          THE COURT:  I'll sustain your objection.

7       (Sidebar concluded.)

8          THE COURT:  Let's move on.

9    BY MR. JUBIN:

10   Q.  So after you told Mr. Horn that you don't show that this

11   $280,000 was transferred from the Bravo Two Zero account into

12   his account, he responded and you asked him "You have no

13   recollection of whether it did or did not?"

14   A.  I don't recall.

15   Q.  And you asked him if he had a recollection whether it even

16   made it into his account; right?

17   A.  I think -- I think I did.

18   Q.  And at some point you ask him about these escrows that --

19   that he was conducting for these companies, and you said,

20   "Where would you receive -- so once the money comes into your

21   account and who tells you where to send it next"; right?

22          Because that's something you wanted to know; right?

23   A.  Yes.

24   Q.  And you followed up and said, "How do you get

25   instructions?"; right?  You wanted to know how he was

19-CR-26-ABJ         HACKER - FURTHER CROSS - JUBIN       Vol. IX-1500
21-CR-14-ABJ

1    instructed to send those monies; right?

2    A.  Yes.

3    Q.  And then there were some discussions that you are

4    initiating as to who it might have been that was giving these

5    instructions; right?

6    A.  I don't recall.

7    Q.  And, of course, you wanted to know whether there were

8    other things that Mr. Horn was doing for Justin Herman in

9    terms of providing legal services of some sort; right?

10   A.  I believe I asked him that.

11   Q.  "Other than these opinion letters that we're discussing,

12   were there any other business you were conducting -- was there

13   any other business you were conducting with Justin Herman?"

14   That's something you asked him about?

15   A.  Yes.

16   Q.  And you then went back to this escrow stuff.  And after

17   you asked about money, you asked "Why -- if it's not opinion

18   letters, then why are you receiving -- why -- why do you have

19   money coming into your account that you're sending out to

20   Justin Herman?"

21        Do you remember asking him about that?

22   A.  Yes.

23   Q.  Okay.  I'll turn away from the interview for

24   a little bit --

25        MR. JUBIN:  Judge, did you want to take another

1   morning break?

2          This is a natural stopping spot if it's natural for

3   anyone to --

4          THE COURT:  Probably -- probably is.  Let's take at

5   least 10 minutes or so.

6          THE COURTROOM DEPUTY:  All rise.

7      (Proceedings outside the jury's presence at 11:21 a.m.)

8          THE COURT:  The Court will provide a written order to

9   you concerning the sidebar that we have had dealing with the

10  theories that are presented and have been presented by the

11  parties in support of their respective positions.  Zigmas has

12  been working on that as we have been going forward.

13         Suffice it to say that the relevance and hearsay

14  issue is -- is really where this Court is going to come down,

15  rejecting the receipt not for the truth of the statement

16  theory, the state of mind theory, and the 106 theory that has

17  been presented under the rules.

18         I'll be back with you shortly.

19         MR. JUBIN:  Your Honor -- Your Honor, may I approach

20  you briefly on an ex parte matter?

21         THE COURT:  Yes, sir.

22         MR. JUBIN:  Thank you.

23     (A recess was taken from 11:23 a.m. to 11:33 a.m.)

24         THE COURTROOM DEPUTY:  Court is now in session.

25         THE COURT:  Thank you.

1           As I understand it, there is an issue.

2           MR. HEIMANN:  I'm sorry, Judge?

3           THE COURT:  There is an issue the parties wanted to

4    talk about?

5           MR. HEIMANN:  Not from the Government.

6           MR. JUBIN:  No.

7           MR. FLEENER:  Judge, I was just wondering about how

8    the day is going to look as far as timing goes.  I'm supposed

9    to appear in State Court at 1:30, and I need to either find

10   someone to cover -- I thought we may be done at noon, so

11   that's why I brought it up.

12          MR. JUBIN:  Are we planning on stopping at noon

13   today?

14          I have a witness who would be terribly inconvenient

15   next week but . . . is available this afternoon.

16          But I don't want to rush things, and, obviously,

17   we -- we aren't done -- anywhere close to done yet here so --

18          THE COURT:  Well -- your witness is Dr. Denison?

19          MR. JUBIN:  No, it's not.  It's not.  He's next week,

20   Tuesday.

21          MR. HEIMANN:  Your Honor, at least for the

22   Government, I think we should go until we've finished --

23          THE COURT:  I do, too.

24          MR. HEIMANN:  -- Inspector Hacker.

25          THE COURT:  I agree.

19-CR-26-ABJ        HACKER - FURTHER CROSS - JUBIN        Vol. IX-1503
21-CR-14-ABJ

1            That still doesn't answer your question.

2            MR. FLEENER:  No.  I was hoping maybe . . . we

3    wouldn't have been -- I'm sorry -- screw- -- I don't mean

4    screwing around.

5            Maybe if we took -- if we could take a late lunch,

6    maybe at 1:00, I could run to State Court and try to get my

7    business done there and be back at 2:00.  Or is that too late

8    for everybody?

9            THE COURT:  I don't mind.

10           MR. FLEENER:  Would that be terrible for the

11   United States?

12           I mean, that would at least take the jury -- they've

13   been coming in and out all day anyway, but that would at least

14   give you a chance to try to get this thing taken care of,

15   Judge.  I would appreciate that.

16           THE COURT:  We'll try to accommodate you.

17           MR. JUBIN:  So we'll go until one o'clock here?

18           THE COURTROOM DEPUTY:  I did tell the jury to have a

19   snack because they might get a late lunch.

20           THE COURT:  Yeah, the jury is aware of it.

21           The other thing I want to bring up for you -- this

22   was at the sidebar on the fly -- selecting our alternate

23   juror, we were wrong.

24           No. 50, who is seated there, was a substitute for the

25   original person who was in that seat as an alternate juror.

 1    The alternate juror who was first seated was the nurse,

 2    No. 47, so Zenith Ward was right in his -- his recollection.

 3            If you want me to correct it, I think we can correct

 4    it.  I'll leave it up to you all.

 5        (Discussion held among counsel.)

 6            MR. JUBIN:  I'm fine with where it is.

 7            MR. FLEENER:  I'm fine with where it is.

 8            MR. WARD:  I'm fine with where it is.

 9            THE COURT:  Very well.

10            MR. HEIMANN:  The Government is, as well.

11            THE COURT:  Hopefully, we won't need any more

12    alternates, but we never know in this environment.  Let us

13    pray -- she'll be the next one if there is a need for another

14    one.

15            Okay.  Let's bring the jury in and see if we can't

16    make some progress here.

17            Before the jury comes in, I'm going to grant the

18    objections, I suspect, if we're going to be proceeding through

19    transcripts in the same way.  If there's some way you want to

20    make a record beyond what we -- the written record that

21    already has been submitted and the arguments at sidebar,

22    please advise and we can arrange that.

23            MR. HEIMANN:  So, Your Honor -- so I'm clear -- and

24    Mr. Jubin is clear -- if I object to this line of

25    questioning -- which -- going through the transcripts page-

 1  by-page to elicit what the questions were -- your intention

 2  would be to grant that?

 3              THE COURT:  Yes.

 4              MR. JUBIN:  To allow it or preclude it?

 5              THE COURT:  Preclude it.

 6              MR. JUBIN:  Okay.  I may need to make some sort of an

 7  offer of proof at some point.

 8              THE COURT:  Absolutely.  I thought you might want to

 9  do that.

10      (Proceedings within the jury's presence at 11:39 a.m.)

11              THE COURT:  I think we abandoned somebody.

12              JUROR 28:  At this point I'm sure we did.

13              JUROR 15:  We were in a hurry.

14              JUROR 56:  I think she's in the restroom.

15              THE COURT:  I like this shirt in the front row here.

16              JUROR 48:  Thank you, sir.

17              THE COURT:  Ladies and gentlemen, we have been -- at

18  least last week -- recessed at the noon hour.  We're going to

19  go a little longer, until at least -- a little longer this

20  afternoon.  We'll probably break for lunch about one o'clock.

21              Please be seated and we'll get started.

22  BY MR. JUBIN:

23  Q.  Does your microphone work?

24  A.  It's on now.

25  Q.  Okay.  Before we took a break here, you testified that you

 1   showed Mr. Horn this unrelated PYTG letter dated May 10th of

 2   2017.

 3          Do you recall that testimony?

 4   A.  Yes.

 5   Q.  I'm going to ask you to take a look at Exhibit IH-Q15a.

 6   This is not admitted yet.

 7          Does this appear to be the letter that you described

 8   showing to Mr. Horn?

 9   A.  Yes.

10          MR. JUBIN:  Your Honor, I'd move for the admission of

11   Exhibit IH-Q15a.

12          MR. HEIMANN:  Your Honor, I'd ask that the witness be

13   allowed to see all the pages before we decide our position.

14          THE COURT:  Very well.

15          MR. FLEENER:  I'm going to have a position, too,

16   Judge.  Hold on for one second, please.

17          I'm sorry.  What exhibit number is it?

18      (Discussion held at counsel table.)

19          MR. FLEENER:  I . . . I guess I don't have an

20   objection, Judge.

21          MR. HEIMANN:  Your Honor, if the witness acknowledges

22   that all five pages are the complete letter, I have no

23   objection, either.

24   BY MR. JUBIN:

25   Q.  Are all five pages a complete letter?

 1   A.  Yes.

 2          MR. FLEENER:  Well, I guess -- I think I'd object to

 3   authentication before it's admitted into evidence and

 4   relevance.

 5          MR. JUBIN:  Do you want me to respond in the presence

 6   of the jury, Your Honor?

 7          MR. FLEENER:  Sure.

 8          MR. JUBIN:  Your Honor, it's --

 9          THE COURT:  I think the relevance is the signature.

10          MR. JUBIN:  Sure.

11          THE COURT:  It will be received.

12     (Defendant Horn's Exhibit IH-Q15a received into evidence.)

13   BY MR. JUBIN:

14   Q.  We're looking at the last page here where it -- the

15   Ian Horn signature.  Do you see that?

16   A.  Yes.

17   Q.  Did you make any comparison between that signature and the

18   signature on the NuTech-related letters?

19   A.  No.

20   Q.  So then there was another interview that we discussed on

21   May 1st of 2019, a few months after Ian Horn testified before

22   the grand jury; correct?

23   A.  Yes.

24   Q.  And he had no obligation to talk to you, but he agreed to

25   do so; correct?

 1   A.   Yes.

 2   Q.   And he did so in the presence of his -- well, this is by

 3   telephone; right?

 4   A.   Yes.

 5   Q.   And -- but his lawyer Gay Woodhouse was on the phone;

 6   right?

 7   A.   Yes.

 8   Q.   And you were on the phone?

 9   A.   Correct.

10   Q.   And was there an Inspector Allen on the phone?

11   A.   Mr. Allen works for the inspection service, but he's not

12   an inspector any longer.  He's retired.

13   Q.   Okay.  But he was on the phone?

14   A.   Yes.

15   Q.   Was there anybody else?

16   A.   Yes.

17   Q.   Who?

18   A.   Agent Pikas was on the phone.

19   Q.   Anyone else?

20   A.   Alex Scoufis was on the call.

21   Q.   Okay.  Anyone else?

22   A.   That's all I recall.

23   Q.   And Mr. Scoufis had an opportunity to ask questions and

24   did, didn't he?

25   A.   Yes.

1  Q.  And Mr. Allen asked questions, as well; right?

2  A.  Yes.

3  Q.  But primarily you were the one doing the interviewing?

4  A.  Yes.

5  Q.  And the focus of that interview was, again, the attorney

6  opinion letters; correct?

7  A.  Yes.

8  Q.  And you had questions about those and how that all

9  happened; right?

10  A.  Yes.

11  Q.  And this was sort of a follow-on to Mr. Horn's grand jury

12  testimony in January; correct?

13  A.  Correct.

14  Q.  And prior to his grand jury testimony, Mr. Horn and his

15  attorney met with you and the agents -- the other agents --

16  and Mr. Heimann in preparation for that testimony; right?

17  A.  Yes.

18  Q.  And, again, the focus of that preparation was on these

19  attorney opinion letters; right?

20  A.  We were going through the records that he had provided as

21  part of the grand jury subpoena, and we also talked about

22  opinion letters.

23  Q.  All right.  And there were discussions about how the

24  different fonts on the letters might reflect authorship; is

25  that right?

19-CR-26-ABJ      HACKER - FURTHER CROSS - JUBIN      Vol. IX-1510
21-CR-14-ABJ

1    A.   There were discussions, yes, about the fonts and why they

2    were different.

3    Q.   Okay.  Trying to come to an understanding as to how that

4    happened --

5    A.   Yes.

6    Q.   -- how these letters were created --

7    A.   Correct.

8    Q.   -- who wrote what parts?

9    A.   Yes.

10           MR. JUBIN:  We can take off that exhibit there.

11           Let's take a look at 603, page 9.

12           If we could expand that box in the middle, the

13   November 26, 2018 -- that's fine -- text from Ian Horn to

14   Justin Herman.

15   BY MR. JUBIN:

16   Q.   That's what that is; right?

17   A.   A text from Ian Horn to Justin Herman, yes.

18   Q.   Okay.  And you read part of this, but it -- it also says,

19   "Keep in mind if any explanation is necessary and you may want

20   to ask Steve about that" -- maybe "what," typo -- I want to

21   include the explanation."

22           Who's Steve?

23   A.   I believe he's referring to the -- Steve Mills, the

24   lawyer.

25   Q.   The lawyer for NuTech, Steve Mills?

1  A.  I wouldn't say he's the lawyer for NuTech.  I would just

2  say he's a lawyer that's referenced in these text messages.

3  Q.  Okay.  Would you agree that if there are documents

4  submitted that the jury has seen that indicate that

5  Steve Mills is the NuTech lawyer, that they could rely on

6  that?

7  A.  Sure.

8  Q.  And so there was a little bit of discussion with

9  Mr. Fleener about this privilege issue.  But Steve Mills --

10  it's your understanding, isn't it, that Steve Mills was

11  involved in vetting these emails and -- and correspondence and

12  documents for any potential that it was privileged material

13  that should not be turned over to the Government because of

14  the privilege?  Correct?

15  A.  I would say my understanding is that I saw Mr. Horn

16  forwarding some of the records to stevemillslaw@gmail.

17       I don't know what it was about or why.

18  Q.  Okay.  But this message tells us what it was about,

19  doesn't it?

20       It says, "I also want to redact any confidential or

21  privileged information on anything we're going to send";

22  correct?

23  A.  Yes, that's what it says.

24  Q.  Okay.  And then it goes on to say "Please advise as to how

25  to send the emails without showing the stream of where the

1   emails went to."  The Government's subpoena just asked for

2   certain emails; right?  It didn't ask for things that might be

3   privileged or might have involved other communications;

4   correct?

5   A.  No.  The subpoena asked for all -- all nonprivileged

6   communications.  And then if there were claims to privilege,

7   then there should have been a privilege log created that

8   listed, you know, some of the information so that, I guess, a

9   determination could be made whether or not those were

10  privileged or not.

11  Q.  So -- so that's how the Government's subpoena requested

12  it; right?

13  A.  Yes.

14  Q.  "Give us -- if you're going to claim privilege, tell us

15  all the things that you have that are potentially subject to

16  this privilege and then we'll know about them so we can

17  litigate whether or not they're privileged"; right?

18  A.  Well, it said to provide a privilege log.

19  Q.  Okay.  And that didn't happen here, did it?

20  A.  Not to -- not -- I never saw one.

21  Q.  All right.  And you saw the emails -- or the -- the text

22  messages where Ian Horn was saying, "Hey, I'm not getting any

23  response from you people, I guess I'm on my own"?  Do you

24  recall that?

25  A.  Yes, I do.

1    Q.  And so he was really getting very little guidance from the

2    lawyer Mills, who was supposed to be vetting this stuff?

3    A.  That's how it appeared.

4    Q.  Take a look at page 10 of this, about three -- two-thirds

5    down the page.

6          Is this what you're talking about, where Mr. Horn is

7    trying to get resolution as to what he's sending out and what

8    he's supposed to claim privilege or confidentiality on?

9          That's what he wrote; right?

10   A.  I didn't follow your question.

11   Q.  Well, maybe --

12   A.  I don't know that --

13   Q.  Maybe I'll do it the way the Government did it.

14         If you could read the message on November 30th of

15   2018 sent -- or received at 2:17:41 p.m. by Justin Herman.

16   Can you read the first -- the first four lines, please?

17   A.  "Still in mediation but I really want to get a resolution

18   as to what I'm sending out what I am claiming privilege or

19   confidentiality on and what I'm not sending out.  I want to

20   get it overnighted as quickly as possible so they get the

21   whole package and then I also want to talk to you about the

22   ramifications, et cetera, cuz I got all the" --

23   Q.  Okay.  And then "girls want to protect me."

24         Do you have any idea what that means?

25   A.  No.

1          MR. JUBIN:  Okay.  Let's take a look at Exhibit 101.

2          I've got the wrong exhibit.  You can take that down.

3          Let's go to page 603, page 15 -- or Exhibit 603,

4    page 15.

5          Let's zoom in on the top box there that was

6    January 3rd of 2019.

7    BY MR. JUBIN:

8    Q.  Would you read -- would you read that text that was sent

9    from Ian Horn to Justin Herman on January 3rd, 2019.

10   A.  "Were you able to get the documents prepared and sent for

11   overnighting or sent to Kinko's for printing?  The sooner

12   I get them the sooner we can go over them and make sure that

13   we're on the same page.  I'd like to run down everything they

14   ask for in the subpoena and what types of responses.  You may

15   want to run it by Steve and I like to speak to someone who's a

16   criminal attorney in Wyoming regarding testimony before the

17   grand jury."

18   Q.  And Mills was the guy who was working on the privilege

19   review, as you understand it?

20   A.  I don't have an understanding of Mr. Mills' involvement.

21   Q.  You simply don't know?

22   A.  Correct.

23   Q.  But you've seen a lot of documents where Steve is supposed

24   to be the one vetting the -- vetting the documents; right?

25   A.  I've seen where Mr. Horn forwarded emails to Mr. Mills and

1   then where Mr. Mills is talked about in these text messages,

2   but I have no additional understanding of what exactly

3   Mr. Mills was doing.

4   Q.   Well, you saw some of those emails where Ian Horn is

5   forwarding things to Steve Mills, the lawyer --

6   A.   Yes.

7   Q.   -- and he's asking if it's privileged.

8          And sometimes he gets a response from Mr. Mills that

9   says "Privileged, don't send" or something like that.  Do you

10  recall that?

11  A.   I don't recall that.  I recall someone else making that

12  assertion.

13  Q.   Who do you recall making that assertion?

14  A.   Mr. Herman.

15  Q.   You have no recollection of Mr. Mills, the attorney hired

16  by Herman to engage in this process of figuring out what could

17  be or could not be provided, saying "Privileged"?

18  A.   I don't.

19  Q.   But you would expect him, as a lawyer for Herman, to be

20  assisting his client in doing that; right?

21  A.   I didn't know if Mr. Mills represented Mr. Horn or

22  Mr. Herman.

23          MR. JUBIN:  Okay.  Let's see page 20 of this

24  exhibit, 603.

25  ///

 1   BY MR. JUBIN:

 2   Q.  I believe you read some of this box at the bottom, the

 3   text message received by Justin Herman from Ian Horn on

 4   January 11th of 2019.

 5           MR. JUBIN:  Can you blow that up a little bit,

 6   Danielle?  Thank you.

 7   BY MR. JUBIN:

 8   Q.  And, here, you can see Mr. Horn sort of thinking through

 9   what his understanding is as to what Herman's role was in this

10   stuff that --

11           MR. FLEENER:  Objection; speculation.

12           THE COURT:  I think he's just asking a question.

13           Overruled.

14   BY MR. JUBIN:

15   Q.  Did you get the gist of the question?

16   A.  Yes.

17   Q.  Okay.  And if -- if you look about halfway down, Mr. Horn

18   said, "I spoke with Steve a little bit today I will be

19   speaking with him again on Sunday okay but I really want to go

20   pretty much document by document that is meaningful and go

21   over it with you.  This would include opinion letters the

22   attorney advice letter and then if you know information

23   regarding the accounts the information regarding individuals

24   I spoke with including Kevin, et cetera."

25           So -- is that what it says?

1   A.   Not word-for-word but, yes, that's the substance.

2   Q.   Did I misread something?  Just a little?

3   A.   Just a little bit.

4   Q.   Did my misreading of it change the meaning in any way?

5   A.   No.

6   Q.   Okay.  But what's going on here is that Ian Horn is to get

7   responses from Mills and from Herman --

8           MR. FLEENER:  Objection.  She can't possibly answer

9   what Ian Horn's trying to do.  It's speculation.

10          THE COURT:  Sustained.

11          MR. JUBIN:  Well, okay.  We'll let the jury figure

12  that out.

13          Let's take a look at page 22.

14  BY MR. JUBIN:

15  Q.   So if we look at the top, Ian Horn is writing to --

16  texting to Justin Herman, asking him if he was able to find

17  the July 10th and July 17th opinion letters; right?

18  A.   Yes.

19  Q.   And Mr. Herman is writing back "On which stock,"

20  "Which year again"; correct?

21  A.   Yes.

22  Q.   And then Mr. Horn tells him "2015"; right?

23  A.   Yes.

24  Q.   And these are the opinion letters that are at issue here

25  in this case; right?

1  A.  I believe so.  I just can't remember all the dates.

2  Q.  Right.  That's hard for all of us.

3         But so far as you know, these are NuTech-related

4  opinion letters; right?

5  A.  Yes.

6  Q.  And Ian Horn doesn't seem to have them?

7  A.  Correct.

8  Q.  And then there was a mention where Ian Horn writes

9  "There's no request for any opinion letter related to Umbra

10  Technologies."

11        Do you see that?

12  A.  Yes.

13  Q.  So it would make sense that a lawyer would want to not be

14  giving things that weren't requested in the subpoena; right?

15  A.  Yes.

16  Q.  And the very next one, on January 14th, Mr. Horn writes,

17  "So now he's just missing that July 17 of 2015, and he wasn't

18  even aware of the June 16 opinion nor was that requested."

19        Do you see that?

20  A.  Yes.

21  Q.  And then he's got another question about the second

22  opinion letter on September 16th, wondering whether he has the

23  right one; right?

24  A.  It seems that he only has one; he's looking for a second

25  one.

1  Q.  Right.  And your understanding is that he didn't have any

2  of these opinion letters, so he got them all from Justin

3  Herman; right?

4          MR. HEIMANN:  Your Honor, I object to the line of

5  questioning that keeps asking the witness to make a conclusion

6  when we have the exhibit with the words on it.

7          MR. JUBIN:  It was far more general --

8          THE COURT:  The question is about the source of the

9  exhibit.

10          MR. JUBIN:  Right.

11          THE COURT:  Overruled.

12          MR. JUBIN:  You can answer.

13          THE COURT:  If you know.

14          THE WITNESS:  I can't remember the question.

15          MR. JUBIN:  Could you read it back?

16      (Pending question read.)

17  A.  Yes.

18  BY MR. JUBIN:

19  Q.  But as I think you've testified earlier, you never found

20  any emails or text messages from the time of the creation of

21  this -- of these NuTech-related opinion letters between

22  Justin Herman and Ian Horn.  Correct?

23  A.  I never saw any, correct.

24  Q.  Okay.  You testified a moment ago on direct examination

25  that emails can be deleted.  Do you recall your testimony in

1    that regard?

2    A.   Yes.

3    Q.   Well, let's talk about what you really mean by that and

4    perhaps what the purpose of that statement was.

5         You have forensics people on your team; right?  And

6    Mr. Berryhill testified?

7    A.   Yes.

8    Q.   Forensics folks are able to basically get deleted

9    messages; right?

10   A.   I think it would depend, and I don't know for sure.

11   I'm not an expert.  That isn't part of my responsibilities.

12   Q.   Fair enough.

13        But you weren't -- I mean, given these emails, given

14   these text messages, you're not suggesting that Ian Horn

15   somehow deleted all the messages that were related to these

16   NuTech-related opinion letters, are you?

17   A.   No, I'm not.

18   Q.   Okay.  Because, surely, if he was going -- well, it's

19   argumentative.  I'll sustain my own objection.

20        You presented and read a couple snippets from a grand

21   jury transcript; correct?

22   A.   Yes.

23   Q.   And the grand jury transcript went on for 53 pages of

24   testimony; right?

25   A.   I don't recall.

 1   Q.  Would it refresh your recollection if I showed it to you?

 2   A.  I don't know that I ever looked at how many pages it

 3   was --

 4   Q.  Okay.

 5   A.  -- though I don't think it would refresh my recollection.

 6   Q.  Okay.  Do you have any reason to disagree that it went --

 7   that the testimony went on for -- let me -- let me ask you

 8   this.

 9        You were sitting out in the hall, I believe you

10   testified.  Right?

11   A.  Yes.

12   Q.  While Mr. Horn was in the grand jury testifying?

13   A.  Yes.

14   Q.  And if the transcript reflects that it started at 8:42 in

15   the morning and ended at 10:12 in the morning, that would be

16   consistent with how long you might have been sitting out

17   there; right?

18   A.  Yes.

19   Q.  But there's only these couple little things you talked

20   about in -- or -- and read to the jury from the grand jury

21   testimony; correct?

22   A.  Correct.

23   Q.  There was a lot more that was said, wasn't there?

24   A.  Yes.

25   Q.  Did you review the entire grand jury testimony?

1    A.  Yes, I did.

2    Q.  Did the questions about the emails come up in the context

3    of what -- of how Ian Horn got these materials that he brought

4    to the grand jury pursuant to the subpoena?

5    A.  I don't remember what was said before or right after.

6    Q.  Okay.  Do you remember a discussion about two Redwelds

7    full of information that was brought?

8    A.  Yes.

9    Q.  And the -- they were labeled as -- well, maybe you

10   wouldn't know that.

11        Do you know what was labeled as grand jury exhibits?

12   Or did you participate in that?

13   A.  I do remember some Redwelds, but I don't remember exhibit

14   numbers or anything like that.

15   Q.  Okay.  And these Redwelds consisted of the documents that

16   Ian Horn had brought that had been provided by him -- to him

17   by Justin Herman; correct?

18   A.  I would slightly disagree with that, just in the sense

19   that Mr. Horn said that the bank records that were in those

20   Redwelds -- that he provided those.

21   Q.  He provided his own bank records?

22   A.  Yes.

23   Q.  Because Mr. Herman wouldn't have had any access to that;

24   right?

25   A.  I don't know.

1   Q.  So as I understand your testimony, you're saying Ian Horn

2   was asked for documents in a subpoena that he had, but he went

3   beyond those requirements and sought documents from someone

4   else, from Justin Herman.

5   A.  It appears so.

6   Q.  Okay.  So if he didn't have them, he could have said

7   "Don't have it"; right?

8   A.  Yes.

9   Q.  But, instead, during the course of this process, he sought

10  to collect and assemble documents that were provided to him by

11  his client that he did not have; is that accurate?

12  A.  Yes.

13          MR. JUBIN:  If I may have a moment, Your Honor, I may

14  be close to finished.

15          I -- I do have Ms. Hacker under subpoena, so she may

16  come back to see us at another point.

17          THE WITNESS:  I'll be here.

18          MR. JUBIN:  Thank you.

19      (Discussion held at counsel table.)

20  BY MR. JUBIN:

21  Q.  I'm showing you Exhibit 603, and this is --

22          MR. JUBIN:  Which page are we on, Danielle?

23          MS. VENEGAS:  5.

24  BY MR. JUBIN:

25  Q.  -- page 5.

 1              There's this language here that says "I'll do the

 2    best" -- this is Ian Horn, who is texting Justin Herman just a

 3    few days before he's supposed to show up at the grand jury;

 4    right?

 5    A.   No.  I thought he testified in January --

 6    Q.   No, this is --

 7    A.   -- 2019.

 8    Q.   I'm sorry.  I misread it.  It's November 9th of 2018.

 9              So this is roughly three weeks after he received the

10    subpoena; right?

11    A.   Yes.

12    Q.   And so it appears he's trying to respond, and he says,

13    "I'm pretty much on my own with the subpoena thing"; right?

14    A.   Yes.

15    Q.   And he says he'll do as best he can "by way of explanation

16    for the emails I have"; right?

17    A.   Yes.

18    Q.   "Obviously I can't explain why I don't have the Pacific

19    Transfer letters so I'll do what I can but I'm not getting a

20    whole lot of feedback from you"; right?

21    A.   Yes.

22    Q.   So he couldn't figure out why he didn't have these letters

23    that he was -- that he told you he had written; right?

24    A.   Well, it says, "I can't explain why I don't have the

25    Pacific Transfer letters."

 1   Q.  Right.  And one meaning of "I can't explain" is "I don't

 2   know"?

 3          MR. HEIMANN:  Your Honor, argument; also, calls for a

 4   conclusion.  The words are what they are.

 5          THE COURT:  It is what it is.  Sustained.

 6   BY MR. JUBIN:

 7   Q.  Are you familiar with Roger Daltrey and the Who?

 8          MR. HEIMANN:  Objection, Your Honor; relevance.

 9          MR. JUBIN:  I guess we'll all have to use our

10   knowledge of human affairs in deciphering what that might

11   mean.  I've just dated myself, I think.

12   BY MR. JUBIN:

13   Q.  You know, there were a number of emails that you prepared

14   to the jury over the course of your testimony, and some of

15   them were from Justin Herman to a woman named

16   Joslyn Claiborne.

17          Do you recall those?

18   A.  Yes.

19   Q.  And in some of those he made representations about what he

20   needed to do in order to obtain these corrections and new --

21   new letters to provide to Ms. Claiborne; correct?

22   A.  Yes.

23   Q.  And in one of those he said, "Oh, yeah, this clown" --

24   referring to Ian Horn -- "yeah, this clown finally got back to

25   me," that sort of thing; right?

1   A.   Something about that.

2   Q.   Do you remember that one?

3   A.   Uh-huh.

4   Q.   And there was another one where he said, "Oh, I finally

5   got ahold of my attorney," blah, blah, blah, blah, blah.

6        You didn't find any correspondence, emails, or texts

7   between Ian Horn and Justin Herman that might support those

8   statements, did you?

9   A.   I didn't see any.

10       MR. JUBIN:  Your Honor, I'm -- well, let me -- let me

11   take a look.  I'd like to be efficient for the jury and . . .

12   BY MR. JUBIN:

13   Q.   Would you agree with me that if you had found this

14   evidence of communications that you just said you didn't find,

15   that would be something you would want to present in this

16   case?

17   A.   Yes.

18       MR. JUBIN:  I don't have anything further at this

19   time.

20       MR. WARD:  Good afternoon, Inspector Hacker.

21                    **FURTHER CROSS-EXAMINATION**

22   **BY MR. WARD**:

23   Q.   As part of the prosecution team's resources in this case,

24   you've been able to issue search warrants; correct?

25   A.   Yes.

1   Q.   And -- and what does a search warrant allow you to do?

2   A.   In this case we executed a search warrant on a couple

3   residences, so we were able to search those residences for

4   evidence related to our case, and then we also executed some

5   search warrants on email service providers.

6   Q.   So you were able to execute a search warrant on a

7   residence and then seize things like phones, computers, and

8   search them; correct?

9   A.   Yes.

10  Q.   You were also -- the grand jury issued subpoenas; correct?

11  A.   Yes.

12  Q.   And you also went out and conducted interviews; correct?

13  A.   Yes.

14  Q.   And with interviews you can't necessarily compel someone

15  to speak with you, but you can go out and see if they're

16  willing to speak with you; correct?

17  A.   Yes.

18  Q.   And so you testified about an exhibit that was introduced,

19  and I -- I think all we have is the paper copy, so give me one

20  moment to grab that.

21          So this is Exhibit 427.

22          And this is a document that you testified about

23  earlier; correct?

24  A.   Yes.

25  Q.   And this is a limited liability company certification for

1   HBA Group; correct?

2   A.  Yes.

3   Q.  And HBA Group is of interest because they were one of the

4   top two dumpers of stock; correct?

5   A.  Initially, I was looking at them for the stock issuance,

6   so they received stock certificates of NuTech.  But I do

7   recall in Mr. Scoufis' chart that they were listed.

8   Q.  And they were -- they were the top one or two; correct?

9   A.  Yes.

10  Q.  Okay.  And you would agree that HBA Group were one of the

11  top two dumpers of NERG stock who made all the money; right?

12          MR. HEIMANN:  Asked and answered, Your Honor.

13          THE COURT:  Overruled.

14  A.  Can I clarify?  Could we just say that I recall that

15  they're in the top five?  I don't recall if they're the top

16  one or two.

17          MR. WARD:  Okay.

18  A.  (Continuing.)  But -- they sold a lot of shares of NuTech.

19  BY MR. WARD:

20  Q.  They sold a lot of shares of NuTech.  And that's of

21  interest in this case because you're investigating a pump and

22  dump of NuTech stock; correct?

23  A.  Yes.

24  Q.  Okay.  So you have this limited liability company

25  certification for HBA Group.

1          Did you do any more investigating into HBA Group?

2   A.  Yes.  I -- I interviewed Alexander Albert and

3   Nathan Hodges.

4          MR. WARD:  Okay.  All right.

5          I'm going to take this exhibit down.  You can . . .

6   BY MR. WARD:

7   Q.  You talked a lot about -- in your direct and your

8   cross-examination -- about the interviews you conducted with

9   Ian Horn; correct?

10  A.  Yes.

11  Q.  And you -- ultimately, you interviewed Ian Horn -- or at

12  least did recorded interviews of Ian Horn on two separate

13  occasions; right?  Once in October of '18 and then once in

14  May of '19; correct?

15  A.  Yes.

16  Q.  And in between those two interviews, Ian Horn testified to

17  the grand jury; correct?

18  A.  Yes.

19  Q.  And during none of those three-plus hours of recorded

20  interviews and not during his grand jury testimony -- he never

21  denied representing NuTech; correct?

22  A.  Mr. Horn never denied writing the opinion letters.

23  I think he told me he was not on retainer with NuTech.

24  Q.  I think that's a -- that's a more accurate way to

25  phrase it.

1    A.   Okay.

2    Q.   He never denied writing the opinion letters for NuTech;

3    correct?

4    A.   Correct.

5    Q.   So in those three hours broken up into two different days

6    of being asked about these opinion letters, he never denied

7    writing them?

8    A.   Correct.

9    Q.   Each one of the opinion letters says in the body of the

10   opinion letter that he is serving as special counsel to NuTech

11   Energy; correct?

12   A.   Yes.

13   Q.   And he never -- he never denied that that was true; right?

14   A.   He never denied anything in the opinion letter was -- was

15   not true, to my recollection, about what you're saying --

16   Q.   Right.

17   A.   -- that section.

18   Q.   And you asked him where he got the information from the

19   opinion -- for the opinion letters; right?

20   A.   Yes.

21   Q.   And he told you he talked to Kevin Trizna; correct?

22        MR. HEIMANN:  Objection; hearsay, no exception.

23        THE COURT:  Sustained.

24   BY MR. WARD:

25   Q.   Now, he also told you and testified to the grand jury that

1   his computer crashed and that's why he didn't have the opinion

2   letters; correct?

3              MR. HEIMANN:  Objection; misstates the testimony.

4              THE COURT:  Sustained.

5   BY MR. WARD:

6   Q.  Ian Horn told you during his recorded interview that his

7   computer crashed; correct?

8              MR. HEIMANN:  Objection; hearsay, no exception.

9              THE COURT:  Sustained.

10  BY MR. WARD:

11  Q.  I'm going to show you what's been marked as Government's

12  Exhibit 605, and that has been admitted into evidence, and

13  this is a portion of Mr. Horn's grand jury testimony.  And

14  when asked why he didn't have his email, he said, "I had a

15  crash of my computer at the end of 2016 that wiped out

16  anything basically that wasn't saved, which was,

17  unfortunately, my emails."  Correct?

18  A.  Yes.

19  Q.  And that was consistent with what Mr. Horn had told you

20  during his interviews; correct?

21  A.  Yes.

22  Q.  And when you went to interview Ian Horn, you showed up at

23  his house unannounced; correct?

24  A.  Yes.

25  Q.  You identified yourselves as investigative agents of the

1  Government?  You probably identified yourself as a postal

2  inspector.  Correct?

3  A.  Yes.  Or I might have said "inspector" sometimes.

4  Q.  Sure.  But it was clear to him that you were agents of the

5  Government; right?

6  A.  Yes.

7  Q.  You're armed when you go out and do an investigation like

8  that; right?

9  A.  Yes.

10  Q.  You advised Mr. Horn before you started talking to him

11  that you were going to record the interview; correct?

12  A.  Yes.

13  Q.  All of that conveys a sense of seriousness to the person

14  you're investigating; right?  Or to the person you're

15  interviewing.  I'm sorry.

16  A.  I would assume so.

17  Q.  And in the beginning of your interviews, before you would

18  ask him questions -- I guess, it wasn't in the very beginning,

19  but you allowed him to look at all of the letters you were

20  asking him about before you asked your questions; right?

21  A.  Yes.

22  Q.  And he took several minutes to read through the letters

23  you were asking him about before you started asking; correct?

24  A.  Yes.

25  Q.  And he never denied writing the letters?

1   A.  Correct.

2   Q.  You also said that you went and interviewed Chuck Winters;

3   correct?

4   A.  I did.

5   Q.  And when you interviewed Chuck Winters, he showed you the

6   tool that he had built; correct?

7   A.  No.  Not that I recall.

8   Q.  I'm going to ask that you take a look at something that

9   has not been admitted but that's been marked as

10  Charles Winters or CW Exhibit B.

11          Do you recognize the item there in the photo?

12  A.  I've seen it before but not from Mr. Winters.

13  Q.  Where have you seen the item in this photo?

14  A.  Well, I don't know if it's the specific one in this photo.

15  But when Agent Pikas and I traveled up to Gillette to conduct

16  some interviews, we were shown something similar to this in

17  Gillette.

18  Q.  Okay.  And when you say "similar," how -- how similar?

19  A.  It was a metal cylindrical item like this.  I couldn't

20  tell you --

21  Q.  Did it have the same --

22  A.  -- yeah, specifics.

23  Q.  Does this look like the -- a photo of the tool that

24  Chuck Winters built and that Mike Perry testified he paid to

25  purchase 12 or 15 of?

1              I can't remember exactly the number.

2    A.  I don't know that.  I didn't do any type of analysis of

3    the tool.  I never, you know, held it or was that involved

4    with it.

5    Q.  The tool is central to your investigation in this case;

6    right?

7    A.  No.  I would say that I was focused more on the stock and

8    the money movement than the tool.

9    Q.  Okay.  When you -- when you saw something that looked like

10   this in Gillette, where -- where were you in Gillette

11   physically?

12   A.  We were out -- I couldn't tell you where it was.  It was

13   out in the middle of nowhere.

14   Q.  Like at a well site?

15   A.  Yes.

16   Q.  Okay.  And when you saw the system that looked like this,

17   what did you learn about it?

18   A.  Nothing.  Someone -- I -- I believe it was maybe Red Luken

19   just pointed it out, and it was up in the rafters -- you know,

20   I never saw it in any well or anything.  It was up in some

21   storage building is what I recall.

22   Q.  Okay.  And so he -- when it was pointed out to you, was it

23   pointed out as, "Hey, there's the IGOR tool"?

24   A.  I don't recall what it was called, other than a tool.

25              MR. WARD:  All right.  I'd move for the admission of

 1    CW Exhibit B.

 2           MR. HEIMANN:  Lack of foundation, Your Honor.

 3           THE COURT:  Sustained.

 4    BY MR. WARD:

 5    Q.  Are you aware that Charles Winters has a patent for the --

 6    the tool that he built?

 7    A.  I remember that there's discussions about a patent.

 8    Whether or not he had one or not I don't recall ever

 9    finding out.

10    Q.  Have you seen the copy of the patent that I provided to

11    Mr. Heimann?

12    A.  No.  I haven't seen it, I mean, in the past couple

13    of weeks or anything.

14    Q.  Okay.  From -- it sounds like when you went up to Gillette

15    you met with Red Luken.  And you'd agree that he's a field

16    guy; right?

17    A.  Yes.

18    Q.  And that's how he presents himself; correct?

19    A.  Yes.

20    Q.  And you were here for Mike Perry's testimony when he said

21    that Red was still working in the field for him; right?

22    A.  Yes.

23    Q.  And that he pays him $3500 a month to work in the field?

24    A.  I don't remember the amount, but, yes, something he pays

25    him.

1  Q.  Were you -- you heard Alex Scoufis yesterday testify that

2  the overarching purpose of this nation's securities law is

3  truthful disclosure to give investors the information they

4  need to make intelligent trades?

5          Do you recall that?

6  A.  I was in here for his testimony, but I don't specifically

7  recall that.

8  Q.  Okay.  Do you agree with that, that the overarching

9  purpose of the securities law in this country is to ensure

10 that investors have truthful information to make investment

11 decisions based on?

12         MR. HEIMANN:  Objection; irrelevant.

13         THE COURT:  Sustained.

14 BY MR. WARD:

15 Q.  Do you agree that part of a pump and dump is putting out

16 false information for investors to rely on?

17 A.  Yes.

18 Q.  Okay.  And without the putting out of false information

19 for investors to rely on, you don't have a pump and dump;

20 right?

21 A.  I would disagree, in the sense that it's not just press

22 releases that can facilitate a pump and dump.

23 Q.  Well, but you don't have a pump and dump if you don't put

24 out false information to the public; right?

25 A.  I would say that you can put out false information through

19-CR-26-ABJ          HACKER - FURTHER CROSS - WARD          Vol. IX-1537
21-CR-14-ABJ

1    other channels than just through press releases.  I mean,

2    posting documents, filings, attorney opinion letters on

3    OTC Markets, those were all available to the public, and they

4    contained things that were false.

5    Q.  My question, though, isn't about press releases.

6    I haven't used the word "press releases."

7           I'm saying, for a pump and dump, that a pump and dump

8    requires putting out false information to the public.  Right?

9    A.  Yes.

10   Q.  Okay.  And throughout this trial we've seen number --

11   numerous press releases; right?

12   A.  Yes.

13   Q.  Okay.  And the press releases were put out to the public

14   specifically for the purpose of the public to rely on those

15   press releases?

16   A.  Yes.

17   Q.  Okay.  And you're aware who was responsible for those

18   press releases, aren't you?

19   A.  I'm aware of some of the people involved in the press

20   releases.  I couldn't tell you, you know, for each one.  But

21   yes.

22   Q.  Well, you specifically investigated a woman named

23   Marisol Elwell; correct?

24   A.  Yes.

25   Q.  And her email address is ghostwriter4hire@ymail.com;

1    right?

2    A.   Yes.

3    Q.   Okay.  And ghostwriter4hire@ymail.com forwarded to Sonia

4    Hacker every single email having to do with her writing every

5    single press release that we've heard about in this trial;

6    correct?

7    A.   Correct.  That was her job.  She was paid to do that.

8    Q.   She was a professional who wrote press releases; right?

9    A.   Yes.

10   Q.   Okay.  And she forwarded to Sonia Hacker all of her

11   emails; correct?

12   A.   Yes.  I asked her to.

13   Q.   You asked her to forward -- and it wasn't like she just

14   turned them over to the Government?  She emailed them to

15   soniahacker@doj.gov or whatever your email address is; right?

16   A.   Yes.

17   Q.   They were sent specifically to you?

18   A.   Yes.

19   Q.   Okay.  And those -- that -- the emails that she sent you

20   showed the back-and-forth for all of the information she was

21   receiving in order to write those press releases; correct?

22   A.   Yes.  And she also had phone calls with people, is what

23   she told us.

24   Q.   Okay.  And in the emails you could see who was directing

25   the release of the press releases; correct?

1  A.  I could see who was involved in -- in providing

2  information to Marisol Elwell.

3  Q.  All of this must have been a pretty important part of your

4  investigation in this case.  Right?

5  A.  Yes.

6  Q.  I mean, you'd agree with me that those emails showed who

7  was behind the press releases?

8  A.  They show the people involved in drafting them, writing

9  them, providing the information, yes.

10  Q.  Okay.  And those people were who?

11  A.  Bob Mitchell and Tony Papa.

12  Q.  Okay.

13  A.  Oh, and I -- there is -- sorry.  May I?

14  Q.  No.  Just wait for a question, please.

15          The -- the people involved in all of the emails

16  having to do with the press releases were Bob Mitchell,

17  Tony Papa, and Mike Baron was involved, as well; correct?

18  A.  Yes.  He was some -- he was on some of the email chains.

19  Q.  And in the email chains, if Tony Papa said a press release

20  should go out tomorrow, Marisol Elwell would email, you know,

21  Bob Mitchell and Mike Baron and say "A press release needs to

22  go out tomorrow"; right?

23  A.  Yes.

24  Q.  So Tony Papa was really the one who was -- was the boss of

25  the press releases; correct?

1           MR. HEIMANN:  Objection; improper characterization.

2           THE COURT:  Sustained.

3   BY MR. WARD:

4   Q.  And in all of those emails about the press releases

5   related to NuTech, there was never any mention of

6   Chuck Winters; correct?

7   A.  Correct.

8   Q.  All right.  I'm going to show you what I've identified as

9   CW-P.1.  This has not been admitted.

10          Can you take a look at this document?

11          And I guess I'm -- I'll scroll for you since you

12  don't have the ability to up there I don't think.

13     (Discussion held between counsel.)

14  BY MR. WARD:

15  Q.  And so this is an email to you from ghostwriter4hire --

16  ghostwriter@yahoo.com; correct?

17  A.  Yes.

18  Q.  And it is a forward from Marisol Elwell of emails going

19  back and forth about press releases; correct?

20  A.  Yes.

21          Sorry.  It was hard for me to see the multiple

22  messages.

23          Yes, it is.

24          MR. WARD:  I'd move for the admission of CW-P.1.

25          MR. HEIMANN:  No objection.

1          THE COURT:  CW-P.1 is received.

2      (Defendant's Exhibit CW-P.1 received into evidence.)

3  BY MR. WARD:

4  Q.  And in this email ghostwriter4hire@ymail says "Tony wants

5  an announcement regarding our plan to uplist"; correct?

6  A.  Correct.

7  Q.  And that is referring to a press announcement about NERG

8  having an imminent uplisting to the Nasdaq; correct?

9  A.  I recall the -- the one you're referring to.  I just don't

10  know if the dates match up.

11  Q.  Right.  But in this email when they're talking about plans

12  to uplist, that would be referring to plans to be listed on

13  the Nasdaq versus listed on the -- just the OTC Markets;

14  right?

15  A.  I don't know what they're intended to say with just

16  "uplist."

17  Q.  Well, based on all of the investigation that you've done

18  in this case and all the work you've done in this case,

19  what -- what would you think that "uplist" is referring to?

20          MR. HEIMANN:  Calls for a conclusion, asked and

21  answered.  She doesn't know.

22          THE COURT:  Sustained.

23  BY MR. WARD:

24  Q.  You're aware that Tony Papa has ties to the Canadian

25  Mafia; correct?

1  A.  I don't have any independent knowledge of that.  I've

2  heard it through this investigation.

3  Q.  And what about ties between Tony Papa and the companies

4  that made -- you know, the top -- top couple companies that

5  dumped the stock in this case?

6  A.  I think through my investigation I've been told that

7  Mike Baron was connected to Tony Papa somehow, and Mike Baron

8  is part of HBA Group and was also on the Skype chats.  So I --

9  that's all I know for sure.

10  Q.  Okay.  Is it of interest to you?

11          MR. HEIMANN:  Objection; relevance.

12          THE COURT:  Sustained.

13  BY MR. WARD:

14  Q.  You have a person here who is clearly involved in the

15  release of all the NERG press releases; correct?

16  A.  Yes.

17  Q.  And that's Tony Papa?

18  A.  Yes.

19  Q.  Okay.  Now, it sounds like you have some indications that

20  he may be connected to the people who dumped the stock;

21  correct?

22  A.  Yes.

23  Q.  Okay.  But you sound very unsure of what that all means,

24  like you stopped investigating.

25  A.  No.  Tony Papa is not in the US, so I couldn't obtain

1   records for SBM Securities to -- you know -- to prove things.

2   Q.   So if someone outside of the United States commits a crime

3   within the United States, there's nothing that can be done?

4   A.   No.  That's not what I meant.

5   Q.   Okay.  Well, then, I guess I don't understand what you

6   mean.

7   A.   That when I tried to track down the SBM records I didn't

8   get anywhere.

9   Q.   Who paid Marisol Elwell?

10  A.   Bob Mitchell.

11  Q.   Who paid for the conference call?

12  A.   Steffan Dalsgaard.

13  Q.   Wasn't Steffan Dalsgaard the company that hosted the

14  conference call?  Who paid Steffan Dalsgaard?

15  A.   I don't know.

16  Q.   Wouldn't that be important to know?

17  A.   Well, we -- I interviewed Mr. Dalsgaard and asked him

18  about the conference call and him paying for it, and I think

19  he said he thought he was going to get reimbursed by NuTech

20  but he didn't.

21  Q.   So Chuck Winters didn't pay Marisol Ellswell [sic];

22  correct?

23  A.   I don't believe so.

24  Q.   And he wasn't involved in any of the emails that preceded

25  each of the press releases with ghostwriter4hire; correct?

```
19-CR-26-ABJ       HACKER - FURTHER CROSS - WARD       Vol. IX-1544
21-CR-14-ABJ
```

1   A.  Correct.

2   Q.  Chuck Winters didn't pay for the conference call; correct?

3   A.  Not to my knowledge.

4   Q.  He didn't participate in the conference call; correct?

5   A.  He didn't speak on it.  I don't know if he listened in.

6   Q.  Well, you have no information that would indicate he did

7   listen in; correct?

8   A.  No.

9   Q.  Who paid for the email blasts?

10  A.  I don't know.

11  Q.  Again, wouldn't -- wouldn't that be important to know in a

12  pump and dump investigation?

13  A.  I would like to know.

14  Q.  But you can't tell the jury who paid for it?

15  A.  No, I can't.

16        MR. WARD:  May I have just a moment, Your Honor.

17        THE COURT:  You may.

18     (Discussion held at counsel table.)

19        MR. WARD:  I'm going to show Inspector Hacker

20  something that hasn't been admitted.

21  BY MR. WARD:

22  Q.  Inspector Hacker, in your investigation of this case, you

23  came across an email that has been admitted into evidence from

24  kevintrizna@nutech where he was talking about attending his

25  sister's wedding; correct?

1    A.  Yes.

2    Q.  Okay.  Do you -- do you recall that and the importance of

3    that?

4    A.  Yes.

5    Q.  Okay.  And that email was actually so important that you

6    did some specific follow-up investigation just specifically

7    about that email and the events in that email; correct?

8    A.  Yes.

9    Q.  And what you did is you saw this email from kevin@nutech

10   saying that he was going to his -- an event for his sister in

11   DC; correct?

12   A.  Yes.

13   Q.  And you knew that Kevin had been claiming that he never

14   used the kevin@nutech email; right?

15   A.  Yes.

16   Q.  And so what you wanted to do was you wanted to figure out

17   if that was really Kevin sending that email from kevin@nutech;

18   correct?

19   A.  Yes.

20   Q.  Okay.  So what you did is you called up Kevin Trizna on

21   the phone and you asked him some very specific questions;

22   right?

23   A.  Yes.

24   Q.  And the only purpose of those questions was to determine

25   whether Kevin was, in fact, in DC at an event for his sister

 1   at the time of the conference call; right?

 2   A.  Yes.

 3   Q.  And you created a memorandum of that very brief interview;

 4   correct?

 5   A.  Yes.

 6   Q.  And that's what is in front of you on the screen as Herman

 7   Exhibit C; correct?

 8   A.  Yes.

 9   Q.  Okay.

10        MR. WARD:  I'd move for the admission of Herman

11   Exhibit C.

12        MR. HEIMANN:  Objection.  This is rank hearsay.

13        THE COURT:  Sustained.

14        MR. WARD:  The results of -- I guess I object to the

15   characterization of it as rank but . . . the --

16        THE COURT:  I'll sustain that objection.

17   BY MR. WARD:

18   Q.  The memorandum -- when you -- when you called Kevin and

19   asked him about where he was at the time of the conference

20   call and who his siblings were, he told you he was attending

21   his sister-in-law's 50th birthday party in the DC area;

22   correct?

23        MR. HEIMANN:  Objection; hearsay.

24        THE COURT:  Sustained.

25   ///

1   BY MR. WARD:

2   Q.   After you conducted this follow-up interview and

3   investigation to determine whether or not kevin@nutech -- or

4   Kevin Trizna was using the kevin@nutech email, the results of

5   that investigation were undoubtedly he absolutely was;

6   correct?

7           MR. HEIMANN:  Calls for a conclusion and argument.

8           THE COURT:  I think I'll overrule the objection.  She

9   can state her conclusion.

10  A.   My conclusion was -- on the email in question that was

11  attached to this MOI -- that it was Kevin who sent it.

12  BY MR. WARD:

13  Q.   Right.  And that was contrary to everything that Kevin had

14  been telling you about whether or not he was using the email;

15  right?

16  A.   Well, as I recall, he told us when we first interviewed

17  him that he had access to the email and that Bob Mitchell had

18  given him the password and created it for him.

19  Q.   But he also told you that he never sent emails from it;

20  right?

21  A.   I don't recall that statement specifically.

22          What I remember is I showed him specific emails

23  dealing with the -- the Russian offer and that communication

24  back and forth and Mr. Trizna said he'd never seen those

25  before and that it wasn't him responding or -- or dealing with

```
19-CR-26-ABJ        HACKER - FURTHER CROSS - WARD        Vol. IX-1548
21-CR-14-ABJ
```

1    that.

2    Q.  Well, you were sitting right there at the table when he

3    testified in court that he never sent emails from that email

4    account; right?

5    A.  Yes --

6              MR. HEIMANN:  Your Honor, I object to this line of

7    questioning.  We've had Mr. Trizna testify; he's been

8    cross-examined.

9              This is cumulative and Mr. Ward's asking these

10   confusing questions -- if it's about testimony, if it's about

11   the interview, if it's about this interview -- so I object to

12   this line of questioning, Your Honor.

13             MR. WARD:  The witness certainly does not seem

14   confused to me.

15             THE COURT:  I'll overrule the objection.

16   A.  (Continuing.)  Yes, I was sitting in the courtroom.

17   BY MR. WARD:

18   Q.  And you must have known right then that his testimony was

19   false.

20   A.  I thought he was mistaken.

21             MR. WARD:  Those are all the questions I have,

22   Your Honor.

23             MR. JUBIN:  Your Honor, looking at the time, I'm

24   wondering if now maybe we could eat lunch.

25             MR. HEIMANN:  I have like five minutes.

 1            MR. FLEENER:  Do you have any redirect?

 2            MR. JUBIN:  I do.

 3            MR. FLEENER:  How long is it going to be?

 4            I'm just trying to --

 5            MR. JUBIN:  Five minutes.

 6            MR. FLEENER:  Can we go on?

 7            I'm going to sit.  I need -- I need to leave in about

 8   10 or 15 minutes, Judge.

 9            THE COURT:  Go ahead.

10                    **REDIRECT EXAMINATION**

11   **BY MR. HEIMANN:**

12   Q.  Inspector Hacker, at the very end of Mr. Fleener's

13   cross-examination, he asked you a question about exhibits that

14   had been produced during this trial.

15            And if I understood the question and answer

16   correctly, it -- it implied that some of the exhibits we've

17   provided to the jury actually came from Justin Herman in

18   response to a subpoena.

19            Over the break did you have a chance to check our

20   witness list -- or our witness list -- our exhibit list and to

21   see where we got the various exhibits that we produced?

22   A.  Yes.

23   Q.  Did any of them come from Justin Herman through the

24   subpoena?

25   A.  No.

1  Q.  There was a point during Mr. Ward's cross-examination

2  where you said "Wait.  May I?"  Do you remember that?

3  A.  Yes.

4  Q.  Was there something you needed to add or change at that

5  point to your testimony?

6  A.  Yes.

7  Q.  What was that?

8  A.  He was asking me about emails involving the press releases

9  and who was on them, and I wanted to clarify that -- that we

10  also have emails between Justin Herman and Bob Mitchell

11  editing press releases.

12  Q.  That's two email that we've put in as exhibits; right?

13  A.  Yes.

14  Q.  The last thing I wanted to do -- during Mr. Jubin's

15  cross-examination, there was some talk about privilege review

16  related to Mr. Mills.  I wanted to be sure there's no

17  confusion here.

18          The investigation involved a privilege review by

19  agents and Government attorneys; right?

20  A.  Yes.

21  Q.  Whatever Mr. Jubin was talking about regarding Mr. Mills,

22  that would have -- that's completely separate?

23          MR. JUBIN:  Your Honor, I object.  It's -- I believe

24  it calls for a corrective instruction.

25          THE COURT:  Well, I'll -- I'll give one.  Hopefully,

1    I get it right; you object if I don't.

2           As previously explained to the jury in this case,

3    when this material came in, a separate group from the

4    prosecutors, independent of the prosecutors, was assembled

5    composed of attorneys in the -- within the Justice Department.

6    A sort of Chinese wall or wall was created between those

7    persons who were reviewing attorney privilege issues for the

8    Justice Department and those persons who had responsibility,

9    like Mr. Heimann, to prosecute the case.

10          They did that work to review -- the privilege review

11   committee independently reviewed those materials, and then,

12   following that, the material -- the matter was submitted to

13   the Court and, ultimately, material was afforded to the

14   prosecutor to use in connection with this case.

15          Mr. -- the testimony in this matter reflects that

16   Mr. Horn in the subpoena, you'll recall, was requested to

17   submit a privilege log.  What that is, materials that his side

18   of the case would consider to be privileged materials.  As an

19   attorney, of course, he had responsibility to his client in

20   that regard.

21          And, apparently, the arrangement that may have

22   occurred -- we don't know now because this witness doesn't

23   know Mr. Miller or the scope of his activity or

24   responsibilities in this matter.  But it appears that --

25   anyway -- one of the theories is that Mr. Miller was to either

 1    prepare that log or was to make a determination as to what

 2    would be submitted as privileged.

 3              That's as far as I can go.

 4              MR. JUBIN:  Thank you, Your Honor.

 5              I -- I think it was important to mention Mr. Horn's

 6    duty and responsibility to his client, which was what the

 7    questioning was suggesting isn't in existence.

 8              MR. HEIMANN:  Your Honor, I -- I meant no such

 9    suggestion.

10              I have no other questions.

11              THE COURT:  Very well.

12              MR. FLEENER:  Can we break, Judge?  I'm sorry.

13              THE COURT:  Very well.  I'm sorry that I've put you

14    in that situation.

15              Very well.  We will stand in recess until -- what

16    time, Mr. Fleener?

17              MR. FLEENER:  Maybe -- I would -- if now is a good

18    time for lunch, maybe 2:30, I guess, Judge.

19              And -- is that okay?  Or I can maybe -- 2:15?

20              THE COURT:  2:15.

21              MR. FLEENER:  Roger.

22              THE COURT:  Ladies and gentlemen, we'll stand in

23    recess until 2:15.

24              THE COURTROOM DEPUTY:  All rise.

25         (Proceedings outside the jury's presence at 1:09 p.m.)

19-CR-26-ABJ                                              Vol. IX-1553
21-CR-14-ABJ

 1          THE COURT:  When we finish with Sonia Hacker, what

 2   more do we wish to accomplish today?

 3          MR. JUBIN:  Mr. Fleener has an opening; right?

 4          THE COURT:  Well, you have -- if the Government at

 5   that point says the Government rests, we have motions that

 6   need to be heard.

 7          MR. JUBIN:  Right.

 8          MR. FLEENER:  Judge, I would propose -- I mean,

 9   I still think we're -- our witness list is down to probably

10   three people.  Or maybe four.

11          I still think that -- what I would propose is the

12   United States close, we make a motion and we adjourn for the

13   day, I open on Monday with the defense case, and we will

14   proceed and be done probably Tuesday or Wednesday.

15          MR. JUBIN:  My only concern is my witness by Zoom

16   who's in Florida who is -- has a really hard time in the next

17   two weeks being available due to business commitments.

18          He's a small business owner, and he's installing a

19   bunch of tanks that have come from overseas, and he's got time

20   this afternoon that works.

21          Of course, I don't know how long Mr. Fleener's

22   opening is or if we would get to it but --

23          THE COURT:  Got it.

24          MR. JUBIN:  Or whether the Court would grant our

25   motions and we'd be done.

 1            THE COURT:  All right.

 2            Well, when we get back, I assume that we will finish

 3  up fairly quickly with Ms. Hacker and we will excuse the jury,

 4  send them home.

 5            MR. JUBIN:  Okay.

 6            THE COURT:  If there's nothing further at this

 7  moment, we'll stand in recess until 2:15.

 8       (A recess was taken from 1:12 p.m. to 2:20 p.m.)

 9            THE COURTROOM DEPUTY:  Court is now in session.

10            THE COURT:  Mr. Jubin, you had something you wanted

11  to bring up?

12            And I see that Mr. Fleener is back with us.

13            MR. FLEENER:  Thank you, Judge.  I do appreciate the

14  break.

15            THE COURT:  I understand.

16            MR. JUBIN:  Judge, I don't think this is anything

17  that can't be remedied, necessarily.  But as I was getting on

18  the elevator with the folks on -- on Mr. Horn's

19  representational team, Mr. Heimann came up and began berating

20  me and saying I was underhanded for having asked

21  Inspector Hacker whether she contrived to avoid learning the

22  facts.

23            And before I had a chance to even respond, jurors

24  started coming out of the -- through the metal detector there.

25  And my investigator was saying, "Eric, jurors, jurors."  And

1   it continued.

2        I don't know what they heard; I don't know if they're

3   going to report something to you.  But, ultimately, the

4   elevator door shut and so -- I don't know if a cautionary

5   instruction might be warranted, something like, "Well, if you

6   see any interaction between the lawyers, you should disregard

7   it" or something to that effect.

8        Thank you.

9        THE COURT:  All right.

10        Well, so far we've avoided a singleton issue here in

11   town, in the courtroom, and now this.

12    (Proceedings within the jury's presence at 2:22 p.m.)

13        THE COURT:  Thank you, ladies and gentlemen.  Please

14   be seated.

15        I just have a brief comment.  If any of you have

16   witnessed or heard or overheard any conversations by lawyers

17   or witnesses outside of this courtroom, please disregard the

18   same.  They are not evidence.

19        Are we prepared to proceed?

20        Ms. Hacker.

21        MR. HEIMANN:  Your Honor, the Government had

22   passed -- or finished its redirect.

23        THE COURT:  Thank you.

24        Ms. Hacker, would you please take the witness stand.

25        MR. JUBIN:  Good afternoon, ladies and gentlemen.

19-CR-26-ABJ    HACKER - FURTHER RECROSS - JUBIN    Vol. IX-1556
21-CR-14-ABJ

1    Good afternoon, Ms. Hacker.

2    **FURTHER RECROSS-EXAMINATION**

3    **BY MR. JUBIN**:

4    Q.  Mr. Ward asked you questions about whether or not you had

5    seen a particular tool.  Do you recall that?

6    A.  The one he showed me on the screen, yes.

7    Q.  Right.  Did you see any other documents that might have

8    been provided by the parties that indicated some sort of

9    defense to the claims that the Government is making?

10   A.  I don't understand the question.

11   Q.  Did -- did you review a 47-page letter correcting

12   Ian Horn's grand jury testimony provided to the Government

13   before he testified -- or before he was indicted for perjury?

14   A.  Could you repeat that again?  I just want to make sure I'm

15   hearing which transcript you're talking about.

16   Q.  Did you review a 47-page letter that was provided by me to

17   the Government correcting his grand jury testimony before he

18   was indicted for perjury?

19   A.  No.

20   Q.  That wasn't shared with you?

21   A.  No.

22   Q.  Mr. Ward talked about a pump and dump, and I think we all

23   know what that is by now.

24        And you made, in your testimony, several references

25   to the indictment in terms of what that pump and dump

1   represented and how -- the manner and means that would

2   establish the pump and dump; right?

3           Do you recall that?

4   A.  In my testimony?

5   Q.  Yes.

6   A.  I don't recall that.

7   Q.  Okay.  Occasionally, when Mr. Heimann would ask you a

8   question, he would preface it with "Now let's talk about --

9   this is related to Overt Act No. whatever," and he would ask

10  you a question.

11          Do you recall that?

12  A.  Yes.  Yes.

13  Q.  Okay.  And so what -- what's charged here is a conspiracy,

14  and so it's really -- some of the charges are conspiracy.  So

15  what is really important as an investigator is to find out who

16  shared the criminal objective of the conspiracy; right?

17  A.  Yes.

18  Q.  And in this case it's -- it's the objective -- the

19  purpose, as the indictment states, is to pump and dump

20  securities; correct?

21  A.  Yes.

22  Q.  And so what you would search for is evidence of a shared

23  criminal objective, evidence that a person knew the specific

24  purpose of the conspiracy; right?

25  A.  Yes.

19-CR-26-ABJ                                          Vol. IX-1558
21-CR-14-ABJ

1   Q.  And evidence that the person agreed to that purpose;

2   right?

3   A.  Yes.

4   Q.  And evidence that the person participated in intending to

5   accomplish that specific purpose; right?

6   A.  Yes.

7              MR. JUBIN:  I have nothing further.  Thank you.

8              MR. HEIMANN:  I have nothing else, Your Honor.

9              THE COURT:  You may step down.

10             MR. HEIMANN:  Your Honor, the Government rests.

11             THE COURT:  Thank you.

12             The Government has now rested in presenting its case

13  in chief in this matter.

14             The next matters that go before the Court do not

15  require the presence of the jury here in court, and for that

16  reason I will release the jury and let you have the weekend to

17  recoup and regain your legs since they haven't been used for a

18  week and, hopefully, to rest and be ready to hear the rest of

19  the evidence when you return.

20             Again, I would remind you that you should not discuss

21  this case with anyone or permit anyone to discuss it with you,

22  not talk about the case with anyone, nor read or listen to

23  anything touching on this case in any way -- including news

24  broadcasts, television reports, or newspapers -- and if anyone

25  should attempt to talk to you about it, please avoid that

 1   conversation and report it to us if they persist in any way.

 2         Don't attempt to learn about the case from anybody

 3   you would consider to be an authority because that would be

 4   gathering information outside of the courtroom that you either

 5   could not share with your fellow jurors or would possibly

 6   influence your decision in this matter and don't attempt to

 7   learn about the case from sources such as the Internet or

 8   textbooks or encyclopedias or dictionaries or anything else.

 9         And, finally, do not make up your minds about what

10   the verdict should be during the trial.  Keep an open mind,

11   remembering that the Government has the burden of proving its

12   case beyond a reasonable doubt in this matter and that each of

13   these defendants is presumed innocent until the evidence, all

14   of the evidence, convinces you otherwise.

15         I think we'll start again on Monday at 9:30 in the

16   morning.

17         Drive carefully, eat well, get a little sleep over

18   the weekend.  Enjoy your families.  And we'll be looking

19   forward to gathering again at 9:30 on Monday morning.

20         We'll stand in recess until that time.

21         THE COURTROOM DEPUTY:  All rise.

22     (Proceedings outside the jury's presence at 2:32 p.m.)

23         THE COURT:  Please be seated.

24         I assume the parties wish to present their motions at

25   this time for judgment of acquittal.

1            MR. FLEENER:  Yes, sir, Your Honor.

2            Under the provisions of Rule 29 of the Federal Rules

3    of Criminal Procedure, Defendant Herman moves for a judgment

4    of acquittal on Counts Thirteen through Nineteen.

5            Count Thirteen is conspiracy to commit securities

6    fraud.  Count Fourteen is securities fraud, aiding and

7    abetting.  Count Fifteen is conspiracy to commit wire fraud.

8    Counts Sixteen through Nineteen is aggravated identity theft.

9    And we believe the United States hasn't met its burden to go

10   forward.

11            Thank you, Judge.

12            THE COURT:  Very well.

13            MR. WARD:  Your Honor, on behalf of Mr. Winters, I'd

14   make a similar motion under Rule 29 as to Counts Thirteen,

15   Fourteen, Fifteen, Sixteen, and Seventeen, as Mr. Winters is

16   not charged in Counts Eighteen and Nineteen.

17            Thank you.

18            MR. JUBIN:  Your Honor, on behalf of Defendant

19   Ian Horn, he moves the Court for a judgment of acquittal

20   pursuant to Rule 29(a).  There's been no evidence whatsoever

21   that Mr. Horn knew of the purpose of whatever he might have

22   done and that that purpose was a pump and dump stock scam.

23            He didn't own any shares; he didn't sell any shares;

24   he didn't buy any shares.  There's no indication he was

25   involved in any way in any kind of transactions involving

1    shares.  But primarily that -- there's been no evidence that

2    he even knew about it.

3          So with respect to Counts -- I think those are

4    Thirteen, Fourteen, and Fifteen -- he moves for a verdict

5    of -- a judgment of acquittal on those counts.  And with

6    respect to the perjury counts, he simply requests that

7    judgment as the evidence is insufficient to move forward.

8          Thank you.

9          THE COURT:  Counsel, how do you wish to proceed?

10         MR. HEIMANN:  I am prepared to describe the evidence

11   that would sustain a conviction on each count, Your Honor.

12         THE COURT:  Very well.

13         Thank you.

14         MR. HEIMANN:  So, Your Honor, if we start with

15   Count Thirteen, that's the conspiracy count charging

16   securities fraud.

17         The Court will recall the exhibit we put in, 28.1,

18   that provided the time line in November of 2015 showing email

19   blasts followed by manipulative trades, all of which were

20   arranged via Skype chat involving Justin Herman and the

21   charged coconspirator Bob Mitchell, Kada Mesli, Mike Baron,

22   Tony Baker.

23         Those chats show a clear attempt to do a manipulative

24   trade as described by Mr. Scoufis at the same time that

25   promotional email blasts are going out hyping the opening

19-CR-26-ABJ          ARGUMENT - HEIMANN          Vol. IX-1562
21-CR-14-ABJ

1    price and the closing price that has been set by the

2    manipulative trading arranged via that Skype chat.

3          We know that that -- the sales continued through

4    January 29th and that transactions -- or we have Wyoming

5    investors who came in and purchased during that time period.

6    Mr. Scoufis also reported the blue sheets describe purchases

7    in Wyoming at that time.

8          The deceptive trading along with the deceptive

9    promotional emails in that first pump and dump period show

10   deceptive practices going out to the public.

11         Mr. Winters is the person making the trades talked

12   about in the Skype chat.  That coordination shows an agreement

13   between Mr. Herman, Mr. Winters, and others to commit the

14   stock fraud, to put the deceptive information into the public

15   and then sell the shares.

16         Prior to that period, we know that Justin Herman and

17   Chuck Winters, via email, created false documents that were

18   submitted to Pacific Stock Transfer Company in order to

19   acquire free-trading shares of NuTech, the same free-trading

20   shares that they then sold when they were manipulating the

21   price.

22         We know they altered bank documents -- and when I say

23   "they," I mean Justin Herman would ask Chuck Winters to fix a

24   document or to add a date and he would change a number.  That

25   was then returned to Mr. Herman and sent to Pacific Stock

1    Transfer.

2          They also created brand-new contracts or documents by

3    putting the signatures of David Rodgers and Gordon Pardy onto

4    an assignment of wells and leases that never happened and onto

5    a statement of nonaffiliation, all of which were required to

6    get the free-trading shares, thus deceiving the transfer

7    company and demonstrating, again, the kind of coordinated

8    activity that proves interdependence and proves the agreement

9    that they had, all of it aimed to pump and dump NuTech after

10   they got the free-trading shares.

11         If we go one step further back, we see the movement

12   of money.  We see money coming out of Wyoming from

13   Nadine McCreery to Bob Mitchell being combined with money from

14   Mike Perry that's then sent to Ian Horn, and we know that

15   Mr. Horn received the money and then distributed it based on

16   instructions from Justin Herman.  We also know that some of

17   that money went to Justin and some of it was sent to Intrepid

18   Resources, an account controlled by Chuck Winters.

19         They purchased the EcoEmissions, which they then

20   acquired free-trading shares through Pacific Stock Transfer by

21   using false and misleading documents.  They then pumped it and

22   dumped it in November, as coordinated via Skype.

23         All of the steps in that process are aimed towards

24   the stock manipulation, and all -- and the coordination of the

25   activities shows agreement, certainly enough evidence to

 1   sustain a conviction on Count Thirteen as regarding Mr. Herman

 2   and Mr. Winters.

 3          Count Fourteen -- actually, I'm going to go to

 4   Count Fifteen, Your Honor, because that's the wire fraud

 5   conspiracy.

 6          All the evidence I just reviewed as to Mr. Herman and

 7   Mr. Winters -- again, showing agreement, the use of false

 8   representation, fraudulent pretenses, and false promises, all

 9   of which were material to getting free-trading shares and then

10   to -- the ability to manipulate the price of NERG stock and

11   sell it to the public, including to investors in Wyoming.

12          The difference is the interstate wires.  We have

13   those.  We have the wire from Nadine McCreery down to

14   Bob Mitchell; we have the various wires of money to Ian Horn

15   and away from Ian Horn.  The Skype chat itself is a wire

16   communication.  The purchase of the stock by our -- our

17   investors in Wyoming, as they testified happened online via

18   E*Trade or Ameritrade, so these are all interstate wire

19   transmissions in support of Count Fifteen as to Mr. Herman and

20   Mr. Winters.

21          The -- Count Fourteen is the actual stock -- is -- is

22   the commission of stock fraud.  We have a -- what's -- the

23   evidence of the conspiracy shows the scheme to defraud, shows

24   all the steps they took to acquire control of a publicly

25   traded shell, to gain free-trading shares of that shell, to

1   create a public image for it as NuTech, and then to manipulate

2   the price via promotional emails, press releases, and

3   manipulative trading.  Mr. Herman did that directly in the

4   Skype chat, and he was aided and abetted by Mr. Winters, who

5   was making the trades.

6          And all of the other steps they took to get the

7   free-trading shares, to prepare for the pump and dump is

8   evidence of their intent, it's evidence of the scheme.  And

9   even if one of them didn't put out a press release or didn't

10  do the email blast, they knew about them because we can see

11  the coordination in the Skype chat, and they certainly aided

12  and abetted those false statements to the public.

13         We -- and the securities fraud and the conspiracies,

14  it was done in connection with the sale of the security.

15  They're a common stock.

16         And the willful conduct is shown by the -- for

17  Mr. Herman and Mr. Winters -- by their purposefully altering

18  documents and purposefully putting signatures onto new

19  documents they created out of whole cloth.

20         The identity thefts -- I'm going to focus on

21  Mr. Herman and Mr. Winters, and then I'll come back to

22  Mr. Horn.

23         If we look at the identity theft counts, Sixteen and

24  Seventeen, which are charged against both Justin Herman and

25  Chuck Winters, Government's Exhibits 24.3 shows Chuck Winters

1    having created a document, an assignment of wells and leases,

2    reciting a $280,000 that matches up with an altered bank

3    statement and altered wire transfer request, both of which,

4    because of email evidence, Mr. Winters did -- I take that

5    back; just the outgoing wire request, Mr. Winters created it.

6         But he created this forged assignment, and he put a

7    digital signature of Gordon Pardy onto it, and he put a

8    digital signature of David Rodgers.  Gordon Pardy and David

9    Rodgers have both testified and said they never saw that, they

10   never authorized anybody to put their names on it.

11        That document was used in furtherance of the wire

12   fraud conspiracy because it was sent to Pacific Stock Transfer

13   by Justin Herman, which is when he possessed and used those

14   forged signatures.  Signatures are a means of -- of identity,

15   and they knew these were real people.  Mr. Herman knew for

16   sure because he put wire instructions out for Gordon Pardy.

17   You don't wire money to somebody you don't think exists.

18        Mr. Herman and Mr. Winters both knew that

19   Gordon Pardy and David Rodgers were real people because they

20   had the debt assignment agreement that Gordon Pardy and

21   David Rodgers had signed, and they spent real time with that

22   agreement because they altered it and backdated it.

23        So there's evidence to sustain a conviction on the

24   aggravated identity thefts charged in Counts Sixteen and

25   Seventeen because they knew they were real people, they had no

 1   authorization to use means of identification, the signatures,

 2   and they did so in furtherance of the wire fraud conspiracy.

 3        Count -- Counts Eighteen and Nineteen are against

 4   Mr. Herman.  Government's Exhibit 26.1, Your Honor, is an

 5   email from Mr. Herman to Joslyn Claiborne at Pacific Stock

 6   Transfer containing that nonaffiliation statement -- or

 7   statement of nonaffiliation -- with Gordon Pardy's signature

 8   on it, apparently, and David Rodgers' signature on it,

 9   apparently.

10        For all the reasons I just said about the last count,

11   Justin Herman knew Gordon Pardy was a real person and

12   Justin Herman knew David Rodgers was a real person.  He used

13   and possessed their forged signatures on this document when he

14   sent it to Pacific Stock Transfer in furtherance of the wire

15   fraud conspiracy, and he knew they were real people because of

16   the debt assignment and having wired money.

17        Gordon Pardy and David Rodgers, again, both testified

18   that -- they looked at that document and said, "I've never

19   seen that before; I didn't sign it; I didn't give anybody

20   authorization to put my name on it."

21        So, Your Honor, that is sufficient evidence to

22   sustain a conviction on Counts Eighteen and Nineteen.

23        So let's talk about Mr. Horn.  And I'm going to start

24   with the perjury counts -- the perjury count.

25        So, Your Honor, we have put into evidence the

1    beginning of the grand jury transcript, which shows when

2    Mr. Horn testified before the grand jury in January of 2019,

3    January 16th of 2019.

4         He was under oath and he made a false statement.  He

5    claimed that his email had been lost in 2016 and he had no

6    online access to that email.

7         Exhibit 101, 5.2, 5.3, 5.13 all show that he had

8    access to his email.  He forwarded the email in October of

9    2018, and he did it again in December of 2018.

10        The chat shows that he was worried about having to

11   talk about his email.  And over the course of time from when

12   he got the subpoena to when he testified, about three months,

13   over and over and over he's talking about the email.  The

14   texts show that he knew that he had to provide nonprivileged

15   parts because he had to redact the privileged parts.  He

16   expressed concern about talking about it.

17        And right from the start he tells Justin Herman

18   "I don't want to harm you, and I don't want to harm myself."

19        He then comes to the grand jury and says -- he

20   doesn't say "I had privileged email I didn't turn over."  He

21   says "I don't have any email and I don't have online access."

22        So, Your Honor, there's plenty of evidence to sustain

23   a conviction that that false statement was made knowingly.

24        There's also evidence to show that the existence of

25   that email was material to the grand jury's investigation.  In

1  the context of a false statement to the grand jury,

2  testimony's material if it had the tendency to influence,

3  mislead, or hamper the grand jury in a matter which it had

4  authority to investigate.  The testimony need not have an

5  actual effect; it merely must be capable of influencing the

6  grand jury.  Your Honor, that's from *United States v. Vap*,

7  V-a-p, 852 F.2d 1249, a Tenth Circuit case from 1988 that we

8  cited in our proposed instructions.

9         The existence of email, in particular email that is

10  in this case that we presented as evidence showing the

11  conspiracies charged, is certainly material to a grand jury

12  investigation into those very crimes.

13         So, Your Honor, there is sufficient evidence to

14  sustain the conviction against Mr. Horn on the perjury count

15  that remains.

16         So let's talk about Mr. Horn and Counts Thirteen,

17  Fourteen, and Fifteen.

18         It's undisputed that Mr. Horn received the money,

19  some of which came from Nadine McCreery in Wyoming, that was

20  used to buy the EcoEmissions shell.  It's undisputed that he

21  was paid to do so and then forwarded that money to people

22  based on instructions from Justin Herman.  And as we've

23  already seen, there's ample evidence to sustain a conviction

24  against Mr. Herman for the conspiracy counts.

25         Mr. Horn is then the name that's on all of the

1   opinion letters, and the opinion letters were essential to the

2   conspiracy in two ways:  They went to Pacific Stock Transfer

3   to justify the issuance of the free-trading shares that were

4   essential to the pump and dump, a manipulation in both the

5   first period, November through January, and then the last

6   period in May.  They also went to OTC Markets.  There, the

7   letters were essential to keeping NERG in the OTC Pink Current

8   Information category.

9          Your Honor will remember the testimony of

10  Mr. Colglazier from OTC about how that kind of filing is

11  essential to keeping an issuer in that Pink category.  And

12  you'll remember that when they're not in that Pink category,

13  they get such very helpful icons attached to their website as

14  yield signs, stop signs, and skull and crossbones.  All of

15  that information is available online, including in the

16  District of Wyoming.  And so those opinion letters were

17  essential.  We know that Mr. Horn never denied writing any of

18  them and repeatedly -- repeatedly -- said that he signed them

19  all.

20         We also know that in March of 2016, when NERG was on

21  caveat emptor status with OTC Markets, a man named Dan Hefner

22  emailed an OTC Market agreement, attorney letter agreement,

23  with the handwritten information of Ian Horn -- Mr. Hefner

24  emailed that agreement to Justin Herman with a copy to

25  Ian Horn.

1        So Ian Horn is aware that there are -- there's an

2   attorney letter agreement out there with his name on it and

3   it's going to Justin.  That attorney letter agreement then

4   ends up at OTC Markets in less than 24 hours.

5        Given the admission of -- that he signed the letters

6   and given that he was on notice that his name was being used

7   on attorney letter agreements, given that he moved the money

8   that made the pump and dump possible, there's sufficient

9   evidence to prove that he was aware of the criminal agreement

10  and its purpose and voluntarily joined it, knowing of its

11  criminal intent or criminal object.

12       And that's true whether we're looking at

13  Count Thirteen, which is the securities fraud conspiracy, or

14  Count Fifteen, which is the wire fraud conspiracy, because

15  Mr. Horn himself is involved in wires and sending email -- or

16  receiving email, I should say, not sending, because we don't

17  have that -- but receiving the email with the signed attorney

18  letter agreement in it.

19       And he's doing it at the beginning of the conspiracy,

20  at the front end where the money's moving and he's getting

21  notice of those attorney letter -- of the attorney letter

22  agreement in March of 2016.

23       We also have, again, the evidence of his response to

24  the investigation, and this is evidence that is of

25  consciousness of guilt, a text message on October 21st where

1   Mr. Horn says "I don't want to cause you" -- Justin -- "any

2   harm, but I also don't want to cause myself any harm."

3          Same message, "Does seem like I have a lot of emails

4   with a lot of wiring instructions," so he's concerned about

5   the wiring instructions, which was his activity at the

6   beginning of the conspiracy.

7          "A lot of agreements and a lot of other information

8   that may be responsive," same one where he's expressing the

9   concern about harming himself and Justin.

10          There is also a text message on 11/9 of 2018.  In the

11   middle of the message he says, "Obviously, I can't explain why

12   I don't have the Pacific Transfer letters."  The reason he

13   can't explain is only obvious if there's some agreement

14   between him and Justin, that they both know what the problem

15   is with these letters.  Again, evidence of consciousness of

16   guilt, evidence of the existence of the agreement that was

17   charged.

18          I'll also point out two text messages on 11/30 of

19   2018, again in the series of text messages in response to the

20   investigation.  At the end of the message Mr. Horn is saying,

21   "I got all the girls want to protect me, but I want to make

22   sure you're okay" to Justin.

23          And Justin's response at the -- ends with "We will be

24   okay together."  Again, evidence that they're in this thing

25   together in response to the investigation, consciousness-of-

1    guilt evidence that would sustain a finding that Mr. Horn

2    voluntarily joined the charged conspiracies and did so knowing

3    their illegal purpose.

4         Lastly, Your Honor, the perjury itself is evidence of

5    consciousness of guilt, the covering up of wire instructions

6    and email, that Mr. Horn expresses a subjective worry that it

7    will harm him and it will harm Justin.

8         The securities fraud count in Number Fourteen, Mr. --

9    the evidence that shows Ian Horn was a member of the two

10   conspiracies charged is also evidence that he aided and

11   abetted the securities fraud itself.

12        Justin Herman, Chuck Winters committed the securities

13   fraud, and Ian Horn associated himself with it in a way -- as

14   if it were something he wanted to accomplish.  He helped move

15   the money so that he could get paid.  His name shows up on

16   opinion letters.  He knows it's happening in March of 2016,

17   and then he lies about the emails when the investigation comes

18   around to see what happened.

19        Your Honor, all that evidence is sufficient to

20   sustain a conviction on each of these counts for each of these

21   defendants.

22        I can answer any questions you have.

23        THE COURT:  Thank you.

24        There is a great deal of evidence that has been

25   received in this matter.  I will examine this and, first thing

1    Monday, will announce my decision on the motions that have

2    been presented by the defendants.

3            Anything further?

4            MR. HEIMANN:  Not from the United States.

5            MR. FLEENER:  No, sir.  Thank you.

6            MR. JUBIN:  Not from Mr. Horn.  Thank you,

7    Your Honor.

8            THE COURT:  Thank you.

9            Have a good weekend.

10           MR. FLEENER:  Thank you, Judge.

11           THE COURT:  Have you checked to make sure that your

12   exhibits have been received?

13           MR. HEIMANN:  Your Honor, we will check that.

14   We've -- we've attempted to check each night with the

15   information Ms. Harris has given us.  We'll verify that before

16   we leave, assuming Ms. Harris is available to help us do that.

17           THE COURT:  I have two documents that have

18   Government's exhibit numbers on them.  One is the amended

19   28.1 -- not the amended one.  The one that was -- was amended

20   is in evidence.  This was the original one that needs to go to

21   the record in this case but does not go to the jury.

22           And then I have a -- a document, Government's

23   Exhibit 426 --

24           MR. HEIMANN:  Your Honor, those are copies that we

25   provided the Court because we did those this morning.

 1          I've talked to Ms. Harris, and she has a redacted

 2   version that we actually put into evidence; it's the one we

 3   used.

 4          And -- of the bank statement.

 5          And the same is true for 427.  We did that this

 6   morning, and Ms. Harris has the physical copy that I used.

 7   And we -- we have no position on whether it is uploaded into

 8   JERS and provided to the -- to the jury in digital format or

 9   if it goes back in paper as we introduced it.

10          THE COURTROOM DEPUTY:  What do you think?  Put it in

11   JERS or keep it in paper format?

12          THE COURT:  I think it should go like the other

13   exhibits, in JERS.

14          THE COURTROOM DEPUTY:  Okay.

15          MR. HEIMANN:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          MR. FLEENER:  Your Honor, something has come up with

18   one of our witnesses.

19          I just received a doctor's note from a guy named

20   Randal Pope, who lives in New Mexico, who has a doctor's note

21   saying that he cannot travel -- he's under subpoena -- that he

22   cannot travel.

23          So -- but he's an essential witness.

24          So I will probably seek -- I'll file a motion over

25   the weekend, but I'm going to seek that he -- we take his

19-CR-26-ABJ                                            Vol. IX-1576
21-CR-14-ABJ

1   testimony in some sort of alternative fashion, by video,

2   I guess.

3            I'll share -- I'll forward the -- certainly -- the

4   doctor's note to the United States, and we can -- I'll work

5   with -- I'll talk to the clerk about how video testimony works

6   because I've never done it before.

7            I just wanted -- I just got the email now.

8       (Discussion held between counsel.)

9            MR. FLEENER:  Yeah.  And I -- that's a good question.

10           Mr. Heimann just asked what the order was for defense

11  cases.  I don't think we're going to have an order.  We're all

12  fighting amongst the three of us as to who goes first and who

13  goes last.

14           I think how it's probably ultimately going to work is

15  it's going to be a jumbled mess.  At least that way no one

16  gets -- at least in my view -- any sort of advantage of

17  putting on their entire case last.  Because we both want to go

18  last.

19           So it seems to be the fair thing to do would be to

20  get our wit- -- all of us get our witnesses on -- and I'm

21  speaking -- and I say "all of us," Your Honor.  It's really --

22  still Mr. Ward and I are together and Mr. Jubin is sep- -- is

23  separate.

24           I'm going to work with -- with -- with Tom and Zenith

25  to try to fill up three days worth of -- of witnesses, and

1    I think that that's -- I think -- I mean, I can't speak for

2    Tom, but I know what his list looks like -- I think.

3          I think it's three days worth of witnesses, but it's

4    going to be a -- a scattered mush of witnesses saying various

5    things for various defendants.  So I -- and I want to make

6    sure our days are filled up.

7          That's why this thing caught me off guard a little

8    bit, because he was going to be a Monday witness.  He still

9    may try to be a Monday witness.  He's one I had lined up for

10   Monday.  And as soon as we get it figured out amongst the

11   defense team as to who we're going to try to call and when, at

12   least for Monday, we'll get the word out to everybody.

13         But I -- I think -- Mr. Jubin, isn't it three -- is

14   it three days?

15         MR. JUBIN:  You know, it's hard to say.  I think

16   I might have a little better than one day's worth of

17   witnesses.  None of them are very long.

18         The Judge can't see me.

19         MR. FLEENER:  I'm sorry.  I apologize.

20         MR. JUBIN:  Thank you.

21         It's really a matter of coordinating schedules

22   for witnesses.  I don't have any preference in terms of

23   going last, going first; I just want to be able to get my

24   witnesses on.

25         And I know I have -- Dr. Denison is available on

1    Tuesday, Gay Woodhouse needs to be on Tuesday, Dr. Reisberg

2    pretty much needs to be on Tuesday, so I'm looking at sort of

3    filling up Tuesday with my witnesses because that's when

4    they're available.

5            My one witness who is -- I've wanted to try to take

6    this afternoon -- his worst day is Monday, so I'll work with

7    him to try to figure out when we can make him available there

8    by Skype wearing his hard hat.

9            THE COURT:  He's one of your -- your client's

10   friends?

11           MR. JUBIN:  Right.  Right.

12           And Marlene Horn, I think, is also scheduling travel.

13   She has her mother who lives with her and Ian, who I think she

14   just brought home from the hospital.  She's arranged to have

15   somebody care for them.

16           I think she's going to fly Monday and, hopefully, get

17   here, testify Tuesday, and that's why I'm thinking I might be

18   filling up Tuesday pretty much.

19           THE COURT:  All right.  I've thought for some --

20   ultimately, I'm going to need -- I think from you because

21   you're offering -- you're the person who's going to be trying

22   to produce expert testimony --

23           MR. JUBIN:  Right.

24           THE COURT:  We've had some brief discussion, but

25   I think with each of your experts I'm going to need to have an

 1  out-of-court jury at least proffer made as to your expert

 2  witnesses.  I've attempted in my order to set forth some

 3  parameters.

 4          As I understand it, the defense that Dr. Reisberg's

 5  going to be talking about is a created memory theory.

 6          MR. JUBIN:  Certainly, that will be the inference.

 7  I think what I'm going to do, Your Honor, is with

 8  Dr. Reisberg -- he -- I pronounced it Reisberg, too --

 9  Dr. Reisberg is going to testify as to general scientific

10  principles.

11          I'm not going to have him talk about Ian Horn or

12  applying those facts to this case.  I mean, I may use a

13  hypothetical but not say "Ian Horn this, Ian Horn that" but --

14  so he's going to talk about general scientific principles.

15          THE COURT:  As I understand, you're not going to get

16  an opinion concerning memory from Denison.

17          MR. JUBIN:  No.  His testimony would be essentially

18  to say that he conducted a series of scientific tests, he did

19  the customary collateral source interviews, he diagnosed

20  Ian Horn with a fairly severe case of ADHD, these are the

21  symptoms of ADHD as an adult, and that's likely about it.

22          I'm not going to ask him to opine specifically with

23  respect to any statements that were either true or not true.

24  I don't think that would be appropriate.

25          It's just to provide the jury with the factual

1    information as to what the symptomology is related to that

2    disease and that Ian Horn has it.

3              THE COURT:  Very well.  And Fenoff is going to be

4    talking about signatures?

5              MR. JUBIN:  He'll be talking about signatures, yes.

6              THE COURT:  Okay.

7              MR. FLEENER:  Judge, we have a securities law expert

8    that we are -- you know, we're -- since these are all Court-

9    appointed folks, I -- we're trying to do our best to not have

10   them sit around for a week and bill the Court.  So -- you

11   know, and we've been trying to work these things out.

12             I have him scheduled -- I -- to get in and be prepped

13   on Tuesday and testify on Wednesday.  And I would hope -- and

14   I'll, you know, work with Mr. Jubin.  I would hope that that

15   may be the last witness unless the defendants testify.

16             My real concern is -- when I was talking to our

17   investigator and Mr. Ward -- is Monday.  We have two witnesses

18   that we know are going to be here on Monday, and we have

19   another witness that we were -- I had told to be here on

20   Tuesday because I thought -- well, I told to be here on

21   Tuesday.  He's a Wyoming guy -- it's Tom Throne.  So maybe

22   I'll just tell him that you're going to make him come on

23   Monday and he'll -- he'll listen to you -- listen to me that

24   way, but I told him Tuesday.

25             I'm going to try to get him here on Monday but I --

 1   out of all these days that I'm worried about, I'm worried

 2   about Monday, being able to fill up the day.  I'm glad we're

 3   starting later.  I'm sure we'll have some technological

 4   difficulties with the guy that we're going to try by video, so

 5   that'll take half a day, which is a good thing.  But that --

 6   Monday's the day that I'm worried about.  I think the rest of

 7   the stuff is going to fall in place.  So I may end up

 8   strong-arming -- strong-arming Tom Throne a bit and trying to

 9   get him down here on Monday, Judge.

10          But I think the defense case will be done -- absent

11   defendant testimony, I think the defense case will be done

12   Wednesday, Wednesday noon, Wednesday afternoonish.

13          If it ends up that Mr. Jubin's able to get his

14   witnesses on Tuesday, we're able to get our lay -- most of our

15   lay witnesses on Monday, get the expert on Wednesday,

16   depending on cross-examination, I think we -- and witness --

17   and defendants testifying -- I mean, I think the defense will

18   be done -- all defendants will be done -- on Wednesday,

19   I think.  But Monday is going to be loosey-goosey

20   a little bit.

21          And I have nothing else to say.

22          MR. JUBIN:  One other potential defense witness is my

23   expert on the duties of a lawyer to a client.  And I -- Pat

24   Ridley.  And if the Court's going to give an instruction,

25   I may not need to call him, so that's just something that we

 1   can talk about.

 2           THE COURT:  I'll -- to save time, I might ask

 3   Mr. Heimann to take a close look at that instruction and see

 4   what can be added or subtracted and given or not given.

 5           MR. HEIMANN:  I'll make sure I know where it is and

 6   have something to say about it on Monday.

 7           THE COURT:  Thank you.

 8           MR. FLEENER:  I'll go back over here.

 9           THE COURT:  I think you're fine.

10           MR. FLEENER:  I was milling around, Judge.  I --

11   well, I always mill around.  I'll stand.

12           THE COURT:  Anything else we can do for you?

13           MR. HEIMANN:  Not from the United States.

14           MR. JUBIN:  No.  Thank you.

15           MR. FLEENER:  No, sir.

16           THE COURT:  We'll stand in recess.

17       (Proceedings concluded 3:17 p.m., October 1, 2021.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5         I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14        Dated this 12th day of January, 2022.

15

16

17

18        /s/ Melanie Humphrey-Sonntag

19        _____

20            MELANIE HUMPHREY-SONNTAG
              RDR, CRR, CRC
21          Federal Official Court Reporter

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

_____

UNITED STATES OF AMERICA,       DOCKET NO. 19-CR-026-ABJ
                             DOCKET NO. 21-CR-014-ABJ
       Plaintiff,

                             VOLUME X of XIV
       vs.                     (Pages 1583 through 1800)

JUSTIN HERMAN, CHARLES W.       Cheyenne, Wyoming
WINTERS, JR., a/k/a Chuck       Monday, October 4, 2021
Winters, and IAN HORN,         9:32 a.m.

       Defendants.

_____

TRANSCRIPT OF TRIAL PROCEEDINGS

BEFORE THE HONORABLE ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE
and a jury of twelve and three alternates

*MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*
*Federal Official Court Reporter*
*2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
*630.452.6236 * MelanieSonntagCRR@gmail.com*

*Proceedings reported with digital stenography; transcript*
*produced with computer-aided transcription.*

```
 1    APPEARANCES:
      For the Plaintiff:          ERIC J. HEIMANN
 2                                THOMAS A. SZOTT
                                  ASSISTANT UNITED STATES ATTORNEYS
 3                                DISTRICT OF WYOMING
                                  2120 Capitol Avenue, Fourth Floor
 4                                Cheyenne, WY 82001

 5    For the Defendant           THOMAS A. FLEENER
      Herman:                     FLEENER LAW
 6                                506 South Eighth Street
                                  Laramie, WY 82073
 7
      For the Defendant           ZENITH S. WARD
 8    Winters:                    BUCHHAMER & WARD
                                  1821 Logan Avenue
 9                                Cheyenne, WY 82001

10    For the Defendant           THOMAS B. JUBIN
      Horn:                       JUBIN & ZERGA
11                                2614 Pioneer Avenue
                                  Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2

                                                        PAGE
3      Ruling by the Court                              1588
       Opening Statement by Mr. Fleener                 1598
4
       **DEFENSE WITNESSES:**
5      **RANDAL PRICE POPE**
       Direct Examination by Mr. Ward                   1615
6
       **SONIA HACKER**
7      Direct Examination by Mr. Ward                   1630

8      **DANIEL REISBERG**
       Direct Examination by Mr. Jubin                  1637
9      Direct Examination by Mr. Jubin                  1671
       Cross-Examination by Mr. Szott                   1708
10     Redirect Examination by Mr. Jubin                1714

11     **TOM THRONE**
       Direct Examination by Mr. Fleener                1716
12
       **GERALD LUKEN**
13     Direct Examination by Mr. Ward                   1729
       Cross-Examination by Mr. Heimann                 1748
14
       **RACHEL ROBERTS**
15     Direct Examination by Mr. Ward                   1756

16     **STEPHEN JOSEPH MILLER**
       Direct Examination by Mr. Jubin                  1759
17
                             E X H I B I T S
18                                         IDENTIFIED   RECEIVED
       DEFENDANT WINTERS' EXHIBITS
19       CW-A    Email Chain                1738        1739
         CW-A.1  Well Map                   1740        1740
20       CW-A.2  Well Map                   1741        1741
         CW-B    Photograph                  --         1737
21       CW-C    US Patent Filing           1757        1758
         CW-J    Photograph                 1630        1631
22       CW-J.1  Photograph                 1632        1633
         CW-J.2  Photograph                 1634        1634
23

24

25

```
 1              E X H I B I T S   C O N T I N U E D
                                  IDENTIFIED   RECEIVED
 2       DEFENDANT HORN'S EXHIBITS
         IH-Q1    Opinion Letter Signature    1765        --
 3                Page
         IH-Q1a   Attorney Opinion Letter     1762        --
 4       IH-Q2    Opinion Letter Signature    1767        --
                  Page
 5       IH-Q2a   Attorney Opinion Letter     1766        --
         IH-Q3    Opinion Letter Signature    1768       1769
 6                Page
         IH-Q3a   Attorney Opinion Letter     1768        --
 7       IH-Q4    Opinion Letter Signature    1770        --
                  Page
 8       IH-Q4a   Attorney Opinion Letter     1769        --
         IH-Q5    Opinion Letter Signature    1772       1772
 9                Page
         IH-Q5a   Attorney Opinion Letter     1770       1771
10       IH-Q6    Opinion Letter Signature    1773       1773
                  Page
11       IH-Q6a   Attorney Opinion Letter     1772        --
         IH-Q7    Opinion Letter Signature    1773       1774
12                Page
         IH-Q7a   Attorney Opinion Letter     1773        --
13       IH-Q8    Opinion Letter Signature    1774       1774
                  Page
14       IH-Q8a   Attorney Opinion Letter     1774        --
         IH-Q9    Opinion Letter Signature    1775        --
15                Page
         IH-Q9a   Attorney Opinion Letter     1775        --
16       IH-Q10   Opinion Letter Signature    1776       1776
                  Page
17       IH-Q10a  Attorney Opinion Letter     1776        --
         IH-Q11   Attorney Opinion Letter     1776       1778
18       IH-Q12   Attorney Opinion Letter     1778        --
         IH-Q13   Opinion Letter Signature    1780       1780
19                Page
         IH-Q13a  Attorney Opinion Letter     1779        --
20       IH-Q14   Opinion Letter Signature    1781       1781
                  Page
21       IH-Q14a  Attorney Opinion Letter     1780        --
         IH-Q15   Opinion Letter Signature    1782       1782
22                Page
         IH-Q16   Opinion Letter Signature    1783       1783
23                Page
         IH-Q16a  Attorney Opinion Letter     1782       1783
24       IH-Q17   Horn Letter                 1783        --
         IH-Q18   Attorney Opinion Letter     1784       1786
25
```

```
 1              E X H I B I T S   C O N T I N U E D
                                    IDENTIFIED   RECEIVED
 2      DEFENDANT HORN'S EXHIBITS
         IH-Q19  Horn Letter                 1786       --
 3       IH-Q20  Attorney Opinion Letter     1788      1789
         IH-Q21  Attorney Opinion Letter     1789      1790
 4       IH-Q22  Attorney Opinion Letter     1790      1790
         IH-Q23  Attorney Opinion Letter     1791      1791
 5       IH-Q24a Horn Letter                 1792       --
         IH-Q24b Horn Letter                 1792       --
 6       IH-Q24c Horn Letter                 1794       --
         IH-Q25  Horn Letter                 1795      1795
 7       IH-Q26  Attorney Opinion Letter     1795      1798
         IH-Q27  Attorney Opinion Letter     1796      1798
 8       IH-Q28  Attorney Opinion Letter     1796      1798
         IH-Q29  Attorney Opinion Letter     1796      1798
 9       IH-Q30  Horn Letter                 1797      1798
         IH-Q31  Attorney Opinion Letter     1797      1798
10       IH-Q32  Attorney Opinion Letter     1798      1798

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Proceedings commenced 9:32 a.m., October 4, 2021,

2   in the presence of all defendants, outside the jury's

3   presence.)

4           THE COURT:  Thank you.  Please be seated.

5           We are now commencing the third week of this trial.

6   The three remaining defendants in this case are Justin Wallace

7   Herman, Charles Winifred Winters, Jr., and Ian Horn, and the

8   allegation of the Government in this matter is that these

9   defendants conspired and were principals in a pump and dump

10  scheme of securities and are charged together in -- for

11  conspiracy to commit securities fraud in Count Thirteen of the

12  indictment as well as additional charges in Count Fourteen of

13  the indictment, alleging securities fraud and aiding and

14  abetting securities fraud, Count Fifteen, conspiracy to commit

15  wire fraud.  This case is rife with emails and Skype

16  communications.

17          And in Counts Sixteen and Seventeen, charges of

18  aggravated identity theft only against Defendants Mr. Herman

19  and Mr. Winters, and in Charges Eighteen and Nineteen are

20  other charges of aggravated identity theft; only Mr. Herman is

21  charged in that matter.

22          The Court has, again, reviewed the evidence in this

23  matter that has come in over the past two weeks, and I find

24  that the evidence offered and admitted by the Government in

25  its case in chief leads me to the conclusion that the

19-CR-26-ABJ                    RULING                    Vol. X-1589
21-CR-14-ABJ

1    Government's case in chief is sufficient to con- -- constitute

2    a prima facie case against each of the defendants for each of

3    the counts that are charged in this matter.

4             The Court has been present throughout the trial to

5    this point and has reviewed the evidence that has been offered

6    and received, thus each defendant may be put to his defense if

7    he chooses to offer evidence in this case.

8             By way of noting but not, certainly, a complete

9    summary of the evidence in this matter, I would note that this

10   case involves and rests on a possible technology that could

11   make a significant impact upon the mining of coalbed methane

12   in the District of Wyoming and originated -- it's an idea that

13   originated in Wyoming from allegedly -- and the evidence in

14   this matter established as prima facie -- that a fellow by the

15   name of Ed Prosser [sic] acquired what appears to be possibly

16   a patent on a device that has had several names, and the idea

17   was that it could go into old coalbed methane wells and

18   rejuvenate -- through use of the process -- rejuvenate those

19   wells by extracting the coalbed methane without having to

20   extract the water, which has created, in many instances, a

21   substantial environmental problem in that northeast Wyoming

22   area.

23            If it is a successful process or tool, it can be

24   applied in deep coal, very substantial quantities of it that

25   may not be mined, and would allow the harvest of coalbed

1   methane without -- without the -- the water being -- coming

2   with it as well as, in those deep coal seams, reinjecting the

3   biologicals that create the coalbed methane when they become

4   exhausted and, again, renew the process.

5              Interesting ideas yet to be proven but something that

6   may or may not in the future become very significant.

7   Hopefully, it will because the potentials are great.

8              Unfortunately, this case did not turn on that device.

9   It was used as a sales tool and an idea to promote what was

10  going on in the interest of selling stock.  And this case,

11  from its beginning, appears to have been seeking to acquire a

12  shell corporation, public shell corporation, that could be

13  employed in the pump and dump scheme.

14             These defendants, through a connection with a

15  codefendant, Mitchell, Bob Mitchell, became involved and were

16  largely, according to the Government's evidence in this

17  matter, significant figures shown by the email blasts that

18  were sent out, the November 15th Skype chart, the blue sheets

19  that have been received on a disk in this matter showing the

20  purchases of the stock, deceptive public disclosures and press

21  releases, false documents to create free trade submitted to

22  Over The Counter Markets and -- which is the trading hub -- as

23  well as to Pacific Stock Transfer and the creation of -- of

24  false documents concerning lease assignments, false

25  nonaffiliation documents, all establishing the working

 1   together of these defendants.

 2          In addition, the issue that exists in this case as to

 3   whether or not Attorney Horn played a role in the creation

 4   of -- of the opinion letters and knowingly signed them in any

 5   event to facilitate their influence in this matter and the

 6   sending of money and distribution of money from Witness

 7   McCreery and from Bravo 20 that was seed money for acquisition

 8   of EcoEmissions and what occurred.

 9          The evidence is rife with email transactions in

10   support of the scheme, and the same evidence that I looked to

11   in Count Thirteen largely supports the wire fraud conspiracy

12   charge in Count Fifteen and, to a large extent, the securities

13   fraud allegations in Count Fourteen.  Counts Sixteen and

14   Seventeen do not implicate Mr. Horn, but Sixteen and Seventeen

15   do implicate Defendants Winters and Herman.

16          The question is whether or not Winters provided the

17   false -- provided false digital signatures of Mr. Pardy and

18   Mr. Rodgers which were utilized as part of the wire fraud and

19   the assignment of wells and leases that bore their false

20   signatures, and both Mr. Rodgers and Mr. Pardy have testified

21   that the signatures were not -- that they did not sign the

22   documents, although the signatures appeared to be theirs.

23          They were known by these defendants to be real

24   persons and -- by way of the negotiations and what was going

25   on with the acquisition of the publicly traded free-trade

1    corporation EcoEmissions.

2         Counts Eighteen and Nineteen only charge Mr. Herman

3    and deal, again, with the use of those signatures of

4    Mr. Rodgers and Mr. Pardy for the debt assignments and the

5    wires of money as well as the nonaffiliation statements.

6         Mr. Horn is charged in an additional indictment in

7    this matter joined for purposes of trial, charged with --

8    now -- with a single count of perjury in Count One, as pointed

9    out by defense counsel.  It's largely based upon Exhibits 5.2,

10   5.3, 5.13, and the transcript of the -- his grand --

11   Mr. Horn's grand jury testimony is sufficient to establish a

12   prima facie case of false statement made to the grand jury.

13        The Government has rested its case in this matter.

14        And, Counsel for the Defense, what do we have for a

15   lineup today, if any?

16        MR. FLEENER:  Judge, we're going to put on evidence.

17        With the Court's permission, I'm going to give an

18   opening statement.  I reserved on behalf of Mr. Herman, so

19   I'll give an opening statement first thing this morning.  It

20   will probably take about 20 minutes, I think.

21        We have -- just so -- I appreciate the Court asking.

22   The -- the three defense counsel are trying to do our best to

23   coordinate witnesses, and, you know, no one wants to go first,

24   everyone wants to go last, and we have scheduling concerns

25   with all of the various witnesses.

1          I say that and I -- I also will tell you that, on

2    behalf of Mr. Winters and Mr. Herman, our witness list has

3    been cut by probably 75 percent based on the presentation of

4    the Government's case.

5          So when we had originally -- I don't know --

6    13 people that we had under subpoena, I believe we only intend

7    to call 3 now, 3 lay witnesses.  And they are Tom Throne, not

8    really a lay witness but for the purpose of this case is a lay

9    witness; Red Luken, who the Court has heard about raising

10   money up in Gillette; and a guy named Randal Pope who --

11   I filed the motion that he appear by video this morning.

12   I don't know if the Court had a chance to see that or rule

13   on it.

14          THE COURT:  I've ruled on it and approved.

15          MR. FLEENER:  Okay.  Good.  Because I didn't think

16   the United States -- the United States told me they didn't

17   object to him appearing -- they may have some objections to

18   his testimony, of course, so I appreciate them at least not

19   opposing that motion, and I'll -- we'll be prepared to put him

20   on.

21          And then on behalf of Winters and Herman, we have an

22   expert, securities law expert, who I think is going to be

23   testifying -- planning to testify either late Tuesday

24   afternoon or Wednesday morning.

25          I know that we've been coordinating with Tom Jubin on

1   behalf of Ian Horn, and Tom is prepared to take most of

2   tomorrow up, I think, with his witnesses.  We have a couple

3   foundational witnesses that we'll be bringing up.  I believe

4   Tom and Zenith will be bringing up the United States'

5   investigators to lay some foundation for documents.

6           With all that being said, there may be some downtime

7   today.  I think tomorrow is full; I think Wednesday will be

8   full because we'll be putting on our expert and then probably

9   closing and then moving into whatever happens next.

10          Today what we have lined up -- and I should have said

11  this, you know, bottom line, up front.  Today we have Tom

12  Throne and Red Luken that are going to go in here -- probably

13  around lunchtime is as quickly as we could get them in -- so

14  they'll testify after lunch.

15          We have my opening in the morning, and then we have

16  one -- with the video witness, we're planning on having him

17  appear after our opening, so we probably recommend that, after

18  our opening, we send the jury back for a minute to get the

19  video thing set up for Randal Pope.

20          Hopefully, Mr. Jubin and Mr. Ward are prepared to use

21  the investigators to lay some foundations to get us to

22  lunchtime, then we have our two witnesses at lunch, after

23  lunch.  I expect both those witnesses probably to take a

24  combination -- a total of maybe an hour to an hour and a half,

25  couple of -- maybe a little bit longer, depending on

1   cross-examination.

2            Mr. Jubin has indicated that he has an expert who

3   could appear this afternoon, as well.

4            I'm still not sure it's going to get us to 5:00, but

5   it will -- we'll do our best.  And then tomorrow should be a

6   full day, and Wednesday we should be wrapping up, we think.

7            I think -- Denison Wednesday, as well, Jubin?  Tom?

8            MR. JUBIN:  Yes.  We could -- I -- if I could tell

9   him firmly Wednesday morning, that might save some funds

10  because he's expensive on a daily rate.  And so if we said,

11  "Yeah, don't come Tuesday; we're full; come on Wednesday

12  morning," that would be -- make sense.

13           I might also add that I don't have my paralegal here

14  this morning -- she has other obligations -- and so I don't

15  have the ability to present foundational information in the

16  morning.  I may be able to do so in the afternoon.

17           And I'm working to try to get ahold of Dr. Reisberg

18  to -- to make sure he's available this afternoon.  I know this

19  was one of the times he was available, so, hopefully, we can

20  do that and make good use of the Court's time.

21           THE COURT:  All right.  Thank you.

22           MR. FLEENER:  Zenith, are you -- would you be able to

23  lay some foundation this morning?

24           MR. WARD:  I -- yeah, I could do some things, but

25  they'll be very short, so it's not going to fill up much time.

1            MR. FLEENER:  We've already wasted a half hour with

2     me talking, so that's a good start, I guess.  That's what we

3     have, Judge.  So I'm prepared to open, and then we'll be

4     bringing in video testimony, and we'll drive through the day

5     the best we can.

6            THE COURT:  I want to spend a moment with each of the

7     defendants at this time -- I see Mr. Horn has been hidden most

8     of the time behind the television screen here -- but simply to

9     make reference to -- none of you have an obligation to present

10    any evidence in this case.  The burden of proof, of course,

11    rests with the Government.  You've heard this before.

12            None of you are required to provide testimony in this

13    matter.  You have a right to remain silent.  It's a

14    constitutional right that you cannot be forced to incriminate

15    yourself in any way or to risk incrimination through questions

16    or cross-examination of you under the law and can decline

17    to -- and may decline to provide testimony.

18            On the other hand, the law certainly allows you to

19    testify if you choose to testify in your case in this matter,

20    and your testimony would be treated like the testimony of any

21    other witness in the proceedings.  You, of course, will be

22    subjected to cross-examination by the Government, I suspect,

23    as part of -- as part of their proceedings.

24            It is a matter that is really -- whether or not you

25    decide to testify is a matter within your power to decide, and

1   it is something that you should absolutely discuss with your

2   attorney in detail before you make any decision in that

3   regard.

4          I don't think I need to say anything further,

5   Counsel.  Anything anybody would like to add at this point?

6      (No response.)

7          THE COURT:  Mr. Herman, do you understand?

8          DEFENDANT HERMAN:  Yes, sir.

9          THE COURT:  Mr. Winters?

10         DEFENDANT WINTERS:  Yes, sir.

11         THE COURT:  Mr. Horn?

12         DEFENDANT HORN:  Yes.

13         THE COURT:  Very well.

14         Well, I think we're ready to get started.  And we

15  will look forward to hearing from Mr. Fleener first thing this

16  morning.

17      (Proceedings within the jury's presence at 9:58 a.m.)

18         THE COURT:  Good morning, everyone.

19         JURY MEMBERS:  Good morning.

20         THE COURT:  It's good to see you on the -- as we

21  begin the third week this morning.  So please be seated and

22  let's get started.

23         You'll recall that Mr. Fleener, on behalf of his

24  client, Mr. Herman, reserved making his opening, and we will

25  hear that opening statement at this time.

1          MR. FLEENER:  Thank you, Your Honor.  May it please

2    the Court.

3          THE COURT:  Mr. Fleener.

4          MR. FLEENER:  Counsel.

5          Ladies and gentlemen, good morning.

6          Thank you for paying attention for the last

7    two weeks.  I hope to be somewhat short, probably 15 or

8    20 minutes, hopefully no longer.

9          And I -- and, you know, the purposes of -- purpose of

10   an opening statement -- a couple -- there's a couple different

11   purposes of an opening statement, but one of them is to give a

12   preview of the evidence as -- as we expect it to be presented

13   over the next couple days.

14         Now, this is a weird case because you have three

15   codefendants.  Two of them have already given opening

16   statements, the United States presented 10 days worth of

17   testimony, and now I'm up here talking.

18         So almost inevitably my opening statement is going to

19   include some comment on what you've already seen because

20   you've already seen it, and then it's going to continue on to,

21   hopefully, address a little bit of what we hope to present

22   going forward.

23         Now the question is who's "we" because, as you've

24   been able to tell through the last two weeks, there's

25   differing defense theories over here.  So when I say "we,"

1    I mean primarily Chuck Winters and Justin Herman.  They're

2    business partners.  Their defense is essentially the same.

3         So I certainly am not speaking for -- for Mr. Horn

4    here, but it does kind of draw out and make opening statement

5    just a little bit different -- or a little more difficult.

6         But the first thing I wanted to -- to say -- and

7    you're going to hear from a couple different witnesses at

8    least on behalf of Mr. Herman and Mr. Winters.  You're going

9    to hear from a guy named Randal Pope, who's in New Mexico and

10   has -- won't be able to be here because he had a knee

11   replacement about two weeks ago, and he has a very, very

12   ugly-looking knee and can't travel, so we're going to be

13   having him present his testimony by video.  And we expect that

14   you will hear from him sort of a history of -- another history

15   of -- or some more history, rather -- of how NuTech got

16   involved.

17        You're also going to hear from him how -- how his

18   understanding of shares were being traded in NuTech to avoid a

19   pump and dump.  And we expect you'll -- you'll be hearing from

20   him that -- that -- that the -- the -- that he's -- he's been

21   told to -- or he was told to not sell a whole bunch of shares

22   and to keep the -- because if you sell a whole bunch of

23   shares, the stock price plummets.

24        So you're going to hear from Mr. Pope, we believe,

25   that some protections were put in place to keep some nefarious

 1   players from -- from pumping the -- from dumping this

 2   particular stock.

 3          Did it work?  Not necessarily, but you're at least

 4   going to hear that -- that some protections were put in place.

 5          We also expect you're going to hear from two

 6   witnesses that we're going to call, Tom Throne, who's an oil

 7   and gas attorney from Sheridan -- he should be here right

 8   after lunch -- and you're going to hear from Red Luken, who is

 9   the oil field worker from Gillette.

10          And if you remember way back to the McCreerys'

11   testimony, who gave the initial money to sort of fund the

12   purchase of the shell, they -- they -- they blamed Red and

13   Richard Shupick for, you know, stealing their money.  I think

14   what you're going to hear from Mr. Luken is that he was

15   involved in raising money and involved in some of the

16   operations of -- of NuTech Energy's when it was -- was, in

17   fact, a company.

18          And a couple themes are going to be clear throughout

19   at least the presentation of our witnesses.  And you're going

20   to hear -- I'm sorry.  You're going to hear from a securities

21   expert that we're bringing in, and he's -- and I think he's

22   going to testify on Wednesday morning, hopefully, if this

23   thing works out right; maybe Wednesday afternoon.

24          And he's going to talk about some of the thing --

25   some of the areas of -- of Mr. Scoufis' testimony which we

 1   take issue with.  He's going to go into more detail on issues

 2   of the tacking and time periods of debt.

 3           We expect that you're going to hear testimony from

 4   him that this January 2014 to January 2015 -- that none of

 5   that really mattered at the end of the day because the debt

 6   period actually started to run back in 2008.

 7           And I'm going to try to put it into a context that

 8   makes it easy to understand.  He's going to go into more

 9   detail, I think, about how the stock market works and just how

10   speculative these particular companies are.

11           And I think that's going to be all the testimony

12   that -- that we present -- and I say "we."  That will be

13   Mr. Herman and Mr. -- and Mr. Winters.  Our clients may

14   testify.  I don't know.  They may not.

15           You know, the Court's going to advise you -- he

16   already has advised you, of course, but he's going to advise

17   you again that if people don't testify, they don't have to

18   testify, and lawyers make these decisions -- or advise clients

19   on decisions -- on testifying all the time, and our advice

20   changes based on sort of how the case gets presented.

21           Again, it's -- whether they do or not isn't a concern

22   of y'all's, but I'm just trying to give you a time line going

23   forward as to how the week may look.  I expect you're going to

24   get done with this case this week and that it's either going

25   to be Thursday or Friday when you're back deliberating.

1          I don't -- I can't speak for the United States on the

2    rest of the case.  I can't speak for Mr. Jubin on his defense

3    of -- of Mr. Horn, though I can tell you that all the lawyers

4    here are trying to coordinate our cases so as not to waste

5    anyone's time because we know that your time is valuable.  So

6    we're doing our best, and that's what we sort of expect the

7    case to show.

8          And -- and in sum, when I was preparing for my

9    opening -- you know -- a couple of things are going to be

10   clear.  But when I was preparing for my opening, I opened up,

11   just for the heck of it, NERG's Yahoo Finance stock quote.

12   And it's still there.  It's still a company.  And you can just

13   open up the big chart and take a look at Yahoo Finance.

14         And I -- one of the things that's going to stick out

15   in my mind -- and I expect our securities guy is going to

16   testify about this -- is just how minimal Justin Herman and

17   Chuck Winters' role was in, quite frankly, the entire

18   operation but in particular -- in particular to selling shares

19   of this stock.  And, of course, there's nothing wrong with

20   selling shares of the stock you own.

21         But I -- when I pulled up the chart -- and, again,

22   I think you'll hear this from our securities guy.  Remember

23   the testimony that -- and you've heard questioning about

24   how -- the fact that -- that NuTech's shares are still selling

25   on the open market and they had a -- I don't know -- a couple

1   hundred million shares sell this spring on a company that

2   doesn't really even exist anymore.  Our securities expert will

3   talk about that a little bit more.

4        But just to put Justin Herman and Chuck Winters'

5   stock sales into context, you're going to hear evidence,

6   I think, that Chuck Winters and Justin Herman's stock sales

7   combined to less than 10 percent of the stock sales that took

8   place this last spring when there wasn't even a company in

9   place.  And, to me, that just was interesting, and -- and it

10  highlighted just how minimal Justin Herman and Chuck Winters'

11  role was in this whole thing.

12       What -- you know, what the last two weeks has shown

13  you -- and what we argue it will continue to show -- is that

14  Justin Herman and Chuck Winters aren't guilty of anything

15  they've been charged with.  They're not guilty of securities

16  fraud; they're not guilty of wire fraud or the conspiracy to

17  commit either of them.  And they're certainly not guilty of

18  identity theft.

19       A lot of what I'm saying and my proclamation that

20  they're not guilty we hope will come into -- will be

21  crystallized at the end of our case, and I appreciate you

22  keeping an open mind for the last two weeks.  It's why you

23  keep an open mind during a trial, because of this -- the fact

24  that you're still hearing evidence.  But we believe that --

25  that you'll -- you will come to the same conclusion at the end

1    of the -- the closing of the evidence in this case.

2              And -- and bottom -- and the bottom line is -- and,

3    again, you're going to take your instructions, of course, on

4    what the law is and what these definitions are -- you're going

5    to take your instructions from the Court, as you absolutely

6    should.  You shouldn't listen to Mr. Heimann talk about it or

7    me talk about it, quite frankly.  If you have a question about

8    who's right or who's wrong, you listen to -- listen to the

9    Judge, obviously.

10              But when I was, again, trying to prepare this opening

11   statement, I was -- I was breaking this -- this case down

12   because there's been so much testimony and evidence that's

13   already been presented and there's going to be a bunch that's

14   presented this week.

15              And when you really think about it, three things are

16   necessary for the United States to secure a conviction on

17   securities fraud and wire fraud in this case, really.

18              And what are those three things?  What are the three

19   things that you need to do that are fraudulent in this kind of

20   a case?  One is going up and raising money from investors and

21   lying to investors and taking their money and involving it in

22   some sort of scheme.  That's fraudulent.

23              Second, it's providing false information.  It's the

24   pump.  We've talked about the pump and the dump.  It's

25   providing false information to the investing community to try

 1   and pump up the stock.

 2          And then the third thing is, after you provided that

 3   false information and you've got the stock sufficiently pumped

 4   up, selling your shares and dumping the stock.

 5          And what's interesting in this particular case -- and

 6   I ask you folks please to keep an open mind and keep this

 7   concept in mind -- is that Justin Herman and Chuck Winters

 8   didn't do any of those three things.  They weren't up raising

 9   money.  That's Red Luken and Richard Shupick and Bob Mitchell.

10   They were the ones in Gillette talking to the McCreerys,

11   raising money, getting money from Mike Perry.  It wasn't

12   Justin Herman and Chuck Mitchell -- or -- excuse me --

13   Justin -- I'm sorry -- Justin Herman and Chuck Winters.

14          They weren't involved in the pumping of the shares.

15   I mean, Justin Herman isn't sending out email blasts.  There's

16   nothing tying him to email blasts or Chuck Winters, for that

17   matter.

18          They weren't on the conference call that you heard

19   that was clearly full of false information, and they weren't

20   on it.  They weren't -- they had nothing to do with it.  That

21   was Chuck Winters -- or excuse me -- "Chuck Winters."

22   I apologize.

23          That was -- that was Kevin Trizna and -- and

24   Mike Perry selling the stock on -- on things that just weren't

25   true.

1          Tom Throne was on there, an oil and gas attorney, and

2   he's going to tell you that, you know, he was -- he was

3   skeptical of this thing when he heard about the Russian offer,

4   and it didn't stop him from getting on the conference call for

5   a few minutes.  That wasn't Justin Herman.  That wasn't

6   Chuck Winters.

7          So now we know they didn't take investors' money

8   under false pretenses; right?  They weren't in Gillette.  They

9   didn't involve themselves in the unlawful pumping of the stock

10  by giving up this -- you know, tying themselves to this weird

11  Russian buyout for 2 1/2 cents and getting on a conference

12  call and lying to investors.  That wasn't them.

13         And then the third part, again, of this pump and dump

14  is the dump and they didn't dump.  As they sit here today --

15  and you'll hear this from our securities expert, I believe --

16  I think they have 6 billion shares of NuTech Energy, maybe the

17  largest shareholder now.  Who knows?  They didn't sell their

18  shares of NuTech Energy.

19         And I want to -- I want to go in -- and I'm going to

20  use the ELMO real quick.  I'm going to use Exhibit 510 -- and

21  this has been admitted into evidence already, and it's the

22  exhibit where it talks about -- so, basically, the largest

23  dumpers.

24         And just so the record's clear, that is Exhibit 510,

25  and I'm going to slide it down a bit.  And everyone can see

1   that.

2          And Intrepid Capital Holdings is fourth in this list,

3   but a couple of things stick out that I -- I want you to keep

4   in mind when you're deciding the facts in this case.  They

5   sold -- Intrepid Capital Holdings, according to this exhibit,

6   sold 74 million shares of stock.  They have over 6 billion

7   shares.

8          So if you look at 74 million compared to 6 billion --

9   I mean, that's less than 1 percent of the shares of the stock

10  that they've sold.

11         Also, the -- if you remember that sort of nefarious

12  Skype chat where it shows that -- you know, Justin Herman and

13  others, you know, trying to put share -- put bunches of stock

14  and sell it -- and the Government's going to be arguing -- as

15  they should if you're the United States; I'd argue it, too --

16  that it shows this bad intent and evil intent to -- to

17  manipulate the market and to -- you know -- to do bad things

18  as far as the trading of securities goes.

19         And we're going to argue that means a different

20  thing.  First of all, we're going to argue that the purpose of

21  putting -- of having Justin Herman's Intrepid Capital Holding

22  holding all those shares of stock for all these other players

23  was to keep greedy individuals from dumping all the shares of

24  stock in the open market, thereby making -- making a fortune

25  and making the price go down; that by -- by Justin Herman and

1    Chuck Winters being sort of the -- the holders of it with

2    Intrepid Capital Holding of all these shares, that it was

3    actually a good thing, that it kept these players from all

4    dumping their shares, which it did.

5            They sold -- again, he sold a total of 74 million

6    shares, and there's an exhibit -- I'm sure it's been

7    admitted -- where it talks about -- where Justin is sending

8    instructions, I think to Kingdom Trust, about -- or maybe it

9    was -- I don't remember who he was sending the email to --

10   about the percentages of where the money needs to go.

11           I think you'll see that Intrepid Capital Holding has

12   only got like 10 percent of these proceeds of this sale,

13   which, again, indicates that -- that there was very little

14   dumping.  He sold shares of stock, like a whole bunch of other

15   people did, and he had every right to sell shares and he did.

16           The other -- the other thing that we're going to get

17   out -- we're going to talk about this with our securities

18   expert, and I'd appreciate you keeping an open mind on this,

19   as well -- and I just looked at this yesterday when I was

20   preparing this opening and -- starting to prepare it -- is

21   that when Intrepid sold their stock -- again, Intrepid Capital

22   Holdings, the 74 million with 182,000 of proceeds -- they

23   didn't sell their stock anywhere near the high where the stock

24   price was, which is what you'd expect a guy who's dumping

25   stock to do.  If you were going to dump stock, you'd dump a

1    bunch of stock, and you'd dump it as high as you can.

2            I believe -- and give or take a millionth of

3    a percent, I believe that they were selling, basically,

4    at .24 of 1 -- of a penny.  A quarter of a penny is where they

5    were selling their stock.

6            And if you look at SBM Securities -- gosh, I think

7    they were selling at about 25 or 30 times that amount.  So

8    Justin Herman and Chuck Winters weren't dumping stock to try

9    and make a fortune on it.  What they were doing is selling

10   shares that they owned -- of their relatively small amount in

11   the grand scheme of things -- to pay bills like -- like

12   everybody else.

13           So if they weren't raising money illegally, they

14   weren't pumping the shares, and they weren't really dumping

15   the shares, why are they here?

16           I -- I would argue that -- and Mr. Ward and I have

17   got to know each other well over the last year, I guess,

18   trying this case.  And we tried to figure out what the right

19   analogy is to the prosecution of Justin Herman and

20   Chuck Winters.  And -- and I mean no disrespect to Mr. Ward

21   because I know that he thinks the analogy is -- I've changed

22   it because I think it's even a more innocent the -- than the

23   analogy that he came up with, which was -- Mr. Ward came up

24   with the analogy of the United States -- a bank robber getting

25   tires on the car and then the United States prosecuting the

1    guy who put the tires on the car rather than the guy who robs

2    the bank.

3          And that makes some sense, but that also -- you know,

4    there may not be -- there may not be anything wrong with that.

5    If you're putting tires on a car and you know the car is going

6    to be used to rob the bank, you could probably find some legal

7    liability, some criminal liability for aiding and abetting,

8    assisting -- assisting somebody by putting tires on the car

9    and having the car go right to the bank.

10         What this case is more like, though, it's even

11   more -- I guess -- more innocent than that.  This is the

12   equivalent of Justin Herman and Chuck Winters owning a tie

13   shop -- or a tire shop -- and a vehicle comes in that they

14   think has some great new technology that is going to make

15   everybody rich and win all the races.

16         So Chuck Winters and Justin Herman do what needs to

17   be done to get the tires on the shop.  Maybe they fudge an

18   invoice with the company that's selling the tires to get the

19   tires, but they know that they need to get the tires onto this

20   car so it can go win races, and that's what they think is

21   happening, that the car is going to go win races; "We've done

22   what we need to do to put the tires on the car."

23         But then the guy who's driving the car goes off and

24   robs the bank with no know- -- with Chuck Winters and

25   Justin Herman having no knowledge that the guy -- the guy's

1  going to rob the bank.  He just decides, rather than enter a

2  race, he goes and robs the bank.  That's what this prosecution

3  is more akin to.  And I've already gone through the evidence

4  that -- that -- that we intend to present and the witnesses

5  that we intend to present it with.

6        And understand that the United States can prosecute

7  whomever they choose to prosecute as long as those

8  individuals, they believe, committed a crime.  Right?

9  That's -- that's what happens.

10        But a couple of things are clear here today, and I --

11  I want you -- I ask that every one of you keep this in mind

12  because I've learned such a tremendous amount defending this

13  case, and I'm sure you've learned as witnesses in this case --

14  and you're going to continue to learn, especially through our

15  securities expert.

16        A couple things are really clear:  And that is every

17  single person that testified believes -- believes and --

18  believed and continues to believe in the technology, in the

19  tool that was created by Chuck Winters that you put in the

20  ground and deal -- to deal with coalbed methane wells.

21  Everyone still believes in the technology.

22        Tom Throne, who you'll hear from today, Mike Perry,

23  who you heard from the United States last week or two weeks

24  ago use a version of the tool.  So the technology -- whether

25  it works or not, everyone -- everyone believes in it,

 1    including the -- the initial investors who really just sort of

 2    hoped to believe in it to the folks who are on the ground

 3    messing with the -- the methane -- the coalbed methane wells.

 4    They all believe in the technology.  That's one point to

 5    please keep in mind.

 6          Two, while the United States will disagree with this,

 7    certainly, we're going to be arguing to you at the end of this

 8    case -- and the evidence I believe will demonstrate that --

 9    this -- that this has been a tremendous overreach by the

10    United States of America.  Keep that in mind.

11          You know, there is an adage that we learned as kids

12    because our parents told us, and this really -- and this last

13    point that I get to -- I'm going to sit down, and we'll get to

14    the presentation of evidence because you don't need to hear

15    from me anymore.

16          But this adage really sort of sums up, I think,

17    everybody in this case, which is -- you know, our parents told

18    us this; we tell this to our kids -- if it looks too good to

19    be true, it probably is.

20          And in this particular case, like life, the -- and it

21    goes from some of the evidence that's already been presented,

22    the -- I think Tom Perry -- or Mike Perry gave a hundred

23    thousand dollars to Bob Mitchell and in return -- and signed a

24    note and was supposed to get like $200,000 a couple months

25    later.  I mean, who gets that kind of return?  Is it too good

1    to be true?  It probably is.

2          Keep that in mind.

3          Because the -- the final fact that -- or the final

4    point, which is very, very clear -- again, everyone believes

5    in the technology.  Our belief that the United States is doing

6    a tremendous overreach.  The third point is that everybody

7    involved in this process, from the most innocent of investor,

8    the McCreerys, to the most nefarious of invest- -- of people,

9    probably Bob Mitchell -- everybody had the exact same goal.

10   It's to get rich quick.

11          None of these people were buying shares of Microsoft

12   in an IRA hoping to gain 15 or 20 percent a year and get a

13   nice dividend and, with stock repurchases, be able to have a

14   nice retirement.  Every single person here, from the

15   McCreerys, who were -- who gave their money willingly to

16   Red Luken and Richard Shupick, who would then take it to the

17   Albertson and send it off -- send it off through the Wells

18   Fargo down to Bob Mitchell; to -- to Mike Perry, who gave Bob

19   Mitchell a hundred thousand dollars, hoping to get $200,000;

20   to Kevin Trizna, who got up and -- you know, when you -- you

21   saw his testimony but -- to Kevin Trizna, who gave money to

22   Bob Mitchell.  These guys are all just hoping to get rich

23   quick.  Everybody is.  Everybody is greedy.  It's the American

24   way.  You hope to get rich quick.

25          Here's my final point, members -- ladies and

 1   gentlemen:  When everybody in this entire process is trying to

 2   get rich quick -- and you're going to hear from Tom Throne,

 3   who's going to say something about the fact that he has shares

 4   in all sorts of companies that are worthless.  This is --

 5   these -- there's nothing more speculative than oil field --

 6   small oil field start-ups and then there's nothing more

 7   speculative about penny stocks.  And when you combine those

 8   penny stocks, you are dealing with a get-rich-quick scheme

 9   where 9 times out of 10 it fails.

10           But in this process, folks, where everybody is trying

11   to get rich, Justin Herman and Chuck Winters, they're no

12   better than those guys.  But they're also no worse.

13   Everybody's in bed with -- everybody's in bed together on this

14   scheme.  And we ask at the end of -- at the end of this -- at

15   the end of this trial, after listening to all the evidence,

16   that you come back and deliver a not guilty verdict.

17           Thank you.

18           MR. WARD:  Your Honor, I think we're going to take a

19   minute to queue up the video.

20           THE COURT:  Very well.  Do you want to take a short

21   break?

22           MR. WARD:  I think that would make sense.

23           THE COURT:  Very well.  We'll take a short recess.

24           THE COURTROOM DEPUTY:  All rise.

25       (A recess was taken from 10:23 a.m. to 10:34 a.m.)

```
19-CR-26-ABJ                POPE - DIRECT - WARD              Vol. X-1615
21-CR-14-ABJ
```

1         THE COURT:  Thank you.  Please be seated.

2         Mr. Ward.

3         MR. WARD:  Your Honor, I think it would be

4  appropriate to swear the witness.

5         THE COURT:  Who are you calling?

6         MR. WARD:  Randal Pope, Your Honor.

7         THE COURT:  Mr. Pope, would you raise your right hand

8  and be sworn.

9     (Witness sworn.)

10        MR. WARD:  Good morning, Mr. Pope.  My name is Zenith

11 Ward.  I represent Charles Winters.

12            **RANDAL PRICE POPE, DEFENDANT WINTERS' WITNESS**

13                          **DIRECT EXAMINATION**

14 **BY MR. WARD:**

15 Q.  Can you please say and spell your full name for the

16 record.

17 A.  Randal Price Pope, R-a-n-d-a-l P-r-i-c-e P-o-p-e.

18 Q.  And, Mr. Pope, I'd like to confirm -- you don't have

19 anyone else with you in the room that you're testifying from

20 right now, do you?

21 A.  I don't.

22 Q.  Okay.  And I know I emailed you some proposed exhibits.

23 But unless you are -- unless I ask you to look at a specific

24 document, can you confirm that you won't be looking at any

25 notes or any documents while you testify today?

1   A.  I can confirm that.

2   Q.  Thank you.

3         Where are you located and testifying from today?

4   A.  My home in Rio Rancho, New Mexico.

5   Q.  And, Mr. Pope, how old are you?

6   A.  73.

7   Q.  What is the highest level of education that you have

8   obtained?

9   A.  I have a master's in business, Colorado State.

10  Q.  What year did you get your master's degree?

11  A.  I graduated in '74.

12  Q.  And tell us about your undergraduate degree, as well,

13  please.

14  A.  I have an undergraduate in business, majoring in finance

15  and marketing, from Northern Arizona University, graduated

16  December of '72.

17  Q.  Are you currently employed?

18  A.  I do things on the side.  I will build a home now and then

19  to generate some income but I'm basically retired.

20  Q.  When was the last you were working before your occasional

21  employment?

22  A.  I would say probably July 2010.

23  Q.  And tell us about that.  What were you doing in July of

24  2010?

25  A.  In 2010 I lived in Gillette, Wyoming.  I had a -- a

19-CR-26-ABJ              POPE - DIRECT - WARD              Vol. X-1617
21-CR-14-ABJ

1  consultancy.  I was a project director for various mineral

2  companies, principally involved in setting up and fabricating

3  pipe to and from compressor stations for natural gas.

4          At that time my major company that I did work for was

5  Rowdy Pipeline, which is a subsidiary of Yates Petroleum out

6  of Artesia, New Mexico.

7  Q.  And you said the most recent time you were doing that was

8  July of 2010.  When did you start doing that work?

9  A.  In October of 2001.

10  Q.  And, if you would, just explain to us a little bit more

11  about what your specific role was, what the work you were

12  doing was from October of 2001 to July of 2010.

13  A.  It was the installation of compression stations, large and

14  small.  That included anything from moving an existing

15  compressor and providing the changes in piping and

16  instrumentation that was needed to bringing in a new

17  compressor skid and doing all the fabrication of the piping,

18  et cetera, for that unit to function.

19          Two, being on a completely virgin site and providing

20  the dirt work or the -- providing things like putting up

21  fencing, et cetera, et cetera.  I was a project director on

22  those.

23          And I was a one-man company, so I would hire rigging

24  crews, roustabouts, welders, whoever was needed to get the job

25  completed.  And, in short, I was a project director under the

1   direction of whichever mineral company that I had -- was

2   working with at the time.

3          And most all of it was with Rowdy, but there was some

4   with Devlin; there was some with Bear Paw; there was a variety

5   of companies I did work for that I, as an individual, did work

6   for as an independent contractor.

7   Q.  Prior to the work you just discussed which began in

8   October of 2001, can you just give us an overview of your

9   other professional engagements over the course of your

10  lifetime, the other kind of work that you've done, just kind

11  of as a general overview?

12  A.  Sure.

13         Prior to going to Wyoming, I had taken a small hiatus

14  as -- and -- a year or so.  But prior to that, I was, for

15  seven years, president of a small paper converting company,

16  Williams Paper Company, out of St. Louis, Missouri.  It was a

17  small company when I was brought in, about a million dollars.

18  When I left, it was about $7 million revenue, giant changes in

19  terms of efficiency and profitability and professional

20  organization, et cetera.

21         Prior to that, I was in my own consultancy.  In fact,

22  it was via that consultancy that I did work for Williams Paper

23  Company and was ultimately invited to be the president of the

24  company.

25         Prior to that, I was a -- my ending position with

1  Monsanto Company in St. Louis, Missouri, I was an

2  international prod- -- I was a worldwide product director,

3  responsible for herbicides where applied in corn, soybeans,

4  rice, sunflowers, and a variety of other crops.  And I had,

5  for years, international responsibility in all the world

6  areas.

7            Prior to that, I was a marketing guy in the same

8  company.

9            And prior to that, I was a market research manager, a

10 numbers guy.

11           And before that, I worked as an assistant city

12 manager for the City of Yuma, Colorado, in northeastern

13 Colorado.

14           Prior to that, I had a one-year stint with a company

15 called City Service Oil in Tulsa, Oklahoma.  It no longer

16 exists.  It was bought out by Occidental Petroleum.

17           And then prior to that, I -- excuse me.  I'm --

18 I left out a giant segment of which you're going to talk to me

19 about.

20           From 1979 to 1991 I was the international product

21 director, then the city manager, and . . . and -- yeah.

22 That -- that's the order.

23           And then even prior to that, in 19 -- I graduated in

24 1974 from Colorado State, and I had a stint as a research

25 associate in which I was contracted to write mathematical

1  modeling software for the USDA for a specialty code that

2  nobody knew about.  I mean, it's called "Revised Simplex

3  Product Form of the Inverse, A Means of Calculating Linear

4  Programming on Large-Scale Computers" of -- that at the time

5  didn't exist.

6         I probably got things out of order, but if there's

7  questions, I can certainly fill in gaps.

8  Q.  Sure.

9         So your employment and professional history that

10  we've discussed through July of 2010, did any of that

11  employment have anything to do with penny stock companies?

12  A.  No.

13  Q.  When did you first become involved in an investment with

14  Bob Mitchell?

15  A.  Well, do you mean when did the first dollars pass?  Or

16  when did I become aware of Bob Mitchell and what he's doing?

17         Can you be more specific?

18  Q.  Sure.

19         When did you first become aware of Bob Mitchell and

20  what he was doing?

21  A.  I believe it was in 2011.

22         It might have been the spring of 2012.  There's a

23  woman I know in Gillette, Wyoming, whose name is Jody Faulk

24  [phonetic], a very nice woman, and she said "I believe there's

25  a business opportunity."  And she mentioned the people

1    involved, which included Bob Mitchell.

2            I asked who Bob Mitchell was.  She said he's a guy

3    that had been involved in -- in investments previously.  And

4    I says, "Is that what he does?"

5            She said, "No.  He's a roofer in Denver."

6            And at present he was -- I guess had his own roofing

7    company.  Anyway, he was a roofer in Denver.

8            She mentioned the name of a guy named, I think,

9    Red Luken, a local fellow.  I kind of knew his face; I didn't

10   know him from my business dealings.

11           And it was via that and an explanation of what was

12   going on that I said "Do you have a number?  And I'll call Bob

13   and talk to him."

14           So there was a couple of occasions where I had phone

15   calls trying to understand what he was up to.  He explained

16   the demise of a -- of a certain company that went into default

17   with a Pennsylvania bank and how, because of that, he was

18   involved in securing access to all their assets and doing it

19   for whatever means that he was using; I'm not aware but it did

20   not include money.

21           At some point I met him at a restaurant.  The first

22   two meetings were at the Prime Rib there on the main drag in

23   Gillette, Wyoming, also known as the Douglas Highway.  And we

24   talked several times.

25           At some point he explained that there was a -- an

1    opportunity to take over those properties and they had a

2    technology that used a membrane technology instead of the

3    traditional water-separation technology to separate the CH4,

4    methane, from the waters that existed in coalbed methane in

5    the coalbeds that included water.

6          And at some point I looked -- I sought an investment

7    opportunity.  I visited several people in between.  There's a

8    guy named Ed Pressley, and I visited with him.  I visited with

9    Red Luken, if that's his name -- and, again, I'm not sure of

10   that one.

11         And my question was, "Is there anything real about

12   this?"  And -- and I knew it was loosey-goosey.  There was

13   very little structure to it.  It's kind of like there's a guy

14   there in Wyoming that you probably all know, David True.  He

15   owns a bank there called Hilltop right there in Casper where

16   you are.

17         And he owns half of Wyoming and nobody knows it, and

18   he's a wildcatter.  And if anybody had ever figured it out --

19         MR. SZOTT:  Your Honor, I object to relevance.  It's

20   become a narrative.

21   A.  (Continuing)  -- and invested with him, they would have

22   retired years ago.

23         But that said, I knew that this was not some big,

24   professional thing.  I believe I was aware, but not sure, that

25   Bob at some previous point in his life had been involved in

 1   something that included investments.  I don't know what it was

 2   or how it was or in what capacity.

 3            But at some point I invested.  I sent him a check for

 4   50,000.  And at a future time I sent another 50, and my wife

 5   at some future time sent another 50.

 6            They weren't put into his -- maybe they were his

 7   personal account.  I don't know where they went.  I know that

 8   two of them went to what he -- they were written out to

 9   Bravo Two, and I'm sure that your investigators know what

10   Bravo Two is better than I do.

11   BY MR. WARD:

12   Q.  So, Mr. -- Mr. Pope, what was the -- what -- what was the

13   idea that you were investing in or what was the pitch that you

14   got from Mr. Mitchell?

15            And I guess -- or not a pitch, but what information

16   did you learn that made you interested enough to invest your

17   money in -- in the idea that Bob Mitchell had?

18   A.  Okay.  First of all, I want to reemphasize your own words.

19   There was never a pitch.  I was never solicited.

20            I was full of questions.  I'm a numbers guy.

21   I wanted something to run numbers.

22            Involved in that was the technology that would allow

23   the extraction, separation of the gas from the water in the

24   wells, without the need of pumping the water out of the well.

25            And it was for this reason that I went and visited

1   Ed Pressley.  He had numbers that were just stupid.  I don't

2   think these were business guys.  I think they were horse

3   traders because they couldn't read a financial thing or run a

4   book.

5          But, anyway, I read numbers.  And if the data I had

6   was correct -- and I said, "Well, you're not going to produce

7   enough gas at this; the gas price needs to be X for you to be

8   viable in this.  And you haven't included the compression cost

9   of the gas, even though you're separating at no cost, because

10  you don't have any downhole submersible pumps.  You still have

11  to compress the gas and prepare it for market, and that's

12  about 35 cents a thousand.

13         "And, plus, it consumes about -- if you're using your

14  own gas stream to do it, it consumes about 15 percent of your

15  gas stream to fire the engines that run the compressors to

16  compress the gas."

17         And so to answer your question, I was seeking

18  information; he was trying to fill in blanks so I could run

19  numbers.  And so no pitch.

20  Q.  Sure.

21         I guess you -- you've explained a little bit about

22  why it sounded like what they were proposing wouldn't work.

23  But what about it made it interesting enough to you that you

24  ultimately decided to invest?

25  A.  Well, the problem they had is that they were looking at

1    gas at $2 a thousand.  And the reason my career in Wyoming

2    quit in mid-2010 was because gas prices were about 2.50.  And

3    production prices were about $2, $2.50, 1.60, but to actually

4    get it to a sales line, you need $4 gas, 3.50 gas, depending

5    on where you're doing it.  We always measured our gas out of

6    Fort Lupton.

7             And so I was looking at the numbers, and if you go

8    back to 1998 and start looking, you'll see that $4 gas is not

9    unlikely.

10            And then you also start looking at several other

11   factors.  There were considerations for using additional

12   bacteria.  It's a bacteria that eats the coal that produces

13   the methane that makes for our natural gas stream, and there

14   were various technologies that exist.  Whether or not the

15   Government would allow us to inject them into a strata of the

16   earth is a different story.  It would enhance the production

17   of methane.  So that was a future technology that -- or an

18   additional technology in combination that made it viable.

19            Also, the wells would be everlasting, and I say that

20   tongue in cheek.  Nothing's everlasting.

21            But my experience with traditional mineral extraction

22   from methane was a giant, giant flow at the beginning, maybe

23   a year, maybe two years.  If you're lucky, three.  And then

24   the production drops off, and you start looking at another two

25   years with a smaller compressor and another two years with a

1    even smaller compressor.

2           And then at some point you put even something like a

3    compressor that's powered by an engine out of an automobile or

4    a pickup just to maintain your lease because it was required

5    that you produce these leases in order to maintain them.

6           So my experience said if you got seven years out of a

7    well, you were doing well.  And this indicated that it was not

8    a fast production because you were not pulling out the water

9    and, therefore, exposing it and breaking the surface tension

10   of water and allowing the gas to escape rapidly.

11          But the methane -- I don't know anything about the

12   technology of some permeable membrane that they had that

13   allowed that separation to take place, but it was kind of a

14   constant long term -- like 30 years, like 50 years, like a

15   long time.  That has value.

16          I know that Yates Petroleum didn't get its money out

17   of the giant infrastructure and all the high-pressure lines

18   that they put in, and so my thought was that if this -- some

19   cost infrastructure in terms of -- of gas lines and gathering

20   lines and compressor stations could be used in place, then all

21   of a sudden you were in a position for a long-term use of that

22   infrastructure at -- and the marginal cost of it was minimal.

23          THE COURT:  What's your next question, Mr. --

24          MR. WARD:  I'm sorry.  I didn't hear you, Judge.

25          THE COURT:  Do you have a question?

 1           MR. WARD:  I do.

 2  BY MR. WARD:

 3  Q.  Your investment with -- or investments -- it sounds like

 4  between you and your wife, you invested a total of $150,000.

 5  Is that correct?

 6  A.  Correct.

 7  Q.  Was any part of that investment involved with a -- the

 8  purchase of a shell corporation or -- or a shell?

 9  A.  I think all -- each one of them was.  The first one was

10  for a CHAMA Technologies Corporation.  The next one was for

11  a -- MCT or some name.  Then there was a -- and that's all

12  that I did.

13           At some future time I received some shares for a

14  company called NuTech, and that was kind of a -- had nothing

15  to do with the gas-separation process at that point.

16  Q.  And so you -- you did ultimately receive some shares;

17  right?

18  A.  Correct.

19  Q.  All right.  Did you have any understanding about -- or did

20  Bob ask you anything about the process for selling those

21  shares?

22  A.  No.  He didn't ask me anything about selling those shares.

23  It was many, many years later, like in -- I want to say --

24  2015, probably, maybe 2014 -- probably 2015 -- and it was

25  NuTech shares.  And at some point they had found a shell

1    corporation that could be traded and had got the bookwork

2    right so it could be traded on the OTC.

3          And there was some process by which I believe other

4    shares -- quite honestly, at some point I thought it was a

5    lost cause and did not pursue details.  I don't know whether

6    I was issued NuTech shares for others' shares or whatever --

7    but the issue was NuTech shares.  Those are the only ones that

8    were ever considered to be traded -- well, that's not true.

9          I took the CHAMA shares and -- and I have somebody

10   that manages some of my investments.  And they took those

11   shares, and they're held in trust in Morgan Stanley, and

12   Morgan Stanley knows that they're worthless and are figuring

13   out a way to back them out.  And those are CHAMA shares that

14   are in Morgan Stanley.

15   Q.  Did you ever have conversations with Mr. Mitchell about a

16   concern that, if you sold your shares without his involvement,

17   that it could hurt the price of the company?

18   A.  No.  He had a discussion with me that if we dumped a lot

19   on a market that was turning out low volume, that would affect

20   the short-term price of the stock.  And if you're talking

21   about total capitalization and inferring that that is the

22   price of the company, you could make that argument.

23          But on a start-up company, I don't think he ever said

24   anything -- I'd affect the price of the company.  He said,

25   "You would create an erratic price of the stock being traded."

1   Q.  So explain a little bit more about that.  What was the

2   concern if you tried to sell shares without his involvement?

3   A.  Well, he said I could do it if I wanted to.

4           He just suggested that if I wanted to make it a -- a

5   more orderly flow and not disturb the price and create a low

6   price at which I didn't want to do further trades, that he'd

7   be willing to work with me to -- in that process.

8           And since I never did one of them, then I don't know

9   what that means.

10          But it was never a suggestion that I put it in his

11  hands and he trade them.  It was a suggestion that when I'm

12  ready to trade, if I wanted to, he would be willing to

13  facilitate those trades and do it in such a way that we did

14  not create an erratic stock price.

15  Q.  And did that concept make sense to you?

16  A.  Yeah, it did.  Sure.

17          There's all sorts of histories of cornering markets

18  and -- I meant -- ask Lamar Hunt about silver, you know.

19  I mean, we don't have to go far.  That's not a stock.

20          THE COURT:  What's your next question?

21          MR. WARD:  May I have just a moment, Your Honor.

22          Those are all the questions I have for Mr. Pope.

23          Thank you.

24          THE COURT:  Mr. Jubin, do you have any questions

25  you'd like to ask?

 1            MR. JUBIN:  I do not, Your Honor.

 2            MR. SZOTT:  Your Honor, no questions from the

 3   Government.

 4            THE COURT:  Mr. Pope, thank you for being present.

 5   I understood you had knee problems.

 6            THE WITNESS:  I do.  I did.

 7            THE COURT:  Well, I hope they are -- you're having a

 8   good recovery.

 9            THE WITNESS:  I am and I thank you for that.

10            THE COURT:  Very well.

11            THE WITNESS:  Am I free to leave?

12            THE COURT:  You are free to leave.

13            THE WITNESS:  I'll push the button.  Thank you.

14       (Discussion held at counsel table.)

15            MR. WARD:  Your Honor, the defense calls Sonia

16   Hacker.

17            Good morning, Inspector Hacker.

18    **SONIA HACKER, DEFENDANT WINTERS' WITNESS, DIRECT EXAMINATION**

19   **BY MR. WARD:**

20   Q.  You've testified a number of times.  You understand you'd

21   still be under oath; correct?

22   A.  I do.

23   Q.  All right.  I'd like to show you a couple photos that are

24   not yet in evidence.

25            Do you recognize this photo?

1   A.  Yes.

2   Q.  What is this a photo of?

3   A.  I don't know what it is of.  But it's out in the oil

4   fields in Gillette.

5   Q.  And this is a photo that was taken by the United States

6   investigators when you were out visiting field sites with

7   Mr. Luken; is that correct?

8   A.  Yes.

9   Q.  All right.  And is this one of the well sites that you

10  visited?

11  A.  Yes.

12  Q.  All right.

13          MR. WARD:  I'd move for the admission of Exhibit J,

14  CW-J, Judge.

15          MR. HEIMANN:  No objection.

16          THE COURT:  CW-J is received.

17     (Defendant Winters' Exhibit CW-J received into evidence.)

18          MR. WARD:  I guess we can publish it to the jury --

19  oh, it's there.

20  BY MR. WARD:

21  Q.  And what was the purpose of visiting the field sites?

22  A.  I'm trying to recall.  We were interviewing Mr. Luken,

23  I think, and Mr. Shupick, and they wanted to take us out to

24  show us the well sites.  That's how I recall we ended up out

25  there.

1   Q.  I'm going to show you another photo that has not been

2   admitted into evidence.  This has been marked as CW

3   Exhibit J-1.

4           Do you recognize this photograph?

5   A.  Yes.

6   Q.  And what is this photograph of?

7   A.  These are the tools that I was talking about last time

8   that were up in the rafters that were in some storage

9   building.

10  Q.  Were they in the -- in the building we were just looking

11  at the photograph of?

12  A.  No.

13  Q.  All right.  So these were a different location on that

14  same trip with Mr. Luken?

15  A.  Yes.

16  Q.  All right.  And what was your understanding of what these

17  units were?

18  A.  I did not have an understanding of what they were.

19  Q.  Were you told these were the -- the tools that were put

20  into the ground --

21          MR. HEIMANN:  Calls for hearsay, no exception.

22          THE COURT:  Sustained.

23  BY MR. WARD:

24  Q.  What was the purpose of taking this photograph or what

25  were these items that were photographed?

19-CR-26-ABJ          HACKER - DIRECT - WARD          Vol. X-1633
21-CR-14-ABJ

1   A.   These were tools.

2   Q.   Were they tools associated with the removal of natural

3   gas?

4   A.   I think these would have been the same, yeah.

5          MR. WARD:  I'd move for the admission of Exhibit J-1.

6          MR. HEIMANN:  No objection.

7          THE COURT:  J.1 is received.

8       (Defendant Winters' Exhibit CW-J.1 received into evidence.)

9   BY MR. WARD:

10  Q.   Was it your understanding that these were the tools that

11  were shipped to Wyoming from Chuck Winters?

12  A.   I don't recall that.

13  Q.   Wouldn't you agree that whether or not Mr. Winters

14  manufactured and shipped tools to Wyoming would be important

15  to your investigation in this case?

16          MR. HEIMANN:  Objection, Your Honor; relevance.

17          MR. WARD:  I think it's relevant.

18          THE COURT:  Overruled.

19  A.   I didn't think that there was any question whether or not

20  Mr. Winters shipped tools to Wyoming.

21  BY MR. WARD:

22  Q.   So you knew he had; correct?

23  A.   I guess I never questioned whether or not it happened.

24  I just -- I had heard that he did and that was that.

25  Q.   And then the photograph of the tools out in the field in

1   Wyoming was further verification of what you believed,

2   I guess.  Is that fair?

3   A.  Well, I just -- I knew there was a lot of talk about these

4   tools.  Where they came from or who made which version I --

5   I wasn't sure.

6   Q.  All right.  I'd like to show you one more photograph that

7   hasn't been admitted in evidence.

8           All right.  Do you recognize the photo here in

9   Exhibit CW-J.2?

10  A.  Not specifically.

11  Q.  Would you agree that this is a close-up of the tools that

12  we saw in the last photograph?

13  A.  That's what it appears to be.

14  Q.  And do you know what the significance is of the markings

15  on this tool?

16  A.  I recognize that "Intrepid" is a -- is a name that

17  Mr. Winters and Mr. Herman used for their companies.

18  Q.  And --

19          MR. WARD:  I'd move for the admission of Exhibit J.2.

20          MR. HEIMANN:  No objection.

21          THE COURT:  J.2 is received.

22      (Defendant Winters' Exhibit CW-J.2 received into evidence.)

23  BY MR. WARD:

24  Q.  And so we're looking at this "Intrepid Innovations"

25  marking on the tools that we just saw in Exhibit J.1.  Was

1   this further verification that these were the tools that came

2   from Chuck Winters?

3   A.  You walking me through it now, I -- I follow your train of

4   thought.  So I would assume that this was one of the tools

5   from Mr. Winters.

6          MR. WARD:  All right.  Thank you.

7          Your Honor, those are the questions I have for this

8   witness at this time.

9          THE COURT:  Thank you.

10          MR. FLEENER:  No questions.

11          MR. JUBIN:  No questions.  Thank you.

12          MR. HEIMANN:  I have no questions.

13          THE COURT:  You may step down.

14          MR. FLEENER:  Your Honor, may we approach?

15          THE COURT:  You may.

16     (Proceedings held at sidebar with Prosecutor Heimann

17   and all defense counsel.)

18          MR. FLEENER:  Your Honor, we're trying to fill the

19   morning.  And we have no more witnesses for the morning except

20   Mr. Jubin still needs to do the proffer from his expert

21   outside the presence of the jury, so we can take an early

22   lunch and do that maybe.

23          MR. JUBIN:  I think we could do that proffer right

24   now and let the jury go because that will presumably take them

25   45 minutes.

1            THE COURT:  When do you want them to come back?

2            MR. JUBIN:  1:15?

3            MR. WARD:  That works.

4            MR. HEIMANN:  Which expert?

5            MR. JUBIN:  Dr. Reisberg.

6            MR. HEIMANN:  I -- Your Honor, that schedule will

7    work for us.

8            THE COURT:  Okay.

9        (Sidebar concluded.)

10           THE COURT:  Ladies and gentlemen, we're going to send

11   you off for an early lunch.  We'll have you come back at 1:15.

12   1:15.

13           The weather looks pretty nice outside, so take full

14   advantage of it.  Again, remember the Court's admonition.

15           We have some work to do outside of your presence.

16   We'll stand in recess -- recess until 1:15.

17           THE COURTROOM DEPUTY:  All rise.

18       (Proceedings outside the jury's presence at 11:14 a.m.)

19           THE COURT:  Keep an eye out because these jurors may

20   be hanging around at one location or another.

21           MR. JUBIN:  Your Honor, perhaps we could take about

22   five minutes while we get the connection with Dr. Reisberg

23   set up.

24           THE COURT:  Absolutely.

25       (A recess was taken from 11:15 a.m. to 11:27 a.m.)

 1          THE COURT:  Thank you.  You may be seated.

 2          MR. FLEENER:  Your Honor, with the Court's

 3     permission -- this doesn't really involve Mr. Herman and

 4     Mr. Winters.  Can they leave?

 5          THE COURT:  If they wish.

 6          MR. FLEENER:  Thank you.

 7       (Proceedings outside the presence of Defendants

 8     Herman and Winters.)

 9          THE COURT:  Will the witness please raise his right

10     hand and be sworn.

11       (Witness sworn.)

12          THE COURT:  Thank you.

13          Mr. Jubin, you may continue with the offer of proof.

14          MR. JUBIN:  Thank you, Your Honor.

15     **DANIEL REISBERG, DEFENDANT HORN'S WITNESS, DIRECT EXAMINATION**

16     **BY MR. JUBIN:**

17     Q.  Dr. Reisberg -- Reisberg --

18     A.  Reisberg, please.

19     Q.  Right.

20          Can you please spell your name for the court

21     reporter.

22     A.  Sure.  It's Daniel Reisberg, D-a-n-i-e-l R-e-i-s-b-e-r-g.

23     Q.  Where do you live, sir?

24     A.  I live in Portland, Oregon.

25     Q.  And what's your educational background?

1  A.  I have a bachelor's, master's, and PhD degree.  They're

2  all in psychology.  The master's and the PhD are in what's

3  referred to as experimental psychology, which basically means

4  I'm not what most people think of as a psychologist.  I'm not

5  a mental health professional.  I don't do diagnosis or

6  therapy.

7           I'm trained as a scientific researcher, and that's

8  basically what "experimental psychology" means.  The master's

9  and PhD are both from the University of Pennsylvania in 1976

10  and 1980, respectively.

11  Q.  So what kind of work have you done with these

12  qualifications?

13  A.  Most of my work, you know, over the last, oh, 30 or

14  40 years has been within the broader scientific community.

15  That means I have held a teaching position, first in New York

16  City and then for 30-plus years here in Oregon.

17           And as part of the routine activities of any

18  scientific researcher, I've been writing, doing studies,

19  collecting data, publishing data, writing commentary on

20  others' data, working in various capacities as an editor, and

21  also doing some amount of consulting outside of the academic

22  world.

23  Q.  Okay.  What positions have you held in the academic world?

24  A.  My first academic position after I got my PhD was at the

25  graduate faculty in New York City.  It was the New School for

1    Social Research.  It was basically a research position.  I was

2    doing very little teaching and mostly working full-time on

3    scientific research.

4              I left there and moved to Reed College in Portland in

5    1986, and across, you know, 30-plus years, I was -- you know,

6    worked my way through the professional hierarchy from

7    assistant professor to associate professor to full professor,

8    and eventually Reed honored me with an endowed chair.  And

9    then I stepped down from that position and retired from

10   teaching in 2019.

11   Q.  In the course of your career, did you provide any kinds of

12   presentations?

13   A.  Sure.  I mean, one of the, I think, you know, essential

14   elements of working in the scientific community is that you

15   are expected both to make your own contribution by collecting

16   data, by offering discussion and elaboration on other

17   researchers' data, but, in addition, that's also a pivotal

18   part of how the scientific community does its quality control.

19             Because, basically, by virtue of doing presentations

20   or publishing, you are putting your views out in public view

21   where they can be evaluated and scrutinized and, if

22   appropriate, criticized by your scientific colleagues.

23   Q.  Can you give us some idea of how many presentations you

24   have given?

25   A.  Oh, presentations, I'm not sure I have a list.  You know,

1  certainly for putting things in print and -- I believe my

2  total count of publications is 90-some-odd by now.  That's a

3  mix of a dozen-or-so books, scholarly articles in professional

4  journals, chapters that I've contributed to other books.  And

5  the number of presentations, either within the scientific

6  community or for a broader audience, is -- oh, I'm going to

7  guess -- a couple hundred although I haven't counted.

8  Q.  Sure.  You mentioned publications.

9      Is there a -- are you an author of a textbook?

10 A.  Actually -- author of a couple, actually.

11     I'm the author of an entry-level -- or I should say

12 coauthor of an entry-level textbook introducing students to,

13 you know, psychology broadly and the scientific approach to

14 psychology in particular.  I'm also the author of an advanced

15 textbook that is focused on cognitive psychology, which is my

16 particular area of work.

17     I'm also the editor of what is essentially a textbook

18 aimed at my scientific colleagues, basically trying to teach

19 researchers working in one corner of the field what's going on

20 in other corners of the field.  That's the Oxford Handbook of

21 Cognitive Psychology.

22 Q.  What's that advanced textbook called?

23 A.  It's called Cognition, Exploring the Science of the Mind.

24 Q.  Okay.  And has it had various editions?

25 A.  Yes.  I'm happy to say -- proud to say -- that book has

1    been rather well received over the years, and, you know, each

2    time one of the editions is a success, we go on to the next

3    edition.  The eighth edition will -- is going on sale

4    basically this month, and I'm starting to think about plans

5    for the ninth edition.

6    Q.  What is it that requires you to update and make additional

7    editions?

8    A.  In large measure, it's an issue of the evolving science.

9         I want my textbooks to be true to the current state

10   of the art.  New discoveries come into view, you know, old

11   disagreements get resolved.  Psychologists shift to new

12   questions that hadn't been asked in the past, perhaps

13   because -- they hadn't been asked because we hadn't realized

14   they were worth asking.  But there's always new material that

15   guides each edition.

16   Q.  You mentioned you stepped down from teaching in 2019.

17   What's been the focus of your work since that time?

18   A.  Primarily, I've been working as an author.  I mean, my

19   major efforts were focused on the -- the eighth edition,

20   which, as I said, is now completed.  I've also been working on

21   a couple of scientific journal articles, presenting new data.

22        I'm about to go to work on what is essentially a

23   discussion piece for the field, thinking through what is the

24   best way to communicate scientific evidence.  But, you know,

25   mostly I've been busy with various writing projects and then

1   also doing some amount of consulting.

2   Q.  Have you done any consulting for, say, prosecutors and

3   defense lawyers in terms of court testimony and that sort of

4   thing?

5   A.  I mean, I guess -- let me answer broadly, if I may.  Most

6   of my consulting focus is on issues relevant to law

7   enforcement or the legal system because my particular

8   professional specialty over the years has been focused on the

9   study of memory, and, therefore -- I mean, I've worked on a

10  number of projects concerned with memory for faces and,

11  therefore, eyewitness identification, projects worked --

12  focused on people remembering past events that are relevant to

13  the legal system.

14          And as part of that, I have over the years worked

15  with many actors, players within the legal system, law

16  enforcement, private investigators, attorneys, Judges, and so

17  most of that work -- you know, the vast majority of that

18  work -- has been away from the courtroom.

19          But, you know, in addition I have, you know, a

20  certain number of times each year ended up, you know, in the

21  witness stand testifying on a scientific perspective on memory

22  issues.

23  Q.  Have you qualified as an expert in the science of human

24  memory and perception?

25  A.  Yes.  Repeatedly.

1   Q.  Okay.  And you've testified -- you said you've testified a

2   number of times.

3        Have you had occasion to have any work in the

4   District of Wyoming?

5   A.  Not that I recall.  I believe I would recall, so I think

6   the answer's going to be no.

7   Q.  Okay.  Do you recall a Judge Skavdahl in Casper?

8        Did you have anything in front of him?

9   A.  Unfortunately, my focus is on the case facts, the case

10  material.  So with apologies and respect to the judiciary,

11  I often have no sense or no recollection of, you know, who was

12  the Presiding Judge at that trial.

13  Q.  Sure.  Sure.

14        Where have you testified as an expert?

15  A.  I have over the years been admitted as an expert and

16  allowed to testify in a couple different jurisdictions, a

17  Federal Court and then in State Courts in Oregon, my home

18  state, of course, but also Washington, California, Idaho,

19  Montana, Colorado, Illinois, Alaska, New Hampshire, Nevada --

20  I may have missed 1 or 2, but, you know, 12-or-so states

21  primarily across the -- the West and the Northwest in

22  particular.

23  Q.  Okay.  Are you familiar with the research in the field of

24  cognitive psychology dealing with the science surrounding

25  human memory?

1  A.  Oh, I have to be.  I mean, it's essential for, you know,

2  every aspect of my work.

3  Q.  Okay.  Is there a body of knowledge concerning human

4  memory that's based on peer-reviewed scientific study?

5  A.  Certainly, there is.  I mean, that is, in fact, you know,

6  the -- the enterprise that defines modern cognitive

7  psychology.

8  Q.  Okay.  So what's the nature of the research that occurs?

9  A.  Boy -- I mean, that's a -- an open-ended question.

10       The research proceeds on multiple levels.  I mean, in

11  many regards the design of the research is quite

12  straightforward.  You arrange for people to observe an event

13  or perhaps participate in an event, you make sure you know

14  what happened within that event, you let some time go by, and

15  then, with one form of questioning or another, you quiz people

16  about, you know, how the event unfolded, what they recall

17  about the event.

18       And from that base you can now start asking various

19  questions.  You know, what happens if you quiz them after one

20  day as opposed to one month?  What happens if you ask them

21  neutral, open-ended questions as opposed to what happens if

22  you lead them?  What happens if, you know, they are -- they

23  come into the event with, you know, no prior understanding of

24  the event as opposed to an event that's virtually familiar?

25  I mean, a list of variations but all on that, you know, common

1    frame.

2            That family of studies is one aspect of the research,

3    but I raise to say it's only one aspect because the strength

4    of that kind of study is that you can set things up exactly

5    the way you want to, you can arrange for the right

6    measurements, you can control things appropriately, but often

7    this comes at the price of some level of artificiality, and,

8    as a result, it's crucial always to cross-check those results

9    against results taken from essentially, you know, studies in

10   the field.

11           And sometimes those are studies that focus on police

12   reports, sometimes those are studies that report -- focus on

13   court records, and sometimes they're studies that just involve

14   surveying people or interviewing people for, you know, events

15   they've experienced as their day-to-day lives.

16           And what you hope for in, you know, this or in any

17   science is that these very different lines of research are all

18   going to converge on a common set of conclusions, and it's

19   that convergence that tells you that you do have a good handle

20   on how things actually operate and you're not just getting --

21   you know, if I can put it bluntly here -- you're not getting a

22   goofy answer because you asked the question in a foolish way.

23   Q.  Okay.  Is the state of the knowledge in your field such

24   that there is a body of knowledge that's generally accepted in

25   the relevant scientific community?

1   A.   Is there a body of knowledge that's generally accepted?

2   Oh, absolutely.  Yes.

3           I mean, look -- I mean, scientists go out of their

4   way to find disagreements.  You know, that's, you know, a

5   healthy part of the science because it's the way we go looking

6   for issues that are uncertain and need clarification.

7           But, you know, certainly, since this research has

8   been going on for, you know, a couple -- you know, a century

9   or well more than a century by now -- there is an accumulated

10  body of knowledge that is utterly uncontroversial and, I would

11  say, not just generally accepted but universally accepted.

12  Q.   Does memory work according to the commonsense perception

13  of it?

14  A.   I think that a -- the best answer I can give has to be yes

15  and no.

16          You know, certainly, all of us, you know, have

17  memories, all of us use our memories all the time, and so, you

18  know, there is a number of commonsense understandings about

19  memory that are rooted in reality.  But it's also the case

20  that there are many commonsense beliefs about memory that in a

21  pretty powerful way understate particular patterns.  And

22  there's also commonsense understandings about memory that are

23  just flatly false.

24          So the answer has to be a mix.

25  Q.   Okay.  Can you tell us a little bit about memory error,

1  what that is and how it works?

2  A.  Sure.

3         I guess -- let me start by saying that the kinds of

4  memory errors that people usually talk about are not in any

5  fashion an indication that our memories are flawed or

6  defective in some fashion.  Instead, the key here is that what

7  our memories are really good at is taking in knowledge from

8  many different sources, including knowledge that we come up

9  with on our own, you know, inferences or suppositions that we

10 make but, also, things that we might hear, things we might

11 read about, things that we might imagine perhaps even in a

12 dream.

13        And what our memories do wonderfully well is take all

14 of those elements and weave them together so that what we all

15 end up with is which cross-reference integrated knowledge.

16 It's why all of us know so much about so many things.

17        And the reason I wanted to emphasize that is that

18 that wonderful operation has a price attached to it.  And the

19 price is, because of this constant weaving together of

20 different types of information, different sources of

21 information, people regularly become confused about where

22 exactly they got this piece of information or that piece of

23 information.

24        And now we're ready to talk about memory errors

25 because, by far, the most common source of memory errors is

1   what scientists refer to as source confusion, and that

2   terminology reflects the fact that the person is correct in

3   saying -- believing that a particular element, a particular

4   idea, was somehow, somewhere, sometime part of their past.

5   But then they make a mistake about where and when and how it

6   was part of their past and make a mistake about the source of

7   the knowledge.

8          And source errors and source confusion are certainly

9   the dominant form of memory errors and can, in fact, happen

10  quite often.

11  Q.  What is required in terms of -- well, does it take a

12  little or just -- or does it take a lot to produce memory

13  error?

14  A.  There is a principle of proportionality here.  It is

15  certainly the case that it takes very little to produce a

16  relatively small error.

17         And, in fact, you know, many studies show that just,

18  you know, a one-word difference in how a question is phrased

19  can have a substantial impact on someone's memory.  I mean,

20  studies that have asked, for example, eyewitnesses to crimes

21  "Did you see a gun?" versus "Did you see the gun?" -- I mean,

22  that difference from "a gun" to "the gun" produces a dramatic

23  uptick in the number of people who falsely report seeing a

24  gun.  But, you know, many studies along those lines show that,

25  you know, just one or two words can produce a memory error.

1            But, of course, if someone is exposed to more

2    extensive influences -- you know, perhaps on multiple

3    occasions they're given suggestions about how the past

4    unfolded or they're given new information about how a

5    particular episode eventually ended -- with larger scale

6    influences, you can get much larger errors, including, you

7    know, easily demonstrated cases in which people remember

8    entire episodes that didn't happen at all.

9    Q.  Is it difficult to undo memory error once it occurs?

10   A.  Oh, absolutely, yes.  I mean, the key goes back to what

11   I was saying earlier about how memory errors arise.

12           I mean, memory errors are the by-product of our

13   weaving together different bits and pieces of information that

14   we picked up in different settings.  And because of that

15   weaving together, what we remember at any particular moment is

16   what we genuinely believe about the past.

17           And in study after study, it is enormously difficult

18   to unring the bell, to unscramble the egg.  Memory errors,

19   once they're established, are very resistant to any sort of

20   corrective strategy or questioning.  You know, the errors

21   remain in place in most cases.

22   Q.  So do individuals who have memory error perceive that they

23   have it?

24   A.  In many cases, no.  I mean, obviously -- no.  I think

25   every one of us has had an experience of, you know, realizing

1    that we have made a memory mistake.

2           I mean, the easy example was a case in which -- oh,

3    I don't know -- somebody is quite certain that they mailed a

4    letter and then they get home and they find the envelope is

5    still in their pocket.  I mean, in those cases, obviously,

6    people realize that they've made a memory mistake.

7           But in the clear majority of cases, memory errors

8    look, for most purposes, just undetectable.  And what I mean

9    by that is that, you know, when people misremember how the

10   past unfolded, they can remember it with just as much detail,

11   just as much certainty, often just as much emotion as they

12   would a factually accurate memory.  And in some ways, that's

13   not surprising because both a memory error and an actually

14   accurate memory are what the person remembers.

15          And memories are memories, and, therefore, false

16   memories look, in most regards, just like accurate memories

17   and are, therefore, undetectable.

18   Q.   How does the passage of time factor into memory?

19   A.   I mean -- again, let's start with, I guess, an element of

20   common sense, but then, obviously, we're going to move quickly

21   beyond common sense.

22          Common sense tells us, of course, it's more difficult

23   to remember something that happened 20 years ago rather than

24   something that happened 20 minutes ago.  I mean, it's clear

25   that, as things recede into the past, memory errors can become

 1    more likely.

 2            But, I mean, from that base, the science now is going

 3    to add a number of points, including the fact that the major

 4    source of that loss of accuracy, as time goes by, is actually

 5    not the passage of time.  The reason passing time matters is

 6    because passing time creates an opportunity for the person to

 7    encounter new ideas, new influences, new information, and

 8    it's, in essence, the interference from that late-arriving

 9    information that does the damage from passing time.

10            So that's, you know, one regard in which I think

11    people misunderstand what passing time does.

12            And then I guess another regard is that people often

13    seem to have the idea that some memories are immune to the

14    passage of time, and people will routinely say things like

15    "I'll remember that forever" or "It's burned into my brain,"

16    words to that effect.

17            And that's just a case in which common sense is

18    simply wrong.  As far as anybody has been able to detect, all

19    memories are likely to show some erosion as the weeks

20    and months and years go by.

21    Q.  What about the notion that some memories can get better

22    over time?  Is there any validity to that?

23    A.  There is a very narrow set of circumstances in which that

24    can happen, but in the vast majority of cases, if someone

25    seems to remember more and more as time goes by, that's very

 1  likely to reflect the fact that they are now adding to their

 2  memory, not on a basis of what they remember from the original

 3  episode, but they're adding to their memory based on other

 4  influences, other inputs.

 5          And so, you know, in the huge majority of cases,

 6  memories get worse as time goes by, not better.

 7  Q.  Can you tell us a little bit about memory as it relates to

 8  the accuracy of dates?

 9  A.  I mean, I shouldn't be, you know -- memory for when

10  exactly things happened, dates in that sense?

11  Q.  Right.

12  A.  Well, I -- let's start with -- I think, on a surprising

13  point, that our memories are better for some things than for

14  others, and it turns out that memory for dates -- you know,

15  exactly when something happened -- is an aspect of memory that

16  tends to be particularly unreliable.  People are often quite

17  poor at remembering exactly when things happened.  And the

18  only time that people seem to be accurate in remembering when

19  things happened is if there's not just some connection to some

20  external benchmark but a meaningful connection to some

21  benchmark.

22          And so, you know, if somebody says, "I know it

23  happened at Christmas" or "I know it happened a week before

24  Christmas" -- or a week after Christmas -- that does have a

25  benchmark as part of the recollection.

1          But it's not obvious what's gluing the pieces of that

2     recollection together in contrast to -- I don't know.  If

3     somebody says "I know it was right after Christmas because

4     I remember we were all hanging out complaining about how we'd

5     eaten too many cookies over the holidays and we were all

6     feeling sore" and they can start weaving it into an episode

7     that meaningfully ties it to the Christmas holiday, then

8     memory accuracy starts to be much better but still not great.

9          And one of the reasons it's not great is that -- you

10    know, if I can push on with that same example, that example of

11    "I remember I was feeling stuffed with cookies; I remember

12    I decided I needed to lose a whole bunch of weight" -- that

13    might help you remember that something happened at Christmas,

14    but it might not help you to remember which Christmas it

15    happened on.

16         And as a result of that kind of consideration, errors

17    about dates are often cyclic.  And, you know, what this term

18    refers to is you might remember that it was Christmas, but you

19    remember it as being the wrong Christmas.  And so you might

20    remember it as being two Christmases ago when, in fact, it was

21    three or four or even one.

22         And, therefore, this is one of the sort of peculiar

23    situations in which large memory errors are more common than

24    small memory errors.

25         You're more likely to be off by a full year in

1   remembering a date than you are in remembering being off by

2   9 or 10 months because, again, of that cyclic nature.  You

3   know, likewise, you might remember that something happened on

4   a weekend but lose track of which weekend, so you're more

5   likely to be off by seven days rather than four or five.

6   Q.   Is there a term you use in your field called "engagement"?

7   A.   Certainly, people routinely talk about engagement.

8   I don't know if it's a term of art or if it's being used in

9   pretty much the same way the term is used in ordinary speech.

10        I mean, intellectual engagement -- you know, thinking

11   about something, paying attention to it, thinking about what

12   it means, thinking about what its implications are -- is a

13   crucial step for getting information into memory.  And, in

14   fact, one of the important lessons of 50 years of research and

15   one of the lessons I think is surprising for many people is

16   that, you know, passive exposure with no engagement has

17   essentially zero impact on memory even if the exposure is, you

18   know, hundreds of times, thousands of times.  You know, things

19   that you've seen over and over and over or things that you've

20   heard over and over and over but never paid attention to

21   simply don't get recorded into memory.  And it's in that

22   regard that some amount of intellectual engagement is

23   essential in getting information stored into memory in the

24   first place.

25   Q.   So as I understand your testimony, you're saying if

 1  someone's really paying attention, that assists in forming

 2  memories?

 3  A.  That's -- absolutely, yes.

 4  Q.  And what if the person is easily distracted?  Does that

 5  have an effect on the formation of accurate memories?

 6  A.  Certainly.  I mean, if someone's easily distracted, then

 7  that's going to interfere with their paying attention, it's

 8  going to interfere with their engagement, and then we're in a

 9  situation that's just the opposite of the one you just

10  described in your, you know, question a moment ago, which is

11  poor engagement, heavy layers of distraction lead to

12  relatively poor memories down the road.

13  Q.  What's the effect on memory of information that's provided

14  by others?

15  A.  We now go back to that idea of source confusion.

16          Our memories are wonderfully dynamic.  We are always

17  picking up new information and adjusting our memories in light

18  of the totality of what we believe and understand at the time

19  of recollection.

20          And so if you hear information from other people and

21  particularly if it's information that you are inclined to

22  think as trustworthy, then that simply gets absorbed into your

23  memory.  It becomes part of the totality of what you now

24  believe about past events.

25          And, you know, it's -- if you want to spin this

1  negatively, the new information interferes with your

2  recollection, but I think the same point can also be spun in a

3  positive way.  The new information allows you to update your

4  recollection in the same way that, you know -- I don't know --

5  if a lawyer is writing a brief and, you know, finds a --

6  another ruling that's relevant or finds another point that

7  needs to be included.  You toss out the old version of the

8  brief and you replace it with a new and improved version.

9  That's exactly what memory does.

10  Q.  What about the effect of visual evidence presented to

11  someone with respect to memory formation?

12  A.  This is visual information at the time of the original

13  event?  This is visual information in between the learning and

14  the recollection?  Or at the --

15  Q.  Let's say it's -- why don't you tell us about visual

16  information presented to someone at some point down the road.

17  A.  So let me echo this just to make sure I'm understanding

18  the question.

19          So someone experiences an event, and then at some

20  later point they're provided with some sort of photograph or

21  document that presumably comes from that original event?

22          I mean, have I got that right?

23  Q.  Right.  Let's start with that.

24  A.  Sure.  I mean, in the -- that puts us right back in the

25  situation we were talking about a moment ago, which is --

1    I mean, as new information comes in, you update your memories,

2    you improve your memories, you fill in gaps in your memories

3    with the result that the original record in your memory is

4    essentially destroyed.  It's lost.  But what you now have in

5    memory reflects the totality of what you now believe and

6    understand.

7              And the role of documents or photographs in all of

8    that is that, first of all, they often provide rather vivid

9    information, and vivid information is more likely to be

10   absorbed into your memory.

11             They also establish the credibility of the

12   information.  And I said a minute or two back, that if the new

13   information comes in and you regard it as trustworthy, that

14   makes it much more likely that you will absorb that new

15   information.

16             And if the new information comes with some sort of

17   visual corroboration -- you know, a photograph, a document --

18   that makes the information more credible; that makes the

19   information more powerful for you and much more likely to be

20   absorbed into your recollection.

21   Q.  Let's take a little different example now and say that you

22   didn't have the experience, the person didn't have the

23   experience, but then they're shown a document or receive other

24   inputs.

25             What kind -- how does that affect their memory?

1   A.  I mean, in some ways the answer's going to be the same.

2   I mean, there's now -- boy, on -- three or four or five

3   different studies that have asked not just about the role of

4   leading questions at the time of recall but have asked

5   specifically what happens if leading questions are accompanied

6   by some sort of visual documentation.

7           In some of these studies the visual documentation has

8   been, I mean, artificially produced -- I can give you an

9   example if you'd like.  In other circumstances the visual

10  information has been, you know, unaltered, you know; it's a

11  real document -- it's a real document that actually says very

12  little about the past.

13          And study after study makes it clear that that sort

14  of visual support for a leading question, that sort of visual

15  support for a suggested interview magnifies enormously the

16  impact of leading questions and suggested interview -- and

17  I can give you examples if you'd like.

18  Q.  That's okay.

19          What if -- what if information is given orally, like

20  it's something you hear as opposed to something that you see

21  as a document?

22          How does that -- and let's assume the event never

23  occurred but you hear something about it.

24          How would that affect memory?

25  A.  I mean, basically, the same answer.  I mean, if that

1   information strikes you as credible, strikes you as

2   compelling, you think it's coming from a trusted source, you

3   think it comes from somebody who actually knows what they're

4   talking about, you're likely to accept that information at

5   face value.

6          It becomes part of the full package of what you now

7   believe about the past, and it is absorbed into your memory

8   and, again, can cause you to jettison an old memory or it can

9   cause you to fill in substantial gaps in an old memory, and

10  that new information becomes now part of your beliefs about

11  how the past unfolded.

12  Q.  Does it make any difference if you believe that the person

13  who provides the information has -- is a superior source of

14  information?

15  A.   I mean, again, yes.  I mean, outside influences, outside

16  suggestion are going to be much more influential if they are

17  giving you information that you think is credible, that --

18  giving you information that you think comes from a reliable

19  source, giving you information that you think sounds

20  plausible, given your broader understanding of the world.

21  I mean, all of those things make it more likely that you will

22  accept this information at face value, absorb it into your

23  recollection, and, thereby, essentially distort what was in

24  your memory 10 minutes earlier.

25  Q.  Once that distortion has occurred, what's the duration of

1   that effect?

2   A.  I mean, I -- I think the -- if I can answer in crude

3   terms, the answer is, you know, the duration is forever.

4           The information literally alters what is in your

5   memory.  It launches -- I mean, if you want to shift into the

6   biology -- a new process of memory consolidation and --

7   I mean, the process is often described as destructive

8   updating, and that's just a fancy way of saying that the old

9   record is gone and has been replaced by this new and, one

10  hopes, improved record of how things unfolded in the past.

11  Q.  What about the details of memories that are the product of

12  memory error?

13  A.  In many cases those details are suggested from the

14  outside.  In other cases those details are drawn from other

15  related experiences.

16          And so -- let's see if I can make this concrete.  If

17  I try to lie to you and get you to believe a memory of a

18  vacation you took once in South Africa, presumably what you

19  would do under my influence is populate that memory with

20  details about other vacations you took, other plane rides

21  you've been on, other suitcases that you had to drag from one

22  end of the airport to another.

23          And so what you would do is, I mean, basically flesh

24  out that memory, drawing on other knowledge you have so that

25  what you would end up with is a memory initially suggested in

1   somewhat skeletal form, but then it's very common for people

2   to flesh out that memory as they try to reconstruct what

3   actually happened.

4   Q.  What if a person is trying to remember what they used to

5   believe?  Is there any way to go back?

6   A.  I mean, I -- again, I mean -- to the extent that what

7   happens in memory is, you know, what I've already described as

8   disruptive updating, the old record is gone.

9         And, again, I can, you know, give you research

10  examples of this if you'd like.  But -- I mean, basically, you

11  cannot unring the bell.

12        Once a memory has been updated, elaborated, altered,

13  that's now your understanding of the past.  And in procedure

14  after procedure, people have tried and failed to peel back the

15  subsequent influences to return to the original memory.  It

16  just is enormously difficult.

17  Q.  So, given that, what's the usefulness of the present

18  memory of a person who has had their memory affected by false

19  memories?

20  A.  Let me start by saying that, you know, false memories

21  don't happen all the time.  False memories are unlikely to

22  occur if your memory can be cross-checked against other things

23  you believe, other things you've experienced, other knowledge

24  that you have.  I mean, I can't create a false memory,

25  something that just doesn't fit at all with the rest of your

 1    knowledge.  And so that certainly places a limit on how often,

 2    how far, and under what circumstances memory can go off track.

 3            But, in addition, let me circle back to something

 4    I said before, which is, rather than lamenting memory errors

 5    as a terrible problem, memory errors are essentially the

 6    byproduct of a really good feature of our memory because in

 7    many circumstances -- perhaps not the circumstances of a

 8    courtroom but in many other circumstances -- what we want with

 9    regard to the past is knowledge that is as rich, as full, as

10    well informed as possible.

11            And under those circumstances pooling together

12    information from various sources is a good thing and not a

13    problem because it gives us a richer understanding of how past

14    events unfolded.

15    Q.  What role does similar prior circumstances play in memory

16    error?

17    A.  I'm not quite sure I understand, although -- let me pause

18    for a moment and comment.  I just had a message flash on my

19    screen that my Internet connection is unstable.  I hope that's

20    not going to be a problem for us, but if I suddenly freeze,

21    it's not because I've been frozen in indecision.  It's -- but

22    that said, I'm not sure I understood the question.

23    Q.  For instance, if somebody is in the habit of writing

24    letters and there's questions about particular letters, is

25    there anything about prior similar circumstances that would --

1  that would play into memory error potential?

2  A.  Sure.  Two-point answer.

3       First of all, if somebody has gone through a series

4  of similar activities, that actually helps them to remember

5  the features that were shared from one event to another.  So,

6  I mean, if you've been in a coffee shop many, many times, that

7  will help you to remember the things that are always there in

8  that coffee shop.

9       But here's the other part:  That repetition

10 invites what is sometimes referred to as "repisodic blurring."

11 That's a terminology that's a shorthand for "repeated

12 episodes," and the "repisodes" blur into each other, making it

13 extremely difficult and, in many circumstances, impossible to

14 recall which conversations happened in which episode and which

15 details are associated with which episode.  You know, that's a

16 well-established pattern.

17      MR. JUBIN:  Okay.  Your Honor, I -- I think we're at

18 a point where I would offer Dr. Reisberg as an expert in the

19 science of memory and cognition and would request the Court's

20 permission to have his testimony go before the jury.

21      MR. SZOTT:  Your Honor, no objection to his

22 qualifications as an expert.  Clearly, he's qualified.

23      The Government's concerns, Your Honor, would be under

24 Rule 401, relevance; Rule 403, the danger of just confusing

25 the jury.

 1              I might also suggest Rule 104(b), which is

 2    conditional relevance.  To the extent some of these opinions

 3    are relevant, they may depend on facts that are not yet in

 4    evidence and may never be in evidence and in which case the

 5    United States might reserve the right to move to strike this

 6    testimony after it's offered, assuming that those additional

 7    facts are never presented.

 8              Those are the Government's concerns, Your Honor.

 9    This sort of testimony -- and, again, I -- the information is

10    fascinating -- but this -- this could potentially be presented

11    in any case -- or at least any case that involves, you know,

12    historical memories and periods.

13              So those are the Government's concerns, Your Honor.

14              MR. JUBIN:  Your Honor -- Your Honor, obviously,

15    evidence is admissible if it tends to make a fact more or less

16    probable if that fact is of consequence.  Here, we're talking

17    about a perjury allegation as one of them, so the -- the state

18    of human memory is incredibly important.

19              The Government has introduced not only documents

20    which tend to be inconsistent with -- with what happened but

21    also specific audiotapes, transcripts, things where it is

22    clearly already in issue that this testimony relates to.

23              Concerning, you know, Ian Horn and these NuTech

24    letters, there's no contemporaneous record of communication --

25    no -- no exchange of letters, submission of letters, that sort

1   of thing -- to suggest that it occurred.

2          And his lack of communication regarding these letters

3   that were obtained from Justin Herman's computer and these

4   letters and exchange between Winters and Herman bearing this

5   forged signature, it creates an obvious question as to whether

6   or not Mr. Horn's memories -- which the Government has

7   introduced -- are accurate or not accurate.

8          And the science as applied to that issue is just so

9   clear.  This isn't difficult or attenuated.  It's just clearly

10  relevant to whether or not his confession was accurate.

11         There's been interviews recorded, testimony already

12  about what he said, transcripts of it, so it's all in play at

13  this point, and, certainly, the information that Dr. Reisberg

14  provides is highly relevant to those questions.

15         THE COURT:  Well, the -- I agree with Mr. Szott.

16  Dr. Reisberg is qualified as an expert in cognition psychology

17  and, as an expert, of course, can express his opinions on

18  matters in issue before the Court.  I think the issue that we

19  are confronting is one that also has been identified by

20  Mr. Szott, and that is conditional receipt of -- of those

21  opinions with a possibility that the Government will move to

22  strike the testimony.

23         It sounds to me that based upon the facts that you

24  feel have been established in this case or the evidence in

25  this case as a basis for those opinions is presently in the

1    record of this proceedings.

2           Am I missing the boat with you, Mr. Jubin?

3           MR. JUBIN:  No.  You're -- you're right.  That

4    evidence is clearly in the record, the evidence to which these

5    opinions pertain.

6           THE COURT:  I'll -- whether anything's clearly in the

7    record is a very good question in my mind, in that one of the

8    issues in this case is your client testified before a grand

9    jury that the reason he did not have the evidence was his

10   computer crashed at a point, and, yet, there are a number of

11   emails that have been produced during that period.

12          MR. JUBIN:  Well, the issue there, Your Honor, is

13   whether or not he made a mistake.  There will be other

14   evidence that suggests his computer crashed.  Who knows when?

15          But the evidence is -- or the defense is that he

16   misunderstood the question because the focus has always been

17   on these opinion letters, and then he gets asked a leading

18   question -- if you'll look at that question that Mr. Heimann

19   asked in the perjury -- "How come you don't -- why don't you

20   have any emails?"

21          THE COURT:  There's absolutely no evidence that he

22   was confused whatsoever.  He didn't say he was confused.

23          MR. JUBIN:  No.  He didn't react as if he was

24   confused because he thought he understood the question.

25          But in combination with the other information that

1  the Court will receive concerning his lack of ability to pay

2  attention to things and Dr. Reisberg's testimony about

3  engagement and the formation of memories, it certainly goes a

4  long way to explain why he would make a confessional statement

5  about having written opinion letters -- many, many of them --

6  when there's no indication in the documents or the

7  communications that he had anything to do with them, number

8  one; and, number two -- I'm sure the Court has seen the

9  signatures.  There's really -- it's quite clear that these are

10  all cut-and-pasted signatures and he didn't sign them, yet he

11  testified that he signed them.

12          So these are areas of evidence that's in the case

13  that can be explained by the expert testimony of Dr. Reisberg.

14          THE COURT:  Well, whether or not these signatures --

15  signatures were furnished as part of a conspiracy -- you

16  realize people can participate in conspiracies in many, many

17  different ways.

18          MR. JUBIN:  Right.  But you can't deprive Mr. Horn of

19  his defense with respect to those --

20          THE COURT:  He cannot express opinions about this --

21  the particulars of this case or the credibility of this

22  witness.

23          MR. JUBIN:  Okay.

24          THE COURT:  And he's not a witness, not going to be a

25  witness in this case, so this is a fab- -- you know, something

 1   that's created out of -- something the jury will have to put

 2   together.

 3          MR. JUBIN:  Right.

 4          So what I'm saying is the expert testimony is

 5   relevant to those facts that are already in -- already before

 6   it.  And you're absolutely right; Dr. Reisberg will not go

 7   beyond what we just proffered and start talking about Ian Horn

 8   or -- or the plausibility of his -- his statements.

 9          THE COURT:  Never interviewed him; never studied him.

10          MR. JUBIN:  Right.  So -- so we'll limit the

11   testimony to avoid that issue.

12          MR. SZOTT:  Your Honor, one -- one request I might --

13   or one suggestion I might make -- I was mentioning this to

14   Ms. Harris before.

15          If it would be possible to at least try having

16   Professor Reisberg to call in for his audio, that might

17   alleviate any issues we have with bandwidth.  At least that's

18   something that has been suggested to us upstairs when we're on

19   video calls because, obviously, we don't want the connection

20   to lag the way it did during the prior witness.

21          So I -- if there's time to at least experiment with

22   that, that's a suggestion I might make.  I don't know if it

23   will help or not.

24          MR. JUBIN:  I didn't perceive we had any problems

25   here.  There was a couple times there was a brief flash.

19-CR-26-ABJ                                              Vol. X-1669
21-CR-14-ABJ

1          THE COURT:  He jiggled a bit.

2          No, he's been very clear and the reception has been

3     excellent.

4          But, Mr. Szott, I would take you under advisement.

5     If we have a problem, that's something maybe we should be

6     prepared with, maybe in advance.

7          MR. JUBIN:  So can we proceed, then -- it looks like

8     it would be a little less than an hour.  And I -- I don't know

9     exactly the order of witnesses here.  I'll work -- I'll work

10    with them and see if Dr. Reisberg is available to commence at

11    1:15 Mountain Time, which would be noon:15 in Portland.

12         THE COURT:  Yeah.  In addition, in terms of the

13    second piece of your argument, the jury will not have any

14    direct opportunity to form any opinions about your client's

15    memory.

16         MR. JUBIN:  No.  They'll have -- they'll have to use

17    circumstantial evidence, essentially, which, of course, the

18    Court will tell them they can use the same as direct evidence.

19         THE COURT:  True.

20         Okay.  Thank you, Dr. Reisberg.  We'll see you back

21    in -- well, Tom, you handle Dr. Reisberg's situation and talk

22    to him and --

23         MR. JUBIN:  Okay.

24         THE COURT:  -- keep him informed.

25         MR. JUBIN:  Okay.  So about 55 minutes or so.

1            Thank you.

2            THE COURT:  Are you going to miss your lunch?

3            MR. JUBIN:  Okay.  We'll see you then.

4            THE COURT:  We'll stand in recess.

5            MR. JUBIN:  You can sign off for now.

6            THE COURTROOM DEPUTY:  All rise.

7        (A recess was taken from 12:19 p.m. to 1:16 p.m.)

8            MR. FLEENER:  Judge, real quick:  With the Court's

9    permission, I'd like to step out -- this is Tom Fleener.

10           I'd like to step out and prep a witness while

11   Mr. Jubin's working with the good doctor.

12           THE COURT:  I have no objection.

13           MR. FLEENER:  Thank you.  I appreciate that.

14       (Proceedings within the presence of Defendants

15   Herman and Winters.  Mr. Fleener no longer present.)

16       (Discussion held between counsel and the witness.)

17           THE COURT:  The neurosciences have certainly changed

18   your field with great understanding of matters of drug

19   addiction, the role of the nucleus accumbens and the ventral

20   regimental accessories.

21           THE WITNESS:  Yes.  And the neurosciences had a

22   similar impact on, you know, the understanding of ordinary

23   functioning, like the understanding of memory.  We now know an

24   enormous amount about the biology of memory.  And if you want,

25   I suspect we could have a great time boring the jury by going

19-CR-26-ABJ          REISBERG - DIRECT - JUBIN          Vol. X-1671
21-CR-14-ABJ

1    through all of those nuts and bolts.

2            But I'm ready if you're ready.

3            THE COURT:  I was interested on the right side of

4    the -- oops.  Jury.

5        (Proceedings within the jury's presence at 1:22 p.m.)

6            THE COURT:  Thank you, ladies and gentlemen.  Please

7    be seated.

8            Mr. Jubin, you may introduce the next witness for us.

9            MR. JUBIN:  Thank you, Your Honor.

10           THE COURT:  And would he please -- in front of the

11   jury -- raise his right hand and be sworn.

12           MR. JUBIN:  Good afternoon, ladies and gentlemen.

13   Ian Horn calls Dr. Daniel Reisberg.

14       (Witness sworn.)

15    **DANIEL REISBERG, DEFENDANT HORN'S WITNESS, DIRECT EXAMINATION**

16   **BY MR. JUBIN:**

17   Q.  Could you state your name and spell it for the court

18   reporter, please, sir.

19   A.  Certainly.  My name is Daniel Reisberg, D-a-n-i-e-l

20   R-e-i-s-b-e-r-g.

21   Q.  And where do you live, Dr. Reisberg?

22   A.  I live in Portland, Oregon.

23   Q.  Can you tell the jury a little bit about your educational

24   background?

25   A.  Sure.

1    I have a bachelor's, master's, and PhD degrees.  They

2  are all in psychology.  The bachelor's degree is just in

3  psychology.  The master's and PhD are in what's called

4  experimental psychology, which basically signals that it is

5  the scientific research end of the field.

6    I'm trained as a scientist.  I use, you know, the

7  normal procedures and logic of science to study why people do

8  what they do, why people think what they think, and so on.

9  But, you know, basically, I'm trained as a researcher.

10  Q.  What kind of work have you done in your profession?

11  A.  Well, since, you know, 1980, which is when I got my PhD,

12  I've been working pretty much full-time as a member of the

13  scientific community.  That means I was a full-time faculty

14  member, first in New York City and then for the last

15  30-plus years here in Oregon.

16    And as part of my professional activities, I continue

17  to do research, continue to gather data, continue to publish

18  scientific articles, publish books, participate in, you know,

19  scholarly conferences, just, you know, basically being an

20  active member of the scientific community.

21  Q.  Do you do any kind of -- or have you done any kind of

22  teaching in the course of this work?

23  A.  Yes, I have, certainly.

24  Q.  And can you tell the jury about what -- what the nature of

25  your -- your teaching has been since you've been in Oregon for

1    these last -- what? -- 30 years?

2    A.   30-plus years.

3         My teaching has primarily focused on the corner of

4    experimental psychology that is my domain, namely cognitive

5    psychology.

6         A major topic within cognitive psychology is the

7    study of how memory functions, what helps people to remember,

8    what can sometimes undermine memory, and so with that I've

9    also been teaching a number of advanced seminars specifically

10   focused on memory.  And also because of my own interests

11   professionally, of course, that's specifically focused on how

12   the scientific study of memory can both help the legal system

13   and also be helped by the legal system.  The information flows

14   in both directions.

15   Q.   Do you hold or have you held any kind of professorship?

16   A.   Yes, I have.  I mean, in my years at Reed, I went through

17   the normal steps of promotion.  I started as an assistant

18   professor, promoted to associate professor, then full

19   professor.

20        And then several years before I retired, Reed honored

21   me by granting me an endowed chair so that, officially, my

22   title is the Patricia and Clifford Lunneborg Professor of

23   Psychology Emeritus.

24   Q.   So you said "emeritus."  What does that mean?

25   A.   It means I stepped down from teaching a couple years ago,

1    and so I'm no longer teaching.  I'm working mostly these days

2    as a writer and also doing some consulting.

3    Q.  Okay.  In the course of your professional life, have you

4    given any kinds of presentations?

5    A.  Yes, I have, both, you know, presentations inside the

6    scientific world -- and so, you know, for years I've regularly

7    attended -- excuse me -- the meetings of the Psychonomic

8    Society, meetings of the Western Psychological Association,

9    meetings of the American Psychology Law Society -- but, you

10   know, professional meetings in which academics get together

11   and discuss current research, discuss research questions that

12   need to be pursued.

13        I've also given a number of presentations outside of

14   the scientific world just as part of the broader effort toward

15   sharing this knowledge and making it, you know, accessible as

16   much as possible and as useful as much as possible.

17   Q.  What kinds of outside agencies have you given

18   presentations to?

19   A.  Well, primarily, they have been agencies connected with

20   some aspect of the legal system.  I have over the years given

21   presentations for law enforcement, both detectives and uniform

22   officers.  I have over the years given presentations for

23   private investigators.  I've given a number of presentations

24   for attorneys on -- more often defenders than prosecutors but

25   for both.  I've given presentations for the Oregon Bar

1    Association.  Those meetings were attended by prosecutors,

2    defenders, Judges.

3            I've given presentations, also, for the Oregon State

4    Legislature, trying to help the legislature think through

5    scientific basis for developing legal procedures governed by

6    Oregon statute.

7            I think that covers most of it.

8    Q.  Okay.  Have you done any publishing?

9    A.  Yes, I have.  I mean, certainly it's a -- in some ways

10   it's a requirement of living in the scientific world, both

11   because -- I mean, scientists are expected to make their

12   contribution, to add to what we know by doing research.

13           But, in addition, publishing is an absolutely crucial

14   part of the quality control that governs the scientific world

15   because, in the process of publishing, you take your reviews

16   and you present them to your colleagues, and then they are not

17   shy if you say something that's foolish or not justified or

18   out of step with other evidence, so it's a key part of how we

19   do our quality control.

20   Q.  Have you been involved in sort of the quality control for

21   the publications of others in your field?

22   A.  Yes, I have.

23           The official process of getting things into the

24   journals is a process referred to as peer review.  It's the

25   process that scientists of any sort use.  It's the, you know,

1    same process you would find in biology, chemistry, physics,

2    you know, any of the sciences.

3            And in that process I have served both as the person

4    who oversees the process -- you know, basically as a journal

5    editor or an associate editor -- and I've also participated as

6    the person who's actually doing the evaluation of papers that

7    some of my other colleagues are trying to get published.

8    Q.   Have you written any textbooks?

9    A.   Yes, I have.

10   Q.   What textbooks have you written?

11   A.   Well, I guess -- I mean, of the books that I've written,

12   I guess I'd say that four of them count as textbooks.

13           One of them is a book that is just a general

14   introduction to the scientific approach to psychology, what it

15   means to do research on a range of issues in psychology.  That

16   book is basically, you know, aimed at first- and second-year

17   university students.

18           I've also written a second book that's, you know,

19   aimed at more advanced students, specifically trying to

20   introduce them to the topic of psychology and what we know in

21   that domain.

22           The -- I guess a third textbook was aimed at my

23   colleagues, and it's a book that, you know, is aimed at

24   a clearly advanced audience, trying to let colleagues who work

25   in one part of the field know what's going on in other parts

 1   of the field.

 2          And then I guess the last one is a sort of textbook

 3   I wrote for Judges and lawyers, trying to, you know, train

 4   them on what the science offers in a fashion that I hope will

 5   be useful in the legal system.

 6   Q.   Do you have one of those textbooks in particular that's

 7   gone through multiple editions?

 8   A.   About -- actually -- I mean, both the -- the general

 9   psychology book made it to its eighth edition before we

10   decided we wanted to work on other projects.  The cognition

11   textbook is the ongoing project.  That's what I'm most engaged

12   with these days.  And I just finished up the eighth edition of

13   that book.

14   Q.   What's that book called?

15   A.   It's called Cognition, Exploring the Science of the Mind.

16   Q.   Have you been qualified as an expert in the science of

17   human memory and perception?

18   A.   Yes, I have.

19   Q.   And that's in court?

20   A.   Yes.

21   Q.   Have you testified as an expert before?

22   A.   Yes, I have.

23   Q.   And how frequently?

24   A.   Oh, it varies year by year.  I mean, this is not work I go

25   looking for, so it's just a question of, you know, what cases

 1  come my way and, from that larger group, you know, what

 2  fraction of them end up in the courtroom.

 3        I'd say in a slow year I might be testifying, you

 4  know, every two or three months.  In a really busy year

 5  I might testify as many as, you know, every three weeks.

 6  Q.  Okay.  Where have you testified as an expert?

 7  A.  I have over the years testified in both Federal Court and

 8  in State Court, Federal Court in a couple of different

 9  jurisdictions.  In State Court I've testified in -- let me

10  count -- Alaska, Washington, Oregon, California, Idaho,

11  Montana, Colorado, Nevada, Illinois -- at some point I ended

12  up on the East Coast in New Hampshire.

13        I think that's most of them.  I may have forgotten

14  one or two, but mostly states in the western portion of the

15  US, mostly this side of the Rockies.

16  Q.  Forgive me if you've answered this question.  But where

17  did you get your PhD?  Where did you do your graduate studies?

18  A.  Sorry.  My undergraduate degree and my bachelor's degree

19  was from Swarthmore College just outside of Philadelphia, and

20  then I moved all the way into the center of Philadelphia, and

21  my master's and PhD are both from the University of

22  Pennsylvania.

23  Q.  How is cognitive psychology different from psychology

24  involved in the treatment of clients or patients?

25  A.  If I can, let me broaden that a bit.  I mean, I've said

1   earlier on that I'm trained as an experimental psychologist.

2   That term in some ways marks the fact that there's really two

3   different fields, both of which are called psychology, so it's

4   easy to be confused about this.

5           There is the psychology that is concerned with mental

6   health issues, and those are the people who do diagnosis, they

7   do assessment, they do counseling, they help you out if you're

8   struggling with life's challenges.  They are, for the most

9   part, licensed by the State.  They might have a hospital

10  affiliation, but for the most part they have a private

11  practice, and all of that is separate from experimental

12  psychology.

13          We do not do research -- therapy; we do not do

14  diagnosis.  As I said earlier, we're scientists and, you know,

15  we ask questions using the scientific method about, you know,

16  how the mind works, how behavior works.

17          And then, you know, within cognitive psychology --

18  which is what you asked about.  Cognitive psychology is, you

19  know, routinely defined as the scientific study of how people

20  gain their knowledge, how people store their knowledge in

21  their memories, and then how people use their knowledge for

22  making decisions, for drawing conclusions, or in any other

23  way.  And so that group of topics is what defines cognitive

24  psychology.  And, again, as a subfield within the broader area

25  of scientific psychology.

1  Q.  So I gather, then, that you're familiar with the research

2  in the field of cognitive psychology dealing with the science

3  surrounding human memory.

4  A.  Oh, I have to be.  I mean, that's what -- I mean, among

5  other things, you know -- fills my days; that's what fills my

6  books.  So, yes, I am familiar with it.

7  Q.  Is there a body of knowledge concerning human memory

8  that's based on peer-reviewed scientific study?

9  A.  Yes.  I mean, basically, all of the scientific knowledge

10  has to be run through the peer-review process.  It is, again,

11  how we do our quality control.

12        And there's a large body of knowledge accumulated

13  across the last -- oh, I guess I would say -- across the last

14  120, 130 years studying different questions about memory.

15  Q.  Can you sort of generally describe how the research is --

16  the nature of the research that is conducted in your field?

17  A.  I mean, the answer's a little complicated because there's

18  not a -- you know, one path that is always traveled.  One

19  large portion of the research uses one or another variation on

20  sort of the same skeleton.

21        I mean, you arrange for people to witness an event or

22  experience an event or participate in an event.  You then let

23  some time go by and, in one fashion or another, you question

24  them about what happened.

25        And since you know what the original event was,

1  you're then obviously in a position to evaluate whether their

2  memories are accurate, whether their memories are mistaken,

3  what things they do remember, what things they leave out.

4       And from that sort of skeleton, you can now layer on

5  a long list of research questions of, you know, what happens

6  if you question people this way versus that way, what happens

7  if you question people after a year rather than asking --

8  questioning them after a day.  I mean, you can then ask many

9  questions about how the results change as you alter one or

10  another aspect of the situation.

11       So that really describes not a -- a procedure but a

12  broad family of procedures.

13       The problem with doing that research is that it is

14  often done in a circumstance that is separate from people's

15  day-by-day lives, and in some ways that's useful because it

16  means the scientists can set up the situation exactly the way

17  they want it, make the right comparisons, make the right

18  measurements.

19       But there's a danger there of artificiality, and

20  that's why a completely separate line of work studies memory

21  as it functions in normal day-to-day functions, and, you know,

22  research in this category -- again -- takes several different

23  forms.

24       There are studies that rely heavily on court records

25  and examine what witnesses do or did not remember.  There are

1   studies that rely on, you know, police files; again, asking

2   what witnesses -- or, for that matter, victims -- do or do not

3   remember.

4           There's also studies that just, you know, go out into

5   the field and quiz people about, you know, day-to-day events

6   that they've experienced as part of their ordinary lives.

7           And what you want to do is then use each of these

8   different lines of research to cross-check each other with the

9   hope that you're going to get, basically, the same conclusions

10  no matter what form the research takes.

11          And, you know, I might mention that's a -- an

12  important part of all of the sciences.  You always want to

13  come at a question from different angles just to make sure

14  that you're really seeing what's there and not somehow

15  distorting the picture by asking the question in a peculiar

16  way.

17  Q.  Is the state of knowledge in your field such that there's

18  a body of knowledge that's generally accepted in the relevant

19  scientific community?

20  A.  There's certainly a large, you know -- very large, you

21  know -- group of claims that are now firmly rooted in

22  evidence, certainly generally accepted.

23          I mean, there are points of disagreement because

24  scientists go looking for points of disagreement.  That's how

25  we figure out where we need more information, where we need

1    more research.

2            But yeah.  I mean, across the last century plus we've

3    accumulated, I think, a fairly rich, fairly powerful

4    understanding of how memory functions.

5    Q.  Are your opinions and descriptions in this matter based

6    upon that body of knowledge that's generally accepted in the

7    relevant scientific community?

8    A.  Certainly, in testimony I either would rely on claims that

9    are generally accepted or, if we stray into material that's in

10   some way controversial, I'll certainly do my best to flag that

11   at that moment I'm talking about something controversial.

12   But, in general, what I would always want to do for the courts

13   or for any audience is present the science that is firmly

14   established and generally accepted.

15           MR. JUBIN:  Your Honor, at this time I'd offer

16   Dr. Reisberg as an expert in cognitive psychology involving

17   the study of human memory and perception.

18           MR. SZOTT:  No objection, Your Honor.

19           THE COURT:  Ladies and gentlemen, Dr. Reisberg is

20   called as an expert witness.  Normally, persons who are

21   appearing before a Court or jury are not able to express

22   opinions about issues, but where issues involve matters that

23   may benefit from the opinions of someone who has special

24   knowledge, an expert may be called upon.

25           So what we're concerned about is education,

1   knowledge, experience in the field, which you will judge,

2   ladies and gentlemen, as well as the opinions that are given

3   and whether they seem to you to be reasonable and supported by

4   the evidence that's provided.

5          You do not give up your job as jurors in weighing the

6   credibility of each expert witness who appears, just as you

7   judge the credibility of all witnesses who appear before you.

8   BY MR. JUBIN:

9   Q.  Dr. Reisberg, does memory work according to the

10  commonsense perception of it?

11  A.  I mean, I -- the fast answer is no.  And maybe we should

12  start by being clear on, you know, what the commonsense

13  understanding is.

14         You know, many people seem to have the idea that

15  memory works pretty much the same way a video recorder works,

16  and, you know, at -- you know, as a first pass, that

17  comparison is sensible.

18         I mean, memory and the video recorder both have an

19  input process in which information is placed into storage.

20  Both systems then hang onto that information, whether it's,

21  you know, in, you know, tissue in your brain or whether it's

22  on, you know, your computer hard drive.  The information is

23  then held.

24         And then, later on, there's an output process when

25  the time comes to remember, perhaps because someone's asking

1  you questions or, in the case of the device, because somebody

2  hits the "Play" button.

3          But, you know, even though there is that superficial

4  resemblance, memory, is in a number of crucial ways, very

5  different from a video recorder.  And if I may, let me just,

6  I think, point to two, I think, really important differences.

7          One of them is -- I mean, if a video recorder is

8  turned on and it's functioning properly, it records absolutely

9  everything that's in front of the lens.  It doesn't make any

10  selections; it doesn't make any choices; it just takes in

11  everything.

12          That's not at all how memory works.  Our memories are

13  much more selective than that.  We only take in some of the

14  information that's reaching us through our eyes or reaching us

15  through our ears, and we're also much more active in bringing

16  in the information.

17          And so if the information is sort of in a passive

18  way, just washes over us, it's likely not to get into memory

19  at all.  And so that's one, you know, very different pattern

20  of functioning with our memories being selective and also

21  active.

22          And then the other, I think, very large difference

23  between our memories and a video recorder is that -- I mean,

24  when information is put onto your computer drive or onto

25  the -- you know, inside your phone -- however, you know, it's

1  stored in the phone; please don't ask me about the

2  technology -- I mean, it just sits there.  It's just dormant.

3          And assuming that the device is kept intact -- that

4  it's not, you know, overheated or gotten wet -- when the time

5  comes for playback, what you're going to get back is exactly

6  what went in in the first place.  And, again, memories are

7  very different.

8          Our memories are fabulous at constantly absorbing new

9  information -- sometimes from the outside, sometimes

10  information that we figure out for ourselves -- but that new

11  information is always getting layered on top of and, for that

12  matter, woven into what's in storage.

13          And so, if I may, our memories are both better and

14  worse than the video gadget.  They're worse because our

15  memories do a much less good job of hanging onto what was

16  there in the first place, but, at the same time, our memories

17  are better because our memories can, you know, repair

18  misunderstandings, fill in gaps, update information once we

19  learn a little bit more.  So our memories just do a much

20  better job in the end of representing our understanding of how

21  our lives have unfolded.

22          So -- sorry.  Long answer but there it is.

23  Q.  Are there ways in which memory is consistent with

24  commonsense notions?

25  A.  Oh, absolutely.  I mean -- look.  We all have memories;

1   we've all been relying on our memories for, you know, all of

2   the years of our lives.  That's certainly given us an

3   opportunity to, you know, observe how our memories function.

4        And so, yeah, there are certainly many commonsense

5   understandings of memories that are correct.  But those sit

6   alongside of the fact that, you know, in many cases, our

7   commonsense understanding is either just flat-out wrong or, in

8   some cases, has a seed of truth but doesn't really capture the

9   full truth.

10       So, yeah, the relationship between the science and a

11  commonsense understanding is a little bit complicated as you

12  move from issue to issue.

13  Q.  Let's talk a little bit about memory errors.  What does

14  the science tell us about memory error?

15  A.  I mean -- I mean, in some ways that's going to build

16  directly on what I just said about the contrast between our

17  memories and a video recorder.  What our memories are really,

18  really good at is absorbing new and different pieces of

19  information as, you know -- imagine I'm learning for the first

20  time about, you know, how a court trial unfolds.

21       And I might learn something, you know, from reading

22  the book, and then I might learn something else from watching

23  a TV show, and then I might learn something else because I'm

24  in the courtroom and I observe it for myself.  And I might

25  learn something else because the Judge gives me an important

 1    bit of information.  And that information comes in in bits and

 2    pieces; it comes in at different times.

 3         And what our memories are fabulous at is taking all

 4    of those different pieces of information and doing cross-

 5    referencing, doing integration.  And so what we end up with in

 6    our knowledge is not "This is what I learned last Tuesday" but

 7    "This is what I know overall.  This is the full pattern of

 8    what I know."

 9         And so, you know, in that regard, our memories are

10    knowledge accumulators -- or maybe I should say "knowledge

11    builders."  It's how we get to know so many things about so

12    many things.

13         And now I'm ready to talk about memory errors because

14    we pay a price for that richness, which is, as we weave

15    together things that we encountered in one setting with things

16    that we encountered in some other setting, we often lose track

17    of where and when and how we picked up each piece of

18    information.  And that's where the memory errors come from,

19    because people often make errors about the source of this or

20    that bit of knowledge, and that's why, from a scientific

21    perspective, the vast majority of memory errors are described

22    as "source errors" or sometimes "source confusion," because in

23    those cases you are correct that an idea was somehow,

24    somewhere, sometime part of your past, but you make a mistake

25    about the where and when.  And so you might think you

1  experienced something when the reality is you only heard about

2  it, or you might think that you saw something firsthand when

3  the reality is you read it in a book, you know, that sort of

4  thing with many variations on those ideas.

5        That's what memory errors are all about.  They're

6  basically the price we pay for this exquisitely powerful

7  knowledge generator.

8  Q.  Does it take much to cause memory error?

9  A.  No.  I mean -- I mean, in, you know, study after study --

10  and, you know, I'm happy to walk through research examples if

11  it would be helpful.  But in study after study, we can easily

12  document that just a single exposure to a bit of information

13  you hear from a friend or just even a single word in a

14  question is enough to spin memory offtrack.

15        You know, for example, it matters whether the police

16  ask a witness "Did you see a gun?" or "Did you see the gun?"

17  That difference from "a gun" to "the gun" in some studies

18  quadruples the number of people who say they saw a gun.

19        If you ask people "How fast were the cars going when

20  they bumped into each other?" versus "How fast were they going

21  when they smashed into each other?" you know, that one-word

22  change can produce a large shift in memory.

23        So, you know, it takes remarkably little to pull

24  information -- to pull our memories offtrack.

25  Q.  Once they are pulled offtrack, how difficult is it to undo

1    what's been pulled offtrack?

2    A.   The answer is it's very difficult.  I mean, what literally

3    happens when you pick up this new information is that you

4    basically rewrite what's in your memory.

5         It's -- I mean, I guess -- and I -- the example that,

6    you know, I sometimes use is -- I mean, if you have a rough

7    draft of a paper and you edit it to add new information or

8    correct your earlier mistakes, what you now have is the new

9    draft.  And that's what's now in your memory, and the old

10   draft is gone in most cases.

11        It's why this process of knowledge accumulation is

12   sometimes referred to in the field as destructive updating.

13   And the idea of updating makes it sound like it's a good

14   thing, because you end up with more knowledge than you had

15   before, better knowledge than you had before, but the notion

16   of destructive updating really answers your question because

17   the old information is, in most cases, gone.

18   Q.   What -- what is the scope of these kinds of errors?

19   A.   If there is a limit, we have not found it yet.  You know,

20   I've mentioned studies in which just a single word can change

21   somebody's memory.  In order to produce larger errors,

22   I think, not surprisingly, you need a larger influence.

23        But, you know, again, I'm happy to give you research

24   examples if you'd like.  But, you know, in a number of studies

25   just, you know, two or three rounds of questioning, sort of

19-CR-26-ABJ        REISBERG - DIRECT - JUBIN        Vol. X-1691
21-CR-14-ABJ

1    an hour of questioning here, come back a week later, an hour

2    of questioning there -- you know, a procedure like that is all

3    it takes in many cases to get people to remember -- I should

4    put, you know, quotes around the word "remember" but -- you

5    know, to get people to remember entire episodes that never

6    took place at all.

7            And so in some studies people have remembered, you

8    know, trips to the emergency room that actually did not

9    happen.  In some studies people have remembered a time they

10   almost drowned at the ocean, even though it never happened.

11   In one study people remembered being detained by the police

12   for a major felony, even though it never happened and on

13   through.

14           I mean, it's -- like I said, if there is a limit on,

15   you know, how far offtrack memory can sometimes go, we haven't

16   located that limit yet.

17   Q.  Is there any difference with respect to memory error if

18   we're talking about at the time of the event or when you're

19   trying to recall prior instances or if it's at some moment of

20   recall?

21           Can you tell the jury what you know about the timing

22   of memory error?

23   A.  Boy, memory errors -- or, if I may, source confusion or,

24   if you prefer, destructive updating -- those processes can

25   happen pretty much at any time.

1          I mean, when you are first experiencing an event, if

2    you do not pay close attention, you're not thinking about the

3    event, you're not engaging it, then what's going to go into

4    your memory is going to be pretty thin, and that's going to

5    leave you much more vulnerable to memory errors down the road.

6          Likewise, if, when you're experiencing something, you

7    misunderstand it and you interpret it the wrong way, then what

8    goes into your memory is not the raw information.  What goes

9    into your memory is your interpretation.

10          So those are two regards in which events at the

11    moment of the experience itself can have an impact on how

12    accurate your memory's going to be down the road.

13          And then, in the period of time after the event and

14    before the time when you're trying to recall, the period of

15    time obviously matters, and the main reason it matters is

16    because, as time goes by, there's more and more of a chance

17    that you might come across some other information that is, in

18    one way or another, connected to the original episode.  And

19    that new information's going to get woven into the original

20    episode, and that can have an impact on memory and accuracy.

21          So we've got influences during the event, we've got

22    influences after the event, and then when the time comes to

23    recall, if you are asked questions that are in any way leading

24    or guided -- if you're exposed to, you know, somebody saying,

25    "Hm-m, I think this is the way it played out" -- you know, any

1    of those things at the time of recall can also have an impact.

2            So -- I mean -- again, I mean, what's going on here

3    is that our memories are just fabulous at absorbing

4    information and that, you know, new information can get woven

5    in at any point in the sequence.

6    Q.  Once -- once there has been a memory error, can the person

7    tell that they're experiencing a memory error?

8    A.  I mean -- yes, in some circumstances.  Right?  I mean,

9    if -- I mean, you'll remember very vividly that you were

10   supposed to -- oh, I don't know -- buy milk at the store, and

11   then you get home and, you know, you're pretty sure you bought

12   milk, and then you look in the refrigerator and there's no

13   milk.  Sometimes just physical evidence tells you immediately

14   that your memory must be offtrack.  You're sure you mailed the

15   letter, but, oops, there it is still in your pocket.

16           You know, physical evidence can signal a memory

17   error, but, you know, if we step away from those somewhat

18   unusual circumstances, the reality is that most memory errors

19   are undetectable.  And what I mean by that is, you know, if

20   you look at cases in which we are totally sure somebody's

21   making a memory error and you look at cases in which we're

22   totally sure somebody has it right and you compare the two,

23   there's really no difference worth talking about in terms of

24   how detailed they are or how certain the person says they are,

25   just -- you know, those obvious commonsense ways of checking

1   on a memory turn out not to be very useful at deciding whether

2   a memory is accurate or not.

3           And so on that basis, often our memories go

4   completely -- our memory errors go completely undetected.

5   Q.  Tell the jury a little bit about what level of certainty

6   people who have experienced memory error might have with

7   respect to the memories they claim to hold.

8   A.  The answer is a little bit complicated.  And part of the

9   reason is, you know, level of certainty is not a fixed

10  quantity.

11          Again, you know, let's start with common sense.  You

12  know, we often talk about how important it is to build

13  somebody's confidence because they're, you know, not confident

14  enough, and we try to build their confidence.  I mean, the

15  fact that we talk like that makes it clear that somebody's

16  confidence level can be massaged up or down.

17          You know, we talk about circumstances that cut into

18  somebody's confidence.  Again, the fact that we talk like that

19  emphasizes that we all understand that a confidence level can

20  be massaged up or down.  Researchers refer to that as

21  confidence malleability, the idea that somebody's level of

22  confidence can be changed.

23          And from that base, I mean, what the research tells

24  us is under very fussy, precise conditions there is a really

25  tight relationship.  If somebody says they're certain, they're

1   going to get it right.  And if somebody says they're guessing,

2   then there's a real danger of error.  And so in a range of

3   circumstances, how certain somebody is and the likelihood of

4   being right track each other beautifully.

5          But now confidence malleability enters the scene, and

6   if somebody's memory is what it is and we do steps that

7   inflate their confidence or somebody's memory is what it is

8   and we do steps that cut into somebody's confidence, the

9   relationship just collapses.

10          And so in many day-to-day, real-life circumstances,

11  somebody's level of certainty actually may tell you rather

12  little about whether their memories are accurate or not.

13  Q.  What influence does the passage of time have on memories

14  and how does that compare to the commonsense notion?

15  A.  Okay.  Again, let's start with common sense.  Common sense

16  tells us, of course, that it's, you know, easier to remember

17  things that happened, you know, a few minutes ago compared to

18  things that happened a year ago; right?

19          I mean, if I ask you what you had for lunch today,

20  the chances of you getting it right are pretty good.  If I ask

21  you what you had for lunch two years ago, there's no way that

22  you're going to be able to come up with it, I suppose.  But

23  common sense suggests that what really matters here is the

24  passage of time, and it turns out that that's wrong.

25          The reason that it's harder to remember events from

1    way back when is that, as time goes by, there's just more and

2    more of a chance that you're going to encounter new

3    information, new ideas, new suggestions that can shift your

4    memory.  And so what happens as time goes by is essentially

5    interference from new information that you encounter.

6           So common sense has it right, the passage of time has

7    it -- you know, it does matter, but common sense has it wrong

8    when it identifies the -- the mechanism, the cause and effect

9    there.

10          And I guess the other thing that's important is

11   common sense suggests that some memories last forever.

12   I mean, people talking about things like "I know it was

13   many years ago, but I remember it as though it was yesterday."

14   Or "I'll remember that until the day I die."  I mean, people

15   talk like that.

16          But when you examine those memories, you find,

17   basically, there's no such thing as a memory that is immune to

18   the passage of time.  Some memories fade more rapidly; some

19   memories fade more slowly, but all memories fade as time

20   goes by.

21   Q.  What relevance might there be concerning the accuracy of

22   dates in terms of like when things actually happened?  Is

23   there any scientific knowledge in that area in your field?

24   A.  Sure.  I mean, it's a topic that has been, I think,

25   reasonably thoroughly researched.

1      Let's start with the fact that, you know, we're

2  better at remembering some things, worse at remembering other

3  things.  And one of the things that we're quite bad at is

4  remembering dates, you know, exactly when something happened.

5      The one circumstance in which we do remember dates is

6  if there's some solid benchmark -- you know, a holiday, a

7  particular vacation, Christmas, a birthday -- and there has to

8  be some meaningful connection between the event and the -- the

9  benchmark.

10      And so, you know, if somebody says, "I'm sure it

11  happened before Christmas," that's not going to be an

12  indication of accuracy.  If somebody says, "I'm sure it

13  happened before Christmas because I remember we were right in

14  the middle of a great big discussion about what gifts we were

15  going to buy and we were right in a big discussion about where

16  we would find the time to do all the shopping" -- you know, if

17  they can link it in that sort of meaningful way, that does

18  give you relatively accurate memory.

19      And the reason I just landed on the word "relatively"

20  is even there there's some slippage because, you know, the --

21  the specific example I just gave you would allow you to

22  remember that a particular event was in the lead-up to

23  Christmas, but it won't tell you which Christmas.

24      And people, even when they're accurate in tying an

25  event to a benchmark, often make errors about which benchmark.

 1  So they might remember that it was Christmas, but they lose

 2  track of which Christmas.  They might remember that it was a

 3  weekend, but they lose track of which weekend.

 4         And so, you know, when they make errors, they're

 5  often offtrack in a really obvious way, off by 12 months --

 6  and if not off by 12 months, off by 24 months; right?  I mean,

 7  they're off by one year or two years or three years because

 8  they're confused about which Christmas it was.  That's the

 9  pattern that you see even when an event is meaningfully tied

10  to a clear benchmark.

11  Q.  What's the effect of the level of engagement of a person

12  at the time the events that form the memory occurred?

13  A.  I mean, the answer is the level of engagement is crucial.

14  And, again, we can go back to what I said earlier about the

15  comparison between your memory and a video recorder.

16         It takes some work to get information into memory.

17  And there's by now, oh, dozens of demonstrations of -- again,

18  I'm happy to give you examples if you like but -- dozens of

19  demonstrations that if someone has a particular item in front

20  of their eyes over and over and over -- even for -- you

21  know -- for years -- but they never have any reason to pay

22  attention to it, to engage with it in some way, to think about

23  what the thing means or what it implies -- I mean, if you

24  don't do that mental work, things do not go into memory, even

25  things that you've been exposed to over and over.

1    So the level of engagement is crucial for getting

2  information established in memory at the start.

3  Q.  What is the effect on memory of information provided by

4  others?

5  A.  Again, you know, we're back to that same general

6  principles.  What our memories are really good at is taking in

7  many different pieces of information and assembling them into

8  a package so that what now lives in your memory is based on

9  the totality of what you know, what you've heard, what you've

10  seen about a particular topic.

11    And if you pick up information from others, that just

12  becomes part of the package.  It becomes part of the broad

13  package of what you know about a particular event.  And so

14  information from others is one of the very easily demonstrated

15  ways that source confusion can arise when you think you

16  experienced something when the reality is you merely heard

17  about it from some other person.

18  Q.  Does it make any difference if the person you heard it

19  from has some perceived authority in your mind?  Or

20  perceived --

21  A.  Oh, absolutely.  Yeah.  Absolutely, yes.  I mean, it's --

22  I mean, you're much more likely to take information seriously

23  and absorb it into your memory if it comes from a source that

24  you think is likely to be trustworthy, either because the

25  source has some professional authority or maybe the source is

1    someone who's told you good information in the past.  But, you

2    know, no matter how it happens, if it's a source that you

3    trust, you're more likely to absorb information that they

4    suggest to you.

5    Q.  What about visual inputs?  If you're shown documents or

6    something like that, what's the effect of that?

7    A.  I mean -- I guess -- several-part answer.  First of all,

8    since our memories are so good at picking up information, they

9    can pick up information from, you know, language that you

10   encounter.  They can pick up information from, you know, a

11   picture that you see, a document that you view.  I mean, all

12   of that just gets, you know, absorbed into the totality.

13          In addition, pictures turn out to be -- or

14   documents -- turn out to be particularly powerful as a way of

15   establishing memory errors, mostly because the documents, you

16   know, are connected to what we were talking about just a

17   moment ago; namely, the documents make the information look

18   more trustworthy, look more compelling, look more persuasive.

19          And so, you know, again, you know, an easy thing to

20   show and research.  What you do is make a suggestion to some

21   people without any sort of documentation or you make a

22   suggestion to people with the documentation, and what you find

23   out is a much greater risk of error in the people who saw the

24   documents or the pictures or whatever.

25   Q.  What about leading questions?  What's the effect on memory

1  there?

2  A.  Same answer:  I mean, it's going to be the same mechanism

3  throughout.  You know, whether you're picking up information

4  from a document or a suggestion that you hear or a leading

5  question -- I mean, in some ways our memories are -- how do

6  I want to say this? -- are gloriously opportunistic.

7         I mean, they grab information anywhere they can.  And

8  in many regards it does not matter how that information comes

9  in, a suggestion, a document, a leading question.  All of that

10  ends up getting soaked into your memory and, you know,

11  becoming part of the package of how you think about the past.

12  Q.  You mentioned the -- the authority of someone.  Does it

13  make any difference if it's somebody like a prosecutor or a --

14  a law enforcement agent or something like that?

15  A.  I don't think any studies that I know of have ever

16  compared questions from somebody wearing a badge versus

17  questions from somebody not wearing a badge.  What matters,

18  study after study, is whether you trust the person, whether

19  you think they know what they're talking about.

20  Q.  And if they know what they're talking about, what happens?

21  A.  You take their information more seriously, increasing the

22  likelihood that you'll absorb it into your memory.

23  Q.  Does it make any difference if you believe that the person

24  has superior information?

25  A.  Same answer:  I mean, what really matters is do you think

1    the person knows what they're talking about so you can take

2    their information seriously.  That's what makes the outside

3    suggestions more powerful.

4    Q.  Once you've been pulled offtrack -- once a person -- the

5    person whose memory is at issue -- has been pulled offtrack,

6    is there any way to reclaim what's -- what's real, in essence?

7    A.  Yes and no.

8         I mean, certainly, research has been poured into the

9    question of whether it's possible to peel back these

10   influences, whether it's possible to unring the bell.  And,

11   you know, there are specific procedures that can, by a small

12   amount, decrease these influences but only by a small amount.

13        It really looks like the main pattern of the evidence

14   is once new information has been absorbed into your knowledge,

15   once it's part of what you now believe happened in the past,

16   it's now what you believe.

17        And so, you know, there's -- if you confront

18   somebody, aggressively confront somebody, quiz somebody, what

19   you're going to get is what they believe, and what they

20   believe is now shaped by this new information.

21   Q.  What happens regarding the details surrounding a memory

22   that is the product of memory error?

23   A.  Well, I've already testified that in many cases memory

24   errors can be just as richly detailed as memories for actual

25   events.  And often what happens is when someone, you know,

1  starts thinking back to a past event that actually did not

2  happen, what they tend to do is, you know, fill in the event

3  with other things that they know.

4          And so -- I mean, somebody might, from the outside,

5  make a broad suggestion of, you know, "Do you remember the

6  time you were at the seashore and almost drowned?"  And that's

7  the influence.  But then the person on their own starts

8  fleshing out that memory with other things they know about

9  seashores and other things they know about lifeguards and

10  other things they know about swimming accidents.

11          And so often it's sort of a cooperative effort of

12  influence coming from the outside and then the person on their

13  own fleshing out that memory based on other things they know.

14  Q.  So they sort of populate the information with details?

15  A.  Yeah, that's right.  That's exactly right.

16  Q.  So what comes into play when a person tries to remember

17  the past?

18  A.  What happens at the time of remembering is -- I mean, let

19  me put this positively, and then we can, you know, look at the

20  downside.

21          What happens is a wonderfully sophisticated process

22  in which the person draws some bits out of their memories.

23  And, for what they don't remember, they engage in some amount

24  of after-the-fact reconstruction, sort of backfilling based on

25  other things they believe, other things they assume, other

 1    things that they know about how the world works in general.

 2          And the key is going to be that the actual bits of

 3    memory and the bits of backfill, the after-the-fact

 4    reconstruction, are woven together seamlessly, and so the

 5    person often has no way of knowing which bits they're really

 6    recalling and which bits they're inferring.  It's just the way

 7    it works.

 8          Anyway, so in some ways -- I mean, like I said -- if

 9    we can spin this positively, it means you really do your best

10    to reconstruct what happened in the past based on everything

11    you know, which sounds really terrific.  The problem is that

12    sometimes your supposition, sometimes your inferences are

13    offtrack because maybe an event unfolded in that particular

14    occasion differently, the way -- than how it usually unfolds.

15    That's going to be a case in which your memory is going to be

16    offtrack.

17    Q.  Does -- the person who holds a memory that's -- that's

18    been influenced by memory error, do they have a -- do they

19    know that -- do they know that fact, that there's memory error

20    there?

21    A.  Usually not because, like I said, the weaving together of

22    memory and after-the-fact supposition is seamless.  And, for

23    the memory itself, again, memories that are actually mistaken

24    can be just as detailed and associated with just as much

25    certainty as any other memory.

1  Q.  What's the usefulness of the present memory of a person

2  who has had their memory affected by false memories?

3  A.  I mean -- I mean -- I keep trying to spin this positively.

4  I mean, it depends on what use you have in mind when you're

5  evaluating usefulness.  I mean, if the use is you want to have

6  the very best understanding of what happened in the past, then

7  our memories are great.

8          And, if I may, the comparison that's sometimes made

9  is a comparison to what a jury has to do in a trial.  I mean,

10  a jury has to form their very best assessment of what did or

11  did not happen at some particular point in the past, and

12  they're going to pull together information that they heard

13  from one witness with information they heard from another

14  witness with things that they were able intelligently to

15  figure out on their own.  And I assume that's what we want the

16  jury to do, to make the smartest possible, wisest possible

17  understanding of what happened in the past.

18          If that's the kind of use of memory that you have in

19  mind, let's not talk about juries; let's talk about a single

20  person.  For that purpose our memories are fabulously useful.

21          On the other hand, if you want memory to be something

22  like a time machine that lets you go back in time and look

23  exactly at what happened 17 months ago, 29 months ago, at

24  whatever point in the past -- for that very different purpose,

25  memory errors are a problem and cut into the usefulness of

1    memory.

2    Q.  So for somebody who has experienced false memories or --

3    or been subject to memory error in the past, if they were to

4    try to relate presently what the reality is, how would that

5    work?  Would it be possible?

6    A.  I mean, if someone is trying right now to remember exactly

7    what happened in the past -- you know, step by step, moment by

8    moment, what was the historic event -- for that purpose that

9    person is very likely to be influenced by, you know, whatever

10   else they have heard, read, thought about, dreamed about in

11   the interim.  And so for those sort of nitty-gritty, moment-

12   by-moment details, they're going to have a problem.

13   Q.  Can you tell the jury a little bit about similar prior

14   circumstances and how that may affect -- how that may affect

15   false memories?

16   A.  I mean, I'm not sure -- I mean, false memories are going

17   to be what's crucial here, although we'll get there in a

18   second.

19           I mean, if someone experienced a series of obviously

20   related events -- I mean, conversations that you've had with

21   your boss on various points or visits to a particular

22   restaurant that you've gone to over and over -- the main thing

23   to keep track of is that those various episodes are likely to

24   blur into each other.  Researchers talk about those as

25   repeated episodes and use the fancy shorthand of "repisodes."

 1   And the pattern that you get is what's referred to as

 2   "repisodic blurring" for "repeated episodes blurring

 3   together."

 4            And so, at the very least, somebody's going to have

 5   trouble remembering which bits happened in which episode.

 6   "Did I have the conversation with my boss at that meeting or

 7   at that meeting?"

 8            And the errors that you often observe in those

 9   cases -- and, again, I'm happy to give you research examples

10   if you'd like.  But the errors that you observe is that

11   somebody might vividly and with great certainty recall that

12   they had a conversation in this meeting when the reality is

13   that it happened in some other meeting.  That's the kind of

14   errors that you get when you have repeated episodes.

15            MR. JUBIN:  I'll pass this witness.

16            Thank you, Dr. Reisberg.

17            THE WITNESS:  You're very welcome.

18            THE COURT:  You'll be speaking to Mr. Szott.

19            MR. SZOTT:  Professor Reisberg, good afternoon.

20            THE WITNESS:  Good afternoon.

21       (Mr. Fleener present.)

22            MR. SZOTT:  If you are unable to understand one of my

23   questions because of the mask, would you please let me know.

24            THE WITNESS:  Certainly.

25            MR. SZOTT:  Thank you.

1                      **CROSS-EXAMINATION**

2  **BY MR. SZOTT:**

3  Q.  Just for the record, without an address, where are you

4  appearing from this afternoon?

5  A.  I am in my study in my home.

6  Q.  And that's in the state of Oregon?

7  A.  Yes.  It's in Portland, Oregon.

8  Q.  I just have, I hope, a few questions for you, Professor.

9          Let me start with this:  If you were to ask me about

10  something that had happened to me in the past and I were to

11  answer off the cuff right away, as opposed to maybe thinking

12  about it for a few minutes or maybe even going and looking at

13  some things and pictures and sleeping on it, would the

14  reliability of my answer increase based on more time I take to

15  actually sort of search my memory, so to speak?

16  A.  The -- the fast answer is no.  I mean, among the various

17  ways we've tried to tell apart memory errors from correct

18  memories is by looking at speed of response, and it turns out

19  not to be a reliable way to tell them apart.  So the answer,

20  unfortunately, is, nope, that one doesn't work either as a way

21  of spotting memory errors.

22  Q.  And I guess maybe -- let me try to ask it this way:

23  I mean, if you were to ask me right now to name everyone in my

24  law school class, go, and I were to start naming names, do you

25  think that I would be able to remember the exact same as if

1  I went upstairs and took out a pen and paper and started

2  writing down names and -- doesn't it seem likely I'd get a few

3  more if I had more time to think about it?

4  A.  No.  I mean, your question is -- you know, rests on

5  exactly the right idea.  For many purposes not only does it

6  take work to get information into memory; in some settings it

7  takes work to get memory -- information out of memory.

8         And if you're trying to remember, you know, a long

9  and complicated list like everybody you went to law school

10  with, yeah, it might take you some work, and you might need to

11  come at it from this angle and that angle, you know, coming up

12  with as many names as you could.

13  Q.  Professor, I'd like to return to the -- the concept of

14  intellectual engagement.

15  A.  Uh-huh.

16  Q.  Would you remind the jury again, how does intellectual

17  engagement help to prevent what you called source confusion?

18  A.  Well, intellectual engagement on its own does not

19  create -- or prevent source confusion.  Intellectual

20  engagement gets the information into your memory in the first

21  place.

22         If you hope to avoid source confusion, now, what you

23  want to do is not just engage the meaning of the material but,

24  you know, during the event think a lot about "How does this

25  day feel?  Where am I?"  I mean -- "What did I do 10 minutes

1  ago?"

2          I mean, if you engage with those bits of the setting,

3  those bits of the context, that will help you to remember the

4  setting and the context, and that will make you more resistant

5  to source confusion.

6          But, I mean, just intellectual engagement, thinking

7  about the content of information is going to give you not much

8  memory -- is going to give you memory for the meanings, the

9  stuff you pay attention to, which may or may not be open to

10  source confusion down the road.

11  Q.  So if I am paying attention to something, repeatedly

12  thinking about it, repeatedly focused on it, repeatedly

13  worried about it, is that the sort of factors that would help

14  to prevent source confusion?

15  A.  No, actually.  I mean, it's -- as you said, you know,

16  "worried about it, thinking about it" -- I mean, we need to

17  worry about what "it" is.  As I said before, one of the

18  differences between your memory and a video gadget is what

19  goes into your memory is what you're thinking about.

20          And so, you know, if, for example, I really want to

21  think about, you know, the meaning of the questions that

22  you're asking me -- which, obviously, I do -- that will help

23  me to remember the meaning, but it will not at all help me to

24  remember whether we had this conversation in the morning or

25  the afternoon, whether we had this conversation on a Monday or

 1  a Saturday -- or I guess obviously not a Saturday -- but,

 2  I mean, in order to remember -- sorry.

 3          In order to avoid source confusion, you need to pay

 4  special attention to the source so that the source, the

 5  setting, the context is well-established in memory.  You can

 6  pay deep attention to an event but pay attention to the

 7  meaning, the implications, without any attention to the -- the

 8  context, and that would certainly be still wide open to source

 9  confusion.

10  Q.  So what I'm paying attention to or what you're paying

11  attention to, that really matters?

12  A.  Absolutely.

13          MR. SZOTT:  Your Honor, may I have a moment.

14          THE COURT:  You may.

15          I have a question while Mr. Szott is taking a moment.

16          These principles you've talked about, do they apply

17  to each and every one of us, all human beings?

18          THE WITNESS:  With some minor variations on the

19  theme, yes.  And, you know, the variations include things like

20  I was just discussing in response to the question.  I mean,

21  different people pay attention to different things.

22          And so to the degree that attention is crucial for

23  memory and to the degree that people pay attention to

24  different things, then what you might remember about an

25  episode might be very different from what I remember about an

 1   episode.  But, at the same time, the overarching principle

 2   that matters with great force for both of us is what you

 3   remember depends massively on what you paid attention to.

 4          So there's an overarching principle that works for

 5   everybody, but the details of how it plays out vary a lot

 6   person by person by person.

 7          THE COURT:  Observing the same event?

 8          THE WITNESS:  Observing the same event.

 9          THE COURT:  Are there differences, significant

10   differences, among people by virtue of the human variation

11   that exists in -- in -- in the functioning of the brain?

12          THE WITNESS:  I mean -- I mean -- well, let's start

13   with the fact that -- I mean, the biology of the brain is

14   remarkably similar for all members of our species.  And that

15   almost guarantees that there's going to be principles that

16   apply to all of us.

17          But, you know, again, there are differences from, you

18   know, men to woman, and there are differences from European --

19   Europeans to Asians and Asian-Americans.  But, you know,

20   again, those differences really over and over boil down to

21   what anyone is encouraged to pay attention to.

22          So if I can just, you know, make that concrete, women

23   tend to be much better than men after an event at remembering

24   what people were wearing.  And it's not because their brains

25   are wired differently.  It is, instead, because in our

 1  culture, for better or worse, women are strongly encouraged to

 2  pay close attention to those things and men are not.

 3          And so, again, the overarching principle -- you

 4  remember what you paid attention to -- is the same, but it

 5  shows up in different ways in men and women.  And the same

 6  principle is going to apply for, you know, Europeans versus

 7  Asians.

 8          So, I mean, those things are, you know, I think, a

 9  reflection of the fact that, you know, we start with all --

10  you know, basically -- the same brain.  I mean, we all have a

11  left hemisphere and a right hemisphere.  We all have a frontal

12  lobe, an occipital lobe, a parietal, and a temporal lobe.

13  I mean, we all have a hippocampus on each side.  That basic

14  equipment is just part of our human heritage, and it's true

15  for pretty much everyone in our species.

16          But how that equipment gets used exactly is heavily

17  influenced by, you know, how you're trained, what you're

18  encouraged to pay attention to, and things like that.

19          THE COURT:  Thank you.

20          Do emotions play a role at -- for memory at the time

21  of the event?

22          THE WITNESS:  Absolutely.  Yes, Your Honor.  It's a

23  terrific question.  It's a question I've spent several decades

24  writing about.

25          All things equal, emotion is a positive force for

1    memory.  You tend to have better memory for events that were

2    emotional compared to events that were in one way or another

3    flat.  But there are some complications because not only does

4    emotion help memory; emotion also turns out to focus your

5    attention.

6           And so the usual finding is that if you quiz people

7    about emotional events they've been through, they have better

8    memory than you might otherwise expect for the central

9    elements that really made the event what it was, but, at the

10   same time, they were just less observant during the event, and

11   so they have worse memory for all the details at the

12   periphery.  So you get that combination effect.

13          THE COURT:  Sorry to interrupt you, Mr. Szott.

14          MR. SZOTT:  No apologies necessary, Your Honor.

15   I have nothing further.

16          Professor Reisberg, thank you.

17          THE WITNESS:  You're very welcome.

18          MR. JUBIN:  I have one follow-up, Your Honor.

19                     **REDIRECT EXAMINATION**

20   BY MR. JUBIN:

21   Q.  Professor Reisberg, you were asked and testified here with

22   respect to this notion of difficulty -- or with respect to

23   this notion of intellectual engagement and paying attention.

24   You've just described that in great deal -- great detail.

25          If a person has difficulty paying attention -- in

 1    other words, a lack of engagement -- what is the effect on the

 2    formation of memories for that person?

 3    A.  I think you can anticipate the answer.  I mean, more

 4    engagement -- fuller engagement, deeper engagement -- is good

 5    for memory.  And, correspondingly, if somebody cannot control

 6    their attention, if they're constantly being distracted, if

 7    their attention is hopping from one thing to another, that

 8    means the kind of engagement that is a positive force for

 9    memory is not going to happen.

10         And so somebody who is easily distracted or, for that

11    matter, somebody who's just in a distracting environment is

12    going to do a less good job of recording anything from that

13    event into their memory, and, therefore, they're going to

14    remember less of the episode.  And because they remember less

15    of the episode, they're going to be more vulnerable down the

16    road to outside suggestion, outside leading because -- I mean,

17    I think it cannot be a surprise that if you really, clearly,

18    wonderfully remember an event, that's going to help you to

19    resist outside suggestion.  If your memory is thin and, you

20    know, you're -- has great big gaps in it, that's going to make

21    it harder for you to resist outside suggestion.

22         MR. JUBIN:  Thank you.  I have nothing further.

23         Enjoy your day, Dr. Reisberg.

24         THE COURT:  You may sign off.

25         THE WITNESS:  Okay.  Good afternoon to you all.

 1              MR. FLEENER:  Mr. Herman calls Tom Throne to the

 2    stand, Judge.

 3              Mr. Throne, come on in.  And if you would stand over

 4    here -- yes, please, sir.  And face -- face the clerk, and

 5    she'll swear you in.

 6        (Witness sworn.)

 7              THE COURTROOM DEPUTY:  Please take a seat.

 8              And please state and spell your name for the record.

 9              THE WITNESS:  My name is Tom Throne.  Tom is T-o-m;

10    Throne is T-h-r-o-n-e.

11      **TOM THRONE, DEFENDANT HERMAN'S WITNESS, DIRECT EXAMINATION**

12    **BY MR. FLEENER:**

13    Q.  Mr. Throne, where are you from, sir?

14    A.  Sheridan, Wyoming.

15    Q.  And what do you do in Sheridan, sir?

16    A.  I'm a lawyer.

17    Q.  And what kind -- well, let me ask you this:  How long have

18    you been a lawyer?

19    A.  42 years?

20              42 years.

21    Q.  That's a while.

22    A.  Yeah.

23    Q.  What kind of practice do you engage in?

24    A.  I represent almost exclusively oil and gas exploration

25    companies.

1    Q.  And what is -- what -- I don't want to give -- I don't

2    need you to give me a name -- names of the companies.  But

3    what kind of work do they do?

4    A.  Well, they do hearings in front of administrative

5    agencies.  There is an administrative agency that regulates

6    oil and gas development.  Sometimes operators do not agree

7    with each other so they have contested cases.

8         Before every oil and gas well is drilled, there is a

9    title opinion prepared to determine who owns the rights to

10   drill the well and, if the well is productive, who gets the

11   money and how much of it.

12        And those are the primary areas that I have been

13   practicing.  There's also sometimes contracts and litigation

14   over title and those sorts of things.

15   Q.  All right.  So you -- you -- your practice essentially is

16   oil and gas energy work full-time?

17   A.  Yes.  I have done three divorces in 42 years.  That was

18   probably two too many.

19   Q.  It would be -- it would be a few too many.

20        So you consider yourself knowledgeable, I assume,

21   about the oil and gas industry, at least the legal aspect

22   of it.

23   A.  I do.

24   Q.  And the -- and you've been -- for the last 40-some-

25   odd years, this is all you do, oil and gas work?

1    A.   Yes.

2    Q.   Okay.  The -- the companies that you have -- let me ask

3    you about energy start-up companies.

4         Do you have experience working with energy companies

5    like NuTech and other start-ups?

6    A.   Some, yes.

7    Q.   Are -- these energy start-ups, have you ever invested in

8    them?

9    A.   Time only.

10   Q.   And -- and for your time what do you receive sometimes?

11   A.   Interest in the company.  Or interest in the well.

12   Q.   Okay.  So is it safe to say that you will -- you will do

13   some work on some start-ups, you may get paid or you may get

14   shares in the company or -- or an interest in the company or

15   the well?

16   A.   Correct.

17   Q.   Do you consider these start-ups to be secure investments

18   or more speculative?

19   A.   Oh, no.  They're speculative big time.

20   Q.   Explain that.

21   A.   Well, most ideas -- correction.  Back up.

22        A lot of companies have an idea and, for whatever

23   reason, they cannot get anybody else to believe in the idea.

24   A lot of times they have an idea that doesn't work.

25        But you start with a company, and you work with them

1   because their idea might work.

2   Q.  You -- you were -- during an interview today you were

3   telling me about two guys in Gillette.

4   A.  Correct, Martens and Peck.

5   Q.  What did they do?

6   A.  They initially started the coalbed methane play in

7   Wyoming.  People had speculated on the ability of the coalbed

8   methane play to work.  Nobody thought it would.  They pooled

9   their own money and took a lease from a mineral owner and

10  drilled a well and proved that coalbed methane could be

11  produced from the coal seam.

12  Q.  And everybody thought they were crazy?

13  A.  Before they did it, yes.

14  Q.  And I -- the reason why I asked this question, because

15  I -- you know, we're down in the southeast corner of the

16  state, and it's just a different economy in many, many ways

17  down here.

18          You live in Sheridan, sir; correct?

19  A.  Correct.

20  Q.  The -- how many -- how many of these energy start-ups have

21  you worked with and worked for over the years?

22  A.  Quite a few.  Some have gone on to be purchased by others

23  and merged.  Others fizzled.  I got my start in the oil and

24  gas -- working for oil and gas companies with a company out of

25  Douglas named Chinook Resources that discovered the Scott

1  field that's one of the most prolific oil fields in Wyoming,

2  and it was a start-up.  It was a family company, mom, dad, and

3  two kids.

4  Q.  Okay.  But it's safe to say that in the investing and

5  working with small -- small energy start-ups, you're going to

6  strike out a lot, but you may hit a home run or two?

7  A.  Exactly.  It's all a probabilities game.

8  Q.  And we talked about -- when we were preparing your

9  testimony in the back -- it's not just energy start-ups that

10  swing and miss a lot?  It's -- it's large energy companies,

11  too?

12  A.  All the majors do, too, because it's a high-risk business.

13  Q.  What do you mean?

14  A.  Well, let's go back to the Minnelusa play in eastern

15  Campbell County.  It's a vertical traditional oil and gas

16  play.  1 in every 10 wells produces so that -- and when they

17  do produce, they produce lots of money.

18          So the game there was to pay 10 percent of 10 wells

19  and 1 of them works and you make money, rather than a hundred

20  percent of one well.

21          And the current play, the horizontal play, was first

22  discussed by a gentleman named George Mitchell, I believe,

23  from Houston a long time ago.  Everybody thought he was crazy.

24  But he took a chance and did it and it was successful.

25          A lot of the horizontal wells now, even though the

1    technology's proven, where they're drilling a brand-new area

2    they don't have any idea what they're going to get.  They

3    don't know if they're going to get a great well that makes

4    lots of money or if they're not going to get a good well or if

5    they'll have mechanical issues and they lose all their money.

6         So it's a numbers game.

7    Q.  Sure.  And that's why -- I think -- that's one of the

8    reasons we brought you here today, is because I want to make

9    sure that -- that everyone understands that this is -- and you

10   would agree, I assume -- that this is a -- it's a numbers

11   game.  You're going to strike out many more times than you hit

12   the home run, and you hope to hit the home run more than the

13   average guy?

14   A.  That's right.

15   Q.  I'm going to shift the focus now to NuTech Energy in

16   particular because I know that you are involved in NuTech.

17   Correct, sir?

18   A.  I represented the people in NuPeck -- NuTech -- and

19   advised them on what they should be doing.

20   Q.  The -- the -- well, I -- I actually want to -- I want to

21   back up because you -- they heard -- the jury heard from

22   Mike Perry last week.

23        You know Mike Perry how?

24   A.  Very well.

25   Q.  How do you know Mike?

1   A.  I picked Mike to operate the coalbed methane wells on the

2   ranch that my sister and I own and picked him to develop the

3   coalbed methane wells on our minerals because I trusted and

4   respected him.

5        We are currently partners in the new iteration of the

6   tool that we now have perfected.

7   Q.  And the -- there's been a lot of discussion about the

8   tool.  The tool has formed over years, safe to say?

9   A.  Quite a few times, yes.

10  Q.  This -- and the -- the underlying technology behind the

11  tool -- I want to -- is -- is it separates the gas from the

12  water so it's easier to extract the gas?

13  A.  It separates the gas from the water downhole.  Traditional

14  coalbed methane was produced by pumping the water up the well

15  bore and separating the gas and oil at the surface and then

16  disposing of the water on the surface.

17       That is a costly method of producing because it takes

18  a lot of electricity to pump the water up.  And then when it's

19  on the surface, the water had to be treated or else it would

20  sterilize the soil when it was put back on -- on the soil.

21       When gas was north of $10 an MCF -- gas is back up to

22  5 now but for the last several years has been 3 and below --

23  you could afford to pay the costs of pumping it up and

24  disposing of it.  If you don't have at least $4 -- roughly $4

25  an MCF, you can't afford to do that to make money.

1        The beauty of the tool is it eliminates the cost of

2    pumping because you don't have to pump the water; you don't

3    have to treat the water.  You produce the gas that's in the

4    coal seam with -- with a lot lower overhead and a lot less

5    environmental damage.

6    Q.   Okay.  And I appreciate that.  That was -- that was

7    informative, as well.

8        The tool works?

9    A.   The tool works.

10   Q.   And it's been shaped over time?

11   A.   It's had to be modified significantly over time.

12   Q.   Now we'll focus on NuTech in particular.

13       You said your role -- that you -- when I asked you

14   your role for NuTech, your answer was that you have done some

15   work for the -- the individuals involved in NuTech; correct?

16   A.   Correct.

17   Q.   Sir, what did you do for NuTech?

18   A.   I would advise them on what needed to be done in order for

19   them to produce coalbed methane like they wanted to, the --

20   "What do you have to do to get a permit to operate a coalbed

21   methane well?"

22       "Well, you've got to do A, B, and C with the Oil &

23   Gas Commission.  You need money for that."

24       "How much?  How do you do that?  How do you get

25   access to the surface?"

1              "Well, you have to talk to the surface owner, the

2    rancher, and get an agreement with the rancher to allow you to

3    come on and do the work."

4              The nuts and bolts stuff on how it works.

5    Q.  And this -- this nuts and bolts stuff, these are the same

6    activities that you've done with lots of companies like

7    NuTech?

8    A.  Correct.

9    Q.  And so that's the kind of stuff you did with NuTech, the

10   nuts and bolts stuff of what you just talked about, to --

11   to -- in order to secure the rights to drill a well?

12   A.  In short summary, yes.

13   Q.  Okay.  Were you paid by NuTech?

14   A.  No.  I had one check for $8,000.  That was it.

15   Q.  You -- you did get some shares, though.  We talked about

16   that today.  You -- I reminded you that you received 2 billion

17   shares of NuTech stock.

18   A.  That's what you said, 2.4 billion.  Didn't realize I was

19   so rich.

20   Q.  And I -- and I -- I appreciate you -- you -- you saying it

21   that way.

22              This isn't the first time that you've essentially

23   taken -- taken a shot with an energy company, getting a --

24   a billion shares of who knows what it would be worth, who

25   knows what it's going to be worth, hoping that you catch

1  lightning in a bottle?

2  A.  Correct.  As -- as a lawyer representing oil and gas

3  companies, you make a good living.  Make no mistake about it.

4  You make good money.

5        To make substantial money, you need to be in an

6  ownership position, an equity owner, and you can do that by

7  investing your money.  If you have certain expertise, you can

8  use that expertise in exchange for equity ownership in the

9  entity.

10 Q.  And you've -- you say you generally don't invest money;

11 you invest sweat equity?

12 A.  Correct.

13 Q.  In your experience you certainly dealt with investors in

14 these companies; correct?

15 A.  Correct.

16 Q.  In your experience, is -- the average oil and gas

17 investor, do they understand the nature of their investment as

18 being a little bit more speculative than buying a hundred

19 shares of Microsoft?

20 A.  If they are experienced in the business, yes, they

21 understand that.

22 Q.  Because that's just sort of common knowledge among energy

23 investors?

24 A.  It's -- it's a high-risk game, yes.

25 Q.  When -- the jury listened to -- I'm -- I'm almost finished

 1   with you, sir.

 2           The jury listened to the conference call that -- that

 3   you were on for just a -- a few seconds.  You recall the

 4   conference call back in 2016?

 5   A.  I do recall.

 6   Q.  And you had a chance -- I think I sent it to you over the

 7   weekend.  Did I not?  Did I send you that?

 8   A.  You did.

 9   Q.  Did you have a chance to listen to your role and what you

10   said again during the conference call?

11   A.  I read it.  I did not listen to it.

12   Q.  The -- what was going through your mind when Mr. Mitchell

13   pitched -- or Mr. Trizna or whoever it was -- said that they

14   thought that the company was going to be sold for a billion

15   and a half dollars?

16   A.  Well, I don't remember that part.  I do remember that when

17   the conference call was put together they asked if I would

18   participate, and I said I would.

19           I anticipated, since it was a call to inform

20   investors, that it would be treated like a case.  Right?  We

21   would have a conversation on who was going to say what,

22   what -- what person was going to testify or -- or talk about

23   which subjects, and what was our end goal and where we were

24   going to go.  And none of that happened.

25           What I did say in the -- in the blurb on the

1    conference call is that the parties have a plan that would

2    satisfy the regulatory agencies.

3    Q.  And you believed that?

4    A.  Yes.  It's the same plan we're executing right now.

5    Q.  Through Emerald Operating?

6    A.  Correct.

7              MR. FLEENER:  May I have a minute, please, Judge.

8              THE COURT:  Yes.

9              THE WITNESS:  Are we off the record?  My mask broke.

10             MR. FLEENER:  Oh.  I can get you a new one -- or the

11   clerk can.

12             THE WITNESS:  Thank you.

13        (Discussion held at counsel table.)

14             MR. FLEENER:  One second, please.

15             I have no more questions for you, Mr. Throne.

16   I appreciate you coming down and -- and sharing your expertise

17   and your time.

18             All the other lawyers may have some questions for you

19   now, and I'll start with -- well, I'll let the United -- the

20   Judge run the show.

21             MR. JUBIN:  I have no questions, Your Honor.

22             MR. WARD:  No questions, Your Honor.

23             MR. SZOTT:  No questions, Your Honor.  Thank you.

24             THE COURT:  Mr. Throne, thank you.

25             THE WITNESS:  Thank you.  I could have talked a lot

1    longer but don't need to.

2            MR. FLEENER:  Don't break that one.

3            THE WITNESS:  No, I won't.

4            MR. FLEENER:  The Court will start billing you

5    for it.

6            Thank you, sir.

7            THE WITNESS:  Thank you.

8            MR. FLEENER:  Judge, this might be a good time for

9    the afternoon -- midafternoon recess before we call our next

10   witness.

11           THE COURT:  Very well.

12           We'll stand in recess for 15 minutes.

13           THE COURTROOM DEPUTY:  All rise.

14      (A recess was taken from 2:49 p.m. to 3:09 p.m.

15   Proceedings outside the jury's presence.)

16           THE COURT:  Thank you.  Please be seated -- or not.

17      (Proceedings within the jury's presence at 3:10 p.m.)

18           THE COURT:  Thank you.  Please be seated, ladies and

19   gentlemen.

20           Before the next witness comes, I wanted to give you

21   an instruction.

22           I think with Dr. Reisberg I asked a couple of

23   questions.  Do not assume that I've taken any position in this

24   case by any question I ask.  Usually, I'm just trying to think

25   of something that you might want to know as jurors and kind of

 1   on your behalf asking the question, not to indicate any belief

 2   or opinion I have about the case.

 3          Mr. Ward, you're up.

 4          MR. WARD:  Judge, Charles Winters would call Gerald

 5   Luken.

 6          THE COURTROOM DEPUTY:  Please raise your right hand.

 7      (Witness sworn.)

 8          THE COURTROOM DEPUTY:  Please take a seat.

 9          Please state and spell your name for the record.

10          THE WITNESS:  Gerald Luken, G-e-r-a-l-d L-u-k-e-n.

11          MR. WARD:  Mr. Luken, you can go ahead and take your

12   mask off while you testify.

13          Good afternoon.  My name is Zenith Ward.  I represent

14   Charles Winters.

15    **GERALD LUKEN, DEFENDANT WINTERS' WITNESS, DIRECT EXAMINATION**

16   **BY MR. WARD:**

17   Q.  We've gone over your name.  Can you tell us where you

18   live?

19   A.  In Gillette, Wyoming.

20   Q.  How long have you lived in Gillette?

21   A.  I think since about '98.

22   Q.  And how old are you?

23   A.  58.

24   Q.  What's the highest level of education that you've

25   obtained?

1   A.   12th.

2   Q.   Graduated from high school?

3   A.   Yeah.

4   Q.   Are you currently employed?

5   A.   Yeah.

6   Q.   Who do you work for?

7   A.   Consultant for Emerald Operating.

8   Q.   How long have you been employed as a consultant with

9   Emerald Operating?

10  A.   I'm kind of unsure on that.  Five or six, seven years,

11  maybe.

12  Q.   Prior to working for Emerald, what did you do for

13  employment before that?

14  A.   Black Diamond.

15  Q.   How long were you employed by Black Diamond?

16  A.   I think from '03 to 2010.

17  Q.   And from 2003 to 2010 when you were employed with Black

18  Diamond, what were you doing for Black Diamond?

19  A.   They were drilling new gas wells -- I think gas wells and

20  pipeline and -- and set -- getting all the pipelines done and

21  pumps and motors in the wells.

22  Q.   What was your job title with Black Diamond?

23  A.   Field supervisor.

24  Q.   And so would I be correct -- it sounds like you were

25  involved with building well sites.  Is that right?

 1   A.  Yes.

 2   Q.  And then also dealing with pipelines, connecting those

 3   well sites to the pipeline?

 4   A.  Yes.

 5   Q.  Okay.  Why did you leave your employment with Black

 6   Diamond?

 7   A.  I got laid off from them in late 2010.

 8   Q.  Was -- were you laid off and Black Diamond was still going

 9   on as a company, or did the company shut its operations?

10   A.  They were starting to get shut down.

11   Q.  How did you first come into contact with Robert or

12   Bob Mitchell?

13   A.  I was doing a little bit of work, and then I had some

14   service rigs kind of helping with the Emerald a little bit.

15   And then this Bob Mitchell comes in from another friend of

16   mine and wanted to talk to us about some wells and the gas

17   wells and that he was a stock guy and that he would like to

18   pick up -- pick up some wells and then have me help him with

19   the wells.

20          And then he knew that Black Diamond -- from my other

21   friend -- and he said that Black Diamond was needing some

22   help.  So I introduced him to Black Diamond.

23   Q.  When would this initial contact with Bob Mitchell have

24   been yearwise?

25   A.  It's been so long -- it would have been after 2000- -- no,

1    I think -- at the very end of 2010 is when he kind of started

2    talking to me a little bit and then also the Black Diamond.

3    Then on into 2011.

4    Q.  And did you and Mr. Mitchell end up pursuing a business

5    venture?

6    A.  He was just getting tight with Black Diamond.  And then he

7    said that -- because they were trying to get their notes back

8    from an S and T bank, and he said that he knew how to get

9    the -- get the wells -- or the notes back for all the wells

10   because they owed them money.

11         And then he knew that I knew what I was doing out in

12   the field, so I'd be working in the field.

13   Q.  So was the goal to obtain some wells that could then be

14   operated by you?

15   A.  He was going to have the wells, and then I would have

16   to -- I guess that's part of the negotiation that he was doing

17   with the Black Diamond -- that I would be working on those

18   wells along with the Black Diamond wells while they were still

19   in business, and then he would start doing the stock, and then

20   I would just watch over the wells.

21   Q.  And I'm realizing I think I -- I skipped something

22   I wanted to ask you about your employment history.

23         We talked about your employment with Black Diamond

24   from 2003 to 2010.

25         Prior to that, did you have any history of working in

1  natural gas production?

2  A.  Yes.  I went to work at Key Energy when I first come over

3  here in '98.  And then I was just an employee there.  That's

4  why I started learning how to work on the rigs and what all

5  was involved on what it takes to drill a well.

6         Then I became a driller, and then I drilled many

7  wells for Key Energy.

8  Q.  Prior to 1998, did you have any experience in oil and gas

9  operations?

10  A.  I worked in Dallas, Texas, and they were making

11  hydroclones, which were actually just part of a mud pump for

12  big rigs, which I learned later.

13  Q.  All right.

14         So kind of jumping back to your involvement with

15  Bob Mitchell, what was the first company that was formed for

16  purposes of pursuing an oil and gas venture or a gas venture?

17  A.  He had so many of them.

18         I think it was the -- Mitchell Resources I think is

19  one of the first ones that he's made.

20  Q.  And did you invest money with Mitchell Resources?

21  A.  With Bob I invested many times.

22  Q.  Did -- did your investments go all the way back to

23  Mitchell Resources?

24  A.  I'm sure.

25  Q.  And so you said that there's been so many of "them,"

1   talking about the business entities.  What was the next Bob

2   Mitchell business entity after Mitchell Resources?

3   A.  I can't remember.  It's been so long on which order they

4   were, but I know that there was DEAC; there was CHAMA; there

5   was NuTech, of course.  And putting them in order after all

6   this time, I don't remember which order for sure.

7   Q.  How about RWM?

8   A.  That's one of them.

9   Q.  And so what was your understanding of why Mitchell

10  Resources ever changed into a different company?

11  A.  It was just getting bigger deals.  Bob was always getting

12  a better deal, so it was getting just moved over and over.  So

13  it was like over and over he was creating another company to

14  move us forward, to get shares.

15  Q.  And so do you know where RWM fit in terms of orderwise?

16  I mean, was it after Mitchell Resources?

17  A.  I can't remember on those.

18  Q.  How about a company called CHAMA?  Did you ever hear --

19  A.  Yeah.

20  Q.  -- of a company called CHAMA?

21  A.  Yes.

22  Q.  What was CHAMA's role?

23  A.  That was going to take kind of everything over, I guess.

24  And then we were promised money.  And then Bob and -- was

25  working on the CHAMA.  And then that was supposed to be where

1  we started getting money for like our wells that was supposed

2  to be in our hands but which never ended up in our hands with

3  the Black Diamond, even.

4  Q.  Did you ever work with a tool, a specific tool that was

5  supposed to help produce these wells?

6  A.  Yes.

7  Q.  Tell us about that.  When -- when did you first get

8  introduced to any kind of a tool?

9  A.  I don't remember the year.  We were going to put them in

10 the Emerald wells.  We was going to put some in them.

11 Q.  How was the tool supposed to work?

12 A.  We put them in the wells, and then we don't have to run

13 the pumps and motors and we don't have to move water to

14 surface, which should save a ton of money in cost.

15       So these should have filtered or separated the gas

16 and water because these tools were going to be 300 feet to

17 3,000 feet, and then they could be as far underwater as, say,

18 300 feet to 3,000 feet of water.  So the filter that should

19 have been in the tool was going to have to stand up with all

20 the pressure and separate the gas and the water.

21 Q.  What was the very first version of this tool made out of?

22 A.  There was one that was made out of like plastic.

23 Q.  Okay.  Do you know who manufactured or who made that tool?

24 A.  Ed Pressley.

25 Q.  And do you know which company, which Bob Mitchell company

19-CR-26-ABJ                LUKEN - DIRECT - WARD              Vol. X-1736
21-CR-14-ABJ

1   corresponded with the Ed Pressley tool?

2   A.  Say again.

3   Q.  Well, so we've talked about a number of Bob Mitchell

4   companies --

5   A.  Yeah.

6   Q.  -- RWM, Mitchell Resources.

7           I was asking, when you were dealing with the

8   Ed Pressley tool that was made out of plastic, which

9   Bob Mitchell entity was in existence at that time?

10  A.  I don't know which one -- or I don't remember which one.

11  Q.  Okay.  Did that -- did you ever attempt to put that

12  plastic tool in the ground?

13  A.  Yes.

14  Q.  And did it work?

15  A.  No.

16  Q.  Okay.  At some point in time, were you provided another --

17  an updated version of that tool?

18  A.  We ran three different tools, and none of them even -- we

19  couldn't get nothing out of the tools at all.

20  Q.  Are you talking about the plastic tools?

21  A.  The plastic tools.

22  Q.  Okay.  At some point in time, did you get a tool that

23  wasn't made out of plastic?

24  A.  Yes.

25  Q.  All right.  I'm going to show you a document that has not

 1    yet been admitted into evidence.

 2            Can you tell me what's in this photo here that's been

 3    marked as CW Exhibit B?

 4    A.   That's the aluminum tool.

 5    Q.   All right.  And do you know who manufactured this tool?

 6    A.   Chuck was building those in Florida.

 7    Q.   When you say "Chuck," do you mean Charles Winters?

 8    A.   Yeah.

 9            MR. WARD:  I'd move for the admission of Exhibit B.

10            MR. HEIMANN:  No objection.

11            THE COURT:  Exhibit B -- CW-B -- is received.

12        (Defendant Winters' Exhibit CW-B received into evidence.)

13    BY MR. WARD:

14    Q.   All right.  Tell me about -- did you work with

15    Chuck Winters or communicate with him about the manufacture of

16    this tool?

17    A.   Yes.

18    Q.   Tell the jury about that.  How did you work with

19    Mr. Winters in the development of this tool?

20    A.   These tools were going to go into some wells that were on

21    Emerald's with Thrones, so we started talking about how to

22    make this tool.

23            So Chuck and I was talking about how big it's got to

24    be.  We were going to try to make it to the patent, but then

25    like my pipe that I used to tie into the top end of the red

1  part, that's got to be like 2 3/8.  So we talked a lot on what

2  I need so it will fit into the 7-inch casing to go down to,

3  say, upwards -- up to even 3,000 feet.

4  Q.  And after you received this tool from Mr. Winters in

5  Florida, did you end up deploying it in a well?

6  A.  Yes.

7  Q.  And what was the results?

8  A.  It kind of worked but, I mean, there was room for probably

9  improvement.  But compared to the plastic tool, this moved

10  some gas along with some water.

11  Q.  And when you first deployed this tool in a -- in a well

12  and it kind of worked, was that exciting?

13  A.  Yeah.

14  Q.  All right.  I'd like to show you another document that has

15  not been admitted into evidence.

16       And I guess before I do that, did you -- did you tell

17  Chuck that his tool worked?

18  A.  Like I say, it moved some along with water, yes.

19  Q.  All right.  I'm -- I'm showing you now what's been marked

20  as CW Exhibit A.

21       Is this an email that you sent to Chuck?

22  A.  I don't really recall.  It's got my name and stuff on it.

23  Q.  Do you remember sending Chuck an email with some well maps

24  attached --

25  A.  Yeah.

1   Q.  -- and telling him that --

2   A.  Yes.

3   Q.  -- "These are the wells that your tool is going to go

4   into"?

5   A.  If we keep moving forward, that's a big potential, yes.

6   Q.  And this is a copy of that email that you sent to

7   Mr. Winters; correct?

8   A.  I don't really recall that part.

9   Q.  Well, you do recall sending him an email with some --

10   A.  Some maps, yes.

11   Q.  Okay.  And does this look to be like a copy of that email?

12   A.  Oh, I see the PDFs at the bottom.  Yeah.

13        MR. WARD:  All right.  I'd move for admission of

14   Exhibit A.

15        MR. HEIMANN:  No objection.

16        THE COURT:  Exhibit A is received, CW-A.

17    (Defendant Winters' Exhibit CW-A received into evidence.)

18   BY MR. WARD:

19   Q.  And this email is dated April 8th of 2015.  Does that

20   sound like the approximate time line where you would have

21   deployed the tool and then been communicating with

22   Mr. Winters?

23   A.  I'm unsure on the dates and times.

24   Q.  I'm going to show you another document that has not been

25   admitted into evidence.

1           MR. WARD:  And -- Your Honor, if I can -- may

2    I approach the witness?  I've just got a paper copy because

3    I think it may be easier than me trying to zoom in and out on

4    the exhibit so --

5           THE COURT:  Yes.

6    BY MR. WARD:

7    Q.  I'll hand you a paper copy of this.

8           Does this look to be -- this document I've handed

9    you, it's marked as Exhibit A.1.

10          Does that look like the -- one of the well maps that

11   would have been attached to your email?

12   A.  Yeah.

13   Q.  All right.

14          MR. WARD:  I'd move for the admission of Exhibit A.1.

15          MR. HEIMANN:  No objection.

16          THE COURT:  CW-A-1 is received.

17      (Defendant Winters' Exhibit CW-A.1 received into evidence.)

18   BY MR. WARD:

19   Q.  And then I'm going to -- and I'll -- I'll show you

20   another --

21          MR. JUBIN:  You're displaying all of your exhibits.

22          MR. WARD:  Oh, sorry about that.

23          Thank you, Mr. Jubin.

24   BY MR. WARD:

25   Q.  I'm going to show you another exhibit that has not been

1   admitted into evidence.

2          And you can turn the page on your paper copy there to

3   Exhibit A.2.  Does this look to be the other well map that you

4   would have sent to Mr. Winters?

5   A.  Yes.

6   Q.  All right.

7          MR. WARD:  I'd move for the admission of Exhibit A.2.

8          MR. HEIMANN:  No objection.

9          THE COURT:  CW-A.2 is received.

10     (Defendant Winters' Exhibit CW-A.2 received into evidence.)

11  BY MR. WARD:

12  Q.  And so how many wells were included in these two

13  attachments to your email, Exhibit A.1 and A.2?

14  A.  I don't remember because the Patriot and the High Plains

15  wells would have been close to 3500 to 5,000 wells.

16         MR. WARD:  All right.  You can -- Ms. Harris, you can

17  pull that exhibit down if you don't mind.

18  BY MR. WARD:

19  Q.  Were you involved with friends or family investing into

20  NuTech?

21  A.  Yes.

22  Q.  Tell us about that.  How did you -- what was your

23  involvement and your friends and family investing in NuTech?

24  A.  I put lots of money into this, and my family and friends

25  put them in.  Bill Lasharo [phonetic] was even -- we became

1    friends.  A lot of us have experience, you know, that's got

2    wells out on these -- in these fields, so we're -- all become,

3    like I say, friends.

4           My family and friends have put money into this.  And

5    then we get just visiting on Christmas or Thanksgivings or

6    just visiting about what we're doing, and then like this tool,

7    it's -- it's exciting that we're able to move gas through a

8    tool without pumps and motors that's been done all this time.

9    Q.  And so would friends and family talk to you about

10   investing in this company or this idea?

11   A.  Yeah.  They would want to be in on -- invested on this,

12   too.

13   Q.  Did you take their money, or how did their money get into

14   the -- into the company?

15   A.  Sometimes I would -- they'd want to talk to Bob and get

16   some more information, so they would talk and -- directly

17   to him.

18          Or he would say that if anybody wanted to put money

19   in, they would get two for one.  So I mean two -- two times

20   the amount of shares.  So some of my friends that have put

21   money in -- or when I was going down there, I would put money

22   in also again.

23   Q.  When you say "two for one," do you mean two shares for $1?

24   A.  Yeah.  That's what I was getting, too.

25   Q.  Okay.  And so when -- when you said people would want more

1  information from Bob, would you put them in touch with Bob?

2  A.  Yeah.  I'd just say, "You can call Bob."  Or if they

3  wanted to talk to me about the tool, well, we'd put one in, so

4  we would share what we found or what we thought might need to

5  be improved on the tool.

6  Q.  Was there a -- a group of guys, including yourself, that

7  would talk about this oil and gas idea at a café up there in

8  Gillette in the mornings?

9  A.  Yeah.

10  Q.  Would -- did investors ever come to talk to you at coffee

11  or overhear you at coffee and then become investors because

12  that's how they found out about the technology or the idea?

13  A.  We would meet at coffee and then go over what we were

14  going to do today or what our plans was, and a lot of us at

15  the coffee would be going out to these wells and doing our

16  inspection on them, just moving everything forward on looking

17  for pressures and good wells so we can start getting ready

18  for -- if we're going to be putting more tools in.

19  Q.  We talked about the -- the one tool that you got from

20  Chuck Winters in Florida.  After you got that tool, did you

21  get another set of tools from Mr. Winters?

22  A.  Yes.

23  Q.  How many?

24  A.  I don't recall for sure on -- I don't know the exact

25  number.  But I know that Mike said that he ordered some more

19-CR-26-ABJ          LUKEN - DIRECT - WARD          Vol. X-1744
21-CR-14-ABJ

1  tools, and I said, "Then we're going to have to make some

2  changes on these before we put them in because I can see some

3  changes that need to be done on this tool."

4        And then when we got the second set in there, some of

5  them would fall apart.

6  Q.  And so you made some improvements or -- to that tool and

7  then put those additional tools that you received in the

8  ground?

9  A.  Chuck and I was talking about where we could make some

10  changes, how we can make some things better.  But then when we

11  got -- we decided to get rid of the steel part on top, and

12  then we decided to go with aluminum, so that way -- because

13  the water is so hard down there that it will make a chemical

14  reaction and they'll fall apart.

15  Q.  Did you take Special Agent Pikas -- that's seated here at

16  the table -- and Postal Inspector Sonia Hacker out to a

17  well site in Gillette?

18  A.  Yes.

19  Q.  Tell us about that.  What did you show them when you took

20  them out to a well site?

21  A.  We took them out to -- there was a few of us that went out

22  there.  So we went out there and we looked at a well site, and

23  there was a tool in there, and it was making some gas.

24  Q.  Now, you invested your own money into these companies that

25  Bob had; correct?

1  A.  I tried to help where I can.  And I invested lots of money

2  and time.

3  Q.  And were you supposed to receive shares of NuTech?

4  A.  I got shares -- well, I was told I was supposed to get

5  shares until I got a certificate.

6  Q.  At some point in time, did you receive an actual

7  certificate?

8  A.  Much later.

9  Q.  Okay.  And tell us about that process.  I mean, it sounds

10  like there was a -- you said you didn't get the certificates

11  until later.  Did you have to wait quite a long time until you

12  got the certificates?

13  A.  A few years.

14  Q.  And while you were waiting, were you doing anything to try

15  and move along the process of getting the certificates?

16  A.  Doing what we can with the tool and, also, started to get

17  annoyed and started demanding "Where is our certificates?"

18  Q.  Is that something you talked to Bob Mitchell about?

19  A.  Directly, yes.

20  Q.  And what -- what was his response when you'd ask about the

21  status of your certificates?

22  A.  He would say he was working on them or he would say that

23  he was waiting for Justin to get them done.

24  Q.  Would that be referring to Justin Herman?

25  A.  Yes.

19-CR-26-ABJ                LUKEN - DIRECT - WARD              Vol. X-1746
21-CR-14-ABJ

1    Q.  And was there a point in time where you wanted to talk to

2    Justin Herman directly about it?

3    A.  Yes.

4    Q.  And what were you told?

5    A.  I was told by -- I was told that "I wouldn't call him

6    because he doesn't like you."

7    Q.  Who told you that?

8    A.  Bob.

9    Q.  Is that generally how Bob operated in terms of keeping

10   things compartmentalized?

11   A.  He's told me that quite a few times.  And I said, "Well,

12   I want my certificate; we want our certificate; our friends

13   want our certificates; my family wanted certificates."

14   I wanted to be calling Justin myself.

15        So there's a lot of times he said "Don't call him; he

16   doesn't like you."

17        I said, "Well, I never done nothing to him."

18   Q.  The shares that you were to receive, were a portion of

19   those shares -- were you holding a portion of those for

20   Bob Mitchell?

21   A.  At the beginning he said that "You're going to have to

22   hold all my shares because I'm going to be putting this all

23   together and I can't have any shares."

24   Q.  And did -- you agreed to that?

25   A.  I just said, "Whatever."  Because -- like I'm not greedy,

1    and it's like -- because mine were going to be restricted

2    anyway.

3    Q.  And you were designated as the COO of NuTech at some point

4    in time; correct?

5    A.  Yes.

6    Q.  Were you aware of that before it happened?

7    A.  No.

8    Q.  So how did you come to find out that you were the --

9    the COO?

10   A.  Me and my friends were at the coffee shop, and we were

11   sitting there making plans to go out into the fields and do

12   some more work again when another guy that worked for the

13   High Plains -- used to -- he come in to visit and have coffee.

14   And he's the one that come in and told me congratulations,

15   that I'm the COO.

16            I said "Of what?"

17            He said "Of NuTech."  I didn't have a clue that I was

18   even the COO.

19   Q.  Was your understanding that "COO" meant "chief operating

20   officer"?

21   A.  I didn't even know what it was at first.  And I said,

22   "What's a COO?"

23            And he told me -- he said -- well, he read it and he

24   said "That's chief operating officer."

25            MR. WARD:  May I have just a moment, Your Honor.

 1            THE COURT:  You may.

 2            MR. WARD:  Those are all the questions I have for

 3    this witness, Your Honor.

 4            Thank you.

 5            THE COURT:  Thank you.

 6            MR. JUBIN:  No questions.

 7            MR. HEIMANN:  Good afternoon, Mr. Luken.

 8            THE WITNESS:  How are you?

 9            MR. HEIMANN:  I'm good.  How are you?

10            THE WITNESS:  Good.

11                        CROSS-EXAMINATION

12    BY MR. HEIMANN:

13    Q.  We've met a few times during this investigation; right?

14    A.  We have.

15    Q.  You answered some questions on direct about being the COO

16    at NuTech.  Did you receive any salary for that position?

17    A.  I don't think -- not for that salary -- or for that

18    position.

19    Q.  Okay.  Did you receive some payments from Mr. Mitchell?

20    A.  Yes.

21    Q.  What were those payments for?

22    A.  For working on wells or later, when I was getting annoyed

23    and started demanding.  And then I kept giving him money for,

24    you know, rent on his own place, and then I started demanding

25    that I want my money back.

1  Q.  You testified that you gave Mr. Mitchell money to support

2  this venture and he sometimes gave you money.

3       Where's the balance?  Did you come out ahead over

4  the years or did you come out behind?

5  A.  Behind.

6  Q.  During the time it was NuTech, was a man named Kevin

7  Trizna the CEO?

8  A.  Yes.

9  Q.  How often did you meet with Mr. Trizna?

10 A.  I didn't -- I can only remember maybe a couple times that

11 I met with him.

12 Q.  Okay.  Other than Mr. Trizna and you as the COO, did

13 NuTech have any employees?

14 A.  No.

15 Q.  Any revenue?

16 A.  Our -- our money coming in that I know of -- or my money.

17 Q.  Any gas wells producing gas?

18 A.  No.

19 Q.  Did the company own a truck?

20 A.  No.

21 Q.  Did you have an email account at nutechenr.com?

22 A.  I did.

23 Q.  Did you use it?

24 A.  Not very often.  I -- it didn't work or I couldn't get

25 into it or -- it didn't work very good.

1   Q.  Did Kevin Trizna have an email account?

2   A.  I believe so.

3   Q.  What email account did you use to communicate with him?

4   A.  I usually used -- I think we tried using that one, but

5   I couldn't get it to work, so I used my own personal.

6   Q.  So I'm clear, what email account would you send email to

7   when you wanted to communicate with Kevin Trizna?

8   A.  My personal email.

9   Q.  I understand.  You're sending it from your personal

10  account?

11  A.  Yeah.

12  Q.  To what account of Kevin Trizna's?

13  A.  I don't remember on that one.

14  Q.  Did Kevin have an account, kevin@nutechenr.com?

15  A.  I can't remember his.

16  Q.  Did NuTech have an office in Gillette?

17  A.  Yes.

18  Q.  Who paid for that office?

19  A.  I did and fellow shareholders.

20  Q.  Why did NuTech have to have an office in Gillette?

21  A.  I was told that we had to have an office in Gillette -- in

22  Gillette so that Bob can move forward with the stocks because

23  he couldn't have just a PO box.

24  Q.  On direct examination you testified that Bob Mitchell told

25  you "Don't call Justin Herman; he doesn't like you."

1           Did you, in fact, talk to Justin Herman a couple

2    times?

3    A.  Yes.

4    Q.  What did you talk to him about?

5    A.  About where's our certificates.

6    Q.  What did he tell you?

7    A.  He said that he was working on them and then going to get

8    them back to Bob.

9    Q.  Did he reference a company called Kingdom?

10   A.  Yes.

11   Q.  What did he tell you about Kingdom and your certificates?

12   A.  When he was telling me about the Kingdom, then he had to

13   get -- it's going to be a transfer agent and he would be

14   working on Kingdom.  And then once we got our certificates, we

15   would have accounts set up in Kingdom.

16   Q.  Do you know what a transfer agent does?

17   A.  Not for sure.  It was supposed to take our restricted

18   shares so we can start actually selling them, maybe.

19   Q.  Who told you that?

20   A.  Bob.

21   Q.  You got a certificate.  Was it at EcoEmissions or NuTech?

22   A.  I don't remember mine.  I know there was kind of both

23   because some of my family and friends got an EcoEmissions and

24   a NuTech.

25   Q.  Was yours restricted?

1   A.   Yes.

2   Q.   Were you ever able to sell those shares?

3   A.   No.

4   Q.   Did you try?

5   A.   Yes.

6   Q.   What did you do?

7   A.   I went to DA Davis, and I went to an Edwards and Jones,

8   and they said, "They've got to be unrestricted before we can

9   even touch them."

10  Q.   Did you ask Bob for help to get them unrestricted?

11  A.   I told him "What's this restricted?"

12         And he said, "They're restricted for a year."

13  Q.   Okay.

14  A.   So I assume, "Well, we're going to be working on the wells

15  so a year will go by fast."

16  Q.   After the year, though, you couldn't get them

17  unrestricted?

18  A.   No.

19  Q.   You talked about this group of investors in Gillette.  Did

20  you and the other investors in Gillette monitor NuTech online?

21  A.   Yes.

22  Q.   Did you see press releases for the company?

23  A.   Yes.

24  Q.   You talked about this tool.  The first one, the PVC one,

25  what was that called?

1    A.   The Gazmo.

2    Q.   Then Mr. Ward showed you the tool with the red -- the red

3    part, was that the steel part?

4    A.   Yes.

5    Q.   What was that called?

6    A.   That tool, I think, was either the IGOR or they were

7    trying to change it to Intrepid.

8    Q.   You testified that it moved some gas along with some

9    water.

10   A.   Yes.

11   Q.   And I want to be clear.  Did that go into an Emerald well?

12   A.   Yes.

13   Q.   Was any gas ever sold out of that well?

14   A.   Yes.

15   Q.   How much?

16   A.   I'm unsure.  It's the same one that we tried the plastic

17   well on.  And it's the Emerald well on Tom Throne's.

18   Q.   There were problems with Chuck Winters' tool; right?

19   A.   Yes.

20   Q.   You made improvements?

21   A.   Yes.

22   Q.   The tools that are currently being deployed, are -- are

23   they your tools?  Or are they Mr. Winters' tools?

24   A.   They're -- we're not using aluminum tools no more.  We're

25   using a new tool.

1    Q.  You saw the -- the email and the maps with the thousands

2    of wells on them?

3    A.  Yes.

4    Q.  Were tools ever deployed in those thousands of wells?

5    A.  No.

6    Q.  Before you got involved with Bob Mitchell and got the

7    certificate with the restrictions on it -- before I ask this,

8    where did you get the certificate?

9    A.  From Bob.

10   Q.  Before you got the restricted certificate, did you know

11   what a restricted share in a company was?

12   A.  No.

13   Q.  Do you know what an attorney opinion letter is?

14   A.  A what?

15   Q.  An attorney opinion letter.

16   A.  No.

17   Q.  Do you know what a prospectus is?

18   A.  No.

19   Q.  Do you know what "market capitalization" means?

20   A.  No.

21   Q.  Do you know what the OTC Markets are?

22   A.  It's where the stocks are.

23   Q.  Who told you that?

24   A.  Bob.

25   Q.  You talked about going out online to look at the stock.

1    Is that one of the places you would go look?

2    A.  I would go look at the NuTech stock for the announcements

3    and what the price was.

4    Q.  Was there a time when you saw a skull and crossbones

5    attached to NuTech on that website?

6    A.  Yes.

7    Q.  What did that mean?

8    A.  I found that it's not going to be trading any with those

9    on there.

10   Q.  I'm sorry.  Say that again.

11   A.  It was not going to be trading with the skull and

12   crossbones on them.

13   Q.  Do you know what status it was under at that time?

14   A.  I don't know.

15   Q.  Did you ever sell any NuTech stock?

16   A.  No.

17        MR. HEIMANN:  May I have a moment, Your Honor.

18        THE COURT:  Yes.

19        (Discussion held at counsel table.)

20   BY MR. HEIMANN:

21   Q.  One last question:  When you got your stock certificate,

22   you said you got it from Bob.  Did he hand it to you?  Did he

23   mail it to you?

24        How did he get it to you?

25   A.  He mailed it.

19-CR-26-ABJ            ROBERTS - DIRECT - WARD            Vol. X-1756
21-CR-14-ABJ

1        (Discussion held at counsel table.)

2              MR. HEIMANN:  No further questions, Your Honor.

3              MR. FLEENER:  No questions for Mr. Herman, sir.

4              MR. WARD:  And I have no redirect, Your Honor.

5              THE COURT:  Thank you.

6              MR. JUBIN:  Nothing further.

7              THE COURT:  Mr. Luken, you are excused.

8              THE WITNESS:  Okay.  Thanks.

9              THE COURT:  You can take off that microphone.

10             THE WITNESS:  Yeah.

11             THE COURT:  Sir, the microphone.

12             THE WITNESS:  Did you want this map, also?

13             THE COURT:  Yes.  Thank you.

14             THE WITNESS:  I'd be better off to leave my shirt.

15             MR. WARD:  Your Honor, Mr. Winters would call Rachel

16      Roberts.

17        (Witness sworn.)

18             THE COURTROOM DEPUTY:  Let me wipe that down before

19      you have a seat.

20             Please state and spell your name for the record.

21             THE WITNESS:  Rachel Roberts, R-o-b-e-r-t-s.

22             MR. WARD:  Good afternoon, Ms. Roberts.

23      **RACHEL ROBERTS, DEFENDANT WINTERS' WITNESS, DIRECT EXAMINATION**

24      **BY MR. WARD:**

25      Q.  How did you get involved in this case?

1   A.  I was hired by Tom Fleener.

2   Q.  And what were you hired to do?

3   A.  As a legal investigator to conduct interviews and review

4   discovery.

5          MR. WARD:  Your Honor, may I approach.

6          THE COURT:  You may.

7   BY MR. WARD:

8   Q.  I'm handing you what's been marked as Exhibit CW-C.

9          Can you tell me what this document is?

10  A.  Sure.  This is a United States patent filing.

11  Q.  And who is the inventor listed on the patent?

12  A.  Charles W. Winters.

13  Q.  And what is the -- when was the application for

14  this patent filed?

15  A.  September 11th, 2017.

16  Q.  If you look down on the first page here, there's an

17  application number and then next to that there's a filing

18  date.

19  A.  Yeah.  So the application number is 62393041, and the

20  filing date is September 11th, 2016.

21  Q.  And then I believe -- the date you were referring to,

22  that's when the patent was actually filed?

23  A.  Correct, September 11th, 2017.

24  Q.  And what is this a patent for?

25  A.  This is a patent for a downhole filter tool.  And there's

 1  a descriptor if you'd like me to read the whole description.

 2  Q.  I don't believe that's necessary.

 3          Is this a patent for the tool that we've been

 4  discussing throughout this trial?

 5  A.  Yes, it is.

 6          MR. WARD:  All right.  I would move for the

 7  introduction of Exhibit CW-C.

 8          MR. HEIMANN:  Your Honor, I object to the relevance

 9  of a patent that was filed and issued after the charged

10  conspiracy.

11          MR. WARD:  Your Honor, I think it's relevant that

12  Mr. Winters holds a patent for the tool that he manufactured.

13  There's evidence that he manufactured it, that it was deployed

14  in this case, so the fact that he's patented it, I believe, is

15  certainly relevant.

16          THE COURT:  It will be received for that purpose

17  only.

18      (Defendant's Exhibit CW-C received into evidence.)

19          MR. WARD:  Those are all the questions I have for

20  this witness, other than to maybe briefly publish to the jury

21  the first page of this patent.

22          Those are all the questions I have.  Thank you,

23  Your Honor.

24          MR. FLEENER:  No questions for me, Judge.  Thank you.

25          MR. JUBIN:  No questions.

```
19-CR-26-ABJ          MILLER - DIRECT - JUBIN          Vol. X-1759
21-CR-14-ABJ
```

1          MR. HEIMANN:  No questions.

2          THE COURT:  You may step down.

3          THE WITNESS:  Thank you.

4          MR. JUBIN:  Your Honor, in an effort to make good use

5    of the jury's time, we've got about an hour left today, and

6    I have a witness through whom I can put in some foundation for

7    some exhibits, so Ian Horn would call Stephen J. Miller.

8       (Witness sworn.)

9          THE COURTROOM DEPUTY:  Please take a seat.

10          Please state and spell your name for the record.

11          THE WITNESS:  Stephen Joseph Miller, S-t-e-p-h-e-n

12    J-o-s-e-p-h M-i-l-l-e-r.

13          MR. JUBIN:  Good afternoon, Mr. Miller.

14          THE WITNESS:  Good afternoon, sir.

15       **STEPHEN JOSEPH MILLER, DEFENDANT HORN'S WITNESS**

16                    **DIRECT EXAMINATION**

17    **BY MR. JUBIN:**

18    Q.  How old are you?

19    A.  67 years old.

20    Q.  Where do you live?

21    A.  Cheyenne, Wyoming.

22    Q.  And how long have you lived in Cheyenne?

23    A.  Since 1982.

24    Q.  What's your occupation?

25    A.  I'm a licensed private investigator.

1  Q.  Can you tell the jury a little bit about your educational

2  background?

3  A.  I have an associate's degree in business management and

4  accounting, a bachelor's degree, and then a master's in public

5  administration from the University of Wyoming.

6  Q.  Where did you get your bachelor's?

7  A.  Ohio State University in Columbus, Ohio.

8  Q.  Do you have any certifications?

9  A.  I do.  I'm a certified fraud examiner and a certified

10  professional investigator.  Both of those are board

11  certifications, require an exam and a mixture of education and

12  experience.  Both require approximately 20 hours of continuing

13  education per year.

14  Q.  What kind of professional experience do you have doing

15  investigation-type work?

16  A.  Over 43 years, 5 years in the state of Ohio as a police

17  officer and criminal investigator with the State Attorney

18  General and then 20 years as a special agent with the Wyoming

19  Division of Criminal Investigation here in Wyoming.

20  Q.  And what have you been doing after -- well, what did

21  you -- when did you end up leaving the DCI?

22  A.  December 31st, 2002.

23  Q.  And so what have you been doing for the last 18 years

24  or so?

25  A.  Licensed private investigator here in Cheyenne.

1   Q.   Who were you working for in this case?

2   A.   For you, Mr. Jubin.

3   Q.   And when did you become involved in this case?

4   A.   This year, 2021.

5   Q.   And what have you been asked to do?

6   A.   Review potential evidence, Government discovery materials,

7   assist with review of exhibits, preparation exhibits, and,

8   generally, assist in the case.

9   Q.   Did you have an opportunity to review the Government's

10  evidence in this case?

11  A.   I did.

12  Q.   How much of the stuff is there?

13  A.   There's a substantial amount of materials provided by the

14  United States Government, thousands of pages literally,

15  terabytes of digital information.

16  Q.   So you reviewed some of these things?

17  A.   I did.

18  Q.   And did you review them in connection with any other

19  person?

20  A.   At times I would work with your paralegal to review

21  exhibits, prepare exhibits, and organize evidence.

22  Q.   What kinds of documents did you review?

23  A.   A whole host of documents.

24          For example, text messages, emails, letters, wire

25  transfers, bank statements, regulatory filings, transcripts,

1   and audio clips.

2   Q.  Did you also review materials related to the grand jury?

3   A.  I did.

4   Q.  Were these things easy for you to locate, or did this take

5   some effort?

6   A.  It took a great deal of effort, and I've been doing this

7   since August of this year, right up through the present day.

8   Q.  Did you prepare a list to assist you in informing the jury

9   as to the source of the documents that you're going to talk

10  about here?

11  A.  I did.

12  Q.  Would it assist you to make reference to your list in

13  terms of letting them know where you found things?

14  A.  Extremely so.

15  Q.  I'm going to be going through a series of documents now.

16  These have not been admitted, save one perhaps.

17          If you would take a look at IH-Q1a, what is that?

18  A.  It is an opinion letter dated March 18th, 2015, directed

19  to the OTC Markets Group.  Topic is "Umbra Applied

20  Technologies Group, Inc., Initial Information and Disclosure

21  Statement Dated March 17th, 2014, and Posted on March 18th,

22  2015."

23  Q.  And who is shown as purportedly having authorized this

24  letter?

25  A.  On the signature page of this letter, Ian Horn.

1   Q.   Whose letterhead is on it?

2   A.   Ian Horn & Associates.

3   Q.   Okay.  If we can take a look at the signature page . . .

4   and is -- is that the Ian Horn signature you mentioned?

5   A.   Yes.

6           MR. JUBIN:  I'd move for the admission of IH-Q1a.

7       (Discussion held between counsel.)

8   BY MR. JUBIN:

9   Q.   Mr. Heimann reminds me that I didn't ask you some

10  foundational information.

11          Can you tell the jury where you found this letter?

12  A.   This was obtained through discovery materials provided to

13  your office by the United States Government, and it was in a

14  digital format.

15  Q.   Okay.  And do you know where it came from in terms of in

16  the Government's discovery, what their source was?

17  A.   Again, some of the materials came from grand jury

18  exhibits, for example, and the documents provided were in --

19  like I said -- in a digital format on several occasions.

20  Q.   Okay.  Do you know if this was part of the privilege

21  review materials?

22  A.   I believe it was, yes.

23  Q.   Okay.  And those privilege review materials, the testimony

24  has been, came from Justin Herman's computer?

25  A.   Yes.

1          MR. JUBIN:  Okay.  I'd move for the admission of

2   IH-Q1a.

3          MR. HEIMANN:  Your Honor, I don't object to the

4   foundation as to this file being found on Justin Herman's

5   iMac.

6          I do object as to relevance.  This is a different

7   company, and there's no testimony as to how it relates to this

8   case.

9          So if it's going to be admitted, I would ask that it

10   be admitted conditionally.

11          MR. JUBIN:  I'll tie it in, Your Honor.

12   BY MR. JUBIN:

13   Q.  Are you familiar with -- with the look of the signature on

14   this document?

15   A.  I am.

16   Q.  Have you made a personal -- have you reviewed -- for your

17   own purposes -- reviewed signatures on the documents we're

18   about to talk about?

19   A.  Yes, I have.

20   Q.  Are a number of them similar in appearance?

21   A.  They are.

22   Q.  Are you familiar with the fact that we'll be calling an

23   expert in this case to talk about those similarities?

24   A.  Yes, I am.

25          MR. JUBIN:  Your Honor, I think, you know, we can

 1   conditionally admit it or admit it.  I don't know that it

 2   makes a difference.

 3            I'd -- I'd request it be admitted.  I think it's

 4   relevant.  The jury can make their own judgments, too.

 5            THE COURT:  Well, I think it's a legal issue that I'm

 6   going to have to resolve.

 7            It's conditionally admitted.

 8            MR. JUBIN:  May I publish?

 9            THE COURT:  You may publish it.

10            MR. JUBIN:  Okay.

11            THE COURT:  When I say "conditionally," ladies and

12   gentlemen, if this is not tied up to this specific NuTech

13   fraud case, I will order it to be stricken from the record.

14   BY MR. JUBIN:

15   Q.  Okay.  And is -- the jury's now looking at the third

16   page of that exhibit that contains Ian Horn's signature;

17   right?

18   A.  Yes.

19   Q.  Okay.  If we could take a look at Exhibit IH-Q1, which is

20   not admitted.  There's the sticker.

21            What is that?

22   A.  That is the signature page of the opinion letter.

23   Q.  Of the opinion letter we just looked at, IH-Q1a?

24   A.  Yes.

25   Q.  Okay.

1         MR. JUBIN:  Your Honor, I'd move for the admission or

2    conditional admission of the signature page.

3         And my reason for doing that is the -- the forensic

4    document examiner used and labeled these in a certain way, and

5    so I want to make sure we keep it straight.

6         MR. HEIMANN:  Your Honor, no objection if

7    conditional.

8         THE COURT:  It is received under that understanding.

9    BY MR. JUBIN:

10   Q.  And we won't publish that since we just looked at it.

11        Let's take a look at Exhibit IH-Q2a.

12        Are you familiar with this document?

13   A.  I am.

14   Q.  What is it?

15   A.  It is an opinion letter -- opinion letter, excuse me --

16   dated March 20th, 2015, regarding "Umbra Applied Technologies

17   Group, Inc., Initial Information and Disclosure Statement

18   Dated March 17th, 2014, and Posted on March 20th, 2015."

19   Q.  And on whose letterhead is it?

20   A.  Ian Horn & Associates.

21   Q.  What's the source of this document?

22   A.  Again, it is information that was provided to your office

23   via discovery by the United States in digital format.

24   Q.  And is this part of the privilege disclosure from

25   Justin Herman's computer?

1    A.  It is.

2          MR. JUBIN:  Your Honor, I'd move for the conditional

3    admission of IH-Q2a.

4          MR. HEIMANN:  Your Honor, it is from the iMac.  No

5    objection as long as it's conditional.

6          THE COURT:  It is received.

7          MR. JUBIN:  Let's scroll down to the third page.

8    BY MR. JUBIN:

9    Q.  And who does it show -- whose signature appears on this?

10   A.  Ian Horn.

11         MR. JUBIN:  Okay.  And . . . is the jury looking at

12   this?  Is this published?

13         THE COURTROOM DEPUTY: (Moved head up and down.)

14         MR. JUBIN:  Okay.  Great.

15   BY MR. JUBIN:

16   Q.  Let's take a look at IH-Q2.

17       And what is that?

18   A.  That is the signature page of the opinion letter

19   exhibit we just discussed.

20   Q.  Oh, okay.

21         MR. JUBIN:  I'd move for the conditional admission of

22   IH-Q2.

23         MR. HEIMANN:  No objection.

24         THE COURT:  It is received.

25   ///

1    BY MR. JUBIN:

2    Q.  I draw your attention to an un -- not yet admitted

3    exhibit, IH-Q3a.  At least not admitted under this number.

4          Can you tell us what that is?

5    A.  This is also an opinion letter dated May 19th, 2015.

6    Topic is "NuTech Energy Resources, Inc. (Formerly Known as

7    EcoEmissions Solutions, Inc.) Initial Information and

8    Disclosure Statement Dated February 28th, 2015, and Posted on

9    May 14th, 2015."

10   Q.  On whose letterhead does this appear?

11   A.  Ian Horn & Associates.

12   Q.  Is this document in evidence under any other exhibit

13   number?

14   A.  Yes, it is.

15   Q.  And what exhibit is that?

16   A.  It is listed as, I believe, Government Exhibit 8, and it's

17   also a grand jury exhibit.

18          MR. JUBIN:  I don't think I'll admit this since we

19   already have the document in evidence and it would seem

20   duplicative and probably cumbersome to have multiple of the

21   same thing.

22   BY MR. JUBIN:

23   Q.  If you'll take a look at IH-Q3, what is that?

24   A.  That is the signature page of the opinion letter we just

25   discussed.

 1             MR. JUBIN:  I would move to conditionally admit

 2    IH-Q3.

 3             MR. HEIMANN:  No objection to conditional admission.

 4             THE COURT:  It is received.

 5             MR. JUBIN:  I guess I don't need to admit it

 6    conditionally, Your Honor.  I'd ask that it be received since

 7    it's already an exhibit in the case.

 8             THE COURT:  It's been received.

 9             MR. HEIMANN:  No objection.

10             THE COURT:  Received.

11      (Defendant Horn's Exhibit IH-Q3 received into evidence.)

12    BY MR. JUBIN:

13    Q.  If you would take a look at Exhibit IH-Q4a.

14             What is this?

15    A.  It's an opinion letter dated May 21st, 2015.  The topic is

16    "Umbra Applied Technologies Group, Inc., Initial Information

17    and Disclosure Statement; Date, May 13th [sic], 2015, and

18    Posted on May 15th, 2015."

19    Q.  Do you know where this letter came from?

20    A.  Again, this was a letter provided through United States --

21    to your office via the United States in digital format.

22    Q.  Was it part of that privilege disclosure?

23    A.  Yes, sir.

24    Q.  On whose letterhead is this?

25    A.  Ian Horn & Associates.

1   Q.  And does it contain a signature?  Do you want to scroll to

2   the third page?

3   A.  It does, "Ian Horn."

4           MR. JUBIN:  Move for the admission of IH-Q4a.

5           MR. HEIMANN:  Your Honor, no objection to foundation.

6   It was found on Mr. Herman's iMac.

7           Objection as to relevance and would request it be

8   admitted conditionally.

9           THE COURT:  So admitted.

10          MR. JUBIN:  If we could publish that to the jury,

11  please.

12  BY MR. JUBIN:

13  Q.  I draw your attention to Exhibit IH-Q4.  What is that?

14  A.  That is the signature page of the exhibit -- or

15  excuse me -- of the opinion letter.

16  Q.  The one we just looked at, IH-Q4a?

17  A.  Yes.

18          MR. JUBIN:  Move for the conditional admission of

19  IH-Q4.

20          MR. HEIMANN:  No objection, Your Honor.

21          THE COURT:  It is received.

22  BY MR. JUBIN:

23  Q.  I draw your attention to Exhibit IH-Q5a.

24          What is that?

25  A.  It is an opinion letter dated June 16th, 2015, directed to

1   the Pacific Stock Transfer Company regarding "Supporting Legal

2   Opinion for Request to Issue Free Trading Shares of Common

3   Stock of NuTech Energy Resources, Inc."

4   Q.  And what's the source of this document?

5   A.  Again, discovery provided by the United States Government

6   to your office in a digital format.

7   Q.  Is this also part of the privilege review that came from

8   Justin Herman's computer?

9   A.  Yes, it is.

10  Q.  Does this contain Ian Horn's -- appear to contain

11  Ian Horn's signature?

12          MR. JUBIN:  Scroll down to page 4.

13  A.  It does, "Ian Horn."

14          MR. JUBIN:  Scroll back up to the first page.

15  BY MR. JUBIN:

16  Q.  And this -- is this June 16, 2015, letter related to

17  NuTech?

18  A.  Yes.

19          MR. JUBIN:  I'd move for the admission of IH-Q5a.

20          MR. HEIMANN:  No objection.

21          THE COURT:  It is received.

22     (Defendant's Exhibit IH-Q5a received into evidence.)

23          MR. JUBIN:  If you could scroll down.

24          Okay.  So now we're showing -- we're displaying the

25  signature page.

1              If we could show IH-Q5.

2    BY MR. JUBIN:

3    Q.  Could you tell the jury what that is?

4    A.  That is the signature page of the opinion letter we just

5    discussed.

6              MR. JUBIN:  Move for the admission of IH-Q5.

7              MR. HEIMANN:  No objection.

8              THE COURT:  IH-Q5 is received.

9         (Defendant's Exhibit IH-Q5 received into evidence.)

10   BY MR. JUBIN:

11   Q.  I draw your attention to Exhibit IH-Q6a.  Can you tell the

12   jury what this is?

13   A.  This is an opinion later -- letter -- dated July 10th,

14   2015, directed to the Pacific Stock Transfer Company regarding

15   "Supporting Legal Opinion for Request to Issue Free Trading

16   Shares of Common Stock of NuTech Energy Resources, Inc."

17   Q.  And -- and this is -- is this also a Government exhibit?

18   A.  It is.

19   Q.  And what's the Government exhibit number?

20   A.  The grand jury exhibit is 30.5.  I believe the trial

21   exhibit number is 305.

22   Q.  Yeah.  Okay.  Thank you.

23             MR. JUBIN:  Your Honor, rather than move for its

24   admission, I would -- rather than duplicate the record --

25   we'll hold off on that.

1   BY MR. JUBIN:

2   Q.  Can you take a look at Exhibit IH-Q6?  What is that?

3   A.  That's the signature page of the opinion letter we just

4   reviewed.

5          MR. JUBIN:  Move for the admission of IH-Q6.

6          MR. HEIMANN:  No objection.

7          THE COURT:  IH-Q6 is received.

8      (Defendant's Exhibit IH-Q6 received into evidence.)

9   BY MR. JUBIN:

10  Q.  I draw your attention to Exhibit IH-Q7a.  What is that?

11  A.  That is an opinion later -- letter -- dated July 17th,

12  2015, directed to Pacific Stock Transfer Company reference

13  "Supporting Legal Opinion for Request to Issue Free Trading

14  Shares of Common Stock of NuTech Energy Resources, Inc."

15  Q.  Is this also a Government exhibit?

16  A.  It is.

17          I believe it's Government Exhibit -- Grand Jury

18  Exhibit 30.6, Trial Exhibit 306.

19  Q.  So it's Exhibit 306 for these folks?

20  A.  Yes, sir.

21  Q.  All right.  I draw your attention to Exhibit IH-Q7.  What

22  is that?

23  A.  That is the signature page of the opinion letter we just

24  reviewed, "Ian Horn."

25          MR. JUBIN:  Move for the admission of IH-Q7.

1        MR. HEIMANN:  No objection.

2        THE COURT:  IH-Q7 is received.

3     (Defendant's Exhibit IH-Q7 received into evidence.)

4  BY MR. JUBIN:

5  Q.  I draw your attention to Exhibit IH-Q8a.  Can you tell the

6  jury what that is?

7  A.  This is an opinion letter dated July 23rd, 2015, directed

8  to Pacific Stock Transfer Company regarding "Supporting Legal

9  Opinion for Request to Issue Free Trading Shares of Common

10 Stock of NuTech Energy Resources, Inc."

11 Q.  And is this also a Government exhibit?

12 A.  Yes, it is, Exhibit 307.

13 Q.  Okay.  And it also appears on the face of it that it was a

14 grand jury exhibit?

15 A.  Yes.

16 Q.  I draw your attention to Exhibit IH-Q8.  What is that?

17 A.  That is a signature page with Ian Horn's signature, the

18 opinion letter we just reviewed.

19        MR. JUBIN:  Move for the admission of IH-Q8.

20        MR. HEIMANN:  No objection.

21        MR. JUBIN:  And ask that it be published.

22        THE COURT:  Received.

23        It may be published.

24     (Defendant's Exhibit IH-Q8 received into evidence.)

25 ///

1    BY MR. JUBIN:

2    Q.  I'd like you to take a look at Exhibit IH-Q9a.  What is

3    that?

4    A.  That is an opinion letter dated September 16th, 2015,

5    directed to Pacific Stock Transfer Company regarding

6    "Supporting Legal Opinion for Request to Issue Free Trading

7    Shares of Common Stock of NuTech Energy Resources, Inc."

8    Q.  And on whose letterhead is this?

9    A.  Ian Horn & Associates.

10   Q.  Is this also a Government exhibit?

11   A.  Yes, 308.

12   Q.  Are you looking at IH-Q9a?

13   A.  I'm sorry, Counselor.  Wait here.

14          Yes.  I misspoke.  My apologies.

15   Q.  And you're showing that as Government Exhibit what?

16   A.  One moment, Counselor.

17          I'm sorry.  It should be Exhibit 22.5.

18          MR. JUBIN:  Now we're on the same page.

19          THE WITNESS:  Sorry.

20          MR. JUBIN:  And then scroll down to the last page.

21   BY MR. JUBIN:

22   Q.  Okay.  Having reviewed that, let's take a look at

23   Exhibit IH-Q9.  And what's IH-Q9?

24   A.  It's the signature page of the opinion letter we just

25   reviewed, Ian Horn's signature.

1          MR. JUBIN:  Move for the admission of IH-Q9.

2          MR. HEIMANN:  No objection.

3          MR. JUBIN:  Publish to the jury, please.

4    BY MR. JUBIN:

5    Q.  Let's take a look at IH-Q10a.  What's that?

6    A.  It is an opinion letter from Ian Horn & Associates dated

7    September 23rd, 2015, directed to Pacific Stock Transfer

8    Company regarding "Supporting Legal Opinion for Request to

9    Issue Free Trading Shares of Common Stock of NuTech Energy

10   Resources, Inc."

11   Q.  Is this also a Government exhibit?

12   A.  Yes, 25.2.

13          MR. JUBIN:  Let's scroll down to the last page.

14   BY MR. JUBIN:

15   Q.  And what signature is applied?

16   A.  "Ian Horn."

17   Q.  Let's take a look at IH-Q10.  What is that?

18   A.  It's the signature page of the opinion letter we just

19   reviewed.

20          MR. JUBIN:  Move for the admission of IH-Q10.

21          MR. HEIMANN:  No objection.

22          THE COURT:  Received.

23      (Defendant's Exhibit IH-Q10 received into evidence.)

24   BY MR. JUBIN:

25   Q.  Let's take a look at IH-Q11.  What's that?

 1  A.  It is an opinion letter -- excuse me.  One moment.

 2          Yes.  An opinion letter dated January 19th, 2016,

 3  from Ian Horn & Associates directed to Empire Stock Transfer

 4  Company.

 5  Q.  And where did this come from?

 6  A.  It came to you through discovery provided by the

 7  United States Government in digital format.

 8  Q.  Was this part of the privilege disclosure from the

 9  Government?

10  A.  It is.

11  Q.  So it came from Herman's computer?

12  A.  Yes.

13      (Discussion held between counsel.)

14  BY MR. JUBIN:

15  Q.  Okay.  There's a notation on -- on this that indicates

16  it's from -- that's "ISP."  Is that one of the search

17  warrants?

18  A.  I believe so.  I think it indicates "postal inspection

19  search warrant."

20  Q.  Okay.  And do you know what device this came from?

21  A.  This would have come from one of the electronic devices of

22  Mr. Herman's that were seized.

23  Q.  Seized by the Government and provided in discovery?

24  A.  Yes.

25  Q.  And whose signature is applied at the bottom?

1    A.   Ian Horn.

2    Q.   And it's on his letterhead?

3    A.   Ian Horn & Associates.

4              MR. JUBIN:  Move for the admission of IH-Q11.

5              MR. HEIMANN:  One moment, Your Honor, please.

6         (Discussion held at counsel table.)

7              MR. HEIMANN:  No objection, Your Honor.

8              THE COURT:  It is received.

9         (Defendant's Exhibit IH-Q11 received into evidence.)

10             MR. JUBIN:  I'd ask that it be published.

11             THE COURT:  Granted.

12   BY MR. JUBIN:

13   Q.   And this letter also shows the application of Ian Horn's

14   signature?

15   A.   It does.

16   Q.   I draw your attention to IH-Q12.  Are you familiar with

17   that document?

18   A.   Yes.

19   Q.   And what is that?

20   A.   It is an opinion letter from Ian Horn & Associates dated

21   January 19th, 2016, directed to Empire Stock Transfer Company.

22   Q.   And what is the source of this document?

23   A.   It was digital discovery provided to your office by the

24   United States.

25   Q.   And it also shows us "No. 26 ISP"?

1  A.  Yes.

2  Q.  If I tell you that's related to a -- that is an email

3  attachment, is that consistent with your understanding?

4  A.  Yes.

5  Q.  Okay.

6          MR. JUBIN:  I move for the admission of IH-Q12.

7          MR. HEIMANN:  Your Honor, on this one I'd object to

8  anything other than conditional admission.  It appears to be

9  for a company called Midwest Oil and Gas, not NuTech.

10          THE COURT:  It is received as conditional.

11          MR. JUBIN:  Ask it be published.

12  BY MR. JUBIN:

13  Q.  What's the date on this letter?

14  A.  January 19th, 2016.

15  Q.  Okay.  And let's go back to IH-Q11 for a moment.

16          And what's the date on that letter?

17  A.  Also January 19th, 2016.

18  Q.  Same day?

19  A.  Yes.

20  Q.  Let's go to IH-Q13.  What is that document -- I'm sorry.

21  Q13a is what I meant to ask you about.

22  A.  Yes.  This is an opinion letter from Ian Horn & Associates

23  dated March 7, 2016, directed to OTC Market Group, Inc.  The

24  topic is "NuTech Energy Resources, Inc. (Formerly Known As

25  EcoEmissions Solutions, Inc.) Initial Information and

1   Disclosure Statement Dated November 30th, 2015, and posted on

2   March 4th, 2016."

3   Q.  Is this also a Government exhibit?

4   A.  Yes, it is, Government Exhibit 34.1.

5         MR. JUBIN:  And go down to the last page.

6   BY MR. JUBIN:

7   Q.  And does this contain an applied signature?

8   A.  Yes, "Ian Horn."

9   Q.  Okay.  Take a look at IH-Q13.

10      What is that?

11  A.  That is the signature page with Ian Horn's signature of

12  the opinion letter we just discussed.

13        MR. JUBIN:  Move for the admission of IH-Q13.

14        MR. HEIMANN:  No objection.

15        THE COURT:  IH-Q13 is received.

16      (Defendant's Exhibit IH-Q13 received into evidence.)

17  BY MR. JUBIN:

18  Q.  I draw your attention to IH-Q14a.  What is that?

19  A.  This is an opinion letter from Ian Horn & Associates dated

20  April 3rd, 2016, directed to the OTC Markets Group, Inc.,

21  regarding "NuTech Energy Resources, Inc. (Formerly Known as

22  EcoEmissions Solutions, Inc.) Amended Initial Information and

23  Disclosure Statement Dated November 30th, 2015, and Posted on

24  March 1st, 2016."

25  Q.  Is this also a Government exhibit?

1    A.  Yes, Government Exhibit 36.1.

2         MR. JUBIN:  Let's scroll down to the signature page.

3    A.  (Continuing.)  It has a signature, "Ian Horn."

4    BY MR. JUBIN:

5    Q.  Take a look at IH-Q14.  What is that?

6    A.  It is a signature page of the opinion letter we just

7    reviewed, Ian Horn.

8         MR. JUBIN:  Move for the admission of IH-Q14.

9         MR. HEIMANN:  No objection.

10        THE COURT:  IH-Q14 is received.

11    (Defendant's Exhibit IH-Q14 received into evidence.)

12        MR. JUBIN:  I draw your attention to IH-Q15a.

13        If I may have a moment, Your Honor.

14        This is already in -- in evidence, so I'd ask that it

15   be published, if you could confirm that, Becky.  Thank you.

16        THE COURT:  It has been.

17    BY MR. JUBIN:

18    Q.  So what is this?

19    A.  This is a letter dated May 10th, 2017, from Ian Horn,

20   Attorney At Law, regarding "Rule 144 Compliance and Shares to

21   be issued as Unrestricted and Free-Trading.  Issuer" -- I need

22   to spell it because I can't pronounce it --

23   "P-y-r-a-m-i-d-i-o-n Technology Group, Inc.," also known

24   as PYTG.

25        MR. JUBIN:  Okay.  And scroll down to the signature

1    page.

2    BY MR. JUBIN:

3    Q.  I'm going to ask you to take a look at IH-Q15.  What is

4    that?

5    A.  It is the signature page of the letter we just discussed,

6    "Ian Horn."

7            MR. JUBIN:  Move for the admission of IH-Q15.

8            MR. HEIMANN:  No objection.

9            THE COURT:  It is received.

10       (Defendant's Exhibit IH-Q15 received into evidence.)

11   BY MR. JUBIN:

12   Q.  Let's take a look now at IH-Q16a.  What is that?

13   A.  It is also a letter from Ian Horn, Attorney At Law, dated

14   May 10th, 2017, regarding "Rule 144 Compliance and Shares to

15   be issued as Unrestricted and Free-Trading.  Issuer:

16   P-y-r-a-m-i-d-i-o-n Technology Group, Inc.," also known

17   as PYTG.

18           MR. JUBIN:  And scroll down to the bottom.

19   BY MR. JUBIN:

20   Q.  Does it contain a signature?

21   A.  "Ian Horn."

22   Q.  And where was -- what's the source of this document?

23   A.  This was discovery provided to your office by the United

24   States in digital format.

25   Q.  And it's also this No. 26 ISP source?

 1    A.  Yes.

 2            MR. JUBIN:  Move for the admission of IH-Q16a.

 3            MR. HEIMANN:  No objection.

 4            THE COURT:  It is received.

 5        (Defendant's Exhibit IH-Q16a received into evidence.)

 6            MR. JUBIN:  We can leave it there for a moment while

 7    it's published.

 8            And we can scroll up to the first page.

 9    BY MR. JUBIN:

10    Q.  I draw your attention to IH-Q16.  What is that?

11    A.  That's the signature page of the letter we just reviewed,

12    "Ian Horn."

13            MR. JUBIN:  Move for the admission of IH-Q16.

14            MR. HEIMANN:  No objection.

15            THE COURT:  Received.

16        (Defendant's Exhibit IH-Q16 received into evidence.)

17    BY MR. JUBIN:

18    Q.  I'd ask you to take a look at IH-Q17.  What is that?

19    A.  It is a letter from Ian Horn, Esquire, Horn & Associates

20    dated January 9th, 2013, directed to Intrepid Resources, LLC,

21    regarding "Assets in escrow."

22    Q.  So the date on this is January 9th of 2013?

23    A.  Yes.

24    Q.  So this is before the charged conspiracy; correct?

25    A.  That is correct.

1   Q.  And does it contain a -- a signature of some sort?

2   A.  It does, "Ian Horn."

3   Q.  Are you able to observe any irregularities in the

4   signature just looking at it?

5          MR. FLEENER:  Objection; foundation.

6          THE COURT:  Sustained.

7          MR. JUBIN:  Well, I'll move for the admission of

8   IH-Q17.

9          MR. HEIMANN:  Your Honor, the foundation is there.

10  This was found on Justin Herman's iMac.

11          Relevance, it doesn't mention NuTech and it's outside

12  the time of the charged conspiracy, so I would ask that it be

13  admitted only conditionally.

14          THE COURT:  It is so admitted.

15          MR. JUBIN:  Conditional is fine.

16          THE COURT:  It is so admitted.

17          MR. JUBIN:  So we can display that.

18  BY MR. JUBIN:

19  Q.  Are there marks between the signature line and the typed

20  information "Ian Horn, Esquire"?

21  A.  There is.

22  Q.  I draw your attention to IH-Q18.  What is that?

23  A.  It is a letter from Ian Horn & Associates dated May 19th,

24  2015, directed to the OTC Markets Group, Inc., reference

25  "NuTech Energy Resources, Inc. (Formerly Known As EcoEmissions

1   Solutions, Inc.) Initial Information and Disclosure Statement

2   Dated February 28th, 2015, and Posted on May 14th, 2015."

3   Q.  And where did this document come from?

4   A.  It was digital discovery provided to your office by the

5   United States.  It was seized from the Justin Herman device.

6   Q.  The iMac device?

7   A.  Yes.

8          MR. JUBIN:  If I may have a moment, Your Honor.

9      (Discussion held at counsel table.)

10          MR. JUBIN:  I'm not sure if we already have this as

11   an exhibit or not.

12          So if you'd scroll down.

13      (Discussion held between counsel.)

14   BY MR. JUBIN:

15   Q.  And looking at the signature page, whose signature appears

16   on it?

17   A.  Ian Horn.

18   Q.  And what's the source of this?

19   A.  Digital discovery provided to your office by the

20   United States.  Again, seized from the Justin Herman computer

21   device.

22   Q.  The iMac device?

23   A.  Yes.

24          MR. JUBIN:  Move for the admission of IH-Q18.

25          MR. HEIMANN:  No objection.

 1              THE COURT:  It is received.

 2         (Defendant's Exhibit IH-Q18 received into evidence.)

 3              MR. JUBIN:  Scroll back up to the first page.

 4              I think we may see this as one of the Government

 5    exhibits but obtained from a different source.

 6              But -- let's take a look at IH-Q19.

 7              THE COURT:  Mr. Jubin, could I interrupt you a

 8    minute?

 9              Would you look around the room.  Is any other

10    witnesses in this case present?

11              There's a sequestration order.

12              MR. JUBIN:  Oh.  I -- I don't know this gentleman, so

13    I don't know that he's a witness or not.

14              MR. FLEENER:  He's our expert witness, Judge.  He can

15    remain -- I mean -- permission for him to remain.

16              THE COURT:  Very well.

17              Any objection?

18              MR. HEIMANN:  No objection.

19              THE COURT:  Sorry to interrupt.

20              MR. JUBIN:  That's fine.

21              THE COURT:  Your back was turned so I needed you to

22    look.

23              MR. JUBIN:  That's all right.  He, too, can watch the

24    paint dry.

25    ///

1          THE COURT:  You're the painter.

2    BY MR. JUBIN:

3    Q.  Are you looking at IH-Q19?

4    A.  Yes.

5    Q.  What is that?

6    A.  It is a letter dated April 4th, 2013, from Ian Horn,

7    Esquire directed to Intrepid Resources, LLC, regarding "Assets

8    in escrow."

9    Q.  And where was -- what's the source of this document?

10   A.  Discovery provided to your office by the United States,

11   digital format, from the Herman iMac computer device.

12          MR. JUBIN:  Move for the admission of IH-Q19.

13          MR. HEIMANN:  No objection as to foundation.

14          As to relevance, it doesn't mention NuTech and is

15   outside the charged conspiracy so would ask that it be

16   admitted conditionally.

17          THE COURT:  It is admitted conditionally.

18   BY MR. JUBIN:

19   Q.  I draw your attention to the address at the top.  Do you

20   see that?

21   A.  The address for Ian Horn, Esquire?

22   Q.  Yes.  Could you read that, please?

23   A.  Yes.  "PO Box 691, Brandenton, Florida" 33500.

24   Q.  33509?

25   A.  I'm sorry.  33509.

1  Q.  I'm wearing my reading glasses.  Are you?

2  A.  I am trying, sir.

3  Q.  In the course of your investigation, have you come to

4  learn what city Mr. Horn lives in?

5  A.  Yes.

6  Q.  And what's that?

7  A.  Branderton, Florida.

8  Q.  Brandon, Florida?

9  A.  Brander- -- Brandenton, Florida.  Excuse me.

10  Q.  Have you heard of Bradenton, Florida?

11  A.  Bradenton, Florida.  My apologies, Counsel.

12  Q.  Maybe you're not familiar with this issue.  I won't ask

13  you any more questions about that.

14       This signature on this document, does it have marks

15  between the signature and Mr. Horn's name?

16  A.  Yes.

17  Q.  Okay.  Let's take a look at Ian Horn -- or IH-Q20.  What

18  is this document?

19  A.  It is an opinion letter dated June 16th, 2015, from

20  Ian Horn & Associates directed to Pacific Stock Transfer

21  Company regarding "Supporting Legal Opinion for Request to

22  Issue Free Trading Shares of Common Stock of NuTech Energy

23  Resources, Inc."

24  Q.  And what's the source of this document?

25  A.  It is digital discovery provided to your office by

1   United States seized from Mr. Justin Herman's computer, iMac.

2          MR. JUBIN:  Move for the admission of IH-Q20.

3          MR. HEIMANN:  No objection.

4          THE COURT:  It is received.

5      (Defendant Horn's Exhibit IH-Q20 received into evidence.)

6   BY MR. JUBIN:

7   Q.  I draw your attention to the address at the top.

8   A.  Yes.

9   Q.  Can you read the address?

10  A.  "PO Box 691, Brandon, Florida 33509-0691."

11  Q.  If you had an opportunity to review Mr. Horn's driver's

12  license, would that assist in -- you in determining what his

13  address -- residence address is?

14  A.  It would.

15  Q.  I may ask you to do that at some point.  If I had -- if

16  I was facile enough to know what exhibit to point you to,

17  I would.  But maybe we'll see you again.

18          MR. JUBIN:  I'd move for the admission of IH-Q20.

19          THE COURT:  It has been received.

20          MR. JUBIN:  Okay.

21          Scroll down to the signature line.

22  BY MR. JUBIN:

23  Q.  Is there an applied signature on this document?

24  A.  There is, "Ian Horn."

25  Q.  Let's take a look at IH-Q21.  What is this document?

1   A.  It is an opinion letter from Ian Horn & Associates dated

2   July 10th, 2015, directed to Pacific Stock Transfer Company

3   regarding "Supporting Legal Opinion for Request to Issue

4   Free Trading Shares of Common Stock of NuTech Energy

5   Resources, Inc."

6   Q.  And what's the source of this document?

7   A.  Digital documents provided to your office by the

8   United States through discovery seized from the Justin Herman

9   iMac.

10          MR. JUBIN:  Move for the admission of IH-Q21.

11          MR. HEIMANN:  No objection.

12          THE COURT:  21 is received.

13      (Defendant's Exhibit IH-Q21 received into evidence.)

14          MR. JUBIN:  Let's scroll down to the signature page.

15  BY MR. JUBIN:

16  Q.  And does it have a signature applied?

17  A.  It does, "Ian Horn."

18  Q.  Please take a look at Exhibit IH-Q22.  What is that?

19  A.  This is an opinion letter dated July 17th, 2015, from

20  Ian Horn & Associates directed to Pacific Stock Transfer

21  Company regarding "Supporting Legal Opinion for Request to

22  Issue Free Trading Shares of Common Stock of NuTech Energy

23  Resources, Inc."

24  Q.  And what's the source of this document?

25  A.  Discovery provided to your office in digital format seized

19-CR-26-ABJ        MILLER - DIRECT - JUBIN        Vol. X-1791
21-CR-14-ABJ

1    from the Justin Herman iMac device.

2            MR. JUBIN:  Move for the admission of IH-Q22.

3            MR. HEIMANN:  No objection.

4            THE COURT:  IH-Q22 is received.

5        (Defendant Horn's Exhibit IH-Q22 received into evidence.)

6            MR. JUBIN:  Let's scroll down to the last page for

7    the signature.

8    BY MR. JUBIN:

9    Q.  Is there a signature applied?

10   A.  Yes, "Ian Horn."

11   Q.  I draw your attention to IH-Q23.  What is that?

12   A.  This is an opinion letter from Ian Horn & Associates dated

13   July 23rd, 2015, directed to Pacific Stock Transfer Company

14   regarding "Supporting Legal Opinion for Request to Issue

15   Free Trading Shares of Common Stock of NuTech Energy

16   Resources, Inc."

17   Q.  And what's the source of the document?

18   A.  Discovery provided to your office in digital format from

19   the United States.  It was seized from the Justin Herman iMac.

20           MR. JUBIN:  Move for the admission of IH-Q23.

21           MR. HEIMANN:  No objection.

22           THE COURT:  Received.

23       (Defendant Horn's Exhibit IH-Q23 received into evidence.)

24           MR. JUBIN:  Let's scroll to the last page.

25   ///

Melanie Sonntag, RDR, CRR, CRC            MelanieSonntagCRR@gmail.com

1  BY MR. JUBIN:

2  Q.  Is there a signature applied?

3  A.  There is, "Ian Horn."

4  Q.  I'd like you to look at IH-Q24a.  What is this?

5  A.  It is a letter from Ian Horn, Esquire, dated August 28th,

6  2013, directed to Intrepid Resources, LLC, regarding "Assets

7  in escrow."

8  Q.  And what's the source of this document?

9  A.  Discovery provided to your office in digital format by the

10  United States, again seized from the Justin Herman iMac

11  device.

12        MR. JUBIN:  Move for the admission of IH-Q24a.

13        MR. HEIMANN:  No objection as to foundation,

14  objection as to relevance.

15        MR. JUBIN:  I'd ask the exhibit be admitted

16  conditionally.

17        THE COURT:  It will be admitted conditionally.

18  BY MR. JUBIN:

19  Q.  Let's take a look at IH-Q24b.  What's this?

20  A.  It is a letter dated August 28th, 2013, from Ian Horn,

21  Esquire, directed to Intrepid Resources, LLC, regarding

22  "Assets in escrow."

23  Q.  And where was it -- what's the source of this document?

24  A.  Discovery provided to your office by the United States in

25  digital format.  It was seized from the Ian Herman -- excuse

1   me -- Justin Herman iMac device.

2          MR. JUBIN:  Move for the admission of IH-Q24b.

3          MR. HEIMANN:  No objection as to foundation,

4   objection as to relevance.

5          MR. JUBIN:  I'd move that it be conditionally

6   admitted.

7          THE COURT:  It is conditionally received.

8   BY MR. JUBIN:

9   Q.  Do you see the amount on this letter?

10  A.  Yes.

11  Q.  How much is supposedly in Mr. Horn's escrow?

12  A.  Assets valued in excess of $2,500,000.

13  Q.  Okay.  Let's go back to conditionally admitted IH-Q24a.

14         What's the amount supposedly held in Mr. Horn's

15  escrow account on this one?

16  A.  $6,500,000.

17         MR. FLEENER:  I object.  That's mischaracterizing the

18  exhibit, Your Honor.

19         The exhibit says "assets valued," not "amount."  He's

20  making it sound like it's money, not assets valued.

21         THE COURT:  You are correct.  It says "assets

22  valued."

23  BY MR. JUBIN:

24  Q.  It's "assets valued"?

25  A.  That is correct.

1  Q.  Okay.  Let's take a look at Exhibit IH-Q24c.  What is that

2  document?

3  A.  It is a letter dated August 28th, 2013, from Ian Horn,

4  Esquire, directed to Intrepid Resources, LLC, regarding

5  "Assets in escrow."

6  Q.  And what's the source of this document?

7  A.  Discovery provided to your office by the United States in

8  digital format, seized from the Justin Herman iMac device.

9          MR. JUBIN:  I'd move for the conditional admission of

10  IH-Q24c.

11          MR. HEIMANN:  No objection to conditional admission.

12          THE COURT:  It is admitted conditionally.

13  BY MR. JUBIN:

14  Q.  This purports that Mr. Horn is holding assets valued in

15  excess of how much?

16  A.  Assets valued in excess of $6,500,000.

17  Q.  And for whom?

18          For -- for what purpose?

19  A.  Oh, for LR Energy Transactions.

20  Q.  Let's go back to IH-Q24b.

21          And for whom was -- was this escrow letter

22  related to?

23  A.  PAKS, P-A-K-S, Drilling transactions.

24  Q.  And let's go back to Q24A.

25          That's a -- a different amount; right?  A greater

1   amount?

2   A.   Yes, assets valued in excess of $6,500,000.

3   Q.   And related to who?

4   A.   PAKS Drilling transactions, P-A-K-S.

5   Q.   Okay.  Let's go to IH-Q25.  What's that?

6   A.   It is a letter from Ian Horn & Associates dated

7   August 31st, 2015, "Confirmation of Escrow Agreement."

8   Q.   And what's the source of this document?

9   A.   Discovery provided to your office by the United States in

10  digital format seized from the Justin Herman iMac device.

11  Q.   And is this related to the ECMZ NuTech issue?

12  A.   Yes.

13         MR. JUBIN:  Move for the admission of IH-Q25.

14         MR. HEIMANN:  No objection.

15         THE COURT:  It is received.

16     (Defendant Horn's Exhibit IH-Q25 received into evidence.)

17     (Discussion held between counsel.)

18         MR. JUBIN:  Given the hour and what Mr. Heimann just

19  told me, I think we'll do the next ones as a group and we can

20  probably end there.

21  BY MR. JUBIN:

22  Q.   I'll show you Exhibit IH-Q26.  What's that?

23  A.   It's an opinion letter dated September 23rd, 2015, from

24  Ian Horn & Associates directed to Pacific Stock Transfer

25  Company regarding "Supporting Legal Opinion for Request to

1   Issue Free Trading Shares of Common Stock of NuTech Energy

2   Resources, Inc."

3   Q.  And let's take a look at IH-Q27.

4   A.  This is also an opinion letter from Ian Horn & Associates

5   dated March 7th, 2016, directed to OTC Markets Group, Inc.,

6   regarding "NuTech Energy Resources, Inc. (Formerly Known As

7   EcoEmissions Solutions, Inc.) Initial Information and

8   Disclosure Statement Dated November 30th, 2015, and Posted on

9   March 4th, 2016."

10  Q.  On Ian Horn's letterhead?

11  A.  Yes.

12  Q.  And Exhibit IH-Q28.  What's that?

13  A.   It is an opinion letter from Ian Horn & Associates dated

14  September 15th, 2015, directed to Pacific Stock Transfer

15  Company regarding "Supporting Legal Opinion for Request to

16  Issue Free Trading Shares of Common Stock of NuTech Energy

17  Resources, Inc."

18  Q.  On whose letterhead?

19  A.   Ian Horn & Associates.

20  Q.  And what's the source of this?

21  A.  Digital discovery provided to your office by the

22  United States, seized from the Justin Herman iMac device.

23  Q.  Take a look at IH-Q29.  What's this?

24  A.  Opinion letter from Ian Horn & Associates dated

25  September 16th, 2015, directed to Pacific Stock Transfer

1    Company regarding "Supporting Legal Opinion for Request to

2    Issue Free Trading Shares of Common Stock of NuTech Energy

3    Resources, Inc."

4    Q.  And what's the date on that?

5    A.  September 16th, 2015.

6          MR. JUBIN:  Let's go back one to Q29 -- 28.

7    BY MR. JUBIN:

8    Q.  What's the date on that?

9    A.  September 15th, 2015.

10         MR. JUBIN:  Okay.  Let's go back -- let's go to

11   IH- -- well, first of all, let's go back to IH-Q29.

12   BY MR. JUBIN:

13   Q.  Did you tell me the source of that?

14   A.  Digital discovery provided to your office by the

15   United States.

16   Q.  How about IH-Q30?  What's that?

17   A.  A letter dated September 16th, 2015, from Ian Horn

18   & Associates regarding "NERG" -- N-E-R-G -- "Issuance."

19   Q.  And what's the source of that?

20   A.  Discovery provided to your office by the United States in

21   digital format seized from the Herman iMac device.

22   Q.  How about IH-Q31?  What's that?

23   A.  This is an opinion letter from Ian Horn & Associates dated

24   April 1st, 2016, directed to OTC Markets Group, Inc.,

25   regarding "NuTech Energy Resources, Inc. (Formerly Known As

1    EcoEmissions Solutions, Inc.) Amended Initial Information and

2    Disclosure Statement Dated November 30th, 2015, and Posted on

3    March 1st, 2016."

4    Q.  And what's the source of that?

5    A.  Discovery provided to your office in digital format by the

6    United States seized from the Justin Herman iMac device.

7    Q.  And, finally, IH-Q32.  What's this?

8    A.  This is an opinion letter from Ian Horn & Associates dated

9    April 3rd, 2016, to the OTC Markets Group, Inc., reference

10   "NuTech Energy Resources, Inc. (Formerly Known As EcoEmissions

11   Solutions, Inc.) Amended Initial Information and Disclosure

12   Statement Dated November 30th, 2015, and Posted on March 1st,

13   2016."

14   Q.  And what's the source of this document?

15   A.  Digital discovery provided to your office by the

16   United States.  It was seized from the Justin Herman iMac

17   device.

18           MR. JUBIN:  I'd move for the admission of

19   Exhibits IH-Q26, IH-Q27, IH-Q28, IH-Q29, IH-Q30, IH-Q31, and

20   IH-Q32.

21           MR. HEIMANN:  No objection.

22           THE COURT:  They are received.

23       (Defendant Horn's Exhibits IH-Q26, IH-Q27, IH-Q28, IH-Q29,

24   IH-Q30, IH-Q31, and IH-Q32 received into evidence.)

25           MR. JUBIN:  Let's take a quick look at the signature

1    page on each of those exhibits -- listed exhibits.

2          There's 32.

3          There's 31.

4          There's 30.

5          There's 29.

6          There's 28.

7          There's 27.

8          There's 26.

9          I have nothing further at this time.  Thank you for

10   your indulgence to finish up.

11         MR. HEIMANN:  The Government has no

12   cross-examination.

13         THE COURT:  You may step down, Mr. Miller.

14         Ladies and gentlemen, thank you for your patience as

15   we've gone through these.

16         I will not repeat the admonition that I gave you on

17   Friday and most evenings, simply draw your attention to it.

18         Counsel, when will you be ready to proceed tomorrow?

19         MR. FLEENER:  Can I speak with Mr. Heimann?

20         THE COURT:  Please.

21      (Discussion held among counsel.)

22         THE COURT:  Feel free to stand, ladies and gentlemen,

23   stretch.  You've been seated a long time.

24         MR. FLEENER:  8:30, Judge.

25         THE COURT:  I think we'll have a busy day tomorrow,

19-CR-26-ABJ                                                    Vol. X-1800
21-CR-14-ABJ

1    8:30, please.

2            And, remember, get some rest.  We'll see you

3    tomorrow, 8:30 o'clock.

4            THE COURTROOM DEPUTY:  All rise.

5        (Proceedings concluded 5:08 p.m., October 4, 2021.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5          I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14         Dated this 14th day of January, 2022.

15

16

17

18                    /s/ Melanie Humphrey-Sonntag

19         _____

20              MELANIE HUMPHREY-SONNTAG
                     RDR, CRR, CRC
21              Federal Official Court Reporter

22

23

24

25

1     IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF WYOMING

3 _____

4

UNITED STATES OF AMERICA,   DOCKET NO. 19-CR-026-ABJ

5           DOCKET NO. 21-CR-014-ABJ

    Plaintiff,

6           VOLUME XI of XIV

    vs.      (Pages 1801 through 1990)

7

JUSTIN HERMAN, CHARLES W.   Cheyenne, Wyoming

8 WINTERS, JR., a/k/a Chuck   Tuesday, October 5, 2021

 Winters, and IAN HORN,    8:36 a.m.

9

    Defendants.

10

11 _____

12

13     TRANSCRIPT OF TRIAL PROCEEDINGS

14

15    BEFORE THE HONORABLE ALAN B. JOHNSON

      UNITED STATES DISTRICT JUDGE

16   and a jury of twelve and three alternates

17

18

19

20

21

22   *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*

     *Federal Official Court Reporter*

23 *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*

   *630.452.6236 * MelanieSonntagCRR@gmail.com*

24

 *Proceedings reported with digital stenography; transcript*

25   *produced with computer-aided transcription.*

1 Case 2:19-cr-00026-ABJ    Document 555-2    Filed 11/14/22    Page 1851 of 2494

1 Vol. XI-1802

```
 1   APPEARANCES:
     For the Plaintiff:         ERIC J. HEIMANN
 2                              THOMAS A. SZOTT
                                ASSISTANT UNITED STATES ATTORNEYS
 3                              DISTRICT OF WYOMING
                                2120 Capitol Avenue, Fourth Floor
 4                              Cheyenne, WY 82001

 5   For the Defendant         THOMAS A. FLEENER
     Herman:                   FLEENER LAW
 6                             506 South Eighth Street
                               Laramie, WY 82073
 7
     For the Defendant         ZENITH S. WARD
 8   Winters:                  BUCHHAMER & WARD
                               1821 Logan Avenue
 9                             Cheyenne, WY 82001

10   For the Defendant         THOMAS B. JUBIN
     Horn:                     JUBIN & ZERGA
11                             2614 Pioneer Avenue
                               Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1 Melanie Sonntag, RDR, CRR, CRC          MelanieSonntagCRR@gmail.com

WYD 1851

1                        I N D E X

2                                                      PAGE
    MOTION FOR MISTRIAL
3    Argument by Mr. Ward                              1808
     Argument by Mr. Heimann                           1811
4    Argument by Mr. Ward                              1812
     Ruling by the Court                               1812
5
    DEFENSE WITNESSES:
6    GAY WOODHOUSE
     Direct Examination by Mr. Jubin                   1814
7    Cross-Examination by Mr. Heimann                  1825
     Cross-Examination by Mr. Ward                     1825
8    Cross-Examination by Mr. Fleener                  1828

9    MARLENE HORN
     Direct Examination by Mr. Jubin                   1832
10   Cross-Examination by Mr. Heimann                  1840

11   CHARLES DENISON
     Direct Examination by Mr. Jubin                   1842
12   Direct Examination by Mr. Jubin                   1862
     Cross-Examination by Mr. Heimann                  1892
13   Cross-Examination by Mr. Ward                     1897
     Redirect Examination by Mr. Jubin                 1902
14   Examination by the Court                          1905

15   STEPHEN JOSEPH MILLER
     Further Direct Examination by Mr. Jubin           1910
16   Voir Dire Examination by Mr. Fleener              1954
     Further Direct (Continued) by Mr. Jubin           1957
17   Cross-Examination by Mr. Heimann                  1963
     Cross-Examination by Mr. Ward                     1965
18   Redirect Examination by Mr. Jubin                 1966

19   ALSTON LEE BURNETT
     Direct Examination by Mr. Jubin                   1970
20

21

22

23

24

25

Vol. XI-1804

1                    E X H I B I T S
                                    IDENTIFIED   RECEIVED
2    DEFENDANT HORN'S EXHIBITS
         IH-Q9     Opinion Letter Signature      --        1805
3                  Page
         IH-1029   Horn Letter              1911      1912
4        IH-1031   Email Chain              1913      1916
         IH-1044   Email Chain              1916      1918
5        IH-1044a  Email Abstract           1919      1920
         IH-1047   Email Chain              1922      1022
6        IH-1048   Email Chain              1924      1924
         IH-1049   Email Chain              1925      1926
7        IH-1057   Email Abstract           1929      1931
         IH-1058   Email Abstract           1932      1933
8        IH-1076   Email Chain              1934      1935
         IH-1078   Email Chain              1936      1937
9        IH-1079   Email Abstract           1938       --
         IH-1080   Email Abstract           1939      1941
10       IH-1082   Email Chain              1942      1943
         IH-1084   Email Chain              1943      1944
11       IH-1086   Email Abstract           1945      1946
         IH-2194a  Text Message Chain       1958       --
12       IH-2206a  Verizon Record            --       1957

13

14

15

16

17

18

19

20

21

22

23

24

25

 1       (Proceedings commenced 8:36 a.m., October 5, 2021,

 2   in the presence of all defendants, outside the

 3   jury's presence.)

 4            THE COURT:  Thank you.  Please be seated.

 5            Melanie pointed out last evening that I had failed to

 6   admit IH-Q9 on the record.  It is received.

 7       (Defendant Horn's Exhibit IH-Q9 received into evidence.)

 8            MR. JUBIN:  Thank you, Your Honor.

 9            THE COURT:  Do the parties have a matter they wish to

10   bring to the attention of the Court?

11            MR. FLEENER:  Your Honor, I'm concerned.  And I've

12   talked with Mr. Jubin and Mr. Ward.

13            There's going to be a big block today where we have

14   nothing because when I was -- when we were communicating --

15   the defense was -- was communicating this weekend -- trying to

16   look at witnesses, it was our understanding that Mr. Jubin was

17   going to put on his handwriting guy today and we were going to

18   put on our securities expert tomorrow.

19            I've just been informed that he doesn't have his

20   handwriting guy ready for today.  I don't have my securities

21   guy expert ready for today because I thought I was going to be

22   tomorrow.

23            And so I think Tom only has the morning and a

24   four o'clock witness, so I don't know what's going to happen

25   between lunch and four o'clock.  But we're not -- we have

 1    additional witnesses, and we're not prepared to put any of

 2    them on.

 3              THE COURT:  Hm-m.

 4              MR. JUBIN:  When I saw the securities guy in the

 5    courtroom, I thought he was here to testify, so I put my

 6    handwriting guy off, and he arranged things to be available

 7    first thing Wednesday morning.

 8              So we are probably -- we have a couple witnesses this

 9    morning who are going to go perhaps an hour, and then

10    Dr. Denison, who we'll need to do a proffer without the jury

11    and then testimony before the jury, and this could take --

12              THE COURT:  An hour.

13              MR. JUBIN:  -- a couple hours.

14              And -- and then I have the guy lined up for

15    four o'clock by Zoom who can only be available at that time.

16              MR. FLEENER:  And our -- even if -- even if -- Judge,

17    even if -- even if we could get our securities guy on today,

18    he's not going to be -- he wouldn't be finished today and

19    cross today.  I mean, it would be -- which I -- I -- again,

20    I haven't -- I'm nowhere where I need to be with that man.

21    I've talked to him for a few minutes here and there.  But --

22    because I thought we were going to do this tomorrow.

23              And so even if I were to put him on -- even if for

24    some reason we were to put him on, he would fill the afternoon

25    until four o'clock, but it would just be on direct, and he

1  wouldn't be crossed, and then we'd be bringing Mr. Jubin's

2  witness in.

3          And I -- again, I don't want to do that because

4  I'm not remotely -- and I'm sitting here in the courtroom

5  today.  I'm not remotely prepared to put the guy on.

6          THE COURT:  Well, I don't want to convert this --

7  because you didn't prepare your witnesses -- into a four-week

8  trial, is what you're telling me.

9          MR. FLEENER:  Well, Judge, no, I'm not telling you

10  that.  We're still going to be done tomorrow -- we'll still be

11  done on Wednesday.  I'm just -- we're going to -- I have this

12  block of Tuesday that I can't put anything on.  I mean,

13  I still think that on Wednesday the case will be done.  And

14  I imagine on Thursday the jury will have the case unless the

15  Government has extensive rebuttal.

16          But I'm just worried about this afternoon.  And

17  I brought this -- bring this up.

18          MR. JUBIN:  I do have Mr. Miller to add some

19  foundation for exhibits, and that could take perhaps an hour

20  so . . . maybe we'll be done sort of sometime during the early

21  afternoon and need a break until 4:00 when the next witness is

22  available.  It's hard to say because you never know how long

23  things go.

24          THE COURT:  All right.  We'll see how we're doing.

25          This has to be in the hands of the jury by Thursday,

 1   I think, at some point.

 2           MR. JUBIN:  Yeah.  I -- I don't anticipate that the

 3   evidence from the defense side -- I don't know how long

 4   Mr. Fleener's expert's going to be, but I don't know that he

 5   has any other witnesses.

 6           I would think -- I certainly will be done presenting

 7   evidence on Wednesday, and it sort of depends on the duration

 8   of the Government's rebuttal.

 9           MR. FLEENER:  And I -- I do want the Court to know

10   we're not -- there's no -- I know -- I know the Court doesn't

11   think we're playing games anyway.

12           But we communicated our schedule by email, trying to

13   coordinate both Mr. Jubin's defense and ours.  And though --

14   you know, the last communication we have is with him having

15   Dr. Fenoff on Tuesday, my guy on Wednesday, and we haven't

16   changed that.  It's just that we got here today, we found out

17   that Fenoff's going to be on Wednesday, so we're stuck.

18           So we'll drive forward, Judge, the best we can.

19           THE COURT:  All I can expect.

20           MR. FLEENER:  Yes, sir.

21           MR. WARD:  And, Judge, I also have another issue to

22   raise before we bring in the jury.

23           THE COURT:  Thank you, Mr. Ward.

24           MR. WARD:  And, Your Honor, we didn't raise this

25   yesterday.  I wanted to give a little more thought to what

1   kind of a remedy we'd be asking for.

2           But when the Government closed their case on Friday,

3   we heard some extremely surprising testimony from Inspector

4   Hacker, and that had to do with the fact that she had

5   interviewed Alexander Albert and Nathan Hodge.

6           Towards the end of the Government's case, they put in

7   a document from HBA Group, and the Court will recall from the

8   Government's Exhibits 510 and 510.1 that HBA Group was the

9   second largest dumper of stock.

10          The Government disclosed -- and so when Inspector

11  Hacker testified that she had interviewed Alexander Albert and

12  Nathan Hodge, that came as an absolute shock to me because

13  there were no memoranda of interviews for Alexander Albert or

14  Nathan Hodge in the discovery that was provided.  I addressed

15  this with Mr. Heimann on Friday afternoon in an attempt to

16  determine whether maybe those MOIs were in discovery and

17  I just hadn't found them or come across them.

18          But what I can tell the Court is what I -- what

19  I received from Mr. Heimann was an indication that there was

20  an -- that the Nathan Hodge MOI was in a Nathan Hodge folder

21  and that the Alexander Albert MOI was in the Alexander Albert

22  folder.  My discovery didn't have a Nathan Hodge folder

23  at all.

24          The discovery was provided, you know -- one, it's

25  numerous folders and subfolders, and then the Government also

1    provided an Excel spreadsheet that acted as kind of an index;

2    you could do a search for a name.  So I had no Nathan Hodge

3    folder, and my Alexander Albert folder did not have an MOI

4    in it.

5            And so I certainly believe that the failure to

6    disclose those MOIs was a *Brady* violation.  As the Court's

7    aware, a *Brady* violation essentially requires three -- three

8    elements, that the evidence was favorable to the defense --

9    and, in this case, the MOIs of the number two dumper were

10   certainly important, and they're all the more important

11   because this HBA Group, LLC, lists three members, Alexander

12   Albert, Nathan Hodge, and Michael Baron.

13           And the Court will recall that Inspector Hacker

14   testified that Mike Baron was one of the three individuals

15   that was involved in the creation of the press releases with

16   Marisol Elwell.

17           And so this tie here -- I mean, this case is a pump

18   and dump, and, here, we have the pumpers -- who also were the

19   largest -- the second largest dumper -- and we didn't have the

20   MOIs prior to the close of the Government's case.

21           And, of course, ever since my opening, part of my

22   theme has been that the Government didn't, you know,

23   investigate the -- the true pumpers, the true dumpers, and

24   these MOIs are absolutely critical to -- to that.

25           So I don't really know how the Court can remedy the

1   situation at this point in time, given that the Government

2   closed its case, and I was under the mis -- you know, I was

3   under the impression that they hadn't interviewed any of these

4   folks until after their case was closed and have planned my

5   case accordingly.

6          So I think the *Brady* violation is grounds for a

7   mistrial.  At -- at a minimum, I believe that the Court should

8   instruct the jury about the *Brady* law and allow the defense to

9   argue in our closing arguments that the failure to disclose

10  these interviews in a timely fashion, as the law requires,

11  is -- is reasonable doubt in and of itself.

12         So I would ask the Court for a mistrial but, at a

13  minimum, a remedy that would instruct the jury about the *Brady*

14  law and allow us to make that argument.

15         THE COURT:  Have you seen the MOIs at this point?

16         MR. WARD:  We did get the MOIs Friday evening -- or

17  afternoon.  I can't remember the -- the time.  I don't want to

18  mischaracterize it.

19         Thank you, Judge.

20         MR. FLEENER:  I join, Judge.

21         MR. HEIMANN:  Your Honor, I believed that these MOIs

22  had been provided with the initial discovery.  So they were

23  not intentionally withheld.

24         Second, they have them and they cannot tell you one

25  thing in those MOIs that would exculpate their clients.  It is

1    not a defense that someone else is guilty.

2            And so it's not a *Brady* violation.  They weren't

3    witnesses the Government called, so there's no 26.2 witness

4    statement, Jencks Act requirement.  They're not even Rule 16

5    because they don't contain exhibits or anything else.

6            So it was unintentional, they can't tell you one

7    thing in those MOIs that exculpate their clients, so a

8    mistrial is unnecessary, and the requested instruction isn't

9    the law and is also unnecessary.

10           I can answer any questions Your Honor has.

11           THE COURT:  Thank you.

12           MR. WARD:  And, Your Honor -- I mean, I disagree that

13   there's nothing in the MOIs that exculpate our clients.

14           Proof that someone else committed the crime is

15   exculpatory in its very nature.  The Government has put in all

16   of the press releases as evidence, and so the fact that those

17   press releases were created by someone other than our

18   clients -- and -- and these MOIs provide further connection.

19   They provide the connection between HBA Group, Mike Baron, and

20   the press releases, so I disagree that there's nothing

21   exculpatory in the MOIs.  There certainly is.

22           And whether it's intentional or inadvertent doesn't

23   matter under *Brady*.  It's the fact that they weren't

24   disclosed.

25           THE COURT:  Well, a conspiracy is much greater than

1  the activity of one person.  The motion will be denied -- is

2  denied.

3         Let's bring the jury in.  We'll try to do the best we

4  can.

5         Mr. Miller was on the stand today -- yesterday --

6  and --

7         MR. JUBIN:  I think we completed him for now.  We'll

8  probably have more with him later, but this morning we'll call

9  Ms. Woodhouse first.

10         THE COURT:  Very well.

11     (Proceedings within the jury's presence at 8:49 a.m.)

12         THE COURT:  Thank you, ladies and gentlemen.  Let's

13  proceed.

14         Mr. Jubin.

15         MR. JUBIN:  Thank you, Your Honor.

16         Good morning, ladies and gentlemen.

17         JURY MEMBERS:  Good morning.

18         MR. JUBIN:  Mr. Horn calls Gay Woodhouse.

19     (Witness sworn.)

20         THE COURTROOM DEPUTY:  And please state and spell

21  your name for the record.

22         THE WITNESS:  My name is Gay Woodhouse, G-a-y

23  W-o-o-d-h-o-u-s-e.

24  ///

25  ///

1    **GAY WOODHOUSE, DEFENDANT HORN'S WITNESS, DIRECT EXAMINATION**

2    **BY MR. JUBIN:**

3    Q.  Ms. Woodhouse, could you tell us a little bit about your

4    educational background?

5    A.  I went to the University of Wyoming as undergrad, and

6    I went to University of Wyoming law school.

7    Q.  And when was that?

8    A.  In the '70s, graduated in 1977.

9    Q.  From law school?

10   A.  Yes, uh-huh.

11   Q.  And so you've been working as an attorney since that time?

12   A.  Yes, 43 years.

13   Q.  Tell the jury a little bit about your background and the

14   positions you've held.

15   A.  I worked in private practice in Torrington, Wyoming, for a

16   couple of years and then started working with the Wyoming

17   Attorney General's Office.  I had a number of different

18   positions there with criminal law appeals and consumer affairs

19   and other things like that.

20        And then in 1990 I worked for the US Attorney's

21   Office as an Assistant United States Attorney until 1995.

22        I then went over to the -- back to the Attorney

23   General's Office as a chief deputy, where I served for

24   three years before becoming the Wyoming Attorney General from

25   1998 to 2001.

1    Then I opened my own private practice, which was a

2    solo private practice, which has now got eight people in it.

3    It's called Woodhouse Roden Nethercott here in Cheyenne.

4    Q.  Are you familiar with Ian Horn?

5    A.  I am, yes.

6    Q.  How are you familiar with him?

7    A.  I was contacted to represent Mr. Horn when he had been

8    asked to -- or subpoenaed to testify before the grand jury

9    here in Cheyenne a few years ago.

10   Q.  Tell the jury about what it was that you were doing.  Was

11   there any involvement with documents and -- kind of describe

12   what was going on.

13   A.  Yes.  There was -- there was an extensive involvement with

14   documents.

15       Not so much with me, I have to say, but he had

16   provided documents to the Government pursuant to a grand jury

17   subpoena, and then he was going to be testifying about those

18   documents.

19       So one of my -- the traditional way I would do that

20   is to get all the documents that he had provided and then sit

21   with him for a whole day before the grand jury testimony and

22   go through each and every document to make sure what -- that

23   I understood what he had provided and what he was going to say

24   about each one of those documents.

25       It didn't work out quite that well.  He didn't have

 1   all the documents that he'd provided.  I later found out that

 2   he hadn't really provided documents from his own files.  I'm

 3   not sure exactly when I found that out but -- so it wasn't the

 4   typical session that I would have with someone where we would

 5   go through these documents and he would be readily able to

 6   tell me what they were and what they were about.

 7   Q.  So -- so you -- you indicated that your understanding was

 8   the documents didn't come from his files.  What was your

 9   understanding as to where they came from?

10   A.  I'm not sure exactly when I learned it, but I found out

11   later that all the documents that he had provided that were

12   given to the grand jury were provided to him by Justin Herman.

13   Q.  Except perhaps for some of his banking records?

14   A.  Except -- yes, that's right.  He provided some bank --

15   banking records.

16   Q.  So you said he had provided these and you wanted to look

17   at the documents that he had provided to the Government?

18   A.  Yes, uh-huh.

19   Q.  And did he have them?

20   A.  He -- he didn't have them.  I had some documents --

21        MR. FLEENER:  Objection.  This violates Mr. Herman's

22   confrontation rights.

23        MR. WARD:  Join.

24        THE COURT:  Overruled.

25   ///

1    BY MR. JUBIN:

2    Q.  You may continue.

3    A.  Can you repeat the question?

4    Q.  Yeah.

5         I -- I think you were describing where the documents

6    came from, what your understanding was.

7    A.  Yes.  I -- they came -- the other documents, particularly

8    the -- there were letters, opinion letters regarding

9    securities.  And those documents had come from Justin Herman

10   to Ian Horn to give to the grand jury.

11   Q.  And as you were saying, what -- what Mr. Horn had given

12   the Government he no longer had?

13   A.  He did not have -- he did not keep a set, no.

14         MR. FLEENER:  Objection.  That's hearsay and it again

15   violates Mr. Herman's confrontation rights.  He's -- she's

16   testifying about what Mr. Horn apparently told her.

17         MR. WARD:  Join.

18         THE COURT:  Sustained.

19   BY MR. JUBIN:

20   Q.  What did you observe --

21         THE COURT:  The jury will disregard the last answer.

22   BY MR. JUBIN:

23   Q.  What did you observe about Mr. Horn's organizational

24   skills?

25   A.  He seemed very disorganized.

1      He didn't have a -- didn't appear to have a set of

2  files that he had kept in his practice that would have

3  included all of these things that he had created for any given

4  case and unlike what we tend to do in our practice.

5      So he really seemed disorganized.  He didn't seem to

6  understand maybe the significance of what he had done --

7          MR. FLEENER:  Objection; speculation.

8          THE COURT:  Overruled.

9          MR. FLEENER:  And foundation.

10          THE COURT:  Overruled.  It's simply present-sense

11  impression.

12  BY MR. JUBIN:

13  Q.  Did the issue of attorney-client privilege come up?

14  A.  Yes, it did.

15  Q.  How does privilege work?

16  A.  Privilege is -- attorney-client privilege is really the

17  sacred bond of any attorney-client relationship.  It is held

18  by the client.

19      So a client can come to me or any other attorney and

20  tell us things that we will not be revealing to anybody else

21  under any circumstances unless that client tells us, "Yes,

22  it's okay for you to provide this information to someone else"

23  for some specific reason.

24      And we need to know on each and every instance what

25  is -- what's it -- is it okay to reveal this information that

1   you've either told me or given me.

2   Q.  Did -- there's been some testimony in this case about the

3   Government's subpoena requesting some sort of privilege log.

4   So did this come up in the course of -- of the representation?

5   A.  I -- as far as I know, there was no privilege log created.

6   And I'm not sure why or whether or not Mr. Horn understood

7   what that is.

8          A privilege log is if I would have a number of

9   communications -- I'm providing information to a third party,

10  and usually it's information that comes from other third

11  parties, so it doesn't have that attorney-client relationship

12  involved with it.

13         If I have some of those documents and there -- that

14  I'm -- that I'm not going to provide, I make a list of -- you

15  know, I have an email that happened a certain date.  I'll say

16  "Email between the attorney and the client," and I just put,

17  "This is part of the privilege log."

18         I don't even really have to put what the subject

19  matter is but just that I had these 10 or 20 or 30 emails that

20  were between myself and the client or that I have notes that

21  I took when I was visiting with the client.  I'm not going to

22  provide those.

23  Q.  How's the attorney supposed to determine whether the

24  client wants to assert a claim of privilege?

25  A.  The attorney really needs to talk to the client about that

1   on each instance, "Is it -- is this okay for me to reveal to

2   someone else?"

3           In this case it would have been "Is it okay for me to

4   provide this information to the grand jury?"

5   Q.  And what happens if the client is nonresponsive and

6   won't -- won't tell the lawyer what -- won't provide the

7   lawyer with the necessary guidance?  What happens then?

8   A.  What I would do is err on the side of caution and --

9   and -- and assume that there's an attorney-client privilege

10  attached to all these things that could potentially have --

11  have that characterization.  You know, they -- my client told

12  me something in confidence, and I would put that -- I would

13  consider that to be privileged.

14  Q.  Would it be evidence of wrongdoing if an attorney had

15  communications with his client to ascertain whether or not

16  there was a privilege?

17          MR. HEIMANN:  Objection, Your Honor; argument.  The

18  jury should weigh the evidence.

19          THE COURT:  Sustained.

20  BY MR. JUBIN:

21  Q.  In the course and scope of a lawyer's duties, would it be

22  proper to communicate with a client about what documents might

23  be privileged?

24  A.  Yes.  That's exactly what -- what I would need to do and

25  what any attorney would need to do, is communicate directly

1   with the client about which items should be subject to the

2   privilege and not provided.

3   Q.  Did you participate or attend any interviews of Ian Horn

4   that were conducted by the Government agents related to this

5   NuTech matter?

6   A.  Yes.  Yes, I did.

7   Q.  And when was that?

8   A.  Well, it was the day before his grand jury testimony.

9   Q.  Okay.  And what was the focus of the questioning there?

10  A.  The primary focus was about the opinion letters and

11  specifically regarding some different fonts that appeared on

12  the opinion letters that made it appear that it hadn't all

13  been written by one person or at one time.

14  Q.  Okay.  And so what happened concerning that?

15  A.  Mr. Horn didn't seem to have a real clear idea about the

16  fonts.  I'm not even sure he'd noticed it before.  He was

17  trying -- he was --

18          MR. WARD:  Objection; hearsay.  And confrontation.

19          THE COURT:  Sustained.

20  BY MR. JUBIN:

21  Q.  Were -- were the parties able to reach some conclusions as

22  to who had written these letters based on this conversation?

23          MR. WARD:  Objection; hearsay.

24          MR. FLEENER:  Objection; foundation.

25          THE COURT:  Sustained.

1    BY MR. JUBIN:

2    Q.  What was your impression of Ian Horn as he gave this

3    interview in his preparation for the grand jury testimony?

4    A.  He was -- he was cooperative and wanted to be helpful to

5    the Government.

6    Q.  Did the questioning focus on -- more on the documents or

7    independent recollections, as best as you could tell?

8    A.  I can't recall at this time.

9    Q.  The next day when Mr. Horn testified before the grand

10   jury, had his attitude changed at all?

11   A.  No.  His attitude was still the same, wanted to be

12   cooperative, helpful.

13          MR. FLEENER:  Objection.  That's speculation.  She

14   doesn't know what his attitude is.  She could observe him and

15   hear it --

16          MR. JUBIN:  She observed it.

17          THE COURT:  She observed his demeanor.

18   BY MR. JUBIN:

19   Q.  After the grand jury in 2019, did you represent Ian Horn

20   in connection with another interview by the agents?

21   A.  Yes, I did.

22   Q.  And that was May 1st?

23   A.  It was.  It was May 1st.  It was by telephone.

24   Q.  Okay.

25          THE COURT:  Would you give us the year again.

1          MR. JUBIN:  Pardon?

2          THE COURT:  Would you give us the year.

3   BY MR. JUBIN:

4   Q.  May 1st of 2019?

5   A.  Yes.

6   Q.  Okay.  The grand jury was January of 2019; right?

7   A.  Yes.

8   Q.  So this is 4 1/2 months later or so?

9   A.  That's correct.

10  Q.  Was it any different this time around?

11  A.  It did seem different.  It seemed that he was giving

12  different answers than he'd given in the interview that I sat

13  through.

14          And I -- I was concerned that he -- he was either

15  confused or had forgotten or wasn't -- just wasn't clear about

16  what he'd said before.

17  Q.  So --

18  A.  I would --

19  Q.  Go ahead.

20  A.  I was just worried about him.  It didn't seem -- didn't

21  seem right.

22  Q.  So what did you do?

23  A.  I interrupted the questioning and said I thought he was

24  confused and that I wanted them to be asking questions about

25  specific documents, to be talking about a specific document.

1           And they said this was -- these were just general

2   questions, didn't -- didn't relate specifically to -- to a

3   document, so they kind of shut down the interview, I think,

4   about that point.

5   Q.  So he was giving answers at this interview that were

6   different than what he'd given before?

7   A.  They were, yes, uh-huh.

8   Q.  Okay.  From your representation of him, did you form any

9   impressions as to Ian Horn's skills as a lawyer?

10  A.  He seemed kind of lack- -- maybe lackadaisical or --

11          MR. WARD:  Objection; foundation.

12          MR. JUBIN:  I think she's describing her -- her

13  impressions of him as a lawyer.  I don't know that it --

14          THE COURT:  Overruled.

15          MR. JUBIN:  -- is missing --

16          THE COURT:  Overruled.

17  A.  (Continuing.)  And it isn't so much as a lawyer in

18  other -- in other regards.  But regarding this particular

19  matter, it seemed that he hadn't either paid attention very

20  much to what he had done, had very bad recollection of what

21  had occurred or what his involvement was or why, and he seemed

22  very naive about everything.

23          MR. JUBIN:  I have no further questions at this time.

24          MR. HEIMANN:  Good morning, Ms. Woodhouse.

25          THE WITNESS:  Good morning, Mr. Heimann.

1                          CROSS-EXAMINATION

2    BY MR. HEIMANN:

3    Q.  Who paid you to represent Ian Horn?

4    A.  He -- he paid me.

5    Q.  Justin Herman didn't wire you the money?

6    A.  No.

7    Q.  Did you and Mr. Horn meet with Tom Fleener prior to

8    Mr. Horn's grand jury testimony?

9    A.  No.

10   Q.  You talked a little bit about a lawyer's duties?

11   A.  Yes.

12   Q.  Is a lawyer allowed to lie on behalf of his client?

13   A.  No.

14          MR. HEIMANN:  That's all I have, Your Honor.

15          MR. WARD:  Good morning, Ms. Woodhouse.

16          THE WITNESS:  Good morning.

17                          CROSS-EXAMINATION

18   BY MR. WARD:

19   Q.  You testified about documents related to these opinion

20   letters coming from Justin Horn's computer; correct?

21          MR. JUBIN:  Objection.  It -- I think it's a

22   misspeak.  From whose computer?

23          MR. WARD:  Justin Herman.

24          MR. JUBIN:  Thank you.

25   A.  I can't say whose computer they came from.  I understood

Case 2:19-cr-00026-ABJ    Document 555-2    Filed 11/14/22    Page 1875 of 2494

1  they came from Justin Herman.

2  BY MR. WARD:

3  Q.  Okay.  And you're aware that Mr. Horn testified to the

4  grand jury that his computer crashed?  That's why he didn't

5  have documents?

6  A.  That's correct, yes.

7  Q.  Throughout your interactions with Mr. Horn, nothing would

8  indicate to you that he wouldn't understand what it would mean

9  for his computer to crash; right?

10  A.  I -- he knew what it meant, yes.

11  Q.  Okay.  And you're aware that he was interviewed for over

12  three hours by the Government and he never once said he didn't

13  write the letters; correct?

14  A.  No, he didn't.

15  Q.  Never said that he didn't write the letters?

16  A.  He did not.

17  Q.  In over three hours of interviewing?

18  A.  That's right.

19  Q.  And he didn't -- he didn't tell the grand jury he didn't

20  write the letters; correct?

21  A.  That's right.

22  Q.  Mr. Jubin asked you about what a lawyer should do if his

23  client's not getting back to him about a question involving

24  privilege.  But isn't it ultimately for the lawyer to

25  determine what's privileged?

1   A.  It -- the privilege lies with the client.  The lawyer can

2   weigh in on how extensive the privilege is or what documents

3   or conversations may be subject to the privilege, but the

4   client is -- is actively involved because it's the client's

5   privilege.

6   Q.  Well, but wouldn't that assume that the client understands

7   the law of privilege more so than the lawyer?

8   A.  I would say it's up to the lawyer to explain to the client

9   the extent of the privilege and how it -- how it applies.

10  Q.  You never observed Mr. Horn practicing law; correct?

11  A.  I did not.

12          MR. WARD:  Those are all the questions I have.

13          MR. JUBIN:  Nothing further.

14          MR. FLEENER:  I have some questions.

15          MR. JUBIN:  Oh.

16          MR. FLEENER:  May I have a second, please, Judge.

17          Just a second, please, Your Honor.

18          Your Honor, I apologize.  There's just so much stuff

19  I'm trying to find here.  I apologize.

20          Thank you, Your Honor.

21          THE COURT:  Mr. Fleener.

22          MR. FLEENER:  Ms. Woodhouse, good morning.

23          THE WITNESS:  Good morning.

24  ///

25  ///

1                      CROSS-EXAMINATION

2    BY MR. FLEENER:

3    Q.  When -- so you were present during Mr. Horn's interview

4    on -- May of 2019; correct?

5    A.  May 1st, by the telephone, yes.

6    Q.  And you were also present during the October 16th, 2018,

7    interview; correct?

8    A.  If that's the day before --

9    Q.  The grand --

10   A.  -- the grand jury.

11              I didn't think it was October.

12   Q.  Hold on for one second.  I'm sorry.

13              Please repeat your answer.

14   A.  I -- I didn't think it was October.  I thought it was the

15   day before grand jury testimony.

16   Q.  Okay.  That's fine.

17              Were you aware, though, then -- you were aware

18   that -- you were hired because Mr. Horn had been interviewed

19   by the -- by investigators and was responding to a grand jury

20   subpoena?

21   A.  Yes.

22   Q.  And when you were -- when you were -- began representing

23   Mr. Horn, you know that he'd been interviewed already by

24   the -- by agents; correct?

25   A.  Yes.  He'd told me that.

1    Q.  And it was at that time or near that time that he was

2    given a -- a grand jury subpoena for documents?

3    A.  I didn't know that until later but yes.

4    Q.  Okay.  And then you got involved in this case towards the

5    end of 2018, beginning of 2019; correct?

6    A.  Yes.

7    Q.  And that was -- and you're -- you viewed your role

8    primarily advising Mr. Horn through grand jury subpoena

9    responses and possible grand jury testimony and cooperation

10   with the United States?

11   A.  Yes, uh-huh.

12   Q.  Were you aware -- and during your -- like Mr. Horn

13   asked -- or Mr. Horn asked on direct examination -- I'm sorry.

14   I've got a . . .

15          When -- throughout his -- and he was formally

16   interviewed by the investigators directly before his grand

17   jury testimony; right?

18   A.  Mr. Heimann and the investigators were all there, yes.

19   Q.  Do you -- do you recall who was there?  I know --

20   Mr. Heimann was there.  Do you know who else was there, ma'am?

21   A.  I don't recall their names right now.

22   Q.  God.  I'm sorry.

23          But throughout that interview, like Mr. -- like

24   Mr. Ward asked you, Mr. Horn never denied writing these

25   opinion letters; right?

 1   A.   That's correct.

 2   Q.   In fact, he -- are you aware that during his interview in

 3   2018 he went into great detail about --

 4           MR. JUBIN:  Objection; foundation.

 5           MR. FLEENER:  I'm just testing the basis of her

 6   knowledge, Judge.

 7           THE COURT:  Let's hear the question.

 8   BY MR. FLEENER:

 9   Q.   Were you aware that in the interview in 2018 he -- that he

10   went into -- into detail about NuTech and who he may have

11   talked to and who he may have worked with during -- during the

12   time that he said that he wrote the letters?

13   A.   I don't really know what he told them in -- in October.

14   Q.   And that was -- I'm glad you -- you said that,

15   Ms. Woodhouse.

16           Do you -- did you have access to his interview in

17   October --

18   A.   No.

19   Q.   -- when you were representing him in 2019?

20           You're shaking your head.  I assume the answer's no.

21   A.   I did not, no.

22   Q.   Okay.  So what he said in 2018 you wouldn't have any

23   knowledge of?  You just knew that they had interviewed him in

24   late 2018 and now you're representing him in early 2019?

25   A.   Yes, that's correct.

 1          MR. FLEENER:  No further questions.  Thank you.

 2          MR. JUBIN:  I have no redirect.

 3          THE COURT:  Ms. Woodhouse, thank you.

 4          THE WITNESS:  Thank you.

 5          MR. JUBIN:  Will you please ask Ms. Horn.  Thank you.

 6          Mr. Horn calls Marlene Horn.

 7          THE COURTROOM DEPUTY:  Please raise your right hand.

 8      (Witness sworn.)

 9          THE COURTROOM DEPUTY:  Please take a seat.

10          MR. FLEENER:  Mr. Jubin, can we all approach the

11      bench, please?

12          MR. JUBIN:  Sure.

13      (Proceedings held at sidebar with Prosecutor Heimann

14      and all defense counsel.)

15          MR. FLEENER:  Your Honor, I would ask to be excused

16      for the rest of the morning.  I'm going to go under the

17      assumption that we're not going -- that there's going to be a

18      big break in the afternoon, that the Court would prefer to

19      fill it up with testimony, and I have an expert I can find and

20      start prepping him, so I'd like to leave.  These witnesses

21      really have nothing to do with our defense.

22          I think it's more important for me to get the hell

23      out of here and try to get a witness ready for this afternoon.

24          MR. HEIMANN:  I have no objection, Your Honor.

25          MR. JUBIN:  I have no objection.

 1              MR. FLEENER:  I just -- I didn't think anyone would

 2    have an objection.  I just wanted to let the Court know I'm

 3    leaving.

 4              THE COURT:  Very well.

 5              MR. FLEENER:  Thank you, Judge.

 6              THE COURT:  Your client will be all right?

 7              MR. FLEENER:  What's that, Judge?

 8              THE COURT:  Your client will be all right leaving him

 9    in the hands of Mr. Ward?

10              MR. FLEENER:  I will leave him in the hands of

11    Mr. Ward.

12              MR. JUBIN:  And he's agreeable?

13              MR. FLEENER:  Yeah, he is.  Thank you.

14          (Sidebar concluded.)

15              THE COURTROOM DEPUTY:  Please state and spell your

16    name for the record.

17              THE WITNESS:  Marlene Horn, M-a-r-l-e-n-e H-o-r-n.

18              MR. JUBIN:  Good morning, Ms. Horn.

19              THE WITNESS:  Good morning.

20      MARLENE HORN, DEFENDANT HORN'S WITNESS, DIRECT EXAMINATION

21    BY MR. JUBIN:

22    Q.  What city do you live in?

23    A.  Brandon, Florida.

24    Q.  And how do you spell Brandon?

25    A.  B-r-a-n-d-o-n.

1   Q.  And how long have you lived in Florida?

2   A.  Since 1976.

3   Q.  Okay.  And who do you live with?

4   A.  My husband and my mother.

5   Q.  And who is your husband?

6   A.  Ian Horn.

7   Q.  And he is the defendant in this case?

8   A.  Yes, sir.

9   Q.  And how long have you been married to Ian?

10  A.  38 years.

11  Q.  You said your mother.  Tell us a little bit about those

12  circumstances.

13      (Proceedings outside the presence of Defendants Herman,

14  Winters, and Mr. Fleener.)

15  A.  Ian agreed to have my mother come live with us rather than

16  have her in an assisted-living facility.  She has Stage IV

17  metastasized breast cancer, congestive heart failure, A-fib,

18  several other issues.

19  BY MR. JUBIN:

20  Q.  How long has she been living in your home with you?

21  A.  We moved her in with us five years ago.

22  Q.  I noticed you were wearing a shield.  I gather she has

23  some immunocompromised issues.

24          MR. WARD:  Objection; relevance.

25          MR. JUBIN:  Well, I want to make the witness

1    comfortable here.  I want to make sure that she -- if she

2    prefers to wear the shield -- that she be permitted to do

3    that.

4              THE COURT:  You may do so.  If you want to.

5    BY MR. JUBIN:

6    Q.  Do you prefer to have the shield on, or do you feel

7    comfortable the way you are?

8    A.  No, I feel comfortable without it.

9    Q.  Okay.

10             What kind of work have you done?

11   A.  I made most of my career out of being a bookkeeper, full

12   charge, and an office manager.

13   Q.  Okay.  Who did you work for?

14   A.  My last employment was with Coca-Cola Enterprises, which

15   became Coca-Cola Refreshments.  They had quite a bit of

16   structural change.  At the point that they became CCR, I was

17   in a subsidiary of Coca-Cola North America.

18   Q.  Okay.  And this was work as a bookkeeper?

19   A.  I was actually a CMA analyst.

20   Q.  What is that?

21   A.  We put accruals on the books to pay rebates to companies

22   who advertised on behalf of Coke.

23   Q.  Okay.  And what did your husband, Ian, do for a living?

24   A.  He's been practicing as an attorney since 1986.

25   Q.  Okay.  And what type of practice does he have?

 1  A.  Currently, it's a general civil practice.  He has done --

 2  specialized in bankruptcy.  He has done some domestic

 3  divorces.

 4  Q.  Do you remember any kind of lawsuits that he's been --

 5  that he's represented clients in lawsuits?

 6          Not specific lawsuits, but is that the kind of work

 7  he's done?

 8  A.  Yes.  He's done corporate and -- for individuals as their

 9  needs -- if they have come to him for bankruptcy, he might end

10  up representing them in their corporate field and that sort of

11  thing.

12  Q.  Okay.  So it's a general civil kind of practice?

13  A.  Yes, sir.

14  Q.  Was there ever a time when Ian worked in connection with

15  other lawyers?

16  A.  Yes.  At one time he did have a law firm where he had

17  partners.

18  Q.  And how long ago was that?

19  A.  It would be about 30 years ago.

20  Q.  And since that time he's been a solo practitioner?

21  A.  That is correct.

22  Q.  So he practices on his own?

23  A.  Yes.

24  Q.  Does he go into an office that's out of the home, or is

25  his office in the home?

1    A.   For the most part his office is in the home.

2    Q.   And that's been true for the last 30 years?

3    A.   Yes, sir.

4    Q.   In his home office I gather he has some sort of a

5    computer.

6    A.   Yes.

7    Q.   Has there ever been an instance when his computer has

8    crashed?

9    A.   Yes.

10   Q.   Do you remember when that was?

11   A.   I do not.

12   Q.   Are we talking 30 years ago, or are we talking more

13   recently than that?

14   A.   It would be sometime after 2000, but I honestly -- if it

15   was 2014, if it was 2016, I don't recall exactly so I --

16   I don't recall.

17   Q.   And how did he handle the repairs, if you recall?

18   A.   He took the computer to Best Buy and let the Geek Squad

19   handle it.

20   Q.   Do you recall if he was able to recover anything from it?

21   A.   I don't know specifically what, but he was able to

22   continue to work after -- I think he lost some things

23   permanently, but some things, I think, were recovered.

24   Q.   Let's talk a little bit about Ian's ability to pay

25   attention.

1              Tell the jury what you've observed about that.

2    A.   Ian was diagnosed with ADD, I guess even when he was

3    younger, because I actually came across some medication he had

4    taken before I met him.  But he struggles a great deal with

5    being able to stay on task.

6              He -- I love him but he's socially inept.  I mean,

7    he's likable but . . . he gets in people's space.  He talks --

8    he answers my question before I've asked it.  It's like

9    "That's not what I was going to ask.  Can you just let me say

10   what I need to say?"  It can be frustrating.

11             Yeah, he -- he has a great deal of issues when it

12   comes to focus.

13   Q.   Have you observed anything about issues involving

14   interruption?

15   A.   He interrupts almost every time I open my mouth.  I start

16   to tell a story; he's heard the story; he starts telling the

17   story.  It's like, "Wait a minute; it's my story."

18   Q.   Does he get it right?

19   A.   Most of the time, no.

20   Q.   Have -- is he able to stay organized with respect to

21   documents, personal items, that sort of thing?

22   A.   Absolutely it is one of his greatest challenges, and it's

23   been an issue for us because I tend to be organized and he's

24   not.  And it affects our home because he works out of the

25   office at home.

1    Q.  Was there ever a time when Ian sought treatment for his

2    issues?

3    A.  He did.

4    Q.  Why did he seek treatment?

5    A.  We had -- I needed therapy and he was participating.  And

6    when he was meeting with the therapist, she had us both take a

7    test, very lengthy test, like 600 questions.  And she

8    determined that he had ADD --

9            MR. WARD:  Objection; hearsay.

10           THE COURT:  Sustained.

11   BY MR. JUBIN:

12   Q.  So did he -- Ian got some treatment then?

13   A.  He did.

14   Q.  Do you recall if there was any medication he was

15   prescribed?

16   A.  Yes.  It was either Adderall or an equivalent.  And I made

17   him get off of it ultimately because he had an accident while

18   he was on it.  It made him very dopey.

19   Q.  What time frame are we talking about here?

20   A.  It would have been about 15 years ago that he took the

21   medication.

22   Q.  Okay.  How long did he stay on the medication?

23   A.  He tried for several months.  But he was falling asleep at

24   stoplights, and it really made him very drugged, and I didn't

25   feel it was safe.  He didn't like how it made him feel.  He

1   couldn't focus.  It was -- it wasn't doing what we needed it

2   to do, so I urged him to go ahead and come off of it.

3   Q.  Was there an incident that sort of precipitated that

4   decision?

5   A.  Yes.

6   Q.  What was that?

7   A.  He backed my car into a mailbox when he was dropping our

8   son off at his girlfriend's house, and he took out the

9   taillight, and we couldn't afford replacing the taillight.

10  Q.  And so then the decision was made that Ian was going to

11  get off the medication?

12  A.  Yes.

13  Q.  What happened, then, with his ADD symptoms?

14  A.  He completely reverted to the way that he's been since

15  I've known him.

16  Q.  Do those symptoms continue today?

17  A.  Without a doubt.

18  Q.  Based on your experience and interaction with Ian, has he

19  suffered from these symptoms in the last several years?

20  A.  Yes.

21          MR. JUBIN:  I don't have any further questions at

22  this time.

23          Thank you.

24          MR. HEIMANN:  Good morning, ma'am.

25          THE WITNESS:  Good morning.

1              **CROSS-EXAMINATION**

2  **BY MR. HEIMANN**:

3  Q.  Did I you hear correctly you've been married 38 years?

4  A.  Yes.  We celebrated our 38th anniversary August 13th of

5  this year.

6  Q.  Congratulations.

7  A.  Thank you.

8  Q.  Your husband is a licensed -- licensed attorney?

9  A.  He is.

10 Q.  And he maintains his own law practice?

11 A.  Yes, as a sole practitioner.

12         MR. HEIMANN:  Your Honor, that's all I have.

13         MR. WARD:  No questions.

14         THE COURT:  You may step down.

15         THE COURT REPORTER:  Oops.  Your microphone, ma'am.

16         THE WITNESS:  I knew there was something else

17 I forgot.  I hope I'm not the only one that's done that.

18         THE COURT:  No, you're not.

19         MR. JUBIN:  Have a safe trip back to Brandon.

20         Your Honor, at this time Mr. Horn would call

21 Dr. Denison.  I know the Court wanted to hold a proceeding

22 outside the presence of the jury.

23         THE COURT:  Yes.

24         We will take our midmorning break at this time and

25 allow us to hear Dr. Denison outside the presence of the jury.

19-CR-26-ABJ                                              Vol. XI-1841
21-CR-14-ABJ

 1          (Proceedings outside the jury's presence at 9:34 a.m.)

 2              THE COURT:  We'll take about 5, 10 minutes.

 3          (A recess was taken from 9:34 a.m. to 9:58 a.m.)

 4              MR. JUBIN:  Your Honor, the Court wanted to do a

 5     proffer with respect to Dr. Denison's testimony, so he is here

 6     and available to do that.  And Ian Horn would call

 7     Dr. Denison.

 8              THE COURT:  Very well.  Thank you.

 9          (Witness sworn.)

10              THE COURTROOM DEPUTY:  Please take a seat.

11              And then please state and spell your name for the

12     record.

13              THE WITNESS:  My name is Charles Denison, spelled

14     D-e-n-i-s-o-n.

15              THE COURT:  Mr. Jubin.

16              MR. JUBIN:  Your Honor, in speaking with counsel, the

17     Court is familiar with Dr. Denison, familiar with his

18     credentials.  He's testified in this court on many occasions

19     and provided this Court with a considerable amount of work

20     over the years.

21              And so rather than proffer his credentials through

22     him, I think we can stipulate as to his expertise in the field

23     of forensic psychology.

24              MR. HEIMANN:  For purposes of the proffer,

25     Your Honor, we would stipulate to that.

1          THE COURT:  Thank you.

2          We -- and I can certainly attest to the accuracy of

3    your statement.

4          THE WITNESS:  Good morning, Judge.

5          THE COURT:  Good morning.

6    **CHARLES DENISON, DEFENDANT HORN'S WITNESS, DIRECT EXAMINATION**

7    **BY MR. JUBIN:**

8    Q.  So we'll cut right to -- well, I suppose I better have a

9    little in the record.

10         So, Dr. Denison, you're a PhD in clinical psychology;

11   is that correct?

12   A.  Yes, sir.

13   Q.  And you specialize in forensic psychology?

14   A.  Yes, sir.

15   Q.  And you've done a number of -- you've done a lot of

16   forensic work in this court, haven't you?

17   A.  I have, yes.

18   Q.  And you're familiar with ADD and ADHD and its diagnosis?

19   A.  Yes, very much.

20   Q.  And that's a significant part of your forensic practice?

21   A.  It is about 20 percent now.

22   Q.  Okay.  Were you asked to do any work relating to Ian Horn?

23   A.  Yes.

24   Q.  What did you do with Ian Horn?

25   A.  I did an evaluation for attentional deficit.

1    Q.  Describe what it is that you did to accomplish this

2    evaluation.

3    A.  I had a couple of in-person interviews with Mr. Horn.

4    I interviewed his wife by telephone.  When he was with me, we

5    also called his sister, so I had pretty much an interview with

6    his sister with Ian in the room because we were trying to ask

7    her some questions about his childhood functioning.

8            And then more recently I had an interview with a

9    friend whose name is Al -- it's Burnett or Burkett; I can't

10   remember which --

11   Q.  Burnett is right.

12   A.  Burnett.  It's one of Mr. Horn's best friends.

13           And then began with the basis of the clinical

14   interview to look at whether he met certain criteria for ADHD,

15   and then we went into test sessions where I gave him about

16   three different tests, tests that are designed specifically to

17   look at attention deficits and impulsivity and hyperactivity.

18           And those -- those tests that I use also have

19   validity measures to look at the possibility of whether a

20   person might be malingering or trying to exaggerate any

21   symptoms.  So as we always do in a forensic-type setting,

22   we're -- we're looking for these various areas to make sure

23   that a person is not misrepresenting the facts about himself

24   or his functioning, as best as that can be done.

25   Q.  So what tests did you administer?

1   A.   I administered the MMPI, which I know I've described to

2   the Court many times before.

3        And -- and partially I administered that to see if

4   there might be any other things that would be functionally

5   problematic for Mr. Horn.  And partially it's just to get that

6   validity factor in there to see if this is a person who tends

7   to be overreporting -- we call it faking bad profiles when --

8   in forensic cases we look for a fake bad profile when a person

9   is a defendant, perhaps hoping to get out of a certain amount

10  of trouble by having a mental condition.

11       So that was the main reason for the MMPI.  It's not

12  an ADHD test, although there are -- there are factors that

13  could come up in it that would -- that would be part of ADHD.

14       And then I use one of the three most widely used

15  neuropsych tests for ADHD.  It's called the Conners CPT3,

16  which I'm sure I've never talked about in this court before.

17  But "CPT3" stands for "Continuous Performance Test," and the 3

18  is simply that it's in its third edition.

19       So that is a computer-based test that helps us look

20  at measures of error in how quickly and how accurately a

21  person can process mundane information.  And it's still, after

22  all these years, considered one of the best kinds of tests out

23  there to determine whether a person has a bona fide case of

24  ADHD versus they're just edgy or, for example, a schoolboy

25  who's just kind of rowdy and -- and sometimes called ADHD when

 1   he doesn't really have that disorder.

 2           Oh, a couple of other things.  I did a test called

 3   the CAARS, C-A-A-R-S, and that stands for "Conners Adult

 4   ADHD" -- something -- "Survey."  I would have to look at that

 5   and remember what that is.

 6   Q.  Any other -- any other psychological testing you

 7   performed?

 8   A.  That is it for the testing portion.

 9           No -- I'm sorry.  Actually, I did one other thing

10   that I don't typically do in ADHD testing.

11           In addition to using the CPT3, which is a test of

12   visual stimuli, I also used the C-A-T-A -- called the CATA --

13   and that is the Continuous Auditory Test of Attention.  So we

14   take the same basic ideas that we use in the CPT3, but we

15   present the stimuli as auditory stimuli rather than reading it

16   off a screen.  So that was the addition.

17           And, by the way, the CAARS stands for "Conners Adult

18   ADHD Rating Scales."

19   Q.  You mentioned "adult."  Is this disease something that is

20   more prevalent in children or adults or how does that work?

21   A.  Well, we think of it as being more prevalent in kids for

22   this reason:  That many kids will have it or something that

23   mimics it and then they'll outgrow it so that by the time a

24   person is an adult they probably would not test positive, so

25   to speak, for having the condition.  Or they've compensated so

 1   well for it that, if it's there, it's -- it's very minimal in

 2   its presence.

 3          And as far as like giving the diagnosis to an adult,

 4   there has to be at least some kind of sign that it was present

 5   in childhood, because it's considered a neurodevelopmental

 6   disease.  That means it has to have been present in some form

 7   from an early age.

 8          Otherwise, if we have an adult who just out of the

 9   blue begins to have attentional problems, we're probably

10   looking at some other kind of neurocognitive problem, perhaps

11   head injury or dementia, something like that.  So with ADHD,

12   we are looking back at the neurobehavioral history of that

13   person.

14   Q.  And so did you obtain that history from sources that you

15   found sufficiently reliable?

16   A.  Yes.

17          And that is one of the reasons to do collateral

18   interviews, especially in -- in forensic psychology, that we

19   want to see if there's something significant there and that we

20   have good, solid information about the person.

21          So this is -- this is where the interview with his

22   sister came in.  Her name is Ms. Lindquist.  She lives back

23   East somewhere.  She's a couple of years older than Mr. Horn,

24   and so she was able to provide a little bit of information

25   about how the parents had taken Ian to a doctor and he'd

1  gotten some medicine as a kid, so we know it's

2  well-established in his childhood.

3  Q.  Did you also have the opportunity, beyond the testing, to

4  observe him in the clinical setting?

5  A.  Yes.  Absolutely.  I was not willing to do this evaluation

6  by Zoom or anything.  It -- this is one of those kinds of

7  evaluations that needs to be done in person, whatever the

8  circumstances, because there are behavioral observations that

9  go along with it.

10  Q.  And where did this interview happen?

11  A.  At my office in Laramie.

12  Q.  So what were your conclusions?

13  A.  Mr. Horn has a pervasive case of ADHD.  It's a highly

14  significant level of severity.

15        My conclusion was also that he -- he's not faking it

16  or trying to trump it up.  There's a number of different

17  sources that would attest to what his behaviors have been over

18  the years, and then, of course, I have the objective data from

19  the testing that shows it, as well.

20  Q.  What are the symptoms of ADHD that you observed in

21  Ian Horn?

22  A.  Well, ADHD is broken up -- this might be something that

23  might help the jury to understand better, that ADHD and what a

24  lot of older people will call ADD instead of ADHD, it's all

25  the same thing.

1             But the way that it's set up now is that ADHD has

2    two sets of symptoms with nine criteria in each symptom.  One

3    is the attentional set of criteria, so there are nine items

4    there, then there are another nine items that fall under

5    what's called the impulsivity and hyperactivity symptoms.

6             So we can literally go through the DSM and check them

7    off to make the diagnosis.  In fact, in most clinical settings

8    that's what they do; somebody will check off the numbers and

9    see if there are an adequate number there to make the

10   diagnosis.

11            In reality, that's -- that's not the best way to do

12   it.  When someone has done a lot of these, it should be more

13   of a universal approach where we would look at the examinee

14   and see what the behavioral patterns are, what the thinking

15   patterns appear to be, and then go back and take that profile

16   of the person and test it against those criteria.

17   Q.  What are these symptoms?

18   A.  And these are found in the DSM-5, and they can be found on

19   the Internet and places like that, as well.

20            So for the inattention symptoms, the nine of them

21   I mentioned -- or do you -- Tom, do you just want me to talk

22   about the nine that I found as present with Mr. Horn?

23   Q.  Sure.

24   A.  Okay.  So I -- I have counted -- one, two, three, four --

25   six of the nine symptoms that are very clearly present, and

1    they go like this:  That a person often fails to give close

2    attention to details or makes careless mistakes.  And this

3    says "in schoolwork, at work, or in other activities."  So, as

4    you recall, the same DSM criteria is being applied for

5    children and adults.  It's applied in a little bit different

6    way, so most of these will talk about schoolwork.  We

7    translate it to adult settings, social settings, work settings

8    for adults.

9          Another one that I found with Mr. Horn is he often

10   has trouble holding attention on tasks.

11         Third, that he does not often seem to listen to -- to

12   listen when spoken to directly.  And all -- that is one of the

13   symptoms.  I think there's a lot more to it than that.  This

14   is about information processing.  Attention is a lot more

15   about information processing and the ability of the brain to

16   do that than it is just about the behaviors.

17         The fourth symptom I identified was that he does not

18   follow through on instructions or tasks that need to be done.

19         The next part -- which really should be before

20   follow-through in the listing -- is that there's the initial

21   organizational difficulty, so mental organization.

22         A couple of things that I don't know whether they're

23   there or not simply because I didn't have enough information,

24   and that is that a person may avoid or is reluctant to do

25   tasks that require long-term mental effort.

1          And, actually, through a recent interview that I had

2   with a friend, that -- I did see signs of that where Mr. Horn

3   would have the tendency to start a task, but when he finds out

4   it's going to be much bigger than he thought, then he's not

5   able to maintain his attention and follow through, so I would

6   actually put a checkmark by that one now.

7          The next one, often loses things that are necessary,

8   I don't know about that one so I didn't check it one way or

9   another.

10         And then distractibility is another one.  So

11  distractibility we most identify as where a person is

12  attempting to pay attention to a task and then an actual

13  external distraction pulls the attention away.

14         We do that a lot in -- in neurobehavioral testing,

15  too.  We're looking to see, if we tell a person to put their

16  attention on something, are they easily distracted away by it.

17  So a lot of like our pilot evaluations, we're looking to see

18  can a person maintain attention.

19         And then often forgetful in daily activities.

20  I think that one is probably true of him, although I didn't

21  put a checkmark by it because I think I lack sufficient

22  evidence to know for sure.

23         But there were more than enough criteria to meet

24  Part 1 and I --

25  Q.  Let me take you back for a second to the distractibility.

1          Do you recall any information coming from Mr. Horn's

2   friend Al Burnett that might inform that question?

3   A.  Yes.  There's kind of a -- a funny little thing that

4   I think they do that -- I think it's all in -- intended in --

5   in good humor.

6          They like Mr. Horn very much, but they'll use the

7   word "squirrel" to talk him -- about him being distractible.

8   And there is a Disney cartoon that's out that kind of picked

9   up on that classic idea that you have a dog and you tell the

10  dog to sit and pay attention.  And the dog seems to be doing a

11  good job until something moves; a squirrel runs across the

12  yard.  And in this cartoon the dog would try to pay attention,

13  and every time he'd see a squirrel, he'd go "Squirrel" and his

14  attention would be diverted.

15         So I think the cartoon kind of picks up on that

16  classic idea of attention diversion or distractibility.

17  Q.  Okay.  I think you were going to move on to the next set.

18  A.  The next set is combined hyperactivity and impulsivity.

19  Some of these are difficult to place with adults.  For

20  example, one of the factors that the DSM uses is the person

21  often fidgets with or taps hands or feet or squirms in his

22  seat.

23         Certainly, something that can be observed, but it's

24  more easily observed in a classroom, so that's one that you

25  see checked off a lot with kids because teachers are seeing

1    that.  May be more difficult to see that in an adult,

2    especially because it's socially inappropriate, and so adults

3    tend to compensate for that and try to put a lid on it once we

4    grow up.

5           Another one is often leaves seat in situations when

6    seating is expected, remaining seated is expected.  Again,

7    that's more of a classroom behavior, although I thought it was

8    interesting that Mr. Burnett -- is it Burnett or Burkett?

9    Q.  Burnett.

10   A.  Mr. Burnett talked about Amway conventions -- because the

11   families used to get together for Amway trainings -- and how

12   Mr. Horn would just be up and at 'em, kind of always wandering

13   around the room, working the room instead of sitting and

14   paying attention to a specific conversation like the other

15   folks would tend to do.

16          So he would probably meet that criteria based on

17   that, and I did check that one.

18          Another one, typically a playground behavior, runs

19   around or climbs in situations where it is not appropriate.

20   Or in an adult it may simply be the idea of being restless, so

21   that one, to me, kind of combines with the previous one.

22   I don't see them as very distinct.

23          Often unable to play or take part in leisurely

24   activities quietly, I don't know the answer to that one so

25   I didn't mark it.

1         I did mark as positive for symptoms that he is often

2    on the go, as if driven by a motor.  And this is -- from what

3    I've heard and in collateral interviews, this is more people

4    who recognize him being on the go mentally, just kind of

5    moving from one thing to the next, coming up with a big idea

6    and then unable to -- to finish it out.

7         The talking excessively has been present in pretty

8    much every interview I've done and in talking with Mr. Horn,

9    who's a -- a very pleasant person.  And his talking was all

10   positive but very rapid, very distracted, very tangential

11   throughout a full day of testing and interviews.

12        And then the final one that I marked was the person

13   often blurts out an answer before a question has been

14   completed.  So even though I have not been able to watch him

15   do that, this is something that we pick up on the testing.

16   They're called anticipatory responses, where a person with

17   ADHD is unlikely to complete the analysis or the processing of

18   the piece of information before they react to it.

19        And he did that on both versions of the Conners test

20   that I use, both visually and -- and the auditory version, not

21   something that a person is likely to know how to cheat the

22   test on, so that one was very clear to me.

23        I mean, that's the criteria for a diagnosis.  I'm

24   afraid it doesn't really tell a lot about things like severity

25   level of ADHD.  It doesn't tell very -- it doesn't tell us

1   very much about how it develops, in that it is -- it's a brain

2   condition, not just a person who's bored so they get up and

3   walk around.

4        That -- there are the medication or the treatment

5   responses to ADHD that I think are pretty important to

6   understand because we live in a world where ADHD is treated a

7   lot with medications, and medications have paradoxical

8   effects.  They can have bidirectional effects, cyclical

9   effects, and the -- these things are as important as the

10  diagnosis itself.

11       So at least as a clinician, I think just putting a

12  diagnosis on someone only tells maybe a third of the story.

13  Q.  When -- when you initially began your testimony here, you

14  said he has a -- I think you said "pervasive and severe."  And

15  I'm wondering -- and then I heard you say you have some

16  difficulty in ascertaining the severity.

17       Can you tell the Court what -- what you mean?

18  A.  Sure.

19       And I -- I think probably the first time I talked

20  with you about it I said he has it in spades that -- I mean,

21  you know, that's very clearly the hand he has to play, that he

22  has to live life with ADHD.

23       So the severity with children is a little more

24  difficult to distinguish from one child to another because

25  they're at this early stage in development, and all kids will

 1  have overlap in how they present their ADHD because they have

 2  not yet developed the skills to compensate for the ADHD.

 3          Now, one of the things we know is that it's diagnosed

 4  in boys at probably four times the rate that it is in girls.

 5  There probably are neurocognitive reasons for that; there may

 6  be some social reasons for that, as well.

 7          So we look at the severity with kids just based on

 8  how much disruption did they cause in a classroom.  Then when

 9  we get up to people who are, say, 25 years old -- that's a

10  typical marker for human development; we say the brain is

11  pretty much developed at age 25 -- then we start to have to

12  have to look at the severity in terms of how well is a person

13  able to cope or manage the symptoms if they're still there.

14          And so this is what I'm dealing with day-to-day, in

15  that the Government does not want people to fly airplanes if

16  they have ADHD.  It's a disqualifying condition, so that's why

17  I do so much of this work.  And it's considered forensic-level

18  work even though it's a clinical thing, so we have to look in

19  the case of adults to see whether they are actually able to

20  compensate well enough that their distractibility and their

21  inattention doesn't affect their work day-to-day.

22          The problem with compensating is the compensation can

23  usually go so far and then a person breaks down.  So a person

24  will try to tackle some task that requires attention, and they

25  will be able to do that longer than they might have when they

1   were 12 years old, but there may still be a limit to it.

2          So the level of compensation as an adult tells us a

3   lot about the level to which they can maintain focus after a

4   certain amount of time has passed or a certain complexity

5   level of an activity.  At some point everybody's going to meet

6   their threshold if they have adult ADHD.  That's why it's

7   difficult to understand the severity until you see them in

8   action.

9          MR. JUBIN:  Your Honor, I think that proffer is

10  sufficient unless the Court has further questions for

11  Dr. Denison.

12         THE COURT:  All of us exhibit symptoms of ADHD

13  periodically and situationally in our lives would be my guess.

14         THE WITNESS:  Yes, sir.  And that's a good point.

15  And not only do we get distractible, but we're usually

16  distracted for nonneurological reasons.

17         So we have stress or we have 10 pieces of information

18  coming at us, so everybody is going to experience the

19  distractions at those times.  A person who has more of a

20  condition is going to have what's called the ADHD as a

21  disorder, as opposed to our typical distractibility that every

22  one of us is going to have.

23         And -- and then also it depends on what we put in our

24  body.  Mostly I think I would -- I would want to tell a jury

25  that understanding treatment of ADHD is like understanding

1  what happens when I drink a cup of coffee in the morning, that

2  it helps to sharpen my focus, it helps me to get through

3  certain tasks earlier.  And then, if it wears off, I no longer

4  have that ability later.

5          So even in a healthy person -- and research has been

6  done with this.  Give a healthy person caffeine, they're going

7  to make a better score on a test that requires focus.

8  BY MR. JUBIN:

9  Q.  One thing I'd like you to address -- the Judge's question

10  seemed to talk about distractibility in general terms.  But as

11  I understood your testimony, this is -- this is actually a

12  brain condition, the ADHD?

13  A.  Yes.  That's why it's -- that's why it's listed under

14  neurobehavioral conditions in the DSM.

15          So the really strange thing about ADHD is any

16  person -- a social worker, doctor, nurse, pediatrician --

17  could be given the set of symptoms and say, "Okay.  The person

18  meets the behavioral symptoms; we'll give them the diagnosis"

19  and then give them some Ritalin or whatever.

20          Technically speaking, it really needs to be

21  neurologically based, and so it should probably be best tested

22  and diagnosed using neurologically based test structures

23  rather than just asking Mom or asking a teacher if -- if a

24  person meets the behavioral criteria.

25  Q.  What -- if you give somebody a medicine, then, it can help

1   reduce the symptoms?

2   A.  Yes, either by directly adding to the ability to pay

3   attention -- that's what psychostimulant medications do, such

4   as Ritalin, Adderall, Vyvanse, the kind of medications we hear

5   about all the time.  So those are short-acting stimulants.

6   That's why they're given on a daily basis.

7            That's why you can also have, especially for kids,

8   vacations from the medications -- like on weekends don't take

9   it, during the summer don't take it -- because that helps to

10  then lessen some of the side effects.  But short-acting

11  stimulants we know help with focus.

12           Adrenaline is kind of like a short-acting stimulus.

13  Something happens and we have to respond quickly.  Even if we

14  were tired, all of a sudden we have this focus; we have the

15  ability to get through whatever that situation is, and then

16  we'll probably crash again.  That's kind of the back side

17  of it.

18           MR. JUBIN:  Okay.

19           I'd ask that Dr. Denison be permitted to talk about

20  the symptoms of ADHD and his diagnosis of -- testing and

21  diagnosis of Mr. Horn because it is highly relevant to the

22  issues in this matter.  It's strong circumstantial evidence

23  that is beneficial to Mr. Horn's defense.

24           THE COURT:  Well, one other area:  At some point as

25  he was approaching adult life, he finished an undergraduate

1   program, whatever those requirements were, took a bar

2   examination in the state of Florida, usually conducted in a --

3   like a Fontainebleau Hotel in Miami with 200 typewriters --

4           THE WITNESS:  Uh-huh.

5           THE COURT:  -- in a big room to distract you, with

6   applicants typing away, and going through law school requiring

7   preparation every night and the ability to respond to

8   professors' questions and so forth.

9           How does that stack up against . . .

10          THE WITNESS:  One part of my answer would be to

11  assure everyone that ADHD is not about intellectual

12  functioning, so one's intelligence level is not associated

13  with ADHD.  That would -- that would be a separate measure.

14          So this is why we can have people who are doctors,

15  lawyers, professionals who could have ADHD and still do well

16  on the part of their functioning that requires a high level of

17  intelligence.  Okay?  So that part wouldn't -- he wouldn't be

18  counted out from the ability to sustain attention all day

19  through bar exams, which I do understand to be torturous.

20          One thing I would like to know about Mr. Horn and

21  I don't know is whether he was taking psychostimulants at the

22  time of that exam.  And -- and I don't know the answer to it.

23  I didn't ask him that.

24          THE COURT:  You're also telling me that there are

25  lots of doctors out there who may have ADHD and will be

 1   distracted, not listening to my troubles and so forth, and

 2   they will be bad doctors, in essence?

 3           THE WITNESS:  That -- there's no doubt about it.

 4   I'm -- in my own profession we -- we know that there are those

 5   among us who struggle with that.  I mean, it knows no bounds

 6   because, since it doesn't have the intellectual component to

 7   it, you can have people that could get into all kinds of work,

 8   including aviation, which is the area where I practice most of

 9   the time now.

10           And it's -- it's serious enough that in that case the

11   Government says if a person has an unmanaged case of ADHD they

12   shouldn't be in charge of the lives of a lot of people.

13           THE COURT:  So no commercial pilot's license?

14           THE WITNESS:  Yes, sir.  Exactly.

15           MR. HEIMANN:  Your Honor, the Government renews its

16   objections of relevance.

17           At this point we have no testimony or other evidence

18   showing that Mr. Horn was distracted, not paying attention

19   during the interviews or his grand jury testimony.  So at this

20   point, whether or not he had ADHD, there's no reason to think

21   that it affected any of his statements in this case.

22           So, Your Honor, we would object to this testimony.

23   If it's going to be received, we would ask that it be received

24   conditionally on some showing that there was some ADH symptom

25   happening at the time of the statements.

19-CR-26-ABJ                                                    Vol. XI-1861
21-CR-14-ABJ

1           MR. JUBIN:  First, Your Honor, the Government's

2    representation that there's been no testimony that Ian Horn

3    was distracted is simply wrong.  Ms. Woodhouse testified this

4    morning as to what she observed, and I think there's been

5    plenty of testimony along those lines.

6           And, certainly -- I mean, I could recount it all for

7    the Court.  I think the Court is well aware that there's

8    plenty of reasons to believe that Mr. Horn was -- was in a

9    condition to be unable to circumstantially -- he's got a

10   disorder that interferes with that ability to pay attention,

11   and that's critical for the jury to know.

12          Thank you.

13          THE COURT:  We have the testimony of Mr. Horn's wife,

14   Marlene, and the testimony of Ms. Woodhouse.  I'll overrule

15   the Government's objection, allow the testimony.

16          Are we ready to bring the jury in?

17          MR. JUBIN:  Yes.

18          MR. WARD:  May I just step out and grab my clients

19   from the end of the hallway, Your Honor?

20          THE COURT:  Yes, you may.

21          THE WITNESS:  Judge Johnson, am I to stay here or be

22   resworn?  How does that work?

23          THE COURT:  You just stay there.

24          THE WITNESS:  Okay.

25          THE COURT:  You'll be reminded.

 1           THE WITNESS:  Okay.

 2       (Proceedings within the presence of Defendants

 3   Herman, Winters, and the jury at 10:36 a.m.)

 4           THE COURT:  Thank you, ladies and gentlemen.  Please

 5   be seated.

 6           During the time that you've been out of the

 7   courtroom, we have been conducting other business that,

 8   hopefully, will allow this case to go forward in an orderly

 9   way.  Thank you for your patience.

10           Mr. Jubin, you may proceed.  Let's call the next

11   witness.

12           Would you please stand and raise your right hand and

13   be sworn.

14       (Witness sworn.)

15    **CHARLES DENISON, DEFENDANT HORN'S WITNESS, DIRECT EXAMINATION**

16   **BY MR. JUBIN:**

17   Q.  Could you state and spell your name for the record,

18   please.

19   A.  Good morning.  My name is Chuck Denison, spelled

20   D-e-n-i-s-o-n.

21   Q.  And --

22           MR. JUBIN:  You're having trouble hearing?

23           A JUROR:  Yeah.

24           THE COURTROOM DEPUTY:  Can you move that mic up and

25   maybe on your tie.

 1              THE WITNESS:  Is it working now?

 2              MR. JUBIN:  It's not turned on.  Are you turned on?

 3              THE WITNESS:  Test.  Test.

 4              MR. JUBIN:  Are you turned on?  Thank you.

 5              THE COURT:  Thank you.

 6              THE WITNESS:  My name is Chuck Denison, spelled

 7    D-e-n-i-s-o-n.

 8    BY MR. JUBIN:

 9    Q.  And where do you live, sir?

10    A.  I live in Laramie, Wyoming.

11              Laramie Wyoming.  I'm sorry.  I'll stop fooling with

12    this now.

13    Q.  What's your educational background?

14    A.  I have an undergrad degree in business from Texas Wesleyan

15    University, a master of divinity degree in theology from

16    Fuller Theological Seminary in California, a master's degree

17    in psychology from the University of Denver, and most

18    recently, in 1993, a doctoral degree from the University of

19    Denver in psychology and then postdoctoral training in

20    forensic psychology and aviation neuropsychology.

21    Q.  So what's your profession?

22    A.  I am -- I have a dual profession.  Primarily, it's as a

23    forensic psychologist, and then as a subset of that I --

24    I have an aviation neuropsychology practice.

25    Q.  So what kind of work do you do?

1   A.   Day-to-day what I do is evaluations of people who

2   potentially have some sort of neurological condition, and

3   really, that's just a reference to the -- the function of the

4   brain.  So on a day-to-day basis, I will interview and test

5   and otherwise assess people to see if they have any of these

6   conditions.

7   Q.   Do you attend trainings or keep updated on the -- the

8   latest information in your profession?

9   A.   Yes.  I attend several trainings per year.  They're always

10  in neuropsychology or forensic psychology, so I attend those

11  trainings each year.  The COVID year last year was probably

12  the least continuing education I've had in 25 years just

13  because of how things were.

14          And then I also offer trainings or continuing legal

15  education kinds of presentations for attorneys and other

16  groups.

17  Q.   How is the practice of this forensic psychology different

18  from clinical psychology and the treatment of patients?

19  A.   Clinical psychology is what one often thinks of when they

20  think of talking to a therapist or someone who can respond by

21  giving help to a situation.

22          And a clinical psychologist will mostly have a person

23  that we usually call a patient that comes into the office.

24  And they present symptoms and the clinical psychologist is

25  trained to listen to those and -- and believe those symptoms

1   and do what they can to help implement some kind of plan for

2   helping address those symptoms.

3          Forensic psychology, on the other hand, is a --

4   I often say we are trained to be a little less trusting of

5   people because our job is to get objective facts from people.

6   Sometimes those facts will not work in their favor.

7          We're also trained to not just listen and believe

8   what someone tells us but, rather, to have a more

9   investigative approach so that we might look at symptoms, we

10  might do tests for certain conditions, but we're trying to get

11  objective information that may help another agency or -- or a

12  court or a law enforcement agency to better understand how to

13  work with the situation that's before them.

14  Q.   Have you provided expert services in the past in

15  courtrooms?

16  A.   Yes, sir.

17  Q.   And for what kinds of entities or people or -- how's that

18  work?

19  A.   I've been here in -- in this Federal courthouse and in

20  Casper many times.  I've been in courts throughout the state

21  on the District Court level and also in Colorado.  I've done

22  work for agencies such as Child Protective Services,

23  Department of Family Services, where they would contract me to

24  go in and look at a situation either with a family or with an

25  individual.

1          I do work evaluating people who have already pled to

2     a crime, and so as part of their sentencing they may undergo

3     an evaluation, which is then presented to the Court.

4     Q.   Are you -- in your role as a forensic psychologist, are

5     you an advocate or are you looking for objective information?

6     A.   I've been -- by definition we are supposed to not be an

7     advocate for any side or any person, so that's where this

8     forensic part carries over into the aviation practice that

9     I do.  The Government expects me to provide objective data

10    regarding, say, a commercial pilot, whether they're fit to

11    fly, so being similar to what I might provide to a Court.

12    Q.   Tell the jury about that part of your practice, the

13    aviation.  What is it that you do?

14    A.   In -- in aviation psychology a pilot has to have two

15    things to be able to fly an airplane.  They have to have a

16    pilot's license, and they have to have a medical certificate.

17         And if there are any conditions that that person may

18    have that could disqualify them from the medical certificate,

19    my job would be to -- to help understand what those are but

20    purely in the realm of psychology and neuropsychology, so

21    we're looking at brain dysfunctions, if a person had a head

22    injury, if a person's developing Parkinson's or dementia.

23    Then it would be my job to help measure whether that's,

24    indeed, happening.

25         Or about 20 percent of that practice now is in the

 1  assessment of attentional deficits because that's -- that's a

 2  big thing.  A person cannot qualify to have a pilot's -- or

 3  medical certificate if they have ADHD.

 4  Q.  Why is that?

 5  A.  Because ADHD can potentially put people in danger.  It's

 6  a -- one's attention, especially if it's stressed by a lot of

 7  things happening, a lot of things needing to be done at

 8  once -- a person needs to be able to do that, maintain

 9  attention where it should be, not be distractible.  If that

10  were to happen, it could put people in danger, and airline

11  pilots are considered to be in positions of public trust.

12  Q.  In -- in your field of forensic psychology, is it -- is it

13  recognized -- does it have peer-review studies and those sort

14  of things that underlie it?

15  A.  Yes.  Forensic psychology and clinical neuropsychology

16  each have their own sets of groups and journals and research

17  and presentations.  These are the things that -- I'm not an

18  author so I don't -- and I don't work for a university --

19  therefore, I'm not the one that provides the research.  That's

20  typically done in a university setting or a research setting.

21  As a practitioner, I'm the one who takes that information

22  and -- and uses it in the trenches, so to speak.

23          So we'll use tests that have been developed usually

24  over many years, often decades.  Those tests have been put to

25  the test themselves by scholars to determine whether they

1    really measure what they're supposed to be measuring.  So

2    that's -- that's the kind of thing that would be in my toolbox

3    for use.

4              THE COURT REPORTER:  Excuse me one second.  Could you

5    move your microphone up about an inch, please, on your tie?

6              THE WITNESS:  One, two, three.  I think it went away.

7              THE COURT REPORTER:  That's better.  Thank you.

8              THE WITNESS:  We're back now?  All right.

9              THE COURT REPORTER:  Sorry.

10   BY MR. JUBIN:

11   Q.  Is -- is there a body of knowledge in your field that's

12   generally accepted in the scientific community?

13   A.  Yes.

14             MR. JUBIN:  Your Honor, I would ask that Dr. Denison

15   be qualified as an expert in the field of forensic psychology;

16   in particular, attention-deficit/hyperactivity disorder.

17             MR. HEIMANN:  Your Honor, we'd ask for a continuing

18   objection based on our previous one.

19             THE COURT:  You may have a continuing objection.

20             Ladies and gentlemen, I will permit Dr. Denison to

21   express opinions in his field of forensic psychology in this

22   matter.  Remember the instruction I gave you earlier

23   concerning expert testimony.  You still have the obligation to

24   weigh and consider the credibility of each witness.

25   ///

1    BY MR. JUBIN:

2    Q.   Were you asked to do any work relating to Ian Horn?

3    A.   Yes, I was.

4    Q.   What were you asked to do?

5    A.   I was asked to give Mr. Horn an in-person evaluation, a

6    forensic-level evaluation, to determine whether he has

7    problems with attention or impulsivity.

8    Q.   And did you do that?

9    A.   Yes, sir.

10   Q.   And where did you do that?

11   A.   That occurred at my office over in Laramie back in

12   April of this year.  And then other parts of it occurred by --

13   by phone interviews.  But with Mr. Horn it was all in person.

14   Q.   How -- how long was this evaluation of Mr. Horn?

15   A.   It was a full day in duration, and then after the

16   in-person evaluation I would do the phone calls, a lot of test

17   analysis looking at the results of his testing, which are done

18   afterward.

19   Q.   So what did you do?

20   A.   Mr. Horn came to Laramie back in April and spent the day

21   at my office.  We had a couple of different sessions where we

22   would have interviews, where I would look at things concerning

23   his personal history, his behavioral history, going back to

24   childhood because that is part of an ADHD evaluation,

25   determining how well a person was able to function in

1    childhood.

2         I had a neurobehavioral or neurocognitive interview

3    with him to see whether he had any conditions that might have

4    been caused by a brain injury or whether he was developing

5    dementia, anything like that.

6         One of the things we always want to do is look at the

7    potential various causes of any condition, so we're constantly

8    doing something called a -- a rule-out.  That means we take

9    a -- 10 different things that might be present and want to

10   make sure that they're not, so we begin to rule them out and

11   say it's not that, it's not that, and that helps us get down

12   to what the condition may be.  So that's part of the purpose

13   for the interviews.

14        Then, interspersed with the interviews, I would give

15   him these objective tests, most of which are computerized

16   tests now.  And the reason that we really favor using

17   computerized tests is because they give us objective data that

18   I cannot control.

19        So if I have an opinion that I've developed about an

20   examinee, it -- in -- in a world where I was also the tester,

21   I could make subjective interpretations of what was going on

22   during the testing.  If I can put the person in front of a

23   computer and let that person interact with the computer, then

24   the results I'm going to get will be objective, in that I had

25   nothing to do with generating them.

1            What I do later, then, is I interpret them, and I can

2    compare them to the information that I have subjectively or

3    personally gotten from that person by interviewing him, by

4    interviewing friends or family, so then I will bring all that

5    information together.

6            He took several computer-based tests.  One of them's

7    called the MMPI, and it is the most widely used psychological

8    test in the world, and it has about 400-or-so questions in the

9    newer version.

10            And what we look for in that is if there are any

11    conditions to rule out.  So if a person seems to have trouble

12    paying attention, maybe it's because they're really depressed

13    or maybe it's because they have some other disorder.  Maybe

14    they're very anxious.  And so the MMPI helps me to rule some

15    of those things out to say that would not be the cause of an

16    attentional problem.

17            It also helps me look at something that in our world

18    we call malingering.  I think a better word for it is just

19    faking or exaggerating.  And in every forensic evaluation we

20    need to look and see if that person sitting in front of us

21    could be making up symptoms or exaggerating symptoms, and it

22    depends on why they're there.

23            Now, if it's a pilot, they might try to come in and

24    fake good because they want a job with United Airlines; they

25    want to look like everything's great.  If it's a person being

19-CR-26-ABJ          DENISON - DIRECT - JUBIN          Vol. XI-1872
21-CR-14-ABJ

1    charged with a crime, they may want to look really sick so it

2    would look like they weren't responsible for their crime.

3           So that's the -- that's what we want to do, is look

4    at malingering to see if we have a good, solid set of data on

5    the person, so the MMPI helps me establish that.

6           Then the next test I used -- is it all right to just

7    go on --

8    Q.  Sure.

9    A.  -- and explain?

10   Q.  Sure.  I can intersperse a question here.  What other

11   tests did you use?

12   A.  Thank you.

13          So another test I use is one of the three big ones

14   that's used for looking at ADHD, whether it's for kids or

15   adults.  I use a test that's abbreviated as the CPT3, and that

16   stands for "Continuance Performance Test," so "CPT" is

17   "Continuance Performance."

18          One of the things that we know about ADHD is almost

19   anybody can do something for a moment or two, especially if

20   it's interesting.  Even if a person has a terrible attention

21   deficit, you give them an interesting task -- you give a kid a

22   video game and say "Go play this for an hour" -- even if he's

23   got ADHD, he can probably do that because it's brief, it's

24   interesting, it's got his attention.

25          The tests that we use are designed to give someone

1    mundane information and tell them to focus on it, so now we're

2    really looking at the brain's ability to focus on a stimulus,

3    and those -- those stimuli can be presented as visual, which

4    is what the CPT3 is.  It gives some visual information on a

5    screen.  The person is supposed to respond to it in a

6    certain way.

7            We can also extend that test with an auditory

8    edition, which I did in this case.  That's called a C-A-T-A.

9    That's the Conners auditory attention test; I can't remember

10   exactly what it stands for.  We have abbreviations for

11   everything.

12           So I gave him both the auditory and the visual

13   components of this test to see what they might show me.

14   Again, I can also look at those tests and, by looking at the

15   scales, determine whether a person is just trying to give me a

16   story, exaggerate or make up symptoms.

17           And so I did those tests with Mr. Horn, got -- got

18   solid results, in that -- to me, "solid results" means they're

19   interpretable; I can actually use them because they're

20   objective, good data.  So I got that.

21           And then a couple of other things I use are

22   survey-type tests, and I gave one to Mr. Horn.  I sent one to

23   his wife because we use an observer report.  It needs to be

24   with someone who knows that person well and can be relied on

25   to at least understand and give the responses, so I gave

1   two versions of that.

2            I also did an interview with one of Mr. Horn's best

3   friends and did an interview with his wife.  Those were done

4   by phone.

5   Q.  Did you talk to his sister, as well?

6   A.  Thank you.  I also talked to his sister.  On the day that

7   he was in the evaluation, we actually sat together and called

8   his sister on a conference call because I wanted to gain more

9   information about his childhood.

10           His sister's a couple years older, so she would have

11  a little bit of information, maybe a little bit more memory of

12  something, so we asked her questions about when he was ever

13  taken to a doctor, when he seemed to have attentional problems

14  or hyperactivity problems as a kid, and whether he was ever

15  given any medication for that when he was a kid.

16  Q.  Let's return for a second to this testing.

17           You said there were validity measures to make sure

18  somebody's not faking it.  How did Mr. Horn come out on those?

19  A.  All the validity measures I saw in all of the testing

20  across the board was -- was that the results were valid.  Even

21  on the survey form -- so the one that his wife took -- there

22  is a validity measure on that.

23           So we're looking at the level of consistency, so we

24  have one score in that form that's called the validity score.

25  And the person taking the test or the survey doesn't really

1    know what they're being asked about that, so . . .

2          We have something called face value.  If I ask on a

3    test "Is -- is your hair gray?" then the person probably

4    knows, "Oh, they're asking about is my hair gray or maybe

5    they're asking am I an older person or am I a younger person

6    because if my hair's gray I'm more likely to be an older

7    person" -- those are called face-value questions.  You can

8    kind of get what they're going after.

9          But a lot of the -- in the testing we use, we use a

10   lot of questions that are not necessarily face valid.  We're

11   just asking about behaviors, and then it's up to the

12   psychologist to determine what the real meaning of that

13   behavior is.  For example, does it have something to do with

14   impulsivity or attention.

15   Q.  So are -- do these tests have scientific validity in terms

16   of their ability to ferret out or distinguish people who are

17   faking from people who are being genuine?

18   A.  Yes, they do.  That's what a validity measure partially

19   does.  It will see if a -- if a person is -- "faking good or

20   faking bad" are the words that I think I used earlier.

21         So these -- these tests will help determine that,

22   especially the MMPI.  That's a basic, where I'm looking at --

23   whether I'm evaluating a person who's being straightforward

24   with me or comes in with some kind of agenda.

25   Q.  And the tests showed Mr. Horn was genuine?

1    A.   Yes.

2    Q.   You -- you were talking about talking with Mr. Horn's

3    sister and history and childhood.  Why is that important?

4    A.   Part of the reason that's important in -- in an ADHD

5    evaluation is that the disorder itself or the condition itself

6    needs to go back to childhood.

7         ADHD -- which some of you may know as ADD but -- it

8    used to be called ADD in some cases and ADHD in others; now

9    it's always just called ADHD.

10        So we have -- it's broken into two types.  There is

11   an inattentive type, so a person has trouble with attention,

12   and then there is an impulsive hyperactivity type for the

13   person who may do okay with attention but can't sit still or

14   is very impulsive in the way they respond, and then there's a

15   mixed type.

16        In any of those three types, because it's a

17   neurodevelopmental disorder, that means it's a brain

18   functioning condition.  It has to have been present when that

19   person was a little kid.  So that's why, when I'm doing an

20   ADHD evaluation, I want to see were there symptoms present

21   when that person was little because if those symptoms don't

22   develop until a person is 60 years old, then I know there's

23   something besides ADHD that's causing the attentional problem.

24   So it will always go back to childhood; therefore, I always

25   want to get what information I can from childhood history.

1  Q.  So what did your forensic investigation uncover in that

2  regard?

3  A.  That as far back as we can tell and as far back in his

4  sister's memory, there -- there had been problems with

5  impulse, responding with attentional problems.  And so when he

6  was a child, his parents took him to a doctor, and he was,

7  I believe, given some kind of psychostimulant medication like

8  Ritalin, one of those, from when he was young.

9         But even though a person in their 60s may be

10  diagnosed with ADHD, probably when they were a kid they

11  weren't talking about ADHD -- I mean, for those of us who are

12  over 50, we know that they weren't talking a lot about that

13  when we were kids.  This is something that's become

14  well-defined later, but psychostimulant medications like

15  Ritalin have been around for a long time.  They just weren't

16  as popular back in the day.

17  Q.  So tell the jury what ADHD is.

18  A.  So ADHD -- more important, we have to understand that it's

19  multifaceted.  That means it can show itself in different

20  ways, especially in adult life.  Every person with ADHD is not

21  going to look the same, but there are going to be some common

22  factors that are involved.

23         And in general terms, those factors are an obvious

24  inability to pay attention or one starts off paying attention

25  and there's a high level of distractibility, so the person

 1    can't maintain attention for as long as would be reasonable --

 2    reasonably expected.

 3          A person tends to process information the wrong way,

 4    and this is a thing that's not well understood about ADHD in

 5    general terms, is it's not just to say, "Well, this person

 6    doesn't pay attention well."  It's really the brain's weakness

 7    in processing information.

 8          So a person may think that he or she has processed

 9    all the information in front of him and, in believing that

10    it's all been processed, he can make a response.  Now, that's

11    why you would see people with ADHD, for example, answering the

12    question before the question has been completed.  It's

13    probably not just because they're trying to be rude; that's

14    probably not the case at all.

15          Probably what's happening is the person in -- in his

16    or her ability to perceive the information coming in, they

17    perceive that it's been completed and that they're now ready

18    to give the answer, where the rest of us would probably want

19    to listen for a few more seconds and then maybe give our

20    brains another couple of seconds to process even a simple

21    question before we give the answer.

22          So when we see this impulsive responding, which is

23    part of ADHD, what we're seeing is that the person is probably

24    not hearing or -- or able to process the ongoing information.

25    They hear as much of it as the brain can process, and then

 1   they'll give a snap response to it, so that's another part

 2   of it.

 3        The distractibility part is that a person with ADHD

 4   often realizes -- as an adult especially -- that they're not

 5   going to be able to stay with one thing very long or very

 6   in-depth, so we'll see them kind of bouncing around from one

 7   conversation to another, where sometimes if we're talking to

 8   someone with ADHD we'll feel that person's not very interested

 9   in me because he's jumping to the next person or not

10   interested in that topic, jumping to the next topic.  But it

11   may be that they just processed as much as they can because of

12   the attentional deficit.

13        And in an attempt to stay connected, they'll change

14   the topics.  Or they'll turn to the other person or they'll --

15   they'll try to carry on conversations with five different

16   people at the same time and do a pretty poor job of all of

17   them.

18        So these are all symptoms of ADHD.

19   Q.  Are there -- are there diagnostic criteria that sort of

20   list out what -- what sorts of symptoms there are for -- for

21   this condition?

22   A.  There are.  And we have a book in psychiatry and

23   psychology called the DSM.  It's a diagnostic and statistic

24   manual, and it's updated every maybe 15 years or so.  And it

25   was in one of those updates that the DSM stopped using ADD and

 1    ADHD separately and combined them into what we have now when

 2    we talk about ADHD.

 3           And in the current version of that book we -- we have

 4    the symptoms of ADHD divided into two sections with nine

 5    symptoms each.  The first section has to do with nine

 6    different areas that are overlapped.  They have to do with

 7    problems with attention, and those were really the things that

 8    I was just talking about, the distractibility, the inability

 9    to keep the -- the attention on one task and so a person is

10    jumping around.  And that's where those nine symptoms come in.

11           For an adult, in order to make the formal diagnosis,

12    we say that that person has to have five of those nine

13    symptoms and those -- at least five of those nine symptoms

14    need to have been active at some point in that person's life.

15           Likewise, on the impulsive side of ADHD, we have

16    another nine symptoms, and five of those symptoms have to have

17    been present and active at some point in a person's life, so

18    you can actually make checkmarks going down to see if a person

19    seems to meet the criteria for the diagnosis.

20           And then in addition to that -- I mentioned this

21    earlier -- at least some of the symptoms have to have been

22    present since the time the person was a child because it's

23    neurodevelopmental, remember.  It has to do something with the

24    childhood brain function.  It also has to be present in more

25    than one setting.

1          And the real kicker we see here is when we see kids

2    who aren't doing well in school and everyplace else in life

3    they seem to be doing fine.  They may be bored at school.

4    They may not have ADHD.  They may have trouble focusing on

5    something that they're not interested in at all.  Or they're

6    at school and they're getting bullied, and that's why they're

7    not doing well.

8          So when we throw a diagnosis of ADHD on somebody when

9    there's only one area of their life being affected, probably

10   we're making an error in doing that, so it's -- it's part and

11   parcel of the diagnosis.  We have to have these two or more

12   areas of life.

13         So a person -- his behavior will be noted in a social

14   setting, the behavior will be noted in the work setting, and

15   in college it could be in the academic setting for an adult.

16   Q.  Can you tell the jury which of the symptoms of the nine

17   criteria of the attention aspect of the diagnosis were present

18   in Mr. Horn and to what degree?

19   A.  Okay.  So I actually do use a little cheat sheet where

20   I can just see the symptoms.  I mean, anybody can get these

21   off the Internet.  They're out there and it's public

22   knowledge.

23         So I went through the symptoms and I checked off --

24   it looks like -- six of them that I know to be active and

25   present in -- in current or recent history.  Some of the ones

 1    I didn't check off I don't know whether they were present or

 2    not, but I can't show that they are and so I don't give them a

 3    checkmark unless I can be pretty sure of them.

 4           One of them is "Often fails to give close attention

 5    to details or makes careless mistakes."  That could be at work

 6    or with any activity in life, and I checked that one off for

 7    Mr. Horn.

 8           I also checked off that he often has trouble holding

 9    attention to tasks.  The criteria says "task or play

10    activities" because, remember, it applies to children, too, so

11    I'm only applying it as an adult.

12           The third one I checked off says that he often does

13    not seem to be listening when he's spoken to directly, and

14    I got that as a -- a very strong behavioral observation from

15    people that I talked to and actually when he was talking to

16    me, where this -- this person comes and their future kind of

17    depends on having a good assessment and seems to be checking

18    in and out.  That doesn't make sense.  Most people would come

19    and be very serious in the middle of an interview rather than

20    their attention shifting around or appearing that they're not

21    listening.

22           Another is "Often does not follow through on

23    instructions and" -- or fails to finish up duties in the

24    workplace.

25           This next one should really go before the follow-

1    through because it happens before, and that is the person

2    often has trouble organizing tasks and activities.  So where

3    you want to see a normal person, a normally functioning

4    person, is they're able to organize an activity, then they're

5    able to follow through with it and they understand how long

6    they're going to have to give attention to it.  So there were

7    problems with this examinee in both of those.

8           And then another simply says the person is easily

9    distracted.  Distractibility is huge in the understanding of

10   ADHD because that's -- that's where the failure to do good

11   work, like in the part of an airplane pilot, talking about

12   earlier, can come.  If a person's too distractible, they can't

13   stick with the tasks that they're doing.

14   Q.  What level of severity did you observe these symptoms in

15   Mr. Horn?

16   A.  Because of the number of symptoms and the number of -- and

17   the -- the subjective level of these symptoms, I would say he

18   is highly, even profoundly affected with the ADHD.

19   Q.  What is the other -- the other prong here?  It's

20   hyperactivity?  What are those criteria?

21   A.  It's a mixture of hyperactivity and impulsivity, and a lot

22   of these, again, are easier to apply to schoolchildren because

23   we're looking at behaviors, hyperactive behaviors, the kid

24   doesn't stay in his seat, the kid wanders around the classroom

25   bothering other kids who are trying to do the work or pulling

1   somebody's hair or just joking around too much.  Easy to see

2   with kids, a little bit harder to see with adults because we

3   learn to compensate as an adults -- as adults.

4        There are some things that we do as adults that we

5   just wouldn't get away with.  You know, you don't throw your

6   pencil at another adult; you don't go pull somebody's hair.

7   So even people with bona fide impulsivity and hyperactivity as

8   adults will not show it in the same way.

9        So there's -- there's fidgeting, tapping one's feet,

10  tapping one's fingers on the desk.  That can be a part of

11  impulsivity and hyperactivity, or it could be an anxiety

12  reaction.  So I have to look at any criteria and see are there

13  enough of them that actually apply to ADHD and it is not just

14  a -- maybe one of those rule-outs that I need to do, if a

15  person's doing this tapping because they're worried about --

16  that they lied about something -- is one of the things that we

17  look at to try to determine whether the person's telling a

18  lie.  So that has nothing to do with ADHD, but it's a similar

19  behavior.

20        Another one is "often leaves his seat" in situations

21  where remaining seated is expected.  Now, I can't know what

22  Mr. Horn did in the classroom when he was a kid because he's,

23  I think, 67 years old, but I did happen to learn that he's

24  in -- was in this group called Amway.  It's kind of a -- a

25  business setup -- I don't know a whole lot about it, but they

 1   have training conventions.

 2          And one of the people that I talked to would describe

 3   for me the behavior of just getting up, wandering around,

 4   talking with lots of other people at this convention when the

 5   norm would have been to, at that moment, be where you are at

 6   the table where you're supposed to be, rather than up

 7   wandering all over the place, so it looked to me that that's

 8   good evidence the criteria is met.

 9          Feeling restless, the person reports feeling

10   restless.  I had that one marked off as one that was

11   definitely at play here.

12          The person is often on the go or they act like

13   they're driven by a motor.  And what I learned about

14   Mr. Horn's background is that he's very much that kind of

15   person who's on the go, always after the big picture of

16   something, very poor on getting the details done with any of

17   those big pictures.

18          And one example was he got the idea that we should

19   start an alpaca farm and make these investments, and so he got

20   all excited about that and started collecting information

21   about it -- I don't know if any money was spent -- but then in

22   the end it just kind of fell apart because there were too many

23   detailed factors involved.

24          And a person with ADHD, because of their impulsivity,

25   they'll go "Yes, yes, yes."  They give kind of an automatic

1  "Yes" to opportunities that come up, and then there's no

2  follow-through.  Any of us can do that here and there and we

3  will, but when it's done on a chronic basis, that's beginning

4  to look like impulsivity.

5       Another impulsive or hyperactive criteria is the

6  person often blurts out an answer before the question has been

7  completed.  That goes back to where when we interact with

8  adults with ADHD they sometimes seem like they're not

9  listening because they're talking over us.

10       And I learned from, actually, multiple sources and my

11  own clinical observation that Mr. Horn has something of a

12  pretty significant problem in doing that.

13       So that -- that about covers the impulsivity part

14  of it.

15  Q.  Okay.  Did you arrive at a diagnosis, then?

16  A.  Yes.  The diagnosis is ADHD, the combined type.  Even

17  there's -- even though there are more criteria met for the

18  inattention, there are also adequate criteria for the

19  impulsivity to include that in the diagnosis.

20       MR. JUBIN:  If I may have a moment.

21  BY MR. JUBIN:

22  Q.  You know, you talked a little bit about this being present

23  in children to a greater degree.

24       How does this work in terms of growing out of it?

25  Is -- does that happen a lot?

1          Tell -- tell us about that.

2     A.  Right.

3          And I -- if I said it that way, I probably shouldn't

4     say it's present in children to a greater degree but it's more

5     obvious because when we're young we haven't learned a lot of

6     the tricks of the trade yet for getting by socially.

7          When we're young we probably don't care how we acted

8     in the classroom and if the teacher didn't like that.  When

9     we're an adult and we have a job and we know our job could be

10    on the line for misbehavior, well, we give it a second

11    thought.

12         So as we grow up, just because of our own

13    neurodevelopment, our own brain development, we learn which

14    things we really need to put a lid on, we learn not to say

15    some things that we might have said, you know, "out of the

16    mouth of babes," as they say.

17         So as we develop, on one hand it is possible to grow

18    out of ADHD.  I firmly believe that it's possible to where

19    I have met adults in the many evaluations I've done, say with

20    pilots, where it was probably there as a kid because they had

21    the diagnosis but there is simply no sign of it now, either in

22    behavior or in -- in test results.

23         So people have different levels of management skills,

24    coping abilities.  Some people who are very smart can actually

25    use their intelligence to make it look like they've got it

 1   under control.  Intelligence is something completely different

 2   from ADHD, but an intelligent person could kind of mask those

 3   things.

 4        A person also can learn more ways to medicate

 5   themselves, so to speak, as an adult.  So we have things that

 6   help with attention -- those are stimulating chemicals -- or

 7   it could be a medication like Ritalin, a psychostimulant, or

 8   Adderall, all those that we hear about.  So those provide a

 9   stimulant for adults that can help them concentrate longer.

10        Or we know through research -- but you don't need

11   research to know this -- that if you get up in the morning and

12   if you like coffee and you get up and you have that cup or two

13   of coffee, you've taken in a stimulant which has a direct

14   effect on your brain and it just makes the day seem like it's

15   going to be doable now or you can actually concentrate even

16   though you just woke up in the morning.  That's what

17   stimulants will do for us.

18        So, adults, we begin to control our own stimulants.

19   As kids, it may be, "Here, you have to take your Ritalin this

20   morning," but as an adult maybe we drink more coffee or tea;

21   maybe we'll decide we want to use the medication or a

22   combination of medications, as Mr. Horn did at one point in

23   his history.

24        So you can actually outgrow some of it.  Some of it

25   we just learn to mask it and manage it well.  Some people will

 1    manage it better than others.  So you can take two adults that

 2    have similar levels of ADHD from childhood.  One will manage

 3    it much better than another.

 4    Q.  Are you saying that you can basically manage it by

 5    drinking coffee?

 6    A.  I wouldn't say you could manage it, your ADHD, by drinking

 7    coffee, but I think that anybody who has trouble concentrating

 8    learns that any kind of stimulant you can get into your body

 9    will help.

10         I mean, unfortunately, a lot of people who have used

11    one of the most disruptive substances we know of,

12    methamphetamine, they learned early on in the -- a lot of the

13    folks that get addicted to that started using it because it

14    helped them manage their lives in a way that they weren't

15    doing very well as kids, and then they were able to get ahold

16    of this drug.  And cocaine does the same thing.

17         It's the -- those are bad drugs because you can get

18    addicted to them in one shot, so very quickly the bad side of

19    it, the dark side of it, overcomes the good side.  But the

20    psychostimulants, people can use them their whole lives.

21    Q.  Now, the evidence here is that Ian Horn got a college

22    degree, went on to law school, passed the bar exam.

23         How does your diagnosis of ADHD fit in with that

24    academic success?

25    A.  So this is one of those areas where we can say that you

 1   have to separate the intellectual functioning from the

 2   attentional functioning, that if a person has a high level of

 3   intellectual functioning, they will likely be able to do

 4   things.  It may be -- require more years of schooling or -- or

 5   a special expertise, whether that comes from schooling or --

 6   or some other way.

 7        And a person can learn things.  ADHD's not a learning

 8   disorder.  Learning disorders are something different.  So a

 9   person can still learn.

10        Now, the ability to get through something like

11   writing a dissertation or doing a bar exam I think would be

12   pretty darned tough for a person who has adult ADHD, and it

13   would make me think that the person has either done something

14   to manage it -- maybe they've outgrown it.  I mean, in the

15   case where you're using the -- a bar exam, so an attorney --

16   maybe that person outgrew it and so they were able to get

17   through the bar exam.  Maybe the person was able to use a

18   psychostimulant.

19        So when we test pilots, for example, at the end of

20   all their neurocognitive testing I have to bring them a little

21   surprise and it's a cup.  And they have to go pee in it, and

22   I send it to a lab to see if they were using Ritalin,

23   Adderall, or some other kind of amphetamine to help them get

24   through the testing process.  And if they don't pass that,

25   then all the other testing that they've paid for is just kind

1   of down the drain.

2   Q.   So are there professionals, people who are smart and

3   capable who -- who can succeed but have some deficits in this

4   regard?

5   A.   Yes.  Of course.  Of course.  The -- the deficit still has

6   to be significant, in that it has to affect their life and

7   their functioning, but they might be able to manage it to a

8   point where -- a person could be brilliant, could be, you

9   know, a -- whatever you think of as a brilliant profession --

10  I guess you all think of lawyers as a brilliant profession.

11  But whatever it might be, a person could do well in it even

12  with ADHD.

13  Q.   Okay.  You said some people have outgrown it.  Is there

14  any evidence that Ian Horn has outgrown his symptoms?

15  A.   He's definitely not outgrown the symptoms.

16  Q.   And are they --

17  A.   That's not a -- not a character assessment.  I mean, it's

18  just an objective brain functioning assessment of a person.

19  Q.   Right.  So those systems persist today?

20  A.   They do.

21  Q.   And what's the colloquial term you used when you first

22  reported the degree to which you observed and tested his

23  symptoms?

24  A.   Mr. Horn has ADHD in spades.  Shop talk.

25          MR. JUBIN:  I have nothing further at this time.

1                          **CROSS-EXAMINATION**

2    **BY MR. HEIMANN**:

3    Q.  Sir, you were hired by defense counsel, Mr. Jubin, to

4    evaluate Mr. Horn?

5    A.  Yes, sir, that's correct.

6    Q.  For ADHD?

7    A.  Well, that would be as a rule-out.  You don't -- you

8    evaluate someone for the question.  So the -- the presenting

9    question, for example, will be "Does a person have this

10   condition or related condition?"

11   Q.  And the evaluation you were hired to do was to figure out

12   whether Mr. Horn had ADHD?

13   A.  Yes, sir, to make that determination.

14   Q.  You were paid to do that?

15   A.  Yes.

16   Q.  When you did your evaluation, you knew that Mr. Horn had

17   been indicted in this case?

18   A.  I was aware of that, of course.

19   Q.  You knew the charges?

20   A.  Yes.

21   Q.  You talked about that you met with Mr. Horn for the

22   assessment at your office in Laramie.  Was he on time?

23   A.  Yes.

24   Q.  Was he alert during your day with him?

25   A.  I would call him alert in that he was very high-strung

1  from the get-go, so he didn't stumble in there groggy or tired

2  by any means.

3  Q.  You said in your report that he was normally oriented?

4  A.  Yes.

5  Q.  What does that mean?

6  A.  That means a person knows where they are, they know the

7  day that it is, they -- they know the -- the time and the

8  situation.  We call it orientation, person, place, time, and

9  situation.

10  Q.  Full day of testing, how many hours?

11  A.  The testing part, probably --

12  Q.  Full time you spent with him.

13  A.  Full day, probably seven hours.

14  Q.  Okay.

15  A.  All that's not testing, is the point I was trying to make.

16  Not all of it's testing.  Some of it's interviews.

17  Q.  I understand.  I wanted to make sure that we were on the

18  same page with my question so . . .

19        As part of your evaluation, you talked to Mr. Horn

20  about his life?

21  A.  Yes.

22  Q.  You relied upon his self-report, at least in part, to do

23  your evaluation?

24  A.  Yes.

25  Q.  We talked a little bit about professionals.  And if

1  I heard your testimony correctly, you said that there are

2  professionals with ADHD in the world.  Right?

3  A.  Yes, sir.

4  Q.  People have important jobs like doctors; right?

5  A.  Yes, sir.

6  Q.  Lawyers?  Yes?

7  A.  Yes.

8  Q.  And if I heard your testimony correctly, you said that

9  adults learn to compensate for their ADHD.  Did I hear that

10  right?

11  A.  That's very close to right.  I said there would be --

12  there are different levels at which a person can learn to

13  compensate.

14       So that's part of how a -- of what we're trying to

15  measure, is how well is a person compensating for the ADHD.

16  Q.  So if a person is a professional, they maintain a license

17  in a profession, they must be compensating at a fairly high

18  level; right?

19  A.  They are almost certainly compensating at some level.

20  And, of course -- understand me -- it's not just

21  professionals.  In my mind, a welder is also a professional

22  in -- in his trade, and it's important to be able to pay

23  attention.  So it's not just doctors and lawyers that we're

24  talking about.

25  Q.  I appreciate that.  I -- I didn't specify so . . .

1          I think you also said that as we become adults we

2    learn -- or "we."

3          As people with ADHD become adults, they learn to

4    manage particular situations?  Did I hear that right?

5    A.  Yes.

6    Q.  So, for example, a doctor would learn to manage their ADHD

7    when evaluating a patient; right?

8    A.  Yes.

9    Q.  A lawyer would learn to manage their ADHD in a courtroom;

10   right?

11   A.  Well, hopefully.  I mean, this is -- this is the hoped-for

12   outcome.

13   Q.  If they maintain their license, they're probably managing

14   it; right?

15   A.  No, I would not agree with that.  It's not

16   necessarily . . .

17   Q.  You talked about how ADHD is different from intellect.

18   A.  It is, yes.

19   Q.  And I believe I heard you testify that a person who's more

20   intelligent will be able to -- I think the word you used was

21   "mask" their ADHD by using their intelligence.  Did I hear

22   that right?

23   A.  That is a word I used.

24   Q.  Did I hear it right?

25   A.  Yes, sir, you did.

1    Q.  And when you say "mask," what you mean is the symptoms of

2    their ADHD are not perceptible?

3    A.  Present but something is in front of them to hide the

4    severity of the symptoms themselves.

5    Q.  So they don't interrupt people?  Because they're masking

6    it.  Right?

7    A.  No, sir.  That's more management.  I would say that that

8    is successful management of it.  "Mask" -- when I refer to

9    "masking," it's something different.

10   Q.  There was a point in your testimony where you said

11   something to the effect of "It seems strange that a person

12   wouldn't pay more attention when their future depends on a

13   good assessment."  Do you remember that?

14   A.  Yes.

15   Q.  You knew in this case a good assessment was an ADHD

16   diagnosis for Mr. Horn; right?

17   A.  I'm sorry.  Could you repeat -- did I know that or did he

18   know that?

19   Q.  You knew while you were doing your evaluation that a good

20   assessment in this case was an ADHD diagnosis for Mr. Horn --

21   A.  No.

22   Q.  -- right?

23   A.  No, sir.  No.

24   Q.  Are you being paid to testify today?

25   A.  Of course.

1              MR. HEIMANN:  That's all I have, sir.

2    A.  (Continuing.)  I'm a professional.

3              MR. WARD:  Good morning, Mr. Denison.

4              THE WITNESS:  Good morning, Mr. Ward.

5                        **CROSS-EXAMINATION**

6    **BY MR. WARD**:

7    Q.  Did you listen to Mr. Horn's three hours of recorded

8    interviews with investigators in this case?

9    A.  No, sir.

10   Q.  Would you agree that those would have been helpful

11   information to your assessment of Mr. Horn?

12   A.  Only to a limited extent.  I would have had some concerns

13   about conducting that kind of review of -- of an actual case.

14   Q.  Well, in this case, hearing how Mr. Horn answered the

15   questions of interviewers for three hours -- over

16   three hours -- would have given you a pretty solid sense of

17   his interactions and how he answered questions; right?

18   A.  It would have and I did read some transcripts.

19   Q.  Okay.  What transcripts did you read?

20   A.  I cannot remember.  I think I have them listed in my

21   report if you'd like me to refer to them.

22   Q.  Listening to those three hours of recorded interviews

23   would have given you a sense of whether Mr. Horn was starting

24   to answer a question before the question was asked; right?

25   A.  That could have helped me with that.

1  Q.  And as Mr. Heimann discussed with you, you're aware that

2  Mr. Horn graduated from college?

3  A.  Yes.

4  Q.  You're aware that he graduated from law school?

5  A.  Yes.

6  Q.  And I think you differentiated a little bit between

7  intellect and ability to pay attention.  But you'd agree with

8  me that not only do those accomplishments require intellect,

9  they also require an ability to pay attention?

10  A.  Yes, they do.  Yes.

11  Q.  Now, I heard you talk about interesting versus mundane

12  information.  Correct?

13  A.  Right.

14  Q.  And you would agree that an individual may be more likely

15  to exhibit ADHD symptomology when dealing with mundane

16  information versus stimulating information; correct?

17  A.  That's one of several categories that a person would tune

18  into, better or worse.

19  Q.  Sure.

20      But there are going to be certain things that are

21  going to help a person tune in; right?  For instance, armed

22  government agents showing up at your home unannounced and

23  conducting a recorded interview with you, that's going to

24  pique an attorney's attention, wouldn't you agree?

25      MR. JUBIN:  Object to the question.  It assumes facts

 1 | not in evidence.

 2 |          THE COURT:  Overruled.

 3 | A.  So that would be a two-edged sword because, one, you --

 4 | you up the level of anxiety very quickly on a person.

 5 |          We didn't get into a lot of that, but a person with

 6 | ADHD, if they're suddenly given a stimulus that's highly

 7 | anxiety provoking, then that would not do them any favors as

 8 | far as their ability to manage their ADHD.

 9 |          On the other hand, would a person like that take it

10 | seriously that armed law enforcement officials were at the

11 | door?  Yes, of course.

12 | BY MR. WARD:

13 | Q.  Sure.

14 |          And -- and in this case, since we have recordings of

15 | Mr. Horn's interviews with those law enforcement agents,

16 | wouldn't that have been all the more important for you to

17 | listen to those and see how Mr. Horn reacted to that stimuli?

18 | A.  Well, I understand it is distinctly not my role to apply

19 | opinions to this particular legal case, and that is -- that is

20 | a reason to refrain from doing that kind of work.

21 | Q.  Mr. Jubin asked you about what your forensic investigation

22 | revealed about whether or not Mr. Horn was diagnosed with ADHD

23 | as a child.

24 |          What -- what did you do to determine whether or not

25 | Mr. Horn had ADHD as a child?

1    A.   We spoke with his sister to see what she recalled about

2    him being taken to the doctor and given medicine as a child.

3              And there is no requirement that so many of those

4    criteria be met on the checklist; there just needs to be

5    evidence that there was something that looked like an

6    attentional deficit as a child because it's known that you

7    can't actually go through and do a reverse diagnosis of

8    somebody from 50 years ago.

9    Q.   Sure.  So his sister told you that that was -- that was

10   how you conducted that portion of your investigation?

11   A.   Yes.  And his sister actually had no idea, I think, at the

12   time that he was under investigation or that my interview had

13   anything to do with the legal system.

14   Q.   How did you know that?

15   A.   Because we made an agreement that I wouldn't bring that up

16   with her at all.

17   Q.   Okay.  You don't know what --

18   A.   We were just going to talk with her and not talk about

19   anything having to do with his legal case.  My remembrance of

20   it is that his sister didn't know that he was facing any kind

21   of legal charges.

22   Q.   Okay.  But you don't know what -- what Mr. Horn would have

23   said to his sister before you talked to her?

24   A.   No.  I mean, I -- I can't prove what he said.  The

25   questions were about what did the parents do with -- with Ian

 1   when he was a kid, as far as taking him to the doctor, that --

 2   that was the focus.

 3          Obviously, she could have lied to me if that's --

 4   if -- if that's also what you're asking.  Anyone can lie

 5   to me.

 6   Q.  I didn't ask that.

 7   A.  Okay.

 8   Q.  What is your hourly rate for services that you've charged

 9   in this case?

10   A.  $400 per hour.

11   Q.  And how many hours have you worked on this case?

12   A.  I would have to look at the time log.  I can't tell you

13   for sure.

14   Q.  Can you give us a ballpark?

15   A.  I -- I believe that I received a payment after the

16   evaluation for the work up until now of approximately $7,000,

17   so that would have been time spent and the cost of certain

18   tests that have fees associated with them.

19   Q.  I want to ask you a hypothetical question.  If someone is

20   interviewed by government agents for over three hours and

21   they're asked repeatedly whether or not they wrote certain

22   letters, would ADHD keep them from being able to give an

23   honest answer to that question over three hours of repeated

24   questioning?

25   A.  The best answer I know to give you to that is that ADHD

1   has nothing to do with honesty or the honesty of answers.

2   I -- I'm -- I wouldn't want to try to vouch for a person with

3   a condition, whether they're honest or not because of ADHD.

4   It would be a completely separate topic in my mind.

5          MR. WARD:  Those are all the questions I have,

6   Your Honor.

7          Thank you.

8                    **REDIRECT EXAMINATION**

9   **BY MR. JUBIN**:

10  Q.  Dr. Denison, both the Government and Mr. Ward have brought

11  up this notion of payment, and you said you received about

12  $7,000 for your work through a certain point of time.

13         Mr. Horn didn't pay you, did he?

14  A.  No, sir.  The US Court paid me.

15  Q.  Were you present in the test -- in the courtroom when

16  Marlene Horn testified that she found a bottle of Ritalin at

17  some point long ago or some sort of medication that had to do

18  with ADHD?

19  A.  I don't remember her saying it was Ritalin specifically,

20  but I took it as one of the psychostimulants that she had

21  found.

22  Q.  Okay.  And so that would be something that would further

23  confirm this long history of this diagnosis?

24  A.  Yeah, of course.  Any -- any use of Ritalin for something

25  other than ADHD is -- is an off-label prescription of it, and

1   it's a Schedule II medication.  It's not -- it's not given out

2   like candy.

3   Q.  Uh-huh.  Do you happen to recall at this point,

4   several months later, whether those transcripts that you read

5   reflected interruptions, or is that something that's too old

6   for you to remember?

7   A.  I'm sorry.  I just don't recall.

8   Q.  Okay.  Mr. Heimann asked you a question about whether your

9   diagnosis was based in part on self-report, and you indicated

10  that it was in part.

11         Is that fundamentally what a forensic psychologist

12  does, is take what a person says and say, "Oh, yeah, that's

13  right"?  Or is it different than that?

14  A.  Well, we have to look at whether a person is, quote, "a

15  good historian" or not.  But, again, foundational to forensic

16  psychology is not to accept what the person says as the

17  absolute truth because we know that we're being lied to all

18  the time.  I mean, it's -- it's a forensic setting.  I -- I'm

19  often talking with people that would certainly not rather be

20  in my office if they could be somewhere else, and so I'm

21  always skeptical.

22         And that doesn't mean that I don't listen, and that

23  doesn't mean that everyone who walks in my office I assume

24  they're a liar and not going to tell me the truth.  That would

25  be ridiculous, as well.

1  Q.  So you engage in this investigation, testing to try to

2  separate the wheat from the chaff, so to speak?

3  A.  It's partially separating the wheat from the chaff, but

4  it's also look at corroboration.  So do two separate sources

5  tell me the same thing?  Does an objective neuropsychological

6  test give me the same idea about a person's ability to attend

7  to a task as what that person's description to me is?

8          So I'm really trying to take multiple sources of

9  information, including what the examinee tells me.

10  Q.  Does it change your opinion at all that the Court paid you

11  for this?

12  A.  Well, I'm in a much better position than a clinical

13  psychologist on that because here's what happens:  A person

14  goes to a clinical psychologist --

15  Q.  Listen to my question.

16          Does it change your opinion because the Court paid

17  you money to come and testify as to what you've done?

18  A.  No.  I'm not paid for my opinion.  I'm paid for my

19  expertise.

20  Q.  Okay.  Have you told lawyers, "Hey, I've evaluated your

21  client; sorry, can't help you"?

22  A.  No, I don't say "I can't help you."  I say "Here are the

23  facts."  And I remember the first time a lawyer told me he was

24  putting my report in the shredder; you know, it broke my

25  heart.

 1           But, no, I know that that happens.  I give bad news;

 2    I give news they want to hear.  But that -- I don't mean to

 3    sound cold-hearted, but that's not my problem because that's

 4    not my role.  My role is just to find the facts.

 5    Q.  And to be objective?

 6    A.  To be objective.

 7           MR. JUBIN:  I have nothing further.

 8           THE COURT:  You have testified about -- before the

 9    jury -- about the CATA, C-A-T-A, and the CPT3.  Are those the

10    same tests that are given to children?

11           THE WITNESS:  Yes, sir.  We have -- we have normative

12    data from childhood all the way through adults.  So we put the

13    age into the system, and then it compares children with other

14    children, adults with other adults when it's scored.

15           THE COURT:  Is there any test that deals with adults?

16           THE WITNESS:  Well, the -- the CAARS, that -- the

17    C-A-A-R-S; that is, Conners Adult ADHD Rating Scale -- so it's

18    only used with adults.

19           THE COURT:  Did you administer that test?

20           THE WITNESS:  Yes, sir.

21           THE COURT:  Questions, Counsel?

22           MR. HEIMANN:  Not from the Government.

23           MR. WARD:  Not from Mr. Winters.

24           MR. JUBIN:  Nothing further.  Thank you.

25           THE COURT:  You may step down and be excused.

 1          THE WITNESS:  Thank you, Your Honor.

 2          MR. JUBIN:  Your Honor, I think we might be at a

 3   point with witnesses that it makes sense to take a lunch break

 4   a few minutes early.

 5          THE COURT:  Very well.  Do you agree, Mr. Ward?

 6          MR. WARD:  If we could just speak once the jury's

 7   out, that would be great.

 8          THE COURT:  Very well.

 9          Ladies and gentlemen, we'll see you back here at --

10          MR. WARD:  Well, maybe it's best if we approach.

11          THE COURT:  Yes.

12          Hold on for a second.

13      (Proceedings held at sidebar with Prosecutor Heimann,

14   Mr. Ward, and Mr. Jubin.)

15          MR. WARD:  Your Honor, just in communications with

16   Mr. Fleener, he's doing everything he can to get our witness

17   ready to go, but he'd like as much time as possible.  So I --

18   I don't know if we can do any more foundational stuff through

19   Miller --

20          MR. JUBIN:  I might be able to do some foundational

21   things through Mr. Miller.  Maybe bump -- bump lunch until

22   1:30 and --

23          MR. WARD:  And then --

24          MR. JUBIN:  -- and start then.

25          THE COURT:  All right.

1        MR. WARD:  And do you know how much time you think

2   you might --

3        MR. JUBIN:  Depends if it's the paint drying like

4   yesterday or -- probably about half an hour, I would guess.

5        MR. WARD:  Okay.  So if we start at 1:30, I can tell

6   Fleener he might need to be ready by 2:00.

7        THE COURT:  All right.

8        MR. HEIMANN:  Your Honor, I also wanted -- at some

9   point today, preferably before this witness goes home, I think

10  it's important that Mr. Fleener, Mr. Ward, Mr. Herman,

11  Mr. Winters put on the record that they have enough of a joint

12  defense agreement that Mr. Fleener's absence is acceptable to

13  Mr. Herman and Mr. Ward is speaking for him, at least when

14  Mr. Fleener's not here.  I think we need that on the record.

15  And it shouldn't take long, but I think it needs to be done.

16        And I would -- if that fails, we're going to need to

17  bring this witness back, so I think it needs to be done at

18  some point this afternoon.

19        MR. JUBIN:  I think Mr. Fleener indicated that's how

20  he wanted to handle it, and he said his client assented, but

21  perhaps doing that again couldn't hurt anything.

22        MR. HEIMANN:  And, Your Honor, the reason I say it is

23  that's -- that's what Mr. Fleener implied.  That's what

24  I heard him say, but I think we need a clear record where the

25  defendants are agreeing to that, where there's some clear

1    statement from Mr. Herman that they have enough of a joint

2    defense agreement that he's been represented while

3    Mr. Fleener's been out.

4            And yesterday my memory is Mr. Fleener wasn't here

5    for Dr. Reisberg's testimony, but there was no

6    cross-examination from -- from Mr. Ward to imply that there

7    was any interest of those defendants in that testimony.  Now

8    there has been, and so I think we need a very clear statement

9    about that so our record's clean.

10           And if we're going to -- if we have to fix it by

11   bringing in this witness back when Mr. Fleener's here, we can

12   still do it.

13           THE COURT:  I don't -- I don't think -- I don't

14   perceive a problem, I guess.  I asked each of you whether or

15   not your clients objected, and I asked Mr. Fleener, as well.

16   But maybe in the presence of all three again and the clients,

17   that will be a thing we can do.

18           MR. HEIMANN:  Thank you, Your Honor.

19           MR. WARD:  Thank you.

20           MR. JUBIN:  Thank you.

21           MR. WARD:  All right.  1:30.

22      (Sidebar concluded.)

23           THE COURT:  You can stay standing, ladies and

24   gentlemen.

25           We're going to stand in recess.  What obviously is

 1   happening is having testimony here for you to keep you

 2   occupied and to try to reduce having you sitting in that jury

 3   room rather than being out on a nice day and having lunch or

 4   doing some work or whatever else you want to do, certainly not

 5   talking to anybody else about the case or trying to learn

 6   about the case from sources outside of court.

 7           We're going to stand in recess until 1:30 o'clock --

 8   1:30 o'clock -- ladies and gentlemen.  Remember the Court's

 9   admonition and keep your minds open.

10           We're in recess until 1:30.

11           THE COURTROOM DEPUTY:  All rise.

12      (A recess was taken from 11:48 a.m. to 1:35 p.m.

13   Proceedings outside the jury's presence.)

14           THE COURT:  Are you ready to roll?

15           MR. JUBIN:  I think I am.  I noticed the absence of

16   Mr. Fleener, and I just want to make sure that it's okay with

17   his client if he's not here.

18           DEFENDANT HERMAN:  Yes, sir.

19           THE COURT:  Thank you, Mr. Herman.

20           Mr. Ward, is it okay with your client, as well?

21           MR. WARD:  Certainly, Your Honor.

22           THE COURT:  How about you?

23           MR. JUBIN:  It is, Your Honor.  Mr. Horn has no

24   objection to his absence.

25           MR. HEIMANN:  We have no objection.

 1        (Mr. Fleener present.)

 2             THE COURT:  Here's Mr. Fleener.

 3             MR. FLEENER:  Judge.

 4             MR. HEIMANN:  I liked it better before.

 5             MR. FLEENER:  Me, too.

 6             THE COURT:  I kind of wondered what all my problems

 7   were in my life at this point.  Chuck Denison just answered my

 8   questions.

 9        (Proceedings within the jury's presence at 1:40 p.m.)

10             THE COURT:  Thank you, ladies and gentlemen.  Please

11   be seated.

12             Mr. Jubin.

13             MR. JUBIN:  Good afternoon.

14             Ian Horn recalls Steve Miller.

15        **STEPHEN JOSEPH MILLER, DEFENDANT HORN'S WITNESS**

16                  **FURTHER DIRECT EXAMINATION**

17   **BY MR. JUBIN:**

18   Q.  Do you recall you're still under oath?

19   A.  Yes, sir.

20   Q.  When you testified last, there was a little bit of

21   confusion about Brandon and Brandenton and Bradenton.

22             Can you tell us if you've conducted any further

23   investigation to ascertain the name of the city where Ian Horn

24   lives?

25   A.  Yes.  I examined Ian Horn's driver's -- Florida driver's

1   license.  He lives in Brandon, Florida.

2   Q.  And you were also present for his wife's testimony earlier

3   today?

4   A.  Yes, I was.

5   Q.  Okay.  And were you -- were you able to figure out if

6   there is such a place as Brandenton, Florida?

7   A.  I conducted a Google search and also a private

8   investigator database search for such a town.  I was not able

9   to locate that town in Florida.

10  Q.  I draw your attention to Exhibit IH-1029.  What is this

11  document?

12  A.  It's a letter, Ian Horn letterhead, dated August 31st,

13  2015, "To whom it may concern."

14  Q.  And where did you obtain this letter?

15  A.  This letter was obtained through discovery in digital form

16  to your office from the United States.  It originally came in

17  a PDF format, and then the United States provided it in what

18  they call native format; in this case, MS Word.

19  Q.  So it was a Word document that was provided to us both as

20  a PDF initially and then later as a Word document?

21  A.  Yes, it was.

22  Q.  And from whose computer did this come?

23  A.  I believe it came from Mr. Herman's computer, one of his

24  electronic devices.

25          MR. JUBIN:  Move for the admission of IH-1029.

1           MR. HEIMANN:  No objection.

2           MR. WARD:  I would object.  It's cumulative.  I think

3   this document's already in evidence.

4           THE COURT:  Could you give us the exhibit number?

5           MR. WARD:  I don't have it offhand, but I just --

6   I recall the document and that it's already in evidence in the

7   Government's case.

8           MR. HEIMANN:  Not in the Government's case,

9   Your Honor.

10          MR. JUBIN:  I don't think we --

11          MR. WARD:  If it's not, then I withdraw my objection.

12          THE COURT:  It is received.

13      (Defendant Horn's Exhibit IH-1029 received into evidence.)

14          MR. JUBIN:  If we could publish that.

15  BY MR. JUBIN:

16  Q.  So the date on this letter is August 31 of 2015?

17  A.  That is correct.

18  Q.  And it was provided both as the Word document as existed

19  on Herman's electronics and as a PDF to us?

20  A.  Yes, sir.

21  Q.  And I note that it talks about Bravo 20 Partners and ECMZ

22  and $280,000.  Correct?

23  A.  Yes.  It refers to "wire transferred, $280,000."

24  Q.  Is there a signature on this document?

25  A.  There's not a signature.  It says "Very best regards,

1    comma, Ian the Crackhead Horn, comma."

2    Q.  Is there any evidence that this document was ever sent to

3    or received by Mr. Horn?

4    A.  Not that I've been able to find.

5    Q.  I draw your attention to Exhibit IH-1031.  And what is

6    this?

7    A.  This is an email from Ian Horn to Justin Herman, and it

8    includes in the body of it forwarded messages between

9    Justin Herman and Ian Horn.  And Steve Mills.

10   Q.  Where did it come from?

11   A.  That came from electronic discovery provided to your

12   office by the United States.  I believe the source on this was

13   an Internet provider that provided the email to the

14   Government.

15          MR. JUBIN:  Move for the admission of IH-1031.

16          MR. HEIMANN:  Objection; Your Honor.  It's

17   incomplete.  There appears to be an attachment that isn't part

18   of this exhibit.

19          MR. JUBIN:  I'll lay a little additional foundation.

20          THE COURT:  I think the objection is it's incomplete.

21   BY MR. JUBIN:

22   Q.  Mr. Miller, is this -- did this email originally have an

23   attachment?

24   A.  Yes.  You can see the indicator under "Attachments" that a

25   PDF file was attached to it with a numeric identifier.

1   Q.  Okay.

2           MR. JUBIN:  Your Honor, I'd again move for the

3   admission of 1031.  I don't know -- the attachment is not

4   relevant for my purposes.  If the Government wishes to

5   introduce the attachment, they're certainly welcome to do so.

6           MR. HEIMANN:  Your Honor, I still object.  The

7   description I have talks about the attachment so . . . and --

8   and without the attachment, I don't know its relevance.

9           MR. JUBIN:  Your Honor --

10          THE COURT:  Maybe you want to approach, Counsel, and

11  you can make a showing of relevance.

12      (Proceedings held at sidebar with Prosecutor Heimann

13  and all defense counsel.)

14          MR. JUBIN:  Your Honor, this document that's

15  attached -- well, the email is entitled "Attached is a scanned

16  image of a part of the grand jury subpoena."

17          I'm interested in showing this jury that following

18  the receipt of the grand jury subpoena Ian Horn sent a partial

19  copy of that -- or some -- something that purported to be a

20  part of the copy of that subpoena -- to his client Justin

21  Herman.  This shows it was also sent to Steven Mills, who was

22  the lawyer who was responsible for -- the testimony has

23  shown -- responsible for vetting privilege concerns.

24          I don't necessarily care that the portion of the

25  subpoena is attached to the exhibit.  The purpose of the email

 1   is simply to show that this communication occurred with the

 2   heading identifying that he's sending a partial copy of the

 3   subpoena.

 4           MR. WARD:  Your Honor, I would just note that the

 5   document itself has no reference on it to a grand jury

 6   subpoena.  I mean, I just looked at it on the screen over

 7   there.

 8           THE COURT:  Yeah.

 9           MR. WARD:  And -- and the subject line does not say

10   anything about a grand jury subpoena.

11           MR. HEIMANN:  I don't think I would object -- I don't

12   object to the substance of all this, but as presented on this

13   exhibit it's meaningless.

14           MR. JUBIN:  It's --

15           MR. HEIMANN:  Meaningless.  There's no subject; there

16   is -- we don't know what there is -- the jury won't know what

17   the attachment is.

18           The only thing that identifies the attachment is the

19   description that Mr. Jubin helpfully provided to me, which

20   I think is probably the JERS description, but that's not what

21   this is.  And I don't think the JERS description is evidence.

22           MR. JUBIN:  If I may look at the document for just a

23   minute.

24           If need be, I can complete this with -- with some

25   additional foundation for Mr. Miller.

1           MR. HEIMANN:  I think that's necessary.

2       (Sidebar concluded.)

3  BY MR. JUBIN:

4  Q.  Mr. Miller, did you have an opportunity to review the

5  attachment to this particular email?

6  A.  I did.

7  Q.  And what was that attachment?

8  A.  It was several blank pages, and then there was one

9  page with -- looked like to me -- materials requested pursuant

10 to a subpoena.

11 Q.  Did it have to do with the document portion of that

12 subpoena request?

13 A.  Yes.

14          MR. JUBIN:  I'd move for the admission of IH-1031.

15          MR. HEIMANN:  No objection.

16          THE COURT:  1031 is received.

17      (Defendant Horn's Exhibit IH-1031 received into evidence.)

18 BY MR. JUBIN:

19 Q.  I draw your attention to Exhibit IH-1044.

20          I'm sorry.  Let's go back for a moment.  I don't know

21 that the jury had an opportunity to see that enough once this

22 is published here.

23          So looking back at 1031, the date of the original

24 forwarded message is October 16?  Do you see that?

25 A.  Yes.

1   Q.  And that's the date that the agents interviewed Ian Horn;

2   correct?

3   A.  Yes.

4   Q.  And the date that he was served with the subpoena?

5   A.  I believe so.

6   Q.  And so then about a week later, it looks like it got

7   forwarded from Ian Horn to whom?

8   A.  Stevemillslaw@gmail.com.

9   Q.  Okay.  And then at some point was it re-sent from Ian Horn

10  to Justin Herman?

11  A.  Yes, apparently on December 3rd, 2018.

12  Q.  Okay.  And it shows that there's an attachment there, and

13  that's the attachment you just described?

14  A.  Yes.

15  Q.  So fair to say this is Mr. Horn sending his client some

16  portion of the subpoena with which he was served and to which

17  he was required to respond?

18  A.  Yes.

19  Q.  Now let's move to IH-1044.  What is this document?

20  A.  This is an email dated March 10th, 2016, from

21  justin@ichcorp.net to -- individuals in the email is Tony

22  Baker, Sarah Miles, Bob Mitchell, and Steve Mills.  It has an

23  attachment identified as "NuTech Disclosure opinion

24  February 2015.doc," d-o-c, and it indicates "here it is in

25  word."

1              MR. JUBIN:  Let's scroll down.

2    BY MR. JUBIN:

3    Q.  Now is -- is the attachment part of this exhibit?

4    A.  Yes.

5              MR. JUBIN:  And let's scroll down to the very bottom.

6    BY MR. JUBIN:

7    Q.  Okay.  And where did you obtain this document?

8    A.  It was provided to your office through digital discovery

9    provided by the United States.  I believe the email was

10   obtained by the Government from the Internet service provider.

11   Q.  Is this attachment consistent with one of the Government's

12   exhibits that's been admitted in this case?

13   A.  Yes, it is.

14   Q.  Which exhibit?

15   A.  I do not recall.  Sorry.

16   Q.  Okay.  That's fine.

17             MR. JUBIN:  I'd move for the admission of IH-1044.

18             MR. HEIMANN:  No objection.

19             THE COURT:  It is received.

20      (Defendant Horn's Exhibit IH-1044 received into evidence.)

21             MR. JUBIN:  If we can scroll back up to the top.

22   BY MR. JUBIN:

23   Q.  So you identified the individuals who were the recipients

24   of this email, and you indicated that it came from

25   justin@ichcorp.net.  Was there any evidence you found in going

1    through the computer records that this email was ever sent to

2    Ian Horn?

3    A.  Not that I could find.

4    Q.  Now, the attachment is entitled "NuTech Disclosure opinion

5    February 2015.doc."  Do you see that?

6    A.  Yes.

7            MR. JUBIN:  Let's scroll down a page.

8    BY MR. JUBIN:

9    Q.  What is the date of the letter that's attached to it?

10   A.  May 19th, 2015.

11   Q.  Okay.

12           MR. JUBIN:  And let's take a look at the last page.

13   BY MR. JUBIN:

14   Q.  And does it contain an "Ian Horn" signature applied?

15   A.  Yes, it does.

16           MR. JUBIN:  Move for the admission of IH-1044.

17           MR. HEIMANN:  No objection.

18           THE COURT:  IH-1044 is received.

19   BY MR. JUBIN:

20   Q.  I'd draw your attention to Ian Horn Exhibit IH-1044a.  Can

21   you tell us what that is?

22   A.  This is an email abstract that was provided to your office

23   in digital form by the United States.  It was through a

24   Herman-filtered or privilege review at some point before it

25   came to your office.

19-CR-26-ABJ       MILLER - FURTHER DIRECT - JUBIN       Vol. XI-1920
21-CR-14-ABJ

1   Q.  And who -- who is the email to and from?

2   A.  Well, there are several individuals where the email's

3   again from Steve Mills to Justin Herman.  And then, again, you

4   have Bob Mitchell involved at one point or another, so it's a

5   series of forwards and receives here.

6   Q.  It's a string of emails?

7   A.  String of emails, yes.

8   Q.  And is this the format in which these emails -- some of

9   these emails from the Government-obtained records were

10  provided?

11  A.  Yes.

12          MR. JUBIN:  I'd move for the admission of IH-1044a.

13          MR. HEIMANN:  No objection.

14          THE COURT:  It is received.

15      (Defendant Horn's Exhibit IH-1044a received into evidence.)

16          MR. JUBIN:  So if you could blow it up, it's a --

17  that's good.

18  BY MR. JUBIN:

19  Q.  So this is -- the last one we just looked at was

20  March 10th, and so this is now March 11th, one day later; is

21  that right?

22  A.  Yes.

23  Q.  Okay.  And so what does --

24          MR. JUBIN:  Did I admit this, Your Honor?  Did I --

25  was this admitted?

 1              THE COURT:  Yes.  Yes.

 2              MR. JUBIN:  Okay.  We're all looking at it.  Great.

 3   BY MR. JUBIN:

 4   Q.  So what does this reflect in terms of the email in the --

 5   sort of in the center of the page from Steve Mills to

 6   Justin Herman?

 7   A.  It says, "Reference:  legal opinion in word," and then it

 8   has text, "Please review The OTC letter has to go to OTC in

 9   order for me to post the letter."

10   Q.  So -- and this was in response to the Justin email saying

11   "here it is in word"?

12   A.  Yes.  And you'll see a reference below what I just read

13   that says on March 10th, 2016, justin@ichcorp.net wrote "here

14   it is in word."

15   Q.  And so the response came from Steve Mills to Justin Herman

16   talking about who posting the letter?

17   A.  Correct.

18   Q.  Who was going to post this letter?

19              It says "in order for me to post the letter."  Who's

20   that coming from?

21   A.  That's from Steve Mills.

22              MR. JUBIN:  Okay.  If you could pull up Government's

23   Exhibit 36.1.

24   BY MR. JUBIN:

25   Q.  So two -- about two weeks later there is an opinion letter

1   dated April 3rd, 2016.

2         MR. JUBIN:  And let's scroll down to the bottom.

3   BY MR. JUBIN:

4   Q.  And whose signature is applied to that letter?

5   A.  Ian Horn.

6   Q.  In your review of the records in this case, did you find

7   any evidence that Ian Horn was involved in the communications

8   leading to the creation or submission of this letter?

9   A.  No.

10  Q.  Let's turn to Exhibit IH-1047.  What is that?

11  A.  It is an email dated April 21st, 2016, from Gareth

12  Colglazier at OTC Markets to kevin@nutechechern.com -- r.com.

13  Excuse me.

14  Q.  And where did this document come from?

15  A.  This came to your office in digital discovery from the

16  United States.  I believe, again, it was recovered from a

17  provider.

18        MR. JUBIN:  Move for the admission of IH-1047.

19        MR. HEIMANN:  No objection.

20        THE COURT:  1047 is received.

21    (Defendant Horn's Exhibit IH-1047 received into evidence.)

22        MR. JUBIN:  If you could expand, make that a little

23  bit easier to read -- you can take the top off.  Oh, that's

24  great.

25  ///

 1   BY MR. JUBIN:

 2   Q.   So this is from Gareth Colglazier; right?

 3   A.   Yes.

 4   Q.   And it's to kevin@nutechenr.com; correct?

 5   A.   Yes.

 6   Q.   And this is on April 21 of 2016, so some 18 days after

 7   that letter that we just looked at?

 8   A.   Yes.

 9   Q.   And what -- can you read to the jury what -- what

10   Mr. Colglazier wrote to, ostensibly, Kevin at NuTech?

11   A.   "Dear Kevin, We have finished processing your disclosure

12   and attorney letter for the period ending November 30, 2015.

13   NuTech Energy Resources, Inc. (NERG) will be removed -- be

14   moved to the OTC Pink Current information tier before the next

15   market open.  We can remove the Caveat Emptor designation as

16   soon as you have submitted an updated verified company

17   profile, which includes at the very least the company's

18   updated service providers.  These providers should include the

19   company's legal counsel, JSM Law Group."

20   Q.   Did you find any evidence that this communication was ever

21   sent or -- sent to or received by Ian Horn?

22   A.   I did not.

23   Q.   And you looked?

24   A.   Yes, I did look.

25   Q.   Okay.  Describe that process.

1   A.   It was very extensive and involved review of the

2   Government's discovery materials, both texts and emails, and

3   also examination of Mr. Horn's Ian Horn Law Gmail account, as

4   well.

5   Q.   I draw your attention to IH-1048.  It's an exhibit.  What

6   is this?

7   A.   It is an email from Justin Herman on August 26th, 2015, to

8   an individual at Pacific Stock Transfer and, also, Joslyn

9   Claiborne at Pacific Stock Transfer.

10  Q.   This is Jackie and Joslyn?

11  A.   Yes.

12  Q.   Okay.  And were you in the courtroom when Ms. Claiborne

13  testified about her assistant Jackie who was taking care of

14  matters when she was on vacation?

15  A.   Yes.

16  Q.   And where did you get this?

17  A.   This, again, was digital discovery provided to your office

18  by the United States, and, again, it was -- I believe it was a

19  grand jury exhibit.

20        MR. JUBIN:  Move for the admission of IH-1048.

21        MR. HEIMANN:  No objection.

22        THE COURT:  IH-1048 is received.

23      (Defendant Horn's Exhibit IH-1048 received into evidence.)

24        MR. JUBIN:  If you could expand that a little bit.

25  Thank you.

1   BY MR. JUBIN:

2   Q.  Could you read beginning with the "I have all the

3   paperwork required"?

4   A.  "I have all the paperwork required with one exception.

5   Joslyn, you requested proof that the wire (purchase of debt)

6   landed at the account.  Due to circumstances, which are listed

7   below, I would like to know if an affidavit that the funds

8   indeed landed to close the purchase, plus any hold harmless

9   for Pacific, would replace the request for the bank statement

10  copy."

11  Q.  Okay.  That's fine.

12           And who was this coming from?

13  A.  From Justin Herman.

14  Q.  Did you find any evidence that this communication was sent

15  to or received by Ian Horn?

16  A.  No.

17  Q.  Let's take a look at Exhibit IH-1049.  What is that?

18  A.  This is an email from Justin Ederle to Justin Herman at

19  icm- -- ichcorp.net dated August 28, 2015, with an indication

20  of an attachment of "ECMZ debt assignment signed.pdf."

21  Q.  Where did this come from?

22  A.  This also came from electronic discovery provided to your

23  office by the United States.

24           MR. JUBIN:  Move for the admission of IH-1049.

25           MR. WARD:  Objection; hearsay.

1        MR. JUBIN:  Your Honor, it's not to prove the truth

2    of the matter asserted but that it exists in the location it

3    was found.

4        MR. WARD:  It contains hearsay, Your Honor.

5        THE COURT:  It is -- it is hearsay.  I want to

6    caution the jury that I will receive the exhibit only to show

7    that -- it is not received for what it asserts or the truth of

8    the matter that's asserted in the body of the letter.

9        MR. JUBIN:  Is it published?

10        THE COURT:  It's received.

11    (Defendant Horn's Exhibit IH-1049 received into evidence.)

12        MR. JUBIN:  Can you expand this a little?

13    BY MR. JUBIN:

14    Q.  You see that this exhibit requests a brief letter

15    explaining Ian Horn's relationship as the escrow trust since

16    he received funds.

17        Did you find any evidence that Ian Horn received this

18    document?

19    A.  Not this document, no.

20    Q.  In the course of your investigation, did you review the

21    volumes of texts and emails in an effort to locate any

22    communications regarding NuTech involving Ian Horn as either a

23    recipient or sender of those communications?

24    A.  Communications referring to?

25    Q.  Texts and emails.

1    A.   No.  Regarding opinion letters, no.

2    Q.   I don't think you understood my question.

3    A.   Apparently not.  Sorry.

4    Q.   In the course of your investigation, you -- you told this

5    jury that you looked for documents related to Ian Horn; right?

6    A.   Yes.

7    Q.   And related to NuTech; right?

8    A.   Yes.

9    Q.   And you were looking for -- in all these volumes of texts

10   and emails -- what, communications that involved Ian Horn?

11   A.   The only ones I found were on the wire -- referring to

12   wire transfer.

13   Q.   I'm asking if you looked for communications --

14   A.   Oh, yes.  Yes.  I'm sorry.  I did.

15   Q.   Okay.  And how did you do that?

16   A.   I had to review the individual files that were provided to

17   your office as well as search Mr. Horn's Gmail account.

18   Q.   Okay.  And that's what you told the jury about before.

19   You looked through these things; right?

20   A.   Yes.

21   Q.   And you spent some time doing this?

22   A.   Quite a bit of time.

23   Q.   Were there a lot of records?

24   A.   Tremendous number of records.

25   Q.   How did you do this?  Did you use search terms or --

 1   A.  We used -- on the email account and the other documents,

 2   we used search terms to try and narrow it down and then pull

 3   up individual documents if there was anything that was even

 4   close.

 5   Q.  So you did this with Ian Horn's Gmail account?

 6   A.  Yes.

 7   Q.  And you did this with -- how did you access his Gmail

 8   account?

 9   A.  Mr. Horn gave me permission to access it, so I logged into

10   his Gmail account from your office here in Cheyenne.

11   Q.  Okay.  And you looked at the records the Government had

12   provided.  And did you also do that at my office?

13   A.  I did.

14   Q.  With respect to the NuTech-related opinion letters, did

15   you look for email communications between Ian Horn and

16   Justin Herman concerning the creation of those letters?

17   A.  I did.

18   Q.  Did you find anything?

19   A.  I did not.

20   Q.  Did you look for text messages, text communications

21   between Ian Horn and Justin Herman concerning the creation of

22   these NuTech-related opinion letters?

23   A.  I did.

24   Q.  Did you find anything?

25   A.  I did not.

19-CR-26-ABJ      MILLER - FURTHER DIRECT - JUBIN      Vol. XI-1929
21-CR-14-ABJ

1  Q.  Were there any communications you could find between

2  Ian Horn and Justin Herman concerning opinion letters related

3  to NuTech in the time frame that they were created?

4  A.  I did not.

5  Q.  You didn't find any?

6  A.  No.

7  Q.  Were there any communications that you could find between

8  Ian Horn and anyone concerning these letters in the time frame

9  that they were created and submitted?

10 A.  No.

11 Q.  Did you find any communications between Ian Horn and

12 Justin Herman related to opinion letters that were unrelated

13 to NuTech that occurred at a later time?

14 A.  I did.

15 Q.  And for those communications, Ian Horn was part of the

16 communication?

17 A.  He was.  It was an email exchange between he and

18 Mr. Herman.

19 Q.  I show you Exhibit IH-1057.  What is that document?

20 A.  Again, it's an abstract of an email obtained from your

21 office -- by your office in digital form from the

22 United States.  It is Herman-filtered materials from an

23 electronic device.

24 Q.  And, generally, what -- what is this?

25 A.  Again, it's an email dated December 4th --

1    THE WITNESS:  If you could blow it up just a bit,

2  please.

3  A.  (Continuing.)  -- December 4th, 2018; "Reference:  My

4  other corp," c-o-r-p.

5    MR. JUBIN:  If I may have a moment, Your Honor.

6    (Discussion held at counsel table.)

7  BY MR. JUBIN:

8  Q.  So this is a communication between Justin Herman and

9  Ian Horn about an opinion letter that is unrelated to NuTech?

10  A.  That is correct.

11  Q.  And in what year did this occur?

12  A.  Okay.  There was forwarded messages from May of 2017 that

13  were forwarded on December 3rd, 2018.

14  Q.  Okay.  So the original -- the original email involving

15  this unrelated opinion letter was in May of 2017?

16  A.  It started out May of 2017, went to October 2018, then

17  into December 2018.

18  Q.  Okay.  So there were some forwards afterwards?

19  A.  Yes.

20    MR. JUBIN:  Okay.  Move for the admission of IH-1057.

21    (Discussion held between counsel.)

22    MR. WARD:  I'd object that it's not relevant.

23    MR. HEIMANN:  I also object on relevance, Your Honor.

24    MR. JUBIN:  Your Honor, it's relevant because as --

25  if Ian Horn is actually involved in an opinion letter, there's

1   emails between him and Justin Herman.  And the testimony so

2   far has been he's -- there's no communications regarding those

3   related to NuTech.

4        And -- and if you recall Dr. Reisberg's testimony,

5   there can be conflation between something in which someone was

6   involved and something someone was not involved in, and so

7   it's highly relevant to show that Mr. Horn was involved in

8   some letters in contrast to not others.

9        THE COURT:  I do note that this was all during the

10  time that the investigation was going on afterwards.

11       MR. JUBIN:  I'm sorry?

12       THE COURT:  This was going on after -- this string

13  includes the period after the contact by the officers of the

14  Government with your client and the interview that occurred in

15  October of 2018.

16       MR. JUBIN:  It does.  There were -- there was a time

17  period when Ian Horn sent this on to have it vetted for

18  privilege, and that's kind of what captured -- captured some

19  of this, because it went to -- to Justin Herman and there's

20  discussion about whether it's relevant or privileged.

21       THE COURT:  All right.  I will receive it for that

22  limited purpose.

23     (Defendant Horn's Exhibit IH-1057 received into evidence.)

24       THE COURT REPORTER:  Mr. Jubin, could you pull that

25  mic closer, please?

1           Thank you.

2           MR. JUBIN:  Thank you.

3    BY MR. JUBIN:

4    Q.  So you see at the bottom of this particular page, where it

5    says, "PYTG Island Cap 144"?  Do you see that?

6    A.  I do.

7    Q.  To the best of your knowledge, is that one of the

8    Q documents which was -- which we introduced conditionally the

9    other day?

10   A.  It is.

11   Q.  Okay.  And you see Steven Mills is involved in the

12   forwarding of this concerning the privilege questions in

13   October of 2018?

14   A.  Yes, around October 23rd, 2018.

15   Q.  Okay.  And you see there was a response to Mr. Horn's

16   forwarding of it at one point that indicated it's not relevant

17   and privileged; right?

18   A.  That is correct.

19   Q.  Let's move to Exhibit IH-1058.

20           Before we do that, were there a pair of PYTG opinion

21   letters?

22   A.  There were.

23   Q.  And one was related to Island Capital, and the other one

24   was related to Justin Herman?

25   A.  Yes.

1   Q.  What is IH-1058?

2   A.  IH-1058, again, is an abstract of an email provided to

3   your office through electronic discovery by the United States.

4   Q.  And so you got this from the discovery review of the

5   Government documents?

6   A.  Yes, I did.

7   Q.  And, generally, what is it?

8   A.  Again, we have a series of emails forwarded.  The email

9   appears to be dated December 4th, 2018, from Justin Herman to

10  Louis Weissing.  Below are forwarded email messages involving

11  Ian Horn, Steve Mills, Justin Herman, and Jillian Hickory at

12  BMO.com.

13       MR. JUBIN:  Move for the admission of

14  Exhibit IH-1058.

15       MR. HEIMANN:  No objection.

16       THE COURT:  It's received.

17    (Defendant Horn's Exhibit IH-1058 received into evidence.)

18       MR. JUBIN:  Let's expand that a little bit so we can

19  see what's going on here.

20  BY MR. JUBIN:

21  Q.  And so you -- you see emails from Justin Herman to

22  Ian Horn, and there's somebody copied called Jillian Hickory.

23  Do you see that?

24  A.  Yes.

25  Q.  Do you have an idea from your investigation who that is?

1  A.  I believe that was a compliance person at BMO Bank, where

2  Mr. Horn had a bank account.

3  Q.  Okay.  And so this appears to have ECMZ Transaction 3; is

4  that right?

5  A.  Yes.

6  Q.  And it shows there's some documents attached, perhaps an

7  SEC 10-K document of some sort?

8  A.  Yes, "SEC 10-K amended 28 February 2010."

9  Q.  So this is related to the escrow funds?

10  A.  Yes.

11  Q.  Okay.  Let's move on to Exhibit IH-1076.  What is that?

12  A.  It is a Gmail message that I obtained from Ian Horn's

13  email account at ianhornlaw@gmail.com.

14  Q.  And this is one of those Gmail messages that you reviewed

15  by logging on to the account?

16  A.  It is.

17  Q.  And does this exhibit accurately reflect what you found

18  when you logged on?

19  A.  It does.

20  Q.  And did we provide the Government with this in another

21  version?

22  A.  Yes.  The Government requested we also provide it to them

23  in Outlook, which we did in addition to the PDF format.

24  Q.  To enable the Government to essentially verify its

25  electronic credentials?

 1   A.  Correct.

 2          MR. JUBIN:  I would move for the admission of

 3   Exhibit 1076.

 4          MR. HEIMANN:  Your Honor, I agree as to foundation,

 5   and I object as to relevance.  It's a different company, a

 6   different time period, and there's been no testimony about how

 7   this letter was written or created.

 8          MR. JUBIN:  Your Honor, this is the same issue we

 9   just discussed.  It's the other PYTG attachment, and we'll be

10   scrolling through it in a moment.

11          THE COURT:  It will be received.  Objection's

12   overruled.

13      (Defendant Horn's Exhibit IH-1076 received into evidence.)

14   BY MR. JUBIN:

15   Q.  So this was on May 10th of 2017, much more recently than

16   the NuTech matter?

17   A.  That is correct.

18          MR. JUBIN:  Okay.  Let's scroll down and take a look

19   at it.

20   BY MR. JUBIN:

21   Q.  Is that the attachment to the letter?

22   A.  It is.

23   Q.  Okay.  And it comes from which law office?

24   A.  Ian Horn, Attorney at Law.

25   Q.  And it's dated?

19-CR-26-ABJ        MILLER - FURTHER DIRECT - JUBIN        Vol. XI-1936
21-CR-14-ABJ

1   A.  May 10th, 2017.

2            MR. JUBIN:  If we could sort of slowly scroll through

3   the letter.

4   BY MR. JUBIN:

5   Q.  Does this have Ian Horn's signature on it?

6   A.  It does not.  It has "Ian Horn, Esquire," typed but no

7   signature.

8   Q.  So the attachment -- do you recall what the format of this

9   attachment was to this email?

10  A.  MS Word.

11  Q.  So it was a Word document rather than a PDF?

12  A.  It was a Word document converted to PDF.

13  Q.  Well, was this -- did -- was this a native Word format?

14  If you don't recall, that's fine.

15  A.  I just don't recall, sir.

16  Q.  All right.  But in any event, it was unsigned as -- as it

17  was sent in this email?

18  A.  That is correct.

19  Q.  Let's take a look at Exhibit IH-1078.  What is that?

20  A.  Again, it's a Gmail message that I obtained from

21  Ian Horn's ianhornlaw@gmail.com account on September 15th,

22  2021.

23  Q.  And, again, this is something for which we provided the

24  Government information so they could verify the electronic

25  bona fides of this document?

1   A.  Yes.

2   Q.  Does Exhibit 1078 accurately reflect the document you

3   found on Ian Horn's Gmail account?

4   A.  It does.

5           MR. JUBIN:  Move for the admission of

6   Exhibit IH-1078.

7           MR. HEIMANN:  No objection.

8           THE COURT:  It is received.

9       (Defendant Horn's Exhibit IH-1078 received into evidence.)

10  BY MR. JUBIN:

11  Q.  And what date is this?

12  A.  May 11th, 2017.

13  Q.  Again, much later than the documents related to the NuTech

14  investigation?

15  A.  That is correct.

16  Q.  And does this email reflect an attachment?

17  A.  It does.

18  Q.  And this is the attachment not for Island Capital but for

19  Justin Herman?

20  A.  "Justin Herman 144 Opinion Letter edited.docx," which

21  would indicate a Word document.

22  Q.  Okay.  And so this is a communication from Justin Herman

23  to Ian Horn; correct?

24  A.  Correct.

25          MR. JUBIN:  Let's scroll down.

1   BY MR. JUBIN:

2   Q.   And so the -- the first page, it shows -- of the attached

3   letter -- is whose letterhead?

4   A.   Ian Horn, Attorney at Law.

5   Q.   And the date is what?

6   A.   May 10th, 2017.

7        MR. JUBIN:   Okay.   Let's scroll down through that.

8   BY MR. JUBIN:

9   Q.   And we get to the signature line.   And is it -- is it

10  signed?

11  A.   It is not.

12  Q.   So this went from Justin Herman to Ian Horn unsigned?

13  A.   Appears to be so.

14       MR. JUBIN:   Let's go back up.

15  BY MR. JUBIN:

16  Q.   And what is the format of the attachment?

17  A.   It is a dot.docx, d-o-c-x, which, to me, indicates a Word

18  document.

19  Q.   So a Word processing document that can be easily altered?

20  A.   Yes.

21  Q.   Let's take a look at Exhibit IH-1079.   What is this?

22  A.   Again, this is an abstract provided to your office through

23  discovery from the United States in digital format.

24  Q.   So you obtained this from the Government records?

25  A.   Yes.

 1   Q.  And what is it, generally?

 2   A.  Generally, it's a series of emails involving Justin

 3   Herman, Ian Horn, forward emails with the final email being

 4   dated December 4th, 2018, "Reference:  My other corp,"

 5   c-o-r-p.

 6   Q.  And is Steve Mills also involved in this and --

 7   A.  Yes.

 8   Q.  -- in the 2018 time frame?

 9   A.  Yes.

10        MR. JUBIN:  Move for the admission of . . .

11        (Discussion held at counsel table.)

12        MR. JUBIN:  We may have this already admitted.

13   Sometimes it's difficult to avoid duplication, given the

14   volume of documents.

15        It has been admitted.  This is Exhibit 1057.  So we

16   won't talk about it anymore.

17   BY MR. JUBIN:

18   Q.  I draw your attention to Exhibit IH-1080.

19        MR. JUBIN:  Okay.  Thank you.

20   BY MR. JUBIN:

21   Q.  What is this document?

22   A.  Again, it's an email abstract obtained from the

23   United States Government to your office via discovery from an

24   Internet service provider being the source.

25   Q.  It talks about an attachment.  Do you know what that

1    attachment is?

2    A.  It says, "Justin Herman Opinion Letter.pdf."

3    Q.  And you obtained this document from the Government?

4    A.  I did.

5    Q.  The Government files that were provided to my office?

6    A.  Yes.

7           MR. JUBIN:  Move for the admission of IH-1080.

8           MR. HEIMANN:  No objection.

9           MR. WARD:  Objection; not relevant and cumulative.

10          MR. JUBIN:  Let's scroll down a little bit.  I'll lay

11   a little more foundation as to why it's not cumulative.

12          Stay with the email text, please.

13   BY MR. JUBIN:

14   Q.  Did you find any information in this email --

15          MR. JUBIN:  I think you need to scroll up

16   a little bit.  Thanks.

17   BY MR. JUBIN:

18   Q.  Did you find any information in this email that might have

19   indicated that there was editing going on on these 2017 later

20   letters where Ian Horn was involved?

21   A.  I did not.

22   Q.  Take a look at sort of right here, to the right of that

23   box.  Do you see the reference to editing going on?

24   A.  Yes.

25          MR. JUBIN:  I'd move for the admission of

1    Exhibit IH-1080.

2              MR. WARD:  Same objection.

3              THE COURT:  The objection's overruled.

4              It is received.

5        (Defendant Horn's Exhibit IH-1080 received into evidence.)

6    BY MR. JUBIN:

7    Q.  So is -- is that the reference to editing that you're

8    talking about?

9    A.  Yes.  "Made one change.  Prohibited not prohibited."

10   Q.  So --

11   A.  And it was from Ian -- looks like it was involving

12   Ian Horn and Justin Herman.

13             MR. JUBIN:  I'm trying to get this thing to leave.

14   BY MR. JUBIN:

15   Q.  So -- so there was evidence that Ian Horn was reading and

16   altering this particular opinion letter that was in 2017 --

17   A.  Yes, which --

18   Q.  -- in a matter unrelated to NuTech?

19   A.  That is correct.

20             MR. JUBIN:  Let's scroll down to the bottom.

21   BY MR. JUBIN:

22   Q.  So the letter's attached; right?

23   A.  Yes.

24   Q.  And you see a signature there?

25   A.  I do, "Ian Horn."

1  Q.  Let's take a look at Exhibit IH-1082.  What is that?

2  A.  It is an email dated May 11th, 2017, from Ian Horn to

3  Justin Herman regarding PYTG letter.

4  Q.  And so, again, this is in 2017, well after this NuTech

5  matter?

6  A.  It is.

7  Q.  And Ian Horn's the one who authored the email?

8  A.  That is correct.

9  Q.  And it was sent to Justin Herman?

10  A.  Yes.

11  Q.  Does it indicate there's an attachment?

12  A.  Yes.  "Justin Herman 144 Opinion Letter editted.docx

13  2.pdf."

14  Q.  Okay.  And does this also indicate the changes that were

15  made or change that was made?

16  A.  Yes.  There is a reference to where Ian Horn wrote "Made

17  one change.  Prohibit not prohibited."

18  Q.  Does this document appear to be the transmission email of

19  the PDF of the opinion letter?

20  A.  Based on the attachment, yes.

21         MR. JUBIN:  Okay.  Let's move for the admission of

22  IH-1082.

23         MR. WARD:  Cumulative.  I think this is the exact

24  same email we were just looking at.  Also, I think it's

25  hearsay.

```
19-CR-26-ABJ      MILLER - FURTHER DIRECT - JUBIN      Vol. XI-1943
21-CR-14-ABJ
```

 1          MR. HEIMANN:  I also object as to cumulative.

 2          THE COURT:  It does appear to be cumulative.

 3          MR. JUBIN:  Your Honor, it does -- it does have --

 4   oh, let's -- can you scroll down to the signature page?

 5          Your Honor, this -- this is the other letter.  It's a

 6   different letter.

 7          And the fact of the attachment and the transmission

 8   is the important part of it, so I don't think it's necessarily

 9   cumulative because it's the other letter, and there is a

10   distinction to be noted.

11          THE COURT:  It will be received for that -- for --

12   I don't know how to say it.  I guess for the evidence of

13   signature.

14       (Defendant Horn's Exhibit IH-1082 received into evidence.)

15   BY MR. JUBIN:

16   Q.  Okay.  We're scrolled down all the way to the last

17   page here.  Do you see a signature on that?

18   A.  I do, "Ian Horn."

19          MR. JUBIN:  Okay.  Let's scroll back up to the top.

20   BY MR. JUBIN:

21   Q.  So this appears to be a transmission from Ian Horn of the

22   signed opinion letter with a notation.  What is the notation?

23   A.  "here it is."

24   Q.  I draw your attention to Exhibit IH-1084.  What is that?

25   A.  It is a Gmail that I obtained from Ian Horn's

1   ianhornlaw@gmail.com account on September 15th, 2021.

2   Q.  Is this one of those that you got by logging in to the

3   account?

4   A.  It is.

5   Q.  And did we provide the Government with the electronic data

6   so they could verify the electronic bona fides of this email?

7   A.  We did.

8   Q.  And it contains attachments?

9   A.  It does.

10  Q.  Is it those two attachments we just talked about?

11  A.  Two attachments in PDF format.

12  Q.  And who sent this email?

13  A.  Ian Horn.

14  Q.  To whom?

15  A.  jahearn@mtrco.com.

16  Q.  And on what date are we talking?

17  A.  May 11, 2017.

18  Q.  Is -- MTRCO, is that the Manhattan Transfer Company?

19  A.  It is.

20          MR. JUBIN:  I'd move for the admission of IH-1084.

21          MR. HEIMANN:  I don't object.

22          MR. FLEENER:  No objections.

23          THE COURT:  It's received.

24      (Defendant Horn's Exhibit IH-1084 received into evidence.)

25  ///

1    BY MR. JUBIN:

2    Q.   Let's take a look at IH-1085 -- actually, first, let's

3    look at 1086.  We'll come back.

4              What's 1086?

5    A.   1086 is an email abstract obtained by your office

6    through -- from discovery provided by the United States

7    Government.

8    Q.   And is this something you reviewed?

9    A.   It is.

10   Q.   And who -- who is the -- well, it's got some 2018 stuff

11   about the privilege; right?

12   A.   Yes.  It says -- well, there is reference to legal

13   opinions.  I'm looking through the body of the email here --

14   Q.   Were matters sent to Steve Mills Law in October of 2018

15   after the subpoena was served?

16   A.   Yes.

17   Q.   And it's forwarding messages that are from May of 2017?

18   A.   Yes.

19   Q.   And those messages are between Ian Horn and Justin Herman?

20   A.   Yes.

21   Q.   Regarding the legal opinions we were just talking about?

22   A.   At the very bottom, yes.

23             MR. JUBIN:  Let's scroll back up a little.

24             I'd move for the admission of IH-1086.

25             THE COURT:  Received.

1          (Defendant Horn's Exhibit IH-1086 received into evidence.)

2               MR. JUBIN:  Can you scroll down, please?

3    BY MR. JUBIN:

4    Q.   And on -- on the initial email here on May 11th of 2017,

5    what are the instructions that Justin Herman wrote to

6    Ian Horn?

7    A.   "Also, please resend wire instructions to me" --

8    Q.   Let me draw your attention down here.

9    A.   I'm sorry.  Okay.

10              "Please send both legal opinions to the following."

11   Q.   And that's that email, that jahearn@mtrco?

12   A.   Yes.

13   Q.   Okay.  And then there are some wiring instructions you

14   mentioned?

15   A.   There is, yes.

16   Q.   And it's to PNC Bank?

17   A.   Yes.

18   Q.   That's Ian Horn's bank?

19   A.   It is.

20   Q.   Is this consistent with Ian Horn requesting payment for

21   the letters?

22   A.   Yes.

23   Q.   I draw your attention to Exhibit . . . IH-2206a.

24              What is that?

25   A.   This is from Verizon Communications.  It is a description

 1  of how to interpret telephone records.

 2  Q.  Does this have a second page?

 3  A.  It does.

 4  Q.  Let's take a look.

 5         In the course of your investigation, did you become

 6  familiar with the telephone numbers belonging to Justin Herman

 7  and Ian Horn?

 8  A.  I did.

 9  Q.  And how did you know that these telephone numbers belonged

10  to the two of them?

11  A.  There was subscriber information provided with the grand

12  jury information that your office received from the

13  United States.

14  Q.  And what is Ian Horn's phone number?

15  A.  I believe it is (813) 545-1607.

16  Q.  Pretty close.

17  A.  Well . . .

18  Q.  So it's difficult to remember all this.

19         Do you have any notes that would assist you?

20         Or if you look at the document, would that refresh

21  your recollection?

22  A.  The document itself, yes.

23  Q.  What is this document you're looking at?

24  A.  This document is in PDF format.  I created what -- this

25  document with the assistance of your paralegal based on the

1   Verizon Excel spreadsheet provided to your office by the

2   United States.

3   Q.   Okay.  Let's talk about this spreadsheet.  What is the

4   spreadsheet?

5   A.   The spreadsheet is a listing of phone calls to and from a

6   number, date, time, duration of the phone calls.

7            In this case, it was a record of Mr. Horn's phone --

8   phone number, the area code 813 number.

9   Q.   Okay.  It doesn't give you content of calls; correct?

10  A.   It does not.  It's just the date and time, duration of the

11  calls.

12  Q.   And does it include other information that's sort of part

13  of the phone company's information that's less important to

14  our concerns here?

15  A.   It does.

16  Q.   And they provided a key of some sort?

17  A.   Yes.  And the key is what I just referred to on page 1 of

18  this.

19  Q.   The first page is the key?

20  A.   Yes.

21  Q.   So how many rows were in this spreadsheet that you

22  looked at?

23  A.   I believe it was approximately 7,222 rows.

24  Q.   And where did this document come from?

25  A.   Again, it was an Excel spreadsheet provided by Verizon to

19-CR-26-ABJ        MILLER - FURTHER DIRECT - JUBIN        Vol. XI-1949
21-CR-14-ABJ

1   the United States Government pursuant to the grand jury.

2   Q.   And then it came to you and you reviewed it?

3   A.   Through your office, yes.

4   Q.   Okay.  Based upon your review, did you find any phone

5   calls that were made in -- in the time frame around

6   October 15, October 16 of 2018 when --

7   A.   On October 15, 2018, yes.

8   Q.   Okay.  And this is the day before the agents showed up

9   again at Ian Horn's house to talk to him?

10  A.   I believe it was the -- October 15, 2018, was the day they

11  made initial contact with Mrs. Horn, and then the next day

12  they showed up.

13          MR. FLEENER:  Your Honor, can we approach?

14          THE COURT:  You may.

15      (Proceedings held at sidebar with Prosecutor Heimann

16  and all defense counsel.)

17          MR. FLEENER:  Mr. Herman has a bloody nose.  He's

18  bleeding all over.

19          THE COURT:  Oh, yes.  Yes.

20          MR. FLEENER:  Yes.

21          THE COURT:  All right.

22          MR. FLEENER:  Thank you.

23          THE COURT:  Let's take a break.

24          MR. FLEENER:  Yes, sir.

25          (Sidebar concluded.)

 1          THE COURT:  Ladies and gentlemen, we'll take a short

 2   break, 15 minutes.

 3          THE COURTROOM DEPUTY:  All rise.

 4      (Proceedings outside the jury's presence at 2:47 p.m.)

 5          THE COURT:  Mr. Jubin, will you give me the document

 6   number again.  Did you say 226.0a?

 7          MR. JUBIN:  Yes, Your Honor.

 8          IH-2206a, small a in the alphabet.

 9          THE COURT:  So it's 2000 --

10          MR. JUBIN:  2206a.

11          THE COURT:  I can't find it in my list.

12          THE COURTROOM DEPUTY:  It's not on the list.

13          THE COURT:  Here it is.  It's not on the list but

14   it's -- there is a 226 -- a 206.

15          MR. JUBIN:  Oh, you have it under 206 instead of

16   2206?

17          THE COURT:  I'm sorry.  I have a 2206.

18          THE COURTROOM DEPUTY:  Yeah, this --

19          MR. FLEENER:  Your Honor, may I step out and check on

20   the client?

21          THE COURT:  Yes, you may.

22          MR. FLEENER:  Thank you, Judge.

23          THE COURTROOM DEPUTY:  2206a.

24          THE COURT:  Anything we can do to help?

25          MR. FLEENER:  No.  I can get a new mask.

1           THE COURT:  Okay.  We've got that.

2           MR. FLEENER:  Thank you, Becky.

3           You don't want him to wear the other one.

4           THE COURTROOM DEPUTY:  No.

5           MR. FLEENER:  Your Honor, should we consider this the

6    afternoon break and use the restroom, or is the Court going to

7    readjourn --

8           THE COURT:  Go ahead, use the restroom.  I'll do the

9    same.

10       (A recess was taken from 2:52 p.m. to 3:10 p.m.)

11          THE COURT:  Thank you.  Please be seated.

12          Well, we'll cross our fingers for Mr. Herman.

13          MR. JUBIN:  So you're aware, Judge, we have the

14   four o'clock witness lined up.  By the time we're done with

15   direct and crosses here, I think we'll pretty much fill the

16   day.  There might be a little bit of a gap there.

17          And then I think we'll have the two experts tomorrow,

18   and that will be perhaps all unless one of the defendants

19   decide to testify, which could happen.

20          THE COURT:  Understood.

21          I'll try -- if you'll give me places where I can

22   communicate with you by email, I'll try to get you the first

23   draft of instructions so that you can have them and be looking

24   at them.

25          MR. JUBIN:  That would be helpful.  Thank you.

1          THE COURT:  I think -- I think all of you have that

2    with me and the bar directory.

3        (Proceedings within the jury's presence at 3:12 p.m.)

4          THE COURT:  Thank you.  Please be seated, ladies and

5    gentlemen.

6    BY MR. JUBIN:

7    Q.  Mr. Miller, do you recall you're still under oath?

8    A.  Yes, sir.

9    Q.  Did you have an opportunity to identify Justin Herman's

10   phone number?

11   A.  I did.

12   Q.  So did that assist you in reviewing this 7,222-row

13   spreadsheet to identify communications by telephone between

14   Mr. Horn and Mr. Herman?

15   A.  It did.

16   Q.  Did you find any on the 15th of October of 2018?

17   A.  I did.

18   Q.  How many?

19   A.  There were three phone calls.

20   Q.  Did you prepare an exhibit to depict those phone calls?

21   A.  I did with the assistance of your paralegal.

22   Q.  How did you do that?

23   A.  We went to the Excel spreadsheet provided by Verizon

24   Communications.  We looked at the specific rows involving

25   these three phone calls, and then we cut-and-pasted the date

1   and time of the call in both Greenwich mean time, local time,

2   the numbers involved, whether it was being called or received,

3   and a duration of the call.

4   Q.   And the called or received, whose records are these?

5   A.   These are the records of Ian Horn.

6   Q.   So if a call is received on this spreadsheet, it would be

7   received by Ian Horn?

8   A.   That would be correct.

9   Q.   And if it's an outgoing call, it would reflect -- it

10  reflects the called number?

11  A.   Yes.

12  Q.   Okay.  For purposes of -- of your determining what phone

13  calls were between these two numbers, between Mr. Horn and

14  Mr. Herman on the October 15, were the other 718 rows -- other

15  than the header -- relevant to -- to that information?

16  A.   No.  I focused on October 15th, 2018.

17  Q.   And so you've prepared this exhibit that shows those calls

18  on the 15th of October?

19  A.   It is.

20  Q.   And this is Exhibit 2206a?

21  A.   Yes.

22  Q.   And the first page is the key to reading the Excel, and

23  the second page depicts the header and those three calls?

24  A.   It does.

25  Q.   Does it accurately reflect the records that are taken

1    directly from that spreadsheet that was provided in discovery?

2    A.  It does with the relevant information.

3            MR. JUBIN:  Move for the admission of

4    Exhibit IH-2206a.

5            MR. HEIMANN:  No objection.

6            MR. FLEENER:  Your Honor, may I voir dire the

7    witness?

8            THE COURT:  You may.

9            MR. FLEENER:  Sir, how are you?

10           THE WITNESS:  Fine, Mr. Fleener.

11                    **VOIR DIRE EXAMINATION**

12   **BY MR. FLEENER**:

13   Q.  The -- this exhibit, this IH-2206a -- is that the exhibit

14   we're looking at?

15   A.  Yes.

16   Q.  All right.  This is simply three lines of 7,000 entries on

17   an Excel spreadsheet?

18   A.  Yes, sir.

19   Q.  And the Excel spreadsheet itself, is -- it doesn't cover

20   the entire time period that Justin Herman and Ian Horn were

21   communicating?

22   A.  I would say not.

23   Q.  Because this starts in 2008; correct?  The -- the data

24   that you pulled this document from started in March of 2018 --

25   I apologize.  Right?

1    A.   Yes.

2    Q.   And it goes to February of 2019?  Is that safe to say?

3    A.   I believe so.

4    Q.   And so this document itself doesn't cover -- and you've

5    had the opportunity to review all the evidence -- as much of

6    the evidence as you could in this case; correct?

7    A.   As much as I could, yes.

8    Q.   And there's no -- apparently, there's no cell phone

9    records that deal with Justin Herman's communications with

10   Ian Horn during the time of the alleged conspiracy back in

11   2014, '15, '16.

12   A.   I did not see those, no.

13   Q.   So this record we're dealing with only deals with the

14   records obtained in 2018 and '19 to the best -- 2000- --

15   basically, a 12-year -- 12-month period from 2018 to 2019;

16   correct?

17   A.   Yes.

18   Q.   And, presumably, the reason why the United States got

19   these records is because this was -- this dealt with the

20   charge of -- of perjury; correct?

21   A.   I would assume.

22        MR. HEIMANN:  Objection; calls for speculation.

23        THE COURT:  Sustained.

24   BY MR. FLEENER:

25   Q.   The -- and as far as the -- the document that we're -- the

 1   master document that you -- that -- the Excel spreadsheet that

 2   you talked about, there's many, many, many, many calls between

 3   Justin Herman and Ian Horn; correct?

 4          And I used "many, many, many, many" -- I know that's

 5   subjective -- but there's many more than three calls during

 6   this year?

 7   A.  I just focused on the October 15th, 2018, time period.

 8   Q.  Right.  So the other calls that may or may not have taken

 9   place outside of October 15th of 2018, they wouldn't be

10   reflected on Exhibit 2206a?

11   A.  No, they would not.

12   Q.  And, of course, any calls that took place in the years

13   prior between Justin -- between Justin Herman and Ian Horn

14   back, for instance, during the -- the period of the NuTech

15   opinion letters, they're not reflected on IH-2206a because no

16   records exist to demonstrate what communications existed?

17   A.  No records that I was able to investigate or review.

18          MR. FLEENER:  I would object to 2206a, Judge.

19   I don't think it's a business record -- well, let me ask

20   another question or two.

21   BY MR. FLEENER:

22   Q.  This -- you prepared this document in anticipation of it

23   being presented in court?

24   A.  Yes.

25          MR. FLEENER:  I would object to 2206a, Your Honor.

 1   It's not a business record.  It may be something else, but

 2   it's not a business record.  It's prepared for litigation

 3   purposes.

 4          MR. JUBIN:  Your Honor, it is a business record; it's

 5   just a portion of a business record.  Authenticity's already

 6   also been stipulated to with respect to these records.

 7          THE COURT:  The objection is overruled and the

 8   exhibit is received.

 9     (Defendant Horn's Exhibit IH-2206a received into evidence.)

10          **FURTHER DIRECT EXAMINATION (Continued)**

11   **BY MR. JUBIN:**

12   Q.  So what calls occurred between Ian Horn and Justin Herman

13   on October 15 of 2018?

14   A.  There were three calls.  The first was an outgoing call

15   from the Ian Horn phone number to the Justin Her -- Hor --

16   excuse me -- Justin Herman phone number at approximately

17   2:14 p.m. local time.

18          The second phone call -- again, from Ian Horn number

19   to Justin Herman phone number -- was at approximately

20   2:31 p.m. Florida -- local time.

21          The third phone call was an incoming phone call to

22   the Ian Horn phone number from the Justin Horn --

23   Justin Herman -- phone number at approximately 6:15 p.m. local

24   time.

25   Q.  Okay.  If you take a look at the "SOU" column, what does

1   that stand for?

2   A.   That's the duration of the phone call.

3   Q.   In seconds?

4   A.   In seconds.

5   Q.   Okay.  So the first one where Ian Horn called at 2:14 p.m.

6   Florida time was 89 seconds; correct?

7   A.   Yes.

8   Q.   And the second call, where Ian Horn called Justin Herman's

9   phone at 2:31 p.m. Florida time, was 81 seconds?

10  A.   That is correct.

11  Q.   Do we know if he actually spoke to him or left messages or

12  what happened?

13  A.   We don't know.

14  Q.   Okay.  And then there's a phone call from Justin Herman to

15  Ian Horn that's how many seconds?

16  A.   493 seconds, over 8 minutes in duration.

17  Q.   And that was on the 15th of October at 1815 or 16 -- or

18  6:15 p.m.; correct?

19  A.   Local time, yes.

20  Q.   All right.  And, again, we don't know the content of that

21  conversation?

22  A.   We do not.

23  Q.   Let's take a look at Exhibit 2194a.  What's that?

24  A.   This exhibit has four text messages displayed.

25  Q.   And where do these text messages come from?

19-CR-26-ABJ    MILLER - FURTHER DIRECT - JUBIN    Vol. XI-1959
21-CR-14-ABJ

1    A.  It came to your office via discovery from the

2    United States Government in digital format.

3    Q.  Okay.  And this -- so this is something you reviewed at my

4    office that came from the Government?

5    A.  Yes.

6    Q.  I gather you -- how many text messages are depicted in

7    this --

8    A.  There are four.

9    Q.  I gather there were more than four text messages you

10   reviewed.

11   A.  Thousands of text messages, I would estimate.

12   Q.  Okay.  And you -- and you picked out four of them here;

13   correct?

14   A.  Yes.

15   Q.  What's the date of these text messages?

16   A.  Well, at the top of the exhibit is April 1st, 2015, text

17   from Ian Horn to Justin Herman.

18   Q.  What's the next one?

19   A.  April 3rd, 2015, text from Ian Horn to Justin Herman.

20   Q.  And the next one?

21   A.  April 5th, 2015, text from Justin Herman to Ian Horn.

22   Q.  And then what's the next one?

23   A.  April 5th, 2015, text from Ian Horn to Justin Herman.

24   Q.  Does Exhibit 2194a accurately depict the four text

25   communications between Ian Horn and Justin Herman that

 1   occurred between the dates of April 1st, 2015, and April 5,

 2   2015?

 3   A.  Yes.

 4          MR. JUBIN:  I'd move for the admission of IH-2194a.

 5          MR. HEIMANN:  Your Honor, I object as to relevance,

 6   and the second sentence of the second text is hearsay, no

 7   exception.

 8          MR. JUBIN:  Your Honor, it's a document that was

 9   found on -- in the records that the Government located, and

10   certainly there's no -- no -- no reason to believe that this

11   would be anything other than what it is, and the fact that

12   it's found there is important.

13          THE COURT:  It is hearsay.  Sustained.

14   BY MR. JUBIN:

15   Q.  Were the last -- were the last two texts involving simply

16   Easter greetings?

17   A.  It appears to be so based on the date.

18   Q.  Okay.  And what was -- what was the content of the

19   April 1st communication?

20   A.  It says, "Justin, what is going on?"

21   Q.  After these four texts on April 5, 2015, were there any

22   communications between Ian Horn and Justin Herman after that

23   date involving the creation of opinion letters related to

24   NuTech before they were submitted?

25   A.  I did not find any text or emails regarding that.

1   Q.  Do -- those four texts that you've described, do they

2   represent the last communications between Justin Herman and

3   Ian Horn before the May 19, 2015, opinion letter that was

4   posted on OTC Markets?

5   A.  Pertaining to opinion letters, yes.

6   Q.  So no communications following this four-text exchange

7   with some Easter greetings in April, no communications with

8   respect to the creation of NuTech letter between these two?

9   A.  That is correct.

10          MR. JUBIN:  Your Honor, I would renew my motion to

11  admit IH-2194a.  I think it shows the course of what occurred

12  rather than proving anything for the truth of the matter

13  asserted.

14          MR. HEIMANN:  Your Honor, I renew my objection.

15  There's hearsay in that second text.

16          THE COURT:  Sustained.

17          MR. JUBIN:  Well, I think I'm going to get the same

18  objection for the next exhibit as it incorporates this, so let

19  me prepare it without that second text and recall Mr. Miller

20  at another time.

21          At this point I would pass Mr. -- well, I -- I've got

22  one other question.

23  BY MR. JUBIN:

24  Q.  So as I understand your testimony, there's these Easter

25  greetings in April of 2015.

1    A.  Yes.

2    Q.  No communications between these two about opinion

3    letters --

4              MR. FLEENER:  Objection; leading.

5              THE COURT:  Sustained.

6              MR. JUBIN:  Well, I'm just trying to recapitulate

7    what's occurred to ask the next question.

8    BY MR. JUBIN:

9    Q.  You talked about the May 19th opinion letter.  Was there

10   any communication involving opinion letters between

11   Justin Herman and Ian Horn in the creation or leading up to

12   the submission of the May 21 opinion letter that went to

13   OTC Markets?

14   A.  I did not see text or emails to that effect, no.

15   Q.  How about with respect to the June 16, 2015, Pacific Stock

16   Transfer Company opinion letter?

17   A.  I did not see a text or email pertaining to that letter.

18   Q.  How about the July 10th, 2015, opinion letter related to

19   Pacific Stock and NERG?

20   A.  I did not see a text or email communication.

21   Q.  How about the July 17 opinion letter related to Pacific

22   Stock Transfer and NERG?

23   A.  Which year, sir?

24   Q.  2015.

25   A.  No, no email or text communication.

1   Q.  How about July 23rd, 2015, opinion letter for NERG

2   relating to the issuance of free-trading shares of common

3   stock submitted to Pacific Stock Transfer Company?

4   A.  I did not see text or email communication.

5   Q.  So following this Easter greeting on 5 -- on the 5th day

6   of April, there were six submitted opinion letters involving

7   no communication by text or email between Justin Herman and

8   Ian Horn?

9   A.  No.

10  Q.  That's correct?

11  A.  That is correct.

12          MR. HEIMANN:  Good afternoon, Mr. Miller.

13          THE WITNESS:  Good afternoon, sir.

14                       **CROSS-EXAMINATION**

15  **BY MR. HEIMANN:**

16  Q.  You work for Mr. Jubin in this case; right?

17  A.  Yes, sir.

18  Q.  You talked about accessing ianhornlaw@gmail.com?

19  A.  Yes.

20  Q.  When did you access that account?

21  A.  On September 15th of 2021, I believe on September 21st of

22  2021, and I believe September 24th of 2021.

23  Q.  Who gave you access to it?

24  A.  We checked with Mr. Horn first by phone on the first day

25  of September 15th, and he gave us permission to access his

1    email.

2    Q.  Did he give you the password?

3    A.  We had the password that he had provided previously.

4    I confirmed that password and, yes, then we accessed.

5    Q.  You accessed it online?

6    A.  Yes.

7    Q.  You've talked about searching through for various things.

8         As you were looking through ianhornlaw@gmail.com, did

9    you see email messages all the way back to 2014?

10   A.  They went back over a substantial period of time.  There

11   were over 7200 emails, I believe, in his basket.

12   Q.  So a substantial period of time?  They went back past --

13   at least to 2014?

14   A.  I would say so, yes.

15   Q.  You were asked a number of questions about what you didn't

16   find.

17   A.  Yes.

18   Q.  So everybody's clear here, this particular email account,

19   the Government never had access to it; right?

20   A.  Not to my knowledge, sir.

21   Q.  And when it comes to an email that may be in there that

22   may be related to an opinion letter, you decided whether

23   anything you saw was related to any opinion letter; right?

24   A.  That is correct.

25         MR. HEIMANN:  That's all I have, Your Honor.

 1            MR. WARD:  Good afternoon, Mr. Miller.

 2                    **CROSS-EXAMINATION**

 3   **BY MR. WARD**:

 4   Q.  Throughout the exhibits that you've been discussing,

 5   you've been characterizing emails to Louis Weissing as emails

 6   to Ian Horn; correct?

 7   A.  That is correct.

 8   Q.  And, in fact, those emails were to Louis Weissing;

 9   correct?

10   A.  At the Ian Horn Law account, correct.

11   Q.  Right.  At Ian Horn Law, but they weren't to Ian Horn?

12   They were to Louis Weissing?

13   A.  That would be correct, yes.

14   Q.  You were asked a number of times about you not finding

15   evidence of communication between Ian Horn and Justin Herman

16   about the opinion letters.  But you're aware that Ian Horn has

17   said on multiple occasions to the grand jury and to

18   investigators that his computer crashed and he lost

19   information; correct?

20   A.  Yes.

21   Q.  Wouldn't that be a good explanation as to why you didn't

22   find it?

23   A.  It could be.

24   Q.  You first accessed the Gmail account in September of 2021;

25   correct?

1    A.  Yes.

2    Q.  Ian Horn testified to the grand jury in January of 2018;

3    correct?

4    A.  Yes.

5    Q.  So -- and the Government never had access to that Gmail

6    account?

7    A.  Not to my knowledge.

8    Q.  So Ian Horn was the only one with access to that account

9    between January of 2018 and September of 2021?

10   A.  To my knowledge, yes.

11   Q.  And he had access to that account that entire time before

12   you started looking through it?

13   A.  Yes, since he was the account holder.

14        MR. WARD:  Those are all the questions I have,

15   Your Honor.

16        MR. FLEENER:  No questions, Judge.

17        THE COURT:  Thank you.

18        MR. JUBIN:  I just have a couple clarifications here.

19                  **REDIRECT EXAMINATION**

20   **BY MR. JUBIN**:

21   Q.  So what is Ian Horn's email address?

22   A.  Ianhornlaw@gmail.com.

23   Q.  Okay.  And that shows up in various places as either

24   Louis Weissing or Ian Horn?

25   A.  That is correct.

1  Q.  So it's the same email address?

2  A.  Same email address.

3  Q.  Do you know if some other -- other person put -- put

4  Mr. Horn's paralegal as the label for that address and so it's

5  shown up that way on their computer or do you know?

6  A.  I just don't know.

7  Q.  Okay.  Suffice it to say you've seen Ian Horn be the

8  person who is -- or the -- the name associated with the

9  ianhornlaw@gmail.com account?

10 A.  Yes.

11 Q.  When you looked through -- well, let me ask it this way:

12 What is your understanding of how -- what documents you were

13 getting from the Government's forensic download of

14 Justin Herman's computer and -- and electronics?

15      I mean, how does that happen?  What's your

16 understanding?

17 A.  Based on the agent's testimony and the Government report

18 that I reviewed --

19      MR. HEIMANN:  Your Honor, lack of personal knowledge.

20      THE COURT:  Sustained.

21 BY MR. JUBIN:

22 Q.  Did you have an opportunity to cross-check between the

23 Government's exhibits and the -- or the Government's

24 information that came from Herman's electronics and the Gmail

25 account to see that, "Hey, those things are -- are the same

19-CR-26-ABJ          MILLER - REDIRECT - JUBIN          Vol. XI-1968
21-CR-14-ABJ

1   documents" at times?

2   A.  At times, yes.

3   Q.  Of course, you didn't check every single one; right?

4   A.  Of course not.

5   Q.  Was your review for these documents involving text and

6   email communications between Justin Herman and Ian Horn

7   limited to Ian Horn's Gmail account, or did you also do your

8   searches through what the Government had provided from the

9   forensic downloads of Justin Herman's computers and

10  electronics?

11  A.  I also reviewed the Government discovery provided to your

12  office.

13  Q.  And that included the Justin Herman electronics?

14  A.  Yes.

15  Q.  And records from various Internet service providers?

16  A.  That also.

17  Q.  And those are some of the documents that you testified

18  about as we introduced them here today?

19  A.  It is.

20  Q.  Do you have any reason to believe that there are any

21  documents that exist on -- or that existed on Ian Horn's Gmail

22  that are different -- in his communications with

23  Justin Herman -- that are different from those that you looked

24  at from the Government?

25  A.  I don't see any major differences that I can -- that I can

 1    determine.

 2    Q.  When you say "major differences," are there -- are there

 3    differences?

 4    A.  No.  I just meant that, basically, what I could tell,

 5    I didn't see any differences.

 6            MR. JUBIN:  Okay.  Nothing further.

 7            MR. HEIMANN:  No recross.

 8            THE COURT:  Mr. Miller, you may step down.

 9            MR. JUBIN:  Your Honor, I believe our next witness

10    will be at 4:00 p.m. by Zoom.

11            THE COURT:  Very well.  While you're setting that up,

12    there's no need for the jury to be sitting -- seated here.

13    Maybe they'd like to step out in front and get a breath of

14    fresh air or something.

15            If you'll all be back by four o'clock, we'll get

16    started again.

17            THE COURTROOM DEPUTY:  All rise.

18        (Proceedings outside the jury's presence at 3:40 p.m.)

19            MR. HEIMANN:  Your Honor, may we be excused until

20    4:00?

21            THE COURT:  Yes, sir.

22            MR. HEIMANN:  Thank you, Your Honor.

23        (A recess was taken from 3:41 p.m. to 4:06 p.m.

24    Proceedings within the jury's presence.)

25            THE COURT:  The jury is now present.

1           Please be seated, ladies and gentlemen.

2           Mr. Jubin, you may call the -- Defendant Horn's next

3    witness.

4           MR. JUBIN:  Thank you, Your Honor.

5           Ian Horn calls Al Burnett.

6           THE COURTROOM DEPUTY:  Please raise your right hand.

7      (Witness sworn.)

8           **ALSTON LEE BURNETT, DEFENDANT HORN'S WITNESS,**

9                        **DIRECT EXAMINATION**

10   BY MR. JUBIN:

11   Q.  Could you state and spell your name for the record,

12   please.

13   A.  My full name is A-l-s-t-o-n L-e-e B-u-r-n-e-t-t, Alston

14   Lee Burnett, and I go by Al Burnett.

15   Q.  Mr. Burnett, how old are you?

16   A.  You asked me the hard question right off the bat.

17           Let's see.

18           I was born in '63.  I guess I'm 58.

19   Q.  Okay.

20   A.  Yeah, 58.

21   Q.  What's your education level?

22   A.  Second year -- two years college, no -- no degree.

23   Q.  Okay.  And where do you live?

24   A.  Wimauma, Florida.

25   Q.  Can you spell that, please?

1   A.   W-i-m, as in "Mary," -a-u-m, as in "Mary," -a.

2   Q.   And what do you do for a living?

3   A.   We own a water treatment company.

4   Q.   And what does that entail?

5   A.   We do such things as -- small things such as residential

6   water softeners and filters and that sort of thing.  We also

7   do commercial, industrial of the same.  And then we also do

8   like large water tanks and that sort of thing for either fire

9   or water storage.

10  Q.   Who's "we"?

11  A.   My company, which is -- my wife and I are the partners in

12  our company.

13  Q.   Okay.  Are you familiar with Ian Horn?

14  A.   Yes, I am.

15  Q.   How far away from him do you live?

16  A.   Approximately 30 minutes.

17  Q.   A 30-minute drive?

18  A.   Yes, sir.

19  Q.   How did you become acquainted with Ian Horn?

20  A.   Became acquainted with Ian Horn back in the early '90s.

21  My wife and I were in the Amway business.  We had -- were

22  building with a large number of distributors in our downline

23  structure, and Ian was in that downline structure.  I met he

24  and his wife, Ian and Marlene, early '90s.  I can't say

25  the year for sure.

1   Q.   Okay.  Did you have an opportunity to get to know him and

2   spend time with him at that point?

3   A.   Yes, and increasingly more over the years.  We sort of hit

4   it off early on in the Amway business and got to know each

5   other pretty quickly because, at that point, we were close to

6   each other in terms of proximity.  We were only maybe 15 -- we

7   lived about 15 minutes from them.

8           And so we would frequently ride to meetings together,

9   to larger conventions, seminars, that sort of thing, seminars

10  being locally, within the state of Florida, conventions being,

11  you know, mostly southern, certainly eastern half of the

12  United States.  So we'd -- we'd spend a lot of time with them

13  riding together that way and got to know them more and more

14  that way.

15  Q.   Did you also go to conventions that required air travel

16  together?

17  A.   Yes, we did.

18  Q.   Okay.

19  A.   Such places as Washington, DC, and places -- you know,

20  several places that we flew together with.

21  Q.   And did your wife become friends with his wife in part,

22  too?

23  A.   Yes, absolutely.  Yeah.  And have remained friends for

24  whatever that is, almost -- nearly 30 years now.

25  Q.   In the course of that 30-year friendship, knowing each

1    other, have you had occasion to observe any idiosyncrasies

2    about Ian Horn?

3    A.  Yes, for certain.  Ian is -- Ian is a different character

4    for sure.

5          He is -- he's somebody that loves life.  He's a --

6    he's always a real upbeat, happy, positive person.  He -- you

7    know, greets a good number of the people that he meets with a

8    bear hug.  It's -- would be very uncommon for him to not

9    strike up a conversation with a total stranger, whether we're

10   at a restaurant or wherever we're at.  He's always, you know,

11   just very friendly to everybody he talks to, but that's part

12   of his character, as you know.  But he's just -- he's a very,

13   very different person than anybody I've ever known.

14   Q.  Have you ever noticed anything about his ability to pay

15   attention?

16   A.  Yeah.  Ian -- Ian can be easily distracted.

17          For instance, when we would ride to conventions, we

18   had a long Yukon, which is like a Suburban.  It's got three

19   rows of seats.  And I would be the one driving, and then Ian

20   would be in the passenger seat.  And then -- you know, it's

21   hard for me to even hear the third row, but he would be

22   talking to me and then all of a sudden chime in on the

23   conversation in the third row, that sort of thing.

24          He'd just -- you know, and then you wonder, "Well,

25   how much was he really listening to what I was saying?" when

 1   he's chiming in on the third row and then he's chiming in on

 2   the second row.

 3           Or you could be at a big round table at a convention

 4   with 10 people at the dinner table, and I'm really focused on

 5   what we're talking about, but he hears the conversation clear

 6   across the table and, you know, just blurts out something to

 7   the people across the table.  It's very, very unusual that way

 8   for him to be able to, you know, be at least listening on

 9   those conversations.  And then you wonder how involved he is

10   on any one given conversation.

11   Q.  Did you come up with a nickname for him?

12   A.  We have -- we have more than one.  So our nickname over

13   the years was "Tigger" because he was very, very bouncy,

14   energetic.  When you were -- like I said, when you meet him,

15   when you're talking to him, when you're around him, when

16   you're first greeting him, just always very energetic.  And,

17   you know, we had named him Tigger, nicknamed him Tigger

18   because of that.

19           But he was -- but like I said, you know, just like

20   Tigger -- Tigger was the kind of character that would easily

21   become involved in something else going on around him.  So,

22   you know, it was -- if Tigger was -- that's the nickname that

23   we had for Ian.

24   Q.  Did there come a time when his personality changed from

25   that?

1   A.   Yeah.  So I -- it was probably a couple years into the

2   Amway business, I want to say maybe -- you know -- maybe '95,

3   '94.  I don't -- I don't know the year exactly.

4          But we were at a big convention, and, you know, Ian,

5   being the type of personality he is, he was always meeting and

6   greeting everybody.  There might be 2- or 300 people there,

7   and by the end of the week he's probably met, you know,

8   70 percent of them.  And -- or a lot of them we would see

9   again over and over.

10          And so his personality was -- normally, he would be

11   very upbeat, greeting everybody, giving gigantic bear hugs,

12   which people didn't know how to receive that sometimes.

13          But the -- there was -- in the mid-'90s there was a

14   time when he -- everybody came up to me and they were asking

15   me, "What's wrong with Ian?  Is there something wrong?"

16   Because they were -- they were concerned about him, that he

17   was extremely depressed.  And he was there by himself that

18   weekend; he wasn't with Marlene.  They would often come

19   together.  But everybody would come up to -- they were coming

20   to me and asking, "Hey, is he okay?"

21          You know, because they would just -- he turned

22   literally from -- to use the characters again -- from Tigger

23   to Eeyore and just was not really greeting anybody, was -- or

24   if he did, it was kind of "Hey," you know, that sort of thing

25   instead of "Hey," you know.  That's kind of the way Ian always

19-CR-26-ABJ          BURNETT - DIRECT - JUBIN          Vol. XI-1976
21-CR-14-ABJ

1   was, just bright when you met him.

2          And, you know, so he was -- that particular weekend

3   was very -- just seemed really depressed and -- just

4   completely down.

5   Q.  Did you come to understand why that was?

6   A.  Well, eventually I -- I asked him.  I said, "Ian" --

7   I said, you know, "Everybody's asking what's going on," you

8   know.  "Are you upset about something or" -- I said -- you

9   know, because he and I had that kind of relationship.  I could

10  ask him -- I could say -- you know, and we did not ride

11  together at that particular convention, so I, you know, hadn't

12  noticed anything until I got to convention and saw him.  And

13  I said, "We're just concerned about you, that there's

14  something wrong, you know, you're either depressed or

15  something."

16         And so he assured me that that wasn't the case, but

17  he said, you know, he had some new medicines that he

18  was taking and it kind of --

19         MR. WARD:  Objection; hearsay.

20         THE COURT:  Sustained.

21  A.  (Continuing.)  -- made him --

22         MR. JUBIN:  Hang on a second.

23         They -- there was an objection, and if there's an

24  objection in the course of these proceedings, we're required

25  to stop.  I know you probably couldn't hear it.  And so --

 1          THE WITNESS:  I -- yeah.  Excuse me.  I didn't --

 2   I didn't -- I didn't hear "Objection."

 3          MR. JUBIN:  Sure, sure.

 4          THE WITNESS:  I heard something.

 5          MR. JUBIN:  Of course.

 6   BY MR. JUBIN:

 7   Q.  So the Judge has sustained the objection, which means you

 8   cannot continue to answer that question.  Okay?

 9   A.  Okay.

10   Q.  Rather than telling us what Ian told you, did you come to

11   an understanding as to what was causing -- in your own mind --

12   as to what was causing the issue?

13          MR. WARD:  Same objection.

14          THE COURT:  Sustained.

15   BY MR. JUBIN:

16   Q.  Did there come a period of time when Ian was no longer

17   Eeyore?

18   A.  Yeah.

19          So I want to say maybe a couple of months went by,

20   and then I saw him again and he was back to himself, more

21   energetic and -- and, you know, back to the way he always --

22   the way we always had known him.

23   Q.  Uh-huh.

24   A.  Probably about two -- maybe a couple of months.  I don't

25   know.  It's been a long time now so --

1  Q.  Sure.

2        In your contacts with Ian, have you had an occasion

3  to observe whether or not he has the ability to pay attention

4  to details?

5  A.  Yes.

6        So Ian is kind of a big picture-type person where,

7  you know, he will see the overall concept.  But like -- just

8  like in the Amway business, his wife would take care of all

9  the smaller details because that was not as important to him

10  as the bigger picture.

11  Q.  Did you observe any issues with his ability to absorb

12  detail?

13  A.  To absorb detail?

14        So the -- he would -- so he would get distracted by

15  different aspects, and he would kind of tend to focus on one

16  peculiarity, I'll call it.  You know, for instance, in the

17  Amway business, the price of the products.  He would always

18  focus on the price of the products being expensive, rather

19  than the fact of how much money that a person would make back

20  on -- you know, in rebates and so forth.

21        He would always focus on the price of the products,

22  which was a real peculiarity because he was a big picture kind

23  of guy; he could see that there were a lot of people doing

24  well with the Amway business at that point in time.

25        So -- so, yeah, his -- but as far -- in terms of

 1   breaking down details of how the plan worked and all that

 2   stuff, you know, all the -- all the breakdowns of the -- the

 3   numbers and the -- the -- the bonus structure and all that

 4   sort of thing wasn't really his thing.

 5          I'm not saying that he didn't have the ability to --

 6   to -- to understand it, but it just didn't seem that important

 7   to him to understand that detail.

 8   Q.  What about Ian's ability to start and finish?

 9   A.  So Ian is a great starter.  He's, you know, that person

10   that -- you know, "That's a great idea, let's do that."  And,

11   you know, I'll -- and then not follow through.

12          So I'll give you an example of that.  We had seen --

13   you guys remember the shows that were on television for a

14   while, Storage Wars and all that kind of thing where they

15   would, you know, buy these storage units from -- at auctions

16   and then they would sell the stuff to make money?

17          And so Ian and I had talked about, "Well, that would

18   kind of be interesting" and so forth.  And I said, "But that's

19   a lot of work, and I don't really have time; I'm running a

20   business."

21          So Ian called me.  He was in Brandon, which is half

22   an hour from me.  It's up near where he lives.  He calls me

23   at -- I don't know -- five o'clock, six o'clock in the

24   afternoon and says, "I just bought a storage locker."  He

25   says, "I need you to come give me a hand."

1          I said, "How big is it?"  You know, and we had never

2     bought one before.  Okay?

3          So I take my big trailer up there, and we load up my

4     big trailer to get everything out of the locker, and it

5     stayed -- the stuff stayed in that big trailer for -- I want

6     to say -- two years, maybe.  And now it's in my storage shed,

7     which is probably -- you know, the stuff is probably no good

8     anymore.

9          But it was kind of -- after we got the stuff, we

10    tried to start a -- sort of start cataloging it, and it became

11    work at that point so -- it was only, you know, a hundred-and-

12    some dollars for the locker to start with, so it became kind

13    of a -- you know -- a nonpriority, I guess you'll say.

14         So he didn't follow through, and it's still sitting

15    in my shed.  I guess I'll have to pay to remove it because

16    it's probably no good anymore.  A lot of it was electronic

17    stuff.

18    Q.  You talked a little bit about distractibility.

19         Did -- did you discuss that with your wife or with

20    others at times?  And tell the jury about that.

21    A.  Yeah.

22         So -- so you could be in a -- a group setting and --

23    and be discussing something or laughing or whatever, talking

24    about something, and all of a sudden Ian would see

25    something -- for instance, a dog could walk by.  Ian loves

1   dogs.

2         He could walk by -- a dog would walk by and here you

3   are talking to each other about all these different things,

4   and Ian would go -- either just walk off and go see the person

5   that's walking the dog or say, "Oh, you know, look at that

6   dog; that's a unique color" or something like that.  And, you

7   know -- or just look at -- you'd go "Squirrel."

8         Now, what that means is -- there was this little

9   cartoon show.  And I can't tell you -- it was a little movie.

10  But in this little movie there's this great little loyal dog

11  that loves his master, loves his friends.  And then all of a

12  sudden, if a squirrel would walk by, this dog would have to

13  chase the squirrel.  It was in his makeup that he had to chase

14  that squirrel.  So -- and he would -- he would yell

15  "Squirrel," and he'd go chase the squirrel.

16        And that's kind of what Ian, you know, a lot of times

17  will do, so we kind of have that just as a joke.  We'll be

18  somewhere, we'll -- you know, something will happen like that.

19  You just look at each other and you go "Squirrel" and you just

20  laugh.

21        MR. JUBIN:  I don't have any further questions at

22  this time.  Thank you.

23        Others will be able to ask you questions, so please

24  respond honestly to their questions.

25        Thank you, Mr. Burnett.

1           THE WITNESS:  Yes, sir.

2           MR. HEIMANN:  I have no questions, Your Honor.

3           MR. FLEENER:  No, sir.

4           MR. WARD:  No questions.

5           THE COURT:  Thank you, Mr. Burnett, for being present

6    by video today.

7           You are excused and may check out.

8           THE WITNESS:  Thank you, sir.

9           MR. JUBIN:  Your Honor, I think we're finished with

10   witnesses today.

11          MR. FLEENER:  That's true.

12          THE COURT:  We'll be ready to proceed at 8:30

13   tomorrow morning?

14          MR. FLEENER:  Yes, sir.

15          MR. JUBIN:  Yes, sir.

16          THE COURT:  Very well.

17          Ladies and gentlemen, tomorrow I think you're going

18   to be hearing quite a bit of testimony, and we'll start at

19   8:30.

20          Remember the -- before you leave, remember the

21   admonition.  I hope that you're all taking good care of

22   yourselves, driving carefully, getting some rest, wearing your

23   mask when you are in crowds.

24          Actually, Laramie County is doing a little better

25   than the rest of Wyoming.  The report I had today is that

19-CR-26-ABJ                                                    Vol. XI-1983
21-CR-14-ABJ

1   Campbell County is -- is really in bad shape with this COVID,

2   and a couple of other places in Wyoming are not doing too

3   well, but the numbers are a little bit down in Laramie County.

4           So be careful in how you conduct yourselves, eat

5   well, take care of your health.  You are just absolutely vital

6   to what is going on.  I am almost certain that this case will

7   be submitted to you for your decision on schedule this week

8   and -- so don't worry.  Let the attorneys do the worrying

9   about this matter.

10          With that, we'll stand in recess until 8:30 tomorrow

11  morning.

12          THE COURTROOM DEPUTY:  All rise.

13      (Proceedings outside the jury's presence at 4:28 p.m.)

14          THE COURT:  Mr. Herman, how are you doing?

15          DEFENDANT HERMAN:  I'm okay.

16          THE COURT:  Well, everybody -- everybody here should

17  take care of themselves, especially when they're in crowds.

18  And for those who are staying in motels, kind of watch where

19  you are and what's going on around you.

20          Counsel, police your own witnesses and -- and your

21  parties to this litigation so that nothing happens that might

22  cause a problem with our jurors.

23          I've dumped a bunch of instructions on Ziggy.

24  Hopefully, he'll wave his magic wand over them and make them

25  better, and we'll try to get them off to you either tonight or

1    first thing tomorrow morning.

2            MR. HEIMANN:  Your Honor, the Government will be

3    sending via email a proposed instruction regarding the

4    dismissed count.  We'll copy defense counsel on that.

5            And then one other thing that Mr. Szott wants to

6    raise with the Court.

7            THE COURT:  Thank you.  Thank you, Mr. Heimann.

8            MR. SZOTT:  Actually, Your Honor, two things:  The

9    first is just if it would be possible for us to get the draft

10   instructions in Word format or Word and PDF -- but if we get

11   them in Word format, that would at least assist me with my

12   review, so that I would request, if we could get them in Word

13   format.

14           THE COURT:  Any problem with that?

15           MR. FLEENER:  No objection.

16           MR. JUBIN:  That would be great.

17           MR. FLEENER:  I join.

18           MR. SZOTT:  And then, Your Honor, I did want to give

19   notice to the Court that tomorrow the United States may move

20   to compel, if necessary, Mr. Horn to provide signature

21   exemplars, which I believe will be relevant in this case.

22           As authority, I would cite the Court to the case of

23   *United States versus Blakney* -- that's 581 F.2d at 1389 -- in

24   which the Tenth Circuit notes the Supreme Court has expressly

25   held that requiring an accused to give handwriting exemplars

1    does not violate his Fifth Amendment privilege against

2    self-incrimination.  And then, continuing, "It seems accepted

3    that the accused can be required even to duplicate the

4    language of the writings used in the offense."

5            So like -- we may ask Mr. Horn to provide signature

6    exemplars tomorrow, Your Honor.  I wanted to give notice of

7    that.  I've spoken to Mr. Jubin about it, but there is Tenth

8    Circuit authority for that, so I wanted to raise that issue

9    this evening, Your Honor.

10           MR. JUBIN:  Your Honor, certainly, the *Blakney* case

11   sounds like it follows the *Schmerber* line of cases, which says

12   this is nontestimonial, which the Government can certainly

13   request or require handwriting exemplars.

14           However, we are now just a few hours away from the

15   testimony of Mr. Horn's handwriting expert.  I don't know that

16   the Government has a handwriting expert.  I don't want some

17   charade in front of the jury if they have some ability to

18   obtain his handwriting sample and provide it to their expert,

19   who would presumably be required to do the typical forensic

20   examination with lights and lasers and all -- all the, you

21   know, tools of the trade.  That's one thing.  But if we're

22   doing something just for show in front of the jury, I would

23   object.

24           MR. SZOTT:  Your Honor, there should be no need for

25   the Government to have an expert do any comparison.  The -- it

19-CR-26-ABJ                                              Vol. XI-1986
21-CR-14-ABJ

1    will be -- signatures on the exhibits will be testified to

2    presumably by Mr. Horn's expert, and, obviously, if Mr. Horn's

3    providing the exemplar, there's going to be no question as to

4    the authenticity and -- and source of those signatures.

5                 THE COURT:  I would think so.

6                 MR. JUBIN:  Typically these are done in -- in a

7    forensic format where there's -- I mean, if somebody's taking

8    exemplars, they go through an entire alphabet, phrases,

9    numbers, all kinds of things.  I don't really know what the

10   Government's getting at here, but I don't want this to be some

11   charade in front of the jury.

12                If they want an exemplar, provide the form upon which

13   the exemplar would be required, give the Court some basis for

14   its need for it, and explain what's going on and the Court

15   could certainly order Mr. Horn to provide it in advance, as --

16   as may be required.

17                That's my thought.  I would object to doing anything

18   other than that.

19                THE COURT:  Well, I think whatever happens concerning

20   exemplars should happen outside the presence of the jury in

21   this matter initially, and then, once the parties are

22   satisfied they have the exemplars, nobody's going to be

23   arguing that they are not his signatures.

24                MR. JUBIN:  Right.

25                THE COURT:  With that understanding, I suspect they

1   can be presented to the -- your expert, Mr. Jubin, and he can

2   testify whether they're genuine or not.

3            Is that what you're kind of thinking about,

4   Mr. Szott?

5            MR. SZOTT:  Potentially, yes, Mr. -- potentially,

6   yes, Your Honor, or simply having them available for the jury

7   to see.

8            THE COURT:  I don't -- at this point I can't see a

9   problem, but there may be a more specific problem develop with

10  the use of them.

11           MR. JUBIN:  Your Honor, I don't think there is any

12  disagreement that the signature that appears on all these

13  opinion letters at issue is an Ian Horn signature.  The

14  question really is did he put it there.  And so I don't know

15  what use an exemplar could possibly be under those

16  circumstances.

17           But if the Court orders it, he'll provide it.  I just

18  don't want it to be some -- something that occurs in front of

19  the jury.  And -- and is -- and I think the Court has

20  appropriately taken a stand that that should not happen in the

21  presence of the jury.

22           THE COURT:  I agree.

23           What else?

24           MR. HEIMANN:  Nothing else from the Government, Your

25  Honor.

19-CR-26-ABJ                                          Vol. XI-1988
21-CR-14-ABJ

1              THE COURT:  Mr. Jubin?

2              MR. JUBIN:  Nothing further.  Thank you, Your Honor.

3              THE COURT:  Who's going to be first up tomorrow?

4              MR. FLEENER:  He's bossed me around all day.

5         I would ask that Mr. Jubin put his expert on and

6    we'll follow with ours.

7              THE COURT:  Okay.  Hopefully, you will not disappear

8    again --

9              MR. FLEENER:  I -- well, I didn't want to do it

10   today.  It was actually kind of nice.  I'll be ready to go

11   tomorrow after Mr. Jubin's expert.

12             MR. JUBIN:  We managed to use the day pretty well

13   today, so I -- I don't anticipate any witnesses other than

14   Mr. Fenoff and potentially Mr. Horn.

15        I'm wondering what Mr. Fleener's plans are.  One more

16   witness?  Two more witnesses?

17             MR. FLEENER:  We have a securities guy and then, if

18   the defendants testify, the defendants would testify.  We have

19   another witness that we would present if Mr. Horn decides to

20   testify.  But that is our plan.

21        So I guess -- I mean, I -- I would imagine the

22   answer's two witnesses to testify, both experts, and nobody

23   else, but I guess we'll find out.

24             THE COURT:  Very well.

25        Well, we'll all be surprised tomorrow as we learn

1    about this.  So get your rest and we'll see you then.

2              MR. FLEENER:  Oh, yes.  It will be exciting.

3              MR. JUBIN:  Thank you, Judge.

4              THE COURT:  Oh, one other thing.

5              THE COURT REPORTER:  On the record, Judge?

6              THE COURT:  Yes, this has to be on the record.

7              I was questioned today by Ziggy about a question that

8    Becky had concerning the blue sheets and the blue sheets that

9    are contained on a disk.

10             Was it the intention that that exhibit go to the

11   jury?  Were you thinking that we should open court if they

12   wanted to see the blue sheets?  Or should we furnish a clean

13   machine for viewing the blue sheets on the -- in -- in the

14   jury room?

15             My suggestion is a -- a clean desk- -- you know --

16   desktop computer or something of that nature --

17             MR. FLEENER:  I concur with that.

18             THE COURT:  -- or laptop.

19             MR. JUBIN:  With its Internet capabilities disabled.

20             THE COURT:  Yes.

21             MR. JUBIN:  I concur.

22             THE COURT:  You know, we send up those machines to

23   the -- to the detention facility all the time.  I'm sure that

24   our IT people can figure that out.

25             MR. SZOTT:  And it would need to have Excel, Your

1    Honor, Microsoft Excel.

2            THE COURT:  All right.  Thank you.

3        (Proceedings concluded 4:39 p.m., October 5, 2021.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         C E R T I F I C A T E

2

3

4

5              I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6     Reporter for the United States District Court for the District

7     of Wyoming, a Registered Diplomate Reporter, Certified

8     Realtime Reporter, and Certified Realtime Captioner, do hereby

9     certify that I reported by machine shorthand the foregoing

10    proceedings contained herein on the aforementioned subject on

11    the date herein set forth, and that the foregoing pages

12    constitute a full, true and correct transcript.

13

14             Dated this 14th day of January, 2022.

15

16

17

18             /s/ Melanie Humphrey-Sonntag

19             _____

20                  MELANIE HUMPHREY-SONNTAG
                         RDR, CRR, CRC
21               Federal Official Court Reporter

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3    _____

4

UNITED STATES OF AMERICA,        DOCKET NO. 19-CR-026-ABJ

5                                 DOCKET NO. 21-CR-014-ABJ

          Plaintiff,

6                                 VOLUME XII of XIV

          vs.                     (Pages 1991 through 2183)

7

JUSTIN HERMAN, CHARLES W.         Cheyenne, Wyoming

8    WINTERS, JR., a/k/a Chuck     Wednesday,

Winters, and IAN HORN,           October 6, 2021

9                                 8:34 a.m.

          Defendants.

10

11   _____

12

13              TRANSCRIPT OF TRIAL PROCEEDINGS

14

15        BEFORE THE HONORABLE ALAN B. JOHNSON
             UNITED STATES DISTRICT JUDGE
16        and a jury of twelve and three alternates

17

18

19

20

21

22       *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*
              *Federal Official Court Reporter*
23    *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
          *630.452.6236 * MelanieSonntagCRR@gmail.com*

24

     *Proceedings reported with digital stenography; transcript*
25         *produced with computer-aided transcription.*

2042 of 2494

Vol. XII-1992

```
 1   APPEARANCES:
     For the Plaintiff:        ERIC J. HEIMANN
 2                             THOMAS A. SZOTT
                               ASSISTANT UNITED STATES ATTORNEYS
 3                             DISTRICT OF WYOMING
                               2120 Capitol Avenue, Fourth Floor
 4                             Cheyenne, WY 82001

 5   For the Defendant        THOMAS A. FLEENER
     Herman:                   FLEENER LAW
 6                             506 South Eighth Street
                               Laramie, WY 82073
 7
     For the Defendant        ZENITH S. WARD
 8   Winters:                  BUCHHAMER & WARD
                               1821 Logan Avenue
 9                             Cheyenne, WY 82001

10   For the Defendant        THOMAS B. JUBIN
     Horn:                     JUBIN & ZERGA
11                             2614 Pioneer Avenue
                               Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2       GOVERNMENT WITNESSES:
                                                  PAGE
3         ROY FENOFF
          Direct Examination by Mr. Jubin          1999
4         Cross-Examination by Mr. Szott           2029
          Cross-Examination by Mr. Fleener         2048
5         Redirect Examination by Mr. Jubin        2051
          Recross-Examination by Mr. Szott         2052
6         Further Redirect Examination by Mr. Jubin  2056

7         JEFFREY LAYNE GOTTFREDSON
          Direct Examination by Mr. Fleener        2060
8         Voir Dire Examination by Mr. Szott       2069
          Direct (Continued) by Mr. Fleener        2076
9         Cross-Examination by Mr. Szott           2128
          Cross-Examination by Mr. Ward            2154
10        Redirect Examination by Mr. Fleener      2163
          Recross-Examination by Mr. Szott         2166
11        Further Redirect Examination by Mr. Fleener  2167

12        STEPHEN JOSEPH MILLER
          Further Direct Examination by Mr. Jubin  2169
13
          SONIA HACKER
14        Further Direct Examination by Mr. Ward   2173

15
                         E X H I B I T S
16                              IDENTIFIED  RECEIVED
          GOVERNMENT'S EXHIBITS
17            700    Horn Exemplar            1997      2047
              701    Horn Exemplar            1997      --
18
          DEFENDANT WINTERS' EXHIBITS
19            CW-P.3 Email Chain             2174      2176
              CW-P.4 Email Chain             2177      2177
20

21

22

23

24

25

Vol. XII-1994

1           E X H I B I T S   C O N T I N U E D
                                 IDENTIFIED   RECEIVED
2       DEFENDANT HORN'S EXHIBITS
          IH-Q1   Opinion Letter Signature        --        2026
3                 Page
          IH-Q1a  Attorney Opinion Letter         --        2026
4         IH-Q2   Opinion Letter Signature        --        2026
                  Page
5         IH-Q2a  Attorney Opinion Letter         --        2026
          IH-Q4   Opinion Letter Signature        --        2026
6                 Page
          IH-Q4a  Attorney Opinion Letter         --        2026
7         IH-Q12  Attorney Opinion Letter         --        2026
          IH-Q17  Horn Letter                     --        2026
8         IH-Q19  Horn Letter                     --        2026
          IH-Q24a Horn Letter                     --        2026
9         IH-Q24b Horn Letter                     --        2026
          IH-Q24c Horn Letter                     --        2026
10        IH-RF1  Fenoff Signature Comparisons   2014       2015
          IH-1015 Email Abstract                 2169       2171
11       IH-5000-I Grand Jury Transcript         2108        --

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19-CR-26-ABJ                                              Vol. XII-1995
21-CR-14-ABJ

1          (Proceedings commenced 8:34 a.m., October 6, 2021,

2    in the presence of all defendants, outside the jury's

3    presence.)

4               THE COURT:  Thank you, everyone.  Please be seated.

5               How are we doing this morning?

6               DEFENDANT HERMAN:  Well.

7               MR. SZOTT:  Just fine, Your Honor.

8               THE COURT:  Okay.  Have we got our witnesses ready to

9    roll?

10              MR. FLEENER:  Yes, sir.

11              THE COURT:  Okay.  Great.

12              MR. SZOTT:  Your Honor, before we bring in -- before

13   we call any witnesses, I think this would be an appropriate

14   time for the Court to require Mr. Horn to provide those

15   handwriting exemplars that I mentioned yesterday.

16              I provided Mr. Jubin with two separate pieces of

17   paper that the Government would ask the Court to require

18   Mr. Horn to sign.  I can provide copies of those to the Court

19   for your review, as well, Your Honor.

20              One of them replicates the signature or the closing

21   section of the opinion letter that's 22.5 without the

22   signature, and then the other is simply a blank line.

23              With your permission, Your Honor, I'll provide these

24   to Ms. Harris for the Court to review.

25              THE COURT:  Please do.

 1          MR. SZOTT:  And so what the Government would request,

 2   Your Honor, is that Mr. Horn be required to sign on the line;

 3   and then on the one where it says -- the one that's taken from

 4   Exhibit 22.5 where it says "Very truly yours, Ian Horn,

 5   Esquire," that he sign in the midst of that, as it's -- as we

 6   saw on some of these opinion letters.

 7          THE COURT:  All right.

 8          MR. JUBIN:  So --

 9          THE COURT:  I think there will be an issue as to

10   whether or not this -- this was shrunken up in some way.

11          MR. SZOTT:  I -- I -- I agree, Your Honor.  I think

12   that's -- that's certainly pertinent.

13          THE COURT:  Yeah.

14          MR. JUBIN:  I -- it seems superfluous to me.

15          Do you want him to sign right across the "very truly

16   yours," including over his -- the "Ian Horn, Esquire"?  Or do

17   you want him to sign above it or below it?  Or just pick a

18   place?

19          THE COURT:  No, right in between the two lines --

20          MR. JUBIN:  Okay.

21          THE COURT:  -- to the best he can now.

22          MR. JUBIN:  Are you asking him to artificially shrink

23   his signature to go below -- or -- below the top line of text

24   and above the bottom line of text?  Or are you asking him to

25   just simply sign over that?

 1          MR. SZOTT:  I'm asking him to provide a

 2  representative example of his signature as it would appear

 3  between those two lines.  I'm not asking him to modify it in

 4  any way.

 5          MR. JUBIN:  All right.  I think by -- by asking him

 6  to put it between those two lines you are asking him to modify

 7  it.

 8          MR. SZOTT:  Well, Your Honor, the evidence is that he

 9  saw that and said, "That is definitely my signature.  The pen

10  never leaves the paper."  I mean, those were his words.

11          MR. JUBIN:  Sure.

12          MR. SZOTT:  And I'm not -- I'm not trying to

13  mischaracterize.  There was a whole -- there was a whole

14  exhibit -- or there was a whole section of his interview where

15  Inspector Hacker was asking him about the signature being --

16          THE COURT:  Well, all he can do is his best.

17          MR. JUBIN:  I -- I don't think there's any dispute

18  it's his signature so --

19          THE COURT:  It's so ordered.

20          MR. SZOTT:  What I propose, Your Honor, is to mark

21  these as Government's Exhibits 700 and 701.

22          I thought that perhaps if -- if we're worried about

23  authentication, that Mr. Jubin and I could potentially initial

24  the lower right or I could, put the exhibit sticker over that.

25          Ms. Aranda from my office is here, will take these

 1   upstairs to be scanned so that they can be presented

 2   digitally, also copied so that defense counsel has their own

 3   copies.

 4         That's what I propose as an approach for dealing with

 5   these exemplars, Your Honor.

 6         MR. JUBIN:  I object to their use.  I think it's

 7   completely irrelevant.

 8         But if -- procedurally, if you want to have them

 9   scanned and get it digitized, I -- I don't have a problem with

10   that.

11         Your Honor, at some point, also, I think we'll need

12   to -- I didn't yet move for the admission of a number of the

13   conditionally admitted Q exhibits that were admitted for the

14   purposes of the handwriting expert, and so I'll -- I don't

15   know if you want me to do that before the handwriting expert

16   testifies or during his testimony or how you want to work

17   that.

18         THE COURT:  I think we've got to hear his testimony,

19   and -- and then you can make the motion.

20         MR. JUBIN:  Okay.

21      (Discussion held between counsel.)

22         THE COURT:  Are we ready for the jury?

23         MR. JUBIN:  I believe so.

24         MR. HEIMANN:  Yes, Your Honor.  Thank you.

25         THE COURT:  All right.

 1          (Proceedings within the jury's presence at 8:42 a.m.)

 2              THE COURT:  Good morning, ladies and gentlemen.

 3    Another day in the Federal Court.  Welcome.

 4              JURY MEMBERS:  Good morning.

 5              THE COURT:  Please be seated.

 6              Mr. Jubin.

 7              MR. JUBIN:  Thank you, Your Honor.

 8              Good morning, ladies and gentlemen.

 9              JURY MEMBERS:  Good morning.

10              MR. JUBIN:  Ian Horn calls Dr. Roy Fenoff.

11          (Witness sworn.)

12              THE COURTROOM DEPUTY:  Please take a seat.

13              Please state and spell your name for the record.

14              THE WITNESS:  Roy Fenoff, R-o-y F-e-n-o-f-f.

15              MR. JUBIN:  Good morning, Dr. Fenoff.

16        **ROY FENOFF, DEFENDANT HORN'S WITNESS, DIRECT EXAMINATION**

17    **BY MR. JUBIN:**

18    Q.  Where do you live?

19    A.  I live part year here in Laramie, Wyoming, and part year

20    in Charleston, South Carolina.

21    Q.  How old are you?

22    A.  I'm 45.

23    Q.  Can you tell the jury a little bit about your educational

24    background?

25    A.  Yes.

1           I have two bachelor's degrees from the University of

2  Georgia, one in entomology, one in criminal justice.  I have a

3  master's degree from the University of Wyoming.  That's in

4  medical veterinary entomology.  And then --

5  Q.  Let me stop you for a minute.  Do you feel comfortable

6  taking the mask off?

7  A.  Yeah.  I can take it down.  No problem.

8  Q.  Sure.

9  A.  Okay.

10  Q.  All right.  Do you want to take it off or --

11  A.  This is okay.  I'm -- I'm -- I can take it off.

12  Q.  Most witnesses have been testifying without a mask.

13  I just --

14  A.  Okay.

15  Q.  I didn't prep you for that so -- sorry.

16  A.  No, that's okay.  I'm fine either way.

17  Q.  Okay.  Great.

18          Go ahead and continue about your educational

19  background.

20  A.  So my master's degree was from the University of Wyoming

21  in medical veterinary entomology, and then my doctorate degree

22  is in criminal justice from Michigan State University.

23  Q.  And when did you get that doctorate degree?

24  A.  2015.

25  Q.  So what kind of work have you done?

1   A.  So I do a couple of different things currently.

2           One, I'm an associate professor at The Citadel, which

3   is the military college of South Carolina, in the department

4   of criminal justice, where I do research and teaching in

5   criminal justice and forensic science.  And I also have my own

6   consulting, my private consulting, where I do work for

7   questioned documents and handwriting questions related to

8   that.

9   Q.  Do you have any credentials related to forensic document

10  examination?

11  A.  So I've been doing this for 12 -- 12 years now.

12          And I studied under Dr. Larry Miller -- so forensic

13  document examination is one of the forensic sciences that you

14  don't go to college for because they don't have degree

15  programs, not like biology or chemistry.  So what you have to

16  do is you have to apprentice under somebody that is a document

17  examiner in the field.

18          And I so studied under Dr. Larry Miller, and I did a

19  two-year apprenticeship-style training with him, which

20  requires you to do coursework and hands-on work in all aspects

21  of questioned documents with the bulk of that being with

22  handwriting identification.

23          My PhD at Michigan State -- so how PhD programs work

24  is that you have three components.

25          Your first one is you take a lot of classes.  And

1  then when you finish the classes, you have to take

2  comprehensive examinations, and there's three comprehensive

3  examinations.  One is research methodology, one is theory, and

4  then the last one is what they call a cognate area, and that's

5  your area of specialization.  So mine was forensic science and

6  criminal justice theory wrapped up into one.

7         And then the final stage of the program is a

8  dissertation, which is a big research project you do, and then

9  you write up a big paper on what that is in your findings.

10 And my dissertation project was in looking at intentionally

11 disguised handwriting and how people intentionally try to

12 change the way that their handwriting looks and under what

13 situations they do this and how we might be able to prevent

14 that.

15        I also completed a -- a graduate certificate program

16 in questioned documents, again under Larry Miller, and I've

17 taken a variety of continuing education over the years, as

18 well.

19 Q.  Have you held any positions on any kinds of boards related

20 to forensic documents?

21 A.  Yes.  So currently I sit on the American Academy of

22 Forensic Sciences Standards Board.

23        And what this is is that for a long time a lot of the

24 areas of forensic science -- there was a big commission

25 that -- that was put together that was looking at problems in

 1  the forensic sciences because there's been a lot of wrongful

 2  convictions and things like that.  And the idea is we want to

 3  get junk science out of court.  We don't want people coming

 4  into court, claiming areas of expertise or claiming to do

 5  things that the science or the research doesn't support.

 6          So one of the things -- the movements -- to

 7  strengthen forensic science is to create standards.  These

 8  would be standards that we all use in the field for our

 9  specific areas of forensic science and we follow them, that we

10  all come together, meaning community members, and develop.

11          So I'm on the questioned document examiners standards

12  body -- consensus standards body.  And, basically, what we do

13  is we meet once a month, and we develop standards like how do

14  you do a handwriting identification, what are the training

15  requirements, things like that, and there's a whole bunch of

16  them.  Each area of forensic science has their own standards

17  board that -- that they get together to meet on.

18  Q.  Have you testified as an expert in forensic document

19  examination in the past?

20  A.  I have, yes.

21  Q.  And where have you testified?

22  A.  I've testified in several different states, have testified

23  here in Wyoming -- in fact, in this courtroom with Judge

24  Johnson a few years ago.

25          I remember that one well because I drove -- I was at

 1  Michigan State at the time working on my PhD, and I drove

 2  through the night to get here because it was like a

 3  last-minute thing, and I arrived that day.  When I came in,

 4  I immediately arrived, I changed into my suit, and I came into

 5  the court.  I remember that one well.

 6        But some other states, too; here in Wyoming,

 7  Colorado, New Mexico, Nebraska, Michigan.

 8        MR. JUBIN:  Your Honor, I'd move for the admission of

 9  Dr. Roy Fenoff as an expert forensic document examiner.

10        MR. SZOTT:  No objection, Your Honor.

11        THE COURT:  He may express opinions in his field.

12  BY MR. JUBIN:

13  Q.  So what are the tools of the trade for somebody who's a

14  forensic document examiner?

15  A.  Could you be more specific on that?

16  Q.  Well, when you're looking at handwriting, what kinds of

17  things do you use to -- to analyze?

18  A.  Yeah.  So handwriting's unique in that it's considered an

19  identifiable feature of all of us.  So all your handwritings

20  are unique.

21        And so one of the key, fundamental basis of why it

22  works is because no two signatures are exactly the same.

23  There's a little bit of variation.  Some people have a wide

24  range of variation; you know, some people say, "Oh, my

25  handwriting, you know, it's messy, it never looks the same."

1    That's true for some.  Others, their handwriting can be

2    their -- less variation there.

3            What we do when we do this kind of work and we're

4    doing an analysis is you say you have a questioned signature.

5    Then you have to obtain about 15 to 20 comparison signatures.

6            And why you need 15 or 20 -- or in some cases more.

7    If there's a wide range of variation, there will be even more.

8    The reason you need that is because you have to go in and

9    identify what are the unique identifying features for each

10   individual.

11           You can't do that with one signature, one-on-one,

12   because there's variation.  And if you try to do a one-on-one

13   comparison -- well, if no two signatures are the same, you see

14   what I mean?

15           So what you have to do is you have to get 15 to 20,

16   go in there, and find what is consistent in those signatures.

17   And then, once you identify that, you go back to the signature

18   that's being questioned and see if those features are there or

19   not.  If those features are there, you can make an

20   identification.  If those features are there, then you can

21   eliminate the writer.

22           But there's all sorts of factors you have to take

23   into this.  You can't just look at two signatures, go, "Hey

24   they look the same" or "Hey, they look different."  That's not

25   how you do that.

1             What you have to do is you take measurements; you're

2   looking at size and proportions; you're looking at spacing;

3   you're looking at letter forms; you're looking at punctuation;

4   you're looking at connecting strokes, beginning strokes,

5   ending strokes, where does a signature sit on a signature

6   line.  You know, pressure patterns.  You have different

7   pressure patterns when you write.

8             And then there's all sorts of intrinsic -- what we

9   call intrinsic and extrinsic factors that you must take into

10  consideration, so things like medication can affect your

11  handwriting; age can affect your handwriting, your sitting

12  position.  Right?  If you are sitting down at a desk and

13  you're signing a lease or you're buying a new car, that

14  signature is going to look very different than if you're

15  signing that pad at Walmart or if the FedEx Guy comes and says

16  "Sign this."  Those would look very different.  But if you

17  were to, say, take just two of those and compare them, you

18  could come to the wrong conclusion that they were different

19  authors.

20            So you have to consider all of these factors to come

21  into it but keeping in mind that no two signatures are

22  actually the same and there will always be variation in

23  writing.

24            And then the other thing that's very important here

25  is time.  So you want make sure signatures that you're

 1  comparing are contemporaneous or close in time.  And the

 2  reason for that is because handwriting can change over time

 3  due to aging, due to illness, some of these things I just

 4  mentioned.  And so if you get too far out in time with

 5  signatures, there can be differences there.

 6          So what we do is we have to weight those similarities

 7  and differences -- because all signatures are going to have

 8  differences and similarities.  We have to weight them and then

 9  make a call, and that comes from training, experience,

10  education, and looking at a lot of these things over time.

11          THE COURT REPORTER:  If you can slow down just a

12  touch, that would help.

13          THE WITNESS:  Okay.  I will.  I get excited about

14  this.

15          THE COURT REPORTER:  Thank you.

16  BY MR. JUBIN:

17  Q.  Are there different types of forgeries?

18  A.  Yes.  So there's four different types of forgeries.

19          One, let's say I wanted to sign your name to a check

20  and I've never seen how you sign your name and I just sign

21  your name.  That's called a simple forgery, and it probably

22  will look nothing like your normal signature because I have no

23  idea what it looks like.

24          The other one is a simulation forgery.  Now, this is

25  if I was going to sign your name to a check and I had a sample

1  of what your signature really looks like and I try to copy it,

2  make it look as close to yours as -- as normal.  That's a

3  simulation.  I'm simulating how you write your name.

4          And then there's a tracing; right?  Put -- you could

5  take a check, put it up to a window over a natural signature,

6  and you trace over it.

7          And then the -- the fourth and final one is a

8  cut-and-paste forgery, which is what it is.  In the old days,

9  before computer technology, how they would do this, they'd

10  literally take scissors -- right? -- and cut around the

11  signature and tape it to a document or glue it to a document

12  and then maybe scan or copy.

13          But today with digital technology cut-and-paste

14  forgeries are not only more common, they're much easier to do

15  because all you need is photo-editing software.  And a lot of

16  those -- you know, if you take scissors and you cut paper and

17  you paste something on and you scan it, sometimes you get

18  little -- like a box around it because of the way that the

19  photo machine is seeing that.

20          But with today's cut and paste, you don't necessarily

21  get those kinds of trash marks or -- or evidence of that, if

22  you will.  So they're more common because they're just so easy

23  to -- easy to do.

24          But those are the four kinds:  Simple, simulation,

25  tracing, and cut and paste.

1   Q.  What were you asked to do in this case?

2   A.  So I -- when I was first retained, I was asked to evaluate

3   a series of signatures and determine whether or not they were

4   the same.  So I was basically looking at them to see if the

5   signatures were exactly the same or were they different,

6   meaning did they have variation in the writing.

7          Remember, no two signatures are exactly the same, so

8   what we are looking for here is any of these exactly the same.

9   Because if they are, then they weren't naturally produced.

10  They were mechanically cut from somewhere and pasted onto a

11  document or they're a digital signature.

12  Q.  So how did you go about -- how did you go about reviewing

13  the documents to identify if they were the same?

14  A.  So a couple ways.  One, a very simple way to do this is

15  you use a light table and you just overlay the signatures on

16  top of each other.  And if they overlay exactly, they're

17  exactly the same.

18          And then you can also look at the area around the

19  signatures and where they are on the page.  And if they're in

20  the exact same location, they're intersecting the text around

21  it in the exact same location -- you can't do that naturally;

22  right?  Think of how hard that would be to -- one, you can't

23  sign your name the exact same way twice.  But then think about

24  how hard it is to cut a signature from one document and place

25  it in the exact same location where it would intersect text

1   around it at the same -- it's very hard to do that, too.  So

2   you go through and you look at which ones are the exact same.

3          And then as you go through this process, any that are

4   not you put into groupings, so I was able to put all the

5   signatures into different groupings.

6   Q.  Did you -- so did you label the documents that you

7   received -- well, first of all, did you receive some documents

8   from my office?

9   A.  I did, yes.

10  Q.  Okay.  And did you label them in some way that -- so that

11  you could make a report that made sense?

12  A.  Yes.

13         So the way we generally identify documents is either

14  a questioned document or it's a known document.  And so we say

15  "Q" for questioned and "K" for known.  And the known is we

16  know the source; we know it's an authentic document.  Q is

17  we're not sure if this is an authentic document or not.

18         So I labeled all my documents as questioned documents

19  as I was going through because there's questions about the

20  authenticity.

21  Q.  How many documents were you looking at?

22  A.  I don't have my report in front of me, but I believe there

23  was 30 -- 30 -- 34 documents with 37 signatures.

24  Q.  Okay.

25  A.  I -- I'm saying that without looking at my report.

1  Q.  Would it help you to have a copy of your report?

2  A.  It would help very much, yes.

3        MR. JUBIN:  If I may have a moment, Your Honor.

4      (Discussion held at counsel table.)

5        MR. JUBIN:  May I approach, Your Honor.

6        THE COURT:  You may.

7  BY MR. JUBIN:

8  Q.  It looks your CV's there, too, but I'll give you the whole

9  thing.

10  A.  Thank you.

11  Q.  You had a follow-up so you got some additional documents

12  at some point; right?

13  A.  Yes.  I had two reports.  I had my initial report and then

14  a supplemental report later on when I received some additional

15  documents.

16  Q.  Okay.  So how many documents came -- came your way from my

17  office for the first examination?

18  A.  16.  In my -- in my first report I'm seeing Q1 through

19  Q16, 16 documents.

20  Q.  Okay.  And then some additional documents came in.  And

21  what did you call those?

22  A.  I continued calling them questioned documents, but I just

23  started at 17, adding them to the -- to the group.

24  Q.  And went to how many documents?

25  A.  And then, total, that went up to 30 -- 32.

1  Q.  Okay.  Have you had an opportunity to review the Q numbers

2  on your -- in your documents with respect to the exhibits as

3  they've been identified here in court?

4  A.  Yes.

5  Q.  At least for some of them?

6  A.  Yes.

7  Q.  Okay.  And would you be able to recognize, then, your

8  identification of a document as a Q document if you saw it?

9  A.  Yes.

10  Q.  Okay.

11  A.  Anything I labeled, I can identify that, yeah.

12  Q.  Okay.  Let's take a look at Exhibit Q1.

13        Now, that writing on the right-hand where it says

14  "Q1," whose writing is that?

15  A.  That's mine.

16  Q.  Okay.  And this is Exhibit IH-Q1.

17        So you see how it corresponds?

18  A.  Yes.  Yeah.

19  Q.  Okay.  Let's take a look at IH-Q2.

20        MR. JUBIN:  Becky, are these being displayed?

21        THE COURTROOM DEPUTY:  They're not.  Do you want them

22  displayed?

23        MR. JUBIN:  Yes.  These are conditionally admitted,

24  so I think it would be -- let's go back to Q1 so the jury can

25  see that.

1    BY MR. JUBIN:

2    Q.  So it's the handwriting -- that "Q1" on the right side at

3    the bottom, that's yours?

4    A.  Yes.

5    Q.  Okay.  And then there's an exhibit sticker next to it.

6              Let's go to IH-Q2.  And whose handwriting is that to

7    the right of the exhibit sticker?

8    A.  That's my handwriting, yes.

9    Q.  Okay.  So you're identifying these as your Q documents,

10   and they correspond to the exhibit stickers?

11   A.  Correct.

12   Q.  Okay.  Take a look at IH-Q12.

13             Whose writing is the Q12 to the right of the exhibit

14   sticker?

15   A.  My writing.

16   Q.  Take a look at Exhibit IH-Q17.

17             And whose writing -- well, I guess it's not writing

18   in this case.  There's a -- a "Q17" that is affixed to this

19   document.  Who affixed that?

20   A.  That would -- I did that, yeah.

21   Q.  Okay.  And Exhibit IH-Q19.

22             The affixed "Q19" label to the right of the exhibit

23   sticker, who affixed that?

24   A.  I did.

25   Q.  Exhibit IH-Q24a.  Who affixed the "Q24" to the right of

1  the exhibit sticker?

2  A.  I did.

3  Q.  Okay.  How about Q3?  Who affixed the "Q3" next to the

4  exhibit sticker?

5  A.  I did.

6  Q.  And how about Q4?

7  A.  I did.

8  Q.  You did that with that, as well?

9  A.  Yes.

10 Q.  Okay.  So you can see how the exhibit stickers correspond

11 with your questioned document number?

12 A.  I do, yes.

13 Q.  So did you prepare a report that -- let me ask it this

14 way:  Please take a look at Exhibit IH-RF1.  What is this

15 document?

16 A.  This is a court exhibit that I created for today that will

17 just make it easier to see the signatures that we're talking

18 about and to explain, in a sense, the process I went through

19 when I was grouping the signatures and analyzing them.

20        MR. JUBIN:  Your Honor, I'd move for the admission of

21 IH-RF1.

22        MR. SZOTT:  I'd just ask that we scroll through it

23 briefly, Your Honor.

24        I don't anticipate objecting, Your Honor.  I would

25 ask for a little more foundation just in terms of how the

1  exhibit was created, the relative sizes of the copy-and-pasted

2  materials we see on the exhibit.

3           MR. JUBIN:  Sure.

4  BY MR. JUBIN:

5  Q.  Did you hear that?

6  A.  I did.

7  Q.  Can you provide the jury with that information?

8  A.  Yes.

9           So these signatures on this document, this exhibit,

10  were taken directly from the source document.

11           And so all I did is I went in and I cut the signature

12  off the source document, paste it into a PowerPoint slide, and

13  I did that with each signature and enlarged them a little bit

14  so that you could see them a little bit better.  That's all --

15  all I did.

16           I didn't change the signatures in any way other than

17  increasing the size a little bit so that they can be seen here

18  better.

19       (Discussion held between counsel.)

20           MR. SZOTT:  No objection, Your Honor.

21           THE COURT:  IH-RF is received.

22       (Defendant's Exhibit IH-RF1 received into evidence.)

23  BY MR. JUBIN:

24  Q.  Okay.  Dr. Fenoff, if you could take the jury through what

25  it is that you did and how this document depicts your work in

1   this matter.

2   A.   Okay.  So, as I mentioned earlier, what I did here is

3   I went through all of the documents that I -- I received and

4   was looking to see if any of them were exactly the same.

5        And then as I went through them, I identified four --

6   what I call -- unique signatures.  And what I mean by that is

7   in my pool of signatures that I received from Mr. Jubin there

8   were four signatures that were different from each other, but

9   there were also many that were the same.

10       And so what I did here is I just grouped them based

11  on that uniqueness so that we can talk about them

12  individually.

13  Q.   Okay.  So let's start with Q15 and Q16.

14       MR. JUBIN:  Let's scroll down a page.

15  BY MR. JUBIN:

16  Q.   What can you tell the jury about these two?

17  A.   First thing here, just to help you for reference, if you

18  look off to the right, there's a "Q15" with a date under it.

19       That refers to the Document Q15.

20       So if you have any questions about the signature, you

21  can go to the Document Q15, and this is where the signature

22  came from.  And the date is also the date of that document or

23  the date that was on that document.

24       So what you see here with Q15 and Q16 is, if you just

25  look at those, you can see that those look different.  They're

 1   not exactly the same.

 2          In the pool of signatures I received, Q15, that

 3   signature was the only one like that.  In Q16, that signature

 4   was the only one like that.  So these two are unique,

 5   different from all the other signatures, and so I just put

 6   them -- them here.

 7   Q.  Okay.  Let's take a look at the next grouping, Q17, Q19,

 8   and Q24.

 9          MR. JUBIN:  Scroll down, please.

10   BY MR. JUBIN:

11   Q.  Okay.  Tell the jury about these.

12   A.  So what you see here -- now, this is also a unique

13   signature.  So the last slide I showed you two unique

14   signature.  This is Unique Signature No. 3.  What you'll

15   notice here, these three signatures are exactly the same

16   signature.

17          A couple other things to note here.  When you look at

18   the "very truly yours" and the "Ian Horn, Esquire," what

19   you'll notice is that the signature itself, where it sits in

20   relation to the text, is the exact same location.

21          Not only that, if you look under the signature,

22   you'll see like some black dots or little lines under the

23   signature.  That's an indication that it was cut from

24   somewhere and pasted in and that didn't necessarily maybe get

25   cleaned up there.

1          But if you look at that, what you'll see on Q17, 19,

2     and 24 is that all three of those are exactly the same, not

3     only in the signature but its relation to the text around the

4     signature.

5     Q.  And how did you make the determination that it was the

6     same distance from the text around it?

7     A.  A couple of ways:  You can take measurements.  Another way

8     is just overlay them, literally take one paper, overlay the

9     signature on the other.  And if they line up and the text

10    lines up exactly, then you know they're exactly the same.

11         Now, sometimes with cut-and-paste forgeries one of

12    the things someone will do is they'll enlarge a little bit or

13    reduce it so that there's a size variation.  And then, you

14    know, one of the reasons to do that is -- well, they're not

15    exactly the same, are they?  But the thing to remember with

16    cut and paste is that if I enlarge or I reduce something, the

17    only thing I'm changing is the proportions.  I'm not changing

18    letter form; I'm not changing connecting strokes, so

19    everything else is the same.

20         So think of how impossible this is.  You sign your

21    name exactly the same in every way, but you change the

22    proportions?  You know, you can't do that.  We're not

23    machines.  We're human beings so we can't do that.

24         And so you -- one way is to overlay it.  But

25    sometimes when you overlay signatures one -- if they've been

1    reduced or enlarged and proportions change -- and you go in

2    and you take some measurements.

3             But not only that, you can look at the area around

4    it, where it sits on the page, and that, too, will help you

5    understand -- "Okay.  What they did here, it's the exact same;

6    they enlarged it a little bit or they reduced it a little

7    bit."

8    Q.  So what can you tell us about whether any of these three

9    signatures, Q17, Q19, or Q24, are an original?

10   A.  These are not originals because they're digital copies.

11   So when I refer to an "original," what I'm talking about is

12   pen to paper.  I took a pen and I signed a page.  That's an

13   original document.

14            The minute that document is photocopied, that's no

15   longer an original document.  That's a copy.  And in -- and

16   all I had was copies here.

17            Not only do I know that these are not originals --

18   because they're copies -- but I know that they're exactly the

19   same.  And since no two signatures are exactly the same, that

20   means they came from a -- some source document.  And I don't

21   know what that source document is because I never received an

22   original.

23   Q.  Does the -- do the marks underneath tell you anything

24   about whether any of these three could have been a copy of an

25   original?

 1   A.  So there's several different scenarios for this.

 2        So one is whatever the source document, that unknown

 3   source document, the original document or source document --

 4   it could have been another copy used; right?  You can cut and

 5   paste from a copy onto another copy.  There's many ways to do

 6   this.

 7        So two ways:  One, these three here, the person cut

 8   not only the signature but the "very truly yours" and

 9   "Ian Horn, Esquire" -- so they cut around the whole thing --

10   because those three are exactly the same, the same location.

11        But where did the first signature come from?  So one

12   way is the actual signature -- not the text but just the

13   signature -- was cut from a document and pasted in between

14   that and then someone took that and cut and pasted it onto

15   another document.

16        And that would explain why you've got these little

17   marks under the signature, those -- looks like cut marks kind

18   of underneath.  I'm not sure what those -- what those are, but

19   those could be considered, you know, part of something else

20   that wasn't taken out.

21        So there's different ways that this could have been

22   done, but without the source document you have no idea how

23   many times this has been copied.  You know, there is just no

24   way to really know that.

25        What you do know is no two signatures are exactly the

1    same.  These three are.  And their location on the page are

2    exactly the same with the text, which suggests that the text

3    and the signature was actually cut and pasted into the

4    document.

5    Q.  Let's take a look at the next grouping.  These are

6    Documents Q1 through Q14, Q20 through Q23, Q25 through Q32.

7             MR. JUBIN:  Okay.  Scroll down.

8    A.  All right.  What you'll see here is all of these

9    signatures are exactly the same.

10            Not only are they exactly the same but where they

11   intersect with the "truly," if you just want to look at that

12   one and go down and look at where they intersect in the exact

13   same spot all the way down the page.  So if you were to

14   overlay all those, they would lay right on top of each other.

15            So not only are the signatures exactly the same, but

16   the signature's in relation to the text around it in the exact

17   same location, which -- again, then how do you do that?  Well,

18   you cut the text and the signature off a document and you

19   paste it -- paste it on here.

20            Now, you also -- I think it's important to look at

21   the dates of these documents.  You have from March of 2015 all

22   the way through March of 2016, so these documents were -- if

23   the dates are accurate -- these documents were created over

24   a year.  And so if you're taking a signature and you're just

25   pasting it onto documents at different dates throughout

 1   the year, you're probably not going to land that signature in

 2   the exact same location with the text.

 3          So what -- what we're seeing here is a cut and paste

 4   of the text and the signature that was taken from some

 5   document and pasted onto the new document.

 6   Q.   Okay.  Some of -- like if you look in the middle of the

 7   page at Q11 and Q12, it seems darker at the signature.  Or if

 8   you look at Q2, you see sort of the middle of the signature

 9   looks darker but the ends are lighter.

10          Is there any explanation for that from a forensic

11   scientific perspective?

12   A.   Yes.  The signatures are exactly the same.  And, as you

13   can see, where they intersect the text are exactly the same.

14          The quality of the signature -- whether it's darker,

15   whether it's lighter, whether it looks fuzzy like Q3a or

16   whether it's very crisp and clear -- that's an artifact of the

17   copying process.  I can change the settings on my copier to

18   make it darker or make it lighter.  Depending on the printer

19   I'm using, it could vary.

20          Also, how many times has this been copied?  The

21   version I got, I don't know how many times the document had

22   been copied or scanned, but through that process you've got to

23   get some deterioration over time.

24          So, again, everything's the same except for whether

25   it's darker or lighter does not change whether or not these

1    are a cut and paste, you know, and whether or not these are

2    the same.  All that means is something in the copying process

3    changed, in the scanning process changed, the darkness,

4    lightness, and quality.

5            MR. JUBIN:  Let's scroll down a page.

6    BY MR. JUBIN:

7    Q.  And what about -- this is the eighth page of this exhibit.

8    A.  So these are exactly the same.

9            And you'll notice again here -- if you just look at

10   where the signature lies in relation to the text, what you'll

11   notice is that, again, the signatures -- not only are they

12   exactly the same, but the way they approach the text around

13   the signature is exactly the same, too.

14   Q.  If we look at -- are -- these signatures on page 8 of this

15   exhibit, are they identical to any other signatures?

16   A.  Yes.  These signatures -- although the text around the

17   signatures -- so, here, you'll see these signatures and the

18   text match up.  On that last slide I showed you the signatures

19   and the text match up.

20           But if you look at the -- yeah.  Thank you.  This is

21   good.  Just look at the Q27 and Q6a.  Those two signatures are

22   exactly the same, but they're -- there's different text around

23   them.  The difference you might notice is that there is some

24   size variation there.

25           So, again, if I take a signature in a digital

 1   process, I can change the proportions simply by moving, you

 2   know, that around.  I can change it and make it, oh, however

 3   I want.  But they're exactly the same in every other way.

 4          And so all that was done here is someone either

 5   enlarged it, shrunk it down.  It's not a significant

 6   difference -- I would say, "Oh, these are actually different

 7   signatures" -- they're the same signature.

 8          MR. JUBIN:  Okay.  Let's scroll down past page 8.

 9   BY MR. JUBIN:

10   Q.  Okay.  We're on page 9 of the exhibit.  What are we

11   looking at here?

12   A.  So these are all the exact same signature as the previous

13   two slides.  But the text around them is different.

14          So Q25 and Q30, you'll notice here the signatures

15   are -- are very same as before.  And then if you look at Q14,

16   31, 32, those are the exact same signatures as before but how

17   they -- if you look at the text around them and where the

18   signature lies, you'll notice that the text and the

19   signatures -- if you were to overlay those, not only would the

20   signatures match and line up but the text would, as well.

21          And then the final one, Q5, that's the same

22   signature, but it -- its intersection with the text is

23   different, in a different location than any other signatures

24   I showed you.  So I separated that one out.

25   Q.  And all of these signatures identify the Q document from

19-CR-26-ABJ          FENOFF - DIRECT - JUBIN          Vol. XII-2025
21-CR-14-ABJ

1    which they came?

2    A.  Yes.  Yes.

3    Q.  And the date that is at least associated with the document

4    from which it was taken?

5    A.  Right.  So the date on there is the date that was on that

6    document that was taken.

7    Q.  So it looks like Q5 is its own?

8    A.  Q5, the signature is exactly the same but it's different

9    in how it approaches the text than the other signatures.  But

10   it's the same signatures as -- as the others.

11   Q.  Okay.

12          MR. JUBIN:  Okay.  Let's take a look at the next

13   slide.

14   BY MR. JUBIN:

15   Q.  Documents Q3, Q7 through Q10, Q13 through 14, Q26, Q29,

16   and Q30, let's take a look at that.

17          What are we looking at here?

18   A.  So this was due to unknown court procedures.  So

19   Document --

20   Q.  Okay.

21   A.  So this was in case the documents you wanted to get

22   entered were not allowed to get entered, then we would talk

23   about this one.

24   Q.  Okay.

25   A.  So we really don't -- this was only going to be used if we

1  couldn't use the other ones.

2  Q.  Okay.

3           MR. JUBIN:  Your Honor, at this time I would move for

4  the admission of all the conditionally admitted Q exhibits,

5  specifically Q3, Q4, Q1a, Q1, Q2a, Q2, Q4a, Q12, Q17, Q19,

6  Q24a, Q24b, and Q24 -- no, I don't think we talked about b

7  and c -- Q24c, as well.

8           MR. SZOTT:  Your Honor, no objection if received for

9  the limited purpose of supporting and explaining this witness'

10  testimony.

11          Also, I might suggest we strike the last two pages of

12  the current exhibit simply to avoid confusion as long as those

13  are not necessary as part of the witness' testimony.

14          MR. JUBIN:  I would agree to that, Your Honor.

15          THE COURT:  Very well.

16          As modified in this manner, the exhibits are received

17  for the purposes stated.

18      (Defendant Horn's Exhibits IH-Q1, IH-Q1a, IH-Q2, IH-Q2a,

19  IH-Q4, IH-Q4a, IH-Q12, IH-Q17, IH-Q19, IH-Q24a,IH-Q24b,

20  and IH-Q24c received into evidence.)

21  BY MR. JUBIN:

22  Q.  Dr. Fenoff, if you would take a look at Q14 -- right --

23          MR. JUBIN:  Oh, we're on the page that's not being

24  part of it.  Scroll up a little bit.

25      (Discussion held at counsel table.)

 1   BY MR. JUBIN:

 2   Q.  If we take a look at Q14, which is here just un- -- under

 3   the line, the first one under the line, the third signature on

 4   there, there's something on the H, the -- the right part of

 5   the H in the "Horn" portion of the signature.  And -- and you

 6   find that on Q30 above the line, as well.

 7            Can you tell the jury what that is?

 8   A.  It's hard to know for sure what that is.  That could be a

 9   comma where as the signature was cut and if you try to erase

10   the comma it could be taken out or it could be part of

11   Mr. Horn's signature.

12            I don't know for sure.  This is a digital copy.

13   I don't know how many times it's been copied.

14            But it could be an artifact from cutting a signature

15   and taking something from the line above it, or it could be

16   something as part of the individual's signature.

17            THE COURT:  Would you circle what you're talking

18   about.

19            MR. JUBIN:  Sure.

20            THE COURT:  It's that little comma or mark?

21            MR. JUBIN:  That little comma or mark there on -- on

22   the H.

23   BY MR. JUBIN:

24   Q.  Is that what you were talking about?

25   A.  Yes.

 1            MR. JUBIN:  Okay.  The record should reflect --

 2   A.  (Continuing.)  Do you see that there?  That could be a

 3   comma.  I mean, it could be just a part of the way the

 4   individual signs their name.

 5            But it's unique; right?  And as a -- that's a kind of

 6   a unique aspect of the writing, and you'll see that all of

 7   them have it in the exact same spot, same signature.

 8   BY MR. JUBIN:

 9   Q.  Were you asked to determine whether or not this signature

10   actually belongs to Ian Horn?

11   A.  No.  In fact, I've -- I have no idea what Ian Horn's

12   signature looks like.  I've not seen one.

13            I -- I did -- my -- my task wasn't to determine

14   whether or not this was his signature.  My task was are these

15   the same signature, are they different signatures, and that's

16   what I did in this case.

17            MR. JUBIN:  Okay.  Thank you.

18            Nothing further at this time.

19            MR. SZOTT:  Professor Fenoff, good morning.

20            THE WITNESS:  Good morning.

21            MR. SZOTT:  My name is Thomas Szott.  I'm one of the

22   prosecuting attorneys in this case.  I have some questions

23   I'd like to ask you.

24   ///

25   ///

1                      CROSS-EXAMINATION

2    BY MR. SZOTT:

3    Q.  First, just so it's clear and out of a little bit of

4    curiosity, what's -- I know the answer to this.  But what's

5    entomology?

6    A.  Insect biology.

7    Q.  So your career has kind of taken two tracks, insect

8    biology and then forensic document examination?

9    A.  Yes.

10   Q.  And which -- which do you find more interesting?

11   A.  I find both very interesting.

12   Q.  Let me start by referring you to your report.

13           On page 3 of the first report, which is actually --

14   well, I guess I'm not sure where I am in the -- in the filed

15   document.  I believe -- if you'll give me just a moment, I can

16   refer you to the exact page.

17           So if you look at page 20 of the filed document,

18   which is the blue file stamp across the top, or page 3 of 4 of

19   the original report --

20   A.  I -- I think -- I don't have numbers.

21   Q.  I think if you look at the top, there should be a blue

22   file stamp.

23   A.  Oh, okay.

24   Q.  And that would be page 20 of that blue file stamp.

25   A.  Okay.  Thank you.  I've got it.  Yes.

1  Q.  And you -- you talk about the SWGDOC standard terminology

2  for expressing conclusions of forensic document examiners,

3  which is a scale all the way from identification, strong

4  probability, probable, indications, no conclusion, indications

5  did not, probably did not, strong probability did not,

6  elimination.  Do you see that scale?

7  A.  Yes.

8  Q.  Would it be fair as I am asking you questions to refer to

9  that scale?

10  A.  Yes.

11  Q.  You testified that a person's signature will vary?

12  A.  Yes.

13  Q.  In your experience, is a person likely to recognize his

14  own signature?

15  A.  You can.  Some can; some can't.  There's differences with

16  that.

17  Q.  A person's signature, even if it varies, will have unique

18  characteristics?

19  A.  Correct.

20  Q.  So if you have sufficient samples, you can render an

21  opinion as to the -- as to the actual authorship of a

22  particular signature; correct?

23  A.  In most cases, yes.

24  Q.  Now, you were not asked to express such an opinion here?

25  A.  Correct.

1   Q.  So you didn't -- you didn't mark any documents as "K," as

2   containing a known signature of Mr. Horn?

3   A.  Correct.

4   Q.  Professor Fenoff, you testified about the four ways a

5   signature can be forged.  I'd like to ask you some questions

6   maybe in a similar vein but without respect to whether it's

7   forged or not.

8        So when you talk about an original signature or

9   somebody's authoring or signing something and it's an

10  original, that means pen, paper?

11  A.  Correct.

12  Q.  Now, you're aware that using modern technology people can

13  sign documents electronically?

14  A.  Absolutely.  Yes.

15  Q.  And I'd like to just go through some of the different ways

16  that can happen.

17        If -- if I were to take my iPad and take my Apple

18  pencil, depending on the app I'm using or program, I could

19  just sign my name right on the screen and it would be a

20  digital representation of my signature?

21  A.  Correct.

22  Q.  And then using a program, maybe Adobe, there's that thing

23  where there can be like a verified signature?  And I might put

24  in a PIN number or other authentication, and then it would

25  display like a "digitally signed by," and it's a verified

1  digital signature within the program?

2  A.  Correct.  Yes.

3  Q.  Or I might have a scanned copy of an original signature of

4  mine or a picture file of an electronic signature of mine

5  that's saved as just an image on my desktop, and I could just

6  copy and paste that from my desktop into like a Word document

7  or a PDF and it would appear like a handwritten signature

8  that's saved in the file?

9  A.  Correct.  Yes.

10  Q.  And just to -- to go maybe one step further, if I have an

11  original document and I then scan it into a computer -- so

12  it's a -- an image or a copy of that -- then, using the

13  computer, I could like snip out my signature from what I've

14  scanned and, using that snip, I could then stick it in a new

15  document and that would be a -- a cut-and-paste signature?

16  A.  Correct.

17  Q.  And in the summary exhibit that you were looking at with

18  Mr. Jubin, we saw some cut-and-paste signatures; correct?

19  A.  Correct.

20  Q.  And of the different -- so of the different ways I've

21  described of how when a document might be electronically

22  signed, this is that last way?  This is where some sort of

23  source is apparently cut and paste and then placed in a new

24  document?

25  A.  Correct.  Yes.

1  Q.  Fair to say that that's a strong probability?

2  A.  Yes.

3  Q.  Now, before we move on from that, I just want to just

4  emphasize, really, the limits of what that opinion means.

5        If my cut-and-paste signature is on a document,

6  I might have put it there myself, for all you know based on

7  looking at it later; right?

8        So I might have put it there myself; correct?

9  A.  Correct.

10  Q.  Or somebody else might have put it there without my

11  permission?

12  A.  Correct.

13  Q.  Or somebody else might have put it there with my

14  permission?

15  A.  Correct.

16  Q.  I'd like to explore a little further your fourth category

17  of unique signature that you identified from the documents you

18  reviewed.

19        That's the category where the signature has the

20  little unusual mark on the arm of the H.

21  A.  Uh-huh.

22  Q.  So, first, let me ask you, having looked at that signature

23  and its features -- and you did examine that particular unique

24  signature and its features as part of your work in this case?

25  A.  Yes.

 1  Q.  I know what I read in your report.

 2          Let me ask, is it your opinion that at least one of

 3  those might have been actually an original at some point

 4  before it was scanned in?

 5  A.  Could I -- if you don't mind, could you maybe pull up the

 6  signature you're talking about?

 7  Q.  Sure.

 8  A.  Because I'm -- just so I'm sure what you're talking about.

 9  Q.  Absolutely.

10          I'd like to -- let me start by bringing up a

11  Government exhibit, but you can cross-reference your report to

12  make sure this is one of the ones you looked at.

13  A.  Okay.

14          MR. SZOTT:  So, Mr. Davila, would you please bring up

15  which is already in evidence as Government Exhibit 22.5.

16          This is an opinion letter that's dated

17  September 16th, 2015.  In my notes, this is Q9 in your report.

18          MR. JUBIN:  That's correct.

19          MR. SZOTT:  Okay.  And, Mr. Davila, would you advance

20  to the signature page, please.

21  BY MR. SZOTT:

22  Q.  Professor Fenoff, are you able to see the signature

23  page of Government's Exhibit 22.5?

24  A.  Yes.

25  Q.  And is that one of the signatures that sits in your

1  fourth group of unique signatures in your analysis?

2  A.  Yes.

3  Q.  Just based on what you recall, you know, based on your

4  analysis, that not all of those examples we saw are originals;

5  right?  They can't be because the signature is exactly the

6  same?

7  A.  Correct.

8  Q.  So the first thing I'd like to explore is whether there is

9  any possibility on that scale that we talked about that any

10  one of these that we see was an original at some point and

11  then was copied or scanned.

12  A.  Could you repeat that?  What --

13  Q.  Well, let me -- maybe if I just read from your report.

14          So this is page 21 of the file-stamped.  I'm just

15  going to read this and then ask if you would -- ask if you

16  agree, and then I'm going to -- I hope we can explore this --

17  this a little further.

18  A.  Uh-huh.

19  Q.  So number 1, period, "The Ian Horn signatures found on

20  Documents Q1 and Q14 are exactly the same.  Therefore,

21  Ian Horn may have signed one of these documents, but he did

22  not sign all 14 of them."

23          Did I read that correctly?

24  A.  Yes.

25  Q.  Is that still your opinion?

1    A.  Yes.

2          MR. SZOTT:  Would you magnify the signature block,

3    Mr. Davila.

4    BY MR. SZOTT:

5    Q.  I'm going to return to that unusual feature, which is

6    right there, between the Y and the Y, appears on the upper arm

7    of the H.

8          Do you think that might be a natural feature of that

9    signature as written by hand?

10   A.  May or may not be because I -- the thing is I have not

11   seen any of Ian Horn's natural signature.  So we're dealing

12   with digital copies that, in some ways, may have been

13   enlarged, may have been reduced in side, the deterioration,

14   the quality of the copy.

15         So as a result of that I'm not -- you know, I'm not

16   going to say, "Oh, that's -- I know what that is; that's a

17   comma" -- or "That's not a comma."

18         And so saying one possibility is that's a comma where

19   it was cut from some other thing, another possibility is

20   that's a feature -- I've seen a lot of handwriting where

21   people incorporate marks in places within their writing

22   that -- that becomes very unique.

23   Q.  Have you ever seen an H with a comma-looking thing on it

24   like that?

25   A.  I don't recall ever seeing that.

1   Q.  On your scale what would you say is the probability that

2   somebody would sign an H and stick a little extra comma thing

3   on it?

4   A.  That's an unanswerable question.  There is -- you can't --

5   handwriting's unique.  And if you think of how many people

6   there are on earth -- and I haven't seen everyone write the

7   letter H with how they do it.

8          I can tell you from my experience of seeing tens of

9   thousands of signatures, there are all sorts of unique

10  features within handwriting that most people don't notice

11  because you're not looking at it the same way that we do.  But

12  there's all sorts of things that are incorporated into

13  signatures, line under signatures, I dots can be in many

14  different forms, the way people cross their T bar.

15         And so if this was the first time that I'd ever seen

16  that and -- I mean, I've seen a lot of handwriting so I'm not

17  sure -- then that doesn't mean that it's not part of the

18  writing.

19         And so what's the probability?  I don't know how you

20  would get a number like that.  So I -- I can't tell you what

21  the probability of that would be.

22  Q.  What's more likely, that that's a comma that was copied

23  and pasted or that Mr. Horn puts a little extra comma thing in

24  every one of his signatures?

25  A.  Well, no, these are all the same signature.

1           So what that means is if on one signature, you know,

2   that you have with that in it, all of them are going to have

3   it because they're the same signature.

4           Now, what's the -- you asked me the likelihood that

5   that's a comma, did you say?

6   Q.   Yeah.  And I -- and I should strike the portion of my

7   question that assumes -- let me -- let me try to ask it

8   better.

9           Which is more probable, that whoever created --

10  whoever wrote the original signature inserted the extra little

11  comma-looking thing as a feature or if that is a function of

12  this being copied and pasted and the comma being included in

13  the copy-and-paste job?

14  A.   Well, you're assuming that it's a comma.  And what I --

15  what I was saying is that it could be a comma.  I'm not sure.

16          And so to say what's the -- I don't know.  50/50 on

17  it may be, may not be.  Flip a coin.

18  Q.   Are there some -- is there extrinsic evidence, though, in

19  the signature block that would tend to suggest one way or the

20  other whether that's a comma?

21          MR. SZOTT:  Let me -- and let me not be cryptic.  Let

22  me strike that, Your Honor.

23  BY MR. SZOTT:

24  Q.   There are other commas in this signature block; correct?

25  A.   Yes.

1  Q.  So if a signature were copied and pasted from a signature

2  block that included commas, it would be reasonable to think a

3  comma might be included in the signature; correct?

4  A.  Correct.  And that's why I say it could be a comma.

5  I'm not saying it is.  I'm saying it could be.

6          MR. SZOTT:  Mr. Davila, let's bring up Exhibit 19.2.

7          And, Professor, this is, I believe, not a document

8  that you've seen.  So I'm going to try -- I'm not going to ask

9  you -- I don't think -- well, I'll try not to be unfair in

10  asking questions about it.

11          Would you go to the next page, please, Mr. Davila.

12  And then magnify the signature block.

13  BY MR. SZOTT:

14  Q.  So here we see that, clearly, this is not the source

15  because we've got a comma and then the other little what looks

16  like a comma.

17          But is this indicative of how an extra comma might

18  end up in a signature, that the signature itself is close on

19  the page to a comma that just gets naturally included when

20  it's copied and pasted?

21  A.  So just so that I'm clear, what you're saying is if

22  I wanted to cut this signature, I could get that comma after

23  "Horn"?  That would be one way that that could happen?

24  Q.  Right.  That's one way that could happen?

25  A.  It's possible, yes.

1  Q.  Or the comma after the "very truly yours" if this were

2  signed differently?

3  A.  Yeah.  If you cut and you didn't erase or take -- get rid

4  of that comma, then it would end up in that cut and paste,

5  yeah.

6        MR. SZOTT:  Thank you, Mr. Davila.

7  BY MR. SZOTT:

8  Q.  And just so -- let's go back to page 1 of 19.2 just so the

9  jury recalls where this is from.

10        19.2, that's an attachment to an email string.  And,

11  again, this is already in evidence.

12        And you never found the source for this signature

13  with the extra feature on the H?

14  A.  No.

15  Q.  And that may be an unfair question.  You didn't receive

16  that from Mr. Jubin?

17  A.  The source?

18  Q.  The source.

19  A.  Yeah, I -- I have -- didn't see any -- what I'd call --

20  original with pen to paper and anything that was told to me

21  "This is the source document" or "This is the first document."

22        MR. SZOTT:  Let's go back to 22.5, please,

23  Mr. Davila, and then magnify the signature block on the last

24  page.

25  ///

1    BY MR. SZOTT:

2    Q.   Another interesting feature of this signature, Professor

3    Fenoff, that I'm wondering if you had noticed or have an

4    opinion on, that is this straight line that's sort of jutting

5    out there, the signature itself continuing down like so.  I'm

6    highlighting these on the page, on the screen.

7              We've got this straight line that sticks out.

8              What, if any, opinion do you have about that?

9    A.   That's -- again, we're dealing with a digital signature

10   that -- don't know how many times it's been copied, don't know

11   if it's been reduced or enlarged in any way.  And so that went

12   into the factors of saying -- you know, being able to identify

13   that these are all the same signature.

14             So I mean, it was one aspect of it that was added to

15   the other things that shows you that these are exactly the

16   same signature.

17             If you want me to tell you exactly what that is, I

18   can't tell you that because, as you can see from the

19   signature, you know, there's a lot of pixilating out when you

20   enlarge it.  And that could be because when it was scanned

21   into the document it was scanned at a low dot-per-square-inch

22   DPI on the computer.

23             So as you get larger and larger, it starts to

24   pixilate out, and so you have to be careful on some of the

25   things that you're seeing because it may not be what you think

1   you're seeing.

2   Q.  Does that straight line appear to be a natural handwriting

3   feature?

4   A.  Again, I don't know what Mr. Horn's signatures look like,

5   his -- what someone gave to me and said, "This is -- here's a

6   representative one."

7           And, two, I don't know exactly what that is because

8   the signature is kind of crushed between those two texts, and,

9   as you can see, it's pixilating out.

10  Q.  In your experience --

11  A.  It could be.

12  Q.  -- would it be common for someone to have a straight

13  line just sticking out of their signature?

14  A.  Oh, yeah.  Yeah.  A lot of ending strokes will just kind

15  of go off and eventually end.

16  Q.  Well, I see the ending stroke below, but there's also a

17  straight line that's just right in the middle of the last

18  name.

19  A.  Yeah.  I -- I cannot tell you what that is.  It could be

20  part of the cut and paste; right?  It could be part of an old

21  signature line.  It could be part of the signature.

22          Yeah, I can't tell you exactly what that is.

23          MR. SZOTT:  Pull up IH-1082, please.

24      (Discussion held at counsel table.)

25          MR. SZOTT:  And I apologize, Your Honor.  We're going

1   to switch to IH-RF1 rather than IH-1082.

2          So now on the monitor is what's been received as

3   IH-RF1.

4          Would you scroll down a page, Mr. Davila.  And

5   another page.

6   BY MR. SZOTT:

7   Q.  So, Professor Fenoff, is it possible that that straight

8   line is in the signature because the original version,

9   whatever it was, was signed on a line through the concluding

10  stroke and then that straight line became a feature of the

11  cut-and-paste signature?

12  A.  It's possible, yes.

13          MR. SZOTT:  If we can go to page 8 of this exhibit,

14  Mr. Davila, please.  I think it's the previous page.

15          May I have a moment, Your Honor.

16  BY MR. SZOTT:

17  Q.  So this is page 8 of IH-RF1.

18          And if I heard you correctly on direct examination,

19  Professor Fenoff, your testimony was that these signatures are

20  the same and the relation to the text is all the same.

21  A.  Yes.

22  Q.  I call your attention to Q20, where I don't see the

23  comma-looking thing on the H.  Is it possible this one simply

24  is on the wrong page, and that in relation to the text that

25  should have been put elsewhere?

 1              THE WITNESS:  Go ahead and blow that up, if you

 2     could, enlarge that.

 3     A.  See that in the Y?  It's intersecting with the Y.

 4     BY MR. SZOTT:

 5     Q.  I see that.  And on the others I see that it's not

 6     intersecting with the Y, so I'm wondering if the relationship

 7     to the text is, in fact, different and that this signature

 8     should have been placed on a different page of your exhibit.

 9     A.  I'd have to go back and look carefully.  But that's

10     possible.

11              MR. SZOTT:  Mr. Davila, would you please magnify

12     what's on Q10.  Right there.

13     BY MR. SZOTT:

14     Q.  So there it is, clearly visible between the two Ys.  Would

15     you agree that's different than what we just saw on Q20?

16     A.  Yeah.  It's possible that I -- when I put it onto that for

17     the exhibit -- that I had added it to that page.  If I had

18     done that, then that's an error.

19              MR. SZOTT:  May we approach, Your Honor.

20         (Proceedings held at sidebar with Prosecutor Szott

21     and all defense counsel.)

22              MR. SZOTT:  Your Honor, my intention is to show him

23     the exemplars.  I just wanted to let everyone know that that's

24     coming, and I intend to refer to them as a known handwriting

25     exemplar of Mr. Horn, but I don't want there to be any

 1    prejudice to the jury if someone thinks that's inappropriate.

 2            MR. JUBIN:  I think it's irrelevant but -- it's not

 3    really what -- what's at issue here.

 4            THE COURT:  He may answer the question about the

 5    mark.

 6            MR. SZOTT:  He repeatedly said he's never seen an

 7    Ian Horn signature.  I don't know what he's going to say.  But

 8    we also know that those are Ian Horn's signatures, and I think

 9    the jury also can look at them and make their own

10    determinations.

11            MR. WARD:  So --

12            MR. JUBIN:  Sure.  I mean, I think I'd be happy to

13    stipulate that that's likely an Ian Horn signature from some

14    point.

15            So I don't know what point it would be in having him

16    compare something that's an insufficient exemplar to -- he's

17    not even -- I doubt he's going to do it because that's not how

18    the science works but . . .

19            MR. SZOTT:  I think it's relevant, Your Honor.

20            I mean, he -- it's also relevant insofar as Mr. Horn

21    looking at that signature with the comma and the line would

22    have known that wasn't his original signature.  That puts

23    the -- that little -- that argument will allow the jury to

24    draw inferences about why he said that in that interview.

25            MR. JUBIN:  You can make that argument.  I don't know

19-CR-26-ABJ          FENOFF - CROSS - SZOTT          Vol. XII-2046
21-CR-14-ABJ

1   that it has anything to do with this witness' testimony.

2          THE COURT:  I'll allow it.  I'll explain to the jury

3   that I directed him to provide an original signature.

4          MR. JUBIN:  Okay.

5      (Sidebar concluded.)

6          THE COURT:  You may proceed.

7          Ladies and gentlemen, before we started this morning,

8   I directed Mr. Horn to provide an original signature.

9   Mr. Fenoff -- Dr. Fenoff -- has not seen -- has not seen the

10  original signature.  And I directed him to try to squeeze his

11  signature between two little narrow writings.  It's my

12  understanding that the document was then taken by the

13  US Attorney up to their office and processed as they saw fit.

14         MR. SZOTT:  Mr. Davila, would you bring up -- let's

15  mute the -- mute the jury's monitors, Ms. Harris -- 22.5 on

16  the left and then Exhibit 700 -- what's been marked for

17  identification as Government's Exhibit 700 -- on the right.

18         MR. JUBIN:  Your Honor, I would object as beyond the

19  scope of direct.  This witness has testified that he didn't do

20  anything to identify Ian Horn's signature, and Ian Horn is

21  willing to stipulate that that multiple copies of his

22  signature likely came from an Ian Horn signature at some point

23  or another.  It's beyond the scope.

24         THE COURT:  Overruled.

25         MR. SZOTT:  Well within the scope of what he's just

 1    testified to, Your Honor.

 2            THE COURT:  Overruled.  There should be some breadth

 3    to the examination of an expert.

 4            MR. SZOTT:  The Government would offer Exhibit 700,

 5    Your Honor.

 6            THE COURT:  700 is received.

 7        (Government's Exhibit 700 received into evidence.)

 8            MR. SZOTT:  If we could publish these to the jury.

 9    BY MR. SZOTT:

10    Q.  Professor Fenoff, acknowledging that you haven't seen

11    Government's Exhibit 700 before --

12            MR. SZOTT:  I'd ask, Mr. Davila, would you magnify

13    the signature portion.

14    BY MR. SZOTT:

15    Q.  Professor, do you see the comma feature in blue on the

16    upper right arm of the H?

17    A.  No.

18    Q.  Do you see the straight line bisecting the second part of

19    the signature?

20    A.  No.

21            MR. SZOTT:  May I have a moment, Your Honor.

22            THE COURT:  You may.

23        (Discussion held at counsel table.)

24            MR. SZOTT:  Nothing further, Your Honor, for cross at

25    this time.

 1          Mr. Davila, would you please take those down.

 2          MR. FLEENER:  Sir, good morning.

 3          THE WITNESS:  Good morning.

 4          MR. FLEENER:  My name is Tom Fleener.  I represent

 5     Justin Herman.

 6          I've listened and I understand -- I think

 7     I understand your testimony.  I -- I want to pose a couple

 8     hypotheticals to you.

 9                    **CROSS-EXAMINATION**

10     BY MR. FLEENER:

11     Q.  I mean, you're -- I assume you've -- you've seen or are

12     aware of signature stamps?

13     A.  Yes.

14     Q.  And I have one in my office.  And if everybody in my

15     office -- my wife, me, my law partner, legal assistant,

16     bookkeeper -- we all use -- would use that signature stamp

17     and -- and stamp documents, presumably the documents -- or the

18     signatures -- are going to be roughly identical?

19          THE COURT:  I'd caution you, ladies and gentlemen.

20     Mr. Fleener's not under oath and cannot testify.

21          MR. FLEENER:  I was just asking -- he's an expert

22     witness, Judge.  I can ask him a hypothetical, can't I?

23          THE COURT:  Ask a hypothetical question, not testify

24     as to what you do.

25          MR. FLEENER:  Oh, okay.  May I continue with my

1    question or is it -- is the question bad?

2           THE COURT:  Rephrase the question.

3           MR. FLEENER:  Okay.  I just don't -- don't use me.

4    BY MR. FLEENER:

5    Q.  Okay.  Hypothetically, someone in an office can -- with --

6    with a stamp -- a lot -- many people can use their stamp;

7    correct?  And the signature will -- or that stamped signature

8    will look roughly identical?

9    A.  Yes.

10   Q.  And the reason it looks roughly identical is because it's

11   from the same stamping device?

12   A.  Correct.

13   Q.  And there may be some differences based on how hard you

14   smash the stamper or, you know, whether there's more ink or

15   less ink on the stamp pad; correct?

16   A.  Correct.

17   Q.  But, overall, the signatures should be fairly identical

18   because of the -- because you're using the identical stamp?

19   A.  It's mechanical.  It's not human.  Yes.

20   Q.  Likewise, if a person has a -- you know about -- we've --

21   I think there was some discussion about digital signatures.

22   And people can use Adobe and have a digital Adobe signature;

23   correct?

24   A.  Correct, yes.

25   Q.  And the digital Adobe signature is generated by the

1    computer program itself, by Adobe?

2    A.  Correct.

3    Q.  And whether the Adobe signature is -- whether -- two

4    individuals could create -- an individual named Mike Miller

5    and an individual named Tom Jones could create an indivi- -- a

6    signature that says "Greg Smith" on Adobe and it could look

7    exactly the same with the little blue signatures?

8    A.  Yeah.  You can create anything you want in Adobe --

9    Q.  Right.

10   A.  -- so correct, yeah.

11   Q.  Yeah.  So two people could create the exact same

12   signature?

13   A.  I'm not following.  Are you saying -- please -- I'm not

14   following what you mean.

15   Q.  Sure.  If one person wrote -- typed -- one person just

16   types "Greg Smith" --

17   A.  Okay.

18   Q.  -- and creates a signature and Adobe throws it on there,

19   and completely another person types "Greg Smith" and creates a

20   signature and throws it on there, they could be the exact same

21   signatures?

22   A.  Correct.  Yes.

23   Q.  Created by two different people?

24   A.  Yes.

25   Q.  And would be the exact same signature?

1    A.  Correct.

2    Q.  The -- in all of your -- your testimony today, you still

3    have -- you're not able to testify about whether Ian Horn's

4    signature -- whether Ian Horn gave someone permission to use

5    his signature; right?

6    A.  Correct.  Yeah.

7    Q.  And -- and you've heard of people give permission to use

8    people's signatures; correct?

9    A.  Correct.

10   Q.  And like the example at -- at the office where everyone is

11   stamping the signature, presumably somebody has -- well,

12   I'll -- I'll strike that.

13          And so the bottom line is whether Ian Horn gave

14   Justin Herman permission to use his signature you have no idea

15   because you have -- you have no knowledge of any of that?

16   A.  Correct.  No idea.

17          MR. FLEENER:  Thank you.

18          MR. JUBIN:  Mr. Ward?

19          MR. WARD:  I don't have any questions, Your Honor.

20          THE COURT:  Thank you.

21          MR. JUBIN:  I just have a couple brief follow-ups.

22                    **REDIRECT EXAMINATION**

23   BY MR. JUBIN:

24   Q.  You're pretty cautious?  You're not going to say that's a

25   comma unless you know it; right?

1   A.  Absolutely.  Correct.

2   Q.  Okay.  There's -- there's been questions to you about

3   whether somebody else might have put the signature there with

4   permission or without permission.  That's really outside your

5   field of expertise; correct?

6   A.  Correct.  I don't know intentions of anyone.  I can only

7   tell you what the handwriting science says.

8   Q.  Okay.  And -- and so maybe you'd have to look at -- if

9   somebody wanted to find that out, they wouldn't look to you?

10  They'd look to other documents and things like that that might

11  suggest that that was occurring?

12  A.  Correct.

13        MR. JUBIN:  You know, I don't have any further

14  questions.  Thank you, sir.

15        MR. SZOTT:  Your Honor, just very briefly on recross

16  if I might.

17                    **RECROSS-EXAMINATION**

18  **BY MR. SZOTT:**

19  Q.  Professor, you just, in response to Mr. Jubin's question,

20  said you're not going to say that's a comma unless you know

21  it; is that right?

22  A.  Correct.

23  Q.  But you also testified about that scale for expressing

24  conclusions; correct?

25  A.  Correct, yeah.

1   Q.  So if you're not going to say something unless you know

2   it, what's the utility of that scale?

3   A.  Well, the utility of the scale is that you have

4   "I absolutely know," and then you have layers of "I don't

5   absolutely necessarily know."  But it also depends on what --

6   the question you're being asked; you know, depends on where

7   you're going to fall in that scale.

8   Q.  So at least for purposes of that comma, you're not willing

9   to use the scale?

10  A.  It's inconclusive.  On the scale it would be inconclusive

11  of whether that's a comma or not.

12          MR. SZOTT:  I have nothing further, Your Honor.

13          MR. JUBIN:  Nothing further.

14          THE COURT:  Dr. Fenoff, it's good to see you again.

15  You're excused.

16          THE WITNESS:  Thank you.

17          MR. FLEENER:  Judge, now would be a time for a

18  midmorning break, I think.  We have an expert ready to go, and

19  it will allow us to use the restroom and get him ready.

20          THE COURT:  Very well.  We'll stand in recess for

21  15 minutes.

22          THE COURTROOM DEPUTY:  All rise.

23      (A recess was taken from 10:02 a.m. to 10:19 a.m.

24  Proceedings outside the jury's presence.)

25          THE COURT:  Counsel, I wanted to let you know that

1    I'll be taking a break at 11:30 for a Zoom meeting I have.

2             MR. FLEENER:  Judge, is that when you're just going

3    to start lunch with us, then, at 11:30?

4             THE COURT:  I think so.

5             MR. FLEENER:  Okay.

6             MR. JUBIN:  I have just a couple more follow-up

7    questions.  I think I'm going to recall Dr. Fenoff just very

8    briefly.

9             THE COURT:  Very well.  Let's get the jury in and do

10   this.

11            Dr. Fenoff, if you wish to come forward and take a

12   seat here, get the mic all set up on you, that will be great.

13            MR. JUBIN:  The jury's going to wonder -- "Why is

14   that guy still on the witness stand?"

15            THE COURT:  Yeah, they'll wonder about it.

16            Will he need his report --

17            MR. JUBIN:  No.

18            THE COURT:  -- for your questions?

19            MR. JUBIN:  Thank you for asking.

20            THE COURT:  Everybody should at this point have

21   access to the first cut of the jury instructions as well as a

22   verdict form.  And I couldn't, frankly, tell much difference

23   between the different verdict forms that were submitted.

24            MR. JUBIN:  Did those come to our emails just --

25            THE COURT:  Yeah.

1          MR. JUBIN:  Okay.  Thank you.

2          I have to figure out how these guys draw circles on

3     this.  I'm always drawing squares.

4          MR. SZOTT:  It's the little pencil.

5          THE COURT:  Well, all of you have gotten so much

6     better and more comfortable with this technology.  It's great

7     to watch you use it.

8          MR. JUBIN:  It is useful, isn't it?

9          THE COURT:  I think so.

10          MR. SZOTT:  We can do screen capture, too, if

11     necessary.  We can draw, she can capture, and it can become an

12     exhibit or the witness could do that.

13          THE COURT:  Yeah.

14          MR. JUBIN:  I like that zoom feature that the

15     Government has.  We don't have that.  It's specialized

16     software but -- bringing up the -- isolating the text.

17          THE COURT:  Very, very handy.  It gives you an

18     emphasis of what you are -- it gives you your pinpoint site,

19     is what it does.

20          MR. JUBIN:  It does.

21          THE COURT:  And I appreciate the use of -- by both

22     sides -- of paralegals.  That's great.

23          MR. JUBIN:  Couldn't do it without it.

24      (Proceedings within the jury's presence at 10:24 a.m.)

25          THE COURT:  Thank you, ladies and gentlemen.

1         MR. JUBIN:  Your Honor, there were a couple of things

2    that I neglected to cover with Dr. Fenoff, so I've recalled

3    him to the witness stand.

4                    **FURTHER REDIRECT EXAMINATION**

5    **BY MR. JUBIN:**

6    Q.  Dr. Fenoff, you recall you're under oath?

7    A.  Yes.

8    Q.  The prosecution requested and you heard that the Judge

9    required Mr. Horn to provide his signature and Mr. Horn

10   complied.

11        Were you in the courtroom when that occurred?

12   A.  Yes.

13   Q.  Was the prosecution's request in conformity with the

14   scientific standards that are typically employed in this kind

15   of situation?

16   A.  No.

17   Q.  Can you describe that, please?

18   A.  So there's two types of handwriting exemplars we use for

19   comparison.  One is what we call "course of business."  These

20   would be documents that you created throughout your life in

21   the course of business, writing checks, signing receipts,

22   signing a loan agreement, things like that.  Those are the

23   most valuable kind because that's when a person's signing

24   naturally and they're not under duress or stress or they're

25   not being told to do something.

1           The other kind, which is often used by law

2    enforcement and other agencies because they cannot get course

3    of business writing or if you have a situation where course of

4    business writing is unavailable, then we do what we call

5    "request writing."  That's where we bring a person in and we

6    have them sign for us, but you don't just go to someone and

7    give them a sheet of paper and go, "Here, sign it" and tell

8    them there are steps you have to go through.

9           Because if you remember when I -- one of the first

10   questions I was asked today was why is handwriting

11   identifiable, and I explained how there's all these intrinsic

12   and extrinsic factors that are involved that you have to take

13   into consideration.  That includes writing position; that

14   includes in how dating is important.

15          So the way that that signature sample was taken this

16   morning was, basically, give someone a sheet of paper and then

17   tell them to squeeze their name in between.  You never want to

18   tell someone what to do; right?  You want them to sign

19   naturally, without doing that, because you've already biased

20   the sample.  The sample then becomes biased because you're

21   saying, "Here, sign your name and let me tell you how to

22   do it."

23          You don't want to tell someone how to sign their

24   name.  You want to give them -- not only that, you want to

25   give them a series of documents, "Sign with your right hand,

 1    sign with your left hand, sign this one now," speed up the

 2    pace, slow the pace down, because sometimes people will try to

 3    change, intentionally disguise their handwriting.  And so

 4    doing it the way that it was done isn't necessarily helpful.

 5            Also very important is today, as we sat here, it's

 6    October 2021.  The samples that we were looking at or are

 7    interested in this case are dated 2016, 2015.  And things can

 8    change over time, especially if a person has a wide range of

 9    variation, which we haven't established that.  That has never

10    established because we've never had an analysis of what does

11    Mr. Horn's signature look like and then do that kind of

12    comparison.

13            And you never want to do a one-on-one for the reasons

14    that I mentioned earlier, is because you're not getting a fair

15    evaluation of that.  Something's there; something's not there.

16    Well, right, because no two signatures are exactly the same.

17    So what you want to do is get a wide variety of them so you

18    can identify whether a feature is unique or not; in this case,

19    for example, the comma or -- if it was an actual part of the

20    person's handwriting, we don't know that.

21            But whatever that -- that may be, remember most of

22    those signatures are all the same.  So it isn't like you have

23    a sample of 20 or 30 different signatures.  It's one signature

24    like that, so to be able to assess the uniqueness of that is

25    very difficult to do.

19-CR-26-ABJ     FENOFF - FURTHER REDIRECT - JUBIN     Vol. XII-2059
21-CR-14-ABJ

1           Plus we have no idea whether the signature had been

2    shrunken or enlarged, how it was deteriorated or how it was

3    manipulated in any way.

4           So you just have to be very careful with this before

5    jumping to conclusions about what is different, what isn't.

6    We don't eyeball things.  I mean, that works, you know, if

7    you're going to the grocery store, picking out an apple, but

8    not in a courtroom.  We need to go in and do the analysis,

9    take the measurements, consider all the intrinsic and

10   extrinsic factors that are involved, and then reach a

11   conclusion.

12          And if we don't have the evidence to do that, then

13   it's an inconclusive, and that's, unfortunately, just how

14   that is.

15          MR. JUBIN:  Thank you.  Nothing further.

16          MR. SZOTT:  No questions, Your Honor.

17          THE COURT:  You may step down.

18          MR. FLEENER:  The defense calls Jeff Gottfredson.

19          THE COURTROOM DEPUTY:  Please raise your right hand.

20      (Witness sworn.)

21          THE COURTROOM DEPUTY:  Please take a seat.

22          Please state and spell your name for the record.

23          THE WITNESS:  Jeffrey Layne Gottfredson.  It's

24   spelled J-e-f-f-r-e-y L-a-y-n-e.  Gottfredson is

25   G-o-t-t-f-r-e-d-s-o-n.

19-CR-26-ABJ       GOTTFREDSON - DIRECT - FLEENER       Vol. XII-2060
21-CR-14-ABJ

1        MR. FLEENER:  Mr. Gottfredson, good morning.

2        THE WITNESS:  Good morning.

3    **JEFFREY LAYNE GOTTFREDSON, DEFENDANT HERMAN'S WITNESS**

4                    **DIRECT EXAMINATION**

5    **BY MR. FLEENER**:

6    Q.  Sir, where you are from?

7    A.  I'm from Southern California.

8    Q.  Go ahead and take off your mask, if you would, please.

9    You should testify with it off.  Thank you, sir.  I should

10   have told you that beforehand.

11        And I understand now you -- you volunteer at the

12   American Legion.  Correct?

13   A.  That's correct.

14   Q.  But before you did that -- is that because you're

15   essentially retired from your job?

16   A.  I'm semiretired, yes.

17   Q.  What did you do before you were working for the American

18   Legion?

19   A.  Volunteering for the American Legion.

20   Q.  Yes, sir.

21   A.  I owned and operated -- was owner-operator with four

22   different broker-dealers, starting in 1980 through 1991.

23   Q.  What's a --

24   A.  I mean '99.  I'm sorry.  1999.

25   Q.  I apologize.

1              What's a broker-dealer?

2    A.   A broker-dealer is a registered entity which has various

3    capabilities, depending on what their license granted to them

4    allows them to do.

5              Smaller broker-dealers may just do agency

6    transactions with customers for individuals or institutions.

7    Larger ones may be a private placement firm that does private

8    placements for limited partnerships, such as oil and gas,

9    things that, you know, Wyoming's famous for.

10             Even larger ones would do institutional sales, which

11   is selling to mutual funds and, you know, providing research

12   that they would want to go purchase and sell ideas in the

13   marketplace with different stocks.

14             And then the largest ones would be ones that go

15   through and hold their own customer accounts.

16   Q.   E*Trade?

17   A.   E*Trade.  E*Trade is an excellent example of the largest.

18   They do just about everything.  They make markets.  The only

19   thing they don't do is typically do research.

20   Q.   Okay.  And so a broker-dealer can go all the way from a

21   small mom-and-pop shop to Charles Schwab?

22   A.   Yeah, can go from a one-man operation to -- you know,

23   someone like Charles Schwab has thousands.

24   Q.   I understand.

25             And you did that for how many years, sir?  Was a

1    broker-dealer.

2    A.  20 -- I was actually licensed up through 2020 -- or 20- --

3    2003, so I did it from, basically, '78 to 2003.  What is that?

4    25 years.

5    Q.  What did you do after that?

6    A.  I semisold out to a national firm and have kind of been

7    semiretired.  I've dabbled in the markets.  I've -- you know,

8    purchasing and selling ideas.  And I've raised money for small

9    companies.  That -- that was what my background was at -- at

10   Cruttenden and at my firm, Meridian.

11          And I just basically, you know -- basically, was

12   semiretired.

13   Q.  Have you been a market maker?

14   A.  Yes.

15   Q.  What is -- tell the jury -- explain to the jury what a

16   market maker is.

17   A.  A market maker is -- you have to be qualified to do this.

18   You have to have the sufficient capital, money in the bank, to

19   go do this.

20          But you go and purchase on the -- in the over-the-

21   counter market typically -- stocks that you have an interest

22   in.  Like if you were an underwriter and you took a company

23   public -- like which I did -- you would want to make a market

24   in those stocks to, you know, follow it and give it support as

25   best you can within the rules after you take it public.

1   Q.  So what you just said, you were an underwriter.  What's an

2   underwriter?

3   A.  An underwriter is a company that goes -- is a

4   broker-dealer.  Again, you have to be qualified to do that.

5   Q.  Qualified by whom?

6   A.  By FINRA.  Typically on all of these things you're

7   qualified by FINRA.

8   Q.  Okay.  So you've had interactions with FINRA?

9   A.  Oh, absolutely, yes.

10  Q.  All right.  Explain again what an underwriter does and how

11  an underwriter may make a market.

12  A.  Okay.  So let's say that -- an underwriter would go

13  through . . . and say that there was a small idea, a company

14  that was growing rapidly.  That's what I looked for, was

15  rapidly growing, increasing-in-revenue companies that needed

16  access to the capital markets to continue growing.  So --

17  Q.  Capital markets are --

18       THE COURT REPORTER:  Excuse me.

19     (Reporter seeks clarification.)

20  BY MR. FLEENER:

21  Q.  Capital markets are what?

22  A.  Capital markets are organized places where stock trades

23  from -- usually -- from broker-dealer to broker-dealer.

24  Q.  The New York Stock Exchange?  Nasdaq?

25  A.  New York Stock Exchange, that -- although that has a

1   specialist.  A specialist will go through and pretty much

2   direct all of the activity on what to pay for in that stock.

3   Q.  Let's go back to what underwriters do.

4   A.  An underwriter goes through -- taking the company that --

5   that we have an interest in, we would go through and do due

6   diligence on -- that's the most important thing.  You have to

7   go through and verify that what they say they're going to do

8   and how they're going to do it and their business model

9   actually makes sense, and that's -- that's an extensive

10   process.  It can take between three and six months to do or

11   even longer.

12          You would go through and then perform -- do what's --

13   file a registration statement with the Securities and Exchange

14   Commission and get it qualified to trade on one of -- you

15   know, Nasdaq or -- I never did the OTC bulletin board but

16   I always did -- my minimum company I took public, the smallest

17   was always on Nasdaq.  And really large ones would go through

18   and put it right on the exchange, like you see -- you know,

19   like Facebook years ago went public and went right on the

20   exchange.  And among multiple exchanges.

21   Q.  Sir --

22   A.  So you'd go through and you'd do all this work, come up

23   with a valuation that you think -- talking with your investors

24   and with your clients -- they think that you can sell the

25   stock at -- say it's $10 a share.  You would go through and

1   then purchase, at $10 less your commission, all the shares

2   that you want to take them public with.

3         Say it was 5 million, so it would be a $50 million

4   deal.  You'd buy it at about, say, 46 million, turn around and

5   retail it to your customers at $10 a share, and your profit

6   would be the -- the underwriting fees of, you know, basically

7   $6 million.

8   Q.  So the underwriter -- when we hear about initial public

9   offerings, for instance, the underwriter is the person who

10  puts all that into place and then sort of -- the underwriter

11  probably becomes the market maker, as well?

12  A.  Oh, absolutely.  You had to do that.  If you weren't going

13  to be a market maker in a company that you were taking public,

14  that really shows you didn't have any faith in it.

15  Q.  And, again, now explain -- so the market maker -- you

16  explained to me yesterday when we were trying to prep your

17  testimony -- the market maker sort of controls the inflow and

18  outflow of shares --

19  A.  Yeah.

20  Q.  -- to keep the price steady or -- would you explain that

21  to the jury.  Because that's important.

22  A.  Sure.

23        You -- you basically are interested in matching

24  buyers with sellers.  And buyers can be anybody.  It can be

25  customers or institutions with -- that do business with you

1   directly.  It can be other broker-dealers out on the street

2   that express an interest with you or be in what's called your

3   syndicate.

4        And they would have prices that they want to -- they

5   may want to see.  I've had people want to sell them

6   immediately; they just wanted the commission.  Next thing you

7   know, you're seeing that market -- that stock back on the

8   market.

9        But your whole problem -- you know, the whole issue

10  you're trying to -- business problem that you're trying to

11  solve is matching the buyers with sellers.

12  Q.  Sir, your experience -- do you have experience with

13  cleaning up shells, shell corporations?

14  A.  I did it in a -- in a narrow spectrum.  Not all -- there

15  are some people that put -- reverse mergers, it's called -- a

16  shell -- you go through and you put an operating business into

17  it.  And you -- they call it -- you know, getting the filing,

18  making sure the accounting's going to be done because you've

19  got certain audited financials you've got to get filed within

20  a certain period of the merger taking place and then make sure

21  that they're current, you know, from that point forward,

22  helping them to do that.

23       You work with the accountants and with the lit- --

24  you know, the legal teams on both companies to perform that

25  function.

1    Q.  So you've experienced doing reverse takeovers, reverse

2    mergers?

3    A.  Yes.

4    Q.  Do you have any experience in business formation and

5    capitalization of businesses?

6    A.  I love doing that.  We would have a -- I had a -- a little

7    company that had some really high-tech guys come out that --

8    they built a point-of-sale device that you see on the counters

9    when you go into Burger King and things like that now.

10        And this was -- this was back in the -- in the '90s,

11   and technology -- you know, the computers grew up to where

12   they could do that now and order -- manage the order flow.

13   Anyway, we raised them a half million dollars to get them

14   started.  They just took off and -- revenuewise -- and

15   started -- they got a contract with Burger King, a lot of

16   bars.

17        And so then we went and we took them public at --

18   about eight months later -- at $5 a share, and, you know, made

19   a market in the stock for help to support it, get it -- you

20   know, get it into a wider distribution of different people,

21   tried to get institutional interest involved in it, and that

22   was done by our salesmen, our institutional salesmen.

23        And then from that point forward, they just kept

24   growing.  And so then I came in and -- instead of being what's

25   called the lead underwriter that does most of the deal, I got

1    into -- I -- I was able to step down and become less tiered,

2    third tier, and do business with the really large

3    broker-dealers that wanted to do the secondary offerings.

4    Q.  All right.  So it's safe to say as far as the -- dealing

5    with registered securities and the financing that goes along

6    with public companies, you've done a whole bunch of things for

7    a whole bunch of years?

8    A.  Yeah.  Been there, done that, yes.

9    Q.  Okay.  Sir, your education.  You have a bachelor's degree

10   from?

11   A.  UC Irvine.

12   Q.  And your -- you have a graduate degree, as well?

13   A.  From Berkeley, uh-huh.

14   Q.  And what is your degree from Berkeley?

15   A.  It's in -- a master's in business administration.

16   Q.  That's an MBA?

17   A.  An MBA, yeah.

18        MR. FLEENER:  Your Honor, we would move that

19   Mr. Gottfredson be admitted to give opinions as an expert in

20   securities.

21        MR. SZOTT:  Your Honor, may I voir dire the witness

22   on his qualifications?

23        THE COURT:  Sure.

24        MR. SZOTT:  Good morning, Mr. Gottfredson.  My name

25   is Thomas Szott.  I'm one of the prosecuting attorneys in this

1    case.

2            THE WITNESS:  Okay.

3                    **VOIR DIRE EXAMINATION**

4    BY MR. SZOTT:

5    Q.  I'd like to ask you some questions just touching on your

6    experience and qualifications to testify as an expert.

7            Have you ever testified as an expert in a criminal

8    trial before?

9    A.  No, I have not.

10   Q.  And you've testified as an expert in some state cases?

11   A.  State and Federal and civil cases, State civil cases, yes.

12   Q.  One of those State cases was a divorce case?

13   A.  Yes, uh-huh.  Two of them were.

14   Q.  Two divorce cases?

15   A.  Uh-huh.  I believe they were arbitrations.

16   Q.  So, Mr. Gottfredson, you were a licensed broker-dealer

17   from 1978 to 2003?

18   A.  I was with licensed broker-dealers initially in '78, and

19   then in 1981 we formed our own first broker-dealer up in

20   Colorado.

21   Q.  What was the name of that broker-dealer you formed in

22   Colorado?

23   A.  Marshall Davis, Incorporated, with -- I was a minority

24   shareholder.

25   Q.  Where did you go after that?

1   A.   I went to Cruttenden & Company.  It's now Roth Capital in

2   Southern California.  Their primary business model was to be a

3   finder of companies for venture funds to invest.

4   Q.   Did you ever work with a firm called Nielson and Clark?

5   A.   Yes.  Uh-huh.

6   Q.   What was your role there?

7   A.   I was their financial officer.

8   Q.   So you were an officer at Nielson and Clark?

9   A.   Well, I had the financial license that's required to do

10  the type of business that Nielson and Clark did.

11  Q.   And as a broker-dealer you were licensed; correct?

12  A.   That's correct.

13  Q.   And you were subject to oversight -- or oversight;

14  correct?

15  A.   Absolutely.  Everyone is subject to oversight in the

16  brokerage industry.

17  Q.   Would it be accurate that you were at Nielsen and Clark

18  from 1983 to 1985?

19  A.   I believe those were the dates that it was in formation,

20  that's correct.

21  Q.   Mr. Gottfredson, are you familiar with an entity called

22  the National Association of Securities Dealers?

23  A.   Yes.

24  Q.   And that's the predecessor entity to FINRA?

25  A.   Yes, that's correct, NASD.

1  Q.   So during your time as a licensed broker-dealer, you were

2  subject to oversight by NASD?

3  A.   Absolutely.

4  Q.   Now, in 1987 NASD instituted a regulatory action against

5  Nielson and Clark and you were named personally in that

6  action; is that correct?

7  A.   That's correct.

8  Q.   And the allegations in that action included permitting an

9  individual subject to statutory disqualifications to engage in

10  the firm's security's business without NASD approval; correct?

11  A.   I was not named in that allegation.  There were 6 actions

12  out of, I think, 10 or 11.  I was named in 6 of those, and

13  they were all primarily related to the financial condition of

14  the company.

15  Q.   Allegations that you broke the rules in some way?

16  A.   They said that I -- they -- they had allegations that I'd

17  underreported -- I mean -- that I overreported net capital,

18  that we had a books and records violation when our clearing

19  firm failed.

20       And because the clearing firm failed, they stopped

21  updating their records.  I still had business going on.  And

22  I was -- you know, I -- I -- there was nothing I caused it --

23  that I caused it; it was just -- it happened.

24       But you were still responsible for it.  You're still

25  under, you know, supervision of the NASD.

1   Q.   And NASD censured you in connection with that regulatory

2   action?

3   A.   Yes.  They censured and fined me $5,000.

4   Q.   Mr. Gottfredson, you are not a lawyer; correct?

5   A.   I am not an attorney, no, sir.

6   Q.   When's the last time you looked at a legal opinion from a

7   Federal Court involving what's called Rule 144?

8   A.   I did Rule 144 up to about 10 years -- I'm sorry -- 2010.

9   I had, as a result of doing business in my broker-dealer

10  Meridian Capital, warrants and stock in companies that

11  I worked with.  And I was -- you know, you have to go through

12  and -- adhere to the Rule 144 guidelines to go through and

13  sell those securities in the open market.

14  Q.   So you're familiar with Rule 144?

15  A.   Yes, sir.

16  Q.   My question, however, was, when did you last read a legal

17  opinion from a Federal Court involving Rule 144?

18  A.   From a Federal Court?

19  Q.   From a Federal Court.

20  A.   I don't think I've read a Federal Court ruling on

21  Rule 144.

22  Q.   In your experience how many market manipulations have you

23  investigated?

24  A.   Have I investigated?

25       I did a number from 2001 through 2009.  I probably

1    did five or six small -- I guess you would call them -- penny

2    stock offerings and reverse mergers that I did as an expert.

3    Q.  So you were -- you were called as an expert to look at

4    what happened in those cases?

5    A.  Yes.  Uh-huh.

6    Q.  The last one was what year?

7    A.  It -- well, probably 2009.

8    Q.  How many times in your experience have you interpreted

9    what's called -- well, let me ask you first, are you familiar

10   with the term "blue sheet data" or "blue sheet report"?

11   A.  Yes.  Yes.

12   Q.  How many times in your experience have you looked at that

13   data?

14   A.  Have I looked -- I put together that data for several of

15   my broker-dealers.

16   Q.  That means --

17   A.  I would get a blue sheet --

18   Q.  -- you're submitting -- you're submitting the data to

19   FINRA or the SEC?

20   A.  I got the trading records out and -- you know, as a

21   young -- as a younger guy I actually completed the blue sheet

22   and filed it with the SEC.

23   Q.  And that's on behalf of your broker -- on behalf of your

24   broker-dealer?

25   A.  On behalf of my broker-dealer's activity doing, you know,

1    activity in a particular issue that they're inquiring about.

2    Q.   So you have done the submission part of blue sheet data.

3    My question, however, is, how many times have you reviewed the

4    compilations from --

5    A.   This --

6    Q.   -- all the broker-dealers that are submitted to the SEC?

7    A.   I'll be honest with you.  This is the first time.

8    Q.   When Mr. Fleener was questioning you a moment ago --

9    I just want to be sure we're clear on this.  You testified

10   about the OTC BB but that you didn't do -- and I apologize for

11   characterizing and please correct me if this is incorrect.

12           But you said like the smallest you would do was

13   Nasdaq.

14   A.   Yes, sir.

15   Q.   So did you ever -- were you ever involved in trading

16   securities on the OTC markets?

17   A.   On the bulletin board or on the over-the-counter?

18   Q.   Well, let's -- let's say the --

19   A.   Nasdaq is categorized as a broker -- as an over-the-

20   counter.

21   Q.   All right.  So setting aside the Nasdaq.

22   A.   Uh-huh.

23   Q.   What about the OTC BB or the OTC Pink Market --

24   A.   Yes, I --

25   Q.   -- the --

1        THE COURT REPORTER:  Wait, wait.  Excuse me.

2      (Reporter seeks clarification.)

3  BY MR. SZOTT:

4  Q.  What about the OTC BB or the OTC Pink Market that are

5  operated by OTC Markets Group?

6  A.  That I did get involved in at Nielsen and Clark and at

7  some of the other firms I've got into or worked with as a

8  broker from '78 through '80- -- I guess it would be '80- --

9  let's see.  When did we -- we shut down -- or I left Marshall

10  Davis in '87.

11  Q.  So would it be accurate to say the last time you were

12  involved in trading not on the Nasdaq but on the OTC Markets

13  Group-type market -- the last -- the last time you were

14  involved in that was the 1980s?

15  A.  No.  I'd say it's up -- beyond that.  We made markets at

16  Cruttenden in one or two of these type of stocks that you're

17  talking about.

18        MR. SZOTT:  Nothing further on voir dire, Your Honor.

19        THE COURT:  Thank you.

20        MR. FLEENER:  Renew my motion, Judge.

21        MR. SZOTT:  No objection, Your Honor.

22        THE COURT:  Mr. Gottfredson may express opinions

23  concerning matters in issue in his area of expertise.

24        MR. FLEENER:  This will just show me; right?

25  ///

1                    **DIRECT EXAMINATION (Continued)**

2    BY MR. FLEENER:

3    Q.  Okay.  Mr. Gottfredson, how did you get involved in this

4    case?

5    A.  I got a call from an -- my agency that represents me in

6    expert matters, MCS Associates out of Southern California.

7    Q.  And that's one thing I want to talk about.  You're --

8    you're being paid for your testimony today?

9    A.  That's correct.

10   Q.  And you work with an agency that, essentially, employs

11   experts?

12   A.  That's correct.  I've worked with this particular one for

13   over 20 years.

14   Q.  And so when I or other lawyers are looking for -- or

15   anybody, quite frankly -- is looking for an expert in a

16   particular subject matter, we contact various agencies and

17   various agencies have individuals that do all sorts of

18   different things?

19   A.  That's correct.

20   Q.  And like we had an expert in handwriting, you're an expert

21   in securities?

22   A.  I hope to be, yeah.  I hope to show that, yes.

23   Q.  And you're being paid for your testimony, like I said.

24   Right?

25   A.  That's correct.

1    Q.  And I think I'm -- we're paying your agency that's then

2    paying you.  Correct?

3    A.  That's correct.

4    Q.  Do you know what hourly rate your agency is billing you

5    out at?

6    A.  I believe it to be $450 an hour.

7    Q.  And then you get a portion of that and they get a portion

8    of that?

9    A.  I get a portion of that, right, uh-huh.

10   Q.  Mr. Szott asked you if you were familiar with Rule 144 of

11   the Securities Act of 1933.  Are you?

12   A.  Yes, sir.

13   Q.  Are you familiar with Rule 4(a)(1)?

14   A.  Yes, I am.

15   Q.  How familiar are you with Rule 4(a)(1) and Rule 144?

16   A.  Well, I used 4(a)(1) and I used 4 -- Rule 144 with many of

17   my customers and with some of my own personal investments.

18   Q.  For how many years?

19   A.  For 25, 26 years.

20   Q.  Okay.  I'm -- I'm going to show documents; they've all

21   been admitted, best of my understanding.

22          I'm going to show you what has been admitted as --

23   and I'm -- and what we're -- we -- we prepared our testimony

24   yesterday, did we not?

25   A.  Yes, we did.

1    Q.  And you didn't prepare any additional exhibits?  We tried

2    to use the Government's exhibits that had been admitted;

3    correct?

4    A.  That's correct.

5    Q.  I'm going to show Exhibit 11.1 to -- let me just first

6    start just showing it to the witness.

7          You recall this -- looking at this document; right?

8    A.  Yes.  I read this document, uh-huh.

9    Q.  This is -- you can --

10          MR. FLEENER:  And we -- and I'd ask permission for it

11    to be published to the jury, Judge.  It's been admitted.

12          MR. SZOTT:  It is in evidence, Your Honor.

13          THE COURT:  Very well.  It may be published to the

14    jury.

15    BY MR. FLEENER:

16    Q.  This exhibit -- I'm down at page 6 of 6.

17          And you can see the -- the David Rodgers 1/8/15

18    signature, can you not?

19    A.  I do, uh-huh.

20    Q.  And the Gordon Pardy 1/2/15 signature; correct?

21    A.  That's correct.  I see that.

22    Q.  And I'm going to now go to Exhibit 16.2, which has also

23    been admitted.

24    A.  Uh-huh.

25    Q.  And these are the signatures -- these are the documents

1   where the -- the dates have been changed; right?

2   A.   The dates, yeah.  Looks like this one is one year prior.

3   Q.   Regarding the issuance of securities and Federal

4   securities law in this particular case with NuTech and NERG,

5   did these signa- -- did these dates matter as far as when

6   these shares should have been free trading?

7   A.   In terms of --

8            MR. SZOTT:  Objection; foundation.

9            THE COURT:  Sustained.

10  BY MR. FLEENER:

11  Q.   Do you have -- have you had the opportunity --

12  A.   Can you ask the question -- can I get you to ask the

13  question again, please?

14  Q.   Yeah.  I -- I have to lay additional foundation for you.

15  A.   Oh, okay.  I'm sorry.

16  Q.   Do you understand how Rule 4(a)(1) applies to -- how

17  the -- the -- the timing period of debt applies in

18  Rule 4(a)(1)?

19  A.   Yes, I do.

20  Q.   Do you understand how the -- that same question applies to

21  Rule 144?

22  A.   Yes.  I do.

23  Q.   Are you familiar with what it means to be an affiliate in

24  Federal securities law?

25  A.   Yes, I do -- am.

1  Q.  Are you familiar with what it means to be an affiliate

2  regarding Section 4(a)(1)?  Right?

3  A.  Yes.  Uh-huh.

4  Q.  And an affiliate regarding Section -- or Rule 144?

5  A.  Yes.  Uh-huh.

6  Q.  Are you familiar with the differences between Rule 4(a) --

7  excuse me -- Section 4(a)(1) and Rule 144?

8  A.  Yes.

9  Q.  Are you familiar with the different exemptions under

10  Federal securities laws that would -- that apply generally?

11  A.  Uh-huh.

12  Q.  Are you familiar with exemptions that could or would apply

13  in this particular case involving NuTech Energy?

14  A.  Yes.  Uh-huh.

15       MR. FLEENER:  I think he's -- can answer the

16  question, Judge.

17       THE COURT:  In the context of your foundation.

18       MR. FLEENER:  In the context of my foundation.

19  BY MR. FLEENER:

20  Q.  In the context of what you've just -- you've just

21  mentioned, Rule 144, Section 4(a)(1) --

22  A.  Uh-huh.

23  Q.  -- does -- the difference between January 2nd, 2014, and

24  January 2nd, 2015, does that matter in this particular case as

25  far as the issuance of free-trading shares?  Should it have

1    mattered?

2    A.  Yes, under 4(a)(1).

3    Q.  Okay.  Why?

4    A.  Because 4(a)(1) says that the people that purchased this

5    debt were not affiliates.  And this stock -- this debt was

6    issued -- or -- in 2008, I think June of 2008.

7    Q.  You're talking about Mr. Rodgers and Mr. Pardy?

8    A.  That's correct.  This debt was issued to them.

9            They were not affiliates as that term is defined in

10   either 4(a)(1) or Rule 144.  They were also not an

11   underwriter, which is what I did.  They didn't -- they didn't

12   go through and buy -- and purchase these with the intent to

13   redistribute them.  And they're not the issuer.  They are not

14   with NuTech.

15   Q.  So the date would have mattered under Rule 144?

16   A.  Yes, uh-huh.

17   Q.  Why?

18   A.  Because Rule 144 --

19   Q.  And explain that to the jury, please.  You don't need to

20   explain it to me.

21   A.  Sure.

22           Under Rule 144 you'd have to hold -- this particular

23   security that we're talking about now, NuTech, you'd have to

24   hold it for more than a year.  And that's just because you

25   purchased it.  They don't want you being -- acting like an

1   underwriter and redistributing it to people and selling it out

2   real quick.  And this type of stock traded on the over-the-

3   counter bulletin board had a holding period of one year.

4          So the -- the document that's executed in 2015 versus

5   when this is done would not qualify under Rule 144, but it

6   would qualify under 4 -- under 144 if it was executed back

7   in '14.

8          So that's the reason why Rule 144.  But the real

9   problem here is you have two people buying from two other

10  people, all of them not affiliates that -- with a holding

11  period that starts in 2008.  And the way you can do this on

12  convertible debt is you tack -- it's called -- the word is

13  called "tack" -- the holding period for the convertible note

14  to the stock.  So it would have been eligible to trade freely

15  and have the legend removed in, basically, 2009.

16  Q.  Let me ask you this -- because that was a long answer; it

17  was detailed.

18  A.  Uh-huh.

19  Q.  Was there a -- is there another exemption under Federal

20  securities law where this -- these shares would have been free

21  trading?

22  A.  Well, if they were registered, yeah.

23  Q.  What rule -- or what --

24  A.  If you've had -- filed an SB2 or an -- and, you know,

25  or -- in that -- okay.  This back -- would have been an SB2 --

1    I think is what they filed -- or an S1 registration statement

2    and registered these shares.  Then that would be an exemption.

3    Q.  Well, I'll ask you this:  You've been able to review --

4    you know the general facts and circumstances regarding how

5    the -- the debt was converted; correct?

6    A.  Uh-huh.

7    Q.  Was there another exemption under Federal securities law

8    that they could have used that these shares would have been

9    immediately free trading?

10   A.  Immediately free trading?  Well, it would be under

11   4(a)(1).

12   Q.  That's what I'm getting at.  Why -- now, what's the

13   difference -- why would these shares have been free trading

14   under -- under 4(a)(1)?

15   A.  Well, the biggest reason is that under 4(a)(1) you can

16   tack the holding period, as I explained before.

17         So you tack the holding period that began in 2008 to

18   the holding period that these gentlemen had.  That's Winters

19   and -- and Herman.  And so you're well beyond what Rule 144

20   requires that you hold the shares for.

21   Q.  I'm going to show you another document that's been

22   admitted.

23         MR. FLEENER:  Don't show it to the jury yet, please,

24   just show it to the witness.  And it's going to be

25   Exhibit 300.

 1   BY MR. FLEENER:

 2   Q.   Sir, do you see Exhibit 300?

 3   A.   Yes.  I've reviewed this.

 4   Q.   And this is an email -- right? -- from Joslyn Claiborne to

 5   Justin Herman outlining some requirements that she was asking

 6   for under Rule 144; correct?

 7   A.   Uh-huh.  That's correct.

 8   Q.   Should they have been using Rule 144?

 9   A.   I think it should have been brought to the transfer

10   agent's attention that it's eligible for sale under 4(a)(1).

11   Q.   Okay.  So what is your opinion about these requirements

12   under 144?  Would they be required under 4(a)(1)?

13   A.   No.  No.

14          MR. FLEENER:  Can I publish that exhibit to the jury,

15   please?

16          THE COURT:  You may.

17   BY MR. FLEENER:

18   Q.   All right.  So this -- this email from Justin -- from

19   Joslyn Claiborne to Justin Herman, your testimony is that all

20   these requirements under 144 -- that they shouldn't have been

21   using Rule 144 in the first place?

22   A.   They didn't need -- they could have used Rule 144, but the

23   4(a)(1) I think is more applicable.

24   Q.   And under 4(a)(1) the shares -- the tacking period on the

25   debt would have made the shares free trading?

1   A.   That's correct.

2              MR. FLEENER:  And you can go ahead and take it off

3   the screen for the jurors now.

4   BY MR. FLEENER:

5   Q.   And how do you know that Pardy and Rodgers -- Mr. --

6   "Pardy and Rodgers."

7              Mr. Rodgers and Mr. Pardy, how do you know they

8   weren't affiliates?

9   A.   I read testimony by both parties, I think in this trial,

10  where they stated they were not -- you know, they were not

11  officers, they were not directors, they were not controlling

12  entities as that term is defined.  So that would make them

13  unaffiliates.  And -- and when they sold it to the defendants,

14  they -- all four of those people were not affiliates.

15  Q.   Okay.  I'm going to get out of the weeds on Rule 144

16  versus Section 4(a)(1) and move on to something else.

17              Another exhibit that's -- I'm going to have you take

18  a look at.  It's Exhibit 320.

19              MR. FLEENER:  And if you'd just please show -- and

20  these are all Government exhibits -- Exhibit 320.

21  BY MR. FLEENER:

22  Q.   Your understanding in preparing for this case -- well,

23  first, I'm showing you Exhibit 320.  And this is -- what is

24  Exhibit 320, sir?

25  A.   This exhibit is a shareholders list or shareholders

 1   certificate detailed by certificate number of all the holders

 2   of NuTech Energy.

 3   Q.   Okay.  Have you seen documents like this before?

 4   A.   Yes, I have.

 5   Q.   Have you seen -- and you've certainly seen this document

 6   before?

 7   A.   I have -- I've seen this document, uh-huh.

 8   Q.   What does this document -- and I -- this has been

 9   admitted.

10           MR. FLEENER:  Can we show the jury, please?

11   BY MR. FLEENER:

12   Q.   Okay.  This document -- it says "Pacific Stock Transfer

13   Company, NuTech Energy Resources," and it's a 37-page -- it

14   looks to be a 37-page document.

15           You can see my little arrow.  And it's got a whole

16   bunch of names.

17           What is this document?

18   A.   It's a shareholders list.  For example, Clara Ackermann

19   owns 1,000 shares in Certificate 4080 that was issued on 8/9

20   of 2010 for a thousand shares.

21   Q.   And does every -- does every company -- this is NuTech,

22   N-E-R-G.

23   A.   Uh-huh.

24   Q.   So does some company -- is some company responsible for a

25   list on every publicly traded company?

1  A.  Yeah -- well, there's -- you want to have that because

2  you don't want to have a situation where some -- your trading

3  is uncontrolled in your stock.

4        Most public companies choose to employ the services

5  of a transfer agent, and the transfer agent goes through and

6  actually does all this accounting for you.  Certificates come

7  in, they make sure they're properly endorsed, representing the

8  sale, and the title is instructed -- by usually a

9  broker-dealer or -- or a clearing depository -- to reregister

10  the shares in the new person's name.

11  Q.  Okay.  So this -- this document right here from Pacific

12  Stock Transfer, at least as of July 16th, 2018, this whole --

13  this shows, to the best of Pacific Stock Transfer's knowledge,

14  who owns the shares?

15  A.  Yes, that's correct.  But there is one important --

16  Q.  Oh, I apologize.

17  A.  There is one important qualification.

18        Most of you got -- most of us when we go buy stock we

19  hold -- we buy in a brokerage firm and the shares are in our

20  account.  Those shares are not put into our name unless we

21  request it.

22        You go through and look at -- there's one institution

23  called CEDE & Company; that's what their nominee name is.  A

24  nominee name -- it's the Central Depository Trust, and the

25  nominee name is CEDE.  So most shares are registered in that

 1   name, and that's where most of them are held, in that name.

 2          And if you want to go through and get the actual

 3   shareholder list, you have to go through and make a special

 4   request to CEDE that will then go through and retrans not --

 5   every other holder that they show as a record, and they have

 6   to determine who on their records are your shareholders.

 7   Q.  Okay.

 8          All right.  So this -- this document -- and

 9   I appreciate Mr. Szott pointing something out.  I -- I'm not

10   as technologically savvy so I can't make this blue line go

11   away.

12          But --

13          MR. FLEENER:  Somebody did.  Thank you, ma'am.

14   BY MR. FLEENER:

15   Q.  This is -- I -- I had said that this -- this was the

16   number of -- that this was a list of who owned the shares and

17   their numbers as of July 16th, 2018.  It's actually

18   September -- or excuse me -- yeah, September 30th of 2015.

19          Correct, sir?

20   A.  That's correct, uh-huh.

21   Q.  Okay.  And you are under the understanding that Mr. Herman

22   and Mr. Mitchell -- excuse me -- Mr. Herman and Mr. Winters

23   are involved with companies called EY II and also Intrepid

24   Capital?

25   A.  That's correct.  I understand that.

1    Q.  And I'm going to go down to -- starting with -- well, this

2    is EY II; correct?  You can see my little thing?

3    A.  That's correct, uh-huh.

4    Q.  All right.  And so this would indicate that -- and, again,

5    your understanding is that this is Herman and Winters; right?

6    A.  That's my understanding, uh-huh.

7    Q.  How many shares would they own?

8    A.  2 million -- 2 billion.

9    Q.  Okay.  And right above them -- or just two entries above

10   them -- you don't know this, but we've heard testimony from

11   individuals involved in Emerald Operating Company.  And that

12   would show that they have some restricted shares of -- of a

13   little over 2 billion, as well; correct?

14   A.  That's what the report shows.

15   Q.  Okay.  And then I'm going to go to Intrepid Capital, which

16   is page 15.

17          And here's the entry with Intrepid Capital; correct,

18   sir?

19   A.  That's correct.

20   Q.  Shows them with another -- with another 2 billion shares?

21   A.  That's correct.  I see that, yes.

22   Q.  So it's safe to say 2 billion plus 2 billion is -- they

23   have 4 billion shares, at least on the 15th?

24   A.  That's -- that's what the report shows.  That's what you

25   can infer from the report.

1        MR. FLEENER:  Okay.  I've created a PDF that just

2   says "Blank" so I can click that and then you can go ahead and

3   take it away from the -- the witness.

4        Thank you very much.  It's just easier for me not to

5   have something crazy show up on my screen.

6   BY MR. FLEENER:

7   Q.  Are you familiar -- you've testified that you -- you are

8   familiar with pump and dumps; correct?

9   A.  Yes, sir.

10  Q.  And what is the pump?

11  A.  The pump can take various forms of -- of happening or --

12  or activity.

13       Usually, what they do is they -- promoters and

14  shareholders that have a large interest that want to get out

15  will go through and they'll do crazy things, like put the

16  stock on an email list and they -- it may be true or may not

17  be true, but they'll broadcast that -- that email out to, you

18  know, hundreds or thousands of investors, hoping that we can

19  get a percentage -- that they can get a percentage -- small

20  percentage or a larger percentage if it's a good email -- to

21  purchase the stock.  And that would drive up the price.

22  Q.  Okay.  So in this particular case, we've heard about email

23  blasts.  That's a -- that's a pump?

24  A.  That's a -- that's a pump.  News announcements by the

25  issuer typically are part of a pump.

1   Q.  Press conferences or --

2   A.  Press conferences.

3   Q.  -- conference calls?

4   A.  Yeah.  In fact, you know, even the largest companies have,

5   you know, a shareholders meeting after the release of

6   financials, so it's a very common thing that occurs.

7   Q.  Now, is there anything inherently dishonest -- and I'm

8   glad -- I'm going to dovetail, sir, on the answer that you

9   just gave.

10          I mean . . . all large companies and a lot of small

11  companies issue press releases?

12  A.  They do.  That's -- that's part of your responsibility

13  to -- as being public -- is to, you know, properly inform

14  the -- or promptly inform the shareholder base of major

15  events.

16  Q.  Is there a requirement to proper -- to promptly inform --

17  A.  I haven't -- I haven't heard of a requirement.  But most

18  people really try to get the news out within 24 hours because

19  what will happen is it may leak out and you'll get people that

20  are in a position that would know moving on the stock sooner

21  than that.  So the shorter time you cut your -- your news

22  release out from an event, the better off you are.

23  Q.  And so news releases, press releases, conference calls --

24  A.  Email.

25  Q.  -- email blasts, these are all -- would all be considered

1   part of the pump?

2   A.  Uh-huh.  That's correct.

3   Q.  Is it -- is it part of a pump if the information's

4   accurate?

5           I mean, if Apple's coming out with a new iPhone and

6   they issue -- they have a conference -- they have their

7   September investors meeting and -- well, Steve Jobs is dead

8   now so -- Tim Cook gets up and shows the new iPhone -- I mean,

9   that's -- is that a pump or is that just information going

10  out?

11  A.  I would say --

12  Q.  Or does the pump imply false --

13  A.  -- that's --

14  Q.  I apologize, sir.

15          Or does the pump only imply false information?

16  I guess.

17  A.  The pump can involve both.  The -- you can have people who

18  are giving out bad information that causes the stock to go up.

19  You can also have people -- and depending on how it moves is

20  how much credibility that source has with people.

21          Like it might be just some guy that you know is a big

22  shareholder and he's got something -- it's a great thing --

23  happening.  Well, you know what?  There's a reason for him to

24  make that.  He's probably going to try and make some money.

25  Q.  Sir, what's the dump?  The dump, I assume, is the sell.

1    A.  The sell.  The sell.  You, hopefully, inflated the price

2    of the stock.  Now you -- you know -- you need to get rid of

3    your stock because that's what your whole goal was.

4    Q.  Do -- the folks who are pumping and dumping, is --

5    I assume their goal is to try to dump high.

6    A.  Yes.  The higher the better.

7    Q.  Now, you've -- you've had the -- you've had the

8    opportunity to look at Government's -- and I'm going to show

9    you, please -- just you, sir -- Government's Exhibit 520.

10          It's the -- it shows Intrepid Capital -- Herman,

11    Winters -- trading in NuTech.  Right?  We talked -- we went

12    through this yesterday, sir?

13    A.  That's correct, uh-huh.

14    Q.  And what is the highest period -- what is -- excuse me.

15          What -- what is the greatest price that they were

16    able to sell shares in NuTech Energy?

17    A.  I believe it was .0066 cents per share.  Or dollars

18    per share.  That's what I -- 63.  I'm sorry.  That was --

19    occurred on 11/6; 200,000 shares were sold for .0063 dollars.

20    Total proceeds on that transaction were $1,260.

21    Q.  Okay.  And so as far as from --

22          MR. FLEENER:  And this has been admitted.  May it be

23    published, please.

24    BY MR. FLEENER:

25    Q.  And -- and this is -- the document would indicate that

1   these were the shares that were sold by NuTech -- shares that

2   were sold of NuTech by Intrepid from June of 2015 through

3   June of 2016; correct?

4   A.   That's what I understand, yes.

5   Q.   All right.  First sale being 11/2; correct?

6   A.   Uh-huh.

7   Q.   Of '15?  I'm sorry.  That was a buy.

8        The first sale being 11/3 of 2015; correct?

9   A.   Uh-huh.

10  Q.   And then the last sale being 5/19 of 2016?

11  A.   That's what -- that's what the report shows.

12  Q.   Okay.  And out of all these sales of stock, the highest

13  price appeared to be -- most -- and most of these sales --

14  you'd agree most of these sales took place on November 6th --

15  most of these sales took place in November of 2015; correct?

16  A.   That's what I see, half of -- more than half of them,

17  yeah.

18  Q.   And the highest price being right here?

19  A.   That's correct.  And there's also one trade up earlier on

20  11 -- actually, 11/6 and 11/9 they got the same price.

21  Q.   All right.  Was that the high of NuTech stock?  Was

22  that -- did NuTech stock trade -- was that the -- was that the

23  highest-priced NuTech stock trade, or did it trade much

24  higher?

25  A.   No.  It traded considerably higher.

1    Q.  Okay.

2    A.  During the -- the range that they're talking about at the

3    top of this sheet.

4    Q.  I'm going to show you -- just -- just the witness --

5    Exhibit 419.

6            And this is an exhibit that you and I looked at

7    yesterday; correct?

8    A.  It is.

9    Q.  And this exhibit -- this exhibit deals with -- the exhibit

10   itself deals with how press releases -- which are these little

11   yellow dots -- you know, when they happen and what the stock

12   price and volume was at; correct?

13   A.  That's correct, uh-huh.

14   Q.  We chose this exhibit because it was easy to -- to

15   demonstrate.

16           I'm going to draw a line across my copy, and it's

17   just . . . would -- sir, would that be -- and I drew it

18   just -- just between .006 and .008.  And that line I draw to

19   represent .0063.

20           Is that a representative line that would demonstrate

21   the highest price that NuTech -- or excuse me -- that Intrepid

22   Capital sold NuTech shares?

23   A.  It is, uh-huh.

24           MR. FLEENER:  I'd like to publish 419 to the jury,

25   please.

1   BY MR. FLEENER:

2   Q.  All right.  And this -- this is the line I drew; correct?

3   Right here.

4   A.  That's -- yes.  Uh-huh.  I'm assuming you drew that line.

5   Q.  Well -- that's all right.  Were you watching when

6   I drew it?

7   A.  Yeah.  I watched it, yeah.

8   Q.  Okay.  Well, I was shocked I was able to do it, too.

9         The -- what does that line on that document tell you,

10  as a securities expert, about the price that Intrepid Capital

11  was selling NuTech shares in relation to the price of NuTech

12  shares over that time period?

13  A.  Well, they sold at considerably less -- materially less

14  than the highest price.

15        It looks like the stock traded as high as .01 -- they

16  actually have it right here on the very first spike.  It

17  traded over 1 point -- .014 cents per share.

18        So they're coming -- they're less than half the price

19  of -- of the highest price.

20  Q.  And, again, your -- and your testimony is folks who were

21  intending to pump and dump are usually trying to dump high?

22  A.  Oh, they absolutely -- they work -- I mean, they work

23  their orders; they work their releases; they work their email

24  blasts at a point where they can, you know, get the maximum

25  value they think is reasonable for -- for doing the

1     transactions.  And doing the pump and dump.

2          MR. FLEENER:  And I want to now look at a couple

3     other exhibits.  Could you just show the witness, please . . .

4     I'm showing the witness first -- well, actually, I'm going to

5     go back to 419 and -- could you please let the jury see 419?

6     BY MR. FLEENER:

7     Q.  419, again, is -- was prepared by the United States, and

8     I believe it was testified to by Mr. Scoufis about -- and the

9     purpose of this document, sir, was to show, again, where press

10    releases were -- were issued and what sort of happened after

11    press releases were issued to the stock price.

12          Were you able to draw any conclusions whether this --

13    whether press releases -- truthful or not but the actual press

14    release itself -- had any effect on the stock price or any --

15    is there any pattern that you're able to discern?

16    A.  There was no -- there was no pattern that I was able to

17    see as a result of the stock going up appreciably after a

18    release or an email blast.

19          In fact, it went down as many times in that day or in

20    subsequent days as it went up, and that's not a -- I call

21    it -- and then this happens when these stocks are much

22    smaller, traded in these, you know, penny or subpenny markets.

23    I call it random walk.

24          And "random walk" is one day the stock will go up --

25    there could have been no releases.  One day the stock goes up

 1   crazy; the next day it goes down.  Volume goes up; volume goes

 2   down.  You just don't know.

 3          You know, if we could all figure that out, we

 4   wouldn't need to be, all of us, here.  We would be, you

 5   know -- we'd be living -- you know -- living the good life.

 6   Q.  And -- and I -- I -- you know, you've -- there's a couple

 7   other exhibits that we've -- we've gone through and done this.

 8   I mean, you've looked at the -- you've looked -- because

 9   I don't want to beat a dead horse.

10          You've looked at the chart that involved email

11   blasts, too; correct?

12   A.  Uh-huh.  Uh-huh.  That was the previous one.

13   Q.  And did the email blasts have anything -- were you able to

14   come up with any pattern that the email blasts caused the

15   stock to spike?

16   A.  Same pattern.  Some days it would go up; some days it

17   would go down; volume would go up; volume would do gown.  You

18   couldn't discern -- you couldn't tack stock movements or

19   volume movements to the price -- to the -- to the actual email

20   or -- or announcement.

21   Q.  And the conference call?

22   A.  And the conference call.

23   Q.  Okay.  So is your testimony that the -- the email blasts

24   and the press releases and the conference call -- at least

25   there's no pattern as -- as to an effect?

1  A.  Not from what I could discern.

2  Q.  And you've had the opportunity -- we -- and this has come

3  up with a couple different witnesses, I think.

4      You're aware that E*Trade traded like crazy this last

5  spring?

6  A.  Yeah.  Yes.

7  Q.  Does that surprise you?  I mean, with your understanding

8  of NuTech, is there really a business left with NuTech?

9  A.  It's not a going concern as anyone would be interested in

10  it.  It has no revenue.  It has expenses.  So, no, I would say

11  that it's -- no.  Uh-uh.

12  Q.  And -- and -- but the stock still traded --

13  A.  Crazy.

14  Q.  -- millions of shares?

15  A.  Yeah, uh-huh.

16      MR. SZOTT:  Objection to foundation, Your Honor.

17      THE COURT:  Sustained.

18      Counsel, would this be a good time for us to take

19  a --

20      MR. FLEENER:  It would be, Judge.  That's fine.  I --

21  I can -- that's fine, Judge.  Thank you.

22      THE COURT:  -- take --

23      MR. FLEENER:  Was that -- was that last objection

24  sustained so I need to go into a little more foundation?

25      THE COURT:  A little more foundation.

 1              MR. FLEENER:  Thank you, Judge.

 2              THE COURT:  Ladies and gentlemen, we're going to take

 3     an early lunch today.  We'll have you back here at one o'clock.

 4     We're on schedule.  And we'll stand in recess with the Court's

 5     admonition until one o'clock.

 6              MR. FLEENER:  Thank you, Judge.

 7              THE COURTROOM DEPUTY:  All rise.

 8          (A recess was taken from 11:25 a.m. to 1:06 p.m.

 9     Proceedings outside Defendant Winters', Defendant

10     Herman's, and the jury's presence )

11              THE COURT:  Well, here we are approaching the last of

12     this, and we have received some concerning information.

13              MR. FLEENER:  Judge, the record should reflect that

14     we left our clients out because we figured the fewer number of

15     people that could be here the better unless the Court wants

16     them here right now.

17              THE COURT:  No, I don't think it's necessary.

18              MR. FLEENER:  Thank you, Judge.

19              MR. HEIMANN:  Your Honor, I can tell you what I know,

20     which was in my email.

21              Our paralegal was in close contact as, I think,

22     defined by the CDC -- small room, more than 15 minutes -- with

23     two people who today began exhibiting COVID symptoms.  Their

24     contact was on Saturday.

25              Mr. Davila is vaccinated and not showing any symptoms

 1   but he's -- I also left him outside until we figured out what

 2   we wanted to do.

 3          THE COURT:  Well, I'm glad -- and I've noticed

 4   throughout the trial -- that is a comfort level for me -- that

 5   Thomas has worn double masks even when he's questioning

 6   witnesses, so I have confidence in his masking, less

 7   confidence in yours, as I would in my own, seated next to

 8   Davila all morning long and all this week so far.

 9          I would note for the record that Mr. Davila is the

10   paralegal who's been working hand in glove with plaintiff's

11   counsel, the Government's counsel throughout this trial, has

12   been seated at counsel table with them.

13          We are operating in a large ceremonial courtroom with

14   increased air circulation or air exchange during this trial.

15   The counsel has been seated well more than 6 feet from our

16   jurors throughout the course of this proceedings, although

17   there has been a good bit of cross-conferencing between

18   lawyers at sidebar.  In this case, I suspect we're the ones

19   that will come down with it if -- if there's a problem.

20          We don't know at this point.  I think we're all put

21   on notice that I think we need, in all fairness, to get tested

22   and, in every way, stay away from any of the jurors in this

23   case and hope that we can finish this trial without incident.

24          I noticed the Government's agents have sat next to

25   Mr. Davila the entire time, and I don't know what happened

1    between them, whether they ripped off their masks the minute

2    they left the courtroom or maintained them in your office or

3    what happened.

4            MR. HEIMANN:  So, Your Honor, I can tell you that I'm

5    vaccinated, both of my agents are vaccinated and have had

6    boosters.  We have a trial room upstairs that is our large

7    conference room, so for the most part people are more than

8    6 feet apart while in there.  We are sometimes unmasked in the

9    trial room, but if we're coming together to look at the same

10   computer screen, we're trying to mask up conscientiously.

11           So I think, in terms of -- in terms of our trial

12   team, I -- my hope was that we had a rapid test that would get

13   a result from Mr. Davila this afternoon.  I have him waiting

14   outside and could send him off to try to get tested.

15           I just -- I don't know how you want to proceed,

16   Your Honor.  And --

17           THE COURT:  Well, the concerns are false positives.

18   I think -- I think you need to get a rapid test, as well.  And

19   I don't know who is going to be taking this witness on cross.

20           MR. HEIMANN:  (Indicating.)

21           THE COURT:  So you'll have -- I have fair confidence

22   that Thomas can go forward this afternoon and would excuse

23   others if they wanted to get their tests taken.

24           We also have free packages for you of spit tests that

25   we could send out, but they take whenever the mail arrives.

1   We know that there are false positives with the rapid test,

2   but it's what we've got at this point.

3          And if it turned out to be positive, given where we

4   are, I don't know what we would do.  I'm not inclined to

5   declare a mistrial for sure.

6          MR. HEIMANN:  Well, Your Honor, if we did end up with

7   positive tests, my -- my request would be that we continue for

8   an appropriate quarantine period and finish after that -- that

9   period is up.  Or until everybody can get confirmatory tests.

10         But I -- my hope is we don't have to cross that

11  bridge.

12         THE COURT:  That's my hope, as well.

13         MR. HEIMANN:  All right.

14         THE COURT:  Anybody have any brilliant ideas that

15  they want to float by me beyond the brilliance of Mr. Heimann?

16         MR. FLEENER:  I -- I don't.  I'd like -- you know,

17  the Court should know that I think I have another 30 minutes

18  with my expert on direct.  I assume Mr. Szott has questions

19  for him, as well, and -- Mr. Jubin probably does not but

20  Mr. Ward will so --

21         THE COURT:  So another hour anyway.

22         MR. FLEENER:  Yeah, at least another hour with him.

23         I know that Zenith has one witness -- one additional

24  witness that he would like to call, which is the Government

25  agent, to put a couple of exhibits in.

1          And then I think that the defense would -- other --

2    would -- you'd probably want to meet with the attorneys or the

3    defendants outside the presence of the jury and go through

4    whatever advice you go with jur- -- or excuse me -- the

5    defendants to -- about whether to testify or not and then they

6    would make a decision.

7          But I -- I think that's where we are.  So we probably

8    have another hour and a half of substantive testimony.

9          MR. JUBIN:  I do have one other matter, and that is

10   an offer of proof.  I need to make sure I make a good record

11   with respect to the Court's ruling as to the grand jury

12   testimony limitation, particularly in light of the Court's

13   quite proper instruction, so that might take a minute.  Maybe

14   we could do that here now, before the jury comes in.

15         MR. WARD:  I guess my thought, too, is -- I mean,

16   I think we would need to tell the jury that there's been this

17   potential exposure before we bring them back in the courtroom.

18   I think that's only fair, that they understand the situation.

19         I mean, if I -- I guess if I was a juror, I'd want to

20   know that before I was brought back into the courtroom, just

21   given -- I mean, you know, none -- none of this is a sure

22   science or -- but I feel like that -- that would only be fair.

23         MR. JUBIN:  I think so, too.  And for those jurors

24   who are wearing their masks below their nose, maybe that would

25   be an added incentive to be a little more cautious.

1          THE COURT:  Well, of course, they -- they are

2    helpless unless they institute an armed revolt.  They're a

3    captive audience.

4          I noticed -- I got an instruction over lunch break

5    that really suggested that there would be more testimony from

6    the defendants; possibly the attorney Mr. Miller is going to

7    be called as a witness in this case.

8          MR. JUBIN:  I -- I don't intend to recall him.  Oh,

9    the attorney.

10          MR. WARD:  Yeah.  No, that -- I could understand why

11    maybe that's -- the Court would infer that.  But that

12    wouldn't -- no, I don't think we have any intention of calling

13    the -- the Miller attorney.

14          MR. JUBIN:  Are you talking about Steve Mills?

15          THE COURT:  Mills, yeah.

16          MR. WARD:  Steve Mills, yeah.

17          MR. JUBIN:  Thank you.

18          MR. WARD:  I could understand that but that's not --

19    we don't intend to call him.

20          THE COURT:  All right.

21          MR. HEIMANN:  Your Honor, just so I'm clear, I heard

22    you say that I should get tested, so I would then be absent

23    for the afternoon.

24          And Mr. Davila will get -- we'll try to get him

25    tested this afternoon.

1          May our agents come back down and be at counsel table

2    with Mr. Szott?  Or would you prefer them not?

3          THE COURT:  I think so.  She's probably more risky

4    than any of the rest since she's been -- she's been closest to

5    Mr. Davila for the longest period and is not as well masked as

6    Mr. Szott.  But she has been very religious about wearing the

7    mask.

8          MR. HEIMANN:  She's very conscientious about it.

9          THE COURT:  And you told me they were able to get

10   boosters?

11         MR. HEIMANN:  As law enforcement, Your Honor, they

12   were able to get boosters, so both Special Agent Pikas and

13   Inspector Hacker have their booster shots.

14         THE COURT:  Wow.  They must have had the Pfizer.

15         MR. HEIMANN:  I don't know, Your Honor, but I know

16   they've been boosted.

17         MR. SZOTT:  I know this is obvious, Your Honor, but

18   I certainly have been in close contact with Mr. Davila during

19   the trial, you know, obviously, despite the masking.  And,

20   again, I -- so -- I'm certainly prepared to proceed.

21         THE COURT:  He's asymptomatic as I understand it.

22         MR. HEIMANN:  He has no symptoms, Your Honor.  And so

23   the symptoms were the people he was in close contact with on

24   Saturday.

25         And my understanding is those symptoms came on today.

 1   You know, that's not quite far enough to be confident that

 2   they weren't ill on Saturday.  It's kind of on that

 3   borderline, as I understand it but . . .

 4            THE COURT:  All right.  Remind me again -- what did

 5   you want to bring up now?

 6            MR. JUBIN:  An offer of proof with respect to an

 7   issue that arose earlier on what portion of the transcripts

 8   would be admitted.

 9            May I proceed.

10            THE COURT:  Sure.

11            MR. JUBIN:  The Court may recall that there was a

12   disagreement as to what portions of the grand jury transcript

13   were appropriately considered as part of the context

14   surrounding the statement related to the remaining perjury

15   count as to the emails.

16            THE COURT:  Uh-huh.

17            MR. JUBIN:  The Court's initial preliminary

18   instruction that it's provided the parties quite properly

19   recites that "In reviewing the statement alleged to be false,

20   you should consider such statement in the context of the

21   sequence of questions asked and answers given."

22            My concern is that the limited transcript that the

23   jury has so far ignores the context and, thus, would deprive

24   Mr. Horn of his defense, which is that, in context, his answer

25   can be understood differently.

1          So what I have is a renewed offer of

2    Exhibit IH-5000-I, and I'm providing it to the Court to be

3    placed in the record.  It is the grand jury transcript

4    beginning on page 13 where the questioning turns to the

5    subpoena and the production of documents related to that

6    subpoena.  Because, ultimately, the question about the emails

7    involves what was produced in relation to the subpoena, and

8    that's how we get there to that question.

9          And it continues from the grand jury transcript

10   page 13, line 13, all of page 14, and all of page 15, and that

11   portion of the transcript -- transcript of the grand jury

12   includes where the records were coming from and also

13   identifies what some of the focus was in the questioning.  And

14   without that context, the grand jury cannot properly evaluate

15   whether Mr. Horn was tracking when we get to the limited

16   question of whether he produced email correspondence and

17   whether or not he had those because the rest of the testimony

18   concerned other matters of production.

19          And as the Court has heard, the focus was all on

20   these attorney opinion letters in the preparation, the

21   questioning, and now here he is in front of the grand jury, a

22   man with the deficits he has, and that context is essential to

23   his defense, and I think it would be error to exclude it.

24          MR. HEIMANN:  Your Honor, the Government stands by

25   its position that the portion we had offered is as complete as

1   it needs to be.  We begin with the very first question about

2   whether the production contained email correspondence, and we

3   run through the final answer in that line of questioning.

4          So the sections proffered by Mr. Jubin actually

5   confuse the issue rather than clarify it.  We would object to

6   the proffer of IH-5000-I.

7          MR. JUBIN:  Your Honor, my plan would be to argue to

8   the jury as to the context in which this statement was made.

9   If the Court prohibits them from getting the evidence of the

10  context and then instructs them they're supposed to consider

11  the context, I think that's error.  And the instruction to

12  consider the context is absolutely required and correct.

13         THE COURT:  I'll persist in my previous ruling in

14  this matter.

15         MR. JUBIN:  For the record, I will persist in my

16  objection.  Thank you, Your Honor.

17         THE COURT:  You may, certainly.

18         MR. HEIMANN:  Your Honor, I wanted to make one

19  suggestion regarding testing and the like.

20         My suggestion is that we continue trial until

21  tomorrow morning so that Mr. Thomas -- Mr. Szott can get

22  tested, I can get tested, Mr. Davila can get tested, my agents

23  can get tested if we can find a test.  And I think there's an

24  unnecessary risk in going forward this afternoon that we may

25  be able to resolve by getting tests taken care of this

 1  afternoon for the folks who were within 6 feet.

 2         So I'd ask that we do that, come back tomorrow at

 3  8:30.  I can inform the Court and counsel via email as to any

 4  results we get.  Hopefully, we can this afternoon.

 5         MR. WARD:  I would second that.

 6         THE COURT:  Well, you're sitting on a time bomb, you

 7  realize, because you've had every one of these jurors in here

 8  representing the same problem, that you've exposed them to

 9  COVID at this point.

10         MR. HEIMANN:  Your Honor, yes, we're sitting on a

11  time bomb.

12         THE COURT:  So I think maybe we -- the other

13  possibility is declare a -- everybody to be in quarantine at

14  this moment and to send everybody home for 14 days.

15         MR. JUBIN:  Your Honor, I know we are going to have

16  some very unhappy jurors if this drags on beyond this week,

17  and I'm concerned who they might take that out on.  And unless

18  we -- unless we have specific information that someone here is

19  symptomatic, I'm thinking that it makes sense to finish what

20  we can today, see if folks can get tests, and try to get this

21  thing wrapped up this week, as planned.

22         THE COURT:  Well, that's the other problem.  If we

23  lose today, we lose tomorrow, which will be the day that we

24  would hope to get this case at least to the jury's hands with

25  the full Friday in order to consider the evidence.

1          Now, they may have to come back, but it guarantees

2     that they will have to come back is the problem.

3          MR. SZOTT:  Can we have just a moment, Your Honor?

4        (Discussion held at counsel table.)

5          MR. JUBIN:  Of course, I don't know the extent of the

6     Government's rebuttal case.

7          THE COURT:  We don't.

8          MR. JUBIN:  Perhaps they could give us some guidance

9     with that and we'd have a better idea of what makes sense as a

10    practical matter in terms of recessing court.

11         MR. FLEENER:  For what it's worth, I mean,

12    Your Honor, I've tried to remain sort of silent.  I'm just

13    trying to think through things.

14         I mean, they certainly need to get tested as soon as

15    possible.  I mean, I'm speaking of everybody on the United

16    States team, and now I'm wondering -- I mean, I've -- we've

17    all been in close contact with them, too.  I don't want to --

18    I don't want to delay this thing, either, but I'm . . .

19    I don't know.  I -- I don't know.  I just think they need to

20    get tested and we probably do, too, sooner rather than later.

21         MR. HEIMANN:  Judge, Mr. Szott is always helpful in

22    pointing me to what the Wyoming Department of Health actually

23    says, and I think that maybe we should just follow this

24    guidance.

25         It says:  "If a person's been fully vaccinated and

 1  it's been at least 14 days" -- which it has since the final

 2  dose -- "you do not need to quarantine" and recommends wearing

 3  a mask following exposure or until receiving a negative COVID

 4  test result.  That's what we've been doing in court.

 5          So, Your Honor, I'd withdraw my request.  I think we

 6  should go forward today.  That's -- the Department of Health

 7  says it and . . .

 8          THE COURT:  That was my view.

 9          MR. HEIMANN:  All right.  Thank you, sir.  I will

10  still take Mr. Davila and myself and get us tested.

11          THE COURT:  Thank you.

12          MR. JUBIN:  No objection from Ian Horn.

13          MR. HEIMANN:  May I be excused, Your Honor?

14          THE COURT:  Yes, sir.

15          MR. HEIMANN:  Thank you.

16          MR. WARD:  And I guess we haven't addressed the

17  agent.  Is -- is Inspector Hacker going to be back in the

18  courtroom and available to testify?

19          MR. HEIMANN:  May I have a moment, Your Honor.

20          THE COURT:  Yes.

21      (Discussion held between counsel.)

22          THE COURT:  She can be here.  She can be here.  She

23  was boosted and she's masked.

24          MR. HEIMANN:  Sure.

25          And Special Agent Pikas, Your Honor?

1            THE COURT:  Pardon me?

2            MR. HEIMANN:  My other case agent, Special Agent

3    Pikas?  Same situation.

4            THE COURT:  Yeah, that's fine.  He's been seated back

5    there anyway.

6            MR. HEIMANN:  Thank you, Your Honor.

7            MR. FLEENER:  Your Honor, may I step out and grab the

8    defendants, then?

9            THE COURT:  Please do.

10            MR. FLEENER:  Thank you.

11            MR. HEIMANN:  I'm sorry, Judge.  We keep going back

12    and forth on this.

13            But given the Department of Health guidance, I'm

14    vaccinated, so I would be in that same category as not

15    requiring full quarantine.  I can send Mr. Davila to try to

16    get himself tested.

17            May I stay?

18            THE COURT:  Sure.

19            MR. HEIMANN:  All right.  Thank you, Judge.

20            With permission, I'll get my agents down here as soon

21    as possible.

22        (Discussion held at counsel table.)

23            MR. HEIMANN:  Your Honor, thankfully, the exposure --

24    that person who's showing symptoms came back with a negative

25    test.  So I'm glad to say all of the -- what we just talked

19-CR-26-ABJ                                               Vol. XII-2114
21-CR-14-ABJ

1    about is for naught.

2           With the Court's permission, I'd like to have my team

3    in full in court.

4           THE COURT:  Yep.  Let's all join hands and kumbaya.

5           CSO WILSON:  Let's not.

6           THE COURT:  That's right, Steve, no joining hands.

7           MR. HEIMANN:  I don't regret letting everyone know.

8           THE COURT:  I appreciate it.

9           MR. HEIMANN:  I do apologize for all the

10   back-and-forth we just had.  So, hopefully, that's the end of

11   that.

12      (Discussion held among counsel.)

13          THE COURT:  Mr. Gottfredson, feel free to come

14   forward and get ready to testify.

15          THE WITNESS:  Thank you.

16      (Discussion held between the Court and the witness.)

17          THE COURT:  Are we ready to get the jury?

18          MR. SZOTT:  From our perspective, yes, Your Honor.

19      (Proceedings within all defendants' and the

20   jury's presence at 1:40 p.m.)

21          THE COURT:  Thank you, ladies and gentlemen.  Please

22   be seated.

23          When we recessed at 11:30, direct examination was

24   being conducted by Mr. Fleener of Mr. Gottfredson, who was the

25   defense expert in the matter of securities.

1          MR. FLEENER:  Thank you, Judge.

2    BY MR. FLEENER:

3    Q.  And the last question that I asked you was about NERG

4    trading in the spring of 2021.

5          You're correct -- do you recall that?

6    A.  NERG -- oh, yes.  Uh-huh.  Yes.

7    Q.  And were you able to observe how NERG traded in the spring

8    of 2021?

9    A.  Yeah.  It was -- uh-huh, yes.

10   Q.  And what did you use to observe how NERG was trading in

11   the -- in the spring of 2021?

12   A.  I used, I think, the Government's exhibits.

13   Q.  Did you -- did you use anything else?

14   A.  Yes, the blue sheet -- the blue sheets that provided --

15   that's one of the exhibits, also.

16   Q.  Did you use any -- any software or Internet sites to look

17   at --

18   A.  Yeah, I used --

19   Q.  -- trading?

20   A.  -- Yahoo Finance, and there was the otcmarket.com site

21   that had trading data and information.

22   Q.  Are those -- are Yahoo and OTC Markets widely accepted as

23   far as websites where you can get reliable financial data as

24   far as trading, bid, ask, things of that nature?

25   A.  Yes.  The Yahoo Finance is -- is very reliable.  And it

1   gives a lot of information, open, close, price, high, low, and

2   then volume.

3   Q.  And do people in the securities world use Yahoo Finance?

4   A.  Yeah, some of them do.  Most people like to use what's

5   called a Bloomberg machine --

6   Q.  Okay.

7   A.  -- but -- but I didn't -- I did not use a Bloomberg

8   machine.

9   Q.  You used Yahoo Finance?

10  A.  There we go.  Yes.

11  Q.  During the spring of 2021, what did you observe about the

12  trading activity involving NuTech?

13  A.  NuTech?  It was volatile.

14          And I believe this is 2020 -- or '10 -- '16 -- or

15  what -- what year?

16  Q.  No, I'm talking about this last year, just a few months

17  ago.

18  A.  Oh, this last year?  Oh.

19          It was volatile.  It was volatile.  It traded in a

20  much -- as wide a range as -- or a pretty good range, mostly,

21  I think, less than 1.6 or 5 cents per -- .0016 per share.

22  Q.  Were millions of shares trading?

23  A.  Yes.

24  Q.  Now, why?  Why would millions of shares -- in your

25  opinion, why would millions of shares trade on a company that

1   doesn't really exist?

2   A.   That's a good question.  And I --

3   Q.   Do you have a -- do you have an opinion?

4   A.   Yes.  I believe it's momentum trading.

5   Q.   What do you mean by "momentum trading?"  We haven't talked

6   about that.

7   A.   No.

8        Momentum is where there's a -- a stock like NERG is

9   primarily in the market -- you don't have big institutions

10  come and buying it because there's no financials to support

11  what's going to happen.

12       But there are a group of what they call day traders

13  and people that -- that will trade the stock, and they look

14  for stocks with a -- most importantly, they're looking for

15  stocks with liquidity.  And during this period of time it had

16  a lot of liquidity.

17       So they would like look at that and say, "Well, gee,

18  it's trading at .006; it's got, you know, 20 million shares

19  traded; let's go buy it.  At least I know I can get out."

20       And so they'll look at that -- they typically flatten

21  the position out at the end of the day, but -- but their big

22  concern is that there's liquidity in the stock because you

23  want to be able to buy it at a price that you think is

24  attractive, and you want to, most importantly, be able to

25  get out.

1   Q.   Now, as far as -- and that's what -- that's what -- in

2   your opinion -- what happened in 2021?

3   A.   Yeah.  There were no major announcements or anything like

4   that that would have generated this kind of volume.

5   Q.   And one thing I -- one thing I want to make sure is

6   clear -- clear to the jury.

7        When someone is buying shares on the open market --

8   A.   Uh-huh.

9   Q.   -- through my E*Trade account, am I buying shares

10  directly?  If I'm buying Apple, am I buying -- and I won't use

11  me as an example.

12       Is a -- if a person is buying Apple from their

13  E*Trade account, are they actually buying shares from Apple?

14  Or where are they getting their shares from?

15  A.   They're buying it from someone who's willing to sell to

16  you at the price that you put in.

17  Q.   So you -- not -- not the actual company?

18  A.   No.  The company -- they would do that through what's

19  called a secondary, which is an underwriting, but that's not

20  what was going on here.

21       What was going on here is you were looking at what

22  other people were willing to buy and sell the stock for,

23  making a determination that, "Gee, if I can get this a half a

24  penny below what the range is today, I should be able to

25  liquidate it at that price or higher, hopefully" --

 1   Q.   Did --

 2   A.   -- "by the end of the day."

 3   Q.   I apologize.

 4        When people are -- when people are buying NuTech back

 5   in '15 or '16, are they buying shares from the company, or are

 6   they buying shares from the people who are selling shares?

 7   A.   They are buying, again, from people who are selling.

 8   Q.   And you talked about momentum trading just briefly.

 9   I mean, sometimes stocks just -- stock prices -- just move;

10   right?

11   A.   Yeah.  Right.

12   Q.   And if -- if a very, very cheap penny stock -- people are

13   suddenly either buying or selling this -- this very, very

14   cheap penny stock in large volumes as --

15   A.   And in large quantities, large orders.

16   Q.   -- in large quantities -- momentum trading would say what,

17   that other people are jumping in, too?

18   A.   Yeah.  Basically, you're being identified in the

19   marketplace as some -- something or an entity that has a good

20   trading volume.

21        And, you know, a lot of what they call the day

22   traders or SOES bandits, they say, "Gee, I want to be part of

23   that; get me in there."  And, you know, they'll go through and

24   purchase, oh, say, a thousand shares or -- I'm sorry -- in

25   this case it's probably 10 to 50,000 shares, you know, for a

1   thousand bucks and get in and then get out, hopefully at a

2   higher price.

3   Q.  And it just sort of feeds on itself?

4   A.  It feeds on itself.  That creates more volume, creates

5   more interest, more people buy, and away it goes.

6   Q.  Even if there's no news about the company or anything

7   really happening that's material?

8   A.  Well, they may be going to bulletin boards to get news on

9   the company -- or get rumors on the company is probably the

10  more correct terminology.

11       But, yeah, they'll go through and -- they're looking

12  primarily at volume, price, and momentum.

13  Q.  You're aware through the -- the review of records in this

14  case that trades were going through Kingdom Trust -- at least

15  some trades were going through Kingdom Trust --

16  A.  Uh-huh.

17  Q.  -- and then being executed, I guess, by a separate

18  entity --

19  A.  A whole myriad of broker-dealers that they did business

20  with.

21  Q.  So how does that work?  So Kingdom Trust -- the account --

22  what is an omnibus account?

23  A.  Okay.  This is something that is very heavily regulated

24  because it's got a lot of room for problems.

25       But an omnibus account is -- suppose -- I'll just use

1   an example that's really popular.  I'm a mutual fund.  I'm

2   Franklin mutual funds or Dimensional funds or any one of the,

3   you know, American funds.

4          And I've got, you know, six funds and I want to buy

5   IBM and I think IBM should be in our portfolio.

6          So I'll go out and buy 10 to 20,000 shares, say, of

7   IBM, big in a DVP account, and then I would be -- the mutual

8   fund would then take that 20,000 shares, what they say they

9   bought, put 10 in one of their funds, one of their high-cap

10  funds -- and that's a large-capitalization stock -- put one in

11  a -- if they think technology is -- they'll put it in a

12  technology fund.

13         And then those -- those individual funds may be owned

14  by 500 people or a thousand people or -- or even, you know, in

15  the large funds, 10,000 people.  So their proportionate

16  share -- they end up really paying -- their investment of,

17  say, 500 bucks or a thousand bucks, they'll get one or

18  two shares pro rated through that whole fund.

19  Q.  And when a -- when an average stock investor who has a

20  401(k) and the -- the average investor has a mutual fund, do

21  they actually own shares of the stock?  Or they own shares of

22  the mutual fund?

23  A.  They own -- they participate in a mutual fund which owns

24  the stock.

25  Q.  And you were talking about D -- DP --

1    A.   DVP.

2    Q.   What -- the -- the -- you've had the opportunity to look

3    at the -- the Kingdom stock information in this case; correct?

4    A.   That's correct.

5    Q.   The Intrepid Capital account, what kind of account was

6    that?

7    A.   Well, that -- the account is -- from what I'm able to

8    discern -- is a DVP account, which means they'll go through

9    and do one trade with whoever -- say it's with Merrill Lynch

10   or with -- whatever.

11   Q.   Who's "they"?

12   A.   The trader.  Okay.  Let's say -- whoever's running

13   the -- that account would say, "Well, gee, let's sell

14   10,000 shares" -- or sell a hundred thousand shares in this

15   case.  So they would call up a trader at a firm that had --

16   that was bidding for it and get -- and say "I've got a hundred

17   thousand shares to go."

18        And then Kingdom Trust would go through and do it in

19   what's called a DVP account, and the shares would be sent --

20   or the -- first of all, the payment comes in.  That's what --

21   that's what -- I mean -- I'm sorry.  The shares get sold and

22   the stock comes in for the buyer.  And the money goes out

23   after that happens.

24        And that's what a DVP account is; it's a way of

25   protecting the holders of these mutual funds or Dimensional or

1    whatever from any loss because you -- you know, you're doing

2    check for check and check for stock.

3        (Discussion held at counsel table.)

4    BY MR. FLEENER:

5    Q.   Okay.  Are you familiar with the -- the concept of -- of

6    materiality in securities law and securities fraud?

7    A.   Yes, uh-huh.

8    Q.   What is a -- what about a reasonable investor?

9    A.   Oh, a reasonable investor is defined as someone --

10   hopefully, everyone in this room is -- that looks at a --

11   says, you know, "I would buy that at that price.  I may not

12   buy it at a higher price" or "That -- that particular security

13   is out of my risk profile."

14        I mean, I -- I've had people that just wanted to have

15   safe environments -- or safe investments, such as CDs and --

16   you know, good up to a quarter million dollars.

17        There are other people that -- you know, like these

18   momentum traders.  I mean, they're very -- it's a risky

19   business.  And so they'll take -- they may take lesser priced

20   stock; they may take stock that's on the bulletin board,

21   not -- you know -- not fully reporting.

22        And -- but, basically, a reasonable investor judges

23   what their own risk profile is, looks hard at the security

24   that -- that they're being touted on or being -- you know,

25   reading a research report on or, you know, seeing a release on

19-CR-26-ABJ       GOTTFREDSON - DIRECT - FLEENER       Vol. XII-2124
21-CR-14-ABJ

1   and saying, "That's in my -- that's in my price range and risk

2   range.  I'll buy it."

3   Q.  The -- would you -- I believe Mr. Scoufis testified that

4   the primary purpose of the securities laws is to protect

5   investors.  Do you agree with that?

6   A.  I sure do.

7   Q.  The -- the folks that are buying -- in your experience,

8   the folks that were buying this particular stock on the open

9   market, were they investors? speculators?  Who were they?

10  A.  Speculators.

11      MR. SZOTT:  Object, Your Honor, to foundation and the

12  reference to his experience with this particular stock.

13      MR. FLEENER:  He's testified that he has experience

14  in penny stocks; he's testified that he's reviewed the blue

15  sheets in this particular company.  He's testified about

16  everything that we need to lay a foundation for this question,

17  Judge.

18      THE COURT:  Overruled.

19      MR. FLEENER:  So the -- can you repeat the question,

20  please, ma'am?

21      (Pending question read.)

22  A.  For this particular issue they'd have to be a speculator.

23  Most likely they're a speculator.

24          That's a guy that goes in and says, "Well, I'll take

25  a fly on this, I'll -- let's take a flyer.  I can -- I can

1   afford to lose a thousand bucks" -- or, you know, whatever --

2   "and buy, you know, 50,000 shares."  And they're not really at

3   risk for losing their entire wealth in just this one stock.

4          MR. SZOTT:  Objection; foundation.  Move to strike.

5          THE COURT:  Overruled.

6   BY MR. FLEENER:

7   Q.  Okay.  The -- you've reviewed -- let me ask you a

8   foundational question so -- it's going to be a little bit

9   leading but it's foundational.

10          You've reviewed the blue sheets; correct?

11  A.  That's correct.

12  Q.  And you've -- you've reviewed the Kingdom's -- Kingdom

13  Trust account statements?

14  A.  Yes.

15  Q.  Based on your review of the blue sheets and Kingdom

16  Trust -- and understanding that -- that the Intrepid account

17  was holding shares of -- for other people; correct?

18  A.  That's correct.

19  Q.  Because it was -- it's an omnibus account?

20  A.  Omnibus account, that's correct.

21  Q.  How much money did Justin Herman and Chuck Winters take

22  from trading shares of stock?  Were you able to compute that?

23  A.  I -- yes.  I saw it backed up in another sheet.

24          With the percentage they had of the Kingdom Trust,

25  they received -- I think it was total between 2015 and '16 --

19-CR-26-ABJ       GOTTFREDSON - DIRECT - FLEENER       Vol. XII-2126
21-CR-14-ABJ

1   $14,600, approximately.

2   Q.  So the rest of -- I'm going to show you Exhibit 510.

3           MR. FLEENER:  Can you show the witness 510, please?

4           Has 510 been admitted?

5           I think it has.  That's the only one I wasn't sure of.

6           It has?

7           Permission to publish 510 and show it to the jury.

8   Judge?

9           THE COURT:  You may publish.

10  BY MR. FLEENER:

11  Q.  When we're looking at 510 -- and you can see -- again,

12  I'm not as savvy as -- as some, but you see my -- moving the

13  cursor over.

14          The fourth holding, Intrepid Capital Holdings Corp;

15  right?

16  A.  That's correct.

17  Q.  And it shows the shares-sold value, the net proceeds of

18  182,718?

19  A.  Uh-huh.

20  Q.  Based on your prior testimony -- or what you just said --

21  Herman and Winters brought in 12, 14 -- how much of that did

22  they bring in?

23  A.  $14,600, approximately.

24  Q.  The rest of it went to other people?

25  A.  Went to other people.

1        MR. FLEENER:  You can pull that away.

2  BY MR. FLEENER:

3  Q.  Now I want to go back -- and I have just one or two final

4  questions for you, sir.

5        We saw -- and you've seen -- the fact that the dates

6  on the two documents appeared to be fudged; correct?

7  A.  That's correct.

8  Q.  And you're aware that Mr. Rodgers and Mr. Pardy may not

9  have signed the actual nonaffiliation statements?  You're

10 aware of that?

11 A.  I'm aware of that, yes.

12 Q.  Could this -- could these shares have been -- could

13 this -- could this deal have been put together correctly

14 fairly easy on the front end?

15 A.  Oh, yes.  Yes, uh-huh.  By asking for the exemption under

16 the 4(a) -- 4(a)(1).

17 Q.  And even if the shares had been put together correctly,

18 even if Chuck Winters and Justin Herman had dotted the I's and

19 crossed the T's the way it was supposed to be, could the

20 shares have still been pumped and dumped by others?

21 A.  With those specific shares?

22 Q.  Sure.

23       That were issued and then made free trading.

24 A.  Yeah, they would be issued as free trading.  And

25 whoever -- the holder of those as free-trading shares could

1  have sold it and pumped and dumped it, yes.

2          MR. FLEENER:  No further questions.  Thank you.

3          I will turn you over to Mr. Szott and then some

4  questions from others, probably, sir.

5          THE WITNESS:  Okay.

6                        **CROSS-EXAMINATION**

7  **BY MR. SZOTT:**

8  Q.  Mr. Gottfredson, I think we need to start with this

9  purported distinction between 4(a)(1) and Rule 144.

10 A.  Okay.

11 Q.  4(a)(1), is that a statute or a regulation?

12 A.  It's a regulation, I believe.

13 Q.  Really?

14 A.  I mean, it's -- it's a -- I don't know if it's -- it's

15 a -- all I know about -- from what I know most about 4(a)(1)

16 is it's transactions entered into by nonaffiliates,

17 nonbroker-dealers, and nonissuers.

18          MR. SZOTT:  May I approach the witness, Your Honor.

19          THE COURT:  Yes.

20 BY MR. SZOTT:

21 Q.  Mr. Gottfredson, I'm going to show you a 2020 edition of

22 Title 15 -- or part of Title 15 of the United States Code.

23 I'm going to ask you to look at page 175.

24          I'll ask you to take a moment to look at page 175,

25 and then I'll ask you about it.

1    A.   175?  What section do you want me to read?

2    Q.   I'd like you to look at (a)(1) of Section 77d.

3    A.   Okay.  I looked at just page 175 at the bottom.  Is that

4    correct?

5    Q.   Yeah.

6    A.   Or do you want me to keep going?

7    Q.   Do you see that this is Title 15 of the United States

8    Code, Section 77d?

9    A.   Okay.

10    Q.   Is that right?

11    A.   That's correct.

12            Now, I'm not an attorney, so I rely on these

13    exemptions by relying on attorneys that are familiar with what

14    the rules and regulations are.

15    Q.   Is that 4(a)(1), what you see right there?

16    A.   Again, sir, I'm not an attorney.

17    Q.   So you don't know if that's 4(a)(1)?

18    A.   I -- I -- I don't -- again, I am not an attorney.

19    Q.   The whole question under Rule 144 and -- well, let's --

20    let me back that up.

21            The pertinent question is can a holder sell

22    unregistered securities in a public market.  Would you agree

23    with that?

24    A.   If they meet the qualifications for the exemption, yes.

25    Q.   Right.  So if I'm a holder of unregistered securities,

1   I want to qualify for the exemption; right?

2   A.  That's correct.

3   Q.  Because then I can --

4   A.  If I want to sell.

5   Q.  Sure.

6   A.  Uh-huh.

7   Q.  Because then I can sell those securities in a public

8   market?

9   A.  Yes, uh-huh.

10  Q.  4(a)(1) -- what you're calling 4(a)(1), that's the

11  exemption; right?

12  A.  That's correct.

13  Q.  Let's talk about the relationship between that exemption

14  and Rule 144.

15  A.  Okay.

16  Q.  Rule 144 is a safe harbor; correct?

17  A.  That's correct.

18  Q.  So I want to satisfy -- I want to qualify for the 4(a)(1)

19  exemption.

20  A.  Uh-huh.

21  Q.  One way I do that is through the Rule 144 safe harbor; is

22  that correct?

23  A.  You can do it that way or you can use the other exemption,

24  which is 4(a)(1), as I understand it from my legal counsels.

25  Q.  Where in there is this other exemption?

1    A.   Is what?

2    Q.   Can you show me in the US Code book there where the other

3    exemption is?

4    A.   Sir, I'm not an attorney.  I'm not going to sit and

5    purport that I know the specifics of the regular -- of the --

6    of the Code.

7    Q.   You referred to a tacking period.  That's in Rule 144;

8    right?

9    A.   No.  I -- I think those -- well, I've always used an

10   interpretation that it -- you can tack the holding period of a

11   previous -- of a previous form of securities -- in this case

12   it was a convertible note -- to the shares.

13        And as long as it's more than a year in this case of

14   this specific security which is, you know, traded on the

15   bulletin board, you can apply the holding periods, which gives

16   you the free-trading shares, which generates the exemption.

17   Q.   And that one-year holding period and the tacking period,

18   that all comes from Rule 144; right?

19   A.   I'm not sure where -- I just know that whenever I did my

20   underwriting warrants or my convertible set -- debt -- or my

21   convertible preferred, I always had a -- what's called a

22   net issuance clause in the agreements so that I could tack the

23   holding period of owning the -- the previous instrument into

24   the common -- into when I sell the shares.

25   Q.   Now, if I were to show you Rule 144 in this book of

 1   regulations, would it help you to -- to look at that?

 2   A.  No.  I'm not an attorney, sir.

 3        MR. SZOTT:  Your Honor, this witness is not qualified

 4   to opine on the securities laws, as he's just demonstrated.

 5   I move to strike any opinions that relate to Rule 144 or

 6   what's been called 4(a)(1).

 7        MR. FLEENER:  That argument goes to weight, not

 8   admissibility of the person's testimony, Judge.

 9        THE COURT:  I agree with you, Mr. Fleener.

10   BY MR. SZOTT:

11   Q.  Mr. Gottfredson, you reviewed -- did you review

12   correspondence between Justin Herman and Joslyn Claiborne at

13   Pacific Stock Transfer?

14   A.  I reviewed a -- an email, yes.

15   Q.  Was it that email that Mr. Fleener showed you?

16   A.  I believe it was, yes.

17        MR. SZOTT:  If I could have just a moment,

18   Your Honor.

19      (Discussion held at counsel table.)

20        MR. SZOTT:  Mr. Davila, would you bring up 300,

21   please.

22        Ms. Harris, can I have the screens to Government's

23   counsel table, please?

24        Mr. Davila, would you magnify this section.

25   ///

1    BY MR. SZOTT:

2    Q.   First -- or there's a -- there is a bullet point,

3    Mr. Gottfredson, at the top.  Do you see that?

4    A.   Yes, sir.

5    Q.   And is there some subbullet points?

6    A.   Yes.

7    Q.   So Subbullet Point No. 1, it says, "144(a)"?

8    A.   Uh-huh.

9    Q.   Second subbullet point says "144(b), 144(b), 144(b)(1)(i),

10   144(b)(1)(ii)," and then below that, in yet another subbullet

11   point, "144(b)."

12   A.   Uh-huh.

13   Q.   Would you agree?

14   A.   Yes, uh-huh.  That's what it says.

15   Q.   Next subbullet point, "144(c), 144(b)"; right?

16   A.   Uh-huh.

17   Q.   Next subbullet point, "144(d)"?

18   A.   Uh-huh.

19   Q.   They're talking about Rule 144; right?

20   A.   Yes.

21           MR. SZOTT:  We can take that down.

22   BY MR. SZOTT:

23   Q.   Starting basically where Mr. Fleener left off or close to

24   where he left off, he talked about people buying NERG stock

25   being speculators?

1    A.   I'm sorry.  Say that again.  I didn't hear you.

2    Q.   I apologize.

3             You talked about people buying NERG stock --

4    A.   Yes.

5    Q.   -- NuTech stock -- being speculators?

6    A.   Uh-huh.

7    Q.   Are speculators entitled to protection under the

8    securities laws?

9    A.   They're an investor and under issuance of stock -- I think

10   the '33 directs that -- new offerings.  The '34 act is

11   subsequent trading, as I understand it.

12   Q.   If I'm an investor who you would call a speculator --

13   A.   Uh-huh.

14   Q.   -- am I protected by the securities laws of the

15   United States?

16   A.   You're not protected from losing money, but you're

17   protected on being able to have access to, on a reporting

18   company, current financials and information.

19   Q.   What about a nonreporting company like this?  I'm still

20   entitled to truthful information; correct?

21   A.   Well, you may not get it in a company like this.  You just

22   may not get it.

23   Q.   If the company puts out information, if -- and I'm an

24   investor -- I have a right to expect that that information's

25   going to be truthful; right?

19-CR-26-ABJ        GOTTFREDSON - CROSS - SZOTT        Vol. XII-2135
21-CR-14-ABJ

1    A.  Well, you should -- you have recourse back to them for the

2    quality of the information in a court of law like this.

3          But you're dealing in a very speculative

4    environment -- you know, security -- that you have assessed to

5    be within your risk profile.  The SEC regulations are not

6    meant to impede the formation or -- of capital.  They're meant

7    to protect and do full disclosure.  That's a big distinction.

8    Q.  Right.  So truthful disclosure is what I can expect as an

9    investor?

10   A.  That's correct.

11   Q.  Just so we're clear, Mr. Gottfredson, you mentioned

12   looking at the blue sheets.

13   A.  Uh-huh.

14   Q.  This got a little unclear.

15         But if I were to tell you that blue sheet report was

16   generated June 15th of 2018, that -- if that were true, you

17   couldn't have relied on it for anything more recent than that;

18   correct?

19   A.  No, not -- because data doesn't exist.

20   Q.  You opined that Mr. Rodgers and Mr. Pardy were not

21   affiliates --

22   A.  Uh-huh.

23   Q.  -- is that right?

24   A.  That's correct.

25   Q.  Based solely on the fact that you reviewed a transcript of

1    testimony where they testified to that effect?

2    A.   And I also looked at the OTC Markets report, that's

3    correct.

4    Q.   The OTC Markets report?

5    A.   The -- the NERG section in the OTC -- yeah, in the --

6    I believe it's www.otcmarkets.com.

7    Q.   And what did you review there?

8    A.   I looked at the filing.  They had a filing in there.  It

9    was kind of a blog.  And it had in there financial information

10   as of when these shares were bought, and I think there was

11   42 million shares outstanding at that point in time, 42 --

12   yeah, 42 million.

13        And these individuals had a total, I think -- less

14   than 200,000 shares, so they're not a controlling interest in

15   the company.

16        They're not affiliates.  They're not directors -- or

17   so they say in their transcripts, -- and they're not an

18   underwriter.  They're not -- you know, they're not an issuer.

19   Q.   So 42 billion shares, potentially?

20   A.   I can't remember if it was -- they did a -- they did a

21   reverse -- I mean, they did a change in -- let's see.  When

22   was it?  It was November . . . 20 -- 6 -- 15 -- 26 -- 15,

23   November 30th in the OTC Markets.

24        I thought they had --

25   Q.   Well, that -- let me cut you off there.  I don't want you

1    to speculate.

2            Do you remember when the free-trading shares were

3    issued?

4    A.   Free trades were in 20- -- 2014 -- or 2015 or 2014,

5    depending on which of the shares were issued according to the

6    transfer agent, to the letters to the transfer agent.

7    Q.   Well, are you talking about the debt assignment agreement

8    where one was backdated?

9    A.   I believe that's one of them, yes, uh-huh.  One of the

10   two.

11   Q.   But that wasn't the issuance of free-trading shares?  That

12   was just the debt assignment; correct?

13   A.   Yeah, but it also attempted to establish the holding

14   period.  Well, the holding period began in June of 2008, when

15   these original convertible notes were acquired.

16   Q.   Free-trading shares were issued September 28th of 2015.

17   Do you disagree with that?

18   A.   I believe they qualified as free-trading shares.  They

19   just had a legend on them that no one would accept the stock

20   on, no broker-dealer would.

21   Q.   Mr. Gottfredson, how -- how long did you spend reviewing

22   documents for this case?

23   A.   A while.  Last -- I really started diving into the account

24   on Monday of last week.  I've spent about six, eight hours a

25   day on it.

19-CR-26-ABJ        GOTTFREDSON - CROSS - SZOTT        Vol. XII-2138
21-CR-14-ABJ

1  Q.  Would you agree that if your factual recitation differs

2  from exhibits that have been admitted that the jury should

3  rely on the exhibits?

4  A.  I think they need to rely on what the rules and

5  regulations are and whether these shares can be traded freely

6  and then the exemption that they use to get into that status.

7  Q.  But you're really not the one who can tell them anything

8  about what the rules and regulations are, are you?

9  A.  I said I'm not an attorney, so I'm not going to give a

10  legal opinion.  I'm not qualified to give a legal opinion.

11  Q.  Let's talk about what it means to be an affiliate.

12      Let's say you've got a company and you've got a

13  shareholder who owns shares that are 30 percent of that

14  company.  Is that person an affiliate?

15  A.  He would be under Rule 144, uh-huh.  Yes.

16  Q.  What if you've got another person who has a convertible

17  note that he could exchange tomorrow to own 30 percent of that

18  company?  Is that person an affiliate?

19  A.  Depends on what -- how long he's held it and what

20  exemptions he's attempting to use.  If he uses 4(a)(1), he

21  could get those shares to be free trading.  He might be

22  limited on how much he can sell -- no.  I'm sorry.  That would

23  be Rule 144.

24      But he's -- no.  He should -- certain people do that,

25  yeah.  I've seen that done.

1   Q.  I still don't --

2           MR. SZOTT:  Let me strike that, Your Honor.

3   BY MR. SZOTT:

4   Q.  You're not prepared, however, to explain anything to the

5   jury about 4(a)(1) as it might be different from the safe

6   harbor and Rule 144, are you?

7   A.  I believe we did that.  I did that on cross-examination --

8   or the initial questioning.

9   Q.  That person who owns 30 percent of the shares in a

10  company, let's say he claims he's not an affiliate or believes

11  he's not an affiliate.

12          Does that change whether he's an affiliate?

13  A.  Under Rule 144 it can.  Under 4(a)(1) it doesn't.

14  Q.  So I own 30 percent of a company and then I say "I don't

15  consider myself to be an affiliate," you think that that has

16  some effect under Rule 144?

17  A.  Yes.  If you're 30 -- if you're using -- if you're trying

18  to get under Rule 144, it has absolutely every effect.  You're

19  bound, I think, by 10 percent of the issue, not 30 percent.

20  I mean, you're down at 10 percent.

21          And you may have -- in that case, you may be limited

22  to what you can trade, too.  There's another qualification for

23  that.

24  Q.  And there we're talking about control securities or the

25  control limitations of Rule 144?

1    A.   That's correct, not 4(a)(1).

2    Q.   So I need to try to get this clear.

3         You're saying that somebody can just -- if somebody

4    says they're not an affiliate but they own 30 percent of the

5    shares, their say-so has some sort of effect under Rule 144?

6    A.   Their -- no.  I'm -- ask the question again, please.

7    Q.   If someone owns 30 percent of the shares in a company but

8    they say -- or they believe they're not an affiliate and they

9    say that, does the fact that they say that have any legal

10   effect?

11   A.   No.  But I'll tell you what, if I was the transfer agent

12   being asked to make that freedom -- free up those shares,

13   I would want a legal opinion from a reputable attorney to that

14   effect.  I don't do -- a transfer agency is -- has -- is --

15   most transfer agents that I know require a legal opinion and

16   the consent of the company to make that -- remove those

17   legends.

18   Q.   So in terms of being an affiliate, somebody's private

19   opinion doesn't matter?  What actually matters are the facts

20   and circumstances that are connected with their potential

21   control of the company; is that right?

22   A.   That's correct.  But did these two people control the

23   company at this point in time?  I don't believe they did in --

24   they -- they acquired a bunch of wells and gas pipelines at

25   this same time.

1           MR. SZOTT:  Well, that's -- I'd move to strike as

2    nonresponsive, Your Honor.

3           THE COURT:  Sustained.

4           The jury will disregard.

5    BY MR. SZOTT:

6    Q.  Are you aware that one of these notes purportedly was

7    exchanged for common stock that was approximately 30 percent

8    of all the common stock that was outstanding at the time?  Are

9    you aware of that?

10   A.  I don't think it was 30 percent, sir.  I think that there

11   was another individual, a buyer, that acquired for 28 -- 28 --

12   20- -- I'm sorry -- 26.1 billion shares that was the person

13   who was in control of the company.

14   Q.  Let me ask it this way:  Let's say one of these notes was

15   exchanged for 30 percent of the outstanding shares of the

16   company.  That noteholder would be an affiliate; right?

17   A.  He would -- he would -- yeah.  He would probably be an

18   affiliate, yes, uh-huh.  But that's not -- he wasn't

19   30 percent of the company when these two people exchanged

20   their notes.

21   Q.  I don't know that I need to reiterate.

22           But just to reiterate --

23   A.  Go ahead.

24           THE COURT:  I think you're kind of passing.

25           30 percent of EcoEmissions?  30 percent of NERG?

1    What are we talking about?

2    BY MR. SZOTT:

3    Q.  If a note -- if this note was -- if one of these notes --

4    A.  Uh-huh.  So it depends on the outstanding shares.

5    Q.  Please wait for me to ask the question.

6            If one of these notes is exchanged for stock and the

7    stock ends up being 30 percent of the outstanding shares of

8    NERG -- just assume that that's what happened -- that

9    noteholder is an affiliate; correct?

10   A.  Under Rule 144, yes.

11   Q.  So let's assume that set of facts.

12   A.  Okay.

13   Q.  Under that scenario, the holding period does not start in

14   June of 2008?  Rather, the holding period starts when those

15   notes were assigned to Justin Herman and/or Bravo Two Zero

16   Partners?  Do you agree with that?

17   A.  Yes, under Rule 144.

18   Q.  So under Rule 144 someone looking at this transaction

19   might think the one-year holding period starts in either

20   December -- or excuse me -- January of 2015 if we're looking

21   at the real debt assignment agreement or January of 2014 if

22   we're looking at the backdated one?

23           Do you agree with that?

24   A.  If it's been backdated, yes, uh-huh.

25   Q.  Let's talk a little bit about -- or let me strike that.

1    Let's talk about pump and dumps.

2            If you want to dump stock, you need free-trading

3    shares; right?

4    A.  Yes.

5    Q.  And the idea with a pump and dump is to -- you want to

6    increase investor demand to buy the stock?

7    A.  Well, that's one of the things that -- if you're involved

8    in a pump and dump -- that you want to have occur, yeah.  You

9    want to have the -- both the volume increase so you can sell

10   the position and, hopefully, the price increase to where

11   you're making -- you're dumping the stock, yes.  That's what's

12   called a pump and dump.

13   Q.  I believe on direct you testified about buying and

14   selling.  If I want to dump stock, I need somebody to buy it;

15   right?

16   A.  Yes.  That's the -- yeah.  You've got to be matched with a

17   buyer willing to pay for the stock, yes.

18   Q.  So if I decide that I want to dump 2 billion shares of

19   stock at whatever price, I can't do that unless somebody

20   agrees to buy it; right?

21   A.  In the market, yes, uh-huh.

22   Q.  And if there -- if there is a lot of volume, a lot of

23   stock being sold, that tends to drive the price down; right?

24   A.  If it's all sales, yes.  But for every share sold, there's

25   a share bought.  Or they -- well, that -- if -- assuming those

1   short sellers, every share sold -- sold -- you have to have a

2   buyer for.

3          MR. SZOTT:  Let's look at Exhibit 419.

4          THE WITNESS:  I don't see it, sir.

5          MR. SZOTT:  I think we're bringing it up.  It should

6   appear on your monitor in just a moment.

7   BY MR. SZOTT:

8   Q.  Do you remember seeing this exhibit on direct examination?

9   A.  Yes, I do.

10  Q.  And you see that there are references to 12 press

11  releases?

12  A.  Uh-huh.

13  Q.  How many of those did you read?

14  A.  I read the one from the Russians.  And there were other

15  ones that had -- that talked about being -- you know,

16  getting -- becoming a reporting company and getting an

17  accountant to do the financials to make it a reporting

18  company.  But I didn't look at all 12, sir.

19  Q.  Can you tell the jury for a particular day on this chart

20  how the stock price might have fluctuated in relation to when

21  these press releases were issued?

22  A.  During that day fluctuated in that price?

23         This is only, I think, closing prices -- oh, price/

24  volume -- it just has closing price and volume.  It doesn't

25  have range.

1    Q.  So the bottom line is how a price might have fluctuated a

2    particular -- within a particular day you don't know?

3    A.  I don't know the -- the exact -- I didn't see time and

4    sales during the day.  If I'd seen those reports, I could have

5    judged that.

6            I did also look at the blue sheet reports.  It had

7    time and date on those.

8    Q.  Now, just to be clear, pumps and -- pump and dumps are

9    unlawful; correct?

10   A.  They're -- I consider them to be something that you don't

11   want to even be anywhere around.  As for the actual pump and

12   dump, you've got to have a finding of fact, and I don't think

13   that's occurred here.

14           MR. SZOTT:  Let's bring up -- let's bring up

15   Exhibit 513.

16   BY MR. SZOTT:

17   Q.  Mr. Gottfredson, have you seen this exhibit before in your

18   review of materials?

19   A.  Yes, uh-huh.

20   Q.  This is the price, volume, and press release analysis from

21   April 18th of 2016 to June 13th of 2016?

22   A.  Uh-huh.  Uh-huh -- yes.

23   Q.  So here . . .

24           MR. SZOTT:  May we publish this, Your Honor.

25   I believe it was previously received as a demonstrative.

1           Thank you.

2           So now I would note that 513 is again being shown to

3    the jury.

4    BY MR. SZOTT:

5    Q.  Let's look at May 10th.

6    A.  Uh-huh.

7    Q.  Fair to say that's the highest volume -- highest market

8    volume of any day on the chart?

9    A.  Of this period, yes.

10   Q.  Fair to say it's the highest share price of any day on the

11   chart?

12   A.  Of any day?  I -- it appears to be, yes.

13   Q.  There's a box indicating a press release was issued on

14   May 10th.  Would you agree with that?

15   A.  That -- that dot, yeah.  Of course -- yes, uh-huh.

16          MR. SZOTT:  Let's bring up Exhibit 40.4.

17   BY MR. SZOTT:

18   Q.  Mr. Gottfredson, have you seen this exhibit before?

19   A.  I have.

20   Q.  "NuTech Energy Resources Receives Buyout Offer, May 10th,

21   2016, 0900 Eastern Time."  Did I read that correctly?

22   A.  That's correct.

23   Q.  So that would be the press release that's issued on

24   May 10th of 2016?

25   A.  It appears to be, yes, uh-huh.

1          MR. SZOTT:  Let's go back to the -- Exhibit 513,

2    please, Mr. Davila.

3    BY MR. SZOTT:

4    Q.  So that press release comes out May 10th, 2016.  And you

5    would agree that this is the highest market volume, the

6    highest share price of this entire period; is that right?

7    A.  That's -- appears to be, yes, uh-huh.  From the graph.

8          MR. SZOTT:  Pull up Exhibit 520.

9          THE WITNESS:  Uh-huh.

10   BY MR. SZOTT:

11   Q.  What's Intrepid's highest dollar figure day of any of

12   the days on Exhibit 520?

13   A.  .0063 again.  I think I testified to that.

14   Q.  I'm talking just gross -- gross amount, highest gross

15   amount of any of these days.

16   A.  Highest gross -- of volume or of price?

17   Q.  Price -- or -- gross amount, in the "Gross Amount" column,

18   second from the right.

19   A.  That would be the 5/10, 5/11, took 76 million shares on

20   5/10.

21   Q.  You mean --

22   A.  76 -- is it -- yeah, 76.

23   Q.  You mean 27 million shares, $76,599 on 5/10/2016?

24   A.  Yes.  I'm sorry for the -- yes, that's correct.

25          MR. SZOTT:  We'll go back to 513.

1    BY MR. SZOTT:

2    Q.   So 510 is a press release, highest overall volume, highest

3    share price, and it's Intrepid's number one dollar day of

4    anywhere in this period; is that right?

5    A.   That appears to be, yes.

6    Q.   You agree the market opens at 9:30 in the morning?

7    A.   Yes, I guess.  It depends on where you're at.  It opens at

8    various times whether you're at --

9    Q.   Understood.

10   A.   -- West Coast or the East Coast.

11   Q.   Yep.  Understood.  It was an imprecise question.

12        Eastern Time?

13   A.   Pardon me?

14   Q.   9:30 Eastern Time?

15   A.   Yes.  There you go.

16   Q.   So that's all on May 10th.

17        MR. SZOTT:  Let's pull up Exhibit 40.2.

18        Magnify, please, Mr. Davila, the top portion of this

19   with the text.

20   BY MR. SZOTT:

21   Q.   Mr. Gottfredson, have you seen this?

22   A.   Yes, I have.

23   Q.   What's the date?

24   A.   5/9, May 9th.

25   Q.   So approximately the day before all that that we just

1  talked about?

2  A.  Uh-huh.

3  Q.  First line, "I am really expecting to sell several

4  hundred million shares of NERG this week."

5          Did I read that right?

6  A.  That's correct.

7          MR. SZOTT:  We can take that down.

8          Bring up 507.

9  BY MR. SZOTT:

10 Q.  Have you seen this before, Mr. Gottfredson?

11 A.  Yes, I have.  It's the OTC Markets, uh-huh.

12 Q.  And so it's a little -- it's a little difficult to see.

13         MR. SZOTT:  Mr. Davila, would you magnify maybe this

14 top upper right third or so of the exhibit.

15 BY MR. SZOTT:

16 Q.  Would you agree this was a screen capture on May 29th of

17 2016 for the company profile page of NERG --

18 A.  Uh-huh.

19 Q.  -- on OTC Markets?

20 A.  Yes.

21 Q.  Do you see the skull and crossbones?

22 A.  Yes.

23 Q.  And you see the status is suspended?

24 A.  Yes.

25 Q.  So at this point in time, is it possible to trade in NERG?

1   A.  Yes.

2   Q.  Even though it's suspended?

3   A.  Yes.  It's a buyer-beware stock.

4   Q.  Well, I'm -- that's the skull and crossbones?

5   A.  Uh-huh.

6   Q.  What if it's suspended by the SEC?

7   A.  Which I believe that occurred on 5/19.

8   Q.  Well, regardless of when it occurred, if the SEC suspended

9   trading in NERG, could it be traded?

10  A.  No.

11  Q.  Are there other reasons other than a suspension where a

12  holder might be unable to sell stock?

13  A.  Yeah.  It may not qualify as free-trading stock.  He may

14  be a control person, insider, or affiliate.

15  Q.  What if a broker-dealer just decides not to trade that

16  stock?

17  A.  They make that decision.  There are -- broker-dealers will

18  go through and say "We're not interested in taking the risk of

19  clearing these transactions or settling these transactions."

20          MR. SZOTT:  May I have a moment, Your Honor.

21          THE COURT:  You may.

22      (Discussion held at counsel table.)

23  BY MR. SZOTT:

24  Q.  Mr. Gottfredson, on -- on direct examination you made a

25  reference to the OTC BB.

1    A.   Uh-huh.

2    Q.   Just to -- just to confirm, NERG was not traded on the

3    OTC BB; correct?  NERG was traded on --

4    A.   Now that you remind me, yes, it was traded in --

5    Q.   The Pink marketplace?

6    A.   -- the Pink marketplace, yes.

7          I -- I refer to -- I'm sorry.  I should have been

8    clearer on that.

9          I refer to both as -- as the over -- over-the-counter

10   bulletin board or -- basically, they're just interdealer

11   quotes.

12   Q.   You also referred -- I believe -- referred to -- strike

13   that.

14          You also referred to Nasdaq as an over-the-counter

15   market.  Do you remember that?

16   A.   Yes.  Uh-huh.

17   Q.   But Nasdaq is a national exchange; correct?

18   A.   There -- there are different levels of qualification.

19          Back when I was doing underwritings, they had the

20   Nasdaq small cap, which were companies that had like

21   $5 million in assets, audited financials, and then they had

22   the national --

23   Q.   Let's just talk about 20- -- I apologize for cutting

24   you off.

25          Let's just talk about 2014 to the present.  Nasdaq's

1    a national exchange; right?

2    A.   Uh-huh.  It's generically referred to, yes, uh-huh.

3    Q.   It's got listing requirements?

4    A.   Listing requirements.

5    Q.   So Nasdaq is not an over-the-counter market?

6    A.   Well, if that's how you choose to define it, that's the

7    case.  I always -- I always look at Nasdaq -- and, I'm sorry,

8    a lot of the news reporting stations -- as the over-the-

9    counter market.

10        You have the listed exchanges -- New York, American,

11   you know, foreign exchanges -- and then you have things that

12   are not on Nasdaq that a lot of people refer to as the -- as

13   the over-the-counter market.

14   Q.   You mentioned this $14,600.

15   A.   Yes.

16   Q.   What documents did you rely on to reach that conclusion?

17   A.   I relied on statements from King -- Kingdom Trust;

18   I looked at some spreadsheets that were put together by the

19   defendants that allocated the amount sold on -- I think that

20   was one of the exhibits.

21   Q.   Spreadsheets put together by the defendants?

22   A.   Well, he was -- he was basically based off the emails that

23   were sent to allocate the trades at the end of the day, among

24   all of the participants in the particular seller at new --

25   at Kingdom Trust.

1   Q.  I'd ask you to look again at the manual of the

2   United States Code that I handed you at the beginning.

3            So under Section 77d(a)(1) --

4   A.  What page is that one?

5   Q.  I believe it's page 175.

6   A.  Oh, yes.  Okay.

7   Q.  About how many -- or maybe I'll ask you just -- how many

8   words are in Section (a)(1)?

9   A.  (a)(1)?  1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11.  And counting

10  "underwriter" as one word.

11  Q.  And that's just -- that's just after the 1; right?

12  11 words?

13  A.  Yes.  Uh-huh.  "Trans-" -- this "shall not apply to

14  transactions by any person other than an issuer, underwriter,

15  or dealer."

16  Q.  So, basically, one sentence?

17  A.  I'm sorry.  What?

18  Q.  Basically, one sentence?

19  A.  You're right, uh-huh.  Yeah, uh-huh.  I didn't write it

20  but . . .

21            MR. SZOTT:  Nothing further, Your Honor, at this

22  time.

23            MR. WARD:  Good afternoon, Mr. Gottfredson.

24            THE WITNESS:  Hello.

25  ///

1                        **CROSS-EXAMINATION**

2     **BY MR. WARD**:

3     Q.   You testified on direct examination with Mr. Fleener that

4     you're being paid for your testimony today; correct?

5     A.   That's correct, uh-huh.

6     Q.   And, in fact, you're being paid by the United States

7     Government because both Defendants Herman and Winters are

8     indigent; correct?

9     A.   Well, I am paid by my -- by my agency, who has made those

10    arrangements.  I'm not a -- I'm not a direct party to those.

11    Q.   But you're aware that it's the US Government paying for

12    your --

13    A.   I -- I'm learning that, yes, uh-huh.

14    Q.   I want to talk a little bit about DVP accounts.

15    A.   Okay.

16    Q.   A DVP account, what is -- what is the DVP -- what is the

17    acronym for?

18    A.   Stands for "delivery versus payment," which means you

19    deliver the shares so that the buyer's got them and then you

20    receive back total payment for the purchase of those shares.

21    Q.   And you're aware that, in this case, there was an Intrepid

22    DVP account; correct?

23    A.   That's correct, uh-huh.

24    Q.   And you're aware that Intrepid, in addition to -- to

25    having the DVP account, also had some NuTech shares; correct?

19-CR-26-ABJ        GOTTFREDSON - CROSS - WARD        Vol. XII-2155
21-CR-14-ABJ

1  A.  I believe that -- yes.  Uh-huh.

2        MR. SZOTT:  Your Honor, I apologize for interrupting

3  Mr. Ward.

4        I would ask that this witness be treated as though

5  this were direct examination rather than cross.

6        MR. WARD:  It's cross-examination.

7        THE COURT:  I think Mr. Szott is correct.

8        MR. WARD:  Okay.

9  BY MR. WARD:

10 Q.  So did -- in addition to Intrepid having the DVP account,

11 did Intrepid have some shares?

12 A.  Yes, uh-huh.  Uh-huh.

13 Q.  Okay.  And we -- we saw an exhibit earlier where their

14 shares were -- were -- some were labeled in the share issuance

15 sheet as Intrepid, some were EY II; correct?

16 A.  Yes.

17 Q.  Were -- were there additional shares owned by people other

18 than Intrepid or EY II being traded through Intrepid's DVP

19 account?

20 A.  There were other participants, as I understand it, in an

21 Intrepid that were entitled to proceeds from transactions or

22 be responsible for paying transactions if they did it by the

23 interests of their ownership.

24 Q.  Is a -- if -- if you are going to execute a pump and

25 dump --

1    A.   Uh-huh.

2    Q.   -- does it make any sense to try and do so through a DVP

3    account?

4    A.   In my experience, no.

5    Q.   Why not?

6    A.   You're -- if you're using a DVP account and particularly

7    the way the Intrepid account was handled by Kingdom,

8    transactions had to go through -- it was extremely burdensome.

9    They had to go to -- I guess whoever's doing the trading on

10   it, authorizing the shares for Intrepid to be sold, had to go

11   do the transaction with whatever broker-dealer in the

12   marketplace, and there could be, you know, a lot of them.

13        And then you'd have to go back and summarize all

14   those transactions and send an email to Kingdom to prorate

15   those transactions against all of the other holders of the

16   account.

17        And my understanding is that Kingdom had an account

18   for each of the people who had an interest and they just moved

19   the proportionate share of the transactions in shares and

20   money directly to the individual holders that were -- had an

21   interest in it.

22   Q.   I'd like to show you Exhibit 319 that -- that has been

23   admitted in this case.

24        MR. SZOTT:  It hasn't been admitted, Your Honor.

25   It's merely a demonstrative.

 1              The Government would not object to its admission,

 2    Your Honor.

 3              MR. WARD:  So this is -- sorry.  I'm trying to get

 4    this sized in a way that makes some sense.

 5    BY MR. WARD:

 6    Q.  This is a -- a demonstrative exhibit that the Government

 7    used with their securities expert.

 8              Have you -- are you familiar with this exhibit?

 9    A.  Yes, I am.

10    Q.  All right.  The sections of this exhibit where it says

11    "Has at least one year passed since the securities were last

12    acquired from NERG or an affiliate of NERG (including any

13    applicable tacking period)?" -- do you see that box?

14    A.  Yes.  Third one down, uh-huh.

15    Q.  Can you explain to the jury how this applies -- this

16    analysis in 319 -- applied to the convertible notes from

17    Rodgers and Pardy?

18    A.  Well, basically, if they've held it a year, they can --

19    and they get down to 319 -- and they can go through and

20    exchange those for common shares.

21              But, again, we're not using Rule 144; we're using

22    4(a)(1).

23    Q.  And Mr. Szott made a point that Rule 4(a)(1) is only one

24    sentence long; right?

25    A.  He -- yeah, only one sentence, 12 words.

1    Q.   Does that make it any less of the law?

2    A.   No, uh-uh.  It's -- no, uh-uh.

3    Q.   And in your analysis of this case, were you able to

4    determine whether or not Rodgers and Pardy were affiliates?

5    A.   I don't believe they were affiliates.  My opinion, that

6    they were not.

7    Q.   All right.

8    A.   At the time of the issuance of the notes.

9            MR. WARD:   We can take this exhibit down.

10   BY MR. WARD:

11   Q.   You testified -- or you were asked some questions about

12   the press releases; correct?

13   A.   Uh-huh, yes.

14   Q.   And you were also asked about whether you agreed that

15   ensuring that investors had accurate information was the

16   purpose behind the United States securities law; correct?

17   A.   Uh-huh.  Yes.

18   Q.   And that's what the Government's expert testified to, too.

19           And so the problem -- what -- what the securities law

20   is trying to avoid is information that investors rely upon in

21   making decisions; correct?

22   A.   That's correct.  They want to make sure there's full and

23   fair disclosure.

24   Q.   Do you think it is even -- do you -- do you think

25   investors would have relied upon the date in the Pardy-Rodgers

1   convertible notes?

2   A.   I wouldn't think that they would know about it.  They

3   would have no reason to get in and know that.

4        If they might have -- if they conducted due diligence

5   and went into the company and asked specifically to see it,

6   that might be another thing.  But to the best of my knowledge,

7   that never occurred here.

8        MR. WARD:  May I have just a moment, Your Honor.

9        THE COURT:  Yes, you may.

10  BY MR. WARD:

11  Q.   The shares of stock that were sold through Intrepid's DVP

12  account, did they sell at the high in terms of the -- the

13  fluctuating share price over the period of the conspiracy?

14  A.   No, uh-uh.  No.  They sold at -- I think 6.6 was the best

15  we saw.  I think it got up over 1.2, 1.3 -- or .012 -- and

16  they were -- they were not anywhere near that.

17  Q.   We had testimony from a witness who said that he bought

18  his shares back in the 2015-2016 time period and -- I think he

19  said he bought 350,000 -- or he had 350,000 shares and that

20  the value of those shares, you know, was -- was between $50

21  and $500 for several years after he had them and then in the

22  spring of 2021 the -- the price of that block of shares jumped

23  up to $5,000.  And you've testified about that in terms of the

24  spring of 2021 increase in -- in the price of the stock.

25        Can you try to explain to the jury what would have

1   caused that increase in the spring of 2021 when the only

2   foreseeable news that anyone could have heard about NERG is

3   possibly news about this trial and the fact that there was a

4   criminal trial centering on NERG?

5   A.  I don't have the -- other than using the momentum theory

6   of why this stock would go up, increase in volume, I don't

7   have a -- you know -- a reason I can point to.

8           And that's happened in other stocks.  This AMR

9   move -- AMR Theaters group or whatever -- that made big news

10  in the earlier part of this year.  It -- it had no news or

11  anything like that.  What happened was a group of speculators

12  got in and day traders got in and said, "Gee, this thing is

13  short.  How many shares are outstanding?"

14          I don't know that number, but let's say it's a

15  hundred thousand shares.  Well, there was a hundred thousand

16  shares short in the stock, which means it was all

17  short-selling.  They were anticipating it going down.

18          Well, if I'm a -- if I'm a speculator and a -- you

19  know -- kind of an opportunist, I'll go say, "Well, I'll go

20  buy some; I'll put a little bit of money in," and then go

21  buy it.

22          And I think that's maybe what was going on here in

23  the blogs for NERG.  But -- and then they'll get it out on the

24  blog and say "Check out, you know, AMR or NERG and say -- and

25  see that there was -- there is a big short interest and just

1   go buy some and hold it."

2          You get, you know -- you know -- 500, 600 people

3   doing that, you can create some buying that will drive up the

4   price of the stock and -- you know, and it's kind of

5   counterintuitive.  It's very speculative.  I don't want to

6   diminish that.

7   Q.  Did the -- during the time period where this conspiracy is

8   alleged, which is that 2015-2016 time period, did the stock

9   price ever increase as much when -- when those press releases

10  were going out and the graphs that you just testified about --

11  did the stock price ever go up as much as it did in the spring

12  of 2021?

13  A.  I think it's -- percentagewise it had been but not

14  pricewise.  I think we went from, basically, zero up to --

15  what was it?  I can't -- I don't see the chart in front of me.

16         But it was -- it went up like over -- I -- I don't

17  know what the high was, but it went considerably higher.

18  Q.  Let me ask you this way:  What caused more of a change in

19  the stock price, the press releases in 2015-2016 or the

20  momentum trading in 2021?

21  A.  I believe the moment- --

22         MR. SZOTT:  Objection; foundation.

23         THE COURT:  Sustained.

24  BY MR. WARD:

25  Q.  Assuming that you're correct, that it was momentum trading

1   that caused the price to increase in 2021 --

2   A.  Uh-huh.

3   Q.  -- did that momentum trading affect the stock price more

4   or less than the press releases in 2015 and 2016?

5   A.  I would say more.

6   Q.  The momentum trading affected the stock pricing more?

7   A.  Right.  And the press releases -- and you can't tell with

8   the press releases.  That one where they were going to be

9   bought out, the stock cratered the next day.  You know, the

10  next day it was, you know, way less than what anyone who

11  bought it at the high of the day was, the high of the previous

12  day.  Sorry for not being specific.

13  Q.  And after reviewing the materials that you did in

14  anticipation of your testimony, am I correct that you said

15  between the Intrepid stock sales that were actually Intrepid's

16  shares that would be attributable to Defendants Winters and

17  Herman, they received less than $15,000 from all of those

18  shares?

19  A.  That was my testimony.  I believe that to be the case.

20          MR. WARD:  Those are all the questions I have,

21  Your Honor.

22          MR. FLEENER:  One second, Judge.

23          I want to bring up -- I'm -- I've got 513, if you'd

24  show it to the witness and the jury, please.

25  ///

1                    REDIRECT EXAMINATION

2  BY MR. FLEENER:

3  Q.  Mr. Szott showed you this document; correct?

4  A.  Uh-huh, yes.

5  Q.  And this -- you see my little cursor moving around the

6  Russian --

7  A.  Uh-huh.  Uh-huh.

8  Q.  -- buyout offer; right?

9  A.  Uh-huh.

10         Yes.  I'm sorry.

11  Q.  That press release -- the press release happened at the

12  top of the market; correct?

13  A.  That's correct.

14  Q.  But the press release was for a Russian -- a buyout of a

15  Russian company for 2 1/2 cents a share.

16  A.  That's correct as I understand it, uh-huh.

17  Q.  Why didn't the share price go up to 2 1/2 cents a share if

18  people are learning that NERG is going to sell for 2 -- for

19  2 1/2 cents a share?  I would think, as an investor or

20  some- -- a reasonable investor could buy it at -- buy now and

21  wait to get to 2 1/2 cents a share.

22         Why didn't that happen?

23  A.  That probably has -- everybody looked at the Russian

24  announcement and -- and didn't have -- it didn't carry any

25  credibility.  I mean, 2 1/2 cents a share on a stock that's

1   trading, you know, below a half a cent a share, that's cra- --

2   that's crazy.

3           So I'm sure that the investors in the marketplace

4   didn't believe the announcement.  In fact, you see the very

5   next day, on 5/11, it fell back down to below .0015.  So it

6   lost 50 percent of its value the very next day.  So no one

7   took that announcement seriously.  Or there were -- there

8   were -- there were people that were willing to sell on it but

9   not buy on it.

10  Q.  All right.  So no one believed it?

11  A.  No.  I don't believe it.  Sorry.

12  Q.  To make a long story short.

13  A.  Yeah.

14  Q.  And if people -- and you've seen in your experience

15  buyouts where an announcement comes out that one particular

16  company is going to be bought out at a particular price?

17  You've seen these?

18  A.  Oh, yeah, uh-huh.

19  Q.  And if there -- and many times if they're believable, the

20  share -- share price of the stock that's getting bought out --

21  if a company is selling at $25 a share and it's being bought

22  by another company and the other company's willing to pay a

23  premium of $35 a share --

24  A.  Uh-huh.

25  Q.  -- and it looks like it's a transaction that the market

1    believes is actually going to happen --

2    A.   Uh-huh.

3    Q.   -- what would happen to the $25-a-share-stock company?

4    A.   It would go to -- it would probably go up -- wouldn't go

5    necessarily up to the top part of the range, but it would go

6    close to it, maybe 33, maybe 32, maybe $35 a share.

7    Q.   Because not everything is certain?

8    A.   No, not everything is certain.  And, you know, the first

9    thing everyone's going to be digging into on that announcement

10   on the being bought out at 35 is "Can the buyer buy it?  Does

11   he have the money in the bank or does he have the currency in

12   his shares" where they can exchange the shares at the buyout

13   time and have it all, have -- you know, and be able to settle

14   that transaction, that -- you know -- that sale.

15   Q.   One final -- just one final question.  We've heard a lot

16   of back-and-forth between you and me and you and Mr. --

17   Mr. Szott about the application of exemptions under Federal

18   securities law as it relates to NERG stock created from the

19   Pardy debt conversion --

20   A.   Uh-huh.

21   Q.   -- we've talked about transfer agents, Rule 44, all that.

22        One final question, though.  In your opinion, was the

23   13 billion shares of stock that was issued for the Pardy --

24   the Pardy debt tradeable under Section 4(a)(1)?

25   A.   Yes.

1           MR. FLEENER:  Thank you.  No further questions.

2           MR. SZOTT:  Just briefly, Your Honor.

3           THE COURT:  You may.

4                    **RECROSS-EXAMINATION**

5    **BY MR. SZOTT:**

6    Q.  So your opinion is that both those shares were tradeable

7    under Section 4(a)(1)?

8    A.  Yes.

9    Q.  But you don't know if Section 4(a)(1) is a rule or a

10   statute?

11   A.  I rely on my attorneys' advice for what exemption to use

12   on stock transactions that are -- involve restricted shares.

13   Q.  So shouldn't we be talking to your attorney about opinions

14   about whether shares are tradeable?

15   A.  Well, I would suggest that if you're going to go do it and

16   use 4(a)(1) or Rule 144 that you get a good attorney that can

17   advise you properly.

18   Q.  So maybe if we have an attorney who testifies about these

19   rules the jury should believe him and not you?

20           MR. WARD:  Objection; argument.

21           MR. SZOTT:  I'll withdraw it, Your Honor.

22   BY MR. SZOTT:

23   Q.  A moment ago, Mr. Gottfredson, Mr. Fleener asked you --

24   I believe it was a leading question.  He said "no one believed

25   it" in terms of the Russian offer.  Do you remember that?

19-CR-26-ABJ   GOTTFREDSON - FURTHER REDIRECT - FLEENER Vol. XII-2167
21-CR-14-ABJ

1   A.  Yes.

2   Q.  And you affirmed that.

3   A.  I've seen a lot of, you know, offers come through that we

4   can trust.

5         MR. SZOTT:  I just -- I'll strike that -- I'll move

6   to strike that as nonresponsive.

7         THE COURT:  Sustained.

8   BY MR. SZOTT:

9   Q.  Mr. Fleener asked -- he said words to the effect of "no

10  one believed it."  Do you remember that?

11  A.  Yes.

12  Q.  And you -- you affirmed that no one believed it?

13  A.  I don't think it was accepted well in the marketplace to

14  where it would cause you to go buy the stock.

15  Q.  Do you know if no one believed that?

16  A.  I don't know any individual investor and what their

17  thought process for whether they should buy it, no.

18        MR. SZOTT:  Nothing further, Your Honor.

19              **FURTHER REDIRECT EXAMINATION**

20  BY MR. FLEENER:

21  Q.  If people believed that the Russian stock offer was real

22  and that NERG was going to be sold for 2 1/2 cents a share,

23  where would the price go?  Up or down?

24  A.  Should -- it would be -- sold -- if the stock was going to

25  be sold at 2 -- it should go up.

1   Q.  Thank you.

2          Oh, one further question:  And where did the stock

3   go?  Which direction?

4   A.  It went down.

5   Q.  Thank you.

6   A.  It lost half its value.

7          MR. FLEENER:  No further questions, Judge.

8          THE COURT:  Mr. Gottfredson, you are excused.

9          THE WITNESS:  Thank you, Judge.

10         Your Honor, I appreciate the hospitality of the

11  Court.  Thank you.

12         THE COURTROOM DEPUTY:  Don't forget the microphone.

13         THE WITNESS:  Oh, yeah.

14         MR. FLEENER:  Can we have a minute, please, Judge?

15         THE WITNESS:  I believe these are yours.

16         MR. FLEENER:  Oh, Mr. Jubin's up.  I'll sit.

17         MR. JUBIN:  Your Honor, I realize I -- I omitted --

18  missed an exhibit, so I'd like to recall Mr. Miller for one

19  exhibit.

20         THE COURT:  That would be a -- would be a relief to

21  us all.

22     (Discussion held between counsel.)

23  ///

24  ///

25  ///

1       **STEPHEN JOSEPH MILLER, DEFENDANT HORN'S WITNESS,**

2             **FURTHER DIRECT EXAMINATION**

3  **BY MR. JUBIN:**

4  Q.  Mr. Miller, do you recall you're under oath?

5        I'd like you to take a look at --

6  A.  Yes, I recall I'm under oath.

7  Q.  -- Exhibit IH-1015.

8  A.  Yes.

9  Q.  What is that?

10 A.  It's a forwarded email from Ian Horn to Justin Herman

11 regarding what is Bob Mitchell's involvement.

12 Q.  And where did you get this document?

13 A.  It came in the form of digital discovery provided to your

14 office by the United States.

15       MR. JUBIN:  Let's scroll down to the second page.

16 BY MR. JUBIN:

17 Q.  And does that reflect the bona fides from the Government

18 discovery?

19 A.  Yes.  It is the format that it was provided to your

20 office, the sourcing of it, and the identification of it.

21 Q.  And what did this come from?

22 A.  From discovery provided to your office by the

23 United States Government.

24       MR. JUBIN:  Let's scroll back up to the first page.

25 ///

1    BY MR. JUBIN:

2    Q.  And you said this -- what's the date on this email?

3    A.  The master email itself is December 3rd, 2018, but the

4    forwarded emails start January 1st, 2015, then January 5th,

5    2015, and then October 23rd, 2018, and then December 3rd,

6    2018, in that order.

7    Q.  So the email that was forwarded -- the message we're

8    focusing on here is January 5 of 2015?

9    A.  Yes.

10   Q.  And that's the time when the bank was holding up the

11   $80,000; is that your understanding?

12   A.  That is the time period of the $80,000 escrow issue.

13   Q.  Okay.  And -- and the --

14        MR. JUBIN:  Your Honor, I'd move for the admission of

15   1015 --

16        MR. SZOTT:  No objection.

17        MR. JUBIN:  -- IH-1015.

18        MR. FLEENER:  Can you scroll through the document,

19   please?

20        And up, please.

21        No objection from Mr. Herman.

22        Mr. Horn may have one, Judge.

23        MR. JUBIN:  Mr. Horn has no objection.

24        MR. FLEENER:  I'm sorry.  Mr. Winters.

25        MR. WARD:  Your Honor, I'd object.  I think it's

1    self-serving hearsay.

2          MR. JUBIN:  Your Honor, it's not for the truth of the

3    matter asserted, so it's not defined as hearsay.  It's

4    secondarily under Rule 803(3).  It would be a -- a statement

5    of memory but not designed to prove the -- the belief in the

6    memory, but it's a question, what is involved.

7          THE COURT:  It's the question.

8          It is received.

9       (Defendant's Exhibit IH-1015 received into evidence.)

10         MR. JUBIN:  I have nothing further.  Thank you.

11         MR. HEIMANN:  No questions.

12         MR. FLEENER:  Can the defense attorneys huddle,

13   Judge?  Do you mind?

14         THE COURT:  I think this --

15         MR. FLEENER:  Is it time for a break?

16         THE COURT:  This would be a good time to take a

17   break, 15 minutes.

18         THE COURTROOM DEPUTY:  All rise.

19      (A recess was taken from 3:06 p.m. to 3:26 p.m.

20   Proceedings outside the jury's presence.)

21         THE COURT:  All right, Becky.

22         MR. FLEENER:  Your Honor, before Becky runs away,

23   I think we have -- just so the Court knows, I think we just

24   have a very short -- maybe five-minute -- witness and then the

25   defense is going to rest, all -- all defendants.

1        I don't believe any of the defendants are going to

2   testify, but I think the Court has to go to a -- go through a

3   reading with them.  But I think we have five more minutes and

4   then the defense is resting.

5        THE COURT:  Very well.

6        MR. HEIMANN:  I do not think we have rebuttal,

7   Your Honor, but I have five minutes to change my mind.

8        THE COURT:  Just start it all over.

9        MR. HEIMANN:  No, sir.  No, sir.

10       THE COURT:  It would be my intention at that point to

11  inoculate the jury again, send them home.  We can start on an

12  instruction conference if that's okay.

13       MR. HEIMANN:  Your Honor, I think that is okay.

14       At least for the United States, we probably need

15  an hour just to review the instructions so we can be useful

16  and -- and not waste Your Honor's time reading them for the

17  first time thoroughly since we got them this morning.

18       THE COURT:  I want to -- I want you to be useful.  We

19  don't want to make a mistake.

20       MR. WARD:  I can't promise we'll be useful,

21  Your Honor.

22       THE COURT:  I know you will.  You'll be great.

23       MR. FLEENER:  We generally aren't.

24       MR. JUBIN:  I promise I will try to be useful.

25       MR. FLEENER:  He usually is.

1      (Proceedings within the jury's presence at 3:28 p.m.)

2           THE COURT:  Thank you, ladies and gentlemen.

3           MR. WARD:  Your Honor, Mr. Winters would call Postal

4  Inspector Sonia Hacker.

5           THE COURT:  Ms. Hacker.

6           THE COURTROOM DEPUTY:  I don't think I cleaned the

7  witness stand.  Hold on a second.

8           THE WITNESS:  Thank you.

9           MR. WARD:  Good afternoon, Inspector Hacker.

10           THE WITNESS:  Good afternoon.

11           **SONIA HACKER, DEFENDANT WINTERS' WITNESS,**

12                **FURTHER DIRECT EXAMINATION**

13  **BY MR. WARD:**

14  Q.  Part of your investigation in this case involved

15  Marisol Elwell; correct?

16  A.  Yes.

17  Q.  All right.  What was Marisol Elwell's role -- why did you

18  investigate her involvement in this case?

19  A.  She helped draft the press releases for NuTech.  She

20  was -- sorry.

21  Q.  No, go ahead.

22  A.  She was the ghostwriter that you brought up earlier with

23  some exhibit.

24  Q.  Right.  Her email was ghostwriter4hire@ymail.com; correct?

25  A.  Sounds right.

 1  Q.  Okay.  And did you ever meet with her in person or just

 2  over the phone?

 3  A.  In person.

 4  Q.  Okay.  So you -- you met -- went and met with her in

 5  person.  Where is she located?

 6  A.  In Tennessee.

 7  Q.  And -- all right.  I'm going to show you something that

 8  has not been admitted in evidence.

 9       And did you have ghostwriter4hire send you,

10  individually, all of her emails that were related to the press

11  releases in this case?

12  A.  I -- that's what happened.  I served her with a subpoena

13  for records, and she didn't know how to get her emails to us.

14  So for -- to make it easier on her, I just told her she could

15  forward them to me, and that's how my name got on all of the

16  emails.

17  Q.  And so the information from those emails must have been

18  important to your investigation.  Right?

19  A.  Definitely.

20  Q.  Because in those emails you're seeing all of the behind-

21  the-scenes working of the creation of the press releases that

22  we've talked about throughout this case; right?

23  A.  Some of the press releases, yes.

24  Q.  Okay.  And so I'm showing you now what's been marked as

25  CW-P.3.  And you can see here at the top ghostwriter@yahoo

 1   sent this to Sonia Hacker -- or Sonja T. Hacker -- May 16th of

 2   2018.  You can see that; right?

 3   A.  Yes.

 4   Q.  Okay.  And then in this email chain I've scrolled down

 5   towards the bottom.

 6         And these markings on the bottom of each page, can

 7   you tell me a little bit about those markings?  What do those

 8   indicate?

 9   A.  Typically these are Bates numbers, and it would reference

10   what subpoena they are related to when you see the "GJ79."

11   Q.  Okay.  And so the -- the first of these emails in this

12   chain looks like it's from December 3rd, 2015, from

13   ghostwriter4hire@ymail to Tony Papa; correct?

14   A.  Yes.

15   Q.  And she just says "How does it look now?  Let me know";

16   right?

17   A.  Yes.

18   Q.  And she's asking that question to Tony Papa?

19   A.  Yes.

20   Q.  And then December 6th, 2015, 1:25 p.m., Tony Papa responds

21   and says, "Call me please need to put our news tomorrow."

22         MR. HEIMANN:  Your Honor, I object.  This is beyond

23   foundation.  He's simply reading the email into the record.

24         THE COURT:  Sustained.

25         MR. WARD:  Your Honor, I'd move for the admission of

1   Exhibit CW-P.3.

2        MR. HEIMANN:  No objection.

3        THE COURT:  CW-P point --

4        MR. WARD:  3.

5        THE COURT:  -- 3.

6    (Defendant Winters' Exhibit CW-P.3 received into evidence.)

7   BY MR. WARD:

8   Q.  And so now that this email is being published to the jury,

9   we can see here that after Tony Papa says "Call me please need

10  to put our news tomorrow," ghostwriter4hire@ymail responds and

11  says "Hi Boss"; right?

12  A.  Yes.

13  Q.  And she says, "I wanted to let you know I'm a little

14  further than about halfway done with this release and this

15  company does not disappoint my inherent need to be genuinely

16  challenged.  Will call you as soon as the draft is sent";

17  right?

18  A.  Yes.

19  Q.  And then it looks like Tony Papa responds and says

20  "Nothing yet."

21        And then ghostwriter4hire@ymail says "How about now?"

22        And then Tony Papa says "Remove idle and abandoned

23  and I don't like the word strategy."  And then says "Company

24  moving forward very aggressively to take ownership of 7,000.

25  Try to mention that the company will be releasing pipeline

1  information Tuesday"; right?

2  A.  Yes.

3  Q.  And then Marisol responds and says, "Okay.  I removed idle

4  and abandoned"; right?

5  A.  Yes.

6  Q.  Okay.  I'd like to show you another exhibit that has not

7  been admitted.

8          And, again, this is from ghostwriter@yahoo to you;

9  correct?

10 A.  Yes.

11         MR. WARD:  I'd move for the admission of

12 Exhibit CW-P.4.

13         MR. HEIMANN:  One moment, Your Honor.

14         No objection.

15         THE COURT:  CW-P.4 is received.

16    (Defendant Winters' Exhibit CW-P.4 received into evidence.)

17 BY MR. WARD:

18 Q.  And in this email, again, Tony Papa says, "Good evening.

19 The chat rooms have made many comment in reference to today's

20 news release.  I believe that news should go out tomorrow a.m.

21 staying"; correct?

22 A.  Yes.

23 Q.  And then Marisol responds and says "Hi, Tony.  I believe

24 that the way it's put together will help avoid sounding

25 some- -- avoid sounding redundant.  Let me know when you get

1  this"; right?

2  A.  Yes.

3  Q.  And then Tony Papa responds and says "The heading should

4  be changed.  Co to release value to its shareholders on recent

5  events"; right?

6  A.  Yes.

7  Q.  And then Marisol responds and says "Okay, so just to

8  clarify.  You want this release to basically convey that we

9  will be announcing the value of the last announced transaction

10  in a future release"; right?

11  A.  Yes.

12          MR. WARD:  Those are all the questions I have for

13  this witness.  Thank you, Your Honor.

14          MR. HEIMANN:  No questions, Your Honor.

15          MR. FLEENER:  No questions, Judge.

16          MR. JUBIN:  No questions.

17          THE COURT:  Thank you.

18          You may step down.

19          MR. FLEENER:  Your Honor, Mr. Herman rests.

20          THE COURT:  Thank you.

21          MR. WARD:  Mr. Winters rests.

22          MR. JUBIN:  Your Honor, Mr. Horn rests his case.

23  Thank you.

24          THE COURT:  Very well.

25          Does the Government wish to offer any rebuttal

1    testimony?

2         (Discussion held at counsel table.)

3              MR. HEIMANN:  Your Honor, we have no rebuttal case.

4              THE COURT:  Thank you.

5              Ladies and gentlemen, all parties have now

6    arrested -- or rested -- in this matter.

7              You are now in possession in your memories all of the

8    evidence in this case.  It would be difficult if not

9    impossible to replicate all that has transpired over the last

10   2 1/2 weeks in front of anybody, any other group of citizens,

11   so you are -- you are occupying that very important position

12   as jurors in this case, and your value to all of these parties

13   is immense, and the idea of having to repeat this process is

14   one that is unimaginable, frankly, in this day and age.

15             You have worked hard.  I've watched you.  You paid

16   attention.  Some of you are taking careful notes.  And as a

17   group, you've bonded, which I think is important, as well.

18   And I know that there's one amongst you who is a very good

19   cook.

20             So, ladies and gentlemen, I want to again remind you

21   please don't do anything that would jeopardize your fair and

22   impartial decision in this matter and consideration of the

23   evidence together in the jury room when the case is submitted,

24   finally, to you to decide, which will occur tomorrow.

25             Again, I remind you not to discuss the case, don't

19-CR-26-ABJ                                          Vol. XII-2180
21-CR-14-ABJ

1    attempt to learn about the case from sources outside of this

2    courtroom.  Don't use or be tempted to use electronic devices

3    and digitally try to learn about this case from unsworn

4    sources or from your own investigation from other sources.

5    You will receive instructions in this matter but no books,

6    dictionaries, or anything else without permission of the

7    Court.

8           It's my understanding that the jury will be

9    deliberating when they get this case in the room that you've

10   used for your deliberations thus far.  We had considered

11   putting you back in the courtroom, and I think you're

12   comfortable in that jury room as a group and, certainly, are

13   closer to restrooms and all that you need for your own comfort

14   and ability to consider the issues in this case.

15          I want to offer a word:  Don't give up wearing the

16   mask in crowded situations or situations that may jeopardize

17   your safety during this evening and whatever other evening

18   that might be involved in your jury service.  Drive carefully.

19   Get plenty of rest.  At some point we'll be hearing closing

20   statements made by counsel and instructions will be given to

21   you by the Court.  I think a lot of that will be occurring

22   tomorrow morning.

23          So, with that, we're going to release you now because

24   you're not needed for the things that we're going to be doing

25   very shortly.

1          And I'm not hiding this from you:  We'll be

2    considering the instructions that the Court will be giving

3    you.  The parties are offering and have offered to the Court

4    instructions that they feel are significant and should be

5    presented to you, and they'll be given an opportunity to

6    correct or argue or suggest changes to those instructions.

7    Everybody has input, hopefully, to produce a good product as

8    well as a verdict form upon which you will -- which will

9    reflect your unanimous decision on these matters.

10          So with that, unless counsel for the Government or

11   the defense have anything to add, we will excuse the jury.

12          9:30 tomorrow morning seem fair?

13          I mean -- 8:30 tomorrow morning seem fair?

14          8:30?

15          8:30, Mr. Fleener?

16          MR. FLEENER:  Oh, I'm sorry, Judge.

17          Yes, sir.  Thank you.

18          THE COURT:  And Mr. Ward?

19          MR. WARD:  Works for me, Judge.  Thanks.

20          THE COURT:  Thank you.

21          We'll see you at 8:30 tomorrow morning.

22          THE COURTROOM DEPUTY:  All rise.

23     (Proceedings outside the jury's presence at 3:44 p.m.)

24          THE COURT:  Mr. Fleener, you may have been out of the

25   room when we talked to your clients at the close of the

1    Government's case and advised them of their Fifth Amendment

2    right to testify or not as they chose, and all acknowledged

3    that instruction by the Court.

4            MR. HEIMANN:  Your Honor, I'm sorry.  I don't

5    remember us doing that.

6            MR. JUBIN:  I don't think that happened yet.

7            MR. HEIMANN:  I think we need to do it now,

8    Your Honor.

9            THE COURT:  Well, I remember it very clearly, and

10   I remember Mr. Herman answering and Mr. Winters answering, as

11   well.

12           MR. HEIMANN:  Your Honor, I think that was about

13   Mr. Fleener being absent.

14           THE COURT:  No.

15           MR. FLEENER:  I remember it your way, Judge, but

16   I think I'm the only one who does other than you.

17           MR. HEIMANN:  I am 100 percent wrong.

18           MR. FLEENER:  Oh, I'm right.

19           MR. HEIMANN:  I -- lack of sleep, Your Honor.

20   I'm sorry.

21           THE COURT:  That's okay.  You were distracted.

22   There's plenty of other things you were thinking about.

23           MR. FLEENER:  Yes.  I remember nothing.  I got that

24   right.

25           THE COURT:  Actually, we should ask Mr. Herman,

19-CR-26-ABJ                                                    Vol. XII-2183
21-CR-14-ABJ

1    Mr. Winters, and Mr. Horn if they remember.

2              MR. FLEENER:  Yes, sir.

3              DEFENDANT HORN:  Yes, Judge.  You did and we did.

4              THE COURT:  All right.

5              MR. JUBIN:  I didn't remember it, either, so . . .

6              MR. FLEENER:  It's been a long trial.

7              THE COURT:  Perfectly understandable.

8              Well, it is now nearly 4:00.  Do you want to meet at

9    5:00?

10              MR. HEIMANN:  The Government can, Your Honor, yes.

11              MR. FLEENER:  Fine, Judge.

12              Can the defendants be excused?

13              THE COURT:  They are excused.

14              MR. JUBIN:  5:00 sounds good.  Thank you.

15              MR. HEIMANN:  Here in the courtroom, Your Honor?

16              THE COURT:  I think that would be easier for Melanie

17    and everybody, and I think Ziggy can operate their --

18              MR. HEIMANN:  And safer, Your Honor.

19              THE COURT:  Yeah.  Thank you.

20              We'll stand in recess.

21         (Proceedings concluded 3:47 p.m., October 6, 2021.)

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5          I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14         Dated this 14th day of January, 2022.

15

16

17

18         /s/ Melanie Humphrey-Sonntag

19         _____

20              MELANIE HUMPHREY-SONNTAG
                    RDR, CRR, CRC
21           Federal Official Court Reporter

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3    _____

4

UNITED STATES OF AMERICA,           DOCKET NO. 19-CR-026-ABJ

5                                     DOCKET NO. 21-CR-014-ABJ

          Plaintiff,

6                                     VOLUME XIII of XIV

          vs.                         (Pages 2184 through 2364)

7

JUSTIN HERMAN, CHARLES W.            Cheyenne, Wyoming

8    WINTERS, JR., a/k/a Chuck        Thursday, October 7, 2021

Winters, and IAN HORN,               9:04 a.m.

9

          Defendants.

10

11   _____

12

13              TRANSCRIPT OF TRIAL PROCEEDINGS

14

15         BEFORE THE HONORABLE ALAN B. JOHNSON
                UNITED STATES DISTRICT JUDGE
16         and a jury of twelve and three alternates

17

18

19

20

21

22       *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*
              *Federal Official Court Reporter*
23   *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
         *630.452.6236 * MelanieSonntagCRR@gmail.com*

24

     *Proceedings reported with digital stenography; transcript*
25        *produced with computer-aided transcription.*

```
 1    APPEARANCES:
      For the Plaintiff:       ERIC J. HEIMANN
 2                             THOMAS A. SZOTT
                               ASSISTANT UNITED STATES ATTORNEYS
 3                             DISTRICT OF WYOMING
                               2120 Capitol Avenue, Fourth Floor
 4                             Cheyenne, WY 82001

 5    For the Defendant        THOMAS A. FLEENER
      Herman:                  FLEENER LAW
 6                             506 South Eighth Street
                               Laramie, WY 82073
 7
      For the Defendant        ZENITH S. WARD
 8    Winters:                 BUCHHAMER & WARD
                               1821 Logan Avenue
 9                             Cheyenne, WY 82001

10    For the Defendant        THOMAS B. JUBIN
      Horn:                    JUBIN & ZERGA
11                             2614 Pioneer Avenue
                               Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2                                        PAGE
   JURY INSTRUCTION CONFERENCE           2187

3

   **MOTION FOR MISTRIAL**
4  Argument by Mr. Fleener                2193
   Argument by Mr. Ward                   2193
5  Ruling by the Court                    2194

6  **MOTION FOR JUDGMENT OF ACQUITTAL**
   Argument by Mr. Jubin                  2194
7  Argument by Mr. Ward                   2194
   Argument by Mr. Fleener               2194
8  Ruling by the Court                    2195

9  EVIDENTIARY INSTRUCTIONS              2197

10 Closing Argument by Mr. Heimann       2224
   Closing Argument by Mr. Ward          2259
11 Closing Argument by Mr. Jubin         2296
   Closing Argument by Mr. Fleener       2334
12 Rebuttal Argument by Mr. Heimann      2355

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings commenced 9:04 a.m., October 7, 2021,

2    in the presence of all defendants, outside the jury's

3    presence.)

4        THE COURT:  Now we can go on the record, and we'll

5    start with the Government.

6        MR. SZOTT:  Your Honor, thank you.  The Government

7    has no objections to memorialize to the proposed instructions

8    as we've talked about during our off-the-record portion of the

9    conference.

10        THE COURT:  Thank you.

11        Mr. Fleener.

12        MR. FLEENER:  Yeah, Your Honor.  We object to the

13    Court not giving Mr. Ward's proposed instruction on reliance

14    on the advice of counsel.

15        We think the evidence in the record indicates that

16    Mr. Horn was involved in -- in giving advice to Mr. Herman

17    involving the -- involving NuTech securities and that the

18    instructions -- instruction is -- is necessary.

19        We have a couple other issues to bring up on the

20    record, but as far as instructions go, that's all we have,

21    Judge.

22        THE COURT:  Very well.

23        I will need a copy of that instruction to sign as

24    refused so it can go into the record --

25        MR. FLEENER:  Yes, sir.

1          THE COURT:  -- and be filed with the clerk's office.

2          MR. FLEENER:  I'll get it.

3          MR. HEIMANN:  And, Your Honor, in support of the

4    Government's objection to that instruction, I would cite the

5    Court to the Ninth Circuit's decision in *United States versus*

6    *Ibarra-Alcarez*, 830 F.2d 968, and this is the -- this is the

7    Ninth Circuit at 973, quote, "To qualify for an advice of

8    counsel instruction, the defendant must show that there was

9    full disclosure to his attorney of all material facts and that

10   he relied in good faith on the specific course of conduct

11   recommended by the attorney," end quote.

12         We're simply nowhere close to that in this case,

13   Your Honor.

14         MR. WARD:  And I would just add to the record in

15   support of Mr. Winters' request that the instruction be given

16   that the fact that substantial sums of money were paid to the

17   attorney, that the text of the opinion letters that have been

18   introduced into evidence indicate that Mr. Horn was serving as

19   counsel for the specific purpose of the opinion letters as

20   special counsel to NuTech Energy would be sufficient to

21   justify giving that instruction.

22         And -- and just to ensure the record's clear,

23   Mr. Winters is requesting that instruction in addition to

24   Mr. Herman.

25         THE COURT:  That will be your appeal point.  The

 1   Court will persist in its ruling.

 2          MR. FLEENER:  Your Honor, I just emailed that to

 3   Ziggy, so he will have a copy of it.  I put a signature block

 4   on it for you, the big thing that says "Refused."

 5          THE COURT:  Thank you.

 6          MR. FLEENER:  Yes, sir.

 7          MR. JUBIN:  Your Honor, Mr. Horn has a few

 8   objections.  One is the failure to give the *Edwards*

 9   instruction as found in Horn's Proposed Instruction No. 7,

10   which is found at Docket No. 300-1 at page 9 of 36.

11          In particular, the language that really needs to be

12   included is "Each defendant is entitled to have his case

13   determined from evidence as to his own acts, statements, and

14   conduct and any other evidence in the case which may be

15   applicable to him."

16          Next --

17          THE COURT:  Well, I'll rule.

18          If you want to give me that instruction, I'll sign it

19   as refused and note that there is language in the instructions

20   that we will give that will cover that subject.

21          MR. JUBIN:  Thank you, Your Honor.

22          Next, with respect to the Court's 26, Defendant Horn

23   objects to not including the language contained in his

24   submitted Instruction No. 11, which can be found at

25   Document 300-1, page 14 of 36.  It contains some language from

1    O'Malley, Grenig, and Lee, its sixth edition, which talks

2    about "Since these acts may have been performed, these

3    statements may have been made outside the presence of a

4    particular defendant and even done or said without a

5    particular defendant's knowledge, these acts or statements

6    should be examined with particular care by you before

7    considering them against the defendant who did not do the

8    particular act or make the particular statement."

9          In this case, there is a wealth of evidence that

10   there were pump and dump activities, chats, messages, emails

11   between people that had no connection to Mr. Horn.  And so

12   I think that that caution is extremely important in this case

13   where Mr. Horn has no connection to those matters, and the

14   jury should be told to consider it with caution.  And what

15   I would suggest is that the language from Instruction 11 be

16   incorporated into the Court's Instruction 26.

17         THE COURT:  I find that Instruction 26 is sufficient,

18   will deny the request.

19         If you feel it's necessary that I sign something as

20   refused, provide that portion to me, and I will sign it.

21         MR. JUBIN:  Okay.  Thank you, Your Honor.

22         I should note that the citations to the record, that

23   Document 300, are -- is the filing in 19-CR-26.  It's equally

24   applicable to the additional indictment in 21-CR-14.

25         In addition, Defendant Horn objects to the Court's

1   refusal of his Proposed 16, which is a good faith instruction.

2   In the preliminary Court's instructions that we reviewed,

3   there was an Instruction 42 that was taken out as -- as the

4   matter progressed off the record, and I would simply ask that

5   the Court give its Proposed 42 and object to its exclusion.

6        MR. SZOTT:  In response to the proffered good faith

7   instruction, Your Honor, I would cite the Court to the Tenth

8   Circuit's decision in *United States versus Bowling*, 619 F.3d

9   1175, where the -- the Court references the overruling of a

10  prior case that might have required a good faith instruction

11  and cites a prior case for the premise that, because a finding

12  of the intent to defraud -- or let me back up -- a separate

13  good faith instruction is not necessary "because a finding of

14  the intent to defraud necessarily implies that there was no

15  good faith."

16       I believe that's where we are, Your Honor, with the

17  instructions in this case, so that -- I think the good faith

18  instruction need not be given.

19       MR. JUBIN:  I thought I remembered there was a Tenth

20  Circuit case out there that said it was error if you didn't

21  give it, and I do now recall what Mr. Szott just said.  The

22  Tenth Circuit has sort of retracted that a bit, but I still

23  think there's a great deal of information in this case that

24  would warrant the instruction --

25       THE COURT:  Very well.

 1           MR. JUBIN:  -- and I object to its exclusion.

 2      Thank you.

 3           THE COURT:  And we will need to sign that instruction

 4  as refused.

 5           The issue in this case clearly is whether or not

 6  there was an intent to defraud on the part of each of these

 7  defendants.

 8           MR. JUBIN:  May we have five minutes before we bring

 9  the jury in once we're finished here?

10           MR. WARD:  Your Honor, I'd actually ask for a little

11  more than five minutes just because I've incorporated slides

12  into my closing of the jury instructions, and I need to take a

13  moment and make sure that the last-minute changes we've made

14  are reflected, and that's going to take some time with the

15  PowerPoint and ensuring that that language is all correct

16  so --

17           THE COURT:  I understand.

18           We have to get all this ready for you and -- and

19  provide copies -- the information for Becky and provide you

20  final copies of the instructions so that you can refer to them

21  and provide me an instruction book and copies of the super- --

22  second superseding indictment incorporated into it, so you'll

23  have the time that you need.

24           MR. FLEENER:  Your Honor -- I apologize.  Your Honor?

25           THE COURT:  Yes.

1           MR. FLEENER:  I have two issues, one I think that

2     should be taken on the record and one off.

3           On the record, on behalf of the Defendant Herman,

4     we'd renew our motion for a mistrial under *Bruton* and ask that

5     the case be severed out.

6           The record should show that, at least in Mr. Herman's

7     opinion, the entire trial has consisted of Ian Horn's

8     statements that have gone unconfronted where that the gist of

9     the statements have been implicating Justin Herman as far as

10    even writing the opinion letters, which were then used to --

11    at least in the Government's opinion -- defraud investors.

12    And we believe that the -- Mr. Herman's rights to a fair trial

13    have been violated and that his case should be mistried and

14    severed.

15          Thank you, Judge.

16          THE COURT:  Very well.

17          MR. WARD:  And on behalf of Mr. Winters, Your Honor,

18    I would join that motion.

19          I believe, in addition to what Mr. Fleener just said,

20    the accusations that have come from Mr. Horn via both the

21    testimony that's been admitted in evidence as well as other

22    testimonial evidence points the finger at not just Mr. Herman

23    but also Mr. Winters as somehow working together to accomplish

24    untoward ends.

25          And for that reason, I would join that -- that motion

1    that -- for a mistrial and that Mr. Winters be severed out.

2            THE COURT:  Anything from the Government?

3            I don't want to exclude comment from anybody.

4            MR. SZOTT:  I don't think anything more needs to be

5    said, Your Honor.

6            MR. JUBIN:  To the extent it's necessary, I would

7    renew the motion for verdict of acquittal at this point.

8            THE COURT:  Very well.

9            MR. WARD:  I would also renew that motion on behalf

10   of Mr. Winters, Your Honor.

11           THE COURT:  Thank you.

12           MR. FLEENER:  The same, Judge.

13           THE COURT:  Thank you.

14           The Court will deny the motion in this case for a

15   mistrial.  The evidence in this case is evidence all about a

16   conspiracy alleged by the Government against three

17   participants in a pump and dump -- alleged pump and dump

18   scheme.  Naturally, there is going to be evidence received

19   that will be prejudicial to one defendant or another going

20   forward throughout that case.

21           It is not surprising that that would occur, and it

22   will be up to the jury to sort out -- it seems to me from the

23   evidence in this case -- whether or not the Government has

24   proved the conspiracies and the conspiratorial conduct on the

25   part of each of the defendants.

1        The Court will deny the motion for judgment of

2   acquittal at the conclusion of the case at this point.  This

3   is a case that needs to go to the jury for its consideration

4   of the evidence in this matter.  I find that there is

5   sufficient evidence to establish a prima facie case for

6   consideration by a jury.

7        MR. WARD:  Your Honor, I also have one more issue

8   I failed to bring up if now is an appropriate time.

9        THE COURT:  Absolutely.

10        MR. WARD:  Your Honor, and that would just be, as

11   a -- I understand that -- I know time melds together.  I don't

12   know if it was yesterday or the day before but -- the Court

13   denied the motion I made on behalf of Mr. Winters regarding a

14   mistrial based on what we argued were *Brady* violations related

15   to the Albert and Hodge memoranda.

16        When I made that motion, I also proposed that the

17   Court instruct the jury in the jury instructions about the

18   *Brady* law and allow the defendants to argue that the

19   Government's failure to follow the *Brady* law would be

20   reasonable doubt in and of itself.

21        The Court denied that motion, so I didn't submit a

22   proposed jury instruction.  I certainly could for the Court to

23   refuse, but I just wanted to make sure my request for that

24   instruction as a potential remedy for what I've argued is a

25   *Brady* violation is clear in the record.

 1          THE COURT:  Thank you.

 2          The Court will persist in its previous ruling.

 3          MR. FLEENER:  I have one thing to be taken off the

 4   record, probably, Judge.

 5          THE COURT:  Very well.

 6          We don't need -- this can be off the record.

 7     (Discussion held among the Court and counsel.)

 8     (A recess was taken from 9:28 a.m. to 10:01 a.m.)

 9          THE COURT:  Well, are we ready?

10          All right.

11     (Proceedings within the jury's presence at 10:04 a.m.)

12          THE COURT:  Thank you, ladies and gentlemen.  Please

13   be seated.

14          I'm going to be -- I'm going to -- will take off the

15   mask.  I hope that I won't be mumbling too much, but I have a

16   tendency to do that.  I hope that you can hear the

17   instructions as they are read.

18          We will send the instructions as I read them over

19   your screens.  Some of you are visual learners and some learn

20   through your ears, so we'll try to use both today.  But you'll

21   also take with you, when you go into the jury room, a paper

22   copy of the instructions as well as the digital copy.

23          I've already given you instructions -- the

24   introductory instructions.  I will not reread them.  They were

25   read to you at the beginning of the trial.  And if you need to

1   refer to them, certainly, you should do so, but we'll start on

2   the area of the instructions that are more substantive,

3   beginning at Instruction No. 12 and continuing to Instruction

4   No. 49.

5           The parties will then present their closing

6   statements to you, which are aimed at analyzing the evidence

7   and assisting you in your deliberation.  The Court will then

8   give a final set of instructions which primarily deal with

9   evidence, evidentiary matters in this case, as well as

10   introduce you to the verdict form upon which the jury will

11   record their unanimous verdict.

12           Incorporated in this paper copies of the instructions

13   in the folder at the beginning I've included a list of overt

14   acts as well as a copy of the second superseding indictment.

15   Those same list of overt acts are contained in the second

16   superseding indictment, but I thought for your convenience

17   maybe it would be of some assistance to have a separate

18   document containing those overt acts for you to consider

19   during your deliberations, and I will instruct you as to that

20   matter as we go forward.

21           Ladies and gentlemen of the jury, please harken to

22   the instructions that are given to you.

23           Now that you've heard the evidence, it becomes the

24   duty -- my duty -- to give you the instructions of the Court

25   as to the law applicable to this case.  You should use these

1    instructions to guide you in your decisions.

2            All of the instructions of law given to you by the

3    Court -- and those given to you at the beginning of trial,

4    those given to you during the trial, and these final

5    instructions -- must guide and govern your deliberations.  All

6    of the instructions given to you by the Court -- those given

7    to you in this matter -- must govern your deliberations.

8            It is your duty as jurors to follow the law as stated

9    in all of the instructions of the Court and to apply the rules

10   of law to the facts as you find them from the evidence

11   received during the trial.

12           You are not to single out one instruction alone as

13   stating the law but must consider the instructions as a whole

14   in reaching your decision.

15           Neither are you to be concerned with the wisdom of

16   any rule of law stated by the Court.  Regardless of any

17   opinion you may have as to what the law should be, it would be

18   a violation of your sworn duty to base a verdict upon any

19   other view of the law than that given in these instructions of

20   the Court, just as it would be a violation of your sworn duty,

21   as Judges of the facts, to base your verdict upon anything but

22   the evidence received in the case.

23           You were chosen as jurors for this trial in order to

24   evaluate all of the evidence received and to decide each of

25   the factual questions presented by the allegations brought by

1    the United States in the indictment and the plea of not guilty

2    by each of the defendants.

3          In resolving the issues presented to you for decision

4    in this case, you must not be persuaded by bias, prejudice, or

5    sympathy for or against any of the parties to this case or any

6    public opinion.

7          Justice -- through trial by jury -- depends upon the

8    willingness of each individual juror to seek the truth from

9    the same evidence presented to all of the jurors here in the

10   courtroom and to arrive at a verdict by applying the same

11   rules of law as now being given to each of you in these

12   instructions of the Court.

13         The Government has the burden of proving a defendant

14   guilty beyond a reasonable doubt.  The law does not require a

15   defendant to prove his innocence or to produce any evidence

16   at all.  The Government has the burden of proving the

17   defendant guilty beyond a reasonable doubt, and if it fails to

18   do so, you must find the defendant not guilty.

19         Proof beyond a reasonable doubt is proof that leaves

20   you firmly convinced of the defendant's guilt.  There are few

21   things in this world that we know with absolute certainty, and

22   in criminal cases the law does not require proof that

23   overcomes every possible doubt.  It requires that the

24   Government's proof exclude any "reasonable doubt" concerning

25   the defendant's guilt.  A reasonable doubt is a doubt based on

1   reason and common sense after careful and impartial

2   consideration of all the evidence in the case.

3          If, based on your consideration of the evidence, you

4   are firmly convinced that the defendant is guilty of the crime

5   charged, you must find him guilty.  If, on the other hand, you

6   think there's a real possibility that he is not guilty, you

7   must find -- give him the benefit of the doubt and find him

8   not guilty.

9          Each defendant has pleaded not guilty to the charges

10  alleged against him in the second superseding indictment and

11  the additional indictment.  These pleas of not guilty put in

12  issue each of the essential elements of the offenses as

13  described in these instructions and impose on the Government

14  the burden of establishing each of these elements by proof

15  beyond a reasonable doubt.

16         You are here to decide whether the Government has

17  proved beyond a reasonable doubt that each defendant is guilty

18  of the crimes charged.  The defendants are not on trial for

19  any act, conduct, or crime not charged in the indictments.

20         An indictment is but a formal method of accusing a

21  defendant of a crime.  It is not evidence of any kind against

22  the accused.

23         This trial involves two separate indictments:

24  a second superseding indictment filed in Docket 19-CR-26, and

25  a separate indictment filed in Docket 21-CR-14.  Do not be

19-CR-26-ABJ        EVIDENTIARY INSTRUCTIONS        Vol. XIII-2201
21-CR-14-ABJ

1   concerned about the separate docket numbers or the fact that

2   one indictment is referred to as a second superseding

3   indictment.  The second superseding indictment originally

4   involved 19 counts, but the first 12 counts were not involved

5   in this trial.  Do not be concerned about the first 12 counts.

6        A separate crime is charged against one or more of

7   the defendants in the remaining counts of the second

8   superseding indictment.  In the separate indictment, Defendant

9   Horn is charged with a separate crime.  I will give you

10  instructions about the charged counts now.

11       You must separately consider the evidence against

12  each defendant on each count and return a separate verdict for

13  each defendant.  Your verdict as to any one defendant or

14  count, whether it is guilty or not guilty, should not

15  influence your verdict as to any other defendant -- any other

16  defendants -- or counts.

17       You are here to decide whether the Government has

18  proved beyond a reasonable doubt that each defendant is guilty

19  of each crime charged in the second superseding indictment and

20  the separate indictment, respectively.  The defendants are not

21  on trial for any act or conduct or crime charged -- not

22  charged in the second superseding indictment or the separate

23  indictment.

24       The second superseding indictment contains

25  allegations involving persons who are not on trial in this

1   case.  In this regard the second superseding indictment

2   alleges the defendants were involved in securities fraud and

3   wire fraud schemes with Robert William Mitchell, also known as

4   Bob Mitchell, and with other persons known and unknown.

5          Because some of the charges in this trial require the

6   Government to prove the involvement of multiple persons, you

7   may need to evaluate whether a person who is not on trial was

8   involved in one of the alleged schemes.  However, in

9   considering the guilt of each defendant, you must focus on the

10  conduct of that defendant.  The mere fact that another person

11  may be guilty of a crime does not mean a defendant is or is

12  not guilty.  Furthermore, it is not up to you to decide

13  whether anyone who is not on trial in this case should be

14  prosecuted for the crimes charged.

15         The second superseding indictment and the additional

16  indictment each charge that the various crimes were committed

17  on or about a certain date or range of dates.

18         Although it is necessary for the Government to prove

19  beyond a reasonable doubt that the offense was committed

20  reasonably near the date or range of dates alleged in the

21  indictment, it is not necessary for the Government -- United

22  States -- to prove that the offense was committed precisely on

23  the date or within the range of dates charged.

24         An act is knowingly done if done -- an act is

25  knowingly if done voluntarily and intentionally and not

1   because of mistake or accident or other innocent reason.

2          When the word "knew" or "knowingly" are used in these

3   instructions, they mean a defendant realized what he was doing

4   and was aware of the nature of his conduct and did not act

5   through ignorance, mistake, or accident.

6          The intent of a person or the knowledge that a person

7   possesses at any given time may not ordinarily be directly --

8   proved directly because there is no way of directly

9   scrutinizing the workings of the human mind.  In determining

10  the issue of what a person knew or what a person intended at a

11  particular time, you may consider any statement made or acts

12  done by that person and all other facts and circumstances

13  received in evidence which may aid in your determination of

14  what -- of that person's knowledge or intent.

15         You may infer, but you are certainly not required to

16  infer, that a person intends the natural and probable

17  consequences of acts knowingly done or knowingly omitted.  It

18  is entirely up to you, however, to decide what facts to find

19  from the evidence received during the trial.

20         Separately from the conspiracy to commit securities

21  fraud charged in Count Thirteen, each defendant is charged

22  with securities fraud and aiding and abetting in

23  Count Fourteen.  Furthermore, each defendant is charged with

24  conspiracy to commit wire fraud in Count Fifteen.  These are

25  separate charges, and you should consider separately whether

19-CR-26-ABJ          EVIDENTIARY INSTRUCTIONS          Vol. XIII-2204
21-CR-14-ABJ

1   the Government has established the essential elements of each

2   charge for each defendant.

3        I will now instruct you regarding certain legal

4   principles and definitions that apply to Count Thirteen.

5   However, many of these principles and definitions also apply

6   to Count Fourteen or Count Fifteen, respectively.  I will

7   identify these common principles and definitions as I give

8   them, and you should refer to these instructions when

9   considering the Government's proof on each respective count.

10       Each defendant is charged in Count Thirteen with a

11  violation of Title 18, United States Code, Section 371.  This

12  law makes it a crime to conspire to commit an offense against

13  the United States.  In this case, each defendant is charged

14  with conspiracy to commit securities fraud.

15       To find a defendant guilty of this crime, you must be

16  convinced that the Government has proved each of the following

17  elements beyond a reasonable doubt:

18       First, from on or about November 25, 2014, through

19  and including on or about May 19, 2016;

20       Second, two or more persons agreed to carry out a

21  scheme in connection with the purchase or sale (pumping and

22  dumping) of NuTech securities, which involved:

23       A, using a device or scheme to defraud someone;

24       B, knowingly making an untrue statement of a material

25  fact or making such a statement with reckless indifference as

1   to its truth or falsity;

2         C, knowingly, or with reckless indifference, making a

3   misleading statement by failing to disclose a material fact;

4   or,

5         D, engaging in any act, practice, or course of

6   business that would operate as a fraud or deceit upon

7   investors or potential investors in NuTech;

8         Third, in furtherance of the agreed-upon scheme, it

9   was reasonably foreseeable that one or more of the

10  conspirators would use, or cause another person to use, a

11  means or instrumentality of interstate commerce or the mails;

12        Fourth, the defendant knew the essential objectives

13  of the conspiracy;

14        Fifth, the defendant knowingly, willfully, and

15  voluntarily participated in the conspiracy with intent to

16  defraud;

17        Sixth, one of the conspirators committed at least one

18  overt act furthering the conspiracy's objectives; and,

19        Seventh, there was interdependence among the members

20  of the conspiracy.

21        For each defendant, if the Government fails to prove

22  any of these elements, you should find the defendant not

23  guilty.  On the other hand, if the Government proves each of

24  these elements, you should find the defendant guilty.

25        For purposes of Count Thirteen and Count Fifteen,

1   respectively, a conspiracy is an agreement between two or more

2   persons to accomplish an unlawful purpose.  It is a kind of

3   partnership in criminal purposes in which each member becomes

4   the agent or partner of every other member.  The evidence may

5   show that some of the persons involved in the alleged

6   conspiracy are not on trial.  That does not matter.  There is

7   no requirement that all members of a conspiracy be charged or

8   tried together in one proceeding.

9          The evidence need not show that the members entered

10  into an express or formal agreement.  Nor does the law require

11  proof that the members agreed on all of the details.  But the

12  evidence must show that the members of the alleged conspiracy

13  came to a mutual understanding to try to accomplish the common

14  and unlawful plan charged in the second superseding

15  indictment.

16         The purposes of Count Thirteen and Count Fifteen,

17  respectively -- for purposes of Count Thirteen and

18  Count Fifteen, respectively, if you are convinced that the

19  charged conspiracy existed, then you must next determine

20  whether the defendant was a member of that conspiracy; that

21  is, whether the defendant knew at least the essential goals of

22  the conspiracy and voluntarily chose to be part of it.  The

23  law does not require proof that the defendant knew all the

24  other members of the conspiracy or knew all the details about

25  how activities were to be carried out.  A person may belong to

1    a conspiracy for a brief period of time or play a minor role.

2           On the other hand, proof is not sufficient if it

3    merely shows that the defendant knew about the existence of

4    the conspiracy or was associated with members of the

5    conspiracy.  Rather, the evidence must show the defendant

6    knowingly joined the conspiracy with the intent to advance its

7    purposes.

8           For the conspiracies charged in Counts Thirteen and

9    Fifteen, respectively, if you determine that the conspiracy

10   existed and that a defendant was one of the members of the

11   conspiracy, then the acts and statements of any person

12   likewise found to be a member may be considered as evidence in

13   the case as to the defendant found to be -- to have been a

14   member.  This is true even though the acts and statements may

15   have occurred in the absence of and without the knowledge of

16   the defendant, provided that such acts and statements were

17   knowingly done or knowingly made during the existence of the

18   common plan or arrangement and in furtherance of some intended

19   object or purpose of the plan or arrangement.

20          Otherwise, any admission or incriminatory statement

21   made or act done by one person outside of court may not be

22   considered as evidence against any person who was not present

23   and saw the act done or heard the statement made.

24          For purposes of Count Thirteen and Count Fourteen,

25   respectively, the term "willfully" means intentionally

1  undertaking an act or making an untrue or misleading statement

2  for the wrongful purpose of defrauding or deceiving someone.

3  In deciding whether a defendant acted willfully, you may

4  consider evidence of the defendant's words, acts, or

5  omissions, along with all the other evidence.

6        When these instructions refer to a statement or

7  representation being made "with reckless indifference," it

8  means the defendant acted in an extreme departure from the

9  standards of ordinary care and that the defendant's statement

10 or representation presented a danger of misleading a

11 decision-maker.  This danger must have been known to the

12 defendant or so obvious that the defendant must have been

13 aware of that danger.

14       Count Thirteen alleges the commission of 41 overt

15 acts in furtherance of the alleged securities fraud

16 conspiracy.

17       The term "overt act" means some type of outward,

18 objective action performed by one of the parties to or one of

19 the members of the agreement or conspiracy which evidence --

20 which evidences that agreement.  Although you must unanimously

21 agree that the same overt act was committed, the Government is

22 not required to prove more than one of the overt acts charged.

23 The overt act may, but for the alleged illegal agreement,

24 appear totally innocent and legal.  However, proof of an overt

25 act by some member of the alleged conspiracy cannot substitute

1    for proof of the intent to defraud that the Government must

2    prove separately as to each individual defendant.

3              The Court has provided you a list of overt acts taken

4    from the second superseding indictment for you to consider in

5    determining whether the Government has proved that one or more

6    overt acts were committed in furtherance of the conspiracy.

7    Please remember the indictment and the list of overt acts are

8    just allegations, they are not proof of anything.

9              For the conspiracies charged in Counts Thirteen and

10   Fifteen, respectively, the conduct of the alleged

11   coconspirators must be interdependent in some way.

12   Interdependence is present when each alleged coconspirator

13   depends on the conduct of each other to achieve the common

14   goal.

15             In essence, the defendants' actions must facilitate

16   the endeavors of other alleged coconspirators or facilitate

17   the venture as a whole.  In other words, interdependence

18   exists if the alleged coconspirators were united in a common

19   unlawful goal or purpose and if a defendant's activities

20   facilitated the endeavors of another coconspirator or

21   facilitated the venture as a whole.

22             For purposes of the crimes charged in Counts Thirteen

23   and Fourteen, respectively, a statement or conduct is in

24   connection with the purchase or sale of securities if there is

25   some causal connection between the statement or conduct and

1    the purchase or sale of securities.  However, the statement or

2    conduct need not be directed toward a purchaser or seller of

3    securities.

4           For purposes of the crimes charged in Counts Thirteen

5    and Fourteen, respectively, a false or misleading statement is

6    material if there is a substantial likelihood that a

7    reasonable decision-maker would consider the statement

8    significant in connection with the purchase or sale of a

9    security.

10          For purposes of the crimes charged in Counts Thirteen

11    and Fourteen, respectively, a "means or instrumentality of

12    interstate commerce" means the Internet, email, cellular and

13    traditional telephone networks, and payments moving between

14    two states via wire or the electronic transfer of funds.

15          Each defendant is charged in Count Fourteen with a

16    violation of Title 15, United States Code, Sections 78j(b) and

17    78ff, and Title 17, Code of Federal Regulations,

18    Section 240.10b-5.  This law makes it a crime to commit

19    securities fraud using a means or instrumentality of

20    interstate commerce or the mails.

21          To find defendant -- a defendant guilty of this

22    crime, you must be convinced that the Government has proved

23    each of the following elements beyond a reasonable doubt :

24          First, from on or about November 25, 2014, through

25    and including on or about May 19, 2016;

1        Second, the defendant:

2        A, used a device or scheme to defraud someone;

3        B, knowingly made an untrue statement of a material

4   fact or made a statement with reckless indifference as to its

5   truth or falsity;

6        C, knowingly, or with reckless indifference, made a

7   misleading statement by failing to disclose a material fact;

8   or,

9        D, engaged in any act, practice, or course of

10  business that operates or would operate as a fraud or deceit

11  upon investors or potential investors in NuTech;

12       Third, the defendant did so in connection with the

13  purchase or sale (pumping and dumping) of NuTech securities;

14       Fourth, the defendant directly or indirectly used a

15  means or instrumentality of interstate commerce or the mails

16  in some phase of the aforesaid conduct; and,

17       Fifth, the defendant acted willfully, with intent to

18  defraud.

19       For each defendant, if the Government fails to prove

20  any of these elements, then you should consider whether the

21  Government has proved the defendant aided and abetted another

22  person's commission of this crime, as provided later in these

23  instructions.  On the other hand, if the Government proves

24  each of these elements, you should find the defendant guilty.

25       For purposes of the crime charged in Count Fourteen,

1   a defendant need not directly use a means or instrumentality

2   of interstate commerce or the mails to be guilty of this

3   crime.  Rather, it is sufficient if the defendant set forces

4   in motion and it was reasonably foreseeable these forces would

5   entail another person using a means or instrumentality of

6   interstate commerce or the mails.  Similarly, it is not

7   necessary that a deceptive or misleading statement passed

8   through interstate commerce or the mails so long as a means or

9   instrumentality of interstate commerce or the mails were used

10  in furtherance of the defendant's willful conduct in

11  connection with the purchase or sale of NuTech securities.

12          Count Fourteen also charges each defendant with a

13  violation of Title 18, United States Code, Section 2.  This

14  law provides that:  "Whoever commits an offense against the

15  United States or aids, abets, counsels, commands, induces, or

16  procures its commission, is punishable as a principal."  This

17  law makes it a crime to intentionally help someone else commit

18  a crime.

19          Specifically, the defendants are charged with aiding

20  and abetting each other and Robert William Mitchell, also

21  known as Bob Mitchell, in the commission of securities fraud.

22  Therefore, if you find a defendant did not commit a crime

23  charged in Count Fourteen but you should never -- you should

24  nevertheless consider whether the defendant is guilty of

25  aiding and abetting another person's commission of that crime.

1     To be guilty of aiding and abetting, a defendant need

2  not perform the underlying criminal act, be present when it is

3  performed, or be aware of the details of its commission.  But

4  a general suspicion that an unlawful act may occur or that

5  something criminal is happening is not enough.  Mere presence

6  at the scene of a crime and knowledge that a crime is being

7  committed are also not sufficient to establish aiding and

8  abetting.

9     To find a defendant guilty of aiding and abetting,

10  you must be convinced that the Government has proved each of

11  the following elements beyond a reasonable doubt:

12     First, every element of the charged crime of

13  securities fraud, as outlined in Instruction -- and that

14  instruction is 35, 35 -- was committed by someone other than

15  the defendant; and,

16     Second, the defendant intentionally associated

17  himself in some way with the crime and intentionally

18  participated in it as he would in something he wished to bring

19  about.  This means that the Government must prove that the

20  defendant consciously shared the other person's knowledge of

21  the underlying criminal acts and intended to help him.

22     For each defendant, if the Government fails to prove

23  any of these elements, then you should find the defendant not

24  guilty.  On the other hand, if the Government proves each of

25  these elements, you should find the defendant guilty.

1            I'm going to write in "35."

2            Each defendant is charged in Count Fifteen with a

3    violation of Title 18, United States Code, Section 1349.  As

4    pertinent here, this law makes it a crime to conspire to

5    commit wire fraud, in violation of Federal law.

6            To find a defendant guilty of this crime, you must be

7    convinced that the Government has proved each of the following

8    elements beyond a reasonable doubt:

9            First, from on or about November 25, 2014, through

10   and including on or about May 19th, 2016;

11           Second, two or more persons agreed to carry out a

12   scheme to defraud by pumping and dumping NuTech securities;

13           Third, the agreed-upon scheme involved false or

14   fraudulent pretenses, representations, or promises that were

15   material;

16           Fourth, in furtherance of the agreed-upon scheme, it

17   was reasonably foreseeable that one or more of the

18   conspirators would send one or more interstate wire

19   communications or would cause another person or persons to

20   do so;

21           Fifth, the defendant knew the essential objectives of

22   the conspiracy;

23           Sixth, the defendant knowingly and voluntarily

24   participated in the conspiracy;

25           Seventh, the defendant acted with intent to

1  defraud; and,

2          Eighth, there was interdependence among the members

3  of the conspiracy.  These terms were all discussed in previous

4  instructions.

5          For each defendant, if the Government fails to prove

6  any of these elements, you should find the defendant not

7  guilty.  On the other hand, if the Government proves each of

8  these elements, you should find the defendant guilty.

9          The following definitions apply to the crime of

10  conspiracy to commit wire fraud, as charged in Count Fifteen:

11  A "scheme to defraud" is conduct intended to or reasonably

12  calculated to deceive persons of ordinary prudence or

13  comprehension (this definition also applies to

14  Count Thirteen).

15          An "intent to defraud" means an intent to deceive or

16  cheat someone (this definition also applies to Counts Thirteen

17  and Fourteen).

18          A representation is "false" if it is known to be

19  untrue or is made with reckless indifference as to its truth

20  or falsity.  A representation would also be "false" when it

21  constitutes a half truth or effectively omits or conceals a

22  material fact, provided it is made with intent to defraud.

23          A false pretense or statement is "material" if it has

24  a natural tendency to influence or is capable of influencing

25  the decision of the person or entity to which it is addressed.

1        "Interstate wire communications" are any writings,

2   signs, signals, pictures, or sounds that are transmitted in

3   interstate commerce, including (but not limited to) email and

4   other Internet-based communications, communications via cell

5   phones and traditional telephones, and interstate electronic

6   transfers of funds between financial institutions.  To qualify

7   as an "interstate wire communication," the communication must

8   cross state lines.

9        To "cause" the use of interstate wire communications

10  is to do an act with knowledge that the use of the wire

11  communication will follow the ordinary course of business or

12  where such use can reasonably be foreseen.

13       Defendants Herman and Winters are each charged in

14  Counts Sixteen and Seventeen with violating Title 18,

15  United States Code, Section 1028A.  This law makes it a crime

16  to commit aggravated identity theft.

17       For each of these counts, to find a defendant guilty

18  of this crime, you must be convinced that the Government has

19  proved each of the following elements beyond a reasonable

20  doubt:

21       First, on or about September 23, 2015;

22       Second, the defendant knowingly possessed or used

23  another person's means of identification, specifically:

24       A, for Count Sixteen, the forged or unauthorized

25  signature of David Rodgers;

1          B, for Count Seventeen, the forged or unauthorized

2   signature of Gordon Pardy;

3          Third, the defendant knew the means of identification

4   belonged to another person -- another actual person (living or

5   dead) and not a fictitious person;

6          Fourth, the defendant knew he lacked lawful authority

7   to possess or use the means of identification; and,

8          Fifth, the defendant possessed or used the means of

9   identification during and in relation to the wire fraud

10  conspiracy charged in Count Fifteen.

11          For each defendant, if the Government fails to prove

12  any of these elements, you should find the defendant not

13  guilty.  On the other hand, if the Government proves each of

14  these elements, you should find the defendant guilty.

15          The following principles apply to the crime of

16  aggravated identity theft, as charged in Counts Sixteen,

17  Seventeen, Eighteen, and Nineteen:

18          A "means of identification" is any name or number

19  used, alone or together with any other information, to

20  identify a specific person.  A person's signature is a "means

21  of identification."

22          As an element of aggravated identity theft, the

23  Government must prove a defendant knowingly possessed or used

24  another person's identity "without lawful authority."  The

25  Government need not prove the defendant stole the means of

1    identification.  However, the Government must prove the

2    defendant possessed or used the other person's means of

3    identification for an unlawful or illegitimate purpose.

4          As another element of aggravated identity theft, the

5    Government must prove the means of identification was

6    possessed "during and in relation to" the wire fraud

7    conspiracy charged in Count Fifteen.  The phrase "during and

8    in relation to" means that there must be a firm connection

9    between the defendant, the means of identification, and the

10   wire fraud conspiracy.  The means of identification must have

11   helped with some important function or purpose of the

12   conspiracy and not simply have been there accidentally or

13   coincidentally.  The means of identification at least must

14   facilitate or have the potential of facilitating the

15   conspiracy.

16         Defendant Herman is charged in Counts Eighteen and

17   Nineteen with violating Title 18, United States Code,

18   Section 1028A.  This law makes it a crime to commit aggravated

19   identity theft.

20         For each of these counts, to find the defendant

21   guilty of this crime, you must be convinced that the

22   Government has proved each of the following elements beyond a

23   reasonable doubt:

24         First, on or about September 26, 2015;

25         Second, the defendant knowingly possessed or used

1    another person's means of identification; specifically:

2         A, for Count Eighteen, the forged or unauthorized

3    signature of David Rodgers;

4         B, for Count Nineteen, the forged or unauthorized

5    signature of Gordon Pardy;

6         Third, the defendant knew the means of identification

7    belonged to another actual person (living or dead) and not a

8    fictitious person;

9         Fourth, the defendant knew he lacked lawful authority

10   to possess or use the means of identification; and,

11        Fifth, the defendant possessed or used the means of

12   identification during and in relation to the wire fraud

13   conspiracy charged in Count Fifteen.

14        If the Government fails to prove any of these

15   elements, you should find the defendant not guilty.  On the

16   other hand, if the defendant [sic] proves each of these

17   elements, you should find the defendant guilty.

18        Defendant Horn is charged in Count One of the

19   additional indictment with violating Title 18, United States

20   Code, Section 1023(a) [sic].  This law makes it a crime for

21   anyone under oath to make a false material statement when

22   testifying in a proceeding before any United States Court or

23   grand jury.

24        For this count, to find the defendant guilty of this

25   crime, you must be convinced that the Government has proved

1    each of the following elements beyond a reasonable doubt:

2              First, that on or about January 16, 2019;

3              Second, the defendant made the statement, as charged

4    in the additional indictment;

5              Third, at the time the defendant was testifying under

6    oath in a grand jury proceeding;

7              Fourth, such statement was false in one or more of

8    the respects charged;

9              Fifth, the defendant knew such statement was false

10   when the defendant made it; and,

11             Sixth, the false statement was material to the grand

12   jury proceeding.

13             If the Government fails to prove any of these

14   elements, you should find the defendant not guilty.  On the

15   other hand, if the Government proves each of these elements,

16   you should find the defendant guilty.

17             At the beginning of the trial I told you that the

18   defendant Ian Horn was accused of several different crimes.

19   Since the trial started, however, one of the charges has been

20   disposed of, specifically Count Two of the additional

21   indictment.  The charge is no longer before you.  You should

22   not guess about or concern yourself -- yourselves -- with the

23   reason for this disposition.  You are not to consider this

24   fact when deciding if the Government has proved, beyond a

25   reasonable doubt, the counts which remain.

1            The following principles apply to the offense charged

2       in Count One of the additional indictment:

3            A false statement in grand jury testimony is material

4       if it has a tendency to influence, mislead, or hamper the

5       grand jury in a matter which it has the authority to

6       investigate.  To be material, the false statement need not

7       have an actual effect on the grand jury's investigation.  The

8       false statement merely must have the potential or capability

9       of influencing the grand jury.

10           In reviewing the statement alleged to be false, you

11      should consider each statement in the context of the sequence

12      of questions asked and answers given.

13           If you find a particular question was ambiguous and

14      the defendant truthfully answered one reasonable

15      interpretation of the question under the circumstances

16      presented, then such answer would not be false.  Similarly, if

17      you find the question was clear but the answer was ambiguous,

18      and one reasonable interpretation of such answer would be

19      truthful, then such answer would not be false.

20           Evidence has been presented about a statement

21      attributed to a defendant alleged to have been made after the

22      commission of the crimes charged in this case but not made in

23      court.  Such evidence should always be considered by you with

24      caution and weighed with care.  Any such statements should be

25      disregarded entirely unless the other evidence in the case

1   convinces you by a preponderance of the evidence (more likely

2   true than not -- or more likely than not) that the statement

3   was made knowingly and voluntarily.

4          In determining whether any such statement was

5   knowingly and voluntarily made, consider, for example, the

6   age, gender, training, education, occupation, and physical and

7   mental condition of the defendant and any evidence concerning

8   his treatment while under interrogation if the statement was

9   made in response to questioning by Government officials, and

10  all the other circumstances in evidence surrounding the making

11  of the statement.

12         If, after considering all this evidence, you conclude

13  by a preponderance of the evidence, more likely than not, that

14  the defendant's statement was made knowingly and voluntarily,

15  you may give such weight to the statement as you feel it

16  deserves under all the circumstances.  If you determine that

17  the statement is unreliable or not credible, you may disregard

18  the statement entirely.

19         Of course, any statement should not be considered in

20  any way whatsoever as evidence with respect to any other

21  defendant on trial.

22         Members of the jury, those are the instructions on

23  the substantive areas of this case that I've now given to you.

24         I note that the time is now five minutes to 11:00.

25  The Government will have the opportunity to present its

1   initial closing statement and may reserve a portion of its

2   time to rebut the closing statements of the defense.

3           We'll plan on breaking after -- for lunch -- after

4   your opening in this matter.

5           JUROR 49:  Your Honor, can I go to the restroom,

6   please?

7           THE COURT:  Absolutely.

8           JUROR 49:  I drank too much coffee.

9           THE COURT:  Let's --

10          MR. HEIMANN:  Your Honor --

11          THE COURT:  That's -- that's artful.

12          JUROR 49:  You guys had me back there too long.

13          MR. HEIMANN:  Your Honor --

14          JUROR 49:  I'll be back.  I promise.

15          MR. HEIMANN:  -- I do need five minutes to set up my

16   presentation, as well.

17          THE COURT:  Yes.  Why don't we just take a break for

18   about 10 minutes.

19          JUROR 49:  Thank you.

20          THE COURTROOM DEPUTY:  All rise.

21          THE COURT:  Okay.  Don't be embarrassed.

22          JUROR 49:  Sorry.

23          JUROR 28:  I was going to ask first.

24          JUROR 56:  We need a cleanup in Chair 3.

25      (Proceedings outside the jury's presence at 10:56 a.m.)

1          THE COURT:  Anyone else need to take advantage of

2     this time?

3        (A recess was taken from 10:56 a.m. to 11:09 a.m.)

4          MR. SZOTT:  Your Honor, if I might take just a brief

5     moment before the jury returns to memorialize the defendants'

6     waiver of the lack of instruction on venue.

7          MR. FLEENER:  We agree -- I agree.

8          MR. WARD:  That --

9          MR. JUBIN:  No objection.

10         MR. WARD:  On behalf of Mr. Winters, no objection.

11         THE COURT:  Thank you.

12         MR. SZOTT:  Thank you, Your Honor.

13         THE COURT:  You're very welcome.

14       (Proceedings within the jury's presence at 11:13 a.m.)

15         THE COURT:  Thank you, ladies and gentlemen.

16         Mr. Heimann.

17         MR. HEIMANN:  Thank you, Your Honor.

18         Over the last 2 1/2 weeks, we have proven to you

19    beyond any reasonable doubt that the defendants Justin Herman,

20    Chuck Winters, and Ian Horn each played their part in a

21    conspiracy to pump and dump the common stock of NuTech Energy

22    Resources and, in doing so, steal from unwitting investors in

23    the public market.

24         The defendants and their coconspirators worked

25    together to acquire EcoEmissions.  They then reimagined that

 1   shell as NuTech Energy Resources, created a website, a new

 2   name, put it up on OTC Markets for everyone to see.

 3          They then went to Pacific Stock Transfer and they

 4   submitted false and altered documents to get free-trading

 5   shares.  In doing so, they forged the signatures of Gordon

 6   Pardy and David Rodgers.

 7          And then they pumped it and dumped it by putting out

 8   misleading press releases, email blasts, and coordinating the

 9   trades to mark the open and the close to convince people in

10   the public that this stock was worth something when it was

11   still nothing, no business, no revenue, no employees.

12          Defendant Horn, for his part, then lied to the grand

13   jury about the existence of email to cover up the scheme and

14   his part in it.

15          I told you in my opening statement this is a stock

16   fraud, to pay attention to who has free-trading shares, who is

17   selling them, and how they got them.  I'm going to walk

18   through the evidence and show you how each of these defendants

19   is guilty of each crime charged.

20          The pump and dump had five stages.  We talked about

21   this at the beginning, and we walked through each of those

22   stages as we presented our case.  Each defendant had a role to

23   play.

24          You've seen Justin Herman direct the flow of money in

25   documents.  You've seen Justin Herman telling Chuck Winters

 1   what documents to create, what trades to get put in and when.

 2   You've seen him instructing Ian Horn where to send the money.

 3          He coordinated the sale of stock and sold stock

 4   himself during the manipulation period, and he made his money

 5   from the stock sales and from diverting some of the money that

 6   came from Nadine McCreery in Wyoming, Mike Perry in Denver,

 7   through Ian Horn to buy the shell -- he diverted it to himself

 8   and to Chuck Winters.

 9          For his part, Chuck altered documents.  He put

10   signatures on documents that he had no lawful authority to

11   use, and he made up contracts in the process.  He changes the

12   numbers on bank statements.  He sold shares in coordination

13   with Justin Herman and other conspirators.

14          He made his money from selling those shares and from

15   diverting -- Justin diverting some of the money used to buy

16   the shell to Intrepid Resources, Chuck Winters' company.

17          Ian Horn moved the money, and he made his money by

18   doing so.  Justin Herman let him keep some.

19          He concealed email evidence when investors came, and

20   his name and signature are on opinion letters that you have

21   learned are essential to the securities market and to any

22   successful pump and dump because you need those letters.  You

23   need the letters to stay on OTC Market, and you need the

24   letters to get free-trading shares.

25          You've been instructed on the crimes charged, and

1   I told you in the beginning to pay attention to the overall

2   scheme.  And I will tell you now -- pay attention to the

3   overall scheme.  When you go through each count and you look

4   at the individual elements, don't lose sight of the whole

5   scheme because the elements of each crime are embedded in that

6   scheme.

7          I'm going to suggest to you a way to get through your

8   deliberations because you have a lot to do and it won't be

9   easy.

10          I suggest that you start with Count Thirteen.  That's

11  a securities fraud.  And I suggest you start with

12  Justin Herman and then consider Chuck Winters.

13          Next, I -- I suggest you go to Count Fourteen.

14  Count Thirteen is a conspiracy to commit securities fraud.

15  Count Fourteen is a securities fraud.  And, again, I suggest

16  that you begin with Justin Herman, consider Chuck Winters, and

17  then move on to Count Fifteen.

18          This brings you back to a conspiracy; right?  The

19  wire fraud conspiracy.  Same scheme, slightly different

20  elements.

21          But you'll have come a long way by then, figuring out

22  if there was an agreement, and then you just need to look at

23  the unique elements of the wire fraud, did the agreement

24  encompass wire fraud.  Again, I would focus on Justin Herman

25  and Chuck Winters to begin with.

1            Then I would consider the aggravated identity theft

2     counts.  These are against Mr. Herman, Mr. Winters.

3            And then Eighteen and Nineteen are only against

4     Justin Herman.  They're overt acts in the Count Thirteen

5     conspiracy, and they're acts taken in furtherance of the wire

6     fraud conspiracy.  So you will already have thought about some

7     of that evidence, and you can deal with the elements and those

8     defendants.

9            At that point I suggest you turn your attention to

10    Mr. Horn.  My suggestion is you first look at perjury, the

11    perjury count, because it's a very defined section of time.

12           Then I suggest you go back and you consider whether

13    Mr. Horn is guilty in Count Thirteen, Fourteen, and Fifteen

14    because a lot of the evidence that shows his criminal intent

15    is found in the evidence showing the perjury, his

16    consciousness of guilt.

17           When I did my opening statement, I walked through

18    this chronologically; right?  Start to finish.

19           Today I want to do it a little different and talk

20    about the actual pump and dumps first.  And the reason I want

21    to do this is that there's Overt Act 28 -- and you'll remember

22    Alexander Scoufis created that summary chart where he put the

23    email blasts and the chat, Skype chats, and the sales of

24    certain document -- shares -- and email communications into

25    a -- into a time line for you, and the exhibits are 28.1

1    through 28.34.

2           If you didn't figure it out, every overt act, the

3    exhibits proving it begin with its number.  So if you pull up

4    the list of overt acts, 1 through 41, and you want to know

5    which exhibits relate to Overt Act 28, you look at the

6    exhibits that start with "28."

7           We tried to order them chronologically.  We failed in

8    some cases, but they're all there.  And so that's true whether

9    you're looking at Overt Act 11, 30, 28, 1, regardless.

10          We've also, then, separated the rest of the exhibits

11   that are not overt act specific.  I want to go back here

12   quickly.

13          For the steps of the -- steps of the fraud, the ones

14   that -- exhibits that are not overt act specific, we've

15   numbered 100 for Step 1.  There's a series of exhibits, 100 --

16   beginning at 100.  They're related to buying control of

17   EcoEmissions.

18          200 -- the 200 series relates to creating and

19   maintaining NuTech.  300, getting the free-trading shares.

20   400 is the first pump.  500 is the second pump.

21          600 relates to the perjury count and statements made

22   by Mr. Horn, admissible against only him.

23          So this is that summary chart.  And I suggest you

24   start here because this is the conspiracy in realtime.  The

25   Skype chat was in 28.34.  When you first open it, you're going

 1   to go, "I can't read that."

 2          Well, if you focus in, it gets readable, so you can

 3   zoom in and you can find this -- the chats for yourself.

 4   There will be chats in that exhibit that are not in the

 5   time line, so you can go in there and find those if you want.

 6          There are going to be some sales that were outside

 7   the chat time during this pump.  You can find -- this goes

 8   from November 6 to -- starts at November 6th, runs through

 9   about November 10th.  There are some sales that were

10   beforehand, so this is an exhibit that's in that 400 series,

11   where Chuck Winters is telling Justin Herman some other sales

12   that were made.

13          And we also have some email that we got from FinTech

14   showing Chuck Winters putting in sell orders and then

15   reporting them back to Kingdom Trust.  And another and back to

16   Kingdom Trust.

17          The Skype chat itself starts with the email blasts,

18   and you start to see the email coming out November 5th, and

19   then you can read what the defendant -- what the participants

20   on this were doing.

21          Now, we know that Justin Herman was on this chat.

22   He's on there with somebody named Kada Mesli, Mike Baron, and

23   Bob Mitchell, and they're arranging for orders to be placed,

24   and they're marking the open.

25          You remember Mr. Scoufis talked about marking the

 1   open, how important the opening price is, and you can see in

 2   the middle of this where Mesli purchased 1 NERG share, .0054.

 3   And it's at 9:30, right before the market opens -- or right as

 4   it opens, and then there's an email blast that touts the

 5   market open at .0054 and how wonderful it is that it's gained

 6   51 percent.

 7          This is manipulative trading.  It sends a signal out

 8   to the public that this stock is worth something when it's

 9   not, and it's part of the conspiracy that these defendants

10   were involved in.

11          There's coordinated trading then by Chuck Winters --

12   because Chuck Winters isn't on this chat; right?  But he's out

13   doing the trading while Justin Herman is on -- in the chat.

14   So they asked for sale at .0043, 900,000.  And, lo and behold,

15   Chuck Winters sends that order to Scott Gilleland at FinTech.

16          And there's more.  He sends another set of orders for

17   Chronos and Bravo.  Bravo is Bob Mitchell, we'll see in a

18   moment that Chronos is Kada Mesli, and these are coordinated.

19   You can follow the chat and see the sales.

20          Now, there's a "midday coverage just went out" chat

21   from Kada Mesli.  And there's been some talk during the -- the

22   trial how, "Oh, gee, whiz, we don't know who sent out the

23   press releases."  Well, it's a conspirator.  It's Kada Mesli

24   because he says it's about to go out and -- what do you

25   know -- it comes out.

1        He makes the .0054 marking the open sale and a press

2    release touts it, and he's on the Skype chat with

3    Justin Herman, talking about sales they want to make, which

4    Chuck Winters then puts in.

5        Press releases come out the middle of the day,

6    November 6.  And then they want to mark the close, so they

7    drop -- at 3:56 p.m. on 11/6, 10 -- Mesli makes a purchase of

8    10 NERG shares at .0054 and then changes his mind and says,

9    "No, I want to go .0055."  Because he had already put out a

10   press release saying .0055.  This is the conspiracy in action.

11       And what they're doing is they're running this

12   program -- they even called it a program -- to profit from

13   this worthless stock by manipulating its price.

14       Then there's more trading that's coordinated.  Put

15   in -- Kada Mesli put in, you know, 1 million shares at .006,

16   1M shares at .0063, et cetera.  And what happens?

17   Chuck Winters puts in that trade order at FinTech.

18       By the time you get to 11/9, they're again marking

19   the open, this time at 9:46, with a NERG sale, 1,010 shares --

20   which sounds like a lot, but you know from the price of it

21   it's not -- at .0062, inching it up, maybe trying to grab some

22   of those momentum traders so they can steal their money.

23       And then more promotional email comes out, and it

24   talks about a price, .0060.  It's the conspiracy in action.

25       They're splitting up their trades.  If you're going

1  to work together in a criminal agreement, you have to figure

2  out who's going to get what, and here's Justin Herman talking

3  to Chuck Winters about who gets what, how it's going to be

4  split up.

5         You've heard some questions that -- through the

6  course of this trial -- which imply that if a person doesn't

7  get enough money they're not really in the conspiracy, and

8  that's just not true.  People play different roles and they

9  get paid differently.  That doesn't mean they're not in the

10 conspiracy.  Not everybody's getting top dollar.

11        Press releases.  "What time is the PR going out?"

12        "Are you on top of OTC Herm?" from Mike B., Baron.

13 And then, magically, a press release comes out.

14        As we get to the end of this, they're talking --

15 there's a -- this posting of a current disclosure on OTC.

16        You'll remember Gareth Colglazier's testimony, how,

17 in order to stay at OTC Pink, a company has to keep its

18 filings updated, they have to make financial filings, they

19 have to file current information letters signed by an attorney

20 or they fall off that OTC Pink tier.

21        So, again, here's a conspiracy in realtime:  9.2 is

22 the filing records or the disclosure records, uploading

23 records from OTC, and Chuck Winters, chuck@ichcorp, makes that

24 posting that's talked about in the Skype chat -- or on the

25 summary chart -- on time to keep them on OTC Pink.

1          The whole point of this is to make money, and we've

2     shown you how the defendants, Mr. Herman and Mr. Winters,

3     moved money through Kingdom.

4          So you've seen -- and this is -- part of this is

5     40 -- one of this is 28; part of it's 405.  The one on the

6     right is Exhibit 405.

7          And you'll remember Mahauta Reed from Kingdom Trust

8     talked about how Justin Herman and Chuck Winters were ADRs on

9     accounts, would call in and have money sent out, either by

10    email or by withdrawal requests.  Well, this is money going

11    out to Chronos.

12         And as you go further, it's multiple days, multiple

13    thousands of dollars each day.  It's a -- right after that

14    period in the Skype chat we just looked at where they're

15    coordinating trades, manipulative trading to feed the email

16    blasts and following the press release, asked for it to be

17    sent out.

18         And how do we know it's Kada?  Because in 406 Justin

19    Herman's thanking Mahauta Reed and another woman at Kingdom

20    Trust for helping get -- helping -- "Thank you for helping me

21    with that stupid wire for Chronos," Kada.

22         Well, Chuck's the one who sent it in, and Justin's

23    the one who's thanking them.  And Chronos is Kada.  And

24    there's a Kada Mesli on the Skype chat.

25         This -- and 40 percent went to Chronos.  So this is

1    the conspiracy in action, almost realtime.

2          Money went to Bravo Two.  But notice that it is --

3    and this is 407, the withdrawal request -- per Chuck and

4    Justin.  They're the ones making the request.

5          We had some questioning about money to other folks,

6    HBA Group, for example, and here's what we know:  We know

7    HBA Group includes Michael Baron.  Michael Baron is on the

8    Skype chat.  We also know that in January of 2016 Mike

9    Baron -- a Michael Baron sends $41,000 to Bob Mitchell, who

10   was on the Skype chat.

11         And what does Bob Mitchell do?  He sends half of it

12   to Justin Herman.

13         So what we know about this conspiracy is that the

14   company who sold it may not be where the money ended up

15   because they're all working together to share the proceeds and

16   keep the enterprise, the program, the pump and dump, going.

17   This first period runs all the way into January through our

18   overt acts.

19         So 29 relates to an overt act by false documents

20   going to JW Korth.  You remember Holly MacDonald-Korth

21   testified, and she had a compliance person who needed to know

22   where these shares came from in order for Justin Herman to

23   sell the shares through her company.

24         So they submitted a data pack, the KW data NERG pack.

25   And what was it?

1        Well, it was all the stuff they sent to -- to Pacific

2   Stock, and it even said in the email, "Same base data pack

3   that Pacific Stock Transfer reviewed and accepted."

4        And you know -- we're going to talk about it in more

5   detail, but you know from the trial that there was -- a debt

6   assignment agreement was one of those documents, and you know

7   that it was backdated.  You know there were bank statements

8   that had been altered; a wire transfer request, 280 instead of

9   80.  Unauthorized signatures pasted onto phony contracts.  And

10  the opinion letters, based on many of these false documents,

11  talking about $280,000 transactions.

12       And you heard Holly Korth testify that if she knew

13  these kinds of documents were in that pack her company never

14  would have worked with them, which makes it material.

15       We also have evidence from JW Korth of -- of

16  Justin Herman selling on press releases.  There was a

17  recording of a telephone call, 29.4 and 29.5, two separate

18  calls on January 28th of 2016, and it refers to a press

19  release and how Justin Herman wants to sell off the press

20  release.

21       And there it is, 29.3.

22    (Government's Exhibit 29.4 played.)

23       MR. HEIMANN:  And on the second call.

24    (Government's Exhibit 29.5 played.)

25       MR. HEIMANN:  And do you have any reasonable doubt

 1   after seeing the Skype chat that Justin Herman believes that

 2   press release?  Thinks it's real?  It certainly wasn't.  You

 3   know that because there was no company.

 4          Overt Act 29 talks about sales, and there's the

 5   email.

 6          The first pump and dump period ends in January of --

 7   29th -- of 2016 because, as you heard from Gareth Colglazier,

 8   OTC Markets put NuTech on caveat emptor because it had a

 9   public interest concern.  And from that point forward there's

10   a number of overt acts designed to getting rid of the bones,

11   getting rid of that caveat emptor skull and crossbones off of

12   the site.

13          And I'm going to go through these quickly.  Bob

14   Mitchell posts a financial disclosure -- well, I shouldn't say

15   it that way.  Bob Mitchell creates a financial disclosure and

16   Chuck Winters posts it.

17          There's a number of overt acts related to an opinion

18   letter, trying to get them up -- and I'm going to talk more

19   about opinion letters, but the point now is they're used to

20   get back into the good graces of OTC Market.

21          And there it is, "current information."  And who

22   posts it?  Well, this time, kevin@nutech.  You saw that

23   MFA update where that was Bob Mitchell's phone number, and you

24   heard Kevin Trizna say he didn't use that account.

25          Now, we know he used it at least once; right?  And we

 1   know Mr. Trizna got on a conference call.  But that really

 2   doesn't help the defendants because someone else's guilt

 3   doesn't absolve them, assuming he's guilty.

 4        35 and 36 relate to posting another Ian Horn opinion

 5   letter on OTC Markets.  And, remember, these go up onto the

 6   website.  They're still available today.  We got our copies

 7   that we used as exhibits when Inspector Hacker went out to the

 8   website and pulled them down this summer.  They're still

 9   there, available in Wyoming, available to anybody who has

10   access to the Internet, and they say that there's current

11   information available, but the current information doesn't

12   include no business, no revenue, no employees.

13        They need to post that letter, and, again, it's --

14   kevin@nutech is the log-in that's used.  So the defendants --

15   the conspirators are working together to accomplish their goal

16   of getting caveat emptor off.

17        Eventually, they get it off; right?  They file enough

18   that OTC Markets is satisfied, puts them back where they need

19   to be, and then there's a second period.  In May.  And there's

20   a number of overt acts related to this.

21        There's the buyout offer they send to Gareth

22   Colglazier.  It's coming from kevin@nutechenr.  As Mr. Trizna

23   admitted, he read a script on a conference call, and it

24   contained false information.  And then Justin Herman starts

25   dumping on the Russian offer.

1          And this is an important sequence of events

2    because -- I want to do it this way -- this email was sent out

3    on May 9th, and the press release is dated -- well, I'm sorry.

4    I'm getting ahead of myself.

5          They filed a press release on caveat emptor status;

6    right?  They're back in the game.  And then Justin Herman

7    tells Chuck Winters on May 9th, "I'm really expecting to sell

8    700 million shares -- several million shares of NERG this

9    week.  Woo nelly," and that's what they do.

10          A press release comes out.  They sell more.  Press

11   release comes out.  They sell more.

12          And you'll remember this summary over that May

13   period.  They're selling millions of shares and tens of

14   thousands of dollars they make in a three-day period, 151,000

15   in the 10 days from May 9th to 19th, but you can see it's

16   almost all in the three days.

17          And this "woo nelly"?  Indeed.  He did exactly what

18   he said he was going to do.

19          There's one other thing I wanted to point out.  If we

20   go back to "receives buyout offer," look at the date.

21   May 10th.  And this email is May 9th.

22          And you heard a lot of questioning about why would

23   anyone who believed the Russian offer sell below 2 cents.

24   Well -- exactly.  Why did Justin Herman sell several million

25   shares on this buyout offer when he could have made so much

1    more money if it were real?

2          There's only one conclusion:  He knew it was phony,

3    and he was taking his chance to make some money off those

4    people who didn't know it was phony.

5          We have overt acts about money going to Bravo's

6    account and then Bob Mitchell running that -- part of that

7    money to Justin.

8          I'm going to go fast now because I don't have that

9    much time, but I want to walk through our overt acts and show

10   you that we have some proof for all of them that's been

11   offered.

12         Buying -- buying control.  So it's not on overt act,

13   but Kevin Trizna sent $20,000 to Ian Horn, who took his 1250,

14   what Justin Herman told him he could take, and then he sent

15   money to Justin Herman and to Tom Crom at Eureka Ventures.

16         We have Overt Acts 3 through 5, and we had a bunch of

17   bank documents.  But summarized in what was marked as 110, you

18   can see the flow of money from Nadine McCreery in Wyoming down

19   through Bob Mitchell, Mike Perry to Bob Mitchell, money from

20   Bob Mitchell directly to Justin Herman, and from Bob to

21   Ian Horn's bank account.

22         From there it moves to a different bank account

23   because the first bank wouldn't send the wires and then gets

24   distributed as instructed by Justin Herman.  And Ian Horn

25   withdraws $2,000 cash as his cut.

1          The debt assignment agreement.  You've seen it a lot

2     and it -- Justin Herman's the receiving party.  Ian Horn is

3     the person who's supposed to receive money -- or mail.  If

4     anybody has questions about that agreement, that's pretty much

5     that first box.

6          The second box is creating NuTech.  And we know that

7     a website was created and email accounts were created by Bob

8     Mitchell and here's the website.  "Available in Wyoming and

9     around the country."

10          The name was changed.  Tom Crom testified that he was

11     told to change the name.

12          Chuck Winters created this log-in so he could upload

13     documents to OTC Market, and we saw those records.  You have

14     this 9.2.  Anytime something shows up on OTC, you can probably

15     go back to this and find out when it was posted and what email

16     account was used to post it.

17          Opinion letters.  This is one that was put up on

18     OTC Markets by Chuck Winters, and that's Overt Act 8.

19          And then get the free-trading shares.  And you

20     remember all the documents that went to Pacific Stock

21     Transfer; right?

22          Overt Act 10, we need to get -- is basically the

23     initial request, board resolution -- we know there was no

24     board of directors.  It says at least two members.  Well,

25     Kevin Trizna said "I was the only board member."  And even if

1    you don't believe him about the email, there's no reason not

2    to believe him about the -- the board and the request for

3    free-trading shares.

4         It goes on, and here we get to one of those really

5    important sequences of events.  This is where Justin Herman

6    asked Chuck Winters "How do we add date?" and he sends him the

7    debt assignment agreement.

8         And you saw both of these in 11, "How do we add

9    date?"  No other text.  10:00 a.m. on July 27th.

10         Comes back, 10:53 a.m., no text but a new file.

11    And you know -- you've seen this.  You know what the

12    difference is.

13         January 2015, January 2014.  It was backdated.

14         January 2015, December 2014.  Now it's backdated

15    a year.

16         That Skype chat shows you the conspiracy in action;

17    right?  The pump and dump.  This shows you just how tight

18    together Justin Herman and Chuck Winters are.  "Can we add

19    date?"  And less than an hour later, without any other

20    communication, Chuck Winters sends it back to him, magically

21    backdated one year.

22         And you've heard that's significant.  You heard it

23    from Joslyn Claiborne; you heard it from Alex Scoufis.  That

24    holding period matters.

25         Justin Herman then sends it to Joslyn Claiborne --

1    which is why he needed it; right? -- to get the free-trading

2    shares.  If you have no free-trading shares, you have no pump

3    and dump.

4         There's a couple of things in here about applying to

5    Kingdom Trust, which I'll go over quickly, and then we get to

6    the -- the next significant altered document.  And it's the

7    same sequence of events; right?

8         Justin Herman says "Fix" to Chuck Winters.  And what

9    happens?  March 19th, 2015, "Fix" -- no other text of any

10   meaning other than "take care" -- 14 minutes later an $80,000

11   wire transfer is now magically 280.

12        And Justin Herman provides the debt assignment --

13   again, backdated -- and the ginned-up wire transfer request to

14   Joslyn Claiborne to get the free-trading shares so they can

15   pump and dump NuTech.

16        He also sends a list of all the people who are

17   supposed to get them, and he keeps sending more information

18   to her.  He sends this bank statement, which, again, claims

19   there was 280,000.

20        You remember in the 300 series we had an email where

21   Joslyn Claiborne was asking for the bank statement of where

22   the money landed.  The response is this.  From Justin Herman.

23        There's a couple overt acts where Justin Herman and

24   Chuck Winters are trading -- I should say it right.

25        Justin asked Chuck Winters for Ian Horn's letterhead,

 1   and it has a digital signature on it.  And it goes back and

 2   forth a couple times.

 3           I'm going to say more about opinion letters but . . .

 4   another email from Justin Herman to Joslyn Claiborne with a

 5   bunch of nonaffiliation statements.  You remember that

 6   nonaffiliation statements matter.  Joslyn Claiborne said so.

 7   You can't get free-trading shares if the person's an

 8   affiliate, so she needs that statement to go forward with the

 9   packet she's putting together.

10           And Alex Scoufis explained it, what it means to be an

11   affiliate and why you can't get free-trading shares.  So these

12   were essential.  They were important.  And Bob Mitchell signs

13   one.  Chuck Winters signs one.  And he signs another.

14           And you heard the testimony that Bob Mitchell was in

15   charge of NuTech so that one's false.  And Chuck Winters can't

16   get his shares if he doesn't sign that.

17           Again, more information, and this one includes an

18   opinion letter and another one, the short one, talking about

19   the 280,000 tied into the phony bank documents, one of which

20   we know Chuck Winters created.

21           At this point we are looking at Overt Act 24, and

22   this is where Chuck Winters creates a phony contract,

23   purchases an assignment of wells at the request of

24   Justin Herman.

25           He sends him an assignment, Bravo E-Pro.  It comes

1   back, assignment E-Pro.  But what do we know?  This one wasn't

2   signed.

3          This one magically has the signatures of David

4   Rodgers and Gordon Pardy, and you heard them testify -- and

5   they weren't challenged on it -- they never authorized these

6   signatures.  They didn't do it themselves, and they didn't let

7   anybody else do it.  They also said "We were never in this

8   contract."

9          Another legal opinion, and then the contract goes to

10  Bravo -- to Pacific Stock Transfer.  Justin Herman sends it.

11         Nonaffiliation statement.  We know they're important.

12  This one's for E-Pro.  Then, again, it has the signature lines

13  of David Rodgers and Gordon Pardy.

14         Now, we don't know who made this.  We don't have an

15  email where Chuck Winters is making this.  We don't know that.

16  What we know is that Justin Herman sent it to Joslyn

17  Claiborne.  And what's the result?  They get their

18  free-trading shares issued.  How are they issued?  They're

19  shipped to Justin Herman, from Las Vegas to Canonburg [sic],

20  Pennsylvania.

21         So let's look now at Count Thirteen.  And the very

22  first thing on there is "from on or about November 25th, 2014,

23  through and including on or about May 19th of 2016."

24         The email account and the website were created on

25  November 25th, 2014.  That's Overt Act 1.  The last overt

1  act, 41, is $10,000 going from Bob Mitchell to Justin Herman.

2  So we've proven that.

3         The first step, then, is to ask yourself, did the

4  conspiracy exist?  Was there a conspiracy to pump and dump

5  NuTech?

6         Well, there was.  You saw it in Exhibit -- in the

7  exhibits around 28, the Skype chat, the promotional email.  So

8  this conspiracy existed.

9         And as you look at the various options here, if there

10  was an agreement to use a device or scheme to defraud -- well,

11  a scheme to defraud is conduct intended or reasonably

12  calculated to deceive persons of ordinary prudence and

13  comprehension.  Well, public investors, email blasts, marking

14  the open, marking the close, press releases, transfer company

15  with phony documents, broker-dealers with phony documents --

16  there was a scheme to defraud.

17         And it included false and misleading statements that

18  were material.  It mattered.  These statements mattered.  So

19  the conspiracy existed.

20         The jury instruction about overt acts -- we've listed

21  off 41 overt acts.  As I've already told you, the exhibits are

22  out there, numbered with each overt act.  There's a list that

23  you're going to take back with you.  Don't look at the

24  superseding indictment because it's numbered differently.  But

25  it's exactly the same on the list, just different numbers, and

1    we've linked our exhibits to the numbers on the list.

2          We've shown you a bunch, and at least one was

3    committed.  I mean -- making phony documents, putting out

4    those press releases.  Interdependence.  There's a constant

5    working together.  The Skype chat shows it.  Press releases,

6    "I'm doing the marking of the open.  You guys sell these

7    shares.  We'll split up the money."  The movement of the money

8    to buy the shell.

9          I want to talk about, also, commerce.  And it's

10   almost not worth talking about because with all the email that

11   goes back and forth, the wire transfers -- and, ultimately,

12   the purchase of the shares -- the Linharts, Ms. Bluemel,

13   Ray Moore bought their shares online from Wyoming.

14         So the question then is whether the defendant,

15   Justin Herman, knew the essential objective and knowingly,

16   willfully, voluntarily participated in intent to defraud.

17         I've reviewed it, the phony documents.  He's on the

18   Skype chat directly.  He's telling people where money goes,

19   either from the sale or an attempt to buy the shell, which is

20   part of the conspiracy, and he's the one determining who gets

21   what.  He takes the money for himself; he gives some money to

22   Chuck Winters; he gives some money to Ian Horn.  He is

23   fundamental to this conspiracy and was orchestrating the

24   conduct of these defendants and others in coordination with

25   the folks on that Skype chat at a minimum.

1          Let's look at Chuck Winters.  Again, phony documents,

2    willful participation to deceive the transfer agent, brokers.

3    He's in the Skype chat as the person who's buying the shares.

4          Now, he's not sitting on any account, so how would he

5    know that?  Well, because Justin Herman told him.  So he's in

6    this conspiracy and guilty on Count Thirteen.

7          Count Fourteen, this is the securities fraud.  It's

8    really not all that different.

9          It's in the Skype chat.  It's in the false documents

10   to Pacific Stock Transfer and the brokers.  The dates are the

11   same.  There was a scheme to defraud.  If you've done the

12   conspiracy, you've already figured that out.

13          It was connected to the purchase or sale, and that

14   includes the transfer agent, false statements to the transfer

15   agent.  You can't sell stock you don't have, and they could

16   not get free-trading shares by telling the truth.  So those

17   false statements are in connection with the purchase and sale

18   of securities.

19          Used instrumentalities of interstate commerce, email,

20   trading system.  Caused someone else to do it who bought.  And

21   he did so willfully with intent to defraud.  You don't create

22   false documents and submit them as if they're real unless you

23   have intent to defraud, and that is willful conduct.

24          Regardless, he certainly associated himself with this

25   as if it were something he wanted to see happen, so he aided

1   and abetted.

2          Chuck Winters is really in the same place for all the

3   same reasons.  And even if you think you had to be on the

4   Skype to be guilty of this securities fraud count, Chuck

5   Winters is aiding and abetting it by doing the sales on the

6   outside of that Skype chat.

7          Count Fifteen, the wire fraud.  At this point we know

8   when it happened.  The securities fraud conspiracy, wire fraud

9   conspiracy aren't that different, a scheme to defraud by

10  pumping and dumping, involved fraudulent -- false or

11  fraudulent pretenses, representations, and promises that were

12  material.  Again, the phony documents.

13         There was interdependence.  They all worked together,

14  just like in the Count Thirteen conspiracy.  And interstate

15  wires?  Well, of course.  They're doing the sales, email, and

16  they caused other people to do it when they bought the shares.

17         Justin Herman, well, he was creating these false

18  documents along with Chuck Winters.  He's on the Skype chat

19  setting prices, telling Chuck to go sell.

20         And the same is true for Chuck.  He's creating false

21  documents; he's selling based on Justin's instructions.

22         Identity theft.  So we saw the forged signatures of

23  Gordon Pardy and David Rodgers.  Means of ID, signature.

24  Knowingly possessed, without lawful authority.

25         Well, you can't -- nobody has authority to just put

1  somebody's name on a document.  And Gordon Pardy and David

2  Rodgers told you they didn't give anybody authority to do

3  that.  It's not like turning to your spouse and saying, "Yeah,

4  you can sign my check when you go deposit that."

5          During the wire fraud conspiracy.  Well, it's an

6  overt act.  And there it is; right?  So it was during the wire

7  fraud conspiracy.

8          September 23rd, that's when the emails are passed.

9  David Rodgers, his signature's on there.  He told you that he

10  never authorized it.  Same with Gordon Pardy.

11          Knew he lacked lawful authority.  Well, how -- how

12  would anybody think they can just cut and paste somebody's

13  signature onto something?

14          Real people.  Well, Justin Herman told Ian Horn to

15  send David Rodgers money -- or Gordon Pardy money directly, so

16  he knew they're real people.

17          Chuck Winters -- remember the backdated document?

18  And this goes to Justin Herman as to David Rodgers.  It has

19  David Rodgers' signature on it.  So they knew they were real

20  people.

21          In addition, 301.  This is an email where Chuck

22  Winters asked Justin Herman, "Hey, need name and address of

23  other c-o-n-v assigner," and there's a conversion note with

24  Gordon Pardy's name attached.  "C-o-n-v," convertible debt.

25  And he needs the name because he knows he can't just make it

 1  up.  It's got to match, which is evidence he knows this is a

 2  real person.

 3          The same is true for Justin on the same docs.  This

 4  is the attachment.  It's the bottom part of that attachment to

 5  the email in 301.

 6          The identity theft in Eighteen and Nineteen against

 7  Justin Herman, it's part of the conspiracy.  It's an overt act

 8  on September 26th and there it is.  There's the document.  The

 9  signature's attached, David Rodgers.  Gordon Pardy.

10          Never authorized it.  You can't just put somebody's

11  signature on something.  And they knew they were real people

12  for the same reasons I just told you.

13          Ian Horn.  You know, I said when you get to Ian Horn,

14  start with the perjury.  The perjury count's there.  It's

15  about email.  And you know from the evidence we've shown you

16  that email mattered to the conspiracy.  In particular, moving

17  the money.  It helped show what happened.

18          I suggest 604 -- just read it and you'll see that

19  Ian Horn was advised of all his rights, he understood that the

20  grand jury could use his statements against him, and he knew

21  that we were investigating various forms of fraud, investment

22  fraud and securities fraud.

23          He acknowledged that he had a lawyer available and he

24  could go ask questions if he needed to.  And he acknowledged

25  that if he didn't understand a question he would tell us.

1          This is a sequence of questions.  When you're looking

2    at this count, read them.  They're clearly focused on email

3    and the context of that.  He says "I don't have my email and

4    I don't have online access."

5          But that's false and we know it's false because he

6    had email access.  He was forwarding his email in 2018.

7          And again and again.  And again.

8          If you look at these text messages that are in 603,

9    you're going to see a number of text messages about email, and

10   what we will make clear to you is that Ian Horn didn't want to

11   talk about his email, thought it would harm him.  That's the

12   motive.

13         It also shows he was clearly focused on his email.

14   And that he had some.  Which shows that it was a deliberate

15   falsity when he told the grand jury "I don't have it; I can't

16   get it."

17         "It does seem I have a lot of emails and a lot of

18   wiring instructions.  I don't want to cause you any harm, but

19   I also don't want to cause myself any harm."  He's worried

20   about these email.

21         He then forwards them to this stevemillslaw@gmail.

22   "I'm sure sending all the emails that I have will result in a

23   whole bunch of questions, which will require me to be in

24   Wyoming to answer."

25         He doesn't want to answer questions about his email.

1    "I'll do my best by way of explanation for the emails I have."

2    Again, he's concerned about having to explain them.

3          And then he forwards them again, this time to

4    Justin Herman in December.  "I'd like to run down everything

5    they asked for in the subpoena and what types of responses."

6    He's focused on what he provided so that he can respond to

7    questions.

8          Again, "Do we speak on Monday and go over the

9    documents?"

10          "Schedule some time" -- now we're into January.

11          These are the elements and it's not that hard:

12    There's no doubt when he testified; there's no doubt he was

13    under oath; there's no doubt his statement was false.  He was

14    focused on his email, subjectively afraid to talk about it

15    and have to answer questions about it.  He thought it would

16    harm him.

17          He remained focused on the documents he'd produced

18    and his email through the entire 90 days between when he was

19    subpoenaed and when he testified.  There is simply no

20    reasonable doubt that when he said "I lost all my email," when

21    he said "I don't have online access," he knew that was false.

22    And you know it because you can look at the text messages and

23    see why.  He didn't want to answer questions.

24          Was it material?  Well, it's material if it has a

25    tendency to influence, mislead, or hamper the grand jury in a

1   matter which it has authority to investigate.  It was

2   investigating the very crimes it indicted.  And the location

3   of evidence is essential to any investigation.

4          And telling the grand jury, "I don't have email" --

5   when you do and it's related to the investigation which we

6   know because we see it in our evidence -- is a material

7   misstatement.  It's a lie.  And it's a lie that matters.

8          After you find Ian Horn guilty of perjury, I suggest

9   you go back and think about the conspiracies and the

10  securities fraud.

11         Ian Horn moved money to buy ECMZ.  There's no doubt

12  he had some agreement with Justin Herman.  The question is,

13  was it a criminal agreement?

14         And we know it's an agreement because he took his

15  instructions and he got paid.  Think about Ian Horn's reaction

16  when his first bank, BMO Harris, refused to let him wire the

17  second set of money.  There's this text message, 5.3, where

18  Ian Horn is asking Justin Herman, "What's going on?  Why is

19  the money going through me?"

20         If this were a legitimate transaction, if this were a

21  lawful agreement to escrow money, wouldn't the lawyer know why

22  the money was going through him?  Why would he have to check

23  before he talked to the bank?  He could just explain it.  If

24  it's an illegitimate agreement, an illegal agreement, well,

25  you better check with your boss to make sure you've got your

19-CR-26-ABJ              CLOSING - HEIMANN              Vol. XIII-2255
21-CR-14-ABJ

1    stories straight.

2         Ian Horn then closed his account.  When's the last

3    time you closed your bank account?  He was so committed to

4    this agreement that he closed his bank account, moved the

5    money to another bank that would let him send it out without

6    explanation.

7         Ian Horn said he wrote the opinion letters, never,

8    ever denied it.  Very first interview, very first question.

9    (Government's Exhibit 600 played.)

10        MR. HEIMANN:  In that same interview.

11   (Government's Exhibit 601 played.)

12        MR. HEIMANN:  And then May 2019, having all that time

13   to think about it.

14   (Government's Exhibit 602 played.)

15        MR. HEIMANN:  Why would he say he signed them if he

16   didn't?  Over and over.  Ian Horn knew, knew his name was

17   being used on opinion letters.

18        We know that because in March of 2016 -- and this is

19   516 exhibit -- kevin@nutechenr sent Gareth Colglazier an

20   attorney agreement -- this is when they're trying to get out

21   of the caveat emptor and they had to get an agreement for an

22   attorney to write opinion letters -- attorney letter agreement

23   with Ian Horn's name on it.  Sent his bar card, his driver's

24   license.

25        515, same day.  It's an email from a guy named

1  Dan Hefner to Justin Herman.  And who's copied on it?

2  Ian Horn.  It's that attorney letter agreement filled out.

3  Notice the company's blank.

4          Ian Horn knows this is going to Justin Herman.  It's

5  a blank check.  It's evidence that he agreed to let his name

6  be used on opinion letters.  NuTech, any company; it doesn't

7  matter.

8          Bar card, driver's license.  He knows his name's

9  being used on opinion letters.

10          Text messages.  At the very start, before the

11  interview even happens, he knows it's about opinion letters.

12  Where are they?

13          Again, "I don't want to cause you any harm, but

14  I also don't want to cause myself any harm."  Is that the way

15  an innocent person talks?  Or is that the way a person talks

16  to their coconspirator when investigators are there?

17          "Obviously, I can't explain why I don't have the

18  Pacific Transfer record -- letters."  Well, that's only

19  obvious if you know what the problem is.  He doesn't explain

20  to Justin what the problem is.  He says "obviously" because

21  they know -- they both know because they're both in this

22  agreement, that Ian's name can be used on these letters.

23          Again, "The sooner we're on the same page."

24  Legitimate transactions, you don't have to get on the same

25  page; you just have to remember what happened and tell the

1   truth about it.  Criminal agreements you've got to hide.

2   You've got to get together with your coconspirator and figure

3   out what the story is.

4          608 is from Mr. Horn's grand jury testimony.  And

5   what it shows is that he knows what opinion letters are about.

6   They go to transfer agents to get free-trading shares; they go

7   to broker-dealers; they're relied upon by the public.  All

8   that evidence of consciousness of guilty that I just went over

9   with you about opinion letters puts it into securities fraud,

10  wire fraud context.

11         And here's the other thing:  Why would Ian Horn

12  perjure himself about the email, perjure himself about the

13  email if he didn't have something to hide?

14         Read the text messages, 603.  The only reasonable

15  conclusion there is this is a person who doesn't want the

16  truth to be known about these opinion letters, his agreements

17  to move money for Justin Herman.

18         That's why he perjured himself, and it's evidence of

19  his consciousness of guilt.  His agreement with Justin was

20  criminal.  The attorney letters put it right squarely into the

21  securities fraud context and wire fraud.

22         So by the time you get to this point, you'll know the

23  conspiracy existed, and it's just a matter of Mr. Horn's

24  knowledge and voluntary, willful participation.

25         And the best evidence of that is shown by his

1   response to the investigation with the clear knowledge that

2   his name was being used by Justin Herman on opinion letters.

3   His repeated statements that he wrote those letters -- which,

4   by the way, is the only explanation that would protect a

5   conspiracy involving those letters -- are evidence of his

6   guilt on Thirteen, Fourteen, and Fifteen.

7           For Fourteen I will tell you this:  I don't think

8   there's evidence that he committed securities fraud himself.

9   But he aided and abetted by moving money and allowing his name

10  to be used.

11          After defendants make their arguments, I get to come

12  up and talk to you again.  I'll have to talk very fast, so

13  I appreciate your attention and look forward to speaking to

14  you again in a couple hours.

15          THE COURT:  Time for our lunch break.  We'll stand in

16  recess until 1:30 o'clock.

17          THE COURTROOM DEPUTY:  All rise.

18          THE COURT:  Do you need additional time?

19          MR. JUBIN:  A few minutes, yeah, if you would.

20          THE COURT:  Ladies and gentlemen of the jury, defense

21  counsel has asked for an extra half hour to get ready.

22          Two o'clock.

23      (A recess was taken from 12:30 p.m. to 2:01 p.m.

24  Proceedings outside the jury's presence.)

25          THE COURT:  All set?

 1          MR. WARD:  Good.

 2      (Discussion held between the Court and counsel.)

 3      (Proceedings within the jury's presence at 2:03 p.m.)

 4          THE COURT:  Thank you.  Please be seated.

 5          We'll now hear from Mr. Ward on behalf of

 6  Mr. Winters.

 7          MR. WARD:  Good afternoon, ladies and gentlemen.

 8          JURY MEMBERS:  Good afternoon.

 9          MR. WARD:  I hope everyone had a -- had a light lunch

10  with some caffeine.

11          This -- this has been a complex case, and I want to

12  say, on behalf of myself and my client Mr. Winters, that we

13  appreciate the attention that you all have paid over the last

14  three weeks.  And I want to remind you about something that we

15  talked about in voir dire and in opening, and that's the

16  importance of keeping an open mind.  You're in the homestretch

17  and you almost have the case, but don't make your mind up

18  about anything just yet.  Wait until you've heard all of the

19  closing arguments.

20          The Government said something in their closing

21  argument that I think is -- is very important and that I want

22  you all to be thinking about, and that's that the Government

23  told you in their closing argument to, you know -- something

24  along the lines of, you know, don't get bogged down in the

25  instructions.  You know, look at the overall scheme.  You

1    know, don't -- don't focus on the instructions.  Look at the

2    overall scheme.

3           And the reason the Government started their opening

4    statement with -- with that sentiment is because if you follow

5    the law and if you look at the instructions and you fulfill

6    your obligation as a juror to follow the instructions that

7    you're going to receive from the Court in a paper packet,

8    you're going to find that there is not evidence to find beyond

9    a reasonable doubt that my client is guilty of any crime.

10          And if you don't fulfill your obligation as a juror

11   and if you just kind of do what the Government suggested and

12   look at this as one kind of big scheme and you don't follow

13   the law, it may be tempting to, you know, say, "Hey, well,

14   there's crimes being committed.  You know, there's this

15   scheme.  You know, Mr. Winters must be guilty."

16          But if you follow the law, you won't be able to come

17   to that conclusion.  And so it's important that you understand

18   for each of the offenses charged, the Government has to prove

19   each element of that offense beyond a reasonable doubt.  Okay?

20   It's not a plurality.  If the Government proves four out of

21   five elements and fails to prove one element, you must find my

22   client not guilty of that charge.

23          And so as you're deliberating and as you are looking

24   through the jury instructions and you're considering each

25   charge, I -- I plead with you and I beg you, please fulfill

1    your duty as jurors -- and I know you will.  But hold the

2    Government to their burden and don't look at this as one

3    big -- one big scheme.  Look at each defendant, each count,

4    and each element of each count because that's what the

5    instructions are going to tell you to do.

6            And the reason the Government doesn't want you to do

7    that and wants you to look at this as -- as painting with a

8    big, broad brush is because there are critical elements that

9    are going to be a theme throughout all of these charges.

10           Instructions 31 and 32 are going to direct you that a

11   statement is material if it's made in connection with the

12   purchase or sale of a security.  Okay?  If it's made in

13   connection with the purchase or sale of a security.  And the

14   Government has spent two weeks focusing on statements and

15   attempting to prove statements were misleading or false that

16   were not made in the connection with the purchase or sale of a

17   security.

18           And so when you look at the elements, you are not

19   going to find anything in the jury instructions that says you

20   can convict my client if they were involved in getting

21   free-trading shares issued.  That word "issued" is not going

22   to appear in the jury instructions.  The statements must be

23   made in connection with the purchase or sale of a security,

24   and that's what the jury instructions are going to direct you

25   to, and it's important that you follow those instructions.

1            Before we get into the evidence, there's one other

2    thing I'll caution you about in -- in your deliberations, and

3    that is there are 41 or -- or some huge number of overt acts.

4    Okay?  And, again, the overt acts do not matter until you've

5    found that the Government has proved each one of the elements

6    of the offenses beyond a reasonable doubt.

7            And if you get bogged down in considering overt acts

8    and corresponding the, you know, dozens -- probably

9    hundreds -- of exhibits to the overt act numbers, you're going

10   to lose sight of what's important, and that's the elements of

11   the offenses.

12           So if you find all the elements have been met, you're

13   going to be required on the verdict form to make a finding as

14   to -- to what overt acts correspond to a charge, but there's

15   no reason to get to that step until you've found each one of

16   the elements of the offenses beyond a reasonable doubt, and

17   you're not going to get to that step.

18           In their opening statement and throughout the case

19   the Government has talked about a pump and dump.  Okay?

20   That's what this case was supposed to be about, a pump and

21   dump.

22           Well, as the case has progressed, the Government has

23   kind of moved away from a pump and dump and they've focused on

24   getting free-trading shares issued, and that is not a pump and

25   dump.  The Government said they were going to prove to you

 1  that my client, Charles Winters, was involved in a pump and

 2  dump, and they've failed to do that.

 3          And we know that -- let's look at the pump.  Okay?

 4  What do we know about the pump part of the pump and dump that

 5  the Government told you about?

 6          Well, let's start with the conference call.  Okay?

 7  You heard the conference call because I played it for you.

 8  The Government didn't want you to hear the conference call.

 9  I played the conference call for you.

10          And who did you hear on the conference call?  You

11  heard Kevin Trizna, you heard Mike Perry, and you heard

12  Tom Throne.  Okay?

13          You didn't hear Charles Winters, nothing about

14  Charles Winters.  The Government has not presented a shred of

15  evidence that connects Charles Winters in any way to the

16  conference call.  Okay?

17          And is the conference call important?  Was it just

18  any old conference call?  No.  It was an investor conference

19  call.  It was a conference call for the specific purpose of

20  providing information to the investing public.  It's the only

21  reason anyone would be on an investor conference call so,

22  obviously, of critical importance.  Okay?

23          And what did we hear on the conference call?  Well,

24  we heard Kevin Trizna.  Okay?  And what was Kevin Trizna

25  doing?  He was lying.  He was lying and, as the evidence

1   developed, we know he was lying prolifically.  Okay?  He said

2   he had been approached by a Russian company, and then he got

3   on the stand and he told you that was a lie.

4        And then we find out that it wasn't like he was lying

5   off the cuff.  It wasn't like he was put in a spot or

6   something.  He received a script in advance of the conference

7   call that outlined all the lies he was going to tell.  And he

8   was asked -- not only did he receive that script in advance,

9   he had an opportunity to edit that script.  And he chose to

10  fill in some information about his background or what year he

11  graduated college, but he didn't choose to change any of the

12  knowingly false information that was in that script, and he

13  had time to consider it.

14       And that's important.  And you've heard the

15  Government say, "Well, just because someone is -- you know --

16  someone else is guilty, that doesn't matter," and that's true,

17  of course.  Can Kevin Trizna lie on the conference call and my

18  client still be guilty of a crime?  Sure.

19       But it's important that Kevin Trizna lied on that

20  conference call and the depth of his lie, that he knew in

21  advance what he was going to say on the conference call and he

22  knew it was going to be a lie, and that's exactly what he did.

23  He got on that conference call and he lied.

24       You know from the testimony that the Government knew

25  Kevin Trizna was a liar; right?  The Government had the

 1  ability to fully investigate these things.  They've pulled

 2  every email, every bank record, every text message.  Okay?

 3  The Government has essentially unlimited resources to fully

 4  investigate this, and they did investigate it, so they knew

 5  Kevin Trizna lied on that conference call.  They knew he was a

 6  liar.

 7          And the -- the lies that Kevin Trizna told on the

 8  conference call -- I mean -- and we have extensive information

 9  about -- about that, you know.  One -- one thing that might be

10  important is, well, how did Kevin Trizna get the script for

11  the conference call in advance.  Right?  We know he got the

12  script.  I wonder where he got it.  Probably through the

13  kevin@nutech email, but the Government doesn't want you to

14  know these things.

15          The Government has attempted to hide the important

16  facts in this case from you because the Government doesn't

17  care about the truth; the Government doesn't care about

18  justice.  The Government cares about one thing, and that's

19  securing a win.  That's winning against my client at any cost.

20          And how do we know this?  Well, Kevin Trizna's lies

21  on the conference call were just the tip of the iceberg;

22  right?  We know he was lying about other things.  We know he

23  was lying about whether or not he was using the email.

24          And the Government conducted multiple recorded

25  interviews with Kevin Trizna, and he lied in every one of

1   them.  He said he wasn't using the kevin@nutech email.  He

2   said it over and over and over.

3          And then the Government continues to investigate the

4   case, and they come across this email, and it's from the

5   kevin@nutech email address, and it's got some interesting

6   information.  It's from right after the conference call, and

7   whoever is using the kevin@nutech email says "I'm attending my

8   sister-in-law's 50th birthday here in the DC area."

9          Well, what does the Government do?  Inspector Hacker

10  is a skilled investigator.  I think she's shown that.  She's a

11  formidable witness on the stand.  She's sharp.  You know, it's

12  clear this isn't her first rodeo.

13         And so when she comes across this email, she does

14  what she does and she investigates.  And, you know, a

15  less-experienced or less-skillful investigator might have

16  called Kevin Trizna and said, "Hey, are you sure you're not

17  using the kevin@nutech email?" or asked "What about this

18  email" -- but that's not what Inspector Hacker does.

19         She's smarter than that and she calls him and asks

20  him a very pointed series of questions, you know, "Hey, where

21  were you at the time of the investor conference call?  Do you

22  have brothers and sisters?"  You know, "Where do they live?"

23         And what does she find out?  She finds out that,

24  yeah, Kevin Trizna was in DC at the time of the conference

25  call.  He's got brothers and a sister-in-law that live in DC.

1    And at that point in time she knows, without any question,

2    that Kevin Trizna has been lying to her, to her face in every

3    recorded interview.  She knows he lied to the grand jury

4    during his grand jury testimony that he didn't use the

5    kevin@nutech email.

6          And then what does the Government do?  They have all

7    this overwhelming information that Kevin Trizna is a known

8    liar.  He's a pathological liar.  He's a manipulator.

9          And the Government calls Kevin Trizna to the witness

10   stand to testify to all of you knowing that, knowing that he

11   is going to get on the stand and lie.

12         And what did he do when he got on the stand?  Exactly

13   what the Government knew he would do.  He lied.  He said again

14   "I never used the kevin@nutech email" because that's in his

15   best interest.

16         And my client is seated over there, and his life is

17   on the line, and the Government is putting on liars to testify

18   against my client.

19         And it's incredibly important -- you know, we're in

20   this rather, you know, grandiose courtroom.  And as burdensome

21   as serving on this jury has been, I suspect that there's been

22   a positive aspect to your service as jurors, and that is

23   I have no doubt that you've been treated exceedingly well by

24   the -- the court staff.  I mean, we have a wonderful Judge; we

25   have a -- a smart, fair Judge in this case.

1          I'm sure, you know, you've been treated exceedingly

2    well by Ms. Harris.  And as burdensome as your jury service

3    has been, I'm sure you have a sense of, you know, positive

4    feeling about the experience.  I mean, I know you all were

5    interested enough and -- you know, in the way the courtroom

6    works and whatnot -- you spent a little extra time with our

7    fabulous court reporter learning a little bit about the tools

8    of her trade.

9          And what I want to caution you, though, is that

10   feeling that you -- you likely have -- and I suspect you have

11   towards this process -- and the positive feeling you have

12   about the way this court operates -- don't let that seep over

13   and cause you to have inherent trust for the Government

14   prosecutors because you need to hold the Government

15   prosecutors -- you know, you need to hold their feet to

16   the same fire that they're asking you to hold Mr. Winters'

17   feet to.

18         You need to consider the credibility of the

19   information that's being provided to you from the Government,

20   and you know without a doubt the Government has no qualms with

21   putting a pathological liar on the witness stand under oath to

22   lie to you, and that's incredibly important.

23         This email's also important for another reason, and

24   that's the second part that's highlighted here below.  This

25   case is supposed to be about a pump and dump, and the most

 1   important testimony in the entire case came from the

 2   Government's expert Alex Scoufis.  Okay?  The last question he

 3   was asked was "What is at the heart of the securities law in

 4   the United States?"  Right?

 5          And he gave a perfect answer, an answer I absolutely

 6   agree with, and that was "To ensure that investors have

 7   reliable information to base their investing decisions on."

 8          And that same concept is going to be tracked in the

 9   jury instructions that are going to tell you that, in order

10   for you to find that a statement matters, that an untrue

11   statement can be a violation of the law, it must be made in

12   the connection with the purchase or sale of a security.

13          The instructions are not going to say a statement

14   made regarding the issuance of free-trading shares can be

15   material, and that's incredibly important because you all

16   agreed as part of serving on this jury that you will follow

17   the law, and it's essential that you do that.

18          But back to the pump and the importance of this

19   email.  And what we see here is an investor who's listened to

20   the investor conference call and now he's reaching out.

21          And the email first went to Mike Perry, who you also

22   heard from, who forwarded it to Kevin.  And so this investor,

23   this poor guy, says, "Mike, I'll be honest with you.  I'm a

24   struggling 30s male, married, with kids.  I believe in NERG

25   and want to see the good in all this.  I'm getting slammed

 1    left and right saying this is a scam but refuse to believe it,

 2    and I have my life savings into this stock since last year."

 3            Okay?  Why is that important to a pump and dump?

 4            Well, this is the only information that's been

 5    presented to you in the last 2 1/2 weeks that we know an

 6    investor relied on.  Think of all the people who purchased

 7    NERG stock, who came in and testified.  Not a single one of

 8    them said they relied on any of the information that the

 9    Government is asking you to find constituted the pump.  Okay?

10    Not one of them.

11            But this guy did.  And you would think, "Oh, the

12    Government would have brought this guy in to be a witness"

13    because he's obviously important.  He relied on the investor

14    conference call.  He's got his life savings in this company.

15    His -- you know, his -- his wife and kids eating depends on

16    the viability of the information that was presented at the

17    investor conference call.

18            But this is the kind of information the Government

19    doesn't want you to focus on.  The Government doesn't want you

20    to focus on the reality of this case, and they don't want you

21    to think about the reality of who was responsible for the pump

22    and dump here.  They want you to paint with a broad brush.

23    They want you to say, "Look, there was a scheme," you know,

24    everyone -- everyone close to it must have been guilty."

25            But you heard the Judge read another instruction this

 1   morning.  It's not enough that -- it's not even enough if you

 2   know about the conspiracy.  You have to actively participate

 3   in the elements of the crime.

 4            And so we have this investor here relying on what

 5   Kevin Trizna told him, and he's reaching out to Mike Perry.

 6   We heard from Mike Perry.  Did Mike Perry care that this guy's

 7   life savings were on the line?  Did he do anything to address

 8   the falsehoods that were in the conference call?  He sure

 9   didn't.

10            When Kevin Trizna, you know, hears about this and

11   realizes, "Hey, this guy's got his life savings on the line"

12   based on what you were saying on the investor conference call,

13   does Kevin Trizna care at all?  Absolutely not.

14            All Mike Perry cared about was himself; all Kevin

15   Trizna cared about was himself.

16            And this is the pump right here.  The Government says

17   you can see the pump in realtime.  None of the evidence the

18   Government shows you showed you the pump in realtime.  This is

19   what shows the pump in realtime.  This man relied on the

20   investor conference call.

21            There were two other aspects of the -- the pump;

22   right?  We've got the investor conference call that the

23   Government has made no attempt to connect in any way to my

24   client Charles Winters.

25            They haven't even tried.  I mean, it's not like

1   there's a little bit of evidence or -- you know, I'm going to

2   argue the evidence isn't strong enough.  They haven't even

3   tried.  They have conceded that Charles Winters had nothing to

4   do with the investor conference call because he didn't.  Okay?

5        And so then there are two other aspects.  There are

6   email blasts and there are press releases.  Right?  And the

7   Government has you here and is trying to prove to you a pump

8   and dump.

9        And what have they showed you about the email blasts?

10  Have they showed you anything about the nuts and bolts of the

11  email blasts?

12       Do we know who directed them?  No.  Do we know who

13  paid for them?  No.  Do we know who sent an email saying "Hey,

14  we want" -- you know, "We want email blasts"?  No.  Do we know

15  who drafted the email blasts?  No.  We don't know any of that.

16       How can you make a decision -- how can you find

17  anything beyond a reasonable doubt related to this pump and

18  dump when you don't know the basics?  The Government has --

19  has given you no information about the important aspects of

20  the pump.

21       I mean, that's the pump.  The Government is saying

22  the email blasts are the pump.  Well, where is the

23  information?  Who paid for the email blasts?  Where is that

24  information?  Who relied on the email blasts?  Has the

25  Government brought in a single person to say they relied on an

 1   email blast or -- or an email or a part of an email that they

 2   received?  Not one.

 3          Not a single person has come into this courtroom and

 4   testified, "Yeah, you know, I got an email blast so I bought

 5   some NERG stock."  Not one.

 6          The Government is trying to distract.  They want you

 7   to -- to, you know, see a big scheme and just assume that my

 8   client is guilty, and you can't do that as jurors.  You have

 9   to look at the elements of the offenses, and you have to

10   question why you're not being provided this information,

11   because there's been no meaningful information about the email

12   blasts.  But there is one thing we can all be certain about.

13   There's been no allegation that Charles Winters had anything

14   to do with an email blast.  Not a peep, not a shred, no

15   suggestion, nothing.

16          And so then we get to the press releases.  We spent a

17   lot of time on the press releases, you know.  The Government

18   likes -- likes the press releases.  They like to put the press

19   releases up on the screen, read you the press releases; right?

20          And then during the closing argument, after you've

21   listened to evidence for almost three weeks, you've listened

22   to dozens of witnesses -- okay? -- for the very first time, in

23   the closing argument, after the evidence has been closed,

24   after the Government has chosen not to put on a rebuttal case

25   following Mr. Gottfredson's testimony, we hear for the very

1   first time in the closing argument, "Oh, it's this Kada Mesli

2   that was behind the press releases."  Are you kidding me?

3          Why haven't we heard from Kada Mesli?  If Kada Mesli

4   is behind the -- the press releases, isn't that important

5   information to know in a pump and dump case?  I mean, if I'm

6   sitting there, I would sure want to know that.

7          Who paid Kada Mesli if Kada Mesli's behind the press

8   releases?  Who directed that the press releases go out?  Has

9   the Government tried to give you any meaningful information

10  about the nuts and bolts or the facts that underlie the press

11  releases?  They haven't.

12         They want to -- you know, it's like -- you know, I --

13  in my mind, I think about, you know, my kids like dropping a

14  Mentos in a Coke can.  And they want to put the press release

15  out there, but then they don't want to give you any follow-up

16  because they want you to see the press release and, without

17  any evidence, somehow connect it to wrongdoing on behalf of my

18  client, and there simply has been no evidence that connects my

19  client to any part of the pump, not a single shred of

20  evidence.

21         Is there evidence that connects other people to the

22  pump?  Yes.  Right?  Look at Charles Winters' Exhibit P, P.3,

23  P.4.  Okay?  Charles Winters exhibits, CW in the JERS.

24         And what are the emails?  Those are the emails with

25  "ghostwriter4hire"; right?  That's the nuts and bolts of the

 1   press releases.  That's who's directing the press releases.

 2   That's who's drafting it.

 3          And what will you see in those emails when you look

 4   at them?  You'll see it was Tony Papa, you know, this shady

 5   Canadian mafioso figure, you know, prolific penny stock, you

 6   know, defrauder.  That's who's behind the press release.

 7          Have they -- have they done anything to connect that

 8   to my client?  They haven't.

 9          And this is supposed to be a pump and dump case.

10   Nothing that connects my client to a press release, not -- not

11   a single shred of evidence.  And so before you can find that

12   my client had anything to do with this pump and dump, the

13   Government would have to present you some evidence.  And the

14   reason the Government hasn't presented you any evidence is

15   because none exists.

16          And so instead of proving these things up to you --

17   showing, "Hey, this is who paid for the press release; this is

18   who wrote it; this is the ghostwriter they used for the press

19   release; this is -- these are the emails that underlie all of

20   this" -- the Government has all that information.  You've

21   heard the investigative resources they have.

22          I mean, we heard from the Government's witnesses.

23   They had thousands of folders of discovery that they provided

24   to the defense.  I mean, they investigated the heck out of

25   this case.  There were terabytes of information.

1          And what have you heard were the meaningful parts of

2     the pump and dump?  Next to nothing.

3          We heard from a lot of witnesses in this case, and,

4     you know, there was a theme throughout; right?  We heard from

5     a lot of smart people that invested a lot of money in this

6     idea of the oil -- natural gas extraction; right?

7          I mean, who did we hear from?  We heard from Kevin

8     Trizna -- right? -- who -- you know, prolific liar

9     undoubtedly.  But he invested $200,000 into the idea; right?

10         We heard from Mike Perry.  Okay?  Another person we

11    heard from on the conference call.  We heard his testimony.

12         And what do we know about Mike Perry?  Well, from his

13    testimony we know he's been in the oil and gas industry since,

14    you know, the '80s or early '90s; right?  We know he talked

15    about the Bakken play and different aspects of the oil and gas

16    industry.  We know he had a hundred thousand dollars of

17    capital that he invested into NuTech.

18         That's -- that's right from the Government's own

19    information, so you have somebody that -- I mean, a hundred

20    thousand dollars.  That's a lot of money; right?  And he had a

21    hundred thousand dollars to invest into this idea.  You know,

22    cold, hard cash that he paid because he obviously believed in

23    the idea after -- after a -- an extensive and successful

24    career in the gas production industry.  He had a hundred

25    thousand dollars to invest in it; right?

1          You heard from, you know, Randal Pope via video.

2   Long -- long history, you know, international, you know, sales

3   representative for Monsanto, you know, Corporation, a big

4   corporation we've all heard about.  We heard that for

5   10 years, you know, he was a -- had a company in Gillette

6   building, you know, infrastructure -- infrastructure, building

7   pipeline compressors for natural gas production.

8          These are people who are experienced not only as

9   businesspeople but also specifically experienced in -- in

10  natural gas production, you know.

11         Some of the first witnesses, Nadine and Kelley

12  McCreery, they have gas wells on their property, you know.

13  They know a little bit about the oil and gas industry, and

14  they invested substantial sums of money into the idea because

15  they believed in it.

16         So, you know, when we get to my client, you know,

17  Chuck Winters -- what was his involvement in all of this?  How

18  did he get pulled into this case and this idea?

19         Well, what -- what did you hear?  You heard he's the

20  guy who built the tool.  Right?  Because this is how Bob

21  Mitchell operates.  Bob Mitchell brings people in.

22         I mean, how about Tom Throne?  He's a -- an attorney

23  with 40 years of experience in -- working, doing legal work

24  for oil and gas companies.  Again, he's got these gas wells on

25  his property.

1          And -- and did he come in and say, "Oh, yeah, this --

2  there's nothing to this"?  No.  He and Mike Perry are still

3  involved in this same idea, in producing gas with this

4  technology.

5          And so you have to ask yourself, well, what got

6  Chuck Winters involved in this?  It's because he's a hands-on

7  guy; he's a builder.  And when Bob Mitchell got word of that,

8  that's how he sucked Chuck Winters in.  He said, "Look, we

9  need somebody to redesign this tool.  We need somebody to

10 build this tool."  And Chuck Winters is a builder, and so

11 that's what he did, and that's what you're looking at.

12         He built -- you know, he redesigned and built the

13 tool, you know.  You know from the exhibits that have been

14 admitted he patented his design for the tool.  All right?

15         And -- and then what did he do?  Well, he sent his

16 tool up to Red Luken, who's the field guy who, you know,

17 has -- another person that's spent years and years --

18 decades -- in the field as a gas producer.

19         And he sends the tool up to -- to Red Luken.  And

20 what does Red Luken say to -- to Chuck Winters?  You know,

21 it's right there in Chuck Winters' Exhibit A, A.1, and A.2.

22         He sends him an email and he says, you know,

23 essentially, you know, "Gear up and get ready because we're

24 going to be putting your tool in these 1600 wells," you know.

25         Why wouldn't Chuck Winters believe that?  Why

1   wouldn't Chuck Winters be excited about this -- you know --

2   the prospect that this -- this downhole tool that he built is

3   going to be going into 1600 wells?

4           I mean, you heard Mike Perry testify that he paid

5   Chuck Winters to build this tool.  You know, he paid him to

6   build one.  He sends it up to Red Luken.  Red Luken says it

7   works.  They order another, you know, 15 or 20 units for, you

8   know, 12 or $15,000 -- Chuck produces those, ships them up

9   to -- to Red Luken.

10          You know, look at Chuck Winters' Exhibit J, J.1, and

11  J.2.  They're the photos of the tool out in the field.  You

12  can see it's been used.  Red Luken puts it down into the

13  wells, and he reports back to Chuck Winters that "Look, your

14  tool works.  It's moving gas."

15          And it's the same, you know, hook, line, and sinker

16  that pulled in everybody that you've heard from in this case.

17  So that's why Chuck Winters is involved in this case.  That's

18  why Chuck Winters believed in the validity of the work he did

19  in this case.

20          And so he was paid for the tools that he -- that he

21  made.  He was, you know, paid by Mike Perry.  You heard Mike

22  Perry testify that they paid for the tools.  But Bob Mitchell

23  did what he did with everyone else, and he also gave him

24  shares, you know.  And what do you do with shares?

25          And it's important because we're here and the

1    Government is -- is talking about a pump and dump.  And so

2    every time you hear that someone made any money, it's kind of

3    like, "Oh" -- you know, "Oh, he sold some stock and he made

4    some money."

5            Well, why does anyone own a stock except to make

6    money?  I mean, don't lose sight of that.  No one buys, sells,

7    trades -- you know, deposits a stock in a -- in a custodial

8    account like Kingdom Trust unless they're trying to make

9    money; right?

10           I mean, that's what -- that's what stocks and shares

11   and -- is all about.  Everyone wants to, you know, buy a stock

12   or -- or obtain a stock and, if it appreciates in value, make

13   money off that appreciation.  There's absolutely nothing wrong

14   with it.

15           So the fact that, you know, Chuck Winters might have

16   made a little bit of money -- a relatively, you know, minute

17   amount of money, almost a pathetic amount of money -- that's

18   not inherently improper or evidence of some kind of guilt.

19           And that's the other thing that the Government has

20   attempted to absolutely mislead you all about, is the dump

21   aspect of the pump and dump.  And, again, we can -- we can see

22   without any question that the Government is not being straight

23   with you.  Right?

24           And it's been a theme throughout this case.  I mean,

25   I want you to think back to everything we know and learned

 1    about Kevin Trizna and his lies.  Right?

 2          And a criminal defendant seated in a courtroom with

 3    his life on the line, I think he can -- he can only ask for

 4    one thing, and he can ask that -- that people be straight with

 5    you all, the jury.  Right?  There shouldn't be manipulation.

 6    You shouldn't be manipulated into believing that my client did

 7    something wrong.

 8          And after all the testimony we heard about Kevin

 9    Trizna and his lies, I gave Inspector Hacker a -- a chance to

10    be straight with you all.  Right?  I asked her -- I said,

11    "Okay.  You obviously knew Kevin Trizna was lying."  You know,

12    there couldn't have been any doubt.  I mean, "You -- you

13    underwent a specific investigation.  You generated a specific

14    report verifying that he was lying."  You know, I guess the

15    report itself might have been rank hearsay, but you heard the

16    testimony, and that was that she knew absolutely that he was a

17    liar.

18          And so I asked her -- I said, you know, "What were

19    you thinking when, you know, Kevin Trizna got on the -- on the

20    stand and lied just like you knew he would have?"  Right?

21          And what did Inspector Hacker say?  You know, she --

22    she kind of looked up, thought about it for a long moment.

23    She said, "Well, I guess I -- I thought he was mistaken."

24          Was that being straight with you?  Was that -- you

25    know, was that giving you full and fair information so you can

1   make an intelligent decision in this case?  It wasn't.

2           So then we get to Exhibit 510; right?  And I love

3   jury trials.  I love the courtroom.  I love the process

4   because the truth does always come out.  There's no better

5   forum for getting to the bottom of things and the truth than a

6   courtroom.

7           And so we had -- the Government put in Exhibit 510

8   through Alex Scoufis; right?  And this is the exhibit that

9   shows who sold shares and -- and what they received --

10  right? -- for each one of these people.

11          And so the Government puts in Exhibit 510, and then

12  my colleague, Tom Fleener, is, you know, going to cross Alex

13  Scoufis about this exhibit.  And, you know, there's a lot of

14  documents.  There's a lot of work as we're preparing for

15  trial.  You know, you're -- you're updating exhibits; you're

16  making modifications to exhibits.

17          So Mr. Fleener, you know, gets up to question Alex

18  Scoufis, and he's referring to the 510 that he has in front of

19  him, meaning the 510 Fleener has in front of him, and the

20  Government attorneys point out, "Hey, Fleener, you're --

21  that's not the right 510.  There's an updated 510."

22          Oh, okay.  Well, what's the difference?  What's the

23  difference between 510 and then what became 510.1?  Well,

24  510.1 was the original exhibit, and that showed, you know,

25  182,000 of proceeds being attributed to Intrepid, not because

1   they were Intrepid shares or not because the money went to

2   Intrepid but because it was traded through Intrepid's

3   DVP account.

4          And what did the Government do?  Were they straight

5   with you?  No.  They decided "You know what?  We can pump up

6   the numbers a little bit," you know.  This exhibit is supposed

7   to show what these people received.  And the Government had an

8   idea.  They thought, "No, you know what?  We can pump the

9   numbers up a little bit.  Let's add the commissions back in

10  and make it seem like people got more than they did."  The

11  commissions never landed with any of these people.  The

12  commission goes to a third party.

13         So the Government attempted to pump up the numbers

14  because the Government doesn't care about truth.  The

15  Government doesn't care about justice.  The Government isn't

16  being straight with you.  They want to win.  They want a

17  conviction.  They want a notch on their belt, and they're

18  willing to abandon the truth, abandon justice, and manipulate

19  in order to get there.

20         And that's why the Government is asking you not to

21  focus on the elements in the -- in the instructions and just

22  see this as a -- as a big scheme.  They don't want you to

23  follow the law.

24         They don't want you to carefully consider each

25  element of each crime charged because, if you do that, you

19-CR-26-ABJ                    CLOSING - WARD                    Vol. XIII-2284
21-CR-14-ABJ

1    won't be able to find my client, Charles Winters, guilty of

2    any offense because he did not commit any of the offenses that

3    he's charged with.

4            You know, in their -- in their opening statement the

5    Government, I think, told you all to follow the money.  Right?

6    Makes sense.  It's a pump and dump.  It's supposed to be a

7    securities fraud case.  You know, we should follow the money.

8            I absolutely agree.  So let's do that.  Right?  We

9    just saw Exhibit 510, which attempts to attribute $182,000 of

10   proceeds to Intrepid.

11           Well, let's look at the Government's Exhibits 402 and

12   403.  Okay?  You'll recall Mahauta Reed's testimony from

13   Kingdom Trust, and these are the exhibits the Government

14   admitted.  These are sale orders; right?  So these are shares

15   being sold.

16           What do you see on the right-hand side of the column?

17   On every single one of these sale order exhibits that the

18   Government introduced?  Is it Intrepid Capital Holding selling

19   these shares, receiving the proceedings from the sale of these

20   shares?  No.  It's Bravo 20.

21           Is Bravo 20 Charles Winters?  Is it Justin Herman or

22   Ian Horn?  No.  It's Bob Mitchell.  But the Government doesn't

23   want you to focus on the realities.  The Government wants you

24   to just, you know, lump everyone together, and they don't want

25   you to do what you're required to do under the law as jurors,

1     and that's focus on the facts and apply the facts to the law.

2             This is Government's Exhibit 40.15.  This is the

3     Bravo 20 bank account; right?

4             I don't know what happened there.

5             This is the Bravo 20 bank account.  And what will you

6     see when you look at Exhibit 40.15?  It's -- it's a little

7     small, but look at Exhibit 40.15 on JERS.

8             You'll see that $103,888.33 came into Bob Mitchell's

9     account from Kingdom Trust.  Then another $29,944.44 went into

10    Bob Mitchell's Bravo 20 account from Kingdom Trust.  Then

11    another 4,000 went into Bob Mitchell's Bravo 20 account from

12    Kingdom Trust.  Okay?  That's $136,000 -- 132 and 77 cents.

13            This is following the money.  This is what the

14    Government said we should do; right?

15            It's supposed to be a pump and dump.  Who pumped the

16    stock?  Who dumped the stock?  Those are the questions.  Who

17    made money here?  And the answer is Bob Mitchell.

18            The Government talked to you about this exhibit in

19    their closing argument, Exhibit 405.  This is another sale

20    order with Kingdom Trust.  And what does it show you?  Does it

21    show you a penny going to Charles Winters?  No.

22            It's a $14,000 wire and an $18,000 wire going to

23    Chronos, who evidently -- even though we didn't hear any

24    evidence about this during the Government's case -- is Kada

25    Mesli.  Right?  Any connection between Charles Winters and

1   Kada Mesli or Chronos?  Not a shred.

2           So you've got all the money that goes to Bob

3   Mitchell, the money that goes to Chronos -- and these aren't

4   defense witnesses or defense exhibits that we've brought in to

5   show you these things.  These are the Government's own

6   exhibits.  This is the information the Government has vouched

7   for and put in front of you.

8           And you see that $168,832 of the proceeds they're

9   attempting to attribute to Intrepid didn't go to Intrepid.

10  And so when you look at the nonpumped-up Exhibit 5 point --

11  510.1 -- because that's the -- that's the one that has the

12  actual information you're interested in, not the pumped-up,

13  you know, manipulative version that's 510 -- you see that

14  Intrepid, which is Chuck Winters and Justin Herman -- between

15  the two of them, you know, in this conspiracy that went from,

16  you know, 2014 through 2016, of all the shares that they

17  sold -- this is supposed to be a pump and dump -- $13,973.23,

18  that's the money that Intrepid, between the two of them,

19  received in -- in proceeds from shares of sales -- sales of

20  shares.

21          And if I'm sitting where you are, I'm going to be

22  wondering have we really been sitting here for the last three

23  weeks hearing about a pump and dump over $13,000.

24          What about SBA Securities?  You know, it looks like

25  they got $820,000.  What about HBA Group?  $278,000.  You

1    know, what about Tom Collins?  $277,000.  Maybe those were the

2    guys that were behind the pump and dump; right?  I mean, you

3    don't pump a stock to not dump it.

4           The Government has failed to prove to you that

5    Charles Winters had any meaningful involvement in this scheme.

6    He was caught up in a crime being committed by other people,

7    just like you heard from every other victim witness the

8    Government brought in front of you.  Every single one of them

9    were smart people.  Most of them had extensive experience with

10   natural gas production and sales, and every single one of them

11   received shares for their involvement with the company.  They

12   all saw promise, just like Chuck Winters did, and we know all

13   the details about how Chuck Winters, you know, became

14   involved.

15          I mean, he -- he manufactured the tool.  Have we

16   heard a shred of evidence that -- that, you know, would

17   suggest to you that his tool wasn't legitimate, that he

18   didn't -- you know, that he -- he didn't manufacture it, that

19   it didn't get deployed in wells?  We haven't.

20          And so, you know, $13,973 between two people.  And

21   that's exactly what Mr. Gottfredson told you yesterday, that,

22   you know, Intrepid received proceeds from sale -- from -- from

23   the sale of shares of right around $14,000.

24          So I've been -- I've been telling you throughout this

25   that what you need to do when you're deliberating and when

 1   you're considering this case is not do what Government's urged

 2   you to do and disregard the elements of the offenses.  You

 3   absolutely need to look at the elements of each offense.

 4          And so this is Jury Instruction 22, conspiracy to

 5   commit securities fraud, and it requires that two or more

 6   people agree to carry out a scheme in connection with the

 7   purchase or sale of NuTech securities.  Okay?  Not in the

 8   issuance, not in the removal of a legend, but in connection

 9   with the purchase or sale.  Okay?

10          You don't leave your common sense at the door, but

11   you need to follow the law.  And the really critical terms in

12   these instructions are going to be that -- you'll get the

13   elements instruction and Instruction 22.  And you're going to

14   have a big packet, but you've got to -- you've got to look at

15   all the instructions.  You've got to follow all the

16   instructions.

17          And so what you're going to see is that for purposes

18   of Count Thirteen, which is the securities fraud, a statement

19   or conduct is in connection with the purchase or sale of

20   securities if there's some causal connection between the

21   statement or conduct and, again, the purchase or sale of

22   securities.  Not anything having to do with removing a legend,

23   not anything having to do with shares being issued.  That's

24   not what the law says.

25          Subsection B of Element 2, knowingly making an untrue

1  statement of a material fact.  Okay?  Well, what is a material

2  fact?

3          For purposes of the crimes charged in Count Thirteen

4  and Fourteen, respectively, a false or misleading statement is

5  material if there is a substantial likelihood that a

6  reasonable decision-maker would consider the statement

7  significant -- again, in connection with the purchase or sale

8  of a security.

9          You have to focus on this language, ladies and

10  gentlemen, because the Government is trying to manipulate you

11  into not following the law.  Okay?

12          The Government is talking about transfer agents and

13  Rule 144 and Rule 4(a)(1) and removal of legends -- okay? --

14  issuance of shares.  None of that is the purchase or sale of a

15  security.

16          And you have to -- you have to think back.  And if

17  you're going to think of an overarching theme, think about

18  what the Government's expert Alex Scoufis told you.  He said

19  the -- the meaning -- the heart of the American securities law

20  that we're talking about in this case is to ensure that

21  investors have reliable information.

22          Not transfer agents.  Right?  You know, not -- not

23  somebody at Pacific Stock Transfer.  Investors.

24          And why hasn't the Government brought in a single

25  investor to testify for you?  Why not?

1          They brought in people who invested money with Bob

2    Mitchell, but where is the guy from the -- the Kevin Trizna

3    email who actually relied on information being put out there?

4    The Government has -- has -- has not brought that in in front

5    of you.

6          And so when you look at the elements of conspiracy to

7    commit securities fraud, you're going to see that the

8    Government has failed to prove beyond a reasonable doubt the

9    elements of that charge, and you must find Charles Winters not

10   guilty of that charge.

11         Securities fraud, aiding and abetting.  This is

12   Count Fourteen, Instruction 35.

13         And, again, you have to look at the elements, and

14   you'll see that defendant had to have made an untrue statement

15   of material fact.

16         Well -- oops.  When is a fact material?  A fact is

17   material if it's made in connection with the purchase or sale

18   of a security.

19         You must follow the law.  Chuck Winters -- the

20   Government has presented no evidence that Chuck Winters

21   uttered a single statement that was material that was in

22   connection with the purchase or sale of a security, not one.

23         Aggravated identity theft.  Again, you have to look

24   at the elements, and the Government was not -- the Government

25   was wrong in their closing argument when it came to aggravated

1   identity theft.  The critical element in aggravated identity

2   theft is that Element No. 4, "The defendant knew" -- okay? --

3   it has to do with what the defendant believed -- "the

4   defendant knew he lacked lawful authority to possess or use

5   the means of identification."  That -- that element's going to

6   be important.

7           Additionally, the -- the -- you have to possess the

8   means of identification in connection to the wire fraud

9   conspiracy.  Okay?  So those are two elements.  The Government

10  has to prove both of these to you beyond a reasonable doubt.

11          So when it comes to authority -- and the Government

12  got up here and said there was no evidence of authority.

13          Do you remember the testimony of Gordon Pardy?  Do

14  you remember the questions I asked him?  I asked him --

15  I said, "You gave full authority to Alan Lobock to negotiate

16  this transaction?"

17          And, actually, the way I characterized it -- I said

18  "You didn't just give him authority, you gave him full

19  authority" -- because he did.  He wanted to sell the -- he

20  wanted to sell his note, and that's exactly what happened.

21          And he testified that he gave Alan Lobock full

22  authority.  And David Rodgers only dealt with Alan Lobock.

23  And David Rodgers wasn't getting any money.  He was willing to

24  step away from the deal and allow Gordon Pardy and Alan Lobock

25  to complete this transaction, and that's exactly what

1   happened.

2          They both testified "I was willing to sell my

3   convertible note."  That's what happened.  Nothing was stolen

4   from any of these people.  Gordon Pardy said "We agreed on a

5   price of $15,000.  I was going to share it with Alan Lobock.

6   That's what we did; I got my $7500" and "I gave Alan Lobock

7   full authority to negotiate this transaction for us."  He

8   testified he gave them full authority.

9          So when you look at the elements of aggravated

10  identity theft, has there been proof beyond a reasonable doubt

11  that Defendant Charles Winters knew he lacked full authority?

12  Absolutely not.  This is a business transaction; right?

13  Nobody's going to get paid until the -- the shell has been

14  sold and -- and successfully transferred.  Okay?  So there's

15  additional documents that need to get signed.

16         They had full authority to get those documents signed

17  so that the deal could be done and so that Gordon Pardy could

18  get his money.

19         And Alan Lobock's not here to tell you what happened.

20  Alan Lobock is, unfortunately, deceased.  You know, that's the

21  guy that -- remember from my opening?  He was one of the

22  cofounders of SkyMall.  You know, he died of brain cancer.

23  But he's not here to give you the information you need to find

24  beyond a reasonable doubt that anyone lacked authority to use

25  the signature of -- of the folks who were selling the -- the

1   shell or selling the convertible notes and -- why wouldn't

2   they have given authority?  They wanted to get paid.  And

3   they'd given full authority to the negotiator, Alan Lobock,

4   and that's the testimony you heard.

5          I mean, I use the kind of corny picture of these

6   folks so you can hark back and you can remember Gordon Pardy's

7   testimony.  I asked him -- I said, "You didn't just give

8   authority, you gave full authority?" and he said, "Yes,

9   I did."

10         That's the testimony that you have in front of you,

11  so there's no way you could find beyond a reasonable doubt

12  that anyone didn't have full authority to use those

13  signatures.

14         The next element, Element 5, using a signature is not

15  a violation of this criminal law unless it's used in

16  connection to a wire fraud conspiracy, so let's get to the

17  wire fraud conspiracy.

18         And what's important in the elements of the wire

19  fraud conspiracy -- I'm sorry.  This is still at aggravated

20  identity theft -- okay.

21         Conspiracy to commit wire fraud.  Element 2:  Two or

22  more persons agreed to carry out a scheme to defraud by

23  pumping and dumping NuTech securities.  Right?

24         This is about a pump and dump.  The Government has to

25  prove that people agreed to a pump and dump, and then, in

1   Element 4, the Government has to prove to you that -- I guess

2   not Element 4, Element 5 -- that the defendants knew the

3   essential objectives of the conspiracy.

4           What evidence has been presented to you that would

5   indicate that Charles Winters knew what all of these unnamed

6   coconspirators -- what Tony Papa was up to?  Has there been

7   any evidence that he was aware of at all, one piece of

8   communication, one inference that you could draw to determine

9   that Charles Winters knew the objectives of a conspiracy that

10  the Government has presented you, really, no meaningful

11  information about?  We don't even know who the players were.

12          I mean, we -- I've attempted to prove up a little bit

13  that Tony Papa was involved.  Any connection between Tony Papa

14  and Chuck Winters?  Absolutely not.

15          And that's why it is so critical that you all not

16  jump to a conclusion and not do what the Government suggested

17  and look at this as a big -- you know, a -- one big, ongoing

18  scheme that everyone was involved in.

19          You need to carefully consider each element of each

20  offense, and you'll find that there is not evidence sufficient

21  to prove beyond a reasonable doubt that Charles Winters knew

22  anything about the objectives of -- of a pump and dump

23  conspiracy.  There's no evidence.  And for that reason you're

24  going to have no choice but to find my client not guilty.

25          And when you -- when you look at the elements and

1  look at each one of the jury instructions and each element

2  and -- you'll find that there is simply not evidence to find

3  that Charles Wil- -- Charles Winters -- is guilty of any of

4  the five counts that he has been charged with.  And you're

5  going to find that he is not guilty.

6          Thank you.

7          THE COURT:  Let's take a short break.

8          MR. JUBIN:  Thank you.

9      (A recess was taken from 2:58 p.m. to 3:18 p.m.

10  Proceedings outside the jury's presence.)

11         THE COURT:  Set up and ready to go?

12         MR. JUBIN:  I am.

13         THE COURT:  All right.

14         Before they come, briefly, you were alerted to the

15  problems we're having?  I don't see them getting this case

16  until first thing tomorrow morning.

17         Plenty of time for that all to --

18         MR. JUBIN:  Okay.

19         The other thing the Court maybe should be aware of is

20  the alternate juror on the very far left front row was in

21  considerable pain.  It appeared she was almost crying during

22  that closing argument, so I guess -- something to look for

23  anyway.

24         THE COURT:  All right.

25         MR. JUBIN:  She had a heating pad or ice pack or

1    something like that she was trying to --

2            THE COURT:  The front row?

3            MR. JUBIN:  Front row on the left.

4            MR. WARD:  With the white hair.

5            THE COURT:  Our alternate jurors are from Cheyenne

6    and Lingle.  Everybody else is from Rock Springs and places

7    like that.  We'll inoculate them and try to keep them in

8    reserve during the deliberation phase of this case.

9            MR. JUBIN:  Sure.

10        (Proceedings within the jury's presence at 3:20 p.m.)

11            THE COURT:  Thank you.  Please be seated.

12            I wanted to mention something if I haven't already

13    said it.

14            If somebody has a -- a back -- a back problem or

15    something and is having pain, it's perfectly all right for

16    them to periodically step out and stretch while we're going on

17    in the proceedings and see if they can't relax their muscles

18    and be more comfortable.

19            We're at the stage now that Mr. Jubin is going to

20    present for Mr. Horn.

21            MR. JUBIN:  Good afternoon, ladies and gentlemen.

22            JURY MEMBERS:  Good afternoon.

23            MR. JUBIN:  The first thing the Government said was

24    "Pay attention to who has free-trading shares and who is

25    selling them."  That's not Ian Horn.

1        They said he was moving money to purchase the

2   EcoEmissions shell.  But in order to be guilty, he's got to

3   have knowledge, knowledge of the charged wrongdoing.

4        They say he makes money by keeping a portion of the

5   money that came to him through his escrow account.  Okay?  If

6   he knows it's a crime and he's making money from it, maybe

7   he's got some role.  If he's getting paid for his escrow

8   services, there's nothing wrong with that.

9        So if there's two reasonable conclusions, you must

10  adopt the conclusion consistent with innocence.  That's what

11  reasonable doubt is.

12        There's this idea that the Government suggests he

13  concealed his email with some bad purpose, like he was trying

14  to get away with something.  That's not what happened.

15        What happened is he went in front of a grand jury,

16  under oath, sworn to tell the truth, and confessed --

17  mistakenly but confessed -- to writing opinion letters that he

18  never wrote.

19        Now, you tell me, if you go in front of a grand jury

20  and confess to doing something wrong like that and you put it

21  on yourself, does it make sense that you quibble about emails?

22        Or could it have been a mistake?  It was clearly a

23  mistake.

24        Now, the Government notes, "Well, his name and his

25  signature is all over these attorney opinion letters," as if

1  that makes a difference under these circumstances, as if it

2  has some relevance when there's utterly no communications

3  about the creation or submission of these opinion letters by

4  Ian Horn.

5         How would you even get them or receive them or submit

6  them if there's no texts, no emails?  You've got to have

7  something that ties him to these other than his mistaken

8  belief that he wrote them.

9         Inspector Hacker, Investigator Steve Miller, they

10 both looked.  They looked diligently.  They looked through

11 everything.  Where are the communications concerning these

12 emails -- or concerning these opinion letters?  Where are the

13 emails?  Where are the texts?

14        Nothing.  Not a thing.  No texts, no emails.

15        Now, why does the Government ask you to look first at

16 this perjury charge and then come back and work your way to

17 the -- the stuff for which there's no evidence about Ian Horn?

18 Because the evidence that he engaged in any kind of conspiracy

19 or the securities fraud charged here is lousy.

20        The Government wants you to back into this because

21 the evidence doesn't support that Ian Horn was involved in the

22 pump and dump conspiracy, nothing to show that he knew it was

23 occurring, nothing to show that he intentionally participated

24 with the objective that it be -- be successful.

25        Instead, the Government asks you to first look at

1    this memory-impaired, terrible historian who says out of

2    confusion things that -- who knows what he's saying?  They're

3    asking you to rely on tainted statements years later to try to

4    bootstrap some responsibility for something that

5    occurred years before.

6          A guy that can't keep two thoughts in his head and

7    is prone to mistakes, that's the evidence they want you to

8    rely on and evidence that invariably has more than one

9    meaning, one reasonable meaning consistent with innocence.

10    The Government always wants to interpret it as somehow tending

11    to show guilt but it doesn't.  It also has an innocent

12    meaning, and the law requires you to adopt the innocent

13    meaning.

14          The Government asks you to look at the free-trading

15    shares.  Ian Horn has none.  Never had any.

16          The trading company wanted evidence where did this

17    money land, and so they wanted to see the bank account of the

18    person who received these funds, this dummied-up $280,000 that

19    Justin Herman was -- was advancing.  That would require

20    Ian Horn's bank statement.

21          What does Justin Herman provide?  Bob Mitchell's bank

22    statement, not Ian Horn's.  Why?  Why do you think?

23          He doesn't want to alert Ian Horn to that fact,

24    doesn't want to have to explain to Ian Horn, as if you could

25    explain anything to him and he'd hang onto it in his head.

1           And what does Ian Horn know about Bob Mitchell?

2   Well, when the money was stuck in the account and he said

3   "What's going on here?" and he got all these explanations,

4   went to -- went to the bank.  And then a couple weeks later,

5   Ian Horn writes to Justin Herman and says, "What's Bob

6   Mitchell's role in this?"  Is this a conspirator or somebody

7   who's just dumber than a box of rocks?

8           And the escrow funds.  What does he say about those,

9   when we're sending Gordon Pardy and -- and the other guy

10  money?  "Who are these people and why are we sending them

11  money?"

12          Does that sound like somebody who was a knowing

13  conspirator, somebody who shares the criminal purpose when

14  they don't even know who these people are and why they're

15  sending them money?

16          And this is stuff from historical emails.  It's not

17  like it got made up later.

18          The Government said, "You can't get free-trading

19  shares by telling the truth, so they had to lie to them."

20  Well, who is it that lied to them?  Not Ian Horn.  It was

21  Justin Herman.

22          And, you know, there is something very telling in the

23  Government's closing argument.  They said nobody has the

24  authority to put someone's name on a document.  Nobody has the

25  authority to put someone's name on a document.

1          That's what Justin Herman did to Ian Horn.  You can't

2     just put somebody's signature on it.  That's what he was

3     saying about these two, but that's what Justin Herman did to

4     Ian Horn.

5          And then there's this message, "I don't want to harm

6     myself."  When was that written?  That was written at a time

7     when Ian Horn believed he had written these attorney opinion

8     letters and it hurt him.  If he had written them, he'd done

9     something wrong, and he believed he had, and he came in front

10     of a grand jury and he confessed.  How hard was that?  He

11     admitted it when he believed he had.

12          And "I'll do my best regarding the emails."  Like he

13     had -- we had to run this down.  Why do we have to run this

14     down?  Because he's clueless.  He's supposed to be giving

15     effect to the attorney-client privilege, he's supposed to be

16     figuring out what's going on, and he has no idea.  And you

17     would expect a lawyer to prepare with someone in that way.

18          And what are in these emails?  Nothing but escrow

19     instructions.  There's certainly nothing in these emails that

20     talk about attorney opinion letters and providing false

21     information to folks.  If there were, you'd have seen it, and

22     we looked and they looked.

23          So what was in there?  No evidence of criminality,

24     simply references to escrow funding.  So what?

25          Ian Horn wasn't aware of any criminality with that,

1   and then the Government wants to make it look bad, like he

2   says, "Let's get on the same page."  Remember that email?

3           Well, what were they doing at the time?  They were

4   trying to figure out what was privileged and what was not

5   privileged and what they had to turn over.  You've got to get

6   on the same page to do that.  You can't do it without it.

7           It's the client's privilege.  It's not Mr. Horn's

8   privilege.  He has to get his input; they have to get on the

9   same page.  You heard Gay Woodhouse tell you that's a sacred

10  bond.  You -- you can't just give your client's stuff up;

11  you've got to get their permission or there's got to be some

12  reason why you can't, and that reason is your client's

13  permission.

14          So of course they had to get on the same page.  It's

15  perfectly legitimate and expected.  And if you can see it in

16  two ways, one criminal, one innocent, you have to adopt the

17  conclusion of innocence.

18          You know, there's this other thing out there.

19  Ian Horn, a lawyer, gets a subpoena for documents he has.  You

20  know, if he was really guilty, he would have said, "I don't

21  have anything.  I don't have it."

22          What does he do?  He's Mr. Helpful.  "I'll go out and

23  I'll get it for you.  Hey, Justin, they want this stuff.

24  Here.  Here's part of the subpoena.  Go get this and this and

25  this.  Look at this; they want -- I'll get you my bank

1   records.  I don't have -- I can't find these opinion letters

2   that you say I wrote.  Why don't you get those?"

3          Does that sound like somebody guilty?  Or does it

4   sound like somebody's who's kind of clueless?

5          You know, I listened to the Government's closing.  It

6   was brutal.  But it's wrong.  Unlike Mr. Winters, I don't

7   attribute bad motives to these folks here at the table.

8   They're just wrong.

9          Their argument is rooted in a philosophical-blinders

10  kind of a situation.  They made up their mind -- and Agent

11  Hacker pretty much told you that.  They made up their mind

12  when Ian Horn came in and said, "Yeah, I wrote those letters."

13  That is when they just shut down their investigation.

14         We didn't look at signatures.  We didn't look at --

15  the guy said he wrote the letters.  We're done.  And they just

16  haven't found a prideful way to back out of that mistaken

17  conclusion.

18         Ian Horn's not guilty of the offenses he's charged

19  with because he did not share in the criminal purpose when he

20  provided escrow services.  He didn't intend to defraud anyone,

21  and there's been no showing of that, and he did not knowingly

22  participate in unlawful conspiracies to defraud anyone.

23         This is all about a pump and dump scheme.  The jury

24  instructions will make that clear.  Every single one of those

25  offenses in the superseding indictment -- pump and dump, pump

1    and dump, pump and dump -- three charges that apply -- that

2    are applied to Mr. Horn's situation, not one shred of evidence

3    that Ian Horn knew that purpose, much less that he shared that

4    purpose and knowingly tried to advance those goals.

5           Ian Horn never bought, sold, traded or even owned a

6    single share of NuTech or its related companies.  He was never

7    promised shares.  He never knew there was some Russian company

8    offer to buy NuTech.

9           There's simply no evidence that he ever knew the

10   unlawful purpose, criminal purpose, of this apparent pump and

11   dump stock scheme.

12          So how did he get to be here at this table?  He

13   confessed to writing those letters that he mistakenly thought

14   he wrote.  That's where the heart of the evidence starts, not

15   at some backwards effort to infer guilt on the basis of

16   misunderstandings, mistakes, and uncertainty.

17          You start with the fraud claims against him.  Let's

18   talk about the evidence from back at the time of the NuTech

19   deal.

20          The tricky part is that Ian Horn never knew this

21   stuff until years later when my paralegal and I, an

22   investigator, as he talked about, went through the evidence,

23   volumes of records, from Herman's electronic devices and found

24   out and showed Mr. Horn what's been going on.

25          As far back as 2013 we found these forged documents

1    bearing Ian Horn's signature.  Oh, he's got 6 million in

2    escrow -- we've got it, great.  We've got $6 1/2 million in

3    escrow for L&R Energy and -- you know, and recall these

4    letters had this Brandenton, Florida -- not Brandon, not

5    Bradenton but Brandenton -- a place that doesn't exist.

6            And the signatures are faked.  And the expert tells

7    you that.  They're placed on there electronically.

8            Ian Horn never had these millions of dollars of

9    escrow in his account.  He didn't even know somebody was

10   representing that he did.  And he didn't know that until this

11   prosecution and he got to see all this stuff that was found on

12   Herman's electronic devices.

13           If Mr. Horn was involved and he was willing to sign

14   something that was false, why would Herman need to forge his

15   signature with a cut-and-paste forgery?  He wouldn't need to.

16   He would just say, "Ian, sign this thing."

17           With this NuTech deal it was the same thing:

18   Documents formed -- forged without Horn's knowledge.  How do

19   we know?  Well, because of the forgeries and the timing of the

20   communications between others.  There's no evidence that

21   Ian Horn was involved in the creation or submission of the

22   letters, no texts, no emails, which there would have to be if

23   Ian Horn was involved.

24           Think about that.  There would have to be.

25           And he got no payment for the letters.  Now, the

1    Government here at trial says in one of its cross-examination

2    questions, "Oh, can't people delete stuff?"

3           Well, if that's the case, don't you think

4    Justin Herman would have deleted all that other stuff, too,

5    all the other stuff that was found on his devices that was so

6    darn incriminating, all those emails and texts?

7           Does the Government seriously claim here that

8    miraculously the emails and texts involving just Ian Horn are

9    deleted?

10          You know better.  Look at all the evidence in this

11   case, introduced by the lawyers in painstaking, paint-drying

12   detail.  There's no evidence anybody deleted anything.

13          By the way, if I neglected to mention something that

14   I told you you would see or hear in opening from the huge

15   volumes of documents we've had here, hold it against me.

16   Please don't hold it against Ian Horn.  I tried to get it all;

17   I'm not sure that I -- I managed to.  It's pretty tough when

18   there's that much stuff.

19          But from all that, unless the Government has excluded

20   the reasonable possibility that something occurred, you have

21   to give the benefit of the doubt to the defendant.

22          Here's what was found on Herman's devices:

23   September 8th and then September 16th, Winters forwarded his

24   own email to Horn, sending Horn's letterhead with a signature

25   on it, forwarded it to Justin Herman.  Remember that timing?

1          September 16th.  There it is, an Ian Horn letterhead

2    opinion letter, same day.  Found it on Justin Herman's

3    computer addressed to Pacific Stock Transfer.  And at the

4    bottom it had that same forged cut-and-paste signature.

5          Three days later Herman created another one directed

6    to Pacific Stock Transfer, also found on Justin Herman's

7    computer bearing Ian Horn's identical forged cut-and-paste

8    signature.

9          Again, why would Herman and Winters even need to do

10   this if Horn were part of the conspiracy?

11         On August 31, 2015, just two weeks earlier, this

12   faked letter was found on Herman's computer, "Ian Horn,

13   123 Florida Avenue" and "Ian the Crackhead Horn" thing down

14   there, mocking Ian.  Look at the elements -- I'm sorry.  Look

15   at the contents, claiming that there was this $280,000 wired

16   into Horn's account -- we know that's not true.

17         And we'll come -- we'll come later to this 280,000

18   and what Ian Horn knew about it and what the evidence shows

19   there because when -- when Horn later talks to Inspector

20   Hacker about this, he didn't have a memory of it.  But she had

21   documents on it, and she showed those documents, and he must

22   have -- he figured, "Well, she's got better information than

23   I do," and he went right along with her.

24         Who of you, if you had over a quarter million dollars

25   come into your account, would forget it?  Yet, she's asking

 1  Ian Horn, "Well, you got this money?"

 2          And he's going, "Well, I guess.  If you say so.  If

 3  it's in the documents.  Boy, I don't remember that but" . . .

 4  and there's that email where he's saying to -- to

 5  Justin Herman, "Did -- did this go into my other account?"

 6          There it is.  "Hey, my bank statement doesn't show

 7  any such $280,000.  Is it possible it went to PNC" -- that's

 8  his other bank -- "but they didn't" -- "they," meaning the

 9  subpoena -- "doesn't ask for that one from PNC."

10          His -- this is from the time frame.  You know, when

11  he's being asked about this, what happened?  He is clueless.

12          Now, Inspector Hacker led him to believe that this

13  280,000 had been wired into his account and that's her job,

14  you know, kind of fool the guy, figure it out, see what he

15  says.

16          And then he asks her questions, you know, that reveal

17  how truly clueless he is.  "Well, how did it get there, then?

18  Who sent it?"

19          You know, the subpoena requests documents related to

20  this $280,000 that supposedly went into his account and she

21  played him.  She played him to find out what he knew.  And

22  when she finally went to tell him, "Hey, there's no

23  $280,000" -- I think she put it "I don't show this ever

24  happened."

25          And what's his response?  He doesn't get it.  He

1   fails to alert to the fact that there was no $280,000.  He

2   starts thinking, "Well, maybe somebody else put it in there.

3   Is the $80,000 part of the $280,000?"  He doesn't know.

4        At some point later Justin Herman provides bogus

5   documents to Ian Horn that are to be produced responsive to

6   the subpoena about the $280,000, and the confusion is evident

7   later, as Ian Horn wonders in puzzlement in a text message to

8   Justin Herman.

9        Maybe that's the one we're on there.

10       "My bank statement doesn't show this 280.  It's

11   possible it went to another account."

12       What does your common sense tell you about somebody

13   who clearly does not know if he received $280,000 in his bank

14   account, has no memory of it but is willing to go along with

15   it if that's what he is led to believe?

16       Think about that.  That's the essence of Ian Horn.

17   He goes through life unable to form memories because he cannot

18   pay good attention, so he's accustomed to accepting what

19   others tell him.  Others always have superior information.

20   Must be kind of tough.

21       He can't trust his own memory.  He's got to rely on

22   what other people tell him happened, and he's simply willing

23   to go along if that's what he's led to believe.

24       That's the essence of his mistaken confession, that

25   he wrote those letters.  That's the essence of his willingness

1   to agree with a prosecutor who said, "Why don't you have your

2   emails?" suggesting that was the case.  And that is the

3   essence of why he is not guilty.

4          Justin Herman never told Ian Horn he was using his

5   name and letterhead as he contrived to use his signature, his

6   credential as a lawyer, cut-and-paste forged his signature or

7   what he was doing with it.  Herman created these fictitious

8   documents, a copied image of his signature.

9          Ian Horn didn't create the documents, didn't even

10  know about them; no proof of that.  Again, if Mr. Horn was

11  willing to sign something false, why would Herman need to

12  forge Horn's signature with cut-and-paste forgeries?

13         Let's take a look at the many signatures.  You know,

14  it's kind of curious why the Government didn't figure this

15  out.  They wait to bring Ian Horn to trial and then tell you,

16  "Well, there's conflicting evidence," but all along they had

17  evidence that Herman created the letters.  It's obvious.  It

18  was only recently they confirmed Herman and not Horn submitted

19  the letters to the trading agencies.

20         And Inspector Hacker told you they pretty much quit

21  investigating it, those letters, when Ian Horn told them he

22  wrote them.  And in a way that's understandable.  A confession

23  is typically where an investigation ends.

24         "Is there a reason you didn't do signature

25  comparisons?"

1              "Yes."

2              "That's because he told you he signed the letters?"

3              "Correct."

4              "And you took it for what it's worth."

5          But there had to be something obvious that something

6    was off with Ian Horn.  Inspector Hacker told you he sat

7    there, minutes at a time in silence, reading these letters,

8    studying them -- where do you think he got his information?

9    And the dog's making noises.

10         Gay Woodhouse told you about another interview.  Ian

11   just did not seem to have it together.  He had no real memory

12   of things.  He was inconsistent in his statements.  And as a

13   lawyer, of course, she was kind of worried about it.  It was

14   inexplicable, yet here he was, very cooperative and wanting to

15   help.

16         And -- and he can't say the same thing because he's

17   all over the place.  He couldn't fill in the blanks well.  The

18   details were different in his mind.  But, of course, he was

19   talking about letters that he had no role in, he'd never seen.

20   That's what the -- until they were stuck in front of him

21   earlier by the agents.  You heard enough to understand the

22   flavor of these interviews, the uncertainty that he

23   experienced.

24         Remember that the charges in the superseding

25   indictment do not relate to anything that happened afterwards

19-CR-26-ABJ                  CLOSING - JUBIN              Vol. XIII-2312
21-CR-14-ABJ

1    in the investigation.  He's accused of participating in this

2    charged conduct back in 2014 through 2016, not something

3    later.  The Government's trying to use his confusion, his

4    inability, his utter incoherence as some basis to bootstrap

5    that he must have been doing something wrong back then when

6    there's no evidence of that.

7            You know, let's -- later, when he was told about and

8    shown some of these letters, these attorney opinion letters

9    that bore his signature, he came to believe he created them

10   because he had done a few other opinion letters for unrelated

11   companies.

12           In 2017 you saw those two letters.  He read and

13   reviewed them.  There were emails about them between him and

14   Horn.

15           And, you know, at least he corrected a typo; at least

16   he looked at it.  He must have approved them.  And he applied

17   his original signature.

18           There were emails exchanging them.  They came from

19   Justin Herman in Word format, unsigned, with a blank signature

20   line.  And Herman provides the instructions, "Here's the

21   transfer agent or the company you need to send them to."

22           Horn reviews, signs, and sends them to J. A. Hearn at

23   Manhattan Transfer Company.  This is in 2017.  And, sure

24   enough, when Dr. Fenoff looks at the signatures on those

25   letters, he finds that those letters are, indeed, unlike

1   any -- any of the others that Ian Horn doesn't know about that

2   are cut-and-paste forgeries.  They are unique signatures.

3   They are Ian Horn's actual signatures on letters Ian Horn sent

4   to the trading companies and Ian Horn read and communicated

5   about and knew about.

6          There they are, Q15 and Q16, different from all the

7   ones that are involved in this case, and this is 2017.

8          And how does that affect a guy like Ian Horn?  He did

9   something more recently.  "Did you do any opinion letters for

10  him?"

11         "Sure, I remember those opinion letters.  I can't

12  remember what they were about or what company they were for."

13  But it puts something in his head that he conflates.  It helps

14  us understand why he might have been confused and thought he

15  signed other opinion letters.

16         And when he was interviewed initially, he was shown a

17  bunch of attorney -- letter documents.  Investigators asked

18  him about them.  He became convinced, even testified before

19  the grand jury that he wrote them but he was wrong.  He was

20  mistaken.

21         How -- how did this start out?  Well, you saw a

22  couple phone calls the night -- the day before the

23  investigators came, and they talked to his wife and said,

24  "Hey, we want to talk to your husband about this NuTech

25  company."

1      And so what happens?  There's two phone calls,

2  81 seconds, 89 seconds.  What are those likely?  "Hey, Justin,

3  some people are here.  They want to talk to me about that

4  NuTech company that you've got going."

5      Then there's an eight-minute return call from

6  Justin Herman.  What do we know about what happened in that

7  conversation?

8      Nothing.  There's no content.  All we have is

9  eight minutes of call.

10     Who has the burden of proof?  What do you think would

11  have happened in that conversation?

12     Common sense:  "What's this all about?  Hey, Herman,

13  what's this all about?"

14     Now, Justin Herman knows NuTech, "That's the company

15  where I dummied up and cut and pasted Ian Horn's signature all

16  these different times."  He had to be sweating it; Herman had

17  to be.  "So what's he going to do?  I had no contact with

18  Ian Horn about this, and now they're going to ask him about

19  this stuff.  Oh, no."

20     "Hey, yeah, Ian, remember that NuTech deal?  You

21  know, you did the escrow and there were some" --

22     MR. HEIMANN:  Your Honor, I object; facts not in

23  evidence.

24     THE COURT:  Go ahead.

25     Overruled.

1          Go ahead.

2          MR. JUBIN:  That's a -- what might have happened.

3   You get to use your common sense.

4          You see this phone call occurred.  The Government has

5   the burden of proving it didn't, and this is what could have

6   occurred in that situation:  "Hey, you got these letters that

7   you wrote for me.  Remember that?  Remember that NuTech thing?

8   You did the escrow.  It's all about that, you know,

9   EcoEmissions conversion.  Yeah, and you did all these

10  opinion" -- well, okay.

11         And so then what happens?  Justin Herman didn't

12  confess to Ian Horn and say, "Hey, buddy, I put your name on

13  all these letters without your permission.  Sorry."

14         He does what he always did.  What did Herman do with

15  Joslyn Claiborne when she wanted information?  He gave her

16  false information.

17         What did he do when -- what -- what did Herman do to

18  the investigators?  Send them fictitious documents involving

19  some $280,000.

20         You can use your common sense to conclude that in

21  those eight minutes Justin Herman did to Ian Horn what he

22  always does, gave them false information.

23         And then what?  "Well, they probably want to talk to

24  you about those opinion letters," and that probably rang a

25  bell because of the escrow stuff.

1          And Herman had sent Horn all these texts about the

2    money being held up, so it was probably kind of a familiar

3    thing, "Oh, yeah, that transaction," so he knew a little bit

4    about it.

5          And, of course, Horn never paid attention to

6    anything.  And, in fact, he was pretty incapable of doing so

7    but worried about it.

8          Herman reminded Horn about these deals, presumably,

9    and the funds that were held up, and then the agents show up

10   the next morning, and the first thing that's on Ian Horn's

11   mind is, "Oh, yeah, I remember -- I remember those letters.

12   I wrote those letters."

13         Is it because he wrote them?  No.  It's because he

14   believes he did.  Remember, this guy can be -- anything that

15   is in front of him or told to him, that's what leads him to

16   think something.

17         And then he's shown the signature.  "Oh, yeah, that's

18   my signature."  His first impulse when the agents show up

19   isn't to deny and say, "No, I didn't do that."

20         His first impulse is to be helpful, recognize his

21   signature, "That's my signature; I wrote that; I wrote these

22   things."  And he sees his signature and he agrees.

23         And the Government apparently suggests that his

24   wandering statements about his signature -- "Oh, yeah, look at

25   that; the pen never leaves the paper; easier to forge than

 1   I thought" -- is that evidence of guilt?  No.  It's evidence

 2   of Ian Horn being Ian Horn.

 3          Where does his mind go?  Whoo, whoo, whoo.  That's

 4   just how he thinks.  That just shows he can't stop from being

 5   distracted with irrelevancies or talking.  The guy processes

 6   information by talking.  It's just -- it's coming out and the

 7   man has no clue.

 8          Sorry, Ian, but that's true.

 9          And in May of 2019 -- Gay Woodhouse, his lawyer, on

10   the telephone and the agents interview him -- at that point he

11   believes he wrote these letters.  His language remained

12   flooded with inconsistencies that pertained to all the details

13   surrounding these letters and the contents and who spoke and

14   all that sort of thing.

15          The $280,000, Herman told Joslyn Claiborne the deal

16   involved the 280.  It was false.  He sent false documents to

17   support that.  Horn was not part of that.  No, not part of

18   that communication.

19          And five days later Herman does more to cover his

20   tracks.  We talked a little bit about this.  He goes and gets

21   this 280,000 -- this document that he dummies up with Winters

22   for $280,000 -- and he sends it to her.  Never went to

23   Ian Horn.  Kept him in the dark.

24          Some of you might think, "You know, Ian Horn cannot

25   possibly be that naive or trusting of Justin Herman" because

1  you would not be so naive or trusting.  But your common sense

2  tells you that there's lots of kinds of people, and you've

3  heard that Ian Horn is one of a kind.  His friend Al Burnett

4  told you that he's different from anyone he's ever met.

5          So you have to look at the evidence of what is

6  Ian Horn really like.  Who is he?

7          Even if you think he was suspicious or should have

8  been suspicious about what happened, about what Herman was

9  doing with these escrows, even if you think that Horn believed

10 that Herman was engaged in some sort of illegality or was

11 suspicious of it by wiring money to him to distribute to

12 people -- if you think Ian Horn was going "That's got to be

13 illegal," you still have to find Ian Horn not guilty.

14         Why?  Because when these charges were brought, they

15 had to decide what's the purpose of the conspiracy.  And the

16 purpose, the objective of the conspiracy, is to pump and dump

17 securities.  There's no evidence that Ian Horn had any clue

18 about that.

19         The Government has to prove that Ian Horn knowingly

20 participated in the conspiracy with the specific intent that

21 the pump and dump be accomplished.  You can't be part of the

22 conspiracy if you don't know its purpose, and that's why the

23 Government doesn't want you to start there.

24         The Government doesn't get to suggest suspicion and

25 then ask you to convict on a charge which requires proof of

 1    involvement in something that someone has no clue about.

 2            You know, if I forget to tell you something in this

 3    closing argument and you think of it in the jury room and you

 4    say, "Yeah, that supports that Ian Horn didn't know" or "That

 5    supports that Ian Horn wasn't a voluntary participant," share

 6    it with your fellow jurors.  I can't remember it all.  I'm

 7    counting on you.

 8            Now, we've talked a little bit about Ian Horn's

 9    deficits, and you've heard from some experts.  I didn't bring

10    those people here to make you feel sorry for him, to make

11    excuses for Ian Horn, but you deserve to know.  You deserve

12    to know who he is because those things affect how the facts

13    play out.

14            He's vulnerable, both to Mr. Herman and to the

15    Government.  He's got some deficits.  He filled in the blanks

16    in his own mind the same as we all do.

17            You know, Dr. Denison examined him, he tested him, he

18    gave him these objective tests, and said, "Here is somebody

19    who has a severe and significant case of adult ADHD.  He has

20    it in spades."

21            And what does that mean?  He often makes careless

22    mistakes, lacks attention to detail, has difficulty paying

23    attention to tasks, difficulty remaining focused, seems not to

24    listen when spoken to directly, quickly loses focus, easily

25    sidetracked, difficulty being organized in his tasks and

1  activities, loses things like paperwork, often distracted,

2  including unrelated thought, talks excessively, blurts things

3  out before a question's been fully asked, completes people's

4  sentences.

5        Many of these symptoms associated with adult ADHD are

6  profoundly evident in Ian Horn.  He often interrupts.  Ian's

7  friend Al Burnett told you, you know, years ago there was a

8  time period when Ian just went from Mr. Manic to Eeyore,

9  Tigger to Eeyore.  He had the significant alteration of his

10  personality from the medications.

11        Ian's wife, Marlene, told you, you know, she found

12  some medication years ago and -- "What's this about?" -- and

13  found he'd been medicated.  And there -- at a point in time

14  his symptoms were so bad she said, "I can't deal with this guy

15  anymore; I've got to put you on meds," and she took him and he

16  got some medications.

17        And, unfortunately, the side effects were so severe

18  that he couldn't live with them, and she finally said, "Yeah,

19  you can't -- we can't have this.  You've got to go off this

20  stuff."  And his symptoms returned, and he's been that way

21  ever since, couldn't function.

22        Think about how these characteristics that I've just

23  described that Dr. Denison diagnosed.  How do those inform the

24  evidence in this case?  It's not some excuse but it's evidence

25  of actual innocence.

 1          And you heard from Dr. Reisberg.  Interesting guy,

 2    the memory expert.  And -- I mean, the guy who wrote the book

 3    on -- on the study of human memory.

 4          He says people blend their memories with new

 5    information -- new information comes in and you create a new

 6    set of what you honestly believe happened -- and that memory

 7    errors are more likely to occur when people tell you something

 8    or show you something, something that influences you.

 9          And that's exactly what happened here, Justin Herman

10    telling him things on that phone call and the agent showing

11    him these letters and having him read them -- and a person's

12    shown a document -- and the prosecutor pointing things out to

13    him in the document, "Look, there's different fonts here.

14    Maybe you wrote this; maybe he wrote that."  And pretty soon

15    he's got memories of things that -- drafting letters that he

16    has no relation to, that there's no emails for.  It's bizarre

17    but it's -- it's what happened.

18          And Dr. Reisberg told you that when you create these

19    memories, memories that are due to memory error, they're then

20    populated by details that fill in -- it fills in the

21    surrounding context and people come to believe things about

22    the details around them and those memories are no less real in

23    the person's perception than memories that are not error

24    prone.  They're indistinguishable from accurate memories.

25          And Ian Horn filled in the blanks, reconstructed what

1    surely must have occurred based on everything that he heard

2    and was shown him and what little bit of connection he had

3    from escrowing the funds.

4         It turns out he didn't have anything to do with them,

5    but before he -- before he realized that and he saw all these

6    documents and saw the evidence, he did everything he could to

7    try to reconstruct what occurred and be helpful and try to

8    give the details, helpful to the Government, giving details to

9    respond to the subpoena, helpful to try to say "This is what

10   happened."

11        And, you know, some of this reconstruction he had no

12   memory for, but it became his memory.  He didn't get it wrong

13   on purpose.  He wasn't lying.  He was mistaken.  And you heard

14   and saw how that happened.

15        It was confirmed by Gay Woodhouse.  You know, the

16   Government takes a couple snippets from a lengthy interview --

17   they've got this big, long, hour-and-a-half interview;

18   right? -- and they take a couple little pieces and say, "Here

19   you go, listen to this."  It makes him look bad because that's

20   what they selected, but it prevents you from knowing the full

21   scope of how that interview unfolded.

22        Hold them to their burden of proof.  They didn't meet

23   it because they didn't give you the whole story.  Probably

24   didn't help their case.

25        Inspector Hacker admitted a little bit about how

1    Mr. Horn knew next to nothing.  As -- by pointing out her

2    questioning, that sort of came through.

3          Did Justin Herman create these letters without Horn's

4    knowledge?  It's beyond the obvious, "Send me Ian Horn's

5    letterhead and signature" found on Herman's computer, several

6    other versions, all on Herman's computer, including with

7    Ian Horn's signature already affixed.  There is not a single

8    text, not a single email, and I won't -- I'll try not to say

9    it again.  But it's the fact.  I mean, it's -- it's what

10   drives what you know about who did what here.

11         Look at the documents.  That's what you've been told.

12         Dr. Fenoff.  What can we learn from what he had to

13   say?  He was pretty particular.  I think that was an Arial

14   font comma.  What did he think?  He said "It's inconclusive."

15   He's pretty demanding, you know.

16         But he said -- the thing you can take away from his

17   testimony, Ian Horn did not sign the NuTech opinion letters.

18   They're not merely similar; they are cut-and-paste forgeries.

19   It is the same signature over and over and over again.

20         And we know from the rest of the evidence it was done

21   without Ian Horn's knowledge and it was done without his

22   permission.  There is no evidence whatsoever that Ian Horn

23   knew of or approved this.  Instead, it's the very same men who

24   were swapping his cut-and-paste forged signature who are

25   charged in this case with committing identity theft.

1          The escrow.  It's common in business transactions.

2     It's not unusual.  Lawyers do that.  A lot of businesspeople

3     do it.  Ian Horn's job was simply to follow the escrow

4     instructions from his client, confirm the money's in your

5     account, wire it to where it's supposed to go, send the money

6     to the people and the entities as directed, and Ian Horn

7     charged for his escrow services.  Nobody expects him to do

8     that for free.

9          Is it criminal?  No.  Again, if there's two ways to

10    look at it, the Government loses.  You must give the benefit

11    to the defendant.  The Government's burden is to exclude every

12    reasonable doubt.  It's the highest burden known in the law.

13         I told you you might see Ian Horn's bank records

14    showing that he was not paid for writing opinion letters but,

15    instead, for his escrow services.

16         Well, the Government never introduced any Horn bank

17    records to refute this.  Instead, all we see is Mr. Horn

18    receiving funds that he was directed to retain and faithfully

19    wiring out the rest of the funds that came into his account

20    exactly as directed by his client.  He was paid for escrowing

21    funds, not for writing opinion letters, letters of which he

22    was completely unaware.

23         The Government still has on its little chart -- you

24    probably saw -- this bogus idea that there's some $2,000 that

25    Ian Horn got out of this 80,000.  That's not right.  You saw

1    the $2,000 credit that came in on December 23rd of 2014,

2    and then, after the holidays, he goes to the bank and

3    withdraws it.

4        How much did he get from that $80,000?  $3,500.  He

5    was directed initially "Keep 3,000."

6        In the end, when his escrow instructions came in --

7    the last ones where he said, "Who are these people and why are

8    we wiring them money?" -- I think it was those -- he was told

9    to wire out $15,000, 7500 to each, and what was -- what

10   remained was $3500 out of that 80,000.  There's no talk about

11   the $500, but presumably, since it was such a hassle, Herman

12   just said, "Keep that as part of your fee."  I don't know.

13       Inspector Hacker admitted the evidence, that $2,000

14   credit, so we still have an erroneous chart out there.

15       You know, people have been talking about this Kingdom

16   Trust deal.  It's some sort of an account where they'll hold

17   your assets, and you can do penny stocks in there and that

18   sort of thing.

19       And there was some application that Ian Horn -- there

20   was -- I think it was filled out at the top and then Ian Horn

21   had -- by Ian Horn -- and then somebody else -- well, I'm

22   thinking -- I might be thinking of the wrong thing.  But there

23   was a period of time when Ian Horn was asked to fill out

24   something for a Kingdom Trust account.

25       Do you remember Tom Throne?  He told you that lawyers

 1   sometimes take some of the stocks of companies that they get

 2   involved in and provide services to and -- and that's

 3   sometimes how they get compensated instead of getting paid.

 4          Well, that never happened with Ian Horn.  But at some

 5   point surely Justin Herman suggested that that might be a way

 6   that he could be compensated but it never happened.  It never

 7   came to fruition.  Years later we find this document that went

 8   nowhere, means nothing.

 9          The $20,000 escrow on December 15.  As directed,

10   Ian Horn kept $1250, wired out 7950, wired out 10,750, paid

11   himself exactly as directed, everything according to what he

12   was told.

13          "Why are the transfers going through me?"  Do you

14   remember that slide where the Government suggests that somehow

15   these questions from the bank that Mr. Horn was passing on to

16   Mr. Herman when those funds were frozen are evidence of some

17   wrongdoing.  They're not.

18          They're evidence that he's passing on to his client

19   what the bank's concerns are.  "The bank wants to know" --

20   boom, boom, boom, boom, boom.

21          And what does he get back?  "Everyone felt more

22   comfortable with an attorney in the middle of the

23   transaction."

24          Is Ian Horn in the dark?  Is he misled?  He's at the

25   mercy of whatever Justin Herman tells him.

1          And a few days later Justin Herman and Tom Crom

2    provide Ian Horn with additional instructions, where to wire

3    the rest of the money.  And remember Ian Horn's response?

4    "Who are these people and why are we wiring them money?"

5          Is this somebody who is a knowledgeable participant

6    in a conspiracy?  Really?

7          Herman says, "Well, they hold debt in the company,

8    and this purchases the debt from them, thus completing the

9    entire transaction."  Do you think Ian Horn would need that

10   information from Justin Herman if they were buddy-buddy, tied

11   together in some conspiracy, knowing what the other guy's

12   doing?

13         You know, there's reference, too, when Ian's trying

14   to get the documents together -- because he's the one that got

15   the subpoena -- and he's talking to Justin Herman, "Hey, look

16   at the subpoena; I need this stuff.  Where are you?  Come on.

17   Are you going to help?"

18         And he starts sending things to a guy named Steve

19   Mills.  Steve Mills is an attorney.  And you saw -- I think in

20   one of those documents -- you can find it maybe -- I think

21   that Steve Mills might own some stock.  He might have been one

22   of those people who was a NuTech shareholder.  Kind of makes

23   you wonder.

24         But, frankly, Ian Horn wasn't very productive in

25   trying to get responses from Justin Herman.  Ian Horn was

1  pretty minimally involved in what had happened here with these

2  escrows, and he expected Herman to provide the information,

3  and it just wasn't coming and now we know why.  Why would

4  Herman not be responsive?  Well, he's worried.

5          Meanwhile, Ian, who's kind of lazy, too, not very

6  good at what he does, is bugging him occasionally, "Hey,

7  I need some help here.  I guess I'm on my own."

8          And he's puzzled, "I can't explain why I don't have

9  these opinion letters."  Things didn't seem to make sense, but

10 at that point Ian Horn never considered that he hadn't written

11 the letters.  He hadn't seen all this evidence yet.

12         He's a people pleaser.  He's trying to be helpful,

13 honest.  He answered the prosecutor's questions as best as he

14 could, but things were jumbled, inconsistent, unclear because

15 that's who he is.

16         And he was still laboring under the misperception

17 that he'd written these letters when he testified before the

18 grand jury.  You know, if you look at that one little snippet

19 in the perjury charge -- that says "Why don't you have any

20 emails?"; "Well, my computer crashed" -- you might be tempted

21 to think, as the Government has suggested to you, that

22 Ian Horn was lying.

23         But the investigation focused on what?  Opinion

24 letters.  All throughout this -- all throughout this time it

25 had been "your participation in the opinion letters, the

1    fonts, you wrote them."  That's what bothered Ian Horn.

2    That's what he confessed to mistakenly.

3           So when he gets a question that's asking him about

4    emails, where does his mind go?  Well, none of us can predict

5    that very well, but maybe it goes to those opinion letters

6    that he's been worried about.

7           "I didn't get any emails with opinion letters.

8    I can't find any opinion letters.  I can't explain why I don't

9    have any," and his mind goes off.

10          And he had this computer crash, and there had been a

11   lot of discussions about these -- these opinion letters, and

12   he hears the question "opinion letters" instead of "email,"

13   and he makes a mistake.  And he says, "Oh, I lost that in the

14   computer crash."

15          And then there's a follow-up question -- just like

16   the $280,000, he never trips to it.  He never figures it out,

17   that, "Oh" -- now, if Mr. Heimann had asked, "Let me switch

18   your attention to emails away from opinion letters; I want to

19   know if your computer contains any email correspondence" and

20   he wasn't led with a "Why don't you have any emails?" maybe

21   they'd have a case.

22          And the other thing is, if you look at that

23   instruction on perjury, it says consider -- consider the

24   surrounding context, all the questions around it, so you can

25   know if this person made a mistake, if they were tracking, if

 1    they understood the question, so you can know that context to

 2    know if it's a mistake or not.

 3              And what do you get from the Government in this case?

 4    Shrink it down, give you something that makes him look guilty,

 5    and they never gave you the context.

 6              And without the context, you cannot say that he is

 7    guilty beyond a reasonable doubt.  They have the obligation to

 8    give you the context.  They didn't give it to you.  You cannot

 9    find him guilty.

10              To be sure, his answer was inaccurate.  It was wrong.

11    He had emails.  Did he know that?  Was he thinking, "I don't

12    have emails, and I'm going to lie here and deceive this guy"?

13    No.  That's not who Ian Horn is.

14              He's the guy who can't keep two thoughts in his head.

15    He's confused.  It's the hallmark of Ian Horn, confusion.

16    And, you know, it's not just me saying this.  That's what --

17    that's what the witnesses and the evidence shows.  He has an

18    inability to keep things straight.

19              Right there, the refusal to give any context, that's

20    reasonable doubt.

21              Let's take a look at Jury Instruction No. 19,

22    Slide 17.

23              You know, this perjury instruction says he knew it

24    was false.  When the word "knew" is used in these

25    instructions, it means a defendant realized what he was doing

 1   and was aware of the conduct, aware of the nature, and did not

 2   act through ignorance, mistake, or accident.

 3            This was a mistake.  He's not guilty.

 4            Let me return for a moment to the pump and dump.  But

 5   before I do, let me tell you one other thing:  Ian Horn is

 6   plumb full of mistakes.

 7            At the heart of these charges is the pump and dump,

 8   knowingly and with fraudulent intent he participated in some

 9   deliberate conspiracy to fraudulently inflate the price of

10   stocks to sell them at a profit.  There is simply no evidence

11   that that's part of Ian Horn's thinking, that that's part of

12   his knowledge, that that's part of his participation, that

13   that's his intent.

14            He had no role in the opinion letters that made that

15   stock tradeable.  He never owned or bought shares of these

16   stocks, and he never knew what others were up to.  He didn't

17   know the Russian offer.

18            So some of you might be wondering, "Why didn't we

19   hear from Ian Horn?"  Lawyers are always worried about that.

20   Maybe you expected to hear from him.

21            Think about the evidence.  What did Dr. Reisberg tell

22   you?  When somebody has a -- an artificially created memory,

23   one of the -- a memory error, where it just -- it's not

24   there -- you cannot unring that bell.  Once you have it -- and

25   then what?  Your memory's completely unreliable.  You've woven

1    these facts.  So what use would he be?

2           Not only that -- I mean, the guy is so confused.  If

3    you were me, would you put him on the witness stand and let

4    these three sharks after him?  No.

5           And what could he tell you with no memory?  "I'm

6    sorry; I was wrong"?  "Sorry; I was so confused"?  But then

7    what?  Does it makes sense for me to put him up there and

8    subject him to that?

9           And what would you learn?  About nothing.

10          Part of me wanted to show you Ian Horn, Exhibit A,

11   put him on the witness stand, but that wouldn't be fair to

12   him.  The historic facts that he has are altered and forever

13   unreliable, and that would be exploited.  And all he could

14   tell you anyway is what he's come to figure out in the

15   aftermath of the investigation.

16          You know, you have to follow the documents, ladies

17   and gentlemen, and the documents don't lie, the absence of

18   those contacts, the absence of any connection to that pump and

19   dump conspiracy.

20          Mr. Horn's fate is in your hands.  The evidence shows

21   he didn't write these letters, he didn't participate in the

22   pump and dump.  You know, I could go through some jury

23   instructions with you.  I think you'll see them.

24          Perhaps I'll point out a couple.

25          Let's take a look at 39.  This is the Count Fifteen

1  elements.  Look at 5, 6, and 7.  That's sort of the heart of

2  it, and it's pretty similar in all three counts he's charged

3  with in this pump and dump conspiracy stuff.

4        That he knew the essential objectives of the

5  conspiracy.  That means he has to know about the pump and

6  dump, which is up in No. 2, at the end of the line there, by

7  pumping and dumping NuTech securities.  That's the object.

8  That's the purpose.  He had to have known that that was the

9  essential objective.

10        No. 6, that he knowingly and voluntarily participated

11  in the conspiracy.

12        And, 7, that he acted with intent to defraud.  There

13  is simply no evidence of that.

14        You know, there's a -- this aiding and abetting --

15  and let's look at Instruction 38.  The Government suggests to

16  you, "Oh, well, Ian Horn didn't actually commit the crime, but

17  he aided and abetted it."  But, you know, the requirements are

18  the same.

19        Look at No. 2:  "The defendant intentionally

20  associated himself in some way with the crime and

21  intentionally participated in it as he would in something he

22  wished to bring about.  This means that the Government must

23  prove that the defendant consciously shared the other person's

24  knowledge of the underlying criminal act and intended to

25  help him."

1          "Consciously shared the person's knowledge of the

2   underlying pump and dump con- -- scheme."  And "intended to

3   help him with that."  You cannot find him guilty of aiding and

4   abetting, either.

5          It's not some lesser thing; it's the same thing.  If

6   he's not guilty of one, he's not guilty of the other.

7          The case will be in your hands.  I ask you to find

8   Ian Horn not guilty on all the charges.  He trusts your

9   judgment.

10         Thank you.

11         MR. FLEENER:  Judge, I'll be short.  And I mean that.

12         Madam Clerk, please set my clock at 30 minutes.  If

13   I can't convince the jury in 30 minutes that Justin Herman's

14   not guilty, then I need to find a new job.

15         Because what he did, folks -- he did all sorts of

16   things wrong.  He put signatures on documents that -- that

17   were from other places; he -- he changed dates; he and

18   Mr. Winters changed dates on documents.  And there's no doubt

19   that that stuff happened.

20         Here's the rub:  It's not a crime.  Or at least it's

21   not the crime that they charged.  And that's why one of the

22   things that -- that -- that -- after -- and the reason why

23   I'm going to do this in 30 minutes or less is because I care

24   for you.

25         But -- because you've heard from all sorts of lawyers

1  over all -- hours today.  And so I don't think I -- I'm going

2  to try not to repeat too many things that other folks have

3  repeated, which leaves me not much to say, except I'm going to

4  start with this.  And there's one thing that Mr. Ward said

5  which is so important, and I -- and I second it and urge you

6  to do this, which is don't start reading overt acts that --

7  you're going to get a big packet of overt acts, the 41 overt

8  acts.

9          Those -- at the end of the day they may matter.  They

10  want you to read the overt acts because you can allege really

11  simple things in an overt act.

12          And I don't have the overt acts in front of me, but

13  you can say "Justin Herman is a resident" -- Overt Act 1,

14  "Justin Herman is a resident of Pittsburgh, Pennsylvania," and

15  you'll say, "Okay.  He's a resident of Pittsburgh,

16  Pennsylvania."

17          What they want you to do is to go through and

18  think -- and look at these overt acts and say, "Okay.  Well,

19  this is true, this is true, this is true, this is true" when

20  the overt acts, at the end of the day, aren't what make the

21  conspiracy.

22          Because here's something else that you -- you --

23  after three weeks -- you should recognize:  You're probably

24  the only jury to have a two-conspiracy count case in a

25  three-week jury trial and not hear from one coconspirator.

1    That doesn't happen, folks.

2            The way the Government proves a conspiracy -- a

3    conspiracy is an agreement between a whole bunch of criminals

4    to commit a crime.  In layman's terms that's what a conspiracy

5    is.

6            The way the Government proves that in every other

7    case in the free world is they bring up a couple criminals to

8    say, "Hi, I'm a criminal.  I committed this crime and these

9    guys are criminals, too, because we all agreed to do it."

10   That's how you prove a conspiracy.  That's how you prove it

11   beyond a reasonable doubt.

12           They didn't bring anybody up in this conspiracy.  The

13   only folks that were actually -- if there was a crime, if

14   there was a pump and dump -- there may have been a crime;

15   there may have been a pump and dump; there may have been

16   securities fraud.  It wasn't by these guys -- and I'll wrap

17   Mr. Horn in it.

18           There was -- there may have been the Canadians

19   involved; there may have been other folks involved.  And, yes,

20   there's an instruction you're not supposed to consider, you

21   know, if other folks are involved in criminality, but you have

22   to in this case because these guys aren't involved in the

23   criminality.

24           And even -- even today we can still argue that other

25   folks committed the crime and that's what happened if there

 1   was a crime.  And I go back and forth talking to our

 2   securities guys whether there actually was a pump and dump

 3   here.  And I'm not necessarily convinced there was, and we'll

 4   get to that in a minute.

 5         So don't start with the overt acts, please.  Read the

 6   jury instructions and the grand jury indictment and recognize

 7   that there are not -- there's no -- you can never come to

 8   proof beyond a reasonable doubt on a -- on a -- a criminal

 9   conspiracy without having one of the conspirators come up and

10   say, "Hi, I'm the conspirator; I agreed with Mr. Herman."

11         And you know what?  It's their burden.  It's their

12   job to do that.  They're the ones who have to bring the people

13   up to say that "I agreed with Herman" -- or Winters or Horn or

14   whoever it may be -- and they didn't do any of that.  They

15   want you to infer all sorts of stuff when all they have to do

16   is call a witness.

17         I'll dispose of Ian Horn real quick.  Of course he

18   was involving in writing the opinion letters.  Now -- and

19   I mean no disrespect to Mr. Horn.  I haven't said five words

20   to him in the last three weeks.

21         If he's as bad of a lawyer as Mr. Jubin apparently

22   thinks he is, then what probably happened -- what has probably

23   happened with Mr. Horn and his law practice and opinion

24   letters -- I want to make sure you're okay -- and -- and

25   opinion letters?  What's probably happened?

1          Well, we know that opinion letters were written

2    before Mr. -- before this -- the NuTech letters.  We know that

3    opinion letters were written afterwards.  Some of them have

4    Mr. Horn's original signature, and some of them have the

5    signature that was lifted and just sort of placed on there.

6          What does that tell you with any common sense?

7          Well, if Mr. Horn's a really bad lawyer, what

8    probably happens is that he and Mr. Herman and everybody else

9    that Mr. Horn does -- and I use "legal work" -- I'll use air

10   quotes -- they know that they can just write the letter and

11   Ian's going to sign the letter.  And if Ian's not there to

12   sign the letter, you put Ian's signature on the letter.

13         And if you have time to tell Ian that you wrote the

14   letter, he's going to say, "That's fine as long as I get"

15   his -- get -- as long as he gets money for writing the letter.

16   And if you don't have time to tell him you put the signature

17   on the letter -- okay? -- then you -- you'll give -- you'll

18   tell it to him later on.  That's what happened.

19         Which is -- which is what makes the Ian Horn -- the

20   whole -- it -- it confuses me because it makes the

21   whole Ian Horn prosecution weird.  The United States thinks

22   that Ian Horn lied about doing these -- sending these --

23   having emails and apparently writing opinion letters.  They

24   think -- they think he lied about that.

25         Ian Horn, rather than simply saying "I did write

1    opinion letters" -- because all we did was -- exactly like

2    I told you, which is probably what the truth is -- is that

3    "I did -- did I sit down and write these things word by word?

4    No, because I'm such a bad lawyer, according to Mr. Jubin,

5    that I'll have my client write them for me."  So it's some

6    sort of combination.  That's all Mr. Horn had to say.

7           But rather than embracing that issue and just saying,

8    "Yeah, I wrote opinion letters" -- meaning Justin wrote the

9    opinion letters -- "and I -- usually I signed -- usually I'd

10   sign them and review them" -- like the one email that Jubin --

11   Mr. Jubin showed -- "or sometimes I'll just -- you know,

12   I trust him; he knows this better than I do.  He puts his name

13   down and lets me know later on that he wrote the letter.  But,

14   you know, he knows the stuff better than I do.  I got paid."

15   That's what happens.

16          I don't understand why the defense was "I'm too

17   confused to know which letters I wrote" when, for crying out

18   loud, he was involved in opinion letters.  And you know that

19   from his involvement in Kingdom Trust and all the other stuff.

20   I'll leave Ian Horn out of it.

21          Identity theft?  It's silly.  This is a silly, silly

22   count.  And I'll go -- and I'll tell you why, and we'll

23   take -- I'm at 7 1/2 minutes.  I'll tell you about two or

24   three minutes on identity theft, why it's silly.

25          Because one of the things you have to do is -- as

1   every lawyer has mentioned, you don't check your common sense

2   at the door.  You go back in the jury deliberation room, and

3   you take with you your experience, your common sense, your

4   ways of the world, your experiences that you've earned as

5   adults.

6        And you -- I want you to ask yourself -- and you

7   absolutely have to consider the jury instructions and follow

8   the jury instructions.  But to put the jury instructions in

9   context, you have to ask yourself, does this sound like

10  identity theft?

11       In this particular case, the -- Mr. -- Mr. Herman --

12  and I don't know whether Mr. Winters is involved in this or

13  not.  But Mr. Herman had the law -- had the signature of -- of

14  Mr. Rodgers and Mr. Pardy; right?  Because Mr. Pardy and

15  Mr. Rodgers wanted this deal to go through, so they signed

16  documents and sent them off to whoever, however it ended up at

17  Mr. Herman's -- on Mr. Herman's desk.

18       Compare that with what you would think about with

19  identity theft where someone's sneaking around on the

20  Internet, pulls up your social security card who clearly

21  shouldn't have your social security card, has no business

22  having your social security number, versus Mr. Herman, who has

23  documents signed by Mr. Rodgers and Mr. Pardy.

24       The -- the average identity theft case doesn't

25  give -- doesn't give the person whose identity you stole

1   money.  That's what happened here.  They -- Mr. -- they --

2   they put Mr. -- or Herman put Mr. Pardy and Mr. Rodgers'

3   signature -- forged their signatures, put their signatures on

4   a document to give them money, to make -- to make the contract

5   work, to give them what they bargained for.  Does that sound

6   like a -- like identity theft?

7          "I'm going to steal your identity so that you can get

8   a bunch of money that -- so that you could get the contract

9   that you wanted completed."  It doesn't sound like identity

10  theft to me.

11         The evidence of the authority to make it happen.  If

12  someone takes someone's social security card, opens up a bunch

13  of credit card accounts, it's clear there's -- it's clear

14  there was no authority to do that.

15         Here, what did Mr. Pardy say on -- one of the few

16  things I'm going to repeat that Mr. Ward said -- Mr. Pardy

17  said, "I gave Lobock -- I told him you have full authority; do

18  what you need to do."

19         Is it so hard to imagine that maybe Lobock told

20  Herman, "Just get the signatures on the document.  You know

21  they're -- you know that we need to get this deal done so that

22  Rodgers and Pardy, the two guys I'm trying to get paid, get

23  paid."

24         Is that so hard to believe?  Have they proven that

25  beyond a reasonable doubt, that that never happened?

1    And here's the real bottom line on this:  They would

2  have signed anyway.  Remember the two statements of non- --

3  the statements of nonaffiliation or whatever those

4  documents -- they're buried in your discovery -- or in your

5  exhibits somewhere.

6    Folks, they weren't affiliates.  They knew that in

7  order to get the $7500 for Mr. Pardy and to get the $7500 for

8  Mr. Lobock's girlfriend by way of Mr. Rodgers they needed to

9  get rid of this shell, have their debt bought by Mr. Herman,

10  and so they -- and they weren't affiliates.  They would have

11  signed these documents anyway.  This is much to-do about

12  nothing.

13    We spent so much time dealing with Rule 144 versus

14  Section 4(a)(1) and whether security exemptions existed in

15  this case.  My gosh.  All of the documents that have Pardy and

16  Rodgers' signature they would have signed.  Why?  Because they

17  wanted to get the $7500, which they got.

18    There was -- talk about no harm, no foul.  And that's

19  not a defense, no harm, no foul, but it is something for you

20  to consider in identity theft because this wasn't identity

21  theft.  You don't steal someone's identity to give them money,

22  and that's what happened here.

23    You can certainly find that -- that Mr. Herman and

24  Mr. Winters -- whatever his involvement is -- that they had

25  the authority to do this or at least you can't find beyond a

 1  reasonable doubt that they didn't because the folks got their

 2  money.

 3        And here's the final point and I'll move on to the

 4  securities fraud discussion:  You know why it's also not --

 5  not identify theft?  Because rather than the identity theft

 6  that our common sense tells us that we think about -- "Oh, my

 7  gosh, I look at my credit card or I get my credit report;

 8  I see that I've now got an account at Chase National Bank --

 9  I didn't have an account at Chase and now I'm trying to figure

10  out who opened this account at Chase National Bank" -- that --

11  the only way that Rodgers and Pardy knew that their signatures

12  were put on a document that they would have already signed --

13  that they would have signed in the first place -- the only

14  reason they knew was, three years later, law enforcement

15  officers had to say "Is -- did you sign -- take a look at

16  these documents," and they looked at them and said "I didn't

17  sign this one."

18        Do you know why it took three years?  Because they

19  were made whole.  The contract was -- was completed.  They

20  were happy as clams until the United States came a-knocking.

21        This is not identity theft.  It may be something but

22  it's not identity theft, and it's not been -- whatever it

23  would be, if it is a crime, wasn't charged.

24        As far as the securities fraud and wire fraud,

25  especially I'll focus on the securities fraud.  I'm going to

 1  repeat what Mr. Ward said, and I'm not -- I didn't bring a

 2  laptop up to throw this stuff up.

 3       It has -- the fraud -- whatever fraud took place has

 4  to be in connection with the purchase and sale of securities.

 5  That's what the law says.  The United States would like it to

 6  say "with the purchase -- purchase and sale and issuance of

 7  securities," but that's not what the law says.  That's not

 8  what your instructions say.

 9       Lawyers are terribly boring people, as you've seen

10  from the last three weeks.  One of the things that we get

11  excited about is this -- this argument that the law says --

12  "If Congress really wanted the law to say X, Congress would

13  put in the law X."

14       Here, if Congress really wanted to make a securities

15  fraud violation out of whatever was going on between Joslyn

16  Claiborne in Pacific Stock Transfer and Justin Herman and

17  Chuck Winters, they would have simply said, "It is securities

18  fraud to make false and misleading statements in connection

19  with the purchase or sale or issuance of a security."

20       And it goes back to what -- I'll repeat Mr. Ward

21  again.  It goes back to what Mr. Ward said and, really, to

22  what Mr. Scoufis said.  The purpose of securities regulations,

23  of securities laws, is to protect the public.

24       Not one living soul -- except maybe Joslyn Claiborne

25  but no member of the public -- relied on anything that

1    Chuck Winters and Justin Herman did regarding date swaps to

2    get into securities exemptions or not get into security

3    exemptions, putting documents on the OTC marketplace -- not

4    one witness said one word about relying on one thing that

5    these guys did other than Joslyn Claiborne, and she's not --

6    doesn't deal with the purchase or sale of securities.  And

7    that's important to remember, ladies and gentlemen.

8            And I don't mean to get my voice all high and

9    yelling, but I only have 15 minutes left, and I think you'd

10   rather have me yell at you for 30 than be mundane for 90.

11           It's important to keep that in mind, that these guys

12   may have -- Justin Herman and Chuck Winters, they certainly

13   screwed around with a whole bunch of documents.  None of them

14   mattered.  None of them have a thing to do with securities

15   fraud or wire fraud.  Not one of them had -- was material in

16   any way, shape, or form.

17           Is it wrong?  Sure, I guess it's wrong for someone to

18   sign your name and -- I don't know.  If someone is going to

19   contract for something and -- and the only way -- and you

20   have -- the person who contracts for the thing happens to be

21   out of town for a month and a half but they'd really like

22   their money, is it wrong to throw their signature on there so

23   I can give them the $20,000?  I don't know.  It's not identity

24   theft.  It may be something but it's not what's charged.

25           It didn't matter.  All the Rule 144, 4(a)(1) nonsense

 1   that we heard, it didn't matter.  It just didn't.  It was just

 2   noise.  There was no fraud.  There was nothing.  There was no

 3   pump and dump.  If -- and if there was a pump and dump, these

 4   guys didn't pump, and they certainly didn't dump.

 5          Tony Papa may have been involved in the pump and

 6   dump.  Remember the email that Mr. Ward entered into --

 7   admitted into evidence?  And it was an email -- you'll see it

 8   in there under CW something.  We didn't have that many

 9   exhibits.

10          It was an email with -- between Tony Papa, the

11   Canadian pump and dumper, and the ghostwriter of the press

12   releases, I think.  Now, that's a guy who pumped.  That's a

13   guy cooking the books on a press release who then was involved

14   in dumping shares.

15          These guys didn't write any press releases, and it's

16   not a crime to trade on a press release.  If you own shares in

17   IBM and IBM comes out with a press release and says "We are

18   really struggling this quarter, we may not make our quarter,"

19   there's nothing wrong with selling your shares of IBM if

20   you don't want to hold your shares of IBM.

21          What would be wrong is if you had false and

22   misleading information about IBM's bad quarter and you were

23   involved in that false and misleading information and then

24   sold your shares after it.  You can sell shares of any company

25   you want on whatever news you want as long as you're not an

1    insider or an affiliate, and there's no evidence that these

2    guys were.

3           And there's no evidence that they had anything to do

4    with the -- the press releases, news -- press -- email blasts,

5    news releases, press releases, or the conference call.  We

6    forget about the conference call.

7           The clearest evidence of fraud was the conference

8    call, and not one person that's involved in the conference

9    call -- yeah -- is sitting at the table, which is interesting.

10   So if there was a -- if there was -- if there was a -- a

11   violation of the securities -- if there was securities fraud,

12   it was by Tony Papa and the Canadians, and nothing ties these

13   guys to them.

14          And at least -- and even if you have a -- an

15   inkling -- you believe, gosh, Herman and Winters and -- I'll

16   leave Ian Horn out of it -- Herman and Winters, they may --

17   they have to be involved with -- with the Russians -- or "the

18   Russians" -- with the Canadians, are you convinced of that

19   beyond any and all reasonable doubt, the highest standard of

20   proof known to law?  I would hope not.

21          They have to know the -- and even if they're -- you

22   know -- okay.  The United States is going to get up and say,

23   "Well, Herman and Winters didn't have to actually do these

24   things as part of a conspiracy as long as their coconspirators

25   did and they all shared with the same criminal intent.  That's

1   the law."

2          There's no knowledge that Herman and Winters shared

3   the same criminal intent of Tony Papa in Canada.  They can --

4   and they can get up there and say what they like on rebuttal

5   in his 15 minutes that he has left.  It doesn't matter.  You

6   have the evidence before you.

7          If there was a crime committed, it was by the

8   Canadians and Tony Papa, who was cooking the books on the pump

9   and cooking the books on the dump, and there's nothing that

10  ties Justin Herman and Chuck Winters to that, to Tony Papa.

11         Remember, folks, that -- and here -- I mean, a couple

12  other facts -- I'm going to be well short of 30 minutes.

13         You don't -- remember our expert and what he talked

14  about?  And one of the things he really focused on -- which

15  I enjoyed -- was he's had actual practice in markets and

16  securities.

17         And these guys -- these guys sold shares -- they

18  didn't sell shares at the top and they didn't sell many

19  shares.  They're sitting on 99 percent of their NuTech Energy

20  stock.  And I'm going to get to that in a minute, but I want

21  you to keep that in mind, 99 percent -- maybe it's between 98

22  and 99; I don't want to mislead you folks.  They're sitting on

23  almost every share of NuTech stock they've ever owned, still

24  sitting on it.

25         Does it sound like a dump?

1          Again, they can prosecute whoever they -- whomever

2   they want to prosecute -- I said this in my opening

3   statement -- as long as the people that they -- that they're

4   choosing to prosecute committed the crime that they're -- that

5   they've decided to prosecute them for.

6          And, ladies and gentlemen, while Justin Herman and

7   Chuck Winters -- they never -- you know, this 280 versus

8   $80,000 edit on the -- or number fudging on a bank

9   statement -- have they ever explained that to you?  I don't

10  even know what the -- I don't know -- I don't even know if

11  they know what that means.  I guess we'll see.

12          But they can prosecute whoever they want to prosecute

13  as long as the ones that -- they were the ones who were

14  committing the crimes.  Here, they're prosecuting people who

15  weren't committing the crimes.

16          It's -- I'm not going to go back to my tire store

17  analogy about the guy cooking the books to get the good tires

18  and then the bank robber taking off with it, but this is a

19  tremendous overreach by the United States Government, a

20  tremendous overreach by the United States Government.  It just

21  is.  And I ask you to see that.

22          I said in my opening statement a couple things and

23  they're still true.  The technology worked.  Every single

24  person that was involved in NuTech Energy, every single one,

25  believed in the technology.

1          They still believe in the technology.  Emerald

2     Operating systems with Tom -- Tom Throne and Mike Perry are

3     still using the technology, so this isn't -- the United States

4     likes to make it sound like this was never a business idea,

5     this was just a bunch of criminals who took a bunch of

6     people's money and had no intention of putting together a

7     business plan and then they stole all -- they stole

8     everybody's money and investors are left empty handed.

9          That's not what happened here.  Every single person

10    who was involved in this -- in this company believed in the

11    technology.  They believed in the company.  It's why the

12    McCreerys gave money to purchase the shell.  It's why the

13    folks from Sheridan who flew down -- or Cody, I can't

14    remember -- flew down.  They had bought some shares in

15    E*Trade.  Everyone -- people believed in the company.

16          And so the technology is real.  The company is real.

17    Now, did it get hijacked by the Canadians?  Apparently so.  At

18    least the stock did, and the company fell thereafter.

19          But the company was real.  People believed in it, and

20    it's in -- truth be told, in one form or fashion, it's still

21    going on.  Emerald Operating is still doing the same thing

22    that NuTech Energy did, hopefully without Canadians involved.

23          The company would have worked had the Canadians not

24    hijacked the company, and there's a bunch of evidence as to

25    how you know it could have worked -- and -- and I say "could";

1    I'll get to "could" in a minute -- because these guys are

2    still sitting on 4 billion shares, hoping that it would work.

3          Everyone here wanted -- and I say "everyone here";

4    I don't mean everyone here; I mean everyone that came up and

5    testified on the stand for the United States -- and for the

6    defense, quite frankly -- and everybody who didn't testify

7    that probably should have if they had called the people they

8    should have called to prove the case -- wanted to get rich

9    quick.  And I said this in my opening statement.  Everyone

10   wanted to get rich quick.

11         Kevin Trizna got on the stand and just absolutely

12   lied.  And then -- and I -- you know, United States -- and

13   this is the only thing that really -- I would ask that you --

14   you know, Zenith Ward beat up the United States pretty hard.

15   I don't want to beat them up too much on this.

16         But, you know, Kevin Trizna got up on that -- in that

17   conference call and just absolutely flat-out lied, flat-out

18   lied, admitted -- kind of admitted he flat-out lied, and then

19   lied again about not sending any emails.

20         And what did the United States do?  Rather than

21   recognizing what we all recognized -- which is he just got up

22   there and lied and has continued to lie -- they did two

23   things:  One, they tried to invoke sympathy from you because

24   Kevin Trizna's wife died, which is awful -- no one wishes any

25   death on anyone -- but because he invested money and it

 1   happened to come from the funds from his wife's insurance

 2   policy.  That's awful.  It's awful to try to turn Kevin Trizna

 3   into a sympathetic character.  It just is.  And it's awful for

 4   them to play on your sympathy that way.  Whether it worked

 5   I have no idea but it's awful.  I take offense at that.  I'll

 6   leave that alone.

 7          The only other thing with Kevin Trizna -- and it was

 8   really clear that he lied -- is, of course, when Inspector

 9   Hacker got on the stand and -- she knows he lied.  And she

10   knows he lied on the stand.

11          And then when he asked -- Mr. Ward asked that

12   question, "So what was your -- what was your impression?  What

13   were you thinking when you saw Kevin Trizna get on the stand

14   and say that 'I did -- I have never used that email account

15   and I didn't send any emails'?"

16          And what Mr. Ward didn't say is she sat there for

17   like nine seconds and got -- did this and then kind of leaned

18   back and was -- I mean, it was a really, really long pause

19   before she said "I believe he was mistaken," which -- I mean,

20   laughter came from the room.

21          The way they treated Trizna is awful.  But Trizna --

22   Mike Perry, they want -- he wants to get rich, too.  Tom Crom

23   wants to get rich.  Tom Throne admitted so much, that he'd

24   like to get rich.  He invests in all these energy companies.

25          The McCreerys were trying to get rich because they

1    were buying the shell, hoping that this technology would make

2    them a whole bunch of money on their land.  Red Luken was

3    trying to get rich because he was the oil -- hands-on oil

4    field guy who thought he was going to be able to make a

5    fortune on all of his shares.

6         Randal Pope, the intelligent guy who testified by

7    video, wanted to get rich.  And he was -- and he -- and he

8    didn't even appear to be upset about giving the money because

9    he -- he wants to get rich.

10        Justin Herman wants to get rich.  Why -- that's why

11   he has 4 billion shares of NuTech Energy.  It's why he traded

12   a -- 40 or 60 million shares of NuTech Energy -- really just

13   to pay his bills -- he wants to get rich.  Chuck Winters would

14   probably like to get rich.  Everybody in this process wants to

15   get rich.

16        Our guys, Chuck Winters, Justin Herman, they are no

17   worse than anybody else involved in NuTech Energy, the

18   investors on the front end, the folks who bought stock on the

19   back end -- they are no worse than any of these people.  They

20   just want to get rich.

21        And I go back to the adage that I said at the very

22   beginning.  Justin Herman didn't do anything criminal -- or at

23   least he didn't do anything criminal that was charged in this

24   indictment.  He gave in to the exact same philosophy that

25   every single person who's testified in this courtroom -- with

1    the exception of Mr. Scoufis, probably, and the -- and the

2    investigator -- or the law enforcement folks -- same

3    philosophy:  They all want to get rich.

4            Remember, if it looks too good to be true -- it's

5    what we tell our kids; it's what our parents have told us.  If

6    it looks too good to be true, it probably is.  For everybody.

7    For the witnesses, for our guys, for everyone.

8            And that's what this is all about.  It's just a bunch

9    of guys who are trying to take shortcuts and trying to get

10   rich and people -- and he can write down shortcuts if he'd

11   like -- people who are -- everybody wants to get rich.

12           And did our guys do something to -- to mess with a --

13   the transfer agent?  Sure.  Not a crime.

14           Throughout this entire case it has been a conflation

15   of weird securities regulations and securities laws and a

16   bunch of folks wanted to get rich.

17           You're going to find -- your verdicts -- you've been

18   patient for three weeks and we appreciate that.  And about --

19   it's probably the only thing the United States and I agree on,

20   is we appreciate your patience and your attention to detail

21   because you have.  You've been a tremendous jury.

22   I appreciate your time.

23           I left you with a minute and a half so -- enjoy.

24   Thank you.

25           THE COURT:  Let's take a short break, and then we'll

1   hear from Mr. Heimann.

2           THE COURTROOM DEPUTY:  All rise.

3       (A recess was taken from 4:58 p.m. to 5:12 p.m.

4   Proceedings outside the jury's presence.)

5           THE COURT:  I noticed one of our visitors has spent a

6   lot of time in this courtroom during his early years.

7       (Proceedings within the jury's presence at 5:14 p.m.)

8           THE COURT:  Thank you, ladies and gentlemen.  Please

9   be seated.

10          Mr. Heimann.

11          MR. HEIMANN:  Your Honor, thank you.

12          Mr. Fleener ended by regaling us with the observation

13  that people are greedy.

14          Greed is common.  It's understandable.  It's also

15  corrosive and corrupting.  And you've seen different forms of

16  that corruption during this trial.  You've seen people who

17  lost their life savings, hundreds of thousands of dollars,

18  because they wanted to get rich quick.  And they lost it to

19  people who lied to them.

20          You've also seen people who are just hoping to make a

21  little money when they heard about a company, and they were

22  lied to, too.

23          And, lastly, you see the defendants.  They want to

24  get rich by lying to people.

25          Look at the Skype chat, and you will see the program

1    that they had to get rich by lying to people.  You can see

2    them working with at least one Canadian friend.  Mr. Fleener's

3    theme, besides greed, was "blame Canada" when Michael Baron's

4    on the Skype chat with Justin Herman, marking the open and the

5    close.  Ironically or coincidentally or intentionally, those

6    closing prices or those opening prices show up in an email

7    blast while Mr. Herman is gathering up sales data, which --

8    gee whiz, coincidentally -- Chuck Winters places the trades.

9            And who would think it?  Who would think it?

10           Later on Chuck Winters goes to Kingdom Trust and

11   wires money to Kada Mesli.  Weird; right?

12           Folks, there was a pump and dump.  The Skype chat,

13   the surrounding evidence shows it.  It shows a clear agreement

14   that includes Justin Herman and Chuck Winters.  They want you

15   to acquit them apparently because they weren't able to keep

16   the program going because they got found out by OTC Markets

17   and the SEC.  Do you think for one second they would still

18   have their NuTech shares if they could do anything about it?

19           And you know how they sell it.  You've seen the

20   evidence.  Mr. Fleener tells you that you can't prove a

21   conspiracy without a conspirator testifying.  Well, that's

22   just not true.

23           When you have other evidence showing the conspiracy,

24   why do I need to put a conspirator up when the evidence is

25   clear of the agreement, its unlawful nature, and what they

1    were doing, which was pumping and dumping NuTech?

2            Mr. Ward and Mr. Fleener say look at 31, all those --

3    all those lies to Pacific Stock Transfer, the ginned-up

4    documents, forged signatures, they don't matter because it's

5    not in connection with the purchase or sale of a security.

6            Well, look at 31.  "A statement or conduct is in

7    connection with the purchase or sale of securities if there's

8    some causal connection between the statement or conduct and

9    the purchase or sale of securities.  However, the statement or

10   conduct need not be directed toward a purchaser or seller of

11   securities."

12           You can't sell shares you don't have, and you can't

13   sell shares if they're restricted.  Justin Herman and

14   Chuck Winters had to get free-trading shares in order to sell

15   their shares on the pump and dump that's clearly evidenced in

16   the Skype chat and the accompanying evidence, clearly

17   evidenced when Justin Herman's like "woo nelly, I'm going to

18   sell millions of shares of NERG" the day before the press

19   release comes out about the buyout offer.  And that's what he

20   does.  They sold what they could based on lies, lies to the

21   transfer agent to get the shares, lies to shareholders.

22           Not one word from any of them about the manipulative

23   trades, marking the open and close, because they don't want

24   you to look at that.  Not one word from any of them about the

25   Skype chat because they don't want you to look at that.

1        Mr. Fleener says the ID theft charges are silly.

2   Well, respectfully, Mr. Fleener's argument is silly.

3        He said these forgeries had to be done to complete

4   the deal.  Mr. Pardy had already been paid months before the

5   forgeries were done.  Ms. Theresa Jones had already gotten

6   David Rodgers' money months before the forgeries were done.

7        And they admitted -- I mean, you can't listen to

8   those arguments and not realize they've admitted doing it.

9   They don't even contest it.

10        It's also silly to think that if you sign a contract

11   and you get paid and the contract's done that somehow you have

12   authorized someone to cut your signature off and put it

13   somewhere else.

14        And they can do that -- what?  As long as it doesn't

15   cost you money?  No.  That's identity theft.

16        And nobody here thinks that when you authorize

17   someone to negotiate a contract that you authorize them to

18   tell somebody else they can use your signature whenever they

19   feel like it.

20        There is this whole "full authority" thing that we

21   heard.  Well, I want you to think back to when Gordon Pardy

22   was sitting right there.  Did Mr. Ward ask him, "Would you

23   have signed this document?"  He did not.

24        Did Mr. Fleener ask him, "Would you have signed this

25   document?"  He did not.

1            Remember their direct.  They wouldn't have signed it.

2    There was no contract for a purchase and assignment of wells,

3    and they wouldn't have signed it and didn't authorize anybody

4    to sign it.

5            And they knew that.  Don't you think if they thought

6    for one second Gordon Pardy would say, "Oh, yeah, I would have

7    signed that," they would have asked him?  They didn't because

8    they knew the answer was going to be no.

9            Same is true for David Rodgers.

10           Even if you thought that Gordon Pardy and David

11   Rodgers had somehow empowered Alan Lobock to empower somebody

12   else to use their signature months later, after the deal is

13   done, you have no reason to believe that Mr. Lobock ever spoke

14   or communicated anything to Justin Herman or Chuck Winters.

15   You certainly can't give one person authority and then it goes

16   by osmosis into the world for anyone to gather it up.

17           Their arguments are silly.  You should look at the

18   evidence, remember the testimony of Mr. Pardy and Mr. Rodgers,

19   and find them guilty on the identity theft.

20           A lot of talk about Mr. Trizna.  They talked about

21   greed; right?  Kevin Trizna lost a lot of money.  And probably

22   worse, he did lie on the conference call.  He did let Bob

23   Mitchell use his name.  He was corrupted by that greed, but

24   that doesn't make these defendants not guilty.

25           They want to focus on the conference call, but

19-CR-26-ABJ          REBUTTAL - HEIMANN          Vol. XIII-2360
21-CR-14-ABJ

1   there's a lot more to the pump and the dump than that because

2   it went over a period of time.  Again, go back to that Skype

3   summary and you'll see it.

4          Mr. Ward -- Mr. Ward professes to like the trial

5   process.  You know, the difference between the 192- -- 192,000

6   number and the 182,000 number, that was a result of what

7   evidence is actually admissible so -- I -- it's meaningless.

8          Let's talk a little bit about Ian Horn.  The evidence

9   is what you heard there.  It is not Mr. Jubin's playacting

10  here.

11         You have absolutely no evidence about what

12  Justin Herman said or didn't say in an eight-minute call.

13  I can just as easily say, "Oh, they discussed the charged

14  securities fraud and decided how they were going to withhold

15  evidence."  It would take -- it would mean as much as what

16  Mr. Jubin did, which is nothing.

17         What you know about Mr. Herman's and Mr. Horn's

18  communications at that time are in the text messages.  And

19  read them.  Read them.

20         I defy you to come away with the idea that Mr. Horn

21  can't hold a thought for more than a minute.  He's a licensed

22  attorney for goodness sake.  He may or may not have ADHD, but

23  he clearly compensates well enough to go to law school, pass

24  the bar, and maintain a legal practice for decades.

25         And read those text messages.  He is focused on those

1    email; he is focused on figuring out a story to tell about

2    those documents.  And he is focused on not being harmed by the

3    email or whatever story he has to tell.

4            Mr. Horn says he could have said "I don't have it."

5    Well, look at the text messages.  "Obviously, I cannot explain

6    why I do not have the Pacific Stock Transfer letters.  I don't

7    want to harm you, and I don't want to harm myself."

8            And what he did say he didn't have?  His email.  He

9    did.  He did.  And not once but twice.  He sent the

10   whole group off in the week -- in the couple months right

11   before he testified.  The discussions they have, some of them

12   are after he's turned in documents.  He's looking for the

13   story to tell.

14           These defendants are guilty of the conspiracies

15   charged; they're guilty of securities fraud.  Justin Herman

16   and Chuck Winters are guilty of aggravated identity theft.

17   And Ian Horn lied to the grand jury.

18           Look at the evidence and find them guilty because

19   there is no reasonable doubt about it for any of them on any

20   of the crimes.

21           Thank you.

22           THE COURT:  Ladies and gentlemen, we've had a long

23   day and lots of words.  If words were tangible objects, this

24   room would be pretty well filled up at this point.  We are

25   going to recess until 8:30 tomorrow morning.

1          The only remaining thing that's left for me to do

2    will be to submit to case to you for your decision with some

3    short -- fairly short -- group of instructions and a reading

4    of the verdict form.  After that, this case will be in your

5    hands.

6          So terribly important at this point:  Do not discuss

7    the case with anyone or permit anyone to discuss it with you.

8          Counsel, police yourselves and your own witnesses in

9    and around this courthouse and this city.

10          Don't attempt to listen to anything touching on this

11    case in any way, any news articles or television reports or

12    radio reports.  Avoid those.

13          Do not let anyone outside the courtroom tell you

14    anything about the case.  And avoid any contact with the

15    lawyers or the parties or -- if there happens to be a witness

16    around here, avoid them.

17          Don't attempt to investigate; don't use any of the

18    electronic means to try to research about who the attorneys

19    are or what they do or who the parties are.

20          Decide the case on the evidence that has been

21    received here during this -- during this trial.  I can

22    guarantee you that you have received a lot of evidence and --

23    in this matter to consider -- and tomorrow will be a busy day

24    for you.  So get plenty of rest, drive carefully, eat well,

25    and we'll see you tomorrow morning at 8:30 -- yes.

 1          JUROR 56:  So are alternates free to go home now, or

 2   do we have to stick around a while?

 3          THE COURT:  We're going to want you to stick around a

 4   little bit because I'm going to need to instruct -- give you

 5   further instructions.

 6          JUROR 56:  So we have to come Monday, too?

 7          THE COURT:  Come in tomorrow, yes.

 8          JUROR 56:  Tomorrow?

 9          Oh, tomorrow's Friday.  Oh, gosh.

10          Sorry.  Okay.  Well, I'm glad I asked.

11          THE COURT:  I'm glad you did, too.

12          JUROR 56:  Thank you.

13          JUROR 28:  Don't worry, Your Honor.  I'll keep Barb

14   in line.

15          JUROR 48:  He has all week.

16          THE COURT:  Thank you.  We'll stand in recess until

17   8:30 tomorrow morning.

18      (Proceedings outside the jury's presence at 5:32 p.m.)

19          THE COURT:  I'll sign those -- those instructions you

20   offered as refused and deliver them to Becky.

21          MR. JUBIN:  Thank you.

22          THE COURT:  Anything else we need to talk about

23   tonight?

24          MR. JUBIN:  Sleep.

25          THE COURT:  All right.  Get a good night's rest.

1           MR. FLEENER:  Thank you, Judge.

2           THE COURT:  And, Zenith, Eric isn't as bad a guy as

3    he seems.  He's really a pretty nice fellow.

4           MR. WARD:  You haven't spent enough time with him,

5    Judge.

6        (Proceedings concluded 5:33 p.m., October 7, 2021.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

4

5            I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14           Dated this 15th day of January, 2022.

15

16

17

18           /s/ Melanie Humphrey-Sonntag

19           _____

20                 MELANIE HUMPHREY-SONNTAG
                        RDR, CRR, CRC
21               Federal Official Court Reporter

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3    _____

4

     UNITED STATES OF AMERICA,        DOCKET NO. 19-CR-026-ABJ
5                                      DOCKET NO. 21-CR-014-ABJ
             Plaintiff,
6                                      VOLUME XIV of XIV
             vs.                       (Pages 2365 through 2419
7
     JUSTIN HERMAN, CHARLES W.         Cheyenne, Wyoming
8    WINTERS, JR., a/k/a Chuck         Friday, October 8, 2021
     Winters, and IAN HORN,           8:26 a.m.
9
             Defendants.
10
     _____
11

12

13              TRANSCRIPT OF TRIAL PROCEEDINGS

14

15        BEFORE THE HONORABLE ALAN B. JOHNSON
             UNITED STATES DISTRICT JUDGE
16       and a jury of twelve and three alternates

17

18

19

20

21

22        *MELANIE HUMPHREY-SONNTAG, RDR, CRR, CRC*
              *Federal Official Court Reporter*
23    *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
           *630.452.6236 * MelanieSonntagCRR@gmail.com*
24
     *Proceedings reported with digital stenography; transcript*
25         *produced with computer-aided transcription.*

```
 1   APPEARANCES:
     For the Plaintiff:        ERIC J. HEIMANN
 2                             THOMAS A. SZOTT
                               ASSISTANT UNITED STATES ATTORNEYS
 3                             DISTRICT OF WYOMING
                               2120 Capitol Avenue, Fourth Floor
 4                             Cheyenne, WY 82001

 5   For the Defendant        THOMAS A. FLEENER
     Herman:                  FLEENER LAW
 6                            506 South Eighth Street
                              Laramie, WY 82073
 7
     For the Defendant        ZENITH S. WARD
 8   Winters:                 BUCHHAMER & WARD
                              1821 Logan Avenue
 9                            Cheyenne, WY 82001

10   For the Defendant        THOMAS B. JUBIN
     Horn:                    JUBIN & ZERGA
11                            2614 Pioneer Avenue
                              Cheyenne, WY 82001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2
                                                    PAGE
3         Final Instructions                        2371
          Question by the Jury                       2396
4         Rendition of Verdict                       2403

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19-CR-26-ABJ                                              Vol. XIV-2368
21-CR-14-ABJ

1      (Proceedings commenced 8:26 a.m., October 8, 2021,

2  in the presence of all defendants, outside the jury's

3  presence.)

4          THE COURT:  Good morning, everyone.

5          I wanted to give you an update before we get started

6  this morning.  The -- what has happened is that the JERS

7  system nationally still is problematic.

8          So what we did is went back with the system that

9  previously existed within the court served by our own servers

10  and went through every exhibit and double-checked and made

11  sure that everything that's been admitted is on that system

12  for the jury and will be displayed on a large screen in the

13  jury room with a keyboard.

14          It will be on a computer that does not go to sleep so

15  that it will be available from the first moment that they go

16  in.  We've also provided a -- and the jury requested -- a

17  whiteboard, and so they have the whiteboard to use during

18  their deliberations.

19          I will try to remember to tell them that they can

20  stay as long as they need to stay today.

21          We're still missing, I think, one more -- one

22  juror -- juror before we can start.  And we hope everybody

23  passes the test this morning.

24          All right.  Anything happen over the night that we

25  need to worry about?

1        (No response.)

2             THE COURT:  Good.

3             MR. WARD:  I guess, Judge, the only thing I would

4    have is I want to submit the Albert and Hodge MOIs just so

5    that those can be part of the record.

6             I don't think those have been submitted.  So I'll get

7    them emailed to Ms. Harris if that's sufficient or --

8             THE COURT:  That's -- that's sufficient.

9             MR. WARD:  Okay.  Thank you, Judge.

10            THE COURT:  They weren't received in evidence, were

11   they?

12            MR. WARD:  No.

13            MR. JUBIN:  And just to confirm that the Court

14   received the instructions that I had provided and marked and

15   refused or whatever so the record's clear.

16            THE COURT:  I signed them last night, and they are

17   presumably -- they've disappeared out of my filing box

18   overnight.

19            MR. JUBIN:  Thank you.

20            THE COURT:  And Mr. Fleener's, as well.

21            THE COURTROOM DEPUTY:  We're still waiting.

22            THE COURT:  All right.  Still waiting.

23            MR. WARD:  And, Judge, when you said "Mr. Fleener's,"

24   is that the advice of counsel instruction that you're

25   referring to?

 1            MR. FLEENER:  It is.

 2            MR. WARD:  Okay.  I just wanted to make sure.

 3            THE COURT:  This is -- what is this?

 4            Oh . . .

 5            THE COURTROOM DEPUTY:  I think we're ready to go now.

 6    Do you want me to get the jury ready to come in?

 7            THE COURT:  I want to check one thing before.

 8            Okay.  Thank you.

 9        (Proceedings within the jury's presence at 8:35 a.m.)

10            THE COURT:  Good morning, ladies and gentlemen.

11    Please be seated.

12            This morning we're gathered to hear the final group

13    of instructions in this matter and to have the case submitted

14    to this jury to begin their deliberations.  I wanted just to

15    mention a few words about the package of instructions that

16    will go with you into the jury room.

17            You will note that the instructions each have a

18    number at the top.  There will be gaps in that numbering, and

19    they may not be in sequence.  The reason that they are

20    numbered is that when we have our instruction conference

21    somebody says "I object," and he doesn't say "I object to the

22    instruction somewhere in there that says thus and so" and then

23    everybody has to find that language.

24            So they say, "Object, Your Honor, to

25    Instruction No. 50," and we all go to the same place

1    immediately and don't waste any time trying to find the

2    instruction.

3              That's the only significance of the numbering.  We

4    didn't number them in ascending order of importance or -- they

5    have -- the numbers have no significance in that regard.  And

6    don't worry if there is a missing number in the sequence that

7    goes forward as you read through the instructions later on or

8    have reason to want to look to the instructions.

9              We'll begin this morning with Instruction No. 50.

10             You have been chosen and sworn as jurors in this case

11   to try the issues of fact presented by the allegations of the

12   indictment and the denials made by the not guilty pleas of the

13   defendants.  You are to perform this duty without bias or

14   prejudice as to any party.  The law does not permit jurors to

15   be governed by sympathy, prejudice, or public opinion.  Both

16   the defendants and the public expect that you will carefully

17   and impartially consider all the evidence in the case, follow

18   the law as stated by the Court, and reach a just verdict,

19   regardless of the consequences.

20             Unless you are otherwise instructed, the evidence in

21   this case consists of the sworn testimony of the witnesses,

22   regardless of who may have called them, and all exhibits

23   received in evidence, regardless of who may have produced

24   them.

25             Any objection as to which an objection was sustained

1   by the Court and any evidence ordered stricken by the Court

2   must be entirely disregarded.  Anything you may have heard or

3   seen outside the courtroom is not evidence and must be

4   entirely disregarded.

5           There are, generally speaking, two types of evidence

6   from which a jury may properly find the truth as to the facts

7   of a case.  One is direct evidence, such as the testimony of

8   an eyewitness.  The other is indirect or circumstantial

9   evidence, the proof of a chain of circumstances pointing to

10  the existence or nonexistence of certain facts.

11          As a general rule, the law makes no distinction

12  between direct and circumstantial evidence but simply requires

13  that the jury find the facts in accordance with all of the

14  evidence in the case, both direct and circumstantial.

15          The questions asked by a lawyer for either party to

16  this case are not evidence.  Therefore, if a lawyer asks a

17  question of a witness which contains an assertion of fact, you

18  may not consider the assertion by the lawyer as any evidence

19  of that fact.  Only the answers are evidence.

20          Inferences are simply deductions or conclusions which

21  reason and common sense lead the jury to draw from the

22  evidence received in the case.

23          You are reminded you must separately consider the

24  evidence against each defendant on each count charging that

25  defendant.  You must return separate verdicts for each

1  defendant.  Your verdict as to any defendant on any count,

2  whether it is guilty or not guilty, must not influence your

3  verdict as to any other defendant or count.

4        You, as jurors, are the sole judges of the

5  credibility of the witnesses and the weight their testimony

6  deserves.  You may be guided by the appearance and conduct of

7  the witnesses or by the manner in which the witness testifies

8  or by the character of the testimony given or by evidence to

9  the contrary of the testimony given.

10        You should carefully scrutinize all of the testimony

11 given, the circumstances under which each witness has

12 testified, and every matter in evidence which tends to show

13 whether a witness is worthy of belief.  Consider each witness'

14 intelligence, motive, and state of mind and demeanor and

15 manner while on the stand.  Consider the witness' ability to

16 observe the facts to which he or she has testified and whether

17 he or she impresses you as having an accurate recollection of

18 these matters.

19        Consider, also, any relation each witness may bear to

20 either side of the case, the manner in which each witness

21 might be affected by the verdict, and the extent to which, if

22 at all, each witness is either supported or contradicted by

23 other evidence in the case.

24        Inconsistencies or discrepancies in the testimony of

25 a witness or between the testimony of different witnesses may

1   or may not cause the jury to discredit such testimony.  Two or

2   more persons witnessing an incident or transaction may see or

3   hear it differently, and innocent misrecollection, like

4   failure of recollection, is not an uncommon experience.  In

5   weighing the effect of a discrepancy, always consider whether

6   it pertains to a matter of importance or an unimportant detail

7   and whether the discrepancy results from innocent error or

8   intentional falsehood.

9        After making your own judgment, you will give the

10  testimony of each witness such weight, if any, as you may

11  think it deserves.

12       If you believe from the evidence in this case that

13  any witness willfully and corruptly swore falsely to any

14  material matter -- fact -- in this case, you are at liberty to

15  disregard all or any part of that testimony except insofar as

16  the same has been corroborated by other and credible evidence

17  and the facts and circumstances proven during the trial.

18       The rules of evidence ordinarily do not permit

19  witnesses to testify as to opinions or conclusions.  An

20  exception to this rule exists as to those whom we call "expert

21  witnesses."  In some cases, such as this one, scientific,

22  technical, or other specialized knowledge may assist the jury

23  in understanding the evidence or in determining a fact in

24  issue.  A witness who has such knowledge, skill, experience,

25  training, or education may testify and state an opinion

1   concerning such matters.

2          You are not required to accept such an opinion.  You

3   should consider opinion testimony just as you would consider

4   other testimony in this trial.  Give opinion testimony as much

5   weight as you think it deserves, considering the education and

6   experience of the witness, the soundness of the reasons given

7   for the opinion, and other evidence in the trial.

8          In determining the weight to be given to an opinion

9   expressed by any witness who did not testify as an expert

10  witness, you should consider his credibility, the extent of

11  his opportunity to perceive the matters upon which his opinion

12  is based, and the reasons, if any, given for it.  You are not

13  required to accept such an opinion but should give it the

14  weight to which you find it entitled.

15         The defendants did not testify, and I remind you that

16  you cannot consider a defendant's decision not to testify as

17  evidence of guilt.  You must understand that the Constitution

18  of the United States grants to a defendant the right to remain

19  silent.  That means the right not to testify.  That is a

20  constitutional right in this country, it is very carefully

21  guarded, and you must not presume or infer guilt from the fact

22  that a defendant does not take the witness stand and testify.

23         A lawyer's conduct in responding to a grand jury

24  subpoena requesting documents relating to his representation

25  of a client is governed by ethical rules and requirements of

 1   the courts.  Those rules and requirements have the force and

 2   effect of law.  An attorney has a duty of confidentiality,

 3   which prohibits him from revealing any confidential

 4   information he has received as a result of the representation.

 5          In addition, a client who is represented by an

 6   attorney has a right to expect that the attorney will protect

 7   against the disclosure of information and documents that the

 8   client may claim are subject to the attorney-client privilege.

 9   An attorney has a duty to maintain a client's credible claim

10   that requested documents fall within the attorney-client

11   privilege and is prohibited from disclosing such information

12   without a court order.

13          To meet his duty to protect the client's possible

14   assertion of privilege, an attorney has another duty to

15   communicate with his client, both to inform the client that a

16   third party (in this case the Government) seeks information

17   about the representation and to allow the client to determine

18   whether and to which materials the client might assert

19   privilege claims.

20          Your decision on the facts of this case should not be

21   determined by the number of witnesses testifying for or

22   against a party.  You should consider all the facts and

23   circumstances in evidence to determine which of the witnesses

24   you choose to believe or not believe.  You may find that the

25   testimony of a smaller number of witnesses on one side is more

 1   credible than the testimony of a greater number of witnesses

 2   on the other side.

 3          It is the duty of the attorney on each side of the

 4   case to object when the other side offers testimony or other

 5   evidence which the attorney believes is not properly

 6   admissible.  You should not show prejudice against any

 7   attorney or his client because the attorney has made an

 8   objection.

 9          Upon allowing testimony or other evidence to be

10   introduced over the objection of any attorney, the Court does

11   not, unless expressly stated, indicate any opinion as to the

12   weight or effect of any such evidence.  As stated before, the

13   jurors are the sole judges of the credibility of all witnesses

14   and the weight and effect of all evidence.

15          When the Court has sustained an objection to a

16   question addressed to a witness, the jury must disregard the

17   question entirely and may draw no inference from the wording

18   of it or speculate as to what the witness would have said if

19   he had been permitted to answer any question.

20          Certain charts and summaries have been shown to you

21   and received to help explain the evidence in this case.

22   Summaries or charts are not themselves the pertinent evidence

23   but, instead, are summaries, the accuracy and reliability of

24   which are to be determined by the corresponding testimony and

25   exhibits.  Further, the title or heading of any chart or

1   summary is not evidence.

2           It is the jury's duty and province to determine the

3   facts in this case.  You are free to disregard any chart or

4   summary, whether provided to you in written or verbal form,

5   that you find unsupported by the evidence or otherwise

6   noncredible.

7           The punishment provided by law for the offenses

8   charged in the indictment is a matter exclusively within the

9   province of the Court and should never be considered by the

10  jury in any way in arriving at an impartial verdict as to the

11  guilt or innocence of a defendant.

12          During the trial I have permitted you to take notes.

13  Many Courts do not permit note-taking by jurors, and a word of

14  caution is in order.  There is always a tendency to attach

15  undue importance to matters which one has written down.  Some

16  testimony which is considered unimportant at the time

17  presented and thus not written down takes on greater

18  importance later in the trial in light of all the evidence

19  presented.  Therefore, you are instructed that your notes are

20  only a tool to aid your own individual memory, and you should

21  not compare your notes with other jurors' notes in determining

22  the content of any testimony or in evaluating the importance

23  of any evidence.

24          Your notes are not evidence and are by no means a

25  complete outline of the proceedings or a list of the

1  highlights of the trial.  Above all, your memory should be

2  your greatest asset when it comes time to deliberate and

3  render a decision in this case.

4        If any reference by the Court or counsel to matters

5  or testimony or exhibits does not coincide with your own

6  recollection of that evidence, it is your recollection which

7  should control during your deliberations and not the

8  statements of the Court or counsel.

9        You are the sole judges of the evidence received in

10  this case.

11        Upon retiring to your jury room to begin your

12  deliberations, you must elect one of your number -- one of

13  your members -- to act as your presiding juror.  The presiding

14  juror will preside over your deliberations and will be your

15  spokesperson here in court.

16        Your verdict must represent the collective judgment

17  of the jury.  In order to return a verdict, it is necessary

18  that each juror agree to it.  Your verdict, in other words,

19  must be unanimous.

20        It is your duty as jurors to consult with one another

21  and to deliberate with one another with a view towards

22  reaching an agreement if you can do so without violence to

23  individual judgment.  Each of you must decide the case for

24  himself and herself and do so only after an impartial

25  consideration of the evidence in the case with your fellow

1  jurors.  In the course of your deliberations, do not hesitate

2  to reexamine your own views and to change your opinion if

3  convinced it is erroneous.  Do not surrender your honest

4  conviction, however, solely because of the opinion of your

5  fellow jurors or for the mere purpose of returning a verdict.

6          Remember at all times that you are not partisans.

7  You are the judges, judges of the facts of this case.  Your

8  sole interest is to seek the truth from the evidence received

9  during the trial.

10          Your verdict must be based solely on the evidence

11  received in the case.  Nothing you have seen or read outside

12  of court may be considered.  Nothing I have said or done

13  during the course of this trial is intended in any way to

14  somehow suggest to you what I think your verdict should be.

15  Nothing said in these instructions and nothing in any form of

16  verdict prepared for your convenience is to suggest or convey

17  to you in any way or manner any intimation as to what verdict

18  I think you should return.  What the verdict shall be is the

19  exclusive duty and responsibility of the jury.  As I have told

20  you many times, you are the sole judges of the facts.

21          The Court has prepared a verdict form for your

22  convenience.  You will take this form to the jury room and,

23  when you have reached unanimous agreement as to your verdict,

24  you will have your presiding juror fill in, date, and sign the

25  form upon which you have unanimously agreed.  When you have

1   reached unanimous agreement as to your verdict, the presiding

2   juror shall inform the bailiff and you shall return to the

3   courtroom.

4        If it becomes necessary during your deliberations to

5   communicate with the Court, you may send a note, signed by the

6   presiding juror or by one or more members of the jury, through

7   the bailiff.  No member of the jury should ever attempt to

8   communicate with the Court by any means other than a signed

9   writing, and the Court will never communicate with any member

10  of the jury concerning the evidence, your opinions, or the

11  deliberations other than in writing or orally here in open

12  court.

13       You will note from the oath about to be taken by the

14  bailiffs that the bailiff, too, as well as all other persons,

15  is forbidden to communicate in any way or manner with any

16  member of the jury on any subject touching the merits of the

17  case.

18       Bear in mind, also, that you are never to reveal to

19  any person how the jury stands, numerically or otherwise, on

20  the question on whether or not the United States has sustained

21  its burden of proof until after you have reached a unanimous

22  agreement.

23       The last document behind this pink sheet in the

24  instructions is the verdict form that is provided for your

25  convenience in this matter.

 1        I'm sorry, ladies and gentlemen; it is a lengthy

 2   document, and there are a lot of questions for you to consider

 3   in arriving at your unanimous decisions in this matter.

 4        I will read through that document at this time.

 5        It is entitled "Special Verdict," and it states:

 6   We, the jury, duly empaneled and sworn in the above-entitled

 7   cases, do find -- do unanimously find beyond a reasonable

 8   doubt as follows:

 9        And then, in italics, the following charges are

10   contained in the second superseding indictment.

11        Count Thirteen, 1, as to the charge contained in

12   Count Thirteen charging the defendant Justin Wallace Herman

13   with conspiracy to commit securities fraud, in violation of

14   Title 18, United States Code, Section 371, we -- we do

15   unanimously find the defendant -- and then there are two

16   choices.

17        And the way this form is set up, there's a -- a space

18   to put a mark in if that is your unanimous decision, not

19   guilty, and a space, guilty.

20        Question 2:  As to the charge contained in

21   Count Thirteen charging the defendant Charles Winifred

22   Winters, Jr., also known as Chuck Winters, with conspiracy to

23   commit securities fraud, in violation of Title 18, United

24   States Code, Section 371, we do unanimously find the defendant

25   not guilty/guilty.

1      Question 3:  As to the charge contained in

2  Count Thirteen charging the defendant Ian Horn with conspiracy

3  to commit securities fraud, in violation of Title 18, United

4  States Code, Section 371, we do unanimously find the defendant

5  not guilty/guilty.

6      And then there is a special interrogatory following

7  Count Thirteen and in italics:  If you found one or more of

8  the defendants guilty of the charge contained in

9  Count Thirteen, please answer Question 4.  If you did not find

10  a defendant guilty of the charge contained in Count Thirteen,

11  please skip Question 4 and proceed to Question 5.

12      Question 4 is:  As to the charge contained in

13  Count Thirteen, we do unanimously find a member or members of

14  the charged conspiracy committed the following overt acts in

15  furtherance of the conspiracy, and then, in italics, list all

16  numbered overt acts unanimously found, and there's a space for

17  you to write down the numbers from the list that is included

18  with these instructions.

19      Count Fourteen, Question 5:  As to the charge

20  contained in Count Fourteen charging the defendant Justin

21  Wallace Herman with securities fraud or aiding and abetting

22  securities fraud, in violation of Title 18, United States

23  Code, Section 2, and Title 15, United States Code,

24  Sections 78j(b) and 78ff, we do unanimously find the defendant

25  not guilty/guilty.

1    Question 6:  As to the charge contained in

2    Count Fourteen charging the defendant Charles Winifred

3    Winters, Jr., also known as Chuck Winters, with securities

4    fraud or aiding and abetting securities fraud, in violation of

5    Title 18, United States Code, Section 2, and Title 15, United

6    States Code, Sections 78j(b) and 78ff, we do unanimously find

7    the defendant not guilty/guilty.

8    Question 7:  As to the charge contained in

9    Count Fourteen charging the defendant Ian Horn with securities

10   fraud and aiding and abetting securities fraud, in violation

11   of Title 18, United States Code, Section 2, and 15 United

12   States Code, Sections 78j(b) and 78ff, we do unanimously find

13   the defendant not guilty/guilty.

14   Count Fifteen, Question 8:  As to the charge

15   contained in Count Fifteen charging the defendant Justin

16   Wallace Herman with conspiracy to commit wire fraud, in

17   violation of Title 18, United States Code, Section 1349, we do

18   unanimously find the defendant not guilty/guilty.

19   Question 9:  As the charge contained in Count Fifteen

20   charging the defendant Charles Winifred Winters, Jr., also

21   known as Chuck Winters, with conspiracy to commit wire fraud,

22   in violation of Title 18, United States Code, Section 1349, we

23   do unanimously find the defendant not guilty/guilty.

24   Question 10:  As to the charge contained in

25   Count Fifteen charging the defendant Ian Horn with conspiracy

1  to commit wire fraud, in violation of Title 18, United States

2  Code, Section 1349, we do unanimously find the defendant not

3  guilty/guilty.

4        Count Sixteen:  As to the charge contained in

5  Count Sixteen charging the defendant Justin Wallace Herman

6  with aggravated identity theft, in violation of Title 18,

7  United States Code, Section 1028A(a)(1), we do unanimously

8  find the defendant not guilty/guilty.

9        Question 12:  As to the charge contained in

10  Count Sixteen charging the defendant Charles Winifred Winters,

11  also known as Chuck Winters, with aggravated identity theft,

12  in violation of Title 18, United States Code,

13  Section 1028A(a)(1), we do unanimously find the defendant

14  not guilty/guilty.

15        Count Seventeen, Question 13:  As to the charge

16  contained in Count Seventeen charging the defendant Justin

17  Wallace Herman with aggravated identity theft, in violation

18  of Title 18, United States Code, Section 1028A(a)(1), we do

19  find -- we do unanimously find the defendant not

20  guilty/guilty.

21        Question 14:  As to the charge contained in

22  Count Seventeen charging the defendant Charles Winifred

23  Winters, Jr., also known as Chuck Winters, with aggravated

24  identity theft, in violation of Title 18, United States Code,

25  Section 1028A(a)(1), we do unanimously find the defendant not

1   guilty/guilty.

2         Count Eighteen, paragraph 15:  As to the charge

3   contained in Count Eighteen charging the defendant justice --

4   Justin Wallace Herman with aggravated identity theft, in

5   violation of Title 18, United States Code, Section 1028A(a)(1),

6   we do unanimously find the defendant not guilty/guilty.

7         Count Nineteen, paragraph 16:  As to the charge

8   contained in Count Nineteen charging the defendant Justin

9   Wallace Herman with aggravated identity theft, in violation of

10  Title 18, United States Code, Section 1028A(a)(1), we do

11  unanimously find the defendant not guilty/guilty.

12        The last page:  The following charge is contained in

13  the separate indictment.  Count One, Question No. 17:  As to

14  the charge contained in Count One charging the defendant

15  Ian Horn with false declaration before a grand jury, in

16  violation of Title 18, United States Code, Section 1623(a), we

17  do unanimously find the defendant not guilty/guilty.

18        And below that, "Dated this blank day of October,

19  2021" -- and I note today is the 8th day -- and the signature

20  block for the presiding juror.

21        Ladies and gentlemen, once the jury returns its

22  unanimous decision in this matter, you will be brought back

23  into the courtroom.  The verdict will be examined and received

24  if it is consistent and in proper form.  If not, I would send

25  you back into the jury room to resolve that matter.

1        And I will ask at that point -- and I will ask the

2   Courtroom Deputy, Becky Harris, to poll the jury.  I will ask,

3   "Ladies and gentlemen, was this and is this your verdict?" and

4   you will answer that question, and then, individually,

5   Ms. Harris will ask that same question to each of the jurors

6   in the case.

7        Will the bailiff please come forward and be sworn.

8        Ladies and gentlemen, these men who wear the blue

9   coat are all, for the most part, former law enforcement,

10  either military or civilian, have had distinguished law

11  enforcement careers, have been vetted and just felt they

12  needed a few more years of public service, and we're very

13  grateful that they're here to protect the Court and protect

14  you and to prevent anyone from overhearing your deliberations

15  during this case.  All of them have been previously sworn to

16  serve as bailiffs, but we will ask John Bedwell, who has been

17  with us for several years, and we're delighted with his

18  presence here in this court, to raise his right hand and be

19  sworn.

20        (Bailiff sworn.)

21        THE COURT:  And now it becomes my unpleasant duty to

22  deal with the issue of our three remaining alternate jurors.

23        By long tradition in this country and our legal

24  culture, there's been an insistence in criminal cases that a

25  unanimous verdict of 12, unless stipulated otherwise, with the

1   agreement of all parties, decision be received.  My best guess

2   is, not having studied it in depth, that it maybe refers to a

3   more Christian tradition in -- in its background.

4           As a result, we still excuse the alternate jurors at

5   the end of the case who have provided the same attention, the

6   same work, prepared the same notes, and given of their time as

7   citizens.  However, their duties are not over when I let them

8   leave you and separate them from you during your deliberations

9   because if any one of you should become disabled during your

10  deliberations and unable to continue, I will call them in

11  order to serve and go back into the jury room to contribute

12  there to the decision of the jury, whatever that might be, and

13  the jury will start its deliberations over again with the

14  alternate juror present.

15          Now, you may think that has never happened.  Well,

16  I can tell you it has happened to me in a case that took over

17  a month to try.  And thank goodness we had an alternate juror

18  who was willing to drive back to this courthouse from a

19  distance over -- of over 100 miles -- or I was in Casper;

20  I'm sorry -- but over 100 miles and a jury that started all

21  over again with him present and continued with its

22  deliberations and returned a unanimous verdict.

23          So I want to instruct, before our alternates leave,

24  that they are not to discuss this case with anyone or permit

25  anyone to discuss it with you or ask you questions about this

1    case until you are formally excused and released by this Court

2    from your jury duty in this matter; that you are to treat

3    yourself as you -- what you are, judges of the facts of this

4    case, to remain available to this Court by leaving a contact

5    number where you can be reached and brought back if that is

6    necessary.

7              And I will instruct and do instruct Becky Harris to

8    inform you, if you are not called back, when the jury has --

9    immediately after the jury has returned its verdict what that

10   verdict is so that you will know what that situation is and

11   will be -- will be then released from any duties that you have

12   in connection with this matter.

13             Do each of you understand what I've just told you?

14             JUROR 47:  Yes, Your Honor.

15             JUROR 56:  Yes.

16             JUROR 7:  Yes.

17             THE COURT:  The other thing I have observed:  We have

18   spent three weeks together.  You've made probably lifelong

19   friends among some of the folks on this jury.  This is a

20   separation that is not easy and I understand.  I've actually

21   seen alternate jurors and other jurors kind of tearful when --

22   when this separation occurs because so much work and effort

23   has been devoted to this activity that we have all been

24   engaged in in this courtroom.  So take a few moments to take a

25   deep breath and -- and -- before you -- before you leave.

1    I will excuse the three of you at this time to -- but

2    subject to being called back, if necessary, in this matter,

3    and I will ask you to provide your phone numbers or contact

4    information to Ms. Harris so that you can be called back.

5          Ladies and gentlemen of the jury, this case is now

6    submitted to you to arrive at a unanimous verdict in this

7    matter.  You will take with you the evidence in this case that

8    has been received.  You may have no other books, dictionaries,

9    cell phones, or information other than the instructions that

10   have been given, a copy of the superseding indictment, and the

11   list of overt acts which was simply prepared for you for your

12   convenience to be able to look at those separate from the

13   superseding indictment.

14         You will have nothing else to assist you without

15   permission of the Court, no books or dictionaries, newspapers,

16   magazines, or whatnot.

17         I ask you to confine your deliberations to the jury

18   room.  There will be times you'll need to take a break, you'll

19   need to go outdoors and get a breath of fresh air --

20   hopefully, the weather will stay nice so that that will be --

21   it will be refreshing and you'll want to go out and walk up

22   and down and get a little exercise.

23         It is important that each of you have full

24   opportunity to participate in the verdict that is received.

25   It would be a tragedy if we arrived at the point where we're

1    polling the jury and somebody said, "Well, all these decisions

2    were made while I was in the bathroom" or "was out having a

3    smoke in front of the courthouse" or something of that nature.

4    So when people are absent, calm down the deliberations and

5    resume when everybody's present again.  I want everybody to

6    feel that they've had full opportunity to express their views

7    concerning the evidence in this matter in arriving at a

8    unanimous verdict.

9            In terms of the -- the time, we're going to feed you.

10   Becky Harris is in charge of that.  You simply need to send a

11   message to the bailiff that it's time to eat, and those

12   arrangements can be made.

13           The timing of how long you deliberate is entirely up

14   to you.  If you want to work late into the evening, we will be

15   here, and we will attend to your needs, and the bailiffs will

16   be here to attend to your needs.  On the other hand, if you

17   arrive at a point where you say, "We are exhausted and it's

18   time that we end for the day," you determine when that time

19   has arrived and are best able to make that decision.

20           When I was a State Judge, we sequestered the jury in

21   the jury room, and they were there until they received --

22   determined a verdict, and I've sat there until 3:00 or 4:00 in

23   the morning.  We don't do that anymore to jurors.  You're in

24   control of those -- those issues, but we will attend to your

25   needs as they arise.

 1          Now, an all-important matter to deal with:  Jurors

 2   upon request -- well, I'll preface this by saying the verdict

 3   in this case is yours.  You will arrive at the verdict.  You

 4   must decide this case.  If you can.

 5          There may be questions that arise during the course

 6   of your deliberations.  Oftentimes the question may be "Can we

 7   have the testimony of Witness X or Y or Z read back to us?"

 8   You know Melanie.  She's told you what she does, and she's

 9   very good at it.  And she could -- she could read back

10   testimony.

11          The problem is that when I get that question, I call

12   the attorneys and we all gather.  And one side will say, "By

13   all means, read the testimony back.  It is important and the

14   jurors need to hear it."

15          And the other side will say -- I'm not saying which

16   side's going to say this, but one side or the other is going

17   to say it -- "Well, Your Honor, you're unduly emphasizing the

18   testimony of one witness' testimony over the testimony of all

19   the other important evidence that has gone into this case.  If

20   we're going to do that, well, let's read back the testimony of

21   all these other witnesses."

22          Well, I'm not -- I'm not going to have you sit here

23   for another week reading back testimony, and so usually what

24   I'll do is I'll send back -- or -- or bring you back in the

25   courtroom and inform you to review your notes and consider

 1    your most valuable asset, your memories, and continue with

 2    your deliberations.

 3            I know that if the jury is -- if it becomes obvious

 4    the jury is really stuck over certain testimony, I'm going to

 5    say "Read it back," and we will capitulate at that point and

 6    read back the testimony to you so that the jury can move on.

 7            Now, there's a second kind of question.  The jury

 8    upon more than once in my experience has asked a question

 9    concerning the instructions and the law governing the case.

10    Sometimes, you know, we are so focused on the issues that we

11    are concerned about that we may overlook something or we may

12    make some assumption, and more than once we've had to draft

13    another instruction and submit it to the jury.  And the jury

14    unerringly has found a weak spot in our instructions, and

15    we've tried to cure that problem.

16            On the other hand, a lot of time was spent into the

17    late evening hours developing these instructions, and we think

18    it's a pretty complete set of instructions -- I don't know

19    what this is that's interrupting us.

20            THE COURTROOM DEPUTY:  I think --

21            THE COURT:  Can we get it shut off?

22            Thank you.

23            Ghosts, October.

24            So what happens -- if we receive a question from the

25    jury that touches upon the instructions, the note will go to

1    the bailiff.  John or whoever's standing in for John will

2    bring it to me or to Becky, and it will come to me, and we'll

3    call the attorneys, and they will come rushing over here from

4    wherever they're located, and we'll hand it out and go on the

5    record and discuss it and decide what needs to be done.

6            And if a further instruction is necessary, we'll

7    bring you into the courtroom and give you that instruction.

8    Or we may bring you into the courtroom and say that "This is

9    covered in the instructions that have been given" and

10   "Continue about your deliberations."  Those are kind of the

11   options that -- that exist in that regard.

12           I don't know if there are any smokers in the group.

13   That's less of a problem these days, thankfully, than it used

14   to be even 10 years ago.  But this, of course, is a nonsmoking

15   area, and if anybody needs to smoke, that should be done

16   outside.  And so a smoke break can be taken, or just simply a

17   break to get some fresh air is perfectly legitimate here.

18           Becky Harris, is the jury going to go out today for

19   lunch, or are they going to eat in?

20           THE COURTROOM DEPUTY:  In.

21           THE COURT:  So you'll receive menus and be able to

22   order in today.

23           Mr. Heimann, is there anything further that we need

24   to tell the jury about?

25           MR. HEIMANN:  No, Your Honor.

1           THE COURT:  Thank you.

2           Mr. Fleener, is there anything that you can think of?

3           MR. FLEENER:  No, sir.  Thank you very much.

4           THE COURT:  Mr. Ward?

5           MR. WARD:  No, Your Honor.  Thanks.

6           THE COURT:  Mr. Jubin?

7           MR. JUBIN:  No, Your Honor.  Thank you.

8           THE COURT:  There is one thing that -- I think that

9    I probably should say to you, ladies and gentlemen.

10          As you can see, this is a pretty crowded well of the

11   courtroom.  Each of these defendants would have preferred to

12   have a separate table in this courtroom rather than me

13   requiring them to sit virtually together because each of their

14   cases is separate for you to consider, and we just don't have

15   that ability here.

16          The other thing I want to tell you is that everybody

17   wants to sit at this table because they like to get close to

18   the jury and look at you.  So we put signs on the table that

19   says the plaintiff -- whether in a civil case or a criminal

20   case -- sits here because we don't want lawyers hitting each

21   other with their briefcases over where they get to sit in the

22   courtroom, and we put a sign on that one that says defendants

23   sit there.

24          There's no significance in the seating arrangement in

25   this courtroom, and you should disregard any temptation to

1    think about that in your deliberations.  It's just simply the

2    way we're set up to do business in this building.

3              There being no further questions, let us all stand

4    for this jury as they begin their deliberations.

5         (Proceedings outside the jury's presence at 9:26 a.m.)

6              THE COURT:  Going forward, I just wanted to

7    acknowledge the hard work that's been done in this case, as

8    reflected by everybody, the -- and the patience of the --

9    those persons who are defendants in this matter, paralegals,

10   investigators, and others.  We've been together for three

11   weeks now, and I think everybody's conducted themselves

12   civilly and -- and in a way that reflects well to this jury.

13             So I thank you for your efforts and restraint and

14   work that you've done during the past three weeks and

15   the months and years leading up to this.

16             We're all wearing masks, have worn masks for three

17   solid weeks in all open sessions, and it's not been easy but

18   you've done it.  And you deserve credit, all of you.

19             Thank you.

20        (A recess was taken from 9:28 a.m. to 3:41 p.m.)

21             THE COURT:  Thank you, Counsel.

22             We have a jury question concerning the separate

23   indictment, I believe, and the charge against Ian Horn.

24             MR. SZOTT:  Yes, Your Honor.

25             THE COURT:  Do you want me to introduce that

 1  question?

 2          MR. SZOTT:  I'm sorry, Your Honor.  Yes.

 3          THE COURT:  The question that's been submitted by

 4  Presiding Juror Steven Lambson says "In regard to Count One

 5  against Ian Horn, Jury Instruction No. 46, Statement No. 2,

 6  quote, 'The defendant made the statement, as charged in the

 7  additional indictment'" -- end of quote -- "can we have

 8  clarification on the statement or, more so, clear direction to

 9  the evidence in question that we should refer to?  What

10  statement do we need to focus on?"

11          And this was submitted on today's date at 3:10 hours.

12          I note that all of the attorneys are present as well

13  as each of the defendants in this matter, with their counsel.

14          Now, Mr. Szott.

15          MR. SZOTT:  Your Honor, thank you.

16          We have ascertained what happened.  The Court might

17  recall --

18          THE COURT:  We didn't submit the separate indictment,

19  did we?

20          MR. SZOTT:  The separate indictment was not

21  submitted, Your Honor.

22          And, originally, we had Jury Instruction 47, which

23  had a table, and we talked -- I had talked about maybe

24  removing one column from the table because now we don't need

25  to identify the count, but Instruction 47 was not included.

1  I didn't notice it.  So the jury doesn't have the indictment,

2  and they don't have the instruction.

3          So I think this only really -- at least directly --

4  affects Mr. Horn, and we've discussed this with Mr. Jubin.

5  The Government's preference, I think, Your Honor, would be to

6  just have Instruction 47 be given.  The alternative would be

7  to send them with the separate indictment.

8          We had discussed potentially redacting Count Two.

9  From my perspective, the benefit of the instruction is there's

10  no chance that they might look at the wrong count or be

11  confused so -- but Instruction 47, Your Honor, was simply

12  omitted from the instructions.  And I think if that

13  instruction were given, that would be appropriate.

14          THE COURT:  Do you have a copy of Instruction --

15  well, you probably don't have a copy with you of 47.  We have

16  a copy of 47 we --

17          MR. JUBIN:  I only brought with me a copy of the

18  Court's given instructions, so I don't have the proposed

19  instruction in front of me.

20          I've looked at it on Mr. Szott's tablet, and I think

21  I'm in agreement that we simply give that table that indicates

22  the statement, its alleged falsity, and not give the entire

23  indictment.

24          THE COURT:  I -- I think I agree with you.

25          Ziggy --

 1              MR. JUBIN:  I'd like to see it, however, before I --

 2              THE COURT:  We'll let you see it and give you copies

 3     of it and then bring the jury in and instruct them in open

 4     court --

 5              MR. JUBIN:  Okay.

 6              THE COURT:  -- so it's good that your clients are

 7     here.

 8              THE LAW CLERK:  I'm pulling it up.  It's just slow.

 9              THE COURTROOM DEPUTY:  They'll be able to then take a

10     copy of that instruction back with them; right?

11              THE COURT:  Yes.

12          (Discussion held among counsel.)

13              THE COURT:  Okay.  We -- I need to blank out the

14     number on this instruction.

15              THE COURTROOM DEPUTY:  Oh.  I have some whiteout

16     here.  Is that all right?

17              THE COURT:  That's fine.  I'll write over it.

18              THE COURTROOM DEPUTY:  And tell me what number you're

19     going to put on it, and I've got two copies here that I'll

20     need to make --

21              THE COURT:  I'll put a letter A in there.

22              THE COURTROOM DEPUTY:  Okay.

23              MR. SZOTT:  So it was not cut and paste.  There were

24     a couple of stylistic edits.

25              MR. JUBIN:  I'll want to make a record, as well.

1    I renew my objection to the failure to include the

2  context surrounding this statement because it is essential and

3  critical to understanding what Mr. Horn might have been

4  influenced by in providing his answer.

5    And while the jury instruction accurately sets

6  forth -- if we give an instruction with the question in one

7  column on the left and the reason it's supposedly false on the

8  right, while that may set forth what the allegation is, it

9  deprives the jury of knowing the context.

10    And if we tell them about what it is that Mr. Horn

11  allegedly said that's false and give them such limited

12  information about the context of the reply, they can't

13  possibly do their job, and it would be inappropriate, and I'd

14  object on that basis generally.

15    I don't know that it's answered entirely by reference

16  to this question in this instruction, but I want to make sure

17  I preserve that issue.

18    THE COURT:  I do not disagree with you.  You should

19  do that.

20    MR. HEIMANN:  Your Honor, there's an exhibit that the

21  Court admitted over objection from the defendant that does

22  include the context.  So the jury has what they need, and we

23  would ask that Mr. Jubin's motion again be denied.

24    THE COURT:  It is denied.  Can't reopen the door

25  that's been shut.

 1            Are we ready for the jury, gentlemen?

 2            MR. JUBIN:  So is the proposed instruction what's in

 3     the indictment?  Or is it going to be the changed version

 4     that's in Proposed 47?

 5            THE COURT:  It's in A.  It will be in Instruction A.

 6            MR. JUBIN:  The only difference is "JH" is replaced

 7     with "Justin Herman"?

 8            MR. HEIMANN:  Instead of "the defendant," it says

 9     "Defendant Horn."

10            MR. JUBIN:  Okay.

11            I say "okay" without -- without any detriment to my

12     objection.  I maintain my objection.

13            MR. SZOTT:  As to the form of the instruction.

14            MR. JUBIN:  As to the form of the instruction.

15     I don't know what I -- else I can say.

16            THE COURT:  All right.  Let's bring the jury in.

17         (Proceedings within the jury's presence at 3:56 p.m.)

18            THE COURT:  Please be seated, ladies and gentlemen.

19            Shortly after 3:10 this afternoon, we received a note

20     from the presiding juror, Mr. Lambson, in this matter.

21            It states:  "In regards to Count One against

22     Ian Horn, Jury Instruction No. 46, Statement No. 2,

23     question -- quotation mark, 'The defendant made the statement,

24     as charged in the additional indictment'" -- end of quotation

25     marks -- "can we have clarification on the statement or, more

1   so, clear direction to the evidence in question that we should

2   refer to?  What statement do we need to focus on?"

3          You know, I made a note to you before you went into

4   the jury room that more than once a jury has found unerringly

5   a problem in the instructions that have been given.

6          Well, you did it here, and I will give you

7   Instruction A, which I think I need to show how Instruction A

8   will look to you.  It will go into the jury room with you.

9          Instruction No. A:  The alleged statements and

10  alleged falsities for Count One of the additional indictment

11  are as followed -- follows -- and then in big, black titles,

12  it says "Alleged False and Material Declaration -- Allegedly

13  False and Material Declaration.

14         "Question:  Why don't you have any of your email

15  correspondence with Justin Herman regarding NuTech?

16         "Answer:  I had a crash on my computer at the end of

17  2016 that wiped out anything basically that wasn't saved,

18  which was, unfortunately, my emails.

19         "Question:  Do you have access to your email through

20  an online service?

21         "Answer:  I do not."

22         The next title -- and we have to be careful about

23  titles -- "Truth Allegedly Known to Defendant Horn When He

24  Testified," so it's alleged.  The jury will have to make its

25  own determination.

19-CR-26-ABJ          RENDITION OF VERDICT          Vol. XIV-2403
21-CR-14-ABJ

1          "Defendant Horn had email regarding NuTech, including

2     email correspondence with Justin Herman, because Horn could,

3     and did, access email from 2014 and 2015 regarding NuTech,

4     including email correspondence with Justin Herman, between

5     service of the subpoena on October 16, 2018, and Horn's

6     testimony on 2016 -- January 16, 2019."

7          Those will be the documents for you to look at, and

8     I'll give this to our clerk and also give her the note which

9     will become part of the court file in this case.

10         Please continue with your deliberations.  We will

11    stand in recess.

12         THE COURTROOM DEPUTY:  All rise.

13      (Proceedings outside the jury's presence at 4:00 p.m.)

14         THE COURT:  Counsel, thank you for coming over.

15    I don't know; we may have other questions coming at us soon,

16    but we will advise you as we learn.

17         MR. JUBIN:  Thank you, Your Honor.

18      (A recess was taken from 4:01 p.m. to 6:32 p.m.)

19         THE COURT:  Counsel, the jury has announced that it

20    has a verdict in this matter, and so we'll proceed to take the

21    verdict.

22         Please be seated.

23         THE COURTROOM DEPUTY:  Are you ready for the jury?

24      (Proceedings within the jury's presence at 6:34 p.m.)

25         THE COURT:  Thank you.  Please be seated, everyone.

```
19-CR-26-ABJ          RENDITION OF VERDICT          Vol. XIV-2404
21-CR-14-ABJ
```

1           Would the Courtroom Deputy please call the roll of

2    the jury, and will you announce your presence by your number

3    as your number's called.

4           THE COURTROOM DEPUTY:  Juror 28.

5           THE COURT:  Present?

6           JUROR 28:  Present.  Sorry.  Yes, present.

7           THE COURTROOM DEPUTY:  Juror 31.

8           JUROR 31:  Present.

9           THE COURTROOM DEPUTY:  Juror 52.

10          JUROR 52:  Present.

11          THE COURTROOM DEPUTY:  Juror 23.

12          JUROR 23:  Present.

13          THE COURTROOM DEPUTY:  Juror 8.

14          JUROR 8:  Present.

15          THE COURTROOM DEPUTY:  Juror 43.

16          JUROR 43:  Present.

17          THE COURTROOM DEPUTY:  Juror 29.

18          JUROR 29:  Present.

19          THE COURTROOM DEPUTY:  Juror 50.

20          JUROR 50:  Present.

21          THE COURTROOM DEPUTY:  Juror 49.

22          JUROR 49:  Present.

23          THE COURTROOM DEPUTY:  Juror 48.

24          JUROR 48:  Present.

25          THE COURTROOM DEPUTY:  Juror 15.

```
19-CR-26-ABJ          RENDITION OF VERDICT          Vol. XIV-2405
21-CR-14-ABJ
```

1    JUROR 15:  Present.

2    THE COURTROOM DEPUTY:  Juror 21.

3    JUROR 21:  Present.

4    THE COURT:  Thank you.

5    The Court also notes the presence of the

6    United States, represented here by Mr. Eric Heimann and

7    Mr. Thomas Szott, who are present.  Ms. Hacker is also present

8    and Mr. Davila, the legal assistant, is present, as well.

9    Present representing the defendant Mr. Herman is

10   Thomas Fleener, and Mr. Herman is present, as well.

11   Mr. Winters is present and represented here by Mr. Zenith

12   Ward.  And Mr. Ian Horn is also present and represented here

13   by Thomas Jubin.  And I see Mr. Miller is -- investigator --

14   is also present, as are others in the courtroom at this time.

15   Who will be speaking for this jury?

16   JUROR 28:  Juror 28.

17   THE COURT:  And, Juror 28, has this jury unanimously

18   agreed on a verdict in this matter?

19   JUROR 28:  We have, Your Honor.

20   THE COURT:  Would you please hand the verdict to our

21   courtroom bailiff here, and I will inspect the verdict.

22   Thank you -- careful.

23   It appears to the Court that the special verdict form

24   is complete, and I would ask that our Courtroom Deputy read

25   the special verdict in open court.

1          Ms. Harris.

2          THE COURTROOM DEPUTY:  We, the jury, duly empaneled

3    and sworn in the above-entitled cases, do unanimously find

4    beyond a reasonable doubt as follows:  The following charges

5    are contained in the second superseding indictment:

6    Count Thirteen:  As to the charge contained in Count Thirteen

7    charging the defendant Justin Wallace Herman with conspiracy

8    to commit securities fraud, in violation of 18 United States

9    Code, Section 371, we do unanimously find the defendant

10   guilty.

11          As to the charge contained in Count Thirteen charging

12   the defendant Charles Winifred Winters, Jr., also known as

13   Chuck Winters, with conspiracy to commit securities fraud, in

14   violation of 18 United States Code, Section 371, we do

15   unanimously find the defendant guilty.

16          As to the charge contained in Count Thirteen charging

17   the defendant Ian Horn with conspiracy to commit securities

18   fraud, in violation of 18 United States Code, Section 371, we

19   do unanimously find the defendant not guilty.

20          Special interrogatory:  As to the charge contained in

21   Count Thirteen, we do unanimously find a member or members of

22   the charged conspiracy committed the following overt acts in

23   furtherance of the conspiracy:  Nos. 5 through 12, 14 through

24   30, 32 through 33, 35, 40, and 41.

25          Count Fourteen:  As to the charge contained in

1  Count Fourteen, charging the defendant Justin Wallace Herman

2  with securities fraud or aiding and abetting securities fraud,

3  in violation of 18 United States Code, Section 2, and

4  15 United States Code, 78j(b) and 78ff, we do unanimously find

5  the defendant guilty.

6           As to the charge contained in Count Fourteen,

7  charging the defendant Charles Winifred Winters, Jr., also

8  known as Chuck Winters, with securities fraud or aiding and

9  abetting securities fraud, in violation of 18 United States

10 Code, Section 2, and 15 United States Code, Sections 78j(b)

11 and 78ff, we do unanimously find the defendant guilty.

12          As to the charge contained in Count Fourteen charging

13 the defendant Ian Horn with securities fraud or aiding and

14 abetting securities fraud, in violation of 18 United States

15 Code, Section 2, and 15 United States Code, Sections 78j(b)

16 and 78ff, we do unanimously find the defendant not guilty.

17          Count Fifteen:  As to the charge contained in

18 Count Fifteen charging the defendant Justin Wallace Herman

19 with conspiracy to commit wire fraud, in violation of

20 18 United States Code, Section 1349, we do unanimously find

21 the defendant guilty.

22          As to the charge contained in Count Fifteen charging

23 the defendant Charles Winifred Winters, Jr., also known as

24 Chuck Winters, with conspiracy to commit wire fraud, in

25 violation of 18 United States Code, Section 1349, we do

1    unanimously find the defendant guilty.

2          As to the charge contained in Count Fifteen charging

3    the defendant Ian Horn with conspiracy to commit wire fraud,

4    in violation of 18 United States Code, Section 1349, we do

5    unanimously find the defendant not guilty.

6          Count Sixteen:  As to the charge contained in

7    Count Sixteen, charging the defendant Justin Wallace Herman

8    with aggravated identity theft, in violation of 18 United

9    States Code, Section 1028A(a)(1), we do unanimously find the

10   defendant guilty.

11         As to the charge contained in Count Sixteen charging

12   the defendant Charles Winifred Winters, Jr., also known as

13   Chuck Winters, with aggravated identity theft, in violation of

14   18 United States Code, Section 1028A(a)(1), we do unanimously

15   find the defendant guilty.

16         Count Seventeen:  As to the charge contained in

17   Count Seventeen charging the defendant Justin Wallace Herman

18   with aggravated identity theft, in violation of 18 United

19   States Code, Section 1028A(a)(1), we do unanimously find the

20   defendant guilty.

21         As to the charge contained in Count Seventeen

22   charging the defendant Charles Winifred Winters, Jr., also

23   known as Chuck Winters, with aggravated identity theft, in

24   violation of 18 United States Code, Section 1028A(a)(1), we do

25   unanimously find the defendant guilty.

```
19-CR-26-ABJ          RENDITION OF VERDICT          Vol. XIV-2409
21-CR-14-ABJ
```

1           Count Eighteen:  As to the charge contained in

2   Count Eighteen charging the defendant Justin Wallace Herman

3   with aggravated identity theft, in violation of 18 United

4   States Code, Section 1028A(a)(1), we do unanimously find the

5   defendant guilty.

6           Count Nineteen:  As to the charge contained in

7   Count Nineteen charging the defendant Justin Wallace Herman

8   with aggravated identity theft, in violation of 18 United

9   States Code, Section 1028A(a)(1), we do unanimously find the

10  defendant guilty.

11          The following charge is contained in the separate

12  indictment:  Count One:  As to the charge contained in

13  Count One charging the defendant Ian Horn with false

14  declaration before a grand jury, in violation of 18 United

15  States Code, Section 1623(a), we do unanimously find the

16  defendant guilty.

17          Dated this 8th day of October, 2021, signed by the

18  presiding juror.

19          THE COURT:  You may be seated.

20          Ladies and gentlemen of the jury, was this and is

21  this your verdict?

22          JURY MEMBERS:  (Jury members answered affirmatively.)

23          THE COURT:  Would the Courtroom Deputy please poll

24  the jury.

25          THE COURTROOM DEPUTY:  Juror 28, was this and is this

1  your verdict?

2        JUROR 28:  Yes, it is.

3        THE COURTROOM DEPUTY:  Juror 31, was this and is this

4  your verdict?

5        JUROR 31:  Yes.

6        THE COURTROOM DEPUTY:  Juror 52, was this and is this

7  your verdict?

8        JUROR 52:  Yes.

9        THE COURTROOM DEPUTY:  Juror 23, was this and is this

10  your verdict?

11        JUROR 23:  Yes.

12        THE COURTROOM DEPUTY:  Juror 8, was this and is this

13  your verdict?

14        JUROR 8:  Yes.

15        THE COURTROOM DEPUTY:  Juror 43, was this and is this

16  your verdict?

17        JUROR 43:  Yes.

18        THE COURTROOM DEPUTY:  Juror 29, was this and is this

19  your verdict?

20        JUROR 29:  Yes.

21        THE COURTROOM DEPUTY:  Juror 50, was this and is this

22  your verdict?

23        JUROR 50:  Yes.

24        THE COURTROOM DEPUTY:  Juror 49, was this and is this

25  your verdict?

```
19-CR-26-ABJ           RENDITION OF VERDICT          Vol. XIV-2411
21-CR-14-ABJ
```

1          JUROR 49:  Yes.

2          THE COURTROOM DEPUTY:  Juror 48, was this and is this

3    your verdict?

4          JUROR 48:  Yes, ma'am.

5          THE COURTROOM DEPUTY:  Juror 15, was this and is this

6    your verdict?

7          JUROR 15:  Yes, it is.

8          THE COURTROOM DEPUTY:  Juror 21, was this and is this

9    your verdict?

10          JUROR 21:  It is.

11          THE COURT:  It appears to the Court that the jury

12    verdict is complete in this matter, that it is unanimous, and

13    I direct the Clerk to file and record the verdict.

14          We will discharge the jurors, and I will instruct

15    them further now concerning their duties.

16          Ladies and gentlemen, after a jury trial no juror has

17    an obligation to speak to any person or persons about any case

18    and may refuse all interviews and comments.  No person may

19    make repeated requests for interviews or comments after a

20    juror has expressed a desire not to be interviewed or

21    questioned.  You cannot be harassed and should not be harassed

22    if you choose to not speak.

23          If any person violates this prohibition against

24    repeated requests of a juror for interviews or comments after

25    the juror's refusal, the juror or jurors involved shall

19-CR-26-ABJ              RENDITION OF VERDICT          Vol. XIV-2412
21-CR-14-ABJ

1   promptly advise the Court of the facts and circumstances.  The

2   Court shall take such action as it deems appropriate, which

3   may include a contempt citation to the offending party or

4   parties.

5          Having said that, you are citizens of the

6   United States of America, and you have a free speech right.

7   I would give you this further instruction:  If any juror

8   consents to be interviewed after trial, under no circumstances

9   shall such juror disclose or be asked to disclose any

10  information with respect to the specific vote of any other

11  juror other than the juror being interviewed or with respect

12  to the deliberations of the jury.

13         What went on and what was discussed between you in

14  that jury room should remain between each of you and your

15  fellow jurors.  And, of course, each of you knows what

16  impressed you most, what you didn't like that you saw, what

17  you didn't feel was appropriate that you saw, and know your

18  own verdict better than your neighbor does.  Let them speak

19  for themselves.  They are in a good position to discuss their

20  own -- own feelings and beliefs.

21         I can tell you that all of these attorneys are always

22  interested in hearing from jurors and probably will find ways

23  of communicating with you to find out if there's something

24  they could have done that would have improved their

25  performance, something by way of mannerism or otherwise that

19-CR-26-ABJ                                          Vol. XIV-2413
21-CR-14-ABJ

1   may have been an irritant to you rather than something that

2   was -- that you found to be helpful.  You know, we all have

3   mannerisms, we all have styles, and they all are different and

4   vary from one person to another.

5           You have been with us for three weeks.  In a very

6   real sense, we've had time to almost become a family in terms

7   of the relationships that we've had in that jury room and here

8   in this courtroom.  Your jury service has been performed in a

9   time of national stress and especially stress in Wyoming,

10  having lost over 1,000 of our fellow citizens to this nasty

11  disease and many, many others suffering the lingering effects

12  of having encountered the disease in their lives and having

13  the lasting effects.  We have been pretty religious about

14  masking and testing -- and you've put up with it all during

15  this time -- and distancing and separation.

16          It would be improper for anybody to thank you for

17  your verdict, and I certainly don't offer thanks for the

18  verdict.  You made your decision.  It's your verdict.  But

19  I can comment and express great appreciation and thanks for

20  your attention to duty and how you performed the duty as

21  citizen jurors in this case, present every day, not a moment

22  lost to any cause chargeable to this jury, very high quality

23  duty under very difficult and trying circumstances.  And

24  I know some of you have had some worries about children and --

25  and others in your lives who may have been exposed to COVID

1    during this time because Becky has kept me informed of all

2    that is a concern during this time.

3           I would ask Becky to inform -- call our alternate

4    jurors, inform them of what has happened and the nature of the

5    verdicts that have been received in this case, and tell them

6    that Judge Johnson fully discharges them and excuses them from

7    their jury service in this case.

8           Now, some of you may want to have further jury

9    service during this term, and we would be very happy if you

10   did choose to do so, but you have certainly earned to be

11   excused from this jury term.  All you have to do is -- is tell

12   Becky that that is your desire, to be excused from -- from

13   jury service for the remainder of this -- this term.

14          I hope that we have addressed your concerns.  You've

15   had to endure a vast amount of information thrown at you, but

16   you now know more about the ins and outs of the penny stock

17   market than anybody really deserves to know at this point.

18   And I have found that every trial for me represents a learning

19   experience.  Judges are not all-knowing, and every trial

20   teaches us and gives us lessons that we can pick up on and

21   benefit from.

22          And I think each of you have learned that, despite

23   your vast differences one to another by way of experience and

24   residence and what's happened in your lives that have shaped

25   you, that the person seated next to you and working with you,

1    they're all good people, great citizens.  Different stations

2    in life but doing their very best to move forward and be good

3    citizens.

4            So I'm proud that I've been in this courtroom for the

5    last three weeks with each and every one of you, and I'm sure

6    no one disagrees.

7            And I would ask Mr. Heimann, anything further we need

8    to tell this jury?

9            MR. HEIMANN:  No, Your Honor.

10           THE COURT:  Thank you.

11           Mr. Fleener.

12           MR. FLEENER:  No, sir.  Thank you.

13           MR. WARD:  No, Your Honor.  Thank you.

14           MR. JUBIN:  No, Your Honor.  Thank you.

15           THE COURT:  Very well.

16           Now, let me tell you what happens.  I hereby order

17   that a presentence investigation be conducted in this matter

18   as to each of these defendants and that it be eventually

19   delivered to the Court.  It takes about 70 days to complete

20   that process of preparing an investigation and report to the

21   Court.  That's done by an officer of the probation department

22   of the United States.

23           That report goes out after about 45 days to the

24   parties, and they have opportunity to seek corrections or

25   additions to that report as may be necessary or may object to

1  certain findings that are contained in that report.

2          To the extent that the probation officer agrees that

3  they may have made an error, they'll change the report.  And

4  that amended report or revised report will come to me, and any

5  matters that cannot be resolved will be resolved as the first

6  order of business at the sentencing hearing that will occur

7  later.

8          Do we have a sentencing date at this point?

9          THE COURTROOM DEPUTY:  Wednesday, January 5th, at

10  9:30 for Mr. Herman.  Wednesday, January 5th, at 1:30 for

11  Mr. Winters.  Wednesday, January 5th, at 3:30 for Mr. Horn.

12          THE COURT:  Those are public proceedings in this

13  courtroom.  You are certainly entitled, if you have the

14  interest, to attend the sentencing to see what the ultimate

15  decision of the Court will be.

16          As I instructed you, the matter of punishment or

17  sentence is a matter that falls totally upon my shoulders in

18  making that decision and will be an issue that we'll confront

19  in January so feel free, if you wish to attend, to come and

20  sit in the audience and observe those proceedings.

21          We're releasing you on Friday night in the dark.

22  Those of you who are coming from great distance -- Becky,

23  I assume they can stay over until Saturday and -- and drive

24  home at their leisure.

25          If you are driving in the dark tonight, please,

1    please be careful and continue to mask up in crowds and

2    maintain distance and protect yourselves and your families and

3    your other fellow citizens going forward.

4          I found out that my daughters studied with your

5    mother, who was a lovely, lovely lady and took such good care

6    of my family, so there are always -- Wyoming's a small state

7    and we have lots of connections.

8          If there's no objection, we will excuse and discharge

9    this jury at this time.

10         Court will stand in recess.

11         THE COURTROOM DEPUTY:  All rise.

12    (Proceedings outside the jury's presence at 6:59 p.m.)

13         THE COURT:  There's an additional set of findings

14    I wish to make.

15         I find that each of these defendants has attended

16    each and every session that required their presence before

17    this Court and not one of them represents, in my view, a risk

18    of flight.  I have not been in receipt of any information from

19    the probation department that any of the defendants represent

20    a current danger to the communities in which they live.

21         I further would note that each of these defendants

22    have some age on them, and I note that the confinement

23    facilities located at Scotts Bluff and at Platte County are

24    currently under quarantine for outbreak of COVID.  It just

25    makes no sense to me at this point not to continue bond

 1   pending your appearances before this Court for sentencing.

 2          I realize the Government may have objection to that,

 3   and I'll certainly let them state the objection for the

 4   record.  But it just seems, at this point, that should be the

 5   appropriate decision unless these -- any one of these

 6   defendants wishes to -- to -- because any time they spend in

 7   confinement now will be credited on their sentence ultimately

 8   that might be imposed by this Court.

 9          Does anyone -- any defendant -- object to continuing

10   the bond and the conditions that have been imposed by this

11   Court?

12          MR. JUBIN:  Certainly no objection from Mr. Horn.

13          MR. WARD:  None from Mr. Winters, Your Honor.

14          MR. FLEENER:  We appreciate the Court's

15   consideration.  No objections.

16          THE COURT:  That will be so ordered.

17          I assume you're objecting.

18          MR. HEIMANN:  Your Honor, I don't object as to

19   Mr. Horn.  I do object as to Mr. Herman and Mr. Winters.  They

20   are facing mandatory prison sentences at this point.

21          The previous conditions, I think, are inadequate

22   under that circumstance.  Also, based on the trial evidence,

23   we know that they were involved in an international conspiracy

24   and, therefore, have international contacts that would help

25   them to flee, and at this point they would have every

1    incentive to do so.

2            So we do object.  I understand your findings.

3            THE COURT:  Very well.  Thank you.

4            With that, we'll stand in recess.

5        (Proceedings concluded 7:02 p.m., October 8, 2021.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5            I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by machine shorthand the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth, and that the foregoing pages

12   constitute a full, true and correct transcript.

13

14           Dated this 15th day of January, 2022.

15

16

17

18           /s/ Melanie Humphrey-Sonntag

19           _____

20                MELANIE HUMPHREY-SONNTAG
                       RDR, CRR, CRC
21              Federal Official Court Reporter

22

23

24

25

Robert L. Sirianni, Jr. (PHV)
robertsirianni@brownstonelaw.com
George W. Thomas (PHV)
george@brownstonelaw.com
Brownstone, P.A.
P.O. Box 2047 Winter Park, FL 32790-2047
407-388-1900
*Attorneys for Defendant, Justin Wallace Herman*

Robert T. Moxley #5-1726
Robert T. Moxley, P.C.
2718 O'Neil Avenue
Post Office Box 565
Cheyenne, Wyoming 82003-0565
Tel: (307) 632-1112
fax: (307) 632-0401
Vaccinelawver@gmail.com
*Counsel for Defendant Herman*

Zenith Ward #7-4584
Buchhammer & Ward, P.C.
1821 Logan Avenue
P.O. Box 568
Cheyenne, WY 82003-0568
Tel: (307) 634-2184
Fax: (307) 634-2199
zsw@wyoming.com
*Counsel for Defendant Winters*

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF WYOMING

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUSTIN WALLACE HERMAN and<br>CHARLES WINIFRED WINTERS,<br><br>Defendants. | CASE NO. 2:19-CR-00026-ABJ<br><br>**JOINT MEMORANDUM OF LAW<br>IN SUPPORT OF LOSS HEARING**<br><br>Hon. Alan B. Johnson |

1

## JOINT MEMORANDUM OF LAW IN SUPPORT OF LOSS HEARING

Defendants JUSTIN WALLACE HERMAN and CHARLES WINIFRED WINTERS, by and through undersigned counsel, hereby provides this honorable Court with the instant Joint Memorandum of Law in Support of the Loss Hearing (Doc. 463). In sum, the Government advances a "Non-defendant Investor Modified Rescissory Method" for calculating loss, (Doc. 401 at 6), which is a variation of the "Special Rule" for determining loss in securities fraud cases found at USSG §2B1.1, cmt. n.3(F)(ix) (setting forth the so-called "Modified Rescissory Method"). The Court should decline to use this method as it is not required by the Guidelines, is wholly speculative, and otherwise fails to account for causation, i.e, that the investors actually relied on the press release in making their investment decisions.[1]

Under the guidelines, "[a]ctual loss . . . is defined as the 'reasonably foreseeable pecuniary harm that resulted from the offense.'" *United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014) (quoting USSG §2B1.1 cmt. n.3(A)(i)). This definition "incorporates [a] causation standard that, at a minimum, requires factual causation (often called 'but for' causation) and provides a rule for legal causation (*i.e.*, guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination)." USSG App. C, Vol. II at 178, Amend. 617 (Nov. 1, 2001); *see United States v. Evans*, 744 F.3d 1192, 1196 (10th Cir. 2014) ("[Section] 2B1.1 incorporates and requires both factual or 'but for' causation and legal or foreseeable causation."); *United States v. Peppel*, 707 F.3d 627, 643-44 (6th Cir. 2013) (recognizing that, to establish actual loss under § 2B1.1, the government must "establish both cause in fact and legal causation by a preponderance of the evidence"); *see also Burrage v. United States*, 134 S. Ct. 881,

---

[1] Herman and Winters both ended with more stock than they started with.

887–91, 187 L. Ed. 2d 715 (2014) (holding that the ordinary meaning of the term "results from" in a criminal statute requires "but-for causality").

In *United States v. Stein*, in reviewing the use of the modified rescissory method, the Eleventh Circuit Court of Appeals held "that the government must show that the investors **relied** on [the defendant's] fraudulent information to satisfy the 'but for' causation requirement under U.S.S.G. § 2B1.1." 846 F.3d 1135, 1153 (11th Cir. 2017) (emphasis added). To do this, "the government may show reliance in a securities fraud case either through direct evidence or specific circumstantial evidence. The government may of course introduce individualized evidence of reliance—that is, direct evidence that each individual investor read the false information and relied on it when deciding to purchase stock." *Id.* (citing *United States v. Ebbers*, 458 F.3d 110, 126–27 (2d Cir. 2006) (recognizing that reliance can be shown for loss calculation purposes under § 2B1.1 by offering evidence to demonstrate "express reliance on the accuracy of the [fraudulent] financial statements")).

In *Stein*, while the Government had introduced the trial testimony of a single investor, the victim impact statements from other investors, and testimony that at least some investors relied on false press releases issued by the defendant, the Eleventh Circuit found that such was insufficient to support a finding that the defendant's stock fraud caused investors over $13 million in loss. "This evidence standing alone is insufficient to support the inference that *all* 2,415 investors relied on [the defendant's] fraudulent information when deciding to purchase [the] stock. On this thin record, the district court 'engage[d] in the kind of speculation forbidden by the Sentencing Guidelines.'" *Stein*, 846 F.3d at 1154 (quoting *United States v. Bradley*, 644 F.3d 1213, 1292 (11th Cir. 2011)). Accordingly, the Eleventh Circuit found this to be error and reversed for resentencing.

"On remand, the government submitted expert testimony regarding both investor reliance and the effect of intervening events. The government's expert, Dr. Chyhe Becker, conducted statistical analyses which provided evidence of investor reliance. Dr. Becker also concluded that intervening events did not impact Signalife's stock price. Stein produced his own expert, Dr. Edward O'Neal, who disputed both of these findings. The district court found Dr. Becker to be credible and adopted her methodology. Ultimately, the district court determined that [only] 616 investor victims [of the original 2,415] suffered losses in the amount of $1,029,570." *United States v. Stein*, 964 F.3d 1313, 1318 (11th Cir. 2020). The Eleventh Circuit thus affirmed the district court's revised loss calculation based on statistical expert evidence of actual reliance, which significantly reduced both the number of victims (616 down from 2,415) and the loss amount (a little more than $1 million down from $13 million).

Here, the Government's Non-defendant Modified Rescissory Method suffers from the same fate. There is insufficient evidence of actual investor reliance to support a finding of $1.79 million. (Doc. 401 at 10). Rather, the Government's expert, Mr. Scoufis, merely provides a simple calculation without any evidence of actual investor reliance, which is necessary to make a finding of causation. As such, the Court should decline the Government's invitation to speculate as to the loss caused by Mr. Herman's and Mr. Winters's conduct.[2]

As *Stein* illustrates, without taking into consideration actual reliance, any variation of the modified rescissory method necessarily grossly overestimates loss: indeed, to absurd amounts as evidenced by the Government's finding that under the original modified rescissory method, Mr. Herman's and Mr. Winters's conduct caused "an estimated **$42 billion** in actual and intended

---

[2] Herman and Winters applied and subsequently paid for a patent. To say that they were only concerned with the conspiracy is an improper mischaracterization. Moreover, many of the investors, such as Charles Lindhardt and Tom Thorne, were former investors of High Plains Gas. These investors continue to invest in the technology.

loss." (Doc. 401 at 6) (emphasis added). That is more than the gross national product of many countries, e.g., Paraguay ($41.9 billion), Bolivia ($41.0 billion), and Macau—the gambling capital of the world ($35.2 billion).[3]

Moreover, as both the Sixth and Ninth Circuits have recently found, the application notes to USSG §2B1.1 have problematically expanded the definition of loss such that they should not be considered. Specifically, the "special rules" in Application Note 3(F) are inconsistent with the plain meaning of loss.

In *United States v. Kirilyuk*, 29 F.4th 1128 (9th Cir. 2022), the Ninth Circuit Court of Appeals addressed whether the special rule at Application Note 3(F)(i), which holds that in credit card theft cases, each stolen card is attributed to $500 in loss, was consistent with the ordinary definition of "loss". The Ninth Circuit held that it was not. "Though dictionary definitions for 'loss' may vary, they make one thing clear: 'No reasonable person would define the 'loss' from a stolen [credit] card as an automatic $500' rather than a fact-specific amount. [*United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2021)]. Instead, § 2B1.1 is driven by 'the amount of loss *caused by the crime*.' [*United States v.*] *Gainza*, 982 F.3d [762, 764 (9th Cir. 2020)] (emphasis added). So 'loss' cannot mean a pre-determined, contrived amount with no connection to the crime committed, even if it is based on the Commission's "research and data." *See* U.S.S.G. amend. 596 (Nov. 2000). Application Note (3)(F)(i) thus does not illuminate the meaning of 'loss,' but modifies it." *Kirilyuk*, 29 F.4th at 1138. The same, of course, holds true of the special rule setting forth the modified rescissory method at Application Note (3)(F)(ix). Clearly, no reasonable person would define loss from a stock fraud scheme as, automatically, the difference in average stock valuations from two separate 90-day periods of time.

---

[3] https://en.wikipedia.org/wiki/List_of_countries_by_GDP_(nominal)

For the reasons set forth in *Kirilyuk* and *Riccardi*, the Court should decline to use any variation of the modified rescissory method.

Dated: July 20, 2022.

*/s/ Robert L. Sirianni, Jr.*
Robert L. Sirianni, Jr. Esquire (PHV)
robertsirianni@brownstonelaw.com
*/s/ George W. Thomas*
George W. Thomas, Esquire (PHV)
george@brownstonelaw.com
Brownstone, P.A.
P.O. Box 2047
Winter Park, FL 32790
Tel: (407) 388-1900
RobertSirianni@BrownstoneLaw.com
*Counsel for Defendant Herman*
*Admitted Pro Hac Vice*

*/s/ Robert T. Moxley #5-1726*
Robert T. Moxley, P.C.
2718 O'Neil Avenue
Post Office Box 565
Cheyenne, Wyoming 82003-0565
Tel: (307) 632-1112
fax: (307) 632-0401
Vaccinelawver@gmail.com
*Counsel for Defendant Herman*

*/s/ Zenith Ward #7-4584*
Zenith Ward, Esquire
Buchhammer & Ward, P.C.
1821 Logan Avenue
P.O. Box 568
Cheyenne, WY 82003-0568
Tel: (307) 634-2184
Fax: (307) 634-2199
zsw@wyoming.com
*Counsel for Defendant Winters*

6

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2022, the foregoing MEMORANDUM OF LAW IN SUPPORT OF LOSS HEARING was filed electronically and a copy was served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Robert L. Sirianni, Jr.*
Robert L. Sirianni, Jr. Esquire (PHV)

*/s/ George W. Thomas*
George W. Thomas, Esquire (PHV)

*/s/ Robert T. Moxley #5-1726*
Robert T. Moxley, P.C.

*/s/ Zenith Ward #7-4584*
Zenith Ward, Esquire

7

**FILED**



8:47 am, 8/23/22

**Margaret Botkins**
**Clerk of Court**

# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING
## CRIMINAL MINUTE SHEET
### SENTENCING

| | | | |
|---|---|---|---|
| Date: | August 22, 2022 | Before the Honorable: | Alan B. Johnson |
| Time: | 8:42-10:10 / 10:26-11:27 11:43-12:28 / 2:15-4:01 | Interpreter: | N/A |
| Case No: | 19-CR-00026-ABJ-3 | Interpreter Phone: | N/A |

☐ Non-Public Document

UNITED STATES OF AMERICA          VS          Charles Winifred Winters, Jr

| Becky Harris | Melanie Sonntag | Laura M. Harris | N/A |
|---|---|---|---|
| Clerk | Reporter | Probation Officer | Marshal |

**APPEARANCES**

Government:    Eric Heimann

☑CJA  ☐FPD  ☐RET  ☐WAIVED    Defendant:    Zenith Ward

Other: _____

☑ Defendant acknowledges having read the presentence report

☑ Objections to presentence report

☑ Court DENIES objections to PSR          ☑ Court GRANTS objections to PSR

Enhancement for sophisticated means - denied; Loss Calculation Method - granted; Enhancement for more than 10 victims - denied; Guidelines - denied

☑ Witness(es)   Justin Wallace Herman (8:50 - 11:06)

☐ Exhibits received by Court

**SENTENCING INFORMATION**

☑ Defendant is committed to custody

| For a period of | 30 | Months | as to Count(s) | 13 |
|---|---|---|---|---|
| For a period of | 30 | Months | as to Count(s) | 14-15 |
| For a period of | 2 | Years | as to Count(s) | 16-17 |

☑ Sentence shall be served    concurrent    to    except for 16/17 are consecutive to 13-15

☐ Defendant is sentenced to time served

WY60                                                                 Rev. 5/02/2022

☐ Plus up to ten (10) days to allow for deportation proceedings

☑ Upon release from custody, the defendant shall be on **supervised release**

For a period of    3    Years    as to Count(s)    13-15

For a period of    1    Years    as to Count(s)    16-17

☑ Supervised Release shall be served     concurrent    to _____

☐ Defendant to be deported upon release from confinement

☐ Defendant is placed on **probation** for a period of _____

## CONDITIONS OF PROBATION/SUPERVISED RELEASE

☑ Obey all laws, Federal, State & Local

☑ Abide by the standard conditions of supervision

☐ Home confinement for a period of _____

☑ Not use or possess firearms/ammunitions/explosives

☑ Not purchase, use or possess alcohol/intoxicants; frequent

   places where alcohol is bought, sold or dispensed

☑ Submit to mandatory drug testing (w/in 15 days of release)

☐ Notify Probation of change in economic circumstance

☐ Notify employers of conviction

☐ Standard Sex Offender Conditions Apply

☑ Mental Health evaluation and follow through

☑ Other (continued from conditions of Probation/Supervised Release)

☑ Report to Probation w/in 72 hours of release

☑ Provide complete financial disclosure as directed

☐ Electronic monitoring as directed by Probation

☑ Not use or possess controlled substances/drugs

☑ Not open new lines of credit or incur new debt

☑ Submit to additional drug/alcohol testing and treatment

☐ Mandatory drug testing is waived

☑ DNA collection

☑ Cognitive/Behavioral Treatment

☑ Submit to search as conducted by US Probation Officer

Cooperate with IRS; Employment limitations; Third-Party financial info; Apply tax refunds

## MONETARY IMPOSITIONS

☑ Defendant shall pay **special assessment(s)** in the amount of    $100.00    as to Count(s)    13-17

For a total of:    $500.00

☑ Special assessment is due and payable immediately

☑ Special assessment shall be paid through the Inmate Financial Responsibility Program and any balance not paid

   shall be paid during the term of supervision but no later than   60 days

   prior to the expiration of supervision

☑ Special assessment shall be paid in monthly installments of at least   10% of gross monthly income

during the term of supervision

☐ Special assessment remitted upon deportation of the defendant

☐ Other _____

☑ Defendant shall make **restitution** in the amount of    $158,878.86    as to Count(s)    13-15

For a **total** of:  $158,878.86

☑ Restitution is due and payable immediately

☑ Restitution shall be paid through the Inmate Financial Responsibility Program and any balance not paid shall

be paid during the term of the supervision but no later than ___60 days___ prior to the expiration of supervision

☑ Restitution shall be paid in monthly installments of at least

10% of gross monthly income during the term of supervision

☑ Restitution shall be paid jointly and severally with ___Co-Defendants___ during the term of supervision

☐ Other _____

☐ Interest requirement for fine/restitution/special assessment is waived

## INMATE DETENTION STATUS

☐ Defendant is **remanded** to custody of US Marshal

☐ Defendant shall **surrender** to _____ USMS on/before _____ at _____

☑ Defendant shall **surrender** to designated prison on/before ___11/21/2022___ at ___1:30___ PM

☑ Defendant shall report to institution as directed by Probation

☑ Court **recommends placement** at  FPC Miami to be near family

☐ Court recommends defendant participate in the prison industries program

☑ Court recommends defendant participate in Bureau of Prison's 500-hour Residential Drug Treatment Program

☐ Court recommends defendant participate in substance abuse treatment while incarcerated

☐ Court recommends ICE shall begin deportation proceeding during the service of this sentence

☑ Defendant advised of right to appeal          ☐ Defendant waives right to appeal

☐ Defendant shall forfeit the following property _____

☐ Count(s) _____ of the ___ Indictment   **dismissed** on the motion of the United States

☐ Other _____

## MISCELLANEOUS

**FILED**



**1:37 pm, 8/23/22**

**Margaret Botkins**
**Clerk of Court**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

UNITED STATES OF AMERICA

vs

Charles Winifred Winters, Jr

Case Number: 19-CR-00026-ABJ-3

Defendant's Attorney(s):
Zenith Ward

### JUDGMENT IN A CRIMINAL CASE

THE DEFENDANT was found guilty on count 13 - 17 after plea of not guilty.

ACCORDINGLY, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title and Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. §371 | Conspiracy to Commit Securities Fraud | May 19, 2016 | 13 |
| 15 U.S.C. §§78j(b) and 78ff and 18 U.S.C §2 | Securities Fraud and Aiding and Abetting | May 19, 2016 | 14 |
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud | May 19, 2016 | 15 |
| 18 U.S.C. § 1028A(a)(1) | Aggravated Identity Theft | September 23, 2015 | 16-17 |

The defendant is sentenced as provided in pages 2 through 10 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of residence or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's USM No: **73073-018**

August 22, 2022
Date of Imposition of Sentence

*Alan B. Johnson*
Alan B. Johnson
United States District Judge

8/23/22
Date

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 30 months as to Count 13, 30 months as to Counts 14 and 15, to be served concurrently with each other and with Count 13; 2 years per count as to Counts 16 and 17, concurrent with each other, but consecutive to Counts 13-15.

The Court recommends to the Bureau of Prisons that the defendant be designated to FPC Miami, Florida to be near family. The Court also recommends the defendant be allowed to participate in the Residential Drug Abuse Program.

The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons before 1:30 PM, on November 21, 2022, as notified by the United States Probation Office. If defendant is not designated by surrender date, he shall report to the United States Marshals Office in Tampa, Florida.

---

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____ at

_____ , with a certified copy of this Judgment.

_____
United States Marshal/Bureau of Prisons

By: _____
Authorized Agent

---

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 3 years as to Counts 13-15 and 1 year as to Counts 16 and 17, all to be served concurrently.

The defendant shall not commit another federal, state or local crime.

The defendant shall not illegally possess a controlled substance.

The defendant shall refrain from any unlawful use of a controlled substance and must submit to one drug test within 15 days of release from imprisonment and at least at least two periodic drug tests thereafter, not to exceed ten (10) drug tests per month, for use of controlled substance, but the condition stated in this paragraph may be ameliorated or suspended by the court for any individual defendant if the defendant's presentence report or other reliable information indicates a low risk of future substance abuse by the defendant.

If a fine is imposed and has not been paid upon release to supervised release, the defendant shall adhere to an installment schedule to pay that fine.

The defendant shall (A) make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664; and (B) pay the assessment imposed in accordance with 18 U.S.C. § 3013. If there is a court-established payment schedule for making restitution or paying the assessment (see 18 U.S.C. § 3572(d)), the defendant shall adhere to the schedule.

The defendant shall submit to the collection of a DNA sample at the direction of the United States Probation Office if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 (42 U.S.C. § 14135a).

The defendant shall comply with the standard conditions that have been adopted by this Court as defined in the contents of the Standard Conditions page (if included in this judgment). If this judgment imposes a restitution obligation, it shall be a condition of supervised release that the defendant pay any such restitution that remains unpaid at the commencement of the term of supervised release. The defendant shall comply with the following additional conditions:

The defendant shall not incur any new debt or credit without permission of the U.S. Probation Officer, until all court-ordered financial penalties are paid in full.

The defendant shall provide full financial disclosure to the U.S. Probation Officer, including detailed documentation of income and expenses, until all court-ordered financial penalties are paid in full.

The defendant shall cooperate with the Internal Revenue Service and file tax returns timely and lawfully, and pay any back taxes, penalties and interest as determined by the Internal Revenue Service.

The defendant shall not be self-employed as a financial advisor, stockbroker, function as an investment consultant in any fashion, or seek employment with any financial or investment institutions.

The defendant shall not possess, through his employment or otherwise, any third-party identifiers or financial information, except his own and that of his wife or children.

The defendant shall apply the full amount of any annual federal and/or state income tax refund toward payment of any monetary obligations. In addition, if the defendant receives substantial resources (over $500) from any source, including but not limited to inheritance, gift, liquidation of assets, settlement, or other judgment, during a period of supervision, the defendant shall be required to apply the value of such resources to any restitution or other monetary obligations still owed. Regardless of any lump sum payments made from any source, minimum monthly payments shall continue to be made during the period of supervision. At the direction of the U.S. Probation Officer, the defendant shall execute a voluntary wage assignment with any employer for the payment of outstanding monetary obligations.

The defendant shall submit his person, residence, storage facility, office or vehicle to a search, conducted by a U.S. Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

The defendant shall participate in a cognitive-behavioral treatment regimen that may include, but is not limited to, Moral Reconation Therapy, Cognitive Thinking, Thinking for a Change, or Interactive Journaling. The defendant shall actively participate in treatment until successfully discharged or until the U.S. Probation Officer has excused the defendant from the treatment regimen.

The defendant shall participate in and successfully complete mental health treatment in a program approved by the U.S. Probation Officer, and abide by the rules, requirements and conditions of the treatment program. The defendant shall not discontinue treatment without the permission of the U.S. Probation Officer.

The defendant shall participate in and successfully complete substance abuse treatment in a program approved by the U.S. Probation Officer, and abide by the rules, requirements and conditions of the treatment program. The defendant shall not discontinue treatment without the permission of the U.S. Probation Officer.

The defendant must submit to substance abuse testing to determine if he has used a prohibited substance. Testing may include urine testing, the wearing of a sweat patch, breathalyzer, a remote alcohol testing system, an alcohol monitoring technology program, and/or any form of prohibited substance screening or testing. The defendant shall not attempt to obstruct or tamper with the testing methods nor possess any device or item used to evade or impede testing.

Furthermore, the defendant may be required to pay all, or a portion, of the costs of the testing.

The defendant shall refrain from any use or possession of alcohol and/or other intoxicants including over the counter medications used contrary to the recommended dosage, or the intentional inhalation of any substance, prescribed or otherwise, without the permission of the U.S. Probation Officer. Additionally, the defendant shall not enter establishments whose primary income is derived from the sale of alcohol.

## STANDARD CONDITIONS OF SUPERVISION

1. The defendant shall report to the probation office in the federal judicial district where he or she is authorized to reside within 72 hours of the time the defendant was sentenced or released from imprisonment, unless the probation officer instructs the defendant to report to a different probation office or within a different time frame.

2. After initially reporting to the probation office, the defendant will receive instructions from the court or the probation officer about how and when to report to the probation officer, and the defendant shall report to the probation officer as instructed.

3. The defendant shall not knowingly leave the federal judicial district where he or she is authorized to reside without first getting permission from the court or the probation officer.

4. The defendant shall answer truthfully the questions asked by the probation officer.

5. The defendant shall live at a place approved by the probation officer. If the defendant plans to change where he or she lives or anything about his or her living arrangements (such as the people the defendant lives with), the defendant shall notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

6. The defendant shall allow the probation officer to visit the defendant at any time at his or her home or elsewhere, and the defendant shall permit the probation officer to take any items prohibited by the conditions of the defendant's supervision that he or she observes in plain view.

7. The defendant shall work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses the defendant from doing so. If the defendant does not have full-time employment he or she shall try to find full-time employment, unless the probation officer excuses the defendant from doing so. If the defendant plans to change where the defendant works or anything about his or her work (such as the position or the job responsibilities), the defendant shall notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

8. The defendant shall not communicate or interact with someone the defendant knows is engaged in criminal activity. If the defendant knows someone has been convicted of a felony, the defendant shall not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9. If the defendant is arrested or questioned by a law enforcement officer, the defendant shall notify the probation officer within 72 hours.

10. The defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers).

11. The defendant shall not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines that the defendant poses a risk to another person (including an organization), the probation officer may, after obtaining Court approval, require the defendant to notify the person about the risk and the defendant shall comply with that instruction. The probation officer may contact the person and confirm that the defendant has notified the person about the risk.

13. The defendant shall follow the instructions of the probation officer related to the conditions of supervision.

## FINANCIAL PENALTIES

The defendant shall pay the following total financial penalties in accordance with the schedule of payments set out below.

| Count | Assessment | Restitution | Fine | |
|-------|-----------|-------------|------|---|
| 13 | $100.00 | | | |
| Notes: | | | | |
| 14-15 | $200.00 | | | |
| Notes: | | | | |
| 16-17 | $200.00 | | | |
| Notes: | | | | |
| 13-15 | | $158,878.86 | | |
| Notes: | | | | |
| **Totals:** | $500.00 | $158,878.86 | | |

The fine and/or restitution includes any costs of incarceration and/or supervision. The fine and/or restitution, which is due immediately, is inclusive of all penalties and interest, if applicable.

The defendant shall pay interest on any fine and/or restitution of more than Two Thousand Five Hundred Dollars ($2,500.00), unless the fine and/or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the below payment options are subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

The court has determined that the defendant does not have the ability to pay interest or penalties and it is ordered that:

The interest and penalties not be applied to fine and/or restitution.

**RESTITUTION**

The defendant shall make restitution to the following persons in the following amounts:

| Name of Payee | Amount of Restitution |
|---|---|
| Office of the Clerk<br>United States District Court<br>2120 Capitol Avenue<br>2nd Floor, Room 2131<br>Cheyenne, WY  82001 | $158,878.86 |

**Restitution to be paid joint and several with co-defendant(s) Justin Wallace Herman and Robert William Mitchell.**

# SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment; (2) restitution; (3) fine principal; (4) cost of prosecution; (5) interest; (6) penalties.

The total fine and other monetary penalties shall be due in full immediately.

IT IS ORDERED the defendant shall pay a special assessment fee in the amount of $500.00, which shall be due immediately. Payments for monetary obligations shall be made payable by cashier's check or money order to the Clerk of the U.S. District Court, 2120 Capitol Avenue, Room 2131, Cheyenne, Wyoming 82001 and shall reference the defendant's case number, 19-CR-00026-ABJ-3. The defendant shall participate in the Inmate Financial Responsibility Program to pay his/her monetary obligations. The defendant shall pay all financial obligations immediately. While incarcerated, the defendant shall make payments of at least $25 per quarter. Any amount not paid immediately or through the Inmate Financial Responsibility Program shall be paid commencing 60 days after his/her release from confinement in monthly payments of not less than 10% of the defendant's gross monthly income. All monetary payments shall be satisfied not less than 60 days prior to the expiration of the term of supervised release.

Zenith Ward, WSB #7-4584
Buchhammer & Ward, P.C.
1821 Logan Avenue
P.O. Box 568
Cheyenne, WY 82003-0568
(307) 634-2184
fax (307) 634-2199
zsw@wyoming.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket 19-CR-26-J |
| | ) | |
| CHARLES WINIFRED WINTERS, JR. | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF APPEAL

Notice is hereby given that Defendant Charles Winifred Winters, Jr., by and through his undersigned Court-appointed counsel, Zenith S. Ward, appeals to the United States Court of Appeals for the Tenth Circuit from that certain JUDGEMENT IN A CRIMINAL CASE (doc 503), including the District Court's sentence imposed under the Sentencing Reform Act of 1984, entered on the docket in this criminal action on the 23rd day of August, 2022.

*Page 1 of 2*

DATED this 30th day of August, 2022.

Charles Winifred Winters, Jr., Defendant.

By: _____
Zenith S. Ward, WSB # 7-4584
Buchhammer & Ward, P.C.
1821 Logan Avenue
P.O. Box 568
Cheyenne, WY  82003-0568
(307) 634-2184
(307) 634-2199 – fax
zsw@wyoming.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served via CM/ECF this 30th day of August, 2022.

_____
Zenith S. Ward

*Page 2 of 2*